IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | No. 20-CR-00006-PB |
| | ] | |
| CHRISTOPHER CANTWELL | ] | |
| | ] | |

### ADDENDUM TO ASSENTED TO MOTION TO SCHEDULE DETENTION HEARING

Christopher Cantwell respectfully submits the following addendum to his motion for a detention hearing.

On February 13, 2020, the Defendant filed an assented to motion for a detention hearing. The Court held a hearing on February 20, 2020. On that day, the Government submitted a number of exhibits and elicited testimony in an effort to meet its statutory burden. *See Government Detention Hearing Exhibits* 1-16. The hearing recessed due in part to the late hour and because the Defense requested a brief stay to follow-up on evidence presented by the Government. The hearing is scheduled to resume on February 25, 2020.

In its presentation, the Government presented evidence of Cantwell's participation in a demonstration in Charlottesville, Virginia in 2017. The Government played video clips from a Vice News Tonight episode from HBO, presented a still photograph of Mr. Cantwell at that event, and produced documents pertaining to relevant misdemeanor convictions. *See Exhibits* 1-4. 6, and 7.

The protests in Charlottesville were the subject of significant public attention and scrutiny. Following the events of Charlottesville, Timothy J. Heaphy, a former United

States Attorney, then in private practice with Hunton & Williams LLP, spearheaded a comprehensive review of the protests. In November, 2017, Attorney Heaphy issued his "final report," entitled INDEPENDENT REVIEW OF THE 2017 PROTEST EVENTS IN CHARLOTTESVILLE, VIRGINIA, which is publicly available at https://www.policefoundation.org/wp-content/uploads/2017/12/Charlottesville-Critical-Incident-Review-2017.pdf (The Report). In conducting this extended review at the behest of the City of Charlottesville, the writers committed to being "objective" and to complete this "serious task without preconceived opinions." *Id.* at ix. The report writers conducted numerous interviews, gathered more than a half-million documents, consulted with experts, and reviewed photographs and video footage. *Id.* at xi-xii. Cantwell was cooperative with the authors of the report and participated in an interview. *Id.* at 17.

Cantwell appears on several occasions in the body of the report:

- The first hint of trouble on August 11 occurred in the Wal-Mart parking lot on U.S. Route 29 in Albemarle County at approximately 12:00 p.m. Chris Cantwell, the host of a right wing podcast called the "Radical Agenda," told us that he arranged to meet with a number of paying customers at that location. Cantwell noted that he maintains a "pay wall" on his web site in order to protect information regarding his whereabouts from Antifa and other activist groups. Cantwell planned to meet his supporters, find a place to have lunch, and discuss plans for Saturday morning.

    ***When Cantwell and his supporters arrived, they were confronted by demonstrators***. Emily Gorcenski was part of the group; she recalled learning about the meeting through an "intel ring" that had infiltrated Cantwell's web site. Gorcenski drove to the Wal-Mart to take pictures, and she posted the pictures on Twitter. Within minutes, the Albemarle County Police Department received a report of a man with a firearm. When confronted by ACPD, Cantwell indicated that he had a permit to carry a concealed weapon but denied brandishing the firearm. ACPD declined to pursue charges, and Cantwell and his supporters departed. *Id.* at 112 (emphasis added).

2

- Kessler, Cantwell, and others arrived at McIntire Park at 5:00 p.m. to discuss the plans for the evening. ***Cantwell asked if Kessler planned to coordinate with law enforcement.*** Kessler responded that he did not want to inform law enforcement, because he wanted the event to be a "secret." Cantwell strongly disagreed, noting that Antifa and other anti-racist groups often interfere with free speech events held in public areas. ***Cantwell refused to be a part of the march unless Kessler contacted law enforcement***. Kessler then placed a call to [police] . . . *Id.* at 112 (emphasis added). *See also Id.* at 190 ("5:00 p.m. Kessler and Christopher Cantwell meet in McIntire Park to discuss plans for the march that evening; ***Cantwell insists that Kessler contact law enforcement***; Cantwell calls CPD and is redirected to UPD Lieutenant Angela Tabler") (emphasis added).

- The march began early. UPD stationed several officers in the vicinity of Nameless Field, and they followed the procession. Chris Cantwell recalled that he was instructed to join other "guards" on the outsides of the line. The guards were selected for their willingness to "get physical" with Antifa. ***Cantwell was shocked by the absence of a law enforcement presence***, and noted in his interview that "if you notify law enforcement that white nationalists were going to march on a public university with torches, you would think they would take an interest." *Id.* at 117 (emphasis added).

- Marchers formed a semi-circle around the Jefferson statue. The small group of counterprotesters who were waiting for them locked arms. Emily Gorcenski recalled that after observing the march begin, she ran to the Jefferson statue, and warned the group that a large crowd was coming, with torches. ***When she noticed that no police were in sight***, Gorcenski decided to remain with the group. When the torch bearing marchers arrived, confrontations ensued, as the counter-protesters exchanged taunts with march participants. On at least one occasion, a counter-protester attempted to knock down a torch, resulting in a physical altercation. ***At some point, Gorcenski recalled seeing Chris Cantwell deploy mace; both Cantwell and Gorcenski claimed to have suffered injuries as the result of a chemical agent.*** *Id.* at 118 (emphasis added).

- The decision to forego a police escort may not have been clearly communicated to the Unite The Right speakers who were supposed to be in the speakers' convoy. Mike Enoch told us that he believed that the plan had always been for all attendees to be dropped off a block or so from the park and then parade in together. In contrast, Christopher Cantwell told us that he understood the speakers would walk into Emancipation Park from behind the Lee statue with other speakers. ***He did not expect that he would have to walk through a gauntlet of counter-protesters***. *Id.* at 125 (emphasis added).

The above noted sections represent all references to Cantwell other than a brief footnote on page 202.

Cantwell attended the rally among a group of individuals with far-right political views. During the planning phase, the organizer of the rally expressed an interest in keeping certain plans secret from law enforcement. *Id.* at 112. Cantwell disagreed. *Id.* He insisted that the police be informed about the march's plans and noted that he would not participate unless police were notified of their intentions. *Id.*

As the rally got underway, the protesters were met by counter-protesters. The police were not in the area. Cantwell was surprised by their absence. Counter-protesters noted their absence. When the protesters arrived at a statute of William Jefferson, confrontations ensued, as the counter-protesters exchanged taunts with the marchers. A counter-protester attempted to knock down a torch held by a protester and a physical altercation ensued. This back-and-forth between protesters and counter-protesters is evident in the photograph presented as Exhibit 7. *Exhibit 7.* Cantwell said that he suffered injuries as the result of a chemical agent being sprayed upon him. *Report* at 118. Cantwell ultimately pled guilty to two misdemeanor counts of assault and battery, neither of which specified the factual means of the offense. *Exhibit A*.

The report concluded that the City and law enforcement "protected neither free expression nor public safety" during the protest. *Id.* at 7. As the report further explained,

> The City was unable to protect the right of free expression and facilitate the permit holder's offensive speech. This represents a failure of one of government's core functions—the protection of fundamental rights. Law enforcement also failed to maintain order and protect citizens from harm, injury, and death. Charlottesville preserved neither of those

      principles on August 12, which has led to deep distrust of
government within this community.

*Id.*

The cited report describes the events of Charlottesville in great detail. It provides a more comprehensive and less sensational presentation of the rally and of Cantwell's involvement than does a television program intended to maximize its ratings. The Defendant requests the Court consider the facts and conclusions of the report in determining whether the Government has met its burden.

      Respectfully submitted,

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar #18372
Assistant Federal Public Defender
Eric_Wolpin @fd.org

*/s/ Jeff Levin*
Jeff Levin
N.H. Bar # 12901
Assistant Federal Public Defender
Jeff_Levin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2020 the above document was served electronically upon all counsel of record through the CM/ECF filing system.

/s/ *Eric Wolpin*
Eric Wolpin