UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*

UNITED STATES OF AMERICA      \*

                            \*  1:20-cr-6-01-PB
           v.                 \*  February 20, 2020
                            \*  3:08 p.m.

CHRISTOPHER CANTWELL       \*

                                          \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF RECORDED DETENTION HEARING
BEFORE MAGISTRATE JUDGE ANDREA K. JOHNSTONE

Appearances:

For the Government:        John S. Davis, AUSA
                            Anna Z. Krasinski, AUSA
                            United States Attorney's Office

For the Defendant:         Eric Wolpin, Esq.
                            Federal Defender's Office

Probation Officer:        Janice Bernard

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| BRETT FERNALD | 4 | 51 | 80, 81 | 80 |

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibit 5 | | 24 |
| Government's Exhibit 6 | | 26 |
| Government's Exhibit 7 | | 33 |
| Government's Exhibit 8 | | 34 |
| Government's Exhibit 9 | | 37 |
| Government's Exhibit 10 | | 11 |
| Government's Exhibit 11 | | 41 |
| Government's Exhibit 12 | | 43 |
| Government's Exhibit 13 | | 18 |
| Government's Exhibit 15 | | 46 |
| Government's Exhibit 17A | | 22 |
| Government's Exhibit 17B | | 22 |
| Defendant's Exhibit A | | 60 |
| Defendant's Exhibit B | | 67 |
| Defendant's Exhibit C | | 79 |

1          P R O C E E D I N G S

2          THE CLERK:  This court is now in session and

3     has before it a detention hearing in the United States

4     of America vs. Christopher Cantwell, 20-cr-6-01-PB.

5          THE COURT:  Good morning, Mr. Cantwell.

6          Mr. Cantwell, I just want to review some

7     rights with you again before we start today's

8     proceeding.

9          You're not required to make any statement in

10    this matter and you do not need to say anything to

11    anyone.  If you start to make a statement, you have the

12    right to stop at any time and I also just want to remind

13    you that anything you say may be used against you.

14          Do you understand those rights?

15          THE DEFENDANT:  Yes.

16          THE COURT:  You also have the right to counsel

17    at every step in the proceedings and this Court has

18    appointed Attorney Wolpin as your counsel in this case

19    under the Criminal Justice Act and that appointment

20    continues.

21          Do you understand that, sir?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.  Very good.

24          So we are here for a detention hearing today.

25    Attorney Wolpin, if you have anything that you want to

1     advise the Court of in advance of me turning it over to

2     the government, I'm happy to hear it.  If not, I'll ask

3     you to take a seat and I'll turn it over to the

4     government.

5             MR. WOLPIN:  No, your Honor.  As it's their

6     burden, we would let them begin.

7             THE COURT:  All right.  Thank you.  Please be

8     seated.

9             Okay.  Attorney Davis.

10            MR. DAVIS:  The government calls Brett

11    Fernald.

12            THE CLERK:  Please remain standing and raise

13    your right hand.

14            **BRETT FERNALD**, having been first duly sworn,

15    testified as follows:

16            THE CLERK:  Thank you.  Please be seated.

17            For the record, please state your name and

18    spell your last name.

19            THE WITNESS:  My name is Brett Fernald,

20    F-e-r-n-a-l-d.

21                      DIRECT EXAMINATION

22    BY MR. DAVIS:

23        Q.   How are you employed?

24        A.   I'm a Manchester, New Hampshire, police

25    officer.

1    Q.    And are you currently a task force officer

2    with FBI?

3    A.    Yes.

4    Q.    And are you one of the investigators assigned

5    to the Cantwell investigation?

6    A.    Yes.

7    Q.    And would you summarize briefly, please, your

8    law enforcement experience.

9    A.    I graduated from the 154th Police Academy in

10   New Hampshire in April of 2011.  I was -- first worked

11   for the town of Hooksett until 2013 and in 2013, I was

12   hired by the city of Manchester.

13         Within the city of Manchester, I've worked in

14   the patrol capacity and also as a detective.

15   Q.    Very good.

16         And directing your attention to January 23rd

17   of this year, 2020, were you involved in the search

18   warrant at Mr. Cantwell's house in Keene, New Hampshire?

19   A.    Yes, I was.

20   Q.    And can you describe that house, just

21   generally and briefly?

22   A.    Yes.  It was located at 103 South Lincoln

23   Street, Keene, New Hampshire.  It's a white, two-level

24   home, multifamily.

25   Q.    All right.  Did you have a search warrant for

1 both the house and his car?

2     A.    Yes.

3     Q.    And is the house near to a school?

4     A.    Yes, it is.

5     Q.    And how far?

6     A.    So it was -- his residence is located directly

7 across the street from the Monadnock Waldorf School.

8 It's no more than 50 feet from the property.

9     Q.    All right.  Now, in the course of the search

10 warrant, did you identify a number of firearms?

11     A.    Yes.

12     Q.    And seized them?

13     A.    Yes.

14     Q.    How many firearms total were recovered from

15 the car and the house?

16     A.    From the vehicle, there was one firearm

17 recovered and inside of the house, there were 16

18 firearms recovered.

19     Q.    And can you describe the general nature of

20 those firearms?

21     A.    Yes.  There were --

22         MR. WOLPIN:  Your Honor, I would object.  I'm

23 not sure of the relevance here at this point.  Those

24 firearms are in the possession of the police department

25 and my client does not have access to them at this

1  point.
2       THE COURT:  I'm going to allow the questioning
3  to continue and you can raise it when you make your
4  arguments or cross-examine.  When it's your turn to
5  cross-examine, you can ask questions as you deem
6  appropriate.
7       MR. WOLPIN:  Okay.
8       A.   There were six handguns or pistols, there were
9  four shotguns, and there were seven rifles and/or long
10 guns as I would describe them, and two of them were
11 AR-15 rifles.
12      Q.   And, of course, Mr. Cantwell was not a
13 convicted felon, correct?
14      A.   That is correct.
15      Q.   And so possession of the firearms in his home
16 was not unlawful?
17      A.   That is correct.
18      Q.   What are the firearm in the gun; where was
19 that and what was that -- I'm sorry -- the firearm in
20 the car.
21      A.   So the firearm in the car was located in a
22 small Pelican case device that was magnetically attached
23 to the bottom of his vehicle by the exhaust.
24      Q.   Was it visible immediately from the outside?
25      A.   No.

1     Q.   Was it locked?

2     A.   It was not locked.

3     Q.   And was the Pelican case -- did it have

4 anything besides the gun in it?

5     A.   It had the Taurus .38, it also had an empty

6 magazine, and it also had a plastic bag with several

7 rounds of ammunition.

8     Q.   So the rounds of ammunition were with the gun

9 under his car?

10    A.   Yes.

11    Q.   All right.  What other -- what other

12 ammunition did you find in the house, just briefly?

13    A.   There was just a large amount of ammunition

14 cans that contained shotgun, 5.56, .380, just various

15 types of ammunition.

16    Q.   All right.  Other weapons in the house besides

17 firearms?

18    A.   Yes.

19    Q.   What were they?

20    A.   There was a crossbow, there was a machete, and

21 there were several smaller knives located.

22    Q.   Okay.  You described a Pelican case under the

23 car.  Is a Pelican case commonly used to conceal items?

24    A.   It's commonly used -- it's used for storage.

25 It's a hard plastic container meant to keep items in it.

1    Q.    And how -- how large is this Pelican case?

2    A.    It was probably about this size.

3    Q.    The size of a tablet, say?

4    A.    Yeah, a small tablet.

5    Q.    All right.  And were there other Pelican cases

6  in the house?

7    A.    Yes, there were.

8    Q.    How many more?

9    A.    There were three additional Pelican cases.

10    Q.    And in one of them, did you find items?

11    A.    Yes.

12    Q.    What were those?

13    A.    So the other Pelican case that had items,

14  there were vials filled with a clear liquid and there

15  were also several bags with pills that were in it.

16    Q.    All right.  And were those bags with the pills

17  labeled?  Did it say what they were?

18    A.    No.

19    Q.    And are they currently being tested?

20    A.    They are being tested.

21    Q.    Okay.  Did you find other storage items,

22  similar storage items, in the house?

23    A.    Yes.

24    Q.    What were they?

25    A.    In the refrigerator there was a red Coca-Cola

1  can which upon looking at it looks like a can of Coke.

2  However, upon closer inspection, it was a can that the

3  top screwed off and there was a -- essentially a

4  cylinder in the middle of it used for -- to hide items

5  in.

6      Q.  Okay.  And how many Pelican cases total were

7  in the house?

8      A.  Four.

9      Q.  One in the car and three in the house?

10     A.  Correct.

11     Q.  Okay.  Did you find an encrypted hard drive?

12     A.  Yes.

13     Q.  All right.  And did you find evidence of

14 correspondence with followers or fans?

15     A.  Yes.

16     Q.  And what was that?  Describe that briefly.

17     A.  There were several boxes, one box in his

18 vehicle and then one box or several boxes in another

19 room in his residence.

20         There were letters from essentially fans all

21 over the country and then there were some from Europe,

22 Christmas cards, fan mail sending him money, just

23 various people from around the country and Europe also.

24     Q.  Okay.  Now, in the course of your

25 investigation, had you determined that Mr. Cantwell

1  knows a lot about encryption and secure message

2  platforms?

3       A.   Yes.

4       Q.   And showing you first Exhibit 10, which is a

5  post, do you recognize that item?

6       A.   Yes.

7       Q.   And is that a post by Mr. Cantwell in May of

8  2018 about the subject of must-have privacy tools?

9       A.   Yes.

10          MR. DAVIS:  Your Honor, I'd move to admit

11  Exhibit 10.

12          THE COURT:  Any objection?

13          MR. WOLPIN:  No, your Honor.

14          THE COURT:  It's entered.

15          (Government's Exhibit 10 admitted.)

16       Q.   Okay.  And we won't read the whole thing, but

17  the first highlighted item is ProtonMail.  Do you see

18  that?

19       A.   Yes, I do.

20       Q.   And are you familiar with that, just

21  generally, as an investigator?

22       A.   Yes.

23       Q.   What is ProtonMail?

24       A.   ProtonMail is an encrypted email provider.

25  The servers are located in Switzerland.  There's no user

1  information that's required when acquiring an email

2  address.  You can just simply put in a user name and a

3  password and you have email.

4          The only way that they would be able to track

5  would be through an IP address and through the other

6  items on the exhibit shows ways to essentially remain

7  anonymous through using other avenues of browsing the

8  Internet to hide your IP address.

9      Q.    Okay.  Another reference further down is

10  Signal SMS app.  Do you see that?

11      A.    Yes.

12      Q.    And what is the Signal app?

13      A.    Signal is a messenger app and it's also

14  encrypted.  It sends messages and there's also a feature

15  that will destroy messages.

16      Q.    When you say destroy, so that automatically

17  deletes your own messages --

18      A.    Correct.

19      Q.    -- after a certain time set?

20      A.    Correct.

21      Q.    And as a -- as a law enforcement investigator

22  now in New England, are you coming across Signal app

23  with more frequency?

24      A.    Yes.

25      Q.    Who uses it?

1          MR. WOLPIN:  I'm going to object, your Honor;

2    again, relevance.  There's no bearing on my client's use

3    of it.

4          MR. DAVIS:  I'll move on, your Honor.

5          THE COURT:  Thank you.

6      Q.   Telegram Messenger app, do you see that?

7      A.   Yes.

8      Q.   And is Telegram Messenger app the app that was

9    actually used for the threats that are the subject of

10   the indictment in this case?

11     A.   Yes, it was.

12     Q.   And is that also an encrypted way to -- to

13   chat or send texts to someone else?

14     A.   Yes.

15     Q.   Did Mr. Cantwell use -- in fact, use Telegram

16   with great frequency?

17     A.   Yes, he did.

18     Q.   And is it easy for law enforcement to get

19   information from the provider of Telegram messages?

20     A.   No, it is not.

21     Q.   And why is that?

22     A.   Telegram is -- they have servers that are

23   around the -- kind of around the globe.  I know of one

24   that's in Germany.  And they -- there's really no

25   jurisdiction to send a subpoena to them, for them to

 1    respond to it.

 2         Q.   All right.  Okay.  Another -- another item is

 3    the Tor Browser Bundle.  Do you see that?

 4         A.   Yes.

 5         Q.   And what is the Tor Browser?  It says it's --

 6    allows you to visit dark net websites.

 7              Can you explain that?

 8         A.   Yes.  So the Tor Browser, much like the

 9    virtual private network, it hides your IP address.  And

10    with hiding your IP address, you remain anonymous online

11    so you're able to go to dark night -- dark -- excuse me,

12    dark web websites and remain anonymous while there.

13         Q.   All right.  So is it fair to say that you've

14    reviewed a lot of online material that Mr. Cantwell has

15    publicly posted?  Is that fair to say?

16         A.   Yes.

17         Q.   Is it also fair to say that there's an

18    enormous quantity or potential quantity of communication

19    that law enforcement will never see?

20         A.   That's correct.

21         Q.   All right.  I want to ask you briefly about

22    finances and cryptocurrency.  Are you familiar with that

23    in general?

24         A.   Yes.

25         Q.   And, particularly, Bitcoin?

1     A.   Yes.

2     Q.   And to what extent is Mr. Cantwell linked with

3 the use of cryptocurrency and Bitcoin?

4     A.   That's his -- his preferred -- according to

5 his show, it's his preferred method of donations and

6 receiving money.

7     Q.   All right.  And what does that allow one to do

8 if you receive money via Bitcoin?

9     A.   It is -- it's -- again, it's encrypted.

10 There's no way to know how much money someone has.  It's

11 just another -- it's a currency that has no tracking.

12     Q.   All right.  And it's not itself illegal,

13 correct?

14     A.   That's correct.

15     Q.   Is there also a so-called Bitcard, which

16 functions like a credit card but is linked to a Bitcoin

17 account?

18     A.   Yes.

19     Q.   And is Mr. Cantwell known to use a Bitcard

20 with frequency?

21     A.   Yes.

22     Q.   For what kinds of purchases?

23     A.   It would be for gas -- you know, any -- any

24 store that accepts that type of currency.  It converts

25 the BitPay or Bitcoin into currency.

1    Q.   Okay.  So is it fair to say that law

2  enforcement does not with confidence know Mr. Cantwell's

3  financial --

4    A.   Correct.

5    Q.   -- situation?

6    A.   Yes.

7    Q.   All right.  And the reference, again, to

8  the -- to the dark web, what is the dark web, briefly?

9    A.   So dark web would be websites that -- illegal

10  use is child pornography, buying, selling drugs,

11  firearms, human trafficking, things of that nature.

12    Q.   And communications with dark web via the Tor

13  network are essentially anonymous; is that right?

14    A.   That's correct.

15    Q.   Okay.  All right.  Let's turn briefly to

16  Mr. Cantwell's social media preference and websites.

17         So have you studied, actually, his websites?

18    A.   I have.

19    Q.   And what are they?

20    A.   ChristopherCantwell.com.

21    Q.   What is that used for?  What is that --

22    A.   He uses that to host his podcast, Radical

23  Agenda, and also a podcast, The Outlaw Conservative, and

24  he posts another podcast called So to Speak on it.

25    Q.   Okay.  And what's another website of his?

1    A.    He also has another website called Blacks Hate

2    Fags that he talks about in his podcast.

3    Q.    Okay.

4    A.    He has Edgy Goodies.

5    Q.    What is Edgy Goodies?

6    A.    It's a platform where he sells items.

7    Q.    And items are merchandise?

8    A.    Merchandise.

9    Q.    And what is -- and what are examples of that?

10   A.    It would be recording devices -- he had pens

11   that had recording devices hidden in them.

12   Q.    And did he have a T-shirt?

13   A.    Yes.

14   Q.    Okay.  What other websites?

15   A.    ChristopherCantwell.com, Radical Agenda.

16   Q.    What about Outlaw Conservative?

17   A.    Outlaw Conservative, that's another podcast

18   that he records.

19   Q.    Okay.  And there's a reference in the case to

20   incel listeners.  Are you familiar with that phrase?

21   A.    Yes.

22   Q.    What does incel and incel listeners mean?

23   A.    Incel is short for involuntary celibate.  That

24   would be -- it's males that feel like they are -- they

25   desire a romantic relationship, they desire a sexual

relationship with a female, however, they have an

inability to obtain that.  And with that, they -- it

spawns antifeminism views, very antifemale views.

    Q.   All right.  So incel is a reference to a sort

of loose group of involuntary apparently celibate

people?

    A.   Yes.

    Q.   Who are men?

    A.   Yes.

    Q.   Okay.  Showing you now Exhibit 13, and this is

a -- this is a post on Radical Agenda.  Are you familiar

with that post?

    A.   Yes.

    MR. DAVIS:  Your Honor, I move to admit

Exhibit 13 in evidence.

    THE COURT:  Any objection?

    MR. WOLPIN:  No, your Honor.

    (Government's Exhibit 13 admitted.)

    Q.   And I just want to draw your attention to a

paragraph on the third page beginning "thousands of

people."

    Do you see that?

    A.   Yes.

    Q.   And can you read that, Agent Fernald?

    A.   "Thousands of people listen to what I say.  I

1    am certain that if I call for them to engage in such

2    acts, some number of them would.  If I myself were to

3    take such a course, my words would last an eternity and

4    inspire countless others to follow as well.  There are

5    surely days when this seems preferable to the daily

6    struggle of paying bills, planning for the future, and

7    trying to maximize my value to our shared cause while

8    our foes place me prominently in deceptive news stories

9    and presidential campaign advertisements."

10       Q.   All right.  Now, are you also familiar with

11   Mr. Cantwell's -- you can take that down, thank you --

12   abuse of illegal drugs?

13       A.   Yes.

14       Q.   And, in particular, have you listened to a --

15   to excerpts from a -- a recording that Mr. Cantwell made

16   in 2016 while he was using drugs?

17       A.   Yes.

18       Q.   And was that when he was 36 years old?

19       A.   Yes.

20       Q.   All right.  And in the course of that

21   recording, does he discuss using methamphetamine as well

22   as cocaine?

23       A.   Yes, he does.

24       Q.   All right.  And have you listened to the two

25   clips we're about to show?

 1      A.    Yes.

 2      Q.    And are they from that 2016 recording that

 3 Mr. Cantwell made?

 4      A.    Yes.

 5            MR. DAVIS:  Your Honor, I move to admit 17A

 6 and 17B.  Are those the items that you heard?

 7            MR. WOLPIN:  May I just have a moment?

 8            THE COURT:  Certainly.  Give me a moment and

 9 let me hear from defense counsel whether they have any

10 objection.

11            MR. DAVIS:  The approximate time of these is

12 four minutes.

13            THE COURT:  Okay.  Let's give them one moment,

14 please.

15            MR. WOLPIN:  Your Honor, I would object on the

16 basis of foundation at this point.  I don't know what

17 the source of this is beyond he says he's listened to

18 something which purports to be from Mr. Cantwell.  But

19 as far as, you know, it arising from his personal web

20 page or some other indication that it is reliable, I

21 don't think he can simply say some audio from some

22 location has a basis to be admitted.

23            THE COURT:  Attorney Davis, can you lay some

24 additional foundation?

25      Q.    Are you aware that the recording that

1    Mr. Cantwell made was on a website called Bit Chute?

2         A.    Yes.

3         Q.    All right.  And have you listened to the

4    recording in its entirety?

5         A.    Yes.

6         Q.    And do you recognize the voice of Chris

7    Cantwell?

8         A.    Yes, I do.

9         Q.    And does he identify himself as Chris

10   Cantwell?

11        A.    Yes.

12        Q.    And does he say in the course of that

13   recording that -- at least at one point that it's the

14   year 2016?

15        A.    Yes.

16        Q.    And does he also say in the course of it that

17   he is 36 years old at the time?

18        A.    Yes.

19        Q.    And are you also aware that in the course of

20   the pretrial services interview, Mr. Cantwell said that

21   he had been on a meth binge in -- I think he said 2016?

22        A.    Yes.

23             MR. DAVIS:  Your Honor, I move to admit again

24   Exhibit 17.

25             MR. WOLPIN:  Yes, your Honor, we would object.

1    Based on this, it's unclear who would have posted this.

2    Certainly I don't know from what I've been provided that

3    this was posted by Mr. Cantwell or there are a number of

4    people who have used his alias or used his identity to

5    post things in other formats.

6            Without some connection to him having done the

7    actual posting, we would object to its admission.

8            THE COURT:  I'm going to allow it to go

9    forward and you can raise questions and concerns that

10   you might have on cross-examination.

11           Please go ahead.

12           (Government's Exhibit 17A admitted.)

13       MR. DAVIS:  Starting with 17A.

14               (Recording played.)

15       Q.   Showing you now 17B, is that a -- a

16   continuation, a brief continuation, of the discussion of

17   methamphetamine use?

18       A.   Yes.

19           MR. DAVIS:  Your Honor, I move to admit 17B.

20           MR. WOLPIN:  Note the same objection, your

21   Honor.

22           THE COURT:  So noted.

23           (Government's Exhibit 17B admitted.)

24               (Recording played.)

25       Q.   All right.  Special Agent Fernald, I want to

1   move now to threats and threatening conduct by

2   Mr. Cantwell.

3           Have you studied Mr. Cantwell's conduct in the

4   last three years, starting particularly in 2017 and the

5   incident in Charlottesville?

6       A.   Yes.

7       Q.   And did you -- did you note that he gave an

8   interview in June of 2017 that was broadcast in which

9   the discussion -- there was talk of gassing the kikes in

10  a race war --

11      A.   Yes.

12      Q.   -- in which Mr. Cantwell appeared to endorse

13  that idea?

14          MR. WOLPIN:  I'm going to object, your Honor.

15  Again, there's a relevance issue here.  I know the Court

16  has heard basically nothing about the offense that's

17  charged.  The alleged victim in this case is not of a --

18  of a class -- is not Jewish, is not alleged to be

19  Jewish.  Whether he has or doesn't have some kind of

20  feeling about people who are of that background is

21  absolutely irrelevant to the question today of whether

22  or not he's a danger or a flight risk.

23          THE COURT:  I'm going to allow the questioning

24  to continue.

25          Please go ahead.

1          Your objection is overruled.

2     Q.    And are you familiar with a brief excerpt from

3     that broadcast in June of 2017 of Mr. Cantwell being

4     interviewed?

5     A.    Yes.

6     Q.    And was this played over the Internet and

7     available to listeners?

8     A.    Yes.

9     Q.    So let me show you first Government Exhibit 5.

10    There's nothing to show, I guess.

11          Your Honor, I move to admit Exhibit 5 as an

12    excerpt and play it.

13          THE COURT:  Okay.

14          (Government's Exhibit 5 admitted.)

15               (Audio recording played.)

16    Q.    All right.  Now, on August 11th and

17    August 12th, was Mr. Cantwell in Charlottesville,

18    Virginia, as part of the Unite the Right rally?

19    A.    Yes.

20    Q.    And on Friday night of August 11th, did

21    Mr. Cantwell march in a torch-lighted procession in

22    which chanting occurred that ended up at -- in a

23    confrontation at the University of Virginia?

24    A.    Yes.

25    Q.    Was there also demonstrations the following

1  day in which violence occurred?

2      A.    Yes.

3      Q.    And was Mr. Cantwell interviewed immediately

4  after that in a session where he showed the weapons that

5  he had brought with him to Charlottesville?

6      A.    Yes.

7          MR. DAVIS:  Your Honor, I now move to play

8  Exhibit 6, which I would represent is a -- about a

9  four-minute excerpt from a Vice News document --

10  documentary that featured Mr. Cantwell, that showed

11  Mr. Cantwell's actions and statements at

12  Charlottesville.

13          THE COURT:  All right.

14          MR. WOLPIN:  I would object, your Honor.  The

15  government already produced evidence through this

16  witness that there were a number of guns found in

17  Mr. Cantwell's house.  We're not denying at this point

18  that he has had weapons in the past.  And to basically

19  bring this up again in a different format, in a

20  different way, from a distant time, is irrelevant to the

21  question today when it is known to this Court that as of

22  an effort to search his house, there were guns found.

23  There's nothing different, nothing; there's nothing

24  illuminating.  There's nothing new.  At this point it's

25  cumulative and prejudicial.

1          THE COURT:  I'm going to allow it to go

2   forward.  I'm going to overrule your objection.

3          Please proceed.

4          (Government's Exhibit 6 admitted.)

5          MR. DAVIS:  Exhibit 6.

6                  (Recording played.)

7      Q.    That's Mr. Cantwell, correct?

8          Stop.

9          MR. WOLPIN:  I would object to this being

10  played in its entirety.  This is not a referendum on my

11  client's beliefs or his position on certain groups and

12  it's evolving into that argument, that -- the government

13  is essentially asking you to watch something that I

14  believe is inflammatory.  It adds nothing to the

15  question today.  It has legal documents as to things

16  that my client has pled guilty to that occurred in

17  Virginia.

18          But to present something with chanting and

19  this group mentality has nothing to do with the question

20  we're here for today.  It might be different again if

21  the charge we have had some relationship to this action,

22  but it doesn't.  They haven't at least shown it at this

23  point.

24          Without some connection to how does this case

25  focus on his beliefs and background takes us away from

1  answering the question we have here of whether he's a

2  flight risk or whether he's a danger.  And presenting

3  essentially (inaudible) produced HBO material to show

4  that is taking it one step further than I think the

5  government should be allowed to do.

6           THE COURT:  Attorney Davis, in terms of the

7  questions before the Court today about risk of flight or

8  dangerousness, can you provide the Court with some

9  explanation as to the relevance of the particular clip

10  or the entire clip that you intend to play right now?

11           MR. DAVIS:  Your Honor, one of the highly

12  relevant aspects of the detention hearing is

13  Mr. Cantwell's characteristics, including his history of

14  violence and his criminal record.

15           His most recent conviction for a crime of

16  violence, it's actually a misdemeanor, is this event.

17  And this -- it's about another minute and 30 seconds, I

18  think -- shows exactly the circumstances in which he --

19  he found himself using pepper spray against

20  demonstrators who were circling the statue of Thomas

21  Jefferson at the University of Virginia.

22           This is his crime.  And it's followed by

23  excerpts that are his statements, which are -- which are

24  highly violent and threatening.  And then it shows --

25  and not just the guns that he had in his house, but the

1    guns that he brought with him to Charlottesville.

2          This -- and I totally agree this case is not

3    about his beliefs or his views.  And this -- this

4    tape-recording would not be admissible and we would

5    never seek to admit it during his trial on this

6    extortion charge, but the question here is detention and

7    dangerousness.

8          And this was a dangerous event and people --

9    you know, people got hurt a little bit, they got killed

10   the next day.  I'm not even going to go into that.  And

11   he had nothing to do with the person getting killed,

12   but -- but, your Honor, this -- this tape is actually

13   showing the defendant about to commit the crime that

14   he's convicted of.

15         And this is a very plain, planned, deliberate

16   thing to go now with a group of people to march and he's

17   armed with pepper spray and this is what happens.  And I

18   think the Court should see it.  It's an aspect of

19   dangerousness that's highly relevant.

20         THE COURT:  Attorney Wolpin.

21         MR. WOLPIN:  Exactly for the reason the

22   government -- invoking Thomas Jefferson and the

23   protesters and making this into something more than it

24   is.

25         This was at that point a peaceful protest.

1  There was no violence at this point.  I understand that

2  what they are saying may be something that is not agreed

3  upon by others, but they're exercising their right to

4  congregate.  They're exercising their right lawfully.

5  To turn that into Thomas Jefferson stands there around

6  them as sort of the noble protesters do, that is

7  changing the nature of this from one of facts to one of

8  his background and his history.

9        He is allowed to be there.  That is not an

10  issue.  This protest was not -- I mean, we -- we're

11  going to end up essentially in a trial about what that

12  protest was about, whether violence was intended, what

13  the nature of it was.  My client was wearing a body

14  camera at the time.  That video is not being placed in.

15        So we can go down the road of taking a recess

16  and having essentially a whole trial about what did and

17  didn't happen that day.  Ultimately, there was

18  admissions to two assault and battery offenses that had

19  no factual allegations to them.  They were just amended

20  to say assault and battery and that's all.

21        And so to isolate it this way, I think it does

22  a disservice to what was actually supposed to be going

23  on here today.

24        THE COURT:  I'm going to allow the exhibit to

25  continue.  The Court is satisfied that it has the

1 ability to distinguish the factors that the Court is

2 charged with, considering in the context of making a

3 determination as to whether conditions of release can be

4 fashioned, and the beliefs and the other circumstances

5 as they relate to this particular event are not what's

6 in question.

7 So from the perspective of whether or not this

8 ultimately has -- should be given any weight as it

9 relates to dangerousness or conditions of release,

10 that's what the Court's interested in. So I'm going to

11 allow it to continue.

12 Please proceed.

13 (Recording played.)

14 MR. DAVIS: Stop, please.

15 MR. WOLPIN: Yeah, I think we're now in a

16 different phase. I have no reason to believe that this

17 is relevant. This conversation with another person

18 about his beliefs has nothing to do with where we are.

19 I understand the government put this in to show weapons.

20 That's not what this is about.

21 This is about inflammatory content that has

22 nothing to do, again, with what we're actually here for

23 today and I would ask that -- we understand that there's

24 guns in this video; we're not contesting that those were

25 in his possession. Going down this road further I think

1  is more prejudicial than certainly the relevance that it

2  provides.

3       MR. DAVIS:  This is the defendant saying that

4  he's trying to be prepared to be more violent.  He's

5  talking about violence.

6       THE COURT:  I'm going to allow it to continue.

7            (Recording played.)

8       MR. WOLPIN:  Objection, your Honor.

9       Stop.  We're not going to go into this

10  question.  They specifically said they were not going to

11  talk about what happened on another day in which my

12  client wasn't involved.  I object to this.

13       MR. DAVIS:  Your Honor, the -- what he says

14  now is that a lot more people are going to die or could

15  die and that's the only reason we played this.  We don't

16  say that he had anything to do with the car being struck

17  (sic).  He's being asked about someone dying and what

18  his view of that is and he said a lot more people are

19  going to die.

20       MR. WOLPIN:  We are not in a position to go

21  through or relitigate what happened in Charlottesville

22  or not.  If other people are going to do things that

23  might cause death, that's not the question.

24       We I think need to focus this hearing on him

25  and his situation and what this case is about rather

1   than, again, litigating this question of what did or

2   didn't happen in Charlottesville and discuss any event

3   that he had nothing to do with.

4           THE COURT:  I'm going to allow it to continue

5   as it may have relevance -- and I stress may -- to

6   character and past conduct.

7           So go ahead.

8                   (Recording played.)

9       Q.   All right.  Now, was an arrest warrant issued

10  in Charlottesville on Saturday, August 12th, 2017, for

11  Mr. Cantwell?

12      A.   Yes.

13      Q.   And I didn't show you, by the way, Government

14  Exhibit 7.  Was there actually a picture taken of

15  Mr. Cantwell appearing to you with pepper spray during

16  this rally?

17      A.   Yes.

18      Q.   And was he prosecuted for using pepper spray

19  and actually pleaded to an assault and battery

20  misdemeanor?

21      A.   That is correct.

22          MR. DAVIS:  Your Honor, I move to admit

23  Exhibit 7.

24          THE COURT:  Attorney Wolpin, any objection?

25          MR. WOLPIN:  May I have a moment?

1          No, your Honor.

2          THE COURT:  Okay.

3          MR. DAVIS:  All right.

4             (Government's Exhibit 7 admitted.)

5     Q.    So the warrant issued on August 12th, correct?

6     A.    That's correct.

7     Q.    And do you know whether FBI New Hampshire was

8  in contact with Mr. Cantwell on August 16th of 2017?

9     A.    Yes.

10    Q.    And who was the person who had contact with

11 him?

12    A.    It was Special Agent Phil Christiana.

13    Q.    And is he now a supervisor in FBI Bedford,

14 New Hampshire?

15    A.    Yes, he is.

16    Q.    And did he write a 302, a brief 302, about

17 that contact?

18    A.    Yes, he did.

19    Q.    And in that contact, did he tell Mr. Cantwell

20 that there was a warrant for his arrest and that he

21 needed to turn himself in?

22    A.    Yes, he did.

23          MR. DAVIS:  All right.  Your Honor, I'm

24 showing Exhibit 8.

25    Q.    And is that the 302 of Phil Christiana you've

1 referenced?

2      A.    Yes, it is.

3           MR. DAVIS:  Your Honor, I move to admit

4 Exhibit 8 in evidence.

5           MR. WOLPIN:  May I just have a moment?

6           No objection.

7           THE COURT:  All right.  It's admitted.

8           (Government's Exhibit 8 admitted.)

9      Q.    And so, Special Agent Fernald, in the middle

10 paragraph, Mr. Cantwell was advised that Phil had

11 determined that a warrant did exist for him at UVA

12 Police Department?

13      A.    Yes.

14      Q.    He was advised to turn himself in to the

15 closest police agency, correct?

16      A.    Yes.

17      Q.    And he said he was now in North Carolina?

18      A.    That is correct.

19      Q.    And in the next paragraph, do they have

20 further communication on August 17th?

21      A.    Yes, they do.

22      Q.    And would you read that paragraph, please?

23      A.    "On 8/17/2017, writer contacted Cantwell

24 concerning his location.  Cantwell reiterated that he

25 was in North Carolina, but would not provide further

information concerning his location.  Cantwell stated

his intention to turn himself in the same day.  Cantwell

stated that he has firearms, does not want to be a

fugitive with firearms, and would turn himself in as

soon as he turned his belongings over to a friend."

Q.    All right.  Now, are you aware that

Mr. Cantwell eventually did self-surrender to

authorities in Virginia?

A.    Yes, he did.

Q.    And what city in Virginia was that?

A.    Lynchburg, Virginia.

Q.    And is that about an hour from

Charlottesville?

A.    Yes, about 60 miles.

Q.    And what day did Mr. Cantwell actually turn

himself in?

A.    August 23rd.

Q.    Of 2017?

A.    2017.

Q.    Okay.  And had anyone told him between

August 16th and August 23rd to take some more time, you

can turn yourself in whenever you're ready?

A.    No, he was advised by Special Agent Christiana

to turn himself in immediately to the closest police

department.

1    Q.   All right.  Now, Mr. Cantwell was then in jail

2    in Virginia until December of 2017; is that right?

3    A.   Yes.

4    Q.   And in December of 2017, he was released on

5    bail?

6    A.   Yes.

7    Q.   And eventually pleaded guilty in Virginia in

8    July of 2018?

9    A.   That's correct.

10   Q.   So he was on bail between sometime in December

11   of '17 and July of '18 when the case got resolved?

12   A.   Yes.

13   Q.   And during that time, did the prosecutor in

14   Virginia, the state prosecutor, file at least one motion

15   to amend or revoke his bond conditions based on

16   Mr. Cantwell's conduct?

17   A.   Yes.

18   Q.   All right.  Directing your attention to

19   March 31st of 2018, was Mr. Cantwell, while on bail,

20   arrested?

21   A.   Yes, he was.

22   Q.   And where did that arrest occur?

23   A.   Leesburg, Virginia.

24   Q.   And what was the arrest for?

25   A.   Drunk in public.

1    Q.   All right.  And what time in the day did that

2 occur?

3    A.   It was in the early morning hours, between

4 1:00 and 2:00 a.m.

5    Q.   All right.  Showing you Exhibit 9, is that the

6 Leesburg, Virginia arrest report from the arrest on

7 March 31, 2018?

8    A.   Yes.

9        MR. DAVIS:  And, your Honor, I'd move to admit

10 Exhibit 9 in evidence.

11       MR. WOLPIN:  No objection.

12       THE COURT:  It's admitted.

13        (Government's Exhibit 9 admitted.)

14    Q.   And have you reviewed the text of the police

15 department a few pages down?

16    A.   Yes.

17    Q.   And does it say among other things that

18 Mr. Cantwell almost got hit by cars as he was walking?

19    A.   Yes, it does.

20    Q.   Does it say he nearly got struck by two

21 vehicles as he crossed East Market Street in the first

22 paragraph?

23    A.   Yes.

24    Q.   Was he also searched?

25    A.   He was searched.

     Q.   And what was found on him?

     A.   Pepper spray.

     Q.   Okay.  And Mr. Cantwell there advised that he
needed this for protection because he's been threatened
due to his involvement in a recent KKK protest -- it
wasn't KKK, right -- in a protest in Charlottesville,
right?

     A.   That's correct.

          MR. DAVIS:  Now, the -- your Honor, the court
pleadings in the Virginia case are already attached to
the motion.  I won't go through those now unless the
Court would like that.

          THE COURT:  I don't think that's necessary.

          MR. DAVIS:  Okay.

     Q.   Now, when this -- Mr. Cantwell came back to
New Hampshire in approximately when?

     A.   July -- he came back after -- part of his
proceedings in Virginia was he was no longer allowed in
the state, right, so he came back -- would have been
July, August of 2018.

     Q.   All right.  And did he then return to his life
on the Internet?

     A.   Yes.

     Q.   And were there various postings?

     A.   Yes.

1    Q.   And did those postings include threatening

2  conduct?

3    A.   Yes, they did.

4    Q.   Or threats, let's say.

5    A.   Yes.

6    Q.   All right.  Showing you first Government

7  Exhibit 11, do you recognize that post?

8    A.   Yes, I do.

9    Q.   And is that a post by Mr. Cantwell regarding

10  Hilary Sargent?

11    A.   Yes, it does.

12    Q.   And is Hilary Sargent a -- a journalist for

13  the *Boston Globe*?

14    A.   Yes.

15    Q.   And is she someone who had had postings back

16  and forth adversely to Mr. Cantwell?

17    A.   Yes.

18    Q.   Would you read -- well, I move to admit

19  Exhibit 11, your Honor.

20        MR. WOLPIN:  I'm going to object.  There's no

21  verification on the date or location.  Three days ago,

22  that certainly doesn't tell us anything about when this

23  was.  I would argue that it's not properly authenticated

24  without something more linking it to a date and time to

25  Mr. Cantwell.

1     Q.   Do you know when it was?

2     A.   This is on the platform called Gab.  It's a

3 social media network similar to Facebook and this post I

4 believe is in or around the beginning of February 2019.

5          MR. DAVIS:  I'd move to admit it again, your

6 Honor.

7          THE COURT:  Okay.

8          MR. WOLPIN:  May I just have a moment?

9          THE COURT:  Certainly.

10         MR. WOLPIN:  I would still argue something

11 more in the sense that this looks like a photograph of a

12 screen.  I don't even know what the screen was.  I don't

13 know if someone sent this to them.  I don't know if it

14 was something that was accessed by the officer directly.

15         But this alone being a photograph of someone's

16 screen at some point in time that he doesn't know the

17 date, just a month, is certainly insufficient for

18 reliability purposes.

19     Q.   Were there numerous other texts and postings

20 by Mr. Cantwell against Hilary Sargent?

21     A.   Yes.

22     Q.   And what were the context of those postings?

23     A.   Just regarding her either being shot or raped.

24         MR. WOLPIN:  Again, I would object.  Without

25 time frame, without the actual -- I don't know whether a

1   subpoena was obtained to actually get records, I don't

2   know whether this was something that Ms. Sargent

3   allegedly provided them.  Without some authentication of

4   this actual document, this is not evidence the Court

5   should consider.

6           THE COURT:  Attorney Wolpin, I'm going to

7   allow you to raise all of those questions with this

8   witness when you have your opportunity to cross-examine.

9           I'm going to allow this to be entered as an

10   exhibit and allow the government's questioning to

11   continue.

12           (Government's Exhibit 11 admitted.)

13     Q.   Would you just read the posting, please.

14     A.   "If somebody shot Hilary Sargent in the face

15   and then stuffed her worthless corpse behind a Dumpster

16   and spent the afternoon shopping and dining out, waiting

17   for the body to begin to stink more than usual before

18   coming back and raping it, nobody who mattered would

19   give a shit."

20     Q.   All right.  Showing you now -- the next month

21   was March of 2019.  Showing you Exhibit 12, was that

22   another posting by Mr. Cantwell on Radical Agenda?

23           MR. WOLPIN:  May I just have a moment, your

24   Honor?

25           THE COURT:  Certainly.

1          MR. WOLPIN:  Your Honor, again, we have

2     isolated screenshots.  This officer hasn't testified

3     that he personally viewed in context.  I don't know

4     who's providing these to them.  Without some

5     authentication, they should not be admitted.

6          THE COURT:  Attorney Davis, can you provide

7     any additional foundation as it relates to government

8     Exhibit Number 12?

9          Q.    Where was this item from?

10         A.    This is from Telegram chat app, which is

11    the -- it's the Radical Agenda chat channel.

12         Q.    All right.  And was -- and we see the date

13    March 20th there; is that correct?

14         A.    Correct.

15         Q.    And are you familiar with the year that this

16    posting was made?

17         A.    2019.

18         Q.    All right.  And was Molly Conger a person

19    affiliated with the left wing who also sparred with

20    Mr. Cantwell repeatedly on the Internet?

21         A.    Yes.

22         Q.    And can anyone Google Molly Conger and Chris

23    Cantwell and find, if not threats, jousting back and

24    forth between the two of them?

25         A.    Yes.

1     Q.   And Ms. Conger posted items against

2  Mr. Cantwell?

3     A.   Yes.

4     Q.   And Mr. Cantwell posted items against

5  Ms. Conger; is that right?

6     A.   Yes.

7     Q.   And this is the one that he posted on

8  March 20th of 2019; is that right?

9     A.   Yes.

10     MR. DAVIS:  I again move to admit it, your

11  Honor.

12     THE COURT:  Attorney Wolpin?

13     MR. WOLPIN:  No objection.

14     THE COURT:  Okay.  It's admitted.

15     (Government's Exhibit 12 admitted.)

16     Q.   Would you read, please, that message.

17     A.   "Here's a simple statement of fact, not a

18  threat or instruction.  Whoever killed Molly Conger

19  would have done more for the white race and broader

20  cause of decency than anybody who shot up a bunch of

21  strangers in a house of worship.  Why these fucking

22  leaches still burden our welfare system when there is

23  supposedly so much white supremacist terrorism is beyond

24  my comprehension.  Do we not have a single murderer

25  amongst us who is capable of evaluating the worthiness

1  of a target?"

2     Q.    All right.  And that was March of 2019.  In

3  June of 2019, the alleged crimes in this indictment

4  occurred; is that right?

5     A.    That's correct.

6     Q.    And that -- and those were specifically on

7  Telegram Messenger app on June 15th and 16th of 2019?

8     A.    Yes.

9     Q.    All right.  On June 18th of 2019, two days

10 later, did Mr. Cantwell post another threat?

11    A.    Yes, he did.

12    Q.    And who is the target of that threat?

13    A.    I believe it was Roberta Kaplan.

14    Q.    And who is Roberta Kaplan?

15    A.    She is an attorney that is representing

16 plaintiffs in the civil suit that is currently ongoing

17 against Mr. Cantwell.

18    Q.    All right.  And Mr. Cantwell is not the only

19 defendant in that case, correct?

20    A.    That's correct.

21    Q.    But he's one of many defendants?

22    A.    Yes.

23    Q.    And as it related to the action itself --

24          MR. WOLPIN:  Excuse me, your Honor.  Could you

25 give me a moment, please.

1          Your Honor, I would object to the nature of

2     the questioning.  It's one thing to have this officer

3     describe something that he intends to introduce and give

4     him some leeway as far as a leading question; it's

5     another to characterize things that are uncharged

6     conduct as threats that we would not characterize, in

7     fact, as threats.

8          So this attorney is not testifying and the

9     officer is and I would ask that it be stricken, the

10    question, asked that way.  If he wants to introduce

11    these things through the officer instead of just

12    describing them in his own way, instead of simply asking

13    the officer whether there was something on a certain

14    date, we object.

15         THE COURT:  Mr. Davis, do you want to rephrase

16    the question?

17    Q.    In the posting by Mr. Cantwell on June 18th of

18    2019, did he make a statement about Ms. Kaplan?

19    A.    Yes.

20    Q.    All right.  Showing you now Government

21    Exhibit 14, can you see that statement at the top of

22    the -- of this post?

23    A.    Yes, I can.

24    Q.    And, again, that's what Mr. Cantwell wrote?

25    A.    Yes.

1    Q.   Okay.  Would you read it, please.

2    A.   "After this stupid kike whore loses this

3    fraudulent lawsuit, we're going to have a lot of fucking

4    fun with her."

5    Q.   All right.  Now, turning last to October of

6    2019, was there an incident in Keene, New Hampshire,

7    related to the movie Joker?

8    A.   Yes, there was.

9    Q.   And did that involve Mr. Cantwell as well?

10   A.   Yes.

11   Q.   And did that start with a post by

12   Mr. Cantwell?

13   A.   Yes, it did.

14   Q.   And showing you Government Exhibit 15, is that

15   a post that Mr. Cantwell put on the Internet?

16   A.   Yes.

17        MR. DAVIS:  Your Honor, I'd move to admit

18   Exhibit 15.

19        THE COURT:  Attorney Wolpin?

20        MR. WOLPIN:  No objection.

21        THE COURT:  All right.  It's admitted.

22        (Government's Exhibit 15 admitted.)

23   Q.   And would you read just the top, the first one

24   there?

25   A.   "I just sat down to see Joker and I have a

1   gun."

2      Q.   Okay.  Now, had there been news media

3   attention prior to the release of Joker regarding

4   concerns about potential violence?

5      A.   Yes.

6      Q.   And can you summarize those very briefly?

7      A.   Yes.  There was law enforcement both about

8   concerns with movie theater shootings during the movie

9   Joker.  There was also concerns with possible copycats

10   to the 2012 shooting by James Holmes that had occurred

11   during a Batman movie.  And leading up to the Joker

12   movie, there were tips coming in to the FBI regarding

13   possible events, acts of violence, but at the time there

14   were no credible threats --

15      Q.   Okay.

16      A.   -- that were discovered.

17      Q.   So what happened in law enforcement when

18   Mr. Cantwell sat down to see Joker and posted that

19   statement?

20      A.   An agent from the FBI in Seattle contacted

21   Keene PD and made them aware of the post.  And due to

22   the recent media attention to the Joker movie, they felt

23   necessary to contact Keene and let them know about the

24   post.

25      Q.   Okay.  What did Keene Police do?

1    A.    Keene Police, they went over to the local

2    cinema, the Key Road cinema, I believe, in Keene.  They

3    located Christopher Cantwell's 2013 black Ford Taurus

4    through his registration.

5    Q.    So they figured he was inside the movie?

6    A.    Yes.

7    Q.    All right.  And what happened next?

8    A.    They went inside the movie theater, they met

9    with the manager on duty, explained to her what

10   information they had just received from the FBI in

11   Seattle regarding the post, and the manager told her

12   due to the recent -- the media coverage and the -- the

13   potential for violence that she didn't feel comfortable

14   with Chris in the theater.

15   Q.    All right.  So what did the police do?

16   A.    So the police went into the theater playing

17   Joker, they -- the manager turned -- stopped the movie,

18   turned the lights on in the theater, interrupting it.

19   They located Chris sitting by himself close to an exit

20   door.  They went over to Chris, asked him to walk

21   outside with them.  He complied and they walked outside

22   of the movie theater and into the -- into like a lobby

23   area.

24   Q.    All right.  And did they determine whether

25   Mr. Cantwell had a weapon on him?

```
 1        A.    Yes.

 2        Q.    What did they find?

 3        A.    They found a .380 firearm on his waistband.

 4        Q.    And was it loaded?

 5        A.    Yes.

 6        Q.    And was Mr. Cantwell entirely compliant in

 7   dealing with the police and cooperative?

 8        A.    Yes, he was.

 9        Q.    All right.  Did the police report contain a

10   summary of the contact with Mr. Cantwell?

11        A.    Yes.

12        Q.    All right.  Showing you Exhibit 16, is that

13   the Keene Police Department report?

14        A.    Yes.

15        Q.    All right.  And going to the text written by

16   the first officer, can you see we highlighted the

17   portion where he's talking about -- talking to

18   Christopher Cantwell?

19        A.    Yes.

20        Q.    Okay.  And do you see in the middle of that

21   first paragraph where it says "it was confirmed"?

22        A.    Yes.

23        Q.    Could you read that beginning there.

24        A.    "It was confirmed that Christopher did have a

25   .380 caliber handgun on the inside of his waistband.
```

1    However, he claimed to have made the post believing

2    people would see the humor in it.  This was based on the

3    misstatements that the media had been giving the Joker

4    increased coverage citing concerns it may promote

5    theater shootings."

6         Q.   All right.  And he also says his intention was

7    not to create fear, correct?

8         A.   Correct.

9         Q.   All right.  And turning to the second police

10   officer and his summary where it says "Cantwell

11   admitted," can you read there?

12        A.   "Cantwell admitted to making the post about

13   seeing Joker and having a gun.  He thought that with all

14   the media attention surrounding the movie, many media

15   outlets were voicing concern that this type of movie

16   could inspire a shooting, he could get more attention

17   with an edgy joke."

18        Q.   "He could get some attention with an edgy

19   joke," correct?

20        A.   Sorry.  "He could get some attention with an

21   edgy joke."

22        Q.   And then below that he did acknowledge "that

23   was stupid, I know I shouldn't have posted that."

24        A.   Yes.

25             MR. DAVIS:  May I have just a moment, your

1    Honor?

2              THE COURT:  Certainly.

3              MR. DAVIS:  No further questions.  Thank you.

4              THE COURT:  Okay.  Attorney Wolpin.

5              MR. WOLPIN:  Yes.

6              May I just have a moment, your Honor?

7              THE COURT:  Certainly.  Take your time.

8                        CROSS-EXAMINATION

9    BY MR. WOLPIN:

10       Q.   So let's start where you began with the search

11   of Chris's home in Keene.

12            So you started by talking a lot about a number

13   of legal things that he had, including guns.  You were

14   involved, as you said, in the search of the home?

15       A.   Yes.

16       Q.   And meaning you guys showed up at his home

17   unannounced sometime in the last, I forget exact date,

18   but about a month ago?

19       A.   It was January 23rd.

20       Q.   And a number of officers showed up as well

21   with you?

22       A.   Yes.

23       Q.   And when you appeared at his house, did you

24   guys knock down the door, did you knock, how did you

25   enter?

1     A.    The SWAT team made entry.  I was about a block

2 down the street.  I didn't actually physically witness

3 how the house was breached.

4     Q.    All right.  But you're aware of the officers

5 that interacted with Mr. Cantwell that night?

6     A.    Yes.

7     Q.    All right.  And Mr. Cantwell himself did not

8 resist in any way the officers that were there?

9     A.    No.

10     Q.    Okay.  He cooperated with the search of the

11 home?

12     A.    Yes.

13     Q.    Okay.  And he didn't attempt any effort or

14 threat of violence against the officers who were

15 involved?

16     A.    No.

17     Q.    Are you aware that in a prior instance

18 Mr. Cantwell had offered to give the Keene Police

19 Department a key to his home for them to use if

20 necessary?

21     A.    Yes.

22     Q.    And that was in -- among a number of contacts

23 that Chris had had with a particular officer over at the

24 Keene Police Department, correct?

25     A.    That's correct.

1      Q.   And you were aware that Chris had been in

2  pretty regular email contact with this officer?

3      A.   Yes.

4      Q.   And that when the officer had expressed any

5  concern that Chris had volunteered the police department

6  a key to his home?

7      A.   Yes.

8      Q.   So when you were there, ultimately a number of

9  guns were found in the home?

10     A.   That's correct.

11     Q.   Thank you.

12          And among those guns none came back as stolen?

13     A.   That's correct.

14     Q.   None had obliterated serial numbers?

15     A.   No.

16     Q.   None were of the type, for example, of like a

17 sawed-off shotgun that would be somehow illegal to

18 possess even as a nonfelon?

19     A.   That's correct.

20     Q.   So of all the guns that you found in the

21 house, all of them Mr. Cantwell was allowed by law to

22 possess?

23     A.   Yes.

24     Q.   And that is because he has no prior felony

25 conviction?

1     A.    That's correct.

2     Q.    And are you aware whether he had any other

3 sort of pistol licensure or other licenses to have those

4 firearms?

5     A.    As far as a concealed carry permit, I'm not

6 aware.

7     Q.    Now, you talked about finding a gun in his

8 vehicle as well?

9     A.    Yes.  It was underneath his vehicle.

10    Q.    Okay.  And in relation to that firearm, were

11 you aware when you came that Chris had had two of his

12 guns previously stolen from his vehicle?

13    A.    No.

14    Q.    Okay.  So before going, did you have

15 conversations with the Keene Police Department about

16 their interactions with my client?

17    A.    When.

18    Q.    Did you meet with Keene PD and talk about sort

19 of the background of their interactions with Chris over

20 the last number of months?

21    A.    Yes, we've been in contact.

22    Q.    Okay.  And ultimately those guns were taken

23 and removed from the home?

24    A.    Yes.

25    Q.    Okay.  Those guns made their way to the Keene

1  Police Department?

2      A.    No, the guns are currently being stored in

3  Bedford, I am sure.

4      Q.    So they're being stored by the FBI?

5      A.    Yes.

6      Q.    And I assume you guys are thorough searchers,

7  correct?

8      A.    We do the best we can.

9      Q.    Okay.  So you looked, for example, for a

10  firearm underneath the car?

11     A.    Yes.

12     Q.    And you found it?

13     A.    Yes.

14     Q.    And you took it?

15     A.    Yes.

16     Q.    And you guys searched the entirety of Chris's

17  house and you found a number of guns?

18     A.    Yes.

19     Q.    And you took them?

20     A.    Yes.

21     Q.    And you wouldn't have left the house unless

22  you guys believed that all of the guns in the house had

23  been found and removed?

24     A.    We -- I mean, that's what the -- ideally, we

25  would have located any firearm that we could and take.

1    Q.   And how many of you were there involved in

2  this?

3    A.   Oh, more than ten.

4    Q.   All right.  So there's ten officers searching

5  the entirety of the apartment and how many bedrooms?

6    A.   There's three bedrooms, a kitchen, and a

7  bathroom.

8    Q.   All right.  Searching the three-bedroom

9  apartment and that search was completed and you guys

10  left the house?

11    A.   Yes.

12    Q.   Now, you talked next about something else that

13  is legal, software or privacy-related encryption

14  services.  So I'd like to talk with you about that next.

15        Now, if I wanted privacy in my Internet

16  searching, I could go online and use the Signal app, for

17  example, correct?

18    A.   Yes.

19    Q.   Okay.  That's readily, publicly available?

20    A.   Correct.

21    Q.   It's not something that has been deemed

22  illegal?

23    A.   No.

24    Q.   Okay.  And it's something, as far as

25  encryption that I guess these guys probably use, we use,

1    and encryption is not an unusual thing to use when

2    involved on the Internet at this point in time?

3         A.    Yes, that's correct.

4         Q.    Okay.  Now, you talked to some degree about

5    one of these platforms being Telegram, correct?

6         A.    Yes.

7         Q.    And you've shown or the government has shown

8    through you a number of, you know, posts that come from

9    Telegram, correct?

10        A.    Yes.

11        Q.    Those -- were those obtained because you

12   thought there was some encryption and got to them?

13        A.    No.

14        Q.    Of a screen -- well, how did you get it on the

15   screen to begin with?

16        A.    They were messages that were sent within the

17   app.

18        Q.    Okay.

19        A.    And from that they take screenshots of the

20   message that's on the screen.

21        Q.    All right.  So if someone were to send a

22   message to me, for example, through Telegram and I had a

23   Telegram account, I could record that.  It doesn't, you

24   know, disappear or explode before I could have that --

25        A.    You can take a picture of it.

1     Q.    Okay.  And that, in fact, is what happened

2  here and that's what led to certain evidence being

3  admitted in this hearing?

4     A.    Yes.

5     Q.    And other aspects, at least as I understand it

6  to be in Telegram, are, in fact, public, correct?  I

7  mean, Telegram's not an entirely private service.

8     A.    No, you can download it.

9     Q.    Okay.  But in addition, when you want to make

10 things available to be seen by the public through the

11 Telegram app, that is something you can do; it's not a

12 solely private enterprise?

13    A.    I'm not aware of that aspect of it.

14    Q.    Okay.

15    A.    I just know it as the messenger app.

16    Q.    Okay.  Have you, in relation to your

17 investigation, observed the Telegram site for Bowlcast?

18 Is that something you're familiar with?

19    A.    I am familiar with Bowlcast.

20    Q.    Okay.  Have you seen their Telegram page?

21    A.    No, I've just seen -- now, when you say their

22 page, what do you mean by their page?

23    Q.    So they have a Telegram site and on that site

24 is their postings.  So it's comparable, let's say, with

25 a Facebook account; there's a posting and a date and

 1   then there's who's posting it.

 2           Is that sort of display through Telegram

 3   something you are familiar with?

 4       A.    Never been in the -- the channel itself.  I

 5   have seen screenshots of postings that were within that

 6   channel, if that makes sense.

 7           MR. WOLPIN:  Okay.  If I could approach?

 8           THE COURT:  Go right ahead.

 9       Q.    Bringing you what's marked as Defendant's

10   Exhibit A, you said you have seen some screenshots of

11   this Bowlcast site through Telegram.  Is that something

12   that looks familiar to you?

13       A.    I've never seen that.

14       Q.    Okay.  How about to the side -- the part that

15   says the Bowlcast and talks about Telegram?

16       A.    I have seen this before.  Well, I don't know

17   if it had the exact 263 members, 43 photos, but I have

18   seen Bowlcast at -- Bowlcast using Telegram.

19       Q.    Okay.  And does this look to you as sort of

20   the -- look, when you saw them, when you say the numbers

21   are different, but at least you can identify --

22       A.    It was similar, yes.

23           MR. WOLPIN:  Okay.  Now, I would ask it to be

24   admitted.  I would ultimately ask it to be admitted on a

25   proffer for our side, but I think it makes more sense to

 1  do it now.

 2          MR. DAVIS:  No objection.

 3          THE COURT:  Have you seen this, Attorney

 4  Davis?  And you have no objection.  It's admitted.  You

 5  can certainly refer to it when you do your proffer.

 6          MR. WOLPIN:  I will come back to it.

 7          (Defendant's Exhibit A admitted.)

 8      Q.    Now, you've talked about something else that

 9  is perfectly legal to have, and that is cryptocurrency.

10      A.    Yes.

11      Q.    All right.  So cryptocurrency is a manner to

12  basically use money without having money issuing from a

13  government, correct?

14      A.    I'm not a cryptocurrency expert, but it's not

15  currency you can exchange like a dollar or a $5 bill.

16      Q.    But as you said, you can use some form of an

17  ATM version of it --

18      A.    Yes.

19      Q.    -- for ability to pay?

20          And were you involved at all in the

21  subpoenaing or seizure of records from my client's

22  financial situation?

23      A.    I'm part of the team that did subpoena his

24  records.

25      Q.    And I know there were a number of sources, but

1  were some of those related to cryptocurrency?

2      A.    As far as amount of money that he has or how

3  he spends it, I'm not familiar with that.

4      Q.    Okay.  Is it -- to your knowledge, it is

5  possible to obtain certain records for cryptocurrency

6  though, from certain providers?

7      A.    That, I -- I don't know the answer to that.

8      Q.    Okay.  But, ultimately, using Bitcoin, for

9  example, is not illegal?

10     A.    It's not illegal.

11     Q.    Under state law?

12     A.    It's not illegal.

13     Q.    Not under federal law?

14     A.    No.

15     Q.    And you guys were able to obtain just standard

16  bank records for Mr. Cantwell in relation to your

17  investigation, correct?

18     A.    Yes, we obtained bank records.

19     Q.    Okay.  Now, you talked about how Chris has a

20  number of websites?

21     A.    Yes.

22     Q.    It is legal to have websites, correct?

23     A.    Yes, it is.

24     Q.    Okay.  So, for example, chriscantwell.com is a

25  website that he has control of?

```
 1        A.   Yes.

 2        Q.   It's not illegal for him to do so?

 3        A.   No.

 4        Q.   As well as having a podcast; you've talked

 5   about two.  Radical Agenda, while conservative, is not

 6   illegal to speak over the Internet?

 7        A.   That's correct.

 8             MR. WOLPIN:  Now, may I just have a moment,

 9   your Honor?

10             THE COURT:  Certainly.

11        Q.   You went through the postings involving Hilary

12   Sargent and Ms. Conger with the government's attorney

13   and I think he described it as there being a -- an

14   amount of jousting going on or back and forth between

15   those two individuals and Mr. Cantwell.

16        A.   Yes.

17        Q.   And that's your understanding as well?

18        A.   Yes, it is.

19        Q.   I mean, that's what you testified.

20             And so you went through those posts.  To your

21   knowledge, has Mr. Cantwell ever had a physical

22   interaction with Ms. Sargent?

23        A.   Not that I'm aware of.

24        Q.   Ever met her in person?

25        A.   Not that I'm aware of.
```

1    Q.    And with Ms. Conger as well, I understand they

2    go back and forth on the Internet, the two of them, but

3    do you have any information that those two have ever had

4    actual contact as two human beings?

5    A.    No.

6    Q.    Now, you guys show up at Chris's house, I

7    imagine, unannounced; you didn't give him notice that

8    you were going to be there?

9    A.    That's correct.

10    Q.    And the officers interacted with him while he

11    was there and he did not appear at that point to be

12    under the influence, correct?

13    A.    Did not appear to be under the influence.

14    Q.    Okay.  So there was no indication he was

15    actively, you know, using meth, having scabs or

16    scratching, or doing the things you might see for

17    someone who is using meth repeatedly?

18    A.    No.

19    Q.    All right.  And as far as, you know, nodding

20    off or doing something that might be indicative of

21    opioid use, you didn't see any of that?

22    A.    No.

23    Q.    Did you find needles within the house?

24    A.    I personally did not find needles --

25    Q.    Okay.

1       A.    -- in the house.

2       Q.    Okay.  But as far as, again, the interactions

3  with Mr. Cantwell, there was no indication that he was

4  under the influence of substances when you met him?

5       A.    No.

6       Q.    And you know at one point in the audio that

7  was played from -- supposedly from 2016, there was

8  something about sticking the needles hundreds of times

9  in one day as far as using meth.

10          Is that -- that's not consistent with your

11  understanding of meth users, injecting hundreds of times

12  a day?

13      A.    I'm not a meth user, so I can't answer to how

14  it's -- how they use drugs.

15      Q.    Okay.  Now, as to the Charlottesville arrest

16  warrant, that came out in August of 2017 --

17      A.    Correct.

18      Q.    -- the arrest warrant for Chris?

19      A.    Yes.

20      Q.    Okay.  And I think the notation in the

21  officer's report is that he called Chris on the 16th of

22  August and asked -- they had a conversation about that,

23  correct?

24      A.    That was the second part of the conversation

25  that they had.

1   Q. Okay.

2   A. It was -- it was actually Mr. Cantwell that

3 brought it up, that he felt like he may have a warrant

4 for his arrest.

5   Q. Okay.

6   A. Phil, Agent Phil Christiana, checked on it for

7 him.

8   Q. Okay.  So it was Chris's concern that he

9 address it with the officer and not the other way

10 around?

11   A. Yes.

12   Q. Okay.  And the officer did that for him and

13 asked him, you know, essentially to look into it, he

14 looked into it and told him there was a warrant?

15   A. Yes.

16   Q. And then had a conversation where your officer

17 called Chris again the next day?

18   A. Yes.

19   Q. And Chris picked up the phone?

20   A. Yes.

21   Q. And he had a conversation with the officer?

22   A. According to the report, yes, they had a

23 conversation.

24   Q. And Chris explained that he needed to

25 basically, you know, give his gun or guns to somebody

1  else so that it doesn't cause an issue upon his arrest.

2      A.    That's how it read in the report, yes.

3      Q.    And then within I think a week or so or less,

4  he then turns himself in or self-surrenders to a police

5  department or jail?

6      A.    Yes.  It was 11 days from the 20 -- from the

7  12th to the 23rd, about a week or less.

8      Q.    Well --

9      A.    He turned himself into Lynchburg, Virginia.

10      Q.    You would agree that -- I mean, he called on

11  the 16th asking whether there was even a warrant, so it

12  appears he didn't know on the 12th that there was a

13  warrant for him.

14      A.    Okay.

15      Q.    Okay.  And I know the government has presented

16  some information about his bail situation while in

17  Virginia.  I would like to add to that.

18      Ultimately, your Honor, this is another item

19  that I would introduce through a proffer.  It is a

20  letter from a company called Central Virginia

21  Monitoring, Incorporated.  I've provided it to the

22  government yesterday and it addresses his compliance

23  with bail.  And the officer may not be familiar with

24  this item unless the government shared it with him, but

25  I think in that context it makes sense to produce --

1          MR. DAVIS:  No objection.

2          THE COURT:  No objection?  All right.  Go

3   ahead.

4          (Defendant's Exhibit B admitted.)

5      A.   May I review it again?

6      Q.   Yes, you should.

7          THE COURT:  Take your time to read through it.

8      Q.   And if you -- ultimately upon reviewing it, if

9   you could read it aloud.

10     A.   This letter is from Central Virginia

11  Monitoring.  They're located at 1982 Arlington

12  Boulevard, Suite 3, Charlottesville, Virginia.  This

13  letter was drafted by Jay Arsenault, an investigator for

14  the Federal Public Defender, Concord, New Hampshire,

15  sent via email.

16          That may be who -- is that who it was sent to?

17     Q.   Jay Arsenault, yes.  He works for us.

18     A.   Okay.

19          So it's in reference to Christopher Cantwell.

20          "On December 7th, 2017, the Albemarle County

21  Circuit Court granted bond to Christopher Cantwell for a

22  felony assault charge.  Stipulations of the bond include

23  a GPS monitoring by our company.  He was required to

24  remain in the Commonwealth of Virginia pending trial and

25  only live in an approved residence.

1        "For the duration of his time on GPS,

2   Mr. Cantwell was exceptionally compliant with this

3   requirement.  He would constantly contact the office out

4   of apparent fear of violation.  During his placement on

5   GPS, there were no location or proximity violations

6   noted.

7        "However, on March 31st, 2018, Mr. Cantwell

8   was arrested during a period of monitoring by the

9   Leesburg Police Department for public intoxication.  As

10  a result, the circuit court ordered Mr. Cantwell to be

11  placed on a SCRAM," S-C-R-A-M -- what does that stand

12  for?

13     Q.   It's the brand name, I believe, of the alcohol

14  monitoring.

15     A.   Okay.

16      "A SCRAM alcohol monitoring device.  Our

17  office placed the additional bracelet on Mr. Cantwell

18  and the remainder of his bond supervision was uneventful

19  with zero alcohol violations detected.

20      "On July 20th, 2018, Mr. Cantwell's case was

21  resolved in the Albemarle County Circuit Court and both

22  monitoring devices were removed."

23      Signed, Central Virginia Monitoring.

24      MR. WOLPIN:  So if I failed to do so, I would

25  move to have that admitted as a full exhibit.

1          THE COURT:  There's no objection from the

2     government, so it can be admitted.

3          Q.   Now, are you familiar with the allegations

4     contained in the actual charging document here?  I know

5     we've talked about a lot of other times, but as to this

6     June of last year contact, is that something you're

7     familiar with?

8          A.   Yes.

9          Q.   Okay.  And so in relation to that, there is a

10    back-and-forth conversation through I believe it's

11    Telegram at that point as well?

12         A.   Yes.

13         Q.   Okay.  And following that conversation in

14    mid-June, did you have or any officers have

15    conversations with the person who was on the other end

16    of the -- the dialogue?

17         A.   Yes.

18         Q.   Okay.  How long after did you end up having a

19    conversation with that person?

20              MR. DAVIS:  Objection, relevance, beyond the

21    scope of direct.

22              MR. WOLPIN:  I believe it is relevant.

23    Ultimately the government's put in a lot of information

24    that it asserts addresses dangerousness.  We now have a

25    situation there, to my knowledge, has been no contact

1    with this person at all since June.

2         I don't believe as far as the information I

3    have been provided that this person reported being

4    afraid or providing that information to the police and

5    so when we're actually talking about dangerousness in

6    relation to the current offense, I think information

7    about the current offense becomes relevant.

8         THE COURT:  Well, the Court is interested in

9    hearing about the circumstances of the underlying

10   charges as they relate to dangerousness.

11        So, Attorney Davis, I'm going to allow an

12   answer to that question, but I'm not going to allow

13   Attorney Wolpin to turn this into some kind of an

14   inquiry into the underlying offense, which I think is

15   what you were concerned about.  But as it relates to the

16   timing of the circumstances, which as I understand what

17   Attorney Wolpin's inquiring into right now, I'm going to

18   allow that to go for that very limited purpose.

19        But, Attorney Wolpin, I'm going to let you

20   know ahead of time that it's not -- it's the Court's

21   expectation that you'll ask some very narrowly tailored,

22   limited questions.

23        MR. WOLPIN:  Yes.

24        THE COURT:  Thank you.

25        MR. WOLPIN:  Thank you, your Honor.

```
 1              THE COURT:  Yes.
 2              MR. DAVIS:  Could I have a word with counsel
 3    just briefly?
 4              THE COURT:  Certainly.
 5                  (Conference between counsel.)
 6         Q.   So let's take a step back.
 7              So as of what you understand this to be,
 8    there's an interaction over Telegram in June of last
 9    year?
10         A.   Yes.
11         Q.   Okay.  After that, Chris ultimately has a
12    conversation with Keene Police Department about threats
13    he's been receiving.  Are you aware of those?
14         A.   Just to reiterate, after the threat was made,
15    then Chris went to the Keene Police Department?
16         Q.   After there was a -- these conversations
17    over --
18         A.   Yes.
19         Q.   -- Telegram, Chris himself --
20         A.   Yes.
21         Q.   -- had conversations with the Keene Police
22    Department about issues he was having.
23         A.   That's correct.  To make sure, just for the
24    timeline, after the conversation on Telegram which we're
25    talking about --
```

1    Q.   Correct.

2    A.   -- June 15, 16, after that date, Chris went to

3  Keene PD.

4    Q.   Correct.

5    A.   That's correct.

6    Q.   All right.  And he had conversations with them

7  about -- or emails at least -- about this specific

8  conversation over Telegram.  Are you aware of that?

9    A.   The exact exchange?

10    Q.   Just that that was happening, that Chris

11  wasn't hiding this information; Chris presented this

12  information to Keene Police Department.

13         MR. DAVIS:  Objection, specificity.  This

14  information.

15    Q.   The aspect of the -- let me say it the

16  right -- a better way.

17         The conversation that happened over Telegram

18  is something that Chris told the Keene Police Department

19  about?

20    A.   The conversation that he had on --

21    Q.   That forms the basis of this offense.

22    A.   Can I state in his totality?

23    Q.   To some degree.

24    A.   Did he --

25    Q.   Do you know if he had any conversation --

1  let's step back.

2          Do you know if --

3      A.   He may have -- he went to the Keene Police

4  Department and was reporting issues he was having.

5      Q.   Okay.

6      A.   Now --

7      Q.   And, ultimately, Chris brought those same

8  concerns about including this conversation to the

9  organization you work for, which is the FBI?

10     A.   Are you stating that he brought us the

11 exchange and communication --

12     Q.   Correct.

13     A.   -- in its entirety?

14     Q.   Again, I -- let's step back.

15          Chris came and met with the FBI about this

16 allegation?

17     A.   The specifics of the exact things he spoke

18 about with the Keene PD, I can't answer to if it was the

19 exact exchange over Telegram or not.  I'll have to go

20 back and review.

21     Q.   But --

22     A.   I know that a report was made.  He was

23 reporting more so on the group was harassing him --

24     Q.   All right.

25     A.   -- not so much on -- I mean, if you want me to

1  say the exchange --

2     Q.   Well, what I am concerned about is that Chris

3  was cooperative with the FBI as far as the investigation

4  of this particular charge, fair to say?

5     A.   He was cooperative and he -- when we set

6  arranged meetings, he would show up at the date and time

7  that we provided.

8     Q.   Okay.  And the conversations you had with him

9  included about these present allegations?

10     A.   I personally never interviewed Chris.

11     Q.   I understand, but are you aware that other

12  officers --

13     A.   I'm aware that other officers interviewed him.

14  To the exact context, I can't speak for him.

15     Q.   Okay.  Now, the October situation with the

16  movie theater, you became familiar with that situation?

17     A.   Yes.

18     Q.   Okay.  And I know the government has shown you

19  some documents in relation to police reports from that

20  incident?

21     A.   The Keene police reports?

22     Q.   Correct.

23     A.   Yes.

24     Q.   Okay.  And in reviewing all of that, did you

25  review the email that Chris sent to the Keene Police

```
1    Department following that incident?

2         A.   No.

3         Q.   That was not provided to you in your review of

4    that situation?

5         A.   I have not seen that.

6         Q.   Okay.  Are you familiar with the officer,

7    Chidester?

8         A.   Yes.

9         Q.   Okay.  And is he an officer at the Keene

10   Police Department?

11        A.   Yes, he's a patrol supervisor.

12             MR. WOLPIN:  Okay.  And if I could approach

13   with something that is going to be marked C.

14             THE COURT:  Go right ahead.

15             MR. DAVIS:  Could we see --

16             MR. WOLPIN:  Yes.

17             MR. DAVIS:  Thank you.

18        Q.   I'm going to have you just take a look at

19   that.  And does -- and looking at the top of what's been

20   marked as C, who is the email from and who is it to?

21        A.   The email is from Christopher Cantwell.

22        Q.   Uh-huh.

23        A.   ChrisCantwell@protonmail.com.

24        Q.   And sent to?

25        A.   Sent to Officer Joel Chidester,
```

1   JChidester@ci.keene.nh.us.

2       Q.    And he wrote here that this was something he

3   was -- this is the end of the first paragraph -- that he

4   wanted forwarded on to the officers within the Keene

5   Police Department?

6       A.    May I be allowed to read this --

7       Q.    Oh, of course.

8       A.    -- before I speak to it?

9       Q.    Yes.

10      A.    Thank you.

11            Ready for questions, sir.

12      Q.    Thank you.

13            So this is an email he sends to this

14  particular officer, but ultimately he asks that this be

15  forwarded to other officers in the department, the end

16  of the first paragraph?

17      A.    Yes.

18      Q.    And in this, Chris addresses specifically the

19  situation at the movie theater?

20      A.    Yes.

21      Q.    But he also talks about his relationship with

22  the Keene Police Department?

23      A.    Yes.

24      Q.    He explained that when he had come a number of

25  years ago, he felt a certain way about the police?  This

1 is about halfway down.

2     A.   Yes, I'm following you.

3     Q.   And then in the following paragraph, just to

4 give you a direct quote:  Over time, my interactions

5 with Keene Police Department -- or, excuse me -- KPD

6 personnel made that anger unsustainable.  I came to see

7 the childishness and foolishness of it and through this

8 came to regret much of my earlier commentary.

9       Correct?

10     A.   Yes, that's what's written.

11     Q.   Okay.  And I'm not going to read it all,

12 because it's quite lengthy, but I'll -- I'll skip to the

13 second page and just finish the -- the conversation.

14       And just to confirm that this is how it ends,

15 Chris writes:  Most importantly, I want you to know that

16 I can be replied -- relied upon to cooperate with your

17 efforts to maintain peace and order in this city.

18       Anytime my words or deeds create friction of

19 any sort with locals, I welcome any communication which

20 might help to deescalate or avoid conflicts.  To that

21 end, please save my cell phone number, which I will

22 redact -- I failed to redact, your Honor, I would ask to

23 do so, I noted that --

24       THE COURT:  We can do that before you have it

25 finalized --

1            MR. WOLPIN:  Correct.

2            THE COURT:  -- and put into evidence.  Okay?

3            MR. WOLPIN:  Thank you.

4       Q.   -- and do not hesitate to call or text me for

5   any reason.  I have less than zero interest in the cop

6   block style of doing things these days and I will

7   welcome every opportunity to improve and strengthen my

8   relationship with the Keene Police Department.

9            Correct?

10      A.   Correct.

11      Q.   And in other elements, he thanks the police

12  department for their professionalism in relation to this

13  situation at the movie theater?

14      A.   Yes, he does.

15           MR. WOLPIN:  All right.  And may I just have a

16  moment, your Honor?

17           THE COURT:  Certainly.

18           MR. WOLPIN:  I haven't already moved that in

19  as a full exhibit.  I would ask to do so, obviously with

20  redactions of personal identifying information.

21           MR. DAVIS:  No objection.

22           THE COURT:  All right.

23           MR. WOLPIN:  Thank you.

24           THE COURT:  It's admitted and we'll make sure

25  that the telephone number gets redacted.

```
 1              (Defendant's Exhibit C admitted.)
 2              MR. WOLPIN:  There's also email addresses,
 3    your Honor.
 4              THE COURT:  All right.  That should be
 5    redacted as well.
 6              THE CLERK:  Will you provide me with a
 7    redacted copy?
 8              MR. WOLPIN:  Yes.
 9              THE COURT:  All right.  That's the best way to
10    do it.
11              MR. WOLPIN:  Yes.
12              THE COURT:  All right.  Are you through with
13    this witness, Attorney Wolpin?
14              MR. WOLPIN:  Hold on one moment.
15              THE COURT:  All right.
16         Q.   And to be clear, the email that you have, the
17    address that Chris is using is from ProtonMail?
18         A.   Yes.  It says ProtonMail.
19         Q.   To the police officer, Ms. Chidester --
20    Mr. Chidester?
21         A.   Yes, to Joel Chidester.  That is the police
22    officer.
23              MR. WOLPIN:  Okay.  Thank you.
24              MR. DAVIS:  Briefly your Honor.
25
```

1                    REDIRECT EXAMINATION

2      BY MR. DAVIS:

3          Q.    Agent Fernald, you were asked about

4      Mr. Cantwell's contacts with the police after the

5      June 2019 communications with the alleged victim in this

6      case, correct?

7          A.    Correct.

8          Q.    Is it true that Mr. Cantwell never provided

9      actual screenshots of his actual communications that are

10     now the subject of the indictment?

11         A.    That is true.

12         Q.    And did he tell you that he had, in fact,

13     deleted those messages after they were made?

14         A.    Yes.

15             MR. DAVIS:  Nothing further.

16             THE COURT:  Anything further, Attorney Wolpin?

17                    RECROSS-EXAMINATION

18     BY MR. WOLPIN:

19         Q.    I mean, as far as the conversation that's in

20     issue in this case, that all ended up being posted

21     online on Telegram, correct?

22         A.    Yes.

23             MR. WOLPIN:  Thank you.

24             THE COURT:  Re-redirect?

25

1          <u>CONTINUED REDIRECT EXAMINATION</u>

2     <u>BY MR. DAVIS</u>:

3          Q.   But not by Mr. Cantwell, correct?

4          A.   By the victim.

5               MR. DAVIS:  Thank you.

6               THE COURT:  All right.

7               Attorney Wolpin, anything further from this

8     witness?

9               MR. WOLPIN:  No, your Honor.

10              THE COURT:  Does the government have anything

11    further from this witness?

12              MR. DAVIS:  Nothing for the witness, your

13    Honor.

14              THE COURT:  All right.  I'm going to ask you

15    to step down, sir.  You're excused.

16                        (Witness excused.)

17              THE COURT:  Counsel, we need to take a brief

18    recess.  There are some other time constraints related

19    to another matter and we need to just transition to

20    something else briefly.

21              I'm going to guess that we will reconvene in

22    15 or 20 minutes.

23              Thank you.

24              Sorry to keep everyone waiting.  Thank you.

25         (Recess taken from 4:50 p.m. until 5:13 p.m.)

1        THE CLERK:  This court is now in session in

2    the matter of the United States of America vs.

3    Christopher Cantwell, 20-cr-6-01-PB.

4        THE COURT:  Okay.  So this is a continuation

5    of a hearing that started earlier this afternoon.  And

6    before we resume, I just want to let counsel know that I

7    don't have any time limitations on my availability

8    today, but I'm also sensitive to that there are many

9    other individuals that are participating in today's

10   proceedings and they may have time constraints that

11   cause them to either want to continue on until a

12   particular time today and if the case isn't submitted,

13   to continue it on tomorrow or on another day that the

14   Court and the parties are available.

15       But I leave it up to counsel to let the Court

16   know, at least at this juncture, whether or not they

17   want to continue and see how far we get along and/or

18   whether they want a brief continuance and we can resume

19   this tomorrow or Monday.

20       And obviously there may be some objection to

21   doing that as well.

22       MR. WOLPIN:  Yeah.  Your Honor, our position

23   is ultimately going to be to request a -- basically a

24   recess until Tuesday, and that's more based on

25   scheduling than anything.

1          But on the basis of some of the information

2 that has been presented obviously, due to the nature of

3 how detention hearings get scheduled, I understand the

4 government gave us a large volume of exhibits today --

5 I'm not faulting them for giving it to us the same day

6 of the hearing -- but it does mean that sometimes we

7 can't predict what response we might want to give.

8          So in addition to simply the time where we're

9 at today and how much time would be left in the day,

10 there are going to be additional efforts for us to rebut

11 some of the -- the evidence that's been presented and I

12 believe a hearing on Tuesday would give us adequate time

13 to do that.

14          I don't believe, just asking the government,

15 that they have additional witnesses to present, so it

16 would be a matter of proceeding to sort of proffer and

17 argument from the parties.

18          THE COURT:  Okay.  Does the government have

19 any additional witnesses?

20          MR. DAVIS:  We don't, your Honor.

21          THE COURT:  Okay.  So it's just a question of

22 proffer and -- does -- do the defendants expect to bring

23 any witnesses?

24          MR. WOLPIN:  I'm not certain at this point.

25          THE COURT:  Okay.

1          MR. WOLPIN:  That's part of the issue.

2          THE COURT:  All right.  And so if you are

3    going to bring witnesses, I'm assuming that you're going

4    to allow the defendants -- excuse me -- the government

5    an opportunity ahead of Tuesday to know that you're

6    going to do that so that we don't end up with another

7    situation where --

8          MR. WOLPIN:  Yeah, I --

9          THE COURT:  -- where they ask for a

10   continuance and we sort of go back and forth.

11         MR. WOLPIN:  No.

12         THE COURT:  I'm not criticizing you.  I just

13   want to make sure that we understand what the game plan

14   is.

15         MR. WOLPIN:  I'll inform them whether it's by

16   proffer or by witness --

17         THE COURT:  Okay.

18         MR. WOLPIN:  -- before then.

19         MR. DAVIS:  So, your Honor, we would -- in the

20   ordinary situation, we'd -- we would object to a

21   continuance.  We'd like to finish today.

22         If there is more -- if there is substantial

23   defense case and testimony, we would not object to a

24   continuance, but if there's no defense case, we're

25   basically done.  We have a little more proffer and this

1   is a matter of argument and decision.  I wouldn't -- I

2   wouldn't think it would take beyond, say, six o'clock.

3           It seems like what the defense is doing

4   effectively is hearing our entire case and then going

5   away and that's not what a detention hearing is supposed

6   to be.

7           Mr. Cantwell has known since he was arrested

8   that this day was coming.  He's had a full chance to

9   think about what kinds of things he wants to present.

10  I'd -- I just don't think it's necessary.

11          It's 5:15 and -- but, again, if the defense is

12  saying we have -- we have a witness, we have witnesses,

13  it's going to take another two hours, I do think a

14  continuance is reasonable, and Tuesday -- is Tuesday

15  going to work for you?

16          That works for us.

17          THE COURT:  My feeling is that they may call a

18  witness; that witness isn't here today or that person

19  may not be here today.  And so I don't have a problem

20  with continuing things.

21          And I do agree with you under normal

22  circumstances if someone said, based on what I've heard

23  today I want to call some additional witnesses, I

24  wouldn't be continuing a hearing unless there was --

25  there were some extenuating circumstances.  But under

1    the circumstances as they are presented here, I heard

2    that the defense counsel may call a witness and it seems

3    to me that it makes sense to continue the proceeding --

4              MR. WOLPIN:  Thank you.

5              THE COURT:  -- until Tuesday.

6              But I will expect that the government will

7    receive sufficient notice of who that witness is and if

8    there are additional exhibits, that they get those

9    exhibits ahead of time.  Otherwise, this is just going

10   to turn into a rolling detention hearing.

11             All right.  Okay?

12             MR. WOLPIN:  Yes.  Thank you.

13             THE COURT:  All right.  Very good.  Is there

14   anything else that we need to accomplish today?

15             MR. DAVIS:  We just -- we want to keep our

16   case open because we do want --

17             THE COURT:  Your case is open.

18             MR. DAVIS:  Very good.

19             THE COURT:  You have --

20             MR. DAVIS:  We'll rest right -- early on on

21   Tuesday.

22             THE COURT:  All right.

23             THE CLERK:  Do you want Tuesday morning?  We

24   can do 10:00 a.m.

25             MR. WOLPIN:  I have a 9:00 a.m. hearing, but

1  it might go away, so that's fine.

2          THE CLERK:  Okay.

3          THE COURT:  All right.  Let's do ten o'clock

4  then Tuesday.

5          THE CLERK:  The 25th.

6          THE COURT:  All right.

7          So, Mr. Cantwell, what that means for you is

8  that you will continue to be detained and we will

9  continue this hearing on Tuesday.  All right?

10         Thank you.

11         MR. DAVIS:  I'm sorry.  One other thing, just

12  notice to defense.

13         Officer Fernald will not be available on

14  Tuesday.  So just -- so he will not be here, so just so

15  you know.

16         MR. WOLPIN:  Understood.

17         THE COURT:  He's been excused, so I don't see

18  any reason why he needs to be here.

19         MR. DAVIS:  Very good.

20         THE COURT:  All right.  Thank you.

21         MR. WOLPIN:  Thank you.

22         MR. DAVIS:  Thank you.

23         THE DEFENDANT:  Thank you.

24         (Proceedings adjourned at 5:19 p.m.)

25

# C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is true and accurate to the best of my ability and belief.

Submitted: 3/25/2020     /s/  Liza W. Dubois
                                  LIZA W. DUBOIS, RMR, CRR