UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   1:20-cr-6-01-PB
            v.                          \*   February 25, 2020
                                        \*   10:09 a.m.
CHRISTOPHER CANTWELL                     \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


CONTINUED TRANSCRIPT OF RECORDED DETENTION HEARING
BEFORE MAGISTRATE JUDGE ANDREA K. JOHNSTONE


Appearances:


For the Government:        Anna Z. Krasinski, AUSA
                           United States Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                           Federal Defender's Office



Probation Officer:         Janice Bernard

1        P R O C E E D I N G S

2            THE CLERK:  This court is now in session and

3    has before it for consideration a detention hearing in

4    20-cr-6-01-PB, United States of America vs. Christopher

5    Cantwell.

6            THE COURT:  Okay.  Good morning.

7            Attorney Wolpin, I did receive the addendum

8    that you filed in this matter and I have reviewed it, so

9    thank you for getting that to me.

10           Did the government have an opportunity to

11   review that before today's proceeding?

12           MS. KRASINSKI:  Yes, your Honor.  Thank you.

13           THE COURT:  Okay.  Thank you.  Very good.

14           So we had left things last week with a witness

15   having concluded his testimony and it was left also that

16   the government's case would still be open to make any

17   further presentations that it wished to make.

18           Are you calling any additional witnesses?

19           MS. KRASINSKI:  No, your Honor.

20           THE COURT:  All right.  So I'm going to take

21   it then that what you'd like to still do is simply argue

22   through proffers as to your bases for detention.

23           MS. KRASINSKI:  Before argument, your Honor, I

24   would like to proffer regarding the nature and

25   circumstances of the underlying offenses.

1          THE COURT:  Okay.  So before I ask you to do

2   that, I'm just going to turn it over to Attorney Wolpin

3   to ask if he has any witnesses.

4          MR. WOLPIN:  No, your Honor.

5          THE COURT:  All right.

6          So I will turn it over to the government and

7   then I will give defense counsel an opportunity to make

8   its presentation to the Court.

9          Please proceed.

10         MS. KRASINSKI:  As to the nature and

11   circumstances of the offenses, the government proffers

12   that the background of this case involves an online

13   dispute between the defendant and members of a group

14   named Bowl Patrol.

15         Beginning about 2018 and ending, to the best

16   of my knowledge, in about January of 2019, members of

17   Bowl Patrol would prank the defendant's radio show.

18         In February of 2019, the defendant alleged

19   that members of Bowl Patrol were responsible for hacking

20   his website.  He believed that the leader of Bowl

21   Patrol, who he knew used an online pseudonym of Vic, and

22   one other Bowl Patrol member were responsible for that

23   hack.

24         And it's important to note that Vic, Victim 1,

25   other members of Bowl Patrol, used pseudonyms when

communicating online in this context.  And pertinent
here, sometimes individuals attempt to "dox" these
people using pseudonyms, basically to reveal their
personal information to the public over the Internet,
you know, in an attempt to expose that person, attempt
to ruin their life.

      So fast forward to June 15th, 2019.  On that
time -- at that time, Victim 1 briefly entered a chat
room on Telegram that included the defendant.  The two
then began chatting.  That conversation continued on
June 16th, 2019.

      During the conversation, the defendant sent
the following threat to Victim 1:  So if you don't want
me to come and F your wife in front of your kids, then
you should make yourself scarce; give me Vic; it's your
only out; I guess I'm going to have to prove my
seriousness.

      The defendant, in the context of that two-day
communication, also made the following additional
statements:  I bet one of my incel listeners would love
to give her another baby.

      On Tuesday:  I'm going to send every episode
of Bowlcast, along with your identifying information, to
whatever the local equivalent of CPS is in your
jurisdiction.  This way the information won't be public

yet.  On Tuesday you should be able to talk your wife

and kids -- talk to your wife and kids and get them to

all have their stories straight.  Get anything

incriminating out of the house, but I'm pretty sure that

once that visit comes, you'll understand that this is

serious.  If that doesn't work, I'll escalate until I

get what I want.  Tell Vic that if he gives himself up,

he can save your family.

     The investigation reveals that the defendant

did, in fact, contact Victim 1's local child protective

services, although nothing came of that.

     During that conversation, the defendant also

provided Victim 1 with proof that the defendant knew

Victim 1's true identity, including providing Victim 1's

address and a photograph of Victim 1 and a photograph of

Victim 1's family.

     The defendant was interviewed by law

enforcement on multiple occasions.  In addition, he

emailed law enforcement many times.  Not once during any

of those conversations or emails did the defendant

disclose the full nature of his communications with

Victim 1 on June 15th and June 16th of 2019.

     On October 24th, 2019, the FBI showed the

defendant a copy of his exchange with Victim 1 and the

defendant confirmed that he sent the messages to

1  Victim 1.  He added:  I'm a little nervous that I'm

2  being asked about this because, quote, they told him

3  that it was extortion.

4         In an email that the defendant sent to the

5  FBI, he wrote:  I threatened to expose his identity if

6  he continued harassing and defaming me and I did expose

7  him after offering him the out of identifying -- of

8  identifying Vic.  I also called the CPS office in his

9  area.

10         The defendant also emailed the FBI a copy of a

11  recorded call between himself and a female.  In that

12  call, the defendant stated that he had some legal

13  liability for his threat.

14         In his conversations with law enforcement, the

15  defendant stated that he did not have any records of his

16  communications with Victim 1 and that he had deleted

17  those communications.

18         As the Court's aware, a number of the

19  defendant's electronic devices were seized when his home

20  was searched and the examination of his electronic

21  devices shows that he did, in fact, save copies of those

22  communications.

23         Your Honor, would you like argument now or

24  would you like me to wait until the defense has an

25  opportunity to proffer?

1        THE COURT:  All right.  Why don't we do this.

2   I'm going to allow the defense to proffer and then I'll

3   let you make your arguments and then I'll let the

4   defense respond.

5        Thank you.

6        MS. KRASINSKI:  Thank you, your Honor.

7        MR. WOLPIN:  May I just have a moment your

8   Honor?

9        THE COURT:  Certainly.

10       MR. WOLPIN:  Your Honor, I would ask that I be

11  allowed to address the nature and circumstances of the

12  offense within my argument.

13       THE COURT:  That's fine.

14       MR. WOLPIN:  I think from a context

15  perspective, it will make more sense.

16       THE COURT:  That's fine.  Very good.

17       You can proceed.

18       MS. KRASINSKI:  Your Honor, to justify

19  detention, the government has to demonstrate by clear

20  and convincing evidence that the -- that the defendant

21  was a danger to the community or by a preponderance of

22  evidence that he poses a risk of flight or obstruction

23  of justice.

24       Here, the proffer and the testimony

25  demonstrates both.

As it relates to danger to the community, the nature and circumstances of the offense charged you've heard a bit about today.  A grand jury found probable cause to believe that the defendant's statements constituted an interstate threatening communication and an extortionate interstate communication, both of which are crimes of violence by statute.

The conduct, essentially, is a threat to commit a rape.  And it also commits -- or includes a second thinly valid threat to have one of the defendant's incel listeners also commit a rape.

And I think that bears emphasis.  The defendant appears aware of his ability to influence other people.  I think that makes his statements all the more serious, because any victim doesn't know if -- if it's the defendant that's going to carry out a threat or if it's one of his listeners that he has the ability to influence is going to carry out a threat.

As it relates to the weight of the evidence, it includes those threatening communications, the defendant's statements about those communications, admitting to sending them, and his lie to law enforcement about whether or not he retained evidence of those communications.

As it relates to his history and

characteristics, he has a long history of substance

abuse, alcohol, heroin, cocaine, crack, methamphetamine,

PCP, steroids.

The Court has heard a lot that demonstrates

that the defendant is essentially volatile. He makes

decisions that are unsafe or dangerous and it includes,

for example, storing a pistol in an unlocked container

underneath his car that's parked across the street from

a school. Anyone could reach their hand under that car

and access that firearm. It wasn't locked. All the

components were there. There was ammunition there.

Evidence of that includes his Joker post. He

was essentially attempting to exploit fear around mass

shootings at the Joker movie. Why else would he post

about having a gun, taking a gun, into the movie? He's

aware that there's fear of mass shootings during the

movie. He may have said that he intended it as an edgy

joke, as a publicity stunt, but it could have ended very

badly.

He has a strong association with firearms, 17

total firearms found during the search of his home and

his vehicle. And when the defendant traveled to

Charlottesville in 2017, he took a number of firearms

with him, including an AR-style firearm, a knife, pepper

spray.

1          I know there was discussion on Thursday about

2     that he's not legally prohibited from possessing those

3     by virtue of a felony conviction.  And that's true.  But

4     I would say it's certainly at least questionable as to

5     whether or not he's prohibited from possessing them

6     under 18 U.S.C. 922(g)(3) as an unlawful user of illegal

7     substances.

8          In the bond report, he talks about using

9     Ecstasy three times a month from when he was 2000 -- or

10    from when he was 17 to 2018.  So in August of 2017, when

11    he took those firearms to Charlottesville, he was

12    certainly an unlawful user of Ecstasy.

13         And now, during the search of his home,

14    investigators found vials of clear liquids, bags of

15    unlabeled pills.  It's questionable what those are.

16    They're being tested.  While he may not have a prior

17    felony conviction, I'm not certain his possession of

18    those firearms is legal.

19         His criminal history includes a conviction for

20    violating his bond condition -- conditions and while

21    it's one conviction for that, the evidence -- and,

22    particularly, the attachments to the government's motion

23    to detain -- demonstrate repeated bond violations.  He

24    violated his bond conditions by committing a new law

25    violation, and that was the public swearing and

intoxication, and it's worth noting that the initial
bond conditions prohibited him from consuming illegal
drugs or alcohol.

He was also on home electronic monitoring at
the time, so that condition didn't serve to deter him.

Next he violated those conditions by
repeatedly engaging in online conduct intending to
intimidate victims in that case.  Again, conditions like
electronic monitoring, home confinement, wouldn't
address that in this case.

Essentially, he committed three types of bond
violations; excessive drinking, he wasn't home despite
home confinement, and that online harassment.

His history and characteristics also include
engaging in violence.  This is demonstrated by his
activities in Charlottesville, dispensing pepper spray
into a counterprotester's face.  And he pled guilty to
that.  There's no question about that.

He has engaged in continued online harassment
of other individuals -- the Court saw online posts about
that -- attempting to harass journalists, an attorney
representing individuals suing the defendant in a civil
matter.  He has no qualms to using that platform to
engage in further threats.

And he uses -- despite doing many things

1  publicly, he also uses a lot of platforms designed to

2  conceal what he's doing.

3          Telegram, the application that he used to send

4  the messages in this case, is essentially concealed

5  communications.  He uses Bitcoin for his finances.

6          And I agree none of those things are illegal,

7  but they're certainly something the Court can consider

8  in determining whether he's likely to comply with

9  conditions of release and whether or not there are

10  conditions that would allow probation to adequately

11  monitor him.  If -- if he's not disclosing his reliance

12  on cyber currency, if he's using applications that are

13  designed to conceal what he's doing, probation can't

14  effectively -- cannot effectively monitor that.

15          Now, as it relates to his risk of flight, he

16  has limited ties to the area.  He grew up in New York.

17  His mom still resides there.  His on-and-off-again

18  relationship is with someone who lives in Maryland.  So

19  he does not have significant ties to New Hampshire.

20          He lacks steady and gainful employment.  He

21  appears to have last held a regular job in 2013.  He

22  does say he earns approximately $2,000 a month from his

23  four companies, but it's not clear whether this is from

24  actually selling merchandise or just -- or advertising

25  rights or if it's just him asking for donations.

1    And it's concerning to the government that

2  while he did disclose to probation the checking accounts

3  associated with those companies that he doesn't appear

4  to have disclosed anything to probation about his

5  financial holdings and use of cryptocurrency. He didn't

6  disclose that.

7    I also -- you know, the government doesn't

8  have access to it, but I certainly think the Court can

9  consider in determining whether or not the defendant is

10  likely going to comply with it -- any of the Court's

11  orders whether or not he disclosed that on his financial

12  affidavit. And, you know, since the government doesn't

13  have access to it, I don't know.

14    But I think the most significant factor as it

15  relates to the risk of flight is the fact that after

16  Charlottesville, he was aware at least as early as

17  August 16th of 2017 when he spoke to Special Agent

18  Christiana that there was a warrant for his arrest. He

19  was told to turn himself in to the closest police

20  department. He didn't do so. He refused to tell Agent

21  Christiana where he was other than generally what state

22  he was in and he waited until August 23rd, 2017, to turn

23  himself in. That delay is a strong indicator that the

24  defendant is a risk of flight.

25    Based on everything the Court has seen and

heard, his -- his history of threatening communications,

his ability to incite others to act, his criminal

history, his repeated violation of bond conditions,

those demonstrate that the defendant poses a danger to

the community if released.

And his lack of family ties to the area, his

lack of steady and gainful employment, his delay in

turning himself in despite knowledge of a warrant -- of

a warrant demonstrate by preponderance of the evidence

that the defendant is a risk of flight.

May I have one moment, your Honor?

THE COURT:  Yes you may.

MS. KRASINSKI:  Thank you, your Honor.

THE COURT:  Okay.  Attorney Wolpin.

MR. WOLPIN:  Yes, thank you.

Chris is not a danger or a flight risk and we

believe there are conditions this Court can set to

assure his appearance and safety of the community.  This

Court has at its discretion through probation quite a

few possibilities for that, most of which or all of

which we're going to be agreeable.

So we're going to suggest that the Court place

a drug and alcohol testing obligation on Chris; that the

Court allow for the probation officer to order him to

participate in counseling; that he be required to reside

at the same address he's been living at now for a couple

years and which has been confirmed through myself and

probation as a continuing option for him; a condition

that he not have any firearms, which, considering

they're now in the possession of the FBI, becomes

something that is unavailable to him without going out

and actively seeking firearms; a requirement that he be

supervised; a requirement that he not be on any social

media platform, whether that be Telegram, Gab, Facebook,

Twitter, whatever social media platform is available;

and the requirement that he be electronically monitored.

The Court, again, has at its discretion a

number of these options.  There may even be more.  But

those allow the Court to guarantee the safety of the

community and his appearance.

Setting forth the legal framework of this

hearing, there is a rebuttal of presumption as it

relates to detention and the defendant has an obligation

to present some evidence.

As the First Circuit has recognized in the

*Jessup* case, basically, a defendant can basically always

meet that burden and certainly we would assert we have

met that burden throughout, as we presented from his

prior monitor as well as background information

regarding his stability and connection to the Keene

1    community.

2         That means that presumption becomes just one

3    of many considerations when the Court is considering

4    release and it still does not alleviate the government

5    of its burden to prove by preponderance and by clear and

6    convincing evidence.

7         I'd like to start by addressing Chris's

8    personal history and characteristics.

9         Chris has now been living in the Keene area

10   for most of the last seven years.  He's had the same

11   apartment for the last two -- excuse me, six years, not

12   seven, six -- and has had the same apartment for the

13   last two years.  Both myself --

14        THE DEFENDANT:  Six years I've been in this

15   apartment.

16        MR. WOLPIN:  In this apartment?

17        THE DEFENDANT:  Yeah.

18        MR. WOLPIN:  All right.  I guess I had the

19   shorter end of that.  Even longer in that apartment.

20        But he has been a good tenant.  I have spoken

21   with his landlord.  Probation has spoken with his

22   landlord.  He's agreed that he's been unobtrusive, been

23   a good tenant, someone that's been reliable and has that

24   opportunity to return to that same address, which is

25   something that probation is aware of.

1       Although there is a certain public narrative

2   about Chris and his opinions, while he's been in Keene

3   he's worked incredibly hard to keep a strong and

4   respectful relationship with the Keene Police

5   Department.  I submitted to the Court one example of

6   that through his email to the sergeant and I made

7   reference at least with the officer who testified about

8   another contact he had with the Keene Police Department.

9       In June he had contact with the police

10  department by email and he explained that he'd be happy

11  to permit you or anyone under your command to enter my

12  apartment; I would even gladly provide you a key to my

13  entrance, provided we all agree that use of that key

14  without my permission is no different than kicking down

15  my door.

16      So he's someone who has reached out to Keene

17  PD, has offered up his key, has offered up his

18  cooperation with them while living in Keene.

19      We see that same attitude and intent in his

20  email that was submitted as an exhibit to this Court in

21  relation to the Joker situation, where, A, he apologized

22  for that, said, I realize I went too far, I am sorry, I

23  promise to learn from my mistake.

24      He expressed to them that there was a time in

25  his life where he was antagonistic towards police, but

1   that time was no longer, that he appreciated their

2   professionalism, that he appreciated how they treated

3   him.  And through that officer's testimony, although not

4   there, we know that in relation to that event, he did

5   not resist, he was not noncompliant, and he was

6   absolutely to issue in relation to the Keene Police

7   Department.

8           We see the same thing in relation to the

9   search of his home that happened just in the last couple

10  months where the officer, among quite a few others, went

11  to his home, conducted a search of his home.  Chris

12  didn't resist.  Chris didn't cause any issues at all.

13  He was arrested without problem.

14          As I will discuss, this is consistent with his

15  behavior in this case.  So when we get to the

16  circumstances and nature of this case, he was, despite

17  what the government has said, highly cooperative with

18  the FBI and with the Keene Police Department.

19          As to the Charlottesville situation, which the

20  government has referenced and presented evidence about,

21  ultimately, that was the third rally, to my

22  understanding, my client was attending.  The first two,

23  there were no issues at all; no violence, no arguments,

24  nothing of that type.

25          As submitted in the addendum, Charlottesville

went horribly, in large part, according to the
independent evaluator, because of the failure of the
city and the police to adequately address two different
sides of a charged issue.

Now, as the Court can see through what we
submitted, Chris demanded that he would only participate
if the police were involved; that he wasn't interested
in being in a situation where violence might erupt and
the police were not there; that he, in fact, demanded
that those who were organizing call the police and
inform them of their plans.

As noted throughout that much more objective
recitation of how Charlottesville occurred that there
were efforts on people like Chris's part not to
participate in violence, that when Chris appeared at the
UVA green, that it was, to my understanding, a gun-free
zone and he did not have a gun.  So he abided by
obligation not to have one there.

The issue ultimately with the mace, which is
something that as well, from my understanding, happened
to Chris, that he received also pepper spray in relation
to his involvement in the protest, that that led to two
misdemeanor convictions which, as the Court has seen in
the attachment, are quite unspecific as to what actually
was the nature of the conduct.

1    Since then, to my knowledge, Chris has not

2  attended any other such rallies, has not been involved

3  in any physical protests or demonstrations and, thus,

4  this sort of isolated incident, which is not consistent

5  with either the history of prior protests or the history

6  since, I don't think lends itself to a conclusion that

7  he is violent of character because of what happened in

8  Charlottesville.

9    Addressing next that my client does have some

10 experience with computers, has held jobs in computer

11 fields.  The police now have his computers; it's my

12 understanding, all of them.  To the extent that the

13 Court is concerned about his access to computers or

14 websites, he can be limited to a single computer.  That

15 computer can be monitored by probation.  He can be

16 excluded from websites like Telegram, if that is a

17 concern from the Court.  And so there are manners in

18 which that can be addressed without detaining him and

19 removing him from his liberty.

20    As to the situation with turning himself in,

21 he turned himself in in relation to Charlottesville.  My

22 understanding of what occurred is he was taking phone

23 calls from the FBI as they contacted him, as is

24 evidenced through the testimony of the officer, but

25 ultimately my client wanted to have a lawyer when he

1    addressed this issue, worked towards getting a lawyer,

2    and once he was comfortable with that, he turned himself

3    in without violence or without issue.  I don't think

4    that the turning yourself in should become essentially a

5    weapon against the person indicating in the future we

6    should assume your noncompliance of bail conditions.  In

7    fact, I think it's evidence of the opposite.

8           As to some of the issues that occurred while

9    on bail, that is -- some are repudiated by the

10    submission from his supervising bracelet monitor who

11    indicated that he was -- made strong efforts to be

12    compliant; that, in fact, when this issue arose with

13    alcohol, which we've acknowledged -- will acknowledge is

14    an issue, which he will have drug testing and alcohol

15    testing for, which if the Court requires counseling, he

16    will attend -- was something that occurred one night,

17    didn't occur again, that he was then placed on another

18    type of monitor which addressed that issue and that

19    issue did not return.

20           The balance of the violation relates to issues

21    between him and other people involved in the case.  For

22    reasons I'm going to discuss when discussing the nature

23    and circumstances of this case, I don't think the Court

24    needs to have such similar concerns between Chris and

25    the individual involved in our present case.

1        Although there is some history of substance
2   use which Chris has admitted and acknowledged, it's not
3   an active addiction at this time.  I think he's
4   acknowledged that alcohol may be a problem that he
5   should address and is willing to address, but this is
6   not someone where heroin, methamphetamine, were found in
7   his apartment.  And I think the Court can address any
8   prior substance abuse issue through counseling and
9   testing requirements.
10       I do think it's important for the Court to
11  understand some things about the nature and
12  circumstances of this offense, as the statute demands.
13  That context is important and for arguments I'm going to
14  make, this offense doesn't indicate the public or even
15  the alleged victim in this case is ever asked.
16       These allegations surround a chat over an app
17  from June of 2019, meaning the allegations are at this
18  point eight months old.  Although the government has
19  contended that Chris was not all that cooperative with
20  police, we know that Chris provided information to the
21  Keene Police Department, including emails to them of the
22  photographs that the government has referenced,
23  indicating that here, here are the photographs that have
24  become part of the government's case about which we're
25  here for; that he met with the FBI to explain to them

 1  what was going on, twice, voluntarily, without

 2  resistance, without a lawyer, without refusal.

 3        What I've heard is no information that the

 4  government has presented that Chris has contacted this

 5  other person in the last eight months.  So we have an

 6  allegation from June.  We have no, to my understanding,

 7  further contact.  There's effort by the other individual

 8  to contact Chris, I believe, but not the other way

 9  around.

10        Now, the types of things said both by Chris

11  and by the other individual involved in this case are

12  not particularly pleasant.  We concede that.

13        If I can just approach and see the exhibit

14  that we presented?  It's marked as Exhibit A.

15        So as the government has discussed, the other

16  side of this conversation was someone who was affiliated

17  with a group called the Bowlcast.  What is before the

18  Court is the Bowlcast Telegram still from their Telegram

19  site which is public and, in particular, a reference to

20  one of their podcasts, which discusses the following.

21  Their synopsis of their own production is:  The Bowlcast

22  returns to answer the big question, discuss the American

23  addiction to nigger ball, disseminate hard truths about

24  kikes' aversion of the CSA and support our valiant

25  school shooters.

1          This group began harassing Chris over and over

2   and over again.  Chris, when he receives harassment or

3   death threats, has presented them in the past to the

4   police department.  We have, for example, from May, an

5   email he sent to Keene PD explaining the threat that

6   he'd gotten, providing that threat to the police

7   department, and explaining what it was all about.

8          In relation to the harassment he was receiving

9   over the Internet, he himself submitted to the federal

10  authorities months before a complaint explaining to them

11  the issue that was going on.

12         So we have a complaint from February of 2019

13  entitled Complaint Referral Form for Internet Crime

14  Complaint Center.  Chris explains that his website was

15  being defaced.  He complained about the Bowl Patrol,

16  talked about this person named Vic, explained that they

17  had had constant spam and harassment of me for months,

18  even as I distanced myself from the group in the wake of

19  the Pittsburgh synagogue shooting.

20         So Chris went to federal authorities, asked

21  them to help.  Chris then, after making the complaint to

22  the federal government, posted online:  Today I

23  submitted a criminal complaint to the FBI naming this

24  Vic individual and another person for defacing my

25  website last night.

1      So he wasn't hiding it.  He wasn't even

2    thinking about it.  He was attempting to engage the

3    other side of the aisle in helping him deal with the

4    fact that he receives a certain degree of harassment.

5    This chat occurred in that framework.

6      The other party, from everything I've been

7    provided, did not go to the police with this information

8    or express concern for his safety to any law enforcement

9    authority.  Instead what this person did was have that

10   interaction posted online, on the Bowlcast Telegram

11   site, or had someone else do it for him.  He then,

12   within days, made another public post in which he

13   exclaimed that Chris was quote, a fed snitch nigger

14   kike, among other things.  This was, unfortunately,

15   relatively par for the course of the Internet discourse

16   on the Bowlcast Telegram site.

17     So there is a legitimate question of whether

18   this was someone who was truly afraid of Chris, who was,

19   I don't know, thousands or however many miles away.

20   Everyone knows where Chris lives.  Chris's home address

21   is quite popularly known.  This individual certainly

22   knew that Chris lived in New Hampshire and this person

23   does not live in this area.

24     Now, the government was aware of these

25   communications.  I can't quite glean from discovery

exactly when, but I know in their conversations with
Chris this was coming up, so we're in the fall of last
year.  They didn't at that point feel compelled by
public safety to file a complaint in September or
October, November, or December.  They waited to get
their indictment.  They were able to do so because this
individual was not in any risk.  Again, there's been no
evidence presented that Chris has been in touch with
this other party at all in the meantime, even though
it's clear from the evidence the Court has heard that he
was aware of this person's address.

And, thus, as far as the nature and
circumstances of this offense that brings us to today,
because as far as I can tell from discovery, there are
no follow-throughs, there's no effort on Chris to
continue a dispute with this individual, and this person
had their say in a long spree following which in which
they called Chris many slurs and names.

So the Court is then left with the question
based on the nature and circumstances of this offense
and his background whether it can set conditions of
release to assure safety and appearance.

As the Court is certainly well aware of the
supreme court quote in *Salerno*, in our society, "Liberty
is the norm and detention prior to trial or without

1   trial, is the carefully limited exception.  Liberty is

2   the norm."

3         The Court can set conditions.  Chris will be

4   challenged to abide by them, will be required to abide

5   by them.  If he fails to do so, he can be arrested, he

6   can be detained, he can be charged.

7         With the availability of supervision, the

8   availability of the Court to limit Internet access --

9   and, again, the -- the physical, true, in-person aspect

10   of his history are really limited to Charlottesville.

11   And when you look at what we submitted in relation to

12   Charlottesville, that doesn't express an overriding or

13   constant danger to the community.

14         And so for those reasons, we would argue the

15   Court can set conditions and the government has not met

16   its burden of proving that he's not a danger or flight

17   risk.

18         May I just have a moment?

19         THE COURT:  Yes, of course.

20         Anything further, Attorney Wolpin?

21         MR. WOLPIN:  Just to address his -- the

22   government made some indication or assertion that maybe

23   Chris wasn't honest about his finances.

24         Chris doesn't have a lot of money, whether it

25   be crypto or regular.  I know at least from the

1　discovery I've been provided they've gotten access to

2　his bank accounts, they've gotten access to quite a lot

3　of his financial history.　And I don't think that there

4　is some cache of significant money that he's not

5　disclosing to this Court.　I mean, he is in fear that

6　he's not going to be able to make the next rent payment

7　if he's not released today to keep his stuff.　So this

8　isn't, again, someone who has a -- a crypto sort of

9　stash that is being hidden from the Court.

10　　　　　And to the extent, again, the Court is going

11　to put a condition that allows for monitoring of his

12　access to websites, that would allow for some

13　observation of that.

14　　　　　And, again, I can't speak in great detail,

15　because I haven't had the chance to look at it in great

16　detail, but I have received discovery indicating

17　Bitcoin-type transactions from Bit things and Bit -- I

18　mean, again, there are dozens of holders in relation to

19　his -- his records and history, but it does appear that

20　the government has at least been able to obtain through

21　some of these services some actual information as to

22　context.　But as far as him being untruthful with the

23　Court because he has money stored elsewhere, that is not

24　true.

25　　　　　　　THE COURT:　Okay.　Thank you.　Anything

1  further from the government?

2          MS. KRASINSKI:  I'd just like to briefly

3  respond, your Honor.

4          Let's start with the last point.  It's not

5  about how much money he has.  That's not what the

6  government's arguing.  The government's bringing up his

7  use and reliance on cryptocurrency as it relates to

8  whether or not he's being candid with the Court and

9  probation, which I think is something the Court can

10  consider in determining whether or not he is likely to

11  comply with conditions that the Court will set.

12          As it relates to the defendant's perceived

13  cooperation with law enforcement, at -- he's cooperative

14  to a point, to the point where he wants to be.  He seems

15  to try to create this public persona that he can rely

16  on, saying that, yes, I -- I provide information to law

17  enforcement.  Ands he does provide some information to

18  law enforcement.  But he only does that to a point.  He

19  conceals everything else that he wants to.

20          So, yes, he certainly provided some

21  information to the FBI.  He certainly provided a glowing

22  email to the Keene Police Department after this Joker

23  incident.  But he doesn't reveal everything.  He's not

24  candid about everything.  And this lack of candor is

25  something, again, the Court can consider in whether or

1   not he's going to comply with conditions the Court will

2   set or be candid with probation.

3         As it relates to Charlottesville, regardless

4   of whether or not he requested law enforcement

5   present -- presence, there is no dispute that there he

6   engaged in conduct that was criminal.  He pled guilty to

7   the illegal use of gas and to assault and battery.

8         Also, I -- I think it's worth noting that even

9   in the report that the defendant submitted in his

10   addendum, it -- it points out -- and then I'll just

11   read:  Chris Cantwell recalled that he was instructed to

12   join other guards on the outside of the line.  The

13   guards were selected for their willingness to get

14   physical with Antifa.

15         His willingness to get physical -- his history

16   and characteristics include a willingness to get

17   physical even by the groups and individuals that he

18   wants to associate with him -- with.  They knew him as

19   someone who was willing to get physical.  I think that

20   suggests a danger to the community.

21         As it relates to the nature and circumstances

22   of this offense, when the defendant reported that people

23   had defamed his website, Vic and another person,

24   Victim 1 is not a person that the defendant believed to

25   have hacked and defamed his website.  Victim 1 is a

1   person the defendant believed knew the personal

2   identifying information of one of those people.

3            So he didn't -- the defendant didn't directly

4   go after Vic.  He did it in a circular way.  He went

5   after Victim 1 because of Victim 1's association with

6   Vic, who he believed hacked the defendant's website.

7            And, yes, the N word became -- are slurs that

8   are commonplace on these online chat groups that both

9   Victim 1 and the defendant frequent, but I proffer that

10  rape threats are not.

11           Also, I just want to note that I am not aware

12  of any evidence presented here that Victim 1 has

13  continued to attempt to contact the defendant.

14           Finally, sort of turning a bit again to risk

15  of flight, it's not the fact that the defendant

16  ultimately turned himself in; it's the week-long delay,

17  it's the fact that he hesitated, it's that delay that's

18  the weapon regarding risk of flight.

19           And while the defendant has suggested that the

20  Court has a number of tools that could ensure that he'll

21  appear at court and ensure the safety of the community,

22  including electronic monitoring, including orders

23  regarding what websites he can use and regarding

24  monitoring of his electronic devices, the Commonwealth

25  of Virginia had many similar tools in its toolbox, used

1  those tools, and the defendant violated them anyway.

2  His history of violating bond conditions demonstrates

3  that he's not likely to abide by any here.

4          May I have one moment, your Honor?

5          THE COURT:  Certainly.

6          MS. KRASINSKI:  Thank you, your Honor.

7  Nothing further.

8          THE COURT:  Okay.  Attorney Wolpin, anything

9  further?

10          MR. WOLPIN:  Just very briefly.

11          I understand the minimizing of Chris's

12  cooperation, but I don't think that's quite fair.  This

13  is, again, someone who has brought this repeatedly to

14  their attention.  He has shown up without lawyers to

15  speak with them.  He has provided them, again,

16  photographs that are evidence in relation to this

17  offense.

18          So this is someone who has made an effort to

19  be up front with law enforcement about this situation.

20  This chat was ultimately posted online.  It wasn't

21  something we needed to obtain from Chris to have access

22  to because the whole conversation is available to anyone

23  who wants to go get it online with certain profane

24  pictures of Chris sort of blocking out certain pictures

25  that they put over him, but ultimately the content is

1  available.

2  I think that it is -- as to the individual

3  involved, we've sort of made effort not to identify that

4  person.  I think what the government is saying is this

5  is someone who's quite tangential to this activity of --

6  of contact.  There's some indication in our discovery

7  that there were dozens upon dozens of calls by this

8  person in to Chris.  This person is not someone who's

9  tangentially related to the Bowlcast group.  This is

10  someone who is actively involved over and over again and

11  this is a group that dedicates itself to mass murder.

12  Chris attempted to distance himself from that.

13  As some of what the government has submitted as to his

14  past or his past posts, he has made calls not for people

15  to engage in mass violence and said that was not to the

16  benefit of his sort of political interests as opposed to

17  a group that made that the centerpiece of who they were.

18  As to his delay in appearing, I don't hear

19  anything from the Court that -- or from the government

20  that he failed to appear for court hearings that he had

21  in Charlottesville.  I presume he had a number,

22  including bail revocation hearings, and he appeared

23  to -- as far as I understand, at those hearings.

24  I think it's a dangerous approach to say that

25  someone who seeks out an attorney to turn themself in

1    and then does so is sort of doing something nefarious in

2    making that effort, when they ultimately did turn

3    themself in without issue and without requiring any kind

4    of involvement of police other than him showing up at

5    the door of a police station.

6            As to Charlottesville, I'm not going to rehash

7    that.  His convictions were for the sort of unspecified

8    assault and battery, not for the pepper spray.  It's a

9    little unclear what they are about.  I think the Court

10   can take the totality of the addendum to see what

11   Chris's perspective was and I think the Court can see

12   that in the meantime, there has been no attendance at

13   similar rallies and no repeat of that issue.

14           Other than that, his criminal history is not

15   replete with other instances of physical violence and

16   other than, if my memory serves, a DWI from a number of

17   years ago, really since 19 years old, there hasn't been

18   significant criminal record or significant instances of

19   physical violence.

20           I think if the Court restricts access to

21   social media, that takes care of the kind of conduct

22   alleged here.  The back-and-forth, the sparring,

23   unfortunately, has been common on the Internet and has

24   become common with Chris, sometimes going in both

25   directions, including, again, a number of threats on his

```
 1   life that come his way on, unfortunately, a routine
 2   basis.
 3          So if the Court restricts that access, I think
 4   the Court can be assured of safety.  Again, this other
 5   individual is distant, there's been no effort at
 6   retaliation or harm in the matter of months that have
 7   gone on since then, and we would argue that that allows
 8   for the safety of the community to be protected.
 9          THE COURT:  Anything further from the
10   government?
11          MS. KRASINSKI:  No, your Honor.  Thank you.
12          THE COURT:  Okay.  Attorney Wolpin, would you
13   like a few minutes to consult with your client to see if
14   there's anything further you'd like to present?
15          MR. WOLPIN:  We're all set.
16          Thank you, your Honor.
17          THE COURT:  Okay.  Very good.  The Court is
18   going to take this matter under advisement and will
19   issue a written ruling.
20          In the interim, Mr. Cantwell, you will
21   continue to be detained.  Okay?  Thank you.
22          MS. KRASINSKI:  Your Honor --
23          THE COURT:  Yes.
24          MS. KRASINSKI:  -- may I make one brief
25   request?
```

1          Government's Exhibits 11, 12, and 14, may I

2    ask -- move that the unredacted versions of those be

3    sealed and we will provide the clerk's office with

4    versions that redact personal information?

5          MR. WOLPIN:  We have no objection.  And I also

6    submitted a redacted version of C.  So in our version,

7    C-1 would remain sealed and C-2 would have the

8    redacted --

9          THE COURT:  Okay.

10          MR. WOLPIN:  -- information.

11          THE COURT:  So here's what I'm going to ask

12    counsel to do.

13          After the courtroom clears out, before you

14    leave, will you please just coordinate with my deputy

15    clerk, just to make sure that it's clear which documents

16    you'll be sealing and which ones you'll be providing

17    additional redacted versions of?

18          MS. KRASINSKI:  Yes, your Honor.

19          THE COURT:  Thank you.

20          MR. WOLPIN:  Yes.

21          THE COURT:  I appreciate it.  Thank you.

22          (Proceedings concluded at 11:00 a.m.)

23

24

25

# C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is true and accurate to the best of my ability and belief.

Submitted: 3/25/2020     /s/  Liza W. Dubois
                                    LIZA W. DUBOIS, RMR, CRR