IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ] | |
| ] | |
| v.                            ] | No. 20-CR-00006-PB |
| ] | |
| CHRISTOPHER CANTWELL   ] | |

## DEFENDANT'S MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER

Christopher Cantwell respectfully moves the District Court (Barbadoro, Hon. J.) to review the detention order issued by Magistrate Judge Johnstone, and upon review, to revoke the order and release Mr. Cantwell on conditions including home detention, monitored electronically, and a prohibition on any contact with the alleged victim. Judge Johnstone's order is subject to review and revocation by this Court pursuant to 18 U.S.C. § 3145(b). Alternatively, the Defendant requests that he be released pursuant to 18 U.S.C. § 3142(i).

As grounds for this motion, it is stated:

Introduction

Christopher is charged with writing a threat during an online communication in June 2019. The receiving person lives in a distant region of the country, and the two have never met. The other party used an inflammatory and violent online persona and repeatedly and purposefully "trolled" Christopher with the goal of provoking an angry response. The online communication at issue was the final

1

contact between the two men, and, since June 2019, there has been no further communication. The other party has since erased his online presence.

Christopher asserts his innocence, and, as outlined below, has a strong and compelling defense to the charge. Despite the presumption of innocence, Christopher's liberty has been taken, and he has been detained in a jail that has taken inadequate precautions to protect inmates from COVID-19. Obtaining a speedy trial has become illusory, trial preparation is impeded, and it is uncertain when this case will have a true and reliable jury selection date. This Court can craft conditions of release, including electronic monitoring, that will protect the community without holding Christopher in jail indefinitely as he awaits trial.

## Procedural History and Background

On January 22, 2020, the government indicted the Defendant for allegedly violating sections (b) and (c) of 18 U.S.C. § 875 via a June 2019, written communication transmitted over an online messaging platform. The following day, law enforcement officers arrested Christopher at his Keene home without incident or resistance. He appeared before the Court the same day and was detained. On February 13, Christopher requested a detention hearing, ECF 12, and the Government filed a written pleading in support of detention. ECF 14.

On February 20, the Court began but did not complete the hearing. The Defendant filed an addendum to his motion prior to recommencement of the hearing to rebut evidence presented by the Government at the hearing. ECF 17. The hearing reconvened and concluded on February 25. Two days later the Court issued

an order detaining the Defendant pending trial. ECF 20. In its written order, the Court concluded that the Government failed to meet its burden as to risk of flight, but met its burden as to future dangerousness. *Id.* at 3 (citing 18 U.S.C. § 3142). Christopher is detained at a local House of Corrections and has been for the last four months pending trial.

This case is scheduled for a jury trial in July 2020. It was previously scheduled for trial in early June. Prior to the Court moving the trial to July (because of an update in its COVID-19 standing order), the Government filed a motion to continue trial citing its inability to supersede with additional charges as a grand jury was not available prior June. ECF at 24. The defendant objected, citing his right to a speedy trial. ECF at 25. In light of the Court's continuance, the Government's motion became moot. However, this issue will likely reoccur as it appears doubtful that a grand jury will convene prior to the July trial date. Additionally, considering the ongoing pandemic, it is realistic to question whether the court, parties, witnesses, and public will be ready to convene for jury trials as scheduled in July.

<u>Argument</u>

The Defendant seeks relief under two statutory provisions. First, he files this motion seeking release under 18 U.S.C. § 3145(b). That statute calls for the prompt review of a detention order issued by a magistrate judge as a matter of right. Alternatively, the Defendant requests that the Court release him under 18 U.S.C. § 3142(i) which provides for the "temporary release" of a person in custody "to the

3

extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

I. <u>There are conditions that can reasonably assure the safety of the community under the factors set forth in 18 U.S.C. § 3142,</u>

A. <u>Weight of the Evidence</u>

The indictment alleges alternative counts of making an online threat in June 2019. The details of these allegations are relevant to evaluating the defendant's future dangerousness and to the Court's consideration of the "weight of the evidence against the person." 18 U.S.C. § 3142(g)(2). The facts surrounding these allegations have become better defined as discovery has been produced. Considering the evidence in its totality, the weight of the evidence does not support continued detention of the Defendant.

i. <u>Christopher Cantwell</u>

Christopher Cantwell works as an online media personality in the alt-right movement. He obtained a degree of national notoriety after the "Unite the Right" rally in Charlottesville, Virginia in August 2017. Christopher operates a website, produces several podcasts, and sells merchandise. His podcast show is open to callers and operates similarly to a terrestrial morning, call-in radio show. The content, however, is pitched to those with right-leaning, white nationalist viewpoints. Christopher operates and produces these programs under his real name and identity. As his name, phone number, and home address are publicly available

4

and widely known, he has been the subject of regular harassment and threats. Christopher regularly forwarded the most violent ones to police, noting that "[i]t is pretty common for me to receive unpleasant messages from strangers." *E-mail to Keene Police Department,* Dec. 9, 2018.

ii. <u>Cheddarmane and the Bowl Gang</u>



The Bowl Gang (or Bowl Patrol) is a group of pseudonymous individuals who publicly espouse racist and violent rhetoric. They identify with and canonize Dylann Roof, a mass murderer who killed nine African-American churchgoers in a racially motivated terrorist attack in June 2015, in Charleston, South Carolina. Roof was identifiable by his round, "bowl-cut" hair style and thus



the group adopted the "Bowl" as its moniker and identifier. The group operated a public webpage through the social media site Telegram that broadcasted[1] a podcast entitled the "Bowlcast." The Bowlcast was hosted by "Vic Mackey," the pseudonymous, self-professed leader of group and guest starred, among others, "Cheddarmane" whose online avatar is shown to the left.[2]

---

[1] This is noted in the past tense as the group is no longer posting to this Telegram account. It is unclear what prompted the group to shut down its site.
[2] https://twitter.com/Illegal_Aryan/status/1001909154259156993. Bowl Gang members used pseudonyms to shield their identity and these names often signaled their white supremacist views. "Cheddarmane" is a reference to an ancient skeleton (Cheddar Man) whose DNA

5

Those in the Bowlcast routinely used insulting, aggressive, and antagonistic language. It was an all-male organization that used hyper-masculine dialogue, discussed raping a woman as a "joke," and insulted a target's manhood with phrases like "gay" or "cuckold." The group lamented that mass-murderers like Omar Mateen and Dylann Roof were stopped before generating greater casualties among Jewish, gay, and minority communities. They outlined a "goal . . . to make whites more predatory" like their white ancestors who "raped and pillaged." Although it is difficult for most to see the humor in rejoicing in mass-murder and exhorting others to rape and commit acts of terrorism, the podcasts are couched in "humor" and racist "characters" that appealed to its members. That is the manner of language and dialogue to which Cheddarmane partook and that was the context within which Christopher knew Cheddarmane.

iii.   <u>Christopher Cantwell and Cheddarmane</u>

In early 2018, Christopher developed a short-lived online relationship with members of the Bowl Gang. The relationship quickly soured, however, and Christopher became a target for the group's enmity. By November 2018, Cheddarmane and Vic Mackey were publicly explaining their efforts to impede Chris's live show by overwhelming him with offensive prank calls. As Cheddarmane explained, upon seeing that they were getting under Christopher's skin, this "only

---

indicates that "the lighter skin characteristic of modern Europeans is a relatively recent phenomenon." Paul Rincon, BBC news, February 23, 2018, *available at* https://www.bbc.com/news/science-environment-42939192. The pseudonym Cheddarmane mocks this finding that "white" people's ancestors had darker skin.

fueled the fire and made us want to call him more." That Christopher was bothered by their trolling was, as Cheddarmane said, "like throwing gasoline on the fire" and led the Bowl Gang to "escalate[] from there." In an effort to stop this harassment, Christopher reported calls and alleged computer crimes to federal law enforcement in February 2019. He posted publicly online that he had made this report to law enforcement in an effort to deter his harassers from continuing their actions. Federal law enforcement did not promptly investigate and follow up on Christopher's report of cybercrime in February 2019.

In June 2019, Cheddarmane entered an online chat group hosted by Christopher. Christopher had previously obtained Cheddarmane's home address and warned him that he would make it public if he continued to harass him. Christopher and Cheddarmane then had a private back-and-forth communication over a social media app. As is common among this online peer group, coarse and aggressive language was used by both men, including the language Christopher used as noted in the indictment: "So if you don't want me to come and fuck your wife in front of your kids, then you should make yourself scarce." After this statement, which the Government characterizes as a "threat to injure," Cheddarmane responded in a way that suggested that he did not view these statements as true threats. Cheddarmane wrote back to Christopher: "You're such a fucking nobody Chris. Do your worst you crazy Junkie loser. Go boof some meth up your asshole you faggot ass kike;" "You think I'm scared . . . Lol. You have [zero] credibility anymore. You are so desperate and its hilariously pathetic;"" and "[Laugh Out Loud Out Loud] . . . Oh no I'm super scared . . . Hahahahaha." In the following days,

Cheddarmane attempted to call Chris on-air on his show, presumably to provoke him and continue to "throw[] gasoline on the fire," and posted a profanity-laced online screed against Chris on the Bowlcast social media site.[3]

Cheddarmane did not approach law enforcement with concerns for his or his wife's safety following this interaction. Rather, after federal law enforcement officers met with Chris in the fall of 2019 to discuss harassment *against him* by Cheddarmane and others, those officers sought out Cheddarmane to further the prosecution of Christopher on the present charges. Chris and Cheddarmane both explained they had no further contact after June 2019. The two men have never met. Cheddarmane represented that he no longer has an online presence.

The question for trial ultimately will be whether the government can prove beyond a reasonable doubt the elements of the offense and that these statements were "true threats." *See Virginia v. Black*, 538 U.S. 343 (2003); *Elonis v. United States*, 575 U.S. 723 (2015). The above synopsis does not present every fact weighing in favor or against the parties in this case. The discovery in this case is voluminous, and this argument is not intended as a trial by motion. However, it is indisputable that the defense to these charges is grounded in fact and law and far from fanciful or incredible. Christopher is presumed innocent and the Government will be challenged to meet its heavy burden in this case.

Furthermore, as the weakness of the State's case relates to the meaning and context of the statements—and whether they can be fairly considered a threat—it

---

[3] Months later, upon being approached by federal law enforcement, Cheddarmane claimed that he was fearful.

has a direct bearing on considerations of dangerousness. Trial related facts, including (1) that the defendant has not contacted the alleged victim since the end of June, 2019, nearly a year, (2) that the alleged victim purposely provoked Christopher for personal entertainment and engaged in a campaign of harassment using coarse-language against Christopher that led to this interaction, (3) that the alleged victim responded in a dismissive manner during the conversation suggesting that he did not see these statements as threats, and (4) that the alleged victim, rather than shying away from the defendant after this communication, attempted to contact Christopher to have a public confrontation and Christopher declined, are all evidence that the Defendant did not commit a crime and evidence against the Government's assertion that he is a danger.

B. Background and circumstances

Christopher lives in Keene, New Hampshire. He has lived in that area since the early 2010's. Like many Keene emigrants, he was drawn to the area by its libertarian identity. Prior to moving to New Hampshire, Christopher had lived and worked in New York. He completed some college, received a certificate in computer technology, and worked for large companies. Upon coming to New Hampshire, he developed several small businesses that produced online media content, offered voiceover services, and operated as an online retail website. Christopher earns a living through his media productions and related businesses.

Christopher's criminal record over the last twenty years includes a DWI offense in 2009, and a pair of misdemeanor assault charges, a violation of bond

9

conditions offense, and a public intoxication conviction from 2018. He has no felony convictions. The Government and Court relied heavily on the 2018 bail violation in support of its request for detention. The bail violation arose from a case in Virginia that followed from Christopher's attendance at a contentious alt-right rally. That rally led to the two misdemeanor convictions for assault. Although there has been significant media coverage of the event, the rally and Christopher's role in it were detailed in a lengthy independent report commissioned by the city of Charlottesville. Those portions discussing Christopher were noted in the Defense's Supplement to his motion for a detention hearing and do not support detention. *See* ECF 17 at 2-3.

The bond violation pertained to Christopher "refer[ing] to one of the victims in this matter by name on a radio broadcast" and referring on several occasions to "the identifying characteristics" of the other victim through social media. ECF 14, Ex. 3. The bond violation did not allege these references were threatening, encouraged others to act violently, or involved direct communications with the victim. Christopher pled guilty and acknowledged wrongdoing. He is highly motivated not to jeopardize his release in this case by engaging in similar conduct. In relation to the assault cases, Christopher was ultimately placed on an electronic monitor while completing his pretrial release. As noted in Defense Exhibit B from the detention hearing, a letter from the company responsible for his supervision reported that "[f]or the duration of his time on GPS Mr. Cantwell was exceptionally compliant with this requirement [and] would constantly contact the office."

In relation to this case, Christopher has had the ability to communicate with people outside of the prison through phone and tablet. The Government has produced more than a dozen discs of recordings of his phone calls. Upon its review, the Government provided a written synopsis of only two calls, neither of which was in reference to attempted witness intimidation. Christopher has made no effort to contact Cheddarmane directly or indirectly since his incarceration. This is consistent with discovery, including statements from Cheddarmane, which show no effort to communicate after June 2019. The last apparent attempt at communication was from Cheddarmane who called Christopher's show *after* the alleged threat and boasted online about "how quickly [Christopher] hung up on me yesterday." Christopher is not a danger to Cheddarmane or any other witness involved in this case and conditions can be set to assure that there continues to be no contact.

Christopher's history with firearms arose at the original bail hearing and in the Magistrate's order. Law enforcement conducted a search of Christopher's apartment in January. Christopher had a number of firearms. Christopher was lawfully permitted to have these firearms. They were not stolen, altered, or obliterated. He had not used or threatened to use them in relation to this case. Those firearms were seized in relation to this investigation. Christopher has asked that the guns be released to a third-party who intends to sell them through proper and legal means. The proceeds will go directly to satisfy back- and future- rent. Expecting that the Government will expeditiously produce these firearms to the

third-party for sale, Christopher will neither own nor control any firearms upon his release.

    C. <u>The Court should release the Defendant in light of the risk of infection with COVID-19 at Strafford County House of Corrections.</u>

The spread of COVID-19 has created a global pandemic. As of May 21, 2020 there were at least 1,528,235 known cases and 91,664 deaths in the United States.[4] The number of COVID-19 cases and deaths in the United States continues to rise. *Id.* Prisons are environments, much like cruise ships or nursing homes, in which the COVID-19 virus can easily gain a foothold and spread rapidly. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . . Please let as many out as you possibly can."); Maria Guerrero, *More Than 600 Inmates Test Positive for COVID-19 at Federal Prison in Fort Worth*, NBCDFW, May 11, 2020 (reporting conditions at FMC Fort Worth); https://www.bop.gov/coronavirus/ (reporting that there are 2265 currently infected inmates in BOP custody and 58 BOP inmates have died from CVOID-19 ).

Precautionary measures can be taken to prevent the spread of the virus. Foremost among them are limiting crowds and using "social distancing," a practice the CDC calls "a cornerstone of reducing transmission of respiratory diseases such as COVID-19" in detention facilities.[5] Distancing is vital to limiting contagion

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited, May 21, 2020)
[5] *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, *available at* https://www.cdc.gov/coronavirus/2019-

because the virus "can remain viable and infectious in aerosols for hours . . ."[6] Implementing social distancing in congregate settings where people must share sleeping areas, dining halls, bathrooms, showers and other common areas, is often difficult. The Strafford County House of Corrections (SCHOC), where Christopher is being held, has failed to adequately address the risk to inmates and staff in this regard.

The conditions at SCHOC are well documented in light of ongoing civil litigation brought in this Court by immigration detainees held at SCHOC. *See* Order, *Gomes v. U.S. Department of Homeland Security*, 20-CV-453 (LM) (D.N.H. May 14, 2020) (61-page order with factual and legal conclusions based on testimony from jail officials and inmates). SCHOC serves not only as a county jail, housing pretrial and sentenced state inmates, but also as a regional hub for civil immigration detainees and a contract facility for this District's pretrial inmates. In total, several hundred inmates intermingle within the facility. *Id.* at 14 (Immigration "detainees in these units are mixed in with state and/or federal criminal defendants awaiting trial, sentencing, or serving sentences.").

The Chief Judge made a number of disconcerting findings about SCHOC's response to the COVID-19 pandemic and its duty to protect inmate's health. For example, corrections officers continue to move between units within the jail. *Id.* at

---

ncov/community/correction-detention/guidance-correctional-detention.html (CDC noting that "although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19.")

[6] Van Doremalen, et al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N.E. Journ. Med., March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

22. The Court found that "SCHOC has made no effort to reduce the number of inmates each staff member is exposed to—a practice that directly contradicts both the CDC's Interim Guidance and the CDC Detention Report which encourages facilities to '[a]ssign staff members to consistent locations' in order to prevent introduction of COVID-19 into the facility." *Id.* As one medical expert recently noted in class-action litigation challenging conditions at FMC-Devens, a Bureau of Prisons facility in Massachusetts, "officers who routinely enter the facility without any quarantine-period pose the exact same danger of transmission" as newly arrived inmates. *Grinis v. Spaulding,* 20-CV10738 (GAO), Doc. 4-1 (D. Mass. Apr. 15, 2020) (Declaration of Dr. J. Goldenson). SCHOC staff, who are not routinely tested for COVID-19, travel among the general community between shifts, and then return to SCHOC to circulate within multiple units of the jail. A single asymptomatic infected staff member could lead to an explosive outbreak throughout the facility similar to those seen in other jails throughout the country.[7]

The Court found other deficiencies in the SCHOC's efforts to maintain a safe facility. *Gomes* at 23 ("There also appears to be a lack of effective education and communication between SCHOC staff and detainees about the available preventative measures."); *Id.* at 52. The Court concluded that

> The SCHOC has not eliminated many of these risks [of infection]. The conditions of confinement do not allow for social distancing within cells, inmates interact in common spaces, employees move throughout the facility working on multiple

---

[7] There are innumerable articles and tracking websites discussing the many outbreaks of the infection that have ravaged state and federal correctional systems. *See e.g.,* Richard Winton, *After Seventh Coronavirus Death at Terminal Island, Congresswoman Says Inmates Lack Protection*, L.A. Times, May 12, 2020 (discussing the conditions at the Terminal Island federal prison).

14

> units, and attorneys and clergy continue to enter the facility without established social distancing procedures. Moreover, inmates are not required to follow recommendations about masks and social distancing in common spaces. In sum, there are many vectors and paths through which COVID-19 could be introduced and spread quickly through the facility.
>
> COVID-19 is highly contagious, and detainees live in close quarters; therefore, their chances therefore, their chances of infection are higher if COVID-19 is introduced at SCHOC. Once infected, as Judge Young [of the District of Massachusetts] recently recognized in *Savino*, "taking hospitalization as a marker of 'serious harm,' it is apparent that even the young and otherwise healthy detainees face a 'substantial risk' (between five and ten percent) of such harm.", [2020 WL 1703844] at *7. Accordingly, the court concludes that even detainees who do not have a condition that places them at heightened risk of COVID-19 complications or death would likely be able to demonstrate that detention at SCHOC places them at a "substantial risk of serious harm." *Coscia*, 659 F.3d at 39. Case 1:20-cv-00453-LM Document 123 Filed 05/14/20 Page 52 of 61.

*Gomes* at 52. The Chief Judge noted at the outset of the order that "[a]s of the date of this order, there is no evidence of COVID-19 inside the jail." *Id.* at 1. Although the order is only a week old, that is no longer true. SCHOC has three confirmed cases, two immigration detainees and an employee. Kyle Stucker, *2nd Strafford County jail ICE detainee has coronavirus*, May 20, 2020, Fosters.com, https://www.fosters.com /news/20200520/2nd-strafford-county-jail-ice-detainee-has-coronavirus. The Chief Judge was prescient at the outset of the order, noting that "once" rather than if, "the virus is inside the jail, not only are detainees and inmates at great risk due to the nature of the virus and the close quarters of the jail, but the community of Dover could be at risk should large numbers of detainees or inmates need hospital care." *Gomes* at 1-2.

Although two infected inmates among hundreds may appear at first blush as a rather low-risk situation, when the virus has found a point of entry into a facility, its spread has often been dramatic. The Wyatt Detention Center in Rhode Island presents a local cautionary tale. Like SCHOC, Wyatt holds several hundred pretrial federal inmates and immigration detainees. In April, the District of Rhode Island issued a General Order requiring Wyatt's warden to update the Court twice weekly with status reports on mitigation efforts, testing, and positive cases. Even with such scrutiny and the jail administration's mitigation efforts, COVID-19 entered the facility in late April. The submitted status reports show the ease at which the virus spreads in a prison environment. The first submitted status report, dated April 20, 2020, showed no positive tests at the detention center. *In Re: Donald D. Wyatt Detention Center*, ECF 2, 20-mc-00004 (JJM) (D.R.I.). As of the last public report, dated May 18, 2020, or less than a month later, Wyatt reported 45 positive tests among inmates and 11 among staff. ECF at 10. Although SCHOC may or may not impede the spread of the current incursion of the virus, it will enter and spread within the facility and will put inmates and staff at risk of infection and illness.

The conditions set forth above are relevant to the question of release. The Bail Reform Act requires that the Court consider whether someone presents a danger to the community. Under the current circumstances, the Defendant has a compelling personal interest in abiding by bail, as a violation would result in returning to a jail and the attendant risks of contracting the virus.

It is worth remembering that Christopher is not a convicted inmate seeking sentence modification from Court. Courts around the country have recognized the

16

health risks of incarceration among convicted, incarcerated inmates, releasing numerous sentenced inmates via the compassionate release statute. Pretrial inmates are no less at risk of contracting the virus *and* are confined and exposed even though they have not been convicted of a crime. Christopher is innocent. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). He maintains his innocence and has a credible defense to an allegation involving a man from a distant state, involving no in-person contact, and where there have been no interactions within the past eleven months.

      Christopher was scheduled for a jury trial in June. The Government moved to continue as it seeks to supersede and did not foresee having a grand jury prior to the trial date. Christopher objected to the continuance, and sought to keep his trial on track while he was incarcerated. The Court, due to concerns about convening jurors during a public health crisis, continued all trials until July, making the Government's motion moot. However, based on the Court's standing order, the Government will likely be in the same position prior to the July trial date, requesting a continuance of trial until it can convene a grand jury. Furthermore, there is strong likelihood that jury trial dates in July will get continued upon a successive standing order. Although we all hope for a speedy return to normal, solving the puzzle of safely convening juries presents innumerable challenges that, realistically, may not be resolved by early July. Continuing to detain the Defendant under these circumstances and conditions is unwarranted.

II. <u>Alternatively, the Defendant should be temporarily released under 18 U.S.C. § 3142(i) because his release is necessary in order for him to prepare his defense and because the COVID-19 pandemic presents a compelling reason for release.</u>

The Bail Reform Act provides for the "temporary release" of a person in custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

Beyond impacting Christopher's liberty and health, his continued incarceration makes preparation of his case exceptionally difficult. Discovery in this case is voluminous. There are several thousand pages of written discovery, hours of jail call recordings, and terabytes of data seized from Chris's computers. Counsel believes that the seized computers and assorted data storage devices contain information relevant to the defense. Wading through the data equivalent of more than two dozen personal computers to find relevant files would be extraordinarily time consuming if not impossible for Counsel.

Having the defendant do so while incarcerated under COVID-19 related restrictions presents challenges in time, access, and technology. Even as discovery continues to be produced, Counsel has not had an in-person visit with the Defendant for months. The Defendant's release would allow for him to effectively assist in his own defense by carefully reviewing these materials and identifying relevant portions. As he has been incarcerated, Chris has been required to carefully consider his interest in speedy trial against his interest in fully developing the facts of his case. That dilemma is heightened by the fact that incarceration limits his role

18

in providing assistance to counsel. The impacts and risks of COVID-19 and the need to properly prepare for trial presents a compelling reason for such release.

## Conclusion

Continuing to detain Christopher under these circumstances is unwarranted. To strip an innocent person of his liberty, the Government bears the burden of proving that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Such conditions can be crafted in this case. Christopher requests that the Court release him on conditions, including a requirement that he remain in New Hampshire, be subject to electronic monitoring, possess no firearms, consume no drugs or alcohol, and have no contact with the alleged victim, and requests a hearing to address his release under 18 U.S.C. § 3145(b) and 18 U.S.C. § 3142(i).

    Respectfully submitted,
    Christopher Cantwell
    By His Attorney,

Date: May 22, 2020

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar No. 18372
Assistant Federal Defender
Eric_Wolpin@fd.org

*s/ Jeff Levin*
Jeff Levin
N.H. Bar No. 12901
Assistant Federal Defender
Jeff_Levin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on May 22, 2020 to all counsel of record and in the manner specified herein: electronically served through ECF.

>   */s/ Eric Wolpin*
>   Eric Wolpin
>   N.H. Bar No. 18372
>   Assistant Federal Defender
>   Federal Defender Office
>   22 Bridge Street
>   Concord, NH 03301
>   Tel. (603) 226-7360
>   E-mail: eric_wolpin@fd.org