# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:20-cr-00006-PB |
| ) | |
| CHRISTOPHER CANTWELL ) | |
| ) | |

## UNITED STATES' OBJECTION TO DEFENDANT'S
## MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER

Defendant Christopher Cantwell was arrested on January 23, 2020, after being charged by indictment with two crimes of violence for threatening to rape a woman in front of her children. After holding a detention hearing that spanned two days, the Magistrate Judge issued an order finding that "the defendant's release, even on strict conditions, presents too serious a risk of danger" and held that there is no condition or combination of conditions of release that will reasonably assure the safety of the community. *Order of Detention Pending Trial*, ECF No. 20 at 8.

Cantwell now asks the Court to review the Magistrate Judge's detention order under 18 U.S.C. § 3145(b), which authorizes a defendant to move to revoke or amend a detention order with the court having original jurisdiction over the offense. Cantwell raises three arguments in support of his motion. First, he argues that the weight of the evidence does not support continued detention. *Motion to Revoke Detention Order*, ECF No. 28, at 4. Second, he contends that his history of bond violations does not warrant continued detention, particularly when coupled with the fact that Cantwell has not attempted to threaten or intimidate the victim while in custody. *Id.* at 10-11. Finally, he asserts that the possibility of becoming infected with COVID-19 while detained at Strafford County House of Corrections ("SCHOC") warrants his release. This Court should reject Cantwell's arguments and find, like the Magistrate Judge, that the

statutory factors weigh in favor of detention, including "the demonstrated seriousness of the danger to persons in the community that would be posed by the defendant's release, particularly given his prior criminal history, history of threats of violence, demonstrated facility with computer technology, encryption, and cyber-anonymity, and prior bail conditions." *Order of Detention Pending Trial*, ECF No. 20 at 8.

In the alternative, Cantwell argues that his release is necessary for the preparation of his defense under 18 U.S.C. § 3142(i) because "COVID-19 related restrictions" make it difficult for him to review discovery. But Cantwell fails to meet the threshold requirement of identifying an "appropriate person" in whose custody he would be placed. Moreover, inmates at SCHOC are able to review discovery and meet and communicate with their lawyers' one on one. The fact that this case includes significant electronic evidence has no bearing on the question of whether Cantwell poses a danger to the community.

There is no condition or combination of conditions that can reasonably assure the safety of the community. Simply put, Cantwell is not a candidate for release.

### I. Cantwell is a danger to the community and there is no combination of conditions of release that will reasonably assure the safety of the community.

Cantwell seeks release subject to conditions, including requirements that he remain in New Hampshire, be subject to electronic monitoring, and have no contact with the victim. The defendant contends those conditions, as well as the ongoing COVID-19 pandemic, will effectively constrain Cantwell and prevent him from posing a danger to the community. Cantwell is wrong.

#### A. Standard of review.

A district court reviewing a magistrate judge's order detaining a defendant pretrial must "engage in de novo review of the contested order." *United States v. Tortora*, 922 F.2d 880, 884

n. 4 (1st Cir. 1990); *see also United States v. Perozzi*, No. 09-cr-117-16-SM, 2009 WL 2929292, at *2 (D.N.H. Sept. 9, 2009) (conducting de novo review of magistrate judge's detention order).

The Bail Reform Act authorizes courts to detain a criminal defendant upon finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In making its bail determination, courts are required to consider information regarding: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Government bears the burden of demonstrating dangerousness by clear and convincing evidence, and must support a finding of risk of flight by a preponderance of the evidence. *United States v. Johnson*, 12-mj-01-01-LM, 2012 WL 40463, at *2 (D.N.H. Jan. 6, 2012).

### B. Nature and circumstances of the offense.

The United States proffers the following facts:

Although this matter involves Cantwell's June 2019 threats against a member of the Bowl Patrol and his family, Cantwell and the Bowl Patrol were not always antagonistic. Rather, Cantwell and the group were initially allies. Cantwell was, in fact, the guest on the first episode of the *Bowlcast* podcast. Similarly, the victim and other members of the Bowl Patrol would routinely contribute to Cantwell's show, *Radical Agenda*.

That relationship, however, deteriorated in late 2018, and Cantwell began to believe that the members of Bowl Patrol were "Jews trying to make Nazis look bad." *E-mail to Keene Police Dep't*, June 21, 2019. Cantwell's live show was interrupted by prank calls, some of which were attributable to Bowl Patrol members. Cantwell was concerned that he was going to "go out of

3

business," (*E-mail to Keene Police Dep't*, Sept. 12, 2019) and began attempting to identify the leader of Bowl Patrol, who used the pseudonym "Vic Mackey." Cantwell obtained "identifying information on some" Bowl Patrol members, which Cantwell "kept as leverage." *E-mail to Keene Police Dep't*, June 21, 2019.

Then, on June 15-16, 2019, during a series of interstate communications sent by messaging service, Cantwell communicated with the victim. A portion of that conversation is below:[1]

| | |
|---|---|
| Cantwell: | Get a f*cking life or I will ruin the one you have.<br>Don't bother anyone, then you won't have to worry about crossing me. |
| Victim: | I haven't given you any thought and it was an honest mistake. Didn't even know you were in there or I'd have thought better of it. Other than that, all I can do is just leave you the f*ck alone and tell other people to do the same – which I have done.<br>Seriously man I couldn't care less about what you are trying to do these days. |
| Cantwell: | You're a f*cking liar. You came here with your loser f*cking pals because you have the attention span of a n*gger and the morals of a k*ke, and because of that fact, you are going to lose everything you have<br>Next time I post that photo, the faces won't be blurred, and then you're going to start getting unexpected visitors<br>And I don't care if it's you causing the trouble, you're the one who's gonna suffer cause you're the one who I can get<br>If you wanna dox Vic, he's a better target, but if you give me fake info, then your wife is gonna have trouble sleeping at night until she leaves you and takes your kids away |
| Victim: | What picture are you even talking snout<br>About |
| Cantwell: | F*ck around and I'll remind you the hard way |
| Victim: | So I am assuming peach took the picture. Guess that means you don't care what happens to her either |
| Cantwell: | As a matter of fact, I don't. So if you don't want me to come and f*ck your wife in front of your kids, then you should make yourself scarce<br>Give me Vic, it's your only out |

---
[1] "*" alteration added

4

| | |
|---|---|
| | I guess I'm going to have to prove my seriousness |
| Victim: | Show me the picture you have |
| Cantwell: | No<br>[PHOTO OF THE VICTIM's WIFE & CHILDREN]<br>More where that came from.<br>I bet one of my incel[2] listeners would love to give her another baby.<br>You think the FBI would take issue with an LSD user owning guns around kids?<br>[PHOTO OF THE VICTIM WITH STRIPS ON TONGUE]<br>Give me Vic |
| Victim: | I don't own guns or do drugs |
| Cantwell: | Lol<br>OK I guess you're not going to give me what I want<br>Fine. Good luck |
| Victim: | I don't even have his dox |

Cantwell also told the victim that he was going to call the victim's local office for child protective services ("CPS"). Cantwell followed through with this threat. In his call to the victim's local child abuse and neglect hotline on June 17, 2019, Cantwell stated "basically, I'm looking to make this guy uncomfortable is the truth of the matter. I think he's bad for my cause and so I said 'what can I do about this.' And so I called you."

Days after the exchange, Cantwell told local law enforcement: "I threatened to release one of their identities, and he called my bluff, so I published what I had and invited CPS…to check on his children." *E-mail to Keene Police Dep't*, June 21, 2019. Two months later, Cantwell again described the interaction with local law enforcement: "I threatened to expose his identity if he continued harassing and defaming me" and "I did expose him, after offering him

---

[2] "Incel" or "involuntary celibates," are members of a community where men blame "women for their involuntary celibacy, and sometimes advocated rape or other forms of violence." *Wikipedia*, Incel, *available at* https://en.wikipedia.org/wiki/Incel (last visited January 17, 2020); *see also* "Incels: America's Newest Domestic Terrorism Threat," Lawfare, *available at* https://www.lawfareblog.com/incels-americas-newest-domestic-terrorism-threat (last visited June 4, 2020).

the out of identifying Vic....I also called the CPS office in his area..." *E-mail to Keene Police Dep't*, August 28, 2019. Between June and September of 2019, Cantwell e-mailed law enforcement over 50 times. Not once in these communications did Cantwell provide law enforcement with the whole story—Cantwell never mentioned his threat to rape a woman in front of her children or to have his "incel" listeners rape her. When confronted with the messages in an interview with the FBI on October 24, 2019, Cantwell reviewed the exchange and confirmed that he sent the messages. Cantwell added, "I'm a little nervous that I'm being asked about this," because someone told him that it was "extortion."

### C. The weight of the evidence against Cantwell is compelling.

Cantwell does not deny telling the victim that he would "f*ck [the victim's] wife in front of [the victim's] kids" unless the victim provided Cantwell with Vic Mackey's true identity. Rather, Cantwell argues that United States cannot meet its burden to show that this was a "true threat." Despite Cantwell's claims to the contrary, there is compelling evidence that Cantwell knew that the statement would be viewed as a threat.

"A true threat is one that a reasonable recipient familiar with the context of the communication would find threatening." *United States v. Nishnianidze*, 342 F.3d 6, 15 (1st Cir. 2003) (statements that if the victim failed to pay it would be "worse for me and ah, also for your family," that "[t]hey can take the child from yard," that "they" could act at any time, and "[i]f you are afraid for [your son] and his life in this case you must do right for your son, you must pay" constituted true threats); *see also United States v. Stefanik,* 674 F.3d 71, 75-76 (1st Cir. 2012) (statement that "I'll come down there with my shotgun and show you who means business" followed by "[y]ou're lucky I'm only talking on the phone and not driving down there with my shotgun" constituted a true threat); *United States v. Fulmer*, 108 F.3d 1486, 1490-93

6

(1st Cir. 1997) (statement that "the silver bullets are coming" constituted a true threat); *United States v. Whiffen*, 121 F.3d 18, 20, 22-23 (1st Cir. 1997) (statements that "buildings go boom boom" and "Allstate had better stop messing with me or else I'm going to blow up their building" constituted true threats). A true threat must be a real threat, as opposed to a joke, expression of anger, or political argument. *See United States v. Viefhaus*, 168 F.3d 392, 395 (10th Cir. 1999); *United States v. Spruill*, 118 F.3d 221, 228 (4th Cir. 1997). The government need not prove that the defendant intended to or had the ability to carry out the threat. *United States v. Stefanik,* 674 F.3d 71, 75-76 (1st Cir. 2012) ("Even assuming, . . . that he did not intend to carry out the threat, and only made it in a misguided attempt to get information . . . , the statute only requires that the speaker knowingly communicates the threat . . . . It is not required that [the defendant] intended to, or was even able to, carry out the threat.").

Here, Cantwell made the threat in a private chat—it was not made for any sort of entertainment value and had no other purpose than its effect on the victim. The threat was planned—Cantwell obtained the victim's identifying information, kept it as "leverage," and used it when he saw an opportunity to try to get something else he wanted. Indeed, the threat was part of an earnest effort to try to obtain Vic Mackey's identity. The threat was repeated—Cantwell followed it up with a threat to have one of his incel listeners rape the victim's wife. Finally, the threat was accompanied by a different kind of threat—to call child protective services—which Cantwell acted upon.

The United States anticipates that the victim will testify that he took Cantwell's threat seriously. He immediately sought advice from someone he trusted. He obtained a game camera for his home. He informed other members of Bowl Patrol of the threat and told them to stop calling Cantwell's show. He deleted social media accounts. *See, e.g.*, *United States v. Wheeler*,

7

776 F.3d 736, 745-46 (10th Cir. 2015) (noting that, while not dispositive, the court considered that threat recipients armed themselves and their spouses and warned their children's teachers and pastors). And although Cantwell argues that the victim "purposely provoked" Cantwell, provocation is not a defense to the charged offenses. *United States v. Sovie*, 133 F.3d 122, 126 (2d Cir. 1997).

Cantwell argues that the analysis of the weight of the evidence has changed in light of discovery. But Congress cannot have "intended the possibility of detention status modification to be twisted into an open invitation for parties to bring motions for detention review at any and every stage of trial in which new information arises regarding the weight and credibility of evidence in the case." *United States v. Rodriguez-Adorno*, 606 F. Supp. 2d 232, 238 (D.P.R. 2009) (citing *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985) for proposition that need for judicial efficiency necessarily makes bail hearings "typically informal affairs, not substitutes for trial"). More important, as the Magistrate Judge found, the evidence against Cantwell, "which includes a copy of the threatening communication and defendant's admission that he sent the message, is strong." *Order of Detention Pending Trial*, ECF No. 20 at 3.

### D. Cantwell's criminal history and history of bond violations show that he will not abide by release conditions.

Cantwell's criminal history includes "a conviction for two counts of assault and battery involving the use of pepper spray." *Order of Detention Pending Trial*, ECF No. 20 at 4. The convictions stem from his conduct during the torch-lit "Unite the Right" rally at the University of Virginia on August 17, 2017. Some of his conduct during that rally was captured in the below photograph:



Government's Detention Exhibit No. 7.

Cantwell "also has a record of non-compliance with bail conditions." *Order of Detention Pending Trial*, ECF No. 20 at 4. The Magistrate Judge rejected Cantwell's argument, repeated again in his pending motion, that he has a history of complying with bail conditions. *Id.* at 4, n. 1. Following his release on bail conditions in Virginia in December 2017, the court ordered that Cantwell be on location monitoring, have no contact with the victims, and not use alcohol or illegal drugs. *Id.* at 4, n. 1; *Recognizance Bond*, Government's Detention Exhibit No. 7. Despite these conditions, the Magistrate Judge found that Cantwell "continued to engage in online communication intended to harass and potentially intimidate victims." *Order of Detention Pending Trial*, ECF No. 20 at 4, n.1 (quoting *Commonwealth's Motion to Revoke or Modify Bond*, ECF No. 14-3, ¶ 11). Additionally, on March 31, 2018, Cantwell was arrested and charged with public swearing and intoxication. *Order of Detention Pending Trial*, ECF No. 20 at 4; *see also id.*, at 4, n.1. Cantwell possessed pepper spray at the time of his March 2018 arrest. *Order of Detention Pending Trial*, ECF No. 20 at 4. As the Magistrate Judge found, "[t]his history does not reflect a willingness to comply with court orders." *Id.* at 4-5.

Cantwell pleaded guilty to violating his bond conditions, and Cantwell argues that he "acknowledged wrongdoing." *Motion to Revoke Detention Order*, ECF No. 28, at 10. Cantwell certainly pleaded guilty, but Cantwell continues to deny responsibility. In Cantwell's view, the

prosecutor in that case filed a "frivolous motion to revoke my bond," and "[f]aced with the prospect of being judged for my politics by a communist jury, with a prosecutor proven willing to suborn perjury, I pleaded guilty to two misdemeanors at the last minute." *E-mail to Keene Police Dep't*, July 17, 2019. Cantwell's continued denials of responsibility in the face of these convictions indicates contempt for court orders and the judicial process.

Cantwell argues that the fact that he has not engaged in witness intimidation while detained weighs in favor of release. But good behavior while in custody is an insufficient reason to release a defendant. *See e.g., United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989) (affirming district court's decision not to reopen detention hearing based on defendant's exemplary behavior while incarcerated and proffered testimony of defendant's family and friends because length of incarceration not material to risk of flight or dangerousness and proffered testimony was previously available).

Moreover, he is planning to disclose discovery material, in violation of this Court's Protective Order, an order designed to protect witnesses and victims. (ECF No. 11, at ¶ 4 ("The defense team and defendant shall not further disseminate documents or recordings provided in discovery or disclose to others the contents of the documents or recordings without further order of the Court.").) On May 24, 2020, Cantwell spoke to another podcast host by telephone. That individual recorded the conversation and included it in a podcast released the following day. During that conversation Cantwell stated: "when this is over, I'm going to release the documents that I have in my f*cking cell, and you, and people are going to f*cking, people are going to lose their f*cking heads over this." *So To Speak*, Episode 43, at 22:43-22:54, *available at* https://christophercantwell.com/2020/05/25/s-o-t-o-s-p-e-a-k-ep-438-unite-the-right-was-a-honey-pot/ (last visited June 1, 2020); *see also*, *id.* at 25:10 ("I'm going to release the f*cking

10

documents when this is all over.").³ These documents include, presumably, the victim's grand jury testimony and reports of interviews with the victim, which the government has already provided in discovery. Cantwell's recent statements suggest that he has no respect for this Court's Orders.

### E. Cantwell's history of violent rhetoric demonstrates his danger to the community.

Cantwell's statements also demonstrate his danger to the community and propensity for violence. For example, in a Vice News documentary on the weekend events in Charlottesville, defendant made statements that "of course" he is capable of violence: "I'm carrying a pistol, I go to the gym all the time, I'm trying to make myself more capable of violence." *See* Vice News, Charlottesville: Race and Terror. Exhibit 6, Government's Detention Hearing Exhibits. In another exchange, when asked whether he was a non-violent protestor, the defendant stated, "I'm not even saying we're non-violent . . . I'm saying that we didn't aggress. We didn't initiate force against anybody. We're not non-violent. We'll f*cking kill these people if we have to." *Id.* ("*" alteration added).

Indeed, Cantwell has a reputation as an individual who is willing to engage in violence. During the Unite the Right rally on August 12, 2017, Cantwell was asked to "guard" the outside of the line. Cantwell was selected for this because of his "willingness to 'get physical'" with counter-protesters. ECF No. 17, at 3 (citing Independent Review of the 2017 Protest Events in Charlottesville, Virginia, *available at* https://www.policefoundation.org/wp-

---

³ Cantwell acknowledges that there is a "discovery agreement" and "that I can't disclose things right now." *So To Speak*, Episode 43, at 22:52-23:00. Cantwell states that when this case is over, that "f*cking agreement expires and I'm going to release all the 302s of all the f*cking interviews and all the people who gave up all these other f*cking people, everybody, everybody who has the f*cking FBI show up at their door goes f*cking crazy and starts giving people up. That is what is happening in the alt-right." *So To Speak*, Episode 43, at 23:01-23:20. The Court's Protective Order (ECF No. 11) does not expire at the conclusion of this case.

content/uploads/2017/12/Charlottesville-Critical-Incident-Review-2017.pdf (last visited May 27, 2020).

Cantwell has no qualms with using violent rhetoric publicly. Cantwell has posted what appears to be a thinly-veiled attempt to have his listeners engage in violence:



Exhibit 12A, Government's Detention Hearing Exhibits. And in Fall of 2019 he exploited fears of mass-shootings when the Joker movie debuted[4] by posting the following:



Exhibit 15, Government's Detention Hearing Exhibits. When someone reported the post to law enforcement, officers found that Cantwell did, in fact, have a gun in the movie theatre. Although he left the theatre voluntarily, Cantwell's rhetoric and actions created a volatile situation. He later explained that the post "was intentionally provocative, playing to fears drummed up in the media about this film." *E-mail to Keene Police Dep't*, Oct. 11, 2019.

---

[4] *See, e.g.,* CBS New York, 'Joker' Movie Sparking Fears Among Victims of Mass Shootings, Claims Film Will Inspire Copycat Attacks, Sept. 25, 2019, *available at* https://newyork.cbslocal.com/2019/09/25/joker-movie-fears-mass-shooting/ (last visited May 27, 2020).

### F. Cantwell's history of drug use and possession of firearms weighs in favor of detention.

Cantwell's long history of alcohol and substance abuse weighs in favor of detention. He last used alcohol and marijuana on the day of his arrest and tested positive for marijuana on the date of his initial appearance. *Order of Detention Pending Trial*, ECF No. 20 at 5. Lab testing confirmed that Cantwell had THC, a Schedule I controlled substance, in the apartment. In addition, lab testing has confirmed that vials of liquid seized from Cantwell's home contained Schedule III steroids, one of which is available only on the black market.[5] Cantwell did not disclose steroid use to probation but did confirm that he was not prescribed any medications at the time of his arrest. Cantwell's criminal history includes multiple offenses related to intoxication, including convictions in 2000 and 2009 for driving while intoxicated, as well as a 2018 conviction for public swearing and intoxication. This history of substance abuse and his failure to disclose his illegal use of steroids weighs in favor of detention.

Similarly, the Magistrate Judge properly concluded that Cantwell's history with firearms and other dangerous weapons also weighs in favor of detention. *Order of Detention Pending Trial*, ECF No. 20 at 7. Cantwell has a prior conviction for criminal possession of a weapon. Cantwell took multiple firearms and knives with him to the "Unite the Right" rally in

---

[5] Lab testing confirmed some of the vials of liquid to be 23.9 grams of trenbolone enanthate, a "synthetic and injected anabolic-androgenic steroid" which was never approved for medical use and has been "sold on the black market as a designer steroid." Wikipedia, Trenbolone enanthate, *available at* https://en.wikipedia.org/wiki/Trenbolone_enanthate (last visited June 3, 2020); *see also Steroid.com*, Trenbolone Enanthate (Trenbolone Base + Enanthate Ester), *available at* https://www.steroid.com/Trenbolone-Enanthate.php (last visited June 3, 2020) ("Trenbolone Enanthate is strictly an underground black market anabolic steroid."). Trenbolone is a Schedule III controlled substance. Controlled Substances, Alphabetical Order, at 17, *available at* https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf (last visited June 3, 2020). Lab testing confirmed that the other vials of liquid contained 50.3 grams of Testosterone Deconate, Testosterone Phenylpropionate, Testosterone Isocaproate, and Testosterone Propionate. Testosterone is a Schedule III controlled substance. Controlled Substances, Alphabetical Order, at 16, *available at* https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf (last visited June 3, 2020).

Charlottesville, Virginia, and possessed firearms when he was asked to self-surrender following the issuance of the warrant for his conduct during the torch-lit rally. In addition, Cantwell stored a pistol in an unlocked case affixed to the rear underside of his vehicle, which was parked across the street from a school. Cantwell argues that the fact that he will no longer own firearms weighs in favor of release. But it is not the act of possession that demonstrates Cantwell's danger to the community, it is the manner in which he possessed them, i.e., by leaving a pistol in an unlocked case on the outside of his car across from a school, or taking a pistol to a theatre while simultaneously "playing to fears" about mass shootings at a particular film, that demonstrates his danger to the community. While Cantwell may have legally possessed them, the manner in which he possessed them is relevant to the Court's "assessment of dangerousness and weigh[s] in favor of detention." *Order of Detention Pending Trial*, ECF No. 20 at 8.

### G. COVID-19 poses no special risk to Cantwell while he is detained.

Cantwell's arguments concerning COVID-19 also do not warrant his release. Cantwell does not have a medical condition that places him at high risk of severe illness should he contract COVID-19. Rather, Cantwell claims that the *possibility* of becoming infected at the Strafford County House of Corrections ("SCHOC") gives him a "compelling personal interest in abiding by bail." *Motion to Revoke Detention Order*, ECF No. 28, at 17. But Cantwell has already demonstrated that he disregards bail conditions. Even accepting Cantwell's representation, the risk of infection does not outweigh Cantwell's danger to the community.

To date, there are no cases of COVID-19 within the general population at SCHOC. Moreover, SCHOC has implemented substantial precautionary measures to mitigate this risk, including:

- **Limited In-Person Visitation:** SCHOC has suspended all in-person visits, other than by attorneys and clergy, and has suspended in-person programming, and volunteer

activities. *See,* Order at 16, *Gomes v. U.S. Dep't of Homeland Security*, 20-cv-453-LM (D.N.H. May 14, 2020) (hereinafter referred to as *Gomes* Order). For staff, legal, and clergy visitors, SCHOC performs a COVID-19 screening. The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature, as suggested by the CDC. Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility. SCHOC has implemented methods to ensure that inmates are able to meet and communicate with their lawyers' one on one.

- **Inmate Screening and Awareness:** All new detainees and inmates are subject to similar COVID-19 screening. Thereafter, all inmates are placed into a fourteen day quarantine before being entered into the general population. *See*, *Gomes* Order, at 123. SCHOC has implemented many additional measures to prevent infection and contamination, including providing information to inmates about symptoms and precautionary measures. All inmates have daily access to medical call and facility staff frequently remind detainees to put in requests to see medical if they are feeling poorly.

- **Quarantine:** The jails have the ability to place inmates in quarantine both when first entered into the facility and to isolate them if any symptoms of COVID-19 develop. If anyone at the facility has come into contact with known COVID-19 cases, the facility staff employs the appropriate tools at its disposal, including isolation or quarantine, testing and contact tracing.[6] In addition, the jail has already implemented procedures to maximize social distancing and limit large group gatherings, including staggering activities that would previously have exposed large groups to each other.

- **Extra Cleaning:** Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment.

In addition, SCHOC has 24-hour medical staff on duty who are equipped to treat inmates at the facility or transfer them to a hospital if necessary.

---

[6] One immigration detainee at SCHOC tested positive upon transfer to the facility. SCHOC medical staff identified this detainee in booking, and promptly isolated him in a medical area negative pressure cell since his test. The only detainee with whom he has come into contact since the test is his isolation cellmate, a second immigration detainee who tested positive shortly after his arrival at SCHOC. The latter detainee tested positive after placement in a quarantine cell. SCHOC followed up with contact tracing and arranged for COVID-19 testing. Neither of these detainees was ever placed in the general population.

Only one staff member has tested positive. The staff member repeated the testing in two subsequent tests, and tested negative both times. That individual was placed on leave until she received the second negative test, and did not have regular contact with inmates at any time.

Cantwell notes that the *Gomes* Court did find some deficiencies in SCHOC's response to the COVID-19 pandemic. *Motion to Revoke Detention Order*, ECF No. 28, at 13-15. Cantwell ignores, however, that the Court acknowledged that SCHOC has taken many steps to prevent the spread of the virus and that the superintendent "has approached this public health emergency with great concern." *See*, *Gomes* Order at 1, 24. The *Gomes* Court appeared most concerned with the fact that SCHOC had not evaluated or identified which inmates were at high risk for serious illness if they contract COVID-19. *See*, *Gomes* Order, at 24. Cantwell, however, has not represented that he suffers from any health condition that would place him at greater risk if he were to contract COVID-19.

If the Court were to release Cantwell on this basis, it would invite every defendant to make the generic argument, now being made by Cantwell, that he should be released because the possibility of an outbreak within SCHOC gives that defendant a reason to abide by the Court's conditions of release—notwithstanding the fact that the Magistrate Judge detained the defendant to protect the community *from* him. The prospect of a COVID-19 outbreak at SCHOC does not diminish the public interest in keeping Cantwell off the streets based on a judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions. Cantwell's history of repeated bail violations casts doubt on his willingness to abide by conditions of release, and the mitigating measures taken by SCHOC are sufficient to protect Cantwell.

The evidence is clear and convincing that Cantwell poses a danger to the community. Cantwell has a history of threatening violence, engaging in violent behavior, and flouting bond conditions. His criminal history and his willingness to violate bond conditions suggest that he is unlikely to comply with any conditions of release that the Court could devise. The weight of the evidence includes Cantwell's own admissions. Cantwell's proposed conditions—that he remain

in New Hampshire, be subject to electronic monitoring, and have no contact with the victim—do not mitigate the serious danger Cantwell poses. Cantwell should remain detained pending trial.

  **II.** **Release to assist in preparing a defense is unnecessary**.

  Cantwell argues, in the alternative, that he should be temporarily released under 18 U.S.C. § 3142(i). Where a detention order has previously been issued under the Bail Reform Act, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). "The relief authorized by § 3142(i) is to be used 'sparingly'." *United States v. McKnight*, No. cr18-16, 2020 WL 1872412, at *2 (W.D. Wash. Apr. 15, 2020). Moreover, the "defendant bears the burden of proof under this provision." *United States v. Sondergard*, No. cr 19-4048, 2020 WL 195519, at *1 (D.N.M. Apr. 23, 2020). Cantwell's release under this provision is not appropriate for several reasons.

  As an initial matter, based on the bail conditions proposed by the defendant, he would not be "in the custody of the United States marshal" and he has not identified any other "appropriate person" in whose custody he would be placed. *See, e.g., United States v. Landji*, No. 18-cr-601, 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) (denying temporary release under section 3142(i) in part because defendant had not identified an "appropriate person" with whom he was going to stay); *United States v. Steward*, No. No. 1:20cr0052, 2020 WL 1468005, at *1 (S.D.N.Y. Mar. 26, 2020) (same); *but see United States v. Caraballo*, 185 F. Supp. 2d 143, 146-147 (D.P.R. 2002) (releasing defendant, who otherwise would have been detained, to the custody of his mother and grandmother on a 24-hour house arrest due to severe injuries).

17

While section 3142(i) authorizes "temporary" release, Cantwell is actually seeking general release. *United States v. Moran*, No. SAG-19-0585, 2020 WL 1663366, at *2 (D. Md. Apr. 3, 2020) (noting that temporary release "is reserved for very limited purposes such as funeral attendance or other law enforcement (USMS) supervised activity" not general release.). *See also, Caraballo*, 185 F. Supp. 2d at 146-47 (releasing defendant for 24-hour period); *Stephens*, 2020 WL 1295155, at *3 (concluding that temporary release was justified in part to enable the defendant to prepare for an evidentiary hearing only six days away); *United States v. Chambers*, No. 20cr135, 2020 WL 153o746, at *1 (S.D.N.Y. Mar. 31, 2020) (rejecting defendant's request for temporary release when non-evidentiary pretrial conference was still a month away). Section 3142(i) is not the appropriate avenue for general release.

Though counsel may not have had an in-person meeting with Cantwell in months, they are not prohibited from such visits. In addition, inmates are able to communicate with counsel by telephone, and Cantwell has not alleged that unmonitored calls with counsel have been curtailed in any way. *United States v. McDonald*, No. 2:19-cr-00312, 2020 WL 1659937, at *6 (D. Nev. Apr. 3, 2020) (finding that defendant's temporary release is not necessary for the preparation of his defense and noting that there was no evidence that defendant was being deprived of unmonitored telephone calls with counsel). *But see United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2-3 (S.D.N.Y. Mar. 19, 2020) (finding that the obstacles the pandemic poses to preparing a defense for a final supervised release hearing warranted defendant's release where the hearing was six days away, the Court identified an appropriate third-party custodian, and legal visits in the facility where the defendant was housed had been suspended).

If counsel have been limiting visitations in order to mitigate possible exposure to COVID-19, the potential for exposure and transmission will not change if Cantwell is released. Rather, it is "equally unwise" for counsel for visit the defendant outside of jail as it is in jail. *United States v. Cox*, No. 2:19-cr-00271, 2020 WL 1491180, at *5-6 (D. Nev. Mar. 27, 2020) (finding that the defendant's temporary release was not necessary to prepare his defense and noting that it was equally unwise for defendant's attorney's to visit the defendant outside of jail as in jail as the parties could still unknowingly transmit the virus to each other). The United States recognizes that COVID-19 restrictions have limited the opportunities and means of communication between Cantwell and counsel. Those limitations are true of all inmates and, to a large extent, exist regardless of whether Cantwell is in custody or not. Irrespective of his detention, Cantwell's in-person access to counsel will likely be limited while the pandemic continues. The procedures at SCHOC, however, do allow for such visits.

Counsel argue that Cantwell's release will allow him to review discovery, including written discovery, jail recordings, and forensic images of his electronic devices, and identify relevant portions. Nothing precludes Cantwell from reviewing paper discovery while detained and the precautions taken by SCHOC do not hinder counsel from providing him with paper discovery. That Cantwell likely must review the forensic images with counsel places him in no different position than any other detained pre-trial defendant. The fact that this case, like others, includes significant electronic evidence, neither mitigates the danger Cantwell poses to the community nor supports temporarily releasing him.

"Temporary release" under 18 U.S.C. § 3142(i) "requires the defendant to show their release is *necessary* for preparing a defense, not just easier." *United States v. Williams*, 4:19-cr-000370, 2020 WL 2115431, at *4 (May 1, 2020) (emphasis in original). While Cantwell may

19

have an easier time preparing a defense if released, he has failed to meet his burden to establish that temporary release is appropriate here.

### III. Conclusion

For all of these reasons, the United States respectfully requests that the Court order that the defendant remain detained pending trial.

June 5, 2020	Respectfully submitted,

Scott W. Murray
United States Attorney

By:	/s/ Anna Krasinski
Anna Krasinski
John S. Davis
Assistant U.S. Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552