IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA       ]
                               ]
v.                             ]          No. 20-CR-00006-PB
                               ]
CHRISTOPHER CANTWELL           ]
                               ]


MOTION IN LIMINE # 1:
TO ADMIT EVIDENCE OF THE BOWL PATROL AND BOWLCAST AND THE
ALLEGED VICTIM'S INVOLVEMENT THEREIN

Christopher Cantwell respectfully moves to admit evidence of the alleged

victim's membership and participation in the Bowl Patrol, an online white

supremacist group, including the images and recordings the alleged victim and his

associates presented online, as such information is relevant and admissible pursuant

to the Federal Rules of Evidence and the Cantwell's constitutional right to a fair trial,

effective assistance of counsel, due process, and confrontation.

The following is stated in support.


INTRODUCTION

Christopher Cantwell is charged with making threats against "Cheddarmane"

over an internet messaging program in June 2019. A jury will determine whether

those statements were "true threats." In doing so, jurors will consider, among other

things, the nature of the relationship between the two men, the context in which the

statement was made, and whether the alleged threats were careless talk made in a

joking manner.[1] Cheddarmane will testify at trial about the online exchange and relevant contextual facts bearing on the charged offenses. In order to marshal a defense and effectively cross-examine the witness, including challenging Cheddarmane's credibility and demonstrating his motive and bias to lie, the Defense must be permitted to present evidence of Cheddarmane's online activities and those of the Bowl Patrol.

## FACTUAL BACKGROUND

*Bowl Patrol and Cheddarmane*

Cheddarmane described himself as "one of the more prominent members" of an online group called the Bowl Patrol. *Discovery*, 17R239_GJ-000001.09. Bowl Patrol is a neo-Nazi group named after the bowl-haircut worn by Dylann Roof. The



group's avatar is a shield wearing Roof's bowl haircut. Roof killed nine African-American churchgoers in 2015 and was later sentenced to death. The Bowl Patrol characterizes mass-murders acting against Jews, racial minorities, and/or homosexuals as "saints" worthy of honor and reverence.

---

[1] *See, e.g.*, Eight Circuit Model Jury Instructions, 6.18.875B, p. 276, *available at* http://www.juryinstructions.ca8. uscourts.gov/Criminal-Jury-Instructions-2017.pdf "In determining whether the defendant's [communication] [message] was sent with the intent to extort, you may consider all the circumstances surrounding the making of the [communication][message]. For example, you may consider the language, specificity, and frequency of the threat[s]; the context in which the threat was made; the relationship between the defendant and the threat recipient; the recipient's response; any previous threats made by the defendant; and, whether you believe the person making the statement was serious, as distinguished from mere idle or careless talk, exaggeration, or something said in a joking manner."

The leader of the Bowl Patrol is "Vic Mackey." Vic Mackey is a pseudonym derived from a television character. Mackey, Cheddarmane, and a handful of other pseudonymous men were the Bowl Patrol's core participants. The group created a web channel on the Telegram social media platform, produced an online podcast called "The Bowlcast," and shared a prodigious number of online "memes"[2] canonizing racially motivated murders. The group repeatedly expressed an interest in committing mass violence against minority groups and appreciation for those who killed in such a manner. Included are representative example of Bowlcast "memes." The meme to the right displays a "scoreboard" tallying the number of murder victims of prominent mass-killers and asks the reader whether he will "make it onto the leaderboard . . . in the fight for white survival?" The next page includes two common Dylann Roof memes, the first asserting that Roof did nothing wrong by murdering nine black churchgoers and the second revering Roof as a saint.



---

[2] An internet "meme" is an image, often containing words, intended to be spread quickly around the internet with a clear or humorous message.





The Bowl Patrol produced a podcast series called the Bowlcast. The episodes reiterated the themes noted above. The group's podcasts were available online. Cheddarmane was one of a handful of regular guests on the Bowlcast. The cover art for a podcast starring Cheddarmane, included below, shows Cheddarmane (through his avatar wearing a patch with the word "Mane") wearing a headband stating "Kill



[Originally Released July 4th, 2018]

Bowlcast EP 3: Happy Birthday to The Great Satan

Jews," next to Dylann Roof with a saint's halo, and a man with a "Rape" shirt. These programs discussed the benefits of racially motivated mass murder while the hosts wished for more hate crimes. *See Discovery,* 17R239_REP-001954 ("1488 [a reference to white supremacy and Adolph Hitler] I encourage school shooting on the air right now" and "If we had a Nicholas Cruz shooting up a Broward County Jew County school, that would be amazing.").

Violence-inciting language and imagery is replete throughout Bowl Patrol materials and Cheddarmane's online statements. The group's rhetoric reached a crescendo in a podcast addressing the most effective "terror tactics." In that episode, Cheddarmane, Mackey, and others discussed "terror tactics" that listeners could use to "ramp up tension in your local community and make it a less comfortable and safe place to the mamzers [a Yiddish term for an illegitimate child] and the white race traitors in your vicinity." Cheddarmane, together with his cohort, participated in discussions of mass-murder and expressed support for rape and murder in publicly available podcasts.

*Bowl Patrol and Cantwell*

In early 2018, Cantwell developed a short-lived online relationship with members of the Bowl Patrol. The relationship quickly soured, however, and Cantwell became a target for the group's enmity. By November 2018, Cheddarmane and Mackey were publicly discussing their efforts to impede Chris's live show by overwhelming him with offensive prank calls. As Cheddarmane explained, upon seeing that they were getting under Cantwell's skin, this "only fueled the fire and made us want to call him more." That Cantwell was bothered by their harassment, stalking, and trolling, as Cheddarmane explained, was "like throwing gasoline on the fire" and led the Bowl Patrol to "escalate[] from there." In an effort to stop this pattern of harassment, Cantwell reported calls and alleged computer crimes to federal law enforcement in February 2019. He posted publicly online that he had reported the

Bowl Patrol to law enforcement. Federal law enforcement did not promptly investigate and follow up on Cantwell's report of alleged cybercrimes in February 2019.

*The Online Communication that is the Subject of the Indictment*

In June 2019, Cheddarmane entered an online chat group hosted by Cantwell. Cantwell knew Cheddarmane's home address and had previously warned Cheddarmane that he would make it public if the harassment continued. Cantwell and Cheddarmane exited the public group and had a private back-and-forth communication. As is common among this online peer group, both men used coarse and aggressive language, including the language charged in the indictment: "So if you don't want me to come and fuck your wife in front of your kids, then you should make yourself scarce." The Government characterizes this as a "threat to injure."

Cheddarmane responded with insults. He wrote back to Cantwell: "You're such a fucking nobody Chris. Do your worst you crazy Junkie loser. Go boof some meth up your asshole you faggot ass kike;" "You think I'm scared . . . Lol. You have [zero] credibility anymore. You are so desperate and its hilariously pathetic;'" and "[Laugh Out Loud Out Loud] . . . Oh no I'm super scared . . . Hahahahaha." He concluded the conversation by sending a naked image of Cantwell that was commonly circulated by the Bowl Patrol to humiliate Cantwell.

*The FBI's interviews with Cantwell and Cheddarmane*

In September 2019, Cantwell met with the FBI. He explained the Bowl Patrol's pattern of harassment and efforts to deface and interfere with his website. He discussed his online communication with Cheddarmane. In October 2019, four months after the alleged threat, the FBI approached Cheddarmane. They found him at work, wearing a sweatshirt with the Bowlcast logo portraying Dylann Roof's haircut. The FBI made it clear at the outset of this interaction that they were seeking evidence to prosecute Cantwell for the June communication. *See* 17R239_GJ-00001.42 (When asked "What did [the FBI] explain to you when they came to talk to you?" Cheddarmane testified that "They said that there has been a credible threat against me and my family" by Cantwell.); 17R239_REP-000004.02 (FBI informing Cheddarmane and his boss that they were there in regards to a threat against Cheddarmane and his family).

Cheddarmane agreed to speak with the FBI. He prefaced his recorded remarks by noting that he was not going to talk, but would listen, as he felt it was the "safest thing" to do. At the outset of the recorded interview, the FBI agents explained to Cheddarmane that speaking with the FBI was his "opportunity to get ahead of this." Cheddarmane later told a friend from the Bowl Patrol on a recorded jail line that "The focal point of [the FBI] coming was holding [Bowl Patrol] over my head in case I didn't want to help them" prosecute Cantwell. 17R239_REP-001857. He again explained to his friend that the FBI "came at me like they were going to hold the BP stuff over my head." *Id.*

The FBI told Cheddarmane that they had listened to all of the Bowl Patrol's audio recordings. As noted above, the recordings included Cheddarmane and others repeatedly expressing support for hate-filled killers and encouraging mass-murder. The FBI told Cheddarmane during his interview that "it seems like you guys [in Bowl Patrol] take it further. **There's promotion of violence**" and noted that his "rhetoric is violence." The FBI explained to Cheddarmane that "if you happen to inspire somebody . . . [who] goes and does these things and you have inspired them to go commit an act of violence . . . there is accountability there."

In speaking with the FBI, Cheddarmane downplayed the seriousness of Bowl Patrol's messages and his adherence to its violent ideology. He asserted that the Bowl Patrol was "performance art" and that when he says "fuck the cops, rape the cops, kill . . . it's just bullshit" and not serious expressions of intent. He deflected from his online incitements to violence, asserting that the Bowl Patrol was a "think tank," claiming that he is "a lover, not a fighter," and asserting that "I truly see the goodness in people . . . and don't understand . . . how people can't just like be nice to each other." Cheddarmane repeatedly attempted to convince the FBI that Bowl Patrol was not a group of people who encouraged violence. As part of downplaying his potential criminal liability, Cheddarmane discussed a photograph of himself with strips on his tongue that was sent during the June exchange with Cantwell. He said that he wanted "to just put it out there" that he is "not a drug user at all." The FBI had not at that time suggested he was a drug user or asked him about the photograph.

8

Notably, throughout the Bowlcast episodes, Cheddarmane discussed his experiences with acid (LSD) and other hallucinogens.

LEGAL ARGUMENT

Evidence of the Bowl Patrol and Cheddarmane's involvement in it, including images and recordings produced by Cheddarmane and the Bowl Patrol are relevant and admissible pursuant to the Federal Rules of Evidence and Cantwell's rights to confrontation, due process, effective assistance of counsel, and a fair trial under the United States Constitution. *See Crane v. Kentucky,* 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"). This Evidence is relevant and admissible as it is evidence of motive and bias, is intrinsically intertwined with the relevant communication, and provides context necessary to understand the Defendant's intent, an element the Government must prove beyond a reasonable doubt for all charged offenses.

I.  **Cheddarmane feared criminal prosecution for inciting violence and being a drug user in possession of a firearm in light of his involvement with the Bowl Patrol. He believed that FBI was holding this liability "over his head" to get his assistance in their prosecution of Cantwell. Evidence of his Bowl Patrol involvement provides a motive to lie that may be proved by extrinsic evidence.**

Counsel may impeach a witness by several means. One longstanding method of impeachment is to demonstrate that the witness has a bias, motive, or interest to

lie in relation to the case. *See United States v. Abel*, 469 U.S. 45, 51 (1984) ("We think

the lesson to be drawn from all of this is that it is permissible to impeach a witness

by showing his bias under the Federal Rules of Evidence just as it was permissible to

do so before."). Evidence of bias, motive, and self-interest is central to mounting a

defense and can be explored through cross-examination, *see Davis v. Alaska*, 415 U.S.

308, 316 (1974) ("Exposure of a witness' motivation in testifying is a proper and

important function of the constitutionally protected right of cross examination"), and

through extrinsic evidence:

> Bias is a term used in the "common law of evidence" to describe the
> relationship between a party and a witness which might lead the witness
> to slant, unconsciously or otherwise, his testimony in favor of or against
> a party. Bias may be induced by a witness' like, dislike, or fear of a party,
> or by the witness' self-interest. Proof of bias is almost always relevant
> because the jury, as finder of fact and weigher of credibility, has
> historically been entitled to assess all evidence which might bear on the
> accuracy and truth of a witness' testimony. The "common law of evidence"
> allowed the showing of bias by extrinsic evidence, while requiring the
> cross-examiner to "take the answer of the witness" with respect to less
> favored forms of impeachment."

*Abel*, 469 U.S. at 52. A witness's interest in denying criminal conduct and/or pleasing

the government to reduce the risk of criminal investigation, prosecution, or sanctions

is a common motive and self-interest that may be explored through cross examination

and extrinsic evidence. *See United States v. Bagley*, 473 U.S. 667 (1985) (witnesses

could have been motivated by a possible "reward" from the government if testified to

the government's satisfaction); *Davis,* 415 U.S. at 316 (the witness may have falsely

identified the defendant in order to shift suspicion away from himself or because he

feared that his probationary status would be jeopardized if he did not satisfactorily

assist the police and prosecutor in obtaining a conviction.); *United States v. Ulloa*, 942 F. Supp. 2d 202, 206 (D.N.H. 2013) ("There is no question of the relevance of evidence that a witness has a motivation to lie to continue to curry favor with the government. What's more, a witness's self-interest or motive to testify falsely is generally considered to be a non-collateral issue, so extrinsic evidence is admissible to show bias.") (citations and quotation marks omitted).

Cheddarmane had a motive to lie, and repeatedly did so, to paint himself in the least culpable light before federal law enforcement. He attempted to allay concerns of law enforcement by characterizing himself as a law-abiding, patriotic, family man. He discussed coaching kids and his appreciation for fatherhood, explained that he could be "friends" with the non-white FBI agent despite their racial differences, and described himself as "a lover, not a fighter." To appear as a law-abiding person, Cheddarmane claimed that he was "not a drug user at all." The Defense will assert at trial that these statements were lies intended to convince law enforcement that he was not a dangerous domestic terrorist or drug user in possession of firearms and to minimize the chances he would be a target of the FBI's investigation and prosecution.

At the time Cheddarmane spoke to the FBI about his communications with Cantwell, he legitimately feared that the FBI would pursue him as a criminal rather than vindicate him as a victim. The FBI publicly acknowledged that it was targeting white supremacists for criminal prosecution as domestic terrorists.[3] Bowl Patrol

---

[3] Matt Zapotsky, *Wray says FBI has recorded about 100 domestic terrorism arrests in fiscal 2019 and many investigations involve white supremacy*, July 23, 2019, Washington Post *available at*

commonly discussed informants and "feds" in their online community. That the FBI would be inclined to investigate Cheddarmane and Mackey was undoubtedly known to Cheddarmane when the FBI approached him in October. As Cheddarmane himself later explained to a friend, "the focal point of [the FBI] coming" to interview him "was holding [Bowl Patrol] over my head in case I didn't want to help them" prosecute Cantwell. 17R239_REP-001857. The FBI directly suggested that the alleged victim's pseudonymous life (and thus his liability) would evaporate should he cooperate in Cantwell's prosecution.

> FBI Agent: That's why we wanted to talk to [alleged victim's real name], . . . the father, [alleged victim's real name], the husband, [alleged victim's real name] that has a whole lot to lose. . . Cheddar Mane, he just goes off into internet oblivion.
>
> Cheddarmane: Right
>
> FBI Agent: It's [alleged victim's real name] who's sitting here right now that has everything to lose.
>
> Cheddarmane: Um-hum
>
> And that is why we wanted to talk to you.
>
> Cheddarmane: Yeah. Absolutely. Understood

Cheddarmane had a strong motivation to lie to convince the FBI that he was not a domestic terrorist. He had a strong motive to assist in the prosecution of Cantwell to curry favor with federal law enforcement. For a jury to understand Cheddarmane's

---

https://www.washingtonpost.com/national-security/wray-says-fbi-has-recorded-about-100-domestic-terrorism-arrests-in-fiscal-2019-and-most-investigations-involve-white-supremacy/2019/07/23/600d49a6-aca1-11e9-bc5c-e73b603e7f38_story.html (last visited Sept. 1, 2020) ("At a congressional hearing in May, the head of the FBI's counterterrorism division testified that the bureau was investigating 850 domestic terrorism cases and that of those, about 40 percent involved racially motivated violent extremists. Most in that group, he said, were white supremacists.").

motive to lie, jurors must know that his actions and affiliations put him in genuine jeopardy of investigation and prosecution. The jury can only understand that Cheddarmane had a powerful motive to appease the FBI—and avoid prosecution—if it is provided evidence of the Bowl Patrol's statements and his involvement with the group.

Cheddarmane was similarly concerned that his possession of firearms and public presentation as a user of LSD would expose him to criminal liability. When the FBI met with Cheddarmane, he had a gun in his car. He discussed his possession of guns with the agents. An admission to the FBI about drug use would have put him at risk of federal prosecution for being a drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). Notably, federal prosecutors used this criminal statute to prosecute at least two white supremacists who espoused violent, pro-Roof ideology in the same time-frame. In the month prior to the FBI's visit to Cheddarmane, the United States charged Andrew Thomasberg, aka "the psychedelic Nazi," with this firearm offense.[4] *United States v. Thomasberg*, 1:19-cr-00337-LO-1 (E.D.VA) (docket report noting case was unsealed on September 19, 2019). As noted in a Government press release following sentencing, Thomasberg "possessed firearms and was a regular drug user, [and] he glorified racially motivated violence and referred to mass shooters as 'saints.'"[5] Federal prosecutors sentenced another online

---

[4] Tess Owen, *The FBI Just Arrested a 'Psychedelic Nazi' on LSD After Tapping His Wild Text Chats*, September 20, 2019 *available at* https://www.vice.com/en_us/article/qvg3xm/the-fbi-just-arrested-a-psychedelic-nazi-on-lsd-after-tapping-his-wild-text-chats (beginning "A self-proclaimed 'psychedelic Nazi' with an LSD habit and suspected ties to a violent neo-Nazi group was arrested earlier this week on federal gun charges.) (last visited Aug. 25, 2020).
[5] United States Attorney's Office, Eastern District of Virginia, *Former Atomwaffen Division Member Sentenced to Prison*, February 20, 2020, https://www.justice.gov/usao-edva/pr/former-atomwaffen-division-member-sentenced-

adherent to the Bowl Patrol's philosophy, Jeffrey Clark Jr., known by the pseudonym "DC BowlGang," for being a drug user in possession of a firearm that same month. *United States v. Jeffrey Clark Jr.*, 15-CR-0338-TJK, Docs. 1, 6, 17, 24 (D.D.C.). The federal Government prosecuted two similarly situated white supremacists for possession of a firearm as a drug user prior to the time the FBI approached Cheddarmane.

Cheddarmane had valid grounds to fear prosecution under 18 U.S.C. § 922(g) and a motive to lie about his use of LSD. The rather small cadre of online white supremacists who view mass-murderers as "saints" share the same internet spaces. It is likely that Cheddarmane was aware of these prosecutions at the time he met with the FBI. *See also* Rachel Weiner, *Prosecutors say an alleged member of a white-supremacist group was involved with illegal guns, drugs,* Washington Post, Sept. 20, 2019 (discussing Thomasberg's arrest in a major news publication in September 2019). That would explain why, near the beginning of the interview, Cheddarmane, unprompted, brought up LSD to the FBI "to just put it out there" that he is "not a drug user at all."

The Defense intends to assert at trial that Cheddarmane had a motive and interest to lie to the FBI and the United States Attorney's Office to paint himself in the least culpable light. He had and has a motive to lie to assist the Government in its expressed purpose of prosecuting Cantwell in relation to these online

---

prison (press release outlining facts of the offense, guilty plea, and sentence of Andrew Jon Thomasberg) (last visited Aug. 25, 2020).

communications.[6] That motive to lie led him to exaggerate and mischaracterize his communications with Cantwell, deceive the FBI about the purpose of the Bowl Patrol, and lie about his use of drugs. As this impeachment evidence relates to motive, bias, and self-interest, it may be proven by extrinsic evidence, including probative, extrinsic evidence.

**II. Cheddarmane had expressed public disdain for Cantwell in relation to his involvement with the Bowl Patrol. He has a bias against Cantwell that may be proven by extrinsic evidence.**

Cheddarmane and the Bowl Patrol spent months harassing and trolling Cantwell for the pleasure and sport of angering him and interfering with his business. Cheddarmane made "memes" of Cantwell, including one showing Cantwell mopping the floor of the FBI headquarters next to an FBI agent to publicly brand Cantwell as a federal informant or "snitch." While meeting with the FBI, Cheddarmane referred to Cantwell as a "piece of shit." Cheddarmane's statements and actions make clear that he strongly disliked Cantwell. The Defendant must be permitted to explore Cheddarmane's animus toward Cantwell as a witness's bias presents fertile ground for impeachment and cross-examination. The Defendant cannot pursue this line of highly probative questioning without presenting the context of their relationship. That relationship is entirely wrapped up in Cheddarmane's involvement with the

---

[6] The FBI repeatedly informed Cheddarmane of the FBI's position that this was a true threat. Among other statements, the FBI told Cheddarmane: "We want to assure the safety of you and your family," "Where you're in danger, the primary issue we're concerned about is the feud with Mr. Cantwell," "We'll first focus on the threat against your family," "We are taking this very seriously," and "We are not letting it go."

Bowl Patrol. As such, evidence of the Bowl Patrol and Cheddarmane's actions and participation therein is relevant and admissible impeachment evidence.

III.   **Cheddarmane's involvement with the Bowl Patrol is inextricably intertwined with the relevant exchange and his involvement with the Bowl Patrol provides necessary context to understand Cantwell's language and intent.**

Mackey, the leader of Bowl Patrol, appears in the charging document and his identity is the alleged "thing of value" that is an element of count one. Cantwell is communicating with Cheddarmane because of Bowl Patrol's incessant efforts to harass and troll him. Although the parties will differ in their argument as to the intent behind these messages—an intent relevant to all four counts—both parties arguments about Cantwell's intention will be grounded in Cantwell's relationship with Cheddarmane and the Bowl Patrol. To isolate these charges from their context precludes the Defendant from addressing his *mens rea* and denies the jury information necessary to determine whether the Government has met its evidentiary burden. *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015) (holding that the Government must prove more than "only that a reasonable person would regard communications as threat" but instead must prove the Defendant transmitted a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat.).

Cantwell was aware of Cheddarmane as an online persona and Bowl Patrol member. The two men never met. Cheddarmane communicated with Cantwell as Bowl Patrol's "Cheddarmane" and not via his true identity. Cheddarmane and

Cantwell used offensive language and imagery when communicating online. The words used in the relevant online communication are similarly crude and offensive. The Government has alleged one portion of that communication was a "true threat" to injure. The Defense will argue it was not. These arguments will relate to the meaning of the language used and the context of the two men's relationship.

Federal circuit courts have consistently held that determination of whether a "threat" rises to the level of a "true threat" must be determined based on the specific language used, or acts undertaken, and the context within which the alleged threat was made. "Determining whether a statement amounts to a true threat requires a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant.'" *See United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (citations omitted); *Planned Parenthood v. Amer. Coal. of Life*, 290 F.3d 1058, 1078 (9th Cir. 2002) ("We, and so far as we can tell, other circuits as well, consider the whole factual context and all of the circumstances in order to determine whether a statement is a true threat.") (citation omitted).

Cheddarmane and Bowl Patrol members overtly discuss murder, rape, and acts of mass violence as others might follow and discuss a baseball team. Words like "nigger" and "kike" and faggot," images depicting black men hanging from nooses, memes of Jews in gas chambers, are passed along without pause or concern. Offensive and violent words and innuendos are so ingrained and commonplace among Bowl Patrol members that they are normalized, expected, and considered "humor." In

Cheddarmane's interview with the FBI, for example, he asserted that he personally thinks "mass shootings" are not "funny," but he "act[s] like" he finds them funny online."

Jurors will be called upon to determine whether Cantwell's statements were intended to be taken seriously as a threat to injure. Jurors cannot asses the intent of the online communication without knowledge of the depth, frequency, and casual public use of violent rhetoric by Cheddarmane and Bowl Patrol. Cheddarmane himself aptly explained the relevance of context in evaluating whether the speaker had a threatening intent during his grand jury testimony.

> QUESTION: In these online chats where do you consider the line to be between something of "boys being boys" messing with someone and something being threatening?
>
> CHEDDARMANE: **It's mostly contextual, like look at the context of what's being said**. . . I call my buddy Tom—I make fun of him because he's fat. And it's not like I'm mean spirited . . . I'm just kind of messing with him

17R239_GJ-000001.37 (emphasis added). For the jury to evaluate context in this case, they must have knowledge and understanding of the violent rhetoric and imagery commonly used in this subculture as that is how Cantwell knows Cheddarmane. They must understand that this particular community does not operate under the same rules of decorum to which the broader community expects. Without fully understating the context of who Cheddarmane was and presented himself to be, the jury cannot engage in its crucial task of evaluating Cantwell's intent.

WHEREFORE, Christopher Cantwell respectfully moves to admit evidence of the alleged victim's membership and participation in the Bowl Patrol, including the images and recordings the alleged victim and his associates presented online, as such information is relevant and admissible pursuant to the Federal Rules of Evidence and the Cantwell's constitutional right to a fair trial, effective assistance of counsel, due process, and confrontation.

Respectfully submitted,
Christopher Cantwell
By His Attorney,


Date: September 3, 2020

/s/ Eric Wolpin
Eric Wolpin
N.H. Bar No. 18372
Assistant Federal Defender
Federal Defender Office
22 Bridge Street
Concord, NH 03301
Tel. (603) 226-7360
E-mail: eric_wolpin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on September 3, 2020 to all counsel of record and in the manner specified herein: electronically served through ECF.

/s/ Eric Wolpin
Eric Wolpin
N.H. Bar No. 18372
Assistant Federal Defender
Federal Defender Office
22 Bridge Street
Concord, NH 03301
Tel. (603) 226-7360
E-mail: eric_wolpin@fd.org