**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:20-cr-00006-PB** |
| | ) | |
| **CHRISTOPHER CANTWELL** | ) | |
| | ) | |

**GOVERNMENT'S OBJECTION TO**
**DEFENDANT'S MOTION IN LIMINE #1 ADMIT BOWL PATROL EVIDENCE**

The United States of America, by Scott W. Murray, United States Attorney for the

District of New Hampshire, hereby objects to the defendant's Motion in Limine #1 to Admit

Evidence of the Bowl Patrol and Bowlcast and the Alleged Victim's Involvement Therein (ECF

No. 68), and the Supplement thereto (ECF No. 74) (collectively, "MIL #1").  In support of its

objection, the government states as follows:

      **I.**      **Background**

The defendant is charged with Extortionate Interstate Communications, 18 U.S.C. §

875(b) (Count 1), Threat to Injure Reputation, 18 U.S.C. § 875(d) (Count 2), and Cyberstalking,

18 U.S.C. § 2261A(2) (Count 3).  The victim of the crimes was for a period of time a member of

an online alt-right group called The Bowl Patrol (in recognition of the hair style of Dylann Roof,

who massacred members of a Black church in South Carolina and was convicted and sentenced

to death).  The Bowl Patrol made a number of podcasts, known as "Bowlcasts," which were

released on the internet.  The Bowlcasts featured shocking and highly offensive content,

including endorsements of violence, misogyny, racism and anti-Semitism.

The defendant's motive in committing the charged crimes, which occurred over a three-

day span in June 2019, was to obtain the personal information of "Vic Mackey," so the defendant

could "dox" Mackey by publicizing his real name and identifying information.  "Vic Mackey"

was the online pseudonym of the acknowledged leader of The Bowl Patrol. The defendant

believed that the victim was in possession of Mackey's personal information, and tried to coerce

the victim into disclosing the information to him by threats, intimidation, and harassment.

In his MIL #1, the defendant seeks to admit evidence of the victim's membership and

participation in the Bowl Patrol, "including the images and recordings the alleged victim and his

associates presented online."  (ECF No. 68 at 1.)  The defendant's proposed exhibit list includes

some 168 items, the majority of which are recordings and writings pertaining to the Bowl Patrol,

including all of the group's "Bowlcasts" and various excerpts from them.  Although the charged

crimes occurred within a 3-day period in June 2019, the proposed defense exhibits cover a period

of more than three years, beginning at least by May 2017, and extending at least until the end of

July 2020. Only a small percentage of the defendant's exhibits bears any direct relationship to

the charges in the Superseding Indictment.

The defendant argues that the Bowl Patrol evidence is admissible to impeach the victim

to show his bias in favor of the government and his motive to lie.  According to the defendant,

the victim "legitimately feared that the FBI would pursue him as a criminal rather than vindicate

him as a victim."  (ECF No. 68 at 11.)  Further, the defense asserts, for the jury to understand the

victim's motive to lie, "jurors must know that his actions and affiliations put him in genuine

jeopardy of investigation and prosecution."  (ECF No. 68 at 12-13.)  In addition, according to the

defense, to evaluate context in this case, the jury "must have knowledge and understanding of the

violent rhetoric and imagery commonly used in this subculture as that is how Cantwell knows

[the victim]."  (ECF No. 68 at 18.)  Accordingly, the jury must be provided "evidence of the

Bowl Patrol's statements and [the victim's] involvement with the group."  (ECF No. 68 at 13.)

In his later Supplement to MIL #1, the defendant contends that the victim's involvement in a Bowl Patrol discussion of violence to an FBI agent, known to be conducting an investigation following the August 2017 "Unite the Right" Rally in Charlottesville, Virginia, is admissible. (ECF No. 74 at 2-3.)  The defendant particularly focuses on the victim's October 2018 call-in to the defendant's radio show in which the victim said that he was "going to send Mosin Nagant [another Bowl Patrol member later doxed by Cantwell] to shoot [the FBI agent's] fucking grave after he dies as that's Mosin's new hobby."  (ECF No. 74 at 4.)  According to the defendant, the victim's statements "demonstrate that [the victim] was aware of his potential liability (and believed the FBI was similarly aware) prior to commencement of his October 2019 interview with the FBI," and further show his bias and motive to favor the government in his testimony.

As demonstrated below, however, Cantwell cannot show that the Bowl Patrol evidence he proffers should be admitted.  He neglects to explain why so much extrinsic evidence to prove bias is necessary and admissible, in light of the full opportunity he will have to cross-examine the victim.  Likewise, he cannot show that the Bowl Patrol evidence is probative to impeach the victim, since the victim, in his testimony, likely will not dispute the major predicates to Cantwell "bias" theory, including the fact that the Bowl Patrol used racist and violent language.  In addition, Cantwell cannot lay a proper foundation for the extrinsic bias evidence, since the victim never faced a realistic threat of prosecution based on his speech as part of the Bowlcasts. Finally, the proffered evidence is both cumulative, since the jury will be well aware that the victim dislikes Cantwell, and prejudicial, since its inflammatory nature overpowers any probative value it might have, and should therefore be excluded under Rule 403.

II.      **Argument**

A.   **Cantwell Fails To Explain Why The Court Should Allow A Tsunami Of Extrinsic Evidence When He Will Have A Full Opportunity To Cross-Examine The Victim Regarding Potential Bias.**

Cantwell seeks the introduction of 168 proposed exhibits, most of which would constitute, at most, extrinsic evidence to prove his theory that the victim is biased and motivated to help the government because of the Bowl Patrol's despicable statements.  But Cantwell completely skips a step in the evidentiary analysis, in that he utterly fails to demonstrate why, for putative "impeachment" purposes, the Court should open the evidentiary floodgates by admitting extrinsic evidence of every recording ever made by the Bowl Patrol, plus a lot more.  Indeed, Cantwell's proposed exhibits threaten to overwhelm the jury, and transform the trial from a relatively narrow inquiry into an extortion attempt over a three-day period to an exhaustive examination of the Bowl Patrol's entire *oeuvre.*  Fortunately, the law of evidence prohibits such a derailment.

The key to impeachment to show bias is cross-examination.  "As a general matter, a defendant has the right to cross-examine a prosecution witness about matters that might cause the witness to be biased against the defendant."  *United States v. Tse*, 375 F.3d 148, 165 (1st Cir. 2004).  For example, "a defendant has a right to cross-examine an accomplice as to the nature of any agreement he had with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation."  *United States v. Barrett*, 766 F.2d 609, 614 (1st Cir. 1985).  Of course, the right to cross-examine a witness to show bias, although fundamental under the Confrontation Clause, is not unbridled, and a court "has the discretion to limit cross-examination once the defendant's Sixth Amendment right to establish the potential bias of the accomplice-witness has been satisfied."  *Id.  See also Bui v. DiPaolo*, 170 F.3d 232,

242 (1st Cir. 1999) ("The threshold requirement imposed by the Confrontation Clause is satisfied as long as the defendant is given a fair chance to inquire into a witness's bias").  Indeed, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Beyond cross-examination, "extrinsic evidence sometimes may be admitted to prove bias." *United States v. Sabean*, 885 F.3d 27, 40 (1st Cir. 2018).  *See also United States v. Abel*, 469 U.S. 45, 52 (1984) (approving extrinsic evidence of witness's gang membership to show bias after witness denied knowledge of gang on cross-examination).  But there is no automatic right to introduce extrinsic evidence to show bias, particularly where the extrinsic evidence itself "contains no statements relevant to bias," or is merely cumulative.  *Sabean*, 885 F.3d at 40. Accordingly, the court of appeals has repeatedly upheld the exclusion of extrinsic evidence offered to prove a witness's bias where that evidence is too distracting or insufficiently probative.  *See United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) (emphasizing "the court's interest in avoiding a mini-trial" on agent's conduct); *United States v. Gomes*, 177 F.3d 76, 81 (1st Cir. 1999) ("Exclusion of further evidence was within the district court's discretion to limit excursions"); *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) ("the district court was entitled to conclude that the 'marginal relevance' of [proposed extrinsic evidence] was outweighed by the 'time and effort' it would entail to present this testimony").

In this case, the defendant's proposed exhibit list is a declaration of total war against the victim.  Cantwell does not even attempt to explain why he is entitled, in addition to a full cross-examination of the victim, to introduce many hours of shocking and inflammatory extrinsic

5

evidence to support his theory of bias, even though very little of the proffered evidence has anything to do with bias.  The rules of evidence are designed to eliminate delay and protect crime victims from harassment and embarrassment.  *E.g.,* Fed. R. Evid. 102, 412.  Cantwell's proposed exhibit list violates both of those injunctions.  Accordingly, this Court should exercise its discretion to exclude the proffered extrinsic evidence.

### B.  The Extrinsic Bowl Patrol Evidence Has Little Or No Impeachment Value Because The Victim Will Likely Admit The Salient Points Cantwell Seeks To Establish.

The core of Cantwell's argument to admit the Bowl Patrol evidence is that the evidence would impeach the victim by showing his bias.  Cantwell ignores, however, that in his testimony the victim will likely admit many or all of the salient points Cantwell seeks to establish. Specifically, the victim is expected to readily admit:

- That he was a member of the Bowl Patrol;

- That the Bowl Patrol was an Alt-Right group that released "Bowlcasts" in which the participants used racist, violent, and misogynistic rhetoric;

- That he made prank calls to Cantwell's radio show; and

- That he strongly disliked Cantwell.

Thus, it is very likely that the victim will admit in his testimony the essential facts Cantwell seeks to prove with the proffered Bowl Patrol evidence.  In what way, then, does that extrinsic evidence "impeach" the victim?  *Cf. Abel*, 469 U.S. at 47 (noting that trial court "decided to permit the prosecutor to cross-examine [the witness] about the gang, and *if [the witness] denied knowledge of the gang*, to introduce" extrinsic evidence to impeach) (emphasis supplied). In the absence of a satisfactory answer to that question, this Court should exclude the evidence.

### C.  Cantwell Cannot Establish A Proper Foundation For His Theory of Bias.

It is well-settled that "a defendant must lay a proper foundation before evidence of bias is admitted." *Tse*, 375 F.3d at 165.  If the defendant alleges that a witness is biased because of a "coercive relationship," "courts traditionally have required a solid showing that coercion is present." *Bui*, 170 F.3d at 244.  And where there is no evidence of a "coercive dimension" in the relationship between a witness and an organization, "trial courts cast well within their discretion in prohibiting cross-examiners from mounting fishing expeditions." *Id.*

Here, although Cantwell claims that the victim seeks to curry favor with the government by cooperating in this case, Cantwell cannot lay an appropriate foundation to permit the introduction of bias evidence.  Although the usual way of proving such a relationship between a cooperating witness and the government is a plea agreement or an immunity agreement, there is no such document here.  Nor can Cantwell show that the victim has any reason to expect or hope "that he will be treated leniently in exchange for his cooperation." *Barrett*, 766 F.2d at 614.

Most importantly, however, Cantwell cannot show that the victim faces a "realistic threat of prosecution" based on the victim's participation in the Bowlcasts.  *See Gomes*, 177 F.3d at 81. Such a showing is an essential part of the required foundation for the Bowl Patrol evidence Cantwell offers.  In light of the First Amendment, it would be extraordinarily unusual, if not legally impossible, to prosecute a Bowl Patrol member for expressing even the most abhorrent racist and hateful views during a Bowlcast.  As far as the government knows, no such prosecution has been brought.  And the victim knows this as well:  when he was first interviewed by the FBI in October 2019, he declared that he was "so confident that I haven't done anything illegal, and everything's on the up and up," he would tell them the "whole story" of his membership in the Bowl Patrol.

Cantwell's argument that the victim feared prosecution because of the awful things the Bowl Patrol said in its podcasts elides this critical point.  It also risks misleading the jury, which may find itself (if Cantwell has his way) drowning in evidence of the Bowl Patrol's hateful speech offered to prove bias, without also understanding that as a legal matter the victim did not face a realistic threat of prosecution for that speech.  Because the victim was not at risk of being prosecuted for his Bowlcast speech and knew it, the connection with bias is "remote." *Gomes*, 177 F.3d at 81.  And because Cantwell cannot lay a sufficient foundation for his theory of bias, the Court should exclude the Bowl Patrol evidence.

### D.  The Bowl Patrol Evidence is Cumulative and Unduly Prejudicial Under Rule 403.

The proffered Bowl Patrol evidence is both cumulative and substantially more prejudicial than probative under Rule 403.  It is cumulative because the jury will have ample evidence that the victim and his associates did not like Cantwell prior to the alleged offenses in this case, that the victim disliked Cantwell even more after he reported him to CPS, doxed him, and threatened to rape his wife, and that the victim may now very well harbor ill will towards Cantwell.  In light of the obvious state of enmity between the two men, it is not clear how or why establishing the possibility that the victim might *also* color his testimony to favor the government based on a fear of prosecution (which is nearly all that Cantwell's 168 proposed exhibits purport to do) is worth the candle.  Nothing important is added to the proof.  Thus, because Cantwell will have every opportunity on cross-examination to establish that the victim strongly dislikes him, this Court should exclude the Bowl Patrol evidence offered to prove bias.  *See United States v. Landron-Class*, 696 F.3d 62, 72 (1st Cir. 2012) (affirming limitation on cross-examination of witness about dismissed charges, where "there is no doubt the jury was aware of both [witness's] incentive to testify against appellant and the potential for bias"); *Tse*, 375 F.3d at 165 ("Tse's

right to question Williams about his potential bias in favor of the government was satisfied by other lines of questioning"); *United States v. Williamson*, 202 F.3d 974, 978 (7th Cir. 2000) (affirming limitation of cross-examination regarding details of investigation of witness where evidence would have been "at best, needlessly cumulative" and defendant was able to present "reasonably complete picture" of witness's veracity, bias, and motivation).

Likewise, the proffered Bowl Patrol evidence is extraordinarily prejudicial because its content is so repugnant.  It would likely horrify the jury and invite them to condemn the victim; it could hardly be more inflammatory.  Under Rule 403, even if it is relevant, such evidence must be treated with considerable care because of its potential to distract the jury from its duty to decide the case charged in the indictment.  Where the evidence's probative value to prove the victim's bias is slight at best, while its tendency to decisively prejudice the jury against the victim is palpable and manifest, this Court should exercise its discretion to exclude the Bowl Patrol evidence.  *See Gomes*, 177 F.3d at 81 (emphasizing that proffered testimony that witness had boasted of torturing another drug dealer was "doubtful and inflammatory").  *See also Abel*, 469 U.S. at 48 (trial court permitted extrinsic evidence regarding witness's gang membership but required prosecutor not to use the term "Aryan Brotherhood" and sustained defense objection to question concerning punishment for violating the gang's rules).

### E.  To The Extent That The Bowl Patrol Evidence Is Relevant To Prove "Context," Cantwell Must Be Required To Show That He Knew About The Evidence Prior To The Charged Offenses.

Finally, if Cantwell asserts that the Bowl Patrol evidence is relevant and admissible, not as impeachment evidence to prove bias, but to show the "context" of his communications with the victim, the evidence should be excluded at least until Cantwell establishes that he was specifically aware of the Bowl Patrol communication in question at the time of the charged

crimes.  There is nothing to show that Cantwell was aware of many of the Bowlcasts prior to his threats against the victim on June 15-16, 2019.  And the one Bowlcast episode that Cantwell clearly did know about (because Cantwell participated in it) did not involve the victim. "Context" evidence has no relevance or probative value and must be excluded if the defendant was not aware of the information at the time of the charged crimes.  *Cf. United States v. Smith*, 230 F.3d 300, 308 (7th Cir. 2000) ("It is only when the specific instances of [the victim's] conduct are known to the one claiming self-defense, and thus could have factored into the decision making process that resulted in the act, that such instances should be admissible as essential elements of the claim").

### III.    Conclusion.

This Court should deny the defendant's Motion in Limine #1 to Admit Evidence of the Bowl Patrol and Bowlcast and the Alleged Victim's Involvement Therein.


September 16, 2020                                        Respectfully submitted,

                                                         Scott W. Murray
                                                         United States Attorney


                                        By:      /s/ John S. Davis
                                                 John S. Davis
                                                 Anna Z. Krasinski
                                                 Assistant U.S. Attorneys
                                                 53 Pleasant Street, 4th Floor
                                                 Concord, NH  03301
                                                 (603) 225-1552