UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>CHRISTOPHER CANTWELL )<br>_____ ) | No. 1:20-cr-006-PB |

GOVERNMENT'S MOTION FOR TWO-WAY
LIVE VIDEO TESTIMONY OF VICTIM'S SPOUSE

The United States of America, by Scott W. Murray, United States Attorney for the District of New Hampshire, respectfully requests that the Court enter findings and an order permitting the live, two-way video conference testimony of a subpoenaed prosecution witness (the victim's spouse) at the upcoming trial. As detailed below, this application is based on the witness's risk of complications should she contract COVID-19 and her physician's admonition that she not travel from ▇▇▇▇ to New Hampshire given her medical condition. Defendant Christopher Cantwell opposes this motion.

I. FACTUAL BACKGROUND

A. Case Background

Cantwell is charged with one count of extortionate interstate communications, in violation of 18 U.S.C. § 875(b), threatening interstate communications, in violation of 18 U.S.C. § 875(c), threat to injure property or reputation, in violation of 18 U.S.C. § 875(d), and cyberstalking, in violation of 18 U.S.C. § 2261A(2). The crimes stem from a June 2019 exchange he had with the victim, an individual he knew by the pseudonym "Cheddar Mane." Beginning on June 15, 2019, and continuing through the following day, Cantwell sent the victim messages intended to coerce the victim into disclosing personal information about an individual known to Cantwell as "Vic Mackey." Those messages included statements about the witness:

"your wife is gonna have trouble sleeping at night until she leaves you and takes your kids away;" "if you don't want me to come and f*ck your wife in front of your kids, then you should make yourself scarce[.] Give me Vic, it's your only out;" and "I bet one of my incel listeners would love to give her another baby." After the exchange, Cantwell posted photographs of the witness and her children to 293 members of the Radical Agenda telegram group. *See* GX 102. Beneath the photographs, Cantwell identified the street, town, and state where the victim and witness live. *Id.* Cantwell also placed a call to the witness's local child abuse and neglect hotline in an attempt to "destroy [the victim's] life." *Id.* According to Cantwell, "once [the visit from CPS] comes, [the victim would] understand that this is serious." GX 101.

### B. The Witness

The witness, who resides in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The witness's physician has advised her not to travel. According to the physician:



### C. Proposed Procedure

The United States proposes to have the witness testify from the U.S. Courthouse in her local district, via a live two-way video conference system that enables the Court, counsel, the defendant, and the jury to observe her testimony on direct examination, cross-examination, and re-direct examination. A Court Security Officer could be present with the witness in her home district to administer the oath. Before testimony begins, the Court could advise the witness that the Court, counsel, the defendant, and the jury are watching the testimony. Moreover, equipment could be set up, such that the witness, on her screen, could see the defendant, the Court, and counsel as she testifies. To facilitate an orderly examination, at least 24 hours in advance of her testimony, the prosecution would advise the Court and defense of the exhibits to be used during direct examination.

## II. ARGUMENT

### A. Legal Standard

The Confrontation Clause of the Sixth Amendment does not "guarantee[] criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Maryland v. Craig*, 497 U.S. 836, 844 (1990) (emphasis in original); *United States v. Cotto-Flores*, 970 F.3d 17, 38 (1st Cir. 2020) ("[L]ike the presumptions that underpin it, the constitutional right to unscreened in-person confrontation has its limits."). Instead, "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 849 (internal citation and quotes omitted). Thus, in a one-way video

case, the Supreme Court in *Craig* held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850; *see also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*quoting Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

The First Circuit has applied the *Craig* principles to two-way video testimony in child sexual assault cases, finding that courts can allow two-way testimony if the court first determines "whether use of the [CCTV] procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Cotto-Flores*, 970 F.3d at 38 (quoting *Craig*, 497 U.S. at 855).[1]

Recently, during the COVID-19 pandemic, a district court in the Southern District of New York granted the government's motion to permit a 72-year-old man who lived in Texas to testify via live two-way video. *United States v. Donziger*, 2020 WL 5152162 (S.D.N.Y. Aug. 31, 2020). The witness in that case advised that he was not willing to fly commercially to New York and would be unduly burdened if he were required to quarantine for two weeks in New York before the trial. The witness also had a medical condition, which in conjunction with his age put him at a heightened risk of life-threatening complications if he were to contract COVID-19. Finally, the witness's physician opined that the witness should not travel in view of his age and vulnerability to being hospitalized or dying if he contracted the virus.

---

[1] The First Circuit "assume[d] without deciding that the test announced in *Craig* (which involved *one-way* CCTV through which the witness couldn't see the defendant) also applies to the two-way CCTV procedure." *Cotto-Flores*, 970 F.3d at 39 n. 17; *cf. United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (declining to apply the *Craig* standard to two-way testimony because, unlike the one-way video in *Craig*, two-way video preserves "the face-to-face confrontation" required by the Confrontation Clause.").

4

Applying both *Craig* and Second Circuit precedent, the district court in *Donziger* held that the witness could testify via live two-way video conference without violating the Confrontation Clause. The court readily concluded that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus were "critically important public policies" within the meaning of *Craig*. *Donziger*, 2020 WL 5152162 at * 2. Likewise, permitting an elderly man at heightened risk of infection by COVID-19 s to testify via live video rather than in person was needed to promote those policies. *Id.* Finally, the *Donziger* court was satisfied that the procedure proposed by the government, "which would have [the witness] testifying under oath from a federal court in Texas in the presence of court personnel using a two-way video system that lets him view the Court, counsel, and Mr. Donziger, and for them to view him, all in real time," would assure the reliability of the testimony. *Id.* at *3.[2] The court also noted that the witness had previously given a sworn deposition and a sworn statement, both of which addressed the basic facts at issue. *See also United States v. Benson*, 79 F. App'x 813, 821 (6th Cir. 2003) (unpublished) (affirming admission of live two-way video testimony of infirm 85-year-old witness who lived out of state).

**B. The Witness's Vulnerable Medical Condition Coupled with the COVID-19 Pandemic Present a Circumstance in Which Denial of Physical, Face-to-Face Confrontation is Necessary to Further an Important Public Policy.**

The COVID-19 pandemic is a global emergency that is unprecedented in modern history. The virus continues to spread in the United States at an alarming rate. *See* Coronavirus Disease 2019 (COVID-19) in the U.S., Centers for Disease Control and Prevention (updated daily),

---

[2] The trial court in *Donziger* noted that it had used two-way video technology in several other criminal matters, and that the technology had proven to be highly effective in allowing viewers to observe the speaker in real time and virtually assess his or her demeanor. 2020 WL 5152162 at *3 n.4.

*available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 7, 2020).  The death toll, across the world, is staggering.

While anyone exposed to the virus is at risk for contracting it, people with certain underlying medical conditions are at a higher risk for becoming severely ill.  Centers for Disease Control, People Who Are at Increased Risk For Severe Illness, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited September 8, 2020).  Because COVID-19 is a new disease, there is limited data on the impact of the virus on certain underlying medical conditions.  Based on current information, the Centers for Disease Control state ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The Court has taken significant action in light of the COVID-19 crisis.  Following the President's declaration of a national emergency, the Court suspended jury trials scheduled to begin before May 1, 2020.  Standing Order ADM-1, Order 20-5, at 2.  The Court also closed the courthouse to the public except for dates on which the Court conducts in-court hearings.  *Id.* In

6

addition, the Court implemented teleconference and telephonic hearings for proceedings, and frequently uses the Zoom two-way video conference platform for court hearings including for witness testimony. *Id.*

As cases in New Hampshire began to decline, the Court again took significant steps to begin to return to more normal operations. The Court held the first Federal post-COVID-19 jury trial in the nation. To ensure the safety of the Court, the parties, and the jurors, the Court implemented quarantine requirements for witnesses traveling from outside of New England. The Court retrofitted the ceremonial courtroom with prophylactic materials, including plastic shields between the witness stand and the Judge's bench, and rearranged the courtroom in a manner that allows for social distancing for jurors. All of these protocols and orders reflect the seriousness of the ongoing pandemic.

Here, requiring the witness to travel from her home state of ▇▇▇ to New Hampshire to testify would ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The pandemic, coupled with the witness's risk of adverse health consequences should she contract COVID-19, present an exceptional circumstance. Thus, just as in *Donziger*, "there is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies," and allowing the witness to testify via live video rather than in-person is necessary to promote those policies. *Donziger*, 2020 WL 5152162, at *2.[3]

---

[3] *But see United States v. Pangelinan*, 2020 WL 5118550, at *4 (D. Kans. Aug. 31, 2020) (finding that the government had "not shown that it is necessary to present the witness' testimony by video to further important public policies" in light of "reasonable alternatives which would allow this case to proceed, including a continuance.").

C.  **Allowing the Witness to Testify From a Federal Courtroom in Her Home District in the Presence of Court Personnel Using the Same Two-Way Video Conference System That This Court Has Frequently Employed During The Pandemic Will Assure the Reliability of the Witness's Testimony.**

During this pandemic, courts have become accustomed to the technical reliability of video testimony of the kind the United States proposes here: live, two-way, under oath, with the ability for the judge, counsel, and defendant to view the witness on direct examination, cross-examination, and re-direct examination.  For example, witnesses in this district have provided live, two-way video testimony in detention and probable cause hearings, suppression hearings, and sentencing hearings. The witness's two-way video testimony under the procedures proposed here would satisfy the Confrontation Clause and preserve "the salutary effects of face-to-face confrontation[,]" including "1) the giving of testimony under oath; 2) the opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and 4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence." *Gigante*, 166 F.3d at 80.

## Conclusion

For the reasons stated, the United States respectfully requests that the Court enter findings and an order permitting the live, two-way video conference testimony of a subpoenaed prosecution witness (the victim's spouse) at the upcoming trial.

September 17, 2020                                          Respectfully submitted,

                                                               Scott W. Murray
                                                               United States Attorney

By:    /s/ Anna Krasinski
        Anna Krasinski
        John S. Davis
        Assistant U.S. Attorneys
        53 Pleasant Street, 4th Floor
        Concord, NH  03301
        (603) 225-1552