**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-8-2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                       \*
UNITED STATES OF AMERICA     \*
                         \*  20-cr-06-01-PB
        v.         \*  September 25, 2020
                         \*
  CHRISTOPHER CANTWELL     \*
                         \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT EXCERPT OF JURY TRIAL TESTIMONY
OF CHRISTOPHER CANTWELL
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:

For the Government:     John S. Davis, AUSA
                          Anna Z. Krasinski, AUSA
                          U.S. Attorney's Office

For the Defendant:      Eric Wolpin, Esq.
                          Jeffrey S. Levin, Esq.
                          Federal Defender Office

Court Reporter:         Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

```
                    I N D E X


WITNESS:              Direct      Cross      Redirect      Recross


CHRISTOPHER CANTWELL


By Mr. Wolpin           3                      93


By Ms. Krasinski              45



EXHIBITS:                                   FOR ID       IN EVD


Government's Exhibit No. 4BB.                              4
```

1                   P R O C E E D I N G S

2              THE COURT:  Good morning, members of the jury.

3              THE CLERK:  Court is in session and has for

4    consideration a jury trial in United States of America versus

5    Christopher Cantwell, criminal case number 20-cr-6-1-PB.

6              THE COURT:  Mr. Cantwell, you understand you're

7    still under oath?

8              THE DEFENDANT:  I do, Judge.

9              THE COURT:  All right.  Thank you.

10             Go ahead, counsel.

11             MR. WOLPIN:  I would like to just clear up two

12   loose ends from yesterday.

13             One, if for the witness we could bring up 4BB.

14        CONTINUED DIRECT EXAMINATION OF CHRISTOPHER CANTWELL

15   BY MR. WOLPIN:

16        Q.   All right.  This is a redacted version of what we

17   looked at yesterday.  Is this familiar to you?

18        A.   It is.

19        Q.   Okay.  And to summarize, if we could, what do you

20   see on the bottom half?

21        A.   I see a Photoshopped image of me as a janitor for

22   the Federal Bureau of Investigation standing behind Special

23   Agent Dino Capuzzo who was going to investigate people in my

24   social orbit.

25        Q.   Okay.  So the date on this is when, what month?

1          A.    February 16th.  I know it to be from 2019.

2          Q.    Okay.  So this is something you saw previous to

3    now?

4          A.    Yeah, this was five days after I had published on

5    my website that I went to the FBI about the defacement of my

6    website.

7          Q.    And on the above portion and the below portion

8    there's a name that posted these two tweets, correct?

9          A.    Yeah.

10         Q.    And that's a name you're familiar with?

11         A.    The name of the person who posted the tweets?  Yes.

12   This is a pseudonym of a guy named Dallas Medina.

13   Mosin-Nagant.

14              MR. WOLPIN:  I would move at this time for the ID

15   to be stricken and for this to be admitted as a full exhibit.

16              THE COURT:  Any objection?

17              MS. KRASINSKI:  No objection, your Honor.

18              THE COURT:  It will be admitted.

19              (Government's Exhibit 4BB admitted)

20              MR. WOLPIN:  Since the jury has already seen the

21   bottom part, we're not going to talk too much about that.

22              What we haven't seen yet is the top part.  If we

23   could highlight that.  Maybe the whole line so it comes out a

24   little clearer.

25         Q.    All right.  In the top part there's a tweet related

1    to this that appears and that cites an address.  Whose address

2    is that?

3         A.    That's my address.

4         Q.    Okay.

5         A.    My home address.

6         Q.    The 103 Lincoln Street in Keene, New Hampshire, is

7    where you live?

8         A.    103 South Lincoln Street in Keene, New Hampshire.

9    That's my home address, not my publicly listed mailbox.

10        Q.    Okay.  And so this is not something you put up as

11   part of your show?

12        A.    No.

13        Q.    Okay.  And there was some testimony this week that

14   you had doxed someone named Mosin-Nagant?

15        A.    Yes.

16        Q.    Is this the same person?

17        A.    It is the same person.

18        Q.    And which came first, him releasing your home

19   address or your releasing his identifying information?

20        A.    Him releasing my home address along with countless

21   other provocations.

22        Q.    Okay.  But just as far as this?

23        A.    Yes.  He published my home address, and then I

24   published his identifying information probably more than a

25   month later.

1      Q.    All right.  Let's move on from that.  Thank you.

2            I would like to touch on one other thing we talked

3      about yesterday, which is how things started with the Bowl

4      Patrol.  We're going to do just a few quick questions.

5      A.    Okay.

6      Q.    You initially were on their first podcast?

7      A.    To be clear, it was not represented to me as their

8      first podcast when I went on there.  I found that out later,

9      yes.

10     Q.    But you appeared with them and did you participate

11     with them in the kind of talk and humor that they use?

12     A.    I want to be clear.  Sort of, okay?  Like these

13     guys -- I literally didn't know what I was going onto.  And

14     when they started in with the Dylann Roof stuff, I was like --

15     I was uncomfortable with it.

16           But we were in the same category of stuff.  Like I

17     like the racist humor, yes, but the mass shooter stuff I was

18     never into.

19     Q.    All right.  But you participated with them?

20     A.    Yes, I did.

21     Q.    Okay.  And on your show are there jokes about rape?

22     A.    Jokes about rape?

23     Q.    Yes.

24     A.    Yes.

25     Q.    Okay.  Are there skits that are humorous that

1    involve that as well?

2         A.    Yeah, I mean violence is a theme of the show.  It

3    is.

4         Q.    Okay.  So that similar -- that gets talked about or

5    joked about.  You said people getting pushed out of

6    helicopters, that's the kind of thing that gets talked about

7    and mentioned?

8         A.    Yes.

9         Q.    Okay.  All right.

10            Now, moving back to the exchange you had with

11   Cheddar Mane in June.

12            MR. WOLPIN:  If we could bring up Government's

13   Exhibit 208, I would just like to finish with this last point.

14        Q.    The line that follows the Peach line -- the Peach

15   comment he makes is at what time in this conversation?

16        A.    He makes the comment about Peach at 6:39.

17        Q.    How long does it take you before you respond to

18   that comment?

19        A.    Less than two minutes.

20        Q.    Okay.  And as we reviewed a little bit yesterday,

21   did you think through what you were saying at that point or

22   was it more reactionary?

23        A.    I didn't think.  It was within two minutes of what

24   he said, but it was within -- I mean, the amount of time it

25   took me to type that out was how long it took me to think

1    about it.  I just got mad and I reacted.

2        Q.    All right.  In that particular text was there any

3    mention of Vic Mackey?

4        A.    No.

5        Q.    Was there any mention of getting an identity of

6    somebody?

7        A.    No.

8        Q.    Now, there's a gap in time before there is a

9    mention of Vic Mackey, correct?

10       A.    That's right, yeah.

11       Q.    Now, the one before was at 6:41 p.m.  If we can

12   look at -- the next one was when?

13       A.    7:10 p.m.  About a half an hour later.

14       Q.    So half an hour later.

15             In your mind were those two texts connected?

16       A.    No, they weren't, and thank you for helping me

17   clarify, okay?

18             When he said the Peach thing, I replied to that,

19   and then I'm back to the original thought, okay?  This thing

20   became -- this was a prior conversation that's being carried

21   on from another date.  It's, come around here, I'm going to

22   dox you.  He tells me, I'm innocent.  I'm not the one

23   bothering you.  And I say, you can prove that to me if you

24   want to give up Vic, okay?  And then he says the thing about

25   Peach, and I'm replying to his comment about Peach with the

1     thing about his wife, which I regret making that statement,

2     but it's completely disconnected -- in my mind it's completely

3     disconnected from the thing.  A half an hour later I'm back to

4     the original thought.  If you don't want this to happen, if

5     you -- if you want to -- give me Vic is part of the prior

6     conversation.  It has nothing to do with the wife thing.

7          Q.   Okay.  Now, let's talk about what happens as this

8     exchange is winding down.

9               What does the back and forth become at the end?

10         A.   At the end?

11         Q.   Yeah, near the end.  The last half.  The last

12    third.

13         A.   If I -- I mean, at the end of this screenshot?

14         Q.   No.  At the end of the whole conversation.

15         A.   If I recall correctly, now we're talking about CPS

16    towards the end of it.

17         Q.   Okay.

18              MR. WOLPIN:  And if we can bring up 100, I think

19    Government's 100 has the whole chain, and if we go about

20    two-thirds in.

21         Q.   And yesterday we went through the CPS so I'm not

22    going to do that again with you.

23              MR. WOLPIN:  Keep going.

24         Q.   All right.  So at some point he begins in with the

25    you're fucking nobody, Chris, do your worst, junky loser?

1      A.    Yes.

2      Q.    Is that also the kind of language that has been

3  used in the past?

4      A.    Yeah, it was part of a class of, you know, I mean

5  there's the -- yeah, calling me a junky loser was a class of

6  defamatory comments that these guys were making.

7      Q.    Okay.  And you respond, okay, you got it.  He comes

8  back again and says you have very few listeners and zero

9  credibility and says you're hilariously pathetic, correct?

10     A.    Yeah.

11     Q.    At this point have you released to the public a

12  picture of his family that's visible with their faces and the

13  children?

14     A.    No.  I had -- to make him aware of the severity of

15  this I posted the thing with the faces blurred, but I had not

16  posted any unredacted images.

17     Q.    And when you say the faces were blurred, could you

18  tell who the people were?

19     A.    No.

20     Q.    Did you put the address with that?

21     A.    No.

22     Q.    Okay.  Now, this continues on, and then ultimately

23  ends at the end --

24          MR. WOLPIN:  If we can go all of the way to the

25  bottom.

1      Q.     -- with this cartoon?

2      A.     Yeah.

3      Q.     That cartoon, is that something that you had seen

4   before then?

5      A.     I had seen that cartoon entirely too many fucking

6   times.  I'm sorry.

7      Q.     Okay.  Well, let's work on the language.

8      A.     Yeah.  Okay.

9      Q.     And is this the end or is there actually more than

10  this?

11     A.     There's more than that.

12     Q.     Okay.  What was the more than that?

13     A.     This was a thing that they did so many times I lost

14  track of it.  They had this, like, it's called a sticker pack.

15  It's like a thing where, like, you have these images and it's

16  one click to get them, okay, and, like, it was just this

17  collection of them that they had made which was really fucked

18  up.

19     Q.     Chris, you've got to work on the language.

20     A.     I'm sorry.

21            So they would come in and, like, flood my chat

22  rooms with these things all the time.

23     Q.     So were there more than this then?

24     A.     Yes, there were.

25     Q.     Okay.  And how did the whole conversation actually

1    end?

2         A.    It ended with that.  That's when I blocked him.

3         Q.    So you blocked him?

4         A.    Yeah.

5         Q.    Okay.  Now, Telegram has the capacity for sort of a

6    more secretive chat.

7              MR. WOLPIN:  We can take that off, please.

8         Q.    Is that true?

9         A.    Yes.  It's called a secret chat, yes.

10        Q.    And what's the difference between a secret chat and

11   a regular chat?

12        A.    There are several important differences to the

13   secret chat, okay?  Telegram is -- Telegram is -- the entire

14   thing is an encrypted messenger.  So, like, if somebody is,

15   for lack of a better term, tapping your Internet connection,

16   they're not going to be able to see the messages that you send

17   to Telegram, okay, but Telegram can see the messages, like,

18   the Telegram service, the administrator for that service could

19   have read, for example, this conversation between me and

20   Cheddar Mane.  All right?

21              There's a technology known as end-to-end encryption

22   which means that even the service provider can't read that

23   conversation because only the parties involved have what's

24   known as the encryption keys.  So that's an important

25   distinction of it.

1              It also has a couple other important features, one

2    of which is self-destructing messages that you can set a

3    timer -- and this does not exist in the regular direct

4    message, like, between me and Cheddar Mane.  You can set a

5    timer that the message will delete itself in anywhere from one

6    second to, you know, a month.  You can set it whatever you

7    want it to be.

8         Q.    Well, I guess -- can someone or could you have used

9    some kind of technique to make this difficult to preserve?

10        A.    Which leads us to the third and most important

11   feature of secret chats, which is it prevents people from

12   taking screenshots, okay?  A lot of the evidence that you've

13   seen in here is these screenshots.  I don't know if you've

14   ever done this on your phone.  Whatever you're looking at on

15   your phone, you can save that image.  It's like a JPEG file

16   that can be shared and transferred later on.

17             One of the most important features of secret chats

18   is that it can't 100 percent of the time prevent you from

19   taking a screenshot depending on the security settings of the

20   phone, but it will either prevent it depending on the security

21   settings or it will notify the other side that a screenshot

22   has been taken.  So --

23        Q.    Did you make any effort to use these technologies

24   at the outset of your conversation to make it difficult to

25   record?

1      A.   At no point have I ever used secret chats with

2   Cheddar Mane, and I've used that technology in other

3   circumstances.

4      Q.   So you were aware of it at the time in the

5   beginning, and that wasn't something you sought to do at the

6   time?

7      A.   I was 100 percent aware of it, and I made no effort

8   to, you know.

9           And by the way -- I had no expectation of privacy

10  with Cheddar Mane, by the way.  These guys were --

11     Q.   Let's keep to the question.

12     A.   Got you.

13     Q.   All right.

14          MR. WOLPIN:  So if we could bring up for the

15  witness Government 102 which I think -- yes, it has been

16  admitted so that can be brought before the jury.

17     Q.   All right.  So this conversation over the Telegram

18  ends with the pictures, it's over, or what's happening next?

19     A.   Well, you want me to go to what happens next or

20  what's in this image in front of me?

21     Q.   Let's wait on that.  Maybe I brought that up too

22  soon.  I apologize.

23          What happens next?

24     A.   I mean, immediately after the chat it's tough to

25  say.  I kind of just tried to regain my composure and go about

1    the rest of my evening or whatever, right, and then later on I

2    started seeing -- the chat transcripts were showing it.  It

3    became part of the category of spam that they were putting

4    into my comment sections and chat rooms and stuff.

5         Q.    Okay.  So the next thing that's happening in

6    relation to this is you are getting these chats sent back to

7    you in your sort of platforms?

8         A.    Correct.

9         Q.    Okay.  With comments or just the chats themselves?

10        A.    With comments.  I mean, the chats were part --

11   became one of many image macros that they were flooding my

12   chat rooms and comment section with, and sometimes there would

13   be, you know, commentary from the spammer.

14        Q.    Okay.  So as that's happening, had you yet put to

15   the public Mr. Lambert's address or the pictures of his

16   family?

17        A.    No.

18        Q.    I mean in an unredacted form?

19        A.    No.

20        Q.    Okay.  So the ones that are coming in to you are

21   the ones this jury has seen which also don't have the family's

22   picture in it, correct?

23        A.    Right.  As he testified that he put stickers over

24   the unflattering images of me, he put over the faces of his

25   family, et cetera.  The identifying information he took out of

1    it by putting the pictures of me.  He started flooding my

2    chats -- or his associates or whoever started flooding my

3    chats with those images.

4         Q.   Okay.

5              MR. WOLPIN:  So now if we can bring up 102.  That's

6    better timing.

7         Q.   All right.  So the first line -- well, we can see

8    someone is saying something to you before.  Is it more than

9    just that one?  Is this that night or are there --

10        A.   Well, I mean, to be clear, the reason that he was

11   able to do this in March of 2020 is because the chat record is

12   kept --

13             MS. KRASINSKI:  Objection.  Foundation.

14             THE COURT:  Stop for a second.

15             I'm sorry.

16             MS. KRASINSKI:  I objected to foundation.

17             MR. WOLPIN:  His --

18             THE COURT:  Wait a second.

19             (Pause)

20             All right.  So he's not really responding to your

21   question, he's interjecting something, and I don't know what

22   he's saying and what he's about to say.

23             So I'll instruct you to put a question to the

24   witness, and I'll instruct you please listen to the questions

25   and try to answer them so we can have an orderly way of

1    proceeding.

2              All right.  Go ahead.

3              THE WITNESS:  Repeat the question.  Sorry.

4         Q.   So we've gone through -- the chat has happened,

5    you're getting feedback of them from people online, and you

6    haven't posted the family's picture yet.

7              Now what you're looking at, to be clear, is a

8    website?

9         A.   That's the Radical Agenda chat group, yes.

10        Q.   Okay.  From June 17th of 2019?  It has it next to

11   your name.

12        A.   Yes.  Okay.  Yes.

13        Q.   And this is public?  The things that are coming in

14   to you on this are public?

15        A.   Yes.

16        Q.   All right.  And what we first see of your reaction

17   at 1:54 a.m. is, here's the redacted parts.

18        A.   Yes.

19        Q.   Why is that what you're saying?

20        A.   Because I'm replying to what is above or what was

21   above what I'm saying.  They were posting these chat logs and

22   I'm saying, here's what was redacted from the chat logs.

23        Q.   Okay.  So it was only after you got that harassment

24   back that you put up the pictures?

25        A.   When they started flooding my chat rooms with the

```
1    chat logs, I'm, like, you know, like, you think it's -- like,
2    yeah, my attitude is, do you think it's, like, my burden to
3    keep your secrets while you harass me?
4         Q.   Let's get back to the question, okay?
5         A.   All right.
6         Q.   Now, have you called CPS at this point?
7         A.   No.
8         Q.   Okay.  Had you said in the chat that's now public
9    that you were going to call CPS?
10        A.   I had said that in the chat, and they were now
11   making that threat public, yes.
12        Q.   Okay.  Did you eventually call CPS?
13        A.   I did.
14        Q.   Okay.  And what happened with that?  We heard that
15   call.  Were you honest with them?
16        A.   Yes.  To the best of my knowledge, yes.
17        Q.   Did you give your real name?
18        A.   I did.
19        Q.   Did you give your address?
20        A.   I did.
21        Q.   Did you identify kind of your leanings as well?
22        A.   Yes.
23        Q.   All right.  And then at that point is there any
24   further exchange that you remember between you and Mr.
25   Lambert?
```

1      A.      Not that I could identify as Mr. Lambert, no.

2      Q.      Okay.  So there was -- he did at some point --

3      A.      He called the show, yeah, and that I did realize

4   was him from what he was saying, to be clear.

5              So to the best of my recollection I didn't identify

6   anything other than that call in to the show as a

7   communication between me and Mr. Lambert after that date until

8   this case.

9      Q.      So the call in to the show, why did you not engage

10  with him?

11     A.      Because I was -- it became my habit to try not to

12  engage with him and his group for the prior preceding months,

13  okay?

14             One of the things that he testified to while he was

15  here was accurate.  That when they were making prank calls to

16  the show, I was trying to, like, tell them how to make a

17  better prank call, okay, and after -- it got to a certain

18  point where I just had to treat this as if somebody was

19  putting, like, male enhancement spam in my chat room.  I just

20  wouldn't go away.  So I didn't think it was a good idea to

21  even curse them out.  They even said, like, they got a kick

22  out of it when I yelled at them or whatever.

23             So my habit had become by June, after this had gone

24  on for eight months, to just hang up and move on, and most of

25  the time I even deleted it from the thing.  I suspect, I'm not

1    certain of this, but when the government played their

2    exhibit --

3              MS. KRASINSKI:  Objection.  Foundation.

4              THE COURT:  Put another question to the witness.

5    Q.    So the call came in.  You chose not to engage?

6    A.    Right.

7    Q.    The caller -- did you hang up or did the caller

8    hang up?

9    A.    I hung up.

10   Q.    Okay.  After that did you try calling him back

11   privately, Telegram chatting him privately in any way?

12   A.    No.  I didn't even, like, record the phone number

13   that he called from.

14   Q.    Now, we've talked about how in May you had a

15   conversation with the Keene Police Department discussing

16   things among -- some of these issues with the Bowl Patrol?

17   A.    You're talking about the May meeting now?

18   Q.    Yes.

19   A.    Yes.

20   Q.    Okay.  So this is context.  This is now June.

21            After June you have -- or in June you had an e-mail

22   conversation with Joel Chidester of the Keene Police

23   Department.  Do you remember that?

24   A.    Yes.  I had several, but I think you're referring

25   to the one after the Cheddar chat?

1      Q.   Yes.

2      A.   Okay.

3           MR. WOLPIN:  So if we can pull up just for the

4      witness G-7.  G, as in Gary.  Thank you.

5      Q.   All right.  So this is an e-mail that appears from

6      Christopher Cantwell?

7      A.   Yes.  This is my Gmail account.

8      Q.   All right.  And it's to a Joel Chidester?

9      A.   Yes.

10      Q.   At keene.nh.us e-mail address?

11      A.   Yeah.

12      Q.   And it was sent on Friday, June 21, 2019?

13      A.   Yes.

14      Q.   So that's just a few days after the chat we've been

15      talking about?

16      A.   Yes.

17      Q.   All right.  At that point did you tell him anything

18      about what had happened between you and Mr. Lambert?

19      A.   Yeah, mentioning the CPS thing in this.

20      Q.   Okay.  So you provided him information about that?

21      A.   Yes.

22      Q.   You told him about the call to CPS?

23      A.   Yes.

24      Q.   You sent him a file called Cheddar.zip, which is

25      attached to this e-mail?

1      A.    Yes.

2      Q.    What was in the file Cheddar.zip?

3      A.    It was the photos of Cheddar and his family that I

4  had sent to -- that I had put in the chat room.

5      Q.    So essentially the only thing that wasn't public

6  from the chat was those redacted photos?

7      A.    I'm sorry.  I had put those into my public chat

8  room before I sent them to Joel Chidester.

9      Q.    I understand.  I'll reask the question.

10          The chat itself was all already online?

11      A.    Cheddar's chat logs, the screenshots of Cheddar's

12  chats, were online and he had redacted those images which I

13  then provided to Joel Chidester, yes.

14      Q.    Okay.  And you talked about this in the nature of

15  your dispute with the Bowl Patrol as well?

16      A.    I did.

17      Q.    All right.

18          MR. WOLPIN:  We can take that down.  Thank you.

19      Q.    Now, did you send Chidester the Telegram exchange

20  itself?

21      A.    No.

22      Q.    Why didn't you?

23      A.    I didn't think it made me look particularly good

24  for one, and two, I had linked him to -- I know that there was

25  the link to the Uncle Paul channel in there.  I think at some

1    point I provided him with the link to the Bowlcast channel.  I

2    gave them, you know, links to the other side of this thing,

3    but, you know, it might help to -- what I was sending him was

4    what I -- if I had done something wrong, I thought I might

5    have done wrong, and it might --

6         Q.    And it related to the CPS?

7         A.    Yes.

8         Q.    Now, did these communications with Chidester lead

9    to any interaction with you and the FBI?  Yes or no to start.

10        A.    Yes.

11        Q.    Okay.  Did that result from you having an in-person

12   meeting with Joel Chidester or did that result from just some

13   of these e-mails?

14        A.    From the point of this message that we just

15   discussed until the time that I met with the FBI I don't think

16   I had another in-person meeting with Joel Chidester before

17   that.

18        Q.    Okay.  So he works with you to some degree to help

19   connect you to the FBI is how you understand it?

20        A.    That's correct, yes.

21        Q.    All right.

22             MR. WOLPIN:  If we can bring up at this point H-8,

23   and we're going to go down to -- just for the witness.  This

24   is not a full exhibit.  If we can go down to page 10, if we

25   can, it's easily numbered.

1          Q.    So on -- is this something you're familiar with?

2     Take a look at it.

3          A.    There's a lot here, but I recognize this is an

4     e-mail thread between me and the Bedford FBI office.

5          Q.    Okay.  What's the date when you get an e-mail from

6     the Bedford FBI office?

7          A.    July 17th of 2019 is what you're pointing at.

8          Q.    Okay.  And do you see that that's from FBI Bedford?

9          A.    Yes.

10         Q.    Okay.  Now, was there a named person in that that

11    you were to contact or call?

12         A.    No.

13         Q.    Okay.  So that was just sort of a nameless FBI

14    e-mail?

15         A.    Yeah, I think I replied to them as such, nameless

16    FBI agent.

17         Q.    Okay.  So if we go up to the first page, you

18    respond on what day?

19         A.    The e-mail reply that you're pointing to is July

20    17th at 12:44 p.m.

21         Q.    Okay.  So same day within a few hours you've

22    already respond to the FBI?

23         A.    Yes.

24         Q.    Okay.  And I'm not going to go through all of it,

25    but this is an e-mail which includes a lot of information?

1        A.    Yeah.

2        Q.    Okay.  And explains some of the things you've just

3    been testifying about?

4        A.    Yes.

5        Q.    All right.  And you provided that directly to the

6    FBI by e-mail?

7        A.    Yes.

8        Q.    All right.  Now --

9              MR. WOLPIN:  If we could take that down, please.

10       Q.    Now we've seen July 17th they've responded to you.

11   You respond back the same day.

12             MR. WOLPIN:  And then if we can pull up H-7 for the

13   witness.

14       Q.    This is now an e-mail from who?

15       A.    This is from me to the Bedford FBI.

16       Q.    Okay.  And what date are we at now?

17       A.    This is August 4th.

18       Q.    Okay.  And at this point have you gotten a response

19   back from the FBI from the e-mail from the two weeks prior?

20       A.    It's tough for me to say when you're skipping

21   around in the e-mail thread.

22       Q.    The e-mail thread is a little difficult to follow.

23       A.    Yeah.

24       Q.    What do you tell them in the first line?

25       A.    "Is it routine that you ask zero questions of a

1   complainant?  I am still receiving a relentless bombardment of

2   harassing phone calls to my personal cell phone and radio

3   show."

4       Q.   Okay.  You then provide them -- I keep forgetting I

5   can't scroll.

6            You then provide them a whole bunch of numbers that

7   have been calling you in relation to this harassment?

8       A.   Yes.

9            MS. KRASINSKI:  Your Honor, at some point I'm going

10  to object to this.  We're not refreshing recollection.  We're

11  not --

12           THE COURT:  I agree.

13           You can ask the questions.  Just don't basically

14  disclose the content of a document that's not yet in evidence.

15  You can lay a foundation and try to admit the document.  You

16  can ask questions about what he did.  And if he needs to look

17  at the e-mail chain to refresh his memory, he can do that.

18           MR. WOLPIN:  Okay.

19           THE COURT:  The one thing you can't do is take

20  documents not in evidence and basically have the witness

21  describe what they contain.

22      Q.   Now, those e-mails continue.  You send the FBI a

23  number of e-mails?

24      A.   Yes.

25      Q.   And we're not going to go certainly through all of

```
 1   them, but you provide them information about this ongoing
 2   problem that you have?
 3        A.    Yes.
 4        Q.    And is there a time when you are able to meet with
 5   them?
 6        A.    Yeah, I met with them for the first time in
 7   September of 2019.
 8        Q.    Why did you agree to do that?
 9        A.    Because I needed their help.
10        Q.    And where was that?
11        A.    At the KPD.
12        Q.    Keene Police Department?
13        A.    Yeah.
14        Q.    And you went and met with FBI agents, Keene PD.
15   Who did you eventually meet with?
16        A.    I met with Joel Chidester, Kevin LeBlanc, and
17   Shayne Tongbua.
18        Q.    Okay.  And why did you ask that Joel Chidester --
19   did you ask that Joel Chidester be there?
20        A.    Yeah, I asked -- the FBI wanted me to come to their
21   Bedford office, and I didn't trust them and so I said meet
22   with me at the KPD with Joel Chidester because I trust Joel
23   Chidester.
24        Q.    And when you met with them in September, did you
25   talk about Cheddar Mane?
```

1    A.    Yes.

2    Q.    Okay.  Did you tell them about the CPS call?

3    A.    Yes.

4    Q.    Did you tell them whether you had any concerns

5  about liability at that point?

6    A.    Yeah, I told them that somebody told me that this

7  CPS thing was -- it could be interpreted as extortion.

8    Q.    When you were there meeting with them, did you have

9  a concern that you had made a rape threat?

10    A.    No.

11    Q.    Was that what you were talking about when you said

12  liability?

13    A.    No.

14    Q.    Now, you said you got an e-mail from somebody that

15  gave you some concern.  Who was the person you got the e-mail

16  from?

17    A.    It was my system administrator, a fellow by the

18  name of Ryan.

19    Q.    Okay.  Do you remember what he said to you?

20    A.    Yeah, the subject line was --

21          MS. KRASINSKI:  Objection.  Hearsay.

22          THE COURT:  I'm not sure that it's being admitted

23  for the truth, but I need to understand what's being done so

24  go back and use the headsets, please.

25          (SIDEBAR)

1          THE COURT:  What is the witness going to say?

2          MR. WOLPIN:  He's going to say that the person told

3    him he could have some liability for blackmail which --

4          THE COURT:  Excuse me.  Mr. Wolpin, why don't you

5    go back to where you were questioning from because if you're

6    going to stand, it's hard for you to get close to the mic, and

7    there's a mic there, right?

8          MR. WOLPIN:  Right.

9          THE COURT:  So if you would just whisper into the

10   mic.

11         MR. WOLPIN:  So what I expect him to say is that

12   this person sent him an e-mail.  That e-mail included a

13   reference to blackmail.  That was the thing that made him

14   concerned about his liability.  That was his motive to talk to

15   the FBI about that.

16         THE COURT:  And this is in part an explanation for

17   the excerpts that the government introduced?

18         MR. WOLPIN:  Yes.

19         THE COURT:  All right.  So it's not being

20   introduced for the truth of any matter that the person

21   asserted?

22         MR. WOLPIN:  No.  This is not a lawyer or some --

23         THE COURT:  The hearsay objection is overruled.

24         MR. WOLPIN:  Thank you.

25         (CONCLUSION OF SIDEBAR)

1    Q.   So you got an e-mail from your systems
2  administrator?
3    A.   Yes.
4    Q.   And do you remember -- or what did he say that gave
5  you some concern?
6    A.   He said, don't blackmail these guys, and the
7  implication that he made was essentially, like, if you're
8  going to get the government after somebody, just do it.  Don't
9  threaten them because you will get yourself in hot water with
10  the law yourself.
11    Q.   Okay.  So did you have then blackmail on your mind
12  when you went to meet with the FBI?
13    A.   Yeah.  I had Googled the term after that, and it
14  was kind of a downward spiral from there.
15    Q.   Okay.  And you told the FBI at that meeting that
16  you were concerned about that?
17    A.   Yeah.
18    Q.   Okay.  And you went to meet with them knowing that
19  you had that concern?
20    A.   Yes.
21    Q.   All right.  Now, when you meet with them, is it
22  clear to you whether they, that first time in September, is it
23  clear to you whether they have this exchange between you and
24  Cheddar Mane?
25    A.   Yeah.

1       Q.     Okay.  And what would they not have if they had the

2   online version of that?

3       A.     If they had -- which they did, they had the -- the

4   parts that -- they had the screenshots of Cheddar I published.

5   And if they were missing anything from that, it would have

6   been the photographs that I had provided to them.

7       Q.     Okay.  So you ultimately provided them the missing

8   pieces, the actual photographs?

9       A.     Yeah.

10       Q.     Now, did you provide them your own version of that

11   chat?

12       A.     I did not.

13       Q.     Okay.  Did you tell them whether the chat was real?

14       A.     In that moment I didn't go through every line of

15   the thing, but I said I think that you guys are aware of this

16   exchange and I said the gist of what happened.

17       Q.     Okay.  Now at that time -- we're now in September,

18   that was back in June -- what did you think about your own

19   records?

20       A.     Well, I had deleted the chat, okay, and so -- I had

21   taken screenshots of the thing before I blocked and deleted

22   Cheddar Mane, okay, but I had deleted the actual original chat

23   itself and so those were the records that I had.

24       Q.     Okay.  Now, let's talk for a second.  You have --

25   you keep a lot of data?

1      A.   I keep -- yeah.

2      Q.   All right.  How many computers do you have at your

3  house and hard drives and those things?

4      A.   It would -- the easier way to do this might be to

5  say that I had roughly 40 terabytes of data when this case

6  came about.

7      Q.   Okay.

8      A.   Which is a huge -- I mean, it's just ridiculous.  I

9  mean nobody has that.

10     Q.   And what's on that?

11     A.   It is videos, images, thousands and thousands,

12 millions perhaps, hundreds of thousands of images, audio

13 files, recorded phone calls.  I mean, just -- you know, I

14 don't delete things habitually.

15     Q.   Okay.  And at the time you met with the FBI what

16 were you thinking about when they asked you about the chats?

17     A.   I was nervous, okay?  You know, I initially said to

18 them, you know, they told me when we sat down, you don't have

19 to talk about anything you don't want to talk about, okay?

20     Q.   Let's take a pause there.

21     A.   I was nervous about --

22     Q.   Take a pause for a second.

23     A.   Okay.

24     Q.   Specifically as to the exchange between you and

25 Cheddar Mane, what did you think they needed more of?

```
1          A.    I didn't think that we needed to discuss that at
2    all, and I certainly didn't think that they needed more than
3    they had.
4          Q.    Okay.  And you provided them the pictures?
5          A.    I provided them the pictures.
6          Q.    Okay.  Now, did you meet with the FBI a second
7    time?
8          A.    Yes, in October.
9          Q.    Was that a meeting by choice?
10         A.    Yes.
11         Q.    Okay.  And when you met with them that time, what
12   was the purpose of that meeting as you saw it?
13         A.    It was -- they invited me back in an e-mail thread
14   entitled harassment complaint.  They were talking about, they
15   were telling me that they were following up on the complaint
16   that I had made and that they were there to help me.
17         Q.    And then when you appeared to meet with the FBI,
18   who was there from the FBI?  Do you remember?
19         A.    Agent LeBlanc.
20         Q.    Okay.  And did you have a meeting with him at that
21   point?
22         A.    Yeah, him and Joel Chidester were both in the room.
23         Q.    Okay.  And who sort of led that meeting?  Was it
24   you talking or them?
25         A.    That meeting was led by LeBlanc.
```

1          Q.    Okay.  And what was the primary focus of that

2    meeting?

3          A.    The chat with Cheddar Mane.

4          Q.    Okay.  And when you spoke with him, were you

5    honest?

6          A.    Yes.

7          Q.    When you spoke with them the first time, were you

8    honest?

9          A.    Yes.

10         Q.    Now, you ultimately provide them a copy of a phone

11   call between you and Katelen Fry?

12         A.    In December, yeah.

13         Q.    In December.  Again, the government has played that

14   so that's something that's now in their possession, correct?

15         A.    Yeah.

16         Q.    Okay.  Was that something that you were forced to

17   turn over?

18         A.    No.

19         Q.    Okay.  How did it come to be that you recorded a

20   phone call of yourself with Ms. Fry?

21         A.    So I habitually -- I have an app on my phone that I

22   habitually record my phone calls because part of the reason is

23   I'm terrified of finding myself in positions like this one,

24   okay, and so I record my phone calls.

25              I have an app -- New Hampshire law, you have to --

1    both parties have to consent.  So I have a thing that asks me

2    each call, do you want to keep the recording, okay?

3            Katelen understands that if she calls me on the

4    regular phone, that it records the phone call.  If she wants

5    to call me without the recording, she calls me Signal or

6    Telegram or whatever.  So we had trouble connecting with

7    Telegram.  We ended up on a regular thing.

8            So that's how the call gets recorded.

9        Q.    Okay.  And at that point were you trying to

10   preserve evidence for the FBI?

11       A.    No.

12       Q.    Okay.  So that call was recorded.  What was the

13   reason or the context in which you gave that to the FBI?

14       A.    Well, I was -- they came to see Katelen, and

15   Katelen was upset that they -- Katelen was upset that the FBI

16   came to her, she was afraid of them, and so I wanted them to

17   leave her alone.

18       Q.    Did you turn it over because you didn't want them

19   to go out and speak with her again?

20       A.    Yeah, I didn't want them to bother Katelen.

21       Q.    Okay.  And you thought that would contain the

22   information they would be looking for anyway?

23       A.    So I had e-mailed them and I said, don't bother

24   her, because she told me she didn't want to talk to them.  So

25   I said, don't bother Katelen, and they said to me that they

1  had to, like, conduct their interviews and it was standoffish,

2  okay, and so I thought that -- the impression that I got from

3  what the agent said to me was that he thought I was trying to

4  prevent him from speaking to a witness or something, and I'm,

5  like, dude, I'm not trying to prevent you from getting

6  information.  This girl is upset.  This girl I care about, she

7  called me fucking crying and I don't want you to bother her,

8  and so I said here's the recording of the conversation.

9          MR. WOLPIN:  So if we can, if we can bring up 106A,

10  which is a partial transcript of that recording.

11          Now, this is a part of the recording and without

12  going into what else is in the recording, these are just

13  snippets, right?

14      A.   Yeah.

15      Q.   So you provided a recording that was longer and had

16  more information than at this point we've gone through?

17      A.   Substantially.

18      Q.   Okay.  Now, in this you say, "I didn't threaten to

19  rape his wife.  What I said was you don't want me to put this

20  out there.  One of my incel listeners would love to give her a

21  kid."

22          So what did you think -- at that time when people

23  were saying there might be a rape there, what did you think

24  people were referring to?

25          MS. KRASINSKI:  Objection.  Who is saying this?

1            THE COURT:  All right.  Yeah --

2            MR. WOLPIN:  I can rephrase.

3            THE COURT:  Start again.  It's the first part of it

4    that's problematic.

5            MR. WOLPIN:  Okay.

6        Q.   So you say, "I didn't threaten to rape his wife"?

7        A.   Yeah, I'm referencing an earlier part of the

8    conversation.

9        Q.   Okay.  And that's then followed up by the thing

10   about incel listeners?

11       A.   Right.

12       Q.   Okay.  So when you had heard that -- had you heard

13   from people -- let's go back.

14           MR. WOLPIN:  Let's bring up the other one, 105A.

15   Maybe that will make this a little smoother.

16       Q.   So it's not you that first said something about

17   rape his wife, right?

18       A.   Say that one more time.

19       Q.   It's not you that first says something in this

20   conversation about rape?

21       A.   No, no.  She said to me -- she said to me that she

22   -- she said that I threatened to rape his wife.

23       Q.   She had heard that?

24       A.   I heard these words come out of her mouth, and I

25   was shocked to hear them.

1      Q.   Okay.  At that point is that something you had

2  thought was an issue?

3      A.   No.  This was -- to my recollection everybody had

4  talked about this as a problem that I contacted CPS.

5  Everybody talked about it that way.  That I was ratting was

6  the problem.  Even her.  I had talked to her about this

7  multiple times since it happened.

8           And so this was the first time that I recalled

9  anybody describing this as a rape threat, and I was, like,

10  what the hell are you talking about.

11      Q.   Okay.  So that's that first reference.  That's your

12  response?

13      A.   Yeah.

14      MR. WOLPIN:  Now, if we go back to 106A.

15      Q.   Later in the conversation you say, "I didn't

16  threaten to rape his wife," correct?

17      A.   Right.

18      Q.   And the reference you made to the actual exchange

19  was something about incel listeners?

20      A.   Yes.

21      Q.   Okay.  Is that the part of the exchange in which

22  you're charged with making quote-unquote a rape threat?

23      A.   If I recall the indictment correctly, that and the

24  sex with your wife comment are both deemed -- are both alleged

25  to be that is what I understand it to be at this time.

1    Q.   Now, in your mind the one that gave you some

2  concern -- or came to your mind was this incel listener part,

3  not the part about fucking your wife?

4    A.   Yeah.  So when she says this to me, I immediately

5  said I was shocked and I said, I didn't fucking threaten to

6  rape his wife.  But it occurred to me that, like, this woman

7  cares about me.  She's not trying to hurt me.  She's not

8  attacking me.  I shouldn't get defensive, right?  I told you I

9  asked her to marry me and the thing didn't work out.  So I'm

10  trying to say what is her concern, and I stopped to think

11  about it and I'm, like, what did I say that Katelen -- why

12  does Katelen think I threatened to rape a guy's wife, and so I

13  scanned my head.  I haven't seen this conversation in months

14  at this point.  This is December.

15         And I'm, like, all right, the incel thing, they're

16  involuntarily celibate.  If they're giving somebody a baby,

17  she's probably not consenting.  Okay.  I guess that's what you

18  mean by rape.  That must be what you're talking about, but I'm

19  not threatening.

20    Q.   Is that how you saw it at the time when you made

21  the statements, as a rape threat?

22    A.   No.

23    Q.   Now, the government also provided a call with

24  Hannah Pleasants in February?

25    A.   Yes.

1    Q.   Now, the jury has already heard that's a jail call.
2  So where were you at that point?

3    A.   I was in jail.

4    Q.   And in jail do you get a lot of chances to talk
5  about your case or talk about what's going on with other
6  people?

7    A.   Yeah, you could talk about your case with other
8  inmates all day if you feel like it, you know.

9    Q.   Okay.  Is that what you do?

10   A.   No.

11   Q.   Okay.  So you had a call with Ms. Pleasants.

12        MR. WOLPIN:  If we can bring up 110A.

13   Q.   Now, we are in March 7th, 2020.  Do you remember at
14 that time what you were charged with of those -- do you see
15 some statutes?

16   A.   Yeah, I was charged with 875(B) and (C), threats
17 and extortion.

18   Q.   Okay.  Had you been charged with 875(D) at that
19 time?

20   A.   No.

21   Q.   Okay.  Now, when you see what you're charged with,
22 what do you start doing?  I mean, what's your reaction?

23   A.   When I first got arrested, I knew that I might have
24 a problem, right?  This is what I said to the FBI is somebody
25 told me that this might be extortion, and so I wasn't shocked

1     when I got arrested.

2              When I saw the indictment, I panicked because I'm,

3     like, this is not what I thought the problem was that I had,

4     you know, this is a completely different class of issue, and

5     I'm sorry, it's not funny, but it was a completely different

6     class of problem than I was expecting.

7          Q.   Because you didn't perceive it as a threat to

8     injure or a threat to rape?

9          A.   No.

10         Q.   But you do have some conversations about 875(D),

11    but at that point that's not even a charge you're facing?

12         A.   No, no.

13         Q.   And have you looked -- is there, like, law books

14    and --

15         A.   Yeah.  So when I went down my Google rabbit hole, I

16    looked at the federal statute for blackmail, okay, which is a

17    different -- I used the words extortion and blackmail

18    interchangeably until a couple of months ago.

19              And so I looked up the statute for blackmail when

20    Ryan e-mailed me, and that's a misdemeanor if you accuse

21    somebody of a crime for payment, whatever.  And so when I end

22    up in here they tell me I'm charged with Sections 875(B) and

23    (C), and there's a tablet in the jail and there's a -- you can

24    use the law library on the tablet, and I'm, like, what the

25    hell happened here, let me go look this up, you know.

1      Q.    Were you looking at other parts of the code that

2   you haven't been charged with?

3      A.    Well, yeah, you know, I'm sitting in a cell by

4   myself all day.  They had me in administrative segregation.  I

5   started reading everything in that stupid fucking thing.

6   Sorry.

7            And so I'm looking at this thing and I'm, like,

8   okay, I didn't threaten to rape nobody.  This is fucking

9   crazy, but --

10     Q.    Language, Chris.  Language.

11     A.    And then I see right below it, it's (D), and I'm,

12  like, okay, reputation, that rhymes more with this thing that

13  I was looking at before.

14     Q.    Were you charged with causing extreme emotional

15  distress or cyberstalking at that point?

16     A.    No.

17     Q.    Was that something you had a concern about before?

18     A.    No.

19     Q.    So --

20           MR. WOLPIN:  All right.  Let's look at -- there's

21  another call that the government presented.  That's 111A, and

22  that's a full exhibit.

23           I meant to reference the transcript.  Is that the

24  transcript?  Oh, there isn't a separate transcript for that

25  one?

 1                    THE COURT:  You can use the document camera and put

 2     up the transcript.

 3                    MR. WOLPIN:  Unfortunately, because it was e-mailed

 4     to me last night, I only have it --

 5                    (Government's paralegal retrieves exhibit)

 6          Q.    All right.  So this is April 7th of this year.

 7                    Excuse me.  This one, unfortunately, is undated.

 8                    You have a conversation as well with someone named

 9     Ingrid Dean I believe on March 7th?

10          A.    Yes.

11          Q.    And this is another person who you would consider a

12     friend?

13          A.    Yeah, Ingrid Dean is my on-again, off-again

14     girlfriend throughout the years.

15          Q.    So someone else you have a relationship with?

16          A.    Yeah.

17          Q.    Okay.  And you're having and getting to have a call

18     with that person?

19          A.    Yep.

20          Q.    Now, in this you make reference to 875 again (A),

21     (B), (C) and (D)?

22          A.    Yeah.

23          Q.    You note at the top -- again, your sense of what's

24     going on is that this wasn't a rape threat?

25          A.    Right.

1     Q.    But the thing you continued to have concerns about,

2   as you told her, was which part of the statute?

3     A.    875(D), the threats against a reputation.

4     Q.    And in this conversation -- is this someone you

5   care about?

6     A.    Yeah.

7     Q.    Is this someone you're talking to in a normal way?

8     A.    In a normal way?

9     Q.    About what's going on with you, about your case.  I

10   mean, this is what's going on in your life at this point.

11     A.    Yeah, this is somebody who cares about me and I'm

12   in jail, you know.

13     Q.    So did you at any point believe that you had made a

14   rape threat or a threat to injure?

15     A.    No.

16     Q.    Did you believe that you had committed the crime of

17   cyberstalking?

18     A.    At this point I didn't even know about that, and I

19   certainly don't think that I have today, no.

20          MR. WOLPIN:  I have nothing further.

21          THE COURT:  All right.  Thank you.

22          It's probably a good time to break, and then we'll

23   come back with cross-examination.

24          So we'll take a fifteen minute break.

25          (RECESS)

1          THE COURT:  All right.  You can begin

2    cross-examination.

3                    CROSS-EXAMINATION

4    BY MS. KRASINSKI:

5          Q.    Good morning, Mr. Cantwell.

6          A.    Good morning.

7          Q.    We didn't talk too much about Vic Mackey and your

8    testimony so far, but he's peppered throughout these

9    communications so let's talk about him first.

10         A.    Okay.

11         Q.    I want to look at Defense Exhibit B-20.

12               Let's go to the second page of that.

13               THE COURT:  This is in evidence?

14               MS. KRASINSKI:  It is, your Honor.

15               THE COURT:  All right.

16         Q.    And so on March 17th of 2019 you had a conversation

17    with Mr. Lambert, right?

18         A.    Yeah.

19         Q.    And in that conversation you said, "When you get

20    doxed, it's all because of Vic.  Remember that."  Right?

21         A.    Yes.

22         Q.    Now, let's move to Government's Exhibit 304, which

23    is also in evidence, and this is a post on your Gab account,

24    right?

25         A.    Yes.

1      Q.    And you said, "I have dox on several of these Bowl

2    Patrol idiots, and I'm gonna start dropping them until they

3    rat out Vic."

4      A.    Yes.

5      Q.    You believed Vic Mackey defaced your website?

6      A.    Yes.

7      Q.    You told the FBI that he was leading a harassment

8    campaign against you?

9      A.    Yes.

10     Q.    And you were mad at Vic Mackey?

11     A.    I was.

12     Q.    Really mad at Vic Mackey?

13     A.    I was really mad at Vic Mackey.

14     Q.    How mad at Vic Mackey were you?

15     A.    I don't know how to measure that.  I'm sorry.

16     Q.    Now, let's go to the conversation with Mr. Lambert.

17   Government's Exhibit 100.

18           And when you were talking to Mr. Lambert in June of

19   2019, you mentioned Vic.  So the first time is on page 2 of

20   this, so let's take a look at that.

21           And you say, "If you want to dox Vic, use a better

22   target, but if you give me fake info, then your wife is gonna

23   have trouble sleeping at night until she leaves you and takes

24   your kids away."

25           A.    Yeah, I said that.

1      Q.   And so you brought up Vic?

2      A.   I did.

3      Q.   And then if we go to the next page you say, "Give

4  me Vic.  It's your only out."

5      A.   I do.

6      Q.   And so you offered Mr. Lambert an out?

7      A.   I did.

8      Q.   The out of identifying Vic?

9      A.   One of them, yeah.

10      Q.   An out is a way to get out of a situation?

11      A.   Cheddar Mane had presented himself to me as some

12  innocent guy who made a mistake, and he could prove that by

13  giving me Vic's identity.

14      Q.   So an out --

15      A.   Yeah.

16      Q.   -- is a way to get out of a situation?

17      A.   Yes.

18      Q.   A way to prevent you from doing things?

19      A.   Yes.

20      Q.   And on page 5 of this conversation you say, "Give

21  me Vic."

22      A.   I do.

23      Q.   And again what you mean by that is give me Vic's

24  dox.  Fair?

25      A.   Yeah.  I mean, you know, dox is a pretty broad

1    category of stuff, but give me something, yes.  Give me --

2    what you know, tell me.

3         Q.    Something so that you can identify Vic Mackey?

4         A.    Yes.

5         Q.    You can dox Vic Mackey?

6         A.    So I could report him to law enforcement amongst

7    other things, yes.

8         Q.    You can expose Vic Mackey?

9         A.    Yes.

10        Q.    And on page 6 of this you say, "Tell Vic that if he

11   gives himself up, he can save your family."

12        A.    Yep.

13        Q.    You mentioned Vic Mackey four times during this

14   conversation?

15        A.    Thanks for keeping track, yes.

16        Q.    Now, let's go back to the first page of

17   Government's Exhibit 100.  Some way, somehow Mr. Lambert ended

18   up in your Peaceful White Folk Telegram chat.  Fair?

19        A.    Yes.

20        Q.    And you sent him a message?

21        A.    I did.

22        Q.    A private message?

23        A.    Yes.

24        Q.    You said, "I guess you forgot the lesson which kept

25   you away for a short while.  Do you need to be reminded?"

1      A.    That's what I said.

2      Q.    And you sent that message at 9:00 p.m.?

3      A.    Yes.

4      Q.    And then you got his address?

5      A.    Yes.

6      Q.    And you got that from Katelen Fry?

7      A.    I did.

8      Q.    And almost a half an hour later you send another

9   message?

10     A.    About a half hour after the first one, yes.

11  There's a half hour between those two messages, yes.

12     Q.    And you had time to think about what you wanted to

13  say?

14     A.    Well, there's a half hour between these things.  To

15  be clear, I wasn't sitting in front of my screen waiting for

16  the next opportunity, right?  I was doing other things.  This

17  was happening on my phone.

18     Q.    But you did have time to think about what you were

19  going to say?

20     A.    Yeah.

21     Q.    And you sent him a message that said, "Twin Creek

22  Road"?

23     A.    Yes.

24     Q.    And that was deliberate?

25     A.    Yeah.

1    Q.   You wanted him to know you knew where he lived?

2    A.   Yeah.

3    Q.   You wanted him to know that this was real?

4    A.   Yes.

5         MS. KRASINSKI:  And let's go to page 2 of this,

6    Government's Exhibit 100.

7    Q.   And you send a message at 4:15 p.m.  Can you read

8    that for us?

9    A.   "You're a fucking liar.  You came here with your

10   loser fucking pals because you have the attention span of a

11   nigger and the morals of a kike, and because of that fact

12   you're going to lose everything you have."

13   Q.   And when you say lose everything, you're talking

14   about his job?

15   A.   Well, to be clear, I don't know what his job is,

16   okay, but I know that your life gets upended when you get

17   outed, yes.

18   Q.   So potential for losing your job?

19   A.   Yes.

20   Q.   Possibly losing your wife?

21   A.   Yes.

22   Q.   Possibly losing your family?

23   A.   To be clear, I thought at the time that his wife

24   knew about him, but, you know, it will disrupt your

25   relationship if you get outed for a Nazi.  That's for sure.

1      Q.   So you're talking about all these things?

2      A.   Yeah.

3      Q.   And then 30 minutes later you send another message:

4  "Next time I post that photo the faces won't be blurred, and

5  then you're gonna start getting unexpected visitors."

6      A.   Yep.

7      Q.   You were talking about doxing?

8      A.   Yeah.

9      Q.   And you have some thoughts about doxing.  Fair?

10     A.   I do.

11     Q.   You testified yesterday that doxing is serious

12  business?

13     A.   I did.

14     Q.   You've said before in an article on your website

15  that it helps to think of doxing as a form of violence?

16     A.   It helps to think of it in similar terms, yes.

17     Q.   Similar terms as a form of violence?

18     A.   Yes.

19     Q.   And after you talked about doxing him you talked

20  about him getting unexpected visitors?

21     A.   Yes.

22     Q.   People would start coming?

23     A.   I'm sorry?

24     Q.   People would start coming?

25     A.   Well, potentially, yeah.

```
 1          Q.    Coming unexpectedly?

 2          A.    Yeah.

 3          Q.    Whenever they chose?

 4          A.    Well, look, I can't -- the point is that if your

 5   address is out there, yes, then that can happen.  I'm not

 6   saying that I'm sending anybody to your house.

 7          Q.    But that's ominous?

 8          A.    It's ominous, indeed, and intentionally.

 9          Q.    You meant it to be ominous?

10          A.    I did.

11          Q.    Because as you say, doxing carries the potential

12   for violence?

13          A.    It does.

14          Q.    And we've talked a little bit about this.  You sent

15   e-mails to law enforcement?

16          A.    I did.

17          Q.    One of those e-mails was to Keene Police Officer

18   Joel Chidester?

19          A.    Yes.

20          Q.    You sent him an e-mail on June 21, 2019?

21          A.    Yes.

22          Q.    You typed the e-mail?

23          A.    I did.

24          Q.    You chose your words?

25          A.    I did.
```

1       Q.    And in that e-mail you said, "I threatened to

2   release one of their identities and he called my bluff.  So I

3   published what I had and invited CPS in Missouri to check on

4   his children."

5       A.    That sounds about right, yes.

6       Q.    You called it a threat?

7       A.    I did.

8       Q.    And in your testimony yesterday you said, "I'm

9   careful what I call a threat."

10      A.    Yes.

11      Q.    And you also e-mailed with the FBI?

12      A.    I did.

13      Q.    And one of those e-mails was on August 28, 2019?

14      A.    I'm willing to agree to that.  I don't have the

15  thing in front of me, but yeah.

16      Q.    If you don't remember, let's pull up --

17      A.    There were a number of e-mails exchanged.  I don't

18  remember the dates, but that sounds reasonable.

19            MS. KRASINSKI:  For the witness only, let's display

20  what's been marked for identification as Government's Exhibit

21  502.

22      Q.    Take a look at that for a minute.  If you need to

23  scroll through, let us know, and let me know when you've had a

24  chance to finish looking at that.

25      A.    Okay.  I mean, I don't know what the goal is here,

```
 1   but I'm familiar with this message.
 2           MS. KRASINSKI:  We can take it down, Ms. Sheff.
 3   Thank you.
 4        Q.   And that's an e-mail that you sent?
 5        A.   It is.
 6        Q.   On August 28, 2019?
 7        A.   Yes.
 8        Q.   You typed the e-mail?
 9        A.   I did.
10        Q.   You chose your words?
11        A.   I did.
12        Q.   And you were talking about your interactions with
13   Ben Lambert?
14        A.   I did.
15        Q.   And you said, "I threatened to expose his
16   identity."
17        A.    I threatened to expose his identity sounds like
18   something I would have said in that e-mail, yeah.
19        Q.   You characterized it as a threat?
20        A.   Yes.
21        Q.   And you carried out this threat?
22        A.   I did.
23        Q.   You posted pictures of Ben Lambert -- well, a
24   picture of Ben Lambert?
25        A.   Yes.
```

1      Q.    You posted a picture of Mrs. Lambert?

2      A.    I did.

3      Q.    You posted a picture -- that picture -- one of

4    those pictures had her holding her children?

5      A.    I'm sorry.  Say again.

6      Q.    One of those pictures --

7      A.    One of the pictures was of the children, yes, yes.

8      Q.    Where she was holding one of them?

9      A.    Yes.

10     Q.    And you posted another picture of her and her

11   children?

12     A.    That sounds about right, yes.

13     Q.    And we can look at that.  That's Government's

14   Exhibit 102 which is in evidence.

15           And if we look at the second page of that, you also

16   disclosed his identity -- excuse me, his address?

17     A.    Yes.

18     Q.    You said, "Like I said, if I could just drive down

19   to Twin Creek Road in Winfield, Missouri, and shoot this

20   idiot, I would."

21     A.    That's what I said.

22     Q.    You put this in the Radical Agenda Telegram group?

23     A.    Yes.

24     Q.    A public group?

25     A.    Yes.

1      Q.    With hundreds of listeners or viewers?

2      A.    Yes.

3      Q.    With some of your listeners?

4      A.    Yeah.

5      Q.    With some of your incel listeners?

6      A.    Well, to be precise, I know of exactly two incel

7  listeners, and I'm actually not sure that they're in that

8  chat, but potentially, sure.

9      Q.    And I want to go back to Government's Exhibit 100

10 here, back to this statement, page 2 of this exhibit, and you

11 say, "Next time I post that photo," because you had posted it

12 before?

13     A.    I had posted it with the faces blurred out, yes.

14     Q.    And to be clear, you're talking about the picture

15 of Mrs. Lambert and her three children?

16     A.    Yeah, I think it's the one that he described as

17 being from Christmas, yes.

18     Q.    You took the time to edit the photograph?

19     A.    Yes.

20     Q.    You blurred out the faces?

21     A.    I did.

22     Q.    And I believe you testified yesterday that you

23 posted it in the Peaceful White Folk group?

24     A.    That's my recollection, yes.

25     Q.    And I think you testified that that was an

1  invitation-only group?

2      A.    To be precise, that's a functional thing, and so,

3  like, the -- you need an invitation link.  So anybody who has

4  that can get it.  It's not like -- I didn't invite Cheddy Blac

5  into it, but it's what they call the function of it.  You need

6  an invitation link.

7      Q.    And so you hadn't invited Cheddar, Cheddarman, into

8  that group?

9      A.    No.  The invitation link to Peaceful White Folk had

10 been posted to the Radical Agenda public group, which is how

11 people were joining the invitation-only group.  The private

12 invitation link was made public was the function.

13     Q.    And you posted this blurred photo sometime before

14 this exchange, "next time"?

15     A.    I don't know at what point in or before the

16 exchange, but it was around about the time of this discussion,

17 yes.

18     Q.    I think you mentioned in your testimony yesterday

19 that you became aware that Katelen Fry received messages about

20 a photograph with children on June 15th, 2019?

21     A.    Could you repeat that question?  I'm sorry.

22     Q.    I think you testified yesterday about Katelen Fry

23 sending you a message.

24     A.    Katelen Fry sent me a message on the morning of

25 June 15th, yes.

1        Q.    And it was about a photograph of children?

2        A.    No, that was not what Katelen messaged me about in

3    the morning.

4        Q.    But regardless, you posted this some time before

5    this conversation "next time"?

6        A.    Now you're talking about the photo of the blurred

7    faces again?  Yeah, before I said next time I had posted the

8    photo with the blurred faces, yes.

9        Q.    And you blurred the faces because doxing is serious

10   business, right?

11       A.    It certainly is, yeah.

12       Q.    So you threatened to dox Mr. Lambert?

13       A.    Yes.

14       Q.    And you did dox Mr. Lambert?

15       A.    Yes.

16       Q.    And let's talk about Child Protective Services.

17       A.    Okay.

18       Q.    If we go to page 6 of this, you say, "On Tuesday

19   I'm going to send every episode of Bowlcast along with your

20   identifying information to whatever the local equivalent of

21   CPS is in your jurisdiction."

22       A.    That's what I said.

23       Q.    And then you said later in that, "But I'm pretty

24   sure once that visit comes you'll understand that this is

25   serious."

1    A.    Yeah, I had already been to the cops repeatedly

2  about it.  I would say it was serious.

3    Q.    Yesterday you testified that the idea of calling

4  Child Protective Services was somehow supposed to be less

5  serious than doxing.  Is that fair?

6    A.    Yes.

7    Q.    Kind of like an interim step?

8    A.    Yes.  It was a way to prevent the information from

9  becoming public.  Hoping that if he got a visit from the

10  government, he would wake up and stop the problem.

11    Q.    Now, you host the Radical Agenda?

12    A.    Yes.

13    Q.    It's your podcast?

14    A.    It is.

15    Q.    You care about it?

16    A.    A lot.

17    Q.    I mean, you actually changed the name from Some

18  Garbage podcast because you don't think it's garbage?

19    A.    Not anymore.

20    Q.    You create the content?

21    A.    I do.

22    Q.    You put it on your website?

23    A.    I do.

24    Q.    And the Radical Agenda, you were hosting that in

25  May of 2015?

1          A.    I was.  Wait.  I'm sorry.  What year did you say?

2          Q.    May of 2015.

3          A.    2015?  Yeah, yes.

4          Q.    And in May of 2015 you broadcast episode 6 titled I

5    Hate Cops?

6                MR. WOLPIN:  Objection, your Honor.

7          A.    That was a long time ago.

8                THE COURT:  Put the headsets on.

9                If examining counsel can put the headset on and

10   come back up to where you're examining from, I think that's

11   the easier way to do it.

12               (SIDEBAR)

13               THE COURT:  Okay.  Are you following up on his

14   testimony yesterday where he said something about being

15   respectful of police officers?

16               MS. KRASINSKI:  No, your Honor.  This is a podcast

17   about him getting very upset about a fake call to CPS and how

18   it ruined a family.

19               THE COURT:  Okay.  What's the objection?

20               MR. WOLPIN:  I don't see the relevance at this

21   point.  It's years before.  It has no connection to this

22   offense.

23               THE COURT:  All right.  I think it is relevant to

24   his mental state when he engaged in the acts that comprise the

25   charge, so I overrule your objection.

1          MS. KRASINSKI:  Your Honor, if there comes a point
2     we need to refresh his recollection, we have a video of that
3     and we can do it at a break.
4          THE COURT:  Okay.  Thank you.
5          (CONCLUSION OF SIDEBAR)
6     Q.    In that episode you start with a discussion about a
7     Kentucky family?
8     A.    I do not -- I'm not at -- I have no idea what
9     you're talking about.  I'm sorry.  And generally I don't.  I
10    have hundreds of episodes of the Radical Agenda, and I do not
11    know the content of the 2015 episode you're referencing.
12         THE COURT:  Mr. Cantwell, why don't we let her ask
13    the question.  And if you don't have a memory, then she can
14    stop for now and then she can show you the episode to see if
15    that refreshes your memory.
16         THE WITNESS:  Understood, Judge.  Thank you.
17    Q.    Do you remember having an episode where you talked
18    about the police showing up at a family's home to take their
19    kids away after a phone call to CPS?
20    A.    That sounds vaguely familiar.
21    Q.    Do you remember it?
22    A.    I do not remember the details.
23    Q.    Well, we'll put a pin in this, and at a break we'll
24    let you watch your words to help refresh your recollection.
25    So we'll come back to this.

1              Now, again you say that this was supposed to be
2    some type of interim step, something less serious than doxing?
3         A.    Yes.
4         Q.    But you doxed Ben Lambert first?
5         A.    Yes.  That's what happened, yes.
6         Q.    And if we go back to Government's Exhibit 102,
7    which is in evidence, and we go to the second page of that,
8    after posting the picture of Mr. Lambert you say, "That's
9    Cheddar Mane, a/k/a Cheddy Blac, and tomorrow morning I'm
10   calling CPS to give them every episode of Bowlcast and inform
11   them that this acid-dropping fake Nazi is endangering those
12   children with his behavior."
13        A.    Yes, that's what I said.
14        Q.    And let's go to the second page -- or the third
15   page, excuse me, of this, and let's look at your final
16   statement about calling CPS in here.
17             Can you read that for us, please?
18        A.    "I hope every CPS worker in Missouri is a Jew or a
19   nigger, and I hope they break every rule and destroy this
20   scumbag's life."
21        Q.    And you did call the Missouri Division of Social
22   Services?
23        A.    I did.
24        Q.    You called around 12:30 p.m. this day.
25        A.    Okay.

1    Q.    And so you threatened to call CPS?

2    A.    I did.

3    Q.    And you followed through?

4    A.    I did.

5    Q.    So two of the things you've threatened, you

6  threatened to dox, you threatened to call CPS, you followed

7  through on?

8    A.    I did.

9    Q.    So now let's go back to Government's Exhibit 100,

10 and let's go to page 3, and in this same conversation you say,

11 "As a matter of fact, I don't.  So if you don't want me to

12 come and fuck your wife in front of your kids, then you should

13 make yourself scarce."

14   A.    That's how I replied to his comment about Peach,

15 yes.

16   Q.    And you testified on direct yesterday that I wanted

17 to say something profoundly unpleasant?

18   A.    Yes, profoundly unpleasant.

19   Q.    You wanted it to have an impact?

20   A.    I did.

21   Q.    And at this point you had already told Mr. Lambert

22 you knew where he lived?

23   A.    Yes.

24   Q.    So it's possible you could show up at his house?

25   A.    Yes, it's possible.

1      Q.    You could show up at night?

2      A.    I mean, this is within the realm of physical

3   possibility, yes.

4      Q.    You could show up during the day?

5      A.    Yes.

6      Q.    You could watch his house?

7      A.    To be clear, no, I couldn't do any of these things

8   in my own mind, but I mean within the realm of physical

9   possibility these things could happen, yes.

10      Q.    Now, I want to talk about the claim you just made,

11   right, that this was in response to a threat to Peach, a

12   threat to Katelen Fry.

13      A.    An ominous statement about Peach, yeah.

14      Q.    Let's look at that.  Let's look at that statement.

15   Mr. Lambert said, "So I'm assuming Peach took the picture.

16   Guess that means you don't care what happens to her either."

17      A.    That's right.

18      Q.    Then Lambert didn't say he was going to hurt her?

19      A.    He didn't.

20      Q.    He didn't say he was going to rape her?

21      A.    No.

22      Q.    He didn't say that a Bowl Patrol listener would

23   give her a baby?

24      A.    No.

25      Q.    It could have meant that she would have been

1    associated with a doxing?

2            MR. WOLPIN:  Speculation, your Honor.

3            THE COURT:  Overruled.

4        A.    The whole point of this statement is that you don't

5    know what's going to happen.

6        Q.    I don't think you answered my question, though.

7            It could have meant that she would have been

8    associated with the doxing?

9        A.    It could have.

10       Q.    It could have meant that this community, this white

11   nationalist community would have known her as someone not to

12   trust?

13       A.    And it could have meant that his wife would consent

14   to having sex with me in front of the children.

15       Q.    Well, let's talk about that.  Especially in

16   relation to your discussion yesterday of kucking, and you said

17   it's about depriving someone of their masculinity?

18       A.    Yes.

19       Q.    I think the words you said yesterday were:  You

20   can't satisfy your wife so someone else is going to do it for

21   you.

22       A.    Those are the words I believe I used, yes.

23       Q.    So you're going to satisfy Mrs. Lambert?

24       A.    Not in reality, but that's the implication of this

25   statement, yes.

1           MS. KRASINSKI:  Let's look at Government's Exhibit

2    201, which is in evidence, your Honor.

3           Q.    You've never met this woman?

4           A.    The first time I heard her name was in here.

5           Q.    So you've never met her?

6           A.    No.

7           Q.    She's never met you?

8           A.    That's right.

9           Q.    You don't know these children?

10          A.    No.

11          Q.    How old do these children look to you?

12          A.    Too young to watch something like that.

13          Q.    And so it's your claim today that fucking her in

14   front of these kids would be satisfying to her?

15          A.    The point is to say something sick, and it's sick.

16   I get it.

17          Q.    It's your claim that fucking her in front of these

18   children would be consensual?

19          A.    It's not the claim.

20          MR. WOLPIN:  Objection, your Honor.  He answered

21   the question as to his interpretation.

22          THE COURT:  Overruled.

23          A.    I'm pointing out the ridiculousness of what you

24   were saying previously.

25          Q.    Now, let's go back to Government's Exhibit 100.

1          We were comparing your statement with Mr. Lambert's

2     statement about Peach.

3          So Mr. Lambert didn't say he was going to take any

4     action against Katelen Fry?

5     A.    No, he didn't.

6     Q.    And let's look at your statement.  Your response

7     was specific?

8     A.    Yes.

9     Q.    It involved you?

10    A.    Yes.

11    Q.    It involved you taking a specific action?

12    A.    Yes.

13    Q.    It involved you taking that specific action against

14    one particular person?

15    A.    Yes.

16    Q.    And doing it in a particular way?

17    A.    It did.

18    Q.    Fucking her in front of her children?

19    A.    Yes.

20    Q.    And yours was followed by another statement, "Give

21    me Vic.  It's your only out."

22    A.    A half an hour later, yeah.

23    Q.    Now, both today and yesterday you talked about this

24    idea of fantasy violence?

25    A.    Yes.

1      Q.    You explained that there are certain statements of

2   violence that are so ridiculous that no one could take them

3   seriously?

4      A.    Yeah.

5      Q.    The example that you gave yesterday and was brought

6   up again today was throwing someone out of a helicopter?

7      A.    Yes.

8      Q.    And you've said things like this before?

9      A.    Frequently.

10     Q.    Things that are fanciful?

11     A.    What was the word?

12     Q.    Things that are fanciful.

13     A.    Fanciful, yes.  Yeah.

14     Q.    Things that are ridiculous?

15     A.    Yeah.

16     Q.    Things that could never be taken as a real threat?

17     A.    Yeah.

18     Q.    So we've also talked a bit about Gab?

19     A.    Yeah.

20     Q.    A social media platform that you use?

21     A.    Yes.

22     Q.    And you've posted things that --

23           MR. WOLPIN:  I object, your Honor.

24           I think this may require additional discussion.

25           THE COURT:  All right.  Put the headsets on.

```
 1              (SIDEBAR)
 2              MR. WOLPIN:  Your Honor, at this point our client
 3    has acknowledged and agreed that he's made statements of rapes
 4    and whatever kind.  At this point I don't -- we've had these
 5    discussions.  I don't think putting in extrinsic evidence at
 6    this point is necessary.  He can address generalities, but I
 7    don't see why specifics from unknown times to unknown people
 8    have relevance at this time.
 9              THE COURT:  What are you going to put on?
10              MS. KRASINSKI:  So he has a November of 2018 post,
11    "All white men should hunt down and mercilessly kill as many
12    trannies, faggots, niggers, kikes, and cocks as they possibly
13    can in the new game Angry Goy II."
14              That's not a threat, and I want to contrast it.
15    That is fantasy violence.  It is something no one could ever
16    take as a threat and contrasting it with this which is very
17    specific and very directed.
18              THE COURT:  All right.  I'm going to sustain the
19    objection on Rule 403 grounds.
20              In my view there are many other ways you can make
21    your point without calling attention to a specific deeply
22    offensive statement he made that isn't tied directly to the
23    case.  So I'm sustaining the objection on Rule 403 grounds.
24              MS. KRASINSKI:  Yes, your Honor.
25              (CONCLUSION OF SIDEBAR)
```

1     Q.   And fantasy violence is something that
2  reasonably -- that no one could reasonably think was ever
3  going to happen?
4     A.   Pretty much, yes.  I mean, that's a pretty accurate
5  description of it.  It is far enough either in temporal
6  distance or actual representation that it ought not to be
7  taken seriously.
8     Q.   Your statement, "If you don't want me to come and
9  fuck your wife in front of your kids," it's not ridiculous.
10  It's not like throwing someone out of a helicopter.
11     A.   For me to come and fuck his wife in front of his
12  kids to me is ridiculous, and it should be ridiculous to him.
13     Q.   To do that you would have to know where he lived,
14  right?
15     A.   Yes.
16     Q.   And you made sure he knew you knew where he lived?
17     A.   Some numbers of hours prior, yeah.
18     Q.   Now, I want to talk about why you chose Mr.
19  Lambert, why you chose Cheddar to threaten.
20          If we go back to page 2 of this, you told him, "And
21  I don't care if it's you causing the trouble.  You're the one
22  who's gonna suffer because you're the one who I can get."
23     A.   Yes.
24     Q.   "I don't care if it's you causing the trouble."
25     A.   That's what I said.

1      Q.    Because you knew Ben Lambert at that point wasn't

2 causing the trouble.

3      A.    That's not true.  That's very inaccurate.

4      Q.    Let's go back to page 1 of Government's Exhibit

5 100.  Your first message is, "I guess you forgot the lesson

6 which kept you away for a short while."  You knew he had been

7 leaving you alone for a short while?

8      A.    That is not accurate.

9      Q.    You wrote that --

10      A.    There's a lot of inaccurate stuff in this chat.

11 Would you like me to explain?

12      Q.    I would like you to answer my question.  You

13 wrote --

14      A.    I wrote that --

15            THE COURT:  Wait, wait.  I'm sorry.

16            She gets to ask the question.  You answer.  Your

17 lawyer will have a chance to do redirect.

18            Ask a question.

19      Q.    You wrote, "I guess you forgot the lesson which

20 kept you away for a short while."

21      A.    I wrote that.

22      Q.    And you -- and actually, let's turn to defense

23 exhibit, which is already in evidence, I-2-B.  Let's go to the

24 last page of this.

25            The last time Mr. Lambert's cell phone was used to

1  call in to the Radical Agenda was January 30, 2019, before

2  these chats?

3      A.    That's the last time that that number identified

4  itself on my call-in system.

5      Q.    So he didn't use this number to prank call you in

6  February of 2019?

7      A.    He did not use that number to prank call me in

8  February of 2019.

9      Q.    Or in March of 2019?

10     A.    Not with that number.

11     Q.    Or in April of 2019?

12     A.    Not with that number.

13     Q.    Or in May of 2019?

14     A.    Not with that number.

15     Q.    And you testified yesterday -- let me make sure I

16  get it accurate -- that you didn't have anything you could

17  specifically attribute to him.

18     A.    That is accurate.

19     Q.    You said, "I don't care if it's you causing the

20  trouble because you're the one who's gonna suffer because

21  you're the one I can get."

22     A.    Yes.

23     Q.    And when your website was vandalized in February of

24  2018 -- or '19, excuse me.

25     A.    Yes.

1      Q.    It's Vic Mackey who you believe did that?

2      A.    I believed it was Vic Mackey and Mosin-Nagant who

3   vandalized the website, and in the FBI complaint I mentioned

4   the Bowl Patrol and months of a harassment by the group.

5      Q.    Well, let's talk about that.  You have.  You've

6   attributed a lot to the Bowl Patrol, but as you say, you were

7   e-mailing with the Keene Police Department before this?

8      A.    To be clear, not before my contacts with the Bowl

9   Patrol, no, but, you know, I -- from 2018 onwards I had a

10   regular communication with Joel Chidester at the Keene Police

11   Department about a variety of problems that I had.

12      Q.    You e-mailed Officer Chidester --

13            MR. WOLPIN:  I object, your Honor.  Relevance as to

14   the existence of other reports.

15            THE COURT:  Overruled.

16      Q.    -- in December of 2018 talking about texts from

17   individuals who claimed to be Skinheads Against Racial

18   Prejudice?

19      A.    Yes.

20      Q.    That they had been threatening you since the year

21   before?

22      A.    Yes.

23      Q.    And that didn't include any mention of Bowl Patrol?

24      A.    No.

25            MR. WOLPIN:  Again, your Honor, I object to

1    relevance.  That there are other complaints --

2              THE COURT:  Yeah, I think you made that objection

3    and I overruled it.  Thank you.

4              MR. WOLPIN:  Thank you.

5         Q.   In January of 2019 you e-mailed Joel Chidester

6    about a woman named Jackie Mason?

7         A.   Yes.

8         Q.   She's not a member of Bowl Patrol?

9         A.   No.

10        Q.   You followed up with two more complaints about Ms.

11   Mason?

12        A.   That sounds about right.

13             THE COURT:  Okay.  I think you've made your point

14   on that.  You can move on.

15        A.   That's how I handle problems.  I report them to law

16   enforcement.

17        Q.   I want to go back to Ms. Fry.

18             Is it fair to say that she's a member of this white

19   nationalist community?

20        A.   Member is a strong word, but she is familiar with

21   the subject matter of Radical Agenda if that would suffice.

22        Q.   She was part of the Radical Agenda Telegram group?

23        A.   Yes.

24        Q.   She was part of a separate Radical Agenda

25   invitation Telegram group?

1      A.    Yes.

2      Q.    And what was the difference between the two?

3      A.    To be precise, I think there were actually two

4  different invitation groups.  One called Radical Invitation

5  and one was Peaceful White Folk, which was functionally public

6  but technically classified as invitation only.  Radical

7  Invitation was a yet still smaller group.

8           The Radical Agenda Telegram group is public, and

9  literally anybody can join that.  The description of that has

10  been at times:  If you don't want to tell it to the New York

11  Times or the FBI, don't say it here.  That's what I say in the

12  Radical Agenda public group.

13           Radical Invitation was literally you don't get in

14  here unless somebody with administrative privileges

15  specifically lets you in.

16           Peaceful White Folk was technically considered

17  invitation only, but the invitation link was passed around

18  such that it was functionally public.

19      Q.    So she was a member of the public Radical Agenda

20  group?

21      A.    Yes.

22      Q.    Was she a member of Peaceful White Folk?

23      A.    Yes.

24      Q.    And she was also a member of this Radical Agenda

25  Invitation group that required an administrator?

1    A.    Yes.  It would be fair to describe her as inner

2    circle.

3         Q.    And she viewed this as a rape threat?

4               MR. WOLPIN:  I object, your Honor.

5         A.    Not at first, no.

6               MR. WOLPIN:  Objection.

7         A.    Only after the FBI came around.

8               THE COURT:  Hang on a second, Mr. Cantwell.

9               I'm going to sustain the objection.

10              So you don't even have to answer the question,

11   okay?

12        Q.    She talked to you about this?

13        A.    Yes.

14        Q.    And today -- and she -- let me get the wording

15   right.  What I want to focus on is your response to what she

16   says.  She says, "Okay, but you threatened to rape Cheddar

17   Mane's wife."  And you said today that your response to that

18   was, I was, like, what the hell are you talking about?

19        A.    Yes.

20        Q.    But that's not actually what you said to her.

21              MR. WOLPIN:  Your Honor, I object.  I don't know

22   that that's -- I think that he was talking about his internal

23   monologue.  I read him or talked about what he actually said.

24              THE COURT:  What he actually said, didn't we play

25   that?  Isn't it in evidence?

1          MR. WOLPIN:  Yes.

2          THE COURT:  So it's in evidence.  We know what he

3    actually said.

4      A.   I think that, what the hell are you talking about,

5    is a fair characterization of how I responded, but maybe

6    that's not an exact quote.

7      Q.   Well, let's listen to how you responded.

8      A.   Yeah, let's do it.

9          MS. KRASINSKI:  I think it's -- this small portion

10   of Government's Exhibit 5 is named in Trial Director as 105, I

11   believe, Ms. Sheff.

12         THE COURT:  So this is an excerpt of what was

13   played to the jury?

14         MS. KRASINSKI:  Correct, your Honor.

15         THE COURT:  Go ahead.

16         (Government's Exhibit 5 is played)

17     A.   Right.

18     Q.   What you said was, "I fucking left that out there,"

19   okay?

20     A.   As I had described to my attorney previously --

21         THE COURT:  Wait a second.  I'm sorry.  We've got

22   to go one at a time.

23     A.   That's the text --

24         THE COURT:  Hang on a second, Mr. Cantwell.  I just

25   want to get the sequencing right.

1              Okay.  So put your question.

2              Wait till she finishes.  Then you answer.

3              You wait till he finishes.

4         Q.   What you said was, "I fucking left that out there."

5         A.   I said that.

6         Q.   And I just want to be clear because you were very

7    upset in your testimony today talking about the FBI visiting

8    Ms. Fry.

9         A.   I was.

10        Q.   You're the one who gave the FBI Ms. Fry's

11   information, correct?

12        A.   I was.

13        Q.   You're the one who asked them to go speak to her,

14   correct?

15        A.   Yes.

16        Q.   So they went out there at your request?

17        A.   Yes.  You're missing a piece.  She had told me

18   before that she didn't want to talk to them, and that's not

19   included in the little snippet that you included here.

20        Q.   But the FBI went to speak to Ms. Fry because you

21   told them to?

22        A.   Yes, because we were crime victims and wanted their

23   help.

24        Q.   Now, you also talked yesterday about your incel

25   listeners.  Fair?

1     A.    Yes.

2     Q.    You said, and you said it today, I know of two?

3     A.    Yes.

4     Q.    You gave a long description of them yesterday?

5     A.    Yeah, Dave and Joe.

6     Q.    You said they're not violent?

7     A.    No, they're not.

8     Q.    You said they're pathetic?

9     A.    In a lovable, adorable way, yes.

10    Q.    You've written about incel before?

11    A.    I probably have.

12    Q.    And on September 30th of 2019, you posted --

13          MR. WOLPIN:  Objection, your Honor.

14          THE COURT:  Basis?

15          MR. WOLPIN:  The date is after this interaction.  I

16  don't know what his knowledge at a future point would have to

17  do with this.

18          THE COURT:  So the date is what?

19          MS. KRASINSKI:  September 30, 2019.

20          THE COURT:  All right.

21          And your point is anything he says about incel

22  after the date of this incident is not relevant?

23          MR. WOLPIN:  Yes.  I mean, I don't know exactly

24  what content they're going to point out, but since it's

25  referring to incidents --

1          THE COURT:  I think we've covered that subject

2     adequately.  I'm going to sustain the objection.

3          THE WITNESS:  I would like to answer that one.

4          THE COURT:  I think your lawyer would like you not

5     to have to answer that one, but if you want to answer it --

6     wait a second.

7          Go ahead and put the question to the witness and

8     the witness can answer.  I'm not going to deprive him of a

9     chance to answer the question.

10     Q.    You said, "I used to think the incel thing was just

11     a pejorative thrown at right-wingers by lowlife leftists who

12     think with their genitals.  It isn't.  These people are real

13     and they are dangerous."

14     A.    Yeah, in September of 2019 that's exactly what I

15     said about incel listeners, because previously at the time

16     that I said that to Cheddar Mane I thought they were a joke.

17     And then in September I found out about this guy who went and

18     killed some people or did something crazy violent, I don't

19     remember the details, and then when I talked to Katelen about

20     it in December I was like, that must be what she's thinking

21     of.

22     Q.    Well, why don't we talk about a post that you put

23     on Radical Agenda in April of 2018.

24     A.    2018 now?

25     Q.    Yes.

1     A.    Okay.

2     Q.    Again, your website.

3     A.    Okay.

4     Q.    Your content.

5           Give me one moment.

6           MS. KRASINSKI:  Your Honor, can we put the headsets

7     on?

8           THE COURT:  Yes.

9           (SIDEBAR)

10          MS. KRASINSKI:  I anticipate a 403 objection on

11    this so I wanted to raise it before I say it.

12          On April 25, 2018, Mr. Cantwell made a post that

13    says, "Chris Harper Mercer, Elliot Rodger, Nikolas Cruz, mass

14    murderers all, none of whom were white I should point out, all

15    identified as incels."

16          THE COURT:  All right.

17          What's the 403 objection?

18          MR. WOLPIN:  At this point we're over the line.  I

19    don't see the point anymore.  The government has made its

20    purpose and its point, and I think at this point when there's

21    talk about race of those individuals --

22          THE COURT:  But your client just testified that he

23    didn't think incels were violent until a later date so I think

24    it is -- on this basis I think it is -- it's relevant because

25    the charges are based in part about a statement about incels

1    coming to the house and the defendant's recent statement about

2    when he learned that incels were dangerous.

3              So objection is overruled.

4              MR. WOLPIN:  I would ask if we could just --

5              THE COURT:  Do you need to talk more?

6              MR. WOLPIN:  Just one more.

7              If they're going to read it, obviously I would ask

8    that they redact any portion about race that has nothing to do

9    with that.  There's no reason to mention that.

10             THE COURT:  Do you have a problem with that?

11             MS. KRASINSKI:  I don't, your Honor.

12             THE COURT:  So go ahead and do that.  The objection

13   is otherwise overruled.

14             But I am going to ask you to move on from this

15   subject.  We've covered it extensively.  Once you finish this,

16   go on to a different subject.

17             MS. KRASINSKI:  Yes, your Honor.

18             (CONCLUSION OF SIDEBAR)

19        Q.   Now, we're talking about your statements on incels

20   before you made these June 2019 comments to Ben Lambert.

21             And you posted an article on your website on April

22   25, 2018, called Saints and Sinners?

23        A.   Okay.

24        Q.   And in that you wrote, "Chris Harper Mercer, Elliot

25   Rodger, Nikolas Cruz, mass murderers all, all identified as

1    incels."

2         A.   Yes.

3         Q.   Now, let's go back to Government's Exhibit 100 and

4    your claim that all you meant was leave me alone.  Stop

5    harassing me.  Leave me alone.

6         A.   Just the driving thrust of what I'm trying to

7    accomplish, yes.

8         Q.   You sent the first message at 9:00 p.m.?

9         A.   Yep.

10        Q.   And Mr. Lambert doesn't respond to that message?

11        A.   No, he doesn't.

12        Q.   He was leaving you alone.

13             THE COURT:  Well, I'll sustain objection to that.

14   You can move on.  It's argumentative.

15        Q.   Let's go to the next page of that.  You send a

16   message at 4:15 p.m.?

17        A.   Yes.

18        Q.   And Mr. Lambert didn't respond directly to that

19   message?

20        A.   No, he didn't.

21        Q.   And you send another message at 4:45 p.m.?

22        A.   Yep.

23        Q.   And he doesn't respond directly to that message?

24        A.   That's right.

25        Q.   And he doesn't respond directly to the next one?

1      A.   That's right.

2      Q.   And he doesn't respond until after you say, "If you

3  want to dox Vic, he's a better target, but if you give me fake

4  info, then your wife is going to have trouble sleeping at

5  night until she leaves you and takes your kids away."

6      A.   That is what I said.

7      Q.   Let's go to the next page.

8           And at 6:41 you say, "As a matter of fact, I don't.

9  If you don't want me to come and fuck your wife in front of

10  your kids, then you should make yourself scarce."

11      A.   That sounds familiar at this point, yes.

12      Q.   And Ben Lambert doesn't respond directly to that

13  message?

14      A.   No, he doesn't.

15      Q.   You reengage?

16      A.   I'm sorry.  Say that again.

17      Q.   You send the next message?

18      A.   I send the next message a half an hour later, yeah.

19      Q.   You say, "Give me Vic.  It's your only out."

20      A.   Yes.

21      Q.   And Mr. Lambert doesn't respond directly to that

22  message?

23      A.   No, he doesn't.

24      Q.   And then over an hour later you respond?

25      A.   Yes.

1      Q.    You say, "I guess I'm gonna have to prove my

2   seriousness."

3      A.    Yes.

4      Q.    And then, if we go to page 6, after Mr. Lambert

5   tells you he doesn't have Vic's dox, you send a message,

6   "Guess you're fucked then."

7      A.    Yes.

8      Q.    Mr. Lambert doesn't respond directly to that

9   message?

10     A.    Nope.

11     Q.    And you wait a little while and send another

12  message at 9:17 p.m.?

13     A.    Yes.

14     Q.    And Mr. Lambert doesn't respond directly to that

15  message?

16     A.    No, he doesn't.

17     Q.    You send him another message a minute later.  In

18  fact, two messages a minute later?

19     A.    Yes.

20     Q.    Mr. Lambert doesn't respond to either one of those?

21     A.    No, he doesn't.

22     Q.    You send two more messages a minute later?

23     A.    Yes.

24     Q.    Ben Lambert doesn't respond to either one of those?

25     A.    That's right.

1    Q.    And then you send another message, "If that doesn't

2    work, I'll escalate until I get what I want."

3    A.    That's what I said.

4    Q.    And Ben Lambert didn't respond directly to that

5    message?

6    A.    That's right.

7    Q.    And then you wait six minutes and you send another

8    message?

9    A.    I don't know if it would be accurate to say that I

10   waited.  Again, this is happening on my phone while the rest

11   of my life is going on, but I didn't send another message for

12   however number of minutes, yes.

13   Q.    And that's when you said, "Tell Vic that if he

14   gives himself up, he can save your family."

15   A.    Yes.

16   Q.    And Ben Lambert didn't respond directly to that

17   message?

18   A.    That's right.

19   Q.    And then you send the last message on this page,

20   "You won't do it, but at least then you'll know you're certain

21   that you chose the wrong side."

22   A.    That's what I said.

23   Q.    And that's when he responds?

24   A.    Yes.  That's right.  That's when he says, "LOL.

25   You're such a fucking nobody, Chris.  Do your worst."

```
1        Q.    He says, "Do your worst."

2        A.    Yeah.

3        Q.    He doesn't say I'm going to go fuck any of your

4   girlfriends?

5        A.    No.

6        Q.    He doesn't say I'm going to go hurt anyone you

7   love?

8        A.    No.

9        Q.    He doesn't say I'm going to come and do anything to

10  you, Chris Cantwell?

11       A.    No.  He just says go boost some meth up your

12  asshole, you faggot-ass kike."  That's all he said.

13             (Attorney Krasinski confers with Attorney Davis)

14       Q.    I want to go back to something you were talking

15  about yesterday.

16       A.    Okay.

17       Q.    Early on in your testimony you were talking about

18  your early relationship with Bowl Patrol.

19       A.    Yes.

20       Q.    And you said that they were talented?

21       A.    They are.

22       Q.    You talked about Photoshop?

23       A.    Yes.

24       Q.    And you turned to this jury and you said to them,

25  you might hear me use Photoshop as a verb sometimes?
```

1      A.    That sounds right.

2      Q.    You chose your words carefully there?

3      A.    I thought it was worth clarifying.

4      Q.    Because you care about language?

5      A.    I am careless with my words from time to time, so

6  this, I'm looking forward to this one, but, no, I'm not

7  careful about my language in a lot of cases, no.

8      Q.    I didn't say --

9      A.    I care about language.  I do, yes.  That's

10 accurate.  Whether I'm careful, that's another question.

11     Q.    You care about language?

12     A.    I care about language.  I do.  It's a very useful

13 tool and a very beautiful art form.

14     Q.    And with this useful tool and this beautiful art

15 form you said, "So if you don't want me to come and fuck your

16 wife in front of your kids, you should --"

17          MR. WOLPIN:  Objection.  Asked and answered at this

18 point.

19          THE COURT:  You should let the question be asked

20 before you start interposing.

21          The objection is overruled and you can ask your

22 question.

23     A.    Are you asking me again if I said that?

24          THE COURT:  Wait.

25          Ask the question again.  The objection is

1    overruled.  Let's have the answer.

2         Q.    With this useful tool and this beautiful art form

3    you wrote, "So if you don't want me to come and fuck your wife

4    in front of your kids, then you should make yourself scarce."

5         A.    That's what I wrote.

6              MS. KRASINSKI:  Subject to refreshing recollection

7    on that one issue --

8              THE COURT:  Right.

9              Members of the jury, there's one matter left where

10   I need to play something for the witness about refreshing his

11   recollection.  That isn't in evidence so you can't hear it.  I

12   don't know of any way to do it without asking you to leave and

13   come back.  So we'll just take a very short break and come

14   back, we'll just do this last thing, and then we'll do

15   redirect, and then we'll be ready for lunch.

16              (IN COURT - NO JURY PRESENT)

17              THE COURT:  If you have a transcript excerpt, you

18   can try that first if it's more expeditious.  You can refresh

19   recollection with anything.

20              MS. KRASINSKI:  No, this shouldn't be difficult.  I

21   believe it's annotated in your system as CPS 3.

22              (Recording played)

23              THE COURT:  Okay.  So that's what you were going to

24   use to refresh his recollection.  He's now heard that.

25              I suggest that we bring the jury back in, that you

1   ask a couple of leading questions to bring us back to the

2   point where you were.  Ask him, now that you have heard what I

3   have played for you, does that refresh your recollection that

4   you had a -- whatever it is you want to say about it.  All

5   right?  And then he can answer, and then that will end your

6   part of this and then we can have direct.

7          MS. KRASINSKI:  Yes, your Honor.

8          MR. WOLPIN:  I would ask for a moment just to

9   object on grounds of relevance and prejudice.

10         I don't know whether he's talking about people

11  making false statements.  That's what it sounds like.  His

12  statements, as we know, to CPS were not false.  When pushed

13  whether there was a crime committed, he said --

14         THE COURT:  If you want to try to bring that out

15  with him in redirect if you think that will help your case, go

16  ahead.

17         The objection is overruled.

18         MR. WOLPIN:  And I would just like 403, 401.

19         THE COURT:  I think I've made the balancing -- I

20  mean, I hope that a court of appeals reviewing this transcript

21  would understand that I know what Rule 403 is because I've

22  read it.  I've done the balancing test a million times in this

23  trial already.  So please refer to other portions of the

24  transcript to know that I have tried to fulfill my obligations

25  under Rule 403 as best I can with an understanding of the rule

1    that has been developed over 40 years of doing this.

2              All right.  So the objection is overruled.

3              We can bring the jury back in.

4              We'll take a break after we're finished with the

5    cross, and if you could disinfect, and then we'll finish up.

6              MR. WOLPIN:  Thank you, your Honor.

7              THE COURT:  Keep the focus on this.  Keep it brief.

8              MS. KRASINSKI:  Yes, your Honor.

9              (IN COURT - JURY PRESENT)

10             THE COURT:  All right.  Go ahead, counsel.

11             MS. KRASINSKI:  Thank you, your Honor.

12        Q.   Now, we had talked a little bit about this idea

13   that calling Child Protective Services was supposed to be an

14   interim step?

15        A.   Yes.

16        Q.   Somehow less serious than doxing?

17        A.   Yes.

18        Q.   And I had asked you about your May 2015, episode 6,

19   Radical Agenda?

20        A.   Yes.

21        Q.   And now -- and I had asked you about whether you

22   remembered your discussion of a call to Child Protective

23   Services from that episode?

24        A.   You did.

25        Q.   And during the break moments ago you watched a

1    portion of that episode?

2         A.   I watched a brief snippet of it, yes.

3         Q.   And did that refresh your memory regarding your

4    discussion of a call to CPS?

5         A.   It refreshed my memory as to the contents of the

6    snippet that you showed me.  The broader context of it, no.

7         Q.   And so you do remember what you said during that

8    portion?

9         A.   Yes.

10        Q.   That someone was intimidating a woman, threatening

11   to take her babies away?

12        A.   The snippet that I heard was they were going to

13   take the babies away for what they knew was a bullshit call.

14        Q.   And that's a call to CPS?

15        A.   Yes.

16        Q.   And so you knew the possible consequences of

17   calling CPS?

18        A.   If the children are in danger, that's basically why

19   we have CPS.

20        Q.   And you knew that?

21        A.   Yes.

22        Q.   And you called CPS because you wanted someone to go

23   to Ben Lambert's house?

24        A.   Yes.

25        Q.   And you described it in your public doxing,

1    Government's Exhibit 102, because you wanted to destroy his

2    life?

3         A.   I described it in decidedly different terms

4    elsewhere, but that's what I said in the public Radical Agenda

5    chat room, yes.

6              MS. KRASINSKI:  No further questions, your Honor.

7              THE COURT:  Thank you.  Redirect?  Oh, we need to

8    disinfect the front podium.

9              (Podium disinfected)

10             THE COURT:  All right.  Go ahead, Mr. Wolpin.

11                       REDIRECT EXAMINATION

12   BY MR. WOLPIN:

13        Q.   If we could bring up I-2-B again.

14             So one of the things the government talked about

15   with you was the fact that Cheddar Mane made calls from a

16   particular number?

17        A.   Yes.

18        Q.   All right.  And we had your chat log up, and they

19   asked you questions about when you had received calls from

20   him?

21        A.   Yes.

22        Q.   All right.

23             THE COURT:  I would ask my case manager, could you

24   enable the defense assistant's screen.

25        Q.   And what we're looking at are the call logs for

1    Benjamin Lambert's number that he has given.

2              Do you see that in front of you?

3        A.    I'm sorry.  The call logs from Ben Lambert's phone,

4    yeah.  Right.

5        Q.    To your show?

6        A.    Yeah.

7        Q.    Okay.

8              MR. WOLPIN:  And if we scroll down to the last

9    page, if we could.

10       Q.    Now, if we look on the January 18th, 2019, one,

11   what does it say next to that call?

12       A.    Blocked.  Caller on blocked list.

13       Q.    Why does it say that?

14       A.    Because I blocked his number repeatedly.

15       Q.    Why did you block his number repeatedly?

16       A.    Well, I blocked it because his calls were no longer

17   welcome.  The repetition of it, to clarify, is because when

18   the call-in lines get flooded, there were times when I would

19   end up accidentally banning innocent people, and I would get

20   e-mails from listeners sometimes like I've been getting busy

21   signals for weeks or whatever.

22             And so on a semi-regular basis I would just clear

23   the banned list because when I was banning these guys,

24   especially for their carrier being Voice over IP, it ended up

25   catching innocent people in it.  And the numbers were

1    disposable so there was no sense in keeping them in the list

2    anyway.

3              So I blocked Cheddar Mane repeatedly and he was --

4    and then he would get back on whenever he was off the banned

5    list or for all I know by using another number.

6         Q.   So you would ban his number because of the content

7    of the call?

8         A.   Yes.

9         Q.   And that ban might last a while and he wouldn't be

10   able to get through?

11        A.   Not with that number.

12        Q.   Okay.

13             MR. WOLPIN:  And if we sort of get rid of the

14   highlight for a moment.  All right.

15        Q.   We see the next call blocked.  The next call is

16   blocked.  So for that period of time was one of the periods of

17   being blocked?

18        A.   Yeah.

19        Q.   Okay.  But that doesn't appear to have deterred him

20   from calling back from his number again on that number 79.

21   When was that?

22        A.   79 is January 30th is when he -- I guess I had

23   cleared the banned list sometime between the 21st and the

24   30th.

25        Q.   And you have no idea whether he's calling back

1    under other phone numbers?

2         A.   No.  It was impossible for me to keep track of

3    which number was which call because, like I said, they had so

4    many phone numbers, right?  It was almost an episodic thing to

5    use the banned list just so that they didn't get back on the

6    line.

7         Q.   Okay.  And after February when you made public the

8    report to the FBI, did you get more calls that came or less

9    calls that came from sort of these burner type accounts?

10        A.   After I made the report in February, wisely I would

11   say, they were all -- it was almost exclusively coming from

12   these disposable Voice over IP services.

13        Q.   Did the actual content -- did the actual calls

14   cease at that point?

15        A.   No.  It got worse.

16        Q.   Now, Mr. Lambert testified about making a call to

17   your show after June 16th and 17th.

18             Do you remember that?

19        A.   Yeah, I remember him mentioning it and I remember

20   the prosecution playing a clip of it.

21        Q.   Okay.  So we see, at least on 81, that that wasn't

22   the only time he called your show after that?

23        A.   81 is, yeah, July 1st, yeah.

24        Q.   Okay.  So he made an effort to call at that point.

25   What does the screen note tell you?

1    A.    The auto screener?

2    Q.    Uh-huh.

3    A.    It says -- I suspect that there might be something.

4    It says Dan Antica terrorist.

5    Q.    So not identifying himself as Cheddar Mane or

6    Cheddy Blac at that point?

7    A.    No.

8    Q.    And there's another one at 80 that is or is not

9    after the June 16th and 17th interaction?

10    A.    Yeah, that's June 21st of 2019.

11    Q.    And what's the name and the call screen noted on

12    that one?

13    A.    So I'm not sure that it meant to be a name.  The

14    call screen note is Bob reparations, and it seems to be that

15    he said, I'm Bob, I'm calling about reparations, or something

16    like that.  That would be a typical refrain of how somebody

17    would introduce themselves to the auto screener.

18    Q.    All right.  So that's another call from Cheddar

19    Mane that was nine minutes long and was not under the name

20    Cheddar Mane, correct?

21    A.    To clarify, he probably sat on hold for eight

22    minutes and 30 seconds is probably what happened.

23    Q.    Oh.  So that doesn't tell you how long he actually

24    got on the air with you?

25    A.    Right.  Yeah.

1      Q.    But these are two different dates than the dates of

2   his admitted call?

3      A.    Right.

4            MR. WOLPIN:  Now, if we can bring up B-12, third

5   page, which is just for the witness at this point, and

6   actually we should probably start up at the top.

7      Q.    Now, you sent e-mails --

8            MS. KRASINSKI:  Your Honor?

9            THE COURT:  Yes.

10            MS. KRASINSKI:  At this point I'm going to object.

11   We're not refreshing recollection.  He shouldn't be testifying

12   from a document.

13            THE COURT:  Right.

14            Are you trying to lay a foundation for the

15   admission of this document?

16            MR. WOLPIN:  I am.

17            MS. KRASINSKI:  Okay.  I withdraw the objection,

18   your Honor.

19            THE COURT:  All right.

20      Q.    So what you're seeing in front of you, is this

21   something that's familiar to you?

22      A.    That is the -- it's a little bit confusing because

23   I think I forwarded it from my ProtonMail to my Gmail, and I

24   think this is to Ad Hoc Labs, the creators of an app called

25   Burner.

1          Q.    Okay.

2                MR. WOLPIN:  And if we go down to the third page,

3     or actually, excuse me, the second page so that we can see the

4     title of the e-mail.

5          Q.    This shows the date, which is what date?

6          A.    Wednesday, February 13, 2019.

7          Q.    Okay.  And what you are trying to accomplish here

8     is to send to a company names of -- numbers that are causing

9     you significant trouble?

10         A.    Right.  When the numbers started flooding the chat

11    and I figured out what they were doing, I contacted the

12    provider of the app and I said, these are the offending

13    numbers, try to do something about the accounts that are

14    causing me this problem.

15         Q.    Okay.

16                MR. WOLPIN:  And if we move down to the third

17    page -- and before I address this, I can move to admit this as

18    a full exhibit, if I can, to strike the ID and move for

19    admission.

20                THE COURT:  You showed me -- I'm familiar with it,

21    but I'm not understanding why it's admissible in evidence.

22                Get your headset.  Put it on.

23                (SIDEBAR)

24                THE COURT:  And come back over to where you were

25    standing.

1          Now tell me what you're trying to do.

2          MR. WOLPIN:  The next page has Cheddar Mane's

3  number on it showing that he sent to the lab an e-mail to

4  block that number.

5          THE COURT:  Why don't you just ask him, didn't you

6  send Cheddar Mane's e-mail -- telephone number to this service

7  and try to block him.

8          MR. WOLPIN:  Okay.

9          (CONCLUSION OF SIDEBAR)

10     Q.    And included in the list of phone numbers that you

11  sent to be blocked was Cheddar Mane's, 636-248-1958?

12     A.    1958 is in that list, yeah.

13     Q.    And so, as you said, these calls kept coming?

14     A.    Yeah.

15     Q.    Now, the government talked with you a little bit

16  about language and your use of language?

17     A.    Yes.

18     Q.    And I think you said you're not always careful with

19  your language.

20     A.    Yeah, I could work on that.

21     Q.    All right.  And even in the courtroom today you've

22  used a swear word or two?

23     A.    Yeah.

24     Q.    Okay.  Now, when these calls came in, how would you

25  respond?

1        A.      That depends on a call.

2        Q.      Were there calls where you used strong language?

3        A.      Yeah.

4        Q.      Were there calls when you would be yelling and

5   screaming angry?

6        A.      Yes.

7        Q.      Okay.  And so would the callers know that that's a

8   reaction they could get from you?

9        A.      They would certainly know that, yes.

10       Q.      Now --

11       A.      And in fairness, I should say that when they see me

12   screaming angry about it -- there was a point made earlier

13   when I just hung up on a guy and moved on, right?  That's how

14   I tried to discourage the behavior, okay?

15              When I'm yelling, screaming angry about it, I

16   should be honest, like, it's part of the show, okay, and I

17   tried to -- you know, I'm a professional.  This is what I do

18   for a living, okay?  And so people are trying to disrupt the

19   show, and I tried to make it entertaining, right?  So I tried

20   to do what I could with this content.

21              And so -- so, yeah, I mean, I shouldn't say that,

22   like, I told them -- I acted angry and then they should have

23   said that that's the reason not to do it anymore.  When your

24   number is blocked and it's busy and you can't get through and

25   I'm hanging up on you and telling you don't call anymore,

1      that's the point at which, you know, I feel that they're doing

2      something wrong.  When I'm yelling at them FU, in fairness

3      it's not what -- they rightly took that for a period of time

4      as encouragement.

5          Q.    Now, the government pointed out that on the Radical

6      Agenda page you made some strong statements about what would

7      happen with CPS.  Do you remember that?

8          A.    You're talking about on the Radical Agenda show?

9          Q.    No.  On the page that came after where you said

10     things about, I hope they do this, I hope they do that, you

11     know, all that stuff?

12         A.    Yeah.

13         Q.    Why did you use such strong language in public?

14         A.    Well, first and foremost, because I was mad, okay?

15     And secondly, because the honest goal there is to be a

16     deterrent against the behavior, right?

17               And so I'm making a public statement of this

18     behavior that I've been dealing with, this campaign of nonstop

19     torment that's been going on for eight months that I've been

20     to law enforcement about repeatedly really needs to stop, and

21     I will do everything within the limits of the law to

22     accomplish that goal.

23         Q.    So were you purposely using more shocking language

24     in public?

25         A.    That was sort of, like, characteristic of the

1    character I play on the Radical Agenda, which is the host and

2    moderator of a chat room.

3        Q.   Okay.  Did you want to totally destroy his life?

4        A.   I hope that Benjamin Lambert outlives Cheddar Mane

5    by a hundred years and he goes on to lead his kids' hockey

6    team to championships and shit, okay?  I don't want to destroy

7    Benjamin Lambert.  I wanted to destroy Cheddar Mane.

8        Q.   Now, I want to talk to you about Exhibit 206, if I

9    could, the government's exhibit.

10            This is the first part of the exchange.  The

11   comment "kept you away for a short while," what does that

12   mean?

13       A.   It means that an account identifiable as Cheddar

14   Mane had not shown up in my -- had not shown up on my problem

15   radar in the last few weeks.

16       Q.   Okay.  And so that was what you meant by that?

17       A.   To be more precise, I probably hadn't seen a

18   Cheddar Mane account in roughly three months.  Since I told

19   him in March I would dox you, okay, I had not been able to

20   identify him as one.  I would love to say how I know that he's

21   lying about being there.

22       Q.   Okay.  But as far as this time goes, part of the

23   issue is you don't know who's calling you or what numbers

24   they're calling you from?

25       A.   They operated as a black block.  The whole point

1    was anonymity.  You never could tie anything to any

2    individual.

3         Q.    Now, the government made a point of explaining that

4    you had half an hour to think about what to do between the

5    first one and the second one.

6         A.    That's right.

7         Q.    All right.

8               MR. WOLPIN:  Now, if we can move to 208.

9         Q.    And then you had a half an hour to plan what you

10   would say and to think through what you would want to say,

11   correct?

12        A.    That's what they -- that' the implication.

13        Q.    Now, between the text or Telegram chat about Peach

14   and the Telegram chat about the wife, how much time do you

15   have between those?

16        A.    Less than two minutes.

17        Q.    Okay.  How many times do you mention Vic Mackey in

18   that text?

19        A.    In that --

20        Q.    In that specific --

21        A.    In that message?

22        Q.    Yes.

23        A.    Zero.

24        Q.    What do you actually ask him to do in that message?

25        A.    Get scarce, or make yourself scarce, as in don't be

```
 1   around me.
 2             MR. WOLPIN:  If I could just have a moment?
 3             THE COURT:  Yes.
 4             (Attorney Wolpin confers with Attorney Levin)
 5             MR. WOLPIN:  That's all.  Thank you.
 6             THE COURT:  I think we've covered it.
 7             Is there anything else?
 8             MS. KRASINSKI:  No, your Honor.  Thank you.
 9             THE COURT:  All right.  Thank you.
10             Does the defense have any additional witnesses?
11             You can step down, Mr. Cantwell.
12             MR. WOLPIN:  No, your Honor.
13             THE COURT:  Defense rests?
14             MR. WOLPIN:  Yes.
15             (Conclusion of requested excerpt)
16
17
18
19
20
21
22
23
24
25
```

1                        C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 12-8-20    /s/    Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25