*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 9, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:20-cr-6-01-PB
             v.                 *   September 24, 2020
                                *   1:50 p.m.
CHRISTOPHER CANTWELL            *   Afternoon Session
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT EXCERPT OF JURY TRIAL DAY 4
TESTIMONY OF CHRISTOPHER CANTWELL
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           United States Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defender's Office



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter

```
 1                        I N D E X

 2

 3

 4    WITNESS:            Direct  Cross  Redirect  Recross

 5
      CHRISTOPHER CANTWELL      3
 6

 7

 8    EXHIBITS                        FOR ID        IN EVD

 9
      Defendant's Exhibit G                            41
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          (Following is an excerpt of Jury Trial Day 4.)
3               THE CLERK:  Please be seated.  This hearing is
4  back in session.
5               THE COURT:  All right.  The defense may call
6  its first witness.
7               MR. WOLPIN:  The defense would call
8  Mr. Cantwell.
9               THE COURT:  Mr. Cantwell, come on up.  Stand
10 by the witness stand and raise your right hand, please.
11              CHRISTOPHER CANTWELL, having been first duly
12 sworn, testified as follows:
13              THE CLERK:  Thank you.  Would you please state
14 your name and spell your last name for the record.
15              THE WITNESS:  Christopher Cantwell,
16 C-a-n-t-w-e-l-l.
17              THE COURT:  Great.  You can be seated, sir.
18              And go ahead when ready, Mr. Wolpin.
19              MR. WOLPIN:  Thank you.
20                    DIRECT EXAMINATION
21 BY MR. WOLPIN:
22     Q.  So, Chris, let's just start with a little bit
23 about you as a person.
24              Before you came to New Hampshire, where were
25 you from?
```

1      A.    Long Island.

2      Q.    Okay.  New York?

3      A.    Yes.

4      Q.    Okay.  And is that where you grew up as a kid?

5      A.    Yes.

6      Q.    And at some point did you move to

7  New Hampshire?

8      A.    I did.

9      Q.    All right.  Before you came to New

10  Hampshire -- well, did you come to New Hampshire as an

11  adult or as a child?

12      A.    As an adult.

13      Q.    All right.  And when you were an adult, how

14  old were you when you came here?

15      A.    I moved here in 2012, so I would have been 32

16  or 33.

17      Q.    Okay.  Before you came to New Hampshire, what

18  kind of work did you do?

19      A.    I was an IT guy.  Information technology,

20  computers, networks.

21      Q.    Okay.  Did you work for big companies, did you

22  work for yourself?

23      A.    I worked for medium to -- small- to

24  medium-sized companies and I worked as an independent

25  contractor for a period of time.

1    Q.   Okay.  And did you have some education in that

2  realm of computer technology?

3    A.   I learned IT the way I learn all things, the

4  hard way.

5    Q.   Okay.

6    A.   I took a BOCES computer technician's class in

7  Long Island and everything else I figured out on my own.

8    Q.   Okay.  And what brought you to New Hampshire?

9  Why'd you come here?

10    A.   I became concerned about New York State's gun

11  control regime especially, but I -- I liked the -- the

12  freedom-oriented culture here.

13    Q.   Okay.

14    A.   I was specifically interested initially in the

15  Free State Project.

16    Q.   All right.  So what part of the state did you

17  come to?

18    A.   Just outside of Keene --

19    Q.   And what --

20    A.   -- in Marlborough.

21    Q.   And what is significant about Keene, if

22  anything?

23    A.   When I was investigating where in

24  New Hampshire to move, I saw the guys in Keene.  They

25  were producing a lot of media.  It's a -- Keene is home

1    to a broadcast talk radio show, nationally syndicated

2    broadcast talk radio show, called Free Talk Live.  And

3    there were associated media properties associated with

4    Free Talk Live, YouTube channels and blogs and that sort

5    of thing.  And they seemed to be drawing a lot of

6    attention to themselves and I was one of the people that

7    got their attention drawn.

8         Q.   Okay.  So before you came to New Hampshire,

9    you said you were working in IT, but did you have some

10   media background yourself before you came --

11        A.   I did.  I had built up a bit of a social media

12   following in New York.  I ran for the United States

13   House of Representatives in New York's First

14   Congressional District.  During that time, I had built

15   up a bit of a social media following and I did a little

16   bit of standup comedy as well and I sort of developed a

17   YouTube channel.

18        Q.   Okay.  So you said standup comedy.  You mean

19   as in going out at night for open mic nights in

20   New York?

21        A.   Yeah.  I was -- fortunately, for the

22   audiences, never had a big, full-featured thing or

23   whatever, but I was doing open mic nights and I'd -- and

24   I'd get some laughs.

25        Q.   Okay.  And you said you -- you started with a

1    YouTube channel.  Did you have a particular media, a

2    name, of something that you were doing at that time?

3         A.    This was all built up.  This all happened -- I

4    created my YouTube and my Facebook when I was running

5    for Congress, so at that time it didn't make much sense

6    to work under an alias and I've worked under my real

7    name ever since.

8         Q.   Okay.  And what was -- did you have a podcast

9    originally before you got here?

10        A.    No, not originally.  I was making short

11   YouTube videos.

12             A podcast, for those who don't understand it,

13   it's a specific format that it -- RSS stands for real

14   simple syndication.  So like a podcast will go out over

15   iTunes and Stitcher and these sorts of things.

16             My YouTube videos were only on my YouTube

17   channel, so they were not syndicated.  And that's the

18   difference between the YouTube channel and a podcast.

19        Q.   Okay.  And what was the first podcast that you

20   created?

21        A.    The -- the first podcast that I created was

22   called Some Garbage Podcast.  It was a self-deprecating

23   title that me and a business partner of mine started,

24   basically talking about politics after work and we

25   decided we'd let other people listen because it seemed

1   like a lot of people we knew were starting podcasts.

2   And since I did not think our production value was very

3   high, we sort of used a self-deprecating title to get

4   away with the poor production quality initially.

5       Q.   Okay.  Was that something that was able to

6   lead to you making a living from the Some Garbage

7   Podcast?

8       A.   Not initially, no.  -- I started doing Some

9   Garbage Podcast back in Long Island -- I went back to

10  Long Island for a period of time, had a job with my

11  partner Eddie, and I was working for this media

12  marketing company with him and that was paying the bills

13  and we were doing Some Garbage Podcast as a hobby.  But

14  I was surprised to find after some period of time that

15  people were willing to pay for the production and more

16  and more I started to focus my efforts on building a

17  media career.

18      Q.   Okay.  So how does someone make money from or

19  how did you make money from a podcast?

20      A.   There are lots of ways to do that and I tried

21  to do all of them.  You can solicit donations from the

22  audience, and especially in the early stages that tends

23  to be the most lucrative way of doing it.

24           Later on, when you have a larger audience, you

25  get advertising dollars and there's some very --

1    advertising programs with very low bars of entry, such

2    as Google AdSense, Amazon affiliates, and that sort of

3    thing.   And if you have the wherewithal to do it, then

4    you can build premium features into your website,

5    members-only paywall functions, as I did.

6              Later on I began to sell T-shirts, mouse pads,

7    other merchandise with the -- with the show logo on it.

8         Q.   Okay.  So let's get back to what -- when you

9    came to New Hampshire.  You came to New Hampshire about

10   what year?

11        A.   So I had come to New Hampshire -- to be

12   precise, I had come here originally in 2012.  I took a

13   job back in New York for a little while and that's when

14   I started doing Some Garbage Podcast and then I came

15   back to New Hampshire in 2014.

16        Q.   Okay.  And since 2014 to now, have you been

17   consistently a New Hampshire resident?

18        A.   I have.

19        Q.   Okay.  Now, while here, did you develop a new

20   sort of media venture while you were here in

21   New Hampshire?

22        A.   I don't know if I'd call it an entirely new

23   venture, but I rebranded the Radical Agenda -- I

24   rebranded Some Garbage Podcast to Radical Agenda.  And

25   that became -- I -- I -- as the production started to

 1   make more money and gain more attention, I felt it was

 2   worth adding the effort to increase the production value

 3   and at that point it didn't make much sense to call it

 4   garbage anymore.

 5        Q.   All right.  So at the outset, at the beginning

 6   of Radical Agenda, what were sort of the political

 7   leanings of the show?  What were you expressing?

 8        A.   At the beginning stages of the entire venture,

 9   it was -- it was Libertarian and it would be safe to say

10   an extreme form of Libertarianism known as

11   Anarcho-capitalism, the idea being privatize everything;

12   you don't have to have the government involved in any

13   aspect of the human condition, a concept known as the

14   nonaggression principle, stating that the only proper

15   use of coercion or initiatory -- the only proper use of

16   coercion or violence is in defense of person and

17   property.

18        Q.   So over time, how does your content change of

19   this Radical Agenda podcast?

20        A.   Well, it's an open phone show and so the

21   Radical Agenda's theme, above all else, was that you're

22   not going to get hung up on if you call in and you

23   disagree with me or you got an idea that is kind of out

24   there.  Right?

25             And so as I interact with people who have

1    different ideas, one cannot help but be influenced by

2    the people one speaks to.  And as -- especially as

3    Donald Trump began to gain speed for his presidential

4    campaign, that drew a lot of attention to the issue of

5    immigration.  And so you could say that this caused my

6    political views to shift rightward substantially.

7         Q.   Okay.  And on your show, do you say things

8    that are shocking or is it pretty toned down?

9         A.   Shocking is pretty much the whole entire point

10   of it.  I shouldn't say that.  I'm sorry.  It is -- it

11   is part of the branding to be a shocking production.  It

12   is an uncensored -- it's styled in part after -- I

13   always give credit to the Opie and Anthony show, which

14   is a morning radio show, used to be on Terrestrial Radio

15   and then was on strictly satellite radio, and now -- now

16   one of the hosts is no longer even with Sirius XM.  They

17   launched satellites into outer space to get away from

18   the censors and even that didn't work.

19        Q.   All right.  So swearing, is there swearing in

20   your show, yes or no?

21        A.   Oh, yeah.

22        Q.   Okay.  Is there racist language in your show?

23        A.   Yes.

24        Q.   All right.  Is there homophobic language in

25   your show?

1      A.    Yes.

2      Q.    Okay.  And is that by callers or you or both?

3      A.    Both.

4      Q.    Okay.  Now, as the host of Radical Agenda, did

5  you go under the name Chris Cantwell or did you use some

6  other name?

7      A.    I am Chris or Christopher Cantwell.  I never

8  used an alias.

9      Q.    All right.  And as far as the show, did you

10  have a phone number?

11      A.    I -- I should say -- not that I've never used

12  an alias.  There are times when I've played characters

13  on the show, but everybody knows that Christopher

14  Cantwell is the host and that's my real name, yeah.

15      Q.    Okay.  And you have a show number that's

16  published online?

17      A.    Yes.

18      Q.    But you have a private phone number as well?

19      A.    I do.

20      Q.    Okay.  Do you have a -- do you have a P.O. box

21  or an address associated with your show?

22      A.    Yes.  I have a publicly listed -- on my

23  contact form on the website, I have an address where

24  people can send me postal mail and that goes to a -- a

25  service called the Shipping Shack in Keene, New

1    Hampshire, so that -- so I'm not giving my home address

2    out to lunatics.

3        Q.   Okay.  So you made a conscious decision not to

4    put your home address in with your work address as far

5    as the show?

6        A.   Yeah.  If I had my way, my driver's license

7    would say the Shipping Shack's address.  The only things

8    I put my home address on are things that I'm like

9    legally obligated to do so.

10        Q.   Okay.  And so, typically, your home address

11    wasn't known, at least at the beginning?

12        A.   No, it wasn't.

13        Q.   All right.  I'm going to move on and ask you

14    some questions about your original relationship with the

15    Bowl Patrol.

16        A.   Yeah.

17        Q.   So what's the first thing you hear about them

18    and how do you start interacting with them?

19        A.   So the Bowl Patrol shows up in my social media

20    orbit sometime late 2017 to early 2018.  And at the

21    period of time that this happens, there's a lot of like

22    social media censorship going on of right-of-center

23    political views, especially in the financial system as

24    well.  So like I lost my PayPal account and I got banned

25    from Facebook and this type of stuff.

1            And when I first come into contact with them,

2    they're on these uncensored platforms that people were

3    migrating to, Telegram, Gab, Minds, to name the three

4    probably most prominent ones in this category of

5    service.

6            And so they started to show up in my Gab

7    mentions, which is like -- if any of you have used

8    Twitter, somebody mentions you, you see; if somebody

9    retweets you, you see.  It's a similar thing on Gab.

10           I had -- on Telegram I had a chat room

11   where -- it was for listeners to interact with me and

12   with each other and they joined that chat room at some

13   point.  I don't remember which one first, but they

14   basically showed up in my social media orbit in that

15   period of time.

16       Q.   Okay.  So individuals started showing up.  Who

17   were the prominent members at first who started showing

18   up?

19       A.   The ones that first come to my mind would be

20   Vic Mackey, Cheddar Mane, Mosin-Nagant, and Hardmous.

21       Q.   And do you know them personally when they show

22   up in your -- your chat groups?

23       A.   Initially, no, not at all.  I have no idea.  I

24   couldn't pick these guys out of a lineup.  Most of them

25   I still can't.

1     Q.   Okay.  So when they are showing up in your

2  social media world, they're not showing up under their

3  own names?

4     A.   No, no.

5     Q.   They've all picked some kind of pseudonym?

6     A.   Yeah.

7     Q.   Okay.  Do those pseudonyms tend to repeat?  I

8  mean, do they show up under the same pseudonym multiple

9  times?

10     A.   Yeah.  Typically they would stick with an

11  identifiable theme of an identity.  So, for example,

12  Mosin-Nagant might be Masin-Nagant.  Like there would be

13  variations on it at times.  But, generally speaking, you

14  could follow one user from one platform to another.  And

15  even if he got banned from one platform and came back,

16  he would have something that would indicate to you that

17  it was the person that you were talking to.

18     Q.   Okay.  And --

19     A.   But not always.

20     Q.   And so this, you said, is initially happening

21  late 2017, 2018?

22     A.   Yeah, yeah.

23     Q.   Okay.  And where's your head at that time?

24  What are you thinking?  Why are you engaging with them?

25     A.   I'm thinking that -- I'm thinking that he --

1    the social media censorship is a political tactic that I

2    don't want rewarded.  And so I think that the idea

3    behind it is if you're -- if -- that if they censor

4    people from social media and that changes the direction

5    of the content, that that's going to encourage the

6    censorship and that that's going to be negative not only

7    for me, but for society more broadly, and so I want to

8    do the exact opposite of what the censorship means to

9    do.  And --

10        Q.   So you make a conscious decision to sort of

11   engage with them?

12        A.   Yeah.  They are -- I didn't come into contact

13   with a whole lot of people who did edgier content than I

14   did, but the Bowl Patrol met that bill.

15        Q.   Okay.  So you saw them essentially as more

16   extreme than you were?

17        A.   Yes, definitely.

18        Q.   Okay.  And for a time, did that

19   relationship -- I mean, did you guys encourage each

20   other?  Was there some working relationship?

21        A.   Yeah.  I mean, they were -- the Bowl Patrol

22   was talented.  They had -- they -- they were good with

23   photoshopping and image -- image editing application.

24             You might hear me use the word photoshop as a

25   verb sometimes.  They would photoshop things and -- and

1   they -- they were talented guys and they had some --

2   their content was out there, but they had pretty good

3   audio quality and they were useful to me for a period of

4   time.

5        Q.   Okay.  And at some point did that relationship

6   between you and these members of the Bowl Patrol begin

7   to fray?

8        A.   Yeah, that would be one way of putting it.

9   The -- the relationship started to go south towards

10  the -- towards the end of 2018.

11       Q.   Okay.  And would members of the Bowl Patrol

12  call in to your show?

13       A.   Yeah.  They would call in to the show.  And

14  initially it was either productive and/or funny, but

15  towards the end of 2018, it started to get downright

16  scary.  And then after that it started to get just plain

17  disruptive.

18       Q.   Okay.  So is there a particular call from

19  Cheddar Mane in October that you remember?

20       A.   There's a few.  Notably, just before Robert

21  Bowers walked into the Tree of Life Synagogue in

22  Pittsburgh and gunned down 11 people, Cheddar had called

23  in to the show and was asking me something to the effect

24  of -- I should set the stage for this.

25            On the show, I take a view of law enforcement

1   that is at odds with some people on -- in extremist

2   movements.  I think that it's in our best interest to

3   treat law enforcement with respect and to work with them

4   if we can because what we are trying to do is not

5   inherently criminal.  People try to treat us that way

6   and for that reason, it's -- it's in our best interest

7   to maintain positive relationships with law enforcement.

8         The Bowl Patrol took a different angle on that

9   and on I believe it was October 15th, Cheddar called in

10   to the show and started basically saying something to

11   the effect of --

12         MS. KRASINSKI:  Objection, your Honor.

13   Consistent with the other rulings, I'd ask that we not

14   get into those statements.

15         THE COURT:  I'm sorry, members of the jury.

16   I've got to excuse you for a few minutes because I --

17   I've got to hash this thing out.  I thought I had

18   resolved it, but I'll have to take a break.

19         THE CLERK:  All rise for the jury.

20               (Jury excused.)

21         THE COURT:  All right.  Mr. Wolpin, go through

22   step by step every bad thing you want to bring out about

23   the --

24         MR. WOLPIN:  This isn't a bad thing.  That's

25   not the point of this right now.

1          THE COURT:  Well, I've got to understand

2     better what you're doing because I can't keep stopping

3     every two minutes while you guys fight over this stuff.

4          MR. WOLPIN:  So --

5          THE COURT:  What are you trying to do?

6          MR. WOLPIN:  To explain why there's a breach.

7     Essentially, Cheddar Mane calls and they have this

8     discussion that's a real discussion about police, and

9     then Chris sort of shuts them down and doesn't agree

10    with them and that's what starts the rift.

11         So this is an explanation of why they split.

12    This isn't anything --

13         THE COURT:  Does the government know what he's

14    talking about?  I mean, I -- I don't know what the

15    evidence is, so if all he's going to say is we had a

16    discussion and Cheddar Mane expressed different views

17    than I did about the police and we -- we disagreed and

18    that was the beginning of our -- the fallout in our

19    relationship, that's all he's going to say, I don't know

20    why that's objectionable.  Is that all he wants to say?

21         MR. WOLPIN:  Yes.

22         THE COURT:  All right.  Are you going to be

23    trying to go in and say all these bad things about the

24    Bowl Patrol, some more stuff like that?  Are you trying

25    to do that?

1          MR. WOLPIN:  What I -- the audio I have and --

2          THE COURT:  Yeah, because, see, what's hard

3    for me -- and you've got to be careful about what you're

4    doing here because you -- I can't -- I can't let you use

5    rulings like, oh, let's not mention Charlottesville, to

6    try to create an impression about your client while

7    damning the victim.  Do you understand that?

8          MR. WOLPIN:  Yes.

9          THE COURT:  So you run -- you run risks that

10   you will do things that will cause me to reassess prior

11   rulings I've made in this case at your request to limit

12   what the jury can hear about Mr. Cantwell.  So please be

13   aware of that fact.

14         Now, tell me what you want to do that's like

15   why Cheddar Mane's bad, reprehensible, has terrible

16   views; why the Bowl Patrol's bad, reprehensible, has

17   terrible views.  Anything you've got in your direct

18   about those things?

19         MR. WOLPIN:  Not significantly, no.

20         THE COURT:  Okay.  Well, if it doesn't come

21   up, then it's not going to be a problem.

22         All right.  So is that what you were concerned

23   about?

24         MS. KRASINSKI:  Yes, your Honor.

25         THE COURT:  All right.  So he's saying -- he's

1    disavowing any intention to do that and so we won't --

2    we don't have a problem.

3            MR. WOLPIN:  The one side note on that is I

4    do -- would like Mr. Cantwell to be able to play a brief

5    clip of prank calls to explain how that was occurring on

6    his show.  That is an audio I think is --

7            THE COURT:  Is it a -- is it Cheddar Mane --

8            MR. WOLPIN:  Some of them are.  Some are Fevs.

9    It's all mixed in.  It's a sort of a -- in an effort to

10   try to keep it short, we cut them into one cut instead

11   of having, you know --

12           THE COURT:  So you've cut together a bunch of

13   prank calls to say this is an example of what I was

14   getting.

15           MR. WOLPIN:  Yes.

16           THE COURT:  Okay.  Has the government heard

17   those prank calls?

18           MR. WOLPIN:  They were provided in the

19   exhibits.

20           MS. KRASINSKI:  Do we have --

21           THE COURT:  Do you --

22           MR. WOLPIN:  B-5.

23           MS. KRASINSKI:  B-5 is a compilation?

24           MR. WOLPIN:  Yes.

25           THE COURT:  Have you seen a tran -- are you

1    going to object to that compilation?

2              MS. KRASINSKI:  We haven't seen a transcript,

3    your Honor.

4              THE COURT:  If you need to listen to them, you

5    can do that.

6              What I'm trying to do is run a trial where

7    somebody's guilt or innocence doesn't depend upon the

8    beliefs that they have -- not the beliefs Mr. Cantwell

9    has, not the beliefs that Mr. Lambert has -- but it's

10   really hard to do, given the way you want to present the

11   case.  And I'm trying to give you as much latitude as

12   possible, but at some point I'm going to lose the

13   ability to draw lines if you are going to continue to

14   want to engage in this let's try to show what awful

15   beliefs Mr. Lambert and the Bowl Patrol have.

16             MR. WOLPIN:  I wasn't -- that's not the reason

17   I was using this.

18             THE COURT:  All right.

19             MR. WOLPIN:  I was trying to -- I think there

20   needs to be some explanation of what happened between

21   the two of them.  I wasn't planning on playing any calls

22   of -- in that sense.  The pranks was what I was headed

23   to.  So I wasn't --

24             THE COURT:  All right.

25             MR. WOLPIN:  -- attempting to go in that

1  direction.

2          MS. KRASINSKI:  Can you play --

3          MR. WOLPIN:  Sure.

4          THE COURT:  Let's just play it in the

5  courtroom right now.  Play the compilation so we can

6  hear the whole thing.

7              (Audio recording played.)

8          THE COURT:  Stop for a minute.  Stop for a

9  minute.

10         All right.  I'm not going to let you play that

11  whole thing.  That is like -- that's just a complete

12  waste of time.  If you want to play the first

13  30 seconds --

14         MR. WOLPIN:  Okay.

15         THE COURT:  -- you can play the first

16  30 seconds to -- just to say, yeah, it's really

17  frustrating when I can't have an intelligent

18  conversation because a bunch of idiots are calling and

19  making gobbledygook sounds.  You can do that.  But stop

20  it at approximately 30 seconds.  I don't want to go

21  beyond that.

22         It's an illustration.  He can then say, and

23  this went on and on and multiple shows and it was

24  extremely frustrating.

25         All right?  So 30 seconds, approximately, stop

1    it.  Okay?

2              MR. WOLPIN:  All right.

3              THE COURT:  Are you doing anything else that's

4    more along the lines of Bowl Patrol bad, Lambert bad?

5              MR. WOLPIN:  The only other thing was I had a

6    discussion with Mr. Cantwell, a discussion about Fed

7    postings, but --

8              THE COURT:  Yeah.  See, the problem is that I

9    don't even see what the -- frankly, the relevance is of

10   I'm really angry at Mr. Lambert as a Bowl Patrol, other

11   than to prove the government's case.

12             So because I don't see the relevance of it,

13   it's really hard for me to give you any more latitude

14   than what I already feel are the miles of latitude that

15   I've given you.  It will be undisputed -- the government

16   will, in fact, be arguing in its case -- that

17   Mr. Cantwell was angry at the Bowl Patrol because they

18   were disrupting his show.  That -- no one is going to

19   dispute that.  So at this point the evidence on those

20   points are really cumulative, so I can't -- I can't let

21   you go on and on about it.

22             You can play 30 seconds, you can have him

23   explain why he's frustrated, why he's angry, and he can

24   explain how he tried to go to the FBI and they didn't do

25   anything and he -- he wanted to be left alone.  You can

1    explain all that.  But I -- we can't be going into --

2    I'm not letting you go beyond 30 seconds on that

3    compilation.

4              Yes, Counsel?

5              MS. KRASINSKI:  I just want to confirm that's

6    going to be for ID only, like a chalk, and not a full

7    exhibit.

8              THE COURT:  That's -- no, he can -- that can

9    be admitted as an exhibit.  You just have to put --

10             MS. KRASINSKI:  Okay.

11             THE COURT:  -- a composite exhibit together

12   with just the 30 seconds that are actually played to the

13   jury.  That'll be the exhibit.

14             MS. KRASINSKI:  Thank you, your Honor.

15             THE COURT:  But we don't have time to go back

16   and edit it out and et cetera, et cetera.

17             And I can't make out the words, we don't have

18   a transcript, but I think the point is you can't make

19   out the words a lot of time.  So I think we don't need a

20   transcript because it would be unintelligible.

21             All right.  Anything else of that ilk that

22   we're going to be dealing with?

23             MR. WOLPIN:  No.  I think everything else will

24   be --

25             THE COURT:  Okay.

1          MR. WOLPIN:  -- addressed.

2          THE COURT:  All right.  Good.  Are we ready to

3    bring the jury back in?

4          Is my reporter okay?  Do you want a break or

5    do you --

6          THE COURT REPORTER:  We can go a little more.

7          THE COURT:  We'll go 20 minutes or so and then

8    take a break?  Okay.

9               (Jury returned to the courtroom.)

10          THE CLERK:  Please be seated.  This hearing is

11    back in session.

12          MR. WOLPIN:  All right.

13          THE COURT:  Go ahead, Counsel.

14          MR. WOLPIN:  Thank you.

15     Q.    So there was ultimately a split on ideological

16    grounds between the two of you?

17     A.    Yeah.  They -- the --

18     Q.    Well, slow it down there.

19     A.    Okay.

20     Q.    You started a new podcast under a different

21    name, is that correct, soon after?

22     A.    I did, yes.  I started another show called

23    Outlaw Conservative.

24     Q.    All right.  And what was the difference

25    between Outlaw Conservative and Radical Agenda?

1      A.    Outlaw Conservative aimed to do away with some

2  of the is less palatable elements of the Radical Agenda.

3  I wanted to do a very similar format in that there would

4  be an opening monologue, we'd take calls on the air, I'd

5  go over the news and interact with the audience, but we

6  would eliminate the profanity, the racial content, and

7  the fantasy violence themes.

8      Q.    So as that rift happens, you begin to get a

9  number of phone calls from the Bowl Patrol?

10     A.    Yes.  Yes.

11     Q.    Okay.

12     A.    Phone calls, comments, chats, spam.  It was a

13  never-ending torrent of nonsense.

14     Q.    Okay.  And how -- why did you believe that was

15  coming through the Bowl Patrol?

16     A.    Because of the things that they would say.

17          So they had jargon vernacular, if you will,

18  that was a bit of a signature.  The -- the -- the style

19  of image editing, the types of names that they would

20  use, and the things that they would say all indicated to

21  me that they were associated with this group.

22     Q.    Okay.  And the primary people, again, who you

23  were affiliated with Bowl Patrol that were making these

24  kinds of calls or interactions were who?

25     A.    Vic Mackey, Cheddar Mane, Hardmous,

1   Mosin-Nagant.

2        Q.    Okay.

3        A.    Later, Wig Nasty, some other ones, added to

4   the mix over time.

5        Q.    Okay.  So we're just going to play a very

6   brief snippet of what that was like for your show.

7        A.    That'd be a refreshing change of pace.

8             THE COURT:  Let me just stop.

9             Can you clarify, by asking appropriate

10  questions, are these calls coming in to Radical Agenda

11  or to the new show that he's running?

12       Q.    So prior to trial, you took a look through

13  your Radical Agenda archives, correct?

14       A.    Right.  These are not from Outlaw Conservative

15  because on Outlaw Conservative, I edited them out.

16       Q.    Okay.

17             THE COURT:  And, Counsel -- just again, I'm --

18  just so that we avoid confusion, can you ask quick

19  questions to clarify this: Did Radical Agenda continue

20  while Outlaw Conservative was also going on so that

21  there are two programs or did Radical Agenda cease and

22  Outlaw Conservative begin?

23             If you could ask questions on that.

24             MR. WOLPIN:  Yes, please.

25       Q.    So are they concurrent, running at the same

1    time, or you quit Radical Agenda?

2        A.    I was not yet prepared to put the Radical

3    Agenda down yet.  The -- Radical Agenda used to air

4    every Monday, Wednesday, and Friday from 5:00 to 7:00

5    p.m. U.S. Eastern time.

6            What I ended up doing with Outlaw Conservative

7    was replacing the Wednesday airtime with the Outlaw

8    Conservative format.  And so on Mondays and Fridays, I

9    would do the uncensored production and on Wednesdays I

10   would do Outlaw Conservative.

11       Q.    Okay.  And so it sounds like you would get

12   calls of this nature to both shows?

13       A.    Yes.  They were -- they hated Outlaw

14   Conservative.  They -- they thought that it was proof

15   that I was a sellout, you know, just whatever

16   terminology you want to apply.  That was evidence that I

17   was just in this for fame --

18           MS. KRASINSKI:  Objection, basis of knowledge,

19   speculation.

20           THE COURT:  You could lay a -- I will allow it

21   if you can lay a foundation as to that he has a basis

22   for formulating those views.

23       Q.    Are there comments being made to you directly

24   that say those things?

25       A.    The -- the calls -- the comments, I'm sure

1   we'll discuss the website defacement, these things.  The

2   word sellout was a common refrain, yes.

3        Q.   Okay.

4             THE COURT:  And, finally, again, I apologize

5   for interrupting, but just to get -- can you -- you're

6   going to play an excerpt.  Can you give me a bit of a

7   time frame as to the period during which these calls are

8   coming?

9             MR. WOLPIN:  Yes.

10        Q.   So when we're talking about this rift and when

11   these calls are coming in, we're talking about what

12   months, what year?

13        A.   The -- well, we're talking about 20 -- late

14   2018 through all of 2019.  I think what you're about to

15   play is most likely early 2019.

16        Q.   Okay.  So this is at the early stages of 2019,

17   sort of examples of what you've pulled from your show?

18        A.   Yes.

19             MR. WOLPIN:  Okay.  I would move at this

20   point -- obviously it may be redacted in some format --

21   but move a version of B-5 into evidence.

22             THE COURT:  All right.  So, members of the

23   jury, B-5 is a -- as I understand it, and if I'm wrong,

24   counsel will correct me, is a compilation of

25   a -- a number of what have been referred to in this

1   trial as prank calls.  Okay?

2          The actual -- the exhibit that's been offered

3   goes on longer than I believe I want you to hear and so

4   I'm going to allow Counsel -- because he hasn't had time

5   to prepare a redacted exhibit, it will be -- I will tell

6   him to instruct his assistant to stop the call -- the

7   exhibit after about 30 seconds, give or take a little

8   bit on either side.

9          MR. WOLPIN:  Right.

10          THE COURT:  The assistant will note the point

11   at which you stop and then you will prepare a redacted

12   exhibit overnight that will only include the portion

13   that was played to the jury.  And that will -- we'll

14   call that -- what's the exhibit number of the exhibit

15   you have?

16          MR. WOLPIN:  B-5.

17          THE COURT:  A-5, did you say?

18          MR. WOLPIN:  B --

19          THE COURT:  B-5.

20          MR. WOLPIN:  -- as in boy.

21          THE COURT:  So we'll call this B-5a and B-5a

22   will be the redacted copy that will be in evidence.  So

23   if you want to listen to it during deliberations again,

24   you can, but you won't have the full compilation tape

25   because it simply goes on longer than I think is

1  necessary.

2        All right.  So with that in mind, Counsel,

3  when you're ready, you can get your watch out and give

4  about 30 seconds and then we'll -- you'll tell him to

5  stop and we'll go on.

6        MR. WOLPIN:  All right.  Jay, if you can --

7            (Audio recording played.)

8        MR. WOLPIN:  Stop.

9        THE COURT:  We can go another 30 seconds.  We

10  want to get several of these in.

11        MR. WOLPIN:  Yes.  Thank you.

12        Please begin.

13            (Audio recording resumed.)

14        THE COURT:  Okay.

15     Q.   So those are only representative, correct?

16  There's certainly many of others.

17     A.   They are representative and only of a specific

18  category of calls.  This was -- this was when they would

19  flood the call-in lines with pure nonsense.  It wasn't

20  the scary stuff, it wasn't the sexual stuff that you're

21  listening to.  This is just the pure nonsense.  And

22  there was a lot of it.

23     Q.   Okay.  Now, if we can bring up I-2b, which is,

24  I believe, already in evidence.  This is the Call in

25  Studio's records.

1          So you had a company called Call in Studios

2   that sort of ran your phone line system, correct?

3       A.   Yes.

4       Q.   All right.  And they kept track of every

5   number that was identifiable that came in to the show?

6       A.   They did.

7       Q.   Okay.  And what we see here is sort of an

8   excerpt from those records?

9       A.   That's what it appears to be, yes.

10      Q.   Okay.  And so if we look at any particular

11  call, like circle one, it tells us the incoming number

12  and then it has sort of a receiving number.

13          Is the -- and then there's a note with it as

14  to something about the caller.

15      A.   Yes.

16      Q.   How is that generated by --

17      A.   It's a text-to-speech -- I'm sorry,

18  speech-to-text engine.  So you say something and the

19  computer tries to determine what your words are and then

20  it puts it into text.

21          I'm a one-man show.  I do it live on the air

22  by myself.  And so I don't have the capacity to pick up

23  the phone, talk to somebody, and then decide if they get

24  on the air, typically.  I, for a brief period, hired a

25  call screener, but this is the auto-screener system that

1   you say, hey, my name is Chris and I'd like to be on the

2   show and the speech-to-text engine does the best it can

3   to turn that into letters that I can read while I'm on

4   the air.

5        Q.   Okay.  And then we see -- this happens to be

6   just the call log specific to the 636-248-1958, which

7   has already been described as the number of Mr. Lambert.

8        A.   Yes.

9        Q.   Now, as far as this process, did you attribute

10  all of these pranks to Cheddar Mane?

11       A.   Not at the time, no.  I --

12            MS. KRASINSKI:  Objection, your Honor.

13  Misstates evidence.  Ben Lambert testified that not all

14  of these were pranks.

15            THE COURT:  All right.  I -- I think that --

16  you can -- you're not contending that all of them are

17  prank calls, right?

18       Q.   I was referencing as far as the prank calls --

19            THE COURT:  All right.

20       Q.   -- that came in, you're not referencing or

21  believing that every single one is Cheddar Mane?

22       A.   I definitely don't believe that every single

23  prank was Cheddar Mane and I don't believe that every

24  single Cheddar Mane call was a prank.

25       Q.   Okay.

1     A.    In the early stages, I think he was actually a

2  productive participant.

3     Q.    Okay.  And then as you started to get a -- you

4  know, this volume of calls, what did you attempt to do

5  with it?

6     A.    Well, you said when I started to get the

7  volume of -- when the --

8     Q.    Of prank calls.

9     A.    -- the amount of disruptive calls increased?

10 Is that what you're trying to say?

11    Q.    Yes.

12    A.    So I took a number of means to try to deal

13 with this.  Most notably, I had to stop accepting calls

14 from like *67.  You can block your caller ID when you

15 call somebody.  I had to stop accepting those calls on

16 the air, which when you talk about the things that we

17 talk about, will cut your call volume down quite a bit

18 because people, generally speaking, don't want to be

19 identified.  And so I had to do that because I couldn't

20 screen callers based on their caller ID and I had too

21 many coming in.

22         The next thing I did would be to ban the phone

23 numbers of people who were calling in and -- and making

24 calls that were unhelpful in some way.

25    Q.    And, actually, if we bring up I-2b again and

1    go to the last page --

2         A.    If I could just revisit that answer.

3              As I was saying, the interim stage, which was

4    mentioned by Mr. Lambert, was I tried to coach the

5    callers.  That, you know, when they -- when they called

6    in and they -- I tend to give them the benefit of the

7    doubt that they're trying to be funny.

8              And so I would give guys what I thought was

9    helpful feedback.  If I thought that their prank calls

10   were not very good, I'd say things like, you know, maybe

11   you try to do that towards the end of the show --

12   towards the beginning of the show and don't ruin it for

13   me at the end or, you know, your impression is good but

14   you need better lines, or something to that effect.  I

15   tried to give them helpful --

16             I'm sorry.  Give me one second to fix this.

17   My --

18             THE COURT:  Do we have another mask?

19             THE WITNESS:  Let's see how that holds up.

20        Q.    Okay.  And at some point you began reporting

21   these callers back to the hosts, whoever was the phone

22   company that had them, correct?

23        A.    Yeah.  Initially what I started to do was I

24   started to ban the phone numbers.  And then I realized

25   that like I had a problem, that like the same guy would

1    get on five times, no many matter how many times I

2    blocked his number.  And I started -- and I was like how

3    the heck are they doing this?  Nobody's going to buy

4    that many Tracfones.

5            And I figured out that online there's these

6    free services that you can use to do what's called a

7    carrier lookup.  So if you put a phone number into this

8    specialized search engine, it'll tell you it comes back

9    to Verizon or Sprint or AT&T or, in the case of these

10   voiceover IP services that they were using, they could

11   come back usually either to a company called Neutral

12   Tandem or Bandwidth.com.

13       Q.   And did you make efforts to contact those

14   companies directly to get them to block numbers?

15       A.   Yeah.  I found out that they were using an app

16   called Burner initially and I called -- well, I emailed

17   the proprietors of that application and I said, you

18   know, you've got basically a white supremacist terrorist

19   group who's using --

20            MS. KRASINSKI:  Objection, your Honor.

21            THE COURT:  Overruled.

22       A.   That's what I said to them, you know; that

23   they are using this to basically harass people.

24            I believe that they banned them from the

25   Burner app, but then they were on another one called

1    TextNow and --

2              THE COURT:  All right.  So I think you've

3    covered his question and please listen to his questions

4    and try to answer them.

5              THE WITNESS:  Okay.

6         Q.   So those are the efforts you're making to fix

7    it.  You say this started in late 2018.  Was there

8    something in particular that happened in February of the

9    next year?

10         A.   Yeah.  In February 2018 -- of 2019, I wake up

11   very early in the morning to messages from listeners who

12   say that there's, quote, nasty stuff on my website.  And

13   I go to inspect the damage there --

14              If there's another one of these clear masks,

15   I'll take it.  I'm sorry.

16              THE COURT:  Do you have an extra mask?  The

17   one he's got is not working right.

18              THE WITNESS:  It's the adhesive on the foam

19   thing.  I think I can get through the answer here,

20   though.

21              The website was defaced with what might be

22   described as grotesque sexual imagery and things that

23   were unflattering of a correspondent.

24         Q.   Okay.  So --

25              THE COURT:  So hang on just a second.  Let him

1    get the other mask back on.

2            MR. WOLPIN:   Okay.

3        Q.   So you wake up and you see that it's been

4    defaced.  Is it just your website?  What happens when

5    someone posts something defacing on your website?

6        A.   So at that point in time, I had a service

7    signed up for the website which I paid for that every

8    time a new blog post went up, an email would go out to

9    all of about 3,000 email subscribers.

10           And so every single one of these posts, of

11   which there was a dozen or so, every single one of them

12   got emailed out 3,000 times.

13       Q.   Okay.  And you said included were pornography?

14       A.   Pornography, terrorist propaganda, and

15   unflattering photos of me, to name a few things.

16       Q.   All right.  So that incident, someone posted

17   through your site.  Who else had access to your site?

18       A.   At that time, I had -- a couple of people,

19   but, notably, Vic Mackey.

20       Q.   Okay.  And so did you make a report to anybody

21   about this issue?

22       A.   Yes.  And I should clarify that Vic Mackey's

23   posting privileges had been rescinded some time ago, but

24   when that happened, I -- I never expected that he'd have

25   done anything like this and so I neglected to disable

1   his credential.

2          Q.   Okay.

3          A.   After he used that credential, I made a report

4   to the Federal Bureau of Investigation.  I tried to call

5   them on the phone, ended up sitting on hold for like a

6   half-hour or something like that and it kept on

7   repeating this message, you can submit it through the

8   website for the same thing.  And eventually I submitted

9   a complaint through their website.

10          MR. WOLPIN:  Okay.  For the witness you could

11   bring up G, Exhibit G.

12          Q.   Is this something to which you were familiar?

13          A.   It is.

14          Q.   Okay.  And what do you see in front of you?

15          A.   Complaint Referral Form, Internet Crime

16   Complaint Center, and then there's identifying

17   information about me and a description that I gave to

18   them about the problem I had with the website.

19          Q.   So this is the description that you wrote

20   online in February 2019 to the Internet Crime Complaint

21   Center?

22          A.   Yes.  This is, to my understanding, a sworn

23   complaint that I made.

24          Q.   And that's what you wrote on February 11th,

25   2019?

1      A.    Yeah.

2            MR. WOLPIN:  Okay.  I would move at this point

3      to strike the ID and have this in as a full exhibit.

4            THE COURT:  Is there objection?

5            MS. KRASINSKI:  No, your Honor, although I

6      think an unredacted version might be preferable, which I

7      do have a hard copy of.

8            THE COURT:  All right.  Well, we can deal with

9      that later, but we'll admit the redacted version for now

10     and you can deal with the unredacted version later.

11     During cross-examination, if you want to, you can refer

12     to the unredacted version.

13            (Defendant's Exhibit G admitted.)

14     Q.    So this is the complaint?

15     A.    Yes.

16     Q.    Let's go through it a little bit.

17           You give your real address on the top?

18     A.    I do.  And not my Shipping Shack address, my

19     home address.

20     Q.    Okay.  And below, you note here that your

21     website was defaced with terrorist propaganda and

22     pornography last night --

23     A.    Yes.

24     Q.    -- including bestiality.

25     A.    Yes.

1       Q.   Okay.  You provided IP addresses you thought

2  were involved?

3       A.   Yes.

4       Q.   You noted that these were carried out by a

5  group calling themselves the Bowl Patrol and you pointed

6  out Vic Mackey and Mosin-Nagant as people that they are

7  already familiar with at the FBI?

8       A.   I should say that Mosin-Nagant is an alias I

9  knew was familiar to the FBI.  I did not know if Vic

10  Mackey was at that time.

11      Q.   Okay.  Now, down at the bottom, do you note

12  that it's broader than just these two guys?

13      A.   Oh, yes, I definitely do.

14      Q.   Okay.  And what do you say at the bottom?

15      A.   Quoting from the form, I said:  This group has

16  been responsible for constant spam and harassment of me

17  and my communications channels for months, ever since I

18  distanced myself from the group in the way of the

19  Pittsburgh synagogue shooting.

20      Q.   So you do name more than -- you name the whole

21  group as being involved in this harassment?

22      A.   I do.

23      Q.   Okay.  Now, if we could go to B-9.  That's for

24  the witness only.

25           All right.  Is this something you're familiar

1  with?

2       A.    Yes.

3       Q.    Okay.  And what is this -- what account is

4  this posted from?

5       A.    This is posted to my Gab social media account.

6       Q.    Okay.  And do you know what date it would have

7  been posted?

8       A.    It -- judging from what it says here, it -- so

9  I say:  Today I submitted a criminal complaint.

10            I know that date to be February 11th, I

11  believe --

12       Q.    Okay.

13       A.    -- of 2019.

14       Q.    And so this is a public statement that you'd

15  made a report to the FBI?

16       A.    Yes.

17       Q.    Okay.  Why do you put out something to the

18  public saying you reported -- made a report to the FBI?

19       A.    There's -- that's -- that's a jam-packed

20  question, but I'll try to pick it apart a little bit.

21            First thing was I wanted the deterrent effect.

22  I wanted people to know if you're going to screw around

23  with me, you're going to have a problem with law

24  enforcement, so as to prevent these things from

25  happening in the future.

1          Secondly, in the circles I travel and online,

2     you know, there's a perception that we are unjustly

3     targeted by law enforcement, and there's some

4     justification for that view.  And so I don't want people

5     to think that I'm surreptitiously working with law

6     enforcement and trying to do something disreputable.  So

7     when I work with law enforcement, which I've done on

8     numerous occasions, I've said so publicly.

9          Q.   Okay.  So if we could pull up Exhibit B-4 at

10    this point just for the witness.

11          Is this something you're familiar with?

12          A.   It certainly is.

13          Q.   Okay.  And is there a date on this?

14          A.   This is February 16th and 17th.

15          Q.   Okay.  And is there a name attached to it?

16          A.   Mosin-Nagant.

17          Q.   And who is Mosin-Nagant?

18          A.   Mosin-Nagant is the first Bowl Patroller that

19    I banned from my chat rooms.

20          MS. KRASINSKI:  Your Honor, I'm going to

21    object to this.  We've already discussed this exhibit

22    and the contents of it on relevance.

23          THE COURT:  Get the headsets on, please.

24          Well, in fact, I've got to give -- I've got to

25    give my court reporter a break, so I'll excuse the jury.

1          We'll take a short break, come back and finish

2    the day, but I'll spend a few minutes with the lawyers

3    first.

4                      (Jury excused.)

5          THE COURT:  Is this the exhibit that the

6    defense objected to?

7          MR. WOLPIN:  No, this is the exhibit that the

8    government objected to the top piece and we edited it.

9    This was provided by the defendant to the law

10   enforcement.

11         THE COURT:  I need to have it back up.

12         All right.  Why do you want it in?

13         MR. WOLPIN:  Because the government has put

14   into issue my client's feelings about doxing; they put

15   in a writing of his undoxing.  They accused him of

16   doxing this Mosin-Nagant character.  And so the

17   situation is that Mosin-Nagant doxed our client.

18         I think it's fair, based on what the

19   government's presented, to let the defendant explain

20   what doxing means, because they did that through their

21   -- their --

22         THE COURT:  Why do you need this exhibit?

23         MR. WOLPIN:  For the same reason, to show what

24   doxing means.  He's experienced it.  He knows what it

25   means.  It's relevant because the government --

1           THE COURT:  The meme's in.  You want to talk

2   about the meme, that's fine.  You can't put in this

3   exhibit.  The government's objection to it is sustained.

4           Feel free to go into the whole meme thing and

5   he doxed Mosin-Nagant and Mosin-Nagant doxed him and all

6   of the stuff you want to do on that.  Feel free to do

7   it.  You just can't do it with this exhibit.  Okay?

8           What else have you got?

9           MR. WOLPIN:  That's all we've got.  That was

10  most of the end of that chapter, I believe.  I'm trying

11  to move through --

12          THE COURT:  Can you -- help me understand so

13  that when I rule on evidentiary objections, how does the

14  evidence you're eliciting help lead to a verdict of not

15  guilty against your client?  Give me the -- if you can

16  give me one sense of the theory, it might help me when

17  ruling on objections.

18          MR. WOLPIN:  Okay.  So for the offense of

19  cyberstalking, the government needs to prove that this

20  is extreme -- or I forget -- actually, I feel like I'm

21  misquoting the language, whether it's extreme emotional

22  distress or exceptional emotional distress.  The word is

23  escaping me.

24          But that is --

25          MS. KRASINSKI:  Substantial, your Honor.

1          MR. WOLPIN:  That is a relative term by the

2    Court's proposed jury instruction as to what the other

3    party would know or feel.

4          This is a unique situation.  I mean, this is a

5    charge with a significant prison sentence.  I mean, I

6    think my client needs to --

7          THE COURT:  No, but it -- that the crime is

8    serious doesn't make an argument.  I understand the

9    argument about context.  This is a different thing.

10   This is let me tell you why these people were really

11   mean to me and why I was really mad at them.  And I -- I

12   don't understand how that helps you.

13          So tell me how, if the jury follows my

14   instructions, that it can possibly help you.

15          MR. WOLPIN:  Because it tells us for this

16   group this isn't extreme emotional distress.  This is

17   daily happenings in this group.  The things that might

18   cause, quote, unquote --

19          THE COURT:  You can elicit -- I've said you

20   can say, he doxed me, I doxed him, they doxed each

21   other.  I -- you're -- you're fine to do that --

22          MR. WOLPIN:  Okay.

23          THE COURT:   -- but you can't do it with this

24   exhibit.

25          MR. WOLPIN:  Okay.

```
1                THE COURT:  All right?  That -- it's the --

2     it's not the meme, which is already in evidence that you

3     have, it's the statement about meth using blah, blah,

4     blah stuff --

5                MR. WOLPIN:  No, the address.  That was

6     relevant.  It posted his address online, Chris's

7     personal home address online.  I don't care -- I would

8     redact out the meth part.  That's irrelevant.

9                THE COURT:  All right.  I -- I already thought

10    I -- again, things blur together for me, but has that --

11    has the fact that Mosin-Nagant disclosed his exhibit --

12    his street address, isn't that already in evidence?

13               MS. KRASINSKI:  Testimony about that is, I

14    believe, your Honor.

15               THE COURT:  All right.  So you can elicit

16    testimony that they -- Mosin-Nagant doxed you after you

17    doxed -- doxed Mosin-Nagant.  Isn't that what happened?

18               MR. WOLPIN:  I think it's the other way

19    around.

20               THE COURT:  All right.  Tell me -- I'm sorry.

21               Does the government know the sequence of who

22    doxed who?

23               MS. KRASINSKI:  I -- I don't know which

24    individual doxed the other first, your Honor.

25               MR. DAVIS:  I believe Mosin-Nagant was doxed
```

1    by Mr. Cantwell at the very end of February, last part

2    of February.

3                MR. WOLPIN:  Which would have been after this.

4                MR. DAVIS:  So it would have been after this.

5                THE COURT:  Okay.  All right.

6                So Mosin-Nagant doxed him, he doxed

7    Mosin-Nagant.  If you want to introduce that, go ahead.

8    All right.  I -- I understand your point is you want to

9    diminish the importance of doxing.  That's fine.  I'm

10   going to -- I've let you do that already and I'll

11   continue to.

12               MR. WOLPIN:  My only concern is obviously he

13   can say it, but there's an evidentiary proof and I worry

14   if there's some concern about his credibility that I

15   have a document showing it's true.  That's all -- that's

16   the only reason.

17               THE COURT:  All right.  Prepare a redacted

18   exhibit that has everything else from Mosin-Nagant

19   except the street address.

20               MR. WOLPIN:  Okay.  That works for me.

21               MS. KRASINSKI:  We're not going to object or

22   argue that Mosin-Nagant --

23               THE COURT:  He can testify to it and you'll --

24   I'll announce that the government doesn't disagree.  Is

25   that --

1          MS. KRASINSKI:  Yeah.  We don't --

2          THE COURT:  Okay?  I mean -- oh, my goodness.

3     All right.  So you can do that.  All right?

4          MR. WOLPIN:  I appreciate it.  Thank you.

5          THE COURT:  All right.  What else have you

6     got?  Is there -- is there anything else I can talk to

7     you about before we take our break and then bring the

8     jury back in till 4:30?  Or is it already 4:30?  No,

9     3:30.

10         MR. WOLPIN:  I've got March, May -- we're

11    going to get through it.

12         THE COURT:  I -- okay.  So I am fine with you

13    demonstrating to the jury that -- your view that people

14    in this community don't treat doxing as a serious

15    problem.  You can go to town on that.  You can do as

16    much as you want on that.  That -- that I can

17    understand.

18         What I can't understand is -- and I can

19    understand Mr. Cantwell's anger and -- and, really, even

20    rage about how he's been treated by these people, but it

21    just doesn't bear on the case.  It bears on the

22    government's side of the case against Mr. Cantwell, but

23    not your side of the case.

24         MR. WOLPIN:  Again, I would -- I would say the

25    concept of extreme emotional distress varies by group.

1    If this is the type of way they treat each other, then

2    why should what -- I mean, I don't want to be that coy

3    about it, but --

4             THE COURT:  But there's a real difference

5    between calling somebody's show and doing blah, blah,

6    blah, blah, blah and saying I'm going to have sex with

7    your wife in front of her children.  Those don't --

8    they're not equivalent --

9             MR. WOLPIN:  I --

10            THE COURT:  -- Mr. Wolpin.  They are not

11   equivalent.  And so it doesn't tend to prove what --

12   what you're suggesting.

13            So I've let you bring in any other statements

14   about rape; I've let you bring in many, many statements

15   about the -- the Bowl Patrol's beliefs about violence

16   and accelerationism and their vicious racist views and

17   their anti-Semitic views.

18            But based on what your client has said and

19   things that have been testified to, I think your client

20   is of -- and if I'm wrong, you can tell me -- is of the

21   belief that somebody's guilt or innocence shouldn't turn

22   on their -- their views about things, and that's not

23   what this case should be about.  It's about whether he

24   did the things he's charged with doing with the

25   intentions that are required to support a crime.  And

1    what his views are on other subjects and what

2    Mr. Lambert's views are on other subjects is not --

3    should not be the basis of a criminal charge.

4              And I'm trying to draw that line to protect

5    First Amendment rights while also recognizing the

6    government's legitimate interest in prosecuting

7    criminal -- violations the criminal law.  That's what

8    I'm trying to do here.  Okay?

9              MR. WOLPIN:  Okay.

10             THE COURT:  So we'll take a short break and

11   come back and finish up.  All right?

12             THE CLERK:  All rise.

13        (Recess taken from 3:38 p.m. until 3:50 p.m.)

14             THE COURT:  I have another draft of jury

15   instructions that have -- we don't need this on the

16   record.

17                  (Off-the-record discussion.)

18             (Jury returned to the courtroom.)

19             THE CLERK:  Please be seated.  This hearing is

20   back in session.

21             THE COURT:  Go ahead, Counsel.

22             MR. WOLPIN:  Thank you.

23        Q.   So just, again, for the witness only, if we

24   could bring up B-4.  I believe that's where we were.

25             So this is from February 17th, a post from

1  Mosin-Nagant?

2      A.   Yes.

3      Q.   Okay.  And in that post there are two tweets;

4  correct?

5      A.   Yes.

6      Q.   Okay.  And one of those tweets is the FBI meme

7  we saw when Mr. Lambert testified?

8      A.   Yeah, the one with the janitor with Capuzzo

9  there.

10     Q.   Okay.  And in that meme is you with the FBI

11 hat.  And who else is in there?

12     A.   Dino Capuzzo.

13     Q.   Okay.  And was he someone that was known in

14 the White Nationalist movement?

15     A.   Yeah.  He's a special agent that I cooperated

16 with an investigation of his.

17     Q.   All right.  And in this particular tweet from

18 2017 -- excuse me -- from February 17th by Mosin-Nagant,

19 it notes that you live at 103 South Lincoln Street in

20 Keene, New Hampshire.

21     A.   Yes.

22     Q.   Okay.  So --

23     A.   That's where I actually live.

24     Q.   And that's your real address, right?

25     A.   Yes.

1      Q.    So they're calling you a snitch and giving out

2  your address as sort of a one-two combination?

3      A.    Yes.

4            MS. KRASINSKI:  Objection to the

5  characterization --

6            THE COURT:  Yeah, sustained.  It is what it

7  is.

8            MR. WOLPIN:  Okay.

9            THE COURT:  The jury has the meme.

10            MR. WOLPIN:  All right.

11      Q.    And we've already heard testimony that being

12  outed as a snitch is not exactly a positive in the White

13  Nationalist movement?

14      A.    Yeah, they definitely don't like that.

15      Q.    Okay.  Now --

16      A.    If I could say, you know --

17            THE COURT:  No, wait till there's a question.

18            THE WITNESS:  Okay.

19      Q.    As to that view, what else about that view do

20  you have?

21      A.    The -- the label of being a snitch is

22  something that I tried to avoid by telling people when I

23  spoke to law enforcement.  That was the -- that was half

24  the point of it.  And, you know, these guys tried to

25  conflate the two.

1      Q.   Okay.  So, now, as far as the -- what you've

2  described as these repetitive calls from Bowl Patrol,

3  did you ever encourage or ask your listeners to commit

4  violence against them?

5      A.   No.

6      Q.   Now, you have callers in every day or every

7  day you were on the air at least --

8      A.   Yes.

9      Q.   -- correct?

10         Did you ever announce people's personal

11  information from the Bowl Patrol online?

12     A.   Not on the show, no.

13     Q.   Okay.  We'll get to the other issue in a

14  minute.

15     A.   Yeah.

16     Q.   Now, one of the individuals in the Bowl Patrol

17  you've mentioned is Hardmous, correct?

18     A.   Yes.

19     Q.   Okay.  And how did you know him?

20     A.   Hardmous is one of the people who came into my

21  social media orbit in early 2018 or late 2017.  And he

22  displayed a degree of technical talent and so I -- I had

23  him do some work for me.

24     Q.   Okay.  So he was a Bowl Patrol member?

25     A.   Yeah.

1    Q.    Okay.  And when would you say you learned who

2    he was, where he lived, what his name was?

3    A.    Yeah, to -- to do technical work for me, I

4    require somebody to sign a nondisclosure agreement and I

5    need to get a scan of their driver's license.  So I have

6    all of his information.

7    Q.    And how long had you had it?

8    A.    I don't remember precisely the date, but it

9    would have been early to mid 2018.

10   Q.    Okay.  And we're going to hear or talk a

11   little bit more about Katelen Fry and some of the

12   photographs, but did she send you a photograph involving

13   Hardmous or Ben Lambert in the --

14   A.    Yeah, in late -- I guess it was late 2018 she

15   had sent me a photograph of herself on a couch with

16   Cheddar Mane and Hardmous.

17   Q.    All right.  Was that sent to you for -- what

18   was the reason?

19   A.    She had informed me that she was going to see

20   them when she went to go visit family.  Her and I were

21   an item at the time and I said, you know -- we were not

22   public about our relationship, but I said, if you're

23   going to go see these guys, you've got to tell them that

24   I'm your girlfriend (sic), whatever, and I think she

25   sent me a photo to put me at ease.

1      Q.    So was there an ill purpose in that?

2      A.    No.  No.

3      Q.    And you had that, you said, beginning in what

4   month and what year?

5      A.    That would have been -- I've heard it

6   described as around Thanksgiving of 2018.  For some

7   reason, I had it in my head that this was early October.

8   But in the fall of 2018.

9      Q.    Okay.  Now, you've written some things about

10  doxing and we've talked a little bit about doxing, so

11  I'm going to ask you some questions about doxing.

12            To begin with, why are certain people

13  anonymous in this movement, generally?

14     A.    That's a -- that's a loaded question, you

15  know.  There's -- to -- to summarize, if you say things

16  that -- some people want to be anonymous because they

17  want to commit crimes.  Okay?  And that is a different

18  category of problem than somebody who wants to say

19  things which are politically unpopular.  And those are

20  two categories of people who would want to protect their

21  anonymity on the Internet.

22     Q.    Okay.  And are people in the White Nationalist

23  movement doxed fairly regularly?

24     A.    It happens with sufficient regularity that

25  it's -- I find it almost humorous that people get so

1  bent out of shape about it because, you know, you -- it

2  happens a few times a year, somebody that -- whose name

3  you recognize gets doxed, yeah.

4       Q.   Has Vic Mackey been doxed?

5       A.   Recently, yeah.

6       Q.   Okay.  By the Huffington Post?

7       A.   It was the Huffington Post or the Southern

8  Poverty Law Center.  One of these outfits, yeah.

9       Q.   So it's not just other White Nationalists

10 releasing information; it's media?

11      A.   Not even close, yes.  CNN doxes you now.

12      Q.   Okay.  And in reference to what the government

13 put in as your writings on doxing, that was actually

14 about Paul Nehlen?

15      A.   So there was a post in evidence, I believe it

16 was titled dox -- On Doxing and Anonymity.

17      Q.   Yes.

18      A.   Yes.  So that was right after Paul Nehlen had

19 doxed a guy by the name of Ricky Vaughn or Douglass

20 Mackey, real name.  His online persona was Ricky Vaughn.

21           And the Huffington Post hated Ricky Vaughn

22 because he was a big, like, very popular pro-Trump

23 account on Twitter.

24           And -- but Ricky earned himself the enmity of

25 Mr. Nehlen and Mr. Nehlen published his identifying

1   information on the Internet.

2        Q.   Okay.  So --

3        A.   And so this had started this discussion that

4   prompted me to write the article titled On Doxing and

5   Anonymity.

6        Q.   Now, after you make this report to the FBI in

7   February through the Internet crime report --

8        A.   Yeah.

9        Q.   -- does law enforcement respond to you?

10       A.   No.

11       Q.   Do you get a call?

12       A.   No.

13       Q.   Do you get an email?

14       A.   I think I got a receipt, like an automated

15  thing.  But nobody ever said, Mr. Cantwell, we take your

16  complaint very -- nothing like that happened.

17       Q.   Okay.  And how about March, April?  Anything

18  like that?

19       A.   No.

20       Q.   Now, where -- where are things headed?  I

21  know -- where are things headed from February into

22  March?  Is it still the same level of stuff, has it gone

23  down after the report?

24       A.   It got worse.  Once I made the complaint

25  online and I said that I made the complaint, then they

1    started in with this -- this snitch stuff.  And there

2    have been people in the White Nationalist movement who

3    said that about me before because of -- because I've

4    been open that I cooperated with other investigations.

5              These guys started conflating -- the Bowl

6    Patrol characters started conflating the fact that I

7    reported them to the FBI for the website defacement with

8    the arrest of -- with the imprisonment of some other

9    guys who ended up doing years in federal prison for

10   allegedly violent crime.

11        Q.    Okay.  So let's take a step back a little bit.

12              After February, did you continue to get these

13   kinds of calls that we've been talking about?

14        A.    Yes.

15        Q.    Okay.  Now, did they still come from real

16   numbers or did you start to get more from other numbers?

17        A.    I started to get them from what I determined

18   to be these voiceover IP services, which I refer to as

19   caller ID spoofing.

20              So there's apps, like I mentioned, Burner,

21   there's another one called TextNow, where for like a

22   couple of bucks, they'll give you a phone number, you

23   use it a few times, and you basically throw it away and

24   get another one.

25        Q.    So if, for example, someone like Cheddar Mane

 1    had continued to call you, would you necessarily know if

 2    he were using one of those numbers?

 3         A.   No, I wouldn't know.  I wouldn't know who it

 4    was.  I mean, I'd know the call came in and I'd be able

 5    to determine -- after a period of time I managed to

 6    figure out that it was call -- coming from these

 7    services, which helped me screen them, but I wouldn't

 8    know who was doing it until -- unless I was able to

 9    identify the voice or whatever.

10         Q.   And there was an interaction between you and

11    Cheddar Mane online in March, correct?

12         A.   Yes, there was.

13         Q.   Okay.  And what platform was that on?

14         A.   I believe you're referencing a Telegram

15    conversation.

16         Q.   Okay.  So that's a Telegram conversation

17    between the two of you.  So at least on that day, the

18    two of you were in the same Internet location at the

19    same time?

20         A.   Yeah.  I mean, to this day, I still have a

21    Telegram account and I -- and it's the same one.  And

22    so, you know, lots of people are on Telegram.  It's

23    almost like saying that, you know, you're on telephones

24    or something.

25         Q.   But you ended up having an actual --

1      A.    Yeah.

2      Q.    -- face --

3      A.    Not face-to-face -- there was an interaction

4  between us on the Telegram platform, yeah.

5      Q.    Okay.  And at that point you told him in sort

6  of very blunt words that you would dox him if he and his

7  friends continued?

8      A.    Yeah.  I don't have the exact language in my

9  head, but I told him in no uncertain terms that if you

10 keep on bothering me and coming near my audience that,

11 yeah, you're going to get doxed.

12     Q.    I think you talked about Vic Mackey, too.

13     A.    I probably did.

14     Q.    Okay.  Now, at that point in March, did you

15 release information publicly about Mr. Lambert?

16     A.    I did not.

17     Q.    Okay.  Why in March, if he's been bothering

18 you and you guys have an interaction, don't you release

19 his information at that point?

20     A.    There was a couple reasons, most notably that

21 he said he was going to stop.  And so I didn't see the

22 Cheddar Mane account causing the trouble and so since I

23 couldn't personally assign the trouble making to Cheddar

24 Mane, I didn't see fit to cause Cheddar Mane trouble.

25     Q.    Okay.  So as the spring continues into May,

1    you go to your local police department?

2         A.   Yes.

3         Q.   Okay.  And that's to report or have a

4    conversation with an officer at the local Keene Police

5    Department?

6         A.   Yes.  So I have a pretty regular relationship

7    with Joel Chidester at the Keene Police Department --

8         Q.   Okay.

9         A.   -- because from what I do, it's not uncommon

10   for me to get threats or whatever.  And so I send -- I

11   send him emails on a pretty regular basis if somebody's

12   leaving me voicemails that hint at violence or whatever.

13        Q.   So do you end up going to see him in May?

14        A.   Yeah.  I got one of my more explicit threats

15   and he invited me to come have a sit-down.

16        Q.   All right.  Do you pass most of these along to

17   prosecute or are you -- why do you do it?

18        A.   So for the most part they're not what I would

19   call true threats.  They are guys saying things like you

20   should come here and fight me.  Right?  If somebody says

21   you should come to here and fight me, well, I'm not in

22   any particular danger of that happening and so I don't

23   see any reason to go prosecute a guy who's, you know,

24   just expressing his frustration with what I do, which I

25   know is upsetting to a lot of people.

1          And so --

2     Q.   So you just refer them along?

3     A.   I refer them when they talk about violence.

4  So like, you know, if people just say, Nazi, go home or

5  whatever, like, I don't bother to inform the police

6  department.  But if somebody says I want to fight you or

7  hints at violence, I'll send it over.  But if somebody

8  makes like an explicit threat, then I will -- then I

9  will say -- you know, I have said occasionally that I

10 would like to see it prosecuted, yes.

11    Q.   Okay.  And you mean by something like I will

12 kill you?

13    A.   Yeah.

14    Q.   Okay.  Now, did you meet with Chidester

15 actually in person in May?

16    A.   Yes.

17    Q.   Okay.  And what was -- did you mention or talk

18 to him at all about issues you had with the Bowl Patrol?

19    A.   Yeah.  I talked to him about a broader

20 category of problems that I was having and the Bowl

21 Patrol was prominently featured in that category of

22 issues.  And, so, you know --

23    Q.   Was he able to help you with the problem with

24 a group like the Bowl Patrol?

25    A.   No.  The Bowl Patrol was not -- well, they

1    were not Keene residents and so -- and I did not have a

2    thing where I could say this person made this true,

3    actionable threat in terms of Bowl Patrol at that point.

4        Q.   Okay.  So does he -- how does this end up

5    leading to an interaction with the FBI?

6        A.   Well, I -- I'd later come to find out that

7    they had taken pictures of my car in the parking lot

8    while I'm in there talking to Joel.

9        Q.   But that's in the -- so what is it that

10   actually happens from there that gets you to meet

11   with -- or in contact with the FBI?

12       A.   So that particular meeting did not immediately

13   lead to anything with the FBI.  So I went -- I went to

14   meet with Joel, I talked to him about this -- you know,

15   this category of problems that I was having, and then I

16   went home.

17           What happened later was after the -- the

18   interaction at issue in this case, I went back to Joel

19   because I was -- I was having more problems with the

20   Bowl Patrol.  And he ultimately said that we should get

21   the FBI involved or said that he couldn't help me, only

22   the FBI could.

23       Q.   Okay.  So then let's move forward to June.

24       A.   Yeah.

25       Q.   In June, you got a contact from this person

 1  we've talked about named Peach.

 2        A.    Yeah.  So in the early morning of June 15th, I

 3  get a call from --

 4              MR. WOLPIN:  For a moment, if you could bring

 5  up just for the witness B-15.  B-15.  B as in boy, 1-5.

 6  Sorry.  The mask.

 7        Q.    So is this something you've seen before?

 8        A.    Yes.

 9        Q.    Okay.  Did this come into your possession?

10        A.    Yes.

11        Q.    Okay.  When did this come into your

12  possession?

13        A.    In the early morning of June 15th of 2019.

14        Q.    Okay.  And who did it come from?

15        A.    Peach.

16        Q.    Okay.  And Peach is?

17        A.    Peach is my ex-girlfriend, Katelen Fry.

18        Q.    Okay.  So Katelen Fry, on June 15th, forwarded

19  this to you?

20        A.    Yes.

21        Q.    Where were you when you received it?

22        A.    I was home.

23        Q.    Okay.  And did this spur a conversation

24  between the two of you?

25        A.    Yeah.  She asked me if that was Cheddar.

1          MR. WOLPIN:  Okay.  So at this point I would

2   move to admit this as a full exhibit and strike the ID.

3          MS. KRASINSKI:  Objection, 401 --

4          THE COURT:  Sustained.

5      Q.   Let's talk further about it.

6          So this is a message you got from her.  Did

7   this spark any response in you?

8      A.   To -- to clarify, this is an image that she

9   sent me in a message on Telegram.  So this is a

10  screenshot of a Telegram message that somebody sent her,

11  which she then sent to me in the early morning of

12  June 15th.

13     Q.   And what did that cause in you as far as a

14  response?

15     A.   It made me aware that somebody was harassing a

16  love interest of mine and she asked me if it was Cheddar

17  Mane.  I initially said I don't think so, and I asked

18  her why she would think that.  She then explained to

19  me --

20         MS. KRASINSKI:  Objection, hearsay.

21         THE COURT:  Sustained.

22     Q.   Okay.  So from this you had a sense that

23  someone was threatening her; is that what conclusion you

24  reached?

25     A.   I'm careful about how I use the word threat,

1    as you can probably understand, but, yeah, I mean,

2    they're trying to make her very uncomfortable.

3         Q.   Okay.  And was there a reason that you

4    attributed this to Cheddar Mane?

5              THE COURT:  I -- stop.  Put the headsets on.

6              MR. WOLPIN:  Okay.

7                         AT SIDEBAR

8              THE COURT:  All right.  Speak into the

9    microphone.

10             I -- are you going to introduce evidence that

11   would allow a jury to conclude that this screenshot is

12   of a communication that came from Cheddar Mane?

13             MR. WOLPIN:  So the situation is that

14   Mr. Cantwell received this on the morning of.  It's in

15   reference to taking pictures of children.

16             THE COURT:  Yeah, but can you answer my

17   question?  Are you going to try to contend that you have

18   introduced sufficient proof for the jurors, if they

19   receive this exhibit, to conclude that this screenshot

20   was a communication from Cheddar Mane?

21             MR. WOLPIN:  No.

22             THE COURT:  All right.  Why does it come in?

23             MR. WOLPIN:  Because it reflects on my

24   client's state of mind --

25             THE COURT:  No.  No.  Sustained.

1                    CONCLUSION OF SIDEBAR

2           The COURT:  And let me just state for the

3  record under Rule -- it's a Rule 403 ruling that

4  prejudicial effect substantially outweighs any probative

5  value.

6       Q.   So you get a text in the morning.  And is

7  there another interaction you have online that evening?

8       A.   Yes.

9       Q.   Okay.  And can you explain how that

10  interaction begins?

11      A.   Yeah.  The -- I believe the one that you're

12  referencing is when Cheddar Mane and a bunch of Bowl

13  Patrol characters joined the Peaceful White Folk

14  Telegram chat group.

15      Q.   Okay.  And that group named Peaceful White

16  Folk is affiliated with who?

17      A.   Affiliated with what?

18      Q.   With who?

19      A.   With me.

20      Q.   Okay.  So that's a group that you were running

21  at that time?

22      A.   Yeah.  The -- the group came into existence

23  because the -- the public Radical Agenda chat room

24  was -- you couldn't use it on Apple devices anymore.

25  And so we created a separate one that was technically

1    private that you had to have an invite to get into so

2    that -- which would -- it -- the Apple devices did not

3    ban these technically private chat courtrooms and so we

4    created another one that we called the Peaceful White

5    Folk.  That was mine, yeah.

6         Q.    And you said a number of people showed up at

7    the same time; is that correct?

8         A.    Yeah.  It was a like they -- you saw the names

9    join in a list.  It was like so-and-so joined, so-and-so

10   joined, like this.

11        Q.    Okay.  And did you recognize those names?

12   Were they familiar in some way to you?

13        A.    Some of them.  One -- one was Cheddy Blac,

14   which I recognized to be a variation of Cheddar Mane.

15   And another one was a variation of Mosin-Nagant.  And I

16   can't off the top of my head recall what the other names

17   were.

18        Q.    All right.  And what started happening when

19   this group entered the room?

20        A.    They immediately started antagonizing

21   listeners.  I believe Cheddar probably accurately

22   testified that he started beaming at a guy named

23   Heimbach.  He had these -- this sticker pack of

24   unflattering photos of Matt Heimbach.

25              Another person said, let's join the Taliban,

1    which --

2            MS. KRASINSKI:  Objection, hearsay.

3            MR. WOLPIN:  The impact on the listener.

4            THE COURT:  It's not hearsay, because it's not

5    admitted for the truth, but it doesn't strike me as

6    relevant.  So I -- you have to demonstrate that there's

7    some relevance to this.

8            MR. WOLPIN:  It relates to my client's

9    reaction and why he was --

10           THE COURT:  Yeah, your client's reaction --

11   put the headsets on.

12                        AT SIDEBAR

13           THE COURT:  Your client's being provoked is

14   admissible by the government to prove that your client

15   had a motive to commit the crime, but it's not relevant

16   to any of the defenses that you are seeking to pursue

17   here that I can see.  And I've asked you about a

18   thousand times to tell me how it is and you haven't been

19   able to articulate a legally sufficient reason why it is

20   relevant to any defense that you are putting on.

21           Do you want to take one more shot at it?

22           MR. WOLPIN:  I don't want to solely just

23   repeat what I've said, but I think the government has

24   charged this in ways that include offenses that have

25   context in a way that matters as far as the specific

1   group.

2          THE COURT:  I've given you abundant

3   opportunities to demonstrate context.  I have told you

4   over and over and over again that evidence that is

5   relevant, if at all, only because it tends to show that

6   your client has reason to be angry at Cheddar Mane is

7   evidence that the prosecution can introduce because it

8   shows your client has a motive, but it's not relevant

9   that I can see for any other purpose.  So when you try

10  to introduce it over the government's objection, I can't

11  see that there's a relevant purpose to introduce it.

12          Now, you've had abundant evidence on that

13  point, but I'm telling you it's time to move on because

14  if -- to the extent it is relevant, it's minimally so,

15  and the waste of time associated with this evidence and

16  its potential prejudicial effect -- that is, that it

17  encourages the jury to base its decision on anger

18  towards the victim rather than on any admissible

19  basis -- substantially outweighs any minimal probative

20  value that this evidence has.

21          So I'm telling you for the last time, move on.

22                  CONCLUSION OF SIDEBAR

23      Q.   So after this group enters and begins

24  communicating, what do you -- what action do you take?

25      A.   So there's a -- sort of a few things happened

1   at once.  And so the first thing I did was -- I'm trying

2   to remember if I banned them from the chat room before I

3   posted this image in the chat.  But I started banning

4   guys from the chat room, first things first.

5          I also -- in another window, I was having a

6   conversation with Katelen --

7   Q.   Okay.

8   A.   -- and so --

9   Q.   Now, let's just talk about what you did,

10  rather than talking about what's going on with third

11  parties.

12  A.   Yeah, it's difficult if I don't --

13  Q.   Let's just say you banned the people from the

14  chat room.

15  A.   Yeah, I banned the people from the chat room.

16  Q.   Okay.  Did you then have an online

17  communication separately with Cheddy Blac?

18  A.   Yeah, I sent a message directly to Cheddy

19  Blac.

20  Q.   Okay.  What was your purpose for sending that

21  message?

22  A.   Well, I sort of probably had a few things

23  going through my head at once, but I was pissed off and

24  I had warned him that if he came back around that I was

25  going to dox him.  And I figured that I probably

1   shouldn't do that without some process.

2       Q.   Okay.  So you knew you had previously told him

3   to leave you alone or you'd dox him, correct?

4       A.   Yeah.

5       Q.   And we've seen that there was some vulgarity

6   in that, wasn't there?

7       A.   To say the least of it.

8       Q.   Okay.  At the start, at this point, what

9   information do you know about Ben Lambert?

10      A.   To clarify, when I first sent the message, all

11  I've got is this photograph that I mentioned that Peach

12  had sent me the prior fall and at the moment, I couldn't

13  even actually find that image.

14           But I send him the message, do you need a

15  lesson -- a reminder of the lesson that kept you away is

16  the first thing I do.  And at the moment, I'm bluffing,

17  because I don't have it.

18      Q.   All right.  And then do you get -- ultimately

19  you get his street address?

20      A.   Yes.

21      Q.   Okay.

22      A.   And so I have to reference a conversation with

23  Katelen to talk about that, I think, but I asked her for

24  the information.

25      Q.   Okay.  Had you decided what you were going to

1    do with it at that time or what was the plan?  Did you

2    have a plan?

3        A.   No, I -- plan would be a strong word.  I came

4    back and I think I just said the name of the street and

5    I waited to see what he said.

6            And then -- you know, I don't have the thing

7    in front of me, but some time went by before he even

8    replied.  So I left it there.

9            MR. WOLPIN:  Could you put up Government's

10   Exhibit 100 right now, which I believe is a full

11   exhibit?

12       Q.   His eventual response over time, after some

13   time, is "what are you talking about"?

14           And then you see the balance.  What was the

15   message you took from that?

16       A.   He was pissing on my back and telling me it's

17   raining.  He's lying.

18       Q.   All right.  So you had the sense he was there

19   intentionally?

20       A.   Yeah.  He says:  What are you talking about?

21   Some fag pretends to be you -- which means he's well

22   aware of the Telegram account that's been impersonating

23   me, which, to my recollection, wasn't even part of this

24   incident.

25           He says:  I told them to stop.  They did.

1          Well, I'd been dealing with this stuff for the

2   last eight months and it never stopped.  That's not

3   true.

4          Q.   So in this initial part, do you say anything

5   about Child Protective Services?

6          A.   No.

7          Q.   In this initial part, do you say anything

8   about his wife?

9          A.   No.

10          Q.   Okay.  If we can scroll down, as this is going

11   on, do you have a plan?  Do you know what you're going

12   to do at the end of this?

13          A.   No.

14          Q.   All right.  You tell him about a picture and

15   he asks you what picture you're talking about.  What

16   picture are you talking about?

17          A.   So in the -- in a conversation with Peach, she

18   had explained to me that she took a picture -- I don't

19   know how to answer this question.

20          THE COURT:  You were talking about a picture,

21   apparently, and he's -- your lawyer's asking -- just say

22   what the picture is you're talking about.

23          A.   So I have two conversations going on at once

24   and this is the source of the pictures.  Okay?  So I

25   stated --

1          THE COURT:  Let's start with just -- I think

2   what he's asking is just what is the picture you're that

3   you're talking about?

4          THE WITNESS:  I've got several pictures.  They

5   are of Cheddar Mane, Cheddar Mane's family, and a

6   screenshot of Peach's GPS from when she went to visit.

7     Q.    Okay.  And at that point have you decided, I'm

8   going to put him out in the world, or not?

9     A.    No.

10    Q.    Okay.  If we can scroll down.

11          And --

12    A.    To clarify, like I think that at this point

13   I've got the right to do it, frankly, because I told

14   this guy, you stay away from me or I'm going to dox you.

15   And he's back around, I know he's lying to me, and, you

16   know, but I haven't decided to do it or not.

17    Q.    Okay.  Is doxing itself, was it your

18   understanding that doxing was legal or illegal?

19    A.    Doxing is legal.

20    Q.    Okay.  Now, you say some pretty harsh things.

21   You use harsh language.  I think if we go up, I'm sorry,

22   just like halfway up to the one above:  You know, have

23   trouble sleeping at night until she leaves you and takes

24   your kids away.

25          I mean, this is pretty strong stuff.

1      A.    Yeah.

2      Q.    Okay.  Looking at the response that comes in

3   at 6:39, which is -- if we can scroll up a little bit,

4   maybe we can highlight this one.  What did this mean to

5   you?

6      A.    It meant a lot of things, most of which are

7   hard for me to reference without going back to the other

8   chat, but it's -- it's -- primarily I think the guy's

9   trying to get a rise out of me and it's working.

10      Q.    Okay.  And when he says, I'm assuming Peach

11   took the picture, Peach is a reference to who?

12      A.    Peach is a reference to Katelen Fry, my

13   ex-girlfriend.

14      Q.    Okay.  What were -- what had been your

15   relationship with her?

16      A.    I asked Katelen to marry me.

17      Q.    Okay.  So I imagine it's someone you cared

18   about?

19      A.    Yeah.

20      Q.    What did you take this statement by him to

21   mean?

22      A.    I took it to mean, first and foremost, that

23   he's been lying to me throughout this fucking

24   conversation because he's -- what he's referencing, I

25   know isn't true.  And so what he's referencing makes me

1  know that he's been lying to me the whole fucking time

2  in his thing and that he's going to make her life

3  difficult.

4           And to clarify, again, like I said before

5  about the threat thing, I'm careful what I call a

6  threat.  Okay?  And I don't -- and I don't believe that

7  he's going to go do physical violence to her or anything

8  like that, but, you know, he's saying something nasty

9  about her and I -- and I could -- and these guys made my

10  life a living hell for eight fucking months and I don't

11  want that to happen to her.  So I got fucking mad.

12       Q.   Okay.  So if we look at the next one, that

13  contact about Peach was at 6:39?

14       A.   Yeah.

15       Q.   Your response is -- is at what time?  Can you

16  see?

17       A.   It's at 6:41.

18       Q.   Okay.  And what is your response?

19       A.   "As a matter of fact, I don't.  So if you

20  don't want me to fuck your wife in front of your kids,

21  then you should make yourself scarce."

22       Q.   Was that post about I don't care about her

23  true?

24       A.   No.

25       Q.   Were you trying to make him think that you

1   would rape his wife?

2       A.   No.

3       Q.   Did you expect that he would think that you

4   were going to rape his wife?

5       A.   No.

6       Q.   Why not?

7       A.   Because the guy's been calling me a fucking

8   sellout and a fucking rat for the last eight months.  Do

9   you think I'm going to go fucking drive down there and

10  rape his wife because I could make a buck off of that?

11  It's ridiculous.

12           It's -- you know, and I'm not saying that this

13  is a joke.  It's not the theme of the show or whatever.

14  But like we talk about like fantasy violence, things

15  like throwing people out of helicopters, on the show

16  because they're sufficiently ridiculous that people

17  aren't supposed to fucking take them as real things.

18  Okay?

19           What I got bent out of shape with these guys

20  about is they're talking about bodies that ain't even

21  fucking cold yet and they're --

22           MS. KRASINSKI:  Objection, your Honor.

23      A.   -- and they're bringing it too close to the --

24           THE COURT:  All right.

25           THE WITNESS:  I'm trying to --

```
 1              THE COURT:  I'm sorry.  I'm sorry.

 2          What is the basis for the objection?

 3              MS. KRASINSKI:  Relevance, hearsay, 403.  He's

 4   talking --

 5              THE COURT:  Okay.  Put another question to the

 6   witness.

 7          And please listen to what your lawyer says and

 8   try to answer his question.

 9              THE WITNESS:  All right.

10      Q.    Thank you, Chris.

11          Now, is this something that you gave a lot of

12   thought to, that section?

13      A.    No.  I got -- you know, this guy said

14   something about her and I wanted to say something

15   profoundly unpleasant, so I replied accordingly.

16      Q.    In the White Nationalist movement, does the

17   word cuck have a meaning?

18      A.    Yes.

19      Q.    What does the word cuck refer to?

20      A.    Cuck in White Nationalist circles is as

21   versatile as fuck in every other one, but the idea

22   basically being -- it's almost like calling someone a

23   faggot.  It's like depriving somebody of their

24   masculinity.  I'm going to take your woman from you,

25   et cetera.
```

1      Q.    So there's a theme throughout White

2   Nationalism of this idea that sleeping with someone

3   else's wife is an insult?

4      A.    Yeah.  I'd say that that's pretty universally

5   understood.  It's not a particularly pleasant thing to

6   do to somebody.  And in -- and not just White

7   Nationalism, but, you know, on a -- on the right wing

8   typically, it -- the right wing more broadly, cuck has a

9   particular connotation to it.

10     Q.    But, specifically, it impugns someone else's

11  manhood if -- if someone else is sleeping with their

12  wife?

13     A.    Yeah.  You can't satisfy your wife, so

14  somebody else is going to do it for you.

15     Q.    Okay.  So it's an insult?

16     A.    Yes.

17     Q.    Now, if we can scroll down.

18           Okay.  So then you send him the picture that

19  you have of his wife?

20     A.    Yes.

21     Q.    At that time, have you posted it online?

22     A.    I posted it with the faces blurred out in the

23  Peaceful White Folk chat room, which had a limited

24  number of users in it, but I blurred the faces out at

25  that point.

1    Q.   Okay.  So in that one, you couldn't see who it

2  was?

3    A.   Right.

4    Q.   Okay.  Now, this line, you say:  I bet one of

5  my incel listeners would love to give her another baby.

6    A.   Yeah.

7    Q.   What -- where -- there does that come from?

8  What does that mean?

9    A.   Well, if you think it's -- if you think it's

10  disrespectful to get cucked by your favorite podcaster,

11  try getting cucked by somebody who can't get laid to

12  save his life.  Right?

13         And so, you know, I -- and -- look, I get the

14  double entendre here and what people try to connect this

15  to.  I get it.  But anybody who listened to Radical

16  Agenda could identify two particular listeners who

17  identified themselves as incels on the show.

18         One is Dave in New York and another one is

19  Crypto Joe.  They're both autistic and they both call in

20  and they say idiotic-sounding things about like trying

21  to get girls.  Like Dave would call me and ask me for

22  dating advice and he'd never take any of it.  And he'd

23  call me with ridiculous questions like how do I get a

24  girl who paints her nails; how do I get a girl -- I

25  have -- it's notorious, the clip -- how do I find a girl

1    with hair down there --

2              THE COURT:  Counsel, can you tie this in to

3    what you're -- --

4              MR. WOLPIN:  Yes.

5         Q.   So in your listenership, in your mind, are

6    your incel listeners people who are sort of violent?

7         A.   No.

8         Q.   They're more --

9         A.   They're pathetic.

10        Q.   Okay.

11        A.   With all due respect to the listeners if they

12   fucking hear this, like, that's what they sound like on

13   the show.  They're a joke.

14        Q.   And so --

15        A.   And a funny one.

16        Q.   All right.  If we keep scrolling down, you

17   send him the picture of Ben Lambert?

18        A.   Yup.

19        Q.   You talk about Vic and he responds:  I don't

20   own guns or do drugs.

21             Did you take that as a statement that was

22   being truthful with you?

23        A.   No.  I was quite certain that he was being

24   dishonest, like he had been throughout the entire

25   conversation.

1    Q.    Okay.  So it keeps going to some degree.

2          We can keep going.

3          All right.  We get to some mention of CPS.

4    Did you have a plan to reference CPS?

5    A.    I did not, no.

6    Q.    Okay.  Where did CPS come from, if there was

7    no plan --

8    A.    So part of what we've skipped around here is

9    he's basically, like, he's saying to me -- and he's got

10   a point; you dox me, then what are you going to do after

11   that, right?

12         And, generally speaking, like, I -- I -- I

13   don't want to try to, like, not downplay the doxing too

14   much here, because I understand it's in my best interest

15   to do that, but, like, doxing is serious business.

16         As the prosecution noted I've said before, I

17   don't take it lightly to go and put a guy's personal

18   information out there.  And so I'm thinking of an

19   interim step that might actually solve my problem, which

20   is to stop this damn harassment.

21         And so I say to myself, I've already went to

22   the cops about this, I've been to two law enforcement

23   agencies about this, they're not responding to my

24   concerns, what can I do other than publish this guy's

25   information?

1          And I'm looking at a picture of his fucking

2     kids.  And so I think to myself, if the CPS shows up at

3     his fucking house, maybe he's going to realize that,

4     like, this has real-world implications and he'll leave

5     me alone.

6          Q.   Okay.

7          A.   And so I warn him of that.

8               THE COURT:  Okay.  Good.  Pick up your

9     headphones.  I need to ask you both a question.

10              We're going to stop for the day here.

11                         AT SIDEBAR

12              THE COURT:  Mr. Wolpin, I know you have day

13    care concerns, but I really, really think it's important

14    to --

15              MR. WOLPIN:  My headset is -- is on the fritz.

16              THE COURT:  Can you get him another headset?

17              No, we've got ones that work wonderfully.

18    We've got a hundred of them.

19              THE CLERK:  If you tend to face that --

20              THE COURT:  If you want to go to where you're

21    questioning and speak into that microphone where you're

22    standing, is it easier for you?

23              MR. WOLPIN:  All right.  I can't hear, but --

24              THE COURT:  Can you hear me, Mr. Wolpin?

25              THE CLERK:  Is it on channel 1?

1          MR. WOLPIN:  Nope.

2          THE CLERK:  I'll --

3          MR. WOLPIN:  All right.  Thank you.

4          THE CLERK:  Hold the button to 1.

5          THE COURT:  All right.

6          MR. WOLPIN:  It is working now.

7          THE COURT:  I'm giving up.

8          Members of the jury, I will -- I would like

9  you to come back -- I'd like to start at nine o'clock

10  tomorrow.  So I'm going to ask you to show up a little

11  bit before 9:00, because I want to finish with the

12  evidence in the case at or about lunchtime so as soon as

13  we come back after lunch, we can do closing arguments

14  and jury instructions.  I don't want to make you come

15  back an extra day for just a small amount of evidence.

16          So I normally start for 9:30, but we're going

17  to have to make an adjustment and start at nine o'clock

18  tomorrow.  All right?  So please come a little bit

19  early.

20          Keep my general instructions in mind.  Don't

21  discuss the case with anybody, don't disclose -- don't

22  expose yourself to any discussions of this case at all

23  in the media.

24          Have a good night and we'll see you at nine

25  o'clock tomorrow.

```
 1                      (Jury excused.)

 2              THE COURT:  Be seated, please.

 3              So, Mr. Wolpin, I tried to discuss this with

 4    you with the headsets.  I just could not wait any longer

 5    while we were fooling around with the headsets.

 6              I really have tried to accommodate your child

 7    care needs in starting a half an hour later, but I'm

 8    trying now to balance the interests of the jury and the

 9    health risks associated with bringing everybody back

10    here potentially for another day against a half-an-hour

11    problem with health care -- I mean child care.

12              So I -- I -- I just could not figure out a way

13    to do it, so I need you to come back at 9:00 --

14              MR. WOLPIN:  I've been getting here at 8:55 is

15    sort of my --

16              THE COURT:  All right.  If you miss it by two

17    minutes, I'm not going to hold it --

18              MR. WOLPIN:  I'll run in the door.

19              THE COURT:  Okay.  And we'll try to start --

20    but everybody else be here by 8:30 or, in fact, we're

21    going to talk about jury instructions tonight and so I'm

22    going to say everybody else but Mr. Wolpin, be back

23    here -- the defendant doesn't have to be here, but you

24    be back here at eight o'clock tomorrow so that if there

25    are any last-minute issues with jury instructions, we --
```

 1    we can talk about them.

 2            And whoever's giving the closing doesn't

 3    have to come.  So if you're -- so as long as one

 4    representative of the government is here and one

 5    representative of the defendant is here empowered to

 6    raise with me any last-minute concerns with my

 7    instructions.  Okay?

 8            MR. LEVIN:  By 8:00 a.m.?

 9            THE COURT:  8:00 a.m., yeah.

10            MR. LEVIN:  And they'll be told to let us in?

11    Because they haven't been opening the doors until --

12            THE COURT:  The case manager will inform the

13    CSOs that they need to be on duty, ready to go, at eight

14    o'clock, and let anybody in -- let the lawyers in at

15    eight o'clock.  Because I want to get this in and, if

16    necessary, even have the jurors deliberate in the

17    evening until it is clear to me that they are not going

18    to be able to return a verdict.  Because if we -- if we

19    can avoid having to bring people in for another day,

20    that minimizes -- lessens risk.  That's what I'm trying

21    to do.

22            MR. LEVIN:  Will the draft jury instructions

23    be emailed to us?

24            THE COURT:  I have the draft jury instructions

25    here now and I'm going to give you a half an hour to

1 read them and then I'm going to meet with you about them

2 at five o'clock and I'm going to hear your objections to

3 it.

4         MR. LEVIN:  Okay.

5         THE COURT:  And then I'm going to go back and

6 make another round of changes, if you have any, and I'll

7 try to have another set for you available at eight

8 o'clock.  And then I'll meet with you again to see if

9 there are any last-minute changes because I want to be

10 sure everybody has a clear idea as to how I'm going to

11 charge.

12         And I will say this round of changes are

13 not -- they're -- there's one substantial change and

14 that's what I've told you about and that is when proving

15 intent to extort by threat also requires proof of intent

16 to threaten.

17         And that's consistent with the way the

18 government charged it anyway, but I believe that's the

19 law.  I put it in.  If someone can persuade me it's not

20 the law, I'll take it back out.

21         The other changes I have are stylistic, so

22 I've decided to read each count in my instruction when I

23 talk about that count, and I made some other what I

24 think are mostly minor changes to the charge.  But it's

25 very similar to the charge I gave you before the trial

1   even started, which I don't normally do.  I don't

2   normally even give the people a charge until a day

3   before closing.  So I think we should be able to move

4   relatively quickly here if you've looked at the charge

5   before today.

6            But we'll -- we'll take a break till 5:00.

7   We're going to -- I do not need the defendant to be

8   present.

9            I would like -- it has been my practice at the

10  request of defense counsel to record every interaction I

11  have with counsel.  The problem is I have a court

12  reporter who's been working hard all day long.  I would

13  like to be able to hold this meeting at 5:00 without a

14  court reporter and I -- I will allow anybody who wants

15  to put on the record the next morning whatever they

16  think happened that they want to record, but I would

17  like the parties' permission to be able to hold a

18  discussion, as I normally do in every single case, with

19  jury instructions in an informal way without a record,

20  with just counsel present, so that we don't keep the

21  reporter till six o'clock at night when she's been

22  working all day.  That's my request.

23            Is there an objection there?

24            MR. LEVIN:  That's fine, your Honor.  We're --

25  we're agreeable with that.

1           THE COURT:  All right.

2           MS. KRASINSKI:  No objection, your Honor.

3           THE COURT:  All right.  So we won't have the

4   reporter.  I suggest we meet in the jury assembly room,

5   which is already set up.

6           THE CLERK:  I would say no, only because I

7   have to disinfect then down there.

8           THE COURT:  All right.  We'll do it here then.

9           THE CLERK:  Yeah.

10           THE COURT:  You stay here.  I'm going to go

11   upstairs.  I'm going to come back down at five o'clock

12   and we'll do it here.

13           That's -- I appreciate it.  That's fine.

14           MR. WOLPIN:  Your Honor --

15           THE COURT:  Yes.

16           MR. WOLPIN:  -- typically I wouldn't have any

17   contact with my client in between testifying.  I don't

18   think that's appropriate.  But I do have to have some

19   conversation with him about closing.  I would just ask

20   for leave to --

21           THE COURT:  Yes.  Of course, if counsel

22   represents to me that you will not engage in preparation

23   about the testimony but instead need to review the

24   potential closing argument, I have no objection and I'm

25   sure the government would take your representation that

1    you will refrain from --

2                MR. WOLPIN:  Thank you.

3                THE COURT:  -- discussing testimonial matters

4    with your client.

5                All right.  So that being said, whoever -- if

6    you're doing the closing, Mr. Wolpin, and you want to

7    head out, Mr. Levin can probably cover the instructions

8    and brief you.  And, otherwise, I'll see Mr. Levin back

9    here at 8:00, one member of the government team at

10   8:00 --

11               MR. LEVIN:  At 8:00?

12               THE COURT:  At 8:00 tomorrow.

13               MR. LEVIN:  Oh, okay.  But we're going to stay

14   here now --

15               THE COURT:  5:00 tonight --

16               MR. LEVIN:  Okay.

17               THE COURT:  -- you, and 8:00 tomorrow, and

18   Mr. Wolpin at 9:00.  Okay?

19               MR. LEVIN:  Thank you.

20               THE COURT:  All right.

21               This isn't on the record.

22                    (Off-the-record discussion.)

23                 (Proceedings adjourned at 4:40 p.m.)

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 12/9/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR