UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | Cr. No. 20-CR-06-PB |
| | ] | |
| CHRISTOPHER CANTWELL | ] | |

## DEFENDANT'S MOTION FOR VARIANCE AND/OR DEPARTURE AND SENTENCING MEMORANDUM

The Defendant, Christopher Cantwell, through counsel, Eric Wolpin and Jeff Levin, Assistant Federal Public Defenders, files this memorandum respectfully requesting that the Court impose a sentence of time served followed by two years of supervised release as this proposed sentence is "sufficient, but not greater than necessary" to give effect to the statutory sentencing factors set forth in 18 U.S.C. § 3553(a).

## Introduction

In the fall of 2019, Christopher Cantwell drew the ire of the Bowl Patrol, an online group populated by anonymous members. Months later, a person using the name "Cheddarmane," whom Christopher knew to be among the leaders of the group, appeared in Christopher's online chat. He addressed Cheddarmane in a private conversation via Telegram. Christopher was angry, frustrated, and fed up with a campaign of online harassment directed at him by the Bowl Patrol. The jury found that Christopher made threatening statements to Cheddarmane during that

1

exchange to obtain something of value. He did not seek money or tangible property, but the identity of the Bowl Patrol's pseudonymous leader, Vic Mackey, an identity that was widely sought and subsequently revealed by the national media.[1] In the nineteen months that have followed, Christopher has not met, called, emailed, or communicated in anyway with Cheddarmane. The group to which Cheddarmane belonged, the Bowl Patrol, appears to have largely dissolved under the weight of its members' public unmasking. Christopher has spent the last thirteen months in jail.

As a result of his conduct, Christopher lost his home, his employment, and ownership of the website that bears his name (www.christophercantwell.com) and provided him with a public platform and personal income.[2] Christopher has served most of his imprisonment under severe, pandemic-related restrictions. He was infected and symptomatic with COVID-19 during the Strafford County jail's most recent outbreak. Christopher has a misdemeanor criminal record and no meaningful recent history with probation, parole, or other post-conviction supervision. He has a plan for release and supervision that allows him to start largely anew. Per the considerations of 18 U.S.C. § 3553(a), the Court can fashion a sentence consisting of

---

[1] Sebastian Murdock and Christopher Mathias, Leader Of Dylann Roof-Worshipping Neo-Nazi Group Under Police Investigation, Huffington Post, July 27, 2020, *available at* *www.huffpost.com/entry/andrew-casarez-neo-nazi-police-investigation_n_ 5f1f510cc5b638cfec48ba47* (last visited Feb. 12, 2020)(subtitled "Authorities searched the home of Andrew Richard Casarez, aka white supremacist 'Vic Mackey,' and confiscated a gun, an official said.") (Exhibit A).

[2] The web domain Christophercantwell.com sold for $3500 in October 2020. *See* https://www.namepros.com/threads/nihongo-com-sold-for-23-000-pharmainfo-net-for-7-400.1211222/ (last visited Feb. 12, 2021). It has since been either offline or used by a foreign online casino. *See* https://web.archive.org/web/20201231115553/http://christophercantwell.com/desktop/home (last visited Feb. 12, 2021)( online casino games advertised in Indonesian).

time-served and two years of supervision that is sufficient but not greater than necessary to achieve the goals of sentencing.

## The Guidelines

The Guidelines provide a sentencing range based upon the severity of the criminal offense and the defendant's criminal history. Although the sentencing process must commence with a guideline calculation, the United States Sentencing Guidelines are merely advisory, and courts are required to consider all factors listed in 18 U.S.C. § 3553(a) in imposing sentence. *Gall v. United States,* 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220, 262 (2005). The paramount directive of 18 U.S.C. §3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary," to achieve the purposes underlying the sentencing statute. 18 U.S.C. § 3553(a).

*Criminal History Category*

Probation calculated Christopher's criminal history and concluded that he was in CHC III. PSR ¶ 67. The Defense concurs with this conclusion but asserts that it is over-representative of Christopher's criminal history. Christopher scores five criminal history points. One point arises from an OUI committed in 2009 that narrowly meets the expiration threshold set forth in U.S.S.G. § 4A1.2(e).[3]  Four points

---

[3] The charge "counts" toward criminal history points as the *conviction* was entered within ten years of the present offense even though the criminal conduct was completed more than ten years prior. PSR ¶ 61 (showing an arrest date in March 2009 and a conviction date in June 2010); U.S.S.G. § 4A1.1.

arise from a conviction that resulted in a time-served sentence and an unsupervised good behavior period. *See* Exhibit B at 2. (Virginia sentencing document indicating that "The Court finds that the defendant has served the required jail sentence.")

The Guidelines assign the latter misdemeanor convictions two points as the Virginia Court sentenced Christopher to greater than 60 days in jail. U.S.S.G. § 4A1.1(b). Under the Guidelines, sentence length serves as a proxy for the seriousness of the prior offense. U.S.S.G. § 4A1.1. For defendants who are detained pretrial, however, the relatively slow-moving wheels of criminal procedure lead to a nearly inevitable sentence of more than 60 days in jail – and thus a minimum of two points – at the case's conclusion. When a defendant is sentenced to time served, it is unclear whether the length of incarceration reflects traditional sentencing considerations or simply records the accrued pretrial time—some defendants would have been sentenced to time-served had they appeared at sentencing with fewer or even no days of pretrial credit. As a time-served sentence may simply record pretrial confinement, such sentences do not necessarily reflect a reasoned conclusion under pertinent sentencing factors.

In 2017, Christopher pled guilty to two misdemeanor offenses. The charging documents do not describe the means or details of the offense. *See* Exhibit C at 1-2 (two charging documents, amended to read "unlawfully On or about August 11, 2017, did commit assault and battery in violation of" the relevant statute."). It is not plainly apparent that the sentence imposed reflected the offense conduct and other sentencing considerations rather than simply recording the months Christopher was

held pretrial. Had Christopher appeared in Court with five, ten, or 59 days of pretrial credit to enter his plea, it is possible that the Court would have acted in the same manner and sentenced him to time served.

As a result of his sentence in Virginia, Christopher was placed on a term of unsupervised good behavior. The Guidelines attribute two-points to any crime committed while under a "criminal justice sentence." U.S.S.G. § 4A1.1(d). This is a particularly blunt instrument as it fails to distinguish between active supervision like probation or parole and the routine term of unsupervised good behavior that often accompanies less serious offenses. Here, Christopher moved four points, from CHC I to CHC III, because of misdemeanor convictions resulting in a time-served sentence and an unsupervised period of good behavior. This two-category jump overrepresents the seriousness of the 2017 convictions. Christopher should more appropriately be considered as a CHC II.

*Offense Level and Guideline Range*

Probation calculated the offense level under U.S.S.G. § 2B3.2. PSR ¶¶ 44-52. This Guideline has a base offense level of 18. Two points are added as the conviction included a threat of bodily injury. *Id.* The Defense concurs with Probation's conclusion that the adjusted offense level in this case is 20. That offense level with a CHC II leads to a guideline range of 37-46 months and, with a CHC III, to a range of 41-51 months. For the reasons discussed below, the Court should depart or vary from that range and sentence Christopher to time served and two years of supervised release.

## 18 U.S.C. § 3553(a):

## Nature and Circumstances of the Offense and U.S.S.G. § 5K2.10

Among the Court's considerations in arriving at a just sentence are "the nature and circumstances of the offense." 18 U.S.C. § 3553(a). Here, the Court should depart and/or vary from the Guidelines upon consideration of the offense's nature and circumstances. The Court should apply U.S.S.G. § 5K2.10, a departure that recognizes a reduction where the victim's conduct contributed significantly to the offense behavior. Although this departure most commonly bears upon violent offenses, it may apply more broadly where there is an "extended course of provocation and harassment [that] might lead" a defendant to retaliate. U.S.S.G. § 5K2.10. As there is significant overlap between the broader variance argument and the narrower consideration of the departure, the Defense incorporates the § 5K2.10 argument within its discussion of the nature and circumstances of the offense.

*Nature and Circumstances of the Offense*

Prior to his incarceration, Christopher earned a living through his website and online radio program. Whatever one's opinion of his political views, Christopher created a show that had professional production values and was intended to entertain his listeners. For Christopher, his show and website were his creation, a mouthpiece to express his political views, and his source of income. His trouble with Cheddarmane and the Bowl Patrol began as they interjected inflammatory and disruptive "prank" calls into Christopher's show. Although painted as innocuous

6

pranks played for laughs, there was a more sinister intent. During this campaign of calls, Cheddarmane publicly explained that Christopher was "so sick of our calling in" and that he was "all upset at me" for past calls. Def. Trial Ex. E-56. Cheddarmane then explained that a torrent of calls were planned for the following day and that he "predict[ed]" that the mass-call-in event "will be the last day that Radical Agenda is an open call show." *Id.* He explained that their disruption campaign was "going to be pretty funny." *Id.* As Cheddarmane publicly proclaimed, he and his "friends" intended to be so intolerably disruptive that Christopher would be compelled to stop accepting calls on a live show predicated on taking listener calls. These efforts, a low-tech plan with the same goals as a sophisticated DDoS attack, were intended to flood and bog down the show to make it unsustainable in its existing format.

The "pranks" escalated in their severity when the Bowl Patrol defaced Christopher's website in February 2019. This "prank" included presenting fake posts on ChristopherCantwell.com purporting to originate from Christopher. In one such post, Christopher purportedly expressed his support for having sex with children. The post included a photograph of a child's head pasted on a naked adult body being anally penetrated by an adult man. The "child" pictured in post was referred to as "Fevs," a character Cheddarmane regularly voiced in calls to Christopher's radio show and on other programs.[4] Other posts mocked Christopher for providing information to federal law enforcement or included compromising pictures. Christopher's website was formatted so that his postings were automatically emailed to all listeners

---

[4] Cheddarmane performed the "Fevs" character on the podcast cited in the prior paragraph. Def. Trial Ex. E-56. The "Fevs" reference, among other things, connected the defacement to Bowl Patrol.

enrolled in his mailing list. All of Christopher's listeners received emails from Christopher professing his support for raping children and explaining that he was a federal informant. Christopher reported this conduct to federal law enforcement immediately and indicated that he had done so online to discourage further harassment.

These repeated "pranks" had other effects. Although free speech is protected, public statements approaching the line of illegality—typically those supporting or encouraging violence—were known in this community to draw the attention of federal law enforcement. Statements made with an eye to drawing FBI attention, called "fedposting," were thought to draw adversaries into the federal spotlight. Christopher worried about these repetitive calls. He saw Cheddarmane and others' calls to his show as intentional "fedposting." For example, when Cheddarmane discussed the hypothetical desecration of a specific FBI's agent grave in a call, Christopher responded that such talk was "too edgy" for him.[5]

Such federal law enforcement attention cannot be taken lightly. This case demonstrates the breadth of the government's power when it turns its attention to investigating its citizens. In August 2019, the Government obtained a sealed court order (now unsealed) to review Christopher's personal email account without his knowledge or permission. *United States v. Google*, 19-mc-AJ, ECF 3, Order (D.N.H. Aug 14, 2019) (granting application for an order pursuant to 18 U.S.C. § 2703(d)). In

---

[5] Christopher's concerns about Cheddarmane's and others' calls were founded. In March 2020, The Government provided the Defense with two excerpts from Christopher's podcast as part of discovery. The call from Cheddarmane noted above was spliced from the show and provided to the Defense with the label, "Threat to FBI [Agent Name]." Def. Trial Ex. C-1.

addition, the Government subpoenaed, obtained, and reviewed Christopher's personal data from more than twenty sources, including financial institutions, social media providers, phone companies, and EZ-pass travel data. The FBI watched Christopher as he came and went from his house, using a "pole camera" outside his residence to record his movements day and night. One brought into the eye of the federal government's surveillance apparatus has little privacy, and "fedposting" is a way to bring that scrutiny about.

At the time of his fissure with the Bowl Patrol, Christopher was seeking to distance himself from the group. He correctly suspected that law enforcement had accessed his email and was interacting with undercover agents online. Much of the Bowl Patrol's ire arose from their belief that Christopher had "sold out" by creating a new mainstream media program (the "Outlaw Conservative") that eschewed the harsh language and subject matter common to his original show. That "fed-posting" content repeatedly appeared on his program through Bowl Patrol calls heightened Chris's fears of federal law enforcement surveillance. This was one among several reasons why Christopher wanted the Bowl Patrol's "pranks" to end.

In March 2019, Christopher and Cheddarmane communicated online. Christopher told Cheddarmane to leave him alone. At that time, Christopher had access to Cheddarmane's personal information, but he did not reveal it. In May 2019 Christopher made further reports to local law enforcement about harassment by the Bowl Patrol. In June 2019, the day prior to the online encounter at the heart of this case, Christopher's ex-girlfriend (known as Peach) forwarded Christopher an

electronic communication she received. Exhibit D. Christopher understood this communication ("So why did you take picture of those kids") to reference photographs that Peach took of Cheddarmane's children in the fall of 2018. Christopher believed that this message was sent by Cheddarmane or a close associate as few others were aware of the photographs. Christopher understood the latter portion of the message sent to Peach ("Do you think we're going to forget?") to be intentionally menacing.

Cheddarmane later entered Christopher's chat group. Christopher initiated an online exchange. During that back-and-forth, Cheddarmane wrote "so I assume Peach took the picture. Guess that means that d9n't [sic] care what happens to her either." Gov.t Trial Ex. 100 at 3. Christopher viewed this as similarly menacing, not all that dissimilar from the, "It would be a shame if something happened to your friend" Hollywood mafia trope. Christopher's quickly written response refers back to this statement about Peach ("As a matter of fact I don't"), and is then followed by the statements that forms the crux of the § 875(b) conviction ("So if you don't want me to come and fuck your wife . . ."). *Id.* Christopher response came within two minutes of receiving Cheddarmane's text about Peach. *Id.* Following on the heels of the above-noted text, Christopher lost his composure and lashed out. As Christopher explained in his testimony, Peach was a person for whom he held strong feelings and had earlier asked to marry him. Although he professed not to care what happened to her in the Telegram exchange, he cared deeply about what might happen and was worried she would be targeted by the Bowl Patrol for harassment.

During the Telegram exchange, Christopher lost his temper when he made the statements that form the basis of these convictions. He made these statements out of anger and months of pent-up frustration with the above-described interactions. He attempted to block "prank" calls by blocking phone numbers, but Bowl Patrol members found workarounds. He reported bad acts by the Bowl Patrol against him to law enforcement and contacted journalists to publicize and dissuade his harassers, but these actions led nowhere. He went public with his report to police, but that led to his public derision as "rat" or a "snitch." These lawful efforts did not resolve the situation.

The interactions between Christopher and Cheddarmane ended in June. Christopher has not contacted Cheddarmane since. Christopher spoke to the FBI about his interactions with Cheddarmane twice. When pressed on a private phone call to explain why he would speak with a law enforcement group that was unlikely to view him favorably, Christopher explained that he wished not to commit crimes in retaliation and saw presenting his grievances to law enforcement as the lawful course. Gov't Trial Ex 105A. When meeting with the FBI, Christopher acknowledged sending the messages that formed the present charges. He admitted that he had called CPS. He explained the background of his relationship with Cheddarmane and the Bowl Patrol and the circumstances of the communications. He was honest and direct. The Government may assert that Christopher was not forthright with the FBI because he did not produce saved copies of the Telegram exchange. However, Christopher knew the FBI had the publicly posted exchange in its entirety and he

admitted to the statements made therein. The only missing element in the public presentation were redacted photographs which Christopher supplied in their original form to law enforcement. In January 2020, Christopher was arrested by law enforcement without resistance.

*U.S.S.G. § 5K2.10.*

Guideline § 5K2.10 sets forth a non-exhaustive list of considerations that are relevant to the departure's application.[6] This departure primarily focuses on provocation and proportionality. *United States v. Mussayek*, 338 F.3d 245, 254-55 (3d. Cir. 2003). Here, the provocation included months of harassment by Cheddarmane and the Bowl Patrol. Some of the "provocation" is directly attributable to Cheddarmane, but the specific Bowl Patrol-affiliated actor was not always clear. What is clear, as detailed above, is that Cheddarmane directly participated and incited others to harassment while inhabiting his Bowl Patrol character. *See also,*

---

[6] "If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
(1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
(2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
(3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.
(4) The danger actually presented to the defendant by the victim.
(5) Any other relevant conduct by the victim that substantially contributed to the danger presented.
(6) The proportionality and reasonableness of the defendant's response to the victim's provocation.
Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses. There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." USSG § 5K2.10.

Def. Trial Ex. C21 (online post from Cheddarmane encouraging others to "Do your worst on [C]antwell."). This harassment was done over the internet with the intent of causing disruption, financial damage (shutting down his call-in format), and harm to Christopher's reputation (i.e. by posts suggesting he was a pedophile). *See e.g. United States v. Dailey*, 24 F.3d 1323 (11th Cir. 1994) (upholding application of departure where defendant extorted a victim who had defrauded him).

Provocation is "such conduct or actions . . . as tends to arouse rage, resentment, or fury." *Mussayek*, 338 F.3d at 255 (quoting Black's Law Dictionary 1225 (6th ed. 1990). Here, causing rage, anger, resentment, and fury in Christopher Cantwell was not the inadvertent consequence of Cheddarmane and his associates' actions— causing range, anger, and resentment and fury in Christopher was *the purpose* of their actions. It continued despite Christopher's report to law enforcement and despite his public declaration of doing so. Intentional efforts that served only to amuse the harassers as they caused harm and damage are provocation.

The departure is also concerned with the proportionality of the defendant's response. For example, plotting to blow up the car of the person who committed adultery with one's spouse is disproportionate to the wrong and does not support the application of this departure. *United States v. Shortt*, 919 F.32d 1325, 1328 (8th Cir. 1990). Here, however, although Christopher acted with anger, he did not change the fundamental nature of this feud. This began as an online dispute. It remained so. Christopher did not show up in person or turn something verbal into a physical confrontation. It remained a mean-spirited battle of the written and spoken word

carried out online. Furthermore, although releasing Cheddarmane's identity was unkind, Christopher doing so was not out of proportion to the provocation; as presented at trial, the Bowl Patrol, months earlier, publicly posted Christopher's house number, street, and city online with a meme depicting him as a federal informant. Def. Trial Ex. B-4b.

Whether the Court considers provocation's role in Christopher's actions as grounds for a departure under § 5K2.10 or a variance under § 3553(a), the result is the same. The lead-up to this exchange, Christopher's efforts to engage law enforcement, his efforts to take remedial actions on his show, his public acknowledgment of his report to law enforcement to discourage harassment, were all attempts by Christopher to mitigate the impacts of the Bowl Patrol's purposeful harassment campaign without resorting to criminal behavior. The nature and circumstances of the offense make it far different than where the defendant was unprovoked or there was a vulnerable victim. Here, the nature and circumstances of the offense, among other factors discussed below, justify a time served sentence and two years of supervision.

## Victim Impact

The Defense anticipates the Government and Court will address the impact of these offenses on the victim. The Court should do so. The feelings engendered in Cheddarmane by these statements are appropriate considerations for sentencing. However, the unpleasantries Cheddarmane suffered due to being publicly identified

as an online proponent of hate was not a consequence of this offense, but rather a willful and knowing consequence of his decision to participate in an online hate group. To attribute his public "outing" as an online Nazi, and its collateral consequences, to these convictions is beyond the scope of the convicted conduct and should not be a factor at sentencing.

      Members of the Bowl Patrol and other online hate groups adopt pseudonyms so that they can make offensive and anti-social statements that are not attributed to their real-life selves. They do so with knowledge that they may be publicly identified and ostracized for their statements. For some, the cat-and-mouse-game that comes along with pseudonymous online-hate postings heightens the thrill and further drives participation. However, doing so has known risks, and almost inevitably leads to exposure. At this point in time, every major member of the Bowl Patrol has been publicly identified, including its leader, Vic Mackey, who was "doxxed" by the national media and law enforcement.

      Christopher posted personal information online about Cheddarmane in June 2019. He posted it in a chat group of several hundred participants. Christopher's post was not searchable under Cheddarmane's real name as Christopher did not post his name online. The relevant day's chat log fell among thousands of posts that accumulated in a chat group. Although Christopher had a thrice-weekly radio program, participated in podcast interviews about his feud with Bowl Patrol, and operated a website that forwarded posts to thousands of listeners, he did not identify Cheddarmane in any of these forums that had a far greater reach. When the FBI

appeared at Cheddarmane's home in November 2019, four months after the online exchange, his identity had not been brought to broad public awareness and not even his wife was aware that he was Cheddarmane.

Cheddarmane, like all other prominent members of the Bowl Patrol, has since been identified. The person behind the Cheddarmane mask has suffered harm as his community has learned of the racist, antisemitic, and violent things he said online. That harm, however, does not arise from Christopher Cantwell. Cheddarmane, consistent with his first amendment rights, made a knowing and voluntary decision to present unpopular statements in a public forum. The harm that follows his public statements being correctly attributed to him does not arise from the Defendant's offense conduct and is not a basis upon which to sentence Christopher.

### 18 U.S.C. § 3553(a)(6): Avoiding Unwarranted Sentencing Disparities.

Data from this district and surrounding districts indicates that it is unusual for the United States to charge interstate extortionate threats under 18 U.S.C. § 875(b) and (d) in this region. Counsel, through PACER, generated and has attached "criminal case reports" identifying all charges brought under § 875(b) and (d) in this and neighboring districts. These reports identify stand-alone charges as well as those within multi-count indictments. Attached are searches of the PACER system for all § 875(b) and (d) charges filed in New Hampshire over the past ten years. *See* Exhibits E and F (PACER reports on § 875(b) and (d) cases filed in the District of New Hampshire rom February 15, 2011 to February 15, 2021). PACER reports that

Christopher Cantwell is *the only defendant* charged with violating § 875(b) in the District of New Hampshire over the last ten years. *Id.* He is only the second person charged with violating § 875(d) in the District of New Hampshire in the last ten years. Exhibit F. *See United States v. Vallee*, 15-CR-115-PB-1, ECF 42, Judgment (D.N.H.) (31-count indictment for a scheme to obtain naked photographs of numerous teenage victims over a period of years which included several counts for violating § 875(d)).

These charges are uncommon regionally. In looking to Massachusetts, a larger neighboring District within the First Circuit, PACER reports that the United States similarly has not brought a single charge alleging a violation of § 875(b) in the last decade and only three charges for violating § 875(d) during that time. *See* Exhibits G and H (PACER reports on § 875(b) and (d) cases filed in the District of Massachusetts rom February 12, 2011 to February 12, 2021). The § 875(d) charges in Massachusetts over the last decade are as follows: In *United States v. Pizette,* the defendant was convicted of Possession of Child Pornography and § 875(d) and received concurrent 65-month sentences. *Pizette,* 11-CR-10151-MLW, ECF 25, Judgment, Oct. 17, 2012 (D. Mass). In *United States v. Paulino*, the defendant was a convicted of being a Felon in Possession of a Firearm and § 875(d) and received concurrent 24-month sentences. *Paulino*, 13-CR-10138-GAO, ECF 63, Judgment, June 13, 2014 (D. Mass). In *United States v. Connor*, the defendant was convicted of Cyberstalking and § 875(d) and received a time served sentence. *Connor*, 15-CR-10398-WGY, ECF 55, Apr. 8, 2016 (D. Mass).

When comparable charges have been brought in neighboring states, courts have routinely issued below-Guideline sentences. The United States Sentencing Guidelines provides an online "Data Analyzer" tool for examining sentencing data from 2015 to 2019. The Commission's analyzer parses convictions by numerous variables, including the "primary guideline" applied at sentencing, by District, and by date. The Guideline applicable here (§ 2B3.2) applies to more than a dozen statutory offenses, including the relevant statutes in this case.[7] The Commission's analyzer tool notes that the District of New Hampshire has issued **zero sentences** applying a primary guideline of § 2B3.2 over the tool's five-year collection period.[8] Exhibit I. New Hampshire, Maine, Rhode Island, and Massachusetts, together account for 2,3,1,7, and 0 such cases in 2015 to 2019 respectfully. Exhibit J. The data indicates that **all 13** cases where § 2B3.2 was the primary guideline in neighboring First Circuit states over the last five years involved a downward departure or downward variance. *Id.*

The data indicates that the charge itself is a relative outlier. It is made more unusual in that the victim did not report the crime to law enforcement, the convictions were not part of a scheme of repeated threats to a vulnerable victim, the charges did not facilitate another offense (i.e. child pornography, felon in possession of a firearm), and Christopher did not seek an item of significant monetary value. The

---

[7] The relevant Guideline in this case, U.S.S.G. § 2B3.2, applies to convictions for 18 USC § 874, 875(a),(b), and (d), 876, 877, 878(b), 1030(a)(7), 1951, 2113(a), 2280, 2280(a), 2281, 2281(a), and 29 U.S.C. § 530 and 1141. U.S.S.G., App. A.

[8] https://ida.ussc.gov/analytics/saw.dll?Dashboard (data produced after entering "New Hampshire" under the "District" pull down menu and "§ 2B3.2" under the "Primary Guideline" pull down menu) (last visited February 12, 2021)

sentencing data from nearby states where the primary sentencing guideline was §
2B3.2 (and thus not tied to another offense like child pornography) indicate that
below-guideline sentences are the norm for this offense in this area. Considering the
nature and circumstance of the offense and the above noted data, a sentence that is
below the Guidelines range would not create unwarranted sentencing disparities, but
instead reinforce sentencing uniformity among defendants.

### 18 U.S.C. § 3553(a)(2): The Purposes of Sentencing

The Court must balance several sentencing purposes under 18 U.S.C. §
3553(a)(2) to achieve a sentence:

> (A) to reflect the seriousness of the offense, to promote
> respect for the law, and to provide just punishment for
> the offense
> (B) to afford adequate deterrence to criminal conduct
> (C) to protect the public from further crimes of the
> defendant
> (D) to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner.

In this case, the Court can accomplish its punitive and deterrent goals through
Christopher's year-long removal from the community prior to sentencing and two-
years of curtailed freedoms on supervised release. The Court can accomplish the
rehabilitative and community-protection through those same means.

Thirteen months in prison is punishment. It represents hundreds of days of
repeated, daily confinement. The pandemic has created particularly harsh punitive
conditions replete with regular lockdowns. In the most recent surge, Christopher

contracted COVID-19 and recuperated in a jail cell with another infected cellmate. Supervised release, with rules and conditions that limit travel, association, and personal privacy, among other freedoms, serves a punitive function in addition to its rehabilitative purpose. *Gall v. United States*, 522 U.S. 38, 48 (2007) (describing substantial restrictions of freedom on probationers as punishment). For this Defendant, becoming a felon, and losing valued Second Amendment rights, is a collateral consequence that serves as a punitive result of the offense. *United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Lastly, losing financial independence due to his incarceration and losing the right to his own named domain on the internet, largely resets the career he built and requires him to start a life anew, with different housing, likely in a different state, and with new professional goals. Additional prison time is not required to further the punitive goal of sentencing.

These consequences similarly support the deterrent goals of sentencing. Thirteen months of imprisonment, multiple years of compliance with supervision, becoming a felon, and losing much of one's grounding in life, sends a deterrent message to those making threatening statements on the internet in an ongoing dispute. Although threatening statements among internet enemies must be deterred, this is not a case where a threat was intended to deter governmental action, silence vulnerable crime victims, or impair the functioning of a business, such that it may implicate greater policy issues and a heightened need for public deterrence. This was

a dispute between two men who were actively engaged online in a tit-for-tat, line-pushing rivalry. The Defendant's proposed sentence is sufficient to meet the deterrent goals of sentencing.

As to aims of rehabilitation, Christopher intends to start anew upon release. He intends to move from New Hampshire. He has arranged to live at an unoccupied residence in an East Coast state. The Defense's investigator has confirmed this plan with the homeowner. Although Christopher has earned a living as a media personality for much of the last decade, he is skilled and experienced in computer infrastructure and internet technology. Christopher has developed a plan to work with a software development company. The Defense's investigator spoke with the company's owner who indicated that he has offered Christopher a full-time job upon his release. Christopher intends to focus on his sobriety upon release. He has had a lengthy struggle with alcohol overuse. The inhibition-lowering effects of alcohol contributed to this offense. The Court's supervised release conditions, which will include restrictions on consumption and requirements for substance use disorder treatment, serve the ends of rehabilitation and community-protection.

## Objection to Proposed Special Conditions of Supervision

Christopher objects to the proposed supervision conditions that subject his computers to monitoring by Probation while on supervised release as they present a greater deprivation of liberty than is reasonably necessary to achieve the non-

punitive goals of sentencing. United States Probation has proposed special conditions

of release to include:

> 10. You must allow the probation officer to install computer monitoring
> software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use.
> You must pay for the cost of this monitoring software to the extent you
> are able, as determined by the probation officer.

> 11. To ensure compliance with the computer monitoring condition, you
> must allow the probation officer to conduct initial and periodic
> unannounced searches of any computers (as defined in 18 U.S.C. §
> 1030(e)(1)) subject to computer monitoring. These searches shall be
> conducted for the purposes of determining whether the computer
> contains any prohibited data prior to installation of the monitoring
> software; to determine whether the monitoring software is functioning
> effectively after its installation; and to determine whether there have
> been attempts to circumvent the monitoring software after its
> installation. You must warn any other people who use these computers
> that the computers may be subject to searches pursuant to this
> condition.

PSR, PROPOSED SENTENCING OPTIONS AND SUPERVISION CONDITIONS, p.

3. Christopher objects to these condition as they create a greater deprivation of liberty

than is reasonably necessary and are likely to inhibit his employment and

rehabilitation upon release.

Pursuant to 18 U.S.C. § 3583(d), the Court may impose special conditions of

supervised release if the Court determines that the conditions (1) "will further at least

one of the three legitimate statutory purposes of deterrence, protection of the public,

and rehabilitation," *United States v. Medina*, 779 F.3d 55, 60 (1st Cir. 2015), (2)

"involves no greater deprivation of liberty than is reasonably necessary," § 3583(d)(2),

and (3) "is consistent with any pertinent policy statements issued by the Sentencing

Commission," § 3583(d)(3). "[A] court may not take account of retribution (the first

purpose listed in § 3553(a)(2)) when imposing a term of supervised release." *Tapia v. United States*, 564 U.S. 319, 326 (2011). The special conditions also must have "adequate evidentiary support in the record" based on defendant's specific characteristics and background. *Medina*, 779 F.3d at 61 (citations and quotations omitted).

Upon release from incarceration, Christopher intends to work full time for a software development company. Christopher has a background and training in computers and internet technology that have been dormant while he has lived in New Hampshire. This work opportunity has a significant rehabilitative and public protection function as it will provide consistent income in a traditional field of employment. The offer is for a full-time "remote" work position that requires the regular use of a computer. To perform his job functions, Christopher will access and use the company's data. Computer monitoring software presents concerns for his employer as it will provide the government access to, among other things, customer billing data and non-disclosure agreements, and bring into question the company's obligation to inform clients of the circumstances that expose their information to government review.

Although directed toward supervision conditions prohibiting work in a particular field, Section 5F1.5 of the Sentencing Guidelines provides relevant guidance when considering the impact of special conditions on employment. Section 5F1.5 directs the court to limit work activities only if there is a nexus between the work and the "conduct relevant to the offense of conviction" and restrictions are

"reasonably necessary to protect the public because, absent such restriction, the defendant will continue to engage in unlawful conduct similar" to the convicted conduct. U.S.S.G. § 5F1.5; *id.*, comment. (backg'd) ("the provision was 'intended to be used to preclude the continuation or repetition of illegal activities while avoiding a bar from employment that exceeds that needed to achieve that result.'"). Monitoring all computers, including those used for work, with intrusive software does not protect the public or serve rehabilitative ends.

Although courts may imposed monitoring conditions where the underlying offense involved the internet, *United States v. Aquino-Florenciani,* 894 F.3d 4, 7 (1st Cir. 2018), the decision to impose such a condition is an individualized one governed by the 18 U.S.C. § 3583(d) standard cited above. Broad computer monitoring software is invasive and involves a significant deprivation of liberty. *See e.g.*, *United States v. Lifshitz,* 369 F.3d 173, 191 (2d. Cir. 2004) ("Constant inspection of the documents that [the defendant] creates on his computer might be more like searching his diary or inspecting his closets than it is like the highly targeted diagnosis accomplished by drug testing."). The proposed special term cited above addresses the installation of monitoring software, but does not illustrate what that monitoring would entail in practice. To better address the suitability of this condition, Counsel spoke with United States Probation as to how it conducts computer monitoring. Counsel understands that the Probation department contracts with an outside company in relation to monitoring software. That company's software collects data from the monitored computers, including recording keystroke and typed-in terms, including

24

internet search terms, and routinely takes "screenshots" of the computer monitor's display. When installed on a smartphone, that software allows the tracker to monitor "app" usage and track the details of a defendant's communications. This preserved data is screened by the software company and is available for review by the supervisee's probation officer. Company employees may provide special alerts to Probation if certain data (i.e. images of child pornography) is seen on the device.

Although this case involved the use of the internet, monitoring software creates a greater deprivation of liberty than is reasonably necessary and is not well tailored to the facts of the offense and the purposes of sentencing. This case arose from a dispute that escalated and peaked in the summer of 2019. In the superseding months, Christopher has not contacted Cheddarmane through a computer or any other means. The Court need not use computer monitoring technology to ensure that behavior continues; a condition prohibiting contact with Cheddarmane and his family will suffice. Computer monitoring conditions are well tailored to discover and discourage covert and repetitive online activities. For example, monitoring software may reveal hidden viewings of child pornography by a defendant with a past collection of such images or uncover search queries (i.e. "how to make a bomb?") for a defendant convicted of a terrorism offense. Here, there is nothing to suggest that the government requires routine access to Christopher's personal communications and electronic content to effectively protect public safety. The current charge—having an online exchange with adversary containing what a jury found to be an unlawful threat—is not a private act likely to be uncovered through monitoring software.

Unlike the examples noted above, making statements to a third party is not a secretive act that hides in the recesses of one's computer; by their very nature, statements to another can be reported by the victim to law enforcement or, as here, published to others. There is simply not the same need to access private data here as in a case where the offense conduct involved secretive computer activity. As such, the deprivation of liberty is greater than what is reasonably necessary to accomplish the goals of supervision and the Court should omit the computer monitoring condition.

Should the Court deny this request, Christopher requests that the Court permit review of the collected data only if reasonable suspicion exists that there has been a violation of a condition of supervision and that stored data contains evidence of this violation. As the condition is currently written, Probation has no governing standard for when and why a search may be conducted. Recording or capturing personal writings, banking records, photographs, work documents, communications with friends and family, and search histories represents a near complete invasion of privacy. The Defendant proposes that if a monitoring condition is imposed, that  data be preserved, but only examined should reasonable suspicion independently arise. For example, were law enforcement to  receive information that a communication running afoul of release conditions happened on a particular date, probation would have reasonable suspicion to conduct a narrow search of potentially relevant data from that date. Such a condition narrowly tailors the search and protects the defendant's privacy interests.

## Conclusion

Over the last several years, Christopher went from being an anonymous libertarian candidate for Congress and niche podcast entertainer to a national public figure forever known as the "Crying Nazi." The last several years brought attention, which Christopher desired, but also a regular stream of violent threats, persistent mockery, and intense law enforcement surveillance. Since becoming publicly maligned, Christopher has oscillated between defiantly embracing his public persona and wishing to escape it. During a dispute with others who embraced harsh online personalities, Christopher let anger and frustration drive his conduct. He has lost much and been imprisoned for more than a year,  A post-incarceration transitionary period with restrictions and limitations enforced by a supervising federal probation officer and full time employment will allow Christopher an opportunity to lower the temperature from the roiling boil it reached during his dispute with the Bowl Patrol. A sentence that follows a time served period of imprisonment with conditions of supervised release that protect the community and allow for rehabilitation is sufficient to meet the balance of sentencing purposes under 18 U.S.C. § 3553(a)(2) and achieve a sentence that is  sufficient, but not greater than necessary to meet those objectives.

WHEREFORE, Christopher Cantwell respectfully moves the Court to impose a sentence of time served followed by two years of supervised release.

Respectfully submitted,
Cristopher Cantwell
By his Attorney,

Date:  February 16, 2021

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar No. 18372

*/s/ Jeff Levin*
Jeffrey S. Levin
N.H. Bar No. 12901
Assistant Federal Defenders
Federal Defender Office
22 Bridge Street
Concord, NH 03301
Tel. (603) 226-7360
E-mail:  eric_wolpin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon AUSAs Anna Krasinski and John Davis by ECF/CM filing system on February 16, 2021.

*/s/ Eric Wolpin*
Eric Wolpin

28