UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:20-cr-06-PB |
| v. ) | |
| ) | |
| CHRISTOPHER CANTWELL ) | |
| ) | |

# Government's Response to Defendant's Sentencing Memorandum and Motion for Downward Variance and Departure

**I.   Introduction**

Defendant Christopher Cantwell urges the Court to impose a time-served sentence (approximately 13 months) followed by two years of supervised release. ECF No. 123, at 14. In doing so, he ignores the gravamen of his offense – that he engaged in a campaign of extortion, that he threatened to rape Mrs. Lambert in front of her three young children, and that he posted photographs of Mr. Lambert's innocent family members online and called a state agency in an attempt to disrupt their lives. Instead, he repeats the refrain that he lost his temper after members of Bowl Patrol had harassed him for months.

That excuse rings hollow. It is certainly true that the defendant and members of the Bowl Patrol engaged in an online feud. But the defendant's deliberate threats and harassment of an innocent mother and her children in June 2019 cannot be explained or justified by prank calls and memes that had largely ended months before these crimes. The defendant's offenses were not provoked. And they involved vicious and repeated threats of sexual violence.

A time-served sentence would not reflect the nature, circumstances, and seriousness of these crimes. Neither would it promote respect for the law, provide just punishment, or afford adequate deterrence for similar crimes. The defendant has showed no remorse for his conduct, only regret for the consequences he now faces. In the government's view, the nature of the

offense and the surrounding circumstances warrant a sentence at the high end of the guideline range: 51 months of imprisonment followed by a term of three years of supervised release.

## II.     Offense Conduct

In April 2018, the defendant appeared as a guest on the first episode of the "BowlCast," a podcast produced by the Bowl Patrol. The defendant gave Vic Mackey log-in credentials to post content on his website, including the BowlCast. By late 2018, however, the relationship between the defendant and the Bowl Patrol soured. Members of the Bowl Patrol began prank-calling the defendant's podcasts—the kind of prank the defendant himself engaged in on his podcast.[1]

Members of the Bowl Patrol made a song about the defendant – "Chris Cantwell go back to Albemarle." The defendant responded with a song about Bowl Patrol – "I'm a Jew, yo." Members of Bowl Patrol created memes involving the defendant. Members of Bowl Patrol doxed the defendant by publicly posting his address. In February 2019, the defendant doxed Bowl Patrol member Mosin Nagant.

Also in February 2019, two members of the Bowl Patrol—Vic Mackey and Mosin Nagant—used their log-in credentials to create a series of posts that appeared as though the defendant had authored them. There is no evidence that Mr. Lambert was involved in these posts; he testified that he was not involved in altering content on the defendant's website, and the defendant offered no contrary evidence. The defendant filed an online complaint with the FBI claiming that Vic Mackey and Mosin Nagant defaced his website, and that members of Bowl Patrol were harassing him.

---

[1] For example, in February of 2019, the defendant had Radical Agenda listeners post fliers that read "Stop Trump! Call 540-701-5653," and then heckled those who called in.

The defendant then began a campaign to unmask the Bowl Patrol's leader, Vic Mackey. In late February of 2019, the defendant explained to his audience that he was "going to ruin the people who came after me."



GX 303. In March of that year, he told others of his plan:



GX 304. Then, on March 17, 2019, the defendant directly threatened to dox Mr. Lambert. "When you get doxed, it's all because of Vic. Remember that."



DX B-20.

There was no evidence of further contact between Mr. Lambert and the defendant after mid-March 2019, and no evidence that Mr. Lambert did anything to provoke him. However, on or about June 15, 2019, the defendant publicly posted pictures of Mr. Lambert's wife and children. Although the defendant's testimony at trial did not explain why it happened, we know that someone saw the posted photos and texted "Peach," the defendant's ex-girlfriend and the

known source of the photos, saying, "So why did you take pictures of those kids." Peach relayed a screenshot of the text to the defendant, who kept it. The defendant understood the text as a reference to the photos of Mr. Lambert's children. ECF No. 132, at 9-10.

The trial evidence thus established that it was the defendant, not Mr. Lambert, who commenced hostilities. When first posted, the faces in the photos were apparently blurred, part of the defendant's plan to proceed incrementally against Mr. Lambert. The defendant admitted to publicly posting the photograph in his exchange with Mr. Lambert the following day:

> Next time I post that photo, the faces won't be blurred, and then you're going to start getting unexpected visitors 4:45 PM

GX 100. And the defendant still possessed a file with blurred photos of the Lambert Family when his computer records were seized in January 2020.

Late on June 15, 2019, Mr. Lambert (apparently still unaware that the defendant had posted photos of his family) joined one of the defendant's Telegram chat groups, "Peaceful White Folk." Mr. Lambert testified that he did not know that "Peaceful White Folk" was run by the defendant. When the defendant saw Mr. Lambert in the chat group, he was angry and sent Mr. Lambert a menacing private message that included an implied threat to dox him:



The defendant waited for two hours until Mr. Lambert responded with an attempt to de-escalate the situation. The defendant chimed in again at nearly 4:00 a.m. on June 16, threatening to "ruin" Mr. Lambert's life. Nothing further occurred in the chat until the afternoon of June 16,

when Mr. Lambert wrote, "all I can do is just leave you the fuck alone and tell other people to do the same – which I have done." After two more hours, the defendant responded ferociously, using vile epithets, vowing that Mr. Lambert would "lose everything you have," and threatening to post un-blurred family photos, to bring "unexpected visitors" to Mr. Lambert's home, and to make Mr. Lambert suffer "cause you're the one who I can get."

Only then did the defendant turn to his real objective – obtaining identifying information for Vic Mackey:



Two more hours went by, until 6:37 p.m., when Mr. Lambert asked what picture the defendant was talking about. The defendant replied immediately: "Fuck around and I'll remind you the hard way." Two more minutes went by (when Mr. Lambert figured out the only way the defendant could have obtained photographs of his family was through "Peach"). Lambert wrote, "So I am assuming peach took the picture. Guess that means you don't care what happens to her either." The defendant again responded immediately, then waited again for an hour and a half:

> As a matter of fact, I don't. So if you don't want me to come and fuck your wife in front of your kids, then you should make yourself scarce
> 6:41 PM

> Give me Vic, it's your only out   7:10 PM

> I guess I'm going to have to prove my seriousness
> 8:17 PM

When Mr. Lambert finally replied, at 8:21 p.m. on June 16, "Show me the picture you have," the defendant responded in rapid succession. At 8:27 p.m. he posted an unblurred family

5

photo and said there was "[m]ore where that came from."  A minute later he invoked his incel listeners.  And three minutes later he referred to calling in the FBI, posted an "LSD" photo of Mr. Lambert, and demanded again, "Give me Vic."

When Mr. Lambert told the defendant that he did not have Vic Mackey's dox, the defendant made a new threat – to call child protective services to initiate a child welfare investigation.  The defendant made good on his multiple threats – he publicly posted the Lambert's address and photographs of Mrs. Lambert and her children, while wishing that CPS would "destroy this scumbag's life."  The next day he called the child abuse and neglect hotline to report Mr. Lambert as a dangerous individual, in hopes of breaking up his family.

### III. Argument

#### A. The Defendant's Extortion and Threat Crimes Were Not Provoked, But Were Long Intended, Planned, and Deliberately Executed Over the Course of Several Days.  Accordingly, a Downward Departure Under Section 5K2.10 is Not Warranted.

The defendant claims that the Bowl Patrol provoked his crimes, and that his threat to rape Ms. Lambert in front of her children was made in the heat of the moment.  He blames the Bowl Patrol's campaign against him in late 2018 and early 2019 and claims that he "lost his composure and lashed out" when Mr. Lambert referred to Peach. (ECF No. 123 at 10.)  But the above record shows that the defendant deliberately executed an extortion campaign over the course of two days, during which he (1) patiently waited, sometimes for hours, for a response from his victim, then promptly fired back; (2) continually escalated his threats, while gradually revealing the extent of his extortion tool kit (blurred photos, an address, unblurred photos, the LSD photo); and (3) followed through by doxing Mr. Lambert and his family and reporting them to CPS.  This was not an impassioned response to a perceived threat, as the defendant now claims.  Nor

was it provoked. Rather, it was a coordinated, planned attack to obtain Vic Mackey's identifying information.

Accordingly, a three-level reduction under section 5K2.10 is not appropriate in this case. Section 5K2.10 provides that a departure may be made where "the victim's wrongful conduct contributed significantly to provoking the offensive behavior." The guideline indicates that this departure is most often applicable in the context of a violent offense, but also that there may be "unusual circumstances" where "substantial victim misconduct" such as "an extended course of provocation and harassment" could lead to a departure in a case involving theft or destruction of property. *Id.*

Here, the defendant's threats and attempt to extort information from Mr. Lambert came months after he ceased prank calling the defendant's radio shows. Moreover, Mr. Lambert was not involved in defacement of the defendant's website. Thus, any wrong that the victim himself committed against the defendant was long over. *See United States v. Mussayek*, 338 F.3d 245, 256 (3d Cir. 2003) (affirming that no departure is available where defendant attempted to extort victims who had scammed the defendant "long after the alleged scams; he did not react within days, or even weeks, but many months – and in the case of [one victim], nearly a year - later."); *United States v. Bigelow*, 914 F.2d 966, 975 (7th Cir. 1990) (reversing departure for defendants who made extensive extortionate threats to victim who owed them money).

In addition, the defendant's conduct was extremely disproportionate to Mr. Lambert's conduct. *See Blankenship v. United States*, 159 F.3d 336 (8th Cir. 1998) (noting that departure under § 5K2.10 is not appropriate where the defendant's "response was disproportionate to the threat posed by the victim's conduct."); *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990) ("A concern for the proportionality of the defendant's response is manifested by the terms

7

of § 5K2.10"). The defendant claims that his threat to dox Mr. Lambert was not out of proportion to the provocation. But this argument ignores that, in addition to the threat to dox, the defendant threatened to rape an innocent mother—who was not involved in the prank calls, or in altering content on the defendant's website, or in any of Bowl Patrol's activities—in front of her children. This was not a proportionate response. *Compare Bigelow*, 914 F.2d at 966, 975 (finding departure was inapplicable where defendants repeatedly threatened victim and his family if he failed to pay debt, where victim refused to repay debts, wrote bad checks, and attempted to block entry to his home when bill collectors came) *with United States v. Dailey*, 24 F.3d, 1323, 1324, 1328 (11th Cir. 1994) (upholding application of departure under clear error standard and finding that defendant made single threatening phone call threatening that victim would "never walk again" if victim did not repay debt, where victim defrauded defendant of tens of thousands of dollars).

It is clear from the context of the defendant's own statements that his threat was not an immediate response to provoking behavior. Instead, it was a concerted effort to threaten and intimidate Mr. Lambert into giving the defendant Vic Mackey's identifying information. Evidence obtained from the defendant's hard drive indicates that, as early as February 25, 2019, in a discussion about "Bowl Gang," the defendant stated that "I am going to ruin the people who came after me." *See* GX 300, 303. In March 2019, the defendant wrote, "I have dox on several of these Bowl Patrol idiots and I'm gonna st[art] dropping them until they rat out Vic." *See* GX 300, 304. On March 17, 2019, the defendant directly threatened to dox Mr. Lambert. *See* DX D-20. Thus, this offense represented the culmination of a plan formed much earlier – at least in March of 2019. The spirit of the departure provision is to recognize that a hasty decision made in a physically dangerous circumstance may be mitigated by evidence of provocation. That spirit

does not extend to a long-planned extortion and harassment crime. Nor does it extend to an offense whose time to execute is measured not in seconds, but over the course of two long days.

In summary, for the defendant, Mr. Lambert and his family represented not a provocation, but an opportunity. As the defendant himself explained:

> And I don't care if it's you causing the trouble, you're the one who's gonna suffer cause you're the one who I can get     4:45 PM

### B. The Defendant Victimized an Innocent Woman and Her Children.

In his pleading the only victim the defendant acknowledges is Mr. Lambert. But there were additional victims in this case, who cannot be ignored. Although Mr. Lambert was the sole direct recipient of the threat, the defendant threatened to rape Mrs. Lambert, threatened to have their three minor children watch the rape, and publicly posted the Lamberts' address and images of Mrs. Lambert and her children. Those postings remain up and publicly accessible – the defendant never deleted or removed them.

Where, as here, the offense involved "a threat to a family member of the victim," the guideline suggests that an "*upward* variance may be warranted," rather than the downward departure or variance the defendant seeks. U.S.S.G. § 2B3.2, cmt. (n.8) (emphasis added); *see also United States v. Adams*, 385 F. App'x 114, 117-18 (3rd Cir. 2010) (upholding upward departure where offense involved threat to victim's family despite the fact that there was no evidence that the victim's family was aware of the threat, and concluding that "application note 8 does not require an awareness of the threat by the victim's family.").

And despite the defendant's claim that this offense did not involve a "vulnerable victim" (ECF No. 132, at 14), this offense involved three small and highly vulnerable victims—none of

9

whom provoked or engaged with the defendant in any way. As the defendant recognized at trial, the children are "too young" to be watching something like that.

In addition, the defendant selected Mrs. Lambert for attack because she is a woman. His public posts have made clear that the defendant is a misogynist. He has repeatedly posted about women being raped or killed. For example, in 2014 he encouraged a female reporter to kill herself. In multiple posts in 2019, he fantasized about another female journalist being raped by MS13 or murdered and raped. Here, the defendant chose to threaten sexual violence against Mrs. Lambert—he threatened to rape her and to direct his "incel listeners"—those who endorse misogyny and advocate rape and other forms of violence against women—to "give her another baby." GX 100.

The defendant seemed fixated on Mr. Lambert's wife. He began the confrontation in June 2019 by posting a photo of Mrs. Lambert. The defendant referred to her expressly when he said that she was "gonna have trouble sleeping at night" until "she leaves you and takes your kids away." He messaged Mr. Lambert with an unblurred photo of his wife. Later, he threatened to rape her, then luridly remarked that one of his incel listeners "would love to give her another baby." And he referred to her again when he imagined Mr. Lambert talking to her and the children to get "their stories straight."

For the defendant, Mrs. Lambert and her children were just collateral damage. But the harm they suffered and may still suffer is palpable. That the defendant chose to make threats of sexual violence against them, and to take action to harass them and disrupt their family, is an aggravating sentencing factor. *See* U.S.S.G. § 3A1.1(a) (noting that a 3-level enhancement applies where a defendant intentionally selected any victim as the object of the offense of conviction because of the actual or perceived gender of that person). By choosing the target of

10

his threat based on gender, the defendant essentially made Mrs. Lambert the victim of a hate crime.  See U.S.S.G. § 3A1.1(a).  And despite what the defendant now says, this case *does* involve "vulnerable" victims:  three little children.  See U.S.S.G. § 3A1.1(b).

### C. A Criminal History Category of III Does Not "Substantially Over-Represent" the Seriousness of the Defendant's Criminal History or the Likelihood That He Will Recidivate.

The defendant asks the Court to depart downward under section 4A1.3(b)(1) of the sentencing guidelines. He contends that a criminal history category of III overrepresents the seriousness of his criminal history.

Before addressing the defendant's arguments for a downward departure, it is worth noting that several aspects of the defendant's criminal history constitute aggravating factors, suggesting that a Criminal History Category of III is if anything *under-representative* of the seriousness of the defendant's record and the likelihood he will re-offend.

First, that record includes seven adult criminal convictions for which zero criminal history points were imposed, including a weapons case and a larceny conviction after which his probation was revoked and the defendant was jailed.  PSR ¶¶ 56-60, 63, 64.  Although they do not add to his criminal history score, those convictions are relevant to the Court's determination of whether a criminal history category of III "substantially over-represents" the defendant's record.  Second, the defendant was convicted in two separate Assault and Battery cases in Charlottesville, involving two separate victims, but the two sentences were counted as a single sentence because the crimes were not separated by an intervening arrest and the sentences were imposed on the same day.  PSR ¶ 63.  Third, the two Charlottesville misdemeanor crimes occurred in the context of a violent confrontation to which the defendant brought a small arsenal

11

of firearms and other dangerous weapons. This Court should fully consider that context as it evaluates the criminal history score in this sentencing proceeding.

As for the defendant's request for a downward departure, § 4A1.3(b)(1) authorizes a departure "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." In this case, the defendant's criminal history substantially differs from the benchmark given in the Guidelines commentary, which states:

> A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

USSG § 4A1.3 application note 3.

The defendant committed the instant offenses less than two years after committing assault and battery offenses against two separate victims. He was still subject to the sentences for those offenses – a term of good behavior – when he committed the instant offenses. In addition to committing the instant crimes while serving the sentence for the assault and battery convictions, he committed other offenses while the assault and battery charges were pending. The defendant also violated his pretrial release condition of house arrest and was arrested and convicted of public swearing/intoxication. PSR ¶ 64. He continued to violate his bond conditions by engaging in online communication intended to harass and potentially intimidate victims of the assaults. (Exh. 3 to Motion to Revoke Bond.) The defendant ultimately pleaded guilty to violating his bond conditions. PSR ¶ 62.

The defendant argues that it is somehow less serious that he committed these offenses while under a term of good behavior than if he had been under a term of active supervision such

12

as probation or parole.  *See* ECF No. 132, at 5.  But the comments to the guidelines note that active supervision is not required.  U.S.S.G. § 4A1.1, application note 4 ("[A]ctive supervision is not required for this subsection to apply.").  *See also United States v. McCrudden*, 894 F.2d 338, 339 (9th Cir. 1990) (finding that period of unsupervised probation that resulted from prior conviction for driving on suspended drivers license could be considered a criminal justice sentence under guideline 4A.1.(d), rejecting defendant's arguments that summary probation for a traffic offense was too insignificant to be counted as being under criminal justice control); *United States v. Brown*, 909 F.3d 698, 700-01 (4th Cir. 2018) (noting that, under Virginia law, a suspended sentence conditioned on a period of good behavior was functionally the same as unsupervised probation); *United States v. Peters*, 700 F.3d 44 (1st Cir. 2012) (noting that defendant earned two criminal history points under 4A1.1(d) where he committed the offense while under a Virginia sentence of "good behavior" for a period of years from his release from confinement).   The focus, rather, is whether the defendant's conduct suggested a lack of regard for the law and for the sentence imposed by the court in Virginia.  Here, the defendant violated the law before fully serving his prior punishment for two assault and battery convictions.  Including two points under guideline 4A1.1(d) appropriately reflects the seriousness of the defendant's criminal history.

      The defendant also argues that it is unclear whether the sentences he received—twelve months with all but seven months suspended for each indictment to be served concurrently—for the two assault and battery convictions was intended to reflect broader sentencing considerations or simply to record the time he was held pretrial. ECF No. 132, at 4-5.  But the court conditioned the suspended portion of the defendant's sentence upon a number of requirements, including good behavior, a prohibition against entering the Commonwealth of Virginia, a

13

prohibition against possessing firearms while in the Commonwealth of Virginia, and a condition that the defendant not contact the victims directly or indirectly, including by referring to them on social media or radio broadcasts. ECF No. 123-2, at 2-3. The judgment reflects careful consideration of the circumstances surrounding the two offenses, including that the defendant traveled from New Hampshire to Virginia heavily armed to participate in the Unite the Right rally, and committed the assaults at the torch-lit rally the previous night.

Finally, the defendant earned a criminal history point for his OUI by more than a mere technicality, as he claims. For guideline purposes, "offense" is defined as "the offense of conviction and all relevant conduct…unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. n.1(H). The defendant committed the OUI offense in March 2009, began planning to go after members of Bowl Patrol at least as early as February 2019, and, in March 2019, told others he was going to start doxing Bowl Patrol members until they gave him Vic's information and first threatened to dox Mr. Lambert. PSR ¶¶ 12A, 61; G 300, 303, 304. Thus, he committed the OUI within ten years of his relevant conduct with respect to the instant offenses. Regardless, the defendant would remain a criminal history category III if the Court disregarded the criminal history point the defendant received for this conviction.

Given the seriousness and recency of his prior criminal behavior, including violating his bond conditions and committing the instant offenses while serving his sentence for the assault and battery convictions, the defendant cannot demonstrate that his criminal history category substantially over-represents the seriousness of his criminal history or the likelihood that he will commit other crimes.

### D. A Prison Sentence of 51 Months is Warranted.

The defendant is a 40-year-old man with a history of advocating violence, flouting the law, and violating bond conditions.  He has a limited but serious criminal history that includes convictions for driving while intoxicated (2000), criminal possession of stolen property (2000), criminal possession of a weapon (2000), and operating a motor vehicle while under the influence of alcohol.  PSR ¶¶ 58-61.

Then, in 2017, the defendant was scheduled to be a speaker at the "Unite the Right" rally in Charlottesville, Virginia.  The night before the rally, the defendant participated in the "torch-lit" rally where he used pepper spray to attack counter-protesters.  Though initially detained, the defendant was released on bail in December of 2017.  Multiple bond violations followed.  While subject to house arrest, the defendant was arrested for public swearing/intoxication in March of 2018. PSR ¶ 64.  In June 2018, the Virginia court issued a capias for violation of bond conditions after the defendant continued to use his radio show and social media to talk about the victims of the assault.  Ultimately, the defendant pleaded guilty to the assaults as well as to violating his bond conditions.  PSR ¶¶ 62-63.

To this day, however, the defendant denies responsibility for committing the assaults.  In e-mails to law enforcement, the defendant maintains that he was framed and that "faced with being judged for my politics by a communist jury, with a prosecutor proven willing to suborn perjury, I pleaded guilty to two misdemeanors at the last minute."  *See* July 5, 2019 e-mail from Christopher Cantwell to Joel Chidester, 17R239_EMAILS-000149; July 17, 2019 e-mail from Christopher Cantwell to the FBI, 17R239_EMAILS-000047.

Returning to New Hampshire, the defendant continued to produce his podcasts, "Radical Agenda" and "Outlaw Conservative," and post on social media.  He used these platforms to advocate for or incite violence against specific groups and, at times, specific people.  He also

used his platforms to call for the "violent overthrow" of the government and, previously, for the "assassination" of law enforcement officers and government workers. PSR ¶ 82.

Part of the reason the defendant seeks a downward variance is his claim that he lost ownership of the website that bears his name—christophercantwell.com—and that provided him with a public platform and personal income.  ECF 132 at 2, 20.  What the defendant fails to acknowledge is that although the domain name "christophercantwell.com" was sold, he simply moved his platform to "christophercantwell.net."  Indeed, on a jail call, the defendant directed a friend to: (1) purchase "christophercantwell.net," "christophercantwell.org," and "radicalagenda.net;" (2) move content from "christophercantwell.com" onto "christophercantwell.net," and from "radicalagenda.com" to "radicalagenda.net;" (3) get "outlawconservative.com" back up; and (4) send an e-mail to the defendant's followers letting them know that his website was back online.  Exhibit 1, Sept. 2019 Jail Call, at 5:42-6:10, 7:01-11:03; *see also id.* at 3:40 – 4:09 (noting that the value of christophercantwell.com is questionable because the "domain has been completely destroyed by Google and stuff.")  His website remains up and running in the same format as before, and requests donations to his commissary account.  *Christopher Cantwell, Radical Agenda*, https://christophercantwell.net (last visited February 19, 2021); *Christopher Cantwell, Commissary Update*, https://christophercantwell.net/2020/02/11/commissary-update/ (last visited February 19, 2021).  While he may not have been able to record podcasts while detained, he has not lost his public platform.  Therefore, the loss of his previous website is not a reason to grant a downward variance.

Further, a 51-month sentence would provide just punishment and promote respect for the law.  The defendant's previous interactions with the justice system did nothing to deter him from

committing extortion and threatening violence in this case. The defendant's proposed sentence of 13 months would not be sufficient to punish him, deter him from committing future crimes, or protect society. Nor is it severe enough to deter others from committing a like offense. Indeed, the imposition of such a lenient sentence would suggest that the cost of violating federal extortion and threat laws is so low as to make committing the crime worth the risk. This would contravene one of the core purposes of sentencing.

Moreover, a 51-month sentence is in line with other sentences imposed in First Circuit cases involving extortion and violent threats. For example, in 2013, a defendant was sentenced to 60 months of imprisonment for sending two threatening e-mails in violation of 18 U.S.C. § 875(c). *United States v. Clemens*, 738 F.3d 1, 3 (1st Cir. 2013). In 2003, a defendant was sentenced to 57 months of imprisonment after being convicted of threatening and attempting to extort the parents of an adopted child in violation of 18 U.S.C. § 875(b), 18 U.S.C. § 875(c), and 18 U.S.C. § 1952. *United States v. Nishnianidze*, 342 F.3d 6, 10-13 (1st Cir. 2003). In 1999, a defendant was sentenced to 30 months' imprisonment after pleading guilty to one count of the interstate transmission of a threat, in violation of 18 U.S.C. § 875(c), after prank calling a hotline dedicated to missing children and falsely claiming that he had abducted and was abusing a minor. *United States v. Freeman*, 176 F.3d 575, 577 (1st Cir. 1999).

The cases the defendant references in his sentencing memorandum do not support the time-served sentence that he seeks. For starters, in each of those cases the defendant accepted responsibility for his conduct. Moreover, in *United States v. Pizette*, 11-CR-10151 (D. Mass.), the below-guideline sentence of 65 months of imprisonment is higher than the defendant's applicable guideline range. And in *United States v. Connor*, 15-CR-10398 (D. Mass.), the court determined that a sentence of time served followed by 10 months of home detention with

electronic monitoring was appropriate given that the defendant was 19 years old and had significant mental health issues. Exhibit 2, Judgment (noting that the sentence may be weak on general deterrence). None of those factors is applicable here.

Ultimately, courts have repeatedly imposed significant sentences in cases involving extortion and violent threats. To minimize the sentencing disparity among similarly situated defendants, a within-guidelines sentence of 51 is just in this case.

### E.  Computer-Monitoring as a Condition of Supervised Release is Warranted.

The defendant used the internet to commit the offenses of conviction, and has significant background and training in computers and internet technology. Computer monitoring is needed to serve a substantial deterrent purpose—encouraging the defendant to refrain from threatening and extorting others online. A computer monitoring condition is a significant specific-deterrent tool in this case and for this defendant. In addition, like random drug testing, computer monitoring is a tool the probation office uses to avoid recidivist behaviors and to help the supervising officer implement supervision strategies. It is an especially important tool when the defendant committed his criminal conduct online.

Typically, the monitoring software takes random "snapshots" of a defendant's online activities. It does not record every search, every keystroke, or every activity. The defendant complains that the monitoring software amounts to an occupational restriction under guideline 5F1.5. Not so. The proposed conditions do not prohibit the defendant from engaging in a specified occupation and the monitoring software will not interfere with the defendant's ability to access this company's data. The government is sensitive to the company's privacy concerns, and, to the extent that it does capture the company's data, the probation office has informed the government that it will maintain the confidentiality of those materials.

It bears emphasis that the monitoring software is not a search. Proposed supervised release condition number 9 addresses searches of the defendant's electronic devices, and requires that the probation officer have reasonable suspicion that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation.

In summary, the defendant committed internet-related crimes, and his conduct on the internet must be monitored if the probation office is to effectively supervise him. The proposed conditions are reasonable and involve no greater deprivation of liberty than is reasonably necessary.

## IV.   Conclusion

A sentence of 51 months' imprisonment, at the high end of the guidelines range as correctly calculated in the PSR, followed by three years of supervised release, is sufficient but not greater than necessary to meet the purposes of 18 U.S.C. § 3553(a).

Dated: February 19, 2021

Respectfully submitted,

Scott W. Murray
United States Attorney

By:   /s/ John S. Davis
John S. Davis
Anna Z. Krasinski
Assistant U.S. Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552