**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
          v.                        *   June 26, 2020
                                    *   10:02 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BAIL HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           U.S. Attorney's Office




For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey Levin, Esq.
                           Federal Defenders Office




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
 1                    P R O C E E D I N G S
 2             THE COURT:  I want to let the parties know if they
 3    aren't already aware, a reporter has been granted access to
 4    this hearing.  I granted that request.
 5             The reporter must keep her microphone and camera
 6    muted, may not speak during the proceeding or record during
 7    the proceeding, but I wanted the parties to know there has
 8    been a member of the public that has sought access to the
 9    hearing.
10             Mr. Cantwell, can you see me and hear me okay?
11             THE DEFENDANT:  I can, Judge.
12             THE COURT:  Let's first address the fact that we're
13    holding this hearing by video conference.
14             As you all know, we're operating in the midst of a
15    pandemic.  We aren't currently holding court hearings in
16    person at the moment and haven't for a while, but ordinarily
17    if you wanted a hearing like this in person in the courthouse,
18    I would give you that opportunity.  And if that's what you
19    want, I will give you that opportunity.  I might have to wait
20    a while before I can do it, but I will definitely give you
21    that opportunity.
22             The fact that we have this pandemic is restricting
23    our ability to conduct in-person hearings.  Congress has
24    recognized that and it's authorized courts to conduct hearings
25    by video conference in certain circumstances.
```

1           The Judicial Conference of the United States has

2    recognized that it's appropriate to conduct these hearings by

3    video under certain circumstances.  Our Chief Judge has made a

4    finding that authorizes us to conduct hearings of this sort by

5    video conference.

6           I need to make sure that there are two other

7    findings that are made before I conduct a hearing like this.

8    One is a finding that it would seriously harm the interests of

9    justice to delay the proceeding until I can do an in-person

10   hearing.  That's relatively easy because you want out on bail

11   and if I just kept you in indefinitely until the virus was

12   over, it would defeat the very purpose of your motion.  So I

13   don't want to delay the proceeding unless I absolutely have

14   to.

15          The other finding is to make sure that you consent

16   to have this hearing conducted by video because if you don't

17   consent, I wouldn't hold it by video.  I would have to figure

18   out some other way to try to address the issue.

19          So do you understand that you have a right to an

20   in-person court hearing on this matter?

21          THE DEFENDANT:  I do.  Attorney Wolpin explained

22   that to me.

23          THE COURT:  And are you intending to give up that

24   right and do you consent to have this hearing conducted by

25   video conference?

1          THE DEFENDANT:  I do consent, yes.

2          THE COURT:  Based on your statements I find that

3     you've knowingly, voluntarily, and intelligently consented to

4     have this hearing conducted by video conference, so I will

5     proceed on that basis.

6          All right.  Thank you, Mr. Cantwell.

7          Now let me talk to the lawyers for a second about

8     how I would like to go forward.

9          It seems -- and the government looks at this in a

10    similar way.  When I try to divide up the arguments that the

11    defendant is making, they fall into certain categories the way

12    I see it.

13         One category is, hey, I've got a viable defense to

14    this charge and the Magistrate Judge didn't properly evaluate

15    that issue.  So that's one category.

16         Another category is the Magistrate Judge really

17    missed the boat on this, on violations of my conditions of

18    release earlier, and you really need to understand the true

19    story on that and when you do, you'll think about it

20    differently.

21         A third issue is things are really hellish at

22    Strafford County and unduly risky to me, and therefore you

23    should let me out on bail.

24         And a fourth category is you should let me out on

25    bail because I need to prepare my defense and this is

1    interfering with my ability to prepare my defense.

2             Obviously these are generalizations, but do you

3    think it's -- I'll ask, I don't know whether Mr. Levin or Mr.

4    Wolpin will present, but do you think these are categories

5    that allow me to kind of analyze your arguments?

6             MR. WOLPIN:  I do, your Honor.

7             I think the viable defense, sort of the first

8    category the Court cited, is also a reflection on

9    dangerousness.  I think some of the details that have come up

10   as to what's gone on or what the background story of this case

11   in context is is suggestive that there is not a danger to the

12   other party in this case.

13            THE COURT:  All right.  Why don't we take those in

14   that way, one at a time.  Let me hear the defense position on

15   that and then let me hear the government response on it.

16            Please bear in mind that I have the full record of

17   the proceedings before the Magistrate Judge.  I have already

18   read your materials.  I understand we're going to proceed

19   without additional evidence, except maybe the exhibits that

20   have been identified, and you're going to proceed by proffer,

21   which I'm willing to do.  I have high confidence in the

22   integrity of the lawyers for both sides.  I know you won't

23   proffer a fact to me unless you have a good faith basis to

24   believe it's true.

25            So I'm fine with that, but I would ask you not to

1    simply regurgitate what's already there because I've read it,
2    or I will read it, and I will fully understand it, I guarantee
3    you, before I act.  So if we can keep the focus on new
4    information or highlighting the key points that you need to
5    make and let me follow up with questions, both of you, that
6    would be helpful.
7            Mr. Wolpin, let me start with you and let me start
8    with the first argument.
9            Again, this is an oversimplification, but the way
10   I'm kind of seeing it is there isn't a ton of dispute about
11   the actual conduct that the government says comprises the
12   crime.  The real issue -- the primary, there may be others,
13   but the primary issue is this in your view was not a true
14   threat and the government won't be able to prove that it was a
15   true threat at trial, and that when I understand the context
16   of the statement I will come to the conclusion that the
17   government's case is much weaker than it appears to be based
18   solely on the undisputed statements about what -- undisputed
19   evidence about what occurred.  It's how you interpret what
20   occurred that gives you your defense, and you say if I
21   interpret it the way you're suggesting, I will see that the
22   defense is stronger and that the inference of dangerousness
23   from the statement is a less strong inference and justifies
24   his -- makes it possible to me to structure conditions that
25   will release him on bail.

1           So that's the way I'm understanding it.  If I've

2    got it wrong, let me know.  Otherwise, just explain the

3    context to me as to why this true threat defense is really

4    more viable than perhaps the Magistrate Judge thought.

5           MR. WOLPIN:  Yes, your Honor.  And I will do that

6    through the prism of the dangerousness concern as well.

7           I mean, if you look at how this is charged under

8    875, it is very clear from case law about true threat and jury

9    instructions in this area that context is admissible, that

10   context is vitally important to understanding both parties'

11   sense of what this conversation was about, its meaning.  That

12   includes prior context, prior experiences with the person, and

13   how you would understand that other person to be seeing your

14   statements.

15          I focused on this in part as a defense, but more

16   importantly I think when we look at dangerousness the first

17   question should be, not the global question of dangerousness

18   but in a case with an alleged victim, is the alleged victim in

19   danger should there be release.  And I think based on the

20   totality of what I'm going to discuss the evidence is that is

21   simply not the case in this situation.

22          This is a case that was really about trolling and

23   winning.  These are two Internet personas.  One that goes by a

24   pseudonym and Chris who goes by his real name, that say really

25   inflammatory things on the Internet.  That's the context of

1   how they know each other.

2           And when the FBI went to see, for example, the

3   other party, Mr. Cheddar Mane, their description of their

4   conversation include the following, and I think it's important

5   to understand the language.

6           THE COURT:  Before you do, let me just -- I hope

7   you're not saying this.  I hope you're not saying Mr. Cantwell

8   is so inflammatory in the way he generally addresses subjects

9   that he can't make a true threat because everything he says is

10  so outrageous that nobody can take it seriously.

11          MR. WOLPIN:  Absolutely not.  That's why I'm

12  starting with the other party, because obviously a statement

13  to my grandmother is different than a statement to this

14  individual.  So I think it's fact-specific, which is why I'm

15  trying to tailor my arguments to the facts of this person

16  because I agree if this were a targeted thing or something to

17  the public generally, I think that's a different matter, but

18  this is a very specific, concrete, discrete conversation

19  between two people, and so I'm not making that argument.

20          THE COURT:  Okay.

21          MR. WOLPIN:  So I will focus on this other

22  individual and why those conversations are different than

23  conversations that might occur between Chris and another

24  party.

25          But just to understand that that's sort of the

1    context, you know, the FBI goes and speaks with him and he

2    says the following:  Whether he was making comparisons of

3    hard-working ranch niggers in Montana to other African

4    Americans across the country or saying kill the cops, rape the

5    cops, kill this, he described it all as bullshit.

6            Members of their group were always trying to get as

7    close to the edge of legality as possible without going over.

8            That's the mentality of the other party involved.

9    It's a purposeful lion poacher.  This person describes

10   themselves as a troll.  Explains that when they saw that they

11   were getting to Christopher and they were causing a reaction

12   from him, then that was like gasoline on the fire to cause

13   them to push further, to go further and go again and again and

14   again, to troll him, to attempt to cause him to get upset and

15   angry.

16           That is a fundamentally different person than

17   someone who is a member of the public who is not choosing to

18   engage in that behavior and does not come from that mindset

19   that we will push all the limits of the law and say things

20   about rape and killing that is far different than what I think

21   the general public would do.

22           The evidence that Chris is a danger to Cheddar Mane

23   is lacking every step of the way.  It's lacking before this

24   conversation in June.  This is a situation of someone I would

25   describe as a bully.  They selected a person, Chris, that they

1    thought they could bully.  They talk about how they did that.

2            You don't bully someone who you have a true fear is

3    going to cause you harm.  You know that that person really is

4    going to be riled up, but you do it with a knowledge and an

5    understanding that when you bully on the schoolyard, you're

6    bullying someone who is not going to punch you back.  So they

7    walk in and he walked in eyes open.

8            If you then look in the moment of this conversation

9    in June and you look at his responses, it's not indicating

10   someone who believes he's in danger.  He's sparring.  You are

11   desperate and pathetic.  You're a faggot ass kike.  He's

12   responding with all these things that are not indicative of

13   someone who's afraid in the moment but someone who is

14   purposely and sort of enjoying engaging in this kind of back

15   and forth.  That's not evidence of someone who believed he's

16   in danger.

17           What happens immediately after this interaction in

18   June shows that this individual did not believe he was in

19   danger because he posted the conversation online.  That's the

20   game.  That's the goal.  That's how you win at trolling.  If

21   you troll somebody and it's private, it means nothing.

22           THE COURT:  Do you agree that the evidence suggests

23   that -- again, I only have what's -- I'm not prejudging at

24   trial because I have no idea what the evidence at trial would

25   be, but the evidence that we're taking as a given here

1    suggests that Mr. Cantwell wasn't just engaging in a back and

2    forth trolling.  He was trying to get this person to give him

3    something that he wanted, which was identifying information on

4    a third party.

5            And so these were not just a back and forth, two

6    trolls trolling each other.  It was Mr. Cantwell trying to get

7    a troll to give him something that the troll didn't want to

8    give, and so the rhetoric has to be understood in that

9    context, doesn't it?

10           MR. WOLPIN:  It does, but that context also

11   requires a showing of a true threat.  So the threat to injure

12   must accompany the request for some kind of --

13           THE COURT:  Ordinary coercion that doesn't rise to

14   the level of true threat is not going to support the -- or be

15   sufficient to justify a conviction.

16           My point is that this isn't just -- and I think you

17   don't disagree with this.  This isn't just back and forth

18   trolling.  This is you say a troll who is trying to provoke

19   Mr. Cantwell and Mr. Cantwell not simply responding in kind.

20   Mr. Cantwell has a goal.  His goal is I want to force this

21   person to do something he doesn't want to do and how far do I

22   need to go to force him to do what I want him to do, and he's

23   willing to use very extreme rhetoric whether it's a true

24   threat or not as an effort to try to force.

25           I guess my question to you is, if you are using

1   rhetoric to try to force somebody but everybody knows that the

2   rhetoric is empty, how does that force somebody to capitulate?

3   In other words, unless the threat is calculated to be

4   believed, it doesn't seem to have any ability to coerce

5   because the goal here is coercion.  The question is whether

6   the coercive goal was sufficiently extreme to qualify as a

7   true threat.  But how is something coercive if it's just two

8   people who use extreme rhetoric firing at each other?

9        MR. WOLPIN:  I don't think it is particularly

10   coercive, and I think that's why this individual doesn't

11   respond by giving information.  I think that's -- I mean, just

12   for background, the information that's sought is from the

13   person who's sort of the ringleader of the trolls.  This isn't

14   an individual -- again, a general individual.  This is someone

15   who has chosen to sort of engage in this conduct and is sort

16   of the higher-up in this group of individuals.

17        But I don't think it has much power.  I think it's

18   a lot of bluster and not a lot of coercion, because again we

19   see it doesn't effectively work and I don't think it would

20   have worked.  I don't think there was any fear on Mr. Cheddar

21   Mane's part that someone was going to come and have sex with

22   his wife in the same way that, as I put in my most recent

23   filing, he makes a reference to sort of injury could happen --

24   things could happen to this woman who's connected to Chris.

25        I mean, this is just a different situation than two

1  normal individuals.  But rather than again focus on the

2  defense, the question is, is this person in danger, and

3  they're not.  They're thousands of miles away -- or a thousand

4  plus, I don't want to identify where, but a significant

5  distance away.

6          When the FBI goes and talks to him months later

7  they ask, you know, has he e-mailed you, has he contacted you,

8  has he showed up at your door?  No, no, no, no, no.

9          There's nothing that goes on after the summer

10  between these individuals.  The pictures of the family are not

11  to my knowledge ever posted online.  This ends essentially in

12  June or a little bit thereafter between these two individuals

13  with no further contact.

14          THE COURT:  Have I misunderstood?  I thought the

15  government was contending that in fact at least one of the

16  defendant's threats was actually carried out, not any of the

17  violent --

18          MR. WOLPIN:  The call to CPS occurred, yes, but

19  again, that's not a threat to injure or a threat of violence

20  as has been alleged in the current charge.  The charge

21  relates, as they keep referring to, as an allegation of a rape

22  threat.  That's what they've charged, not CPS.

23          THE COURT:  But I think the government's position

24  is -- and I would just be interested in your response.  I'm

25  not adopting it.  The government's position is that in the mix

1    of determining whether something can qualify as a true threat

2    or not when a person makes threats A, B and C and carries out

3    threat C, it tells us something meaningful about whether

4    threat A is also a true threat or is not.

5            MR. WOLPIN:  I mean, I think they can make that

6    argument.  I don't think it holds water in this particular

7    case because I don't think that's the kind of thing that this

8    individual or Mr. Cantwell would think would occur, which is

9    raping his wife.  So that's the charge.  That's sort of a

10   different question, and I think this is of a different

11   character than that.

12           But again, I know -- this is sort of walking this

13   edge between the actual defense at trial versus the question

14   of dangerousness.

15           And, you know, I think there are these questions

16   that will arise at trial.  I think this is a trial with very

17   sort of triable facts under what the law is, but also

18   ultimately the thing is this person has no more Internet

19   presence he's asserted.  He has not had any contact with

20   Chris.  Chris has sat in jail with discovery.  Although the

21   government makes a reference to protective orders, he's abided

22   by that protective order.  He's not revealed this person's,

23   you know, information which he could easily do through

24   contacts outside the jail.

25           This dispute has ended.  It will resolve presumably

1    in the courtroom.  But this is not something where this person

2    needs Christopher incarcerated to protect himself from

3    Christopher.  That's simply not the case.  The evidence

4    doesn't support that.

5              THE COURT:  Can I ask you, what do you say to the

6    government's contention -- again, I'm not adopting it.  I'm

7    testing what the government says and giving you a chance to

8    respond.

9              I think the government is making a contention that

10   your client while incarcerated has made statements that as

11   soon as the case is over he's going to release all of the

12   documents so that people who are cooperating with the FBI will

13   be held accountable, and that sort of, according to the

14   government, undercuts your theory that, oh, this dispute is

15   over, let bygones be bygones, we're all fine.  According to

16   the government, they rely on this exchange he had in some kind

17   of an interview to support the view that it's not in fact

18   over.  That your client is planning to disclose the

19   information as soon as in his view he's free from the order.

20             The government says the order goes beyond that.  We

21   don't need to debate that for the time being.  It's just the

22   inference that I think the government -- the strongest

23   inference the government can draw from that argument is that

24   your client doesn't intend to let this lie.  He intends to

25   just put out on the Internet whatever information he can about

1    the people who he thinks have wronged him.  The government

2    says that kind of undercuts your argument that he's in a let

3    bygones be bygones mode.

4            MR. WOLPIN:  And I'll respond to that in two ways.

5            First, I took that as evidence of the opposite.

6    The fact that -- his understanding of the order is right now I

7    cannot reveal this information.  I am very concerned with

8    abiding by court orders.  I am not going to reveal this

9    information because I understand I'm not allowed to.

10           His understanding was that after the case was over

11   that would no longer be the case.  It wouldn't be a violation.

12           THE COURT:  Let me stop you.  I'm inclined to agree

13   with you on that issue.  I just want to be clear.  I think the

14   government makes too much of it when he suggests that's

15   evidence of an intention to violate orders because they

16   haven't demonstrated that the order is so unambiguous that

17   your client necessarily would have known that it would violate

18   the order.  I'm inclined to agree with you on that.

19           I'm raising a different point, which I think the

20   government is also making, which is whether he's violating the

21   order or not when the case is over, he's made clear his

22   intention, which is to try to do as much as he can to damage

23   in the public eye people who he thinks have wronged him by

24   disclosing information about them which is not the true threat

25   that would put him in jail but is evidence of continued

1    antagonism towards the people who he believes have wronged him

2    and so undercuts your argument that it's let bygones be

3    bygones, this is all in his past, he just wants to get on with

4    his life.  The government says that's not the case.

5                MR. WOLPIN:  Well, I mean, I don't -- obviously

6    there's going to be animosity in a situation like this.  The

7    question is, what actions is the person going to take.

8                And the evidence again here is he's going to abide

9    by the order.  That he hasn't made efforts to contact him.

10   That months have gone by without -- you know, we're talking

11   about the summer of last year.  So we're talking almost a

12   12-month, 11-month window.

13               So I think he's entitled to be frustrated.  He's

14   held in jail on this thing that happened months ago that this

15   guy never reported.  You know, he went to talk to the FBI.  He

16   sought their help.  He went to Keene PD and sought their help

17   as to what these guys were doing.  And rather than them

18   investigate or take that seriously, it gets flipped around on

19   him.  They go out and search out this other individual who is

20   not reporting any fear or threat, and suddenly he's thrown in

21   jail.

22               So I think it's a little unfair to think that he

23   wouldn't have some frustration sitting in a cell all day every

24   day based on this, but the question is not whether --

25               THE COURT:  I don't doubt that for a minute.  I

1    mean, to the extent you're saying it's not anything to worry

2    about going forward, we say it's not anything to worry about

3    not because he doesn't really -- isn't really angry with these

4    people.  It's that it isn't anything to worry about because he

5    will pursue his anger in ways that are legitimate and not

6    illegitimate.

7              MR. WOLPIN:  I think it's fair to say there's a

8    frustration.  I don't know that I would say there's an anger.

9              To the extent that this is the case -- again, the

10   question the Court needs to fashion is whether he can abide by

11   the order.  Is it a situation where it's complete bygones be

12   bygones?  You know, he feels targeted.  The fact that he wants

13   the whole story to come out after this case is over or through

14   this case I think is fair.  It doesn't necessarily mean it's

15   an anger at him.  I think some of the frustration is with the

16   FBI and with the effort that's been made to prosecute him.

17             THE COURT:  I think there's your point.  Your point

18   is that he's not -- his statements shouldn't be construed to

19   mean he's going to try to expose confidential information

20   about somebody or information about their identities.  He just

21   wants the story to be told.

22             So if he were consistent with that, he would say,

23   of course I'm not going to release the identity of people who

24   I know my followers will harass, but I'll release the evidence

25   about the true story so that everybody knows what happened,

1   which is an entirely legitimate decision on your client's

2   part.  It's whether I can construe that statement to be as

3   nuanced as you're suggesting.

4           MR. WOLPIN:  I mean, again, I think the biggest

5   concern on my client's end is it does feel like a targeting

6   situation, a selective type prosecution, for reasons I can go

7   into in greater deal.  I think that's the concern is having

8   the public know why this has happened to him and less to do

9   with exposing.  He could have done that all along.  You know,

10  these pictures could have gone online.  He could be --

11          THE COURT:  That would be clearly in violation of

12  an order while he's facing trial which I assume you would give

13  him the strongest of possible advice that that is not in his

14  personal interest to do something like that because it would

15  redound to his detriment.  I don't doubt you would do that

16  because you're such a good lawyer.  So we can get beyond that.

17  I mean, let's just move on.  I think we got the point.

18          MR. WOLPIN:  Okay.

19          So again focusing on this individual and whether

20  there's a danger to this individual, the answer is simply no.

21  The facts do not support it.  The government waited a number

22  of months to get an indictment.  There was no escalation over

23  the November, December, January as we waited.  It was

24  essentially set at that point.  I don't think there was going

25  to be, you know, any dustup, any blowup, until this came back

1  on the radar because the FBI brought this charge -- or the DOJ

2  brought this charge.

3           So, you know, again I think the focus needs to be

4  on whether there's a danger to this individual.

5           I can discuss in greater detail sort of the broader

6  danger.  I know the Court may be looking to have this be a

7  sort of back and forth so I don't know if the Court wants the

8  government to respond for a portion.

9           THE COURT:  I would like the government to respond

10 on this aspect of it.

11          Of course, you know, you can -- the evidence of

12 guilt of the charge affects the bail analysis in more than one

13 way in a case like this and you certainly can argue the second

14 part of it.

15          I'm just looking at right now trying to assess is

16 the evidence of the case -- the guilt of the defendant as

17 strong as the government suggests it is or is it much weaker

18 as you're arguing, and once I make that determination I'm

19 certainly open to hearing arguments about what that tells us,

20 if anything, about the defendant's dangerousness, and I'll

21 give you a chance to respond on that.

22          I just have one more question for you before we

23 turn to the government.

24          I do not routinely address bail issues.  Bail

25 issues like this have come up only a handful of times in my 28

1    years -- almost 28 years on the court.  They're usually

2    addressed by the Magistrate Judge so I'm less familiar with

3    that.  I read up on the standard.  I think I understand it.

4            One standard I am very familiar with, because it's

5    part of my real life every day, is when evidence is sufficient

6    to allow a case to go to the jury.  You know what that

7    standard is because you deal with it extensively.

8            It would seem if the evidence were to come in as

9    proffered by the parties, and appears to be undisputed here,

10   that this would be a case where the judge would easily have to

11   deny the motion for judgment as a matter of law because it

12   would be really up to the jury to assess this.

13           What I understand you to be saying, and I'll be

14   questioning the government about this, is that true threat in

15   these kinds of cases is almost always a quintessential jury

16   question and whether the government can prove beyond a

17   reasonable doubt.

18           Now, you'll preserve your right to argue that it's

19   insufficient, but I think we both know that that kind of

20   language in the context in which you're describing would be

21   sufficient to permit a jury to find guilt.  Whether a jury

22   is -- how likely the jury is to find guilt is a different

23   matter about which we could debate, but based on my

24   familiarity of the judgment as a matter of law standard and

25   the evidence that the parties have presented to me by proffer

1    that appears to be undisputed, without judging any inference

2    about whether there is or is not a true threat, there's

3    sufficient evidence of a true threat to permit the case to go

4    to the jury it would seem.  Do you have a different view on

5    that?

6              And again, you've reserve your right to argue

7    anything at the trial.

8              MR. WOLPIN:  I mean, I guess what I would say is

9    that to some degree I'm still in the process of going through

10   all of the true threat cases and the jury instructions.

11             You are dealing with a situation where there is a

12   -- we're bumping up against constitutional rights, and so I do

13   think it's something that the Court would need to scrutinize

14   to ensure that there truly is an overcoming of the true threat

15   standard.  Whether ultimately that gets anywhere or not from

16   the legal standard the Court would be using is another

17   question, but I do think the Court -- this is not a situation

18   where it would be necessarily just an obvious call because I

19   do think some of the law on true threat makes clear that you

20   just -- you really do need to have some scrutiny as to whether

21   there is evidence of the mental state portion and that this

22   goes beyond the free speech rights of an individual.

23             THE COURT:  Right.  I don't know as much about the

24   bail standard as I do about the First Amendment which I feel I

25   have a fairly deep understanding of for having worked with it

1       for many, many years, and I've read the true threat cases and
2       understand that.
3               I guess what I'm saying, and I will say to the
4       government, is he clearly has a true threat defense here that
5       has to be explored and that is something that I need to
6       consider in the mix.
7               It appears though on the surface of it given my
8       basic understanding of First Amendment law, and again without
9       prejudging a situation, but this is unusual because the
10      historic facts about what actually occurred don't appear to be
11      in dispute.  And so where there don't appear to be substantial
12      disputes with those facts, and I would apply the very
13      government-friendly standard that would apply in a judgment as
14      a matter of law, that is, could any reasonable jury conclude
15      beyond a reasonable doubt that this was not a true threat --
16      excuse me -- that there's a reasonable doubt about whether
17      this is a true threat -- again, I'm misstating the standard.
18      I apologize.  It is -- at the end of the day the evidence
19      sufficient to permit a reasonable jury to conclude that this
20      was not a true threat and -- that this was a true threat and
21      does justify the conviction, I apologize for the many efforts
22      at restating that, but I think I got to it at the end, that is
23      a question that -- you don't know what a jury will do with it
24      until they hear the fullness of the evidence.
25              My view, as the judge in a trial like that, is not

1    to make a judgment as to whether it is a true threat or is it

2    not a true threat.  It's whether a reasonable jury could

3    conclude that it's a true threat.

4              MR. WOLPIN:  The interesting thing about a lot of

5    the First Amendment cases is they do come from sort of

6    writings that are undisputed.  They're letters to public

7    officials or postings online, and courts are intervening to

8    say this does or doesn't qualify.

9              So again, without going through the full litany of

10   cases, but it isn't a situation where just because sort of

11   facts as to the content of the statement are not in dispute,

12   the courts haven't intervened using --

13             THE COURT:  I completely agree with that.  The

14   problem for you is on the paper surface the language is

15   extremely threatening.  So that's the -- that's what I mean.

16             In a case in which the facts are undisputed and the

17   language used is extremely threatening and directed at a

18   specific individual, if you don't do certain things I'm going

19   to do these horrible things to an individual, and all of that

20   is undisputed, that's the kind of case that ordinarily goes to

21   a jury.  It still is open to a jury to conclude that I have a

22   reasonable doubt about whether that's a true threat.

23             MR. WOLPIN:  I mean, I don't want to get bogged

24   down on the entirety of the chain of conversation, but I know

25   sometimes what happens is the government says rape threat,

1    rape threat, rape threat, and then that essentially becomes

2    the factual foundation of what we're working -- that is not

3    the language in the actual conversation.

4              THE COURT:  I've looked at the language in the

5    actual conversation and I've listened to the excerpt that one

6    of you has produced.  I will study it very carefully.  I

7    understand all of that.

8              All right.  Mr. Davis, you seem to think this is an

9    open and shut case of a true threat.

10             I'm sorry.  Mr. Davis, are you with us?

11             MS. KRASINSKI:  Your Honor, if you don't mind --

12             THE COURT:  All right.  Whoever is going to speak.

13   I assumed it was Mr. Davis, I apologize, because he's in the

14   center of my screen, and you're way off in the corner so I

15   didn't notice you.  I know that you've signed the filings.

16   I'm happy to have you speak rather than Mr. Davis.  He just

17   happened to be in the center of my screen when I was looking

18   for who from the government was going to talk.

19             MS. KRASINSKI:  That's fine, your Honor.

20             THE COURT:  So you seem to think this is an open

21   and shut case, but don't you acknowledge that there is a

22   defense here about whether this is or is not a true threat?

23             If it's not a true threat, it's not going to be

24   constitutionally permissible to incarcerate Mr. Cantwell on

25   the basis of his use of language.

1          MS. KRASINSKI:  I certainly acknowledge that there

2     is a defense that it's not a true threat.  I think the jury is

3     going to have to evaluate all of the context.  That's going to

4     include what Attorney Wolpin discussed but also anticipated

5     testimony from the victim that he was scared.  That he was

6     acting like a tough guy but really he was scared.  He went out

7     and he got game cameras to protect his property to try and

8     protect his family.

9          THE COURT:  What do you say to the argument that he

10    wasn't really fearful because of his actions, not reporting it

11    to the police, not seeking protection, continuing to provoke

12    the defendant, as the way the defense sees it?  What do you

13    say to those arguments?

14         MS. KRASINSKI:  What I think is that the jury is

15    going to have to evaluate all of the context.  That there is

16    evidence that the jury could use to find that it was a true

17    threat, and there's evidence that can be argued to the jury

18    that he really wasn't scared.

19         But I think one of the important factors is the

20    victim's reaction is one of many factors in determining

21    whether or not something is a true threat, and it's certainly

22    an important factor but it's not the only factor.

23         And I think the jury --

24         THE COURT:  What about the history of the trolling

25    relationship between these people where the alleged victim is

1    engaging in provacative conduct that appears to be in part

2    trying to provoke?  That doesn't sound like somebody who

3    believes they're subject to a true threat.

4              MS. KRASINSKI:  Well, I guess I would have two

5    responses to that.

6              The first is that there's no provocation defense to

7    this charge.

8              The second is that that context is slightly

9    different.  They were prank calling his show as a group, and

10   not all of that can be attributable to this one individual.

11   Members of the group, the defendant alleges, hacked his

12   website, but the defendant acknowledges in e-mails that he

13   sent to local law enforcement that that can't be attributable

14   to the victim here.

15             There's certainly a history between these

16   individuals, but I don't think the fact that there's this

17   history means that it can't have been a true threat.

18             And I also think --

19             THE COURT:  Well, yeah, I think -- again, I don't

20   think that it means that it can't have been a true threat, but

21   I don't think the history is irrelevant either.  I think Mr.

22   Wolpin makes an important point that in all communications

23   context matters and we have to consider the totality of the

24   interactions between these individuals in determining whether

25   something that appears on the surface to be extremely

```
 1    threatening, and it does appear to me on the surface to be
 2    extremely threatening and it does appear to be based on a
 3    desire to try to coerce compliance.  And so saying things that
 4    you know the other side won't take seriously, it's hard for me
 5    to see how that -- why you would use that kind of rhetoric if
 6    you're trying to coerce compliance.  It's more likely you use
 7    that kind of rhetoric when you want the person to understand
 8    that your threats have force behind them, I get that, but we
 9    have to consider the entire context of the interaction.
10            MS. KRASINSKI:  I think this entire context is
11    important, too, your Honor.  It includes, even within this
12    correspondence, the defendant's threat to "dox" or expose
13    personal identifying information of the victim and his quest
14    to obtain the information to dox the leader of this group.
15            And that actually ties in to Government's Exhibit 1
16    which is an article called Undoxing Anonymity, which -- it's
17    from the defendant's website, and on page 2 of that article
18    Mr. Cantwell describes doxing and he says, "It helps to think
19    of doxing as a form of violence.  It certainly carries the
20    potential for violence to result.  It is typically seen as a
21    last resort."
22            So in the same communication where he says if you
23    don't want me to come and F your wife in front of your
24    children, he also threatens to do something that he, himself,
25    has described as violent, as something that carries the
```

1   potential for violence.

2          THE COURT:  That evidence -- you're not making an

3   argument that that is the true threat that justifies a

4   prosecution.  You're saying that's evidence that you can

5   consider in context in trying to determine whether the

6   threatened charge is because that wouldn't be a

7   constitutionally permissible threat in my mind to support a

8   prosecution.

9          MS. KRASINSKI:  That's correct, your Honor.

10          THE COURT:  Okay.

11          MS. KRASINSKI:  And I just want to make one point

12   about the pictures of the victim and his family.

13          They were posted by the defendant on the

14   defendant's Telegram account to all of his followers, to all

15   the members of that group.

16          So in addition to calling the victim's local Child

17   Protective Services, he also made public these photos, photos

18   of the victim's wife and their children.

19          THE COURT:  I haven't seen -- I can't remember if

20   I've seen this yet.  Are those photos in the record?

21          MS. KRASINSKI:  They are not, your Honor.

22          THE COURT:  All right.  So you're telling me that

23   the photos clearly show the victim and his family?

24          MS. KRASINSKI:  They do, your Honor.

25          THE COURT:  All right.  What else on this issue of

1   the evidence supporting the charges?  Is there anything else

2   you want to add on that score?

3          MS. KRASINSKI:  I would like to address the

4   protective order issue.

5          And I do think Attorney Davis would like to address

6   some of the new arguments made in the reply that Attorney

7   Wolpin also made here regarding --

8          THE COURT:  All right.  Well, I did bring up the

9   protective order in response to an argument Mr. Wolpin was

10  making, so why don't you address that and then I'll hear from

11  Davis, and then I'll give Mr. Wolpin a chance to reply.

12         MS. KRASINSKI:  So my main concern with the plans

13  to disclose discovery materials is that the effect of this

14  statement, how it was made and who it was made to, is

15  essentially a thinly veiled threat to anyone who has

16  cooperated with the FBI that you are going to be exposed and

17  so you should consider your long-term risk here.  Are you

18  going to continue to cooperate with the FBI?  Are you going to

19  continue to provide information?

20         He made it to someone who he allows to publish a

21  podcast on the defendant's website to someone who is currently

22  operating his website and --

23         THE COURT:  Let me interrupt you.  It would be

24  better for the defendant if he were to have said something

25  like this:  Of course I'm not going to reveal any information

1    about any individual who may have provided information to the

2    FBI, but I just want to get my story out, and when I'm

3    acquitted of this, as I will be, I want the public to know the

4    full story of how the government targeted me.

5            That's an entirely legitimate thing to do.  On the

6    other hand, it's quite problematic for someone charged with

7    threatening people who are not giving him what he wants to be

8    also saying -- or as you're suggesting what he's doing is, I'm

9    doing this to threaten people who might cooperate with the

10    FBI.

11            MS. KRASINSKI:  Well, and I --

12            THE COURT:  He isn't clear about what he's meaning

13    here.  Isn't that at least a fair defendant protective way to

14    look at his statement?

15            MS. KRASINSKI:  Well, I don't think he limits his

16    disclosure to individuals involved with this case.  What he

17    says is --

18            THE COURT:  Yeah, he does not expressly limit --

19    he's going to disclose the records about the case is what I

20    thought.  You don't see it that way?

21            MS. KRASINSKI:  He says:  All the people who gave

22    up all these other Fing people, everybody who has the Fing FBI

23    show up at their door goes Fing crazy and starts giving people

24    up.

25            So all the people who gave up all these other Fing

1   people, that is not just related to the defendant or his case,

2   and so I don't --

3          THE COURT:  With respect, I think you may be over

4   reading it because the protective order doesn't purport to bar

5   him from disclosing information unrelated to this case that he

6   has.

7          Five years ago he learned person A cooperated with

8   the FBI.  Do you construe the protective order as barring him

9   from disclosing that information?

10         MS. KRASINSKI:  No.  He says -- what he says is:

11  I'm going to release all the 302s of all the Fing interviews.

12         I construe the protective order to bar him from

13  disclosing the 302s that he received in discovery.

14         THE COURT:  I think a reasonable way to read that,

15  at least my reading of it, is that he is -- what he's talking

16  about is telling his story and disclosing everything he has

17  about that story, which presumably would include 302s and

18  discovery information that identifies people who are giving

19  information to the government about Cantwell.  That's what I

20  understand him to be doing.

21         I think you're reading a little more into it than

22  it can reasonably bear, but that's just my interpretation.

23         What else did you want to say?

24         MS. KRASINSKI:  I think Attorney Davis is going to

25  address a few issues that Attorney Wolpin discussed and were

1    raised in the reply brief.

2              THE COURT:  All right.  Mr. Davis.

3              You've got to turn your mic on, Mr. Davis.

4              MR. DAVIS:  Can you hear me now?

5              THE COURT:  Gotcha.

6              MR. DAVIS:  I'll address the supplement to the

7    defendant's motion that was filed two nights ago.

8              The first thing is just to talk about the issue of

9    the defendant's cooperation.  The defendant is saying that the

10   government is misstating the element of deception and lack of

11   complete statements about this in his so-called cooperation,

12   and I want to briefly go through the timeline and state

13   exactly what the government's position is on this.

14             All my references to dates are 2019 except the

15   last.  So this is all last year.

16             On February 11th Mr. Cantwell filed an Internet

17   Crime Complaint Center complaint with the FBI about the

18   defacing of his website and he named two people, Vic Mackey

19   and Mosin-Nagant, as perpetrators.  Those are both pseudonyms

20   of people in Bowl Patrol.

21             Mr. Cantwell had already made three previous tips

22   to an FBI hotline all regarding Antifa and none resulted in

23   significant further investigation.

24             In this case the IC3 determined that the

25   information had no current lead value and did not provide a

1    basis to investigate.

2           The important point is the IC3 did not notify FBI's

3    Boston Field Office or FBI agents in New Hampshire.  FBI

4    agents here remained unaware of Mr. Cantwell's IC3 complaint

5    until July 17th when Mr. Cantwell sent them a copy.

6           So the defendant's claim that the government got

7    this report and then deliberately ignored it is not correct.

8    The only unit that received that did not further disseminate

9    it and took no action.

10          All right.  So I'll move through the other dates

11   quickly.

12          On February 26th Mr. Cantwell doxed Mosin-Nagant,

13   one of the two perpetrators he named in his IC3 complaint.  He

14   spread his true name and identity all around and Mosin-Nagant

15   was effectively neutralized just two weeks after his Internet

16   complaint.

17          The events in this case occurred -- the extortion

18   and the threats against Cheddar Mane occurred, as the Court

19   knows, on June 15th and June 16th.

20          On June 17th Mr. Cantwell doxed Cheddar Mane by

21   posting Cheddar Mane's home address and photos of him and

22   family on Radical Agenda.

23          And also on June 17th Mr. Cantwell called the Child

24   Abuse and Neglect Hotline in Cheddar Mane's home state and

25   reported Cheddar Mane.

1          On June 21st Mr. Cantwell e-mailed the Keene Police
2  Department regarding Bowl Patrol.  Mr. Cantwell described his
3  recent exchange with Cheddar Mane and he enclosed photos of
4  Cheddar Mane's family and home address.

5          What Mr. Cantwell did not do is he did not send
6  screenshots of the Telegram exchange and he said nothing about
7  the rape threat he had made or his extortion attempt regarding
8  Vic Mackey's personal information.  Mr. Cantwell also did not
9  claim there that Cheddar Mane threatened Peach.

10          On July 11th of 2019 FBI headquarters discovered
11  Mr. Cantwell's extortion and threats posted on a Bowlcast
12  Telegram channel and then notified the FBI Boston Field
13  Office.  So our FBI agents in New Hampshire found out about
14  this exchange not from Mr. Cantwell but from an Internet group
15  that was monitoring the Bowlcast.

16          In mid July of 2019 the FBI contacted Mr. Cantwell
17  and began an e-mail dialogue.

18          On July 17th Mr. Cantwell sent the FBI a screenshot
19  with the account of someone named Karl Childers sending a
20  message to Peach on July 10, and Peach is a female who
21  actually took the pictures of the family of Cheddar Mane, and
22  Karl Childers' e-mail said:  Agent Peach, you want to take
23  some pictures of my family and send them to your FBI friends.
24  Mr. Cantwell complained of harassment being extended to "a
25  former love interest of mine."  Mr. Cantwell did not claim

1     that Cheddar Mane had threatened Peach in the harassment as he

2     now does.

3           On August 28th Mr. Cantwell e-mailed the FBI in New

4     Hampshire and enclosed photos of Cheddar Mane and his family.

5     That was the first time FBI here actually got that information

6     from Cantwell.  Although Cantwell had e-mailed it earlier to

7     the Keene police.

8           Cantwell in his e-mail to the FBI on August 28th

9     admitted that he threatened to expose Cheddar Mane's identity

10    and offered him the out of identifying Vic, but he says -- he

11    also said he was attaching "the images in the prior message,"

12    but again, and this is what's important, he did not send

13    screenshots of the exchange and he again said nothing about

14    the rape threat.

15          On September 17th the FBI and Keene police

16    interviewed Mr. Cantwell in Keene.  During that lengthy

17    interview that was mostly directed by Mr. Cantwell of all of

18    the different people he wanted to talk about, he mentioned his

19    exchange with Cheddar Mane while again saying nothing about

20    the rape threat.

21          Mr. Cantwell specifically stated that he had not

22    retained any records of his communications with Cheddar Mane.

23    Mr. Cantwell also denied threatening anyone in Bowl Patrol.

24    And finally, after the corresponding exchange with Cheddar

25    Mane, according to Mr. Cantwell he deleted the chat and called

1    Child and Protective Services the next day.  As it turns out,
2    those were false statements.
3            On October 24th the FBI and Keene police again
4    interviewed Mr. Cantwell.  He was then shown the screenshots
5    of the Telegram exchange, and he admitted sending the
6    messages.  We do not contend that he made a false statement in
7    that exchange with the FBI.
8            And finally, on January 23rd, now 2020, the FBI
9    executed search warrants of Mr. Cantwell's residence and
10   seized devices, including computers and a cell phone.
11           On the computer were photos of Cheddar Mane's
12   family in the same labeled file with complete screenshots of
13   his exchange with Cheddar Mane.
14           In addition, screenshots of the Telegram exchange
15   with Cheddar Mane were on his phone and had been saved and put
16   there on June 17th of 2019.
17           Thus, the defendant had the screenshot records all
18   along, but he withheld them from the law enforcement people he
19   dealt with and he claimed to have deleted them.
20           Two other points and I'm done, your Honor.
21           The first is, the defense in the supplement alleges
22   that Mr. Cantwell's threat against Cheddar Mane's family was
23   provoked by Cheddar Mane's "menacing statement about Peach."
24           The defense says that Peach was Mr. Cantwell's
25   "paramour and his girlfriend and significant other."  The

1   defense says that the obvious intent of Cheddar Mane's

2   statement was to suggest that "something bad or injurious

3   would happen to Peach as a result of Cantwell's actions."

4          This new defense claim is beside the point and

5   badly misleading.  There is no obvious intent behind Cheddar

6   Mane's statement which is in its entirety, "Guess that means

7   you don't care what happens to her either."

8          The statement is ambiguous and could have multiple

9   interpretations.  At most, however, it's an implied threat

10  that Peach might be doxed, meaning have her identity made

11  public, just as Cantwell is threatening to dox Cheddar Mane,

12  but it is not a threat to rape Peach or to cause some other

13  physical harm to her.

14         Cantwell's new claim that Cheddar Mane's remark

15  about Peach, which is never repeated in the Telegram messages

16  and never comes up again, the claim that that's in the same

17  league as his repeated threats to harm Cheddar Mane's family

18  is demonstrably false.

19         The new defense claim also ignores that it was

20  Cantwell who almost two hours before this statement about

21  Peach -- again, just going back to the Telegram, he threatened

22  that your wife is going to have trouble sleeping at night

23  until she leaves you and takes your kids away, and nearly two

24  hours after the Peach remark Cantwell returns to Cheddar

25  Mane's wife and bets that one of my Incel listeners would love

1   to give her another baby.

2          Neither of those remarks, both of which were

3   unambiguously menacing, was in any way provoked by the

4   statement about Peach.

5          Finally, to characterize Peach as Cantwell's

6   girlfriend and significant other is flatly misleading.  By

7   June of 2019 Peach was history to Mr. Cantwell.  He had been

8   involved with Peach briefly months earlier but was now well

9   entwined with a different woman in another state.

10          That other woman stayed with Cantwell in New

11   Hampshire as early as May 20th and over a six day period in

12   early June, all before these threats.  And just eight days

13   after the June 21 e-mail to Keene Police Department Mr.

14   Cantwell drove to the other state where his girlfriend lived

15   and began the first of several lengthy visits with that other

16   woman.

17          So, in summary, although the defense now tries to

18   justify Cantwell's rape threat against Cheddar Mane's family

19   on the ground that it was provoked by a similar threat against

20   Cantwell's girlfriend, it turns out the statement about Peach

21   was not a similar threat, it did not provoke Mr. Cantwell's

22   cruel fixation with Cheddar Mane's spouse, and it did not even

23   involve Cantwell's girlfriend.

24          The last point.  Defense also claims with a

25   straight face that Cantwell made a comment about having sex

1    with Cheddar Mane's wife but did not "suggest violence."

2              As the defense would have it, Cantwell was

3    envisioning only consensual relations with Cheddar Mane's wife

4    either by Cheddar Mane or by an Incel listener but never

5    violence.

6              That claim is as desperate and ridiculous as it is

7    offensive.  By sending Cheddar Mane photos of his wife and

8    children, then saying that he would F his wife in front of his

9    kids and that one of his Incel listeners would love to give

10   her another baby, Mr. Cantwell did more than suggest violence.

11   He threatened rape, and there's no question about that.

12             That's all, Judge.

13             THE COURT:  All right.  Again, this is the

14   challenge when you present to the trial judge.  You had a

15   chance to litigate bail in front of the Magistrate Judge.  You

16   now want to litigate bail de novo in front of the trial judge.

17             One of the factors that I must consider when

18   evaluating your request is the strength of the evidence.  So

19   this is why we effectively are in a back and forth proffer

20   battle about what your trial is going to be like.  I would

21   prefer not to be engaged in this kind of analysis, but you

22   require it of me so I will.

23             What else would you like to say, Mr. Davis?

24             MR. DAVIS:  That's all, Judge.

25             THE COURT:  Mr. Wolpin.

1          MR. WOLPIN:  I mean, I guess I don't really want to

2     go through all the efforts Chris made to be in touch with the

3     Keene PD and the FBI, his statements to them, his providing

4     them of the pictures involved.

5          As I noted in what I filed, the reason this comment

6     about Peach and the other parts of this do not show up in

7     Chris's mind is because they were not true threats.  This was

8     part of the back and forth.

9          The thing he tells the FBI and Keene PD about is

10    the thing about CPS and that phone call and the identity

11    because that's the actual substance to some degree of this

12    matter.

13         I think the Court -- and we are in a strange

14    situation because we have a group of people who use a set of

15    language different from the rest of us.  The world that these

16    gentlemen swim in has this concept of cuckoldry.  It's the

17    ultimate Albright insult, okay?  Rush Limbaugh uses it.

18    Everyone in this movement -- you hear it all the time when you

19    start digging into what these guys say.

20         THE COURT:  Just to be clear, you're not saying

21    that someone like Mr. Limbaugh uses the same language that Mr.

22    Cantwell used here?  If he has, I would be very surprised, but

23    do you have evidence that he has used that language?

24         MR. WOLPIN:  Cuck language, yes.  I had cited an

25    article --

1          THE COURT:  No, no, no.  I mean the language that
2     Mr. Cantwell used here.
3          MR. WOLPIN:  No, but I want to put in context for a
4     second what this statement is about as I see it in this
5     culture.
6          THE COURT:  Okay.
7          MR. WOLPIN:  Because it is a culture.  It's not a
8     -- you have to recognize it within the culture within which
9     they operate, which is there's constant conversation about
10    who's a cuck, who's a cuckle.  The concept of cuck and
11    cuckoldry is about someone else sleeping with your wife.  It's
12    the ultimate demasculating thing.  That you are so unable to
13    satisfy sexually your own spouse that she will have sex with
14    somebody else.  This is the primary insult these men give to
15    each other in this culture.  It is not the same as someone
16    else in another situation in another culture.
17         So when they talk about I'm going to have sex with
18    your wife, it's not I'm going to rape your wife.  It's you are
19    such a non-man that someone else is going to move in on your
20    territory and on your wife.
21         THE COURT:  I get your proffer on this, but Mr.
22    Davis is going to be as upset about what you're saying as you
23    are about what he's saying, and I cannot settle that dispute
24    today.  So I would really ask us not to engage in further
25    debate about whether this is simply a statement I want to have

1    consensual sex with your wife and she wants to have it with me

2    or whether it's a -- I mean, come on.  You may be able to

3    present some evidence on that point, but I don't want to hear

4    any more about the back and forth on it because you're both

5    just spinning to support your own position.

6            So let's move on and get into something more

7    substantive.  What else do you want to say?

8            MR. WOLPIN:  That wasn't my goal.  My goal

9    primarily today was to talk about the fact -- not of the

10   incident but the fact of whether or not he's a danger to this

11   person today, because I think that is ultimately -- the

12   factual questions will be resolved by a jury.  That's the

13   point.

14           THE COURT:  Don't you understand -- I understand it

15   as one of the requirements that I assess the evidence and

16   that's why I'm doing this.  I would prefer not to be doing it

17   because I don't like the trial judge to have to come in and

18   make preliminary assessments of evidence before a trial, but

19   you've required me to do it by filing your motion so I have to

20   do it.  I know you want to talk only about dangerousness, but

21   is it not a factor that I'm required to consider?

22           MR. WOLPIN:  It is, and you have a situation where

23   the government is acknowledging there's -- you know, Attorney

24   Krasinski acknowledged there's a true threat defense,

25   acknowledged there's a dispute to be had at trial.

1          So whether that's a 50 percent, 60 percent, 40

2    percent, that obviously is too far to go into.  I think we

3    could almost stop there.

4          This is a triable case with a real defense that's

5    not fanciful that will be heard by a jury in the future.

6          THE COURT:  I will grant you that, but what you're

7    deemphasizing and what the government emphasized in its

8    materials, it's one of these unusual criminal cases where the

9    defendant does not appear to be disputing any of the facts

10   about what actually happened.  And on the basis of those

11   undisputed facts it appears that a jury will have to decide

12   the defendant's guilt or innocence as is always the case in a

13   criminal trial where there's sufficient evidence to permit a

14   guilty verdict.

15         I take your point.  I think you understand my

16   position.  Why don't we move on if there's anything else you

17   would like to say.  I'm not inclined to get into such a

18   fine-grained assessment of the evidence based on the parties'

19   competing proffers.  What matters to me is what happens at

20   trial because I don't see the defendant at the present time at

21   least to be presenting a motion to dismiss based on First

22   Amendment assertions.  Maybe you'll present that in the

23   future.  If so, I'll look at it and consider it, but right now

24   I don't think a more fine-grained analysis of the evidence

25   based on proffers is really productive or good for your client

1    for me to be engaging in.

2              What I take from it is the historic facts on which

3    the government's prosecution is based appear to be undisputed.

4    There appears to be a very vigorous dispute about what to make

5    of those facts and whether what actually occurred is a true

6    threat or not.  That's not a dispute that I could resolve in

7    the government's favor.  It has to be resolved if it's in the

8    government's favor at trial after a verdict, and it would only

9    be resolved in your favor on a motion to dismiss, on

10   constitutional grounds, or on a verdict in your client's favor

11   after a trial.

12             The unusual point is the historic facts about what

13   actually occurred don't appear to be disputed.  In my mind

14   they appear to be sufficient to support a viable trial.

15   Although I keep an open mind about any First Amendment

16   argument you might present.  And I recognize there is a

17   defense about whether this is a true threat in which there

18   almost always is in these cases.  In any case in which someone

19   threatens like this, it is almost always open to the defense

20   to say, I didn't mean it.  It wouldn't be understood as a true

21   threat.  It's not a true threat.  It's constitutionally

22   protected conduct.  That's always the case in criminal

23   threatening cases.

24             So that's what I make of all of this.  Beyond that,

25   I don't think it's productive for you or your client for me to

1    try to get into a more fine-grained analysis.

2              MR. WOLPIN:  Certainly that was not my effort or my

3    goal in our conversation today.

4              THE COURT:  All right.  What else did you want to

5    say about this issue of the evidence supporting the charge?

6              MR. WOLPIN:  I don't think there's anything more to

7    be said.

8              THE COURT:  All right.  Let's turn to the -- this

9    is where I need your most help, and this is understanding --

10   because even reading the materials I'm not sure I have a full

11   understanding of the context about noncompliance, and so if

12   you could lay out in some detail for me your facts that bear

13   on the noncompliance issue, and then I'll hear from the

14   government on it, because I'm not sure I have the same kind of

15   understanding of that issue and where the disputes are.  It

16   will be helpful to hear your views.

17             MR. WOLPIN:  I think unfortunately the record that

18   came from Virginia is not clear as to the progression of

19   events and so I think that's why there's a lot of confusion,

20   but I can go through what I understand them to be and

21   obviously the government can address how they understand them

22   to be.

23             As I understand it, Mr. Cantwell is arrested.  He

24   was released on bond conditions that did not at the time

25   prohibit alcohol but did prohibit arrests.  He ultimately

1    drank, over drank, was stopped, and that caused him to return

2    to court and have a change in his bail conditions that

3    prohibited the consumption of alcohol and placed a bracelet

4    upon him with some kind of alcohol recognition.

5              We submitted to the prior hearing a letter from --

6              THE COURT:  Can I understand just -- can I

7    understand this?

8              So unlike what we have, which is a device that we

9    use regularly to determine whether somebody is complying with

10   a home detention condition, this was a bracelet that monitored

11   where he went and when he went; is that right?

12             MR. WOLPIN:  I'm hesitant to say too certainly

13   because some of the details are a little hazy in my mind.  My

14   memory is it's the kind that's like a SCRAM bracelet that has

15   an alcohol ability to monitor and monitors location to my

16   memory.

17             THE COURT:  He was not prohibited from leaving his

18   home or going to any particular location.  He was simply

19   required to have his location identifiable transparent to the

20   government, and you say also there's an alcohol monitoring

21   capacity with that?

22             MR. WOLPIN:  I believe it was a SCRAM bracelet.

23             THE COURT:  We don't use those in my experience

24   here.  So just tell me what a SCRAM bracelet is.

25             MR. WOLPIN:  It requires you to essentially show

1    that you're not using.  Again, I would maybe take a break and

2    talk to my client because I don't want to make any

3    misrepresentations to the Court, and some of this is not in

4    written documentation so it's coming from memory.

5              THE COURT:  Let's take it for now, though, you're

6    telling me it's basically a GPS monitor and there were no

7    restrictions on where he could go and so he was -- he wasn't

8    in noncompliance because of where he was at any point or that

9    he had left the home or anything like that.  He was in

10   noncompliance for reasons that we'll go into.

11             MR. WOLPIN:  And my understanding there was a

12   geographic limitation within the state and that he was not

13   supposed to leave the state, and there was no assertion that

14   he left.  But once you're on these monitors, obviously that

15   requires check-ins with certain regularity and other sort of

16   details beyond just them physically knowing where you are.

17             The reason we submitted what we submitted is we

18   were able to speak with the individual who did the monitoring

19   in Virginia and explained that once he became involved there

20   were no issues at all.  In fact, I think he called him

21   essentially overly compliant, making continual efforts to be

22   in touch with him and be checking in as necessary.

23             So we submitted that because it showed that with

24   the benefit of the monitor there was strong compliance, and I

25   think it's fairly unusual for the monitoring company to be

1    willing to go on the record and say that, but that's what they

2    did in this case.

3           My understanding of the contact issues is that

4    there was never any effort by Chris to make contact with the

5    two other people involved in his case.  That's how I

6    understand it.

7           And my understanding is that his original

8    conditions did not --

9           THE COURT:  Can I interrupt you and ask, what do

10   you understand the term contact to mean?

11          MR. WOLPIN:  My understanding of contact is

12   calling, texting, third party contact, meaning have someone

13   contact for you, that that was never an issue.  The issue was

14   that the other individual was sort of a high profile person on

15   the other part of this with a Twitter presence and followers

16   and sort of that argument was continuing to follow online, and

17   so Chris was responding to that and there were limitations in

18   place about referencing that.  And my understanding is at one

19   point that person's name did appear on a program, but there

20   was no threatening nature to it.

21          THE COURT:  Let me just be clear.  So you

22   understand the contact restriction to be broad enough to

23   encompass direct physical contact but also less direct forms

24   of contact like phone calls, e-mails, texting, and so you

25   agree that those can give rise to contact violations?

1          MR. WOLPIN:  Correct.

2          THE COURT:  And you're acknowledging that there was

3     some kind of exchange here or some kind of statement by your

4     client in a forum where one of the victims was also present at

5     some point?

6          MR. WOLPIN:  No.  That there was a mentioning of --

7     it got so fine-grained that it led to a mentioning of the

8     identifying characteristics of the person even if not in the

9     same forum.

10         So the violation is mentioning this person's name,

11    as I understand it, on a -- you know, not in a forum she was

12    in.

13         THE COURT:  What is the actual language of the

14    contact condition?  Do you have it?

15         MR. WOLPIN:  I don't know that I do right now.

16         THE COURT:  Does the government have the actual

17    language of the contact condition?

18         MS. KRASINSKI:  Your Honor, I'm looking at

19    Government's Exhibit 1 to the initial detention order, and

20    it's a bond, recognizance bond dated January 31, 2018, and it

21    says, "No contact direct or indirect with the victims,

22    including but not limited to using names or identifying them

23    by specific characteristics which identify them on social

24    media or radio broadcast."

25         Although there's a date to that afterwards, a

1  handwritten date of April 26, 2018.  So I cannot tell when

2  that portion of it was added to it.  The top is dated January

3  31, 2018, and there's an additional handwritten date of April

4  26, 2018, on the bottom.

5           THE COURT:  So let me try to understand this.

6           What appears on the document is a description of a

7  no contact requirement that goes beyond what we would

8  commonsensically understand to be contact and also includes

9  identification.

10          So even if you're not contacting, if you're

11 identifying you would say that violates the condition?

12          MS. KRASINSKI:  Correct, your Honor.

13          THE COURT:  All right.  And you're telling me I

14 can't tell you with certainty when that condition was imposed?

15 Does it all appear to have been imposed at the same time?

16          MS. KRASINSKI:  It doesn't look like it.  It

17 appears that the recognizance bond was entered on January 31,

18 2018, and then at the bottom of it it appears that the

19 defendant initialed it and signed it, but again on the very

20 bottom right-hand of the page there's an additional date and

21 there's really nothing on the face of the document to

22 indicate --

23          THE COURT:  Do you have the courtroom deputy's

24 e-mail address?

25          MS. KRASINSKI:  I do, your Honor.

1          THE COURT:  Could you e-mail to defense counsel and

2     to the courtroom deputy a copy of this document, and then if I

3     could ask my deputy to e-mail it to me directly so that I can

4     see what it is.

5          MS. KRASINSKI:  Yes, your Honor.

6          THE COURT:  It's hard for me without actually

7     physically looking at it to know what's going on here.

8          So if you could do that now, e-mail it to my deputy

9     and defense counsel.

10         Vinny, if you could then promptly e-mail it to me

11    and to my law clerks, that would be helpful.

12         THE CLERK:  Okay.

13         THE COURT:  All right.  So I'll go back over this

14    in some detail once I look at it, but Mr. Wolpin, she's

15    identified -- the prosecutor has identified what she thinks is

16    the condition that would violate it, but there's some question

17    about when that condition was added.

18         Is there anything you want to say about that?  I'll

19    look at it in depth when I actually see the document.

20         MR. WOLPIN:  My technology is failing me at this

21    moment.  It won't let me pull anything up.

22         I think what is clear is there was no direct or

23    third party contact involved at any point in this allegation

24    or this bond violation, and there was never even an accusation

25    that that was done in relation to this case.

1          THE COURT:  What was the violation as you

2    understand it?

3          MR. WOLPIN:  Using this person's name online.

4          THE COURT:  Okay.  So that was the violation.

5          MR. WOLPIN:  Right.

6          THE COURT:  You don't dispute that he did do it,

7    you don't dispute that it was a condition and he violated it,

8    but you have some contextual explanation?

9          MR. WOLPIN:  Yes.

10          THE COURT:  Okay.  Go ahead.  What else did you

11    want to say about it if anything?

12          MR. WOLPIN:  You know, what -- again, some of this

13    is in there and some of it isn't.  That the bond conditions

14    did not allow him to identify -- use identifying

15    characteristics.  That he stopped doing so.  That he had a

16    recorded phone call on his website, and he did not edit out a

17    name when it came up.  And again, I think this condition or

18    this situation is far different because you have someone who

19    was sort of actively engaged on the Internet talking about

20    Christopher, this was an ongoing thing, as opposed to the

21    situation where we have here where in this case there's no

22    Internet presence at all for this individual.  There's no back

23    and forth that's sort of continued to go on.  The other party

24    in the other situation was sort of an antagonist and sort of

25    in that mode from the opposite side of the political spectrum.

1          Again, this is far different.  We've seen months

2  without any contact or efforts to make contact.  Again, he's

3  been abiding by the current bail -- or protective order as far

4  as limiting such information.

5          THE COURT:  All right.  Hang on just a second.

6          (Pause)

7          I would ask the government, can you tell me the

8  date on which you claim the disclosure -- let's call it a

9  disclosure violation rather than a contact violation because

10  it's a little misleading to call it a contact violation.

11          What date do you claim the disclosure violation

12  occurred on?

13          MS. KRASINSKI:  Looking at Government's Exhibit 3

14  from the initial detention hearing, which I've also just

15  e-mailed to your courtroom deputy and defense counsel, that is

16  the Commonwealth of Virginia's motion to revoke or modify

17  bond, and that alleges that there was continued online and

18  on-air communications inconsistent with the amended bond

19  conditions that occur after April 26, 2018.  The motion itself

20  does not identify the date specifically, but the motion

21  alleges that they occurred after April 26, 2018.

22          THE COURT:  All right.  Hang on a second.  I'll put

23  that up on the screen, if I can remember how to do this, so

24  everybody can see what it is we're talking about.

25          MS. KRASINSKI:  And that's on paragraph 15 of

1    Government's Exhibit 3 from the initial detention hearing.

2              THE COURT:  I would ask my clerk to make me a host

3    so that I can share my screen and the clerk will let me know

4    when he's done that.

5              THE CLERK:  You're now a host, Judge.

6              THE COURT:  All right.  Are you able to see a

7    portion of a document that I put up on the screen?  Are the

8    parties able to see that?

9              MS. KRASINSKI:  Yes, your Honor.

10             MR. WOLPIN:  (Nods affirmatively.)

11             THE COURT:  Yes?  Okay.

12             So what I understood the government to be saying is

13   that this handwritten condition which appears to have been --

14   based on the dating was added on 4-26-18, the government is

15   alleging that this disclosure violation that occurred

16   according to the motion of the Commonwealth was after that

17   amended condition was imposed on 4-26.

18             Is that your assertion?  Do I have the government's

19   position correctly on that?

20             MS. KRASINSKI:  That is what the Commonwealth of

21   Virginia alleges in their motion.  Yes, your Honor.

22             THE COURT:  All right.  Good.  Okay.  So I'll take

23   that down unless, Mr. Wolpin, do you need to see anything more

24   on this?

25             MR. WOLPIN:  No, your Honor.

1           THE COURT:  Okay.  All right.

2           So back to you, Mr. Wolpin.  So basically the

3    violation that I think is being talked about is a disclosure

4    violation in violation of a bond condition.

5           Anything you want to add about that?

6           MS. KRASINSKI:  It was not a person that was

7    involved in an outing or a doxing in that sense.  This was

8    someone who has a known presence and name.  So it wasn't done

9    with that kind of malicious effort to sort of identify someone

10   or cause harm in that way which I think again speaks

11   differently than the facts we have in this case.

12          And again, we've had -- obviously there's going to

13   and would continue to be conversations about the limits of

14   whatever order the Court makes about contact reference that

15   would be in place in relation to the bail order in this case

16   should there be one.

17          THE COURT:  All right.

18          What does the government want to tell me about the

19   specific evidence of what actually happened here?  What the

20   defense has alleged is that there was a violation of the

21   disclosure condition that occurred in a forum that didn't

22   involve direct or indirect contact with a person that he's not

23   supposed to have contact with, but it did involve the

24   disclosure of information that the condition prohibited and

25   that this was, according to the defense, a circumstance where

1  the defendant was essentially being attacked on this forum and

2  needed to respond and that disclosure came out somewhat

3  innocuously in the context of his response.  That's what I

4  understand Mr. Wolpin to be telling me.

5           Do you want to give me anymore information on that?

6           MS. KRASINSKI:  I think the best indication of

7  whether or not someone is going to comply with bond conditions

8  is whether or not they've complied with them in the past.

9           THE COURT:  Well, I agree that's important.  I

10  mean, do you know anything more factually about the specific

11  violation here?  If it happened by accident, it's a lot less

12  significant than if it happened intentionally.  Do you know

13  the forum where the violation occurred?  Do you have copies of

14  the exchanges in which the violation occurred?  Do we know

15  more about the circumstances of the violation, anything else

16  like that you can tell me to flesh this out and get more

17  detail?

18           MS. KRASINSKI:  I don't, your Honor.  I only have

19  the defendant ultimately acknowledging and pleading guilty to

20  it, your Honor, but I don't have --

21           THE COURT:  Was there a transcript of the

22  proceeding in which he pled guilty?

23           MS. KRASINSKI:  If there is, I don't have it, your

24  Honor.

25           THE COURT:  All right.  Yeah, it would be helpful

1   if there was one.  And if the Commonwealth operated the way

2   our court did, there would be first a statement that, here's

3   what you're charged with doing.  Here's the facts supporting

4   that charge.  Do you dispute those facts and are you in fact

5   guilty?

6          That would have been nice to know, but you just

7   don't have anything more for me on that?

8          MS. KRASINSKI:  I don't, your Honor.  I'm going to

9   take a peek quickly at the sentencing order and see if there's

10  anything in there, and if there is, I'll circulate it to --

11         THE COURT:  All right.  That would be helpful.

12  Thank you.  All right.  Nothing else to add on this.

13         Anything else from you, Mr. Wolpin?

14         MR. WOLPIN:  No, your Honor.

15         THE COURT:  Okay.  All right.

16         So then let's turn to the third argument, which is

17  Strafford is too risky for someone to be incarcerated in and

18  Mr. Cantwell should be released because it's just too

19  dangerous.

20         MR. WOLPIN:  I think this is a dual argument.

21         One is, it's not just the conditions at the jail.

22  It's that the nature of this pandemic is when there will be a

23  jury trial is fairly uncertain.  I mean, I know we're moving

24  in that direction in court and obviously we're all hopeful,

25  but this case is a case where we're going to have witnesses

1  coming from out of state.  I assume multiple witnesses.  This

2  isn't sort of the test case where we have a one-day trial that

3  we can pull off fairly easily.

4          We're in a position where our ability to

5  communicate, our ability to visit him -- I know the Court and

6  I have had conversations in other conferences about some of

7  the limitations on that.  We have a case with a lot of data, a

8  lot of information that's somewhat difficult to follow up with

9  with Mr. Cantwell.

10          And so we're in a position where, you know, when

11  trial will occur is really uncertain at this point and, you

12  know, we're in a position as we began this hearing arguing

13  about whether there's a viable defense, which there is.

14          And so the concern with the pandemic is, you know,

15  twofold.  One is sitting in jail in the pandemic and the other

16  is sitting in the jail in the pandemic with an indefinite sort

17  of current suspension of jury trials with the hope and

18  expectation that the end of the trial will be a go date but

19  may or may not be.

20          As to the conditions within the jail, obviously we

21  have the fortune of a case going on in this court with

22  extensive pleadings and extensive testimony and a lengthy

23  opinion by the Chief Judge explaining some of the deficiencies

24  that are occurring at the Strafford County House of

25  Correction.

1          THE COURT:  Do you contend that I am bound by her

2     factual findings?

3          MR. WOLPIN:  I don't contend that you are bound by

4     it, but there's a fully litigated record.  It's not a

5     situation by proffer that was disputed.  It was a situation

6     where there is testimony, there was argument, there was, you

7     know, essentially a full airing of the facts and conclusions

8     that were made.

9          Obviously if the Court has reason to feel that

10    those were inaccurate, I'm not going to stop the Court from

11    taking up that issue.

12          THE COURT:  I'm not necessarily saying that I

13    disagree.  I'm saying that one of her principal concerns in

14    that case, as I understand it, that justified her conclusion

15    was concern about whether ICE detainees had been properly

16    evaluated for preexisting conditions and that the risks that

17    are posed to anyone in a prison with preexisting conditions

18    that leaves them at substantially elevated risk is an

19    important consideration when you are required, as you always

20    are, to detain somebody.  And there's no -- and that was one

21    of her principal concerns as I understand it, which is not a

22    concern in this case because you're not asserting that your

23    client has some kind of predisposition that renders him at

24    greater risk than others.  At least I haven't seen your

25    medical evidence of it.  So I don't think that is the concern.

1          You talk about in your materials that people have

2    tested positive, but do you have the details of it?  Because

3    the details that I have had is that to the extent that there

4    have been staff people there, a staff person that's tested

5    positive, they were tested positive, then tested again and

6    were negative and never showed any symptoms.

7          I don't know if you've done a -- if you've delved

8    into the details about testing, but even a test like the

9    current PCR testing for COVID that is maybe 99 percent

10   specific when applied to people without symptoms has a

11   potential for a false positive of approaching 50 percent.

12   There have been no documented transmission from that person

13   who tested positive.

14         The two inmates that you identify, at least it's my

15   understanding, are inmates who entered the facility with a

16   positive SARS diagnosis but that those people were held and

17   are being held and were held in quarantine and not into the

18   general population and that no other identified cases have

19   occurred that have been wholly within the population.

20         I'm also not sure what the basis for the Chief

21   Judge's findings which were more than a month ago really

22   capture what's currently going on at the facility.

23         So I'm not in any way suggesting that I dispute her

24   findings, but I think that if you wanted to make a case to me

25   that in fact the Strafford County Jail is a disaster area

1    where people are at such high risk that they can't be confined

2    there, that would be something you would have to do more than

3    simply cite to the Chief Judge's report because it's not

4    consistent with the way I understand the current conditions

5    are operating.

6            I also think it's important to keep in mind that

7    our baseline numbers in New Hampshire suggest that there are

8    currently diagnosed within the state -- only about .1 percent

9    of the general population currently have a diagnosed case of

10   COVID that have not yet recovered.

11           There are certainly asymptomatic individuals.  I'm

12   aware of many studies that suggest that as many as 50 to 75

13   percent of the population may be without symptoms, either

14   asymptomatic or presymptomatic.  But even if you assume that

15   that is true and that you double or triple the percent testing

16   positive and having active COVID, and say there's an

17   equivalent or double or triple amount within the general

18   population, the evidence suggests to me that the COVID risk in

19   New Hampshire currently to the general population is very low.

20   In fact, almost all of our serious ill cases in the state are

21   in nursing homes which unfortunately have done far less well

22   when compared with the Strafford County House of Correction.

23           So I'm not -- I'm open to hearing evidence from

24   you, but I'm not inclined to make a judgment that Strafford

25   County is so dangerous that no one can be confined there when

1    even the Chief Judge hasn't made that.  Her ruling is based on

2    much earlier information.  Her concern was with a different

3    population and with respect to a particular concern about

4    people with a different risk assessment than your client

5    apparently has.

6            So I understand why you need to do what you do and

7    I've taken your evidence and I'll certainly read and think

8    about the Chief Judge's opinion, but without other evidence

9    I'm not inclined to attribute -- or base a bail decision for

10   your client primarily on evidence that Chief Judge McCafferty

11   relied on in making a very different determination for a

12   different population at a different time.

13           What else would you like to say about that?

14           MR. WOLPIN:  Just two relatively brief responses.

15           The first, if you do look at her order, you know,

16   one of the portions she talks about is those failures as far

17   as social distancing that's occurring within the prison.

18           I know my client is in a bunk situation with

19   another individual in a small cell.  They're going still to

20   sort of get, you know, trays for lunch in a communal

21   atmosphere.  There are a number of things she notes about in

22   her findings that are beyond just those that have a

23   preexisting condition, including citing the Savino case, I

24   won't read the whole citation but it's noted in my filing, and

25   that those things are ongoing and not sort of at their end.

1      I know it feels like it's good news and sunshine in
2   New England.  You know, we're dealing with a lot of clients
3   out of Devens which isn't far where there are numerous cases
4   going on.
5      Whether there's a case today or whether that case
6   comes in tomorrow, I know -- you know, my kids' baseball was
7   just cancelled because someone had a COVID interaction and now
8   that's on shutdown.  We're still going through this.
9      And more importantly, you know, we're taking these
10  precautions ourselves.  I'm not in front of you or none of us
11  are because we have concerns that being in tight spaces for
12  long periods of time is dangerous even though I am relatively
13  young and don't maybe have a preexisting condition.
14      So, you know, I think that applies -- you know, we
15  can't start our hearings by addressing how significant the
16  pandemic and the risk is that we're sort of no longer pushing
17  in-person hearings and then, you know, think that the risk is
18  so minimal that those who are incarcerated should be subject
19  to those risks.
20      I mean, he's still innocent of this charge.  This
21  isn't a compassionate release situation where, you know, we're
22  discussing reducing sentences for those that are guilty.
23      THE COURT:  Well, I hope you don't think so little
24  of me that you think I don't care about the people that I'm
25  dealing with.  I hope you don't think that I'm so ignorant

1   that I assume that there are no risks associated with these

2   activities.  I hope you don't think that I haven't been

3   carefully -- I'm in meetings most of the day, meeting with an

4   expert two days ago about risk assessment.  I have been

5   reading hundreds of studies.  I have been spending countless

6   hours analyzing risk.  I do not think that there is zero risk.

7   I do not think that things are all sunshine in New Hampshire.

8           I think I have a more detailed understanding of

9   this than you.  For example, you don't reference the effective

10  reproduction number in New Hampshire.  The effective

11  reproduction number in New Hampshire is significantly below 1

12  right now.  That tells you something about how rapidly the

13  virus is spread.

14          And I hope you don't think I'm so ignorant to think

15  that people in prisons are not at greater risk than the

16  general population because they necessarily have to be

17  confined together in ways that limit the ability to do social

18  distancing.

19          These things are not all or nothing decisions

20  despite the way people like to argue them.  They are carefully

21  considered nuanced decisions and they may vary over time.

22          Fortunately, we are moving in an environment now

23  where we are moving towards greater access in our court

24  proceedings, but that we are moving towards greater access in

25  our court proceedings does not mean all or nothing.

1          It is in fact every interaction that you have where
2    someone is not able to maintain social distancing is a risk.
3    It might be a small risk with mitigation measures, but it is a
4    risk.  And the more of those interactions you have the greater
5    the risk that there will be a transmission.
6          So it is entirely sensible to conduct hearings
7    where everybody wants them to be conducted by video conference
8    because if you can -- you have to consider the risk and the
9    need.
10          And so there's almost no zero risk situation except
11    when we're doing a video hearing, right?  So that's a zero
12    risk situation.  If there isn't a need to go into a more risky
13    situation, you don't do it, but it's not the same with people
14    who are incarcerated because someone has determined that they
15    pose a risk to the community.
16          There is a risk and a need, and we are doing
17    everything we can to mitigate the risk and balance the risk
18    against the need, and that's how I'm viewing it.  I hope you
19    assume I'm not so cavalier.  I recognize that there are risks
20    to everybody that I incarcerate.  I wish I could work in an
21    environment -- you don't have to make these decisions.  I do.
22    And I have to care about you, and I have to care about Mr.
23    Cantwell, and I have to care about everybody in those prisons,
24    and I do.  All right?
25          So let's just keep this in the right context here.

1          MR. WOLPIN:  The reason -- that is not the basis

2     for the motion.  It's one factor to consider.  I agree with

3     the Court.

4          There is a risk.  It needs to be in there.  It

5     needs to be considered in deciding whether the risk and the

6     action here is necessary.

7          So is continued confinement of Mr. Cantwell

8     necessary when there is this risk that's more than zero, as

9     you noted, and is higher presumably as we tend to understand

10    in communal facilities than if he were living in his solo

11    apartment by himself.

12         So I'm not suggesting that this is the be all end

13    all or the Court is being cavalier or not considering it, but

14    I do think it's part of the picture of do we have to

15    incarcerate when --

16         THE COURT:  One of the things that may help you is

17    I can tell you I have reviewed now every single defendant who

18    was on the trial list for July.  Right now you are number one,

19    okay?  You are my number one case.  So as soon as I get to do

20    a jury trial, right now you're up, okay?  So it's not

21    likely -- it's likely that we will reach your case if you want

22    it to be reached sooner rather than later, but if we are not,

23    this is a dynamic situation.  If there were to be a drastic

24    increase in significant infections in that jail, I would have

25    to reassess my assessment.  I'm not sure how it would come

1  out, but I'm not precluding you from presenting me with new

2  relevant information that bears on this issue because I'm

3  concerned about the people under my control every single day.

4  I control you.  I control the prosecutor.  I control these

5  defendants.  It's a real responsibility, I don't take it

6  lightly, and it may change over time.  I want you to

7  understand that.  I consider risk, but I have to evaluate it

8  in a particular way.  I have to evaluate it scientifically,

9  not emotionally, and I have to balance it against need.

10  That's how I have to assess that aspect of it.

11          So I don't think we really disagree here.  I'm sure

12  you're not assuming that I have this kind of ignorance or

13  indifference.  I care about it.  I really do.

14          Did you want to say anything else on this

15  particular issue?

16          MR. WOLPIN:  No.

17          THE COURT:  All right.

18          Ms. Krasinski, did you want to address this

19  particular issue?

20          MS. KRASINSKI:  In the context of the Bail Reform

21  Act, no, your Honor.

22          THE COURT:  I do want to briefly address, Mr.

23  Wolpin, the other related concern that you touched on, and

24  that is your client's ability to ensure that he's able to

25  prepare his defense.  That's very important to me.

1            I understand your office will not allow you to have

2     in-person visits yet although in-person visits are being

3     conducted at the facility by other lawyers.  That's a decision

4     your bosses have to make, and I respect that because they're

5     concerned about you just like I am.  But I am really pleased

6     that the Chief Judge has taken the lead in ensuring that you

7     can have private Zoom conversations with your client.  I will

8     do everything necessary to facilitate that.

9            As the trial date approaches, if I don't grant your

10    bail motion, I will give you daily, nightly access by Zoom if

11    I need to to ensure your case is ready for trial.

12            As I said, you're number one on my list because

13    everybody else had legitimate reasons why they wanted

14    continuances and you did not assert a need for a continuance,

15    and everybody else on my list had other reasons why they want

16    continuances unrelated to COVID.  So that leaves you as the

17    number one even though your case isn't the oldest, and we'll

18    move forward with it as soon as we possibly can.  And if I

19    don't grant the bail motion, I will make sure personally that

20    you have Zoom contact with your client as necessary to ensure

21    that he can prepare his defense.  It's very important.  I'm

22    really glad the jail has accommodated us on that, I'm grateful

23    to the superintendent, and I'll make sure you have that

24    contact.

25            All right.  What else would either of you -- Mr.

1    Wolpin, I should give you this chance.  I tend to -- the way I

2    tend to analyze problems, you can argue that it is reductive,

3    that what you do is you look at each thing in a silo and you

4    don't look at things holistically, and I'm sure you want to

5    present a holistic argument that, Judge, consider all of this

6    together.  He's not a danger.  You can construct conditions

7    like home detention with electronic monitoring that he'll

8    comply with.  Any kind of holistic argument you want to make

9    along those lines I'll hear it.

10              MR. WOLPIN:  Okay.  Thank you.

11              Yes, we're in a position -- I spoke with his

12   landlord yesterday.  He has a home in Keene that he has lived

13   at for a significant period of time continuously.  Although,

14   you know, his landlord is not someone who may agree with his

15   political beliefs sees him as a positive tenant, someone who

16   doesn't cause issues in the neighborhood or in his home.  And

17   so we have a place that's a solid, known, certain place for

18   both social distancing purposes as well as supervision

19   purposes that he is going to go to and be at.

20              As far as concerns the government has expressed

21   about firearms, we have signed over those firearms to his

22   landlord to be sold to satisfy prior back rent.  Those are no

23   longer in my client's purview or access.  They're not under

24   his name.  They've been provided to a gun shop for sale.  So

25   at this point there is not a firearm available to my client.

1          Obviously there are Second Amendment rights that

2     came with it.  The government has not alleged that he was a

3     person who is prohibited from firearms.  We live in New

4     Hampshire where firearms are a pretty commonly possessed item

5     for many reasons, but at this point that's gone.  They're not

6     his.  They're not accessible.  They're gone.  So we have

7     someone who is a steady residence, who has no firearms, and

8     has those out of his possession.

9          We have someone who has, as we talked about, said I

10    will abide by this discovery order and who the Court can set a

11    monitoring condition.  We have electronic monitoring

12    capabilities.  We have home confinement capabilities.  We have

13    the letter that was submitted in relation to the earlier

14    hearing from that prior monitor that is very positive that

15    indicates, you know, constant contact and communication.

16         He's not someone who fell off the map or wasn't

17    involved and who is compliant with those conditions.

18         So we have housing, no firearms, and we have the

19    ability for electronic monitoring with some track record.  As

20    much as the government is going to point to the track record

21    of the online naming situation, we also have a track record

22    with the bracelet situation and that is far more positive.

23         Looking at what was sent around -- and again, I

24    apologize, I can't access my stuff for some reason.  It did

25    look like it had a 22-mile radius.  So it was beyond simply

1    just staying within the state but staying within a smaller

2    window which again shows an ability to abide by conditions.

3         No contact provisions.  We have -- this is not a

4    situation where we have two local individuals.  The other

5    person, without again getting into details about where they

6    are, is a thousand plus miles away, has eliminated his online

7    presence, and so the sort of likelihood of interactions

8    occurring at this time is incredibly slim.  There is no

9    pattern of that.  There's no evidence or suggestion that Chris

10   ever went out to that place or visited him or called him or

11   e-mailed him in the last, you know, ten plus months.

12        So as far as a concern for that individual, there

13   is no such concern in our mind.  So the Court can set the no

14   contact provision as well.

15        Obviously alcohol and drug, you know, requirements,

16   the Court can set them too with monitoring, with requirements

17   that he participate and do that.  We have some background.

18   Also looking at the -- and I'll use the word SCRAM, which is

19   the alcohol component, is something that he complied with.  So

20   the Court can have some assurance as far as drug and alcohol

21   provision and conditions compliance.

22        As far as his contact with the police, I know

23   there's some dispute about whether he was wholly honest or

24   not, I'll leave that for another day, but it is clear from

25   what both sides have presented that he is someone who has

1    contact with his local police department, a relatively

2    positive one, who has gone to them in the past, who's met with

3    them, who's met with the FBI, who's not someone who is so

4    antagonistic to law enforcement or supervision that he's going

5    to, you know, refuse to participate with them.  That's not his

6    mindset.  We see that throughout discovery that that's not his

7    mindset.

8             So I certainly see in this case conditions the

9    Court can set on a charge like this where we ultimately have

10   someone with a misdemeanor record.  It is for the involvement

11   of pepper spraying of others.  He was pepper sprayed himself

12   in that instance as well.  It was a group, I'm sure the Court

13   has some familiarity from the filings about the findings of

14   the Independent Reviewer of Charlottesville, but in that

15   instance was talking about the need for police to be involved

16   in the safety of others.

17            So this is not someone with a lengthy criminal

18   history of violent acts against others, you know, first degree

19   assaults, second degree assaults, you know, those kinds of

20   things.  Those are simply not in his criminal record or

21   criminal history.

22            I think -- and I know the Court is well aware of

23   sort of presumptions in Salerno in the sense of what bail is

24   intended to do.  It's certainly a sense that bail is just not

25   some kind of global preventative detention issue but should be

1    really tied to the need for this offense to protect the

2    individuals involved as I see it.  Salerno says that

3    incarceration pretrial should not be the norm but the

4    exception.  This is, again, an offense that's not likely

5    guidelines-wise in sort of the upper echelon of potential

6    offenses and certainly something I think the Court can set a

7    whole series of conditions that are very restrictive and

8    agreeable to our client that will assure that the community is

9    protected as well as the safety and appearance of Mr.

10   Cantwell.

11                THE COURT:  All right.  Thank you.

12                What does the government want to say?

13                MS. KRASINSKI:  I'm not going to rehash all of the

14   evidence that was presented before the Magistrate Judge.  I'll

15   just simply say that none of the conditions that Attorney

16   Wolpin presents to the Court mitigate the serious risk of

17   danger that the defendant poses to not just the victim but to

18   the community at large, and so the government respectfully

19   requests that he remain detained pending trial.

20                THE COURT:  All right.  Anything else before we

21   wrap up the hearing?

22                I'll take it under advisement.  I'll issue a

23   written decision.  I will of course apply the correct standard

24   of de novo review.  I'll look at the entire record.

25                These are important decisions.  They're very

1    time-consuming decisions for a district judge, and up till now

2    and up until recent days they've been extremely rare that

3    people are pursuing these kinds of appeals.

4            Unfortunately, I'm backed up because people have

5    been taking these kind of appeals, and I'm not just going to

6    lightly disregard the de novo review standard.  So it may take

7    me a while to work through it, but I will.

8            And in the meantime I would advise counsel for both

9    sides to start getting ready for trial because I can't promise

10   you when we will have a trial date, but I can tell you that we

11   are moving in that direction and a lot will depend upon the

12   prevalence of active SARS in our community and the

13   effectiveness of mitigation measures that we've identified.

14           We're engaged in active planning for restructuring

15   a courtroom to bring a jury back in and to start trying.  The

16   judges on this court want to be able to try cases as soon as

17   we possibly can consistent with the public health needs, and

18   we are moving in that direction.

19           So I can't predict what will happen with the

20   prevalence of the disease in our community, but if it remains

21   at the levels that it's at now, you should expect to be ready

22   for trial within a matter of a couple of months.  So get

23   ready.  I'm going to be calling you first.

24           If for some reason you're not ready or need

25   additional time for reasons unrelated to the pandemic, you

1   should let us know as other defendants have and I will

2   carefully consider requests for extension, but if that's

3   something you would be seeking, I would rather hear about it

4   less than two weeks before the trial because I'm telling you

5   now you won't have to try during July.  I can't rule out

6   trying in August.  I think it's at least a possibility.  I

7   think it's a higher possibility that you should be ready for

8   trial in September.  And if you don't want a September trial

9   date for reasons that are legitimate and unrelated to the

10  pandemic, you need to let me know.  And if you do, I will

11  consider it.  And if you don't, I will proceed under the

12  assumption that you will be the first case that I will try

13  when I get back to trial, okay?

14          Anything else anybody wants to say?

15          MS. KRASINSKI:  No, your Honor.  Thank you.

16          THE COURT:  Okay.  Thank you.  I appreciate it.  It

17  was helpful argument, and the hearing is concluded.

18          MR. WOLPIN:  Thank you.

19          (Conclusion of hearing at 11:49 a.m.)

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings, to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted: 5-4-21        /s/   Susan M. Bateman _____
                              SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25