**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
            v.                      *   August 24, 2020
                                    *   11:00 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF TELEPHONIC CONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:        John S. Davis, AUSA
                          Anna Z. Krasinski, AUSA
                          U.S. Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                          Jeffrey S. Levin, Esq.
                          Federal Defenders Office



Court Reporter:            Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

```
 1                      P R O C E E D I N G S
 2            THE COURT:  All right.  This is Judge Barbadoro.
 3            I would ask my case manager, do I have everybody on
 4   the line?
 5            CASE MANAGER NEGRON:  Good morning, Judge.
 6            Yes, you do have everyone on the line.
 7            THE COURT:  All right.  Great.
 8            Mr. Levin, I've been informed you asked for a court
 9   reporter.  Would you like the entire conference recorded or do
10   you want to wait for some selective part of it?
11            MR. LEVIN:  Your Honor, we don't -- we would like
12   the whole thing recorded.
13            THE COURT:  Okay.  That's fine.
14            So let's -- I would ask the reporter, are you ready
15   to go?
16            THE COURT REPORTER:  Yes, I am, Judge.
17            THE COURT:  Thank you.
18            We're now on the record.  I would ask each party
19   the first time they speak to identify themselves so the
20   reporter can attribute comments to the correct person.
21            Mr. Levin, do you want to just have a practice of a
22   reporter for all of our communications?
23            MR. LEVIN:  You know, your Honor, the last time we
24   had a telephone conference we didn't -- we weren't really
25   aware that it was going to be a pretrial conference that would
```

1    last over an hour, and at about the middle point of that

2    conference it occurred to me that it would be good to have a

3    court reporter.

4            I mean, if we know it's going to be a five minute

5    thing to touch base, that's one thing, but at the beginning

6    when we're not sure how long it's going to last or whether

7    we're going to be arguing motions and people are going to be

8    making factual representations, we just thought it would be

9    the better part of valor to have one.

10           THE COURT:  Well, I think we should have everything

11   recorded.  So for the rest of this trial every interaction I

12   have with you will be recorded.

13           The clerk should have a reporter available for

14   every telephone conference, every Zoom conference, every in

15   chambers conference that occurs.

16           All right.  So I have a few things that I would

17   like to talk about.

18           First, I would like to talk about the pretrial

19   order.  Then I would like to talk about jury selection.  I

20   would like to talk about witnesses.  I would like to talk

21   about evidence.  I would like to talk about the informant

22   motion.  What kind of hearing the parties want for that if

23   they want a hearing at all.

24           But before I do that, Mr. Davis, are you on the

25   line?

 1              CASE MANAGER NEGRON:  Judge, Davis is tied up right
 2       now.  We have Anna Krasinski on the line.  He will be joining
 3       us a little later.
 4              THE COURT:  Unfortunately, Mr. Davis is the only
 5       person in this group other than Jen who has actually done one
 6       of these COVID trials.  I was going to ask him to give us his
 7       impressions.  If and when he joins us, we can ask for that.
 8              Let me start with the pretrial order.  What -- it
 9       looks fine to me.  Should I just go ahead and issue it?
10              First, the government.  Then Mr. Levin or whoever
11       wants to speak for the defense.
12              MS. KRASINSKI:  This is Anna Krasinski on behalf of
13       the government.
14              I think all the dates are agreed upon so we're
15       comfortable if the Court just goes ahead and enters it.
16              THE COURT:  All right.  And the defense?
17              MR. WOLPIN:  Yes.  This is Eric Wolpin.
18              We have the same position.  We've reviewed it with
19       the government and our client, and we're fine with the order
20       as it stands.
21              THE COURT:  All right.  So I would ask my case
22       manager, we can go ahead and issue that as a pretrial order in
23       the case.
24              All right.  Let's turn to jury selection.
25              CASE MANAGER SACKOS:  Judge, this is Jen.  I just

1    have a quick question.  They have 9:30 to 4:00 as length of

2    trial.  I know normally you do 9:00 to after 4:00 so I just --

3              THE COURT:  Oh, yeah.  I'm sorry.  Yeah, we should

4    do 9:00.  Let's start at 9:00.

5              CASE MANAGER SACKOS:  Do you want to go till 4:00

6    or 4:30?

7              THE COURT:  It depends on what's happening, but

8    let's try to go till 4:30 and I will potentially let people go

9    earlier than that.

10             Does somebody want to be heard on that?

11             MR. WOLPIN:  Yeah, this is Eric Wolpin.

12             The reason we had asked for 9:30 and I had

13   preferred to start later and would rather end later is that

14   the reality of the situation is that I've lost my daycare

15   person for the morning for my youngest child, and I'm getting

16   in, gets me to the office right at the 9:00, 9:05 mark when I

17   can drop him off at school, and so it's looking a little

18   behind with this COVID business as far as school starting up,

19   and that's really the week or the week after school starts up.

20   So I would ask for 9:30 so I wouldn't be holding things up or

21   trying to get that done.  So I would ask that it be 9:30.  If

22   it could go later in the day, that's fine, but I would make

23   the request that we start at 9:30 unless that's not possible.

24   Obviously there are unfortunately struggles going on now with

25   scheduling and childcare on my end.

1    THE COURT:  Let me make sure I understand you.  You

2    have no objection to going until 4:30, but you would request

3    that I start at 9:30 to accommodate your childcare needs; is

4    that right?

5    MR. WOLPIN:  Yes, your Honor.  That's correct.  I

6    apologize.

7    THE COURT:  No apology is necessary.  I always want

8    to try to accommodate people's family needs if at all

9    possible.

10    Of course any time I cut down the length of the

11    trial in any way I run the risk that I make the jurors have to

12    come back for an extra day, which I certainly don't want to

13    see happen.  The other concern I have is that sometimes we

14    need to have counsel -- as a general rule, I like to have

15    counsel in the building at least half an hour before the start

16    of trial so that we can take up any pretrial issues.

17    As long as Mr. Levin is able to do that, that's not

18    a problem, but I would be concerned if you're coming in at

19    9:30 or right before 9:30 and we end up spending until 10:00

20    or 10:30 going over matters without the jury present, you

21    know, I really -- that really starts to cut into the day.

22    So as long as Mr. Levin can handle any pretrial

23    stuff, then you can show up before 9:30.  As an accommodation,

24    I'm willing to delay my start time until 9:30, but then we

25    should definitely put 4:30 as the end time.

1           MR. WOLPIN:  9:00 is right about the time plus or

2     minus, you know, a minute or two that I get to Concord so

3     that's why I didn't want to have it at 9:00.

4           THE COURT:  All right.  And I think one advantage,

5     frankly, is that we're going to have the jurors have their

6     lunch in the building.  So we can try to keep the lunch time

7     break to an hour.  No longer than an hour.

8           So we'll try to get full trial days in, but I'll

9     accommodate your request and we'll put 9:30 to 4:30, Jen,

10    okay?

11          MR. WOLPIN:  Thank you.

12          MS. KRASINSKI:  Would it help for me to send a Word

13    copy so that -- I don't know if that just makes it easier to

14    make the change.

15          CASE MANAGER NEGRON:  Yeah, you can send that to

16    me.  Thank you.

17          THE COURT:  So just to be clear on my case managers

18    here, Vinny is the case manager for Cantwell, as you know, but

19    because Jen was the case manager at the last trial I wanted

20    her to be involved in the case as well.  That's why I have

21    both case managers involved in this particular case.

22          So anything else on the pretrial order?

23          CASE MANAGER SACKOS:  No, Judge.  I think that's

24    good.

25          THE COURT:  Okay.  All right.  So let's talk about

1    the jury selection process.

2            So I sent you a pared down voir dire questionnaire

3    to send out to the jurors in advance.  I'm interested in any

4    suggestions you have.  If you want more time to go over it and

5    propose changes, you can meet and confer.  I'm inclined to

6    defer to anything that you can agree on.  I'm inclined to not

7    include anything in the preprinted list unless both parties

8    agree on it, but any reactions either of you have?  Starting

9    with the government.

10           MS. KRASINSKI:  Your Honor, again, this is Anna

11   Krasinski.

12           I thought that it looked good.  I don't have

13   anything else to add because I don't think we should get into

14   sort of the specifics of the case at that point.

15           THE COURT:  Yeah, I fully -- I want to be clear.

16   I'm very open to hearing special voir dire requests addressing

17   any unique circumstance in this case.  I just am not

18   comfortable in raising it in a questionnaire sent to the

19   jurors outside the courthouse because I think it's going to be

20   too tempting for people to start getting on the computer to

21   try to find out what the case is about.  So that's why I'm

22   reluctant to do more on the list that will be sent to the

23   jurors.  I'm fully open to hearing voir dire requests that are

24   tailored to the case.

25           Mr. Wolpin, Mr. Levin, whoever wants to respond,

1       what's your position on that?

2                   MR. WOLPIN:  This is Eric Wolpin.

3                   I tend to agree -- we agree with that future

4       approach, that sort of one version being sent by mail and the

5       other being addressed to them when they're present, and then

6       there being a sort of case-specific version at the courthouse

7       rather than by mail.

8                   I do think it is -- as this -- he's somewhat of a

9       public figure.  I do think some of the wording I might

10      recommend some changes.  It's not just whether they're

11      familiar with the case.  They may be unfamiliar with the case

12      but familiar with prior cases with him or with him in general.

13      So I might just broaden a little bit the questions about

14      reference to the case to be a reference to the defendant.

15                  I was going through whether there might be a few

16      more questions about COVID and jurors' concerns about COVID.

17      Part of the rationale is having people who are really not

18      going to serve because of COVID not even come to the

19      courthouse.  I do think there's not a lot of extra questions

20      but potentially a handful of extra questions that might serve

21      that end.  I would be happy to speak with the government and

22      sort of see if we can reach agreement on anything and return

23      to the Court.

24                  THE COURT:  Yeah.  Okay.  I get it and understand

25      your thinking, and I'm flexible about it.

1          A couple of things to keep in mind.  Anything you

2   do when the people are not within my control that makes it

3   really interesting for them to say, oh, I wonder who this guy

4   is, you run the greater risk that they in fact before I can

5   completely control them go out and try to discover something

6   about the case.  So please think about that as you're

7   proposing any changes on that score.

8          With respect to COVID issues, the concern I would

9   have is any questions you ask them should be phrased in a way

10  that is not unduly alarming to them because when they come to

11  the Court they will see the extraordinary mitigation measures

12  that we are using here and I will explain them to them in

13  detail.  And if you ask a question -- if you ask me as a

14  potential juror, do you have any COVID issues, well, yeah, I'm

15  65 years old.  If I'm going to go to a court where they aren't

16  using social distancing and mask wearing and that they have an

17  inadequate ventilation system, I might have concerns.  But if

18  you ask me, would I have a problem being a juror in a New

19  Hampshire Federal District Court case right now, I would say

20  the answer to that is absolutely no.

21         So be careful about that because if you suggest

22  things that I think are too provacative, they will either

23  require me to modify your wording or to add additional wording

24  to start explaining mitigation measures.  It just complicates

25  the question unnecessarily.

1    You'll have a full and fair opportunity to see the

2    jurors and have them questioned about COVID concerns when

3    they're here.  This is just to get like a really quick screen

4    of people that obviously aren't going to survive.  If we knock

5    off ten jurors that way, there are just ten fewer people we

6    have to bring into the courthouse.

7    That's my only thinking about it, but I'm flexible.

8    I'm open.  I will listen to whatever it is you jointly

9    propose, but please keep those thoughts in mind.

10   When would you be able to get back -- meet and

11   confer and get back to me with any proposed revisions?

12   MR. WOLPIN:  If Anna and John are available today,

13   we can have that conversation today.

14   THE COURT:  Why don't you try to do it as soon as

15   possible.  I think there's a deadline built into the pretrial

16   order, but the sooner you can get it to us the better.  The

17   more time we can get it to the jurors in advance, that would

18   be better for us.

19   All right.  So anything else about the voir dire

20   that I propose to send to the jurors in advance?

21   MR. WOLPIN:  No.

22   THE COURT:  Okay.  I know that the Chief Judge has

23   described to you the jury selection process that we're using.

24   Mr. Davis when he joins could give you a firsthand

25   account.  Jen could give you a firsthand account.  I tend to

1   follow the practices that were employed in the last case.

2          Does anybody have any questions about that or

3   concerns or issues they would like to take up with me

4   regarding the in-person component of the jury selection

5   process?

6          MS. KRASINSKI:  No, your Honor.

7          MR. WOLPIN:  No, your Honor.

8          THE COURT:  Okay.  Good.  Well, we're just rolling

9   right through things here.

10         Okay.  So we'll conduct the jury selection process

11  pretty much the way it was conducted in the last trial, and it

12  sounds like no one has a particular problem with that.

13  Otherwise, we'll do our jury selection the way I ordinarily do

14  it with the modifications necessary to address COVID that

15  occurred in the prior case.

16         Does anybody have anything else about the jury

17  selection process at all?  Anything to do with jury selection?

18         Anything from the government?

19         MS. KRASINSKI:  No, your Honor.

20         THE COURT:  Anything from the defense?

21         MR. WOLPIN:  No, your Honor.

22         THE COURT:  All right.

23         MS. UHRIN:  I'm sorry, Judge.  This is Tracy.

24         The only difference I wanted to raise is that

25  because I believe Mr. Cantwell is detained we'll just have the

1  jurors who are normally seated in -- who are seated from the

2  beginning in Courtroom 3, they'll be -- we'll have them report

3  to the jury assembly room, and then once Mr. Cantwell is

4  seated in the courtroom we can bring in those jurors after the

5  fact is how I had imagined we would do it, but I'm also open

6  to other suggestions.

7          THE COURT:  Perfect.  That's why we have people

8  like you around here, Tracy, to make sure that things happen

9  in the right way.  I appreciate that.  Of course it needs to

10 be changed because he's an incarcerated defendant.

11         MS. UHRIN:  Okay.

12         THE COURT:  Okay.  Good.  Thank you.

13         All right.  Let's talk about witnesses and

14 particularly out-of-state witnesses.  What are the parties

15 thinking, and then I would ask -- well, maybe I'll start with

16 Tracy.

17         Tracy, you have -- you're keeping up on what state

18 practices require and what we've done in the prior trial with

19 respect to out-of-state witnesses and quarantine and testing.

20 What -- can you bring us up to speed on what happened in the

21 last trial on that?

22         MS. UHRIN:  Sure.

23         So the state regulations right now -- there's no

24 order, but it recommends that anyone traveling from outside of

25 New England quarantine for 14 days upon arrival.

1        We have built into our entrance protocol and our

2   kind of guidelines for exceptions to that protocol some

3   additional ways that, you know, we can get witnesses in for a

4   trial.

5        For the _Musso_ case we had two FBI witnesses who did

6   a combined five-day quarantine traveling from the D.C. area.

7   They quarantined for a couple of days in D.C. and then drove

8   up to New Hampshire and continued to quarantine for five days.

9   On the fifth day they took a test, and once they had the

10  negative test result they were able to come in and testify

11  that day.  So that was one way we dealt with kind of the

12  out-of-state, out of New England witnesses.

13       But currently for any witness traveling from

14  outside of New England we probably need a plan for, you know,

15  a combination of quarantine and testing.

16       There's also kind of a provision in the -- as the

17  presiding judge, you can make exceptions.  One of the

18  exceptions is if somebody is just coming in to testify

19  quickly, it's not preferred, but they can come in, testify,

20  and get out with a negative test.

21       So I think -- I know that in this case there are a

22  number of out-of-state witnesses so a combination of

23  strategies might make the most sense.

24       THE COURT:  Right.  So the Court has consulted, as

25  the parties know, with an expert who has been advising our

1    court and other courts, as well as other private entities,

2    about mitigation measures, and I am satisfied based on that

3    information that a combination of a five-day self-quarantine

4    and a negative test result are sufficient to reduce the risk

5    of transmission when coupled with our other mitigation

6    measures to provide a workable solution here.

7              So I want to -- that would be my default position

8    is that any witness traveling from outside of the New England

9    states that all at this point have similar prevalence rates to

10   what we have in New Hampshire should comply with a five-day

11   quarantine and a negative test to be able to come into the

12   courthouse.

13             I'll start with the government.  Does that pose any

14   particular problem for you?

15             MS. KRASINSKI:  Your Honor, first I want to note

16   that AUSA Davis has now joined the call.

17             THE COURT:  Oh.  All right.

18             MS. KRASINSKI:  So he should be on now.

19             MR. DAVIS:  Good morning.  Sorry I'm late.

20             THE COURT:  That's okay.  Mr. Davis, we have a

21   court reporter transcribing this proceeding, and we will be

22   having a court reporter on all subsequent interactions that

23   you have with me.

24             But go ahead, counsel.

25             MS. KRASINSKI:  We are working on serving all of

1    our anticipated out-of-state witnesses.  Some were served last

2    week, we hope to get the remainder served this week, so that

3    we can have these quarantine discussions with them.

4            So far with the witnesses that we have served I

5    don't see this being an issue, but as we talk to our

6    witnesses, we'll raise any concerns with the Court.

7            The one thing that strikes me is that I think for

8    the Musso witnesses, and Attorney Davis can correct me if I'm

9    wrong, they were able to drive here to continue their

10   quarantine.  What I don't know is if people are traveling from

11   further away where it may not be a one-day drive or where they

12   may have to take some other form of transportation, if a

13   combined five-day quarantine would realistically work, but

14   there's issues that we're working through with our witnesses

15   as they're served.

16           THE COURT:  Well, we should talk about that some

17   more.  My initial reaction is you're right that it does pose a

18   problem if you are taking an airplane to get here.  The better

19   practice would be to quarantine here for five days and have a

20   negative test.  Whether that would be absolutely required or

21   not we can talk about, but I think that would be the preferred

22   way of addressing the issue.

23           In terms of getting tests and test results, I mean

24   you hear varying things.  My wife had a test on Thursday to be

25   able to go back to her college where she teaches and had the

1    results by Sunday.

2            Does the government have any ability to get more

3    rapid testing for its witnesses so that we can ensure that

4    they'll have test results in time for them to testify?

5            MS. KRASINSKI:  As I understand it, we are working

6    on having -- on contracting with Elliot Hospital to be able to

7    do that.

8            I think that in the Musso trial they were able to

9    do that and have results within two days.  As I understand it,

10   the contract hasn't been formalized yet, but we're inching

11   closer.

12           MR. DAVIS:  And I would add, Judge, I believe our

13   witnesses were told up to 48 hours, but the good news is they

14   had their results I think in about 26 hours.

15           THE COURT:  Okay.

16           MR. DAVIS:  So they took it on a Tuesday morning at

17   8:00 or 8:30 and they had it Wednesday morning at 10:30 and

18   testified Wednesday afternoon.  So at least there our track

19   record was good.

20           THE COURT:  That is good, yeah.

21           Is your contract flexible enough to include defense

22   witnesses as well?

23           MR. DAVIS:  I'm not sure.  Anna, you may know.  I

24   think we've been anticipating it was just government

25   witnesses.

1          And there was a defense witness in the <u>Musso</u> trial,

2     and I don't think I ever knew how he got tested and cleared

3     because there was a defense witness who had out-of-state

4     travel, but that was done separately I think.  I could find

5     out from Simon Brown how he did it.

6          THE COURT:  Are your witnesses coming from great

7     distances so that they would be likely traveling by plane

8     rather than driving?  Sorry, the government.

9          MS. KRASINSKI:  We know that the victim and the

10    victim's family plan to drive.  I think for the remainder of

11    the witnesses some will drive.  Some will probably decide

12    between driving or flying.  We don't know the answer to that

13    yet.

14          THE COURT:  Okay.  All right.  Well, let's get --

15    I'm glad that you're working diligently on this.  As I said,

16    I'll be as flexible with you as I can consistent with the

17    needs to preserve the health and safety of everybody who's

18    participating in the trial, but I would love if we could have

19    in place a plan that ensures a five-day self-quarantine and a

20    negative test result for witnesses on both sides.

21          Let me ask the defense.  Have you given thought to

22    whether you have any witnesses who are likely to come from out

23    of state, and if so, how you would ensure that they're in

24    compliance with the self-quarantine and testing requirements?

25          MR. WOLPIN:  Your Honor, so the government's

1   witness list under the pretrial order is due Friday.  Our

2   honest answers are that we're going to be responsive to that

3   list.  Depending on who and who is not on that list, we're

4   going to follow up from there.  There's certainly a chance

5   that there really will be overlap and there won't be a need on

6   our end, but the benefit of having the witness list earlier is

7   so that we can follow up if need be.

8           THE COURT:  Have you done any thinking or do you

9   have arrangements in place so that if you do have witnesses

10  and they need to be tested, that they can be tested and have

11  results?

12          MR. WOLPIN:  At this point, we will -- again, I

13  think that on Friday we'll see who's on the list.  I don't

14  think we're going to need to do that.  If we do, we'll put the

15  effort into doing it.

16          THE COURT:  All right.  Let's talk again about that

17  next week.

18          MR. DAVIS:  And I would add, Judge, I'm sure we'll

19  -- even if the government contract doesn't allow for defense

20  witnesses for some reason, I'm sure that we could share all

21  the information we have about how to do a contract with Elliot

22  Hospital, and my guess is there wouldn't be an impediment to a

23  separate contract if that's what's necessary.

24          THE COURT:  Okay.  Well, I appreciate that.  Thank

25  you for looking into it.  Yeah, to the extent you can share

1    that with the defense, that would be helpful.  They may need

2    to contact people directly themselves.

3              Okay.  So we'll mark that down for a subject for

4    additional discussion next week.

5              I want to talk about evidence, but before I do, Mr.

6    Davis, I've been debriefing people who have participated in

7    this first trial, the Musso trial.  I've spoken to the trial

8    judge.  I've spoken to Tracy.  I've spoken to Jen.

9              Anything that you can share with us as a group

10   about what worked and didn't work, what could be improved in

11   making the trial work better having gone through it?  Do you

12   have any thoughts about that?

13             MR. DAVIS:  Judge, from the lawyers' perspective it

14   went about as smoothly as anyone could ask for.  I don't

15   really have a lot of constructive criticisms.

16             The only thing -- and this has already been talked

17   about by Judge Laplante.  The only thing is that the podium

18   situation could be better because there were two podiums.  The

19   defense podium did not have a screen and so there was a need

20   for both counsel to use the main podium with the screen.  That

21   required cleaning, which actually went fine, but it would be

22   helpful if the defense could have their own fully operable

23   podium.

24             And the other thing about the podium, it would be

25   helpful if the podium could be turned to face the jury because

1    the podiums were actually serving as plexiglass props and

2    couldn't be moved and so -- and the podium faced the judge,

3    but the jury was spread way out in the courtroom going down to

4    sort of the side corner, and so both openings and closings

5    were tougher because your notes are kind of to the side and of

6    course you don't use your notes, but if you are using your

7    notes a little bit, you have to sort of look to your right and

8    then look to your left.

9            But that's a very small thing.  Overall it was very

10   smooth.  It didn't feel that different from a regular trial

11   except you have a mask on and your glasses are getting fogged.

12           Jury selection went very well using all the

13   different courtrooms.  So I have full confidence that -- you

14   know, the clerk's office did amazing work and really, you

15   know, really looked at every detail.  So I don't have any

16   misgivings about our collective ability to do this.

17           THE COURT:  Well, let me raise something that you

18   brought up.  I had been alerted to the two podium issue.  We

19   will have a cleaning person under contract, but anything we

20   can do to minimize the need for the cleaning improves

21   efficiency.  So I'm hoping we could have the two podiums

22   equipped appropriately so that the questioner can see the

23   screen.

24           Tracy, have we tried to do something on that?

25           MS. UHRIN:  I've already spoken with our IT

1    department and they believe they can set up a monitor on that

2    second podium.

3              We did offer that in the middle of the last -- or

4    after a couple days of the last trial.

5              But the other issue that defense counsel had raised

6    is that they wanted to be closer to the witness when

7    cross-examining the witness.  So he was going to ask to -- he

8    asked to continue to use that other podium regardless of

9    whether or not we put a monitor on.  So we didn't wind up

10   putting the monitor on, but we did explore whether we could do

11   it and we certainly can for this case.

12             THE COURT:  All right.  I'm going to turn to the

13   defense to see what their position is on this in a second, but

14   let me just ask you again, Tracy, on this.

15             Is it possible to change the angle of the podium so

16   that they are facing the jury rather than the judge?

17             MS. UHRIN:  Yeah, I just made a note to see if we

18   can find a different -- I'm sure we can figure out some way to

19   affix that plexiglass to counsel table so that we can move the

20   podium without the plexiglass falling.  We'll work on that in

21   the next week or so.

22             THE COURT:  Tracy brings a point that may be of

23   concern to the defense; that is, if we use the two podium

24   approach, one's in front of the other.  One's where the

25   government's table is.  The other would be back behind the

1   government's table.  It places you at a greater distance to

2   the jury.

3            The conventional wisdom at least when I was taught

4   40 years ago was you want to do your direct far away so that

5   the witness is the star and can be speaking loudly, and you

6   tend to want to be a little closer to the witness when you do

7   your cross-examination so the focus is more on you rather than

8   the witness.

9            Maybe the training differs from 40 years ago, but

10  what's the defense's perspective on whether you're comfortable

11  with two podiums or whether you want to have one podium and

12  question from the same place the government is questioning

13  from?

14            MR. WOLPIN:  I would personally prefer -- this is

15  Eric Wolpin.

16            I would personally prefer to be on the closer end.

17  The podium obviously would then be in the way.  One in front

18  of you and then as well as the government attorneys being sort

19  of in front of you.

20            I do think it makes sense to share in that sense

21  and am willing to do so and would probably prefer to do so

22  unless the podiums are truly mobile to the point where they

23  can be sort of scooted around and switched, but cleaning might

24  be faster than actual moving.

25            THE COURT:  Yeah, I think we would have to just

 1   wipe it down.

 2            So we would offer you the two podiums, but if

 3   you -- I'm going to assume based on what you've said to me

 4   that you don't want to exercise that option, in which case

 5   we'll have cleaning between direct and cross which I

 6   understand, Tracy, went relatively quickly during the Musso

 7   trial.  Is that your perception?

 8            MS. UHRIN:  That is my perception is that it was

 9   pretty -- you know, he got right in there and it was pretty

10   efficient.  Jen may be able to provide more -- her perspective

11   on that since I wasn't in the courtroom, but everything I've

12   heard is that it went fairly smoothly, and we'll be using the

13   same person so, you know, it will be the same routine.

14            THE COURT:  Jen, what do you think?  Did it go

15   reasonably quickly, the cleaning part of it?

16            CASE MANAGER SACKOS:  Yes.  And Judge Laplante was

17   very good about -- when the government walked away, he asked

18   Eric to come forward and clean it.  So when Eric came up, he

19   was very meticulous.  He moved slowly but meticulous.  So it

20   wasn't really an annoyance to anyone, and the jury actually

21   commented about it at the end that they were appreciative that

22   he was doing that.

23            THE COURT:  Okay.

24            MR. DAVIS:  The other thing, Judge, was redirect.

25   The government just stayed at the table and used a regular

1    microphone.  So there was only one cleaning between direct and
2    cross but not another cleaning for redirect, and that went
3    fine.
4           And I agree that the delay, if any, was brief and
5    that can certainly be -- it was not a major problem at all,
6    the cleaning part.
7           THE COURT:  All right.  Well, I appreciate that.
8    I'll defer to the defense's wishes here.  We'll just have one
9    podium.  We'll clean between direct and cross.  Any redirect
10   or recross will be done from the counsel table, and we'll move
11   through the trial that way.
12          We'll see if we can reorient the podium to address
13   the issue that Attorney Davis raised, but we do need to have
14   that podium equipped with a monitor so that the person can see
15   the document that the witness is being questioned about.
16          I am interested in understanding what each side's
17   position is with regard to who's going to be sitting at
18   counsel table and whether you're going to be able to maintain
19   social distancing with you and your client.
20          So are there going to be two prosecutors at the
21   government table and then a paralegal at a back table?  Is
22   that how you're planning to proceed?
23          MR. DAVIS:  Judge, I was thinking we would do the
24   same as we did in Musso.  We had -- so Anna and I will be
25   separated by a chair, but otherwise we'll be the two at

1      counsel table.

2              Our paralegal will be at a separate table that's

3      right against the wall and near the law clerk table but far

4      enough apart to work and with all the ability to operate the

5      JERS system and pull the exhibits up.

6              And then our case agent, who is Shayne Tongbua, a

7      Special Agent FBI, sat in the front row against the wall.  So

8      he -- you know, he was not at counsel table but he was in the

9      first row of the gallery and, you know, we could go back to

10     him as needed, but that was our four people.

11             Really the fifth would be Robin Abramson who we

12     asked for and got approval for as being the other government

13     person in the courtroom.  She is our fact witness coordinator

14     and really is the one who, you know, has all the witnesses

15     ready to go in the conference room, you know, all the phone

16     numbers.  So her presence in the courtroom is invaluable.

17             So I guess that's five people total.  There may be

18     times when Jen Hunt, our victim/witness coordinator, would

19     sort of trade out with Robin, but that's our configuration I

20     think.

21             Anna, is there anything else I've left out that you

22     can think of?

23             MS. KRASINSKI:  No.  I don't think so.

24             CASE MANAGER SACKOS:  Judge, this is Jen.

25             This trial is going to be a little different

 1    because where we had the paralegal for the government, that is

 2    the door where the marshals bring the defendant through.  So

 3    we are not going to be able to probably have a table there.

 4              THE COURT:  All right.

 5              CASE MANAGER SACKOS:  So we're going to have to

 6    reconfigure things a little bit.

 7              THE COURT:  I don't know.  Did Judge Laplante have

 8    a law clerk in in his trial?

 9              CASE MANAGER SACKOS:  Yes.

10              THE COURT:  Yeah, I don't think I need a law clerk

11    in in my trial.  So if you want to place the paralegal there,

12    you could.  Well, we'll figure something out.  We'll work

13    something out.

14              CASE MANAGER SACKOS:  Okay.

15              THE COURT:  It won't be exactly as it was in your

16    Musso trial, Mr. Davis, but if you need a paralegal there,

17    we'll find a way to have a paralegal there.

18              What's the defense plan regarding seating at

19    counsel table?

20              MR. WOLPIN:  It will be obviously Jeff and I and

21    Mr. Cantwell.

22              Our investigator will need to be sort of our

23    technology person as far as exhibits and will take on the role

24    similar to their paralegal, and so we would need a spot for

25    him.  That doesn't -- similarly to the government, that can be

1   at a distance, but he would need a spot as well.

2           As to our interactions with the client -- I mean, I

3   have a really hard time, to be honest, imagining operating

4   without some violating of the six-foot rule.  You know, we

5   obviously encourage clients to communicate by notes at times,

6   but that can't always substitute for proximity and some actual

7   conversation.  I think that's something I'm aware of and

8   accept as part of the process.  I know there's a phone --

9   possibility of phone set-ups.  I mean, it's conceivable but

10  kind of a clunky way to do it.

11          THE COURT:  Well, let me ask you this.  I'm a

12  little concerned that if you have three of you at counsel

13  table you're not going to be able to maintain social

14  distancing during the entire trial, right?  You'll be -- if

15  you envision the three of you sitting together -- if you feel

16  like it's important to sit with your defendant, you could have

17  one counsel and the defendant sit at counsel table and

18  co-counsel sit at a table behind, and you could rotate who sat

19  with him based on who was doing what.

20          I mean, if you tell me, Judge, I really feel very

21  strongly that I need to have the three of us sitting at the

22  table, and I understand that that poses increased risks for us

23  but those are risks that I'm prepared to assume and I really

24  think it's important, I want to consider what you have to say,

25  but I also want to offer you the opportunity to have two

1   people at counsel table and have the second attorney sit back

2   or have the defendant sit back and have you communicate with

3   him on an as-needed basis.

4          I leave that initially to you to think about and

5   propose something to me and I'm inclined to defer very heavily

6   to what you would like to do, but I want you to know that I

7   will give you the option of having two people per counsel

8   table with a space in between like the government is proposing

9   and if necessary, we'll find a way to fit a second table in

10  there for the third lawyer.  But if you feel very strongly

11  that the three of you have to be sitting together, I'll be

12  willing to consider that, too.  I would like you to think

13  about that and let me know next week what you would propose

14  specifically, okay?

15         MR. WOLPIN:  Okay.  We'll have that conversation

16  internally here.  Thank you.

17         THE COURT:  All right.  I want to talk about

18  evidence.

19         So this is one area where my case manager I think

20  has convinced me that things could run a little more smoothly

21  than they did run, and that is some of the challenges that the

22  JERS system pose that the parties should know about, I know

23  Mr. Davis knows about it, but that you have to have the right

24  naming convention for your exhibits and people have to keep

25  track of what exhibits have been admitted and what are marked

1    for ID.  They have to be able to review with the case manager

2    the exhibits that have been admitted into evidence so that we

3    can assure ourselves that only those exhibits will in fact go

4    to the jury.  So that process needs to run a little more

5    smoothly than it ran during the Musso trial, and I think some

6    of the problem may be addressed by the fact that we're having

7    disclosure of exhibits earlier than was required in Musso.

8             But I would ask my case manager if you could add

9    any detail to what you would like to see from the parties so

10   that we can ensure that the exhibits are dealt with as

11   effectively as possible.

12            CASE MANAGER SACKOS:  Judge, this is Jen.

13            I think that if there can be more agreement with

14   regard to exhibits, if possible.  A lot of exhibits were

15   marked for ID in the Musso trial.  Judge Laplante kind of

16   wanted the parties to get together and work on that.

17   Obviously it didn't happen a couple of times and obviously

18   things were, you know, tougher because it was the first COVID

19   trial.

20            Getting the exhibits to Vinny and I before, you

21   know, much sooner is definitely going to help because you're

22   going to have to give it to us in two different ways.

23            And then moving exhibits into evidence, you know,

24   telling out loud, you know, this is marked for ID, so that

25   we're making sure that the jury isn't seeing it if they're not

1    supposed to, just to remember to do that and keep it running

2    smoothly, that would help.

3              THE COURT:  All right.  So I think -- I would

4    strongly encourage the parties to try to meet and confer.

5    Both sides are very experienced attorneys.  I'm fairly

6    transparent about how I use the rules of evidence.  I think I

7    use them the way they're supposed to be used.  I understand

8    them and I apply them.  People should be able to meet and

9    confer and agree about a subset of exhibits that are either

10   noncontroversial or the government can demonstrate beyond

11   question that the foundation can be laid for their admission.

12              And I would urge you, not require you, but urge you

13   to try to reach agreement regarding admission of exhibits

14   prior to the start of trial.  To the extent you can't, I

15   understand, they will be marked for identification, but I want

16   to insist that the parties alert the Court before they display

17   any exhibit that has not been admitted as a full exhibit.  I

18   mean, everybody makes mistakes and I will be forgiving of a

19   mistake, but I will grow increasingly frustrated with you if

20   you on more than one occasion try to put up an exhibit that's

21   been marked for ID in a way that discloses the exhibit to the

22   jury.

23              So it's in your interest to try to reach agreement

24   if you can.  I urge you to do so.

25              I want you to be very attentive to using the

1   correct naming convention so that the JERS system will

2   function appropriately, and I want you to be -- the clerk

3   keeps a running list of what's admitted and what's an exhibit,

4   and you should do that as well.  And we should have some time

5   built in after the closing arguments for the lawyers to review

6   the final exhibit list with the case manager to make sure that

7   only the right exhibits get to the jury.

8           We will be using the JERS system as the official

9   means of presenting the exhibits to the jury.

10          Does anybody have any comments, questions, concerns

11  about exhibits?

12          MR. WOLPIN:  I have two.

13          One, you know, I'm not as familiar with JERS --

14  this is Eric Wolpin -- as maybe some of the other

15  participants.  You know, I certainly expect that I may ask the

16  clerks if I can come in before trial and at least speak with

17  them or go through the system so I'm a little more familiar

18  with it so we avoid any of the kind of issues you're talking

19  about.  That's thing number one.

20          Number two, I guess I have a question, because I'm

21  not familiar with it as much, as to how -- for example, in a

22  normal trial if I had to refresh recollection, I might bring

23  up with me a transcript and show it to the witness.  Obviously

24  the jury wouldn't see that item.  Is there something built

25  into this system?  Are we going to have an exception for paper

1  in that scenario where it's not something that's necessarily

2  going before the jury but that is being presented to a

3  witness?  That may or may not even be an exhibit.  It may be a

4  transcript that's not admissible as a transcript but would be

5  useful in that purpose.  So I guess that's my question.

6              THE COURT:  Well, yeah, generally you don't need to

7  have any paper in a trial like that to refresh a witness's

8  recollection.  You could have the transcript marked for

9  identification purposes.  Because really, in my trials at

10  least, everything that you show a witness should be marked for

11  identification in case we have to have an argument about it

12  after the trial or on appeal.

13              So ordinarily I would say mark your grand jury

14  transcript for identification and you would just say to the

15  paralegal, I want to show the witness exhibit blank for

16  identification at page 43.  You telling me that it's for

17  identification alerts the case manager that the right button

18  needs to be pressed so that the jury is not seeing it.  The

19  witness then sees it on their screen.  And then you say,

20  please read lines 35 to 40 to yourself.  Having done so, does

21  that refresh your recollection?

22              So that's the way you could do that in a purely

23  electronic system.

24              In terms of training, practice, whatever, I'm happy

25  to make adjustments to let you do whatever you need to do on

1     that.  We just need to -- you need to give us advance notice

2     so we can make sure that the room is available and there

3     aren't people in there and so on and so forth, but we can --

4     to the extent you need to be made familiar with certain

5     aspects of JERS or the electronic evidence presentation

6     system, we can certainly make time available to ensure that

7     you get whatever exposure to it that you need.

8                 MR. WOLPIN:  Thank you.

9                 THE COURT:  All right.  Anything else on exhibits?

10    Okay.

11                The only other issue on my agenda list is the

12    informant motion.  I've reviewed it and I want to know what

13    the defense position is.

14                Do you need a hearing?  Do you want a hearing?  Do

15    you want a Zoom hearing?  How would you like me to address the

16    issue?

17                From my own perspective I think I have everything I

18    need to decide it on the papers, but if you -- or I could hold

19    a -- it doesn't appear to me that I need to hear evidence on

20    it.  I could easily do a Zoom hearing with the defendant if

21    that's how you would like to proceed.  I'm willing to do

22    almost anything you want.

23                What does the defense want to do?

24                MR. WOLPIN:  I think there's value in a Zoom

25    hearing.  I think that can not happen in person and achieve

1    the same ends based on the legal arguments.  I don't think it

2    would be overly lengthy or onerous, but I do think there's

3    some value in it.

4              THE COURT:  Okay.  I'm fine with that.

5              Does the government have any problem with setting

6    that down for a Zoom hearing?

7              MR. DAVIS:  No.

8              MS. KRASINSKI:  No, your Honor.

9              THE COURT:  There is one thing as I think this

10   through, Mr. Wolpin, maybe you can help me on as we prepare

11   for that hearing.

12             So I ask the clerk to set it for a hearing --

13   probably if we could do it later this week.  It should take an

14   hour or less to do.

15             CASE MANAGER NEGRON:  Yes, Judge.

16             THE COURT:  But one of the things I'm thinking

17   through, Mr. Wolpin, or Mr. Levin, whoever wants to comment on

18   this, if you were to succeed in getting the informant's

19   identity disclosed and things were to work out well for you,

20   what would happen?  Would you call the -- would you try to

21   call the informant as a witness to elicit the information

22   about drug use that you think is helpful to your impeachment

23   challenge to Cheddar Mane?  Is that what you would be planning

24   to do?

25             MR. WOLPIN:  Yes.

1          THE COURT:  Okay.  And what would be the theory

2   under which that testimony would be permissible under the

3   rules of evidence?

4          MR. WOLPIN:  Again, the basis for relevance is that

5   this is a statement that is inconsistent that's not extrinsic

6   to the case.  This is not some prior, you know, 2002 false

7   statement on a form.  This is like any other situation where

8   someone is testifying about a fact that's of relevance to the

9   case who says that day, and it turns out to be, you know,

10  demonstrably, or I guess if there's a credibility concern, but

11  that is evidence that it's in fact untrue, I think that allows

12  for the presentation of evidence that the person has not been,

13  A, truthful with the jury here potentially as well as not

14  truthful with the grand jury and the FBI.  To exclude that I

15  think is to put that person -- basically avoid a credibility

16  concern that's central to the case.

17         THE COURT:  Would it be fair to say that your

18  theory would be, Judge, I'm entitled to call this witness and

19  the theory under which I'm entitled to call this witness would

20  be to call him to impeach by contradiction?  That's what I

21  would understand what you're doing.  It would be called

22  impeachment by contradiction.  Is that making sense to you?

23  Is that consistent with what you're thinking you're doing?

24         MR. WOLPIN:  Yes.  Yes.

25         THE COURT:  Okay.  And so the quick work that I've

1    done on that is you would start by saying, okay, is this a

2    608(b) issue, and it isn't really a 608(b) issue, but it is an

3    exception to 608(b) that potentially allows extrinsic

4    evidence only where it is not collateral and only where the

5    statement being contradicted is brought up on direct.   In

6    other words, the case law that I've seen in the circuits that

7    I've seen suggest that impeachment by contradiction is an

8    exception that allows for the use of extrinsic evidence only

9    when the matter is not collateral and only when the statement

10   being contradicted is not brought out for the first time on

11   cross-examination.

12           So I'm wondering if you've thought through how you

13   would anticipate that issue.  And I know you haven't been --

14   we aren't doing oral argument on it.  I'm raising this with

15   you now just to -- as I've been reading and thinking about it,

16   that's an issue that I'm not fully understanding what your

17   position is on it.  So you don't have to say anything today,

18   but when we do the argument, I am going to want to ask you

19   what would you -- if I ordered the identity disclosed, what

20   would happen?  We would then -- I think it is we would

21   subpoena them, bring them to trial, and try to get them to

22   contradict Cheddar Mane's statement to the grand jury that

23   he's not a drug user.  I think that's what you would be trying

24   to do, and I think that's called impeachment by contradiction,

25   and I think there's a problem with that either under 608(b) or

1    the exception to 608(b) for impeachment by contradiction.

2            I mean, I have to go back to 40 years ago to law

3    school to be thinking about that particular issue, but it's

4    something I want you to address.  I have found case law in

5    multiple circuits that enforces both a requirement that it not

6    be collateral and that it not be -- you can't open the door to

7    it by raising it for the first time on cross.

8            I guess I would ask the government.  Are you

9    proposing to elicit an affirmative statement from Cheddar Mane

10   that he's not a drug user on direct?

11           MR. DAVIS:  I don't think so, Judge.

12           THE COURT:  So if it doesn't come up on direct,

13   then the question is how do you introduce it in front of the

14   jury; except to try to show he made a statement under oath in

15   the grand jury and you want to show that statement is false.

16           I understand the government has a threshold

17   argument.  The government's threshold argument, as I

18   understand it, is that the informant doesn't have personal

19   knowledge of drug use by Cheddar Mane, and the records in the

20   case demonstrate conclusively that whatever knowledge he

21   claimed to have was gleaned from participation in a chat room

22   and all of those chats were provided to the defense.

23           Ms. Krasinski, I think you were the drafter on

24   that.  Have I got your position right?

25           MS. KRASINSKI:  Yes, your Honor.

1          THE COURT:  And I understand that position and we

2   certainly will go through it, but I think we also have to then

3   analyze -- because I have to weigh the importance of the

4   information to the defense.  And if the defense is saying it's

5   important because we want to be able to call him as a witness

6   but they wouldn't be able to call him as a witness, that

7   obviously creates a problem.

8          So I would ask the parties to be prepared to

9   address that issue at the oral argument.

10          Does anybody want to say anything else about the

11   informant motion?

12          CASE MANAGER NEGRON:  Judge, this is Vinny.

13          THE COURT:  Yes, Vinny.

14          CASE MANAGER NEGRON:  I'm told that Zoom -- having

15   a sealed hearing using Zoom is problematic, and I believe

16   Tracy has more information about that for you.

17          THE COURT:  I'm sorry, Vinny, I couldn't hear you.

18   Could you repeat what you're saying?

19          CASE MANAGER NEGRON:  The motion was filed under

20   seal, and if it's going to be a sealed hearing, Zoom is

21   problematic, and Tracy has more information for you.

22          THE COURT:  Right.  So I mean I think I know as

23   much as Tracy about this, but Tracy, feel free to contradict

24   me.

25          I think the Court has made a decision out of an

1    abundance of caution because of earlier reports about

2    Zoom-bombing and hacking of Zoom that we were reluctant to

3    conduct sealed proceedings via Zoom.

4              Is that basically what we're talking about, Tracy?

5              MS. UHRIN:  I think the major issue is that Zoom

6    does not have end-to-end encryption, and so I think

7    technically somebody at Zoom can access the hearing.  That's

8    my very basic understanding of the difference between, you

9    know, the level of encryption they have and what they don't

10   have.

11             THE COURT:  Right.  So they do encrypt, but they

12   don't have end-to-end encryption.  So it gets encrypted from

13   here to Zoom and from Zoom out, but they haven't yet adopted

14   end-to-end encryption as do other programs like Microsoft

15   Keys.  So that is an argument that a very sophisticated hacker

16   could potentially compromise a sealed proceeding.

17             This proceeding would not involve the disclosure of

18   the identity of the informant.  It involves legal argument

19   about the informant and whether the informant should be

20   disclosed.

21             I do not consider that kind of risk to be so great

22   as to preclude the use of Zoom for a hearing like this, but if

23   the parties have that kind of concern, we can consider the

24   alternative of an in-person hearing.

25             Thank you for reminding me about that, Vinny.

1          What's the government's thinking about this and

2     then what's the defense thinking?  Have I made clear the

3     problem?

4          There are some perceived -- although I have not

5     seen any report of any actual hacking of a Zoom call by

6     someone at Zoom looking in or somebody hacking Zoom and

7     gaining access to its ability to decrypt things.  The problems

8     with Zoom that have occurred have all been, that I'm aware of,

9     at least some of the problems have been corrected, have all

10    been Zoom bombing problems where we haven't had adequate

11    password protection.

12         Here we use the waiting room.  We use passwords.

13    We use zoom.gov.  We have the -- in my mind I'm completely

14    comfortable in conducting this proceeding using Zoom even

15    though it is a sealed proceeding, but if the parties have

16    concerns, I certainly want to hear them.

17         What are the government's thoughts?

18         MR. DAVIS:  Judge, I think we're fine with it.

19         We also wouldn't object to just a telephone

20    conference if that's more secure.  But I agree with you, you

21    know, I don't think we're prohibited from participating in a

22    court Zoom conference.  I don't think we're allowed to use it

23    ourselves still but --

24         Anna, do you know anything further on that?

25         MS. KRASINSKI:  I don't, and I -- sort of thinking

1    out loud here, I don't know the answer as to whether or not

2    there are additional encryption issues in a breakout room.  I

3    mean, I don't know if that adds some additional security, but

4    I would be comfortable just on a Zoom hearing that we know was

5    not public.

6                THE COURT:  Well, Mr. Davis raises an alternative

7    to having to do an in-person hearing.  We could do the hearing

8    by telephone.  It's not my preferred way of doing it, but I

9    have done hearings by telephone.  We have a court reporter.

10   The parties can present their oral arguments.  The defendant

11   could listen in on the phone call and if necessary communicate

12   with counsel through a separate phone line whenever necessary.

13               The only thing that would be lost there is the

14   actual ability to see counsel, but I wouldn't be making

15   findings of fact.

16               Where I'm reluctant to do telephone conferences

17   even where they're allowed is when I have to make findings of

18   fact and assess credibility.  Here I would be hearing legal

19   argument and so I would be willing to do it by telephone if

20   the parties would be more comfortable doing that.

21               Does the defense have a view on that particular

22   issue?

23               MR. WOLPIN:  Our preference would be Zoom.  It's

24   just a more effective presentation in my opinion to see faces

25   in the same way it is at a trial and for our client as well to

1    see that process.  I think there's an unlikely sort of limited

2    possibility of error I see, but I think what's to be gained by

3    a Zoom hearing is certainly preferable on our end.

4              THE COURT:  All right.

5              And I would just counsel the parties, I'm sure they

6    wouldn't do this anyway, but don't disclose during the call

7    any identifying information about the informant other than

8    what's in the materials that you've supplied, and I'm

9    comfortable doing it by Zoom.

10              So let's plan on that, Vinny.  I don't believe

11    there's any court order that has restricted this.  I think I

12    was the one that came up with this restriction myself.  And I

13    do think there are times when I'm reluctant to deal with

14    sealed matters on Zoom, but this isn't one of them unless

15    there's some sort rule that I have to contend with.

16              Tracy, do you know of anything?

17              MS. UHRIN:  No, there's no formal policy.  It's

18    just kind of our practice that sealed issues are dealt with by

19    telephone or in person.

20              THE COURT:  Okay.  Well, I'll make an exception in

21    this case.  We will hold it by Zoom and the clerk will

22    schedule it for later in the week.

23              All right.  Does anybody want to say anything more

24    about the informant disclosure question?

25              MR. WOLPIN:  No, your Honor.

1                    THE COURT:  No?  Okay.

2                    So I'm going to be very interested to get jury

3     instructions from the parties, special voir dire from the

4     parties.

5                    We're holding another conference next week so the

6     parties can talk to me about their refined thinking,

7     particularly the defense, about social distance and seating at

8     counsel table.

9                    Other than that, I think we've covered everything

10    that I'm concerned about, and I think we can have a good trial

11    that will be conducted safely and efficiently and fairly.

12                   Are there other things on anybody's agenda that

13    they want to take up with me?  No?

14                   MR. WOLPIN:  No.

15                   THE COURT:  Okay.  And nothing from the government?

16                   MR. DAVIS:  No, Judge.

17                   THE COURT:  Okay.  Thanks.

18                   Keep working cooperatively and we'll look for your

19    materials as they come in specifying the pretrial order.

20                   Anything else from my case managers that I need to

21    raise?

22                   CASE MANAGER NEGRON:  No, your Honor.

23                   THE COURT:  No?  Okay.  Tracy, anything from your

24    end we need to talk about?

25                   MS. UHRIN:  No.  I think we're good.

1          THE COURT:  Okay.  Thank you everybody.  That

2   concludes the conference.

3          (Conclusion of hearing at 12:06 p.m.)

1                        C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings, to the best of my knowledge, skill,

7     ability and belief.

8

9

10    Submitted: 5-4-21          /s/   Susan M. Bateman _____
                                 SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25