**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   20-cr-06-01-PB
            v.                    *   September 18, 2020
                                  *   11:01 a.m.
     CHRISTOPHER CANTWELL         *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           U.S. Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defenders Office




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

<pre>
 1                    P R O C E E D I N G S
 2            THE COURT:  There's been a request from the media
 3   to view this Zoom hearing.  The hearing is on motions in
 4   limine.  Several of the motions make reference to matters that
 5   are filed under seal.  In fact, several of the motions may
 6   themselves have been filed under seal.
 7            I'm asking the parties' position as to whether the
 8   hearing will inevitably involve discussion of sealed matters.
 9   Starting with the government and then hear from the defense on
10   that issue.
11            You're muted, Mr. Davis.
12            MR. DAVIS:  The government's argument does not
13   require discussion of specific sealed matters that I know of.
14   We would defer to the Court and the defense.  We wouldn't
15   object to sealing at least a portion of the hearing if
16   specific sealed matters need to be discussed, but I don't
17   think we are going to be straying into sealed matters in any
18   argument.
19            THE COURT:  All right.  Mr. Levin or Mr. Wolpin,
20   one of you, what's your position?
21            MR. WOLPIN:  I guess -- is Mr. Cantwell on?  I
22   mean, to some degree I know what my position would be, but if
23   his right to a fair and open public trial I think is
24   implicated, I would like to have a moment with him, if I
25   could, before I respond.
</pre>

1              THE COURT:  All right.

2              Why don't you move Mr. Cantwell and his lawyers

3     into a breakout room and let them discuss the matter.

4              MR. WOLPIN:  Thank you.

5          (Attorney Wolpin and Attorney Levin and defendant go into

6     a breakout room)

7              THE COURT:  All right.  Mr. Wolpin, what's your

8     position?

9              MR. WOLPIN:  Our preference would be that the

10    hearing be open to the public.

11             To the extent we wish to address the sealed

12    filings, we would ask that portion be sealed.

13             To the extent that some of it we can discuss -- I

14    mean, the two things that we brought up that would be sealed,

15    some of it we can discuss not using the agent's name, for

16    example, in one of the motions, which is how -- what we sealed

17    I didn't feel appropriate putting the name in the motion

18    publicly.

19             And then the other documents I think can be either

20    referenced separately under seal or I know the Court will have

21    read them and I can reference them in a generic sense.

22             So those are the ways we could deal with it.

23             THE COURT:  All right.  I would ask my case

24    manager, has the reporter been informed of his or her

25    obligations with respect to participation by Zoom, that is,

1  that they are barred from recording any of the proceedings and

2  that they may not appear visually or speak, they can simply

3  observe, make notes, and report on what they observed?  Has

4  that reporter been advised of that?

5              THE CLERK:  Yes, your Honor.

6              THE COURT:  Okay.  And can you give that reporter a

7  Zoom link?

8              THE CLERK:  Yes, I can.

9              THE COURT:  All right.

10             So the government does not oppose granting the

11  reporter a link.  The defendants request that there be a Zoom

12  link provided for the reporter.  The defendant has a right to

13  a public trial.  In addition, there's a public right to a

14  public trial that goes beyond even the defendant's rights.

15             I do have some concern about the extent to which we

16  discuss motions in limine and I were to grant requests to

17  limit testimony, and then there is public reporting about

18  matters that I have excluded from the trial.  There are added

19  risks that one or more jurors will become inadvertently

20  exposed to that which I am ordering should not be in the

21  trial.

22             But given that the defense wants it in the public

23  record, I will accommodate that request.  The parties just

24  need to be mindful of the risks that result from that, and

25  we'll have to rely on the jurors to follow my instructions and

1    not expose themselves to any discussions of the case in the

2    media.

3            So given the fact that the defendant wants the

4    matters in the public record, the government doesn't object,

5    given the defendant's right to a public trial and the public's

6    interest in a public trial, and the fact that we can discuss

7    the motions without referencing sealed materials, and to the

8    extent that the parties want to discuss sealed materials, they

9    can ask that we conduct a portion of the proceeding under

10   seal, if I agree to do that, the reporter will be moved back

11   into the waiting room for the sealed portion of the hearing

12   and brought back after the sealed material is properly

13   evaluated.

14           Does everybody understand how I propose to proceed?

15   Any objection?  No objection.

16           Please give the reporter a link and he or she can

17   observe the hearing.

18           THE CLERK:  Okay.

19           THE COURT:  All right.  I have everybody on.  The

20   case manager will call the case.

21           THE CLERK:  The Court is in session and has for

22   consideration motion hearing in United States of America

23   versus Christopher Cantwell, criminal case

24   number 20-cr-6-1-PB.

25           THE COURT:  All right.  I'm holding this hearing on

1    motions in limine.  I remind the parties that if they intend

2    to discuss any matters that are not appropriate for the public

3    record, they should ask to conduct a portion of the hearing

4    under seal, and I will rely on the parties to make sure that

5    we don't inappropriately comment on any sealed materials.

6            There are several motions in limine pending.  I'll

7    hear the government first on any motions in limine it has and

8    then hear from the defendants.  You can take up -- to the

9    extent you have multiple requests, you can take them up in

10   whatever order you choose.

11           So whatever the government wants to say in support

12   of any motions it has filed, identify the motion you're

13   addressing and present your argument, I'll hear from the

14   defense, and then provide any guidance that I feel I can

15   provide after hearing it.

16           MR. DAVIS:  Your Honor, I'll address two motions in

17   limine filed by the government and also, because it's I think

18   related, the objection to the defendant's motion in limine

19   No. 1.

20           The first motion in limine is to exclude evidence

21   of political opinions or endorsements of violence or racist or

22   anti-Semitic statements attributed to the victim or the

23   victim's associates.

24           We filed that and it is our conviction that this

25   case is not about the Bowl Patrol's various rants and

1    despicable statements that they made in a number of podcasts.

2    Many of which included the victim in the case.  The defendant

3    wants to make this case about those statements, but they're

4    not relevant.

5              This is not a case that's about self-defense.  It's

6    not a case where provocation is an admissible affirmative

7    defense.  It's not a case where the jury could or should

8    acquit the defendant because of its belief that the victim has

9    such horrible beliefs that the evidence should be effectively

10   nullified.

11             The government does not see that the political

12   views or statements by the Bowl Patrol is relevant.  And if

13   the Court permits the defendant to go there, there is a real

14   risk of undue prejudice against the victim and a great risk

15   that the trial itself will be derailed into long excursions

16   about what was meant when and what was performance art and

17   what wasn't, and whether the defendant was involved at the

18   time or whether he knew about it at the time, whether the

19   victim knew about it or was involved, et cetera.

20             This case is not about those things and so we have

21   filed that motion.

22             The second motion in limine is --

23             THE COURT:  Let me stop you and let's talk a little

24   bit about that, okay?

25             MR. DAVIS:  Okay.

1          THE COURT:  I have difficulty in seeing how you are

2   going to be able to present your case without any reference to

3   communications between the defendant and the alleged victim

4   which were communications that I understand occurred in a

5   Telegram chat session or sessions involving the defendant, the

6   alleged victim, and members of the Bowl Patrol.

7          I may have the facts wrong.  Can you help?

8          MR. DAVIS:  That's not entirely correct, Judge.

9          And a key part of this case is that the actual

10  threatening communications were private; that is, these

11  threats were not made as part of some sort of entertainment

12  back and forth.  The defendant went after the victim in

13  private communications that just the two of them received and

14  saw.

15         THE COURT:  All right.  Again, I know nothing about

16  the case.  You know all the facts of the case.

17         I do recall because I was asked to rule on a matter

18  dealing with the Telegram chat sessions that were on Mr.

19  Cantwell's phone.

20         Do you know what I'm talking about?

21         MR. DAVIS:  I think so.  The Telegram chat sessions

22  between the victim and Mr. Cantwell which are the subject of

23  the indictment?  Yes.

24         THE COURT:  I thought that they were also

25  communications that involved not just the two of them on his

1    phone.  There were other communications over Telegram that

2    involved -- some involved Mr. Cantwell, some involved the

3    alleged victim, and some involved others as well who are part

4    of the Bowl Patrol.

5            MR. DAVIS:  So Judge, after the communications were

6    made -- and again, they were private when made.  They were

7    between two people only.

8            THE COURT:  I get that part.  But again, with

9    respect, the way it's been presented to me over and over again

10   in our communications is that there was a relationship, online

11   relationship here that resulted from interactions that Mr.

12   Cantwell was having with members of the Bowl Patrol.  Am I

13   just making that up?  I mean, never happened?  Don't know

14   anything about it?

15           MR. DAVIS:  No.

16           THE COURT:  It sounds like this is shocking to you,

17   that this is something that you don't even understand what I'm

18   saying.

19           I'm sorry to be so ill-informed, but please -- if I

20   am not ill-informed, please get to the point and acknowledge

21   what we know to be the case.

22           MR. DAVIS:  Okay.

23           Judge, immediately after the private

24   communications both --

25           THE COURT:  Let me stop you.  There were no

1  communications involving Mr. Cantwell, the alleged victim, and

2  the Bowl Patrol prior to what you say are the threats?  Is

3  that what you're telling me?

4            MR. DAVIS:  No, I'm not telling you that at all,

5  Judge.

6            THE COURT:  Well, that's what I'm trying to get at.

7  There are in fact a whole raft of communications between Mr.

8  Cantwell and members of the Bowl Patrol, and some of those

9  communications involve the alleged victim as well.  Right or

10  wrong?

11            MR. DAVIS:  Yeah, that's correct.  There was a --

12            THE COURT:  Okay.  So the -- just bear with me and

13  let me ask my questions and I'll give you an unlimited

14  opportunity to say whatever you want to say for as long as you

15  want to say it.

16            But the defense, as you well know because they've

17  raised this with me in multiple court hearings, has said we

18  have a defense to this charge, Judge.  Our defense is that

19  when you understand the context in which Mr. Cantwell made the

20  statements that are attributed to him, it will become clear

21  that Mr. Cantwell was not trying to extort, was not trying to

22  threaten, that in context the jury will understand that these

23  communications were not made with criminal intent.

24            Mr. Wolpin, is that part of your defense?

25            MR. WOLPIN:  Yes.  That's fair.

1          THE COURT:  Okay.  So you understand that's his

2    defense.  So let's not pretend like it doesn't exist.

3          And his whole argument is we have a series of

4    communications in which the defendant and Mr. Cantwell to

5    which they were parties before these threats were made, and

6    some of that is going to have to come out during the trial.

7          I thought you would be readily acknowledging to me,

8    of course, Judge, in order for me to prove my case I've got to

9    talk about the Bowl Patrol because otherwise none of this will

10   make any sense to anybody.

11         I mean, do I have that elemental part of this what

12   I understand to be your case wrong?  I mean, are you telling

13   --

14         MR. DAVIS:  No, I agree.

15         THE COURT:  Let me just finish my -- wait till I

16   stop and then you can say what you want to say.

17         MR. DAVIS:  Okay.

18         THE COURT:  But it seems to me quite obvious that

19   even in your case for context there's going to have to be some

20   evidence about how these people came into contact with each

21   other and what Mr. Cantwell was trying to get Cheddar Mane to

22   do.

23         And in order to explain your argument about

24   extortion there's going to have to be some evidence of Mr.

25   Cantwell's white nationalist views and what the Bowl Patrol is

1   and how these people interacted over the Bowl Patrol and how

2   Cheddar Mane came to have some interactions with Mr. Cantwell.

3           That seems to me to be like basic step one in your

4   prosecution.  For you to present your theory, some of that is

5   going to have to come in.  For the defense to present its

6   theory, some of that is going to have to come in.

7           So it's not a case where the motion in limine is

8   sanitize this case to the point that no one knows that anybody

9   has any white nationalist views here because I don't think I

10  can do it and I don't even think you're asking me to.

11          Are you asking me to do that?

12          MR. DAVIS:  I'm not.

13          THE COURT:  Okay.  That's what I'm trying to

14  establish here.  It's not a case of absolute exclusion.  It's

15  a case of line drawing.  How much do you allow.  Is that not

16  right?

17          MR. DAVIS:  I think it is right, Judge.

18          THE COURT:  Okay.  So help me draw the line.  What

19  do you think you should be able to do and what do you think

20  the defense should be able to do that involves expressions of

21  white nationalist views, expressions of violence, expressions

22  of extreme kind of offensive behavior?  What do you think

23  should be allowed to come in on that?

24          And then I'll hear from the defense.

25          MR. DAVIS:  So Judge, I think the key distinction

1    here is between -- the communications between the victim and

2    the defendant, which are quite limited and quite discrete and

3    I agree are relevant and admissible, the communications

4    between the victim and the defendant.

5            And the separate category, which is basically 80

6    percent of the defense exhibit list, which is simply the Bowl

7    Patrol's various expressions in their podcasts which are not

8    communications with Cantwell.

9            THE COURT:  All right.  Let me stop you.

10            Do you agree that any evidence they have that is

11    otherwise admissible because there's a foundation that's been

12    laid for it that involves a communication in which Mr.

13    Cantwell was a party and Cheddar Mane was a party, that those

14    communications are not subject to your motion in limine where

15    both of them are on together exchanging information?

16            Are you trying to limit the defense's ability to

17    introduce evidence of those interactions if there are any

18    apart from the ones that you say are the criminal

19    communications?

20            MR. DAVIS:  So I don't mean to be lawyerly about

21    it.  I can imagine there might be a communication or two that

22    involves both Cantwell and the victim that is highly

23    inflammatory as to both the victim and the defendant and shows

24    nothing about the mindset of the two related to the charged

25    offense where it still would be proper to exclude under 403.

1          But in general -- for instance, there is a record

2     of calls by the victim to the defendant's show.  Both parties

3     have prepared those records, and I agree that records of the

4     victim calling the defendant's show and when those happened

5     and when they stopped happening is relevant, sure, but --

6          THE COURT:  Let me stop you.

7          This illustrates why judges do not make rulings in

8     advance of trial on evidentiary questions that are as involved

9     as this, right?  You're essentially asking me to limit

10    evidence before I even know what the case is about.  This

11    illustrates why this is usually such a waste of time for

12    judges to get involved in efforts to limit evidence before

13    they even know what the case is about.

14         I'm doing this as a courtesy to both of you.  I'm

15    going to tell you quite simply unless you can satisfy me that

16    I have a full and complete understanding of all relevant

17    information that I need to make a reliable ruling, I will

18    simply refuse to rule and let it evolve the way cases

19    ordinarily evolve, which is the judge learns about the case,

20    hears the evidence, decides based on the evidence that's come

21    in what limitations should be made on additional evidence.

22         So you're telling me, though, there were a series

23    of call-ins to the defendant's Internet whatever it is, radio

24    show, whatever you want to call it, between Cheddar Mane and

25    the defendant, and you are not seeking to limit the use of

1   those calls, right?

2           MR. DAVIS:  Correct.

3           THE COURT:  There are also some private Telegram

4   communications between the defendant and Cheddar Mane, and

5   you're not seeking to limit those?

6           MR. DAVIS:  Correct.

7           THE COURT:  There will also be evidence in your own

8   case about the Bowl Patrol, what it is, why it has the name

9   Bowl Patrol, what its general views are.  Is that not right?

10  I mean, how do you keep that out?

11          MR. DAVIS:  There will be some limited evidence,

12  Judge, yes.

13          THE COURT:  Okay.

14          MR. DAVIS:  I certainly don't -- I'm not going to

15  ask the victim to accurately set forth the views of the Bowl

16  Patrol.  I was not going to ask him that.

17          THE COURT:  Right, but it's going to come out what

18  the Bowl Patrol is.

19          MR. DAVIS:  Yes.  I think that's true, yes.

20          THE COURT:  It will have to come out what the Bowl

21  Patrol is for this to make any sense, and we can't so sanitize

22  a trial that the jury can't even understand the context in

23  which things are happening.

24          Now, hypothetically if there were communications in

25  which Cheddar Mane was found to be joking about raping

1  somebody's spouse, that would become relevant, right, in

2  understanding the context for these particular communications?

3          MR. DAVIS:  So Judge, I think it probably would,

4  yes.  That is --

5          THE COURT:  Because it's clear based on the

6  context -- if somebody threatened somebody and there have been

7  back and -- use of communication that I would think is

8  threatening, but it's clear that they've been joking with each

9  other about engaging in that behavior for years, that would be

10  useful information in evaluating a charge threat, right?

11          MR. DAVIS:  I think that's right.

12          What I've said I think in both pleadings is as long

13  as the defense can show the communication involves the victim

14  and not some other person and that the communication occurred

15  before and not after the threats in June '19, and most

16  importantly, that the defendant knew about the joking about

17  rape, if that's what it is, I think if those things can be

18  shown, I think the government likely would not object.

19          THE COURT:  All right.  That's what I'm trying to

20  get from you.  It's like pulling teeth unfortunately, but I

21  think now I understand your position.

22          Let me turn to Mr. Wolpin and ask the other side of

23  this.

24          Mr. Wolpin, you have acknowledged to me on many

25  occasions that it is not your intention to waste the jury's

1    time with hours and hours of review of shocking communications

2    by members of the Bowl Patrol.  Just like if your client had

3    engaged in hours and hours of shockingly bad statements, you

4    would not want the jury to be hearing that, and I would not

5    allow that.

6           I think you have suggested to me that you also will

7    readily acknowledge that this isn't an unlimited opportunity

8    for you to spend hours and hours reviewing every outrageous

9    thing that the Bowl Patrol people may have said, right?  Do

10   you agree with that as a basic proposition?

11          MR. WOLPIN:  I do.  I do.

12          THE COURT:  You've said that to me many times.

13          So this was really a question about line drawing,

14   what kinds of communications should the jury be able to hear.

15          I believe Mr. Davis has said, if I'm understanding

16   him correctly, evidence of communications by Cheddar Mane that

17   are communicated directly to your client or that you can show

18   by some means that he was aware of prior to the time he had

19   his private communications with Cheddar Mane that are the

20   subject of these charges, that Mr. Davis would agree that

21   those communications in all likelihood should be fair game if

22   you can lay the appropriate foundation for their admission.

23          He also I think acknowledges that there will have

24   to be some references to the Bowl Patrol and essentially what

25   it is.  So I think that much doesn't appear to be in dispute.

1          I think you acknowledge that there are limits on

2    the usefulness of evidence for the jury about the Bowl Patrol

3    saying outrageous things about unrelated matters in which

4    neither the victim nor your client were present when they were

5    said, right?  Do you agree with that?

6          MR. WOLPIN:  Yes.

7          THE COURT:  Okay.  So let's then try to narrow down

8    this universe and have you specify for me exactly what it is

9    that you think you need to get in about outrageous statements

10   by the Bowl Patrol, and then we can maybe -- I can maybe give

11   you some guidance about them.

12          MR. WOLPIN:  So as the Court has noted, the context

13   of this begins long before June 2019.  For us it begins

14   certainly in the fall of the year before.

15          That was a time when the relationship between Mr.

16   Cantwell and those in the Bowl Patrol was deteriorated.  The

17   Bowl Patrol made a conscious effort to harass, disrupt,

18   whatever you want to call it, but essentially repeatedly and

19   incessantly call his show, call him a fed in public, suggest

20   he's a federal informant, say things they thought would bring

21   federal attention to his show.

22          The issue with that is it's a cluster kind of bomb

23   situation where they purposely don't use their own identities

24   frequently, they operate under pseudonyms, and so I --

25          THE COURT:  Are you not seeing us?

1          MR. WOLPIN:  I'm just getting frozen.  I was just

2    worried.

3          And so there are times when Chris can't tell who's

4    committing this act, who's saying the things they're saying,

5    but we have Cheddar Mane and Vic Mackey, the two primary

6    people involved, discussing publically this intentional

7    campaign and what their purpose is and why they're doing it

8    and then replaying them on their own podcasts as sort of a way

9    to further mock and harass Chris.

10          THE COURT:  Let me stop you.

11          Mr. Davis, I assume that you will agree that some

12    evidence of Cheddar Mane's attempts to contact Mr. Cantwell's

13    show and engage in this kind of disruptive behavior from

14    Cantwell's perspective is stuff that will come into evidence

15    in the case.

16          Do you disagree with that?

17          MR. DAVIS:  I do agree.  Cheddar Mane made a number

18    of prank calls and will readily admit that.

19          He also will say that those prank calls ended some

20    months before the threats in this case; that is, he

21    deliberately stopped prank calling Cantwell in approximately

22    January of 2019, and it was in June of 2019 that Cantwell

23    threatened him.

24          THE COURT:  All right.  Can I stop you?

25          Will you also agree that -- would Cheddar Mane if

 1   questioned acknowledge that he was coordinating this effort

 2   with this other person who Mr. Wolpin refers to as Mackey?

 3            MR. DAVIS:  I think he'll acknowledge he

 4   participated.  I don't know that he coordinated.  He was not

 5   the leader of the group, I don't think.

 6            THE COURT:  But you'll acknowledge there was this

 7   effort by Mackey and others and he participated in it?

 8            MR. DAVIS:  Yes, he did.

 9            THE COURT:  On the defendant's show and

10   obstructed --

11            MR. DAVIS:  Yes.

12            THE COURT:  -- because of some disagreement between

13   them.

14            Okay.  So that's not going to be a problem.

15            So far, Mr. Wolpin, you'll be able to, through

16   cross-examination and any additional evidence you want to

17   introduce in your own case be able to establish that your

18   client has an Internet radio show, that he had interactions

19   with the Bowl Patrol, that at some point those interactions

20   deteriorated.  The Bowl Patrol began a -- Mr. Mackey and

21   others, including Cheddar Mane, began calling in to his show

22   in an effort to obstruct his ability to conduct his show.  All

23   right?  So that part is not problematic.

24            Now let's go on.

25            MR. WOLPIN:  Okay.  So we get to another situation

1    where this -- I think some context is necessary, so I'll try

2    to be brief, but this exchange happened in June.  The

3    individual known as Cheddar Mane doesn't report this to the

4    police, you know, doesn't present this to anybody.  The FBI is

5    ultimately the one who approaches him four months later.  The

6    FBI does not approach him without some ammunition to point out

7    to him that he has liability.  So they make it clear to him

8    that they are interested in prosecuting Chris Cantwell for

9    these things from months ago and that they are well aware of

10   his public persona, who he is, they listened to everything he

11   said on online, and we are aware from what Mr. -- the

12   individual behind the name Cheddar Mane has said to others

13   that this was viewed by him as an effort to gain his

14   cooperation, this potentially liability and exposure.

15          And so from our perspective, you know, the

16   government has responded by saying objectively there was no

17   concern he should have had for his prosecution, which I think

18   is simply not true.  I think objectively there was, and those

19   are the documents I submitted under seal which I can address

20   in a moment, but it's clear that he had those concerns.

21          And for example -- I mean, it's obvious --

22          THE COURT:  Let me stop you because I think you're

23   straying into another area here.

24          You have a set of arguments about your ability to

25   pursue certain lines of inquiry to establish a claim that

1    Cheddar Mane is providing false information in an effort to

2    curry favor with the government and avoid his own criminal

3    liability.

4              MR. WOLPIN:  Yes.

5              THE COURT:  And we haven't talked about that yet.

6    I have made clear that I intend to give you a substantial

7    amount of leeway in trying to establish arguments of that

8    type.  I don't think that is at the core of what Mr. Davis's

9    motion is dealing with.  So why don't you set that aside for a

10   moment and focus on what I understand to be the core of his

11   argument, which is, Judge, they want to just present to the

12   jury every bad thing that they can identify that any member of

13   Bowl Patrol presented at any point to any person, and 99

14   percent of that stuff is irrelevant and prejudicial.  It's an

15   attempt to do exactly what defense lawyers often accuse the

16   government of doing, which is a kind of garbage dump on a

17   defendant, which I know you would vehemently object to if the

18   government tried to do it to your client.

19             So that's what I want you to focus on.  To what

20   extent are you going to do what the government fears you're

21   going to do, which is try to elicit from witnesses and in your

22   own case every piece of evidence you can introduce about every

23   bad thing any member of the Bowl Patrol ever said?  That's

24   what I'm focused on now.

25             So tell me exactly what you're proposing to do so I

1    can determine whether I'll allow you to do it.

2              MR. WOLPIN:  First of all -- I mean, the government

3    repeatedly cited how many exhibits we sent.  I would caution

4    the Court -- I told them -- explained to them in a phone call

5    that because of the timing of things I gave them everything

6    that I had listened to in preparation for doing a

7    cross-examination.

8              It's clearly not going to be 168 exhibits.  That

9    was made clear.  So, no, I'm not going to do a dump.

10             The goal is to understand two things.  One is the

11   type of joking language used that could be related to this

12   content.  So there will be a handful of clips that address

13   that.

14             The next issue is --

15             THE COURT:  I need to better understand when you

16   say -- is there joking about the specific types of acts that

17   are the subject of these communications?

18             MR. WOLPIN:  There's joking about rape.  There's

19   joking about murder.  There's joking about violence as

20   something that one can talk about in a way that is obviously

21   not -- or I guess, I don't know, I don't see it as humorous,

22   but who in this group sees as humor and so --

23             THE COURT:  Again, I need to understand.

24             Are these communications that either your client

25   was a party to or that you're going to show through some

1    evidence that your client was aware of or that Cheddar Mane

2    was a party to?

3            MR. WOLPIN:  These are almost entirely from the

4    Bowlcast episodes, which is a podcast of which Cheddar Mane

5    was one of the usually three to four hosts.

6            I don't know if there's anything I have in that

7    regard that doesn't have him as a party to it in that sense,

8    that he's participating in that.  The majority of them are his

9    own words or Vic Mackey's words.  I don't think there's a

10   whole lot outside of that.

11           THE COURT:  And was your client -- are you going to

12   show that your client was involved in those communications or

13   was aware of them before he --

14           MR. WOLPIN:  He was made aware of them.  So he has

15   heard or had heard certain of the episodes but to my knowledge

16   not all, but it was repeatedly brought to his attention.  I

17   mean, this was a small community.  They know what the groups

18   are saying.

19           So I can't represent that he's heard every single

20   thing I would consider, but he is well aware of that type and

21   that manner of conversation.  That's what they do.

22           THE COURT:  Give me from your perspective the

23   strongest, clearest example of a piece of evidence that you

24   think you should be allowed to introduce that the

25   government -- that you think is subject to the government's

1    motion in limine.  Give me a concrete specific example of what

2    you're proposing to do that you think the government is

3    seeking to prevent you from doing.

4              MR. WOLPIN:  I think what the government is

5    proposing to exclude are evidence of these two types, and I'll

6    get to the detail in a minute, the joking type and the serious

7    type.  Those are two types that I think are relevant.

8              The joking type is the type that gets to context.

9    The serious type is the type that gets to liability.

10             As to the serious type, this individual, Cheddar

11   Mane himself, the things that will be presented on that are

12   things that he said that would have given him the liability.

13   In discussing how people need to step up and commit mass

14   murder, statements that he's involved in this group with the

15   threats against the FBI agent, those are directly involving

16   him, and his statements that are on the Bowlcast that talk

17   about why people should commit mass murder, which is our --

18             THE COURT:  Can I stop you again?  It's like you

19   want rulings without giving me any actual evidence to

20   evaluate.  So I'm not going to engage in this hypothetical

21   exercise anymore, and I'm simply going to end the hearing and

22   tell you to show up at trial and I'll rule when I have actual

23   evidence to consider if you can't give it to me, okay?

24             Give me a specific piece of evidence that you think

25   the government is seeking to exclude that you think should be

1     introduced.

2          MR. WOLPIN:  I think that what should be introduced

3     are exhibits that I've submitted to them that are audio clips

4     of the Bowlcast episode of Cheddar Mane discussing that people

5     should fear being shot and killed, him talking about that

6     people should accept their role in committing mass murder.

7     Those are specific examples of things that he has said that I

8     believe give him reason to fear liability.  Those are clips

9     that have been provided and that exist.

10          THE COURT:  Let me stop you again.

11          Okay.  It's your -- you're sort of bouncing back

12     and forth between two different things.  All right?  I need

13     you to focus so that I can try to rule.

14          Again, if you don't give me what I need, I'm going

15     to stop the hearing and say show up at trial and let's see how

16     it goes, okay?

17          You've now shifted back into I want to show that

18     the defendant, excuse me, that Cheddar Mane made statements

19     that could cause him to fear criminal investigation, and I

20     want to elicit those statements when cross-examining him so

21     that the jury can understand that he has a motive to falsify

22     to curry favor with the government to avoid his own

23     investigation.

24          I get that.  I see that.  Statements that Cheddar

25     Mane makes himself that you say could cause him to fear

1    investigation and perhaps prosecution potentially give him the

2    motive to falsify.

3              MR. WOLPIN:  Yes.

4              THE COURT:  What we were focused on before you took

5    us down that track was your other argument, which I thought

6    you were trying to make, which is I have certain evidence that

7    shows that there was a joking environment here where people

8    joke about things that ordinarily people would find abhorrent

9    but they're just joking.  And so when my client made

10   statements that many people would find abhorrent, he was just

11   joking and the jury needs to understand that.

12             You are making that argument, aren't you?

13             MR. WOLPIN:  I am, and I have --

14             THE COURT:  Let's get specific on that, okay?

15             MR. WOLPIN:  Okay.  So I have -- and I'll be honest

16   here.  I've gone through the portion of my cross and laid out

17   the ones as far as the liability.  My task for the rest of

18   today was to narrow down this list I have as ones that go to

19   context.  So that's why I'm a little less clear of the exact

20   ones I've used.

21             I have ones labeled things like Cheddar Joking

22   About Raping Kessler, Cheddar Joking About Raping Yentas,

23   which is a name for Jewish women.  Those are the titles of the

24   clips.

25             I don't want to do what they're saying, which is

1   play a hundred of these.  So I don't want to go through -- but

2   those are the clips I have that I'm narrowing down to try to

3   get as representative samples rather than overload.

4              THE COURT:  Let me stop you again, okay?

5              Now you're talking about Cheddar making statements.

6   I don't think the government is seeking to preclude you from

7   evidence about joking statements about foreign subjects that

8   Cheddar Mane himself made at least to the extent they preceded

9   the contacts or the communications that are the subject of the

10  prosecution and that you can show your client was made aware

11  of.

12             Right, Mr. Davis?  If he has evidence that Cheddar

13  Mane made a joking statement about raping someone that Mr.

14  Cantwell was aware of, you would not seek to exclude that?

15             MR. DAVIS:  I would not object to a question on

16  cross of the victim about that statement.

17             THE COURT:  Okay.

18             MR. DAVIS:  I draw a --

19             THE COURT:  I think what you're concerned about,

20  and it's not clear yet to me that the defendant is even going

21  to do it because I've repeatedly asked for a proffer on it and

22  I'm not getting it, is -- what you don't want is completely

23  unrelated discussions by the Bowl Patrol about killing Jews or

24  attacking blacks or things like that that are just

25  disconnected from this case completely, right?  You want to

1    keep that kind of stuff out?

2             MR. DAVIS:  And I don't want extrinsic evidence

3    where there's no reason under the rules of evidence to admit

4    it; that is, this defendant has a full right to cross-examine

5    this victim, and the cross-examination I think is going to be

6    wide-ranging and properly so.

7             What we are very concerned about is the defendant's

8    further ability to introduce extrinsic evidence and to keep

9    playing tapes over and over in a situation where the victim

10   concedes, yeah, in the Bowl Patrol we did joke about rape.

11            I think a lot here depends on what the victim says

12   on cross, and I'm only saying what I expect him to say but --

13   and I sympathize with the Court about the motion in limine

14   issue.  I think a lot of this is not going to be clear until

15   the cross.

16            THE COURT:  What is clear to me is I -- what I

17   wanted to -- even why I'm even entertaining this, and this

18   effort on my part is convincing me that I should never do this

19   with lawyers again, I wanted to help you in structuring your

20   opening statements so that you can both give some general idea

21   for the jury about what the case is all about.

22            I am not in a position to rule before trial as to

23   whether the defense in its own case should be able to

24   introduce extrinsic evidence of bad statements by the Bowl

25   Patrol that are not otherwise tied to Cheddar Mane or Mr.

1    Cantwell.  I just can't do that.

2            But what I can say to you is it seems to me quite

3    clear that both the government and the defendant in their

4    opening statements should be able to provide context for what

5    the case will be about, and it seems to me entirely

6    appropriate for either or both the government and the

7    defendant in their opening statements to identify the fact

8    that Mr. Cantwell has an Internet radio program.  That in that

9    radio program he frequently makes statements that some would

10   interpret as white nationalist statements, that some would

11   interpret as offensive statements.  That there's another group

12   called the Bowl Patrol and that they have expressed similar

13   kinds of views, and that Mr. Cantwell was originally in some

14   kind of cooperative relationship with members of the Bowl

15   Patrol and that at some point that relationship broke down and

16   members of the Bowl Patrol tried to flood Mr. Cantwell's show

17   with calls in ways to disrupt it.  And that this person Mackey

18   was one of the people who was behind that effort, and this

19   person Cheddar Mane was engaged in that effort, and that both

20   Mr. Cantwell's show and the Bowl Patrol frequently espoused

21   views that many would consider outrageous and offensive.  That

22   that effort by the Bowl Patrol to disrupt Mr. Cantwell's show

23   upset him and he attempted to obtain identifying information

24   for Mr. Mackey, and he had these conversations with Cheddar

25   Mane and that those are the communications that give rise to

1    the charges here.

2              The parties should be able to do that in their

3    opening statements.

4              Does anybody disagree with what I've said so far?

5              MR. DAVIS:  No.

6              MR. WOLPIN:  No.

7              THE COURT:  No.  Okay.

8              I also think it's clear that in examining Cheddar

9    Mane -- in cross-examining Cheddar Mane the defense should be

10   allowed to question him about matters that suggest he might

11   have a reason to falsify his testimony in an effort to curry

12   favor with the government.

13             And so I expect during cross-examination that

14   Cheddar Mane will be questioned by the defense about his own

15   communications in which he suggests violent -- that people

16   engage in violent conduct or criminal conduct in ways that

17   could cause him to fear that he could be the subject of

18   government investigation if he didn't win the prosecutors

19   over.

20             So things that he actually said that were publicly

21   available that suggest that he might have reason to fear

22   investigation or prosecution by the federal government likely

23   will be a fair subject of cross-examination.  I think that

24   will need to evolve during the cross, and I can't give a more

25   precise guidance to you about that until I see the direct and

1   the cross unfold.

2           So I don't expect in the opening statements for the

3   defense to be getting up and reading a list of every

4   outrageous statement that it might seek to go into on

5   cross-examination because you run the risk that I don't admit

6   that evidence and you get a negative instruction from me that

7   you referred to things in the opening statement that you did

8   not end up putting into evidence.

9           So I expect in the openings that you should be

10  given an opportunity to develop some background about the case

11  to lay the foundation for one of your defenses, which is Mr.

12  Cantwell didn't mean this in the way that the government says

13  he meant it and we'll explain why that is so.  You should be

14  able to say in your opening statement that the evidence will

15  show that the alleged victim here is someone who's made a

16  number of statements that caused him to reasonably fear

17  prosecution by the government and provided him with a motive

18  to falsify his testimony in this case in an effort to curry

19  favor with the government.

20          I don't expect you to be reading transcripts of

21  Bowl Patrol statements over Telegram that are just generalized

22  statements by other members of the Bowl Patrol.  Whether

23  you're allowed to do that as the case develops will depend

24  upon the evidence at that time.  And beyond that, I don't

25  really think that I could give you much in the way of

1    guidance.

2              I see, Mr. Cantwell, you have your hand up.  Do you

3    want to speak privately with your lawyers?  Yes.  He's nodding

4    his head yes.  All right.

5              Could you move Mr. Cantwell and his lawyers back

6    into the -- well, before we do, let me just --

7              Mr. Davis, do you understand what I'm saying?

8              MR. DAVIS:  Yes.

9              THE COURT:  Do you have any objection to me

10   allowing those generalized statements in the opening statement

11   and reserving any decision on specific evidence about Bowl

12   Patrol offensive statements for when they arise during

13   cross-examination and the defendant's case-in-chief?

14             MR. DAVIS:  No.

15             THE COURT:  Okay.

16             Mr. Wolpin, do you understand what I'm saying?

17             MR. WOLPIN:  Yes.

18             THE COURT:  Do you have any problem with my

19   proposal, which is that you lay the foundation for your case

20   in your opening statement by using generalized statements and

21   refraining from pulling out explicit statements that you may

22   or may not ultimately be allowed to introduce and reserving

23   efforts with respect to those statements until you intend to

24   introduce them?  Do you have any problem with that?

25             MR. WOLPIN:  No.  I understand that.

```
1                    THE COURT:  Okay.

2            All right.  Now you can then let the defendant

3    speak privately with his lawyers, and we'll come back.

4                    (Attorney Wolpin and Attorney Levin go into a

5    breakout room with the defendant)

6                    THE COURT:  All right.  Are we ready to resume?

7                    MR. WOLPIN:  Yes.

8                    THE COURT:  Okay.  Did you want to say anything,

9    Mr. Wolpin, after speaking to your client?

10                   MR. WOLPIN:  No, your Honor.

11                   THE COURT:  Okay.  All right.

12           So here's what I propose to do with respect to the

13   government's motion in limine and the defendant's

14   corresponding motion in limine.

15           I'm not able to make a definitive ruling on those

16   motions at the present time.  I have attempted to provide

17   general guidance as to how I expect the parties to conduct

18   themselves during opening statements.

19           I anticipate that the government will in its

20   opening statement provide information about how the

21   relationship developed here between Mr. Cantwell and the

22   alleged victim, how that relationship broke down, and how it

23   led to the private messages that contain the threats that are

24   the subject of the charges.

25           And I expect that the defendant in its opening
```

1    statement will provide some context that identifies in general

2    terms what Mr. Cantwell's Internet radio program is all about

3    and how Mr. Cantwell came to have interactions with the Bowl

4    Patrol, in general what the Bowl Patrol's views are, what kind

5    of a group it is, and how his relationship with that group

6    developed and how it led to efforts to obstruct his program,

7    and how it led to frustrations on his part, and how it led to

8    the interactions that give rise to the charges.

9              I also expect that the defendant in its opening

10   statement will identify that Cheddar Mane -- there will be

11   evidence that will show that Cheddar Mane had very good reason

12   to fear that he would be the subject of investigation unless

13   he was able to win the government over to his side, and that

14   therefore he has a motive to testify falsely, and that you

15   have to view his testimony with that kind of caution that you

16   need to view testimony from someone who has a motive to

17   falsify.

18             I don't expect in the opening statements to hear

19   quotations from specific communications that are -- and in

20   particular don't expect to hear communications being discussed

21   involving the Bowl Patrol and its views in circumstances where

22   there's no evidence that Cheddar Mane was a participant and

23   that were not communicated to the defendant prior to the time

24   he made these threats.

25             Those kind of specific matters should be reserved

1    for cross-examination or they should be offered in the

2    defendant's case-in-chief.

3            If and when they are offered, they can be the

4    subject of objection, and I will give the parties a ruling at

5    the time when the evidence is being offered.  And until then,

6    I can't give you more specific guidance.

7            I can tell you that I will enforce Rule 401 and

8    Rule 403.  I will not allow evidence to be introduced if the

9    prejudicial effect of that evidence substantially outweighs

10   its probative value.

11           I will not allow evidence that is so cumulative

12   that its cumulativeness substantially outweighs its probative

13   value, and beyond that I can't give you further guidance

14   because that is a highly context-specific ruling.

15           All right?  So that's my ruling on the government's

16   motion in limine addressing the issues we've been discussing

17   and the defendant's corresponding motions.

18           In order to preserve any argument you have

19   regarding the admissibility of evidence on this subject, you

20   need to object at the time the evidence is being offered.  I

21   need to hear your objection and I need to be able to evaluate

22   it in context.  Beyond that, I can't give you further guidance

23   and I will not be bound -- I am not making any ruling and I

24   will not be bound by anything I have said.  It is incumbent

25   upon you to object when the evidence is offered if you don't

1    want it to be admitted.  And I'm not restricting you from

2    trying to offer evidence.  I'm merely instructing you that if

3    it is the subject of a motion in limine, you should inform the

4    Court before you seek to introduce the evidence so that we can

5    evaluate it appropriately.  All right?

6              Anybody need to be heard -- otherwise heard on this

7    particular issue?  Anything more from the government?

8              MR. DAVIS:  No.

9              THE COURT:  Anything from the defense?

10             MR. WOLPIN:  (Nods negatively.)

11             THE COURT:  No.  Okay.

12             All right.  What's the government's next motion?

13             MR. DAVIS:  Judge, the only other thing -- the

14   other motion, which is largely what we've discussed here, is a

15   motion to exclude evidence of other acts of third parties.

16             And the only thing I want to say is that we are

17   going to be careful in our objections to make sure that the

18   defense lays a predicate that what they're trying to ask about

19   or introduce extrinsically is something that either the victim

20   did or that in some cases Vic Mackey did, but it's not just

21   anything and everything that ever happened to Mr. Cantwell.

22             There is a real danger here that Mr. Cantwell will

23   assign to the Bowl Patrol various grievances that he has

24   without being able to show that they are the Bowl Patrol, and

25   some of his exhibits show that.  They have nothing to do with

1    either Vic Mackey or the victim.

2         Anyway, the reason for that motion is to say, yes,

3    in many cases communications or actions by the victim or Vic

4    Mackey are relevant in this extortion case, but all the other

5    things that Mr. Cantwell wants to complain about are not

6    and --

7         THE COURT:  These would be things such as acts that

8    other members of the Bowl Patrol may have taken that upset Mr.

9    Cantwell.  Efforts to block his show?  I'm trying to figure

10   out what it is that we're talking about.

11        MR. DAVIS:  Yes, or calls, prank calls from other

12   people that are not in the Bowl Patrol.

13        THE COURT:  Yeah, and I think in general it's not a

14   defense to these charges to show that Mr. Cantwell was

15   provoked.  There's no provocation defense here that I'm aware

16   of.

17        Certainly I will allow some evidence about why it

18   was that Mr. Cantwell became frustrated, but I don't see

19   evidence that is unconnected to either Mackey or Cheddar Mane

20   as having substantial relevance in the case.

21        In other words, I have no problem with evidence

22   being introduced as a general proposition saying, look, this

23   is why I went to the lengths that I went to here because I was

24   extremely frustrated because people were obstructing my show,

25   but -- and I think that's -- it's not -- provocation isn't a

1    defense, but in order to make any sense of evidence the jury

2    needs to have some context about what's happening.

3            So you can allow evidence that's admissible for

4    contextual purposes that is otherwise of minimal relevance,

5    but you don't have an unlimited right to spend countless hours

6    reviewing grievances that are completely unrelated to the

7    case.

8            So to the extent I can give guidance to the defense

9    on this, I understand that you want to try to provide some

10   context for why it is that Mr. Cantwell acted in the way he

11   did, but we all need to recognize that provocation isn't a

12   defense.  The relevance of that evidence is limited in my mind

13   to context, not -- it doesn't have any independent value as a

14   defense, and at some level it could have prejudicial effect,

15   and it certainly would have waste of time that would

16   substantially outweigh any minimal probative value.

17           So I can't rule on your motion any more

18   specifically than this, Mr. Davis.

19           I am inclined to allow some evidence to explain why

20   Mr. Cantwell was frustrated and sought to undertake the

21   actions that he undertook.  At some level that evidence -- if

22   it is of minimal relevance to establish context, it isn't

23   otherwise relevant in my view to the defense, and therefore at

24   some level I will have to rule under Rule 403 that the

25   prejudicial effect or the waste of time involved substantially

1  outweighs probative value.

2          The defense should be mindful of that, but I'm not

3  going to impose any actual limits on the defense at this

4  point.  I'm just providing general guidance.  It's up to you

5  to decide how far to go, and Mr. Davis to object, and at that

6  point I'll rule on any objection on this subject.  And frankly

7  I don't anticipate that the defense is going to be wasting the

8  jury's time on a lot of that kind of evidence.

9          So I won't make any further ruling on that, but I

10 understand the issue and I've tried to give you guidance to

11 the extent I can.

12         All right.  Does that cover your motions, Mr.

13 Davis?

14         MR. DAVIS:  (Nods affirmatively.)

15         THE COURT:  Okay.  Good.

16         Mr. Wolpin or Mr. Levin, what do you want to say in

17 support of any motion you want to discuss?

18         MR. WOLPIN:  There's a motion in limine regarding

19 drugs and firearms which the government is not objecting or

20 not attempting to introduce.  So No. 71 is agreed upon so I'm

21 not going to address it.

22         THE COURT:  I would say it's moot because the

23 government has represented that it doesn't intend to introduce

24 that evidence.

25         MR. WOLPIN:  Correct.

1          There's filing No. 69 which was the motion in

2   limine with reference to Charlottesville.  The government

3   responded that it would essentially agree to avoid the word

4   Charlottesville but would present information about Virginia.

5   Our position is that it opens up the same Pandora's box by

6   talking about 2017 Virginia.  I don't see that there's any

7   need to have that specific location mentioned.

8          THE COURT:  All right.  Can I stop you and find out

9   from Mr. Davis what he's intending, or Ms. Krasinski, whoever

10  is going to speak?

11         MS. KRASINSKI:  Your Honor, there's one exhibit,

12  it's identified right now as Government's Exhibit 502, and it

13  is an e-mail from the defendant to the FBI.  In part of that

14  e-mail he talks about his interaction with the victim, and he

15  also talks about Bowl Patrol generally.

16         And what he says in that is:  As for whether I know

17  them, that depends on how loosely we define "know."  As I

18  mentioned at the outset, these guys were in my online social

19  orbit when I was in Virginia.  I've given you the real names

20  that I have, but I couldn't pick most of them out of a lineup

21  and most of these guys probably couldn't pick each other out

22  of a lineup.

23         So the government --

24         THE COURT:  Could we agree to redact the reference

25  to the word Virginia and otherwise put the e-mail in?

1      Would that satisfy you, Mr. Wolpin, if we did that?

2          MR. WOLPIN:  Yes.  I just didn't -- there's plenty

3  of other redactions in that e-mail.  I don't see why that

4  needs to be contained.

5          THE COURT:  Do you have a specific reason why you

6  need the reference to Virginia in there?

7          MS. KRASINSKI:  Simply that it ties it to timing.

8  You know, I don't think -- I wouldn't expect any testimony to

9  be, well, he was in Virginia for the Charlottesville rally.

10  He was in Virginia for an extended period of time, you know, I

11  think that someone could say.

12          So the Bowl Patrol and Mr. Cantwell became friendly

13  at some point in late 2017 to late 2018 when Mr. Cantwell was

14  in Virginia.  You know, it's just the government's position

15  that mentioning a state that, you know, the name of the

16  Commonwealth of Virginia in and of itself without any other

17  context about any relationship to Charlottesville or the Unite

18  the Right rally is not unfairly prejudicial under 403.

19  Particularly given that it's the defendant's own words.

20          THE COURT:  So the problem with that is you say

21  that Virginia provides information that's useful to the jury

22  because it helps the jury understand that the relationship

23  developed in the past, but that only is useful to the extent

24  that the jurors identify the reference to Virginia to the

25  Charlottesville rally because otherwise they wouldn't know

1    anything about when he was in Virginia, and so that

2    essentially is -- it's useful because the jurors will know

3    when Charlottesville was, and that defeats the purpose.

4            I don't see much relevance to having the word

5    Virginia in there given the defense's concern about it and

6    your agreement not to reference Charlottesville.  I don't see

7    any reason why we shouldn't redact it.

8            Just brief response and then I'll rule.

9            MS. KRASINSKI:  That's fine, your Honor.  The

10   government can submit a redacted version.

11           THE COURT:  So we'll take out the reference to

12   Virginia and submit a redacted version, and that's the only

13   reference to Charlottesville.  So the motion is otherwise moot

14   because the government has agreed to take out the word

15   Virginia from that e-mail.

16           What else do you have, Mr. Wolpin?

17           MR. WOLPIN:  Let's see.  What is left is, if we're

18   going to address it today, the government's motion regarding

19   the CPS worker from Missouri and our motion regarding --

20   excluding the wife which I mean maybe we should take -- I

21   don't know whether the Court wants to take that up today or

22   when we take up the appearing by video question.

23           THE COURT:  I think it's better to do that one on

24   Monday because I agreed to give you additional time on that.

25           The CPS worker is -- you're seeking to bar her from

1    testifying on relevance grounds?

2              MR. WOLPIN:  Yes.

3              THE COURT:  I think I understand your argument on

4    that, but whatever else you want to say about that, and then

5    I'll hear from Mr. Davis.  I do have some questions about it.

6              MR. WOLPIN:  All right.

7              The short version is essentially, which we've gone

8    through a little bit, that Mr. Cantwell knew what he knew or

9    whatever he did know about what effects there could be to this

10   call when he made it.

11             The person they're intending to call has nothing to

12   do with Chris Cantwell in particular.  It's a generic worker

13   who would say, we could do X, Y, and Z.  Whether the

14   defendant -- whether she can or can't do those things is

15   ultimately irrelevant.  The question in this instance is what

16   the defendant's intent was at the time, what did he know.

17   There's plenty of evidence, as the government has cited, as to

18   what Chris Cantwell said about this call and why he made it

19   and what the consequences could be.

20             THE COURT:  Well, at the risk of sounding pedantic

21   here, let's go back to law school.  I mean, every crime has a

22   mens rea component and an actus reus component.  You're

23   focused on the mens rea component, but there's an actus reus

24   component to these charges as well, isn't there, and isn't it

25   incumbent upon the government to demonstrate that this

1   communication qualifies as a threat, and does not the

2   definition of threat require proof of a serious statement

3   expressing an intent to injure another person which under the

4   circumstances would cause apprehension in a reasonable person

5   as distinguished from a political statement, idle talk,

6   exaggeration, or something said in a joking manner?

7          Isn't the CPS testimony relevant on the actus reus

8   component here as to whether this communication does qualify

9   as a threat?

10          Wholly apart, I agree there's also a mens rea

11   component that you've been focused on.

12          MR. WOLPIN:  I don't think so because in this

13   instance there is no follow up.  They're not bringing someone

14   in to say here's what actually happened as far as an action

15   that we took.  The action that they took was nothing, so it

16   ends at the call.

17          To come in and say hypothetically we could have

18   done X, Y and Z in a case if we so chose isn't at that point

19   part of the actus reus because it didn't happen.  It then

20   reflects back on intent rather than addressing what actually

21   happened as far as the offense.

22          THE COURT:  Well, he has to act with intent but he

23   also has to send a communication that would again cause

24   apprehension in a reasonable person, not what your client --

25   it's not enough that your client intends to threaten.  If the

1    communication -- even if he has the criminal intent if what he

2    exchanges is not something that would cause apprehension in a

3    reasonable person, he's not guilty of the crime.  It's a mens

4    rea plus actus reus requirement.

5              And so the government has to prove not just what

6    your client intended by his action but by what he in fact did

7    and whether what he did meets the definition of a threat, and

8    on that score it seems to me to be highly relevant what a

9    reasonable person would understand a threat to report someone

10   to CPS to mean.

11             I assume that's what the government wants this

12   witness to testify to, not -- because I don't think they

13   did any -- they never did contact Cheddar Mane or his spouse,

14   but explaining what happens when someone does what this threat

15   says seems to me to be relevant.  That's my initial reaction.

16             A brief response from you, and then I'll hear from

17   Mr. Davis or Ms. Krasinski.

18             MR. WOLPIN:  Obviously Cheddar Mane can testify to

19   what his response was to that or what it meant to him in that

20   sense as far as that goes.  To then bring in this third party

21   I think becomes irrelevant and unnecessary.

22             THE COURT:  Okay.  I get it.  I think your focus

23   and -- you know, maybe notwithstanding my instructions the

24   jury focuses on what you want them to focus on.  It isn't

25   Cheddar Mane's response here that is the issue.  It's whether

1    a reasonable person would view it as a threat.

2              Mr. Davis, have I figured out what you are trying

3    to get from this CPS worker correctly?

4              MR. DAVIS:  Yes.

5              THE COURT:  Okay.  So your view is you want to try

6    to -- the jury needs to be informed.  So that they can

7    understand how a reasonable person would view this particular

8    communication they need to understand what CPS is and what CPS

9    does and what happens when somebody reports somebody to CPS,

10   right?

11             MR. DAVIS:  Correct.

12             THE COURT:  Okay.  I understand Mr. Wolpin's

13   argument, but I find it to be unpersuasive here.  I do think

14   the CPS worker has relevant testimony to provide and that the

15   relevance of that testimony is not substantially outweighed by

16   the danger of unfair prejudice, waste of time, or any other

17   reason why it should be excluded pursuant to Rule 403.

18             I will -- of course I don't know what the exact

19   content of the testimony will be.  There may be aspects of the

20   testimony that should be excluded.  And so, Mr. Wolpin, you

21   remain free and should object to any portion of the testimony

22   that you believe is inadmissible, and I will rule on your

23   request at that time.  But as a general matter, it does appear

24   to me likely that this witness will have relevant information

25   to provide and that the relevance of that is not outweighed by

1    any reason identified in Rule 403 as a permissible reason for
2    exclusion.
3            So I'm going to deny your motion without prejudice
4    to your right to object to individual answers to questions as
5    they come up to the extent you have a legitimate basis for
6    interposing an objection.
7            All right.  What else have you got, Mr. Wolpin?  Is
8    there anything else?
9            MR. WOLPIN:  I believe that completes what we have
10   for today.
11           THE COURT:  All right.  I have everything from the
12   government and everything from the defense.
13           What's left is the government's proposal to elicit
14   video testimony from the victim's spouse, and I gave the
15   defense some additional time to prepare for that so we'll
16   discuss that at our conference on Monday.  You can present
17   both the argument that your client does not waive his
18   confrontation rights as to that witness and any argument you
19   have that the spouse's testimony is irrelevant or should be
20   excluded under Rule 403.  All right?
21           So we'll take that up on Monday.  Otherwise
22   everybody -- everything is proceeding appropriately and the
23   parties will be ready for trial on Tuesday morning.  All
24   right?  Anything else before I adjourn the hearing?
25           MR. WOLPIN:  No.  Thank you.

1          THE COURT:  Okay.  Thank you.  I'll talk to you

2   again on Monday.

3          (Conclusion of hearing at 12:20 p.m.)

C E R T I F I C A T E

    I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.


Submitted: 5-4-21        /s/   Susan M. Bateman _____
                         SUSAN M. BATEMAN, RPR, CRR