**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
            v.                      *   September 22, 2020
                                    *   9:38 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
DAY ONE - MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO


APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           U.S. Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defenders Office



Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
                         I N D E X


                                                    Page

OPENING STATEMENT BY MR. DAVIS:                      22


OPENING STATEMENT BY MR. WOLPIN:                     37



WITNESS:            Direct        Cross        Redirect      Recross

SARAH SMITH


By Mr. Davis          60                         78

By Mr. Levin                        73



EXHIBITS:                                    FOR ID      IN EVD

Government's Exhibit No. 103.                             79
```

```
 1                      P R O C E E D I N G S

 2              (IN COURT - NO JURY AND NO COURT PRESENT)

 3              THE CLERK:  In the case of the United States of

 4   America versus Christopher Cantwell, criminal case number

 5   20-cr-06-01-PB, the government has premarked Exhibits 100

 6   through 700.  All exhibits are marked for identification and

 7   shall remain marked for ID at this time.

 8              The defendants have premarked Exhibits A through J.

 9   All exhibits are marked for identification and shall remain

10   marked for ID at this time.

11              (IN COURT - NO JURY PRESENT)

12              THE CLERK:  Court is in session and has for

13   consideration the jury trial in United States of America

14   versus Christopher Cantwell, criminal case number

15   20-cr-6-1-PB.

16              THE COURT:  Good morning.  I wanted to talk to you

17   about a couple of matters before we begin.

18              First, a person presented himself at the door today

19   and asked to enter and not be required to wear a mask.  That

20   person claims to have some kind of condition that prevents him

21   from being able to wear a mask.  He's unwilling to come in

22   wearing a mask so I can't evaluate his request in person.

23              I instructed the staff to give that person the

24   option of submitting a written request, and I believe that

25   person has done so, but I'm not going to delay the trial while
```

1    I wait to evaluate that.  Instead, I intend to proceed.

2            And when I get to a break, we'll give the jury a

3    break, hopefully by that point I'll have a chance to review

4    that matter with you, hear any views that you have on the

5    subject and make a ruling on it, but I won't be able to do

6    that until the first break.  So that's the first thing that I

7    wanted to address with you.

8            The second thing was to follow up on an issue that

9    we discussed during our video hearing yesterday and that is

10   the issue that arose during the impanelment process.  And I

11   won't go through and describe in detail what that issue is

12   because I laid it out for the parties over the video

13   conference, but essentially it is that we agreed to use a

14   prescreening procedure for selection of jurors in which the

15   parties were given an opportunity to review juror

16   questionnaires, including a non-case specific supplemental

17   questionnaire that was submitted to jurors, and they were

18   permitted -- counsel was permitted to meet and confer and

19   agree on jurors who would be excused for cause.  The Court

20   accepted their agreed excusals, and a number of potential

21   jurors were excused before the impanelment process began.

22           As I reflected on this and discussed the issue with

23   colleagues, it became apparent to me that there was a

24   potential issue with the use of that prescreening process that

25   arises based on Rule 43 of the Rules of Criminal Procedure.

1          Just to quote to you the relevant part of that

2    rule, it provides, "Unless this rule, Rule 5, or Rule 10

3    provides otherwise, the defendant must be present at every

4    trial stage, including jury impanelment and the return of the

5    verdict."

6          I explained to the parties that the case law on

7    this is somewhat less than clear on whether the prescreening

8    process that we used here is a trial stage that is part of

9    impanelment at which the defendant would have a right to be

10   present or not.

11         In light of that uncertainty and because the

12   parties hadn't raised it with me, I felt it was important to

13   raise it on my own with the parties.

14         I presented the issue to the parties.  I did not

15   require them to take a position on it immediately.  Instead, I

16   asked the defendants -- defense counsel to meet and confer,

17   consult with their client, and I made clear to the parties

18   that I was inclined, if the defendant wanted it, to re-impanel

19   an entirely new jury with a new jury panel to ensure that any

20   right the defendant may have to be physically present during

21   that prescreening process was fulfilled, and I explained how

22   that would work.

23         I was informed later in the day that the defendant

24   does -- and I explained further that that impanelment would

25   incur at the next jury draw which would be in approximately

1    two weeks.

2            So I essentially gave the defendant the option to

3    do that, and I asked counsel to confer and tell me whether the

4    defendant wanted to proceed with the jury that has been

5    selected or whether the defendant wanted to select a new jury

6    with a new impanelment process, and I was inclined to defer to

7    the defendant's request on that.

8            I asked counsel to confer, consult with their

9    client.  The message I got back was they have conferred and

10   counsel is not seeking to have a new jury impaneled.

11           I simply want to verify with Mr. Cantwell that that

12   is in fact your desire here, that is, that we not proceed with

13   a new impanelment and instead it is your preference that we

14   proceed with the jury that has been selected.

15           Mr. Cantwell, can you just tell me, have I got that

16   right?  Is it your desire here to proceed with the jury that

17   has been selected rather than to seek a new jury impanelment?

18                THE DEFENDANT:  It is, Judge.

19                THE COURT:  All right.  Thank you.  I appreciate

20   that.

21           I appreciate the parties working with me on these

22   issues.  These are challenging times in which to conduct a

23   trial, and we want to be sure we're doing it the right way.

24   We want to make sure that the defendant's constitutional

25   rights are respected, and I'm erring on the side of caution

1    here.  That's why I was willing to offer a new impanelment,

2    but the defendant has thought about the issue, consulted with

3    counsel and made a decision on it, and I'm perfectly fine in

4    proceeding as we have scheduled.

5              So I'm ready to bring the jury in.  Are there other

6    issues that the parties need to take up with me before we

7    bring the jury in?

8              MR. WOLPIN:  Just one brief issue in relation to

9    opening, your Honor.

10             I've had obviously some conversations in the last

11   either phone or Zoom meeting about what was and wasn't

12   presentable within the opening.  We talked about audio and

13   transcripts and the like not being quoted verbatim, but

14   discussions were had and I took that to heart.

15             The only exhibit I intended to display was a

16   physical exhibit which was the alleged victim's avatar or his

17   public presentation of himself that my client would have been

18   familiar with at the time of the alleged statements.

19             And so from our perspective this is evidence that

20   is relevant and is coming in.  I don't intend to do more with

21   it than show it to them so they understand within the context

22   of my opening who that person presented themself to be, and I

23   certainly expect that to be admitted.

24             I notified this morning the government of my

25   intent, I wasn't looking to surprise anybody and, you know,

1    the government does not think that should be showed at this

2    time.  I think it should, and I think rather than --

3              THE COURT:  Let me stop you and step back because I

4    want to make sure that you don't have a misimpression about my

5    position with respect to opening statements.

6              I'm not saying that there is a blanket prohibition

7    on quoting from transcripts of documents that the parties have

8    a reasonable basis to believe will be admitted into evidence.

9              For example, I would be surprised if the government

10   didn't intend to quote from transcripts of communications that

11   are the communications at issue here.

12             It's more about the issue of line drawing about

13   when information becomes either so prejudicial or so unduly

14   repetitive and a waste of time that I might not allow it, and

15   I've just informed the parties that I intend to postpone

16   decision-making on those line-drawing questions until the

17   evidence is being offered.

18             So I don't want voluminous detailed statements in

19   the openings about evidence that may never get to the jury.

20   That's where I'm drawing the line here for openings, and I'm

21   reserving the right to make a final decision on how far I'm

22   going to let the parties go until I have to make that decision

23   when the evidence is actually offered.

24             Now, the avatar.  Just refresh my memory.  What is

25   the avatar like, why do you want to bring it out in the

1    opening, and then I'll hear from the government as to why they

2    don't think it should be permitted.

3            MR. WOLPIN:  So the avatar was Cheddar Mane's

4    public presentation within the Bowl Patrol.  So I think we can

5    actually put it up for the Court to see.  It is how he

6    presented himself online.  Again, it is something that

7    predates I believe -- I have reason to believe predates the

8    interaction in this case.  That is how my client knew this

9    individual, not as Ben Lambert or not as some other entity,

10   but as this individual.

11           Obviously the Court through other hearings is aware

12   of the importance of context, of reasonability, of intent, and

13   a number of these statutes, and so from our perspective the

14   jury is going to see this.  Seeing this now allows them to

15   understand in a way that -- you know, I can go on for a

16   paragraph about what it looks like, but I have the thing.  And

17   the reason we present evidence is so that the jury can see

18   what actually was known and available.

19           THE COURT:  So I don't -- I am not a person who

20   engages in any kind of interactions on social media, so you'll

21   just tell me.  The avatar is a way in which people like your

22   client and Cheddar Mane present themselves to the Internet

23   world?  They take an image and that is available when they

24   make entries under their own name?  Is that what happens?

25           MR. WOLPIN:  It depends on the platform, but you

1   can present yourself through any photograph or visual

2   representation along with your name.  This is one that this

3   individual chose to use to represent himself online.

4           THE COURT:  Did he represent himself in that way on

5   platforms that will be discussed in evidence that will involve

6   communications in which Cheddar Mane and the defendant were

7   engaged?

8           MR. WOLPIN:  I certainly have reason to believe so,

9   but if I could just have a moment.

10          (Attorney Wolpin confers with the defendant)

11          MR. WOLPIN:  Okay.  Alternatively, could you bring

12   up Bates 6.

13          You can see this is another version of the avatar

14   that was in fact posted on Mr. Cantwell's website.  There will

15   be no dispute, I believe, of his familiarity with it.  It's

16   the same basic premise.  Machine guns or Mane on the chest.

17          (Court Reporter asks Attorney Wolpin to turn his

18   microphone on)

19          MR. WOLPIN:  Oh, excuse me.

20          This was presented on Telegram through the Bowlcast

21   website, which is something the jury is going to see and hear

22   about.  This is dated July 4, 2018, so we know a date from

23   that.  We know when that date occurred and that it predated

24   the relevant act in this case from 2019.

25          So this one I can show for certain.  I know exactly

1   where it was presented.  It was presented on the Bowlcast

2   website through Telegram.  It was presented and familiar to

3   Mr. Cantwell prior to the interaction.

4          THE COURT:  And what's the theory under which you

5   say it would be relevant?

6          MR. WOLPIN:  In the same manner that other evidence

7   is relevant.  For two reasons.  One being that the defendant's

8   understanding of how this person presented themselves, what

9   language they used, what imagery they used, how they wanted

10  themselves to be seen matters in understanding what intent one

11  would need to have to threaten someone whose public persona

12  and efforts are alike.

13         Additionally, within the cyberstalking statute

14  there's a reasonability question of the person receiving it as

15  far as whether you would expect a reasonable person in that

16  position to have emotional distress.  When this person is

17  presenting themself like this, it's a far different

18  expectation about how that person is going to respond than

19  maybe if it's someone who, you know, presents in a more

20  conventional way.

21         So I think it certainly is going to be relevant

22  from a trial perspective and something that I expect the jury

23  to see in this case.

24         THE COURT:  All right.  I understand your point,

25  counsel, and I'm not going to make any definitive ruling on

1    the admissibility of the avatar in a trial.  But if it is

2    relevant, it strikes me as being minimally relevant, and so

3    I'm not going to -- I'm going to instruct you not to refer to

4    it in the opening statement.  I need to make that relevance

5    call when the evidence is offered so that I can understand

6    better how it supports your case.

7              So I am going to sustain the government's objection

8    to referencing it in the opening statement, but I want to be

9    clear.  I am not trying to restrict your ability to describe

10   the Bowl Patrol and Cheddar Mane and what the evidence will

11   show about that, and I believe you can fairly and fully

12   present your argument about context initially in the opening

13   statement and when the time comes through evidence.

14             But I just am having trouble seeing how an image

15   like that really conveys information that bears on your

16   defense.  That's how I have trouble seeing it at the present

17   time.

18             Look, I appreciate you refrain from eye-rolling

19   when I say things that you don't like.  Of course, counsel,

20   your job is to basically make your arguments by speaking.  And

21   when I rule, you accept them and then reverse me on appeal,

22   which is fine, but don't eye-roll, you know, don't take that

23   kind of reaction when I explain my rulings, okay?

24             Do you understand?

25             MR. WOLPIN:  Yes, I understand.  I apologize.

```
 1                THE COURT:  Okay.  Good.  Thank you.
 2                So I sustain the government's objection to the use
 3      in the opening statement without prejudice to the defendant's
 4      right to elicit the information during the course of the
 5      trial.
 6                MR. WOLPIN:  Thank you.
 7                THE COURT:  All right.  Is there anything else we
 8      need to take up?
 9                Okay.  We can bring the jury in.
10                MR. DAVIS:  Judge, there is one other matter.  I'm
11      sorry.
12                THE COURT:  Logistics are difficult enough.  If I
13      ask you if there's anything else, tell me.
14                MR. DAVIS:  I apologize.
15                THE COURT:  All right.  What's up?
16                MR. DAVIS:  The first witness will be in Missouri
17      by live two-way video.
18                THE COURT:  This is one that's done by agreement --
19                MR. DAVIS:  Correct.
20                THE COURT:  -- with a waiver by the defendant of
21      any confrontation clause rights that he may have to the
22      presentation of that testimony.
23                There is another witness who the government wants
24      to testify by two-way.  The defendant is fully preserving his
25      rights under the confrontation clause to object to that.
```

1          I have that matter under advisement and hope to

2    give a ruling soon.  I'm reading the cases that the parties

3    have presented me.

4          So just let me be clear.  The defendant is not

5    waiving any confrontation clause rights he has to any other

6    video testimony by any other witness.

7          But Mr. Cantwell, I want to just make sure with

8    respect to this witness and this witness only, do you agree to

9    waive any rights under the confrontation clause to have that

10   witness testify in person and instead agree that that witness

11   can testify by two-way video?

12          THE DEFENDANT:  I do, Judge.

13          THE COURT:  And I want to be clear.  You have a

14   really important argument with respect to another witness.

15   You are preserving all of your rights with respect to that

16   other witness.

17          THE DEFENDANT:  I completely understand that,

18   Judge.  Thank you.

19          THE COURT:  Okay.  Thank you.  You can be seated.

20          All right.  I'll instruct the jury on this, that

21   they will be receiving this witness testimony by two-way

22   video.

23          (IN COURT - JURY PRESENT)

24          (Deputy clerk swears in the jury)

25          THE COURT:  Good morning, members of the jury.

1          I'm sure you don't necessarily feel this way, but

2    this is the first time I've been in court with a jury since

3    March, and it's a good thing for me to be back here conducting

4    jury trials again.

5          I've spent a good chunk of the last 40 years of my

6    life in courtrooms in different places, the last 28 years

7    here, and this is going to be different in some ways from the

8    ways in which we conduct trials.  Please bear with us.  We're

9    going to do everything we can to make this an experience

10   that's comfortable for you in which you feel safe and in which

11   you can evaluate the evidence that you're going to be hearing

12   over the next few days and that you can render a verdict that

13   is true and honest and fair to the defendant and to the

14   government.

15         There are going to be some differences.  Some of

16   these are obvious.  Jurors are seated in a different

17   configuration from the way in which we ordinarily have jurors

18   sit, we're all wearing masks, and there will be times in which

19   I may be interacting with the lawyers using a headset like you

20   did during the jury selection process where I will be

21   communicating with the lawyers and they can hear me and I can

22   hear them, but you won't be able to hear what we're saying.

23   In a non-pandemic trial that would be done at sidebar, but we

24   won't have the lawyers come up to sidebar.  So if we do have

25   to speak with them -- if I do have to speak with them on the

1   headset, just bear with us as you ordinarily would at a

2   sidebar conference.

3               I know you're all carefully following the court

4   staff's instructions with regard to social distance, and I

5   would ask you to please follow those instructions throughout

6   the trial for your safety and the safety of the other members

7   of the jury.

8               Other than that I'm going to try to have this run

9   very much like a regular trial.

10              So how's it going to work?  Well, we're going to

11  start, like we do with all trials, with opening statements.

12  So that's going to happen in just a couple of minutes.

13              The lawyers will have an opportunity -- each side

14  will have an opportunity to speak with you and give you kind

15  of a preview of what they expect the evidence in the case will

16  show.

17              After we complete the opening statements, the

18  prosecutors will present their evidence through a series of

19  witnesses and exhibits.

20              The prosecutors will have a chance to ask questions

21  called direct examination of witnesses.  The defense will have

22  an opportunity to cross-examine witnesses.

23              After the defense is completed, the prosecution

24  will have a brief opportunity to ask redirect questions, and

25  generally speaking we'll be done with those witnesses at that

1    point.  I don't generally allow multiple rounds of

2    examination.  I will make exceptions in unusual circumstances.

3           We will then proceed one at a time through the

4    government's witnesses.  And when the government has offered

5    all of the evidence it wants to offer, the government will

6    rest its case and the defense will have an opportunity to

7    present any evidence it chooses to present.

8           I want to remind you of something that we talked

9    about during the jury instructions.  The burden of proof in

10   this case is on the government, as it always is, to prove

11   every element of every charge beyond a reasonable doubt.

12   Unless the government proves the defendant's guilt beyond a

13   reasonable doubt, the defendant must be found not guilty.

14          The defendant is entitled to a presumption of

15   innocence.  Until and unless the government proves his guilt

16   beyond a reasonable doubt, the defendant remains innocent and

17   you cannot find him guilty unless the government proves guilt

18   beyond a reasonable doubt.

19          The defendant has no obligation to present any

20   evidence or to testify.  The defendant has a constitutional

21   right to remain silent and you can't -- if the defendant

22   elects not to produce evidence or not to testify, you can't

23   hold that against him in any way.  The government has the

24   burden of proof here, not the defense.

25          But if the defendant elects to produce any

1    evidence, it will come in in the same way that the

2    government's evidence came in.  Each defense witness will

3    testify, the defense will ask questions, the government will

4    cross-examine, the defense will have an opportunity to ask

5    redirect, and that will be the end of those witnesses.

6              When the defendant's case is completed, I will give

7    you jury instructions on the law.  So we're both judges here,

8    you and I, but we have different roles.  I'm the judge of the

9    law.  I tell you what the law is that you will apply in

10   deciding this case, and that's my job.

11             Your job is to find the facts and determine whether

12   the government has proved the defendant's guilt beyond a

13   reasonable doubt given the instructions on the law that I will

14   give you.

15             Before I give you those instructions, the parties

16   will have an opportunity to make their closing arguments.  So

17   each side will present a closing argument, and the government

18   may have a brief rebuttal argument, and then I'll instruct on

19   the law.  When that's all done, that's when your job of

20   deliberations begins, okay?

21             So there are some important things to keep in mind

22   here.

23             First, you need to keep an open mind.  You can't

24   make up your mind about the guilt or innocence of this

25   defendant until you've heard all the evidence and really until

1    you've heard the arguments, closing arguments, and my

2    instructions because you won't really know the law that you'll

3    be applying here until I give it to you at the end of the

4    case.  So keep an open mind throughout the entire trial, all

5    right?

6             Your verdict in this case has to be based entirely

7    on what happens here in court.  You will hear testimony from

8    witnesses, you will receive exhibits, and you will be able to

9    use your common sense and draw reasonable inferences from that

10   witness testimony and those exhibits.  That's something we

11   call circumstantial evidence.  And you will have to base your

12   verdict on all of that, what happens here in court.

13            I've reminded you not to go out and expose yourself

14   to any discussions of the case in the media.  I've reminded

15   you not to go out and conduct any kind of investigation about

16   this case or even about what your responsibilities are as

17   jurors.

18            Everything you need to decide this case will be

19   provided to you here in court, all right?  So please remember

20   those instructions throughout the case.

21            We'll go for about an hour and a half, usually not

22   much longer than that, and take a break.  We'll take a break

23   at lunch.  We're going to bring your lunch in to you.  You'll

24   have a chance during the break to get outside if you need to

25   take the mask off for a little bit, and we want to make sure

1    you have a good time for lunch but we'll probably just take a

2    one hour break, just get your lunch, the lawyers get their

3    lunch, and then we move right back in for the afternoon.

4    We'll take a break in the middle of the afternoon.

5              You aren't really allowed to speak out.  So as a

6    general matter, you have to sit and remain silent during the

7    proceedings.  But if somebody needs a break for some reason,

8    you know, you need to use the restroom and you can't wait or

9    you need something, just raise your hand and I'll ask you if

10   you need to take a break, okay?

11             I don't have a problem if somebody has a bad back

12   and they want to stand and stretch a little bit, that's fine

13   too.  Feel free to do that.  Just try not to obstruct any

14   other juror's view.

15             Generally speaking, you will see the exhibits

16   displayed on a screen.  It's possible though that there will

17   be times where an exhibit is being displayed but only the

18   lawyers and the judge and the witness can see it, not you.

19   Don't worry about that because sometimes exhibits are not

20   fully admitted.  Until they're fully admitted, they can't be

21   shown to you.  But if you think you should be seeing something

22   and you're not by chance, again raise your hand.  I'll ask you

23   if there's a concern about that.

24             That light on there tells me -- if you look on the

25   front of the bench there behind some of you in the very front

1   row, it tells that you're seeing what I'm seeing.  So if that

2   light is on, I know that you should be seeing what I'm seeing.

3   If it's not on, it's probably because you shouldn't be seeing

4   the exhibit.  But if you have some concern about that, let me

5   know.

6           You also have notebooks.  I want to tell you about

7   what your general responsibilities are with respect to

8   note-taking.

9           First of all, you do not have to take any notes,

10  all right, no obligation to take notes whatsoever.  You're

11  free to take notes if you choose, but if you take notes, don't

12  let it detract from your responsibility as a juror.  You need

13  to be watching the witnesses, listening to the witnesses,

14  looking at exhibits.

15          Your job is not to transcribe what happens in

16  court.  We fortunately have a very highly-trained, skilled

17  person here who will take care of that for us, and you don't

18  need to make a transcript, all right?  So don't get distracted

19  with note-taking.  But if you want to take notes, feel free to

20  do that.

21          There are a couple of things to keep in mind about

22  notes.  First, no one but you will ever see your notebook.  At

23  the end of every day you're going to put it in an envelope.

24  The envelopes will be collected.  Nobody is going to look at

25  them.  It will be given back to you the next day.  At the end

1    of the case your notebooks will be destroyed.  So you can

2    write what you want in your notebook, but I instruct you, you

3    can't show your notebook to other people, other jurors.  The

4    purpose of the notebook is not to help convince other jurors

5    of something.  It's to help refresh your memory if you find it

6    helpful in doing so.

7              So feel free to take notes if you want.  You don't

8    have to take notes.  Don't show your notes to anybody else.

9    Don't read from your notes to anybody during deliberations.

10   We will collect the notes at the end of the day and destroy

11   them at the end of the trial.

12             So those are some general instructions about how to

13   proceed, and I think unless --

14             Does counsel need to see me with respect to any

15   additional matters before we go to opening statements?

16             No.  Okay.  Thank you.  Let's proceed right to

17   opening statements.  The government will go first.

18             MR. DAVIS:  Good morning.

19             This is an extortion case.  It's about the

20   defendant, Christopher Cantwell, a white nationalist radio

21   personality in New Hampshire who wanted to get something.

22             It's about the victim, Benjamin Lambert, known

23   online as Cheddar Mane, who is a Missouri husband and father

24   also involved in white nationalism and who had what the

25   defendant wanted.

1          And it's about the private threats the defendant

2     made in writing and the actions he took against the victim and

3     his family over the course of a few days in June of 2019 all

4     to get what he wanted.

5          So what did the defendant want so badly?  He wanted

6     the personal information of a third white nationalist who went

7     by the name Vic Mackey.  The defendant wanted Vic Mackey's

8     name, address, and identifying information so he could dox Vic

9     Mackey.  That's D-O-X, dox.

10          You'll hear a lot about doxing in this trial.

11     Doxing happens when an online person using a pseudonym is

12     outed on the Internet when the actual name, actual address,

13     and actual identifiers of an anonymous social media figure are

14     suddenly revealed for all the world to see.

15          When a person is doxed, the real world can come

16     crashing down on him.  Particularly when its target has said

17     things that are abhorrent and condemned.  Doxing can wreck a

18     person's reputation, ruin his ability to function in society,

19     causing him to lose his employment and result in threats and

20     even violence from hostile members of the public.

21          The defendant who knew all of this detested Vic

22     Mackey and he wanted to destroy him by doxing him.  And so

23     when the defendant saw a golden opportunity to extort Ben

24     Lambert, a/k/a Cheddar Mane, in Missouri into giving him Vic

25     Mackey's identifying information, he took it.

1          The indictment contains three charges or counts.  I

2   apologize in advance for the coarse language.  All the counts

3   in the indictment name the defendant and pertain to the same

4   time period, mid June of 2019, around the Father's Day

5   weekend.

6          Count 1 alleges that the defendant, with the intent

7   to extort from the victim personal identifying information for

8   Vic Mackey, transmitted a communication in interstate commerce

9   containing a threat to injure the victim's wife.

10          The defendant sent a message through the Telegram

11   app stating:  So if you don't want me to come and fuck your

12   wife in front of your kids, then you should make yourself

13   scarce.  Give me Vic.  It's your only out.

14          Count 2 charges that the defendant again with

15   intent to extort personal identifying information for Vic

16   Mackey knowingly transmitted in interstate commerce

17   communication containing a threat to injure the victim's

18   reputation and a threat to accuse the victim of a crime by

19   doxing the victim.  Meaning posting photos of the victim and

20   his family and disclosing the victim's home address in

21   Missouri and by reporting the victim as a dangerous and

22   drug-using father to Child Protective Services and to law

23   enforcement.

24          The final count, Count 3, charges cyberstalking.

25   It says that the defendant with the intent to harass and

1   intimidate the victim used the telephone and the Internet to

2   engage in a course of conduct that placed the victim in

3   reasonable fear of serious bodily injury to his wife and

4   caused or would be reasonably expected to cause substantial

5   emotional distress to the victim and his wife.

6           The course of conduct included three separate

7   actions:

8           First, the private Telegram messages in which the

9   defendant threatened to dox the victim, report the victim to

10  Child and Protective Services, and rape the victim's wife.

11          Second, the defendant actually doxed the victim by

12  posting the victim's address information along with photos of

13  the victim, his wife, and their three small children on the

14  Internet.

15          And third, telephoning the Child Abuse and Neglect

16  Hotline in Missouri and making a report against him.

17          So that's the indictment.

18          The government expects the evidence will show the

19  following:

20          By the year 2018 Christopher Cantwell was a known

21  media personality in the white nationalist movement.  From his

22  residence in Keene he had a live call-in radio show called

23  Radical Agenda and he was active as a blogger and in various

24  chat groups.

25          Initially, Mr. Cantwell was on friendly terms with

1   a far-right Internet chat group called the Bowl Patrol.  The

2   Bowl Patrol was an association of men who espoused extreme

3   views.

4            Vic Mackey was the founder and the leader of the

5   Bowl Patrol, and the victim who used the name Cheddar Mane was

6   a member of the chat group.

7            The Bowl Patrol was named after the distinctive

8   bowl haircut of Dylann Roof, a man who murdered nine people in

9   2015 in an African American church in Charleston, South

10  Carolina, and was later convicted and sentenced to death.

11           The Bowl Patrol's product, other than their

12  Internet chats and memes, was the Bowlcast, a series of nine

13  podcasts featuring offensive humor and the endorsement of

14  sexism and racism and anti-Semitism and violence.

15           On the first Bowlcast in 2018 the defendant was a

16  special guest, and Bowl Patrol members, including the victim

17  in this case, sometimes called into the defendant's radio show

18  and contributed.

19           But at the end of 2018 relations between the

20  defendant and the Bowl Patrol began to sour.  Bowl Patrol

21  members started making prank calls in to the show in which

22  they imitated voices or made stupid jokes.

23           In February 2019 someone defaced the defendant's

24  website by posting spam and crude images on it.

25           The defendant filed a complaint with the FBI's

1   Internet Crime Complaint Center and identified two Bowl Patrol

2   members as the culprits, Vic Mackey and another man named

3   Mosin-Nagant, and the defendant declared on the Internet that

4   he was going to ruin the Bowl Patrol.  In one post he wrote:

5   I have dox on several of these Bowl Patrol idiots and I'm

6   going to start dropping them until they rat-out Vic.

7            In the meantime, the defendant came into possession

8   of some of the victim's personal information, including his

9   home address in Missouri, as well as photos of the defendant

10  and his wife and the children.

11           The defendant received the photos and information

12  from his ex-girlfriend, a woman known as Peach, who along with

13  another Bowl Patrol member visited Mr. Lambert at his home in

14  Missouri around Thanksgiving of 2018.  After that visit the

15  defendant stored the materials on his computer until he was

16  ready to use them.

17           In March of 2019 the defendant overtly threatened

18  the victim with doxing.  In a chat the defendant told Cheddar

19  Mane to, stay the fuck away from me and my platforms or I'll

20  dox your stupid ass.  When you get doxed, it's all because of

21  Vic, remember that, the defendant said.

22           The defendant definitely got the victim's

23  attention, and after that Cheddar Mane did not contact the

24  defendant.  He also asked his Bowl Patrol associates to do

25  likewise.  The victim did not want to be doxed since no one in

1    his community knew about his online moniker or his association

2    with the Bowl Patrol.

3              A few months went by with the feud seemingly over

4    between Cheddar Mane and the defendant, but on June 15, 2019,

5    an incident happened that changed everything.  The victim,

6    Cheddar Mane, clicked on a link that someone else posted and

7    found himself in a chat group where Chris Cantwell was

8    present.  After a short time the victim left the chat or was

9    excluded from the chat, but Cantwell had noticed him.

10             Mr. Cantwell acted immediately.  Over the next 24

11   hours in a series of direct messages to the victim's Telegram

12   account, the defendant sent the private threats described in

13   this indictment.

14             The defendant's Telegram message, much like a

15   private text message, came in to the victim, the first one, at

16   about 8 o'clock p.m. Central Time on June 15th:  I guess you

17   forgot the lesson which kept you away for a short while, do

18   you need to be reminded, the defendant said.

19             The victim did not initially respond, but after a

20   half hour the defendant wrote the name of the defendant's

21   street in Missouri -- I'm sorry, the name of the victim's

22   street in Missouri.  That's all he wrote, just the street.

23             Then the victim did respond:  What are you talking

24   about?  What do you even stand to gain here?  Every time you

25   think someone you think is in the Bowl Patrol talks shit about

1    you, a public figure, you threaten to dox me?  I honestly

2    don't know what I even did.  I followed the link into a group

3    I didn't even know you were in.  That's what the victim said.

4            The victim was trying to be reasonable, but he was

5    scared and worried about being doxed.  He was so worried that

6    he wrote drafts of possible replies to the defendant's threat

7    and he took screenshots of them.

8            He sent those screenshots to a mentor of his named

9    Paul Nehlen and he asked Nehlen for his advice.  He also

10    telephoned Nehlen to discuss the situation and how to respond.

11            Finally the victim -- the defendant finally replied

12    around 3 o'clock a.m. Central Time on June 16th.  He said:

13    Get a fucking life or I will ruin the one you have.

14            The victim wrote back that afternoon:  All I can do

15    is just leave you alone and tell other people to do the same,

16    which I have done.  Seriously, man, I couldn't care less about

17    what you're trying to do these days.

18            The defendant replied the victim was a fucking liar

19    and that he was going to lose everything you have.  The

20    defendant threatened to post a photo after which he said:

21    You're going to start getting unexpected visitors.  And the

22    defendant wrote:  And I don't care if it's you causing the

23    trouble.  You're the one who's going to suffer because you're

24    the one I can get.

25            Then at 3:47 p.m. on June 16th the defendant

1    revealed his purpose.  Vic Mackey.  If you want to dox Vic, he

2    said, he's a better target, but if you give me fake info, then

3    your wife is going to have trouble sleeping at night until she

4    leaves you and takes your kids away.  So if you don't want me

5    to come and fuck your wife in front of your kids, then you

6    should make yourself scarce.  Give me Vic.  It's your only

7    out.  And after a pause the defendant wrote:  I guess I'm

8    going to have to prove my seriousness.

9          The victim asked the defendant to show him the

10   picture he had.  The defendant sent it.  It was a photo of the

11   defendant's wife at Christmastime in her kitchen smiling and

12   holding an infant with the defendant's two other small

13   children nearby.  More where that came from, the defendant

14   wrote, and then the defendant added, I bet one of my Incel

15   listeners would love to give her another baby.

16         Incel is Internet slang for voluntarily celibate

17   men who cannot find a sexual partner.

18         Next the defendant wrote:  You think the FBI would

19   take issue with an LSD user owning guns around kids?  And he

20   followed up with another photo, this of the victim with strips

21   of cardboard on his tongue.  Give me Vic, the defendant

22   directed.

23         When the victim still refused to supply Vic

24   Mackey's personal information, the defendant spelled out his

25   plan:  All right.  Since you're obviously not understanding

1    the severity of this, I'll do you a favor.  On Tuesday I'm
2    going to send every episode of Bowlcast along with your
3    identifying information to whatever the local equivalent of
4    CPS is in your jurisdiction, but I'm pretty sure once that
5    visit comes you'll understand that this is serious.  If that
6    doesn't work, I'll escalate until I get what I want.  Tell Vic
7    if he gives himself up, he can save your family.  CPS will
8    visit you soon.
9              Although Mr. Lambert, the victim, put up a brave
10   face and he even taunted the defendant, he took the threat
11   seriously and not as a joke.  He lost sleep for a while.
12             With Paul Nehlen he decided to post the entire
13   threatening exchange after covering up his address and
14   covering up the pictures of his family, but to post that in
15   the Bowl Patrol's chat group so his associates would know
16   exactly what the defendant was doing to him.
17             And on June 18th the victim even sought the advice
18   of his lawyer asking whether he should contact the county
19   sheriff in case the defendant actually went through with his
20   threat.
21             In the meantime, the defendant did follow through.
22   On June 17th to the 293 members of the Radical Agenda chat
23   group the defendant doxed the victim just as he had
24   threatened.  He posted for everyone to see two photographs of
25   the victim's wife and children and a photo of the victim and

1    the address, and then he added as commentary:  That's Cheddar

2    Mane, a/k/a Cheddy Blac, and tomorrow morning I'm calling CPS

3    to give them every episode of Bowlcast and inform them that

4    this acid-dropping fake Nazi is endangering these children

5    with his behavior.

6             The defendant identified the victim's home town and

7    street saying:  If I could just drive down to that street and

8    town in Missouri and shoot this idiot, I would, but I can't so

9    I'll let the law do it.  I think when CPS hears that fucking

10   podcast he hosts, they'll pay his fucking criminal ass a

11   visit.

12            And the last thing in that doxing:  I hope the CPS

13   workers in Missouri will break every rule and destroy this

14   scumbag's life.

15            And so the defendant doxed Cheddar Mane and his

16   family all because he wouldn't supply him with Vic Mackey's

17   information so the defendant could dox Vic Mackey.

18            Later that same day, June 17th, the defendant

19   dialed up the Missouri Child Abuse and Neglect Hotline and

20   made a complaint about the victim.  You'll hear a recording of

21   that call in the trial.

22            The defendant said that Cheddar Mane was

23   potentially putting the child in danger.  The defendant

24   identified Cheddar Mane, the father of the children, as a Bowl

25   Patrol member and a drug user and offered to send the Missouri

1    agency all of the Bowlcast recordings.  I think this guy is a

2    problem and the thing is that what he does to the best of my

3    understanding is not a criminal act.  I am looking to make

4    this guy uncomfortable is the truth of the matter.  I think he

5    is bad for my cause, and so I said what can I do about this,

6    and so I called you.

7              Although it documented the defendant's call, the

8    Missouri agency determined that the call did not rise to the

9    level of a report of abuse or neglect.  Ultimately, the agency

10   did not investigate the defendant's complaint.

11             Two days later on June 19th the defendant (sic)

12   called the victim's (sic) radio show directly:  I just wanted

13   to thank you very much for posting pictures of my wife and --

14   but the defendant immediately cut off the call, gave no

15   explanation for it to his listeners, and moved on as if

16   nothing happened.

17             After that there were no more communications

18   between the defendant and the victim, Cheddar Mane, Ben

19   Lambert.

20             The FBI learned about the defendant's threats and

21   extortion in July of 2019.  They interviewed the defendant in

22   September.  The defendant admitted that he had threatened to

23   dox Cheddar and call CPS if Cheddar did not provide Mackey's

24   information.  He also admitted that he had called CPS in

25   Missouri.  He explained that he felt that he did not have

1    protection from law enforcement and that he had to take action

2    himself, but the defendant said nothing about the rape threats

3    and claimed that he had deleted the chats and not retained any

4    records of his communications with the victim.

5           In a second shorter interview with the FBI in

6    October of 2019, the defendant was shown screenshots of his

7    Telegram messages with the victim, and he admitted he sent

8    them.

9           But the defendant knew he had a problem.  He knew

10   he had committed extortion.  In a telephone call with his

11   former girlfriend in December 2019 the defendant explained:

12   The thing that there's liability on is, like I said, give me

13   Vic's information, you know, to prevent me from doing

14   something.

15          In another call in February of 2020 with a

16   different woman the defendant explained:  What I threatened to

17   do is dox this fucking asshole, and then I end up fucking

18   adding CPS to the fucking mix, and I called CPS and they've

19   got the phone call of that.  So, like, you know, that's a

20   different category of -- you know, it's not legal to do that.

21          And in another call in March the defendant

22   explained:  You can harm someone's reputation, you can dox

23   them, but if you say give me something in exchange for it,

24   give me something to prevent me from doing that, then that's a

25   crime.

1            On January 23rd of 2020, the defendant was arrested

2    at his residence in Keene, and the FBI executed search

3    warrants.  On several computer devices, including his cell

4    phone, the FBI found that the defendant had stored records of

5    his threatening text exchange with the victim as well as the

6    personal information and photographs of the victim and his

7    family that he collected.

8            That's a summary of the evidence.  You'll hear a

9    lot of bad language in this trial and you will see and hear

10   images you may find appalling and offensive.

11           The key will be to focus not on the atmosphere but

12   on the actual charges in the indictment, the actual elements

13   of the offenses, and the actual evidence that proves them.

14           I'll ask you to use your common sense and your

15   experience, ask yourself whether the evidence is corroborated

16   by other evidence, and listen and read the defendant's own

17   words as he wrote them and spoke them.

18           I emphasize writing.  The distinctive thing about

19   this crime is it's all written down or recorded.  You will be

20   asked to return again and again to the defendant's written

21   threats on the Telegram message app.  Note that they occurred

22   over the course of many hours with long gaps in between with

23   time to consider and reconsider and write and rewrite and then

24   push send.  What do those writings tell you about the

25   defendant's intent?

1          In the end the evidence will prove beyond any

2    reasonable doubt that the defendant sent a communication

3    containing a threat to injure the victim's wife with intent to

4    extort something he wanted to get.  That he also sent a

5    communication containing a threat to injure the victim's

6    reputation and accuse him of a crime again with intent to

7    extort that same thing of value to him.

8          And finally, that with intent to harass and

9    intimidate the victim he engaged in a course of conduct that

10   placed the victim in reasonable fear of serious bodily injury

11   to his wife or caused or would reasonably be expected to cause

12   substantial emotional distress to the victim or his wife.

13          I'm confident you'll listen carefully and follow

14   the Court's instructions.

15          At the close of the evidence Ms. Krasinski and I

16   will ask you to return a verdict of guilty as charged.

17          Thank you.

18          THE COURT:  Thank you.  We'll hear from the defense

19   now.

20          Mr. Wolpin.

21          MR. WOLPIN:  Thank you.

22          THE COURT:  I need to explain.  We have a little

23   bit of a break here because one of our staff is disinfecting

24   surfaces that someone else will have to touch.  So just bear

25   with us while we do that.  It happens very quickly and

 1    unobtrusively.

 2              (Podium and microphone are disinfected)

 3              THE COURT:  Thank you.

 4              Mr. Wolpin, you can go ahead.

 5              You'll see us doing that when witnesses get off the

 6    stand as well.  We just want to make sure that any surface

 7    that someone is touching gets disinfected before somebody else

 8    touches it.

 9              Go ahead.

10              MR. WOLPIN:  Thank you.

11              Chris Cantwell wanted to be left alone.  Chris had

12    been pushed, taunted, and harassed for months to make him

13    angry, to wind him up, to provoke a bigger and bolder

14    response.

15              After asking his harassers to stop, after asking

16    law enforcement to help make it stop, after posting online

17    that he had talked to the FBI to try to make it stop, after

18    months of harassment continued, it did not stop.

19              Chris responded in kind.  He responded crudely with

20    insults and anger with the only type of language his harasser

21    would understand, but he did not seriously threaten to injure

22    and he did not intend to extort.  His intent was simple.

23    Leave me alone.  Just leave me alone.

24              Chris Cantwell did not threaten to injure, he did

25    not intend to extort, and he did not cyberstalk.  He is not

1    guilty.

2            Before we get to what happens in this case, I want

3    to point out the following:  The prosecution has asked you

4    largely to focus on a tiny snapshot, that June 15th, June 17th

5    time frame, and then for all kinds of malice on the part of

6    Chris, a true threat to injure and intent to extort in that

7    brief window of time.

8            But this case is a movie, not a snapshot.  You need

9    to see, hear, and understand a longer story, a bigger

10   landscape, the men's relationship over months, the language

11   they used with each other and the language they used in

12   public.  To understand Chris's intent, to understand why he

13   felt he had to use the words he used in order to be left

14   alone, you need to see the movie and not the snapshot.

15           Chris Cantwell, over here in blue, came to Keene,

16   New Hampshire, because of our Live Free or Die motto and our

17   libertarian ideals.  He created a website and hosted an online

18   radio show with callers.  He did so under his own name.  The

19   website was christophercantwell.com.  It was his public

20   platform.  It was his business.  It was how he supported

21   himself.  How he paid the rent.

22           He operated like a white nationalist shock jock

23   Howard Stern.  That was his thing.  Callers would call in and

24   chat about everything from mainstream conservative politics,

25   Trump, the Democrats, to far-right, far-fringe white

1    nationalist ideas.

2          The show was uncensored.  His callers used crude

3    and derogatory language.  Chris said outrageous things, used

4    filthy and sometimes racist language.  He has significant

5    notoriety because of his show.

6          He knows that many will not like him because of

7    what he has said.  He knows that you may not like him because

8    of what he has said.  But he says what he says under his own

9    name.  He doesn't hide behind a mask or fake name or online

10   anonymity.  Chris Cantwell stands in public for better or

11   worse as Christopher Cantwell.

12          Now, you will also hear from Ben Lambert.  He is

13   the alleged victim in this case, but to Chris he was never Ben

14   Lambert.  To Chris he was Cheddar Mane or Cheddy Blac or some

15   other moniker meant to hide Ben Lambert's true identity.

16          Ben Lambert was part of a group who hid behind

17   nicknames and labels and characters who called themselves the

18   Bowl Patrol.  As the government explained, the Bowl Patrol

19   honors the hairstyle of their self-chosen saint, the person

20   they idealized, Dylann Roof, the mass murderer of nine black

21   church-goers in South Carolina.

22          And Cheddar Mane and the Bowl Patrol used

23   disturbing humor and talk and repetition to discuss rape and

24   murder and hate and genocide over and over again.

25          In the fall of 2018 the Bowl Patrol and Cheddar

1    Mane developed a new hobby.  The hobby was to troll Chris for

2    sport.  To push him, enrage him, destroy his show.  Basically

3    ruin him.

4           Chris had a brief relationship with the group

5    online, but that quickly soured and to the Bowl Patrol Chris

6    was a phony, a fake, a sellout, and whatever other word they

7    could come up with.  Not one of them.

8           So Cheddar Mane and the Bowl Patrol called Chris's

9    show incessantly from different phone numbers and different

10   characters to interrupt and to disrupt, and you will hear some

11   of these calls.  You will hear what they said, how angry they

12   made Chris, how Cheddar Mane would laugh and discuss them on

13   his own podcast about how their goal was to really piss him

14   off.

15          What Cheddar Mane wanted was how far can I push

16   Chris?  How angry can I make him?  How outrageous a reaction

17   can I trigger?

18          What Chris wanted from Cheddar Mane and the Bowl

19   Patrol was just leave me alone.  Chris tried to make it stop.

20   He contacted phone companies and Internet hosts to try to

21   block their calls so at least they couldn't call in and ruin

22   his show.  He blocked Ben Lambert's phone at one point.  That

23   didn't work.  They didn't leave him alone.

24          In February 2019 after four months of this, four

25   months, the Bowl Patrol defaced his website with pornography

1    and violent content and Chris reached a breaking point.

2    Enough.  He reported his cyber harassers to the FBI in

3    February.

4              What did the FBI do with that report of crimes

5    against Chris Cantwell?  They did nothing.

6              So Chris went online and he said to the world and

7    he posted on an online post:  I reported the Bowl Patrol to

8    the FBI for harassing me.  Stop.  Just leave me alone.

9              But they didn't stop.  They didn't leave him alone.

10   The Bowl Patrol -- to the Bowl Patrol this only proved that

11   Chris was the worst kind of white nationalist, a snitch, a

12   rat, a federal informant who works with the FBI.

13             In March, another month later after Chris's plea

14   for help from the FBI, Chris and Cheddar Mane were in an

15   online chat.  Chris told Cheddar Mane in that chat he would

16   release his true identity, his Ben Lambert identity, if he

17   didn't leave him alone.

18             The online Cheddar Mane calls for mass murder of

19   children, but offline Ben Lambert has a wife and kids.  Online

20   Cheddar Mane jokes about rape and murder.  While offline Ben

21   Lambert hides himself from his wife and family and community.

22             Chris thinks in March by warning him, not by doing

23   anything, by just saying I could release your identity, he

24   loses power of anonymity.  He would stop.  The harassment

25   would stop.  Leave me alone.

1              In June 2019 Cheddar Mane and others from the Bowl

2    Patrol enter a chat room of Chris's and they started in with

3    their usual business, but this time instead of being some

4    other anonymous name Cheddar Mane was Cheddy Blac, and Chris

5    recognized it was Cheddar Mane once again and so Chris sent

6    Cheddar Mane a private message, again as the government noted,

7    referencing the prior time:  Didn't you learn your lesson?  I

8    told you leave me alone.

9              And the two are quickly off and running.

10             You are going to see the full transcript of that

11   back and forth over two days.  It is ugly and crude.  Both men

12   are trafficking in the type of language that Cheddar Mane and

13   Chris use.

14             Chris says nasty things about Cheddar Mane's wife.

15   Says:  If you don't want me to come and fuck your wife in

16   front of your kids, then you should make yourself scarce.

17   Make yourself scarce.  Leave me alone.

18             But it was never a true threat.  It was bluster and

19   exaggeration and mutual linguistic combat.  There was no true

20   threat to injure or rape.  The word rape was never used.

21             And thus, Chris is certainly not guilty of the

22   first count the government discussed with you.

23             Now, Cheddar Mane being Cheddar Mane decides at

24   some point to egg Chris on, to wind him up.  He suggests

25   something bad will happen to Chris's ex-girlfriend:  I guess

1    you don't care what happens to her.

2              And he starts into his usual business:  Ha, ha, ha.

3    Oh, no.  I'm super scared.  Do your best.  You are hilariously

4    pathetic.

5              And the conversation ends with the capstone, the

6    Bowl Patrol's favorite piece of humiliation, a naked

7    photograph of Chris Cantwell -- or in this case a naked

8    drawing of Chris Cantwell.

9              Cheddar Mane knew at the time that this was

10   over-the-top bluster, and he responded in kind because it was

11   not a true threat.  He pushed it along trying, as he had so

12   many times before, to make the pot boil.

13             And when it was all done, Cheddar Mane did not call

14   the police out of fear for his safety.  He called Chris's live

15   show online to see if he can provoke an on-air dispute for his

16   friends' entertainment.  He does not after the exchange is

17   over forward it to law enforcement.  What did he do with it?

18   He gets ready to post it online within hours.  Again, with the

19   naked picture of Chris over the top of his own family, and

20   within hours this private chat has been posted to the Bowlcast

21   website.  Within days Cheddar Mane is online calling Chris a

22   fed, snitch, nigger, kike.  This was not serious.  This was

23   not a crime.

24             And Chris, now that Cheddar Mane has made this all

25   public, feels the pressure to follow through.  His outrageous

1   insults, his private bluster, begin to reign down on him

2   again.  If he doesn't called CPS, if he doesn't follow

3   through, what then?

4           So he posts a picture on a website frequented by a

5   few hundred people, not CNN, not New York Times.  Cheddar

6   Mane's response online is this is "a pathetic dox."  That's

7   how he saw it.

8           Being egged on and being boxed in, Chris called

9   CPS.  You're going to hear that call my guess is in a few

10  minutes.  He gave his name.  He gave his address.  He told

11  them who he was.  He says why he's calling.

12          It wouldn't stop.  Maybe this will work.  Maybe

13  they will leave me alone.

14          And the storm does temporarily pass at that point

15  between Chris and Cheddar Mane.  A number of months go by,

16  July, August, September.  In any of those months did Cheddar

17  Mane go to the police?  No.  Why would he?  Chris is

18  "hilariously pathetic."

19          And the two men do not communicate again.  No

20  calls.  No texts.  No chats.  One chapter in what is a long

21  saga between Bowl Patrol and Chris Cantwell.

22          Child Protective Services doesn't show up at his

23  house and the men move on.

24          So how do we get here then with a witness list full

25  of FBI agents, with you in court, with Chris in court, if

1    Cheddar Mane never thought this was such a real thing that he

2    should go to the police?

3           I'll take you back a few months in the story, back

4    to February when Chris made his complaint to the FBI about

5    them that they never looked into.

6           Chris goes to his local police department in May in

7    Keene, a detective.  He talks to him.  The Keene detective

8    helps him get in touch with the FBI.  And in September, seven

9    months after he asked for help, he showed up to meet with the

10    FBI to in his mind talk about the harassment and cyber crimes

11    that happened to him.

12           He shows up with no protections, no promises, no

13    lawyer thinking and hoping he'll be treated like anyone else

14    complaining of a crime committed against him.  He knows he's

15    not the most likable person.  He understands that there's a

16    risk that they will not see him as a crime victim, and what he

17    found was the FBI's interest was in prosecuting Chris Cantwell

18    and not investigating the crimes against him.

19           Chris begins to panic.  He begins to worry and

20    wonder, did I in fact do something illegal in June in that

21    interaction?  He never in a million years thought he made a

22    threat to rape, but what about the Child Protective Service

23    thing?  What about the part about asking for the identity of

24    the Bowl Patrol member?

25           And so he does what we all do now, the worst idea

1    we all have, which is to go to the Internet.  Try to figure it

2    out.  Try to understand what he did.  Try to figure out

3    whether it's a crime.

4            And you'll hear several recordings, as the

5    government noted, of him talking with his friends, stumbling

6    and bumbling over statute numbers and legal terms, things he

7    wasn't even charged with at the time, trying to figure out and

8    explain what might give him liability.

9            The government will call these confessions, but

10   listen carefully.  Consider his fits and starts.  Consider how

11   he tries to piece together some way he might be liable.

12           So Chris meets with them in September thinking he's

13   going to meet with them about this harassment, but it becomes

14   about the interaction with Cheddar Mane.

15           And so after the meeting the FBI goes on down to

16   Missouri to meet with Ben Lambert not really to look into

17   Chris's complaint.  The FBI had made a decision.  Its purpose

18   was to get what they needed out of Ben Lambert to prosecute

19   Chris Cantwell.  To get Ben Lambert on board.

20           They made their interest clear to Ben Lambert right

21   from the beginning.  They are the one that told him this

22   threat was serious, not the other way around.  They told him

23   that the FBI was not "letting this go."

24           Ben Lambert was presented with a clear and obvious

25   choice.  If you give us what you want, if you say this is

1   serious, then Cheddar Mane, the FBI said, can go off into

2   oblivion and disappear.

3           The converse was true, too.  If you don't get on

4   board, they make it very clear we know who you are online.

5   We've listened to the Bowlcast episodes, we know what you say,

6   and they hold that over his head.

7           To understand what that means -- to understand what

8   it meant, excuse me, to Ben Lambert to have the FBI hold the

9   Bowlcast over his head to get his cooperation, you need to

10  understand a little bit about what was on those podcasts.

11          Ben Lambert will explain that as part of Bowl

12  Patrol they tried to go to the edge of illegality.  That fine

13  line between when something is legal and something is illegal

14  without crossing over it.  But when you repeatedly go to the

15  edge, sometimes you're going to cross that line.

16          Sometimes, as you will hear, the humor fades away

17  and the true incitement to violence, the true terrorism that

18  is the Bowl Patrol comes out.

19          He crossed that line, and the FBI told him if he

20  said what they needed him to say, Cheddar Mane could go off

21  into oblivion.  That is how the FBI held Bowl Patrol over his

22  head.

23          Ben Lambert knows what he said.  He knows what now

24  to say, and he told the FBI what they wanted to hear, and that

25  is now why we're here.  Chris as a criminal defendant.  Ben

1    Lambert as an alleged victim.

2              Now, you will hear from us just like the government

3    will approach you at the end and have a further discussion

4    when we have the Judge's instructions of the law.  At that

5    time we'll go through in far finer detail the law of the case,

6    but this is the broader picture.  This is the greater story

7    you will need to understand to understand that law, to

8    understand why Chris Cantwell is not guilty.

9              What Chris wanted was for Cheddar Mane to leave me

10   alone.  How do you say leave me alone to someone whose entire

11   identity is wrapped up in trolling and violence and threats

12   and harassment?  He said what he said to be left alone.

13             Chris Cantwell is not guilty.

14             Thank you.

15             THE COURT:  Thank you, counsel.

16             Members of the jury, our first witness, let me

17   verify this, will be testifying by two-way video.

18             Is that correct?

19             MR. DAVIS:  Correct, Judge.

20             THE COURT:  All right.  I think it's a good time

21   for us to take our mid morning break now so we can set up the

22   video testimony and have it ready for you.  So we'll take a

23   short break.

24             I also -- I have another matter related to this

25   case that I have to attend to, so the break may stretch a

1    little longer than I would otherwise like.  I'll try to do it

2    as quickly as I can.  But in some way trials are like a play

3    where you go to the theater where you see what's on the stage,

4    but there's a lot of stuff going on behind the scenes that you

5    don't necessarily see, and I've got to attend to a lot of

6    different kinds of things to keep this all moving.  So bear

7    with me.

8             We'll take a break.  I'll get back to you as soon

9    as I can.  We'll go on and we'll probably go till 12:30 and

10   try to take a hard break at 12:30 for lunch, okay?

11            Yes, ma'am.

12            THE JUROR:  I'll need to see the jury clerk.

13            THE COURT:  I'm sorry?

14            THE JUROR:  I will need to see the jury clerk.

15            THE COURT:  You can speak to the court manager

16   here.  All right.  Thank you.

17            (RECESS)

18            (IN COURT - NO JURY PRESENT)

19            THE COURT:  I have two issues.

20            A juror after hearing opening statements claims to

21   have knowledge about the case and Mr. Cantwell.  I want to

22   bring the juror in, ask her some brief questions, excuse her,

23   ask the parties for their views, and we'll proceed from there.

24            Does anybody have a problem with that?

25            MR. LEVIN:  No, your Honor.

1            MR. DAVIS:  No.

2            THE COURT:  Then I will address the issue of the

3    member of the public who wants to enter the courthouse without

4    a mask.

5            So if we could bring the juror in and seat her at

6    the witness stand.

7            (Juror enters the courtroom)

8            THE COURT:  So good morning, ma'am.

9            I want to assure you you've done nothing wrong,

10   everything is fine, and you did exactly the right thing by

11   asking to speak to the case manager.

12           Could you briefly just tell us here in court what

13   you told the case manager?

14           THE JUROR:  Okay.  Good morning still.

15           So when we were in initial jury selection last

16   Tuesday morning we had video conferencing audio that read the

17   defendant's name, and I thought I heard Cantrell.  We only

18   heard it once.

19           After that we went through jury selection and I did

20   not see the defendant except from finally the back right-hand

21   side of the court or back left-hand side at a diagonal.  I did

22   not recognize him as Chris Cantwell from the incident in

23   Charlottesville, Virginia, my home town, and where I was

24   actually after the event the Emergency Manager for the

25   University of Virginia that developed the AAR evaluating the

1  events, known associates of those individuals involved in the

2  murder of Heather Heyer, and subsequently a computer software

3  program known as Veoci.  It is an incident management and

4  clearance platform.

5          THE COURT:  All right.  So you have prior knowledge

6  of Mr. Cantwell and his association with the Charlottesville's

7  incident?

8          THE JUROR:  Correct.  And I have concerns that I

9  would not be truly non-prejudicial towards him that, that I

10 could not be absolutely fair with that prior knowledge and

11 exposure, pretty intimate exposure to --

12         THE COURT:  Have you discussed your familiarity

13 with Mr. Cantwell with any member of the jury?

14         THE JUROR:  No.  I have said nothing, nor to family

15 members or anyone knowing I was on jury duty.

16         THE COURT:  All right.  Thank you, ma'am.

17         The clerk will take you to step outside for just a

18 moment, and then I'll bring you back in in a second, okay?

19         THE JUROR:  Okay.

20         (IN COURT - NO JUROR PRESENT)

21         THE COURT:  For the person who just called in by

22 video, you're going to be muted in a second and then we'll

23 start you when we're ready to go.

24         All right.  So this doesn't seem to be a close call

25 to me.  I think we can all agree that the juror should be

1    excused.

2             I'm confident that she has not disclosed any of her

3    information to any member of the jury.  If anyone would like

4    me to conduct any further examination, I will, or if anyone

5    wants to object, I'll hear that, but it seems to me obvious.

6             I want to thank her for her service and excuse her.

7    Does anybody disagree?

8             MR. LEVIN:  No, your Honor.

9             MR. DAVIS:  No.

10            THE COURT:  All right.  Thank you.

11            Can we bring the juror back in.

12            (IN COURT - JUROR PRESENT)

13            THE COURT:  All right, ma'am.  I'm sorry to have

14   inconvenienced you.  You did exactly the right thing.

15            It's a challenge when you want to select a jury

16   that doesn't know anything about something like

17   Charlottesville but also making sure that those that do can

18   associate the person with this case.  We didn't succeed

19   perfectly with you, and that's more on us than it is on you.

20   You've done exactly what you should do.  You disclosed.

21            We do not want to have people on the jury who are

22   familiar with Mr. Cantwell's past association with

23   Charlottesville, so I'm going to have to excuse you from

24   service.

25            Thank you again, and you're done.  You're released

1   from your oath and you can do whatever you want with respect

2   to the trial.

3            Do you have anything in the jury room?

4            THE JUROR:  No.

5            THE COURT:  You've got everything with you?  Good.

6            Sorry.  I won't even allow you to go back in and

7   say anything to anybody.

8            The clerk will help you out, and we'll get going

9   with the trial.

10           Thank you for your service.

11           THE JUROR:  Thank you all and good luck.

12           (IN COURT - NO JUROR PRESENT)

13           THE COURT:  All right.  Be seated again.

14           So now let me take up the issue of the member of

15  the public that would like to be admitted to the court without

16  a mask.

17           I've asked the member of the public who wants

18  admission without a mask to submit a written request.  He's

19  done so.  You have a copy of it.  He's someone who's on the

20  defense list of people to be brought into the courtroom, so

21  I'll hear from the defendant first.

22           What, if anything, do you want to say to me with

23  respect to this particular issue?

24           MR. WOLPIN:  From our perspective ideally this

25  person could come in and witness the trial.  As the Court

1  noted, he is on Mr. Cantwell's list of three individuals he

2  asked to be here as a support person in this case.

3           I understand maybe it's somewhat lacking in detail

4  as to what the medical condition would be that would allow the

5  Court to make the necessary finding.

6           THE COURT:  Yeah, the chief deputy clerk told me

7  that he refused to provide any additional detail regarding his

8  medical condition.

9           MR. WOLPIN:  Ultimately -- I mean, I guess I'll see

10  what the government's position is and what the Court says.  I

11  mean, we would like to find a way for him to be admitted but

12  understand the Court has authority to make certain rules and

13  requirements.

14           THE COURT:  All right.  Thank you.  I appreciate

15  that.

16           The government's position?  Do you have a view?

17           MR. DAVIS:  Judge, I guess we oppose the motion.

18           The court has safety rules that should be followed

19  and applied, and I think the Court has the right under the

20  circumstances of the pandemic to enforce those.

21           The only thing I can think of is, if it were

22  readily doable, to set up a private room where the video feed

23  that is going to the -- you know, there could be essentially a

24  different room for overflow viewing that would just have this

25  petitioner sitting in it.  And if he would be willing to wear

1   a mask entering the courtroom, courthouse, going all the way

2   through the public areas and then be seated there, he could

3   take off his mask sitting alone in his room.  I don't think we

4   would object to that, but I don't know that that's feasible at

5   all and it hasn't been raised ahead of time so the motion as

6   has been made we oppose.

7          THE COURT:  All right.  So let me just lay a little

8   groundwork here and explain my ruling.

9          So as the parties know, we're among the first

10  federal courts in the country to resume holding jury trials

11  during the pandemic.  We've done that after very careful

12  evaluation of risks and benefits.  We're mindful of the -- our

13  defendants who are charged with crimes have a right to a

14  speedy trial.  The public has a right to have criminal charges

15  heard against people who have been charged.  We want to have

16  trials as soon as we can hold them safely.

17         Developing a mitigation plan for conducting trials

18  was central to the work that we've done in preparation for the

19  trial we're holding here today.  I can't tell you how many

20  hundreds of hours have gone into the preparation of our

21  mitigation plan.  We have consulted with an expert.  We have

22  made physical changes to the courtroom.  We have tried to

23  acquaint ourselves with the most recent information regarding

24  how COVID-19 is spread.  And I have to say that mask wearing

25  is one of the central aspects of our mitigation plan and we

1    simply cannot lightly deviate from that aspect of the

2    mitigation plan.

3           Now, Mr. Cantwell has a right to a public trial.

4    The general public has a constitutional interest in public

5    trials that have to be respected.  I would not do anything

6    lightly to interfere with the ability of the public to attend

7    these proceedings.  We have made space in this courtroom for

8    as many members of the public as we can safely accommodate.

9    We have an overflow courtroom where people who might want to

10   attend can observe the proceedings through live streaming.

11          We cannot allow someone without a mask into the

12   courtroom here or the overflow courtroom without endangering

13   the safety of the people who are required to be here and who

14   want to be here.

15          And so I recognize that there is an important

16   constitutional right of access.  I also note that this member

17   of the public claims to be a minister and that mask wearing is

18   inconsistent with his religious views.  And clearly there are

19   First Amendment rights that people have that need to be

20   respected even when they come into the courthouse, and I'm

21   mindful of those rights, but neither the right of public

22   access to a trial nor any free expression rights a member of

23   the public may have are absolute.

24          I simply do not believe that under these

25   circumstances I can accommodate this person's request by

1    allowing him into the courthouse without a mask.

2            I also note that although he was requested to

3    explain his medical condition so that I could evaluate it and

4    to the extent to which it supported his claim that he couldn't

5    wear a mask, he's refused to do that.  He also has provided me

6    with no supporting information regarding his religious views,

7    so I'm really in no position to evaluate those either.  But

8    even if he provided that information, I have to be very

9    cautious about granting any exceptions to mask wearing.  We

10   have been open to considering limited exceptions for people

11   who are actually testifying while they're actually testifying

12   or lawyers who are questioning while they're questioning,

13   we've considered those kinds of issues, but we have to

14   strictly limit that if we allow them at all.

15           So I simply don't believe at the present time

16   there's any way that I can accommodate his request, and I

17   don't believe he has sufficiently documented it or justified

18   it.

19           Now, Mr. Davis, you present an interesting

20   solution.  If he wears a mask to come into the courthouse and

21   we can arrange a separate room for him to take a stream, I

22   don't know how feasible that would be.  I would have to

23   evaluate it with my staff.  I'm certainly not in a position to

24   do it now.  I'm willing to consult with them about it.  And

25   we'll take the member of the public's name and contact

1  information and if we can feasibly arrange something like that

2  without compromising public safety, I'm willing to consider

3  that, but that's something we haven't built into our plan and

4  I would need to investigate.

5          He can't go into the overflow courtroom because

6  there are other members of the public that might wind up in

7  there, and I can't allow him to put them at risk because he

8  doesn't have the ability or doesn't want to wear a mask.

9          So I'm going to deny the person's request at this

10  moment.  I'm going to ask the chief deputy clerk to take the

11  contact information for the individual.  I will consult with

12  my staff about whether it is possible to consider the

13  request -- the suggestion that Mr. Davis has made.  And if it

14  is, we'll contact him and try to set it up, but that too would

15  require me to very carefully analyze the safety implications

16  of that kind of practice, because we really require members of

17  the public who come into our building to be wearing masks at

18  all times when they're in public spaces and all of our staff

19  does when they enter into public spaces as well.

20          So I'm willing to consider that, but I can't do it

21  now and I don't want to delay the trial further.

22          So I would instruct the chief deputy clerk to tell

23  the witness I've heard his request.  I've reviewed it with

24  counsel and with the defendant present.  I've denied the

25  request.  I'm evaluating whether there's any alternative that

1  we can provide him that is consistent with our need to protect

2  public safety.  And if we should decide there is a way to

3  accommodate him, I will have you notify him.  And if not, he

4  simply has to take the ruling and decide what if any action he

5  wants to take next, okay?

6            All right.  Thank you.

7            Are we ready to bring the jury in?  I propose to

8  say nothing to the jury about the juror who has left.

9            Does anybody want me to say anything?

10           MR. DAVIS:  No.

11           MR. WOLPIN:  (Nods negatively.)

12           THE COURT:  No?  Okay.  Thank you.

13           (IN COURT - JURY PRESENT)

14           THE COURT:  All right.  Our first witness is going

15  to be testifying by video.  You should be able to see the

16  witness testifying and hear the witness testifying.

17           The witness will be under oath and you may consider

18  the witness's testimony in the same way you would consider any

19  other evidence presented live from the witness stand here in

20  court.

21           So this is a sworn witness testifying in the same

22  way the witness would testify in court and you can consider

23  that testimony in the same way you would consider the

24  testimony of any other witness.

25           If you're ready to proceed, the clerk should

1    administer an oath and we will proceed with the direct

2    examination.

3                          SARAH SMITH

4         having been duly sworn, testified as follows:

5              THE CLERK:  Would you please state your name and

6    spell your last name for the record?

7              THE WITNESS:  Sarah Smith, S-M-I-T-H.

8              THE CLERK:  Thank you.  You may be seated.

9              THE COURT:  All right.  Did I see -- is our IT

10   person here, Mr. Chiavaras?

11             THE CLERK:  He just stepped out.

12             THE COURT:  Would you grab him a second?

13             I'm just wondering if there's a way to display the

14   witness's box on a full screen rather than counsel.

15             All right.  You can proceed, Mr. Davis, and we'll

16   see.  It would be preferable if I could get the witness up on

17   a full screen image rather than a split screen.

18                      DIRECT EXAMINATION

19   BY MR. DAVIS:

20        Q.   How are you employed?

21        A.   I'm the Deputy Director of the Missouri Children's

22   Division.

23        Q.   And are you in the Missouri Department of Social

24   Services?

25        A.   I am.

1      Q.    And would you summarize briefly, please, your

2   experience working for Department of Social Services in

3   Missouri?

4      A.    I've worked with the Department of Social Services

5   Children's Division since April of 2006.  I did investigations

6   and then also out-of-home investigations, worked at the

7   hotline, which is our centralized unit for the state of

8   Missouri.  I was also a unit manager of the hotline and have

9   been a Deputy Director with Children's Division since January

10  of 2020.

11             THE COURT:  Excuse me, ma'am.  This is the judge.

12             I can't see well enough to know.  Is there a

13  microphone in front of you or is it a remote mic?

14             Now I'm not hearing you at all.  Ma'am, can you

15  speak again, please?

16             All right.  I think what we need to do is take

17  another break and see if we can set this up so it's working.

18             MR. DAVIS:  Are you on mute, Ms. Smith?

19             MR. LEVIN:  Your Honor, we just wanted to renew our

20  oral motion to exclude this witness.

21             THE COURT:  The one you made previously?

22             MR. LEVIN:  Yes.

23             THE COURT:  And the same grounds you identified for

24  me previously?

25             MR. LEVIN:  Yes.

1          THE COURT:  Your objection is noted and preserved

2    for the record.

3          MR. LEVIN:  Thank you.

4          THE COURT:  All right.  I think we need -- the

5    screen is frozen and we need to take a break.  I'll remain in

6    the courtroom and bring you back in as soon as I can.

7          (IN COURT - NO JURY PRESENT)

8          (IN COURT - JURY PRESENT)

9          THE COURT:  Sorry about that, folks.  I wanted you

10   to be able to see the witness better by having her on the full

11   screen, and then we had a problem with our audio system.  We

12   had to reboot it.  I think we're ready to go now.

13          I would ask the witness to please speak loudly.

14          Mr. Davis, go ahead.

15          MR. DAVIS:  Shall I start again, your Honor?

16          THE COURT:  Please feel free.

17   Q.   How are you employed?

18   A.   I'm the Deputy Director with Children's Division

19   within the Missouri Department of Social Services.

20          THE COURT:  Hang on a second.

21          MR. LEVIN:  I don't believe the witness can see the

22   attorney.  That's the only thing I want to point out on the

23   screen.

24          THE COURT:  All right.  Let me ask the witness.

25          What do you see on your screen, ma'am?

```
 1              THE WITNESS:  You, your Honor.

 2              THE COURT:  Me.  Okay.

 3              Could we switch the view to the counsel?

 4              Good.  I think we're good to go.

 5              Thank you, Mr. Levin.

 6       Q.    How long have you worked, Ms. Smith, for the

 7  Missouri Department of Social Service?

 8       A.    Since 2006.

 9       Q.    Sorry?

10       A.    Since 2006.

11       Q.    2006?

12       A.    Yes.

13              THE COURT:  Just shout out your answers, ma'am,

14  okay?

15              THE WITNESS:  Okay.

16       Q.    And when did you become a supervisor?

17       A.    I've been with the Children's Division since 2006

18  as an investigator, then a supervisor in 2008, and then after

19  that a unit manager, and then I've been Deputy Director of

20  Children's Division since January 2020.

21       Q.    And would you briefly summarize, please, your

22  duties of Deputy Director of Children's Division?

23       A.    Yes.  My duties entail everything on the front end

24  of the child welfare system, so before a child comes into

25  care.  That would include the Child Abuse and Neglect Hotline,
```

1    investigations, and family-centered services that we offer.

2         Q.    Okay.  And do your duties include the hotline that

3    the Missouri department runs for child abuse and neglect?

4         A.    That's correct.

5         Q.    All right.  I have a few questions about the

6    specific recording in this case.

7              Are you familiar with a recorded telephone call

8    from Christopher Cantwell to the Missouri Child Abuse and

9    Neglect Hotline that occurred on June 17th of 2019?

10        A.    I am.

11        Q.    All right.  And do you recall approximately when

12   you became aware of that call?

13        A.    It was the fall of 2019, probably October, when I

14   was contacted by the FBI.

15        Q.    All right.  And did you play a role in actually

16   finding that recording in archives and providing it to the

17   FBI?

18        A.    I did.

19        Q.    And did you find it and send it to FBI?

20        A.    Yes.

21        Q.    And did you listen to the call?  Are you familiar

22   with it?

23        A.    I have listened to it since then.  I did not listen

24   to it prior to providing it to the FBI.

25        Q.    Okay.  Now, just a few questions about how calls

1    are categorized.  When someone calls in and makes a report to

2    the Child Abuse and Neglect Hotline in Missouri, what are the

3    basic ways the call that be categorized?

4         A.   The calls that are received at the Missouri Child

5    Abuse and Neglect Hotline can be sent out to the field as an

6    investigation or an assessment or screened out as a documented

7    call.

8         Q.   All right.

9         A.   There are also referrals that we would send out

10   that do not meet the criteria for a --

11        Q.   Speak a little more slowly, Ms. Smith.  The

12   criteria at the end, what did you say?

13        A.   A referral.

14        Q.   Okay.

15        A.   It would either be a report or a referral or a

16   documented call.  Those are our three categories.

17        Q.   Okay.  Now a report did you say can be either an

18   investigation or an assessment?

19        A.   That's correct.

20        Q.   And is an investigation or assessment the highest

21   level of reports that come in to child abuse and neglect?

22        A.   An investigation would be the highest report that

23   would come into the hotline in Missouri.

24        Q.   Okay.  In investigations -- once a call is treated

25   as an investigation, what role does law enforcement have?

1      A.    Sure.  In Missouri state statute requires law

2  enforcement to co-investigate all investigations.

3      Q.    Okay.  So when you say co-investigate, does that

4  mean your agency notifies law enforcement and invites them to

5  participate in the investigation?

6      A.    That's correct.

7      Q.    Okay.  And what's the difference between an

8  investigation and an assessment?

9      A.    An investigation is typically something that would

10  be criminal in nature, and then an assessment is more

11  something that the family receives in services.

12      Q.    Okay.  So an assessment is about basically finding

13  services that could help the child in the situation?

14      A.    That's correct.

15      Q.    All right.  Now, when you do either an

16  investigation or an assessment, to what extent is a

17  walk-through of the home required?

18      A.    Sure.  Our policy requires that a walk-through of

19  the home is done to ensure that it's safe for the child and

20  children on every report.  So that would include an

21  investigation or an assessment.

22      Q.    All right.  And how soon does a walk-through occur

23  after a report is received?

24      A.    Typically within 72 hours of the report being

25  received a walk-through is completed.  Depending on the

1   allegations, it could be within the first three hours of

2   receiving a report.  It depends on the specific circumstances.

3        Q.   And when a walk-through occurs, what actually

4   happens?

5        A.   An investigator would go to the home with law

6   enforcement if there is an investigation or without law

7   enforcement potentially for an assessment.

8             THE COURT:  Excuse me, ma'am.  This is the judge

9   again.

10             We're having a little trouble hearing everything

11   you say.  So I'm going to ask you to speak a little slower

12   because you tend to go quickly.  It's common for people

13   testifying to move quickly, but I would ask you to try to

14   speak slower.  I would ask you to try to speak as loudly as

15   you can.  Even if it seems a little unnatural for you, to

16   shout out your answers.  And particularly at the end of your

17   answers you tend to trail off a little bit, and that's when we

18   have the most difficulty hearing you.  All right?  So just try

19   to bear in mind those things.

20             Counsel, could you put the question to the witness

21   again?

22        Q.   What actually occurs on a walk-through?

23        A.   On a walk-through of the home the Children's

24   Division usually arrives at the home and ensures that it's a

25   safe environment for children.

1      Q.   And does law enforcement also participate in a

2   walk-through if law enforcement is co-investigating?

3      A.   Yes, they do.

4      Q.   All right.  And to what extent is the parent

5   notified that the walk-through is going to occur?

6      A.   Children's Division wants to make sure that the

7   home is safe whenever we arrive, and so we typically do not

8   give notice that we're coming to the home.

9      Q.   All right.  So you show up without notice?

10      A.   Correct.

11      Q.   All right.  Now, when the Children's Division does

12   an investigation or an assessment, to what extent do you

13   interview children?

14           THE DEFENDANT:  We're required to interview

15   children on each investigation or report and make contact and

16   ensure that they're safe, and so we do that typically outside

17   of the home setting if we can in a safe environment.

18      Q.   And does that sometimes require interviews of

19   children in schools?

20      A.   Yes, it does.

21      Q.   All right.  Now, do you sometimes -- as part of

22   reports to Child Abuse and Neglect Hotline, do you receive

23   complaints that a parent is a drug user?

24      A.   Yes, we do.

25      Q.   And how are those reports handled in terms of

1    investigation or assessment?

2        A.    When a Children's Service worker at the hotline is

3    screening the call, they really look at the impact to the

4    child from parental drug use, look and see how often a parent

5    may or may not be using, if they're using around the child or

6    children, and if there are any impacts.

7        Q.    Okay.  Do you also evaluate the potential impact of

8    firearms in the home in addition to drugs?

9        A.    Yes.  On each report or referral that we send out

10   there's a closing script that asks about potentially dangerous

11   weapons, drugs, animals around the home since our worker will

12   be responding to the home.

13       Q.    All right.  Now, if the Children's Division has a

14   concern that a child is not safe in the home, can you request

15   removal of the child?

16       A.    Yes.

17       Q.    And how does that work?  Briefly.

18       A.    In Missouri Children's Division cannot take custody

19   of a child.  We would request that from the juvenile office

20   and they would contact the court.  So the juvenile office, law

21   enforcement, or a physician can take custody in the state of

22   Missouri.

23       Q.    And when a child is removed from the home, what are

24   the restrictions on the parent, including the right to visit?

25       A.    That's a case-by-case basis.  A team decides that

1    made up of the juvenile office, the courts, and they would

2    evaluate the safety factors and then they would set up

3    visitation for a family depending on what the specific

4    allegations are.

5        Q.    Okay.  And as of right now in Missouri,

6    approximately how many children are in care and have been

7    removed from their homes?

8        A.    In Missouri it's approximately 13,000 children.

9        Q.    And all of those have been the subject of court

10   involved removal?

11       A.    Yes.

12       Q.    Okay.  Is there also something called a Missouri

13   Central Registry?

14       A.    Yes.

15       Q.    Can you explain what that is and how that can

16   become involved with a report to the child and abuse -- Child

17   Abuse and Neglect Hotline?

18       A.    The Missouri Central Registry is something that an

19   alleged perpetrator's name goes on when an investigation is

20   substantiated.  Central Registry checks are conducted for

21   those that want to work or volunteer around children.  And

22   once their name goes on and they've exhausted their appeal

23   process, it remains on indefinitely.

24       Q.    And when you say the name remains on the Missouri

25   Central Registry indefinitely, do you mean for life?

1          A.   I do.

2          Q.   And is there an appeal process or a way for a

3    parent to get his or her name removed from the Missouri

4    Central Registry?

5          A.   They can.

6          Q.   Can you explain briefly how they can do that?

7          A.   Within the first 30 or 60 days of receiving notice

8    of a report that has been substantiated the alleged

9    perpetrator can either appeal directly to the circuit court or

10   select an administrative review through the division.

11         Q.   Okay.  And can the division also refer complaints

12   directly to prosecutor's offices for consideration for

13   criminal prosecution?

14         A.   Yes.  It's our policy that any substantiated report

15   is sent over to the prosecuting attorney's office.

16         Q.   Okay.  So referring back to the call from Mr.

17   Cantwell to the Child Abuse and Neglect Hotline on June 17th

18   of 2019, how was that call categorized?

19         A.   That call was classified as a documented call.

20         Q.   And again, what does that mean?

21         A.   It was not referred to field staff for follow up.

22         Q.   And why was it not referred to field staff for

23   follow up, briefly?

24         A.   Whenever the person that was screening the call

25   reviewed the allegations, there was not a known impact to the

1    child or children involved.

2        Q.    Do you have to have a known alleged impact to the

3    child to actually get action from the division?

4        A.    Typically that's something that we would look for.

5        Q.    Okay.  And do you -- as the deputy director, do you

6    agree with how this particular call was handled?  Was it

7    handled in accordance with your criteria?

8        A.    Yes, I agree with the classification.

9        Q.    Okay.

10            MR. DAVIS:  If I may have just a moment.

11            (Attorney Davis confers with Attorney Krasinski)

12            MR. DAVIS:  No further questions.

13            Thank you, Ms. Smith.

14            THE COURT:  Thank you.

15            Cross-examination.

16            Again, we just need to take a brief moment to

17    disinfect the questioning area.

18            Oh, are you going to go from the back?

19            MR. LEVIN:  As long as she can see me.

20            THE COURT:  All right.

21            Ma'am, can you see the defense lawyer who is

22    standing in the back?

23            THE WITNESS:  I can, your Honor.

24            THE COURT:  All right.  He can question from the

25    back then.

1                          CROSS-EXAMINATION

2    BY MR. LEVIN:

3        Q.    Good morning, Ms. Smith.

4        A.    Good morning.

5        Q.    So you are familiar with the call that Mr. Davis

6    was questioning you about; is that right?

7        A.    Yes.

8        Q.    And you're familiar with what actions, if any, were

9    taken following the call?

10       A.    Yes.

11       Q.    And you agree that this was recorded as a

12   documented call; is that right?

13       A.    That is correct, sir.

14       Q.    It did not rise to the level of a report?

15       A.    That's correct.

16       Q.    And it wasn't a referral either?

17       A.    Correct.

18       Q.    And that determination was actually made while the

19   caller was on the line; is that right?

20       A.    Yes, sir.  The majority of calls that are screened

21   in the Missouri hotline the decision is made while they're on

22   the call.

23       Q.    The person who answers the call spoke to his or her

24   supervisor and indicated to the caller that the call would be

25   documented but that no further action would be taken?

 1        A.    That's correct.  That's what I heard on that call

 2   as well.

 3        Q.    Now, it's quite common obviously for this hotline

 4   to get complaints; is that right?

 5        A.    Yes.

 6        Q.    That's what the hotline is set up for?

 7        A.    Yes.

 8        Q.    To get reports of abuse to elders and children?

 9        A.    Just children, sir.

10        Q.    Okay.  So -- but is the -- the hotline -- when the

11   person answers the hotline, do they say child abuse hotline or

12   do they say child/elder abuse hotline?

13        A.    Missouri Child Abuse and Neglect Hotline is

14   typically how they would answer the phone.

15        Q.    So it's just for children?

16        A.    Yes, sir.

17        Q.    And those calls come in from anonymous people at

18   times?

19        A.    Yes.  If someone is not a mandated reporter, then

20   they can report anonymously.

21        Q.    So there are anonymous calls that are made?

22        A.    Yes.

23        Q.    There are also calls that are not anonymous that

24   are made by mandated reporters?

25        A.    Correct.

1      Q.    And those would be teachers and doctors and people

2  who are mandated by law to report child abuse when they come

3  across it in their professional lives or even in their

4  personal lives?

5      A.    That's correct, sir.

6      Q.    And then there are citizens that aren't mandated

7  reporters who also call the hotline and give their names and

8  addresses and telephone numbers in connection with their

9  complaint; is that right?

10     A.    That's correct.

11     Q.    In this case you listened to the call?

12     A.    Yes.

13     Q.    Does the caller identify himself?

14     A.    Mr. Cantwell did identify himself.

15     Q.    Did he give his name?

16     A.    Yes.

17     Q.    And his telephone number and address?

18     A.    I believe so.

19     Q.    And did he give information about children that he

20  thought might be in danger?

21     A.    He did.

22     Q.    Did he indicate that those children might be

23  exposed to drugs?

24     A.    He did.

25     Q.    Might be exposed to violent ideology?

1     A.   He did.

2     Q.   And you don't have any information that any of the

3 information that Mr. Cantwell left on -- or left with the

4 person who answered the hotline was false or untruthful in any

5 way?

6     A.   No, sir.

7     Q.   Your agency didn't refer him to law enforcement,

8 for example, for making false or untrue reports?

9     A.   We did not further that information to law

10 enforcement.

11     Q.   Now, you indicated that it didn't again rise to the

12 level of a report.  So nothing was done in response to this

13 call; is that right?

14     A.   Not from the Children's Division.  No, sir.

15     Q.   There was no further investigation of the

16 allegation?

17     A.   Not from Children's Division.

18     Q.   No home visit?

19     A.   No, not from Children's Division.

20     Q.   No phone call?

21     A.   Not from Children's Division, sir.

22     Q.   No referral to any other agency?

23     A.   Not from the division.

24     Q.   Now, you indicate -- you keep saying not from the

25 division.  Are you aware of any other follow up that was done

1    by anyone else with regard to this?

2         A.    I think I recall hearing in the recording Mr.

3    Cantwell had mentioned contacting the FBI with concerns, but

4    besides that I'm not aware.

5         Q.    But the Children's Division didn't do anything to

6    follow up on that?

7         A.    The Children's Division did not follow up on the

8    allegations.

9         Q.    Mr. Cantwell offered more information; is that

10   right?

11        A.    That is correct.

12        Q.    And there was no follow up with regard to that?

13        A.    The hotline in Missouri does not receive -- the

14   camera is -- okay.

15             I mean, the Children's Division hotline typically

16   does not receive evidence.  Once the allegations are screened,

17   that information is then provided to the field.  So if we

18   would have alerted that call to the field, then we would have

19   encouraged Mr. Cantwell to contact the investigator on the

20   case to share those files that he referenced.

21        Q.    Now, was -- to the best of your knowledge, Mr.

22   Cantwell didn't insist on an investigation; is that right?

23        A.    That's correct.

24        Q.    He was cordial with the person who answered the

25   phone?

```
 1        A.    He was.

 2        Q.    He didn't mention the name Vic Mackey, did he?

 3        A.    Not that I recall.

 4        Q.    He didn't mention demanding something of value?

 5        A.    Not that I recall.

 6              MR. LEVIN:  Thank you very much.

 7              THE COURT:  Redirect?

 8              MR. DAVIS:  Briefly, your Honor.

 9                        REDIRECT EXAMINATION

10  BY MR. DAVIS:

11        Q.    Ms. Smith, I think you said that the call was not

12  referred to harassment; is that right?

13        A.    That's correct.

14        Q.    Is there something called -- or something that the

15  division recognizes as harassment that can be related to a

16  call to the Child Abuse and Neglect Hotline?

17        A.    If the person that is screening the call feels that

18  the allegations are being made maliciously, we do have a

19  script that is read that mentions that that person could be

20  charged with a Class A misdemeanor.

21        Q.    So a malicious report in Missouri is actually a

22  crime; is that right?

23        A.    That's correct.

24        Q.    All right.  But that referral was not made here?

25        A.    Correct.
```

 1          MR. DAVIS:  All right.  Nothing further.  Thank

 2   you.

 3          THE COURT:  Anything else from you?

 4          MR. LEVIN:  No, your Honor.

 5          THE COURT:  Thank you.

 6          Ma'am, thank you for your help here.  You're

 7   excused.

 8          We can terminate the video link at this time and

 9   you can call your next witness.

10          THE WITNESS:  Thank you, your Honor.

11          MR. DAVIS:  Your Honor, at this time the government

12   moves to admit Exhibit 103 and play Exhibit 103 with Exhibit

13   103A, which is the transcript.  This is the actual call.

14          THE COURT:  All right.  Subject to your original

15   objection to the witness's last testimony, do you have any

16   other objection?

17          MR. LEVIN:  No, your Honor.

18          THE COURT:  All right.  So it will be admitted.

19   The defendant's previous objection expressed outside of court

20   is preserved.  Otherwise, there's no other objection.  It's

21   admitted and it may be played.

22          MR. DAVIS:  Thank you.

23          (Government's Exhibit No. 103 Admitted)

24          (Government's Exhibit No. 103 played)

25          THE COURT:  All right.  What's your next witness?

1          MR. DAVIS:  The next witness is Shayne Tongbua of

2    FBI and will be a lengthy witness, your Honor.

3          THE COURT:  All right.  Let's take our lunch break.

4          Let me ask my case managers.  We have lunch.  Would

5    it already have arrived?

6          THE CLERK:  Yes.

7          THE COURT:  Is it reasonable to think we could do

8    the jury lunch break in 45 minutes rather than an hour?

9          THE CLERK:  I would assume so, your Honor, yes.

10          THE COURT:  All right.

11          Can the lawyers get their lunch and be back here in

12    45 minutes?  Okay.  Let's try to get going again at 1:15,

13    okay?

14          We'll take a break until 1:15, members of the jury.

15          (RECESS)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Susan M. Bateman, do hereby certify that the
foregoing transcript is a true and accurate transcription of
the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5-4-21          /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR