**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   20-cr-06-01-PB
         v.                       *   September 23, 2020
                                  *   1:16 p.m.
   CHRISTOPHER CANTWELL           *
                                  *
* * * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF JURY TRIAL
DAY TWO - AFTERNOON SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO


<u>APPEARANCES</u>:


<u>For the Government</u>:          John S. Davis, AUSA
                               Anna Z. Krasinski, AUSA
                               U.S. Attorney's Office



<u>For the Defendant</u>            Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
                               Federal Defenders Office




<u>Court Reporter</u>:             Susan M. Bateman, RPR, CRR
                               Official Court Reporter
                               United States District Court
                               55 Pleasant Street
                               Concord, NH 03301
                               (603) 225-1453

```
                    I N D E X

WITNESSES:              Direct      Cross      Redirect        Recross

BENJAMIN LAMBERT


By Mr. Davis              8


By Mr. Wolpin                         21



EXHIBITS                                      FOR ID       IN EVD

Government's Exhibit No. 119.                                10

Government's Exhibit Nos. 104 and 104A.                      16

Defendant's Exhibit C-7.                                     25

Defendant's Exhibit A-6.                                     29

Defendant's Exhibit B-41.                                    38

Defendant's Exhibit I2E.                                     49

Defendant's Exhibit C-2.                                     88

Defendant's Exhibit C-19.                                   102
```

```
1                     P R O C E E D I N G S

2                 (IN COURT - NO JURY PRESENT)

3           THE COURT:  Mr. Davis, make a proffer as to what

4    question you're going to ask and what you expect the answer to

5    be.

6           MR. DAVIS:  Judge, I'll ask if the witness raised

7    with his wife -- I believe on the Monday after the threats,

8    this would have been June 17th, he decided that he wanted to

9    give her a heads-up regarding the potential that someone had

10   threatened to call CPS.

11          And so what I expect him to say, and he's in the

12   courtroom, your Honor, I expect the witness to say I felt like

13   I should advise my wife and what I said was someone may call

14   CPS about our family.  I don't know whether he'll do it or

15   not, but if he does, I want you to know and not be blindsided.

16   Something to that effect.

17          THE COURT:  And he's going to say I looked at her

18   and she was visibly upset?

19          MR. DAVIS:  No.  I wasn't even going to ask that,

20   no.

21          THE COURT:  Okay.

22          MR. DAVIS:  But I suppose I could.

23          THE COURT:  I'm not inviting you to.  Believe me.

24          What is it important for?

25          MR. DAVIS:  It shows the seriousness with which he
```

1    took this exchange with Mr. Cantwell and he was worried enough

2    about it that something he's --

3            THE COURT:  Well, you're not offering it to try to

4    establish the commission of the crime here --

5            MR. DAVIS:  Correct.

6            THE COURT:  -- because the wife was upset.

7            MR. DAVIS:  Correct.  And I'm not going to ask

8    about the wife being upset.

9            THE COURT:  Okay.  So thankfully you seem to -- in

10   light of my ruling on the denial of your request to have video

11   conference testimony, you're abandoning any theory you might

12   have of proving this charge solely because -- what's your

13   name, sir, Lambert -- Mr. Lambert's wife got upset when she

14   was told about the CPS investigation?

15           MR. DAVIS:  Honestly, your Honor, I don't think we

16   finally decided, but it's possible we will ask Task Force

17   Officer LeBlanc, who's the last witness, about his interview

18   with Pam Lambert and --

19           THE COURT:  All right.  We don't have to deal with

20   that now.  I've got to tell you that's at the outer limit of

21   how I could construe your indictment and how you could prove

22   the charge, and I'm unlikely to allow you to get into any

23   evidence on that point since the principal evidence is the

24   response of the victim testifying to it.  I've not allowed her

25   to be testifying by video.  But for reasons that I will

1  explain to you that will take a very substantial period of

2  time, because of the way you've indicted this case you've --

3  it is an extremely complex indictment in which by using the

4  prosecutor's conjunctive form you have in disjunctive form

5  said I could prove the case by this or this, this, this or

6  this, this, this or this, this or this.  At the very end of

7  the chain is because she got subjectively -- she was upset

8  even though no one else was.

9            Now, you're not going to -- you don't need that.

10  There is a substantial question in my mind as to whether

11  that's a reasonable way to construe the indictment because the

12  person that you -- it seems to me the person you are alleging

13  Mr. Cantwell was trying to cause distress to was not the

14  victim's spouse.  It was the victim.  That's why you call him

15  the victim, and that's why you call in the indictment the

16  victim's spouse.  You don't call her victim too.  You call her

17  the victim's spouse.  Because your allegation is that the

18  intention that Mr. Cantwell had was to cause distress to Mr.

19  Lambert, right?

20            MR. DAVIS:  Right.

21            THE COURT:  Okay.  And if we were to pursue this

22  kind of chart theory about all of the alternative methods, you

23  would be asking me to say the jury should convict the

24  defendant if they believe he was trying to cause upset to Mr.

25  Lambert, but he didn't cause any upset to Mr. Lambert and a

1    reasonable person in Mr. Lambert's position wouldn't have been

2    upset, and a reasonable person and a victim -- Mr. Lambert's

3    spouse wouldn't be upset, but she was upset.

4           Do you see the problem with that?  I understand

5    your idea as a prosecutor that I should charge every possible

6    theory that I can conceivably come up with and write the

7    indictment to give me the maximum amount of discretion, but

8    there's a real problem with even going on that theory and it

9    is -- I mean, if you stop and think about it, I think you will

10   realize there's no way that could ultimately be the basis on

11   which this jury would convict or acquit, and therefore why are

12   you pursuing it?

13          So you think about that.  We don't have to get into

14   it now, but I do think it is relevant as to this -- the person

15   you've charged as the victim, what his emotional response is,

16   why he had to tell his wife, but not her reaction to what he

17   said to her.

18          And I am advising you that at the current time I'm

19   not inclined to charge a theory under which Count 3 could be

20   proved on the theory that Mr. Cantwell intended to harm Mr.

21   Lambert.  He didn't harm Mr. Lambert.  No reasonable person

22   would think that he was harming Mr. Lambert.  No reasonable

23   person would think he's harming Mrs. Lambert, but Mrs. Lambert

24   was subjectively upset.

25          Do you see that, how strained that theory is?

```
 1              MR. DAVIS:  Yes, your Honor.

 2              THE COURT:  I'm not requiring you to give it up

 3   now, but you reflect on that.  I'm just advising you if you

 4   want an instruction on what I think is a very strained theory

 5   of liability, you better come loaded for bear when we get to

 6   the jury instructions because based on what I know so far I'm

 7   not inclined to allow it.

 8              So what I propose to do is take the simple question

 9   and answer, did you tell her, what did you tell her, why did

10   you tell her, but no questioning about her reaction.

11              That having been said, does the defense have any

12   objection?

13              MR. WOLPIN:  As long as the witness isn't going to

14   then explain her statements in response.

15              THE COURT:  Mr. Lambert, I'm instructing you, do

16   not in responding to questions from counsel discuss your

17   wife's reaction, whether she was upset or not.  Just listen to

18   his questions and answer the question that he's asking you.

19              Do you understand?

20              THE WITNESS:  Yes, your Honor.

21              THE COURT:  All right.  We can bring the jury back

22   in.  We'll reserve judgment on this other issue until later.

23              (IN COURT - JURY PRESENT)

24              THE COURT:  All right.

25              Go ahead, counsel.
```

1          CONTINUED DIRECT EXAMINATION OF BENJAMIN LAMBERT

2     BY MR. DAVIS:

3          Q.    Good afternoon, Mr. Lambert.

4               When we broke, I was asking whether you had spoken

5     to your wife about the subject of a call to CPS.

6          A.    Yes, I did.

7          Q.    All right.  And when did that happen in this

8     chrono?  Do you recall?

9          A.    It was -- it would have been Monday afternoon.

10         Q.    So that would have been Monday, June 17th, 2019?

11         A.    Yes.

12         Q.    And why did you mention something to your wife

13    about CPS?

14         A.    Well, I took the threat seriously enough that I

15    wanted to let her know so if CPS did show up, that we wouldn't

16    be blindsided by it.  That she would know that, you know, it

17    could happen.  I didn't know for sure.  She just needed to

18    know.

19         Q.    All right.  And were you intending to tell her then

20    a full confession about your being in Bowl Patrol and your

21    being Cheddar Mane?

22         A.    No.

23         Q.    But you did want to tell her about the potential of

24    CPS?

25         A.    Yes.

1      Q.    So what did you say to your wife?

2      A.    I'm paraphrasing, but the gist of it was somebody

3  online made a threat that they were going to call CPS, which

4  it's called DCFS in Missouri.  So I let her know that I didn't

5  know whether it was going to happen or not, but I felt like

6  she needed to know so she wouldn't be blindsided by it if

7  somebody were to show up.

8      Q.    All right.  And in fact you didn't know that Monday

9  afternoon that a call to CPS had already happened, did you?

10     A.    No.

11     Q.    Okay.  Now, the next day, June 18th of 2019, do you

12  recall contacting your lawyer?

13     A.    Yes.

14     Q.    And did you actually write a note to your lawyer?

15     A.    Yes.  It was sent via text message.

16     Q.    All right.  And what was your purpose in contacting

17  your lawyer?

18     A.    I wanted to know if I should let the county sheriff

19  know that there had been a threat so there could be some

20  record of the situation just to put it out there I guess.  I

21  wanted to know what he had to say about it.

22     Q.    Okay.  And this is June 18, 2019?

23     A.    Yes.

24     Q.    And did you make screenshots of your communication

25  with your lawyer?

1        A.    Yes.

2        Q.    And showing you now Government Exhibit 119 for

3    identification, do you recognize that item?

4        A.    Yes.

5        Q.    And does this item have the response from your

6    lawyer redacted?

7        A.    It does.

8        Q.    So what is in blue is just what you wrote; is that

9    correct?

10        A.    That's correct.

11        Q.    And is this an accurate copy of the message you

12    wrote to your lawyer on June 18th of 2019 about this

13    situation?

14        A.    Yes.

15            MR. DAVIS:  Your Honor, I move to admit Exhibit 119

16    in evidence.

17            THE COURT:  Is there objection?

18            MR. WOLPIN:  No, your Honor.

19            THE COURT:  It will be admitted and may be

20    displayed to the jury.

21            (Government's Exhibit No. 119 admitted)

22        Q.    Can you read that, Mr. Lambert?

23        A.    "I had a guy say he was going to call DCFS and tell

24    them I am some kind of drug user and potential terrorist and

25    then posted pictures of my family from Pam's Facebook.  I

1   think he is full of shit, but in this case" (redacted) "and a

2   lunatic.  Should I contact the county sheriff and let him know

3   what's going on in case he actually goes through with the

4   threat?  I'm mostly only worried about the DCFS thing.  I

5   think he is bluffing, but I also think he has violated the law

6   saying that he was going to rape my wife in front of my kids

7   and hope that people would take my address and pay me a visit

8   and saying things like I wish I could drive to Winfield and

9   kill this idiot myself.  I'm so sorry to bother you with this

10  gay bullshit.  Really just wondering if I should call cops or

11  not."

12      Q.   And did you get some advice from your lawyer and

13  then write him again?

14      A.   Yes.

15      Q.   And can you read what you wrote after that?

16      A.   "I wouldn't put it past him.  That being said, I

17  have nothing to hide, but DCFS is who he says he's going to

18  call and that scares me because I have heard horror stories,

19  but Pam also says they never take kids away unless it's

20  extreme abuse in her experience.  There's nothing close to

21  actionable going on up here."

22      Q.   All right.  So again, why did you send that to your

23  lawyer on June 18th?

24      A.   Because I was worried about whether the defendant

25  would go through with the threats or not.

1          Q.    And you were actually thinking about calling the

2    sheriff about this?

3          A.    Yes.

4          Q.    All right.  Did you ultimately decide not to call

5    the sheriff?

6          A.    Correct.

7          Q.    Why?

8          A.    For a few reasons or a couple reasons.  Reason

9    number one being that in this world of the far-right calling

10   the police on somebody is one of the most taboo things that

11   you can do, so I didn't want to be a snitch, and number two,

12   he told me that --

13              MR. WOLPIN:  Object, your Honor.  Hearsay.

14              THE COURT:  Let's stop.  Disregard the statement

15   "he told me that."

16              If you want to put another question, you can, and

17   I'll hear your objection.

18         Q.    Based on advice from your lawyer, did you decide

19   not to contact the police or the sheriff?

20         A.    That's correct.  I did not contact them based on

21   advice from my lawyer.

22         Q.    All right.  And can you -- without saying what your

23   lawyer said, can you explain what your thinking -- you said

24   you didn't want to be a snitch, right?

25         A.    Correct.

1      Q.    That was one reason.  What's the other reason you

2   didn't want to contact the sheriff?

3      A.    He essentially told me that --

4            THE COURT:  No, not what he told you.  What you

5   concluded after talking to him was your motivation.

6            THE WITNESS:  Okay.

7      A.    What I concluded after talking to him was that it

8   wasn't necessary to do that.

9      Q.    Okay.  And can you explain that further?  Again, if

10  you can't without talking about what he told you, then don't

11  do it.

12     A.    It's hard to say without saying what he said.

13           THE COURT:  All right.  Let me just try to give you

14  some clarification here as to what I'm looking for.

15           I do not want you to testify to what your lawyer

16  said to you, but after your lawyer said something to you, you

17  apparently formed a view as to why you should not contact the

18  sheriff.  You explained one reason why.

19           THE WITNESS:  Uh-huh.

20           THE COURT:  Mr. Davis is asking you about whether

21  there was another reason why.  That reason could be because

22  you formed a view about something based on what your lawyer

23  said.  I just don't want you to say the words that your lawyer

24  said.

25           THE WITNESS:  Understood.

1    A.    My view, based on what he told me, was that I was

2    not a hundred percent certain that a call was going to be

3    made, so therefore there was no reason for me to have to

4    contact the sheriff.

5    Q.    Okay.  And again, on June 18th you didn't even know

6    that Mr. Cantwell had called already on June 17th, right?

7    A.    That's correct.

8    Q.    Okay.  Now the next day, June 19th of 2019, did you

9    actually call in to Mr. Cantwell's show?

10    A.    I did.

11    Q.    And what was the name of that show?  Do you recall?

12    A.    The Outlaw Conservative.

13    Q.    And that show aired on Wednesdays?

14    A.    That's correct.

15    Q.    Okay.  And did you actually review a recording of

16    that show and pull the clip of where you called in?

17    A.    Yes.

18    Q.    All right.  So you're familiar with the show and

19    your conversation and what Mr. Cantwell does, correct?

20    A.    Yes.

21    Q.    All right.  Now, tell the jury, why did you call in

22    to Outlaw Conservative on June 19th?

23    A.    I called because I wanted to confront him.  I felt

24    as though I had been wronged and that I was -- I wanted to put

25    him in an uncomfortable situation.

1      Q.   All right.  Were you going to threaten him?

2      A.   Absolutely not.

3      Q.   Okay.  And when you called in, were you going to

4   pretend to be someone else?

5      A.   No.

6      Q.   Okay.  And when you called in on June 19th, did you

7   know that you already had been doxed?

8      A.   By Cantwell?

9      Q.   Yes.  Did you know that --

10      A.   Yes.  He had already posted pictures and the

11   address was already out there, yes.

12      Q.   So you knew that the photos of your family had

13   already been presented to the chat group, right?

14      A.   Yes.

15      Q.   Okay.  So showing you Government Exhibit 104 and

16   104A, is that a recording of the brief call that you made that

17   day?

18      A.   It's not up there.

19           THE COURT:  It's been admitted?

20           MR. DAVIS:  It has not been admitted yet.

21           THE COURT:  All right.  So stop the jury from

22   seeing it.

23           He has.  Now you can put up the exhibit.

24      Q.   And do you recognize now the brief dialogue from

25   that call-in?

1        A.    Yes.

2        Q.    And is that the complete dialogue you had that day?

3        A.    Yes.

4              MR. DAVIS:  Your Honor, I move to admit 104 and

5    104A and play it.

6              THE COURT:  Is there objection?

7              MR. WOLPIN:  No objection.

8              THE COURT:  Without objection it will be admitted

9    and can be played for the jury.

10             (Government's Exhibit Nos. 104 and 104A admitted)

11       Q.    This is June 19th, correct?

12       A.    Correct.

13             (Government's Exhibit No. 104 played for the jury)

14       Q.    Was that it?

15       A.    That was it.

16       Q.    Did you try to call back to Mr. Cantwell on that

17   show?

18       A.    No.

19       Q.    Did you harass him after that?

20       A.    No.

21       Q.    All right.  And on that show did he say anything to

22   explain what you were calling about?

23       A.    I don't know because I didn't listen.

24       Q.    All right.  But that was it?

25       A.    That was it.

1          Q.    Okay.  To your knowledge did you ever call him

2    again or call his show again after that?

3          A.    I don't remember doing so, no.

4          Q.    Okay.  Now, I direct your attention finally to June

5    20th of 2019.  Do you recall whether you wrote a message that

6    was posted on the Bowl Patrol channel?

7          A.    Yes.

8          Q.    And what was that message about?

9          A.    It was basically my take on what had happened.

10         Q.    All right.  So I'm not going to ask to introduce

11   this, but I will ask you to identify it.

12               Showing you Defense Exhibit C-19 for

13   identification, do you recognize C-19?

14         A.    Yes.

15         Q.    And that's dated June 20th; is that correct?

16         A.    That's correct.

17         Q.    And it's on the Bowlcast forwarded from Uncle Paul,

18   correct?

19         A.    Yes.

20         Q.    And it starts from Cheddar Mane, right?

21         A.    That's correct.

22         Q.    Okay.  And can you look at the second page also?

23   Do you see that?

24         A.    Yes.

25         Q.    And do you recognize this as the full and complete

1    statement that was your account of what had happened that you

2    wrote and posted on June 20th?

3         A.    Yes.

4         Q.    Okay.  And why again -- that's all I have on that.

5               Why did you write an account and post it?

6         A.    To eliminate any question as to what had

7    transpired.  It was my take on what had happened, and so I

8    wanted to -- I just wanted to get it out there.

9         Q.    Okay.  All right.  Now, afterwards -- the FBI

10   didn't come to talk to you until October of 2019, correct?

11        A.    Yes.

12        Q.    Did you ever get a call from Child Protective

13   Services?

14        A.    No.

15        Q.    Or DCFS in Missouri?

16        A.    No, I didn't.

17        Q.    And so no one came and visited your house?

18        A.    Correct.

19        Q.    And have you ever as a parent had any issue with

20   Child and Protective Services?

21        A.    No.

22        Q.    Okay.  After the exchange you had with Chris

23   Cantwell how, if at all, did you change your own situation?

24        A.    Well, I took steps to protect myself to, you know,

25   make sure that we were secure at home.

1       Q.    All right.  Do you carry a firearm?

2       A.    Yes.

3       Q.    And is your wife also able to carry a firearm?

4       A.    We have constitutional carry in Missouri so she

5   could if she wanted to, usually she doesn't, but she knows how

6   to operate a firearm, yes.

7       Q.    Okay.  Did you take any steps to drive your wife

8   anywhere?

9       A.    Yes.  I drove her back and forth to work a few

10  times right around that period.

11      Q.    Okay.  And then you stopped doing that?

12      A.    That's correct.

13      Q.    Okay.  Do you recall a so-called trail camera?

14      A.    Yes.

15      Q.    And what was the trail camera and what happened

16  with that?

17      A.    A trail camera is a motion activated camera that

18  takes a photo when it's triggered by motion and stores it on

19  an SD card so you can review it later.

20      Q.    Okay.  Now, did you get a trail camera?

21      A.    I did.

22      Q.    And did you get it after the exchange with Mr.

23  Cantwell?

24      A.    I did.

25      Q.    And did you have that up and operating in October

1    of 2019?

2         A.    By the end of October 2019 it was operating.

3         Q.    But when the FBI came, you had not turned it on; is

4    that correct?

5         A.    Not yet.  That's correct.

6         Q.    Why not?

7         A.    Well, for -- mostly because I just -- by that point

8    I didn't think that anybody was going to actually show if they

9    hadn't shown themselves by then and because we didn't have a

10   whole bunch of extra money sitting around for me to be able to

11   buy batteries and an SD card.

12        Q.    Did you not have an SD card at that point?

13        A.    I had an SD card -- I purchased an SD card in late

14   October.

15        Q.    All right.  So what did you do about your social

16   media profile?

17        A.    The Facebook account that I had at the time, I took

18   it down.  I contacted all of the different data mining sites

19   that post your personal info and I requested that they take my

20   information down, and I took my LinkedIn page down.

21        Q.    All right.  And what about your Telegram account in

22   the name of Cheddar Mane?

23        A.    I deleted that account.

24        Q.    And why did you delete it?

25        A.    Just for more security.

1          Q.    Okay.  Mr. Lambert, at 8 o'clock p.m. on June 15th

2    if Mr. Cantwell had texted you and said, just leave me alone,

3    what would you have done?

4          A.    Said okay and continue to leave him alone.  I had

5    been leaving him alone up until that point when I made the

6    mistake of entering a chat room that I didn't know that he was

7    in.

8          Q.    All right.

9               MR. DAVIS:  If I may have just a moment, your

10   Honor?

11              THE COURT:  Yes.

12              (Attorney Davis confers with Attorney Krasinski)

13              MR. DAVIS:  No further questions.  Thank you.

14              THE COURT:  Thank you.

15              Cross-examination.

16              MR. WOLPIN:  Could I use the --

17              THE COURT:  You want to use the front?

18              MR. WOLPIN:  Yes.

19              THE COURT:  All right.  If we could disinfect that,

20   please.

21              (Podium is disinfected)

22              THE COURT:  Okay, Mr. Wolpin.

23                        CROSS-EXAMINATION

24   BY MR. WOLPIN:

25         Q.    So between 2018 and 2019 you were in -- or a part

1    of this group called the Bowl Patrol?

2        A.   Yes.

3        Q.   And the Bowl Patrol was sort of a loose group of

4    people.  There were no clubhouses, correct?

5        A.   Correct.

6        Q.   There were no official central offices?

7        A.   Correct.

8        Q.   And there was no official hierarchy?

9        A.   Official?  I'm sorry.

10       Q.   Hierarchy.  There was no one who was the treasurer

11   and the vice president?

12       A.   Correct.

13       Q.   However, you would describe yourself as being one

14   of the more prominent members of the group?

15       A.   Correct.

16       Q.   So among that group -- the sort of core of that

17   group is, I don't know, eight, ten people, correct?

18       A.   Approximately, yes.

19       Q.   Okay.  And you were in that core of the group the

20   Bowl Patrol in 2018 and in 2019?

21       A.   Yes.

22       Q.   And just to understand, the group had a number of

23   outlets.  One of those outlets we've heard about is a Telegram

24   account, correct, or channel?

25       A.   Yes.

1      Q.    And for the juror's sake, that channel looks a

2   little bit like a Facebook feed or another social media feed

3   where there's posts and people can view them?

4      A.    That's correct.

5      Q.    And as far as the Bowl Patrol's primary Telegram

6   channel, it was called the Bowlcast?

7      A.    Yes.

8      Q.    And that's also the name of the group's podcast?

9      A.    That's correct.

10     Q.    And that podcast, that Telegram channel, those

11  things are public, correct?

12     A.    Yes.

13     Q.    So the world can see what is done and said on that

14  group?

15     A.    That's correct.

16     Q.    Okay.  Now, in that context -- in that platform you

17  used a number of pseudonyms, but your primary pseudonym was

18  Cheddar Mane, your primary alias?

19     A.    That's correct.

20     Q.    Okay.  And some variation of that, Cheddarman,

21  Cheddar Mane, Cheddy Blac?

22     A.    That's correct.

23     Q.    Now we're going to talk in a minute about other

24  profiles you had, but let's stick with the Cheddar Mane one.

25              As far as the Cheddar Mane identity, you had an

1   avatar created to represent yourself?

2        A.   Yes.

3        Q.   Okay.  And the purpose of that avatar was to

4   present Cheddar Mane publicly as more than just a voice or a

5   piece of text, correct?

6        A.   Yeah.  I guess you could say that, yes.

7        Q.   Okay.

8             MR. WOLPIN:  If I could see C17 just for the

9   witness at this point, please.

10       Q.   All right.  So at this point we're looking at a

11  picture.

12            THE COURT:  I'm sorry.  I can't see it.

13            Okay.  Go ahead, counsel.

14            MR. WOLPIN:  Okay.

15       Q.   So first of all, this is something you're familiar

16  with?

17       A.   Yes.

18       Q.   Okay.  And this is something that you had created

19  as your avatar to represent you?

20       A.   Yes.  I didn't create it but, yes, I had it

21  created, correct.

22       Q.   You had someone create it on your behalf.  And then

23  this is something that online you would use as your online

24  Cheddar Mane presence?

25       A.   That's correct.

1      MR. WOLPIN:  I would ask that it be admitted as an

2  exhibit.

3           THE COURT:  Is there objection?

4           MR. DAVIS:  No objection.

5           THE COURT:  Without objection it will be admitted

6  and it can be shown to the jury.

7           (Defendant's Exhibit No. C-7 admitted)

8      Q.   All right.  So we see this is how you wanted the

9  world to see Cheddar Mane.  We see in here the Mane part on

10  his chest, M-A-N-E, it's a little hard to see from a distance,

11  but that's correct, those four letters?

12          MR. DAVIS:  Objection to counsel's comment about we

13  see how you wanted the world to see Cheddar Mane.

14          THE COURT:  I'll overrule the objection, but be

15  careful with your phraseology, counsel.

16          MR. WOLPIN:  Thank you.

17     Q.   This is the public presentation of Cheddar Mane,

18  correct?

19     A.   Correct.

20     Q.   Okay.  And in that we can see again a patch on his

21  shirt saying M-A-N-E?

22     A.   Yes.

23     Q.   And we can see a shield in the upper right-hand

24  corner?

25     A.   Yes.

1        Q.    And that shield is the representation of Dylann

2    Roof's haircut that we've talked about is the bowl cut,

3    correct?

4        A.    That's correct.

5        Q.    That's sort of in honor of the murderer Dylann

6    Roof, correct?

7        A.    Correct.

8        Q.    And that's the Bowl Patrol's overall symbol as a

9    group is that shield with the Dylann Roof haircut, correct?

10       A.    Yes, or some variation of it, but yes.

11       Q.    And then in the middle we see a large firearm being

12   carried by the avatar?

13       A.    Correct.

14       Q.    Now, you said you were a prominent member of the

15   group the Bowl Patrol.  We're going to only briefly talk about

16   where that name came from as you already talked about it a

17   bit, but it's in reference, as you said, to an individual

18   named Dylann Roof?

19       A.    That's correct.

20       Q.    Okay.  And Dylann Roof is known as an individual

21   who walked into a church and shot and killed nine

22   church-goers, correct?

23       A.    That's correct.

24       Q.    Do you know the date that happened?

25       A.    Not off the top of my head, no.

1    Q.   2015, June, sound correct?

2    A.   That sounds right, yes.

3    Q.   Okay.  And all of the individuals he killed were

4  black church-goers?

5    A.   Yes.

6    Q.   And so your group adopted that image, that haircut

7  as we can see on this avatar, as its primary emblem?

8    A.   Yes.

9    Q.   Now as to the public presence of the Bowl Patrol, I

10  would like to talk about the two ways, the Telegram site and

11  the podcast, the Bowlcast.

12       MR. WOLPIN:  We can take this down now for now.

13  Thank you.

14    Q.   As to the Bowlcast, that is a podcast, correct?

15    A.   That's right.

16    Q.   Meaning it's essentially a recorded program that

17  you can put up online for people to listen to?

18    A.   That's correct.

19    Q.   So it's not a live radio show, it's recorded, and

20  it may be edited and then posted online?

21    A.   Correct.

22    Q.   And I think you said there are ten total?

23    A.   Yes.

24    Q.   And those are posted publicly?

25    A.   I don't know if they're still available publicly,

1    but they were posted publicly, yes.

2         Q.   At or around the time they were made, they were

3    posted publicly?

4         A.   Yes.

5         Q.   Okay.  And they run from the spring of 2018 until I

6    think you mentioned they ended in June of 2019?

7         A.   That was the last one that I appeared on.

8         Q.   That was the last one that you appeared on.

9              MR. WOLPIN:  I would like just for the witness at

10   this point and the parties Exhibit A-6.

11        Q.   Now, as far as ones you appeared on, your first

12   appearance was on episode 3?

13        A.   That's correct.

14        Q.   Okay.  And in front of you is something you

15   recognize?

16        A.   Yes.

17        Q.   Okay.  And that is sort of your introduction or the

18   cover shot on the Telegram site that goes with the podcast

19   itself?

20        A.   That's correct.

21        Q.   Okay.  And in that is your avatar -- or a version

22   of your avatar we just saw?

23        A.   Yes.

24             MR. WOLPIN:  I would ask that that be published --

25   or admitted as a full exhibit and then published to the jury.

```
 1                THE COURT:  Is there objection?
 2                MR. DAVIS:  Objection.  Relevance and 403.
 3                THE COURT:  Overruled.
 4                It may be admitted and displayed to the jury.
 5                (Defendant's Exhibit A-6 admitted)
 6        Q.   So this is, as noted, released on July 4th of 2018.
 7                Does that sound correct in your head as to the
 8   release date?
 9        A.   Yes.
10        Q.   Okay.  And visible in that is your avatar with a
11   headband saying kill Jews?
12        A.   That's correct.
13        Q.   And behind you is a representation or photograph of
14   Dylann Roof with kind of a yellow halo around his head,
15   correct?
16        A.   That's correct.
17        Q.   And to the right is the avatar of Vic Mackey?
18        A.   Yes.
19        Q.   Okay.  And his avatar has that bowl haircut along
20   with a sort of skeleton face?
21        A.   Correct.
22        Q.   And then on his shirt it says the word rape?
23        A.   That's right.
24        Q.   So this is what was presented along with your first
25   sort of entry into the Bowlcast podcast process?
```

```
 1        A.    Yes.

 2        Q.    And after that you appeared regularly as

 3   essentially consistently on 3, 4, 5, 6, 7, 8, those numbered

 4   podcasts as well?

 5        A.    Yes.

 6        Q.    And each time you appeared you appeared under this

 7   name, this identity of Cheddar Mane?

 8        A.    Yes.

 9        Q.    Okay.  All right.

10              MR. WOLPIN:  We can take it down if you would like.

11   Thank you.

12        Q.    Now, one way members of the Bowl Patrol communicate

13   either thoughts or ideas, I guess humor, is through something

14   called a meme?

15        A.    That's correct.

16        Q.    And you discussed a bit of that with Attorney

17   Davis, but the jury might not be familiar with memes.

18              So a meme is a manner of showing something visually

19   to get an idea across basically?

20        A.    Yes.

21        Q.    Okay.  And there are thousands of, I don't know,

22   maybe not thousands, but certainly dozens upon dozens of Bowl

23   Patrol memes in relation to that group, correct?

24        A.    Yes.

25        Q.    I mean, would you agree with me there may be
```

1    hundreds if not thousands?

2         A.    Yes.

3         Q.    Okay.  And these memes, these pictures, are then

4    either shared with each other, correct?

5         A.    Correct.

6         Q.    Or sometimes presented publicly?

7         A.    That's correct.

8         Q.    And you had an involvement where you made some of

9    these memes, some of these memes were your project, something

10   you put out in the world?

11        A.    That's correct.

12        Q.    And some of these memes are, you know, Vic Mackey's

13   project or Mosin-Nagant's project or someone else who created

14   them and put them out in the world to say something?

15        A.    Yes.

16        Q.    Okay.  I'm not going to go through 10,000 memes

17   with you, but I would like to present to you sort of

18   emblematic memes of what those are intended to present to the

19   public.

20             MR. WOLPIN:  If I could pull up just for the

21   witness at this point A7.

22        Q.    Now, you've described memes as a joke?

23        A.    Yes.

24        Q.    Now, you see in front of you a meme -- you're

25   familiar with this meme?

1          A.    I am.

2          Q.    Okay.  This is one made by Vic Mackey?

3          A.    I guess.  If you say so.  I can agree that that's

4    the type of meme he made, yes.

5          Q.    This is a prominent meme, let's say.

6          A.    Yeah.

7          Q.    Okay.  And in this meme are four photographs of

8    Dylann Roof.  That's familiar to you?

9          A.    Yes.

10         Q.    Okay.  And so this is representative of the memes

11   that the Bowl Patrol put out into the world?

12         A.    Yes.

13               MR. WOLPIN:  I would ask to mark this as a full

14   exhibit.

15               MR. DAVIS:  Objection.  Relevance.

16               THE COURT:  Put the headset on.

17               (SIDEBAR)

18               MR. DAVIS:  The government objects, your Honor.

19   This is not --

20               THE COURT:  See my hand?  Stop.  He needs to put

21   the headset on.  I need to be sure he's hearing you, okay?

22               MR. DAVIS:  Sorry.

23               THE COURT:  All right.

24               Now, I have allowed the defense to examine

25   extensively about Dylann Roof.  We've elicited the fact that

1    he's a mass murderer, a racist, a reprehensible individual

2    who's been sentenced to death for his crimes.  I've allowed

3    evidence that the Bowl Patrol people put him up as a saint.

4             I do not -- I'm going to sustain the objection to

5    this meme, but I am going to allow the defense to pursue any

6    evidence that it has about memes for sexually assaulting

7    people that the defense can show that Mr. Lambert was aware of

8    as a result of his participation in the Bowlcast or whatever

9    it's called, because one of the defense arguments here is, as

10   I understand it, that these people use such offensive language

11   with such frequency about sexually assaulting people that a

12   reasonable person in his position, that is, Mr. Lambert's

13   position, would not take it as a threat.

14            Now, that argument strikes me as an extremely

15   strained argument, but I'm not going to deny the defense the

16   opportunity to pursue it especially in view of the questioning

17   from the government of Mr. Lambert about him not having ever

18   seen people threatening to rape other people.  I think you

19   elicited information -- questioned responses from Mr. Lambert

20   in which he said essentially that I haven't ever seen anybody

21   threaten to rape somebody's spouse before.

22            And to the extent that the defense wants to pursue

23   this defense of these people speak to each other in such

24   extreme language that when ordinary people would see this as a

25   threat, a reasonable person in the victim's position would not

1      see it as a threat, I need to allow them to do it.

2                  But we're getting too far afield when we are going

3      over and over again about what a bad person Dylann Roof is.

4      We're getting too far afield when we're talking about memes

5      about killing Jews and things that don't have anything to do

6      with this particular case.

7                  No one's on trial here for their views.  No witness

8      is on trial here for his views.  That's not what the case is

9      about.

10                 So I've made clear that the defense has two ways of

11     proceeding here with respect to this type of evidence.  One is

12     evidence that the parties used such extreme language with each

13     other that a reasonable person in Mr. Lambert's position would

14     not perceive it as a threat and that Mr. Cantwell did not

15     intend it as a threat.

16                 The second ground is to allow vigorous

17     cross-examination on grounds of bias.  So to the extent that

18     the defense wants to question this witness about evidence that

19     this witness may have engaged in criminal conduct and

20     therefore may have a motive to curry favor with the government

21     and to provide false testimony in this case, I am going to

22     give the defendant substantial latitude in pursuing through

23     questioning evidence of that kind of bias.

24                 So based on what I've heard so far, Mr. Wolpin,

25     you've got two things that you can do on this subject.  One is

1   vigorously pursue issues of bias based on potential criminal

2   liability, and the other is evidence of communications about

3   sexual assault that tend to support your theory that either

4   Mr. Cantwell didn't intend this as a threat -- or a reasonable

5   person wouldn't have seen it as a threat in the position of

6   the person at whom the threat was directed.

7          Am I clear about this?  I have been trying to give

8   general guidance to the parties up to now.  I've now heard

9   substantial evidence and I'm beginning to have a better

10  understanding of the case, so I'm trying to give you some

11  guidance as to line drawing and I hope I've done that so we

12  don't have to be popping up and the government objecting to

13  things I'm not going to sustain, but the government can have

14  sufficient guidance from me so that you can reasonably

15  anticipate what I will sustain.  All right?

16         Do either of you have any questions about it before

17  we proceed?

18         MR. DAVIS:  No.

19         THE COURT:  Mr. Wolpin?

20         MR. WOLPIN:  For the purposes of the record and

21  supplementing the argument, the reason we're asserting these

22  are relevant is that what he has said is they view these as

23  jokes.  I know the Court is limiting it in its ruling to sort

24  of rape related things, but our argument is that violence

25  generally is treated as a joke, as a comedy by these

1    individuals, including the defendant and Mr. Lambert.

2              So to understand or put yourself in the other

3    person's shoes -- I mean, like I said, I think I have five in

4    total.  The point was to just show that they treat violence as

5    a joke.

6              THE COURT:  You can pursue them and the government

7    can object, and I'll deal with them one at a time.

8              I'm sustaining the objection as to this one.

9              You have established already beyond question that

10   they use memes expressing violence in a humorous way.  I don't

11   know how that helps your case, but I've let you do that

12   already substantially.  I might let you do a little bit more,

13   I don't know, I'll have to see what you're doing, but you've

14   already made that point and it's undisputed that that's what

15   these people do.  No one is going to argue anything against

16   that.  You've already established that point.  So at some

17   point it starts to spill over and is just raw efforts to

18   prejudice the jury against the witness which is not consistent

19   with the requirements of Rule 403.

20             Of course I must admit relevant evidence unless the

21   prejudicial effect or the waste of time substantially

22   outweighs any probative value.  Since you're seeking to

23   produce this evidence on a point that's undisputed that no one

24   is contesting, there's a limit to how much I'm going to let

25   you go on given its potential prejudicial effect.

1          So I've advised you.  Let's move on and let's see

2    how we go.

3               (CONCLUSION OF SIDEBAR)

4               MR. WOLPIN:  May I just have a moment?

5               THE COURT:  Yes.

6          My clerk is reminding me that I speak too loudly.

7    I've spent a lifetime in courtrooms.  I've learned to speak

8    without needing amplification, but it's hard for me to whisper

9    I have to admit.

10        Q.   So let's conclude that.  To be clear, your group

11   makes memes that are intended to be jokes that show and talk

12   about violence?

13        A.   Yeah, I think that's fair.

14        Q.   Now, on the Bowlcast of which you've appeared there

15   is discussion not just of violence but also of rape?

16        A.   Yes.

17        Q.   Okay.  And in those episodes you have made jokes

18   about rape?

19        A.   I don't recall specifically.

20        Q.   Okay.

21        A.   But it's definitely within the spectrum of

22   possibility, I suppose.

23        Q.   Okay.  You appeared on the third episode of the

24   Bowlcast?

25        A.   Yes.

1      Q.    And I assume if I were to play for you a recording

2   that has Vic Mackey's voice and your voice, that's something

3   you would recognize?

4      A.    Yes.

5      Q.    Okay.  So what I would like to do is play for you a

6   clip from the third episode of the Bowlcast where you and Vic

7   Mackey are having a joking discussion about rape.

8            I know the Court has asked for --

9            THE COURT:  Is it an exhibit?

10           MR. WOLPIN:  It is.

11           THE COURT:  Can you tell me the exhibit number?

12           MR. WOLPIN:  B-41.

13           THE COURT:  Has it been admitted?

14           MR. WOLPIN:  No.

15           THE COURT:  Are you moving its admission?

16           MR. WOLPIN:  I am.

17           THE COURT:  Is there objection?

18           MR. DAVIS:  I don't think so, Judge.

19           May I just have a word with counsel?

20           THE COURT:  Yes.

21           (Attorney Davis confers with Attorney Wolpin)

22           MR. DAVIS:  No objection.

23           THE COURT:  Without objection it will be admitted

24   and can be played.

25           (Defendant's Exhibit No. B-41 admitted)

 1          Q.    All right.  I'm going to play for you episode 41.

 2    We might pause early on to make sure we understand who's

 3    speaking, but otherwise it's a relatively short clip.

 4                (Defendant's Exhibit B-41 begins to be played)

 5                Pause.

 6                Does that voice ring a bell?

 7          A.    That's Vic Mackey.

 8          Q.    That's Vic --

 9                THE COURT:  I'm sorry.  You're talking over each

10    other.

11                Your answer is you recognize the voice?

12                THE WITNESS:  I do.

13                THE COURT:  Who is it?

14                THE WITNESS:  Vic Mackey.

15                THE COURT:  All right.

16                MR. WOLPIN:  Continue.

17                (Defendant's Exhibit B-41 continues to be played)

18          Q.    So Vic first and the second voice is yours?

19          A.    That's correct.

20          Q.    Okay.  And it's a joke about Jason Kessler?

21          A.    Yes.

22          Q.    Okay.  And that's another persona in the white

23    nationalist movement?

24          A.    He was the organizer of Unite the Right.

25          Q.    Okay.  And this is a joke about raping someone who

1    you guys weren't then getting along with I presume?

2         A.   Yes.

3         Q.   Okay.

4              One of the things that occurs on the Bowlcast as

5    you said or in this world is playing characters, correct?

6         A.   Yes.

7              THE COURT:  He said yes.

8         Q.   Excuse me.  My hearing.

9         A.   Sorry.  I'll speak up.

10        Q.   I apologize.

11             And those stories or characters are supposed to be

12   funny or comedy, correct?

13        A.   Yes.

14        Q.   Okay.  And one of those sort of characters that

15   comes up is someone by the name of Edward Kempbowl.  Does that

16   ring a bell?

17        A.   Yes.

18        Q.   And the joke -- the primary identity of Edward

19   Kempbowl is that he likes to rape women?  Yes?

20        A.   I really -- I don't know.  I don't know how to

21   answer that.  I mean, if you say so, yes.  I mean, I'm aware

22   of the skit that you are talking about.  That's not a Bowlcast

23   that I appeared on.

24        Q.   Okay.  But you appeared on the next one and the

25   third one where you speak with Vic Mackey about Edward

1     Kempbowl and sort of go back and joke again about that?

2          A.   Yes.

3          Q.   Okay.  So what I would like to do is -- this is the

4     same episode we just played from where we identify, this is

5     E-43, Vic's voice and your voice and go through this clip

6     together as well.

7               THE COURT:  Is there objection?

8               MR. DAVIS:  No.

9               THE COURT:  Without objection it may be played.

10              (Defendant's Exhibit E-43 begins to be played)

11              MR. WOLPIN:  Stop for a second.

12         Q.   Starting, that's your voice, correct?

13         A.   Correct.

14         Q.   Okay.

15              (Defendant's Exhibit E-43 continues to be played)

16         Q.   And that's you at the end saying you gotta rape

17    her?

18         A.   Yes.

19         Q.   Now, there are a number of examples of times when

20    you or Vic Mackey joke about violence?

21         A.   Yes.

22         Q.   Now, people getting shot, people getting killed,

23    people getting murdered, that is sort of territory for jokes

24    in the Bowlcast, correct?

25         A.   Yes.

1      Q.    Now, Christopher Cantwell knew you as Cheddar Mane,
2    correct?  That's how he knew you?
3      A.    Yes.
4      Q.    Okay.  He knew you as Cheddar Mane, a member of the
5    Bowl Patrol?
6      A.    I don't necessarily agree with that.
7      Q.    Okay.  Well, let's go through how this works.
8            You've been involved in chat groups you said on the
9    Radical Agenda platform, correct?
10     A.    Yes.
11     Q.    And in those chat groups did you appear as Cheddar
12   Mane?
13     A.    Yes.
14     Q.    Okay.  And that's a chat group run by Chris
15   Cantwell?
16     A.    Correct.
17     Q.    When you called in to his show, did you ever call
18   in and say, hey, I'm Ben Lambert?  Is that how it ever
19   started?
20     A.    No.
21     Q.    So there was no time when you're calling in to the
22   show and you were chatting in this chat group where you were
23   being Ben Lambert?
24     A.    Correct -- or I should say not that I recall, no.
25     Q.    Now, before I forget, you know, there are a number

     1    of different names or pseudonyms or characters you've used

     2    involving the Bowl Patrol and potentially Mr. Cantwell, so I

     3    just want to review those quickly and see if those are you or

     4    not.

     5              You had -- in addition to Cheddar Mane you had

     6    Cheddy Blac?

     7         A.   Yes.

     8         Q.   You had Fuck Niggers?

     9         A.   No.

    10         Q.   That wasn't you?

    11         A.   I don't think so, no.

    12         Q.   Okay.  You had Fevs?  The character Fevs was yours?

    13         A.   I did a Fevs voice on his show, but that was never

    14    my -- I don't remember having that as a profile.

    15         Q.   Okay.  But that was a voice or a character that you

    16    did?

    17         A.   Yes.

    18         Q.   Okay.  And George Knox?

    19         A.   Yes.

    20         Q.   Cheddarman?

    21         A.   Yes.

    22         Q.   Hombre Cheddar?

    23         A.   Yes.

    24         Q.   This Nigga?

    25         A.   Yes.

```
 1        Q.    Niggas Kissin'?
 2        A.    There was a channel that I ran called Niggas
 3   Kissin', but that was somebody else's account name.
 4        Q.    But you ran the channel?
 5        A.    I did run the channel.
 6        Q.    Do you still run the channel?
 7        A.    No.
 8        Q.    Okay.  When did you stop running the channel?
 9        A.    A couple months ago.
10        Q.    So for a number of months -- do you remember
11   exactly when you stopped or you're not sure?
12        A.    I'm not sure.
13        Q.    Do you know when you started?
14        A.    No, no.
15        Q.    Okay.  Would it have been last year?
16        A.    Probably, yes.
17        Q.    You pretended to be Mosin-Nagant before, another
18   member of the Bowl Patrol?
19        A.    I have, yes.
20        Q.    You've been Demarcus Chambers?
21        A.    Yes.
22        Q.    Are you Lauren Southern, that site?
23        A.    No.
24        Q.    Do you know who is?
25        A.    No.
```

1      Q.   But fair to say there are many pseudonyms you've

2  used over the last two to three years online?

3      A.   That's fair to say.

4      Q.   We're going to return to Bowl Patrol later, but I

5  want to shift gears and talk to you about Chris Cantwell and

6  your experience with him through the Radical Agenda.

7           In 2018 Chris Cantwell had his own online podcast?

8      A.   Yes.

9      Q.   It was called the Radical Agenda?

10     A.   Yes.

11     Q.   And it was sort of right-leaning white nationalist

12 in nature?

13     A.   Yes.

14     Q.   You described him as kind of a shock jock with a

15 white nationalist slant.  Is that a fair summary?

16     A.   Yes.

17     Q.   And his show wasn't like the Bowlcast in the sense

18 that it wasn't prerecorded, it was live?

19     A.   That's correct.

20     Q.   Meaning people could call in and be a part of the

21 show?

22     A.   That's correct.

23     Q.   Okay.  And it was also public.  This wasn't an

24 invitation only situation?

25     A.   That's correct.

1    Q.    And you testified that you would listen to Chris's

2  show seriously for some period of time; is that correct?

3    A.    I would say that's fair, yeah.

4    Q.    Okay.  So your testimony just before was that, you

5  know, at the beginning you were listening to it seriously and

6  only at some point later did you begin prank calling him?

7    A.    Yes.

8    Q.    Okay.  Now, you gave an interview with the FBI in

9  October, correct?

10    A.    That's correct.

11    Q.    And part of what came up in that interview was this

12  situation with Chris and the Bowl Patrol?

13    A.    Correct.

14    Q.    And your participation in that.  And you -- I mean,

15  these were FBI agents.  You knew to be honest, correct?

16    A.    Yes.

17    Q.    And were you honest?

18    A.    There were times that I didn't give them all of the

19  information that I think that they wanted, but I would say in

20  general, yes, and -- yeah, yeah.

21    Q.    And in that interview --

22    MR. WOLPIN:  Just for the witness if we could bring

23  up page 43 of Exhibit D, I believe.

24    Q.    If you go scanning down to the bottom, this is a

25  transcript of your interview with the FBI.  The third sort of

1    entry from the bottom says from you:  I only ever listened to

2    his podcast when I was pranking him.

3         A.   Yes, I see that.

4         Q.   All right.  Now, we'll get back to pranking in a

5    minute but --

6              MR. WOLPIN:  You can take that down.  Thank you.

7         Q.   Now we're going to get to those calls.  You've

8    testified that you are from Missouri?

9         A.   Yes.

10        Q.   And you have a 636 phone number?

11        A.   That's correct.

12        Q.   And your phone number ended in 1958?

13        A.   That's correct.

14        Q.   You testified that you would call Chris's show from

15   that number?

16        A.   I did.

17        Q.   And that you would call him from other numbers too,

18   some beginning in 636 and some beginning in a Florida area

19   code?

20        A.   I don't think I testified that I did.  I mean, for

21   clarification, I didn't testify today that I used a Florida

22   area code but, yes, I did have a number that was a Florida

23   area code.

24        Q.   Okay.  So you had the 636 ending in 1958, you had

25   another 636 which was your work cell, and I couldn't tell

```
 1    whether you were saying there was another 636.

 2         A.    The work cell is a 314 area code number.

 3         Q.    Okay.  So three to four separate numbers you used

 4    to call in to the show?

 5         A.    Yes.

 6              MR. WOLPIN:  If just for the witness at this time

 7    we could bring up I2E, I believe.

 8              This was agreed upon as a full exhibit beforehand.

 9              THE COURT:  Has it been admitted?

10              MR. DAVIS:  We stipulated it's authentic, your

11    Honor, I think.  Yes.

12              THE COURT:  I'm sorry.  Have the parties agreed

13    that it should be admitted or not?

14              MR. DAVIS:  No.  We have stipulated it's authentic

15    I believe, unless I'm wrong.

16              MR. WOLPIN:  If we can get on the headsets real

17    quick, if I could make a --

18              (SIDEBAR)

19              MR. WOLPIN:  This is an excerpt of

20    self-authenticating phone records from Chris Cantwell's show

21    that was provided to the government along with sort of

22    necessary certifications.

23              THE COURT:  So he isn't going to require foundation

24    to be laid.  He wants it to be relevant.  He may have other

25    objections.  I don't know.
```

1              What are you introducing it for?

2              MR. WOLPIN:  This shows the number of calls he made

3    to the Cantwell show.

4              THE COURT:  All right.

5              Mr. Davis, what's your issue?

6              MR. DAVIS:  Is it from just one number or multiple

7    numbers?

8              MR. WOLPIN:  There are -- it's from the 636 number,

9    and then there's one extra 636 number.  I didn't know whether

10   it was his or not, and I can validate that one if that's --

11             MR. DAVIS:  I don't object.

12             THE COURT:  All right.  It will be admitted.

13             MR. WOLPIN:  Thank you.

14             (CONCLUSION OF SIDEBAR)

15             THE COURT:  It will be admitted and may be shown to

16   the jury.

17             (Defendant's Exhibit I2E admitted)

18        Q.   This is a document showing phone calls from

19   636-248-1958.  That is in fact your number?

20        A.   It is.

21             MR. WOLPIN:  Okay.  And if we can scroll down, can

22   you just pick one of the entries so we can see the call-in

23   number and make sure that's accurate.

24             So these are call-ins to Chris Cantwell's show, and

25   we can see that those are all calls from 248-1958.

1          If we can continue to scroll down, we can see that

2    there are a number of calls, and we're not going to go through

3    every one.

4          Q.   But that's from the 636 number.  I think

5    erroneously they're -- no, it was removed -- from another 636

6    number, but that just covers the one ending in 1958.

7          And we can see you were calling -- if we go up to

8    the top and keep going, there we are -- October or November

9    quite a few times.  Is that fair to say?

10         A.   That's my number, yes.  I mean, maybe say the

11   question again.

12         Q.   That you called quite a few times in to Chris

13   Cantwell's show?

14         A.   Yes.

15         MR. WOLPIN:  We can take this down for the moment.

16         Q.   Now as began to be discussed, there was a time

17   where Bowl Patrol and Chris Cantwell kind of co-existed and

18   got along?

19         A.   Yes.

20         Q.   Okay.  As noted, Chris appeared on the first

21   podcast even before you started appearing on the show?

22         A.   That's correct.

23         Q.   As you said, this relationship deteriorated and

24   fell apart?

25         A.   Yes.

1      Q.   Okay.  And that's happening sort of in 2018, the
2  last half of 2018?
3      A.   Yes.
4      Q.   Okay.  And as you said, there was some sense that
5  Chris Cantwell was not sort of a true enough believer but was
6  a sell-out?
7      A.   Yes.
8      Q.   All right.  That his beliefs weren't in line with
9  yours and he was just doing this all for the money?
10      A.   I don't think I would say that his beliefs were not
11  in line with mine.  I would say that he changed his beliefs
12  and so therefore it was -- it appeared that he was doing it
13  for the money.
14      Q.   Okay.
15      A.   And perhaps notoriety.
16      Q.   Okay.  So he changed his beliefs and that was sort
17  of the basis of the dispute?
18      A.   Correct.
19      Q.   And by prank call you mean calling in and say
20  something that would be disruptive?  That was the point of the
21  prank call?
22      A.   I wouldn't agree that that's the point of the prank
23  call, no.
24      Q.   Okay.  So let's talk about that.
25           The pranks included things like characters and

1    yelling and all kinds of other things, right?

2         A.    They were different each one.  Are you talking

3    about mine or are you talking about in general?

4         Q.    Well, let's get both.

5         A.    Okay.

6         Q.    Now, you were familiar or aware that others in the

7    group were doing the same thing, correct?

8         A.    Yes.

9         Q.    Okay.  So it wasn't an isolated thing that it was

10   just you.  It was coming in from multiple sides, multiple

11   people?

12        A.    Right.  Yes.

13        Q.    Okay.  Now, after the prank calls you guys would

14   then cut them up and put them into your Bowlcast episodes?

15        A.    Yes.

16        Q.    Okay.  And then you would play them again, correct,

17   in your Bowlcast episodes?

18        A.    I don't recall specifically.  I'm not going to say,

19   no, that's not correct because I don't specifically recall,

20   but if you say it, then I'm inclined to believe you, I guess.

21        Q.    Okay.  Well, I'm going to show you an example

22   hopefully in a moment.

23        A.    Okay.

24        Q.    But you appeared on the sixth episode of the

25   Bowlcast, correct?

1          A.    That's correct.

2          Q.    And by the sixth episode we're now into February of

3     2019.  Does that sound right?

4          A.    That sounds right, yes.

5                MR. WOLPIN:  Okay.  And I would ask to play Exhibit

6     28 which involves a prank call and then Cheddar Mane's

7     involvement.

8                THE COURT:  Is it admitted as an exhibit?

9                MR. WOLPIN:  It is not.  To be clear, if I could, I

10    can explain in greater detail if the Court wishes, it is not

11    Cheddar Mane himself.  It's him playing it as part of his role

12    on the Bowlcast.

13               THE COURT:  All right.  Well, first let me just

14    make clear what I would like to do in terms of -- if you want

15    to introduce something that has been marked for

16    identification, please tell me -- refer to the exhibit by

17    identification and then when you have laid the foundation to

18    justify its admission, then say I move for its admission and

19    request that it be played.  That way I'll know whether it's

20    been admitted or not.

21               So this is an exhibit that has not yet been

22    admitted and you are moving for its admission?

23               MR. WOLPIN:  Correct.

24               THE COURT:  Is there objection?

25               MR. DAVIS:  Yes.

1          THE COURT:  All right.  I don't think I can

2    evaluate the objection without hearing from counsel on the

3    headsets.  So can you go back to the headset and explain to me

4    what this is, and then I'll hear Mr. Davis's objection.

5          (SIDEBAR)

6          THE COURT:  All right.  What is it that the jury

7    will hear if I allow the exhibit?  Speak into the microphone.

8          MR. WOLPIN:  I'm still not used to this technology.

9          There are ultimately two prank calls that I intend

10   to elicit from this witness.  They're both played by him on

11   the sixth episode.  It shows how angry they were making Chris

12   intentionally in reviewing that.  So this is a call from

13   Mosin-Nagant and it's a Bowl Patrol member.

14         THE COURT:  I'm sorry.  I'm confused.  Is this Mr.

15   Lambert calling in and pranking Mr. Cantwell or is this

16   someone else calling in and pranking Mr. Cantwell?

17         MR. WOLPIN:  This is I presume someone else.  This

18   is him introducing it in the Bowlcast in a way that shows that

19   he's sort of reveling in it or continuing it.

20         THE COURT:  Him introducing it?

21         MR. WOLPIN:  Uh-huh.

22         THE COURT:  All right.  Let me unravel this again.

23         So what you're saying is that this is an excerpt

24   from Mr. Cantwell's Internet radio show that Mr. Lambert in

25   your view has taken and put up in the Bowlcast episode and

1    that he is then -- he is playing that excerpt and referring to

2    it in a way that suggests he approves of what has happened?

3              MR. WOLPIN:  Yes.

4              THE COURT:  All right.  And the purpose for doing

5    this is what?

6              MR. WOLPIN:  The purpose for doing this is we are

7    going to eventually be in an argument as to whether a

8    reasonable person in his position would see what Chris said as

9    harassment.  When you see sort of how the nature of this

10   relationship exists, they go back and forth between each other

11   as far as saying things that make them angry and do that on

12   purpose and elicit that on purpose and find the humor in that.

13             So that's the purpose for this exhibit.

14             THE COURT:  I'm really struggling to understand

15   your theory.  It isn't making any sense to me.  You're saying

16   that you want to prove that this evidence in your view tends

17   to prove that Mr. Lambert understands that prank calls make

18   Mr. Cantwell angry?

19             MR. WOLPIN:  I'm using it to show that the nature

20   of the relationship is to say things that bother the other

21   person, make them angry, cause a reaction.  That is the whole

22   nature of Bowl Patrol and Chris Cantwell's relationship.

23             So when Chris sends what he sends, the question is

24   going to be was that to provoke, you know, that same kind of

25   reaction that's not intended to make him actually fear for his

1      safety or injury but just to be over-the-top in the same way

2      they do.

3              THE COURT:  How does this in any way undermine the

4      government's claim that Mr. Cantwell acted with criminal

5      intent when he made the communications that are at issue here?

6              MR. WOLPIN:  Because our argument is he did not

7      have the intent to put him in fear of injury.  Our argument is

8      that his intent was to say things as they had said to each

9      other in the past that were inflammatory and would be known to

10     the other party not to be taken seriously.

11             THE COURT:  What's the prank that's described here?

12             MR. WOLPIN:  This is where they just call in and

13     they just drive Chris up the wall.  There's barely anything to

14     the prank.  It's his reaction that's relevant in this one.

15             THE COURT:  I sustain the government's objection,

16     and I will allow you to, I mean, reiterate the point you've

17     already made a thousand times, that they were making prank

18     calls to the show.  Those were upsetting Mr. Cantwell.  That

19     Mr. Lambert knew that.  That he continued to make the prank

20     calls.  That he continued to be aware of them.  You can go

21     over all of that again and again as you've already done many

22     times, but I don't see -- it's a complete waste of time to

23     play this particular prank call and that the waste of time

24     substantially outweighs any probative value.

25             I can barely understand your theory of defense as

1  it is.  This certainly is repetitive of the theme that I've

2  already allowed you to pursue in many different ways.

3          So I sustain the objection, but you can continue to

4  do it again if you want, establish that Mr. Cantwell gets very

5  angry when he's pranked and that Mr. Lambert knows it.  Okay?

6          So the objection is sustained.

7          MR. WOLPIN:  It may make sense to address the

8  following so we don't have to come up here again.

9          THE COURT:  All right.  Go ahead.

10          MR. WOLPIN:  I can skip that one then on the same

11  rationale.

12          I'm going to ask him what his intent was as far as

13  the calls.  He talks about trying to essentially ruin the

14  format and make it so that all of his calls would cause him to

15  no longer be able to operate the radio show.  That's not

16  consistent with what he's been saying all along.

17          THE COURT:  Again, I'm confused.  Can you explain

18  yourself?

19          MR. WOLPIN:  Again, the purpose of what they do to

20  each other -- it is somewhat hard to understand because most

21  people don't usually do this to each other.

22          THE COURT:  I'm sorry.  I think I'm wasting the

23  jury's time here.  I'm going to excuse the jury.  We'll take a

24  break now, and then you can argue this at whatever length you

25  want when the jury is not here, okay?

```
 1                    (CONCLUSION OF SIDEBAR)
 2               THE COURT:  I need to take a break so I can go over
 3     this in greater detail.  I don't like to have you just sitting
 4     here while I'm whispering and probably not all that
 5     effectively whispering.  We'll take a break.
 6                    (IN COURT - NO JURY PRESENT)
 7               THE COURT:  All right.
 8               MR. DAVIS:  The witness was signaling, Judge.
 9               THE COURT:  Do you need to use the restroom or
10     something?  Do you need a break?
11               THE WITNESS:  No.  I just have some information
12     about the topic at hand.
13               THE COURT:  Yeah, well, we really can't do much for
14     you on that score, all right?
15               If you have made an answer to a question that you
16     don't think is complete and truthful, I'll give you a chance
17     to expand on your answer.
18               THE WITNESS:  Okay.
19               THE COURT:  But once the examination is ongoing,
20     essentially you can't really talk to counsel for either side.
21     They have to do their examinations of you.
22               If you think you need to expand on an answer or you
23     think you can volunteer something, you can ask and we'll see
24     what the lawyers say, but Mr. Davis can't really give you any
25     guidance about whatever it is you think you might want to
```

1  contribute, okay?

2          All right.  Why don't you step down.  Take a break.

3          I'll talk to the lawyers about this issue.

4          THE WITNESS:  Sure.

5          THE COURT:  Okay.  Mr. Wolpin, your theory is, as I

6  understand it, that by showing that they have interactions in

7  which Mr. Lambert recognizes that the Bowl Patrol is

8  succeeding in making Mr. Cantwell angry, that that will tend

9  to show that when Mr. Cantwell makes the statements at issue

10 here, either that he's not acting with criminal intent or that

11 the statements wouldn't be understood in the way they have to

12 be understood by a reasonable person in the context of victim

13 1.

14         MR. WOLPIN:  Yes.

15         THE COURT:  And because you show that they do a lot

16 of angry things to each other, that would suggest that the

17 thing that Mr. Cantwell did was not done with an intent to

18 extort as is required under the -- I mean, I'm just having

19 trouble -- I've heard you say it many, many times, and I can't

20 really understand it.

21         MR. WOLPIN:  I mean, the first count is -- although

22 it has intent to extort in it, it requires that it still be a

23 true threat.  That's a part of that count.

24         And so the question does continue to be, what's the

25 context of the language, what's the context in which they know

1     each other, how do they treat each other in the past.

2              THE COURT:  I get all of that and I agree with you.

3     In fact, I will be proposing an amendment to the draft charge

4     I gave you to make clear in my definition of intent to extort

5     that an intent to extort by means of threat requires intent to

6     extort by a threat that you intend to be a threat.  So that

7     much I -- that's not in the charge I'm proposing to give right

8     now, but I'm telling you I agree with you on that point.

9              My problem is not in understanding the elements of

10    the charge.  My problem is understanding how this evidence in

11    any way supports your theory of defense because -- and let me

12    just state it this way.

13             Showing that Mr. Cantwell gets angry at Mr. Lambert

14    doesn't tend to show that what Mr. Cantwell did to Mr. Lambert

15    was not done with an intent to extort.  One can intend to make

16    somebody angry by an intent to extort and an intent to

17    threaten.  It's not inconsistent with the government's theory

18    at all.  I just don't understand how it has any relevant

19    tendency to prove or disprove anything at issue in this case.

20             MR. WOLPIN:  In the same way -- I'm trying to think

21    of an analogy as the best way to explain it, because we do

22    have a unique relationship and that's not normal or typical.

23             You know, people joke with each other in a certain

24    way, push around each other in a certain way physically, and

25    we have an assault charge.  When people behave in a certain

1    way over time to each other with the expectation that that's

2    what you do, that's how you do it, it doesn't mean you intend

3    them to think you're actually going to injure their wife.

4              THE COURT:  Well, that's why I -- I'm allowing all

5    of the comments between them about rape, okay?  So you're

6    getting all of that in.  That isn't in dispute.

7              This is, as far as I know, and if it isn't, you'll

8    tell me, a prank that doesn't in any way suggest that anyone

9    is threatening violence against anyone else.  It's generally a

10   conduct that's, as it's been described so far, I would say

11   inanely stupid that makes somebody angry.

12             Is this prank of that nature?

13             MR. WOLPIN:  It isn't, but the next one I was going

14   to address was, which -- one of the purposes of the pranking

15   beyond making him angry is what they call fed posting, which

16   means trying to get the other person in legal trouble by

17   saying things that are so inflammatory that the feds will be

18   paying attention.

19             THE COURT:  Read me the actual language of the

20   excerpt you want to play.

21             MR. WOLPIN:  All right.  So the one -- all right.

22   This is -- I don't think I have -- do I have this one

23   transcribed?

24             This is the one that was in the motion in limine:

25             As far as Special Agent Dino Capuzzo, I hope he

1   dies of brain cancer.

2           THE COURT:  Slow down.  You've got to read -- when

3   you read things, you can't read at a hundred miles an hour.  I

4   have a reporter taking things down.

5           MR. WOLPIN:  I'm sorry.  I apologize.

6      At the end of the day do what is right for the right

7   race.  As far as Special Agent Dino Capuzzo, I hope he dies of

8   brain cancer.  I'm going to shoot his grave with Mosin-Nagant,

9   is what gets said in that one.

10          THE COURT:  Can I stop you?  Is this something that

11  Mr. Lambert is saying?

12          MR. WOLPIN:  Yes.

13          THE COURT:  And he's talking about shooting

14  someone?

15          MR. WOLPIN:  Shooting the grave of an FBI agent

16  known to investigate far-right groups.

17          THE COURT:  Shooting the what?

18          MR. WOLPIN:  The grave of FBI --

19          THE COURT:  The grave?

20          MR. WOLPIN:  Grave, G-R-A-V-E.

21          THE COURT:  So this FBI agent is dead?

22          MR. WOLPIN:  He is not dead now.  He's wishing for

23  his death and talking about how he's going to shoot up his

24  grave when he's dead.

25          THE COURT:  Okay.  That isn't a threat to kill,

1   right?  If you were charged with that, you would say that's

2   not a true threat, Judge, right?  That's not a threat.  That's

3   a statement that someone has a constitutional right to make in

4   your view, right?  It isn't a criminal threat.

5          MR. WOLPIN:  It's something that's designed to draw

6   federal attention to my client.

7          THE COURT:  Could that be a basis for a successful

8   prosecution for someone for criminal threatening in your view?

9          MR. WOLPIN:  No.

10          THE COURT:  That's because it's constitutionally

11   protected because it's carefully crafted not to be what in

12   First Amendment parlance is a true threat, right?  It's

13   basically saying I'm not going to kill this person but I would

14   love to shoot at his grave after he's already killed.  That's

15   suggesting you want him to die, you'll be happy when he dies,

16   but that's exactly the kind of thing that Mr. Cantwell would

17   stand up and tell me, I'm sure, Judge, that's not a criminal

18   threat, right?  So that's very different from what we're

19   dealing with here, isn't it?

20          MR. WOLPIN:  And my assertion is not that it's a

21   criminal act.  My assertion is one of the things they're

22   trying to do is cause him to be a subject of an FBI

23   investigation.  That's why they say things like that.  It's

24   not just for fun and happiness and just the mocking of him.

25   There's more to it than that.

1          THE COURT:  I don't think that could be the basis

2     for an FBI investigation, could it?

3          MR. WOLPIN:  The FBI watches people who make

4     statements like that.

5          THE COURT:  I know but an investigation has to be

6     predicated, and that isn't a sufficient predicate for an FBI

7     investigation.  I may be wrong, if the government wants to

8     tell me I'm wrong about that.  My understanding is that the

9     FBI can't simply go out and look at people's protected speech

10    and start investigating them because of their protected

11    speech.  They need more than that to open an investigation.

12    That's my understanding of the law.  I may have it wrong.

13         MR. DAVIS:  The government agrees, your Honor, and

14    the government made that point in the pleading.  The whole --

15    much of the impeachment by bias case is predicated on the sort

16    of general belief that the Bowl Patrol at any point could have

17    been indicted and sent to prison for these Bowlcasts, but

18    that's not --

19         THE COURT:  I want to be clear.  That's not why I'm

20    allowing it.  To the extent I'm allowing it -- as I said, what

21    I see is there are these two theories that the defense has

22    presented that allows bad stuff about Mr. Lambert or the

23    Bowlcast.

24         One theory is impeachment by bias.  The other

25    theory is context to understand that the communications are

1   not intended to be a threat and would not be reasonably

2   understood in context to be a threat.  Like, if people have

3   a -- I think their argument, and I guess I see it somewhat

4   differently from the defense, but I think the argument is when

5   people are part of an insular group that has a very unusual

6   way of communicating with each other, you have to allow

7   evidence of how they communicate with each other to allow a

8   jury to determine whether a reasonable person in that position

9   would understand the communication as being one which is

10  sufficient to serve as a basis for the prosecution.

11          And that's why I'm allowing as much of this as it

12  is.  It's not because anyone has shown me anything yet on a

13  Bowlcast statement that would be criminal conduct or that

14  could be the basis to open an investigation, but I think the

15  defense is presenting some argument -- now, they call it

16  joking, but I can't imagine any jury would think that what was

17  being said was joking.  It makes a little more sense for me to

18  see it as Mr. Cantwell wasn't joking when he made these

19  statements, he was deadly serious, but he was trying to

20  express anger in a way that a person on the other end of it

21  would understand is merely an expression of anger, not an

22  intention to act.

23          That's why I'm allowing this, you know, we say all

24  kinds of extreme stuff to each other all the time, because the

25  defense has a theory that people in this subculture

1    communicate with each other in ways that normal human beings

2    don't.  I think that they should be entitled to pursue that

3    theory, and I'm trying to allow them to do that.

4              That's not to say that anything in the Bowl Patrol

5    is prosecutable or investigable without other predication.  So

6    I'm not admitting it on that basis.

7              Examination about Mr. Lambert being a drug user or

8    an illegal possessor of guns or someone who lies to the police

9    and therefore could be prosecuted if he doesn't cooperate,

10   that kind of stuff goes to the different theory.

11             Have I got it right?  Do you have those two

12   theories?

13             MR. WOLPIN:  We haven't gotten to that second part

14   yet, and I haven't even made a proffer as to what I think does

15   give them legal liability.

16             THE COURT:  Right.  So the Bowl Patrol stuff comes

17   in to say, here's the subculture.  They communicate in a

18   particular way.  It's very different from what you're used to

19   hearing.  And what may be seen by you as a threat wouldn't be

20   seen by a reasonable person in this community as a threat

21   because of the way they communicate with each other.  Not

22   because they're joking, which is what you were saying to me,

23   like, at the beginning before the case started, because I

24   don't see anybody seeing this as a joke, but because it's --

25   we have ways of sending signals to each other that we're angry

1    that are not intended -- will not be understood as we're

2    actually going to do these things.

3              Now, I mean there are obvious evidentiary problems

4    with that because in fact he said something and he did it, and

5    because he's demanding something -- because your theory is a

6    theory of extortion it's hard to say, well, I'm going to say

7    something to make Mr. Lambert angry and that will induce him

8    to give me what I want that he otherwise doesn't want to give

9    me.

10             That's why it's not making any sense to me.  All

11   this stuff about I'm really, really angry at Mr. Lambert is

12   evidence of motive.  That's why I'm just having a lot of

13   trouble understanding your theory of defense, and I'm trying

14   very hard to do it.

15             To the extent I understand your theories of

16   defenses, they are:  Don't believe a word Mr. Lambert says

17   because he is biased and is protecting himself by currying

18   favor with the government, and, hey, these things happened.

19   They're outrageous.  You might be shocked by them, but what

20   we've shown you here is that these people have a pattern of

21   communicating with each other in this way, and that he did it

22   doesn't establish that it was done with an intent to extort.

23             The response to that is the obvious response.  That

24   if it was just to make him angry, how does that induce him to

25   give over what he otherwise is not inclined to give over?

1    People who don't want to give you something you're asking for

2    don't give it to you just because you make them angry.

3              So that's where I am right now.  So say what you

4    want to say about these two excerpts, and then I'll rule and

5    we'll move on.

6              MR. WOLPIN:  I mean, I mostly said it.  I mean, the

7    purpose is to show it does show bias.  It shows interest in

8    sort of making people angry for sport.  That's what it shows.

9    It shows that he had that kind of relationship with Cantwell,

10   and making someone angry for sport is a unique relationship

11   that is not typical, and without understanding that background

12   the jury can't process what's going on in this discussion.

13             THE COURT:  If you have any evidence in these

14   communications about someone threatening Mr. Cantwell in a way

15   to make him angry that's not a threat, that kind of evidence

16   can definitely come in, but just they were pranking him and

17   making him angry, that doesn't tend to establish either of the

18   defense theories that we've been discussing.

19             So if that's all you've got, the objection is

20   sustained.

21             Did you want to add anything else?

22             MR. WOLPIN:  I guess to add that to the extent the

23   Court is considering whether these are threats, they are

24   threats to his livelihood.  We have Mr. Cheddar Mane admitting

25   on another podcast that it's expected that that show would

1   essentially be shut down.  So the threat is not to his person

2   but to his sort of economic well-being.

3           THE COURT:  That he has a motive to want to injure

4   Mr. Cantwell, you can pursue that vigorously.  You were

5   pranking him.  You've already established all of this.  That

6   you thought he was betraying the movement just doing it for

7   money.  You want to ask him about, you were trying to get his

8   podcast shut down.  You were trying to render it ineffective.

9   You were trying to make him angry.  You can pursue all of that

10  and he'll -- I expect, he already has, he'll acknowledge it a

11  hundred times over, but feel free to do that.  I'm not

12  restricting you from doing that.

13          I just -- I think it is a complete waste of time to

14  play prank calls or actions that other people take that you

15  could show Mr. Cantwell takes pleasure in seeing your client

16  suffer.  He'll acknowledge that and you can pursue that, but

17  we've gone over that many, many times already.

18          I mean, is there going to be any doubt in this case

19  that Mr. Lambert and the Bowl Patrol soured on their

20  relationship with Mr. Cantwell, they repeatedly called his

21  show to prank it and make it ineffective, trying to render him

22  unable to make a living doing what they thought was a betrayal

23  of the cause?  Is there going to be any doubt about that?  The

24  evidence is undisputed on that point.

25          MR. WOLPIN:  You know, what I was thinking in my

1    head as far as an analogy -- you know, the point of this is to

2    show the emotions that are attached to it.  So it's almost --

3    you know, you play a 911 call.  You don't have to play the 911

4    call.  You don't have to present here the actual document of

5    the communication.  They could have just had Cheddar Mane talk

6    about it.

7            The reason you present source material is it most

8    effectively conveys sort of whether they -- and to the extent

9    that watching someone get angry and joking about it or

10   laughing about it, hearing those is different than me telling

11   him he did it.

12           THE COURT:  All right.  Play the exhibit you want

13   to play to the jury so I can hear it.

14           MR. WOLPIN:  Okay.  So let's go back.  E-27 is one

15   of them.  There's only two in this regard.  E-27.

16           (Defendant's Exhibit E-27 played for the Court)

17           THE COURT:  So that's just an excerpt from Mr.

18   Cantwell yelling during his show and expressing anger, right?

19           MR. WOLPIN:  Yes.

20           THE COURT:  And then Mr. Lambert taking pleasure in

21   it?

22           MR. WOLPIN:  Yes, and it starts with High Hard

23   Mouse, which is one of their compatriots.

24           THE COURT:  The objection is sustained as to that

25   exhibit.  What's the next one?

1          MR. WOLPIN:  E-28.

2          (Defendant's Exhibit E-28 played for the Court)

3          MR. WOLPIN:  That's Cheddar Mane introducing, and I

4     cut it as short as I could.

5          THE COURT:  All right.  I sustain the objection as

6     to that one.

7          Now let me explain my -- so that the appellate

8     record is clear, I'm doing a Rule 403 analysis.

9          I don't want anyone to suggest on appeal that I

10    don't understand Rule 403.  I have not applied the correct

11    balance so let me read the rule out loud to you, explain my

12    reasoning, and I hope that I can just make a shorthand

13    reference to it when I exclude things based on Rule 403 in the

14    future.

15          Rule 403, one of the most important rules of

16    evidence, is the Court may exclude relevant evidence if its

17    probative value is substantially outweighed by the danger of

18    one or more of the following:  Unfair prejudice, confusing the

19    issues, misleading the jury, undue delay, wasting time, or

20    needlessly presenting cumulative evidence.

21          This evidence in my view has minimal if any

22    probative value, and the minimal if any probative value is

23    substantially outweighed by the danger of wasting time and

24    needlessly presenting cumulative evidence.

25          So on that basis I sustain the objections to both

1    exhibits.

2              Can we take a break now or are there more kinds of

3    things you want to talk to me about?

4              All right.  Let's take a break.

5              (RECESS)

6              (IN COURT - JURY PRESENT)

7              THE COURT:  Go ahead, Mr. Wolpin.

8              MR. WOLPIN:  Thank you.

9         Q.   So let's finish up on this idea of the calls that

10   were coming in to Chris's show from the Bowl Patrol.

11             So fair to say you've describe this as trolling?

12        A.   I think that's fair, yes.

13        Q.   Okay.  And so the purpose or the meaning of

14   trolling is to provoke a response from the other person that

15   you're trolling, correct?

16        A.   Correct.

17        Q.   To bother them or anger them or cause a reaction?

18        A.   That's correct.

19        Q.   All right.  And I think you've said that the number

20   one rule of trolling is don't feed the trolls?

21        A.   That's also correct.

22        Q.   Meaning if the trolls see you get angry, they're

23   just going to do it more?

24        A.   Yes.

25        Q.   Okay.  And so what was going on here was that you,

1   along with the members of the Bowl Patrol, were trying to make

2   Chris angry?

3        A.   Yeah, I would say that's fair.

4        Q.   Even if he just wanted to be left alone?

5        A.   Yeah.

6        Q.   You knew he didn't -- excuse me.  I'm sorry.

7        A.    I mean there were numerous times when, I'll

8   paraphrase, it was said, do you want to prank the show?  Fine,

9   go ahead and do it.  You know, there were times when, you

10  know, he knew that it was a prank but he engaged and it went

11  somewhere so --

12       Q.   You often would call in or other Bowl Patrol

13  members and Chris would get visibly angry -- or audibly angry?

14       A.   Yes.

15       Q.   And you knew that?

16       A.   Yes.

17       Q.   And just to wrap that up, there are times when

18  those calls are coming in and it's unclear who the caller is.

19  And what I mean by that, I'll explain that question better, is

20  when someone calls to make that prank, like you, you don't say

21  this is Ben Lambert calling, correct?

22       A.   That's correct.

23       Q.   Okay.  So the underlying identity of the caller is

24  often -- or was often unidentified or unknown?

25       A.   Yes.

1      Q.    Now, you became aware that Chris had made a

2 complaint to the FBI citing the Bowl Patrol's harassment?

3      A.    Yes.

4      Q.    And that was made and you became aware of it in

5 February; is that correct?

6      A.    To be honest, I don't recall specifically when it

7 happened.

8      Q.    Okay.  But you remember there was a time in this

9 process when Chris went online and said I reported you guys to

10 law enforcement?

11     A.    Yes.

12     Q.    Okay.  After that happened -- that month did law

13 enforcement come and speak with you about it?

14     A.    No.

15     Q.    A month after did law enforcement come and speak

16 with you about it?

17     A.    No.

18     Q.    A month after that did they come and speak with you

19 about it?

20     A.    No.

21     Q.    Okay.  So the whole winter goes by.  The whole

22 summer goes by.  They only come speak to you in October?

23     A.    That's correct.

24     Q.    Now, you've talked a little bit about memes -- or

25 we talked a little bit about memes and what they are.

1          You made memes including Chris Cantwell in the

2    meme, correct?

3        A.    Yes.

4        Q.    Okay.  And I want to talk with you about one meme

5    in particular.

6              MR. WOLPIN:  Just for the witness, Jay, you can

7    bring up H5.

8        Q.    Now, what you're looking at is a meme.  Is it a

9    meme that includes -- you can see Chris Cantwell?

10       A.    Yes.

11       Q.    Okay.  And it is a meme that you created?

12       A.    Yes.

13       Q.    Okay.  And it was a meme that Bowl Patrol publicly

14   posted?

15       A.    Yes.  I believe so.

16       Q.    Okay.

17             MR. WOLPIN:  Well, if you can shrink it back down

18   for him for a moment.

19       A.    I saw that it was Mosin-Nagant.

20       Q.    Okay.  So you know -- you're familiar with

21   Mosin-Nagant?

22       A.    I am.

23       Q.    Okay.  And he's someone who also trafficked in Bowl

24   Patrol and memes and things like that?

25       A.    Yes.

1      Q.    Okay.  And you were aware that Mosin-Nagant had

2  doxed Chris Cantwell?

3      A.    No.

4            MR. DAVIS:  Objection.

5            THE COURT:  I'm sorry.  I think I need the headset

6  again.

7            (SIDEBAR)

8            THE COURT:  What is the defense offering this for?

9            MR. WOLPIN:  The government has had the defendant

10 testify generally about doxing and why it's such a big deal

11 and it's this huge, massive thing, and they even had him

12 testify that Chris Cantwell doxed Mosin-Nagant.  And the fact

13 is the meme that individual Mr. Lambert made was the one used

14 to dox Chris Cantwell at Chris Cantwell's address in Keene,

15 New Hampshire.

16           So he's presented this as if this is this horrible

17 thing that he would never be a part of, and yet he was a part

18 of making the meme that doxed Chris as a federal informant

19 which is doubly bad.

20           THE COURT:  Okay.  I'm confused.

21           First, I thought that you folks were arguing that

22 unlike this witness your client was not making any secret of

23 who he was, where he lived, what his -- you can't dox somebody

24 who already makes public everything about themselves.

25           MR. WOLPIN:  His address he kept unknown.  He had

1    his show sent to a P.O. box.

2         THE COURT:  So you're saying your client did

3    conceal his address from people?

4         MR. WOLPIN:  Correct.

5         THE COURT:  And you're saying that Mr. Nagant

6    disclosed his address and he did it using a meme that Mr.

7    Cantwell created?

8         MR. WOLPIN:  Mr. Lambert created.

9         THE COURT:  Okay.  Now, you want to offer this to

10   do what?

11        MR. WOLPIN:  To show that his statement, and I have

12   it written down up there from his direct testimony, that

13   doxing is the worst thing you could do to somebody.  This idea

14   that they've put out there that he somehow would never be

15   involved in that, is not a part of that, that this is some

16   surprise to him, and he's out there participating in this.

17        THE COURT:  Okay.  Can you lay a foundation to show

18   that he was a participant in the doxing of Mr. Cantwell?

19   Because showing that he had prepared the meme doesn't show

20   that he was a participant in the disclosing of Mr. Cantwell's

21   address.

22        MR. WOLPIN:  I can continue the effort to do so.

23        THE COURT:  Why don't you do that.  If you can't do

24   that, I'm not sure how you can make your point.  So see if you

25   can lay a foundation for that.  If you can, I'll let you ask

1    the question about doxing.

2              Is there anything else either of you want to say on

3    this point?

4              MR. DAVIS:  No.

5              MR. WOLPIN:  I would note there's a second version

6    of this in our exhibits that does not include the above noted

7    tweet.  It just includes the meme that he created in order to

8    make Chris look like an informant.

9              THE COURT:  Well, do you have a reasonable basis to

10   believe that the witness will acknowledge that, A, not only I

11   created the meme, but I understood that it would be

12   distributed in a way that would publicly implicate Mr.

13   Cantwell as a government informant?

14             MR. WOLPIN:  Yeah, that's the point.

15             THE COURT:  Okay.  If you can do that, then I will

16   allow you to put in the exhibit showing the meme, not the

17   exhibit and the discussion of doxing unless you can show that

18   this witness was somehow participant in the doxing.

19             MR. WOLPIN:  It will just take a moment for me to

20   locate the other exhibit.  Thank you.

21             THE COURT:  Okay.

22             (CONCLUSION OF SIDEBAR)

23        Q.   So let's go through -- there's a number of parts to

24   what you see in front of you.  We're going to go through those

25   parts.

1          There is a visual representation, what we've called

2    a meme, in what's in front of you, correct?

3        A.   Yes.

4        Q.   Okay.  And that meme is something you are familiar

5    with?

6        A.   Yes.

7        Q.   Okay.  And that meme, as you discussed, is in fact

8    something that you created, you manufactured?

9        A.   That's correct.

10        Q.   Okay.  And as we talked about, the purpose of memes

11    is to then share that with other people, correct?

12        A.   Yes.

13        Q.   Okay.  And so this meme that you made was a meme

14    that you then shared with others?

15        A.   Correct.

16        Q.   And you shared this with others by posting it in

17    Telegram sites?  How did you share it with others?

18        A.   I posted it in Telegram.

19        Q.   Okay.  So you posted it in Telegram and then others

20    who visited that Telegram site would be able to see the meme

21    that you created?

22        A.   That's correct.

23        Q.   Okay.  So let's first see if we can -- if you can

24    give me a moment.

25          So this meme gets shared on Telegram?

1   A. Yes.

2   Q. And do you specifically share it with someone named

3 Mosin-Nagant?  Would he have had access to it?

4   A. I didn't specifically share it with him, but he

5 would have had access to it, yes.

6   Q. Okay.  And the reason -- as we've said, the reason

7 you're sharing this is so that it will be publicly available

8 to other people?

9   A. Yes.

10   Q. Okay.  Now what you're looking at in front of you

11 in addition to the meme is a tweet from someone named

12 Mosin-Nagant who we've heard about in this case?

13   A. Yes, I see it.

14   Q. Okay.  And you can see both the identifier of

15 Mosin-Nagant and you can see the @ symbol and his handle, and

16 we can see the dates as February 17th and February 16th?

17   A. Yes.

18   Q. Have you seen Mosin-Nagant's posts before?

19   A. Yes.

20   Q. Okay.  And you're familiar with his postings?

21   A. Yes.

22   Q. Okay.  And what you see before you is a tweet from

23 what appears to be his post.  Do you agree?

24   A. Yes.

25   Q. Okay.  So you would say that this is something that

1    appears to you to be posted by Mosin-Nagant involving a meme

2    that you created?

3         A.   Yes.

4              MR. WOLPIN:  I would ask that this be admitted at

5    this point as a full exhibit.

6              MR. DAVIS:  Same objection, Judge.  There's no

7    foundation for --

8              THE COURT:  The objection is sustained.  If you

9    have an exhibit with the meme alone, you can display the meme.

10   You haven't laid a sufficient foundation to tie this defendant

11   to the content of the text that goes with the meme.  If you

12   can do that, you might be able to introduce the full exhibit.

13   Without that you can introduce the image of the meme but not

14   the text that goes with it.

15             MR. WOLPIN:  Okay.

16        Q.   So as to what you see before you, that in fact is a

17   tweet you're saying you've never seen or you have seen?

18        A.   I've never seen Mosin-Nagant on Twitter at all.

19   It's not really a platform that I've ever used, so I mean --

20        Q.   Did it go around Bowl Patrol circles that he had

21   made a post like this?

22        A.   Not that I can recall, no.

23        Q.   So you've testified you're familiar with the fact

24   that Mosin-Nagant was doxed by Chris Cantwell, but you're

25   saying you have no familiarity with this information?

1        A.      I recognize the meme, but I've never seen this post

2   by Mosin-Nagant on Twitter ever.

3        Q.      At this point I'm not asking whether you've seen

4   the post itself.  I'm asking whether you're familiar with its

5   content from other sources, that you knew about this back in

6   February?

7        A.      No, I didn't.

8            MR. WOLPIN:  Okay.  If I can have a moment, I

9   believe it's B4.

10            THE COURT:  If you need more time later, you can

11   come back to it even if the witness has completed his

12   testimony.  I'll allow it.

13            MR. WOLPIN:  All right.  We're going to have to

14   split that up into two exhibits.

15            THE COURT:  Mr. Wolpin, maybe this will be a

16   benefit for you.  Let me just describe for the jury what's in

17   the meme.  You can still introduce the meme, but would it be

18   helpful to you at this point since you can't --

19            MR. WOLPIN:  I mean, I can go through it with the

20   witness if you would give me leave to do so.

21            THE COURT:  Pardon me?

22            MR. WOLPIN:  I can go through it with the witness

23   if you would give me leave to do so.

24            THE COURT:  All right.  Yeah, why don't you do

25   that.

1           MR. WOLPIN:  I apologize.  I do have this as a

2    caller separate meme.

3           THE COURT:  So the jury will see this meme at a

4    later point in the proceeding, but I'll allow the witness to

5    be examined about its contents to just describe it to you

6    since it's come up at this point in the examination.

7        Q.   Okay.  So in this meme we see two individuals, two

8    men, correct?

9        A.   That's correct.

10        Q.   Okay.  And there is a man second from the left that

11    is Mr. Cantwell?

12        A.   That's correct.

13        Q.   Okay.  And we see at least from the date on this,

14    this is February 16th, so it was made sometime I presume

15    before February 16th of 2019?

16        A.   Yes.

17        Q.   Okay. Do you know exactly when?

18        A.   No.

19        Q.   But fair to say in that time frame this would have

20    been consistent with when it was made?

21        A.   Yes.

22        Q.   And Mr. Cantwell is pictured with a hat that says

23    the letters FBI, correct?

24        A.   That's correct.

25        Q.   And he's shown with janitorial supplies, you know,

1   mops and stuff?

2       A.   Yes.

3       Q.   And behind him is the seal of the FBI?

4       A.   That's correct.

5       Q.   And in the front left there's another man who's

6   clearly identifiable, and the man in the front left is an FBI

7   agent?

8       A.   Yes, he is.

9       Q.   He's someone whose name you knew at that time, that

10  being FBI Agent Dino Capuzzo?

11      A.   Yes.

12      Q.   And Dino Capuzzo was somewhat renowned in these

13  circles because he has investigations into white nationalists?

14      A.   Yes.

15      Q.   Okay.  And so you created this meme in an effort to

16  show that Chris was a snitch or a rat or a federal informant,

17  that was the point of the meme?

18      A.   Yes.

19      Q.   And then to put it out publicly to others that he's

20  a fed or a snitch or a rat or a federal informant?

21      A.   That's correct.

22      Q.   And this was, as we said, in and around February of

23  2019, correct?

24      A.   Yes.  Correct.

25      Q.   Thank you.

1            Now, we see the March 2019 chat that you had with

2   Chris over Telegram.  You went through that on direct,

3   correct?

4       A.   Correct.

5       Q.   Okay.  And in that interaction Chris at that point

6   is still visibly frustrated with you, correct?

7       A.   Yes.

8       Q.   He's saying to you at that point, with some swear

9   words and other things involved, if you don't leave me alone

10  I'm going to dox you?

11      A.   Yes.

12      Q.   Okay.  And you say at that point everything between

13  you and him had already stopped before March, all the prank

14  calls and all the other business?

15      A.   I believe so, yes.

16      Q.   Okay.  But you're still in a chat room with him on

17  Telegram with your account that says deleted but you're still

18  appearing as Cheddar Mane, correct?

19      A.   I'm not sure I understand.

20      Q.   When we see that chat from March 2019, you were

21  again appearing as Cheddar Mane or you're appearing under some

22  other alias?

23      A.   I don't recall.

24      Q.   All right.  And on the Bowlcast as we get through

25  all the episodes, even as far as No. 7, you're still mocking

1   and taunting Chris in that episode?

2       A.   I don't remember specifically, but it's definitely

3   possible.

4       Q.   Okay.  Do you remember when -- I mean, episode 7 is

5   kind of a particular episode.  Do you remember when that

6   episode actually went up online?

7       A.   No.

8       Q.   Okay.  You know the episode before we established

9   was February and the last one was in June.  So it had to be

10  sometime between February and June?

11      A.   Sure.  Yes.

12      Q.   Okay.  And as you said, you wouldn't be surprised

13  if there was still discussion and mocking of Chris Cantwell on

14  that seventh episode?

15      A.   Yeah, that's fair.

16      Q.   Now you say you told others in the Bowl Patrol to

17  leave Chris alone after this, somewhere in this range?

18      A.   Correct.

19      Q.   Okay.  I mean, you've provided the government with

20  a number of e-mails and we saw your screenshots and things.

21  Have you provided the government anything supporting that you

22  did that, any texts you sent, any Telegram chats you sent to

23  Vic Mackey saying leave him alone?

24      A.   It wasn't directed -- the answer is no.  What I

25  told them to stop doing was messing with him, like pranking

1    the show, things like that.

2         Q.   Okay.  But you weren't doing it on anything that

3    was preserved like a Telegram chat?

4         A.   Unfortunately, that account -- once they are

5    deleted you can't go back, and there's no way to get that.

6         Q.   Okay.  So that's gone.

7              And from the other people involved you've never

8    asked them to give you those?  You know, you're in touch with

9    Paul.  You're in touch with some of the other folks of the

10   Bowl Patrol.  They haven't provided you those contacts from

11   their account?

12        A.   No.

13        Q.   Now, let's transition a little bit into June 2019

14   when you end up in a chat room with Christopher Cantwell.

15             You enter that online chat room as Cheddy Blac?

16        A.   Yes.

17        Q.   So this is a riff on your original Cheddar Mane

18   identity.  It's a new identity?

19        A.   Yes.

20        Q.   Okay.  When did you get rid of Cheddar Mane and

21   when did you start with Cheddy Blac?

22        A.   I don't recall exactly, but there was no -- there

23   was no intention to obfuscate who I was.  I mean, it was --

24   anybody who knew who Cheddar Mane was would know that Cheddy

25   Blac was also Cheddar Mane.

1          Q.    Okay.  So you appeared as Cheddy Blac.

2                MR. WOLPIN:  Can we pull up Exhibit C-2 just for

3    the witness at this point?

4          Q.    Okay.  This was your account as Cheddy Blac.  This

5    is how you sort of, I don't know what to call it, the

6    faceplate for your account of Cheddy Blac with Telegram?

7          A.    That's correct.

8          Q.    Okay.  And this again is sort of the identity you

9    came into Chris's chat room with on that day in June?

10         A.    That's correct.

11               MR. WOLPIN:  I would ask that this be made a full

12   exhibit.

13               MR. DAVIS:  Objection.  Relevance.  403.

14               THE COURT:  All right.  Overruled.  It can be

15   admitted and shown to the jury.

16               (Defendant's Exhibit No. C-2 admitted)

17         A.    I think I know where you're going with this and I

18   have --

19         Q.    I'll ask you questions.

20               THE COURT:  He'll ask questions.

21               THE WITNESS:  Okay.

22         Q.    So this is still how you're presenting yourself

23   publicly as of June 2019?

24         A.    Yes.

25         Q.    Okay.  And this is the identity you used when you

1    came into Chris Cantwell's Peaceful White Folk group?

2         A.    Yes.

3         Q.    Okay.  And you didn't come in alone.  There was

4    multiple of you that came in?

5         A.    I don't know, honestly.

6         Q.    Was it a link provided to you by other Bowl Patrol

7    members?

8         A.    Yes.

9         Q.    Okay.  Did other Bowl Patrol members enter at the

10   same time or you don't remember?

11        A.    I don't think so, but I can't say that I remember

12   for sure.  So I don't know.

13        Q.    And you said as you came in, it was sort of

14   instantly a sticker pack about someone in the group?

15        A.    Correct.

16        Q.    Okay.  And when we say sticker pack or stickers,

17   Telegram has a function that lets you create sort of little

18   pictures or meme type things within Telegram, right?

19        A.    That's correct.

20        Q.    And then you can submit those and show those to the

21   other people in the group?

22        A.    Correct.

23        Q.    And at least in these contexts there was a sticker

24   pack for Chris Cantwell and you had another sticker pack for

25   some other guy, Heimbach, and those were sort of passed around

1   among Bowl Patrol members?

2        A.    Not just among Bowl Patrol members.  There are --

3   sticker packs, anybody on Telegram can get them.

4        Q.    But as far as the two we're talking about, the

5   Chris Cantwell sticker pack and the Heimbach sticker pack,

6   those were ones that were sort of used by Bowl Patrol members?

7        A.    Yeah.  I mean the Heimbach sticker pack, it wasn't

8   just Heimbach in there.  It was Heimbach and, you know, a

9   bunch of other stuff, but yes.

10       Q.    Okay.  And so when you come in, you sort of come in

11  hot with the stickers.  That's what's going on at the

12  beginning, right?

13       A.    Yeah.  I said something to the effect of, oh,

14  Heimbach's in here, awesome, what's up, Heimbach, and then

15  posted a couple stickers, yeah.

16       Q.    Okay.  And your testimony is that you had no idea

17  this Peaceful White Folk group was related to Chris Cantwell?

18       A.    That's correct.

19       Q.    Okay.  If -- all right.  So we begin with what

20  happens next.

21             So you come in.  You're posting stickers about this

22  guy, and you say you instantly get sort of kicked out of the

23  group at that point?

24       A.    Correct.

25       Q.    Okay.  You then get a private Telegram chat from an

1    account that is from Chris Cantwell?

2         A.    Yes.

3         Q.    Okay.  So that comes in.  And the first part of

4    that is:  I guess you forgot the lesson which kept you away

5    for a short while.  Do you need to be reminded?

6              That's sort of the starting point of that?

7         A.    That's the starting point, yes.

8         Q.    Okay.  Now, one of the features of Telegram, as we

9    were kind of just talking about, is that you have the ability

10   to block people, right?

11        A.    That's correct.

12        Q.    You have the ability to instantly shut it down, get

13   over it, right, just by blocking the person?

14        A.    Yes.

15        Q.    All right.  But by that point you don't block him?

16        A.    That's correct.  I didn't.

17        Q.    All right.  And you respond with this:  What are

18   you talking about?  That's your first sort of opening line:

19   What are you talking about?

20        A.    Correct.

21        Q.    But you knew what he was talking about.  He had

22   told you in March, and now suddenly the two of you are

23   together again.

24        A.    I didn't know he was in the room so, no, I didn't

25   know what he was talking about.

1    Q.   You knew in March he had told you to leave him

2  alone and about the doxing, and then he comes back to you and

3  says, you know what I'm talking about, and you respond -- or

4  he responds, you forgot the lesson, and you ask him, what are

5  you talking about.

6         You knew what he was interested in.

7    A.   No, I didn't know what he was talking about.

8    Q.   Okay.  He came in to that chat with his own name,

9  it was Chris Cantwell?

10   A.   Yes.

11   Q.   He wasn't hiding his identity?

12   A.   Correct.

13   Q.   Okay.  And in that sort of -- first statement at

14 9:29, his next one is around -- before 4:00 a.m., so hours and

15 hours.  You didn't block the chat at any time during that

16 point?

17   A.   No.

18   Q.   Now --

19        MR. WOLPIN:  Is there any way I can see the

20 conversation again, please?  Pull up -- this is Government's

21 Exhibit 100 on page 3.

22   Q.   All right.  So we're a little ways into the chat at

23 this point, and we've hit June 16th.

24        Chris has referenced at this point --

25        MR. WOLPIN:  If we can go back a page.

1     Q.    -- the picture, and your response is:  What picture

2   are you even talking about?

3     A.    Yes.

4           MR. WOLPIN:  Now, Jay, if you can move back to the

5   next page.

6     Q.    I mean, Chris says:  Fuck around and I'll remind

7   you the hard way.  And your response to that is:  So I'm

8   guessing or assuming Peach took the picture.  I guess that

9   means you don't care what happens to her either.

10          Peach is someone real.  Peach is a real person?

11    A.    Yes.

12    Q.    Okay.  Peach's name is Katelen Fry, correct?

13    A.    That's correct.

14    Q.    Peach is someone you knew had a romantic

15   relationship at one point with Mr. Cantwell?

16    A.    Yes.

17    Q.    Peach is a person you believed had provided him the

18   picture?

19    A.    Right.

20    Q.    Okay.  So you tell Chris that he must not care

21   what's going to happen to her, and within two minutes he says

22   the fuck your wife line, correct?

23    A.    Correct.

24    Q.    So things were going to happen to Peach.  What was

25   going to happen to Peach?

1          A.     It would be known that she was the one who had

2    helped him dox me.

3          Q.     You just have testified previously that being known

4    as someone who cooperates or doxes people is a pretty serious

5    business, right?

6          A.     Yes.

7          Q.     Okay.  So you're telling him you're going to make

8    it known that she was involved in doxing you?

9          A.     No.

10         Q.     No?

11         A.     No.

12         Q.     Okay.  You don't care what happens to her either

13   suggests again something is going to happen to her.

14         A.     People would know that she had proliferated the

15   pictures.

16         Q.     Okay.  And the reason you wanted people to know

17   that is to imply that there may be some consequences to her

18   for that?

19         A.     Sure.

20         Q.     Okay.  And those consequences could be up and to

21   including violence?

22         A.     There was no way for me to know that, so no.

23         Q.     Consequences to her could be up and to including

24   threats?

25         A.     There's no way for me to know what the consequences

1    would be.

2         Q.   Now, one thing the government didn't go through

3    with you about this chat is at some point, I believe, you send

4    him a song; is that correct?

5         A.   No.

6         Q.   Okay.

7         A.   That's not correct.

8         Q.   That's not correct?  I will come back to that in a

9    minute.

10             Now, you say things to Chris like the following:

11             You're such a fucking nobody, Chris.  Do your worse

12   you crazy junky loser.

13             Correct?

14        A.   Yes.

15        Q.   You use words like faggot ass kike in this

16   communication, correct?

17        A.   I do.

18        Q.   You tell him you're scared of the 200 and so

19   listeners you have now.  Laugh out loud.  You have zero

20   credibility anymore.  You're so desperate and it's hilariously

21   pathetic.

22        A.   I said that, yes.

23        Q.   Okay.  So at this point when you're saying these

24   things you have no idea whether Chris has released the

25   photograph of your wife; is that correct?

1      A.    No.

2      Q.    You don't know whether he's called CPS or even

3  going to call CPS?

4      A.    Can we go back to the last question?  I think maybe

5  I need to answer it more clearly.

6      Q.    Okay.

7      A.    The question about I don't know that the pictures

8  are up.

9      Q.    Yes.

10      A.    At that point I had confirmed that the pictures

11  were up, I believe.

12      Q.    The ones that are blurred out, not the actual

13  photographs?  The photographs aren't posted, as far as I

14  understand, until the Radical invitation played that you took

15  the screenshot of.

16      A.    I can't recall the exact order without being able

17  to look at it in front of me.

18      Q.    Okay.

19          MR. WOLPIN:  Your Honor, if I could just have a

20  moment.  I have to look through and find which government's

21  exhibit that is.

22          THE COURT:  Okay.

23          MR. WOLPIN:  I will come back to this as well.  I

24  don't have the government's exhibit in front of me.

25      Q.    Now, this Telegram conversation ends with you

1    sending what we've called stickers from the Chris Cantwell

2    pack, correct?

3         A.   Correct.

4         Q.   It ends with you sending a drawing of Chris

5    Cantwell naked to Chris Cantwell?

6         A.   Correct.

7         Q.   Okay.  Now, you say you had a conversation with

8    your wife afterwards that CPS could show up to your house?

9         A.   Yes.

10        Q.   Okay.  You did not have a conversation with your

11   wife afterwards that she was at risk of personal injury or

12   rape?

13        A.   That's correct.

14        Q.   All right.  So the only thing you told her -- the

15   only thing you were concerned about potentially happening to

16   her at that time enough to tell her was the thing about CPS?

17             MR. DAVIS:  Objection.  Compound question.

18             THE COURT:  Yeah, rephrase your question.

19        Q.   The thing you told your wife after this was that

20   CPS might visit, correct?

21        A.   That's correct.

22        Q.   You did not tell your wife afterwards that she was

23   at some risk of physical violence or rape?

24        A.   No.

25        Q.   Now, the conversation, if we pull back up 100 of

1    the government's exhibit, ends at 9:42 p.m.?

2         A.    Yes.

3         Q.    Can we agree?

4         A.    Yes.

5         Q.    And that is on June 16, 2019?

6         A.    Correct.

7         Q.    Now, you've talked about the fact that then you did

8    things with your screenshots of this conversation?

9         A.    Correct.

10        Q.    You took the screenshots that you had and began

11   posting things on top of the pictures of you and/or your

12   family?

13        A.    Correct.

14        Q.    Okay.  And the things you posted on top of them

15   included a photograph -- a naked photograph of Chris Cantwell?

16        A.    Yeah, the sticker.  Yes.

17             MR. WOLPIN:  Okay.  And so if we look at Exhibit A

18   for just identification at this point of our exhibits.  You

19   can scroll down a bit.

20        Q.    So what you have in front of you I believe is

21   something you're familiar with.  This is the Bowlcast Telegram

22   site.

23        A.    Yes.

24        Q.    And on that site is where your screenshots end up,

25   correct?

1        A.    Yes, I believe so.

2        Q.    Okay.  And so --

3              MR. WOLPIN:  There should be a page 15-16.  All

4    right.  Go up.

5        Q.    Now, this is the actual site where the conversation

6    ends up, correct?

7        A.    That was a forwarded message from the Uncle Paul

8    channel.  So, yes, it did end up there.

9        Q.    All right.  So it gets posted online from Uncle

10   Paul to the Bowlcast?

11       A.    Correct.

12             MR. WOLPIN:  Scroll up.  I want to see what time

13   this ended up.  You can go to that top part.  Start on the

14   date up there.

15       Q.    The date that it's online is June 16, 2019?

16       A.    Correct.

17       Q.    So we established that this all ended at 9:42 on

18   June 16, 2019, and it's up on the Internet before the end of

19   that day?

20       A.    Yes.

21       Q.    If we look down below, do you see the time when

22   these things begin to get posted?

23             MR. WOLPIN:  Oh, back up.  Just hold it still for a

24   second.  Does that show us?  All right.

25       Q.    Well, let's just be clear.  There's only two and a

1    half hours left in the day.  It's up on the Internet before

2    the end of that day?

3         A.   Yes.

4         Q.   Now, in that time that you were putting naked

5    pictures of Chris over yourself, that was a time where if you

6    had wanted to you could have called the police?

7         A.   Yes.

8         Q.   Okay.  It, however, was not something you did that

9    day, correct?

10        A.   That's correct.

11        Q.   It's not something you did the next week, correct?

12        A.   That's correct.

13        Q.   It's not something you did the next month?

14        A.   Also correct.

15        Q.   Okay.  So obviously, as you might have expected,

16   once you posted this online there are all kinds of things then

17   posted about Chris Cantwell following what you post online,

18   correct?

19        A.   Yes.

20        Q.   Okay.  Many of them severe, derogatory, mean

21   towards Chris?

22        A.   Sure.

23        Q.   Okay.  So the follow-up sort of as you would have

24   expected to your posting of all of this on the Bowlcast was

25   that others would then chip in -- or through Uncle Paul others

1    would then chip in against Mr. Cantwell?

2         A.    Sure.   Yes.

3         Q.    Now, you said you put it up online so there would

4    be a record of it?

5         A.    That's one reason, yep.

6         Q.    Okay.   Another way to have created a permanent

7    record of it would have been to forward it to police, correct?

8         A.    Yes.

9         Q.    But you didn't do that?

10        A.    No, I didn't.

11              MR. WOLPIN:   Now, if we go to C-19, just for the

12   witness at this point.

13        Q.    Is this something you're familiar with?

14        A.    Yes.

15        Q.    Okay.   And this is something you wrote?

16        A.    Yes.

17        Q.    And this is something through again Uncle Paul you

18   had posted online?

19        A.    Correct.

20        Q.    And posted from Uncle Paul to the Bowlcast?

21        A.    That's correct.

22              MR. WOLPIN:   I would move to have this admitted as

23   an exhibit at this time.

24              MR. DAVIS:   No objection.

25              THE COURT:   Without objection it will be admitted

1    as a full exhibit.

2              (Defendant's Exhibit C-19 admitted)

3        Q.   Now, this now is your public response to what's

4    happened?

5        A.   Yes.

6              MR. WOLPIN:  If we can scroll down to the next

7    page.  Actually, hold up a second.  Sorry.  It is on the

8    second page.

9        Q.   So the first line.  So you described what happened

10   to you as "a pathetic dox," right?

11       A.   Yes.

12       Q.   And this is now four days later.  This is on June

13   20th, so a couple days later?

14       A.   Yes.

15       Q.   Okay.  And the reason you call it a pathetic dox is

16   because he put it up on a site of his that only had 300 and

17   something subscribers, correct?

18       A.   No.

19       Q.   Okay.  After this interaction you put the whole

20   conversation online and then called it a pathetic dox.  You

21   then --

22             MR. WOLPIN:  If we can scroll down to the "don't

23   trust."

24       Q.   You called him a fed, a snitch, a nigger, and a

25   kike?

1     A.   Correct.

2     Q.   Okay.  And you even mention the fact that the phone

3   call you did place was to his show?

4     A.   Yes.

5     Q.   Okay.  And so sometime between, as we've seen,

6   between this happening, you posting it online, and you writing

7   this, you made a call in to Chris's show?

8     A.   That's correct.

9     Q.   Okay.  Yet you didn't call the police?

10     A.   That's correct.

11     Q.   Okay.  Now, the government went through with you

12   examples of things you may have done after this interaction,

13   and one of the ones you talked about was this trail camera?

14     A.   That's correct.

15     Q.   Okay.  Now, when you met with the FBI, you told

16   them that you had gotten your SD card that day?

17     A.   Yes.

18     Q.   Okay.  So we're now -- when?  When are you meeting

19   with the FBI, middle of October?

20     A.   October.

21     Q.   Okay.  So June passes, July, August, September,

22   those months go by, and that entire time the trail camera has

23   no actual recording SD card in it?

24     A.   That's correct.

25     Q.   Okay.  You --

1           MR. WOLPIN:  If I could just have a moment.

2      Q.   Now, the government went through with you some

3  photographs or screenshots of potential things you could have

4  said to Chris during this interaction, screenshots that you

5  had made of responses where you typed out things?

6      A.   Yes, yes.

7      Q.   Okay, and then didn't actually necessarily send

8  them?

9      A.   That's correct.

10     Q.   And when you spoke with the FBI in October 2019,

11  did you give them those messages at that time?

12     A.   No, because I didn't realize that I had them.

13     Q.   Okay.  When you spoke to the FBI in December of

14  2019, did you give them at that time?

15     A.   No.

16     Q.   When they came to Missouri to meet with you in

17  March of 2019, did you give them to them at that time?

18     A.   No.

19     Q.   They gave you their e-mails of the agents involved?

20     A.   Yes.

21     Q.   Okay.  And this is something that you sent to them

22  when, last week?

23     A.   Approximately, yeah.

24     Q.   Okay.  Now, you say these are contemporaneous.

25  These are things you're doing at the time after you've gotten

1    --

2          MR. WOLPIN:  We're now on Government 116, which is

3    a full exhibit.

4          THE COURT:  Are you waiting for the exhibit to be

5    brought up?

6          MR. WOLPIN:  Yes.

7      Q.    So this is a screenshot you say happened at sort of

8    the outset of the conversation.  We can see the one, two,

9    three contacts at the top?

10     A.    That's correct.

11     Q.    Okay.  Now, at this point Chris has sent you two

12   things:  I guess you've forgotten the lesson which kept you

13   away for a short while, did you need to be reminded, and Twin

14   Creek Road?

15     A.    Correct.

16     Q.    Your response is:  You specifically mentioned my

17   kids.  And yet he hadn't mentioned your kids?

18     A.    Not in that conversation, no.

19     Q.    Not in any conversation, at least any conversation

20   we've seen?

21     A.    Not in one that we've seen, but I'm sure that I

22   didn't pull that out of the air.  I'm sure there was some sort

23   of relevance or validity to it or else I wouldn't have said

24   it.

25     Q.    Well, it would make a lot more sense if it was

1  somehow later in the conversation when there was talk about

2  your family, but at that point at least in this conversation

3  he hadn't specifically mentioned your kids?

4      A.   That's correct.

5      Q.   Now, prior to your interaction in June with Mr.

6  Cantwell you knew he lived in New Hampshire?

7      A.   Yes.

8      Q.   Obviously you lived in Missouri, correct?

9      A.   Correct.

10     Q.   And the two of you had never physically crossed

11  paths, you had never had an interaction, been in the same room

12  in the same place in your entire life?

13     A.   That's correct.

14     Q.   Okay.  After June 16th, 2019, that didn't change.

15  You guys never had a physical interaction or were in the same

16  room until today?

17     A.   That's also correct, yes.

18     Q.   Now, after June 16th Chris didn't e-mail you?

19     A.   No.

20     Q.   He didn't call you?

21     A.   No.

22     Q.   He didn't send you additional Telegram messages?

23     A.   No.  There was no need to do it.  He had already

24  doxed me.

25     Q.   He didn't come to your door?

1          A.    No.

2          Q.    The only contact between you and him after June

3    16th is you calling in to his show to talk to him?

4          A.    That's correct.

5          Q.    Now, you've talked about doxing in general and

6    you've described it as a very serious thing.

7          A.    Yes.

8          Q.    Okay.  Your testimony today is a very serious

9    thing, correct?

10          A.    Yes.

11          MR. WOLPIN:  If I could have a moment, your Honor,

12    just to check with my assistant.

13          (Attorney Wolpin confers)

14          Q.    Now, you've talked about being friends with Paul

15    Nehlen.

16          A.    Yes.

17          Q.    Okay.  And someone who you respect and looked up

18    to?

19          A.    Yes.

20          Q.    Okay.  And someone you're familiar with as the

21    things he has done publicly as well.  You know him as a public

22    figure.  You said he ran for Congress.

23          A.    Yes.

24          Q.    So he is publicly known to have himself doxed

25    someone, being Douglas Mackey?

1              MR. DAVIS:  Objection.  Relevance.

2              THE COURT:  Sustained.

3              MR. WOLPIN:  Your Honor, if I could, there's a --

4              THE COURT:  Let's get the headsets on because I

5    can't understand the relevance.

6              (SIDEBAR)

7              MR. WOLPIN:  Your Honor, the government put in an

8    exhibit, which was the defendant's, on doxing.  The whole

9    content about doxing is -- the subject matter is Mr. Nehlen's

10   doxing of another individual.  This person has said that

11   doxing is this horrible, terrible thing, and yet the person

12   he's communicating with about doxing is sort of renowned for

13   having doxed.  That's already in an exhibit that has been

14   submitted to the jury.

15             THE COURT:  It's already been -- it's in an exhibit

16   admitted to the jury that Mr. Nehlen has doxed someone?

17             MR. WOLPIN:  Yes.

18             THE COURT:  What exhibit is that?

19             MR. DAVIS:  101, Judge.

20             THE COURT:  All right.  And what else does this add

21   to talk about Mr. Nehlen doxing somebody if it's already in

22   evidence?  You've got to speak into the mic.

23             MR. WOLPIN:  So again, the individual is saying

24   that doxing is something extraordinary.  It's not

25   extraordinary.  It's common.  It happens all the time in this

1    community.  It's been painted as in and of itself nearly a

2    crime or something that's akin to a crime, but it is not.

3    It's common.  Newspapers do it.  That's how Vic Mackey was

4    doxed.

5              I think the way the government has presented its

6    case is to make a question of what does doxing mean relevant

7    by putting in Chris's musings on doxing.

8              THE COURT:  I'll let you question the witness about

9    the government exhibit that shows that Mr. Nehlen doxed

10   somebody.  That's just going over something the government

11   introduced during its questioning so you can do that, but

12   don't take much more time on it because it's of such minimal

13   relevance that I don't want to waste the jury's time, okay?

14             MR. WOLPIN:  Thank you.

15             (CONCLUSION OF SIDEBAR)

16             MR. WOLPIN:  So at this point if we could just

17   bring up 101 for just the witness.

18             MR. DAVIS:  101 is in evidence, your Honor.

19             THE COURT:  All right.  It's in evidence so you can

20   show it to the jury.

21        Q.   All right.  In that, what you're seeing -- or will

22   be seeing -- is something that the government has put into

23   evidence as far as Chris Cantwell.  It's a writing he had back

24   in 2018 about doxing.

25             MR. WOLPIN:  Can we highlight this section right

1   here?

2       Q.    The article he wrote is entirely in response to a

3   situation where Paul Nehlen, the person you went to to talk

4   about doxing, had himself doxed somebody else.  Is that

5   something you're familiar with?

6       A.    Yes.

7       Q.    Okay.  So it is known among the alt-right that Paul

8   Nehlen himself has been a doxer of others?

9       A.    Yes.

10      Q.    Now, you've testified that --

11            MR. WOLPIN:  We can put this down for a moment.

12      Q.    -- that doxing is a big deal?

13      A.    Yes.

14      Q.    Okay.  Now, you have a friend, a Mr. Moeller, Mr.

15  Tactical Bowlcut?

16      A.    Yes.

17      Q.    Okay.  And Mr. Moeller is a confidante of yours,

18  someone you talk to about things?

19      A.    Yes.

20      Q.    Okay.  And he is someone who has also been a part

21  of the Bowl Patrol?

22      A.    That's correct.

23      Q.    Okay.  And sort of the unique aspect with Mr.

24  Moeller is the conversations you had with him were while he

25  was in jail?

1        A.    Yes.

2        Q.    All right.  So your conversations with him were

3   recorded?

4        A.    Correct.

5        Q.    All right.  And those conversations between you and

6   your other Bowl Patrol member, Mr. Moeller, you told him that

7   doxing people is not really a big deal like it used to be?

8        A.    I mean, if you say so.  I don't remember

9   specifically saying that but --

10        Q.    I can play it for you.

11        A.    Okay.

12        Q.    Okay.

13             MR. WOLPIN:  So we have -- I would ask at this

14   point to move in as an exhibit -- it got renamed late so I

15   don't have the number in front of me -- F-24, which is an

16   audio of the witness.

17             THE COURT:  You're asking to play this so that the

18   witness can hear it only?

19             MR. WOLPIN:  At this point I think it's

20   impeachment.  He said he didn't say it.  To the extent he says

21   he doesn't remember, I can play it to refresh his

22   recollection.

23             THE COURT:  In general impeachment by contradiction

24   you can ask the witness if he doesn't remember it, you can

25   show it to him or have him listen to it to refresh his

1    recollection, but you ordinarily can't introduce extrinsic

2    evidence solely for the purpose of contradiction.

3            MR. WOLPIN:  In this case because I don't have a

4    witness to do it, I have an audio, rather than calling in --

5            THE COURT:  No, the problem is it's extrinsic

6    evidence.  It's not that it's the audio versus the witness.

7            You can ask him, didn't you say in another

8    conversation doxing is not a big deal.  And if he says I don't

9    remember, then you can say, well, let me play this for you.

10   Listen to it.  Does that refresh your memory?  Didn't you say

11   that?  And if he says, no, I didn't say it, then ordinarily

12   you have to accept the witness's position and move on, and the

13   jury will judge his credibility.

14           I mean, I've gone over this with counsel prior to

15   trial.

16           MR. WOLPIN:  If it's necessary to refresh his

17   recollection rather than to impeach, I would ask that we have

18   a moment to play it for him outside their presence.

19           THE COURT:  All right.

20           Can we play this over headsets or do I have to

21   excuse the jurors?

22           THE CLERK:  You have to excuse the jurors.

23           THE COURT:  All right.

24           Let me find out, how much more cross-examination do

25   you have?

1              MR. WOLPIN:  I would say probably an hour.

2              THE COURT:  All right.  So we're not going to

3     finish with the witness today.  So go on to another subject.

4     We'll come back to this.  We'll stop at 4:30 for the day.

5     We'll play it for the witness after the jury is gone, and

6     we'll go from there.  We're just not going to be able to

7     finish with this witness unfortunately so we'll have to go

8     into tomorrow.

9              All right.  So go on to a different subject.

10        Q.   Let's move on from the concept of doxing and move

11   on to October of 2019.

12        A.   Okay.

13        Q.   So there was a day in October 2019 when the FBI

14   showed up at your house?

15        A.   Correct.

16        Q.   Now, that's, as I said, about four months after

17   this exchange?

18        A.   Yes.

19        Q.   And those officers came in a group.  How many came

20   total?  Do you remember?

21        A.   Well, I was at work at the time but it was four.

22        Q.   Okay.  So four officers showed up at your house?

23        A.   Yes.

24        Q.   And then they came to find you at work?

25        A.   Correct.

```
1          Q.    It was immediately apparent to you that these guys
2     were sort of ex-military type, serious guys?
3          A.    Uh-huh.
4          Q.    And when they --
5          A.    I mean yes.  Sorry.  Yes.
6          Q.    Thank you.
7                They then come to your work after they go to your
8     home?
9          A.    Correct.
10         Q.    And talk to your boss?
11         A.    That's correct.
12         Q.    And they tell your boss at that time that there's a
13    threat against your family?
14         A.    I didn't hear the conversation so I would assume --
15    I mean, they did later but --
16         Q.    If you didn't hear the conversation, you don't need
17    to answer, but they came showing up at your work unannounced
18    looking for you?
19         A.    Correct.
20         Q.    Okay.  Now, when they first see you, you're there
21    wearing a sweatshirt with the Dylann Roof bowl symbol on it?
22         A.    Correct.
23               MR. DAVIS:  Objection.  Relevance.
24               THE COURT:  Overruled.  That's already come into
25    evidence anyways, I believe.
```

1      Q.   So right away if the FBI knows anything about Bowl
2   Patrol at all, they can tell that you're part of Bowl Patrol
3   just by your clothing?
4      A.   Correct.
5      Q.   Now, they tell you they are there because of a
6   threat against your family?
7      A.   Yes.
8      Q.   They tell you that your safety is in danger?
9      A.   That's correct.
10      Q.   And they repeat that throughout the interview?
11      A.   Yes.
12      Q.   Okay.  They tell you things like, we came from
13   Boston because we're concerned about you, your wife's safety,
14   your children's safety, and your safety?
15      A.   That's correct.
16      Q.   Now, you spoke with the FBI first at your work and
17   then went back to a local police station?
18      A.   That's correct.  We briefly spoke.
19      Q.   And that brief speaking, whatever was said, wasn't
20   in fact recorded to your knowledge?
21      A.   To my knowledge, no.
22      Q.   Okay.  Then you go to the police station, and at
23   the police station that part of the interview is recorded?
24      A.   Correct.
25      Q.   I want to go through with you some of the things

1    that the FBI said to you at the beginning of that recorded

2    interview as far as their purpose.

3            MR. WOLPIN:  If we could bring up Exhibit D just

4    for the witness.

5        Q.    So this is -- at the outset we're in the first,

6    what is ultimately the first few --

7            MR. WOLPIN:  No.  Excuse me.  The FBI interview,

8    excuse me, not the grand jury transcript.

9        Q.    I can read for you --

10           MR. DAVIS:  Objection to reading, your Honor.

11           THE COURT:  Well, all right.  Yeah, first you need

12   to -- you can ask the witness, didn't the officers do X,

13   didn't they say this.  If he says he can't remember, you can

14   show it to him and ask him to refresh.

15           MR. WOLPIN:  That's how I intended to do it.

16           THE COURT:  All right.

17           MR. WOLPIN:  However, it's a transcript so I

18   thought it would be more efficient to have it ready.

19       Q.    So they said to you:  We want to assure the safety

20   of you and your family?

21       A.    Yes.

22       Q.    Where you're in danger the primary issue we're

23   concerned about is the feud with Mr. Cantwell, correct?

24       A.    Yes.

25       Q.    Where he threatened your wife and children, we take

1    those things very seriously?

2         A.    Yes.

3         Q.    Do they tell you, we'll focus first on the threat

4    against your family?

5         A.    Yes.

6         Q.    That they saw the exchange online?

7         A.    Yes.

8         Q.    And that because we are taking this seriously,

9    we're not letting it go?

10        A.    I don't remember that that was specifically said.

11               MR. WOLPIN:  If we could go to page 8.

12        Q.    Let's see if this refreshes your recollection.

13               MR. WOLPIN:  And the third line down.

14        A.    Okay.

15        Q.    So it was made clear to you that -- so they did

16   say, we're not letting it go.  Does that refresh your

17   recollection?

18        A.    I mean, yes.

19        Q.    So before the recorded part began, they had told

20   you they were there for the threat, correct?

21        A.    Correct.

22        Q.    During the recorded part they began by telling you

23   that they were there to talk to you about the threat?

24        A.    Correct.

25        Q.    They're using the word threat?

```
 1          A.    Yes.

 2          Q.    They're using the word seriously?

 3          A.    Yes.

 4          Q.    They're telling you they're not going to let it go?

 5          A.    I can see that they said that, yes.

 6          Q.    And then at that point they turn it over to you as

 7   to what you want to tell them?

 8          A.    Yes.

 9          Q.    Now, after they explain to you what they're there

10   for, the next thing you blurt out after, we're not letting it

11   go, is:  Just to put it out there with you guys, the picture

12   with the supposed LSD on my tongue, that was fucking

13   construction paper from my kids.

14          A.    Yes.

15          Q.    Okay.  So your first response to them coming is not

16   to say, it's a threat, it's not a threat.  Your first response

17   is you're worried about the LSD?

18          A.    Well, I knew what pictures were out there and I was

19   concerned with, you know, the potential for the perception to

20   be that I was a drug user and I knew that that was illegal.

21          Q.    And the next line, the next thing you tell them is:

22   Anything that is said in the Bowl Patrol or anything like that

23   is strictly performance art.  Strictly.

24          A.    Yes.

25          Q.    So that's what you want them to know at that point
```

 1   before you talk anything about threats is that Bowl Patrol is

 2   just performance art?

 3       A.   Correct.

 4       Q.   Now, continuously they work to redirect you back to

 5   this exchange between you and Cantwell?

 6       A.   Yes.

 7       Q.   All right.  So you go off on these other tangents

 8   and they keep bringing you back?

 9       A.   Correct.

10       Q.   We're not going to interrupt you or anything you

11   need to say, so let's focus.  You're aware of the threat from

12   Cantwell to your family.

13            Does that seem correct?

14       A.   Yes.

15       Q.   Okay.  And they say again to you:  So obviously you

16   took that threat very seriously, right?

17       A.   I mean, I remember that being said, yes.

18       Q.   Okay.  So they're telling you they take it

19   seriously and they're asking you, right, you do too?

20       A.   I mean, it would be better if I could see it in

21   front of me so I can confirm it.

22            MR. WOLPIN:  Can we show the witness 26, page 26?

23            MR. DAVIS:  Again, objection to reading from a

24   transcript.  This is proper to refresh recollection.

25            THE COURT:  Right.  But it is entirely proper to

1    question a witness, didn't the officer do X, didn't the

2    officer say, and you can use the exact words.

3           What you can't do is read the transcript to the

4    jury.  It's a difference.  Look, we're at 4:27.  I don't want

5    to waste the jury's time here.  Let's stop for the day.

6           Members of the jury, I was hoping we could finish

7    with this witness because I want to get him back as soon as we

8    can to Missouri, but we'll have to go with him tomorrow.

9    There's just no option here because the defense has

10   substantial additional cross and the government will have

11   redirect.

12          So I will excuse you for the day and ask you to

13   keep an open mind.  It's very important that you just make

14   real efforts for the next few days, just tune out the media,

15   okay?  Don't read any newspapers, listen to news on the radio.

16   Don't go on the Internet.  Don't go out and do any

17   investigations.  Keep an open mind.  Come back.

18          I believe we are -- is it safe to say that we are

19   well within the schedule that we have been anticipating?

20          MR. DAVIS:  I think we're within it.  Maybe not so

21   well within it.

22          THE COURT:  We're going to move even more quickly

23   tomorrow and we will stay on schedule.  So in case you have

24   any apprehension about that, I do not anticipate any delays in

25   the schedule.  If they happen, I'll give you notice, and it's

1    possible, but I'll do my best to keep us moving, okay?

2              Have a good evening everybody.  We'll see you

3    tomorrow at 9:30.

4              (IN COURT - NO JURY PRESENT)

5              THE COURT:  Sir, you're done for the day.  You can

6    step down.  Come back tomorrow and be ready to finish up

7    tomorrow.

8              Okay.  Be seated everyone.

9              So you're all highly experienced lawyers.  I have

10   respect for your knowledge and ability to do trial work.

11             My understanding about the right way to take a

12   statement that's in a police report, and this transcript is

13   effectively equivalent to a police report the way I see it, is

14   that it is perfectly acceptable for an examiner on

15   cross-examination to take a statement from a police report

16   that's in quotations and say you said to the officers and then

17   that exact word.  If he says, really it would be better if I

18   see the document, then you can show the document to him and

19   say, read it to yourself.  Having done so, is your

20   recollection refreshed that in fact you said blank?  And if he

21   says, no, I didn't say that, then you just have to move on.

22   You can't, like, introduce the police report or anything like

23   that.  That's the way I understand matters like that are dealt

24   with, and I think this transcript should be dealt with in the

25   same way.

1          Now, I may be wrong.  I may be missing something.

2    If either of you see it differently, let me know.  I don't

3    think it's -- a lot of lawyers come in and they want to just

4    pull out police reports and start reading from them to the

5    jury.  I don't think they can do that.  I think they can

6    cross-examine and use the exact words that are attributed to

7    the defendant to see if he'll adopt them.  And if he won't,

8    there's not much he can do about it, as opposed to sworn

9    testimony which can be dealt with in a different way.

10          So that's how I expect you to go, and if I'm wrong,

11   you'll tell me and I'll let you modify your practices.

12          Now, anything more on that subject?  Then we have

13   to jump back and go into this issue about doxing and what the

14   defense wants to do on doxing where I told us to move on.

15   Maybe we're just by it now and it doesn't matter.

16          Is there something more you want to do about the

17   doxing stuff?

18          MR. WOLPIN:  I would.  There's an impeachment to do

19   or a refreshing.  I actually don't -- at this point I would

20   have to go back through it with him to see whether he doesn't

21   remember saying it or he claims he didn't say it.

22          THE COURT:  Okay.  So what you have there is you

23   have a transcription of a call to the prison between the

24   witness and this friend of his who's in prison where he

25   says -- and what's the quote on that?  Do you know?

1          MR. WOLPIN:  Doxing people is not really a big deal

2     like it used to be.

3          I don't have a transcript because it's so short.

4     That's the exhibit, the most recent exhibit --

5          THE COURT:  So there's some recent disclosure from

6     the defense to the government where this is a --

7          MR. DAVIS:  F-24.  Thank you.

8          THE COURT:  F-24.  So it would seem to me that that

9     works the same way as reading from this transcript.  That you

10    can say, he's your friend.  You talked to him in jail.  You

11    had a conversation on or about this date.  Do you remember

12    that, you talked to him?  And in that conversation didn't you

13    tell him doxing is not a big deal anymore?  And if he says,

14    yeah, I did, okay, you got it.  If he says I can't remember,

15    you can show him the thing to see if it refreshes his

16    recollection.  If he says, no, I didn't, then we have to deal

17    with the question of should you be allowed to introduce it, is

18    it collateral or not collateral, is it extrinsic evidence?

19    We'll deal with that as sort of the next step in the process,

20    but that's how I propose to deal with that, okay?

21         Anything else that either of you want to take up

22    with me today?

23         MS. KRASINSKI:  Just to put a pin in it that both

24    parties had submitted to Courtroom Deputy Negron last night

25    transcripts of two jail calls where the defense has made 106

1    objections.  So your Honor should have the government's

2    transcript.

3               THE COURT:  The excerpts that you propose and the

4    full transcript so I can do the same thing I did yesterday?

5               MS. KRASINSKI:  Yes, your Honor.

6               THE COURT:  All right.  So I'll ask the clerk to

7    give me that, and I'll rule on that at 9 o'clock tomorrow.

8               In terms of scheduling -- so let's assume that this

9    witness is off the stand by 10:00.

10              What are you going to do tomorrow?  What's the

11   government going to do?

12              MR. DAVIS:  I think we can probably rest at the

13   very end of the day.  Do you think?  No?

14              (Attorney Davis confers with Attorney Krasinski)

15              MR. DAVIS:  It depends on the length of cross.

16   Paul Nehlen is one witness.

17              THE COURT:  Okay.

18              MR. DAVIS:  And there are four other witnesses, but

19   none of them should be too long.  So I think if we move --

20   it's possible we'll rest tomorrow.

21              THE COURT:  One day blends into the rest for me.

22   What day of the week is this?

23              MR. DAVIS:  It's Wednesday.

24              THE COURT:  It's Wednesday.  Okay.

25              So you'll be resting either Thursday or Friday,

1   right?

2          MR. DAVIS:  If not Thursday, Friday before noon.

3          THE COURT:  Okay.  And then of course the defense

4   will always say to me, I can't say anything, I don't know

5   anything, I have to wait.

6          I'm just trying to get a handle on it.  If the

7   defendant testifies, it will be another day.  If the defendant

8   doesn't testify, probably not a long time.  Is that fair?  I'm

9   not holding you to anything, the world might change, but I'm

10   just trying to plan it out, all right?

11          So there's a reasonable prospect we could argue and

12   charge on Friday, more likely Monday?

13          MR. LEVIN:  More likely Monday.

14          THE COURT:  That's sort of where I'm seeing us.  Is

15   that consistent?  And that would still be within the schedule

16   we told them about, isn't it?  We told them we could extend

17   into next week is what I remember.

18          MS. KRASINSKI:  Yes, Judge.

19          THE COURT:  So we're still on schedule.  They

20   shouldn't -- they aren't going to need to panic on that.

21          Okay.  That's good.  I think we'll plan on that.

22          I gave you a very rough first draft charge.  I've

23   explained to you that I'm going to -- I am likely -- I want to

24   hear obviously arguments from parties, but the case law I've

25   reviewed on the extortion charges suggest that intent to

1    extort by threat includes an intent to threaten, because the

2    concept of extortion by threat just doesn't make sense unless

3    you're also intending to threaten.  I can give you case law on

4    that or you can research it.

5             So I'm inclined to say something along those lines

6    in addition to what I've said under intent to extort, that the

7    intent to extort also when you extort by means of a threat,

8    requires that the defendant have an intent to threaten.  So

9    I'm inclined to do that as an additional charge.

10            I'm inclined in the cyberstalking charge -- and we

11   can pars this out if you want, but I'm inclined to write these

12   charges to make it clear to the jury that the intent to extort

13   and the cyberstalking are directed at Mr. Lambert.  That

14   that's who he's trying to stalk and who he's trying to extort.

15   The standpoint from which a reasonable person views this is

16   from Mr. Lambert's standpoint, not Mr. Lambert's spouse's

17   standpoint.  So the intent to extort has to be proved as to

18   Mr. Cantwell.  The intent to engage in the acts which qualify

19   as cyberstalking have to be proved as to Mr. Cantwell.

20   Whether a reasonable person would view the statement as

21   harassing or a reasonable person would understand this or

22   that, that's viewed from the standpoint of -- it seems to me

23   from the standpoint of Mr. Lambert, and that's how I intend to

24   instruct the jury.

25            You don't have to say anything now, but think about

1    that and see if that's consistent or inconsistent with what

2    you're proposing to do.

3            All right.  Is there anything else anyone wants to

4    take up with me today?

5            I will provide a revised charge to you hopefully by

6    the end of the day tomorrow and certainly before you're

7    required to give closing arguments.  All right?

8            Anything else from anyone?  Okay.  Thanks.

9            Be here -- Mr. Levin, for your side if you could be

10   here by 9:00, and if the government could be here by 9:00, so

11   I can rule on any preliminary issues.

12            (Jury trial adjourned at 4:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

128

```
1                        C E R T I F I C A T E

2

3

4           I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings, to the best of my knowledge, skill,

7     ability and belief.

8

9

10    Submitted: 5-4-21        /s/   Susan M. Bateman _____
                               SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```