**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 2, 2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
            v.                      *   February 24, 2021
                                    *   10:05 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:

For the Government:        John S. Davis, AUSA
                          Anna Z. Krasinski, AUSA
                          U.S. Attorney's Office


For the Defendant:         Jeffrey Levin, Esq.
                          Eric Wolpin, Esq.
                          Federal Defenders Office


Probation:                 Sean Buckley


Court Reporter:            Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

<pre>
 1                    P R O C E E D I N G S
 2            THE CLERK:  Court is in session and has for
 3    consideration a sentencing hearing in United States of America
 4    versus Christopher Cantwell, criminal case
 5    number 20-cr-6-1-PB.
 6            THE COURT:  All right.  Here's how I intend to
 7    proceed.  I would like to first review the report with the
 8    defendant to make sure he's read it and understands it.  I
 9    want to determine the defendant's guideline sentencing range
10    in the absence of a departure or variance.  I then will
11    address departures and variances together.  I have certain
12    specific questions that I want to review with the parties, and
13    then I'll give them an opportunity to say anything else they
14    want to say.  I'll give the defendant an opportunity to speak.
15    I'll then rule on departures and variances and impose the
16    sentence I intend to impose.  All right?
17            So let's start with the presentence report.
18            Mr. Cantwell, I have a report for you that was
19    prepared originally on November 20th of 2020, and it was
20    revised on December 17th.  Have you seen that report?
21            THE DEFENDANT:  I have.
22            THE COURT:  Have you read it and discussed it with
23    your attorney?
24            THE DEFENDANT:  I have.
25            THE COURT:  Do you feel you understand it?
</pre>

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Thank you.  You can be

3   seated.

4          Does the government dispute any of the facts or

5   legal conclusions contained in the report?

6          MR. DAVIS:  No, your Honor.

7          THE COURT:  Is the defense pressing any objections

8   to the facts and legal conclusions set forth in the report?

9          MR. WOLPIN:  No, your Honor.

10          THE COURT:  I adopt the findings of fact and

11   conclusions of law set forth in the report which will be made

12   a part of the record under seal.

13          I determine that the defendant's total offense

14   level in the absence of a departure or variance is 20 and his

15   Criminal History Category is III.  The guideline sentencing

16   range is 41 to 51 months.

17          So the parties have filed detailed and helpful

18   memoranda that affect my sentencing judgment.  I've had a

19   chance to study those.  There are three specific issues that

20   have come up that I want to talk to the parties about.  So

21   there is an argument that the defense has that the defendant's

22   criminal history category overstates the seriousness of his

23   criminal history and that that warrants departure or variance.

24   I want to hear from the defense on that first and then hear

25   from the government.  So that will be the first issue I want

1   to take up.

2           The government has asserted in its papers that the

3   fact that the threat was made against the victim's family

4   member is a potential ground for an aggravating factor that I

5   should consider in sentencing.  I want to hear your argument

6   and the defense's response on that.

7           And then the matter that I need the most help on is

8   with respect to the defendant's provocation argument and how

9   that should affect this particular sentencing judgment, and I

10  want to focus on what I see -- and maybe there's a way to

11  reconcile it, but it seems to me that you -- the parties have

12  vastly different views about the events that immediately

13  preceded the conduct for which the defendant was convicted,

14  and I want to understand both parties' positions on that and

15  what your reactions are to the other party's take on the

16  sequencing of events because that can affect how I evaluate

17  the provocation argument that the defense is presenting.

18          So I want to deal with those three things in that

19  order, and then I'll turn to the government and have it make

20  its argument for sentence and then the defense.  Then I'll

21  give Mr. Cantwell an opportunity to speak.

22          Okay?  Everybody understand how we want to go

23  ahead?  Okay.  So let's start with the overrepresentation of

24  criminal history category argument.  I've read your papers.  I

25  think I understand your arguments, but if you want to add

1     anything to them, feel free to do that.

2            MR. WOLPIN:  Yes, your Honor.  Our argument stems

3     from the fact that obviously we have a point based system that

4     does its best to approximate prior past behavior through

5     certain variables like length of sentence.  As discussed in

6     what we filed, that gets I think more complicated in a time

7     served scenario, because it becomes less evident that the

8     sentence length imposed is truly a proxy for the seriousness

9     of the offense.

10            In this case there was a situation where Chris

11    appeared in court, left that day and left the state as

12    required, and that was simply the end of it.

13            Whether a court in another sort of hypothetical

14    world where he was not held pretrial that appeared with no

15    days or ten days or five days or whatever it might have been

16    would have similarly reached a sentence as here, it is

17    unclear.

18            THE COURT:  Let's make this concrete, okay?  So

19    let's start with -- which of the convictions are you arguing

20    aren't really dealt with in a way that's consistent with the

21    underlying purposes of the sentencing statute, and let's take

22    them one at a time and identify what points are assessed and

23    why you think those points produce overrepresentation.

24            MR. WOLPIN:  Yes.  All right.

25            So the points that are scored in this case only

1    come from two incidents or two sets of conviction.  The first

2    is a 2009, and I'm on page 15 of the PSR.

3                    THE COURT:  Got it.  Paragraph 61?

4                    MR. WOLPIN:  Correct.

5                    And then paragraph 62, which is two points from a

6    2017/2018.

7                    In this situation -- this argument focuses on the

8    last --

9                    THE COURT:  So he gets one point based on 61 and

10   gets two points based on 62, but then he gets another two

11   points because of the supervision essentially that adds to

12   this offense while on supervision.

13                   MR. WOLPIN:  Correct.

14                   THE COURT:  All right.  And so what do you want to

15   say as to 61?

16                   MR. WOLPIN:  So as to 61, this becomes a question

17   of date.  It falls really right at that relatively arbitrary

18   ten-year mark.  So I understand there needs to be arbitrary

19   rules and timing and that is not illogical.  However, it does

20   lead to circumstances where if one has committed something

21   just a couple months before, it would count as zero as opposed

22   to one.

23                   THE COURT:  So what we're talking about is the

24   equivalent of a DUI charge?

25                   MR. WOLPIN:  Correct.

1            THE COURT:  And that was in 2009 and he was

2    assessed one point for that.

3            MR. WOLPIN:  Correct.

4            THE COURT:  If the charge had occurred how much

5    earlier would it be zero?

6            MR. WOLPIN:  Well, our argument would be this

7    offense begins in June, ends in June of 2019.  So this would

8    have been March.  So if this -- the conduct, your Honor, in

9    our position predates the ten-year mark.  The conviction for

10   whatever reason took 16 months or so to actually be entered.

11           So had this case simply resolved in a more

12   expeditious manner, our argument is this would have counted as

13   zero.

14           THE COURT:  All right.  So your view is if it's

15   close to the ten-year cutoff, it meets it technically but not

16   practically because the conduct that gave rise to conviction

17   well predates the ten-year period and it seems to be just a

18   delay in processing the case which results in the conviction

19   being within the ten-year period and the one point therefore

20   is excessive.

21           MR. WOLPIN:  Fair.  Yes.

22           THE COURT:  Okay.  Got it.

23           What do you want to say?  Do you agree that two

24   points is warranted based on 62?

25           MR. WOLPIN:  Correct.  So how that sentence was

1    imposed, it imposed greater than 60 days of jail time.  This

2    case began as a number of felonies, ultimately resolved as

3    misdemeanor offenses with time served resolutions.

4                 THE COURT:  These are the Charlottesville -- one of

5    the Charlottesville convictions?

6                 MR. WOLPIN:  There are two together that are

7    misdemeanors charged from the same incident.

8                 THE COURT:  Okay.

9                 MR. WOLPIN:  And --

10                THE COURT:  He gets points for one but not the

11   other because they occurred on the same day.

12                MR. WOLPIN:  Because it's all the same, yes.  It

13   ultimately is.

14                THE COURT:  The government points out he assaulted

15   two different people, each one resulted in a conviction, but

16   they don't count -- you don't double count the points.  You

17   just get two for that.

18                MR. WOLPIN:  Correct.  And my understanding of what

19   these allegations were, it's a single spray of OC spray.

20   There were two people that were named as being sort of

21   affected by that and that's why there are two charges.  So it

22   truly is the same act even though there ended up being two

23   convictions.

24                THE COURT:  Well, yeah, they are two distinct

25   victims -- you're saying that -- are you making the contention

1  that it was a single spray that hit two people?

2          MR. WOLPIN:  That's my understanding of the facts

3  of that case, correct.

4          THE COURT:  Okay.  All right.  Got you.

5          MR. WOLPIN:  So from our position -- again, I

6  understand why when this case started as a felony there may

7  have been, you know, a detention --

8          THE COURT:  Let me just go back to this single

9  spray issue.  Whether it was a single spray or not still would

10 only be two points for the two convictions, wouldn't it?

11         MR. WOLPIN:  Yes.

12         THE COURT:  So that point is like not determinative

13 of whether the two points is appropriate or not.

14         MR. WOLPIN:  No.

15         THE COURT:  Two points and only two points should

16 be assessed based on those two convictions under the guideline

17 whether it is a single spray or two distinct sprays that

18 occurred in close proximity to each other with no intervening

19 arrests, et cetera.

20         MR. WOLPIN:  Yes.

21         THE COURT:  Okay.  That's your position, but you

22 agree two points is the right assessment for that.

23         MR. WOLPIN:  Correct.

24         THE COURT:  Okay.  So you have a problem with the

25 two points based on the commission of the offense -- I want to

1    say under supervision.  That's sort of a traditional way we

2    talk about it.  What do you want to say about that?

3              MR. WOLPIN:  I want to say that -- in relation to

4    this offense, yes.

5              So there was an unsupervised good behavior period

6    which was imposed as part of a 2017 case.  That ends up

7    causing what are misdemeanors to jump from what was originally

8    two points to four points total for that offense.

9              THE COURT:  Wait, wait, wait.  I'm not

10   understanding you.  What do you mean?

11             MR. WOLPIN:  So it starts as two points as noted in

12   the, sort of within that section on paragraph 62.  Then this

13   criminal justice sentence issue elevates that another two

14   points.  So we're at a total ultimately of four points that

15   originate, I understand originates from the criminal justice

16   sentence provision but ultimately stems back from that.

17             THE COURT:  Well, it comes from the fact that while

18   he was under this period he committed the offenses of

19   conviction here, right?

20             MR. WOLPIN:  Right.

21             THE COURT:  So it's not like it changes a

22   misdemeanor to a felony.  It doesn't do that at all.  It's

23   basically if you're -- if you're being -- in the typical case

24   we have where you're being supervised -- if you commit a crime

25   while you're being supervised, you get extra points added on

1   because we need to be holding people who are supposed to be

2   under special supervision terms to a greater responsibility to

3   avoid criminal conduct.  And when they do it, it shows they're

4   not being rehabilitated by the prior sentence and therefore

5   justifies the imposition of more points.  That's the way I

6   understand it works.  Is that -- my thinking of it

7   incorrectly?

8            MR. WOLPIN:  No.

9            THE COURT:  Okay.  So that's what happened here,

10  and your point is that because he was not being formally

11  supervised by probation you think that it's improper to give

12  the two points.

13           MR. WOLPIN:  I'm not arguing from a legal

14  standpoint that that is not what the guidelines call for.  I'm

15  arguing from a consideration of how the points are being --

16  reflecting the history, yes.  I think that unsupervised

17  conditions of supervision or nonsupervision, just good

18  behavior, are so routine and commonplace, don't have that

19  rehabilitative function with supervision, that I think it

20  stretches beyond -- even though technically within the rule it

21  stretches beyond two points and sort of ends up having a

22  significant impact beyond what I think that good behavior

23  period should reflect.

24           THE COURT:  Okay.  I understand your argument.

25  Basically then you're saying treat -- don't treat -- don't

1    give him one, effectively give him one for what happened with

2    the DUI of ten years ago.  Don't give him two.  And if he's

3    left with that, he only has two points so he would be a II

4    rather than a III, right?  That's your position?

5             MR. WOLPIN:  Yes.

6             THE COURT:  And did you want to say anything else

7    about that?

8             MR. WOLPIN:  No, your Honor.

9             THE COURT:  All right.  What does the government

10   want to say in response?

11            MR. DAVIS:  Your Honor, the standard is whether a

12   Criminal History Category of III substantially overrepresents

13   either the risk of recidivism or the seriousness of the

14   history.

15            As we argued, the defendant cannot meet that burden

16   of showing substantial overrepresentation.  He's got five

17   criminal history points on this calculation.  As we argue,

18   there are seven criminal convictions that result in precisely

19   zero criminal history points.  Those are nonetheless

20   convictions and they bear on the seriousness of his offense

21   and certainly the seriousness of his criminal history, and the

22   recent ones --

23            THE COURT:  The ones prior to 2009, the ones

24   reflected in paragraphs 56 through 60 are offenses that

25   occurred in 1997, 1998, and 2000, right?

```
 1                    MR. DAVIS:  Yes.

 2                    THE COURT:  So they're a long time ago when he

 3       was --

 4                    MR. DAVIS:  They're old convictions, yes.

 5                    THE COURT:  They're old convictions for which he

 6       served a total of 45 days -- or no, he also did 60 on the

 7       criminal possession of a weapon.

 8                    MR. DAVIS:  Yes.

 9                    THE COURT:  So he did 60 on that and 45 days on the

10       operating under influence charge.

11                    MR. DAVIS:  Yes.

12                    THE COURT:  Okay.

13                    MR. DAVIS:  And two of them, your Honor, are much

14       more recent.  One of them is the -- one of the assaults and

15       batteries in Charlottesville.

16                    THE COURT:  Well, the defense agrees that he

17       deserves the two points for that.

18                    MR. DAVIS:  Right.  But the point is there is

19       another one that's a zero that does not result in more points.

20                    THE COURT:  Yeah, but the guidelines specifically

21       think about why you should not give points for those -- the

22       fact that there are two convictions why the guidelines

23       shouldn't give points.

24                    MR. DAVIS:  Right.

25                    THE COURT:  I don't have to accept his single spray
```

1  argument to say, oh, it was -- he shouldn't get an extra two

2  points.

3           MR. DAVIS:  Right.

4           THE COURT:  Like if it were two sprays separated by

5  half an hour during the course of this demonstration, it would

6  still only be two points.

7           MR. DAVIS:  Yes.

8           THE COURT:  Okay.

9           MR. DAVIS:  Although it's even closer because under

10  4A1.1(e), if the assault and battery in Virginia was a "crime

11  of violence," then another point would be added, and the issue

12  there is that --

13           THE COURT:  Why doesn't it qualify as a crime of

14  violence?

15           MR. DAVIS:  Because it's not categorically a crime

16  of violence I don't think, and we're not saying that it is,

17  but it's close.  The only point being --

18           THE COURT:  That's part of the fundamental

19  misjudgment by the United States Supreme Court to use a

20  categorical approach which restricts the power of a judge to

21  actually look at what happened.  I can't look at what happened

22  and say, oh, you should get points or not get points based on

23  what actually happened in the case.  I have to look at the

24  offense of conviction, and you're saying this offense of

25  conviction is not categorically a crime of violence even

1     though by its terms because it's an assault conviction you

2     would think, oh, that's got to be a crime of violence, but it

3     isn't and because we have to use this categorical approach I

4     can't dig into the underlying circumstances.

5          MR. DAVIS:  And I'm not arguing that you should,

6     your Honor.  I'm only saying this is a discretionary call on

7     your part.  The defendant is asking for a departure.  The

8     Court can assess anything and everything, and all the

9     government is saying here is the defendant missed by a hair

10    getting another point because that was almost a crime of

11    violence.

12          The question is whether this criminal history score

13    somehow substantially overrepresents his record or whether

14    he'll recidivate, and we're just saying there are a lot of

15    things here where he ekes out a no score.

16          We also argue the Charlottesville misdemeanors are

17    not your ordinary misdemeanor.  There's the Unite the Right

18    rally.  There are guys driving from New Hampshire with an

19    armory of weapons, including guns and knives, who is in that

20    march and is in a confrontation.

21          And, yes, he scrapes by with misdemeanor

22    convictions, only one of which counts, but that's another

23    consideration for the Court.  Are these misdemeanors that are

24    meaningless or are they misdemeanors that say something about

25    criminal intent or the likelihood of more crimes?

1          THE COURT:  All right.  So you recognize that I

2   can't do that in determining how many points to assess.

3          MR. DAVIS:  Correct, correct.

4          THE COURT:  But you're saying I can do it and

5   should do it with respect to evaluating a request for a

6   departure.

7          MR. DAVIS:  Yes.

8          THE COURT:  Okay.

9          Do you have some argument that I am not permitted

10  to do what the government says that he's asking me to do?

11         MR. WOLPIN:  No.  I do think it is a broader

12  consideration of his record is sort of the version the Court

13  is looking at.

14         THE COURT:  Okay.

15         MR. WOLPIN:  I mean, this is not a categorical

16  issue because these are misdemeanors and they're not crimes of

17  violence because the penalty doesn't exceed one year.  So that

18  is not the sort of question that -- it would never have been a

19  crime of violence under the definition because they're just

20  misdemeanor offenses.

21         I don't think the Court should be taking into

22  account the government's version of bringing guns.  There was

23  nothing that this charge related to.  There was no gun

24  involved.  There was no gun ever alleged to be involved.

25         And so to sort of take that as some kind of bad

1    fact that changes the nature of the actual conviction and the

2    actual conduct, I think that's unfair and that I would say is

3    beyond the Court's consideration in looking at his record.

4            THE COURT:  I think what he's saying is this

5    two-point assessment is technically a two-point assessment,

6    but it's actually -- when you look at what he actually did,

7    it's worse than two points.

8            So when you are looking at other convictions and

9    saying that's not as bad as the guidelines suggest, you should

10   be able to consider that this particular conviction in the

11   government's view is worse than what the point level suggests

12   and therefore I should exercise my discretion to not depart

13   downward.

14           To me what matters is he's close to the line

15   between a II and III, and I'm looking at whether -- in my mind

16   what weighs heavily when I decide on somebody's criminal

17   history and I exercise discretion about it, it's how has that

18   person been treated by the criminal justice system for the

19   offenses.

20           So if people have not served substantial prison

21   time for offenses, then that's a factor that weighs in my

22   discretionary judgment as to when someone is close to the line

23   whether he looks more like a II than a III.  People who have

24   been exposed to the criminal justice system and have received

25   substantial prior sentences, in other words, where we try to

1    hold them to account and they still aren't deterred from their

2    criminal conduct, that's a reason to be cautious about

3    granting a close-to-the-line horizontal departure.

4            Cases where someone may have accumulated a number

5    of convictions that technically move him from a II to a III

6    but who hasn't served substantial prison sentences, has had

7    less opportunity to have the ability of a sentence to deter

8    him, to be tested.  So that's a factor that weighs

9    significantly in my judgment on that.

10           Did you want to say -- I was interrupting you,

11   counsel.  Did you want to go back and say anything more about

12   the criminal history category issues?

13           MR. DAVIS:  I don't think so, Judge.

14           THE COURT:  I've read your memorandum and I think I

15   understand your position.

16           Okay.  Let's turn to your issue.  You point out

17   that the guidelines recognize that it can be an aggravating

18   factor in a threatening case if there's -- if a threat is

19   directed to a victim's family member as it was in this case.

20   I understand your point quite well.  I did want to give the

21   defendant an opportunity to respond to it.

22           Did you want to say anything more about that?

23           MR. DAVIS:  Only that we are not seeking an upward

24   departure.

25           THE COURT:  But it's an aggravating factor.

1              MR. DAVIS:  Sure.

2              THE COURT:  That when I consider where to sentence

3    him within whatever range I land at, or when I consider

4    whether to vary downward, you're saying take that aggravating

5    factor into account, right?  I think that's what you're

6    saying.

7              MR. DAVIS:  Yes.

8              THE COURT:  Okay.  It is what it is.  It was a

9    threat against the victim's family.  The guideline book

10   recognizes that is potentially an aggravating factor.  He's

11   not arguing for an upward variance, but it is a factor that I

12   feel that I would be inclined to take into account in

13   sentencing unless you can convince me that it's not something

14   that I should consider at all here.

15             MR. WOLPIN:  I would say it fits within the nature

16   and circumstances of the offense for sure.  I think there are

17   some points to address around that issue, though.

18             THE COURT:  You can do that -- if you want to do it

19   as a whole towards the end sort of like in this case

20   fortunately the victim's spouse was not informed of the

21   threat, so in that sense it wasn't quite as bad as it might

22   have been, you know, you can make those kind of totality of

23   circumstances arguments later.  But again, it is what it is.

24   It's a potential aggravating factor.  It's something I'm

25   inclined to take into account.  Legally you're not telling me

1    I can't do that.  You're saying consider it in the context of

2    the entire case, Judge, and it won't be as big a factor as the

3    government says it should be.

4              MR. WOLPIN:  Correct.

5              THE COURT:  Got it.  Okay.  Now let's get to the

6    issue that I'm most confused about and maybe you can easily --

7    it seems that you disagree fundamentally about what

8    precipitated the criminal conduct by the defendant in this

9    case.

10             Your position is, as I understand it, this was a

11   long-standing plan to get dox on Vic Mackey and the defendant

12   had a long-standing plan to try to compel people to give him

13   dox on Vic Mackey, and that on the day that the particular

14   extortion and threats that occurred here occurred it was not

15   the victim who provoked the defendant.  It was the defendant

16   who before the victim did anything had posted a picture of the

17   defendant's family, where as I understand you seem to be

18   taking the position that's not the sequencing of the events;

19   that there was a decision by the victim to go on to

20   the Telegram site that the defendant was involved in, and that

21   it was that action that precipitated publication of the

22   blurred image and precipitated the discussion that you say led

23   to an implied threat against Peach, the defendant's

24   friend/wannabe girlfriend, and that that is what provoked the

25   extreme criminal behavior by the defendant.

1         So you think of it more as an extortionate plan

2    that developed over a long period of time and that wasn't

3    precipitated by some bad conduct by the victim, but that the

4    immediate precipitating event was the victim happened to go on

5    to a site he didn't know the defendant was associated with.

6    The defendant had already posted an image of the victim's

7    family.  The victim tried to deescalate matters, and it was

8    the defendant who was aggravating the situation and that

9    prompted the Peach conversation.

10        Do you agree your version seems to be in conflict

11   with the defense version?

12        MR. DAVIS:  Yes, I think the spirit of it is.  I

13   think we agree on a lot of facts but --

14        THE COURT:  But it does seem to disagree about when

15   this first photo of the family was published.  You say it

16   occurred before the victim entered into the website that the

17   defendant was affiliated with.

18        MR. DAVIS:  Right.

19        THE COURT:  The defense doesn't expressly say

20   that's wrong but appears to describe an account that's

21   inconsistent with the one you describe.

22        So it is your contention, is it not, that the

23   sequence -- what happened that day was, first, the picture,

24   the blurred picture was published.  Then the victim entered

25   the site.  Then the exchanges occurred.  The victim tried to

1     deescalate.  The defendant refused to deescalate.  Then they

2     had the discussion where Peach was mentioned.  Then the

3     defendant made the threats that led to his conviction.

4               Have I got your view of the sequencing right?

5               MR. DAVIS:  Yes.  So the government doesn't know

6     all of the facts -- it knows a few things.  What it knows is

7     that the person known as Peach sent a message to Mr. Cantwell

8     that's dated very early on June 15th of 2019, and what Peach

9     is doing there is sending a query by someone else, it's not

10    clear who it is, but asking basically why did you take those

11    pictures of his family.

12              And so it's clear that those pictures had been

13    posted.  People have seen them.  People know that Peach was

14    the person who was the source of those photos and people are

15    asking Peach questions.  And again, the date of the screenshot

16    that Peach sends to Mr. Cantwell was very early on June 15th.

17              Now, is that screenshot accurate?  Do the dates

18    work out?  Is there --

19              THE COURT:  I thought your memo did a pretty good

20    job of stating what I thought your version was.

21              So what you've alleged on page 3 of your memorandum

22    is that the defendant began a campaign to unmask Vic Mackey in

23    late February.

24              MR. DAVIS:  Correct.

25              THE COURT:  And you post something that the

1 defendant said, and then you say that in March he threatened

2 to dox the victim.

3          MR. DAVIS:  Directly, yes.

4          THE COURT:  And said:  When I do, it will all be

5 because of Vic.

6          So you say this is a plan that is unfolding in

7 February and March.

8          MR. DAVIS:  Yes.

9          THE COURT:  And you provide what you say are

10 supportive postings that document that.

11          MR. DAVIS:  Correct.

12          THE COURT:  You allege that -- you acknowledge that

13 there was this extreme I would call it a trolling campaign

14 against Mr. Cantwell's site by the Bowl Patrol.  They were

15 trying to disrupt his site during this period and that was

16 extraordinarily frustrating for him.  I don't think you

17 dispute the fact that the victim was involved in some way in

18 that campaign.  He was making calls.

19          MR. DAVIS:  Yes.

20          THE COURT:  But you allege that those calls had

21 largely ceased involving the victim and a substantial period

22 of time went by where there's no evidence that the trolling

23 behavior involved the victim and there's no evidence that it

24 was continuing at the same clip for a significant period of

25 time.

1           MR. DAVIS:  Correct.

2           THE COURT:  And so then we get to the dates in

3    question, which is in June, and what I understand your memo to

4    suggest is it was the defendant, not Mr. Lambert, who

5    commenced hostility.  When first posted, the faces in the

6    photos were apparently blurred.  Part of the defendant's plan

7    to proceed incrementally with Mr. Lambert.  The defendant

8    admitted to publicly posting the photograph in his exchange

9    with Mr. Lambert the following day.

10          MR. DAVIS:  Yes.

11          THE COURT:  And that was all before Mr. Lambert

12   inadvertently went on to the site that Mr. Cantwell was

13   associated with.

14          MR. DAVIS:  Well, the admission the defendant is

15   making is that in the course of the Telegram app

16   communications that are the subject matter of the case.

17          THE COURT:  Yeah, but you're implying that the

18   posting predated --

19          MR. DAVIS:  Yes.  But the posting itself -- because

20   of the Peach screenshot, the posting itself predated this

21   event.

22          THE COURT:  Okay.  And I do remember seeing

23   exhibits to that effect at the trial.  I'm just asking you to

24   refresh my memory about exactly what your evidence is that

25   supports that contention.

1          MR. DAVIS:  If I may, your Honor?

2          THE COURT:  Yeah.  And I don't mind if both of you

3    talk.  I'm more in the free-for-all category with these

4    things.

5          MR. DAVIS:  Yes.  Judge, it's in document 123-4 and

6    it starts with -- it's a screenshot.  It says June 15th.

7          THE COURT:  Yeah.

8          MR. DAVIS:  But the first time on it is 12:47 a.m.

9    So it's very early on June 15th if that is correct, and

10   there's also a time difference because Peach may well be in

11   California at the time and there may be a three-hour

12   difference.

13         THE COURT:  Would you read the exchange?

14         MR. DAVIS:  Yes.  "Hello Katelyn.  So why did you

15   take pictures of those kids?"

16         THE COURT:  Okay.  That's a communication to Peach

17   from someone we don't know?

18         MR. DAVIS:  Correct.

19         THE COURT:  At a particular time?

20         MR. DAVIS:  Correct.

21         THE COURT:  And you're saying that's evidence of

22   the fact that that image had been posted by that point?

23         MR. DAVIS:  Correct.  And the defendant's statement

24   to Cheddarman in the Telegram app confirms that because the

25   defendant is the one who says:  The next time they won't be

1  blurred.

2          THE COURT:  Next time I post.  Okay.

3          MR. DAVIS:  And it's all sort of -- the victim

4  doesn't know what he's talking about at that moment, right?

5          THE COURT:  Yeah.

6          MR. DAVIS:  And then when Mr. Cantwell provides --

7          THE COURT:  And then when does the victim log on to

8  the site that Mr. Cantwell is associated with?

9          MR. DAVIS:  On the evening of June 15th.

10          THE COURT:  So the exchange with Peach telling us

11  that the image had been posted by that point in your view

12  occurred early in the morning on the 15th?

13          MR. DAVIS:  Yes.

14          THE COURT:  And the entry into the Cantwell

15  affiliated Telegram site did not occur until the next day.

16          MR. DAVIS:  Well, that same day.  But, yes, the

17  following evening, correct.

18          THE COURT:  In the evening of that day.

19          MR. DAVIS:  Yes.

20          THE COURT:  Okay.  And then it was -- then when did

21  Mr. Cantwell post:  The next time I post that photo the faces

22  won't be blurred, and then you'll be going to start getting

23  unexpected visitors.

24          When did he post that?  That says 4:45 according to

25  your --

1          MR. DAVIS:  He sent an unblurred photo as part of

2     the Telegram exchange.  That's one of the photos that's part

3     of the Telegram exchange.  So he actually showed it to the

4     victim as part of the Telegram exchange.

5          He also posted it on his own podcast or whatever

6     his group is called on the night of the 16th.

7          THE COURT:  When did Mr. Cantwell first communicate

8     with the victim about the fact that he had gone on the

9     Telegram app?

10          MR. DAVIS:  At approximately 8:00 p.m.  It's the

11     first time on the Telegram app sequence.  It's June 15th.

12          THE COURT:  Yeah.

13          MR. DAVIS:  So the whole sequence begins on the

14     evening of June 15th.  I'm sorry, I'm not looking at the --

15          THE COURT:  I don't have all the exhibits in front

16     of me, but am I understanding your position is that what

17     happened is the blurred image was posted, someone communicated

18     with Peach about why the image was being posted, much later

19     that day the victim enters the Telegram site, and following

20     that the defendant initiates communication with the victim and

21     the victim tries to deescalate by saying, hey, I don't want

22     anything to do with you, essentially, and then what followed

23     were the communications where Mr. Cantwell refused to

24     acquiesce in that approach, and that led to the Peach comment

25     which led to Mr. Cantwell engaging in the criminal act?

1    That's the sequencing of what you think is what happened on

2    the 15th?

3           MR. DAVIS:  Yes, as supplemented by Mr. Cantwell's

4    testimony at trial which did not fully explain the posting of

5    the photo but did acknowledge that he was having two

6    communications at once at various times with Peach, that he

7    was talking to Peach and he may well have been getting

8    additional photographs or getting photographs ready to use as

9    part of his doxing campaign with the address of the victim.

10          So this whole chrono, your Honor, stems from the

11   date stamp on the screenshot that Peach sent to Mr. Cantwell

12   because that's what we have and it says June 15th, and then it

13   says 12:47 a.m. on June 15th.

14          But what seems clear beyond any doubt is that the

15   blurred photo had been posted by that time.  If that time is

16   accurate, the blurred photo had been posted because someone is

17   reaching out to Peach and asking her about it and she's

18   involved enough and engaged enough that she's sending that to

19   Mr. Cantwell immediately.

20          THE COURT:  Okay.  All right.  So that's your view

21   about the sequencing of the event.

22          Let me just hear from the defense about what's

23   wrong with the sequencing of the --

24          MR. WOLPIN:  I do think there's a fundamental sort

25   of factual disagreement about the sequencing of the events.

1          It is correct that Peach sent this message to Chris

2     that's attached to our sentencing memorandum that is from June

3     15th.

4               There is no posting of a blurred photo --

5               THE COURT:  What time is reflected as the posting

6     time?

7               MR. WOLPIN:  Morning.  Early morning on June 15th.

8               THE COURT:  All right.  And you don't disagree that

9     the victim entered the Telegram site in the evening of the

10    15th?

11              MR. WOLPIN:  Correct.

12              THE COURT:  Okay.

13              MR. WOLPIN:  Later Cheddar Mane joins this chat

14    group.  It's Cheddar Mane's joining of the chat group that

15    then prompts Chris to ask Peach for the photographs.  The

16    photographs are then blurred.  They are then posted -- our

17    sequence does not involve blurred photographs being posted

18    prior to the participation in this online chat between Cheddar

19    Mane and Chris.  That's the fundamental difference.

20              THE COURT:  You're saying that Peach and the

21    defendant were communicating in the early morning of the 15th,

22    but they weren't communicating about a blurred image and no

23    blurred image had been posted as of that point?

24              MR. WOLPIN:  No.  It was after joining the chat.

25    As the government noted, there was back and forth that

1    continued with Peach and Chris.  At that point is when he got

2    the photos, blurred them, they went up, and then there's a

3    reference to them within the chat.

4              So it is certainly our position that the

5    photographs were not --

6              THE COURT:  When do you say the defendant posted

7    the blurred image of the victim and his family?

8              MR. WOLPIN:  Once that Telegram -- again, I don't

9    know the exact time, but once that Telegram interaction in

10   that chat group, or ultimately not a group but individual chat

11   occurred, it followed from that, not before.

12             THE COURT:  Okay.  So that seems to be a

13   fundamental difference between you.  I know you argued

14   otherwise at the time of the trial, that's my recollection at

15   least, about when that blurred photo was posted.  You argued

16   that it was posted before the Telegram chat.  That's my -- the

17   exchange about the Telegram entry.

18             If I'm misremembering that, you'll tell me, but you

19   had a sequence of exhibits that purported to support your view

20   of the timeline.  Those exhibits should be still available to

21   you.  You should still be able to get them and walk me through

22   them so that I can see the actual documents.

23             Well, let's be clear.  Why is this relevant?  This

24   is relevant because you agree -- you acknowledge that the

25   sentencing guidelines recognize that provocation in a case

1    like this under certain circumstances can be a basis for a

2    downward variance, right?

3                  MR. DAVIS:  Yes.

4                  THE COURT:  Okay.  So you understand they're

5    asserting my client was provoked and you should vary downward

6    because he was provoked.  And your response to that argument

7    is to say, this wasn't provocation, Judge.  This was a

8    long-standing plan that the defendant developed months before

9    he committed the criminal acts to use threats to extort the

10   victim to give him dox on Vic Mackey.  And even on the day in

11   question it wasn't the victim who provoked, it was Mr.

12   Cantwell who was provoking by putting out that blurred image.

13                 That's your argument, isn't it?

14                 MR. DAVIS:  Yes.

15                 THE COURT:  Okay.  So I just want to be sure

16   factually, if you can support that, that I know exactly what

17   the sequence of evidence is.

18                 You say, he's got the facts wrong, Judge.  That's

19   not what happened.  There wasn't a long-standing plan to

20   provoke.  There was frustration, and, yes, he wanted Vic

21   Mackey's information, and, yes, he was mad at the victim, and

22   he thought Vic Mackey was leading the Bowl Patrol and that's

23   all he was saying in those early communications, and this

24   wasn't a plan -- a long-standing plan to extort by threat

25   information.  The defendant lost it, Judge, when his wannabe

1   girlfriend, Peach, was impliedly threatened, and that made him

2   go over the line.

3           That's what you're saying happened, right?

4           MR. WOLPIN:  Yes.

5           THE COURT:  And those are two very different takes

6   on the case because you would agree, would you not, that

7   provocation is less compelling as a justification for a

8   variance if the provocative act occurred months in the past,

9   the defendant waits months and months and months and then

10  claims provocation when he acts improperly, and it's also not

11  appropriate to use provocation as a downward variance where

12  the defendant engages in a conduct that produces a response

13  that causes the defendant to be provoked.

14          So understanding what's really happening with these

15  facts is important insofar as it bears on your argument for a

16  downward variance based on provocation.  That's why I'm

17  asking -- it may sound like, why is the Judge getting bogged

18  down on these little details?  Because you're each telling a

19  different story factually, so I need to know which one to

20  believe.

21          MR. WOLPIN:  Your Honor, if I might, I hate to do

22  this, ask for a brief break.  I would like to take a look back

23  at some paperwork that we have in relation to this and make

24  sure that we're --

25          THE COURT:  I would like the government to come

1   forward with its exhibits and walk me through and show me

2   sequentially why it is the government thinks the defendant's

3   characterization of the case is wrong, and if you have

4   evidence to support your characterization of the case, I'd

5   like to see it.  Because my recollection is that this was an

6   issue between you even during the trial that neither of you

7   focused on in great depth, but it was something that I was

8   aware of during the trial that you seem to have different

9   views about the sequencing of the relevant events here.  And

10  because you're raising a provocation variance, it's important

11  for me to do the best I can and try to make sense of that

12  evidence when I evaluate your provocation variance.

13          MR. DAVIS:  The only thing I would say about that,

14  Judge, is I don't think there's any disagreement, though, that

15  the posting of blurred photos occurred prior to -- if the

16  provocation is, I guess Peach took those photos, I guess you

17  don't care what happens to her, so that's an event.  That's

18  something said in the Telegram messages.  The Court has seen

19  that.  We can show you that.

20          But there's no doubt that before that was said,

21  this defendant placed in a place where the public could see it

22  blurred photos of the victim's wife and family and people did

23  see it and people did communicate with Peach and he's on the

24  phone with Peach while this is happening and --

25          THE COURT:  Let me try to tell you what I think the

1    defense is saying here, okay?

2            MR. DAVIS:  Okay.

3            THE COURT:  What I think the defense is saying is

4    what happened here was these guys embarked on a group effort

5    to destroy my means of making a living and that made me really

6    mad and I wanted it to stop, and I tried all means available

7    to me to get it to stop, and these people, including the

8    victim, persisted.

9            What happened on June 15th that set me off was I

10   found the victim lurking at one of my Telegram sites and that

11   pissed me off and I posted a blurred image.  So it was, the

12   immediate precipitating event was started by the victim and

13   not me.  He came on to my site.  I posted a blurred image.  We

14   then had the exchanges we had.  During that exchange I

15   threatened.  He tried to deescalate.  I wouldn't accept the

16   deescalation.  He made a comment about Peach.  I took that to

17   be a threat to Peach.  That made me really angry.  I flipped

18   out, lost control, and made threats that turned out to be

19   criminal.  And that's exactly the kind of provocation that the

20   guidelines say a judge should take into account.

21           You say it worked very differently.  You say he had

22   a long-term plan to extort members of the Bowl Patrol to give

23   up Vic Mackey.  He focused on the defendant as a way to do

24   that.  Months go by.  He has an opportunity to do it again.

25   He posts an image, a blurred image of the victim's family to

1    try to again threaten the victim to get him to give up Vic

2    Mackey.  He then contacts the victim and they have the

3    exchanges that they have.  The contents of which are not in

4    dispute.

5             So your view is it was a preexisting plan.  Your

6    view is immediate precipitating events on June 15th were

7    started by the defendant, not the victim, and those are

8    important facts that should affect your judgment about whether

9    there was any provocation here, right?  Isn't that what you're

10   saying?

11            MR. DAVIS:  Except that we also don't agree that

12   wandering into the chat group and whatever the victim did was

13   provocation at all under 5K2.10.  It was an annoyance, it was

14   irritating, but the guideline talks about --

15            THE COURT:  I'm not saying that the defendant's

16   version of facts is true, that he's entitled to a variance.

17   I'm just saying a judge should try to determine what the

18   actual facts are to the extent the judge can before the judge

19   makes a judgment about how to exercise discretion to consider

20   a concept like provocation.

21            MR. DAVIS:  Right.

22            THE COURT:  I just want to get the factual record

23   straight.

24            MR. DAVIS:  So the record is this man had a real

25   beef with the Bowl Patrol.  He wanted to dox Vic Mackey.

```
1              THE COURT:  All right.  That much is undisputed.

2              MR. DAVIS:  He said that he would dox other Bowl

3    Patrol members when he could, and he posted that in February

4    or March of 2019.  He did then dox Mosin-Nagant at the end of

5    February of 2019 and got him out.  Then on March 17th of 2019

6    --

7              THE COURT:  I get all of that.  You make the --

8    wait.  You make the following statement:  It was the

9    defendant, not Mr. Lambert, who commenced hostilities on the

10   15th.

11             He says it wasn't the defendant who commenced

12   hostilities on the 15th.

13             MR. DAVIS:  Then why does the screenshot from Peach

14   say June 15th, 12:47 a.m.?

15             THE COURT:  I want you to make your record.  I

16   don't have to just take your word for it.  You've got all

17   these exhibits.  If you went back and refreshed your memory

18   about how you proceeded at trial, you should be able to say

19   here's our view, Judge, here are the following five exhibits.

20   Let me produce copies of them.  You can read them.  Draw your

21   own conclusions, Judge.  That's all I'm saying.  You should be

22   able to do that.  It's not an unreasonable request.

23             And apparently the defendant wants an opportunity

24   to take a short break and marshal its evidence just so I can

25   make the record.  I'm not saying even if everything the
```

1    defendant says is true that I would grant a variance, okay?

2    I'm just saying I've got to do my job here, which is make sure

3    I understand the factual record as best I can before I make an

4    important decision.  That's all I'm asking.

5              I mean, are you willing to do that if I give you a

6    fifteen-minute break to come back and -- with your exhibits

7    and you can look at the trial exhibits, they're all there, and

8    say here are the relevant ones, Judge, and here's how we

9    interpret them.  If you have other exhibits, you can say here

10   are the relevant ones, Judge, here's how we interpret them.  I

11   will then have the record and I'll make my best judgment.

12   That's all I'm asking.

13             MR. DAVIS:  That's fine, your Honor.

14             Just one other thing, Judge.  On the sentencing

15   memo, page 9, of the defendant, Mr. Cantwell, it says:  In

16   June of 2019, the day prior to the online encounter at the

17   heart of this case, Christopher's ex-girlfriend known as Peach

18   forwarded Christopher an electronic communication she had

19   received, Exhibit D.  Christopher understood this

20   communication, so why did you take picture of those kids, to

21   reference photographs that Peach took of Cheddar Mane's

22   children in the fall of 2018.

23             The defendant's own pleading acknowledges that the

24   day before June 15th Mr. Cantwell gets a text message or a

25   screenshot from Peach, and what he knows is going on is there

1    are photos posted of the victim's family, his wife and

2    children, and Peach is getting questions about it.  That's

3    what he says.

4              THE COURT:  All you've got to do is make some

5    photocopies of a few documents, put them in the right

6    sequence, and hand them to me and say, look at this, Judge.

7    Start with this one and then go to that one, and you'll see

8    the actual evidence that supports what I'm saying.

9              Is that too much to ask of you?

10             MR. DAVIS:  It is not, Judge.

11             THE COURT:  All right.  Good.

12             And you'll do it from your perspective.

13             We'll take a short break.  When you're ready, we'll

14   come back and finish this thing.

15             I just want to understand each party's position and

16   the evidence supporting it so that I can make my own judgment

17   about it.  I mean, I'm making an important decision that

18   affects a person's life.  I want to be sure I do it on the

19   best possible record I can with as little misunderstanding as

20   possible.  That's all I'm trying to do.

21             (RECESS)

22             THE COURT:  So take me through the documents, what

23   story they tell you from your perspective.  I'll hear from the

24   defense after.

25             MR. DAVIS:  We request permission to use the ELMO.

1          THE COURT:  Go ahead.  Do we need to turn it on?

2    Is it on?

3          THE CLERK:  Yes.

4          MS. KRASINSKI:  Your Honor, defense provided us a

5    copy of the broader communications between Peach and the

6    defendant and not just that screenshot, so what I'm going to

7    attempt to do is present a very neutral time frame with that

8    new document.  I only have the one copy.

9          THE COURT:  Was this an exhibit at trial?

10         MS. KRASINSKI:  It was not, your Honor.

11         THE COURT:  Okay.

12         MS. KRASINSKI:  It's something we just received

13   today.

14         THE COURT:  Okay.

15         MS. KRASINSKI:  So I'd ask permission to mark that

16   as Government's Exhibit 1.

17         THE COURT:  All right.  Are you going to refer to

18   any other documents?

19         MS. KRASINSKI:  Yes, your Honor.  I e-mailed a copy

20   to the deputy clerk, but I also have printed copies.

21         THE COURT:  Okay.  Great.  You can hand me the

22   printed copies.

23         Are other documents being referred to by their

24   trial exhibit number or are we going to mark them separately?

25         MS. KRASINSKI:  My plan was to refer to them by

1    their trial exhibit number, your Honor.

2              THE COURT:  All right.  That's fine.  Except for

3    the one document that's new that we're marking.  Go ahead.

4              MS. KRASINSKI:  So, your Honor, Defense Exhibit

5    B-20 indicates that on March 17, 2019, the defendant first

6    threatened to dox Mr. Lambert:  Stay the fuck away from me and

7    my platforms or I'll dox your stupid ass.

8              THE COURT:  This is Defendant's B-20?

9              MS. KRASINSKI:  Correct, your Honor.

10             And later in that conversation is where the

11   defendant says:  When you get doxed, it's all because of Vic.

12   Remember that.

13             THE COURT:  Got it.

14             MS. KRASINSKI:  Now, in some time of March 2019 the

15   defendant posted:  I have dox on several of these Bowl Patrol

16   idiots and I'm gonna -- we assume that says start -- st

17   dropping them until they rat out Vic.

18             And this is Government's Exhibit 304.

19             THE COURT:  The date on that again?

20             MS. KRASINSKI:  So the date comes from Government's

21   Exhibit 300 from the computer -- the forensic extraction of

22   the defendant's computer.  And March 17, 2019, is the date

23   that the screenshot of Government's Exhibit 304, the I have

24   dox post, was saved on the defendant's computer.

25             THE COURT:  Okay.

1          MS. KRASINSKI:  So this is where the defendant's

2    new exhibit comes into play.

3          Defense Exhibit B-15 is what we've sort of all been

4    looking at before, this message that Peach sent to the

5    defendant on June 15th that the defendant says in his

6    sentencing memo that he understood to be referring to pictures

7    of Mr. Lambert's family.

8          THE COURT:  We don't know who is communicating with

9    Katelyn on this?

10         MS. KRASINSKI:  That's correct.  At trial the

11   defense asked Mr. Lambert if it was Mr. Lambert.  He said no.

12   Other than that, there's no evidence of who sent these

13   messages to Katelyn.

14         THE COURT:  And that appears to be 12:47 a.m., and

15   we don't know who sent them so we don't know -- that would be

16   the time or the place where the document is posted?

17         MS. KRASINSKI:  These were messages received on

18   Katelyn's phone, so it would be the time that she received the

19   message -- or, well, she took the screenshot, but the time of

20   hello Katelyn would be the time she received the message.  We

21   believe she resides in California, so that would be the time

22   in California.

23         THE COURT:  Okay.  Good.

24         MS. KRASINSKI:  Okay.  So we have always assumed

25   that because the defendant understood this very early June

```
1    15th message to be referring to pictures of Mrs. Lambert's
2    children that no one could send a message to Katelyn about
3    that photograph --
4               THE COURT:  Unless it had been posted.
5               MS. KRASINSKI:  Exactly.
6               THE COURT:  So that was an assumption you made
7    based on the fact that someone is communicating with Katelyn
8    about what you thought was an image, and it's a reasonable
9    assumption therefore that the image was available in some way
10   over the Internet.
11              MS. KRASINSKI:  Correct, your Honor.
12              THE COURT:  All right.  Go ahead.
13              MS. KRASINSKI:  So this is Government's Exhibit 1,
14   the communications that defense provided us, sort of the more
15   complete communications between Katelyn and the defendant, and
16   that frankly changes this a bit.
17              THE COURT:  All right.
18              MS. KRASINSKI:  So, again, it shows on June 15th
19   that Katelyn sent the defendant the screenshots we just looked
20   at from Defense Exhibit B-15.  But then it also shows the
21   defendant's reaction and so --
22              THE COURT:  Is this from the defendant's phone?
23              MS. KRASINSKI:  As I understand it as it was
24   represented to me, Katelyn provided these screenshots to
25   defense counsel.
```

1          THE COURT:  So this is Katelyn's phone?

2          MS. KRASINSKI:  That's my understanding.

3          THE WITNESS:  Screenshots that Katelyn took from

4     her phone?

5          MR. WOLPIN:  Yes.

6          THE COURT:  Okay.  And they were provided to

7     defense counsel and not the government.

8          MS. KRASINSKI:  Correct, your Honor.

9          THE COURT:  The government didn't have these?

10          MS. KRASINSKI:  We just received these during this

11     hearing, your Honor.

12          THE COURT:  All right.

13          MS. KRASINSKI:  So the defendant responds that he

14     doesn't know, but he doubts that the person who sent those

15     messages was Mr. Lambert.

16          THE COURT:  Okay.

17          MS. KRASINSKI:  And Mr. Cantwell says, I have not

18     leaked that photo and the photo in question has not been

19     published, and then --

20          THE COURT:  So the defendant is denying that he

21     posted it.

22          MS. KRASINSKI:  And as you read this, it becomes

23     sort of clear that they're talking about different

24     photographs, that the defendant is talking about a photograph

25     of Katelyn with Ben Lambert and one other individual when they

1  were all hanging out together at the Lambert's house.

2          So that conversation began at 2:56 a.m. on June

3  15th.  Again, since this is from Katelyn's phone, that would

4  be in California.

5          Later in that conversation, so at 7:51 p.m., the

6  defendant says, give me the address and those pictures, and

7  she sends him images of the defendant's family and address

8  information.

9          And so that is at 7:51 p.m. there, which is

10  approximately 10:00 p.m. here.

11          THE COURT:  Okay.

12          MS. KRASINSKI:  On June 15th.

13          THE COURT:  All right.

14          MS. KRASINSKI:  So now we go to Government's

15  Exhibit 100, which is the communication between the defendant

16  and the victim, and at 9:00 p.m. is when the defendant first

17  sends a message to the victim, and at 9:29 p.m. before he asks

18  for the address information from Katelyn, he sends a message

19  to the victim with his street address.

20          THE COURT:  Yep.

21          MS. KRASINSKI:  Then -- and I should note that

22  these times, the times on Government's Exhibit 100 are Eastern

23  Time.

24          THE COURT:  Okay.  So we're looking at the

25  defendant's phone, the screenshots?

1          MS. KRASINSKI:  Yes, your Honor.

2          THE COURT:  All right.

3          MS. KRASINSKI:  Then they communicate.  At 2:13

4    p.m. the victim tries to deescalate, and the defendant

5    responds at 4:45 p.m.:  Next time I post that photo, the faces

6    won't be blurred, and then you're going to start getting

7    unexpected visitors.

8          THE COURT:  Is that -- do you contend now that

9    that's when that photo was published?

10          MS. KRASINSKI:  At some point before 4:45 p.m. the

11    blurred photo would have been published.

12          THE COURT:  And the entry into the Telegram account

13    was when?

14          MS. KRASINSKI:  So the entry into the Telegram

15    account that we have is when he posts the unredacted versions.

16          And I want to be clear.  No one has been able to

17    recover a copy of the redacted version that he posted so

18    that's why we don't have that date and time information.

19          THE COURT:  But you know it was posted by 4:45 p.m.

20    Eastern Standard Time?

21          MS. KRASINSKI:  Yes, your Honor.

22          THE COURT:  On the 15th?

23          MS. KRASINSKI:  On the 16th, your Honor.

24          If we go back to the first page of Government's

25    Exhibit 100, you see that the date -- it rolls -- the

1     conversation rolls from the 15th to the 16th.

2             THE COURT:  When did the victim join, what is it,

3     the I Like White People account or --

4             MS. KRASINSKI:  Peaceful White Folk.

5             THE COURT:  The Peaceful White Folk account, when

6     did the victim enter that?

7             MS. KRASINSKI:  The testimony from both the

8     defendant and the victim was consistent on that, that it was

9     essentially immediately before this 9:00 p.m. message.

10            So the victim entered Peaceful White Folk.  I think

11    his words were he posted a Heimbach meme, and then he was --

12    the defendant kicked him out of the chat.

13            THE COURT:  So my confusion about this stems from

14    your incomplete information about it and the inferences you

15    drew from it.  And now that we have seen the full chain, the

16    government understands better the sequencing of events, and I

17    understand now the government agrees that the sequencing is

18    such that the victim entered the Peaceful White Folk account

19    before any pictures were posted of the victim's family and the

20    sequencing of events is otherwise as they are represented in

21    the exhibits that were contributed to the trial.  Is that fair

22    to say?

23            MS. KRASINSKI:  Yes, your Honor.

24            THE COURT:  So we're now at a point where there's

25    no fundamental disagreement between the defense and the

1    government as to the historic facts that lay out the timeline

2    about what the defendant said about the Bowl Patrol people,

3    when the victim entered the Peaceful White Folk account, and

4    all of the exchanges between the defendant and the victim that

5    followed that were captured and produced at trial in the way

6    we understood them to be.

7              So we have resolved that point of confusion.  Is

8    that fair to say?

9              MS. KRASINSKI:  Yes, your Honor.

10             THE COURT:  And from your perspective, you don't

11   have any disagreement with the defense as to the historic

12   facts.  You disagree about what inferences should be drawn

13   from them and what significance to attach to them, but the

14   factual record is now undisputed?

15             MS. KRASINSKI:  Yes, your Honor.

16             There's one other historical fact that I would just

17   like to point out and that's from Defense Exhibit I think it's

18   I2A, the I series, and this is the defense exhibit showing the

19   victim's call-ins to the defendant's show.  And the final page

20   of that shows that there were no calls from the victim --

21   attributable to the victim after February 15, 2019, until

22   after this incident.

23             THE COURT:  Okay.  Good.  Thank you.  That was a

24   point of confusion in my mind at the trial and it wasn't

25   important to me because I wasn't a fact finder and provocation

1  isn't a defense to the charge, and clearly the defense did not

2  see any tactical advantage to them in disclosing the correct

3  sequencing, and so now we've resolved that and I can better

4  evaluate the parties' arguments with respect to the

5  provocation defense here.

6            Does the defense want to respond to anything you've

7  heard at this point?

8            MR. WOLPIN:  No.  I think the fundamental sort of

9  timing question that was at issue with the Court has been

10  resolved.  I just note it is consistent as well.  I mean, the

11  government did review Chris's phone in relation to this

12  investigation and did ultimately produce a timeline.  That

13  timeline shows these photos that we've been talking about

14  coming on to the phone on the 16th, which is consistent with

15  that these were not sort of had for a long period of time or

16  had days before or something like that.

17            THE COURT:  All of that makes more sense to me.

18            MR. WOLPIN:  Yes.

19            THE COURT:  From the very beginning that was a

20  point of dissidence in my mind because trying to put the

21  evidence in the case together logically, there doesn't even

22  appear to be a motivating force for the timing of the release

23  of the blurred image other than entry into the Peaceful White

24  Folk account and therefore would follow logically that it

25  would happen afterwards.  To the extent the government was

1    suggesting in pleadings with me that that was not the case,

2    there's a dissidence here and it wasn't making a lot of sense

3    to me and I wanted to try to resolve it.

4              MR. WOLPIN:  Thank you.

5              MS. KRASINSKI:  Your Honor, one procedural thing.

6    May I move that the public version of Government's Exhibit 1

7    be redacted with the photographs of the minor children

8    redacted?

9              THE COURT:  Yes.  So in terms of what would be

10   available to the public, we aren't going to disclose the

11   images of the minor children.

12             MS. KRASINSKI:  Thank you, your Honor.

13             THE COURT:  Okay.  So this took longer than I

14   hoped, I apologize, but I need to be -- when I'm confused

15   about something, it makes me nervous because I make decisions

16   that affect people's lives and I don't want to be confused.

17             We've now resolved that point of confusion.  I'm

18   ready to hear the defense -- the government's recommendation

19   and anything you want to say about sentencing.  I'll then hear

20   from the defense.

21             Please keep in mind, as you know, I studied very

22   carefully your memoranda.  You provided me very detailed and

23   helpful memoranda, so you don't need to repeat what's in

24   there.  I think I understand it.

25             So what would the government like to say about your

1    recommendation and anything you would like to say in support?

2              MS. KRASINSKI:  Your Honor, the government opposes

3    the request for a variance and departure and recommends a high

4    end of the guideline sentence of 51 months of imprisonment

5    followed by three years of supervised release.

6              The defendant committed two very serious crimes

7    less than a year after he pled guilty to two assault and

8    battery crimes in Virginia and was still subject to the

9    sentences for those offenses.  He began his campaign against

10   Mr. Lambert with the goal of obtaining Mr. Vic Mackey's

11   identity and exposing Vic Mackey to the world and everything

12   that doxing entails.

13             It was in this pursuit of Vic Mackey's

14   identification that the defendant made repeated threats of

15   physical and psychological violence.  And I view a threat to

16   rape a mother in front of her children as a threat to commit

17   psychological violence against those children to witness that,

18   and so that is a part of the threat here.

19             The context of the threats matter, because at the

20   time the defendant made them it was public knowledge that he

21   had traveled from New Hampshire to Virginia armed with

22   firearms, knives, and it was public knowledge that he didn't

23   hesitate to use pepper spray on counter protesters and was

24   convicted of offenses related to that.

25             It was public knowledge by that point that the

1    defendant had made statements that he was trying to make

2    himself more capable of violence.  And the defendant

3    acknowledges that he had a platform.  He had listeners.  He

4    had followers.  And so that context matters because he invoked

5    his followers, his Incel listeners, in part of this campaign

6    to threaten and extort Mr. Lambert.

7                And to me it's magnified because as a recipient of

8    a threat like this, you don't know what to look out for.  You

9    don't know if you're waiting for Mr. Cantwell to show up at

10   your door.  You don't know if you're looking for some

11   unidentified listener to show up at your door.

12               THE COURT:  I'm inclined to agree with all of that.

13   Let me ask you a question that I have struggled with, and I'm

14   interested in your answer to this.

15               Would it have made any difference to you if Mr.

16   Cantwell had engaged in his -- the identical behavior with a

17   member of the public with whom he had had none of the prior

18   interactions that he had with the victim in this case?  I

19   understand your position that provocation shouldn't be a basis

20   for a variance, but is there anything about the nature of the

21   interaction between the two of them that differentiates the

22   outcome in this case from a case in which Mr. Cantwell learned

23   that a member of the instant messenger company that had the

24   messages knew Vic Mackey's address and he contacted that

25   person cold and threatened to rape his wife in front of their

1    children?  Are these two cases, would they be -- all other

2    things being equal, should they be sentenced identically, or

3    is there something about the nature with the interactions that

4    preceded these threats, although in your view not amounting to

5    provocation, nevertheless should affect the outcome?

6             Because at least there would be an argument, I

7    think the defendants allude to this, that these people have

8    exchanged such incredibly offensive and violent conduct on a

9    routine basis that would shock the ordinary person and that in

10   effect they had become through their interactions with each

11   other desensitized to their extraordinarily horrendously

12   violent nature of the exchanges between the two of them.

13            So answer my question about are those two cases,

14   should they be sentenced identically, in other words, there

15   should be no consequence, no evaluation of the interaction

16   between the two people that preceded the defendant's criminal

17   conduct, is it just the came as if he had called up an

18   employee at a company who had nothing to do with any

19   interaction with the defendant and made these threats?

20            MS. KRASINSKI:  So to me, in answering your

21   question what I look at is the fact that the victim himself

22   had stopped harassing Mr. Cantwell for months before this

23   exchange.

24            Had Mr. Lambert --

25            THE COURT:  It's not just that.  I'm talking about

1    how two people who have a pattern of interacting with each

2    other in extraordinarily offensive and violent ways become

3    desensitized to the very nature of their communications and so

4    the effect on victim is different.  Is there an argument to be

5    made here, and what's your response to it?

6            MS. KRASINSKI:  I think even in this community that

7    spits vitriol and disgusting views, even in this community

8    there is a line, and I think that line is underscored by the

9    fact that the defendant viewed this language, so I'm assuming

10   Peach took that picture, guess that means you don't care what

11   happens to her either, that the defendant viewed a comment

12   that innocuous about a partner to be so offensive that he

13   claims that that's what spurned this whole thing, that that

14   shows that his following statement, so if you don't want me to

15   come and fuck your wife in front of your kids, then you should

16   make yourself scarce, is way over the line even in this

17   community that says disgusting things about Jews and about

18   black people.

19           THE COURT:  I don't agree with you at all about

20   that.  It's not a question of whether it's criminal and over

21   the line warranting punishment.  It's a question of would I

22   sentence those two cases in exactly the same way.  Because I

23   think if you are here in front of me with the hypothetical

24   case that I've given you, you would be saying to me this is

25   not a person who lives and interacts in this community where

1   people spew violence on a daily basis, that spew hatred on a

2   daily basis.  This is a person that, like all the rest of us

3   that live in society where that kind of conduct is so shocking

4   that it's almost inconceivable, and the harm to a victim who

5   is subjected to that kind of threat in that kind of

6   environment is so extraordinary that it warrants a gigantic

7   upward departure.  I think that's the argument you would be

8   making to me.  If I'm wrong about that, tell me.

9           So I'm just trying to figure out do you really

10  sentence those two cases identically.  I think there's a good

11  argument that they shouldn't be sentenced identically.  That

12  doesn't mean that the defendant's sentence in this case should

13  be nothing.  It just means that context matters when you try

14  to evaluate and make a sentencing judgment.  That's all.

15          MS. KRASINSKI:  No, I agree that context matters,

16  and it has been a very difficult deep dive into a world that I

17  was never a part of.  But from my deep dive, even in this

18  world where people spew violence and hatred, making a comment

19  about someone's partner, about someone's children, is outside

20  of the norm of even that.

21          THE COURT:  I don't disagree with you on that.  I

22  understand what you're saying.

23          MS. KRASINSKI:  And I want to address something

24  else that the defendant raises, and that is sort of that

25  unmasking white supremacist who posts this vitriol under a

1    pseudonym is some sort of social good, because that's another

2    one of his arguments for a downward variance.

3            But he didn't dox Mr. Lambert out of some sense of

4    moral obligation and -- you know, this case isn't about

5    whether it's a good thing.

6            THE COURT:  I'm unlikely to credit the defendant

7    with some kind of altruistic act if that's what you're

8    suggesting.  That's not a high likelihood.

9            MS. KRASINSKI:  He also asks the Court to

10   disregard, and the term he uses is the unpleasantries that Mr.

11   Lambert has suffered as a result of being doxed.  And the

12   Court -- I mean, I don't think the Court should do that

13   because it was exactly those unpleasantries that the defendant

14   was invoking when he threatened to dox Mr. Lambert.  I mean,

15   that was what he was threatening to do.

16           And so I don't think the Court should disregard

17   that.  And, you know, he says, well, I only posted it to a few

18   hundred people, but once information is online that's it, it's

19   available for the world.  The damage is done.  I mean, any

20   further dissemination of that was absolutely reasonably

21   foreseeable to the defendant and whatever Mr. Lambert said

22   online as Cheddar Mane, Cheddarman, or any of his other

23   pseudonyms, you know, he sat on that stand and at the end of

24   his testimony he talked about not being able to be a hockey

25   dad.  And I may disagree with all of the views he said under

1  his pseudonym, but that's a real consequence and I don't think

2  the Court should disregard that.

3         And I also want to focus on the fact that, you

4  know, we know at the time this was happening Mrs. Lambert was

5  not aware of the threat, but I think in sentencing the

6  defendant and in considering his motions for a departure and a

7  variance that the Court should consider the very lasting

8  implications for her and those children as well.  Their

9  photographs are in the public domain.  Their address is in the

10  public domain.  They no longer have any control over the use

11  or misuse of photographs of their children.

12         You know, the Court is well aware that once

13  something is on the Internet it can be copied, it can be

14  further disseminated.  You don't know who has copied it.  You

15  don't know who they've shared it with.  You can't measure the

16  ripple effect.  You can't find and delete every single copy.

17         He essentially gave hundreds of people the ability

18  to further disseminate this very private information, and the

19  truth is she knows about it now.  I've met with her and

20  frankly, you know, even now it's too painful for her to really

21  want to participate.

22         And what the other sort of interesting part of this

23  to me is, you know, the defendant testified that he regretted

24  what he did, but even by the time of trial he never once took

25  steps to mitigate that.  Those photographs could have been

1  deleted long ago, at least his posting of them.  The address

2  information could have been deleted long ago.

3          Now, I get that that's, you know, closing the

4  stable door after the horses have already bolted, but it would

5  at least show some type of real regret for the actions he

6  took, you know, some sort of attempt to mitigate the damage.

7          But when Attorney Davis and I were preparing for

8  trial and meeting with Mr. Lambert, you know, that was sort of

9  the one thing that really -- that Mr. Lambert really continued

10 to struggle with, with this sort of online platform, is that

11 the photographs, all that information was still up, it was

12 still accessible.  Someone in my opinion with true remorse,

13 true regret for this exchange, for this conduct, would have at

14 least taken some effort to mitigate the damage but never did.

15         So in sum, based on the history and circumstances

16 of this offense, the defendant's history, the nature and

17 circumstances of this offense, a sentence of 51 months of

18 imprisonment would reflect the serious nature of Mr.

19 Cantwell's crimes, it would promote respect for the law, it

20 would provide just punishment, it would afford adequate

21 deterrence, and it would protect the public from future crimes

22 of the defendant.

23         THE COURT:  Thank you.

24         All right.  I'll hear from the defense.

25         MR. WOLPIN:  So this case is less about the what

1    and more about the why.  I mean, ultimately the discovery we

2    were provided has everything in writing.  Much of what was

3    presented at this trial was fixed in writing.  And so there

4    isn't a dispute at this point as to the what.  But I do think

5    the why, as the Court has alluded to, is an important

6    consideration particularly for sentencing, and I make that

7    argument because there's a spectrum of why.  There is on one

8    end completely unprovoked, the sort of model that the Court

9    noted, and probably as far on the other end is self-defense,

10   that the conduct leading up to it was egregious or sufficient

11   to the point to make someone not even guilty of the offense.

12   This in our opinion falls somewhere obviously in the middle of

13   that spectrum.

14          It is not an unprovoked situation, it is not a

15   self-defense situation, but it is a situation where context

16   and why matter, and we are asking that the Court consider the

17   13 months that Christopher has already served in relation to

18   pretrial time, which with sort of the nuances of federal good

19   time is about a 15-month sentence with the good time credit as

20   well as continued supervision upon his release.

21          Before talking a little more about the sort of

22   context of this case, I do think it's worth addressing the

23   context of other cases, and there is some of that in my motion

24   and some of that in the government's response as to other

25   cases charged similarly or with similar facts.

1           And to some degree it is somewhat difficult --

2           THE COURT:  Yeah, there are a couple of things in

3     your memoranda on that point that troubled me.

4           MR. WOLPIN:  Okay.

5           THE COURT:  To the extent that you're implying that

6     prosecutors don't often charge these kinds of offenses and

7     therefore I should give the defendant a lighter sentence,

8     again, I don't see that as part of the calculus that I should

9     be engaging in when trying to avoid unwarranted sentencing

10    disparity.  And to the extent you identify specific cases

11    where you say the sentence was lower and the charges are

12    comparable, and the government identifies cases that it says

13    are comparable and the sentences are higher, that's an inquiry

14    that rarely turns out to be useful in evaluating claims of

15    unwarranted sentencing disparity.

16          What would be useful if you had it that you don't

17    provide is -- if you could demonstrate that a very high

18    percentage of certain kinds of cases are routinely the subject

19    of downward departures and variance that are similar to this

20    case, that would be useful.

21          And a good example of that is in the child

22    pornography area where you well know there are certain kinds

23    of enhancements that the guidelines call for that almost no

24    judge gives.  And when judges widely don't follow the

25    guidelines, that is important information because if you're

1    the one judge who sticks with the guidelines, you may be

2    promoting unwarranted sentencing disparity.

3            But the kind of information you provide me on that

4    point does not cause me to think that the sentence should be

5    other than a guideline sentence simply to avoid unwarranted

6    sentencing disparity.  It's the kind of analysis that just is

7    very rarely fruitful, but you can say what you want to say

8    about it.  I've read your memorandum.

9            MR. WOLPIN:  The effort -- obviously with the less

10   frequency or infrequency of this charge, it is harder to

11   collect that data.

12           I do think that was addressed in the best way I

13   could come up with, which was the tool through the guidelines

14   itself, this analyzer tool, which allowed me to collect all

15   2B3.2 cases within our region and say, hey, what is going on

16   in those cases broadly rather than saying this particular case

17   had this fact and this fact.  It's a broader data.

18           And when you look at 2B3.2 which is the guideline

19   we're dealing with here, there were 13 cases in the time frame

20   available through the data analyzer, which is 2015 to 2019,

21   looking through New Hampshire, Maine, Rhode Island, and

22   Massachusetts, our sort of First Circuit neighbors, there were

23   13 cases noted in those circuits or in those districts over

24   those five years.  All of them were given below guideline

25   sentences.

1          So from the perspective -- and that's attached as

2     Exhibit I, I believe, and J, sort of what was pulled out of

3     that tool.

4          So that I agree it can be tough to come in and say

5     case X, case Y, here's the difference.

6          THE COURT:  And especially when there's a very

7     small subset of cases you analyze.  That's why -- I find the

8     argument persuasive in the context of child pornograhy where

9     you could say 75 percent of the judges depart downward given

10    these circumstances, and if you don't depart downward, there's

11    no good reason to distinguish your decision from others.

12    You're in fact promoting unwarranted sentencing disparity by

13    sticking with the guideline.

14          That argument where it can be demonstrated is

15    appealing.  This one is harder to establish because you're

16    using a very small subset of cases.  To really evaluate it I

17    would have to kind of undertake a detailed analysis of each of

18    the cases that you are proposing.  I would have to read the

19    sentencing transcript to understand whether there was any

20    cooperation and what the judge found about how accepting

21    responsibility -- in how many cases there was acceptance of

22    responsibility credit given because the defendant pleaded

23    guilty.  There are just so many factors that really would have

24    to be considered to prepare case A against case B, and I don't

25    think that's what the drafters of the sentencing statutes were

1    after when they talked about avoiding unwarranted sentencing

2    disparity.

3            So I don't tend to give much weight to that

4    argument.  I certainly considered it to the extent you

5    outlined it in your brief.  I would suggest you find a more

6    better use of your time on other aspects of your memorandum.

7            MR. WOLPIN:  Okay.  So to finalize or move on from

8    that, and it directly relates to the circumstances of this

9    case which I'm about to address, is I do think that what a lot

10   of these charges are intended to address, including one cited

11   by the government, are when there's commentary to public

12   officials, there's an interference with government action.  So

13   we've had recent cases like that where there's a threat to a

14   legislator, a threat to someone counting votes, that there's a

15   broader need for deterrence and punishment where there is an

16   effort to inhibit the effective administration of our

17   government.

18           That is not the situation here.  This is ultimately

19   a dispute that is limited to a dispute between two individuals

20   involved in a far longer running dispute, not something that

21   has this broader impact of government operation.

22           The other cases I tend to see in reviewing this are

23   sort of the sexting scenario where there's an effort to

24   obtain, you know, naked photographs, many naked videos, and

25   those are again similar cases cited that have another broader

1   deterrent-based interest.  I think --

2            THE COURT:  Yeah, I sentenced that case, and I can

3   tell you the sentence was a lot longer than the sentence that

4   he's being exposed to here.  Those kind of cases -- I don't

5   remember the sentence I gave, but if you went back and looked

6   at it, you can see it's way, way higher than what we're

7   talking about here.

8            MR. WOLPIN:  I do think those are the kind of

9   scenarios where general deterrence and punishment has to be at

10  its utmost.  I think when it's a private dispute, that is not

11  the same situation where there's a -- I mean, not that there's

12  not a need to punish and regulate that behavior but not to the

13  same punitive extent as where there are broader public

14  interests at work.

15           So getting back to our situation, you know, the

16  government presented a timeline just now that incorporated

17  some of our facts but obviously not all.  It did come through

18  the government's prism.  We do think it's important for the

19  Court to understand the context and why this came to be.  And

20  I know there is I think -- although we've resolved that

21  factual dispute, I think there is some factual dispute as to

22  what kind of role Cheddar Mane had in this process.

23           THE COURT:  Yeah.  So let's be clear.  I am quite

24  satisfied that during the period in February and March that

25  there was a very -- a coordinated campaign by the members of

1    the Bowl Patrol, including the victim in this case, to harass

2    Mr. Cantwell to attempt to disrupt his ability to earn a

3    living off of his programs and it drove him crazy.  That to me

4    is -- that was established at the trial.

5            But there is an additional contention that the

6    government is making that you may have evidence to refute that

7    you want to bring to my attention, which is that that pattern

8    of harassment had waned by June and in any event did not

9    involve the victim in the case.  I think the government is

10   making that contention.

11           Have I got that wrong?  Am I mischaracterizing your

12   position?

13           MS. KRASINSKI:  I don't know about the broader

14   campaign.  I think the evidence established that --

15           THE COURT:  Your memorandum sort of suggested that

16   the campaign had already fallen off at that time.  If you're

17   not contending that, that's fine.  If they are contending

18   that, then to the extent you want to refute that, you can, but

19   I do think it is the government's contention clearly that the

20   government asserts that the victim in this case was not an

21   active participant in that campaign in the months immediately

22   preceding the defendant's criminal conduct.  And if you want

23   to refute that, you can.

24           MR. WOLPIN:  I'll refute that in the sense that the

25   issue Christopher was dealing with from his end wasn't

 1    resolving.  It wasn't diminishing.  He was continuing to get

 2    these kinds of actions.

 3            What became more difficult for him to unpack was

 4    who it was coming from because as was brought out to some

 5    degree at trial, there became the use of spoofing software

 6    and, you know, phone companies that allowed you to do this and

 7    that, and he spent a significant amount of time trying to make

 8    it stop from that end, but he was never certain who was the

 9    person calling even when it was Cheddar Mane or not Cheddar

10    Mane.

11            THE COURT:  I agree with that.  That's consistent

12    with my understanding.

13            MR. WOLPIN:  I mean, it's sort of the amorphous

14    sort of conspiracy concept that you can't always tell where

15    it's coming from.  And so for Christopher when this contact

16    came to him from Peach which -- and I know the government

17    addressed the one as well in the chat that is sort of

18    downplaying that, that language has an implicit malice built

19    in whether it's --

20            THE COURT:  What are you talking about?

21            MR. WOLPIN:  The June 15th contact to Ms. Peach

22    that has been provided.

23            THE COURT:  The one we talked about just today you

24    mean?

25            MR. WOLPIN:  Just today, correct.

1              THE COURT:  Okay.

2              MR. WOLPIN:  Which was then forwarded along to

3     Chris.

4              THE COURT:  Doesn't that exchange show that Mr.

5     Cantwell didn't think that came from Mr. Lambert?

6              MR. WOLPIN:  Chris doesn't know who that comes from

7     at the time.  I mean, he understands that --

8              THE COURT:  Well, you're not saying that -- I'm not

9     understanding you.

10             MR. WOLPIN:  Okay.  So Chris gets this from Peach

11    out of the blue.  He understands that it's in reference,

12    because she explains it to him, to her visiting of Cheddar

13    Mane.  He's aware that this has to have a sort of Cheddar Mane

14    nexus.  Again, the same thing.  He doesn't know who it's from,

15    he can't be certain, but it's on his mind.

16             And then the next day that person who sort of gets

17    involved shows up in his chat room and to him that's not a

18    coincidence.  There is some, in his mind some pattern of

19    malice.  It can't be proven, it's uncertain, but in

20    understanding provocation I think the Court does need to

21    consider what his view of what was happening was, and it

22    wasn't an unreasonable view in light of sort of the very

23    narrow subject matter of that text.

24             THE COURT:  Do you contend that anything -- that

25    the victim -- anything the victim did while in the -- what is

1   it called, Peaceful White Folk or something?

2            MR. WOLPIN:  Yes.

3            THE COURT:  Whatever it's called, that Telegram,

4   did the victim do anything provocative other than to enter

5   that room?

6            MR. WOLPIN:  It's his appearance that was viewed

7   with others who are also --

8            THE COURT:  You agree he didn't do anything

9   provocative other than to appear in the room?

10           MR. WOLPIN:  Not in language.  In appearance with

11  others who are Bowl Patrol folks in a chat room run by Chris,

12  that was the beginning.  That was sort of an unexpected -- to

13  be clear, this is not something where Chris sought out contact

14  with him that day or the initial contact comes from that.  So

15  this idea that there's a long-standing plan and it came to

16  fruition on that day, Chris was not expecting to have any

17  contact with Cheddar Mane that day.

18           THE COURT:  No, that's a different statement from

19  there was a long-standing plan to try to dox Vic Mackey and to

20  try to threaten people who might be able to give him

21  information to dox Vic Mackey.  That seems to be clear from

22  the evidence in the case.

23           MR. WOLPIN:  Yes.

24           THE COURT:  I agree with you that there's no

25  evidence to suggest that he planned that this will occur on

1    June 16th, that instead there are these circumstances someone,

2    the victim said it wasn't him, we don't have any evidence it

3    was him, communicated with Peach about a photo.  Peach shared

4    that information with the defendant.  The defendant responded

5    and said he didn't think it was Mr. Lambert who shared that

6    information.

7            Mr. Lambert then joins the Peaceful White Folk

8    Telegram channel.  He testified he didn't know that the

9    defendant was associated with it.  We have no evidence to call

10   that into question.  The defendant, though, I understand sees

11   him there, identifies him with the Bowl Patrol, connects it

12   with the photograph that occurred that was commented on to

13   Peach, and at that point becomes in your view upset again that

14   Lambert is again trying to disrupt his life or interfere with

15   him in ways that he didn't want to be interfered with.

16           MR. WOLPIN:  Yes, and then within the context of

17   how that conversation evolves, there's another reference to

18   Peach, it's another sort of menacing type statement, and

19   that's when we get the statement that really is the crux of --

20           THE COURT:  Right, but you're leaving out the

21   victim trying to deescalate the situation and your client

22   being unwilling to deescalate.

23           MR. WOLPIN:  My -- yes.  I mean, Chris's

24   frustration is he believes there's more going on here and

25   Cheddar Mane is saying, I'm not involved, I'm not involved,

1    and that's not something that Chris finds credible and that's

2    what's sort of driving that continuing conversation.

3              I do want to address this concept of doxing.  I

4    mean, it's implicit in this case.  It's also in and of itself

5    not an illegal act and commonplace, fortunately or

6    unfortunately, in this group.  It's not a social good

7    question.  We're not arguing that the Court should assign

8    altruistic motives and this is a social good.

9              We're arguing that the inevitability of his doxing

10   was not Chris's doing.  Chris could have taken much more

11   aggressive efforts --

12             THE COURT:  I'm not sentencing him because Mr.

13   Lambert's identity became public, if that's what you're

14   worried about.  I'm sentencing him because he threatened to

15   rape Mr. Lambert's wife in front of his children in order to

16   extort something from him.  That's what he's getting sentenced

17   for and the other crimes which he's --

18             MR. WOLPIN:  Understood.  But my concern is the

19   presentation about impact and how this has impacted Cheddar

20   Mane and his family.  It is very hard to untangle those two

21   things because the hockey business, that's not because of a

22   threat.  That's because ultimately his identity in his own

23   words were revealed, and the community has decided that that's

24   not someone they want in that position.  That's not, you know,

25   Chris's action and, you know, A to B to get to that result.

1    And so I agree that the Court is considering the dispute

2    between these two men for I believe what it is.

3              As to this concept of mitigation and could have

4    deleted it, brings up other concerns obviously with defendants

5    who go about deleting information that relates to their case.

6    I mean there's certainly circumstances as defense attorneys

7    when that's flipped on its head, and the argument is there's

8    hiding, there's deletion -- it could arguably be a crime to

9    tamper with evidence and eliminate evidence.

10             Certainly I don't recall any conversation between

11   the parties, you know, can you do this, are you willing to do

12   this, can you take this down.

13             THE COURT:  I don't think the length of the

14   sentence is going to be determined by whether he took down the

15   information or not.

16             MR. WOLPIN:  All right.

17             I mean, ultimately again, the Court is required and

18   should consider the nature and circumstances of the offense

19   which revolved around this dispute between these two men.  I

20   do believe that mitigates to a significant degree.  We're

21   still looking at a highly -- even time served.  He lost his

22   home.  He sat in jail.  He has gotten COVID in jail.  This is

23   not something where anyone who is sort of thinking about a fly

24   by night threat or saying something like this on online is

25   going to view this as something you just get away with or walk

1    away from.  This has been seriously impactful on his life,

2    will continue to be through supervision, and certainly will be

3    on the punitive end, and that the whole time I've been working

4    with him he's been in jail.

5              If I could have a moment, your Honor.

6              THE COURT:  Yes.

7              (Attorney Wolpin confers with the defendant)

8              MR. WOLPIN:  I would just reserve -- to the extent

9    I haven't addressed orally arguments in the motion about

10   computer monitoring, about application of the departures, I

11   would just incorporate those within and not address those.

12             THE COURT:  Yeah.  So obviously we're mostly

13   concerned with getting the length of the sentence right here,

14   and I'm sure that's the biggest concern your client has here.

15             MR. WOLPIN:  Of course.

16             THE COURT:  But I am concerned with crafting a

17   monitoring of Internet access as narrowly -- narrowly so that

18   we can to the maximum extent possible preserve the defendant's

19   ability to lawfully use the Internet for work and other things

20   while appropriately allowing supervision of his activities.

21   I'm willing to work with the parties about crafting that, but

22   I'm not sure it makes tremendous sense to devote lengthy

23   argument to it now.

24             I think that clearly there is -- and we can talk

25   about it if necessary, but the government's suggestion I think

1    is the way this software would operate is that it would keep a

2    record of what he did, but it wouldn't be subject to

3    inspection without -- could we craft a condition that allowed

4    for the monitoring to occur but not routine inspection of the

5    data that is collected without reasonable suspicion to believe

6    the defendant has engaged in conduct that would violate, and

7    perhaps we should do another hearing on that later.  We can do

8    it by Zoom or something.

9             But that's -- I'm sensitive to the fact that

10   despite the defendant's use of the computer to commit these

11   crimes a blanket kind of -- certainly a blanket prohibition on

12   use would be problematic, but even a monitoring and routine

13   inspection of routine interactions that the defendant has

14   could impair his ability to use the computer for work-related

15   purposes because certain employers might not be willing to

16   allow that kind of inspection.

17            So I'm aware of the concern, I want to address it,

18   but the most important thing today is to get the sentence

19   right.

20            MR. WOLPIN:  We agree.

21            THE COURT:  So I take your argument.  We can talk

22   about that in a minute if we need to.

23            MR. WOLPIN:  Thank you.

24            THE COURT:  Mr. Cantwell, you have an opportunity

25   to speak.  You don't have to say anything.  I won't hold it

1   against you if you don't.  But if there is anything you want

2   to say, I'll be happy to hear it.

3          Do you want to say anything?

4          THE DEFENDANT:  I do.  There's a couple of things I

5   want to say.

6          THE COURT:  Yeah, go right ahead.

7          MR. WOLPIN:  Your Honor, could I just ask for a

8   moment?

9          THE COURT:  Yeah.

10         Mr. Cantwell, if you're more comfortable sitting,

11  you can do that, or stand, whatever you're comfortable doing,

12  but consult with your lawyers first.

13         (Attorney Wolpin confers with the defendant)

14         THE DEFENDANT:  Is this suitable?

15         THE COURT:  I can hear you fine, yes.

16         THE DEFENDANT:  Okay.

17         So the only thing that I want to convey -- I think

18  Mike Tyson is quoted as saying everybody has a plan until they

19  get punched in the face.  And while I certainly haven't been

20  punched in the face today, it's kind of like the metaphors

21  that I'm sort of in the habit of using.

22         THE COURT:  Hang on just one second.

23         Counsel, could you move that microphone a little

24  bit closer to him so that he can be heard?

25         THE DEFENDANT:  And so I had written a pretty

1    lengthy thing, which I am not going to go through today.

2              I think that what has been lost here and has

3    frustrated me, and as I've done my best to speak to my

4    attorneys, is that my lived experience is that this problem

5    continued perpetually literally every day for eight months and

6    it consisted of threats of violence against me, but I could

7    not attribute them to individuals because they behaved

8    functionally -- I don't know if you're familiar with the term

9    black block, okay?  This is when you see these anarchists

10   running around in the streets dressed in all black breaking

11   windows and stuff because -- and it's difficult to identify

12   them because they're all dressed the same, okay?  It's a

13   tactic that they use to avoid liability for their crimes, all

14   right?

15             And these guys, this is exactly what they did on

16   the Internet, and this was reflected to some extent in a 302

17   of Cheddar Mane's interview with the FBI or with the

18   prosecution.  I forget.  There were several different 302s

19   that I read.  And he said that he had many different screen

20   names that he used with names as innocuous as FU, but using

21   the full word.  I mean, like that N word was -- like names

22   like this he used.  He created countless fake accounts, as did

23   the entire Bowl Patrol group.

24             And so my lived experience is the Bowl Patrol is

25   perpetually, constantly harassing me, threatening me, trying

1    to destroy my business, pretending to be me, defaming me,

2    telling people -- trying to stir violence against me saying

3    that I ratted on the Rise Above Movement, guys who were

4    convicted of fighting down in Charlottesville, which I didn't

5    do by the way.

6              I gave video to the FBI in cooperation with their

7    investigation voluntarily because we were being accused of

8    things that we didn't do down there and I wanted to do the

9    right thing.  And I gave them my body camera video and I gave

10   them all the information that I had about what happened down

11   there because what they were under the impression of was

12   false.

13             And so, you know, when the Bowl Patrol is running

14   around saying that I ratted out the Rise Above Movement, they

15   knew that wasn't true.  They were trying to get guys to harm

16   me.  That's my lived experience with this.

17             And I did not attribute any of those threats to

18   Cheddar Mane because I couldn't.  You know, when the FBI asked

19   me, did he threaten you, I said, no, I can't say that he did

20   because I never saw him actually do that, but a lot of this

21   was coming in.

22             And so when Peach sends me this screenshot, okay,

23   she says, is this Cheddar Mane, and, yes, I initially say, I

24   don't think so, why would I think that's Cheddar Mane.

25             Later on in that conversation, I think that we

1    glossed over that chat log a little too quickly and I hope

2    that you'll take another look at it, okay, is that she

3    explains to me, I took this picture of his kids and he got all

4    weird about me taking the picture so I never sent it to you.

5    And so when she sends me this screen cap of the message that

6    she's getting, my perception is, after it's explained to me,

7    that has to be Cheddar because nobody else would have known

8    she took those photos.  Cheddar is super scared that somebody

9    is going to dox him, that he's going to get identified, he

10   wouldn't run around telling everybody that Katelen has

11   pictures of his kids, okay?

12          So my perception of this is I have a constant

13   stream of nonstop harassment that I've been to law enforcement

14   about repeatedly asking for help.  They're ignoring my cries

15   for help.  And then this guy -- he goes from me to this woman

16   who I asked to marry me and so -- I'm sorry.  When he comes

17   into the chat the next day and then he tells me that he left

18   me alone, I know that that's not true.  I know that he's lying

19   because he was just harassing Katelen earlier that day, and

20   so when it's portrayed as he's trying to deescalate the

21   conflict, that's not my perception of it.

22          My perception is he's continuing this.  He's lying

23   to me.  He's trying to avoid responsibility for what he's been

24   doing, which is a constant pattern that's been going on now

25   for eight months, and this was something that happened because

1   they didn't think I was supportive enough of a guy walking

2   into a synagogue and killing a bunch of people.  That was what

3   motivated their vendetta against me, that I said I don't want

4   you to promote this stuff on my platforms.

5          And so they -- you know, that was my lived

6   experience of it in any case, and I don't believe that he was

7   innocent.  When he showed up in that chat room with that name,

8   the mistake that he made was that he showed up using an

9   account that I could identify.

10          Cheddy Blac was not his username in other contexts.

11   That was just something that bore enough resemblance to the

12   Cheddar Mane name that I recognized it that I called him out,

13   and then he got scared and he tried to backpedal and he tried

14   to get his way out of it, you know.

15          And so it is true that I had threatened to dox him

16   previously, it's true that I associated that with Vic, but

17   when I get these photos from Peach -- I had never seen or

18   heard of Mrs. Lambert before that day, okay?  I never -- I'm

19   not even sure I knew if he had kids.  I knew he was

20   married but, like, you know --

21          THE COURT:  Excuse me.  You don't have to answer

22   this if you don't want to but --

23          THE DEFENDANT:  I'm happy to answer your question.

24          THE COURT:  -- given all that you're saying to me,

25   I'm just a little confused about something, and don't answer

1    if you don't want to, but when did you learn Cheddar Mane's

2    identity?

3              THE DEFENDANT:  I learned -- Peach had sent me a

4    photograph of her, Cheddar, and Hard Mouse sitting on a couch

5    when she went to go visit them in the fall of 2018.  So that's

6    what I had.

7              And I knew that Peach had been to his house at that

8    point because she told me about the visit, and at that time

9    things were copacetic.  Things were, you know, reasonably

10   friendly or whatever, right?

11             THE COURT:  So you knew at that point that this

12   person she had visited was Cheddar Mane?

13             THE DEFENDANT:  Yeah.  And so I knew that I could

14   identify Cheddar Mane, but at that point I had never gone to,

15   like, get the information, right?

16             THE COURT:  I got it.  I got it.

17             THE DEFENDANT:  And so what happens is when he

18   shows up in the chat, and you could cross reference the

19   timestamps, I say to Peach, give me those photos and the

20   address, okay, and that's when I go to obtain the information.

21             Now, I could have done this forever ago, and the

22   prosecution pointed out that I doxed the guy Mosin-Nagant,

23   another one, okay?  And when I doxed Mosin-Nagant I never

24   said, give me Vic Mackey's identifying information, because

25   there was no doubt that Mosin-Nagant was guilty of what he

1    did.   That was when Mosin-Nagant posted my address on Twitter

2    under his own Twitter handle, okay?

3              So there was no doubt that Mosin-Nagant had

4    published my address, so I just went ahead and published

5    Mosin-Nagant's address.   I just published his information.   I

6    didn't say give me something.

7              What happened with Cheddar Mane was --

8              (Attorney Wolpin confers with the defendant)

9              DEFENDANT:   Okay.   Thank you.

10             When I'm talking to Cheddar Mane, he tells me, I

11   didn't do this, okay?   And I say, well, if you didn't do it,

12   then give me Vic's identity, he's a better target than you.

13   All right?

14             So this emerges -- the point that I'm trying to

15   make is that this emerges spontaneously in that moment for

16   that purpose, okay?   Yeah, I could have doxed this guy anytime

17   I wanted to.   I could have contacted him anytime I wanted to.

18   I could have showed up at his house anytime I wanted to, and I

19   just didn't have any desire to do it.

20             When he comes into the chat room after he had been

21   harassing Peach and he lied to me, you know, yeah, this thing

22   went on for a long time, but that's my lived experience of

23   what happened, and I guess that's all I've got to say.

24             THE COURT:   Okay.

25             THE DEFENDANT:   And I'm happy to answer other

1   questions if you got them.  I'm happy to do that.

2              THE COURT:  No.  I think I have the gist of your

3   position down I think and --

4              THE DEFENDANT:  And I want to -- sorry.  I should

5   also say I do regret whatever discomfort I've caused Mrs.

6   Lambert, okay?

7              I could have had people come in to this courtroom

8   and say positive things about me.  And when people do that,

9   they run the risk of people bothering them online, threats of

10  violence.  I recognize that, and I don't want to have anybody

11  come do that for me for that reason.

12             To the best of my knowledge she's an innocent

13  person, so I do feel bad about that.  Again, it wasn't a

14  thought-out thing with her.  This was something that is like

15  -- I'm in the middle of this conversation and I get this

16  picture, and I don't mean to cause her, you know, any trouble.

17  I don't think that Cheddar Mane is an innocent victim,

18  frankly, but to the extent that she is, I'm sorry for whatever

19  discomfort I've caused her because that wasn't my goal.

20             THE COURT:  All right.  Thank you.  I appreciate

21  that.

22             Anything else from the defense counsel before I

23  impose sentence?

24             MR. WOLPIN:  No.

25             THE COURT:  Anything else from the government?

1        MS. KRASINSKI:  No, your Honor.

2        THE COURT:  All right.  Thank you.

3        All right.  I'm going to decline the defendant's

4   motions for departure and variance.  I determine that the

5   defendant's total offense level is 20, his Criminal History

6   Category is III, that no departures or variance is warranted.

7   I'm going to sentence the defendant to a sentence at the

8   bottom of the applicable range of 41 months.  Let me explain

9   my thinking.

10       Let me start with the Criminal History Category

11  calculation.  I think it's a close call in my mind.  The

12  defendant does qualify as a Criminal History Category III

13  literally.

14       The defense put forth some arguments that I took

15  very seriously about the age of the one point attributed for

16  the DUI conviction and I carefully considered the defendant's

17  argument that the two points that resulted from the fact that

18  the crimes were committed while the defendant was under a

19  period of supervision is technically a correct adjustment, but

20  when I look at this defendant holistically and his background,

21  it's borderline whether he's a Criminal History Category II or

22  III.  I think he meets it.  I think I can take into account

23  the borderline nature of this by determining where in the

24  range to sentence the defendant, and I have done so and

25  concluded that a sentence at the bottom of the applicable

1   range is warranted.

2          I do think that in this case the fact that the

3   defendant threatened the victim's family member is an

4   aggravating circumstance that would ordinarily justify a

5   sentence higher than the bottom of the applicable range.  So

6   why am I sentencing the defendant at the bottom of the range?

7          The threats here that the defendant made are

8   abhorrent, shocking, they are extremely damaging, and I don't

9   diminish those, the seriousness of those threats to any

10  degree.  It's just horrendous threats.  So I want to make that

11  clear right from the outset.

12         Why then would I sentence at the bottom of the

13  range?  I want to evaluate the provocation argument that the

14  defendants put forth for a variance.

15         I don't believe that there was provocation in this

16  case that warrants a downward variance.  I largely accept the

17  revised chronology that the government has produced today as

18  being a correct description of what occurred here, and I do

19  agree with Mr. Cantwell's position to this extent.  I think

20  the members of the Bowl Patrol were trying to drive him crazy.

21  They were trying to deprive him of his ability to earn a

22  living, they were trying to disrupt his program, and Mr.

23  Cantwell chose a criminal and ultimately criminal and

24  certainly irresponsible way to respond to that effort, but I

25  don't believe it warrants a variance for provocation because I

1    do believe that while the victim in this case was a

2    participant with other Bowl Patrol members in some of the

3    early trolling behavior that occurred here, I'm not satisfied

4    that the immediate incident was precipitated by any

5    provocation by the victim in this case.

6            I don't believe and I'm not persuaded that the

7    communication to Peach about the photo came from the victim.

8    We don't know who communicated with Peach about that, but the

9    defendant according to the screenshots did not believe that

10   Mr. Lambert was the source of that communication.

11           And what happened here, Mr. Lambert entered into

12   the Peaceful White Person site and that in and of itself is

13   not provocation under these circumstances to justify in any

14   way, shape, or form Mr. Cantwell's behavior.

15           I understand from your perspective you thought this

16   guy, you know, was part of a campaign to drive you crazy, and

17   I do not doubt that you were extremely agitated when you saw

18   him there and you disregarded his efforts to deescalate

19   because you determined he was part of a group of people that

20   were still out to get you, but I can't say that you were

21   provoked in any way in the immediate sense by what occurred

22   there.  You engaged in threatening behavior to Mr. Lambert and

23   he responded in a way that was unacceptable in my view and

24   does imply a threat against someone you care deeply about.

25   And then you escalate it further, and that's where you engaged

1    in the conduct that resulted in your presence here today, and

2    I don't believe that that is provocation that justifies a

3    sentence below the bottom of the applicable range.

4                But I do understand the human circumstances you

5    were in.  You felt these people were trying to destroy you,

6    they were trying to drive you crazy, you were extremely

7    agitated, you thought Mr. Lambert was a part of that group.

8                And there was a pattern in your interactions with

9    him in which you both had become desensitized to the

10   horrendous nature of your interactions with each other, and

11   that's the only reason that I'm not giving you a sentence

12   above the top of the range, that I'm not in fact varying

13   upward in this case, because the conduct you engaged in in my

14   mind is so serious and so damaging that it ordinarily warrants

15   an even higher sentence than the one that I have imposed here.

16   But I've tried to understand your circumstances and why you

17   ended up where you did, and I tried to take that into account

18   as best I could, and given the totality of those circumstances

19   I've decided not to sentence you at the top of the range, not

20   to vary above the range, but to give you a guideline sentence

21   which still is a very significant period of incarceration.  I

22   understand that and I believe that the interests of justice

23   require it.

24                In developing a sentence here I have to consider

25   what a just sentence is, and as I said, the nature of your

1    behavior is so serious, so egregiously wrong that justice

2    requires a significant prison sentence.

3            And I think both individual and general deterrence

4    require a significant prison sentence here, and that's why I'm

5    imposing it.

6            I believe that I'm avoiding unwarranted sentencing

7    disparity by sentencing the defendant to a term of

8    imprisonment within the guideline range.

9            So I am going to impose a sentence of imprisonment

10   of 41 months, which is the bottom of the applicable range.

11           I want to reserve the right to consult with the

12   parties about the Internet supervision condition in a later

13   telephone conference, because I want to make every effort to

14   craft a condition that serves the government's interests while

15   also protecting the defendant's ability to engage in lawful

16   business activities using the computer when he completes his

17   sentence.

18           Let me read the sentence as I propose to give it:

19           Pursuant to the Sentencing Reform Act of 1984, and

20   having considered the sentencing factors enumerated at 18

21   U.S.C. Section 3553(a), it is the judgment of the Court that

22   the defendant is hereby committed to the custody of the Bureau

23   of Prisons to be imprisoned for a term of 41 months.  This

24   term consists of a term of 41 months on Counts 1 and 2 to be

25   served concurrently.

1            Upon release from imprisonment the defendant shall

2    be placed on supervised release for a term of two years.  This

3    term consists of two years on Count 1 and a term of one year

4    on Count 2, such terms to be served concurrently.

5            Within 72 hours of release from the custody of the

6    Bureau of Prisons the defendant shall report in person to the

7    district to which the defendant is released.

8            While under supervision the defendant must comply

9    with the standard conditions that have been adopted by this

10   court and the defendant must comply with the mandatory and

11   proposed special conditions attached to the presentence report

12   except for the computer monitoring condition which we will

13   have a further discussion about and it will eventually get

14   incorporated in the judgment in an effort to try to address

15   the specific concerns raised in the defendant's memorandum.

16           It is ordered that the defendant shall pay to the

17   United States a special assessment of $200.  It shall be due

18   in full immediately.

19           The Court will waive the fine in this case as the

20   defendant does not appear to have the financial ability to pay

21   one.

22           The defendant is remanded to the custody of the

23   United States Marshal.

24           Are there any objections from the government to

25   this proposed sentence other than the ones raised during the

1    course of this hearing?

2            MS. KRASINSKI:  Your Honor, I think as it relates

3    to Count 2 the statutory maximum is 24 months of imprisonment.

4    So I think -- if I heard the Court correctly --

5            THE COURT:  Why did I miss that?  I'm sorry.

6            MS. KRASINSKI:  -- I think you said 41 months of

7    imprisonment on both, but I think it should be 41 months on

8    Count 1 and then 24 months on Count 2.

9            THE COURT:  That I think is a mistake.  I

10   apologize.

11           Yes.  So Count 2 is a 24-month sentence to run

12   concurrently with the 41-month sentence imposed on Count 1.

13           Thank you, counsel, for drawing that to my

14   attention.  I apologize.

15           All of the defendant's objections as stated in his

16   memorandum and during this hearing are preserved for purposes

17   of appeal.

18           Beyond that, is there anything else you need to

19   bring to my attention?

20           MR. WOLPIN:  No, your Honor.

21           THE COURT:  All right.

22           I'll impose the sentence as I've read it.

23           So you went to trial in this case.  You have a

24   right to appeal.  To perfect that appeal, you need to file a

25   Notice of Appeal within 14 days or you lose your right to

1    appeal.

2              You can ask your lawyers to file the notice on your

3    behalf or you can file it yourself if you want to, you can ask

4    the clerk's office for help, but it has to be filed within 14

5    days or you lose your right to appeal.

6              So unless you're planning to give up your right to

7    appeal, tell your lawyers, file that notice for me, because

8    otherwise you'll lose your right to appeal.

9              All right.  Is there anything else that we need to

10   take up today?  No?  Okay.  Thank you.  That concludes the

11   hearing.

12             (Conclusion of hearing at 1:03 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3

 4          I, Susan M. Bateman, do hereby certify that the

 5     foregoing transcript is a true and accurate transcription of

 6     the within proceedings, to the best of my knowledge, skill,

 7     ability and belief.

 8

 9

10     Submitted: 5-4-21        /s/   Susan M. Bateman _____
                                SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```