*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 10, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   1:20-cr-6-01-PB
              v.                        \*   September 10, 2020
                                        \*   2:30 p.m.
CHRISTOPHER CANTWELL                     \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO



Appearances:


For the Government:          John S. Davis, AUSA
                            Anna Z. Krasinski, AUSA
                            United States Attorney's Office




For the Defendant:           Eric Wolpin, Esq.
                            Jeffrey S. Levin, Esq.
                            Federal Defender's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                            Official Court Reporter

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Hi, this is Judge Barbadoro.  I'd ask my
 3   case manager, do I have everybody on who needs to be on?
 4            THE CLERK:  You do, your Honor --
 5            MR. LEVIN:  Jeff Levin and Eric Wolpin are on.
 6            THE CLERK:  John Davis and Anna Krasinski are on as
 7   well, your Honor.  Everyone's here.
 8            THE COURT:  And do I have a court reporter?
 9            THE CLERK:  You do, your Honor.
10            THE COURT:  All right.  Great.
11            So I understand that the government wants to conduct
12   the deposition of a government witness that would require
13   removing Mr. Cantwell from the jail and the parties traveling
14   out of state to take the deposition.  Do I have that right?
15            MS. KRASINSKI:  Yes, your Honor.
16            THE COURT:  All right.  I guess the first question I
17   have is I met with you on Tuesday, if I'm remembering
18   correctly.  Why -- why didn't you raise this with me then?
19            MS. KRASINSKI:  Candidly, your Honor, I was hoping
20   to, but the call ended pretty abruptly because we had the
21   informant call scheduled after.  And so it -- we just sort of
22   ran out of time and I was still trying to work out whether it
23   would even be logistically possible.
24            THE COURT:  Okay.  Well, I've got to tell you, I'm
25   quite disappointed.  This has been extremely disruptive.  I'm
```

1    currently at a place where I have very limited Internet and

2    telephone access.  I fortunately just happened to have a chance

3    to log on and see that the motion had been filed.  I have been,

4    at least in my mind and in my experience, devoting an

5    extraordinary amount of time in meeting with counsel for both

6    sides as the case trial date nears in an effort to try to help

7    counsel prepare for trial because I recognize that this is a

8    somewhat unusual case.

9           But I really do expect that counsel for both sides

10   will work as hard as I am to try to make this process work and

11   I really would have expected to have heard from you during the

12   regular call.  And I -- this is quite disruptive for me and I'm

13   not happy about it.

14          So you -- I've now expressed my unhappiness.  Now

15   let's turn to the merits.

16          I -- I can't really understand from your motion

17   where -- where is this person who you want to depose?

18          MS. KRASINSKI:  The -- the witness is in a suburb of

19   St. Louis, your Honor.

20          THE COURT:  All right.  So you're going to say my

21   whole trial team, both sides, are going to get on a plane,

22   Cantwell is going to get on a plane with an FBI agent, you're

23   going to fly to St. Louis where there's a higher positivity

24   rate than we have here, conduct a deposition, and then come

25   back?  Is that what you're telling me?

1          MS. KRASINSKI:  That's how Rule 15 reads, your

2    Honor.  If the --

3          THE COURT:  Well, why are -- why are we not -- why

4    are we not bringing her here?  I don't understand this.  You've

5    told me she's pregnant.  What else is there about it that tells

6    me this is a -- such an extraordinary problem that I have to

7    endanger the entire trial team, perhaps disrupt the entire

8    trial schedule, to accommodate this one interest?  Does she

9    have some kind of preexisting condition that -- other than the

10   fact that she's pregnant?  I don't know how pregnant she is.

11         Tell me in more detail why you want this

12   extraordinary form of relief that I have not ever had anybody

13   ask me in the 28 years that I've been on the court.

14         MS. KRASINSKI:  Your Honor, she, I believe, is --

15   she's in the first trimester.  We were not aware of the

16   pregnancy until very recently.  She has informed us that she

17   has a history of miscarriages.  At this point the data is

18   unclear as to whether or not a history of miscarriages would

19   impact what the CDC says is -- a woman who is pregnant is at a

20   higher risk of negative pregnancy outcomes, including preterm

21   birth.

22         So her doctor has advised her not to travel.  She

23   informed us of that and informed us of the history of

24   miscarriages.  But, again, there's insufficient data with

25   COVID-19 and pregnancy at this point to know whether or not

1    that history of miscarriages would place her at greater risk of

2    a negative pregnancy outcome if she were to contract COVID-19.

3              And --

4              THE COURT:  I --

5              MS. KRASINSKI:  -- Attorney Davis -- sorry?

6              THE COURT:  I -- I'm sorry.  But are you aware of

7    data that suggests that -- that the risk of -- of -- being

8    infected with COVID-19 does have an effect on negative outcomes

9    with pregnant women that's different from ordinary risks that

10   people face if they're infected by COVID-19?

11             MS. KRASINSKI:  The CDC --

12             THE COURT:  I haven't seen any of that data.

13             MS. KRASINSKI:  The CDC has updated its guidelines

14   to say that from what they can tell right now, there may --

15   they don't say definitively, but there may be an increased risk

16   of severe complications where a pregnant woman contracts

17   COVID-19 and that there may be an increased risk of negative

18   pregnancy outcomes, including preterm birth.

19             So the CDC guidelines say nay.

20             THE COURT:  Okay.  I guess my next question is why

21   shouldn't I order you guys to go out there tomorrow, get on a

22   plane, get this thing done, so that everybody can

23   self-quarantine and take negative tests in a way that satisfies

24   me that I'm conducting a safe trial and not delaying the trial?

25   Why -- why do I need to wait till the 16th, just because that's

1    when people are available?

2              MS. KRASINSKI:  I -- I think if doing it tomorrow

3    would give people sufficient time for the Court to feel safe

4    for everyone to appear on the 15th, I think that we could make

5    that work.  I was trying to see if there was a day after jury

6    selection --

7              THE COURT:  Well, we can send one of you out

8    there --

9              MS. KRASINSKI:  Yes.

10             THE COURT:  -- from each -- one from the defense

11   team, one from the government team, and the other defense

12   lawyer and government lawyer can conduct the jury selection.

13   And then the ones that have gone out there can quarantine and

14   we should be -- well, I guess I still have to have Cantwell

15   there, don't I, at the jury selection?

16             I mean, this is -- this is so frustrating for me to

17   be presented with this on such short notice.

18             MS. KRASINSKI:  I understand, your Honor.  I -- I

19   think Attorney Davis and I were trying to come up with any

20   possible way to basically not ask for a continuance to May of

21   next year and I -- I really do apologize for the way that

22   this -- that I -- you know, I raised this with the Court and

23   that I wasn't able to raise it on Tuesday.

24             THE COURT:  All right.  I -- it wasn't clear to me

25   what the defense's position is on your proposal.  I --

1          MR. LEVIN:  We filed an objection, your Honor.  I

2     don't know if the Court has seen it, but we --

3          THE COURT:  I -- no, I have not seen it.

4          MR. LEVIN:  Oh, okay.

5          THE COURT:  I have not seen it.

6          MR. LEVIN:  Well, we filed a detailed objection.  We

7     don't believe that she's unavailable, which I think the

8     government has the burden of showing she's unavailable, and

9     also her testimony isn't material.  We -- you know, we object

10    to it.

11          And, also, the rule does require the defendant to be

12    present at the deposition as well, so he'd have to be moved

13    there tomorrow.

14          THE COURT:  Right, that's what I -- I understand.

15    That's what I'm -- that much I do understand from reading the

16    government's motion.  I did not know of your objection.

17          MR. LEVIN:  We cited some cases as well that

18    indicate that motions such as this made on the eve of trial,

19    there's no abuse of discretion in refusing to grant them.

20          THE COURT:  Yeah.  Well, I know, but I -- I'm not

21    into game-playing on either side to benefit or hurt either

22    side.  I try to get the right thing done if there's a way to do

23    it.  So I'm not going to just deny it out of spite.  I -- I

24    want to try to find a way for both sides to have a fair and

25    safe trial and that's why I was talking to you multiple times

1    before -- in the weeks prior to the trial to try to flush out

2    any of the issues like this that the parties, if they were

3    doing their job, should be able to foresee, raise with the

4    Court, and we can work it out in advance.  And that's why I'm

5    expressing the frustration that I'm expressing.

6              So I understand that you are objecting.  Your view

7    is her testimony is not material.  Your view is that she's not

8    unavailable.  Is that essentially what the bottom line is on

9    your -- and that I have discretion to deny because it's close

10   to the time of trial.

11             MR. LEVIN:  Right.  And we -- we also -- we're not

12   available to fly halfway across the country for a deposition.

13   We have other cases and we're busy getting ready for -- to try

14   this one.

15             THE COURT:  Yeah.  I understand.  But what -- I

16   mean, we'll have to -- you'll have to be available when I

17   require you to be available.  That's just the way things work.

18             Okay.  Tell me, Ms. Krasinski, what is this witness

19   supposed to testify to?

20             MS. KRASINSKI:  So her testimony is relevant to the

21   cyberstalking count.  She will testify basically the impact of

22   Mr. Cantwell posting pictures of her on the Radical Agenda

23   Telegram, the public Telegram group, as well as Cantwell

24   calling CPS to try to break up her family.

25             Count Four, the cyberstalking statute, allows -- a

1   person can violate that statute by acting with the specific

2   intent to harass a person and engage in a course of conduct

3   that causes or would reasonably be expected to cause distress

4   to that person's spouse.  And so her testimony is relevant to

5   establishing whether or not his course of conduct, which

6   included more than just the communications between Cantwell and

7   Cheddar, Cheddar Mane, it -- you know, it included this call to

8   Child Protective Services, it included posting pictures of her

9   and her children in her home to this -- to this broader group,

10  posting her address information under that, everything but the

11  street number -- but the number of her house; her street, her

12  town, her state.

13          And so her testimony is relevant to that count, to

14  an essential element of that count.

15          THE COURT:  Can I -- again, unfortunately, because

16  I -- I think not unreasonably -- expected that the parties

17  would bring issues that needed to be brought to my attention to

18  my attention at the conference call I scheduled for that

19  purpose, I do not have access to the materials that I would

20  ordinarily have in front of me.  So you need to answer this

21  question for me.

22          I do not recall whether the cyberstalking count as

23  charged identifies her as a person who -- whose reaction is an

24  element of the -- of the charged offense.  Can you refresh my

25  memory on that?

1          MS. KRASINSKI:  It does, your Honor.  And I can read

2   you the -- that portion of Count Four.  Let me just turn to it

3   right now.

4          So this is on page 3 of docket 33, the superseding

5   indictment, of between in or about June 15th and June 17th,

6   2019, within the District of New Hampshire and elsewhere, the

7   defendant, Christopher C. Cantwell, with the intent to harass

8   and intimidate Victim 1, did use facilities of interstate and

9   foreign commerce, including electronic communication services

10  and telephone facilities, to engage in a course of conduct that

11  placed Victim 1 in reasonable fear of serious bodily injury to

12  Victim 1's spouse and that caused, attempted to cause, and

13  would reasonably be expected to cause substantial emotional

14  distress to Victim 1 and Victim 1's spouse.

15         It then goes on to describe some of the course of

16  conduct.

17         THE COURT:  All right.  So you did identify the

18  spouse in the indictment as one of the people who the course of

19  conduct is affecting, right?  So that's -- that's why you think

20  it's important to have her testify.

21         MS. KRASINSKI:  Yes, your Honor.

22         THE COURT:  All right.  What's the defense say to

23  that?

24         MR. WOLPIN:  That --

25         MR. LEVIN:  I'm sorry.  Was someone trying to speak?

1          MR. WOLPIN:  Yeah.  Do you mind, Jeff?

2          MR. LEVIN:  Okay.  Go ahead.

3          MR. WOLPIN:  Okay.

4          Your Honor, the -- I think it's important to

5    understand some of the factual background of this.

6          The communication occurred in June of last year.

7    Those communications were online, as the Court is aware,

8    between Cheddar Mane and the defendant.  Ms. Lambert had no

9    knowledge of that at the time.  She doesn't learn about this

10   until four months later when the FBI shows up at her door and

11   sort of points this out to her as being in existence.  So for

12   that entire four-month period, there's no communication or

13   interaction.  She has no knowledge of this.

14         When the FBI interviews her in October, she says she

15   doesn't know who Cheddar Mane is; she doesn't know who Chris

16   Cantwell is; she doesn't know who Vic Mackey is; she does not

17   know about her husband's online activities or the extent to

18   which he has these views and had not learned about this until

19   the point at which the FBI brought it to her attention.

20         So to suggest that somehow four months later when

21   the FBI comes knocking at the door saying your family's in

22   danger that she has a reaction, I don't see that as relevant.

23   That -- she was never actually part of this.  She didn't know

24   about it at the time.  And so to suddenly say that her reaction

25   four months later informs the jury of things that are relevant

```
 1    I just think isn't the case.  That is -- again, that's how her
 2    involvement comes about.
 3              It would be something different if she had told the
 4    FBI that she was actually involved in this or knew about it or
 5    was made aware of it or her husband had reacted in a certain
 6    way, but he didn't tell her about it.  She didn't know about
 7    it.  This is a self-contained interaction between this online
 8    community that never ends up involving her until the FBI gets
 9    involved and sort of takes this approach of explaining to her
10    what happened.
11              And so what I believe the government would present
12    is her reaction some months later with no context of who my
13    client is, of how this interaction occurs online, of what kind
14    of words her husband says, and so I think it has no relevance
15    in relation to what we're actually dealing with in this
16    offense.
17              And, you know, I certainly don't know exactly what
18    they are going to have her testify to, but my suspicion is to
19    have her come in and say how horrible it was when she read it
20    and that's how she felt when she -- when the FBI came to her
21    without context and provided this to her.  I simply think that
22    is not relevant at this point and is -- is prejudicial in the
23    sense that this certainly was never going to get to her but for
24    the FBI's approach of her and Mr. Lambert never --
25              THE COURT:  Can I interrupt, Mr. Wolpin --
```

1          MR. WOLPIN:  Yes.

2          THE COURT:  -- and ask you about the child and

3    family services portion of this?

4          MR. WOLPIN:  Yes.

5          THE COURT:  I don't know the facts of the case.

6          MR. WOLPIN:  Yes.

7          THE COURT:  And can you -- I imagine that there

8    was -- what I'm understanding -- again, I don't have the

9    materials in front of me.  I'm proceeding on a recollection

10   that may be imperfect.

11         I -- I thought there was some action actually taken

12   by Cantwell to notify child and family services.  And did that

13   prompt some kind of interaction between child and family

14   services and Cheddar Mane's spouse?

15         MR. WOLPIN:  The answer to the first part is yes,

16   there is a call that was made in June to CPS.  That, according

17   to what the government has told us, did not result in any

18   interaction with the family.  So she had no knowledge that that

19   had occurred, as far as I can tell, at the time in June or July

20   or August or September until the FBI comes and tells her the

21   story of what happened.

22         So to my knowledge, no, she has no --

23         THE COURT:  So the -- so, again, just -- let me just

24   interrupt you and confirm my understanding that it is your view

25   that the Cheddar Mane spouse had no awareness of this

1    communication until the FBI showed up at her door --

2              MR. LEVIN:  The CPS -- the CPS report?

3              THE COURT:  Any part of it.  I -- not that the --

4              MR. LEVIN:  So the -- the real --

5              THE COURT:  Just let me -- just let me finish for a

6    minute, please.

7              MR. LEVIN:  Oh, sorry.

8              THE COURT:  Yeah.  Okay.

9              I -- I am understanding Mr. Wolpin to be saying to

10   me that the Cheddar Mane spouse had absolutely no awareness of

11   anything that was happening in communications from Mr. Cantwell

12   to her husband about these alleged threats until the FBI showed

13   up at her door and made her aware of them.  And I just want to

14   know if I'm understanding what I'm being told correctly,

15   Mr. Wolpin.  Am I --

16             MR. WOLPIN:  Yes.  So I have --

17             THE COURT:  Now, Mr. Levin --

18             MR. LEVIN:  Yeah.  I just want to make a -- just to

19   make a caveat to that, which is that the report we received

20   said that she felt like, in quotes, someone may have mentioned

21   the CPS threat to her, but she was not sure.

22             So that was the extent of whether or not she was

23   aware that Cantwell had called Missouri Child Protective

24   Services to make a report and that was a -- during a later

25   interview.  They asked her if she was aware, prior to speaking

1   with the FBI in October, that Cantwell had called CPS and she

2   said she felt like someone may have mentioned it to her, but

3   she was not sure.

4            THE COURT:  And -- okay.

5            MR. WOLPIN:  As far as the October interview, the

6   language from the 302 is she was asked if she was aware of any

7   online activity or any groups that Cheddar Mane may be a part

8   of; she was aware of his beliefs, she was not aware of the

9   content of his online activity or to what extent his beliefs

10  are, she has not heard the names Chris Cantwell, Vic Mackey, or

11  Cheddar Mane before, and she -- and it goes from there.

12           So --

13           THE COURT:  Okay.  All right.  Thank you.

14           Let me ask the government to simply tell me, do you

15  agree with what I am understanding, which is if the -- the

16  Cheddar Mane's spouse were called as a witness to testify about

17  the impact of this communication on her, her testimony would be

18  essentially it had no impact on me until the FBI showed up and

19  made me aware of it; is that right?

20           MS. KRASINSKI:  I don't think so.  I think she would

21  say that she thinks her husband told her about a potential CPS

22  call before the -- before the FBI showed up at her door.

23           I agree that she did not know about the words

24  exchanged between Mr. Cantwell and her husband.  She did not

25  know about those.

1      Sort of the only other thing I would mention is that
2  the photographs and the address -- I mean, the last time the
3  FBI checked, those are still up and available in Telegram from
4  when Cantwell posted them.  So he may have posted them in June
5  of 2019, but the impact to her is ongoing.  That information is
6  up, it is out, it is available, it is public.  It remains
7  public.  So the --
8      THE COURT:  I don't think -- excuse me, Counsel.  I
9  don't in any way mean to suggest that these kinds of
10  communications are not painful for those that become aware of
11  them when the -- when they're aimed at them and they become
12  aware of them, whenever they become aware of them.  Years
13  later, it's painful.  And I certainly understand to the extent
14  you are telling me that these communications still exist in the
15  online world and still have the capacity to injure Mr. -- or
16  Cheddar Mane's spouse.  I -- I'm not in any way trying to
17  minimize that.  I'm just not sure how that has a bearing on the
18  element of a cyberstalking charge.  And so that -- help me
19  connect what you're saying --
20      MS. KRASINSKI:  So I'm not talking --
21      THE COURT:  -- to the extent you're telling -- I've
22  got -- just let me finish.
23      To the extent that what you're telling me is, yeah,
24  Judge, even if she never heard of it until the FBI showed up at
25  her door, the fact that those are online now means that the

1    crime is ongoing and she can be able to testify about it even

2    if she only found out about it last week.  That -- that

3    doesn't -- again, unfortunately, because of the circumstances

4    in which this has been raised with me, I don't have any access

5    to the actual documents to be able to study the problem.  I'm

6    trying to work as efficiently as I can, given the limited

7    resources that I have available to me.

8              But am I understanding -- is that what your position

9    is, that you need her -- you're going to have her testify that

10   my husband may have made some reference to me, I'm not sure

11   what, about a possible CPS call; but there will be no evidence

12   that CPS ever contacted her, there will be no evidence that she

13   knew about the communications in any kind of detail other than

14   that prior to the time the FBI showed up at her door, and what

15   she's going to be primarily testifying to is how it affected

16   her when the FBI told her about what Mr. Cantwell had said.

17             Is that basically why you're calling her?

18             MS. KRASINSKI:  No.  And I want to be clear.  There

19   are sort of distinct categories of postings.  There's the

20   communications themselves, which I'm kind of separating out

21   right now.

22             After the actual communication between Mr. Cantwell

23   and Cheddar, Mr. Cantwell went on to the Radical Agenda chat

24   group with over 200 members and in that group he publicly

25   posted photographs of this woman and her children.  He -- and

1  he posted essentially her address, everything but the number of

2  her house.  He posted the street, he posted the town, he posted

3  the state.

4        And what Mr. Cantwell publicly posted, not -- not

5  the communications, but this public posting, he put up in a --

6  in a way that it -- it is still readily available.

7        And so for that, I think that's separate than the

8  communications between Cantwell and her husband because this

9  public posting of her, anyone could have called her about that,

10 right?  I mean, not just the FBI.  Someone else could have

11 said, hey, look, here you are with your kids in this -- in this

12 Radical Agenda Telegram group with 290-something --

13        THE COURT:  Let me stop you --

14        MS. KRASINSKI:  -- listeners.

15        THE COURT:  Let me stop you.  Okay.  Let me stop

16 you.

17        Part of the reason that this is so unpleasant and

18 frustrating for me is I don't have available my copy of the

19 indictment, my copy of the statute, and so I am trying to parse

20 a statute that I've never had to deal with in court before --

21 that I have looked at, that I have done research on, that I

22 prepared extensively to discuss with you at the last telephone

23 conference where I had those materials available, but I don't

24 have them available to me now.  So I'm proceeding with very

25 limited resources to try to analyze this problem.

1          My recollection is that the -- and, now, you -- you

2     tell me what the elements of the cyberstalking charge are that

3     you have brought as they apply to the -- Mr. Cantwell's spouse

4     here.  Is it the subjective reaction of the victim that's

5     relevant?  Is it what a reasonable person understanding the

6     communication to be that is relevant?  What is the -- what is

7     the test here for the element that you're trying to get at by

8     having her testify?

9          MS. KRASINSKI:  So the jury instruction, based on

10    Judge Laplante's instruction in *United States vs. Ackell*, is:

11    In order for you to find that the defendant engaged in a course

12    of conduct that would reasonably be expected to cause emotional

13    distress, the United States must prove that the course of

14    conduct would have caused substantial emotional distress to a

15    reasonable person.

16         THE COURT:  Yeah.  So it's not the subjective -- you

17    don't need to prove the subjective response of the spouse of

18    Victim 1 to prove your charge, right?  It's what a reasonable

19    person would understand that the nature of the communication

20    would be.

21         MS. KRASINSKI:  That's one prong.  Another method of

22    proving it is that it actually caused substantial emotional

23    distress to her --

24         THE COURT:  That's what I'm asking.  I had a

25    recollection --

1          MS. KRASINSKI:  I'm sorry.

2          THE COURT:  -- that it was an unusual statute in

3    that it could be proved by either it provoked a subjective

4    response -- a response or it would reasonably be understood.

5    And you're telling me --

6          MS. KRASINKSI:  Yes.

7          THE COURT:  -- you're going to -- your instruction

8    proceeds under both of those prongs.

9          MS. KRASINSKI:  Yes.

10          THE COURT:  All right.  Read me the proposed

11    instruction that deals with the subjective part of it.

12          MS. KRASINSKI:  So that is:  In order for you to

13    find the defendant guilty of the chime charged in Count Four,

14    you must unanimously agree that the United States has proven

15    one of the following beyond a reasonable doubt:  That the

16    defendant's course of conduct actually caused, attempted to

17    cause -- although we -- we talked about that, that that may not

18    be appropriate -- or would reasonably be expected to cause

19    substantial emotional distress to either the victim or his

20    spouse.

21          THE COURT:  Okay.  Now, is your -- is it your

22    position that the crime could be committed even if the

23    "actually caused" occurs as a result of the FBI making the

24    victim aware of the threat after it occurs?

25          MS. KRASINSKI:  So I think that --

1          THE COURT:  Do you see the problem with that?  It's

2    almost like then the FBI can complete a crime that otherwise

3    would never have been committed because they go to the victim,

4    make the victim aware of it, the victim actually becomes -- has

5    the emotional reaction that's necessary, and that is how the

6    crime gets committed.  That strikes me as a problematic way in

7    which a defendant can be convicted of a crime.

8          In other words, if it doesn't meet the reasonable

9    test but it meets the subjective test, but the subjective

10   test -- the crime is satisfied only because the FBI goes and

11   shows the victim the reaction and -- the communication and

12   says, how do you react to that, that -- and that's what you're

13   getting at here, you want to try to satisfy the subjective

14   element by calling her to get her to say, when the FBI told me

15   about this, I was extremely upset.

16          MS. KRASINSKI:  So I don't think that we intend to

17   discuss with her the contents of the communications between

18   Cantwell and Cheddar directly, the -- if you don't want me to

19   come and F your wife in front of your kids.  And I think if it

20   were only those communications -- I think if the course of

21   conduct was limited to Cantwell saying things to her husband, I

22   think that would be correct, that if she becomes aware of it by

23   the FBI that her testimony probably wouldn't be relevant.

24          The difference is the posting of the public pictures

25   and the actual calling CPS.  Both of those actions, I would

1    argue, Cantwell engaged in with the purpose and expectation

2    that she would be impacted by it.  I think she would testify

3    that, you know, she -- she -- she -- her husband may have

4    mentioned the CPS thing and what she thought was, well, I don't

5    think any investigation would result in my kids being taken

6    away from me, but I certainly don't welcome the intrusion into

7    my life.  And I think the fact that Cantwell publicly posted

8    pictures of her, that this is his action that are still

9    available, I think the fact that he has publicly posted them in

10   a way that still has the potential to impact her life that her

11   testimony on those points is relevant because those relate

12   directly to Cantwell's activity towards her.

13              THE COURT:  Okay.  A brief response from the

14   defendant and then we'll wrap up on this particular issue.

15              MR. LEVIN:  Your Honor --

16              THE COURT:  Do you want to say anything else?

17              MR. LEVIN:  I'm sorry.  Just that materiality is not

18   just relevance, it's super -- super relevance in the context of

19   a Rule 15 deposition.  We don't believe the testimony is even

20   relevant.  In fact, we filed a motion in limine on this point

21   to prevent the testimony that's still outstanding.  It's --

22              THE COURT:  Could you -- could you read me the text

23   of Rule 15, please, again?  I'm not -- I'm acting without any

24   ability to do the ordinary kind of legal research and analysis

25   that I'm required to do generally.  So please read me the text

1    of Rule 15.

2         MR. LEVIN:  Okay.  It says -- I'm sorry.  I have to

3    pull it up here.

4         A party may move -- this is when -- there's --

5    there's multiple parts.  There's when taken -- it says:  A

6    party may move that a prospective witness be deposed in order

7    to preserve testimony for trial.  The Court may grant the

8    motion because of exceptional circumstances and any interest of

9    justice.  If the Court orders the deposition to be taken, it

10   may also require the deponent to produce certain materials.

11        And then it says notice -- you have to have

12   reasonable written notice of the date and location, the name

13   and address of each deponent, and defendant's presence is

14   required.

15        Then there's a --

16        THE COURT:  What portion of the -- what portion of

17   the rule leads you to the -- what you call a super materiality

18   requirement?

19        MR. LEVIN:  Well, it's in case law and we -- we

20   cited various cases in our --

21        THE COURT:  Yeah.  So you understand I don't have

22   the -- your objection, so now's your chance to make me aware of

23   it.  So tell me what the case law tells me -- tells me about

24   super materiality.

25        MR. LEVIN:  We cited a case called *United States vs.*

1    *Drogoul*, D-r-o-g-o-u-l, 1F.3d 1546.  Testimony is material if

2    it is highly relevant to a central issue in the case.  The

3    burden of proof rests with the movant to demonstrate the

4    necessity for preserving prospective witnesses' testimony by a

5    deposition.  That's the *Ismaili* case, 828 F.2d 153, a Third

6    Circuit case.  It talks about -- *Ismaili* talks about testimony

7    that negates the crux of the government's case as material, 828

8    161.

9            And then *United States vs. Al Fawwaz*, which was a

10   Southern District of New York case, a district court case from

11   2014:  It need not be definitive proof of guilt or innocence,

12   but should be more than merely relevant.

13           Those are the -- those are the --

14           THE COURT:  Okay.

15           MR. LEVIN:  -- the cases.

16           THE COURT:  I'm not sure where that -- I don't find

17   it in the text of the rule that you've read to me anything that

18   allows me to impose a -- a super relevancy requirement before

19   allowing a deposition, but I do think the test for

20   admissibility of evidence isn't restricted just to a Rule 401

21   relevancy analysis and instead, ultimately, a Rule 403 analysis

22   can -- a judge can consider a variety of factors, such as the

23   cumulativeness or the burdensomeness of producing the evidence

24   when deciding whether the evidence comes in.

25           I -- I -- I want to give the government one last

1    chance to respond because this is -- my initial reaction to all

2    of this is, unfortunately, this is being brought to my

3    attention very late in the game at a time where I have a

4    limited capacity to conduct my own research of the -- of the

5    problem and I do really need to give you an answer on an

6    expedited basis.

7              But, second, based on what I've heard, it sounds

8    like if this witness does not testify, it will impair your

9    ability to prove your case in any significant way.  The

10   communications are what they are.  Your arguments I think are

11   powerful arguments about how a reasonable person would perceive

12   these kinds of communications.  And I -- you're free to make

13   all of those arguments whether this particular person testifies

14   or not.  I understand there might be additional -- an emotional

15   component to her testimony when she delivers it directly to the

16   jury about how upsetting this is and I'm assuming -- I

17   obviously don't know what she would say, but I'm assuming if

18   you want to call her it's because she wants to tell the jury

19   how upsetting it is to have learned about these communications.

20             But where she's learned about them because the FBI

21   show up at her door long after the communications occur, I --

22   it raises questions about whether that kind of testimony should

23   even be allowed to determine the subjective component of the --

24   of the crime and diminishes its usefulness when making

25   arguments about the objective component.

1          Mr. Cantwell's going to testify.  He can testify as

2   to his reaction to the communications.  The communications will

3   be in front of the jury.  The government will have full right

4   to argue about how a reasonable person would perceive those

5   communications.

6          I'm not sure -- given the extraordinary problems

7   that doing what you're asking me to order the parties to do

8   here would cause, I'm just not seeing how this extraordinary

9   relief you're requesting at a very late stage in the proceeding

10   can be justified.

11          So what do you want to tell me, Counsel, in response

12   to what we've been discussing?

13          MS. KRASINSKI:  So I think there are a couple

14   important things.  The first is that it's not learning about

15   the communications between Cantwell and her husband that

16   she's -- I mean, I think those certainly were upsetting to her,

17   but I don't think that's the issue.

18          I think the issue is, for her, the fact -- the fact

19   that Cantwell publicly, separate from his communications with

20   Cheddar, the fact that he publicly posted her photographs and

21   address in a way that is permanently and publicly accessible in

22   this group that she does not want any part of, this Radical

23   Agenda Telegram group that she doesn't want to be a member of,

24   I think that is distinct from the private communications with

25   Cantwell and her husband and there are -- there's not much case

1    law on that.  The only cases that I could find even sort of

2    remotely on point deal with essentially whether or not an

3    indictment should be dismissed based on multiplicity and I -- I

4    only found two cases that even sort of deal with this at all,

5    both district court cases, one, *United States vs. Moreland*,

6    M-o-r-e-l-a-n-d, 272 F.Supp. 3d 1222, and that's the Northern

7    District of Oklahoma, 2016.

8             And in that case, that's kind of similar to what

9    you're talking about, your Honor, where someone emails a victim

10   hundreds of times and that was it and then the victim actually

11   forwarded one of those emails to a family member.  And what the

12   Court in *Moreland* said was, well, look, the defendant didn't do

13   that, so we agree that dismissal is appropriate here.

14            But separate and distinct from that there's a

15   Southern District of Georgia case from 2019, and that's *United

16   States vs. Oury*, O-u-r-y, 2019 Westlaw 8440692, that makes a

17   distinction where the defendant engaged in conduct that is

18   directly targeted at the -- at this third person, so where the

19   defendant drove past the victim's parents' house, where the

20   defendant engaged in conduct that was purposely directed at the

21   victim's parents.

22            So here I think if it was just the communication

23   between Cantwell and this -- and her husband, I think we'd be

24   in a different boat and I don't think I -- I -- I think her

25   testimony would not be that relevant.  But where Cantwell took

1    separate steps apart from that in a -- and that Cantwell's

2    actions have put her pictures and her address forever publicly

3    available, it's his actions that caused the emotional distress

4    on that part, not the communications on -- on his conduct of

5    posting her photographs, her children, and her address

6    publicly.  And I think that's distinct.

7              THE COURT:  Okay.  I -- I think I fully understand.

8    Again, she became aware of those public postings from the FBI

9    making her aware of that; is that right?

10             MS. KRASINSKI:  I think she did.  I think she knew

11   of a CPS call separate from, before the FBI, but I think she

12   became aware of -- that Cantwell posted these pictures of her

13   and that they continued to be available later.

14             THE COURT:  And I -- I'm very reluctant to rule on

15   this issue without undertaking the normal approach to resolving

16   legal problems that come up that I follow in my work, but I'm

17   feeling that we are facing some significant time pressure to

18   get a ruling from me on this because we need to have this

19   matter resolved in a way that does not delay the trial and that

20   does not expose people who attend the trial to an undue risk of

21   infection.

22             And I -- what the -- the government is proposing to

23   me is either a practice that deviates from the agreed-upon

24   quarantining and testing protocol which we have agreed upon in

25   this case and which the Court has followed in the first case

1    that it tried and that we developed in consultation with the

2    judges and a retained expert.  And I'm very reluctant to

3    deviate from that, that quarantining and testing protocol, and

4    I'm not seeing how we can comply with that quarantining and

5    testing protocol without delaying the trial if I'm to go with

6    your proposal.

7             Do you have a solution that allows compliance with

8    the quarantining and testing protocol that does not delay the

9    trial?

10            MS. KRASINSKI:  So I think if this occurs on the

11   16th, it -- and one attorney traveled, it would allow the

12   attorney that traveled, if they came back the day of, to

13   quarantine and test.

14            I -- I -- I understand the -- I mean, it's --

15   COVID-19 is the reason that we even filed this and so I

16   certainly understand the Court's hesitation here.

17            The one thing I would ask is that, you know, I

18   certainly understand that the Court is considering whether or

19   not it wants to allow her testimony at all in determining

20   whether or not to grant this motion.  If the Court is concerned

21   with the quarantine requirement, I -- you know, we wouldn't --

22            THE COURT:  In truth, the least risky thing that she

23   could do for herself would be to get in a car right now and --

24   with her husband and drive to New Hampshire and stay in an

25   Airbnb in New Hampshire until the trial's over.  We have a

1    prevalence rate in this state that is vastly lower than it is

2    in the state that she's currently residing at.  She would have

3    minimal exposure to the virus if she got in a car and drove.

4              It's unclear to me what the risks -- added risks are

5    to an otherwise healthy young person in the first trimester of

6    pregnancy anyway, but the procedure you're proposing exposes

7    multiple additional people to added risk of coronavirus.  And

8    that isn't just you; it's the defense lawyer, it's

9    Mr. Cantwell, I assume the jail will have to quarantine him for

10   the entire time that the trial -- leading up to the trial, but

11   he still is going to end up getting in a van with a driver

12   every day back and forth to court and by releasing him in the

13   custody of an FBI agent, they have to get on a plane and go out

14   to the place where the victim's spouse is.

15             So it substantially changes the risk calculation

16   that we are using when we decide that we can, with sufficient

17   safety, conduct a trial.  And, you know, that's, in part, why I

18   talked to you multiple times about is everybody okay on the

19   compliance with our quarantining and testing protocol, what

20   contract do you have in place for testing of your witnesses, is

21   the defense ready with having his witnesses testify -- tested.

22   These are -- these are things that we tried really hard to make

23   parties aware of, work with parties well in advance of the

24   trials.  They're not simple things to conduct.  And this is

25   extraordinary problematic.

1      So -- but I don't see how I can really wait much

2  longer.  I really am not inclined to delay the trial because

3  I've already submitted a jury questionnaire to the panel

4  advising them about the dates in which we'll be conducting

5  the trial and it will -- it will potentially require

6  disqualification of other jurors if we move the -- the date for

7  taking of evidence in the trial.  So I -- I don't consider

8  continuing the trial to be, really, a viable option here.

9           MS. KRASINSKI:  Then I would --

10          THE COURT:  Go ahead.

11          MS. KRASINSKI:  You know, I -- I understand all of

12  the Court's concerns.  You know, obviously we are trying to do

13  this in a way that respects Mr. Cantwell's rights under Rule 15

14  because it is ultimately up to him whether he would attend.

15  But I would just ask if the Court is -- you know, doesn't want

16  to grant the deposition in light of COVID-19 risk, I absolutely

17  appreciate and understand that, but I would ask that before

18  ruling on whether or not to exclude her testimony the Court

19  allow the government time to work with her to see if either we

20  would just not call her or if she would ultimately, over her

21  physician's counsel, travel.

22          I don't know that we can make that call for her, but

23  it would certainly be something we'd like to discuss with her

24  if the Court is not inclined to grant the motion for

25  deposition.

1          THE COURT:  Yeah.  I'm not ruling on admissibility

2     of her testimony, but I am considering the -- not just whether

3     the testimony meets the minimal threshold of relevance, which

4     it -- it appears to do in certain respects, but whether given

5     the risks that it poses to our ability to conduct a trial if

6     I'm to accommodate the government in the way the government

7     wants me to accommodate it with respect to authorizing the

8     Rule 15 deposition, I -- I need to consider how that affects my

9     ability to conduct the trial on the schedule that we've set, to

10    conduct the trial safely.

11          And when the witness has information to provide that

12    meets the minimal threshold of relevancy but isn't essential to

13    the government's ability to prove its case, that can -- it

14    seems to me -- again, I, unfortunately, I have not had a chance

15    to study the case law on this, but it seems to be entirely

16    appropriate to consider those kinds of impacts when evaluating

17    a request to allow a deposition.  So how important the

18    witness's testimony is should be a consideration in determining

19    whether to grant the motion.  So I'm -- I'm evaluating it for

20    that reason, not to determine whether it meets the minimal

21    threshold of relevancy or whether it should be excluded under

22    403 as a waste of time.

23          If she were -- if she were in New Hampshire, able to

24    comply with our quarantine protocols and you wanted to call her

25    as a witness, that would be a simple Rule 401, Rule 403

1   calculation.  I've already suggested it appears to easily

2   satisfy the Rule 401 standard.

3           The Rule 403 criteria are completely different, but

4   I don't have to worry about, well, if I call her, it's going to

5   delay the trial; if I call her, she's going to increase the

6   risk that I'll have to stop the trial because one or more

7   people will become infected with COVID during the trial because

8   she hasn't complied with the quarantine procedures that we've

9   agreed on or that other people who have traveled out to take

10  her deposition are no longer complying with the quarantine

11  procedures that we agreed upon.

12          So that's why I'm considering it.  So I -- don't

13  worry.  I'm not saying she can't testify at all.  The defense

14  certainly has a right to try to move to bar her testimony.

15  There's a motion in limine apparently that's been filed to that

16  effect.  But I -- I don't have to rule on that until you try to

17  call her as a witness, so ...

18          All right.  Well, I -- I understand.  I think I

19  understand both parties' arguments here.  And I just want to be

20  very clear at the outset here, and I hope you accept this as

21  being a statement by me made in utmost good faith.  I would

22  never rule against a party on any issue because I'm

23  dissatisfied with the way in which the party raised the issue

24  with me.

25          So, Ms. Krasinski, I'm frustrated that I didn't have

1    this in front of me at a time when I could analyze it in a way

2    that I ordinarily analyze problems, but that has nothing to do

3    with whether I grant or deny the motion.  It's not -- I'm not

4    ruling on this matter as a matter of personal pique, you know,

5    that I have some kind of anger and I'm just ruling to punish

6    someone.  That has nothing to do with my analysis of the issue.

7            But I am going to deny the government's motion, and

8    let me explain my reasons.  And I've alluded to them during the

9    course of our discussion here.

10           First, it is important to me that this request is

11   being made at a very late date in the trial process, after the

12   last scheduled telephone conference with the parties that I

13   arranged to discuss issues of this sort with the parties prior

14   to my leaving the court for a few days to be away from the

15   court for the first time in about 15 or 16 months.  And I -- I

16   am now hearing this matter at a time when I'm away from the

17   court, when I have very limited Internet access, very limited

18   telephonic access, no ability to have in front of me the case

19   law that the parties are citing to me, no ability to analyze

20   the statutes and the rules that we've been discussing except in

21   the way that I'm trying to do it here.

22           And that is important to me, that this request is

23   coming to me at a late date.  A later than -- it could have

24   raised with me -- it could have been raised with me at a time

25   when I would have had a greater opportunity to act.  So that's

1    important to me in my analysis, not because I'm frustrated with

2    the government's conduct, but because it has an effect on my

3    ability to analyze the issue the way I want to analyze it and

4    it could have been raised with me at an earlier period of time.

5              More fundamentally here, the motion places me in a

6    very difficult position.  We have tried to give the government

7    and defendant the right to have a trial, a speedy trial, in an

8    environment in which the people coming into the courthouse are

9    placed at risk of infection with the -- with the coronavirus

10   and we have very carefully, in consultation with an expert,

11   developed protocols that are designed to satisfy the government

12   and the defendant's interest in a speedy trial while minimizing

13   the risk to members of the public that we bring into the

14   courthouse against their will to serve on juries and to be

15   testifying as witnesses.  And we developed those protocols very

16   carefully to make sure that we can conduct this trial as safely

17   as possible.

18             The government -- the government's proposal requires

19   me to deviate from those protocols that have been carefully

20   developed or it requires me to continue the trial.  Continuing

21   the trial is problematic because I've already sent a

22   questionnaire to the jurors informing them of when we would be

23   holding the trial and it will complicate our ability to conduct

24   the trial if I am to delay it beyond the dates that we agreed

25   to several weeks ago.  And so the -- I'm placed in a position

1    where either I have to compromise our -- our safety protocols

2    or I have to delay the trial.  Neither of those options is a

3    good one.

4           And so to justify doing what the government wants

5    really requires a very strong reason why I should increase the

6    risk to the public by not complying with our quarantining

7    procedures or complicate our ability to try the case by

8    delaying the trial.  And here I just don't see there is a

9    sufficient justification offered by the government for the

10   extraordinarily -- extraordinary relief it is requesting.

11          I have tried to listen carefully to the government's

12   proffer as to what the witness would testify to.  I agree that

13   she has relevant testimony to provide, but that testimony does

14   not strike me as in any way essential to the government's

15   ability to prove its case and, indeed, it seems to be of much

16   lesser relevance than other evidence that the government will

17   rely on, such as testimony from Cheddar Mane.  Almost every

18   argument that the government wants to present that I'm aware of

19   can be fully presented to the jury whether this witness

20   testifies or not.

21          And so -- and then, finally, I would note that it is

22   by no means apparent to me that requiring this witness to

23   travel by automobile to New Hampshire places her at any greater

24   risk than she would face staying home where she is.  On the

25   other hand, requiring a large group of people, including an

1    incarcerated defendant, to travel to her increases the risk

2    significantly that others will become infected.

3              And so I'm not satisfied that from a pure risk

4    reduction standpoint that the government's proposal is a

5    superior proposal to what seems to me to be another available

6    alternative, that is for her to safely travel to New Hampshire

7    by automobile and to remain here in a state which has one of

8    the lower prevalence rates in the United States for a

9    sufficient time to comply with our quarantine and testing

10   protocol.

11             And so for all of those reasons, I don't believe

12   on balance that the government has prevailed and I deny for

13   that reason -- and, of course, I do so without prejudice to the

14   government's right to seek to call the witness if she is

15   willing to come to New Hampshire and testify.

16             Is there -- anyone else need me to say anything else

17   about that particular issue?  There's one more issue on the

18   table I need to talk to you about, but does anyone want to say

19   anything more about that particular issue?

20             MS. KRASINSKI:  No, your Honor.

21             THE COURT:  Anything from the defense?

22             MR. LEVIN:  No, your Honor.

23             THE COURT:  All right.  So that -- that motion is

24   denied.

25             Now, there's another problem with another witness

1    the government has filed and that appears to be a witness who

2    is not communicating with the government, according to the

3    government, because she's been told not to communicate with the

4    government by the defendant.

5              Is that -- is it that the -- is that --

6    Ms. Krasinski, is that what the problem is?

7              MS. KRASINSKI:  So my only concern is whether or not

8    I can tell the Court whether or not she's complied with

9    quarantine requirements.  And, actually, this morning she

10   called and said that she had seen a copy of our notice and has

11   a call I think scheduled with our victim/witness coordinator

12   this afternoon, so I'm hopeful that we'll be able to resolve

13   that issue.

14             THE COURT:  All right.  Well --

15             MR. LEVIN:  We received correspondence from her

16   indicating that she's been trying to reach both the court the

17   U.S. Attorney's Office.

18             THE COURT:  I don't know what she -- I've not been

19   made aware of any efforts on her part to communicate with the

20   court.

21             I'd ask my case manager:  Are you aware that this

22   person has been trying to communicate with the court?

23             THE CLERK:  She called me today, your Honor.

24             THE COURT:  Oh, she did.  Okay.  Can you tell me

25   what -- as best you can, what was the nature of the

1    communication you had with her?

2            THE CLERK:  She called and said she was trying to

3    get in touch with the victim/witness coordinator at the U.S.

4    Attorney's Office and that she did not -- that he had been

5    trying for several days and was unable to do so.

6            THE COURT:  Okay.

7            THE CLERK:  I gave her the phone number and email

8    address.

9            THE COURT:  All right.  So, Ms. Krasinski, you think

10   that she is going to talk to the coordinator this afternoon?

11           MS. KRASINSKI:  I think they spoke briefly this

12   morning and that they are going to -- they scheduled a call for

13   this afternoon and I'm hopeful that that occurred.  The last

14   time they had something scheduled, she sent an email saying

15   that she wasn't going to communicate with us.

16           So I'm -- I'm hopeful that we can all get on the

17   same page just about being able to discuss with her whether or

18   not she is complying with the court's quarantine requirement.

19   But that's it.  You know, she has an absolute right not to

20   speak to us or meet with us before trial and I don't have any

21   issue with that.  My concern is simply making sure I can

22   represent to the Court that she's complied with those

23   quarantine requirements.  I'm hopeful now that we'll be able to

24   do that.

25           THE COURT:  Do you have her under subpoena?

1           MS. KRASINSKI:  Yes.

2           THE COURT:  All right.  Because I am going to want

3    to ensure that our witnesses have complied with the quarantine

4    requirements.  If after this communication you have doubt about

5    whether she is willing to do that, it would seem to me the next

6    step would be for you to seek a warrant for her detention as a

7    material witness and then we can hold her in quarantine for the

8    required period so that she can testify safely.

9           I -- those are not measures that I would resort to

10   lightly, but I want this trial to be conducted and it's going

11   to be conducted in a way that's safe.  And it -- it -- I don't

12   know what -- if you've given any thought to that, but one thing

13   to do is subpoena her for the first day of trial, subpoena her

14   to come here for jury selection, and require her to remain here

15   until the -- we're ready to have her testify.

16           Another -- another way to do that would be to seek a

17   warrant for her arrest as a material witness and we could -- I

18   would consider whether I need to have her detained until she

19   can testify.  We're not going to fool around with this.  People

20   are going to comply with whatever orders or you can ask me to

21   issue an order ordering her to do it under pains of contempt if

22   she does not.

23           So there are -- those at least are three options

24   that strike me as available options to the Court.  I would like

25   your -- your thoughts and the defense's thoughts about that.

```
 1              MS. KRASINSKI:  I -- I would -- I would like to wait
 2     and see what happens with this call with the victim/witness
 3     coordinator this afternoon.  You know, seeking a warrant for
 4     her would be my absolute last resort.  I would hate to have to
 5     do that.  So I'm hopeful that this issue can be resolved now,
 6     but if not, we'll alert the Court.
 7              THE COURT:  All right.  And defense response?
 8              MR. WOLPIN:  Yeah, I don't think there is an issue.
 9     I mean, she emailed -- she cc'd us on the email as well
10     explaining her understanding of the quarantine and how many
11     days she would have to be quarantined, that she'd been trying
12     to leave messages with the government, that she'd called the
13     court leaving messages, and she would need a plane ticket.
14              So I don't think we have a foundation at this point
15     that she's noncompliant or noncooperative.  And as -- you know,
16     I'd just like to address they noted in their motion I did
17     advise her to -- the only advice I thought I could give her --
18     which was to contact the party who subpoenaed you for those
19     arrangements.
20              I had, at the government's request, reached out to
21     her again to see if she was represented by counsel so there was
22     someone who could advise her if it was heading toward the
23     direction of do I have to comply or not have to comply with
24     court orders.  I felt that was beyond what I could get into
25     with her.
```

1          So we've made the effort and then she indicated this

2    morning that she was making the effort as well.  So I think

3    it's little premature to suggest that she's sort of drawing a

4    line in the sand or saying she's not going to cooperate with

5    them as far as quarantine requirements.

6          MS. KRASINSKI:  And I just want to be clear.  My

7    understanding of the quarantine requirement is a five-day

8    quarantine and test if she were to drive.  If she flies on a

9    commercial flight, I think that requires a 14-day quarantine

10   period.

11         Do I have that -- am I understanding that correctly,

12   or if she flies a commercial flight that she --

13         THE COURT:  I don't have access to the specific

14   protocol.  You can contact the chief deputy clerk.  She's

15   extraordinarily knowledgeable about these matters.  Any

16   questions you have about the quarantining protocol she can

17   answer.

18         I just want the parties to understand I'm serious

19   about this.  Okay?  We're conducting this trial, we're

20   conducting it on time, we're conducting it in as safe a way as

21   we can, consistent with the carefully developed procedures that

22   we are implementing for these trials, and I expect the parties

23   to ensure that there has been compliance.

24         And if someone is -- has been -- if the parties are

25   unable to assure the Court that there has been compliance, the

1   parties should notify me and my -- my case manager should track

2   me down immediately if there is any kind of filing to that

3   effect and we will consider what these options are.  And

4   certainly one option is to give a person who doesn't want to

5   comply with the protocols the opportunity to challenge them.

6   And I'm happy to appoint counsel and give that person an

7   opportunity to challenge.

8           What I'm not prepared to do is have these issues be

9   unresolved heading into the trial.  And if people are not

10  responding, which is what I was presented with in the filing --

11  just not that they've been trying to contact people but that

12  they weren't going to talk to the government.  That's the

13  impression I was given in the filing that was made to me --

14  I -- we're not going to fool around with that.  Okay?  People

15  need to comply or they need to tell the Court, I don't think I

16  should have to comply.  And if they don't think they have to

17  comply, I can appoint counsel for them and they can come in and

18  we can address this in a -- in the ordinary fashion.

19          But if they are not willing to communicate with the

20  Court, then we may have to resort to the use of judicial power

21  to compel them.  And I am willing to use that power as

22  necessary, but I -- I don't do it lightly and I certainly

23  wouldn't do it if someone is trying to comply or trying to

24  determine what their obligations are.

25          And so I -- it sounds like the situation has

1    developed from the time the government filed its initial motion

2    with me, but if that should change, you need to let me know

3    right away because I need to get some means of communicating

4    with that person, I need to perhaps issue orders, I need to

5    perhaps issue warrants, I need to perhaps appoint counsel.

6    There are a variety of things I may need to do.

7              So let's hope that you're successful in resolving

8    this matter in the way it should be resolved, but if you are

9    not, let my case manager know immediately.  My case manager

10   will let me know immediately and we will get another telephone

11   conference and figure out what to do.  But it's not going to be

12   an option to just sort of let things go until the time of

13   trial.  Okay?

14             Anything --

15             MS. KRASINSKI:  Your Honor, can I --

16             THE COURT:  Anyone want to say anything else about

17   this particular issue?  Yes, go ahead.

18             MS. KRASINSKI:  I just want to make sure the record

19   is clear on this, and it doesn't impact anything since she has

20   contacted us today.

21             I know she has said in an email that she has been

22   attempting to contact us.  We have no record of even an attempt

23   at contact since September 4th.  So I know she had said that.

24   I just want to make sure the record's clear on that because the

25   victim/witness coordinator, you know, works very hard to

1    respond to people when they call.  So I just want to make sure

2    that's clear.  It's of no matter since she has contacted our

3    office today.

4            So the only other issue that I want to raise with

5    the Court is something that just happened last night.  I have a

6    family emergency that just happened.  I would like to travel to

7    New York for it.  I would drive in a personal vehicle, I would

8    go and then I would come back.  I would quarantine for five

9    days and test.  I understand that it would mean I would miss

10   jury selection, but --

11           THE COURT:  Well --

12           MS. KRASINSKI:  -- assuming a negative test, I

13   should --

14           THE COURT:  Yeah.  Well, let me just stop you.  So

15   I'm sorry that you have your emergency.  We want to try to

16   accommodate you if we can.

17           Are you -- and I don't need to know the details of

18   the emergency, but New York has -- it depends on where you are

19   in New York, but New York is among the lowest prevalent state

20   in the country right now with a positivity rate -- test

21   positivity rate of below 1.  I was in New York for a couple

22   hours ten -- about eight or nine days ago.  I don't have any

23   problem with you traveling to New York and, frankly, I don't --

24   I'm not even concerned about a need to quarantine as long as

25   while you were there you were maintaining social distancing,

1  meeting with people outdoors, not being in rooms with people

2  that you -- whose COVID status you don't know.

3            Are you going to be able to do that or are you going

4  to have to be physically present indoors for extended periods

5  of time with people who -- with whom you are not currently

6  exposing yourself to on a regular basis?

7            MS. KRASINSKI:  I would need to be indoors with

8  someone who has been homebound for, you know, about a year, so

9  who has been essentially socially isolating this whole time.

10  You know, she has no indications of COVID-19 and hasn't been in

11  contact with anyone because she's homebound.

12            THE COURT:  Yeah.

13            MS. KRASINSKI:  It would be driving there, seeing

14  her, driving back.  I would be masked the whole time.  I could

15  certainly ask the one other family member who would be present

16  to wear a mask.  I don't even need to stay for an extended

17  period of time.

18            THE COURT:  It -- is it New York City or where in

19  New York is it?

20            MS. KRASINSKI:  Westchester County, New Rochelle.

21            THE COURT:  Okay.  Yeah.  So, again, there were

22  times when -- that New Rochelle had a very high prevalence

23  rate.  It doesn't now.  And I -- I mean, I -- of course, attend

24  to the emergency.  That -- it's good that we have two lawyers

25  on the case and we'll do whatever we need to do.  And if you

1    need to be absent for jury selection, that's fine with me.  You

2    can show up halfway through the trial, as far as I'm concerned.

3    Mr. Davis is a very able prosecutor and more than able to

4    handle whatever he needs to handle in your absence.

5              So, again, I'm really sorry that you face this

6    problem and of course you should attend to it and you should

7    keep in communication with the court.  But this is a -- a

8    relatively low risk event that I'm confident you can attend to

9    and with -- usually -- the information I have is that 80 or

10   90 percent of cases in which symptoms develop, they develop

11   within five days of exposure.  The 14-day period is an out --

12   outside limit on transmissibility.  Transmissibility really

13   tends to occur relatively early on in the -- after exposure and

14   we are quite confident that in those cases, a five-day

15   quarantine and a negative test is -- leaves you at

16   substantially reduced risk of transmitting the disease.

17             So I know you'll be careful.  I know you'll follow

18   as many of the social distancing and mask wearing and proper

19   ventilation guidelines as you can.  And when you come back, you

20   can test -- you can quarantine for five days and take a

21   negative test and you should be good to go.

22             So you might miss the jury selection, but you should

23   be fine for the trial, right?

24             MS. KRASINSKI:  Right.

25             THE COURT:  Yeah.  Okay.  So -- and, Mr. Davis, are

48

1    you on the line?

2              MR. DAVIS:  Yes, I am, Judge, and that's fine.

3              THE COURT:  You can handle the jury selection,

4    right?  You've done probably a hundred trials.  You can do --

5    you can do this without Ms. Krasinski's able assistance.

6              All right.  So that's fine.

7              MR. DAVIS:  She will be greatly missed, your Honor,

8    but yes.

9              MS. KRASINSKI:  I have faith in Attorney Davis.

10             THE COURT:  Okay.  So I appreciate knowing that and

11   obviously let me know if there's anything that -- that happens.

12             All right.  So what else -- I really would like to

13   try not to spend -- I'd like to have a few days where I am not

14   focusing on court business, if it's at all possible.  So while

15   you have me on the line now, is there anything else that you

16   think I need to be talking to you about before the jury

17   selection on Tuesday?

18             Anything from the government?

19             MR. DAVIS:  No.

20             MS. KRASINSKI:  No, your Honor.

21             THE COURT:  Anything from the defense?

22             MR. WOLPIN:  No.

23             MR. LEVIN:  No, your Honor.

24             THE COURT:  Okay.  All right.  So I -- I'll tell my

25   case manager, while I've got you on the line, you and Jen and,

1    if necessary, you can ask my law clerk, Samira, anything that

2    these people file, as soon as it comes in, if you think that

3    it's something that could affect the schedule of the trial,

4    then by every means available, text me, try to call me, email

5    me, with an emergency notice.  And I will try to check at least

6    once a day to see whether there's anything like that being

7    filed and we will get people on the phone and I will resolve

8    these issues.  And -- and, you know, I -- I really do want to

9    try to move ahead.

10            While we are on the phone, let me address one issue

11   that you're not raising with me right now, but that I -- I

12   wanted to raise with you and that is with respect to the

13   confidential informant.

14            I questioned the confidential informant and a

15   transcript is going to be prepared of that conversation.  As

16   far as I can see, there's nothing in that conversation that

17   cannot be released to the defendant.

18            Does the government have a view about that?

19            MR. LEVIN:  We received it already, your Honor.

20            THE COURT:  Okay.  Good.  Good.  Okay.  So you --

21   you know what that communication is.  Now, there's one thing

22   there that I wanted to draw to your attention and that is as

23   far as I could see, the one thing that that witness might have

24   that was useful to me, there may be other things that are

25   useful to you, but he did have -- he did recall another person

1    who he had a communication with that had a -- again, I don't

2    have the transcript in front of me -- personal familiarity with

3    Cheddar Mane and the use of drugs and I instructed the witness

4    to give that name to the FBI agent.

5            Has -- do you intend to do anything with respect to

6    that information which all of what I've just described and

7    anything I know about it is reflected in that transcript,

8    Mr. Levin?

9            MR. LEVIN:  Well, information that we haven't

10   received yet, but we're -- I guess we'll have to discuss that.

11   I think given the time line now, it's unlikely that we're going

12   to be able to do anything with it, but --

13           THE COURT:  Well, my -- my strong sense, Mr. Levin,

14   is that because you have available to the -- the chat in the

15   invitation-only group that you have everything that I could

16   nail down that this witness had that bears on Cheddar Mane's

17   use of drugs.  And, therefore, it does not seem to me that

18   under *Roviaro* and the controlling First Circuit precedent that

19   I've previously cited and, unfortunately, again, I don't have

20   it in front of me now, that it seems to me that there -- that I

21   should not order the disclosure of the confidential informant's

22   identity.

23           If you have any different -- any additional -- I

24   mean, you're preserving your argument for purposes of appeal,

25   but having received the transcript and having reviewed the

1   transcript, do you have any additional arguments to present to

2   me on that point?  Because my inclination is he doesn't know

3   anything that would be potentially useful by way of extrinsic

4   evidence about Cheddar Mane's use of drugs that you don't

5   already have available to you.  Do you have a different view on

6   that, having looked over the transcript?

7            MR. LEVIN:  No, we do not, your Honor.

8            THE COURT:  Okay.  All right.  So you've preserved

9   your argument for purposes of an appeal.

10           I'll ask my case manager to remind me when I get

11   back to memorialize this and explain it further on the record

12   either on the day of jury selection or at some other point

13   during the trial because I don't have the case law in front of

14   me now and I don't want to make a fully explained ruling.

15           But so that the parties know for purposes of their

16   preparation, it's my judgment after questioning the witness

17   under oath that the witness does not have any information about

18   Cheddar Mane's use of drugs that would be useful to the

19   government by way of extrinsic evidence to show Cheddar Mane's

20   bias that -- that which the defendant already has available to

21   it because they have access to the records of the

22   communications in the Telegram group which was the principal

23   source of the informant's knowledge about drug use by Cheddar

24   Mane.  And, therefore, under the existing precedent, the

25   disclosure of the informant's identity should not be required

1    and I do not intend to order it to be produced.

2            And I'll provide a -- a more detailed oral ruling on

3    that during the course of the trial and I'll just ask my case

4    manager to remind me of that when the time comes.

5            Okay.  Is there anything else anyone wants to say to

6    me on any other subject?

7            MR. LEVIN:  No, your Honor.  Enjoy your vacation.

8            THE COURT:  Thanks.  What's left it, because I've

9    given up the -- all day Tuesday and Wednesday of it for the

10   trial.  So I've got a couple days anyways, but I thank you.  I

11   appreciate that.

12           And, Ms. Krasinski, I really do hope things turn out

13   well for you and I fully understand the -- the need that you

14   have to do what you need to do and you should do it.  And,

15   fortunately, we have Mr. Davis here and whatever happens, I'm

16   completely comfortable even if necessary he could do the whole

17   trial by himself.  So do what you need to do and we'll work

18   around that.  All right?

19           Thank you.  That -- that concludes our -- that

20   concludes our hearing and I'll see everybody on Tuesday.

21           MR. LEVIN:  Thank you, your Honor.

22           (Proceedings concluded at 3:54 p.m.)

23

24

25

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5/12/21        */s/  Liza W. Dubois*
                              LIZA W. DUBOIS, RMR, CRR