```
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *  1:20-cr-6-01-PB
            v.                      *  September 15, 2020
                                    *  9:32 a.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY SELECTION
BEFORE THE HONORABLE PAUL J. BARBADORO


Appearances:


For the Government:          John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             United States Attorney's Office



For the Defendant:           Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defender's Office



Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter

<pre>                    P R O C E E D I N G S
</pre>

1

2          CASE MANAGER NEGRON:  Court is in session and has

3   for consideration jury selection in the United States of

4   America vs. Christopher Cantwell, criminal case number

5   20-cr-6-PB.

6          THE COURT:  So I want to confirm for you that the --

7   the audio and video in the other courtrooms have been turned

8   off, so none of the jurors are hearing what we are doing now.

9   Okay?

10          The government has a motion to dismiss one of the

11   counts.  I just wanted to make sure that there's no objection

12   to that and I can go ahead and grant the motion.

13          Is there any objection to the motion?

14          MR. WOLPIN:  No, your Honor.  We take no position.

15          THE COURT:  All right.  So then I will grant the

16   motion to dismiss Count Two; and that leaves Counts One, Three,

17   and Four.

18          MR. DAVIS:  We'll substitute, your Honor, if that's

19   appropriate, an indictment that just says One, Two, Three.

20          THE COURT:  Yeah, we'll do a redaction.  That's the

21   ordinary way that I do this.

22          I wanted to talk to the -- to counsel about how much

23   detail they want me to provide about the charges.  I don't

24   ordinarily read the charges to the jurors, but if you are --

25   I'm -- I -- in order for them to know more than the name and

1    the charge, I would need to inform the jurors of the nature of

2    the charge and I'm happy to read the charge at the outset

3    before I begin to ask the questions you want me to ask about

4    it.

5              Do the parties have a view about that particular

6    issue?

7              MR. WOLPIN:  Your Honor, I -- I think, from our

8    perspective, the charge -- I'd rather the jury not spend the

9    next week, since we we're not starting tomorrow, with the

10   contents of the charge.  The charge includes basically

11   everything negative about -- that we could say about our client

12   without the rebuttal at that point.  I think the Court can

13   make -- we would ask the Court read, certainly, what the nature

14   of the charges is and that --

15             THE COURT:  Well, I can -- excuse me.  I'm concerned

16   about me selecting what to tell them rather than you -- if you

17   don't want me to read it, I'm happy to just say he's been

18   charged in Count One with extortionate interstate

19   communications and in Count Three he's been charged with this

20   and in Count Four he's been charged with -- so I'll just call

21   it the first count, the second count, and the third count and

22   just list the charge and then the on or about date specified in

23   the charge, but not tell them anything more about the charge.

24             But I want to be sure you're okay with that, because

25   you want me to ask them do you know anything about the case.

1    But if I don't tell them anything about the case, then they'll

2    only know his name and the approximate date and the charge.

3    And you're fine with that?

4              MR. WOLPIN:  Yes, your Honor.

5              THE COURT:  Okay.  Good.  I wanted to be sure about

6    that.

7              MR. WOLPIN:  Thank you.

8              THE COURT:  All right.  So let's address the -- the

9    elephant in the room here, in my view, as far as voir dire is

10   how should we deal with any defendant victim -- alleged victim

11   or witness who has espoused white nationalist views.  And

12   that's a challenge for the defense; it's a challenge for the

13   government; it's a challenge for me.

14             I guess my initial thought about that is that as far

15   as I can see, anyone's views about white nationalism plays no

16   role in the nature of the charge against Mr. Cantwell.  He

17   can't be found innocent or guilty in whole or in part based on

18   his white nationalist views, if he has them; on the alleged

19   victim's white nationalist views, if they have them; and on any

20   witnesses' white nationalist views, if they have them.

21             Does anybody disagree with that proposition?

22             MR. DAVIS:  No.

23             MR. WOLPIN:  Not as a starting point, no.

24             THE COURT:  Okay.  So I -- I would -- I'm wondering

25   how you would feel about me, when I ask them your question

1      about white nationalism; to tell them right up front a person's

2      views about white nationalism plays no role in the guilt or

3      innocence of Mr. Cantwell.  His views on that subject, the

4      alleged victim's views on that subject, the defendant's view,

5      plays no role in the guilt or innocence of Mr. Cantwell and you

6      can't consider that in determining the guilt or innocence of

7      Mr. Cantwell.

8             Will any of you be unable to follow that

9      instruction?  I'm going to ask some of your other questions on

10     that subject as well, but to me that's the starting point.

11     Because if people have trouble separating out anyone's views

12     on white nationalism from the evidence in the case and that

13     they -- that might affect their thinking about Mr. Cantwell's

14     guilt or innocence, I'm going to have a problem with that and I

15     imagine the lawyers would as well.

16            Do you have any problem with me addressing that

17     subject in that particular way as well as asking some of the

18     other questions that you have?

19            MR. WOLPIN:  I'm trying to reconcile -- I do

20     think -- although I agree ultimately with the proposition, it

21     is going to be discussed as relevant evidence that will have a

22     bearing on credibility and things like that as far as that

23     being a thing that gets us there.  It's not because it's white

24     nationalism.  But I'm a little concerned that that basically

25     tells them that's entirely irrelevant when that's true to some

1    extent, but it's also going to have relevance for other

2    purposes.  It's kind of like when you give a limiting

3    instruction:  I understand it can't be used for X, but it

4    can be used for Y, it will have relevance as far as an

5    alternative --

6             THE COURT:  Well, tell me, for what purpose does

7    someone's white nationalism views affect Mr. Cantwell's guilt

8    or innocence?  I'm having trouble seeing it.  I think you have

9    a defense, which I understand and want to give you a full

10   opportunity to present, that context is everything here and the

11   nature of the interactions among the parties is of vital

12   importance in evaluating what the charges are here.  And that's

13   entirely appropriate and I want to give you full rein to do

14   that.

15             On the other hand, I don't want anybody on the

16   juror -- jury who has views about white nationalism that are so

17   strongly held that they could spill over and help them find

18   Mr. Cantwell guilty or not guilty because of his views, because

19   of the alleged victim's views, or because of any witness's

20   views.  That's what I'm trying to reconcile.

21             And so I'm happy to -- I'm going to give you full

22   rein to produce evidence about context here, but I want to weed

23   out from the jury people who have views about white nationalism

24   one way or the other that are -- that are so strongly held that

25   they could affect their thinking.  And that's what I'm trying

1    to get at.

2              So if I make -- give you the assurance that I will

3    give you wide scope to -- to produce your context-relevant

4    defense, are you comfortable with me addressing that subject in

5    that way in the voir dire?

6              MR. WOLPIN:  Yes.  And I think we have all

7    ultimately the same goal on that end.  I'm not trying to reach

8    a different end.

9              THE COURT:  All right.

10             MR. WOLPIN:  So yes.

11             THE COURT:  Let's -- if you -- you listen to what

12   I'm proposing and before I begin asking for individual jurors'

13   responses, if you want to ask me to supplement anything I'm

14   doing, you -- I'll give you that opportunity to be heard.  We

15   can put the headsets on and you can raise, you know, a nuanced

16   kind of point, could you also do this, could you do that, and

17   I'll consider it carefully because this is a -- I think we

18   would all acknowledge this is the challenging part of this voir

19   dire.

20             Because I want to be clear it's not my view that

21   because someone puts a Black Lives Matter sign in their front

22   lawn or that they, say, put a Blue Lives Matter sign in their

23   front lawn or that they're a member of a militia group doesn't

24   automatically justify excusing them.  It may require some

25   further discussion with the juror, but it isn't a per se basis

1    for recusal.

2            On the other hand, someone who says, look, I hate

3    white nationalism so much that anybody who espouses those views

4    I just can't tolerate, we need to get those people off the jury

5    quick.  That's my -- that's my thinking.  Okay?

6            So I'll try to do it the way I think it works and if

7    you need to ask me to supplement or modify something I've said,

8    I'll give you that chance and I'll be open to hearing what you

9    have to say.  Okay?

10           MR. DAVIS:  And may I just suggest, Judge, that a

11   question phrased about whether the juror could -- could be

12   partial or impartial may be appropriate.

13           THE COURT:  Yeah.  Well, I'm going to ask

14   effectively would you have any difficulty in following this

15   instruction that it plays no role in your deliberations.

16           So you listen to what I do and if you think it's a

17   particular problem, I'm very willing to modify what I am

18   proposing.  All right?  Because I recognize this is a

19   challenging subject for the lawyers in this case, how to --

20   everybody agrees in principle with the proposition that anyone

21   is free to hold whatever views they want on this subject and it

22   doesn't affect their guilt or innocence of a crime and we don't

23   want that to affect someone's view of their guilt or -- of the

24   defendant's guilt or innocence of the crime.

25           On the other hand, context really does matter here

1    for the defense the defense wants to put on and so -- and we

2    just can't -- we can't eliminate the white nationalism problem

3    from this case.  It is -- it just -- it's -- the whole milieu

4    is a milieu that's affected by white nationalism, so the

5    evidence is going to -- it's going to come in in order to be

6    able to allow the government to tell the story and the

7    defendant to put on his defense.

8              All right?  So any further suggestion before we

9    begin the -- bring the jury in and get started?

10             I also will tell you I hope you will understand I

11   will be reminding you throughout the trial if I see issues

12   about social distancing or things like that.  I may gently kind

13   of chide you.  Let's make your best efforts to try to really

14   respect all of our guiding principles here.  And we'll get

15   through the jury selection and then afterwards we can do some

16   talking about a couple of issues that may come up during the

17   trial.  Okay?

18             MR. LEVIN:  Can I just -- on that last subject, your

19   Honor, just say that beyond the ideology, there's language

20   that's going to be used in front of the jury in this case

21   that's -- that I think is important to sort of highlight for

22   the jurors that you're going to hear these words, these -- this

23   terminology that may be offensive to you.  It's not just about

24   an ideology.  It's about a whole language.

25             THE COURT:  I understand.  That's one of the reasons

1    I was thinking about reading the charges.  But I'll do

2    something about offensive language, you'll remind me if I

3    don't, and I'll ask a question about that, whether that will be

4    so difficult for you that you -- it could affect your ability

5    to be fair and impartial, something along those lines.

6              Okay.  I'm satisfied.  Thank you.  And I appreciate

7    everybody's effort to try to make this process work.

8              So we can -- we're going to pause because we have to

9    reconnect the various courtrooms and then we'll begin the --

10   and bring the 16 jurors in who'll be here first.

11             (Prospective jurors entered the courtroom.)

12             CASE MANAGER NEGRON:  Court is in session and has

13   for consideration jury selection in United States of America

14   vs. Christopher Cantwell, criminal case number 20-cr-6-01-PB.

15             THE COURT:  All right.  Good morning.  For those of

16   you in the courtroom with me now, good morning to you, and

17   those of you watching in other courtrooms, good morning to all

18   of you.

19             Let me begin by thanking you for your service.  Even

20   in the best of times, jury service is a sacrifice.  I know that

21   all of you have busy lives.  You have jobs, you have people

22   that you care for, you have things that you need to do in your

23   life, and we are taking you away from that.  And I want you to

24   know that we really do appreciate the sacrifice that you're

25   making.

1           These are obviously unusual times and the sacrifice

2    is even greater here.  We have to have you wearing -- sitting

3    and wearing masks and it takes us a little longer than normal

4    to pick a jury here.  So I understand the sacrifice that you've

5    made.  It's a commitment and I -- I really do appreciate it.

6           Before I begin with my ordinary voir dire, let me

7    address the COVID-19 pandemic and talk to you a little bit

8    about how that affects the jury selection process and the trial

9    here.

10           Fortunately, we have a big beautiful courthouse here

11    at the federal court.  We have lots of space.  And we limit the

12    number of people coming into the courthouse and we carefully

13    think through how we use that space so that we can maintain

14    social distancing so that we can bring only limited number of

15    people into the courtroom at any one time and yet still conduct

16    this important process of jury selection.

17           I can tell you that we are also blessed with a

18    modern courthouse with a very effective ventilation system that

19    allows us to filter the air and bring in good quantities of

20    fresh air.

21           During the trial process, we will be maintaining

22    social distancing.  We have people who will be going around

23    during the course of the trial, you'll see people who are --

24    their job is to sanitize areas where people may be touching.

25    If you are picked for the jury in this case, this room will

1  become your jury deliberation room.  During breaks, during

2  deliberation, you will come in here and have this nice large

3  space in which the jurors can remain comfortable during the

4  course of the breaks and deliberations.

5          We will be bringing in lunch for you so that you

6  don't have to go out and get your lunch on your own.  We'll

7  have -- we have space in an outdoor courtyard where you can

8  have lunch.  We'll give you opportunities to have a break if

9  you need one, during breaks, to go outside and take the mask

10 off for a few minutes.

11         We have thought this process through very carefully

12 and we have a very well trained, experienced staff who know how

13 to conduct these trials with the utmost safety.  And so I will

14 do everything I can during this process to make you feel

15 comfortable, to make you feel safe and secure.  And we're just

16 very fortunate that we can hold trials in such a great

17 courthouse with so much space in which to allow us to get this

18 job done.  So thank you, and I assure you that we'll do

19 everything we can to make this process safe and effective.

20         And I want to tell you, although jury service is a

21 sacrifice, it's also one of the few opportunities most of you

22 will ever have to really serve the broader society.  The

23 framers of the Constitution have included a constitutional

24 right to a trial by jury.  They put their faith in the people

25 to make sure that the government is fair with individuals who

1    are brought to trial.  And without this service by you, we
2    could not give people the constitutional right that they're
3    entitled to.  So it's very important that you bear in mind that
4    you are serving an important function here and that opportunity
5    to serve is rewarding.
6            I speak to almost every jury that I've had over the
7    28 years I've been on the court and after the trial's over,
8    almost without exception jurors tell me that they find that
9    experience to be very rewarding and they're glad that they had
10   the opportunity to serve.  And I think you'll find that in this
11   case as well.  So it is a sacrifice, but it's also an
12   opportunity, and I hope that you'll look at that.
13           All right.  Let me proceed with a series of
14   questions.  I think the -- you've already heard something about
15   the way this process works, but you have been randomly selected
16   to come in for jury service and you -- we have also drawn your
17   names randomly so that this is how you're being brought into
18   the courthouse.  So there are 16 of you here now that were
19   chosen randomly and then the next group is chosen right down
20   through everybody on the jury service.
21           I'm going to ask questions to you and if your answer
22   to any of my questions is yes or if you have any other concern
23   that you might need to talk to me, you need to make a mental
24   note of it.  Okay?  Because what we're going to do is I'm going
25   to ask questions to all of you and all of the courtrooms as a

1    group.  And then when we're done with that, we're going to

2    start with the 16 of you that are in this courtroom with me and

3    we're going to go through one at a time and ask you if you have

4    anything that you need to talk to me about based on my

5    questions or any other concerns that you have.

6            And you'll be given an opportunity, if you need

7    to -- you don't have to talk to me.  I won't be offended if you

8    don't.  But if you do need to talk to me or if your answer to

9    any of my questions is yes, you'll be given an opportunity to

10   do that privately.  You'll be given a headset and you'll put

11   the -- the -- the headphones on and I will be able to speak to

12   you.  The lawyers and the defendant will be able to listen in

13   and we will hear your concern and I will make a decision as to

14   whether you should be excused or not.

15           So we'll -- I'll start by asking the questions.  I

16   then will take your individual questions and I'll begin a

17   process of determining who should be excused for cause.

18           If you are qualified, you will be taken into another

19   courtroom to wait temporarily while I complete that process.

20   If you are excused, you'll follow the instructions of the jury

21   administrator as to what to do at that point.  We will then

22   bring in new jurors from the other courtrooms where people have

23   been listening to the voir dire and we will repeat that process

24   until we have enough jurors who are qualified.

25           At that point we will excuse those who are not --

1    who are not qualified, we'll bring the qualified jurors back

2    in, the lawyers will exercise their peremptory challenges, and

3    we'll be done for the day.  So that's basically the way the

4    process works.

5              Why are we doing this?  What is voir dire all about?

6    It's -- it really has three purposes.  One is for you, as

7    potential jurors, to search your own mind and conscience and

8    ask yourself whether you could be fair and impartial if you

9    were picked as a juror.  Because if you don't think you could

10   be fair and impartial, I need to hear about it.  I need to talk

11   to you about that.  All right?  So the first function of this

12   jury selection process is to make sure that you're confident

13   that you could be fair and impartial.

14             The second purpose of jury selection is to give me

15   an opportunity to exercise challenges that are -- challenges

16   for cause; that is, some legal reason why you are not able to

17   sit.

18             And then the third purpose of jury selection is to

19   give the lawyers a limited opportunity to exercise peremptory

20   challenges; that is, a certain number of challenges that they

21   can exercise to a potential juror for any reason or no reason.

22   All right?

23             So bear that in mind, and I'm going to ask you a

24   list of questions.  Keep in mind if your answer is yes to any

25   of the questions I have asked, you need to make a note of it so

1   you can raise it with me when your name is called.  Or if you

2   have any other concern when your name is called, I would need

3   to talk to you individually.

4          All right.  So this is a criminal case.  The

5   defendant is Christopher C. Cantwell.  There are three charges

6   that have been brought against Mr. Cantwell.  The first charge

7   is that he committed the crime of extortionate interstate

8   communications on or about June 16th, 2019, in the District of

9   New Hampshire and elsewhere; the second charge is that he

10  committed the crime of threat to injure property, person, or

11  reputation on or about June 15th and on or about June 17th in

12  the District of New Hampshire and elsewhere; and the third

13  charge is he committed the crime of cyberstalking between --

14  in or about June 15th and June 17th in the District of

15  New Hampshire and elsewhere.

16         Now, I want you to understand something right up

17  front.  And this is very important.  The defendant has pleaded

18  not guilty to these charges.  All defendants in criminal cases

19  are presumed to be innocent until proven guilty beyond a

20  reasonable doubt.  The charge here, called an indictment, is

21  merely a formal means of accusing a person of a crime in order

22  to bring that person to trial.  However, the indictment does

23  not constitute any evidence of the guilt of any defendant nor

24  should you draw any inference from the fact that an indictment

25  has been returned against the defendant.

1          The defendant has pleaded not guilty, he's entitled

2     to the presumption of innocence throughout the trial, and that

3     presumption alone is sufficient to justify a verdict of not

4     guilty unless and until the government overcomes that

5     presumption by proving the defendant's guilt beyond a

6     reasonable doubt.

7          Will any of you be unable to follow the instruction

8     I've just given you regarding the presumption of innocence and

9     the burden of proof being on the defendant -- on the

10    government, excuse me, to prove guilt beyond a reasonable

11    doubt?

12         Now I'd like to have the parties introduce

13    themselves.  I'll begin with the prosecutor.  Please identify

14    yourself and also anybody who will be -- the United States

15    Attorney and anybody who will be sitting with you at counsel

16    table or in the courtroom during the trial.

17         MR. DAVIS:  Good morning.  I'm John Davis.  I'm an

18    Assistant United States Attorney.  With me at the trial will be

19    my colleague Anna Krasinski, who's also an Assistant

20    United States Attorney.  Also with us are the case agent Shayne

21    Tongbua and our paralegal on the case who is Ruth Sheff.

22         That's our trial team, Judge.

23         THE COURT:  Thank you.  And I'd like defense

24    counsel, please introduce yourselves, your client, and anybody

25    who will be sitting with you at counsel table or present during

1    the trial.

2              MR. LEVIN:  Good morning.  My name is Jeff Levin.

3    With me is Eric Wolpin.  We're attorneys practicing here in

4    Concord.  It's our privilege to represent Christopher Cantwell,

5    who's the gentleman in the blue shirt.  We -- with us will be

6    also a -- our assistant during trial, J. Arsenault, who's

7    from -- also from here in Concord.  Thank you.

8              THE COURT:  All right.  Thank you, counsel.

9              So I'd ask you, do you know any of these

10   individuals?  Do you know the United States Attorney or any of

11   the prosecutors, any of defense lawyers?  Do you know the

12   defendant?  Are you related to any of these individuals?  Do

13   you know them in any way?

14             I think you know from the voir dire questions we

15   sent you that this trial is set to start on September 22nd and

16   should end on or about September 30th.  Does the scheduling of

17   this trial present a problem for you?  And let me explain what

18   that -- I mean by that.

19             It's always inconvenient to have to come to trial

20   for a few days, and everybody's busy.  Unfortunately, I can't

21   excuse you just because you're busy.  CEOs of corporations,

22   teachers, nurses, doctors, lawyers, are all busy, but they

23   don't get excused just because they're busy.  It would be

24   unfair to the people in this courtroom if I were to excuse

25   people too lightly because if I excuse you when your name is

1    called, that means somebody else has to step up and assume the

2    responsibility that would otherwise be yours.  So I owe it to

3    all of you to be fairly tough about excusing people based on

4    scheduling conflicts.

5         However, if you have a doctor's appointment that you

6    can't easily change, if you have travel plans that cannot

7    easily be changed, if you have something extraordinarily

8    important going on and unusual in your work that would be a

9    significant sacrifice if you were absent, those are the kinds

10   of things that I would consider as possible reasons for

11   excusing somebody based on inconvenience.

12        Some of you have -- you're the sole caregiver for

13   young children who might not be going to school right now or

14   who have an elderly person that you're caring for and no one

15   else can sit in and do that job for you when you're gone.  I

16   would consider that as a possible excuse.  It's something along

17   those lines that I would need to hear from you based on

18   inconvenience.

19        So with that in mind, does the scheduling of this

20   case pose some kind of significant inconvenience for you?

21        Are you employed by or do you employ any party in

22   this case?  With respect to the United States Government, do

23   any of you or any of your immediate family work for the United

24   States Government at the present time or have any of you or any

25   of your immediate family worked for the United States

1   Government at any time, except for military service?

2            Have you had, do you have, or do you anticipate

3   having any case or dispute with or claim against the United

4   States Government?

5            I'm going to ask the clerk to read a list of

6   potential witnesses.  Not everybody on this list will be

7   called, but listen to the names because in the end, I'm going

8   to ask you a question if you know these people.

9            CASE MANAGER NEGRON:  Karl Acker, Cameron Davis,

10  Ingrid Dean, Brett Fernald, Katelen Fry, Michael Gibeley, Casey

11  Gilmore, James Klingenberg, Kevin LeBlanc, Ben Lambert, Pam

12  Lambert, Sandy Miller Bauer, J. Arsenault, Sean Saulsbury, Nick

13  Nathans, Paul Nehlen, Keri Peters, Sara E. Smith, Khahilah

14  Tennell, and Shayne Tongbua.

15           THE COURT:  Do you know any of these individuals,

16  members of the jury panel?

17           Have you or any member of your immediate family or

18  any close friend ever been employed by or done volunteer work

19  for any law enforcement agency at the local, state, or federal

20  level, including military service that involved a law

21  enforcement-related activity?

22           Have you ever served as a juror in a criminal or

23  civil case or as a member of a grand jury either in the federal

24  or state courts at any time other than your services as a juror

25  in this court at this time?

1           Have you at any time been involved in a criminal

2    matter in any court that concerned yourself or any member of

3    your immediate family, either as a defendant, a witness, or a

4    victim?

5           Are you aware of any prejudice which might affect

6    your verdict in this case?

7           Have you directly or indirectly given an opinion or

8    formed an opinion in the case?

9           Do you know anything about the case or have you

10   advised or assisted in its preparation?

11          Have you read anything in the newspapers about the

12   case?  Have you heard anything on the radio or have you seen

13   anything on television about this case?

14          Do you have any special disability or problem that

15   would make it difficult, impossible, or physically

16   uncomfortable for you to serve as a member of the jury?

17          Some people have disabilities that -- and we can try

18   to accommodate your disability if you want to serve.  But if

19   you have trouble hearing or you have trouble seeing and you

20   think that could affect your ability to fulfill your

21   responsibilities as jurors, that's the kind of thing I would

22   need to know.  Or if you have some other kind of disability

23   that you think could affect your ability to serve as a juror in

24   this case, I would need to -- I would need to know about that.

25          I want to address the presumption of innocence issue

1   again with you.  Do you believe that because the defendant has

2   been charged with a crime that he is probably guilty and

3   therefore, must present evidence to prove that he is innocent?

4   If you have such a belief, would that belief prevent you from

5   accepting from the Court and applying to this case the correct

6   formulation of the law; that is, that a defendant is presumed

7   innocent until proven guilty, that the government has the

8   burden of proving the defendant guilty beyond a reasonable

9   doubt, and that the defendant need present no evidence

10  whatsoever on his or her own behalf?

11          Do any of you hold the belief that because a witness

12  is employed by law enforcement at the federal, state, or local

13  level that the testimony of such a witness is more worthy of

14  belief than that of a witness not so employed?  Put another

15  way, would the mere fact that a witness is a law enforcement

16  officer cause you to give more or less credit to his or her

17  testimony than that of other witnesses simply because he or she

18  is a law enforcement officer?

19          Do you know of any good and sufficient reason why

20  you cannot sit and hear the evidence in this case and render a

21  true and honest verdict under your oath according to the facts

22  as you will find them to be and the law as the Court will give

23  it to you?

24          Do you know of any reason why you cannot serve on

25  this case?

1          I -- I'll tell you just a little bit more about

2    Mr. Cantwell.  The defendant hosts an online radio program.

3    Are you familiar with Christopher Cantwell from his radio

4    program or from any other news source?

5          Have you heard the charges -- are you familiar with

6    the facts of this case -- or excuse me.  Having heard the

7    charges, are you familiar with the facts of this case?

8          Let me address the COVID-19 pandemic.  I want to be

9    sure that if you're picked as a juror that there's nothing

10    about the COVID-19 pandemic that will affect your ability to be

11    fair and impartial and to evaluate the evidence in this case as

12    it comes in and deliberate as a juror towards reaching a just

13    verdict in this case.  So is there anything about the fact that

14    we are living at the present time through a COVID -- the

15    COVID-19 pandemic that could affect in any way your ability to

16    be a fair and impartial juror?  Would you feel pressure to

17    reach a verdict quickly to avoid exposure to COVID-19?

18          Do you have children?  If so, do the arrangements

19    for children for the -- excuse me.  If you have children, do

20    you have arrangements for child care for the entirety of the

21    expected length of the trial?

22          Now, you may hear evidence that the defendant, the

23    alleged victim, and/or witnesses participated in different

24    factions of what's sometimes called the alternative right,

25    sometimes called the alt-right, or sometimes called the white

1    nationalist political movement.  If you are familiar with this

2    movement, do you have any bias against or in favor of those who

3    have participated in this movement?

4            Let me tell you, the defendant in this case is

5    charged with certain crimes.  I've identified those crimes for

6    you.  The issue in this case is whether the government can

7    prove beyond a reasonable doubt that the defendant is guilty of

8    those crimes or not.  Whether the defendant has white

9    nationalist views, whether the alleged victim has white

10   nationalist views, and whether witnesses have white nationalist

11   views have nothing to do with whether the defendant is guilty

12   or innocent of the charges against him and his -- his beliefs

13   or the beliefs of victims or witnesses cannot play any role in

14   your deliberations on these charges.

15           Now, you will hear evidence of context about the

16   interactions between these individuals and you can certainly

17   consider that evidence in evaluating the charges against the

18   defendant, but you can't find the defendant guilty or not

19   guilty based on the alleged white nationalist views that that

20   defendant may have or the alleged white nationalist views that

21   a victim may have or the alleged white nationalist views that a

22   witness may have.

23           Will any of you be unable to follow these

24   instructions?  And that's very important.  If you have some

25   concern about your ability to be fair and impartial given the

1    fact that this case may involve evidence about white

2    nationalist views, I need to know about that.

3                I should also advise you that this case is -- you're

4    going to hear some very strong and explicitly -- explicit

5    language in this case.  So if that becomes a problem, if that's

6    going to be a problem for your ability to sit and be a fair and

7    impartial juror, I need to -- I need to know about that.

8                Are you a member or supporter of any group that

9    campaigns for or against racial, ethnic, gender, or religious

10   equality, something like Black Lives Matter, NAACP,

11   Antidefamation League, an immigrant rights group or feminist

12   group?

13               Do you have views of those subjects which could

14   affect your ability to be fair and impartial?

15               Are you able to afford -- excuse me.

16               Will you -- will you be unable to afford the

17   defendant the same presumption of innocence as any other

18   defendant if you learned that he was involved in the alt-right

19   movement?

20               Are you unable to consider his case, as you must,

21   without bias, prejudice, sympathy, or fear if you learned that

22   he was involved in the white nationalist movement?

23               Does counsel need to talk to me with respect to any

24   other voir dire?

25               MR. DAVIS:  No, Judge.

```
 1                    MR. LEVIN:  No, your Honor.
 2                    THE COURT:  All right.  Thank you.  So what we'll
 3      begin doing now is asking the jury administrator to canvas each
 4      of you.  If you need to speak with me, you will be given a
 5      headset and we'll whisper to each other so that other people
 6      won't have to hear what you're saying and I'll make a decision
 7      after consulting with counsel, if necessary.
 8                    THE JURY ADMINISTRATOR:  Juror number 1, Mr. Bonnin,
 9      does not have any issues.
10                    THE COURT:  All right.
11                    CASE MANAGER NEGRON:  Juror's qualified.
12                    THE COURT:  And are you going to take him into the
13      other room now?
14                    THE JURY ADMINISTRATOR:  Yes, your Honor.
15                    THE COURT:  Thank you, sir.  We'll get back to you
16      as soon as we can.
17                    THE JURY ADMINISTRATOR:  Juror number 2 does not
18      need to address the Court.
19                    THE COURT:  Thank you, ma'am.  You can follow our
20      instructions and we'll bring you back in in a few minutes.
21                    CASE MANAGER NEGRON:  Juror's qualified.
22                    THE JURY ADMINISTRATOR:  Juror number 4, Mr. Fritz,
23      will approach.
24                    THE COURT:  All right.
25                    So, Mr. Cantwell, you can put the headset on.
```

```
 1                         AT SIDEBAR
 2              THE JURY ADMINISTRATOR:  You'll have to bend over.
 3   I apologize.
 4              THE COURT:  Good morning, sir.  Go ahead.
 5              THE JUROR:  I think most far left groups are like
 6   terrorist organizations.
 7              THE COURT:  All right.  These -- this is such a
 8   powerful microphone, I don't even think you'll need to lean in.
 9              THE JUROR:  All right.
10              THE COURT:  So you have views about far left groups,
11   that they're terrorist organizations.
12              THE JUROR:  Yes, sir.
13              THE COURT:  And how do you think that could affect
14   your ability to be fair and impartial in this case, if at all?
15              THE JUROR:  I'm not a hundred percent sure, but I --
16   that's just my view.
17              THE COURT:  Okay.  Let me follow up and ask about
18   that.
19              So there will be a number of witnesses in this case,
20   the alleged victim in this case and perhaps the defendant in
21   this case, who are members of alt-right groups.  How could that
22   affect your thinking as a juror?
23              THE JUROR:  I just think politics in general are
24   affecting a lot of things in society.
25              THE COURT:  I apologize for that screaming sound.
```

```
1              Okay.  Do you think you could -- are you confident

2    you could be fair and impartial if you were picked as a juror

3    in this case?

4              THE JUROR:  No.

5              THE COURT:  You're not confident?

6              THE JUROR:  No.

7              THE COURT:  You think it could affect your ability

8    to be fair and impartial?

9              THE JUROR:  Uh-huh.

10             THE COURT:  All right.  I understand and appreciate

11   your comments.

12             I -- does counsel -- my -- I propose to excuse the

13   juror.  If anybody objects, let me know.

14             MR. DAVIS:  No objection, Judge.

15             THE COURT:  All right.

16             MR. LEVIN:  I just want to make sure I'm using this

17   the right way.  Is that -- can you hear me?

18             THE COURT:  I can hear you.

19             MR. LEVIN:  I'm not -- I'm not entirely sure this

20   gentleman understands what the --

21             THE COURT:  Why don't --

22             MR. LEVIN:  -- the Court's instructions were

23   that you're -- were that --

24             THE COURT:  Why don't I do this.  Why don't I let

25   you ask some follow-up questions.
```

1          MR. LEVIN:  Okay.  Sir, the judge, in -- as part of

2     his questions, instructed that views on politics are not

3     relevant to guilt or innocence.  So I understand you have some

4     views on left wing groups and views on politics in general.

5     The judge has indicated that a person's views on politics are

6     irrelevant as to the guilt or innocence of the defendant.

7          Could you be fair and impartial and listen to the

8     evidence based on that and put your ideas about politics aside?

9          THE JUROR:  No.

10          MR. LEVIN:  Okay.  Can you explain why?

11          THE JUROR:  I just think that in general this

12     political atmosphere that we've been in this whole year has

13     just affected a lot of people.

14          CASE MANAGER SACKOS:  He needs to whisper a little

15     more, Judge.

16          THE COURT:  Just try to whisper.

17          THE JUROR:  Okay.

18          THE COURT:  All right.  I -- I understand.

19     Mr. Levin, did you wish to press an objection to the proposal

20     to excuse the juror?

21          MR. LEVIN:  No, your Honor.

22          THE COURT:  All right.  Thank you, sir.  You're

23     excused.

24          THE JUROR:  Thank you.

25                    CONCLUSION OF SIDEBAR

1           CASE MANAGER NEGRON:  The juror's excused.

2           THE JURY ADMINISTRATOR:  Donna Moses, number 5, does

3  not need to approach.

4           THE COURT:  Thank you, ma'am.  If you could follow

5  instructions, we'll bring you back in a minute.

6           CASE MANAGER NEGRON:  Juror's qualified.

7           THE JURY ADMINISTRATOR:  Juror Salvagno, number 8,

8  does not need to approach.

9           THE COURT:  Thank you, sir.  If you could follow

10  instructions.

11           CASE MANAGER NEGRON:  Juror's qualified.

12           THE JURY ADMINISTRATOR:  Juror number 9, Clanin,

13  does not need to approach.

14           THE COURT:  Thank you, ma'am.  If you follow

15  guidance, we'll bring you back in in a few minutes.

16           CASE MANAGER NEGRON:  Juror's qualified.

17           THE JURY ADMINISTRATOR:  Juror number 10, Mr. King,

18  does not need to approach.  I'm sorry, Ms. King.

19           THE COURT:  Thank you, Ms. King.  We'll get back to

20  you in a minute.

21           CASE MANAGER NEGRON:  Juror's qualified.

22           THE JURY ADMINISTRATOR:  Juror number 11,

23  Mr. Barboza, does not need to approach.

24           THE COURT:  Sir, if you could follow instructions

25  there, we'll bring you back in in a minute.

1          CASE MANAGER NEGRON:  Juror's qualified.

2          THE JURY ADMINISTRATOR:  Juror number 12,

3    Mr. Pillsbury, does not need to approach.

4          THE COURT:  Thank you, Mr. Pillsbury.  If you could

5    follow instructions.

6          CASE MANAGER NEGRON:  Juror's qualified.

7          THE JURY ADMINISTRATOR:  Juror number 13,

8    Ms. Higgins, would like to approach.

9          THE COURT:  All right.  Come on up, ma'am.

10         And these microphones are pretty sensitive, so if

11   you just whisper, we'll all hear you.  Okay?  We you don't even

12   have to get close to the microphone.

13                        AT SIDEBAR

14         THE COURT:  Yes, ma'am.

15         THE JUROR:  Just in response to your question

16   whether or not I had family members who work for the federal

17   government or in law enforcement and I just wanted to bring to

18   your attention that my brother, William Higgins, is a special

19   agent for the Department of Commerce.

20         THE COURT:  Okay.  So try to whisper here.

21         THE JUROR:  I'm sorry.

22         THE COURT:  That's okay.  Just whisper.  Like this.

23   Okay?

24         He's a special agent for the Department of Commerce.

25   What does he do in that job?

```
 1              THE JUROR:  He's in investigations.

 2              THE COURT:  Does he do criminal investigations?

 3              THE JUROR:  Yes, sir.

 4              THE COURT:  I see.  So there may be some law

 5  enforcement witnesses who testify in this case.  Are you more

 6  likely to believe someone who's a law enforcement witness

 7  because you have a relative who's involved in law enforcement?

 8              THE JUROR:  No, sir.

 9              THE COURT:  Does your relative have any involvement

10  with investigations of white nationalist groups?

11              THE JUROR:  No.

12              THE COURT:  No.  So are you confident you could

13  assess the testimony of a law enforcement witness the same way

14  you would any other witness in the case?

15              THE JUROR:  Yes.  I just wanted to bring it to your

16  attention, that's all.

17              THE COURT:  No, I appreciate that.  Thank you.

18              Is there anything else you wanted to take up with

19  me?

20              THE JUROR:  No, thank you.

21              THE COURT:  Could you take the headphones off for

22  just a second?

23              THE JUROR:  Sure.

24              THE COURT:  All right.  Counsel, I -- I propose to

25  find the witness qualified.  Does anybody object?
```

1          MR. DAVIS:  No objection.

2          MR. LEVIN:  No objection.

3          THE COURT:  Thank you.  The witness is qualified.

4   You can follow instructions.

5          THE JUROR:  Thank you.

6                    CONCLUSION OF SIDEBAR

7          THE JURY ADMINISTRATOR:  Juror number 15,

8   Mr. MacCannell, would like to approach.

9          THE COURT:  Come on up, sir.  And I can emphasize

10  that we will talk in a whisper and we will all hear.

11         THE JUROR:  Yes, your Honor.

12                        AT SIDEBAR

13         THE COURT:  Yes, sir; your concern?

14         THE JUROR:  I know somebody named Kevin LeBlanc.  I

15  don't know if it's your Kevin LeBlanc.

16         THE COURT:  Okay.  How -- the person you know, how

17  do you know him?

18         THE JUROR:  I grew up with him.

19         THE COURT:  And where was that?

20         THE JUROR:  Sanford, Maine.

21         THE COURT:  Sanford Maine.  And do you know what he

22  does for a living?

23         THE JUROR:  No.

24         THE COURT:  No.  All right.  Could you take the

25  headset off for a minute?

34

1              Counsel, can you help me?  Is this the person he's

2      thinking of?

3              MR. DAVIS:  I don't think so, Judge.  Kevin LeBlanc

4      is a task force officer with FBI now.

5              THE COURT:  Where does he live?

6              MR. DAVIS:  I believe he lives in southern

7      New Hampshire.

8              THE COURT:  Okay.

9              MR. DAVIS:  He's a witness in the case.

10             THE COURT:  He's a task force officer with what?

11             MR. DAVIS:  FBI.

12             THE COURT:  Okay.  Could you put the headset back

13     on?

14             This Kevin LeBlanc is a task force officer with the

15     FBI who lives in southern New Hampshire.  Is that the person

16     that you know?

17             THE JUROR:  I don't know what he does for a living,

18     so ...

19             THE COURT:  Ah.  When was the last time you saw him?

20             THE JUROR:  Ten years ago probably.

21             THE COURT:  Do you have any kind of close

22     relationship with him?

23             THE JUROR:  I mean, I grew with up with him and went

24     to school with him most of our life, so ...

25             THE COURT:  All right.  I'm not sure I can give you

1    any more information about him as a potential witness.  If he

2    were to testify, would the fact that you knew him growing up

3    play any role whatsoever in how you would evaluate him as a

4    witness?

5              THE JUROR:  Hard to tell.  I don't --

6              THE COURT:  Hard to tell.  I understand.

7              THE JUROR:  Yeah.

8              THE COURT:  Is there any other issue you have that

9    you wanted to take up with me?

10             THE JUROR:  You were just asking about volunteering

11   stuff.  And so one of the groups that I volunteer with supports

12   the New Hampshire police dog association, so we do fund-raisers

13   for them.

14             THE COURT:  For the police dog association?

15             THE JUROR:  Yeah.

16             THE COURT:  Do you feel you have any ties with law

17   enforcement that could affect your ability to be fair and

18   impartial in this case?

19             THE JUROR:  Ties with law enforcement, my -- my

20   cousin-in-law is a law enforcement officer and, you know, one

21   of our best friends is retired SWAT, so ...

22             THE COURT:  Yeah.  So this case is brought by the

23   government.  It was developed in part with law enforcement

24   officers.  Some of those officers may testify at the trial.

25   Are you any more likely to believe those law enforcement

```
1    witnesses simply because they're law enforcement witnesses?
2                THE JUROR:  Probably not.
3                THE COURT:  Okay.  Thank you, sir.  Could you take
4    the headphones off for a second?
5                Counsel, unless I can be provided with additional
6    information about Mr. LeBlanc, I think out of an abundance of
7    caution I ought to excuse the witness.  Does anybody disagree?
8                MR. DAVIS:  I disagree, your Honor.  Kevin LeBlanc
9    is a common name.  There's no --
10               THE COURT:  I know, but if you can give me some more
11   information -- like right now, given that we're operating in a
12   COVID pandemic, I don't want to lose a potential juror because
13   they show up at trial and say, Judge, I told you I knew this
14   guy.  Now, if I could eliminate him --
15               MR. DAVIS:  Judge, sorry.  Could I find out where
16   Kevin LeBlanc went to high school and provide that to the Court
17   as fast as I can?
18               THE COURT:  Yeah, you do that while I listen to what
19   Mr. Levin has to say.
20               MR. LEVIN:  I think there might be another issue,
21   which is I think my sons are in school with Mr. MacCannell's
22   son.
23               THE COURT:  Okay.
24               What school do your kids go to?
25               MR. LEVIN:  Portsmouth High School.  They just
```

1    graduated.

2            THE COURT:  Okay.  Could you put the headset back

3    on, sir?

4            Do you have children that go to Portsmouth High

5    School?

6            THE JUROR:  I do.

7            THE COURT:  All right.  And do you know -- the

8    lawyers' names, did they ring any bell with you?

9            THE JUROR:  For who?  I didn't write it down.

10           THE COURT:  Yeah, Mr. Levin.

11           THE JUROR:  I don't think so.

12           THE COURT:  You know what, I appreciate all your

13   efforts here, sir.  I just think there's enough uncertainty

14   about what connections you might have to the case, so I think

15   out of an abundance of caution I'm going to excuse you.  All

16   right?  Thank you.  You're excused.

17           I'm sorry, Mr. Davis.  I --

18           CASE MANAGER NEGRON:  Juror excused.

19           THE COURT:  -- I didn't want to take any more time

20   on the issue.

21                        CONCLUSION OF SIDEBAR

22           THE JURY ADMINISTRATOR:  Juror number 16, Lynn

23   Filion, does not need to approach.

24           THE COURT:  Thank you.  Ma'am, if you could follow

25   instructions.

```
1                CASE MANAGER NEGRON:  Juror's qualified.
2                THE JURY ADMINISTRATOR:  Juror number 17,
3    Mr. Vachon, does not need to approach.
4                THE COURT:  All right.  Thank you, sir; if you could
5    follow instructions.
6                CASE MANAGER NEGRON:  Juror's qualified.
7                THE JURY ADMINISTRATOR:  Juror number 18, Mr. Miner,
8    does not need to approach.
9                THE COURT:  Thank you, sir; if you could follow
10   instructions.
11               CASE MANAGER NEGRON:  Juror's qualified.
12               THE JURY ADMINISTRATOR:  Juror number 19,
13   Ms. Henderson, would like to approach.
14               THE COURT:  Come on up, Ms. Henderson, and stand
15   away from the mic and whisper.  These things are incredibly
16   powerful.
17                            AT SIDEBAR
18               THE JUROR:  Thank you.
19               THE COURT:  Go ahead.
20               THE JUROR:  Wow, this is loud.  You asked whether
21   there was any background in terms of diversity --
22               THE COURT:  Can you whisper?  Just whisper.
23               THE JUROR:  -- in terms of diversity activities.  I
24   am a former associate dean of diversity and inclusion at
25   Dartmouth.  I am still highly involved in those activities and
```

1    I would say that I have both implicit and explicit biases

2    against white nationalists.  I also very strongly believe in

3    the rule of law and I believe I can carry out the instructions,

4    but I did want to let you know my background.

5              THE COURT:  Thank you.  And I completely understand

6    and accept the sincerity of your views on that subject because

7    one can hold negative views about white nationalism and still

8    believe in the rule of law.  But we're fortunate today in that

9    we have a large number of jurors who have not been

10   professionally involved in issues like the ones that you've

11   devoted your life to and since we have that opportunity to have

12   jurors that simply don't have strongly held views on those

13   subjects serve, I think it is better in this instance that I

14   excuse you.  But I do so with utmost respect and a real,

15   sincere belief that you would, as far as you could consciously

16   do so, would respect the rule of law, would apply the

17   instructions to that I give you.

18             So I don't mean in any way to be critical of you.  I

19   appreciate what you're saying.  I think I just want to have

20   jurors that haven't had that kind of professional involvement

21   sit.  So I'll excuse you from having to sit in this case.

22             Thank you.

23             CASE MANAGER NEGRON:  Juror's excused.

24                       CONCLUSION OF SIDEBAR

25             THE JURY ADMINISTRATOR:  Juror number 20,

1   Mr. Kelley, would like to approach.

2           THE COURT:  All right.  Come on up, sir, and real --

3   just whisper and we'll be good.

4                       AT SIDEBAR

5           THE COURT:  And stand in front of that microphone --

6           THE JUROR:  Uh-huh.

7           THE COURT:  -- and just whisper.

8           THE JUROR:  Okay.  All right.

9           THE COURT:  Yes, sir.  Go ahead.

10          THE JUROR:  Well, let's see.  What was -- is this

11  supposed to be on a specific like things that we --

12          THE COURT:  Yes.  If you heard -- if your answer to

13  any of my questions was yes or if you have any other concern

14  about your ability to sit and be fair and impartial, now's your

15  chance to raise it with me.

16          THE JUROR:  Yeah.  I was part of like lots of

17  different racial justice movements and like recent prison

18  abolition as well as antifascist movements.  So I figure those

19  probably related to the white nationalist or alt-right views of

20  the defendant might -- might conflict with my ability to be

21  impartial on the jury.

22          THE COURT:  Tell me about your involvement in some

23  of these organizations.

24          THE JUROR:  So I've done political organizing, so

25  like anything from getting out to vote to direct action rejoin,

1    and also been in many different protests over the recent years,

2    especially recently in 2020.

3              THE COURT:  All right.  So, sir, I -- well, I will

4    ask you, do you have any concerns about your ability to be fair

5    and impartial if you were picked?

6              THE JUROR:  Slightly, yes.

7              THE COURT:  Yeah.  And I -- look, I appreciate your

8    honest answers to these problems.  And I'm confident that you

9    would do your very best to follow my instructions --

10             THE JUROR:  Uh-huh.

11             THE COURT:  -- but we have a bunch of jurors here

12   who have had no involvement on one side or the other of those

13   issues --

14             THE JUROR:  Right.

15             THE COURT:  -- and I think it's probably better that

16   I excuse you from having to sit in this case.  I do so without

17   implying any criticism at all for your -- the information

18   you've shared with me, but I will excuse you.  So you're

19   excused.

20             THE JUROR:  Okay.  Thank you.

21             THE COURT:  Thank you.

22                     CONCLUSION OF SIDEBAR

23             CASE MANAGER NEGRON:  Juror's excused.

24             THE JURY ADMINISTRATOR:  Juror number 21,

25   Mr. Wheeler, would like to approach.

1          THE COURT:  Come on up, sir, and just whisper.
2    You'll be heard.
3                         AT SIDEBAR
4          THE COURT:  All right, sir.  If you could stand a
5    little closer -- there.  Right there.  Good.
6          Now, all right.  Do you have any concerns that you
7    want to discuss with me?
8          THE JUROR:  The only concern I was thinking about is
9    that I might have a schedule --
10         THE COURT:  Just a little closer to the microphone.
11         THE JUROR:  Sorry.  Is this a little better?
12         THE COURT:  Yeah.
13         THE JUROR:  The only concern that I might have is
14   that I have a schedule conflict.
15         Recently, unfortunately, I have found a mass in my
16   thigh, so I've had a couple doctors' appointments that I've
17   been attending and I have one this weekend and on the 23rd.
18         THE COURT:  On the 23rd.  Yeah, I'm sorry you're
19   dealing with that.
20         THE JUROR:  That's all right.
21         THE COURT:  I think -- I don't want you to be
22   distracted or have to delay the jury trial for that
23   appointment, so I will excuse you from having to sit.
24         THE JUROR:  Thank you.
25                      CONCLUSION OF SIDEBAR

```
1              CASE MANAGER NEGRON:  Juror's excused.
2              THE JURY ADMINISTRATOR:  Juror number 22,
3   Mr. Fisher, would like to -- oh, does not need to approach.
4              THE COURT:  Does not.  Okay.  Thank you, sir.  Could
5   you follow instructions; we'll bring you back in in a few
6   minutes.
7              THE JUROR:  Thank you.
8              CASE MANAGER NEGRON:  Juror's qualified.
9              THE JURY ADMINISTRATOR:  Juror number 23, Ackerley
10  Men, does not need to approach.
11             THE COURT:  Thank you, ma'am.  If you could follow
12  instructions and we'll go from there.
13             CASE MANAGER NEGRON:  Juror's qualified.
14             THE JURY ADMINISTRATOR:  Juror number 24, Samantha
15  Hirsch, would like to approach.
16             THE COURT:  Come on up, ma'am.  Someone will give
17  you a headset and you can stand in front of that microphone,
18  not too close, and just whisper to me and we should be fine.
19                          AT SIDEBAR
20             THE COURT:  Good morning.  Do you have some issue
21  you want to take up with me?
22             THE JUROR:  Scheduling, yes.
23             THE COURT:  Yes.
24             THE JUROR:  I'm a full-time master's student in my
25  last term and so I have to work to get my hours for school,
```

1   intern.

2           THE COURT:  Do you have an internship?

3           THE JUROR:  It's a practicum, yes.

4           THE COURT:  What are you doing for your practicum?

5           THE JUROR:  I work at Ready Set Connect.  So it's

6   like an autism service clinic.

7           THE COURT:  And you need to complete your hours this

8   semester in order to get your degree?

9           THE JUROR:  Correct, yeah.

10          THE COURT:  Okay.  I'll excuse you from having to

11  sit.

12          THE JUROR:  Thanks.

13                      CONCLUSION OF SIDEBAR

14          CASE MANAGER NEGRON:  Juror's excused.

15          THE JURY ADMINISTRATOR:  Juror number 25,

16  Ms. Van Orden, would like to approach.

17          THE COURT:  Come on up, ma'am, put the headset on

18  and just whisper.  We'll catch everything.

19                          AT SIDEBAR

20          THE COURT:  Yes, ma'am.

21          THE JUROR:  Hi.  How are you?

22          THE COURT:  Okay.

23          THE JUROR:  I have a couple of things.  I have --

24  one of the things is the child care.  I have one-year-old

25  twins.  I do work part time, but I have child care just on

1     those days and it's very challenging at this time to find it.

2                THE COURT:  Is there anybody else in your household

3     who can watch the kids for a week?

4                THE JUROR:  My husband is working full time right

5     now as well and does not have any time available.

6                THE COURT:  Yeah, I understand.  Okay.  I'll excuse

7     you from having to sit.

8                THE JUROR:  Okay.

9                THE COURT:  Thank you.

10               THE JUROR:  Thank you.

11                        CONCLUSION OF SIDEBAR

12               CASE MANAGER NEGRON:  Juror's excused.

13               THE JURY ADMINISTRATOR:  Juror number 26,

14    Ms. Pinette, does not need to approach.

15               THE COURT:  Thank you, ma'am.  You can follow

16    instructions and we'll bring you back in in a view minutes.

17               CASE MANAGER NEGRON:  Juror's qualified.

18               THE JURY ADMINISTRATOR:  Juror number 27,

19    Mr. Christiansen, would like to approach.

20               THE COURT:  Sir, come on up.  Put a headset on,

21    stand in front of that mic and just whisper.  We'll catch

22    everything.

23                             AT SIDEBAR

24               THE COURT:  Yes, sir.

25               THE JUROR:  Good morning, Judge.  There are three

1    things that you said that made me think of some things.

2              The first one was you asked about work and

3    occupation.  My team is dealing with a September 30th deadline

4    for some accomplishments that we're trying to make for the 4th

5    quarter -- third quarter -- for fourth quarter.  I can

6    elaborate if you'd like me to.

7              THE COURT:  What do you do for a living?

8              THE JUROR:  I run Northwestern Mutual's operations

9    for New Hampshire.

10             THE COURT:  Okay.

11             THE JUROR:  There are about a hundred people in the

12   state.  So ...

13             THE COURT:  And what's coming up at the end of the

14   month?

15             THE JUROR:  So we've -- we have our fourth quarter

16   hiring.  The deadline is September 30th.  So we're trying to

17   get a lot of, you know, things done before the end of the

18   quarter.

19             THE COURT:  So are you involved in interviewing and

20   selecting candidates for positions?

21             THE JUROR:  Yes.

22             THE COURT:  And you're --

23             THE JUROR:  I'm probably the most important person

24   in the organization.

25             THE COURT:  Okay.  Just briefly tell me the other

1    two issues that you wanted to raise.

2            THE JUROR:  Two is what I know about cybercrime is

3    it's pretty cut and dried.  So I find it a lot more clear-cut

4    than other crimes.

5            The last thing I wanted to share was I have pretty

6    strong political beliefs.  I'm Republican, have been my entire

7    life.  This alt-right wing is tolling the party and is quite

8    offensive to me and what I stand for.

9            And those are the things I just wanted to share with

10   you.

11           THE COURT:  Just to be sure I understand the last

12   point, you've got views that the alt-right has captured the

13   party and -- that you've been a part of for so long and you

14   find that offensive and problematic.

15           THE JUROR:  (Nods head.)

16           THE COURT:  All right.  Could you take the headset

17   off?

18           THE JUROR:  Sure.

19           THE COURT:  I propose to excuse the witness.  Does

20   anybody object?

21           MR. DAVIS:  No.

22           MR. LEVIN:  No, your Honor.

23           THE COURT:  All right.  Thank you, sir.  You're

24   excused.

25                      CONCLUSION OF SIDEBAR

1      CASE MANAGER SACKOS:  Right in the box, sir.  Thank
2  you so much.
3                    (Juror excused.)
4      THE JURY ADMINISTRATOR:  Juror number 28,
5  Ms. Kenton, does not need to approach.
6      THE COURT:  Thank you, ma'am.  Can you follow
7  instructions; we'll be back with you in a few minutes.
8      CASE MANAGER NEGRON:  Juror's qualified.
9      THE JURY ADMINISTRATOR:  Juror number 29,
10  Ms. Coffey, would like to approach.
11      THE COURT:  Come on up, ma'am, and put a headset on
12  and whisper and we'll hear you.  Just stand in front of that
13  microphone there.
14                     AT SIDEBAR
15      THE COURT:  Yes, ma'am.  You have something you'd
16  like to talk to me about?
17      THE JUROR:  Yes, sir.  For the qualification of
18  government service, immediate family, does that include
19  siblings, parents, or grandparents?
20      THE COURT:  Yeah.  Tell me about your connection.
21      THE JUROR:  Okay.  My father was a translator for
22  the Central Intelligence Agency's Joint Publication Research
23  Service, now retired, for the duration of my childhood.  My
24  grandfathers, both military officers, Marine Corps and
25  Air Force.  My cousin, nuclear facility Navy officer Y-12,

49

```
 1   Oak Ridge, Tennessee.
 2             THE COURT:  Did you have other issues that you
 3   wanted to take up with me?
 4             THE JUROR:  Yes, sir.
 5             THE COURT:  You can -- you can actually lean back a
 6   little bit --
 7             THE JUROR:  Oh.
 8             THE COURT:  -- and you'll still be okay.  Just
 9   whisper.
10             THE JUROR:  Okay.
11             THE COURT:  They're very sensitive.
12             THE JUROR:  Thank you, sir.
13             I was myself employed and still am as an independent
14   contractor by FEMA and I work with -- emergency management
15   volunteer paramedic, so I interact with state and local
16   government fairly regularly.
17             THE COURT:  Uh-huh.  Is there any other issue?
18             THE JUROR:  Yes, sir.  I was nolo contendere in the
19   state of Virginia for petit larceny when I was 18, I believe,
20   in 1998, and as the defendant in that case convicted and was
21   absolutely guilty.  And that is all.
22             THE COURT:  Okay.  Sorry to inquire about the last
23   subject.
24             THE JUROR:  No, that's okay.
25             THE COURT:  Do you feel you were in any way
```

1    mistreated by law enforcement?

2            THE JUROR:  Not at all, sir.  They were very fair.

3            THE COURT:  All right.  Are you confident you could

4    be fair and impartial to both the prosecutor, the government,

5    and the defendant in this case if you were picked?

6            THE JUROR:  Yes, sir.  I feel that both sides did

7    their job in that case quite kindly and fairly.

8            THE COURT:  So as a paramedic you oftentimes

9    interact with law enforcement officers, I assume.  Is

10   that --

11           THE JUROR:  Yes.

12           THE COURT:  Yeah.

13           THE JUROR:  As well as patients and a lot of family

14   and a lot of mess.

15           THE COURT:  Yeah.  Are you more likely to believe a

16   law enforcement officer just because they're a law enforcement

17   officer based on your contact with them as a paramedic?

18           THE JUROR:  Not necessarily, no.  The scenes are

19   really messy.

20           THE COURT:  Yeah.  And the family members, it sounds

21   like there's substantial military and CIA service, but not --

22           THE JUROR:  Yes.

23           THE COURT:  -- so much directly involved in criminal

24   justice enforcement, not going out making arrests, conducting

25   those kinds of investigations; is that right?

1            THE JUROR:  No, sir.  Translators and interpreters

2  primarily.

3            THE COURT:  And are you confident you could be fair

4  and impartial if you were picked as a juror?

5            THE JUROR:  Yes, sir.

6            THE COURT:  Thank you.  Could you take the headset

7  off for a second?

8            THE JUROR:  Sure.

9            THE COURT:  I propose to find the witness qualified.

10  Does anybody disagree?

11            MR. DAVIS:  No.

12            MR. LEVIN:  No, your Honor.

13                    CONCLUSION OF SIDEBAR

14            THE COURT:  Thank you.  You're qualified.  Please

15  follow instructions.  We'll go from there.

16            THE JURY ADMINISTRATOR:  Juror number 30,

17  Mr. Munuswamy, would like to approach.

18            THE COURT:  Come on up, sir.  Take a headset, stand

19  in front of that mic and just whisper.  You don't even need to

20  lean in very close.

21                        AT SIDEBAR

22            THE COURT:  Good morning, sir.  What did you want to

23  talk about?

24            THE JUROR:  So in the list of questions, you said --

25  there was a person by Arsenault, last name, and I just wanted

1    to make sure -- I work with a person by the name Jennifer

2    Arsenault and I just wanted to make sure that that's not the

3    same person.

4            THE COURT:  Okay.  So the witness was Jennifer

5    Arsenault.

6            THE JUROR:  The person I work with is Jennifer

7    Arsenault.

8            THE COURT:  Okay.

9            THE JUROR:  And I remembered you saying one of the

10   witnesses has the last name Arsenault.

11           THE COURT:  All right.  Could you take the headset

12   off for a second?

13           I don't know who the Arsenault person is.

14           MR. LEVIN:  He's an employee of our office.

15           THE COURT:  Okay.

16           MR. LEVIN:  But I don't think there's any

17   connection.

18           THE COURT:  Yeah.  Can I represent to the witness

19   that we don't believe there's any connection?

20           MR. LEVIN:  Yes.

21           THE COURT:  Okay.  Thank you, sir.  You can put the

22   headset back on.

23           Okay.  That Arsenault has no connection to the

24   Arsenault who's a witness, so that won't be a problem.  Is

25   there anything else you wanted to talk to me about?

```
1                    THE JUROR:  That's all.  That's all.

2                    THE COURT:  All right.  Thank you, sir.  You're

3      qualified.

4                    THE JUROR:  Thank you.

5                         CONCLUSION OF SIDEBAR

6                    CASE MANAGER NEGRON:  Juror's qualified.

7                    THE JURY ADMINISTRATOR:  Juror number 32,

8      Ms. Wrigley, does not need to approach.

9                    THE COURT:  Thank you, ma'am.  Could you follow the

10     instructions of the staff and we'll bring you back in in just a

11     minute, first him and then you.

12                   CASE MANAGER NEGRON:  Juror's qualified.

13                   THE JURY ADMINISTRATOR:  Juror number 33,

14     Ms. Bristol, does not need to approach.

15                   THE COURT:  Thank you, Ms. Bristol.  Could you

16     follow the guidance of the staff; we'll bring you back in in a

17     minute.

18                   THE COURT:  Juror's qualified.

19                   THE JURY ADMINISTRATOR:  Juror number 34,

20     Ms. Bressette, would like to approach.

21                   THE COURT:  Thank you, ma'am.  Could you step up

22     there, take a headset, and just stand in front of that

23     microphone and just whisper.  We will catch it.  These are very

24     sensitive.

25                            AT SIDEBAR
```

```
 1                    THE COURT:  Okay.  Just whisper.
 2                    THE JUROR:  Okay.
 3                    THE COURT:  Go ahead.
 4                    THE JUROR:  Yeah.
 5                    THE COURT:  What concerns do you have?
 6                    THE JUROR:  My husband works for the federal
 7     government, the FDIC.
 8                    THE COURT:  What does he do for the FDIC?
 9                    THE JUROR:  He's a bank examiner.
10                    THE COURT:  And he doesn't have any direct
11     involvement with criminal justice enforcement, does he?
12                    THE JUROR:  He does not.
13                    THE COURT:  All right.  Are there any other issues
14     that you wanted to take up with me?
15                    THE JUROR:  I help a local democratic group get
16     democrats elected to office.
17                    THE COURT:  All right.  So as I mentioned to you, if
18     you were picked as a juror in this case, you would hear
19     testimony about various people involved in white nationalist
20     movements.  I've told you that what matters here is whether the
21     defendant committed the acts that are described in the
22     indictment with the intention and knowledge that's required for
23     the charge.  Any views he might have on white nationalism play
24     no direct goal in whether he's guilty or not guilty of this
25     crime -- these crimes and you could not hold it against him in
```

```
1    any way if he does -- if evidence does suggest that he holds

2    white nationalist views.

3              Are you confident you could follow that instruction?

4              THE JUROR:  Yes.

5              THE COURT:  And are you confident you could be fair

6    to both the government and the defendant if you were picked as

7    a juror in this case?

8              THE JUROR:  Yes.

9              THE COURT:  Does the -- and I'm sorry to inquire

10   into your political views.  I just want to be sure I understand

11   them.

12             Does the organization or organizations you're

13   involved with, do they have a name -- have names?

14             THE JUROR:  It's -- yes.

15             THE COURT:  All right.  And can you just tell me

16   what they're known as?

17             THE JUROR:  It's the Pelham Democratic Committee.

18             THE COURT:  Okay.  So you're just a -- you're a

19   participant in the Pelham Democratic Committee.

20             THE JUROR:  Uh-huh.

21             THE COURT:  And you're confident you could be fair

22   to both sides if you were picked?

23             THE JUROR:  Yes.

24             THE COURT:  Thank you.  Could you take the headset

25   off for a second?
```

```
 1                  I propose the find the witness qualified.  Does
 2    anybody object?
 3                  MR. DAVIS:  No objection.
 4                  MR. LEVIN:  No objection.
 5                  THE COURT:  All right.  Thank you.  You're
 6    qualified.
 7                  Could you follow instructions?
 8                        CONCLUSION OF SIDEBAR
 9                  THE JURY ADMINISTRATOR:  Juror number 35,
10    Mr. Watterson, does not need to approach.
11                  THE COURT:  Thank you, Mr. Watterson.  Could you
12    just follow the guidance of the staff?  We'll bring you back in
13    in a few minutes.
14                  CASE MANAGER NEGRON:  Juror's qualified.
15                  THE JURY ADMINISTRATOR:  Juror number 36, Mr. Kumar,
16    would like to approach.
17                  THE COURT:  Mr. Kumar, could you come up here and
18    please take a headset and stand in front of that microphone
19    there and just whisper.
20                              AT SIDEBAR
21                  THE COURT:  Good morning, sir.
22                  THE JUROR:  Hi.  How are you?
23                  THE COURT:  Okay.  Whisper is fine.
24                  THE JUROR:  Okay.  So as a person of color growing
25    in the United States, I had incurred racism.  As a physician,
```

1    that's never affected me in any way when I treat patients.  You

2    should know that because of the Black Lives movement that

3    happened this summer there was a movement within health care

4    where we had physicians who kneeled on a certain day in honor

5    of black lives.  And where I worked, I was one of those maybe

6    five physicians who actually posted a photo in reference to

7    black lives.

8              So could I have some inherent bias against white

9    supremacy?  Potentially.  And I think it should be known.

10             THE COURT:  Well, I appreciate you sharing that with

11   me.  And I'm sorry to have to have to inquire into one's

12   political views.  Frankly, it's not something I enjoy doing --

13             THE JUROR:  Sure.

14             THE COURT:  -- but I need to understand these

15   things.

16             It would be entirely understandable to me, given the

17   fact that you've told me that you've personally experienced

18   racism, that you might be concerned about having some kind of

19   feelings that you might not even be fully aware of that could

20   spill over and affect your thinking if you were picked as a

21   juror in this case.

22             Are you confident you could set aside any of those

23   kind of feelings and be fair and impartial or do you have some

24   lingering concern that they could affect your ability to be

25   fair and impartial?

1              THE JUROR:  I do have some lingering concern that it

2    could affect my --

3              THE COURT:  Yeah.

4              THE JUROR:  -- ability to be a hundred percent

5    impartial.

6              THE COURT:  And I appreciate your candor on that

7    subject.  I think, fortunately, we have a number of jurors here

8    who have not had engagement with the movements in ways that

9    could call into question their impartiality and given your

10   personally expressed concern that despite your best efforts you

11   might be affected based on your life experiences, I think we're

12   better off excusing you.

13             Could you take the headset off for just a second and

14   stay there for just a minute.  Okay?

15             THE JUROR:  Sure.

16             THE COURT:  I propose to excuse the juror.  Does

17   anybody object?

18             MR. DAVIS:  No.

19             MR. LEVIN:  No, your Honor.

20             THE COURT:  All right.  Thank you, sir.  You're

21   excused.

22                         CONCLUSION OF SIDEBAR

23                           (Juror excused.)

24             CASE MANAGER SACKOS:  You can set that right in the

25   box.

```
1              THE JUROR:  Right here?

2              CASE MANAGER SACKOS:  Yes, either one is fine.

3    Thank you.

4              THE JURY ADMINISTRATOR:  Juror number 37,

5    Ms. Olsen, would like to approach.

6              THE COURT:  Come on up, put a headset on, and just

7    whisper.  We're -- it's very sensitive.

8                           AT SIDEBAR

9              THE JUROR:  Okay.

10             THE COURT:  Yes, ma'am.

11             THE JUROR:  I have a couple of things.

12             THE COURT:  Just -- move a little bit in front of

13   the -- it's sort of directional.  Right there and just whisper.

14   Yeah.

15             THE JUROR:  Okay.  So scheduling issues, I just

16   started a new job yesterday and so being --

17             THE COURT:  Oh, now, wait a minute.  What's your --

18   what do you do for work?

19             THE JUROR:  I'm a commercial loan assistant at a

20   bank.

21             THE COURT:  All right.  And are you concerned about

22   the fact that you're in your first week of employment in a new

23   job?

24             THE JUROR:  Yes, and that I would be missing

25   potentially --
```

```
1                    THE COURT:  Yeah.

2                    THE JUROR:  -- ten days in the second week and third

3     week.

4                    THE COURT:  I'm concerned about that, too.  Your

5     anxiety level in a new job has got to be high.  If I made you

6     stay here, you'd be distracted.

7                    THE JUROR:  Okay.

8                    THE COURT:  On that basis alone I'm going to excuse

9     you.  So you're excused.

10                    THE JUROR:  All right.

11                       CONCLUSION OF SIDEBAR

12                    CASE MANAGER NEGRON:  Juror's excused.

13                    THE JURY ADMINISTRATOR:  Juror number 38,

14    Ms. Minery, does not need to approach.

15                    THE COURT:  Thank you, ma'am.  If you could follow

16    the guidance of the staff.

17                    CASE MANAGER NEGRON:  Juror's qualified.

18                    THE JURY ADMINISTRATOR:  Juror number 39, Ms. Barth,

19    does not need to approach.

20                    THE COURT:  Thank you, ma'am.  If you could follow

21    the guidance of the staff.

22                    CASE MANAGER NEGRON:  Juror's qualified.

23                    THE JURY ADMINISTRATOR:  Juror number 40, Ms. Patel,

24    would like to approach.

25                    THE COURT:  Ma'am, could you come up to the
```

1   microphone, put the headset on and just whisper.  So stand in

2   front of the microphone so that -- where you're speaking from

3   and then whisper.  We should be fine.

4               Good morning, ma'am.

5               THE JUROR:  Good morning.

6               THE COURT:  What concerns do you have?

7               THE JUROR:  This is one question that ask if I work

8   for government agency or any of my family member works for.

9               THE COURT:  Yes.

10              THE JUROR:  Yeah, I did work in the past for a

11  couple months for the community college.

12              THE COURT:  What community college?

13              THE JUROR:  Middlesex Community College in Lowell,

14  Massachusetts.

15              THE COURT:  Okay.

16              THE JUROR:  And my brother still -- I mean, he is

17  working for community college at this moment in New Hampshire.

18              THE COURT:  Okay.  Is there anything else you wanted

19  to take up with me?

20              THE JUROR:  No, actually.  I just -- it's a yes

21  answer for that question.  That's why I'm concerned.

22              THE COURT:  Yes.  Thank you for raising it.

23              Are you confident you could be fair and impartial if

24  you were picked as a juror?

25              THE JUROR:  Yes.

```
 1                    THE COURT:  Okay.  Thank you.  Could you take the
 2     headset off for a second?
 3                    THE JUROR:  Okay.
 4                    THE COURT:  I propose to find the witness qualified.
 5                    MR. DAVIS:  No objection.
 6                    MR. WOLPIN:  Are we -- I just don't know when we're
 7     talking --
 8                    THE COURT:  Yeah, I'm waiting to see if you have
 9     objection or not.
10                    MR. LEVIN:  No objection.
11                    THE COURT:  You don't have an objection.
12                    THE COURT:  Okay.  Thank you.
13                         CONCLUSION OF SIDEBAR
14                    CASE MANAGER NEGRON:  Juror's qualified.
15                    THE COURT:  Thank you.  You can take it off.
16                    So you're qualified.  If you follow instructions,
17     we'll bring you back in in a few minutes.  They'll tell you
18     where to go.
19                    THE JURY ADMINISTRATOR:  Number 41, Ms. Fleck, does
20     not need to approach.
21                    THE COURT:  Oh, thank you, ma'am.  Could you follow
22     the staff's instructions and we'll bring you back in in a few
23     minutes.
24                    CASE MANAGER NEGRON:  Juror's qualified.
25                    THE JURY ADMINISTRATOR:  Number 42, Mr. Clegg, would
```

1    like to approach.

2              THE COURT:  Come on up, sir.  Stand in front of that

3    microphone and put a headset on.  And you all you have to do is

4    really whisper.  Okay?

5                             AT SIDEBAR

6              THE COURT:  Good morning, sir.

7              THE JUROR:  Good morning.  Oh --

8              THE COURT:  You can just put it down like this.

9              THE JUROR:  Oh, thank you.

10             THE COURT:  Just a whisper.

11             THE JUROR:  Okay.  Okay.

12             THE COURT:  What concerns do you have?

13             THE JUROR:  I have a disability with my right leg

14   that I can't sit for a long period of time.

15             THE COURT:  Okay.

16             THE JUROR:  I had a major operation with it.

17             THE COURT:  Oh, I'm sorry.  So -- so we would go for

18   about an hour and a half and then take a break.  And I -- I

19   don't have any problem if you needed to stand or stretch a

20   little bit, but you'd have to stand in place where -- next to

21   where you're seated.  If that's a problem for you, going for an

22   hour and a half without a break, then it probably is something

23   I ought to excuse you for.  Do you feel like it would be a

24   problem for you?

25             THE JUROR:  Well, the other part is driving here

1   with my foot being numb.

2               THE COURT:  Oh.

3               THE JUROR:  See, right now, my foot's numb.

4               THE COURT:  Just have having to drive here, huh?

5               THE JUROR:  Yeah.  It's poor circulation.

6               THE COURT:  Where do you come from?

7               THE JUROR:  Seabrook.

8               THE COURT:  Uh-huh.  So it's a little over an hour

9   to get here?

10              THE JUROR:  Correct.

11              THE COURT:  And that's a problem for you?

12              THE JUROR:  Longer periods of time, yes.

13              THE COURT:  Yeah.  All right.

14              THE JUROR:  I haven't been out of my house since

15  March.  This is the first time I've worn a mask since March.

16              THE COURT:  Oh, wow.  Yeah.  You know what, even if

17  I give you breaks, you're going to spend most of your day kind

18  of confined, sitting, and then an hour and a half in the car

19  each way.  Given your disability and since you're asking to be

20  excused, I think it's better that I excuse you.  So I will

21  excuse you from having to sit.

22              THE JUROR:  Thank you, sir.

23              THE COURT:  Thank you.  You can take the headset off

24  and they'll tell you where to go.

25                        CONCLUSION OF SIDEBAR

1          CASE MANAGER NEGRON:  Juror's excused.

2          THE JURY ADMINISTRATOR:  Juror number 43,

3    Mr. Kiener, does not need to approach.

4          THE COURT:  Mr. Kiener, could you follow the staff's

5    instructions?  We'll bring you back in in just a minute.  Thank

6    you.

7          CASE MANAGER NEGRON:  Juror's qualified.

8          THE JURY ADMINISTRATOR:  Juror number 45, Ms. Noto,

9    would like to approach.

10         THE COURT:  All right.  Come on up, ma'am.  Put a

11   headset on and stand in front of that microphone and just

12   whisper.

13                        AT SIDEBAR

14         THE COURT:  So you have an issue you want to take up

15   with me?

16         THE JUROR:  I participated on a jury two years ago.

17         THE COURT:  Oh, what kind of case was it?

18         THE JUROR:  It was a hit-and-run.

19         THE COURT:  In -- was it a criminal case?

20         THE JUROR:  I believe it was just a civil case.

21         THE COURT:  Okay.

22         THE JUROR:  It was in Merrimack County.

23         THE COURT:  All right.  Were you being asked to

24   award damages or to find somebody guilty or not guilty?

25         THE JUROR:  Find someone guilty or not guilty.

```
 1                    THE COURT:  I see.  And can you tell me what the

 2    result of the case was?

 3                    THE JUROR:  He was found not guilty.

 4                    THE COURT:  Not guilty.

 5                    THE JUROR:  Correct.

 6                    THE COURT:  All right.  So if you were picked as a

 7    juror in this case, you'd have to follow my instructions on the

 8    law, not anything you heard in that other case.  Are you

 9    confident you could do that?

10                    THE JUROR:  Yes, sir.

11                    THE COURT:  Is there anything else that you wanted

12    to take up with me?

13                    THE JUROR:  No, sir.

14                    THE COURT:  Are you confident you could be fair and

15    impartial to both sides in this case?

16                    THE JUROR:  Yes, sir.

17                    THE COURT:  All right.  Could you take the headset

18    off for a second?

19                    THE JUROR:  Yup.

20                    THE COURT:  I propose to find the juror qualified.

21    Any objection?

22                    MR. LEVIN:  No objection.

23                    MR. DAVIS:  No.

24                    THE COURT:  Thank you, ma'am.  You're qualified.

25    You can follow the instructions and they'll tell you where to
```

```
 1   go.
 2                    CONCLUSION OF SIDEBAR
 3          THE JURY ADMINISTRATOR:  Juror number 46, Donna
 4   Bettez, does not need to approach.
 5          THE COURT:  Thank you, ma'am.  Could you follow the
 6   instructions of the staff and we'll go from there.
 7          CASE MANAGER NEGRON:  Juror's qualified.
 8          THE JURY ADMINISTRATOR:  Juror number 47,
 9   Mr. Benevento, would like to approach.
10          THE COURT:  Sir, could you come up and take a
11   headset and stand in front of that mic?  And just a whisper
12   should be fine.
13                        AT SIDEBAR
14          THE COURT:  Good morning, sir.
15          THE JUROR:  Hello.  Is that --
16          THE COURT:  Just a whisper.
17          THE JUROR:  Is this okay?
18          THE COURT:  Yeah.  Good.
19          THE JUROR:  You asked if anybody testified in a
20   criminal trial.
21          THE COURT:  Yes.
22          THE JUROR:  I testified in a Massachusetts state
23   superior court trial for the prosecution.
24          THE COURT:  I see.  And can you tell me a little
25   about the case?
```

1          THE JUROR:  Sure.  I am a finance director for a
2     city and it had to do with misappropriation of city resources.
3          THE COURT:  I see.  And so you were knowledgeable
4     about the resources that were misappropriated?
5          THE JUROR:  Correct.
6          THE COURT:  Did you have any experience in that --
7     as a witness that could affect your thinking as a juror in this
8     case?
9          THE JUROR:  I don't think it has any impact on this
10    case.
11         THE COURT:  And that's the answer I'm looking for;
12    it has nothing to do with this case.  You'd have to make your
13    decision --
14         THE JUROR:  Nothing.
15         THE COURT:  All right.  So --
16         THE JUROR:  I just wanted to bring it up.
17         THE COURT:  And I'm glad that you did.
18         THE JUROR:  Okay.
19         THE COURT:  Is there anything else we need to talk
20    about?
21         THE JUROR:  Well, being an unbiased juror would be a
22    little difficult.
23         THE COURT:  Well, tell me about that.
24         THE JUROR:  Okay.  Based on what you told us, and I
25    know you didn't purposely mean to do it, but I would have a

1    hard time being unbiased.

2             THE COURT:  And what --

3             THE JUROR:  Against the witness.

4             THE COURT:  You -- you would be -- well, tell me.

5             THE JUROR:  Uh-huh.

6             THE COURT:  You think he might be guilty --

7             THE JUROR:  Correct.

8             THE COURT:  -- or -- okay.  I understand.

9             THE JUROR:  That's --

10            THE COURT:  I -- I get it.

11            THE JUROR:  Uh-huh.

12            THE COURT:  I get it.  Could you take the headset

13   off for a second?

14            THE JUROR:  Sure.

15            THE COURT:  I propose to excuse the witness.

16            MR. DAVIS:  I would ask -- I would ask that the

17   Court ask whether he's instructed appropriately whether he'd

18   retain that bias; does he have a doubt about whether he could

19   put the bias aside.

20            THE COURT:  I might not ask it exactly that way, but

21   I can do a little bit more follow-up.

22            MR. DAVIS:  Thank you.

23            THE COURT:  Mr. Levin, is there anything else that

24   you want me to cover on this?

25            MR. LEVIN:  No, your Honor.

1          THE COURT:  All right.  Could you put the headset

2    back on for a second?

3          So what we're trying to figure out here with

4    potential jurors is not whether you like or don't like what

5    somebody says or what they believe, because we all have our

6    views about --

7          THE JUROR:  Uh-huh.

8          THE COURT:  -- what we believe.

9          THE JUROR:  Uh-huh.

10         THE COURT:  The -- the important issue here is what

11   this defendant believes --

12         THE JUROR:  Uh-huh.

13         THE COURT:  -- about white nationalism doesn't tell

14   us anything useful about whether he's guilty or not guilty, but

15   yet some people might feel so strongly about the beliefs that a

16   defendant has that it could affect their thinking and prevent

17   them from being fair and impartial.

18         Are you telling me that you have that kind of

19   concern?

20         THE JUROR:  Yes.

21         THE COURT:  Okay.  And are you worried that even if

22   I told you that you couldn't -- excuse me.  I'm sorry.

23         Even if I told you that you couldn't consider that

24   fact, his views on white nationalism, you're afraid it would

25   spill over and affect your thinking.

1      THE JUROR:  I know -- I know that I want to say it
2  won't affect me --
3      THE COURT:  Yeah.
4      THE JUROR:  -- and I would like to believe that,
5  but --
6      THE COURT:  But you have some --
7      THE JUROR:  I'm trying to be honest.  That's all.
8      THE COURT:  Yeah.  I appreciate that.  Sometimes the
9  very best jurors are people that are willing to question
10 themselves.  On the other hand, when people have such strong
11 views on a subject, it could affect their thinking.  So I
12 appreciate your views.
13     THE JUROR:  Uh-huh.
14     THE COURT:  I think you would do your very best, but
15 given your expressed doubts, I think it's better that I bring
16 another juror in to take your place.  So I will excuse you from
17 having to sit.  Thank you, sir.
18     THE JUROR:  Okay.
19                  CONCLUSION OF SIDEBAR
20     CASE MANAGER NEGRON:  Juror's excused.
21     THE JURY ADMINISTRATOR:  Juror number 48,
22 Mr. Shepard, would like to approach.
23     THE COURT:  All right.  Come on up, Mr. Shepherd.
24                      AT SIDEBAR
25     THE COURT:  All right, sir.  You have a concern you

1    wanted to take up with me?

2              THE JUROR:  Your Honor --

3              THE COURT:  Just a whisper.

4              THE JUROR:  Your Honor, to start things off, I have

5    two issues.

6              THE COURT:  Okay.

7              THE JUROR:  My occupation requires me to travel very

8    frequently on a weekly basis, so that may be a concern.  And,

9    secondly, the white nationalist mindset that the defendant has

10   kind of conflicts with --

11             THE COURT:  All right.  Let me talk about your job

12   first.

13             Do you travel outside the state?

14             THE JUROR:  Yes, all throughout New England.

15             THE COURT:  I see.  And have you been -- and between

16   now and the time of the start of the jury, will you be

17   traveling again outside of the state?

18             THE JUROR:  Yes.

19             THE COURT:  I see.  And you're telling me that the

20   defendant -- to the extent the defendant -- the evidence

21   suggests the defendant holds white nationalist views, you're

22   afraid that would bias you against him; is that right?

23             THE JUROR:  There's prejudices that come to mind,

24   yes.

25             THE COURT:  Yeah.  So I've explained that those

1    prejudices couldn't play any role in your thinking and I know

2    you would try to follow my instruction, but are you concerned

3    that you might not be able to?

4              THE JUROR:  There is a chance.

5              THE COURT:  Yeah.  Okay.  All right.  Well, I do

6    think the travel outside the state between now and trial raises

7    the risk to the rest of the jury and I want to be careful about

8    that.

9              I'm also concerned about -- I know you would do your

10   best, but when someone tells me even if the judge tells me that

11   I can't consider that, I'm still afraid that it might affect my

12   thinking, I think it's -- we're better off excusing you.  So

13   each of those reasons, in my mind, justifies excusing you and I

14   will excuse you from having to sit.

15             THE JUROR:  Appreciate it.

16                       CONCLUSION OF SIDEBAR

17             CASE MANAGER NEGRON:  Juror's excused.

18             THE JURY ADMINISTRATOR:  Juror number 49, Mr. Gage,

19   would like to approach.

20             THE COURT:  Come on up, sir.  Put a headset on and

21   just whisper in front of that microphone there.  You don't even

22   have to get up too close.

23                           AT SIDEBAR

24             THE COURT:  Good morning, sir.  You needed to speak

25   with me?

1          THE JUROR:  Yeah, I just had a question.

2          THE COURT:  You don't even need to lean in.  You can

3     stand back and whisper.

4          THE JUROR:  All right.

5          THE COURT:  Just whisper.

6          THE JUROR:  I just had a question about law

7     enforcement.

8          THE COURT:  Yes, sir.

9          THE JUROR:  Three of my friends work for the police

10    department, but they're all retired; I have -- their three sons

11    are working for the police department; and one of my friends

12    works for the Attorney General, I guess --

13         THE COURT:  Okay.

14         THE JUROR:  -- doing witness things or something.

15         THE COURT:  So these are friends --

16         THE JUROR:  Yes.

17         THE COURT:  -- and sons of friends?

18         THE JUROR:  Right.

19         THE COURT:  All right.  Now, there will be

20    government agents that are likely to testify in this case.  Do

21    you think because of those connections you're more likely to

22    believe the law enforcement witnesses just because they're law

23    enforcement witnesses?

24         THE JUROR:  No, sir.

25         THE COURT:  So law enforcement people are like

1    anybody else.  There are some that are honest and some that are

2    dishonest; there are some that are accurate and some that are

3    less accurate.  You have to make a decision about whether to

4    credit a witness's testimony based on all of the relevant

5    information -- what the witness says, how it fits with other

6    evidence in the case -- and you couldn't believe or disbelieve

7    somebody just because they have a law enforcement background.

8            Would you be able to follow that instruction?

9            THE JUROR:  Absolutely.

10           THE COURT:  And are you confident you could be fair

11   to both sides in this case?

12           THE JUROR:  Yes, sir.

13           THE COURT:  Is there anything else you wanted to

14   take up with me?

15           THE JUROR:  No, sir.

16           THE COURT:  All right.  Could you take the headset

17   off for just a second?

18           I propose to find the witness qualified.  Any

19   objection?

20           MR. DAVIS:  No.

21           MR. LEVIN:  No.

22           THE COURT:  All right.  Thank you, sir.  You're

23   qualified.  Follow instructions.  We'll bring you back in in a

24   minute.

25           THE JUROR:  Thank you.

1                          CONCLUSION OF SIDEBAR

2              THE JURY ADMINISTRATOR:  Juror number 50, Mr. Coady,

3    does not need to approach.

4              THE COURT:  Mr. Coady, could you follow

5    instructions?  Thank you, sir.  We'll bring you back in in just

6    a minute.

7              CASE MANAGER NEGRON:  Juror's qualified.

8              THE JURY ADMINISTRATOR:  Juror number 51,

9    Mr. Beyrand, does not need to approach.

10             THE COURT:  Sir, could you follow the instructions

11   of the staff?  We'll bring you back in in just a minute.

12             CASE MANAGER NEGRON:  Juror's qualified.

13             THE COURT:  Thank you.

14             THE JURY ADMINISTRATOR:  Juror number 52, Ms. Mann,

15   would like to approach.

16             THE COURT:  Come on up, Mr. Mann.  Please put a

17   headset on and just point yourself in front of that microphone

18   and just whisper.  We'll catch everything.

19                              AT SIDEBAR

20             THE COURT:  Good morning, ma'am.  Can you hear me

21   okay?

22             THE JUROR:  Yeah.

23             THE COURT:  Okay.  Just whisper.  We'll be fine.

24             What concern did you want to take up with me?

25             THE JUROR:  I worked with the Department of

1  Corrections of the state of New Hampshire for 15 years.

2  THE COURT:  Are you still there or did you --

3  THE JUROR:  No, I'm retired.

4  THE COURT:  I see.  And what did you do there?

5  THE JUROR:  I was a clinical social worker.

6  THE COURT:  Ah.  How, if at all, would that affect

7  your ability to serve as a juror in this case?

8  THE JUROR:  It wouldn't.

9  THE COURT:  Are you -- do you have any feelings of

10  allegiance to law enforcement because you worked in the

11  Department of Corrections?

12  THE JUROR:  No.

13  THE COURT:  Are you more likely to believe a law

14  enforcement witness just because they're a law enforcement

15  witness?

16  THE JUROR:  No.

17  THE COURT:  Are you confident that you could be fair

18  to both sides in this case?

19  THE JUROR:  Absolutely.

20  THE COURT:  And do you hold any views about white

21  nationalism --

22  THE JUROR:  No.

23  THE COURT:  -- that are so strongly held that they

24  could spill over and affect your thinking?

25  THE JUROR:  No.

1          THE COURT:  All right.  Could you take the headset

2    on for a second?

3          I propose to find the witness qualified.  Any

4    objection?

5          MR. DAVIS:  No.

6          MR. LEVIN:  No objection.

7          THE COURT:  Thank you, ma'am.  You are qualified and

8    if you'll follow instructions, we'll go from there.  Okay.

9                    CONCLUSION OF SIDEBAR

10         THE JURY ADMINISTRATOR:  Juror number 53, Ms. Kelly,

11   does not need to approach.

12         THE COURT:  Thank you, Ms. Kelly.  If you could

13   follow the staff's guidance, we'll bring you back in in a

14   minute.

15         THE JURY ADMINISTRATOR:  Juror number 55,

16   Mr. Berard, would like to approach.

17         THE COURT:  Come on up, Mr. Berard.  Put a headset

18   on and point yourself in front of that microphone and just

19   whisper.

20                        AT SIDEBAR

21         THE COURT:  Sir, do you have something you want to

22   discuss with me?  And you can just whisper.

23         THE JUROR:  Yeah.  It's pretty long.  So you read

24   off a bunch of questions.  I have some answers.  I may have

25   misheard the question.

```
 1                    THE COURT:  That's okay.
 2                    THE JUROR:  Have you served on a jury already.
 3                    THE COURT:  Yes.
 4                    THE JUROR:  I was on a jury in Fremont five years
 5   ago.
 6                    THE COURT:  Was it a criminal or civil case?
 7                    THE JUROR:  It was criminal.  Road rage.
 8                    THE COURT:  Road rage?  And do you know what the
 9   jury's verdict was?
10                    THE JUROR:  I think we found him guilty on three
11   counts and innocent on two.
12                    THE COURT:  Okay.
13                    THE JUROR:  I was actually the foreman.
14                    THE COURT:  All right.  What else?
15                    THE JUROR:  Was there a question about if you've
16   been personally charged in a court of law?
17                    THE COURT:  Yeah.  And I'm sorry to inquire of this
18   kind of stuff, but --
19                    THE JUROR:  Yeah, that's fine.
20                    THE COURT:  -- what can you tell me?
21                    THE JUROR:  I was charged with operating under the
22   influence on an ATV about three years ago.
23                    THE COURT:  And how did it end up?
24                    THE JUROR:  I pled it down to reckless driving.
25                    THE COURT:  Okay.  Do you feel that you were
```

1  mistreated by law enforcement in any way there?

2          THE JUROR:  In that case, somewhat, because I went

3  to the police department the next day and asked for the police

4  report.  The chief of police said it wouldn't be ready and he

5  said not only was he the chief of the police, he was also the

6  prosecutor for the town, which I'm like, okay, so at that point

7  you never lose a case, right?

8          THE COURT:  Yeah.  So let me ask you this.  Does

9  that experience -- will it spill over and affect your thinking

10 in this case in any way?

11         THE JUROR:  I mean, only that I -- I don't

12 necessarily believe what, you know, the police were putting in

13 their police reports, you know.  So in that regard -- I mean, I

14 can -- you can put it aside as much as you can, but --

15         THE COURT:  Well, so let me -- let me deal with it

16 in this way with you.

17         Police officers are like anybody else.

18         THE JUROR:  Uh-huh.

19         THE COURT:  Some are honest, some are careful, some

20 are dishonest, some are not careful.

21         THE JUROR:  Yes.

22         THE COURT:  Sometimes they get things right,

23 sometimes they get things wrong.

24         What I'm trying to figure out is whether you have

25 any views about police in general that are so strongly held

```
 1   that they could spill over and make you think, like in this
 2   case --
 3              THE JUROR:  Okay.  No.
 4              THE COURT:  -- to -- do you think it could cause you
 5   to not credit a police -- a law enforcement agent's testimony
 6   in this case because of what happened in your case?
 7              THE JUROR:  No.  I would say what you said is how I
 8   feel.
 9              THE COURT:  Okay.
10              THE JUROR:  Some are honest, some are dishonest.
11              THE COURT:  And you have to listen to what they say
12   and put it in the context of the entire case to decide who to
13   believe and who not to believe.  Is that what you're thinking?
14              THE JUROR:  Yes.
15              THE COURT:  Okay.  Good.  What else did you want to
16   talk to me --
17              THE JUROR:  My father-in-law was law enforcement for
18   like 35 years.
19              THE COURT:  Okay.
20              THE JUROR:  I think that was a question.
21              THE COURT:  Yeah.
22              THE JUROR:  And, actually, that was all of them.
23              THE COURT:  Okay.  Let me ask you the kind of
24   ultimate question here.  And only -- you know this better than
25   anybody else.
```

1            If you were picked as a juror, are you confident you

2     could be fair both to the government and to the defendant in

3     this case?

4            THE JUROR:  I mean, personally, I feel like anybody

5     who's a member of alt-right is kind of loopy.

6            THE COURT:  Okay.  Yeah, I -- I understand, and many

7     people hold that view.  Other people have different views about

8     it.

9            In this case, there will be testimony about a number

10    of people, both victim and perhaps the defendant, who have had

11    these kind of alt-right views.  And what I'm really trying to

12    figure out is can you set all that aside and look at what does

13    the evidence show about what the defendant did, what does the

14    evidence show about what his knowledge was when he did it, what

15    does evidence show about the defendant's intention when he did,

16    not does he have these views or not.  Would you be able to set

17    aside any general feelings about alt-right or are you concerned

18    that it could spill over?

19           THE JUROR:  No.  I mean, to be honest with you, I'm

20    going to be like this guy's pretty much an idiot.

21           THE COURT:  Yeah.  Okay.

22           THE JUROR:  I'm sorry.

23           THE COURT:  Yeah.

24           THE JUROR:  It's just --

25           THE COURT:  I -- look, I get it.  People have strong

1    views on these issues and I appreciate you sharing them with

2    them me and I think we'd probably be safer in having jurors

3    that -- where people don't have that kind of strongly held view

4    about it.

5              So I appreciate your willingness to serve and I --

6    but I will find you -- that you should be excused.  All right.

7              THE JUROR:  Thank you.

8              THE COURT:  So you're excused.

9              THE JUROR:  Appreciate your time.  Thank you.

10                        CONCLUSION OF SIDEBAR

11             CASE MANAGER NEGRON:  Juror's excused.

12             THE JURY ADMINISTRATOR:  Juror number 56,

13   Mr. Saglio, would like to approach.

14             THE COURT:  Come on up, sir.  Put a headset on,

15   point yourself in front of that microphone and just whisper.

16   We'll be good.  You don't even have to lean in very close.

17             THE JUROR:  Okay.

18                            AT SIDEBAR

19             THE COURT:  Yes, sir?

20             THE JUROR:  Sorry, it's out.  It's allergies.

21             THE COURT:  All right.  One of the questions was

22   about are you a member of Black Lives Matter, things like that.

23   None of the organizations you named, but my partner and I are

24   both members of the ACLU and she served on the board of

25   New Hampshire ACLU for a long time and the national board of

1  the ACLU.

2          THE COURT:  I see.  How do you think, if at all,

3  that would affect your thinking as a juror in this case?

4          THE JUROR:  I mean, I think I'd still be able to be

5  fair and impartial.

6          THE COURT:  Yeah.  For example, I know the ACLU

7  historically has been very supportive of freedom of speech,

8  including freedom to express views that others might find

9  repugnant like white nationalist views.

10         THE JUROR:  Right.

11         THE COURT:  Do you -- would -- what I'm trying to

12  figure out is whether if there's evidence that the defendant

13  holds white nationalist views or evidence that the victim holds

14  white nationalist views, will that so affect your thinking that

15  it will endanger your ability to be fair and impartial?

16  let's -- you know better than anybody how you're going to react

17  to this kind of evidence.  What's your thinking?

18         THE JUROR:  I don't -- I don't think it would.  I

19  mean, as personally distasteful as I find those ideologies, I

20  don't -- fully understand that that doesn't make someone a

21  criminal.

22         THE COURT:  Yeah.  So let me run a scenario by you

23  and see what your reaction is.

24         Suppose at the end of this case you had come to the

25  conclusion that the defendant had expressed white nationalist

1    views and those views were personally repugnant to you but you

2    had a reasonable doubt about whether he committed the acts that

3    are charged or you had a reasonable doubt about whether he

4    acted with the intention that's required.  Would you be able to

5    find the defendant not guilty?

6              THE JUROR:  Yes.

7              THE COURT:  And let me also hypothesize the other

8    side of that equation.  If there's evidence in this case that

9    the victim has white nationalist views and -- but the evidence

10   convinces you beyond a reasonable doubt that the defendant

11   committed every element of the offense, would you be able to

12   find the defendant guilty?

13             THE JUROR:  Yes.

14             THE COURT:  All right.  So what I hear from that is

15   your basic view that you find white nationalism repugnant, but

16   that you are committed to focusing on the evidence and you'll

17   base your verdict on whether the government has proved beyond a

18   reasonable doubt that the defendant committed the acts that

19   he's charged with committing with the knowledge and/or

20   intention that's required to commit those acts; is that right?

21             THE JUROR:  Yes.

22             THE COURT:  All right.  Is there anything else you

23   wanted to take up with me?

24             THE JUROR:  (Shakes head.)

25             THE COURT:  Could you take the headset off for a

1    second?

2              My inclination is to find the juror qualified.  Does

3    either party have any objection?

4              MR. DAVIS:  No.

5              MR. LEVIN:  No.

6              THE COURT:  All right.  Thank you, sir.  You're

7    qualified.

8              THE JUROR:  All right.

9              THE COURT:  You can follow instructions.  We'll go

10   from there.

11                       CONCLUSION OF SIDEBAR

12             THE JURY ADMINISTRATOR:  Juror number 57, Ms. Kelly,

13   does not need to approach.

14             THE COURT:  Thank you, ma'am.  Could you follow --

15   follow guidance of the staff.

16             THE JURY ADMINISTRATOR:  And I believe that brings

17   us to 36.

18             THE COURT:  All right.

19             CASE MANAGER NEGRON:  It does, your Honor.

20             All right.  So it's my understanding we -- do we

21   need anybody else?  Okay.

22             So we have now selected a sufficient number of

23   qualified jurors to allow the lawyers to exercise their

24   peremptory challenges.  I will leave it to the staff to decide

25   what to do with the remaining jurors who are not needed today.

1          Those of you who are in the courtroom, I again want

2    to thank everyone for their service here today.  Even though

3    you might not have had to be called into the courtroom, we

4    needed you to be here because we can't predict how many people

5    will be qualified or not qualified.  So I know it was a

6    sacrifice to be here.  I want to thank you for your service and

7    I want to ask the staff to deal with you and excuse you as soon

8    as it's appropriate.

9          My understanding is the next step in this process is

10   we need to bring back into the courtroom the qualified jurors

11   and have the staff seat them and then the lawyers will be able

12   to exercise their peremptory challenges.

13          And if we're ready to begin that process, we can go

14   right ahead.

15          MR. LEVIN:  Can we get a few minutes before we --

16          THE COURT:  I need to understand the logistics.  Let

17   me ask Jen.

18          Jen --

19          CASE MANAGER NEGRON:  Jen?

20          CASE MANAGER SACKOS:  Yes.

21          THE COURT:  He's asking can they have a couple --

22   you want -- you're happy to sit in the courtroom?

23          MR. WOLPIN:  Yeah.

24          THE COURT:  Yes, you can take a few minutes, not an

25   hour, but -- you know, try to move quickly, but the time that

1    you need to exercise your judgment.  You aren't asking to leave

2    the courtroom, just --

3              MR. WOLPIN:  No.

4              THE COURT:  Good.  Thanks.  They can bring the jury

5    in.  Everybody can come in.  They just want the time to look

6    the jurors in the eye and talk to each other about their --

7              CASE MANAGER SACKOS:  Okay.

8              THE COURT:  All right.  We've seated everybody?

9              DEPUTY CLERK UHRIN:  Yes.

10             THE COURT:  All right.  So as you can see, members

11   of the jury panel, the logistics of this operation are really a

12   thing to behold.  I think I ought to let the staff go work at

13   Disney World as people movers, they have everybody so well

14   organized.

15             We're almost done with this process and I'd ask your

16   patience.  The lawyers are going to exercise their peremptory

17   challenges, so that'll take place now while you're seated.

18   They just need to be able to put the name and the face

19   together.  No more questioning of anybody or anything like

20   that.

21             So if you'd just wait patiently for a few minutes,

22   when the lawyers are ready, when they're able to exercise their

23   peremptories, they'll go up to the clerk's bench, do that

24   entirely with the clerk.  We will then excuse jurors, their

25   names will be read out, and those people will be asked to leave

1    with the -- to follow the staff's direction.

2              Those who remain will be on the jury and I will give

3    those who are selected some brief instructions and then they'll

4    be taken to another courtroom for some additional instructions

5    from the staff and at that point you'll be free to go for the

6    day and we'll start up with the trial on Tuesday morning.

7    Right, Tuesday?

8              CASE MANAGER NEGRON:  Tuesday.

9              THE COURT:  Tuesday morning at nine o'clock.

10             So please be patient for just a few more minutes and

11   we're almost done.

12             MR. LEVIN:  We're ready, your Honor.

13             THE COURT:  You're ready?

14             Is the government ready?  If you need more time,

15   Mr. Davis, you can do that.

16             MR. DAVIS:  If I could have a few more minutes,

17   Judge.

18             THE COURT:  Yeah.  I understand.

19             While you're waiting, I've been doing this for

20   28 years.  This is obviously a very different kind of process

21   than what I'm used to.  This is the first trial I've had since

22   the pandemic.

23             And I have to say as largely an observer, I'm

24   incredibly impressed with the way the staff has -- has managed

25   this.  It's -- everything's -- every step has been thought

1   through with the idea of keeping you all as safe as possible

2   while still conducting a trial.

3              Those of you who are chosen will see when we bring

4   you into the trial, the trial courtroom, special precautions

5   have been taken there; we have Plexiglas up so that if people

6   are close -- they don't get -- like my court reporter doesn't

7   have to be closer than is necessary.

8              People -- when you -- before you were seated in

9   these seats, while the proceeding is going on, somebody came in

10  to sanitize the seats so that nobody has to sit in a seat where

11  there's been -- somebody else has been sitting without being

12  sanitized.  And we will continue to take all of those

13  precautions while still conducting a fair trial, fair trial for

14  the government and fair for the defendant.  And it's really

15  quite an accomplishment for the staff to have been able to put

16  this together in this way.  I'm very, very impressed.

17             MR. DAVIS:  I'm ready, Judge.

18             THE COURT:  You're ready?  All right.  Counsel can

19  approach.  You can approach the clerk's bench when you're

20  ready.

21             THE COURT:  Stay -- they have to stay separated,

22  Vinny.

23             CASE MANAGER SACKOS:  They stay separated, but they

24  do -- they both stay up here.

25             THE COURT:  Okay.  So, counsel, just approach the

1    clerk's bench, but remain socially distanced, remaining six

2    feet apart.

3            CASE MANAGER NEGRON:  Just point to the card.

4            THE COURT:  So, Mr. Davis, you can actually come up

5    so you can see the card that you'd be pointing to.  And,

6    counsel, you can come up as well.  Just stand -- Mr. Davis,

7    stand a little over -- yeah, there we go, stand back there.

8    All right.  And, defense counsel, stand where you can see the

9    cards.

10            (Peremptory challenges exercised.)

11            CASE MANAGER NEGRON:  The following jurors are

12    excused from this case and may leave the courtroom when

13    directed.  When I call your name, please stand.

14            Nancy Placy; Robert Beyrand, please stand; Carly

15    Salvagno; Sarah Fleck; Donna Moses; Donna Bettez; Tara Clanin;

16    Angela Noto; Meg Bressette; Ernest Miner; John Bonnin, Darnela

17    Kenton; Ronald Pillsbury Jr.; Paul Heinrich Kiener; Melissa

18    Minery; Theodore Barboza Jr; Judith Mann; Sabrina Barth; I'm

19    just going to say the last name, Patel; and Frank Saglio.

20            They can be excused.

21            THE COURT:  All right.  So those of you who are

22    standing, if you'll head out to the back of the courtroom, the

23    jury administrators will tell you where to go from there.  And,

24    again, thank you for your service, folks.  Really appreciate

25    it.

1              What are you going to --

2              CASE MANAGER SACKOS:  He's going to name the panel

3    now.

4              THE COURT:  Are you going to seat them or are

5    they --

6              CASE MANAGER SACKOS:  No, they just need to stand

7    up.

8              THE COURT:  Good.

9              So we're going to name the -- we're going to read

10   the names of the jurors and you'll stand up and then you'll sit

11   back down and I'll give you some basic instruction.  And then

12   we're going to bring you into the actual trial courtroom where

13   the -- the case managers can give you some final instructions

14   and then you'll be on your way.  Okay?

15             CASE MANAGER NEGRON:  The panel will consist of the

16   following jurors:  Juror number 1, Jane King.

17             THE COURT:  Please stand when your name's called.

18             CASE MANAGER NEGRON:  Thank you.

19             THE COURT:  Juror number 2, Paula Higgins; juror

20   number 3, Lynn Filion.

21             THE COURT:  And you can be seated once you're

22   seated.

23             CASE MANAGER NEGRON:  Juror number 4, Jason Vachon;

24   juror number 5, James Fisher; juror number 6, Ackerley Men;

25   juror number 7, Sherene Pinette; juror number 8, Hannah Coffey;

1    juror number 9, Mohan Munuswamy; juror number 10, Lori Wrigley;

2    juror number 11, Sandra Bristol; juror number 12, Richard

3    Watterson; juror number 13, William Gage; juror number 14,

4    Matthew Coady; juror number 15, Aine Kelly; and juror number

5    16, Jean Kelly.

6              That's the panel, your Honor.

7              THE COURT:  All right.  So let me just give you some

8    basic instructions that I'd like you to keep in mind during

9    this trial.

10             First of all, it's really important to remember here

11   that the verdict that you reach in this case will have to be

12   based on the evidence you receive at the trial.  You've

13   received no evidence yet, so you know nothing that can tell you

14   anything about the guilt or innocence of the defendant.  A

15   charge has been brought, but a charge is merely a means of

16   bringing a defendant to trial.  It's not evidence of the

17   defendant's guilt.  Remember, the defendant's entitled to the

18   presumption of innocence.  He remains innocent until and unless

19   the government introduces proof at the trial that convinces you

20   beyond a reasonable doubt that he's guilty.

21             So you don't know anything yet about the case.  You

22   know the defendant is entitled to the presumption of innocence.

23   You know that you'll have to base your verdict only on what

24   happens here in the courtroom.  So do not go out and try to do

25   any investigation between now and the time of the trial or

1    during the trial.

2            Don't expose yourself to any discussions of the case

3    in the media.  Don't try to read anything about the case,

4    listen to anything about the case.  Don't go on to the Internet

5    and try to do research about the case.  I will make sure that

6    you get everything you need to decide this case in this

7    courtroom.  Okay?

8            Keep an open mind.  You don't know anything about

9    the case yet.  And even after you start to hear the evidence,

10   you have to keep an open mind until you've heard everything.

11   So keep an open mind throughout the trial.

12           While you're serving as -- from now until the end of

13   the trial, I'm instructing you to refrain from any posting on

14   social media about your work on the jury.  All right?  Don't go

15   on Twitter, Facebook, and say anything about the case.  Jurors

16   have gotten in trouble when they've, in the middle of trial,

17   started tweeting about what they were doing and thinking and so

18   forth.  So you need to refrain from doing any of that, and you

19   need refrain from discussing the case with other people.  Your

20   family's going to be very interested; what happened, what was

21   it like.  What you can say is the judge told me one thing and

22   that was I can't discuss the case with you.  I can tell you

23   it's a criminal case, we're going to start on Tuesday, we're

24   going to finish by the date I told you, when it's all over, I

25   can tell you all about it, until then I can't really talk to

1     you about it.  All right?

2            There's a real temptation with your spouse or

3     something to say, oh, we heard some really interesting evidence

4     today.  Just -- and they'll be asking you about it.  Just tell

5     them, I really can't talk to you about it.  Okay?

6            Even with the other jurors when you're meeting

7     together and having lunch while the case is going on.  It's

8     fine to talk about something funny that happens in the court

9     that day or something, but don't go in and try to deliberate

10    because everybody needs to deliberate together as a group and

11    you can only do that after you've heard all the evidence in the

12    case.  All right?

13           You also don't know anything about the law because

14    I'll give you that instruction at the end of the case.  I'll

15    give you all the law that you need.  But you don't know

16    anything about that yet and I don't want you to go out and

17    discover anything about it.

18           I did once have a juror that -- he was very

19    conscientious.  He wanted to do the best job.  So he went out

20    on the Internet during the middle of the trial and started

21    doing research on how to be a good juror.  And he found things

22    that were so useful, he thought, that he printed them out and

23    brought them in the jury deliberation and gave them to all the

24    other jurors.

25           Well, we need to have a record of everything you see

1   and everything you're exposed to in the case.  We can't have

2   individuals going out and trying to do things on the Internet

3   to figure out how to do their jobs.  Okay?  So really

4   important; don't discuss the case with anybody, don't expose

5   yourself to any discussions of the case in the media, keep an

6   open mind.

7           And I would add one instruction to my usual

8   instruction and that is please take care -- special care

9   between now and the conclusion of the trial to minimize your

10  exposure to others in ways that could cause you to become

11  infected because we're all in this together; we all need to

12  make efforts to protect each other.  We're doing everything we

13  can in the courthouse.  Of course, if you should develop

14  symptoms, you need to report that before you come into court.

15  But between now and then, let's just take special care that we

16  don't expose ourselves in ways that could put others at risk.

17  All right?

18          And so those are my general instructions to you.  On

19  the first day of trial, I'll have more.  I will commit to you

20  that I will do everything possible to make this work

21  efficiently and safely and to make it an enjoyable process for

22  you.  I really -- and I really will do my best, as the staff

23  will do their best, to make this a good experience for you.

24          So with that said, I -- I will excuse you.  The jury

25  administrator will ask you to follow him into courtroom 2.  Is

1    that where you're going?

2             CASE MANAGER SACKOS:  I'm going to take them into

3    the courtroom, your Honor.

4             THE COURT:  Okay.  So my -- my other administrator

5    will take you into courtroom 4, give you some additional

6    instructions, some contact information, and then we'll see you

7    back here on Tuesday morning at nine o'clock and hopefully

8    we'll be ready to go with the opening statements and evidence.

9    All right?

10            So thanks again, folks, and we'll see you.  And

11   let's all stand for the jury as they leave the courtroom.

12            CASE MANAGER NEGRON:  All rise.

13            (Remaining prospective jurors excused.)

14            CASE MANAGER NEGRON:  Please be seated.

15            THE COURT:  All right.  So I'm going to suggest that

16   we -- we book in telephone conferences on Thursday and Friday.

17   If we don't need to on Friday, we can just cancel it, but

18   anything that -- issues, motions in limine, quarantine

19   protocols, anything that people need to talk about, we can talk

20   about then.  But I -- we've got a few minutes here where

21   everybody's in the courtroom.  If there are any things on your

22   agenda that you'd like to take up with me now, I'm happy to try

23   to respond now.

24            I know the government has submitted a proposal for

25   its quarantining of witnesses that is a slight modification of

1    what we have agreed to.  I haven't had a chance to study it in

2    detail.  I -- I am -- my only concern is with the witnesses who

3    are going to fly here on relatively short notice, stay here for

4    a relatively brief period of time, and leave.  I still want to

5    mull that one through and probably have a position for you

6    on -- tomorrow.  The other proposals don't seem to me to be

7    problematic.  But if there's anything more you wanted to say

8    about that now -- I probably won't be able to give you an

9    answer until tomorrow.  I want to discuss it with a couple of

10   my colleagues to make sure everybody's comfortable with it.  It

11   is a slight deviation from the protocol we agreed to.

12              But is there anything else you wanted to say about

13   that issue?

14              MR. DAVIS:  No, Judge.  And we certainly agree that

15   the flying witness is the most difficult one.

16              THE COURT:  Yeah.  I'll mull that over and talk to

17   my colleagues and try to give you an answer tomorrow at

18   tomorrow's telephone conference on how I want that -- I mean,

19   if worse comes to worst, we make her fly here and stay

20   sequestered for a few extra days and testify not as the first

21   witness, but as one of -- you want her to testify as the first

22   witness, right?

23              MR. DAVIS:  Yes.

24              THE COURT:  I -- I understand that.  And if I feel I

25   can do it safely, I'll try to accommodate you.  I just need to

1   work through that.

2          MR. DAVIS:  And if the Court has any questions, your

3   Honor, about her particular circumstances -- I believe she

4   works from home now.  She is a state employee.  As indicated,

5   she was tested at the end of August and was negative and will

6   be tested again on Thursday.

7          THE COURT:  Yeah.  Yeah.  And -- in truth, my

8   knowledge about airline travel is the time in the plane, if

9   it's not an overcrowded plane, is not a high-risk event.

10  There's opportunities in the terminal if it's crowded to be

11  with people; if the air filtration system is not turned on in

12  the plane while it's sitting there waiting, that can create

13  problems, but the air circulation on airplanes while their

14  circulation system is running is incredibly effective.  So if

15  the plane isn't overcrowded, that event should not be

16  particularly problematic.  If she is working from home and

17  hasn't been going out, maybe we can make an individualized case

18  for it.  I'll mull that over and let you know as soon as I can.

19         Is there anything else the government wanted to take

20  up with me now while the parties are here?  We'll set up --

21  I'll ask my clerk to schedule a telephone conference for

22  Thursday.  I'm going to complete my vacation tomorrow and maybe

23  come back maybe Thursday or Friday and I'll be around.

24         MR. DAVIS:  Just a question, Judge.  Are we arguing

25  the pending motions in limine on Friday, on the 18th?  I

1    thought that was the plan, but maybe --

2              THE COURT:  Yeah.  I mean, we can -- we can book

3    time.  Do we have a hearing set on that or how --

4              MR. DAVIS:  I thought we had one on Friday, but --

5              THE COURT:  For Friday?

6              CASE MANAGER NEGRON:  I don't have the calendar

7    here, but --

8              THE COURT:  Well, we can put together -- if you want

9    to do it as an argument with -- on Zoom so the defendant can

10   watch it, that I guess is sensible.  So let's plan to do that

11   as a hearing on Friday on Zoom, but let's do a Thursday

12   telephone conference because there may be some incidental

13   matters that we need to take up.

14             And -- yeah.  But let's -- we'll talk about the

15   motions in limine in a Zoom conference.  I'm not guaranteeing

16   that I'll make anything more than a tentative ruling, as I've

17   explained to you my routine practice has been not to make

18   definitive rulings on motions in limine unless it shapes the

19   trial in some significant way.

20             But I -- I've already said I am going to -- I do

21   intend to be sensitive to the defendant's -- the need to tell

22   the full contextual story, so we need to be open about that.

23             I also am, of course, very -- I tend to allow fairly

24   wide scope for cross-examination on any bias issues, so some of

25   the -- the white nationalism stuff is going to come in for that

1    reason.  On the other hand, I really believe what I said, that

2    people's views about white nationalism shouldn't affect the

3    outcome of the case and so I don't want to spend hours and

4    hours on every -- everything that someone said that is a white

5    nationalist would like and someone who's not would hate.  It's

6    got to be tied to the evidence in the case.

7          So I am sensitive to the defense and the need to

8    attack someone for bias.  On the other hand, it isn't an effort

9    to try to bring in white nationalism or other views that people

10    find offensive for the sake of offending people.  That's how

11    we're going to try to strike the balance on that.

12          Anything either of you, either side, anything from

13    the defense, that you wanted to raise with me now?

14          MR. WOLPIN:  I guess we've had some discussion back

15    and forth about the CPS folks out of Missouri coming and that

16    issue.  I mean, I didn't in the front end, because I wasn't

17    entirely sure what they were going to call them for, file a

18    motion in limine to exclude.  Maybe I should at this point.  I

19    mean, we're talking about dragging someone out here from

20    Missouri for this to provide information that we don't -- we

21    would assert is not relevant to begin with.

22          THE COURT:  Can I stop you?  And just refresh my

23    memory.  The government wants to introduce evidence that, in

24    fact, calls for CPS and that would be the principal purpose for

25    the testimony from that witness?

1              MR. DAVIS:  So, Judge, the parties are stipulating

2    about the taped call, so the call itself will be played.  The

3    purpose of the CPS witness is to explain what a call to the

4    hotline --

5              THE COURT:  What happens when someone calls the CPS?

6              MR. DAVIS:  What the potential consequences are, how

7    that can be handled.  Because it gives context to the third

8    part of the -- of the harassment in the case; that is, he

9    actually makes a call and he's trying get a household

10   investigated and potentially children removed or separated.

11             THE COURT:  Right.

12             MR. DAVIS:  So the fact that -- is isn't going to be

13   a long witness and I don't think it's going to be disputed, but

14   we -- that's the purpose of the CPS witness.

15             THE COURT:  All right.  So I take the defense as

16   making an oral motion in limine to bar the CPS witness on Rule

17   401 and 403 grounds.  Your argument would be it's cumulative,

18   unnecessary, potentially prejudicial, and I understand why you

19   would make that argument.  I'm not prepared to give you any

20   view on it immediately because I want to go back and look at

21   the charges here and refresh my understanding of the elements

22   of the charges I intend to instruct on because that will inform

23   my 401/403 analysis.

24             So I -- I get your argument.  I understand it.  I

25   also understand the government's argument.  And it's -- it

1   really comes down to a 403 thing because it seems to me that it

2   is logically relevant and meets the 401 criteria.  At what

3   point does it become unduly prejudicial or a waste of time or

4   cumulative or -- given the nature of the stipulation that the

5   parties have that the call itself is going to come in.

6         So I understand that.  I -- I'll talk to you more

7   about it on Thursday.  But you'll be -- you're deemed to have

8   made an oral motion, so you're not surprising that --

9         MR. WOLPIN:  That's -- I just didn't want it to

10  be -- or sort of preserve at least or give the Court a little

11  focus for that.  Obviously we agree that the call is relevant,

12  his actions being relevant.  That's why we stipulated.  So they

13  didn't need to bring a witness to sort of lay a foundation for

14  something we agreed was admissible.

15        Things that Mr. Cantwell wasn't informed about,

16  about what they could or couldn't do, from a third party here,

17  what we would have done or could have done --

18        THE COURT:  Yeah.

19        MR. WOLPIN:  -- is not relevant.  It's beyond just

20  prejudicial.  It's not relevant.  They could have gone X, Y,

21  and Z.  That's not the question.  The question is what did

22  Chris know and do at the time he did it, not what would they

23  say their follow-up --

24        THE COURT:  I think I get all of that.  I just don't

25  want to comment on it now because I think we have to go back

1    and actually look at the elements of the charge, particularly

2    the cyberstalking charge, and I -- I think I -- after I look at

3    those again and the instruction I propose to give, I think I

4    will be better able to evaluate your argument that it's not

5    even logically relevant.  I know you have an argument that it

6    is.  I think I -- I'm usually pretty quick on the uptake on

7    things, so I -- I'll get it and I'll give you a chance to be

8    heard on it.  I just -- until I look at that statute and I look

9    at the instructions I proposed to give, I can't really give you

10   more guidance on it now.

11            Yeah, just quickly.

12            MR. DAVIS:  May I just have a word with counsel

13   briefly?

14            THE COURT:  Yeah.

15            MR. DAVIS:  Judge, just also related to that, it's

16   possible -- it's possible the parties will agree to two-way

17   live video testimony for the CPS witness, again putting aside

18   the motion in limine.

19            THE COURT:  Yeah.  If I rule it admissible --

20            MR. DAVIS:  Right.

21            THE COURT:  -- then that's something you can -- you

22   can take up.

23            MR. DAVIS:  Right.

24            THE COURT:  I think what I -- I get it.  I get it.

25            MR. DAVIS:  Okay.

1              THE COURT:  Thank you.  All right.

2              Anything else anyone wants to raise with me now,

3     knowing we'll have a chance to talk more on Thursday and we'll

4     have a hearing on all motions in limine on Friday?

5              MR. WOLPIN:  No.

6              THE COURT:  I should have by Friday a pretty good

7     idea of the instructions, so I at least should have some

8     preliminary instructions for you before the trial starts.

9              All right.  Well, look, I appreciate everybody's

10    help and I -- I really thought everything worked well.  The

11    only thing I might rethink is the actual exercising of

12    peremptories.  You guys had to get a little closer to each

13    other than I -- than I like and if you think about that and we

14    go forward in future trials, any way to try to avoid that.

15    Otherwise, I think everything worked well and we can -- you

16    know, if you have thoughts about that, I might ask you on

17    Thursday to tell me what you think.

18             All right.  Anything else?  Okay.  Thanks.  I'll

19    talk to you on Thursday.

20             CASE MANAGER NEGRON:  All rise.

21             (Proceedings concluded at 12:05 p.m.)

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 5/12/21          /s/   Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR