*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 10, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:20-cr-6-01-PB
            v.                      *   September 21, 2020
                                    *   10:02 a.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
VIA VIDEOCONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:          Anna Z. Krasinski, AUSA
                             United States Attorney's Office




For the Defendant:           Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defender's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter

<pre>
1                    P R O C E E D I N G S
2              THE COURT:  Good morning.  This Judge Barbadoro.
3    I'd ask my case manager, do I have everybody on the line who
4    needs to be on?
5              THE CLERK:  You do, your Honor.  And, for the
6    record, this is United States of America vs. Christopher
7    Cantwell, criminal case 20-cr-6-1-PB, and we are on this
8    morning for a motion hearing.
9              THE COURT:  Let me also ask my case manager:  I
10   believe there were a couple of requests for members of the
11   press to be given links to the proceeding.  Have they been
12   given links?
13             THE CLERK:  That's correct, your Honor.  They're in
14   the waiting room right now.  I didn't know if you wanted to
15   address some housekeeping matters first before I let them in.
16             THE COURT:  Well, I -- I do need to talk to the
17   parties about an issue concerning the impanelment process, but
18   since all of our proceedings are on the record and I don't know
19   that this would be a matter that should be sealed, I suspect
20   that we should do all of it in the equivalent of open court.
21             And so I would suggest, unless one of the lawyers
22   wants to raise an objection, that we allow the members of the
23   press to have access to the hearing as planned.
24             Is anyone arguing that I should not give the members
25   of the press access to the full proceeding?
</pre>

1          MS. KRASINSKI:  No, your Honor.

2          MR. LEVIN:  No, your Honor.

3          THE COURT:  Okay.  So please bring the two members

4    of the press in who have asked to attend.

5          All right.  We can -- I'd ask the case manager to

6    just call the case.

7          THE CLERK:  Court is in session and has for

8    consideration a motion hearing in United States of America vs.

9    Christopher Cantwell, criminal case number 20-cr-6-1-PB.

10          THE COURT:  All right.  Good morning.  I have

11    granted links to two members of the press who have requested

12    access to this proceeding.  I'd simply remind both -- both

13    viewers that you're subject to all of the ordinary rules that

14    apply to a court proceeding.  You may not record this

15    proceeding.  You may not share the link with anyone else.  You

16    need to keep your camera off and your microphone muted, as you

17    have done.

18          All right.  So we're here today to hear argument on

19    the government's motion for two-way live video testimony of the

20    victim's spouse.  I'll hear you on that motion in a moment, but

21    I have become aware of an issue with respect to the impanelment

22    process that I want to discuss with you.

23          I -- what I intend to do is set the stage for that

24    discussion by providing some background information.  I then

25    will identify the issue that I intend to discuss with you.  I

1    don't intend to require you to take any position on the issue

2    during this conference, but I will lay out some options and

3    give you a chance to reflect on what -- what it is that I'm

4    discussing with you and then ask you to take some positions on

5    the options after you've had a chance to discuss the matter

6    amongst yourselves and the defendant has a chance to discuss

7    the issue with his attorneys.

8         So as the parties are well aware -- and please bear

9    with me as I go through some things that the parties well

10   understand but should be clear as a part of the record.

11        It is an extraordinarily challenging time to try to

12   conduct jury trials during a pandemic.  And we are one of the

13   few courts in the country that has moved ahead with jury trials

14   and we've done so after very careful evaluation of the risks

15   associated with conducting public trials.  We've consulted with

16   an expert, we've made many modifications in our trial

17   procedures, and all of those modifications are designed to

18   mitigate the risk that -- of infection while preserving the

19   parties' rights to a fair and public trial.

20        One of the most challenging aspects of this

21   selection -- of this process is the process by which we select

22   juries.  That's because it is self-evident that the more people

23   you bring into a confined space, the greater the risk of

24   infection, notwithstanding any mitigation measures that you

25   undertake.

1          So one of the most important mitigation measures

2    that we take during the trial process is we try to bring into

3    court as few people as possible while still preserving the

4    parties' rights to a fair trial and preserving the public's

5    right to a public trial.  And -- and so we have tried to look

6    at our jury selection process to find ways to streamline it and

7    reduce the number of jurors that we need to bring in for jury

8    selection.  And I think we've come up with some very effective

9    procedures and the parties have been very cooperative in

10   working with the court to implement those procedures and so far

11   they've been implemented without objection.

12          One of the procedures that we have used here is we

13   have used a prescreening process and we've involved counsel for

14   both the government and the defendant in the prescreening

15   process.  It is routine in federal courts around the country to

16   do prescreening of jurors prior to the commencement of juror

17   impanelment.  The statute that governs the selection of jurors

18   in federal court contemplates this; our jury plan contemplates

19   it; but the kind of -- and that statute and the plan

20   contemplate that much of that prescreening will be done without

21   the defendant being present and without counsel even being

22   involved in the process.  The kind of prescreening that is

23   expressly contemplated by the statute that can occur without

24   counsel or the defendant's presence is screening for undue

25   hardship or extreme inconvenience.  That kind of screening is

1    done routinely in this court and in courts around the country.

2    It's often done administratively pursuant to power delegated

3    under the jury plan to allow for an effective impanelment

4    process by excluding people who have obvious reasons why they

5    cannot attend the jury selection process.  And all of that

6    occurs without the defendant's presence and even without

7    counsel's involvement in the process.

8              Our prescreening process was a little bit different.

9    In addition to the ordinary prescreening process, we decided to

10   involve counsel for both parties and give them an opportunity

11   to review the list of jurors that were to be called into court

12   and to determine whether those -- the lawyers, following the

13   adversary process, could reach agreement about certain jurors

14   whose -- who it was obvious should not be brought into court

15   and -- for any number of reasons and who would likely be

16   excused if they were brought into court.

17             And so we allowed the parties to meet and confer and

18   review the list of jurors.  We also sent out a supplemental

19   questionnaire to the panel members that did not contain

20   case-specific information but asked a variety of questions that

21   are designed to elicit responses that may express concerns

22   about the COVID-19 process, but also about concerns about

23   systemic kinds of biases that could make them clearly unfit for

24   a criminal case regardless of the specific issues that would be

25   evaluated in that case.

1        The parties followed that process.  They met and

2   conferred and reviewed the questionnaires and they agreed on

3   excusals for I believe more than 30 potential jurors and those

4   jurors were, in fact, not summoned to court on the day of jury

5   impanelment.  As a result, we brought in 30 fewer jurors than

6   we would otherwise have to bring into court to select a jury

7   that the parties were comfortable with, and we engaged in an

8   impanelment process that was very similar to the process we

9   ordinarily engage in when we select a jury except that we were

10  employing a variety of mitigation measures such as breaking the

11  jury panel into several different courtrooms where they were

12  streamed part of the general voir dire process and then brought

13  in in small groups where they were permitted to raise questions

14  with the Court and the parties were allowed to evaluate and

15  consider potential causes for -- excuse me -- challenges for

16  cause and then ultimately later peremptory challenges.

17        The defendant was present in the courtroom for

18  that -- the entirety of that process, had the opportunity to

19  consult with his attorneys, and was a full participant in the

20  impanelment process.  What the defendant was not a participant

21  of, at least in court, was the process of prescreening where

22  the lawyers met and conferred and agreed on a certain number of

23  jurors that would not be called into court on that day.

24        Now, there is a rule of criminal procedure that we

25  did not discuss when we began to consider this process, and

1     that's Rule 43 of the Rules of Criminal Procedure.  And that

2     rule provides in pertinent part that a defendant -- now

3     quoting, must be present at -- and I'm skipping over some

4     portions that are not relevant, again quoting -- every trial

5     stage, including jury impanelment.

6            Now, a question, therefore, arises:  Was the

7     prescreening process that the lawyers engaged in a part of

8     the -- was it a trial stage that is part of the jury

9     impanelment process that the rule requires the defendant to be

10    present at.

11           As far as I can tell, there is no controlling

12    Supreme Court or First Circuit precedent that addresses this

13    precise issue.  Issues like this have come up in other circuits

14    and courts have expressed various opinions on it.  I was able

15    to find one district court decision in the Second Circuit that

16    considered whether excusals based on a supplemental

17    questionnaire sent to jurors was part of the impanelment

18    process and that court concluded without substantial analysis

19    that it was not part of the impanelment process.  But I think

20    there is at least a credible argument to -- that a prescreening

21    for reasons other than extreme hardship or inconvenience could

22    be deemed to be part of the impanelment process.

23           So, for example, to the extent that the lawyers in

24    this case agreed to exclude someone, not because they expressed

25    a hardship basis for an excuse but because they expressed a

1    bias, a systemic bias that would cause them to be unfit to

2    serve, whether those kinds of excusals should be considered

3    part of the impanelment process that a defendant has a right to

4    be physically present at.

5             Rule 43 codifies a body of law dealing with the

6    Sixth Amendment's confrontation clause and the Fifth

7    Amendment's due process clause, so there are underlying

8    constitutional rights to be present that need to be considered

9    here, but I think Rule 43 is the codification of that

10   underlying constitutional right that a defendant has to be

11   present.

12            So having provided you with that background, it is

13   at least arguable that the prescreening process that the

14   lawyers engaged in could be considered a trial stage that was

15   part of the impanelment process.  And to the extent that that

16   is considered a trial stage because it's part of the

17   impanelment process, there is an argument to be made that a

18   defendant has a right to be present for that process.

19            A question arises what does it mean for someone to

20   be present and I do not know what consultation the defense had

21   with Mr. Cantwell.  I do not know whether he was present in

22   person with the lawyers when they made that -- their judgments

23   about the -- who to excuse by agreement.  I do not know whether

24   he was present by video.  I do not know whether -- if he was,

25   whether that kind of presence would be sufficient to satisfy

1    the presence requirement of Rule 43.

2           These are all issues that are not resolved by

3    authoritative precedent here, but because I have become aware

4    of the issues, I wanted to make the parties aware of the issue.

5    And I -- I do not want to force the parties to take positions

6    on the issue without opportunity for reflection and

7    consultation, so I'm laying the issue out for you and I am --

8    I -- I have a proposal as to how I would like to address the

9    issue.

10          And that is if this is -- if the practice that we

11   used did violate Rule 43, it would seem to me that Mr. Cantwell

12   would have a right to a remedy.  And that remedy would be, in

13   this case, the impanelment of a new jury.  I could impanel a

14   new jury in two weeks when we have our next jury draw.  There's

15   a new panel set to come in in two weeks and if the parties

16   satisfy me that this is a -- a violation of Rule 43 and

17   Mr. Cantwell wants to have a new jury drawn at which he is

18   present for the entire jury selection process, including the

19   prescreening process, my inclination would be to accommodate

20   him and to allow him to have a new jury selected.

21          I would -- I would follow the same prescreening

22   process that I followed here except that I would bring

23   Mr. Cantwell into court a couple of days before the jury

24   impanelment occurred and make clear that I would then entertain

25   the parties' joint motion to excuse jurors who the parties

1    agree should be excused.  Mr. Cantwell would be present when

2    that motion was presented.  I would then rule on that motion

3    from the bench.  Mr. Cantwell would be present when I rule on

4    that motion.  And I am satisfied beyond any reasonable doubt

5    that that would be in full compliance with Mr. Cantwell's

6    rights under Rule 43, under the Sixth Amendment's confrontation

7    clause, and under the Fifth Amendment's due process clause.

8           But it also occurs to me that Mr. Cantwell might not

9    want to do that.  He might, indeed, be satisfied with the jury

10   that he has drawn.  He might, indeed, want to proceed to trial

11   as scheduled and might not have any interest in pursuing his

12   right to be physically present during the prescreening process

13   to the extent he has such a right.  And if that's the case, I

14   certainly wouldn't want to punish Mr. Cantwell by dismissing

15   the jury we have selected.  And if that's what Mr. Cantwell

16   wants, then I'm inclined to give him that right.

17          So what I am suggesting that we do is that the

18   lawyers say nothing about the issue now; that when we complete

19   this hearing, the lawyers consult -- defense lawyers consult

20   with Mr. Cantwell and tell me what you would like to do.  If

21   you would like to have a new jury impaneled, I'm inclined to

22   give you that right.  If you want the jury that has already

23   been impaneled, I'm inclined to give you that right.

24          Now, I understand the government may have objections

25   to delaying the trial and I -- I deeply regret the fact that I

1    know the government has brought -- must have brought witnesses

2    into the district who have been abiding by our quarantine

3    procedures and this could be a serious inconvenience for those

4    witnesses and for the government.  And I regret that.  On the

5    other hand, given the -- this issue is a serious one and I --

6    it's a lot less inconvenient for the government to do what I'm

7    proposing than to come back in 18 months or 24 months and retry

8    the case.  So I think we have to bear that in mind when we

9    consider the impact on the government.

10           Nevertheless, I don't think the government should be

11   compelled to take a position on the issue without reflection

12   and so what I suggest we do is as follows:  By the end of the

13   day, I would ask the defendant to inform the Court as to its

14   position as to whether it would prefer to proceed to trial as

15   scheduled or whether it would prefer to have a new impanelment

16   in two weeks.  If counsel prefers to go ahead, in my view, that

17   resolves the issue because I have given Mr. Cantwell the right

18   to the very remedy he would be entitled if he goes to trial, if

19   he's convicted, if he appeals on that basis, and if the

20   appellate court determined that he would be -- should have been

21   present during that prescreening process.

22           So I'm giving him the very remedy he would be

23   seeking after an appeal if, indeed, he has a right to be

24   present.

25           So I think that if Mr. Cantwell decides after

1    consultation that he wants to go ahead because he's satisfied

2    with the jury that has been drawn, then he should have that

3    right; and if he wants a prescreening -- to be present during

4    the prescreening of a new panel, I will accord him that right.

5    And I will leave that choice to him.  But he should let me know

6    by the end of the day because we have a jury scheduled to come

7    in tomorrow.

8          If the government -- if Mr. Cantwell decides he

9    wants a new -- a new panel -- a new impanelment, I think it's

10   only fair to give the government an opportunity to try to

11   persuade me that I should not give him that right.  And if the

12   government wants to take that position, I think it's only fair

13   to delay the trial by a day so that the government can brief

14   the issue and we can -- I can give the government a chance to

15   argue it tomorrow.  I'm inclined to give Mr. Cantwell the

16   option to have a new impanelment, but I'm still open to hearing

17   what the government has to say.

18         So I have laid out for you the background that led

19   us to where we are today.  I have explained the rule to you and

20   the issue as best as I can and I've tried to propose a way of

21   addressing the issue that gives Mr. Cantwell the choice to have

22   the jury he's selected and proceed as scheduled or to have a

23   new impanelment with a new jury panel where I will follow the

24   same process I followed here except I will bring Mr. Cantwell

25   into court a couple of days before the jury impanelment begins,

1    I'll hear the parties' motion to excuse jurors by agreement,

2    Mr. Cantwell will be present then, and I will rule.  And I am

3    satisfied that if I do that, Mr. Cantwell's rights to presence

4    will be fully satisfied.

5              So that's -- I -- I hope that I've explained the

6    problem for counsel.  I hope that I've respected your need to

7    have an opportunity to think and to consult, and I hope I have

8    given everyone a chance to be heard before I make a final

9    ruling.

10             I would -- let me start with the defense.  Are there

11   any questions you have for me or anything you would like to say

12   now on this particular issue or the proposal and the schedule

13   that I've laid out for you?  I don't know whether Mr. Levin or

14   Mr. Wolpin should speak, but whoever chooses, feel free.

15             MR. WOLPIN:  Your Honor, obviously what we'll do

16   next is have a conversation with Mr. Cantwell as soon as this

17   hearing is over on this issue.  I -- I agree with the Court

18   it's something that requires us to speak with him before we

19   have any real position to raise with the Court.

20             THE COURT:  All right.

21             And, Ms. Krasinski, again, I -- I regret -- I know

22   this would be hard for you and for your witnesses.  I don't --

23   I -- I wouldn't do it lightly and I do think this is a serious

24   issue.  I think there is a minimal amount of authority at the

25   district court level that suggests that this might not be a

1   rule violation, but I -- I have reviewed a number of other

2   decisions of other courts that don't address the precise issue

3   but address the issue, the general issue, of when -- what is

4   part of the impanelment process and what isn't.  And when you

5   do your own research, you'll discover those cases and I think

6   it will leave you with -- to be in the position of it is

7   unclear what the law is with respect to this particular issue,

8   and there is authority to suggest that questioning on matters

9   other than hardship are part of the impanelment process and

10  under Rule 43, a defendant does have a right to be present at

11  that process.

12         So you'll -- you can look at it and think about it

13  and we'll await the defense position.  I think it -- for what

14  it's worth, my own assessment is if the -- Mr. Cantwell and

15  counsel are satisfied with the jury that they've drawn, the

16  obvious answer is let's just move ahead.  But if Mr. Cantwell

17  and the defendants are not satisfied with the jury they have

18  drawn, it would seem to me that they might well want to assert

19  Mr. Cantwell's presence rights and -- but I'm ready to give him

20  a remedy if that's what he wants and that's just show up in two

21  weeks, we'll do the entire process over.

22         I don't like to waste anyone's time, but I want to

23  do it right and I will do whatever's required to make sure that

24  this trial is conducted properly, in accordance with the law,

25  fairly to the parties, and is, to the greatest extent possible,

1   open to the public.  So that's what I intend to do.

2          Ms. Krasinski, did you want to ask any questions or

3   say anything about this particular issue?

4          MS. KRASINSKI:  No, your Honor.

5          THE COURT:  Okay.  All right.  So I will ask -- and

6   what I might do is when the defense is ready, notify the clerk

7   and I'll convene a telephone conference.  If you are ready to

8   proceed, obviously I will be -- before the jury is brought in

9   on trial tomorrow, I will be asking Mr. Cantwell, do you want

10  to proceed as scheduled.  So if he doesn't want to proceed, the

11  time to tell me is today.  If he does want to proceed, I will

12  be asking him on the record in open court tomorrow, having

13  heard the discussion and consulted with counsel, is it your

14  desire to proceed with the jury that has been drawn.

15          And I just want to -- I want you to make sure that

16  your client is prepared for that question if he does decide to

17  proceed.  Okay?

18          So I think I've laid it out.  I think the parties

19  can have an opportunity to reflect and consult and when you --

20  when the defense has reached a position, let the clerk know,

21  we'll put together a quick telephone conference.  I am not

22  proposing to hold that as a hearing.  There are many kinds of

23  matters that routinely occur in preparation for trial that are

24  not public hearings and I don't intend to go to the trouble of

25  holding a Zoom hearing and providing access to the parties --

1    to the public for that.  Those routinely do not occur in public

2    and it will be simply transmitting information to me as to what

3    you are going to do so that I can -- I can know and the clerk

4    can make an entry on the docket that makes it clear whether we

5    will be going to trial tomorrow or not so that the reporters

6    can -- can be aware of what the -- the result is of this

7    discussion.

8            All right.  So enough of that.  The reason we're

9    here today is to discuss the motion for two-way live testimony.

10           Ms. Krasinski, that's your motion.  I -- I want to

11   compliment you.  I think you've presented a very carefully

12   researched and well-analyzed argument.  I think it's clearly

13   set forth in the papers.  But if there's anything you want to

14   say, I'd be happy to hear it.  So why don't you tell me

15   anything you want to tell me about the motion.

16           MS. KRASINSKI:  So I -- I think *Maryland vs. Craig*

17   makes clear that while the confrontation -- the right to

18   confrontation is an extremely important right that it does, in

19   limited circumstances, have to give way.

20           You know, the First Circuit has not clearly applied

21   it out of the context of cases that involve minor victims, but

22   I think other cases make clear that the principle does apply

23   outside of that context and that when the First Circuit

24   analyzes the issue, it's sort of looking at the two prongs that

25   the Supreme Court looked at in *Craig*, necessity to further an

1  important public policy and where the reliability of the

2  testimony is otherwise assured.

3          I think in the 20-plus years since *Craig* was

4  decided, technology has changed and the technology proposed

5  here is two-way, rather than the one-way video that the Supreme

6  Court approved of in *Craig* and the defendant would be able to

7  see the witness and defendant's counsel would be able to

8  cross-examine the witness.

9          There -- there's definitely case law suggesting

10  that, you know, it might be easier for a witness who's

11  testifying by video than to actually be face-to-face with a

12  defendant, it would be harder -- easier for a witness to point

13  the finger at a defendant.  But I think that that -- I don't

14  think that risk applies with this witness, given what the

15  witness's testimony is expected to be.  You know, the witness,

16  regardless of where she testifies, is not expected to, you

17  know, identify Mr. Cantwell as a perpetrator.  She's -- she's

18  expected to testify about, you know, substantial emotional

19  distress, her reaction.

20          THE COURT:  Let me -- let me stop and first let me

21  make a statement.

22          We discussed this issue in a telephone conference on

23  relatively short notice with respect to your motion under Rule

24  15 to do a -- travel to the witness to do a deposition, which I

25  did not allow.  Since that time -- and you, in that motion, did

1    cite a reference about possible elevated risks to a witness

2    based on pregnancy that was a CDC statement that was really

3    expressed in very tentative terms and basically that it's

4    unknown, is the way I took it, about the risk.

5            I do want to note that since that conference, there

6    has been a study that has been released that does suggest that

7    there is some elevated risk to a pregnant person of

8    complications from COVID.  I don't have that in the record.

9    If you want to find it and add it to the record, you can.  But

10   I -- I want to be clear.  I do not take this issue lightly.

11           I did make a statement at the time that the only

12   evidence you were citing me in your Rule 15 motion was a very

13   tentatively expressed statement by the CDC.  There is some

14   additional evidence.  It's one prepublication.  I don't think

15   it's gone through peer review yet.  It's one study.  I haven't

16   examined it closely.  But I didn't want to leave the impression

17   that I'm uninterested in what the science is on this subject.

18           I do think we're at a point in which we don't have

19   definitive science as to allow us to quantify a risk, but there

20   is some suggestion by the CDC that it could be a risk and there

21   is at least one study that seems to suggest that risk.  You can

22   look for it and put it in the record if you choose.

23           But, again, I can't -- the defendant hasn't had an

24   opportunity to review the study.  We haven't heard evidence

25   about it.  I'm not sure that it would matter one way or the

1    other here to the outcome, but I didn't want to leave the

2    impression that I was not concerned about risks to pregnant

3    women who are required to travel interstate to testify.

4         But I did want to ask you a question about this.  My

5    recollection is that this testimony is primarily being offered

6    to inform the jury as to the -- the witness's emotional

7    response when she learned of the statements that the defendant

8    allegedly made that concerned her.  And that's the principal

9    thing that you want her to testify to; is that right?

10        MS. KRASINSKI:  Not exactly, your Honor.  The -- we

11   intend to present her testimony as to her emotional reaction to

12   the separate public posting of her photograph, of her

13   children's photograph, followed by a statement with her address

14   that as the last time that we checked, which was a couple of

15   months ago, was still publicly posted in this large group,

16   Telegram, that the defendant posted it in.  That is separate

17   from the very private communications between Mr. Cantwell and

18   the victim here.

19        THE COURT:  Can I stop you?  What exactly is it

20   that's in this public posting?  Because I -- the parties forget

21   that I don't have access to the witness -- the witnesses that

22   you do.  I have not conducted my own investigation.  I don't

23   know the details of the facts of the case.

24        So tell me exactly what is in the public record and

25   what she would say about her reaction to these things being in

1    the public record.

2         MS. KRASINSKI:  Yes, your Honor.  And I don't know

3    if you have a copy of the government's proposed exhibits, but

4    it's at Government's --

5         THE COURT:  No.

6         MS. KRASINSKI:  -- Exhibit 102.

7         And so there's a posting in this Radical Agenda

8    Telegram group which at least in Government's Exhibit 2 notes

9    293 members.  The first is an image of the victim's wife

10   holding one very young child with -- being hugged by a second

11   young child with a third child also in the photograph.

12        Mr. Cantwell then posted a second photograph, again

13   of the victim's wife surrounded by three young children.

14        He then posted a photograph of the victim himself

15   and then shortly afterwards made a public post in that same

16   group that says, like I said, if I could just drive down to

17   Twin Creek Road in Winfield, Missouri, and shoot this idiot, I

18   would.

19        And so those are Mr. Cantwell's public posts that

20   are separate and distinct from --

21        THE COURT:  They don't say anything about reporting

22   to the CDC; they don't say anything about raping this -- the

23   spouse of the alleged victim --

24        MS. KRASINSKI:  There's --

25        THE COURT:  They just are those -- you've given me

1   the entirety of what's in that public record.

2            MS. KRASINSKI:  No, your Honor.  There's -- there

3   are references to Child Protective Services.  They include

4   Mr. Cantwell's statements, "that's Cheddar Mane, a/k/a Cheddy

5   Blac, and tomorrow morning I'm calling CPS to give them every

6   episode of Bowlcast and inform them that this acid-dropping

7   fake Nazi is endangering those children with his behavior."

8            He goes on to say:  I think when CPS hears that --

9   excuse me my language, I'm quoting here -- that fucking podcast

10  he hosts, they'll pay his fucking criminal ass a visit.  He's

11  had ample warning, so I'm sure he'll get rid of -- so I'm sure

12  he'll get rid of the drugs before then and come up with

13  suitable lies.

14           And, again, I again apologize for the language, but

15  I'm quoting in the next one.

16           Mr. Cantwell then posts:  I hope every CPS worker in

17  Missouri is a Jew or a nigger and I hope they break every rule

18  and destroy this scumbag's life.

19           So that is the entirety of the public doxing, the

20  public posting --

21           THE COURT:  Do I now have -- so I want to be sure I

22  have what you're telling me, which is you're going to show her

23  those photographs and show her those statements and you're

24  going to say, when did you learn of these?  I learned about

25  them when the FBI agent came to me.  And how -- how did you

1   feel when you saw these things?  And she's going to say how

2   upset she was in more detail than that and that will be her

3   testimony.

4            MS. KRASINSKI:  I anticipate that she will also

5   testify that before she learned about the public doxing from

6   FBI that she had had a conversation with her husband about the

7   potential for a CPS call, that she and her husband had a

8   conversation about Child Protective Services, that she told

9   him, you know, she -- based on her experience and her

10  employment that it is very hard to have children taken away

11  from a family but that she wouldn't have welcomed that

12  intrusion into her life of having a CPS investigation.

13           THE COURT:  All right.  Now, which element of which

14  charge does this testimony tend to prove?

15           MS. KRASINSKI:  So I think it relates to the final

16  element of the cyberstalking charge, which requires -- excuse

17  me.

18           THE COURT:  Do you have my draft, first draft of the

19  instructions?

20           MS. KRASINSKI:  Yes.  I don't have them right in

21  front of me.  But the statute reads conduct that causes,

22  attempts to cause, or would reasonably be expected to cause

23  substantial emotional distress to that person or that person's

24  spouse, essentially, if you look at both 2261(a)(2) and

25  2261(a)(1)(A)(3).

1          THE COURT:  So you're saying essentially there is

2    a -- that element can be proved by subjective cause and she

3    would testify as to subjective cause and that satisfies the --

4    that element of the cyberstalking statute.

5          MS. KRASINSKI:  Yes, your Honor.

6          THE COURT:  Okay.  Let me take a look at my

7    instruction on that point.

8          And is the conduct you've described the conduct that

9    you have charged in the cyberstalking count as the conduct that

10   caused or could reasonably be expected to cause?

11         MS. KRASINSKI:  Yes, your Honor.  It's one of the

12   included portions of the course of conduct.  Let me pull up the

13   superseding indictment.

14         THE COURT:  Okay.

15         MS. KRASINSKI:  So the indictment includes the

16   language, and it's the second page -- or, excuse me, the fourth

17   page of the indictment, as part of the course of conduct on or

18   about June 17th, 2019, doxing Victim 1 by posting Victim 1's

19   state, town, and street and photographs of Victim 1 and Victim

20   1's wife and children on the Radical Agenda account on Telegram

21   Messenger.

22         And then writing that "tomorrow morning I'm calling

23   CPS to give them every episode of the Bowlcast," that portion

24   that I read to you moments ago.

25         THE COURT:  All right.  And the count identifies the

1    emotional distress both of Victim 1 and Victim 1's spouse,

2    right?

3              MS. KRASINSKI:  Yes.  And that's on page 3 of the

4    superseding indictment.  And it says:  To engage in a course of

5    conduct that placed Victim 1 in reasonable fear of serious

6    bodily injury to Victim 1's spouse and that caused, attempted

7    to cause, or would be reasonably expected to cause substantial

8    emotional distress to Victim 1 and Victim 1's spouse.

9              THE COURT:  All right.  I had been operating under

10   the assumption -- and, again, because I don't know the evidence

11   in the case -- that the allegation in Count Four was based on

12   the -- the statement that Mr. Cantwell would come to the

13   victim's house and rape the victim's wife in front of her

14   children.  And I'm using victim here because that's how you

15   describe it and you describe Cheddar Mane as the victim and

16   then you describe his spouse as the victim's spouse.

17             But I -- I guess I've been operating under the

18   misimpression that that was the -- the conduct that -- the

19   statement that was the -- the actus reus for this cyberstalking

20   count and I guess I got that wrong.

21             MS. KRASINSKI:  I think for Count Four the actus

22   reus is broader than that and I think that's because the

23   statute itself requires a course of conduct.  It requires two

24   or more acts committed with the intent to harass.  And so --

25             THE COURT:  All right.  Let me -- again, I -- I need

1    to break this down.

2          The course of conduct that you charge is fear of

3    serious bodily injury to Victim 1's spouse, isn't it?

4          MS. KRASINSKI:  That is included, yes.

5          THE COURT:  Okay.  But do you charge other courses

6    of conduct, such as course of conduct of upsetting her by

7    putting her image on the Internet and the image of her

8    children?

9          MS. KRASINSKI:  So the -- the course of conduct has

10   to be committed with the intent to kill, harass, or injure and

11   then the separate part of the statute has alternate ways to

12   meet the last element.  So one alternate way to meet the last

13   element is to show that Victim 1 was in reasonable fear of

14   serious bodily injury to his spouse.  There are --

15         THE COURT:  That's one that you've charged.

16         MS. KRASINSKI:  That is one that is charged, but

17   there are two other alternates that are charged.

18         THE COURT:  Okay.  Let me break this down better so

19   I can understand.  Because what you say in the first sentence

20   is between June 15th and June 17th, in the District of New

21   Hampshire and elsewhere, the defendant, Christopher Cantwell,

22   with intent to harass and intimidate Victim 1, did use

23   facilities of interstate and foreign commerce, including

24   electronic communication services and telephone facilities, to

25   engage in a course of conduct that placed victim in reasonable

1  fear of serious bodily injury to Victim 1's spouse and that

2  cause and -- and that caused or attempted to cause or would be

3  reasonably expected to cause substantial emotional distress to

4  Victim 1's spouse.

5          So the course of conduct is -- all right.  So the --

6  the way you expressed this is not completely clear to me.

7  You're saying that those are alternative ways of proving the

8  statute so that placing in reasonable fear of serious bodily

9  injure to Victim 1's spouse is one way and that causing,

10  attempting to cause, or would reasonably be expected to cause

11  substantial emotional distress is another way of doing that?

12          MS. KRASINSKI:  Yes, your Honor.

13          THE COURT:  Okay.  Yeah, that wasn't clear to me

14  because you -- the government follows the standard practice

15  that you use of charging things in the conjunctive, but one way

16  to read that is to say that the course of conduct is placing

17  him in reasonable fear of serious bodily injury and that by

18  doing so you cause substantial distress to Victim 1 and Victim

19  1's spouse.  You're saying, no, there are two ways to do it;

20  one is to do by reasonable fear of serious bodily injury to the

21  spouse and/or that caused or attempted to cause substantial

22  emotional distress.

23          But -- I -- I'm going to have to think about that,

24  Ms. Krasinski, because I don't think you charged it in quite

25  the way that you're suggesting that you charged it.

1          MS. KRASINSKI:  No, I -- I understand what the

2    Court's saying.  I think if you look at the statute, I think

3    there's a distinction.  The course of conduct has to be

4    committed with the intent to harass or injure.  And then

5    this -- the element -- so that's one element, right, that the

6    defendant engaged in a course of conduct with the intent to

7    harass or intimidate another person.

8          THE COURT:  And that's what I'm saying, no -- and

9    then I would say and that course of conduct has to place the

10   victim in reasonable fear of serious bodily injury to Victim

11   1's spouse -- or, excuse me, that course of conduct had to

12   cause, attempt to cause, or would be reasonably expected to

13   cause substantial emotional distress.  In other words, the way

14   I was reading -- it's the -- you have to have a course of

15   conduct that placed someone in reasonable fear of bodily injury

16   and in addition to that, that course of conduct must have

17   caused, attempted to cause, or reasonably expected to cause

18   substantial emotional distress.  What you're saying is the

19   statute can be violated without any course of conduct to place

20   somebody in reasonable fear of bodily injury.  Instead it can

21   be violated by a course of conduct that causes, attempts to

22   cause, or would be reasonably expected to cause substantial

23   emotional distress to Victim 1 and Victim 1's spouse.

24          Those are alternative ways, you say, of proving the

25   charge and because you adopted the prosecutor's convention of

1    charging in the conjunctive, what you're saying is we're

2    entitled to prove it either way.  Not --

3           MS. KRASINSKI:  Correct, your Honor.

4           THE COURT:  We're not saying that the second

5    component is an element of the first way of proving it.  We're

6    saying there are two different ways of proving it and we want

7    to prove the second way by having the victim come in and say, I

8    was -- I -- I was substantially emotionally distressed by

9    posting of this on the Internet or in this forum that was

10   available to members of the public and doing this posting while

11   referencing a call to CPS.

12          MS. KRASINSKI:  Correct, your Honor.

13          THE COURT:  Okay.  All right.  Well, I -- again, I

14   had not been aware that that was the theory that you were

15   proceeding under under the indictment.

16          So -- all right.  So I've got your position, I

17   think.  You would say it is -- it -- the witness is not

18   available to testify here for health reasons because of her

19   pregnancy and the pandemic, that her testimony is necessary

20   because it's the -- the principal way by which you prove that

21   alternative theory of -- of liability here -- that is, that it

22   actually caused substantial distress to her, and that the

23   defendant's confrontation right can be fully respected by

24   two-way live video.

25          MS. KRASINSKI:  Correct, your Honor.

1          THE COURT:  Okay.  Do you want to say anything else

2     before I turn to the defense?

3          MS. KRASINSKI:  No, your Honor.

4          THE COURT:  All right.  I'll hear from either of

5     you, whoever wants to speak on that issue.

6          MR. LEVIN:  I'll speak, your Honor.

7          I did file an objection.  I wasn't sure if the --

8          THE COURT:  Yeah, I have it.  Yeah.

9          MR. LEVIN:  So --

10          THE COURT:  I -- let me compliment you as well.  I

11     think it was well done also.  I think the issue has been well

12     briefed and I have read the briefs on it.

13          MR. LEVIN:  So I guess our -- our position is

14     obviously Supreme Court jurisprudence does make very clear that

15     there's a preference for live face-to-face testimony, that the

16     defendant has a Sixth Amendment right to confront witnesses

17     against him.  That right can occasionally fall away if there

18     are important policy considerations and if there's, you know,

19     necessities in the case and that's determined on a

20     case-to-case basis.  And that's from the *Maryland v. Craig* --

21          THE COURT:  Let me ask you.  If you were to -- if

22     you were to decide you wanted a new impanelment process and we

23     had an extra two weeks, would you prefer that I flew everybody

24     out there and had your client do a present face-to-face

25     deposition?  Because if we delay the proceeding by a couple

 1    weeks, then there's more time to do that.  One of the principal

 2    reasons I denied the request was the last-minute way in which

 3    it was presented to me.  Would you prefer to do it live, if

 4    I -- if we have the time to do it live?

 5              MR. LEVIN:  I think that's something we'd have to

 6    discuss with our client, but I don't -- you know, I don't -- I

 7    don't particularly relish the idea of flying to Missouri.

 8              THE COURT:  I don't relish -- I don't relish the

 9    idea of exposing anybody to added risks of COVID and I don't --

10    wouldn't do it lightly.  But if you were not comfortable with

11    live video and we had the time to do it, I would at least be

12    inclined to revisit the issue of whether we should do a live

13    in-person Rule 15 deposition which is a way in which the rules

14    and confrontation clause rights are fully respected.

15              MR. LEVIN:  That's a conversation we'll have with

16    our client.

17              THE COURT:  All right.

18              MR. LEVIN:  The government -- I guess the main point

19    we had is the government raised two cases, the *Cotto-Flores*

20    case, and in that case, the First Circuit was interpreting a

21    statute.  The statute is the Child Victim Rights Act of 1990.

22    There's -- that statute provides the policy framework for

23    having closed-circuit television testimony.  Congress came to

24    the conclusion that that's important in some child sexual

25    assault cases to protect the victim and to allow for the victim

1    to testify where the victim is afraid of -- of the defendant.

2              That statute has very specific case findings --

3    case-specific findings that the Court has to make before

4    resorting to that type of procedure.  It also has a condition

5    in it that the request has to be made seven days before trial

6    and numerous other factors that have to be met, satisfied,

7    before the Court even reaches those conditions.

8              The *Donziger* case --

9              THE COURT:  I'd also note that the Rules of Criminal

10   Procedure do have provisions in them that authorize certain

11   kinds of procedures to be conducted by videoconference.  So

12   there are rules that specifically say this kind of procedure

13   can be done by videoconference.  And when in response to the

14   pandemic Congress amended those rules to allow for certain

15   kinds of proceedings to be conducted by videoconference, that

16   was done at the recommendation of the Judicial Conference of

17   the United States.

18             It is far preferable -- I agree with Ms. Krasinski

19   that technology that has advanced; I agree that we all have to

20   reassess exactly what role videoconferencing should play in the

21   criminal justice system in light of the pandemic; and it would

22   be far preferable for this issue to be joined, carefully

23   considered by Judicial Conference committees, a proposal

24   drafted to Congress that has the support of the entire Judicial

25   Conference, and that we have congressional sanction because

1   that's a good way to flesh out all of the potential benefits

2   and costs of doing something like this.

3          I -- I recognize that we're -- we don't have the

4   luxury of doing that, but it is important to note that the --

5   one of the lines of cases that Ms. Krasinski cites is a line of

6   cases that implements a statutory process for conducting these

7   two-way videoconferences and although the -- Congress and the

8   Judicial Conference did consider certain kinds of procedures in

9   the criminal justice system that could be conducted by

10  videoconference under certain circumstances, they did not

11  include witnesses testifying at trial and all of the emergency

12  measures that were enacted were ones that were enacted that

13  required the defendant's consent to be able to proceed whereas

14  this would be done over the defendant's objection, without any

15  statutory authorization, without any rule of procedure that

16  authorized it.  That doesn't mean I shouldn't do it, but it's

17  counsel's caution.

18         And so I would take your point and just add that to

19  it as I think it through.

20         MR. LEVIN:  Thank you, your Honor.

21         The other point with regard to the *Donziger* case

22  which is, I guess, ongoing litigation right now and that's a

23  very recent decision.  The critical difference in that case was

24  the witness -- first of all, we don't know what medical

25  condition that witness has because it was redacted from the --

1       from the order.  It's under seal.  So we don't know if it was a

2       very serious medical condition that would have been on the CDC

3       list of conditions that put one at increased risk for severe

4       illness or whether it was something more benign.

5              But in that case, the witness had been

6       cross-examined at a deposition, had submitted sworn

7       interrogatory answers.  The defendant in that case is an

8       attorney, so I'm assuming he either conducted the

9       cross-examination himself or was involved in it in some way.

10      So that was a -- a critical difference.

11             The other difference is in the Second Circuit, the

12      test for whether or not live two-way video testimony is

13      permissible, the test they use is the same test that we were

14      suggesting the Court should consider for Rule 15 deposition

15      testimony:  One that depends on materiality, number one; number

16      two, unavailability; and, number three, if the interests of

17      justice require.

18             I'm not sure from that opinion how material that

19      witness's testimony was.  I'm assuming the Court made that

20      finding that it was material.  In this case, I -- I understand

21      the Court has reached the conclusion over our objection that

22      the testimony is relevant.  I'm not sure the government has

23      argued materiality which, in my experience, is something more

24      than relevance, something super relevant, that the charge

25      couldn't be proved without the witness's testimony.

1          And with regard to necessity, again, the allegations

2     about the medical condition, which I'm not going to -- I'm not

3     going to discuss those here because those were filed under seal

4     and I -- my understanding was they were sealed by the

5     government, but --

6               THE COURT:  Well, I do think I -- it needs to be

7     clear on the record here that the issue is that she is in the

8     first trimester of her pregnancy and is otherwise healthy, but

9     has some probable history of problems with prior pregnancies.

10    I can't really analyze the issue in public without those being

11    part of the record.  So I do feel I need to disclose that

12    information.

13              MR. LEVIN:  But our understanding of that issue was

14    that the doctor made a recommendation, it's very vague as to

15    what issues were involved, and that the -- the science

16    regarding pregnancy and COVID risk, the data is mixed.

17    According to the CDC website and whatever we've been able to

18    find shows that there's mixed data on whether that's even an

19    issue.

20              THE COURT:  Uh-huh.  I do want to note that

21    Ms. Krasinski had provided a better explanation of the

22    relevancy and potential materiality of the testimony than she

23    was able to provide to me on short notice over a telephone

24    conference a couple weeks ago.  I do think I have a better

25    understanding of the problem now than I had then.  That was

1  raised in an emergency basis with -- where I was away from the

2  court, had no access to legal research materials, no

3  opportunity to reflect on the issue, had to make an emergency

4  and immediate ruling.

5  But now I have a -- at least I have a better

6  understanding of her position on why she wants to have the

7  witness testify and I do think if she's right about it, and I'm

8  going to have to study the statute, her argument makes more

9  sense to me now than it made at the time she was presenting it

10  over the telephone.

11  MR. LEVIN:  And I just want to make one more point

12  regarding the factual representation that the evidence is that

13  this -- the victim's spouse became upset at learning about the

14  online posting of the exchange or online posting of her

15  photograph and her children's photograph which is that in the

16  evidence that we've received, the -- and, I mean, I'll just

17  read the section.

18  And, again, the -- some of the interview reports

19  that we've received are redacted, so I'm not sure exactly what

20  all the words are, but it indicates that she was shown a copy

21  of the threatening text exchange between Cantwell and Cheddar

22  Mane as well as the pictures that were attached in the posts,

23  but it doesn't indicate that she was actually shown the online

24  version of the posting.  It's not clear that she was made aware

25  at that time or any time that the posts were -- were public --

1                THE COURT:  Yeah.

2                MR. LEVIN:  -- that these were an exchange between

3     Cantwell and Cheddar Mane that she was shown.

4                So I'm not exactly sure about that, but based on

5     what we've received, it was when the FBI showed her the

6     exchange, the private exchange, between herself -- between her

7     husband and Mr. Cantwell --

8                THE COURT:  One of the arguments that Ms. Krasinski

9     has fleshed out now is this idea that at least some of these

10    matters that the FBI presented to her are still on the --

11    available on the Internet publicly available.

12               One of the problems I had with her presentation the

13    last time was it -- and this, I think, was following up on a

14    prompt from the defense -- that it appeared like she was saying

15    that this crime can be committed by having government agents

16    take information that -- communications that a defendant makes

17    but that the victim is not aware of, show them to the victim,

18    produce an emotional response, and satisfy that element that

19    never otherwise would have been satisfied.  In other words, the

20    government's action can complete the crime.  And that, to me,

21    is a very problematic conception.

22               She's added one factor to this, which is that the

23    government -- the government was merely making her aware of

24    something that is still and was at the time out there and it is

25    the public posting of it that is the -- the reaction, not I'm

1   telling you what the defendant did.  And maybe that's

2   different.  But I do have concern about the government action

3   completing the element of a crime that otherwise hasn't yet

4   occurred.

5           And I -- Ms. Krasinski, I -- this must resonate with

6   you at some level, this idea that he didn't commit a crime

7   until the government showed her the posting and then once the

8   government showed her the posting, she got very upset and that

9   satisfies the last element.

10          Do you see the problem with that?  It's like the

11  government makes the crime occur when it hasn't otherwise

12  occurred.

13          MS. KRASINSKI:  I understand the Court's concern

14  about that and that's why I agree that if the defendant's

15  conduct were simply limited to the private exchange between the

16  defendant and her husband, when the FBI showed that exchange to

17  her, I don't think that that -- I don't think we'd be here.  I

18  don't think I'd be asking for her testimony.  I think I agree

19  with the Court on that.

20          But when the defendant engages in conduct publicly

21  posting something that remains publicly available and -- you

22  know, I -- I can't tell you if it's there today.  The last time

23  that we checked, a few months ago, it was still there.  So --

24  you know, up for a very extended period of time.

25          It's the defendant's conduct that did that.  It was

1    the defendant --

2            THE COURT:  Right.

3            MS. KRASINSKI:  -- that made that publicly

4    available.  But I understand and appreciate the Court's

5    concern.  And if it were just the private messages that she was

6    not aware of and by the time she learned of them that had

7    concluded, then that testimony wouldn't be relevant at all.

8            THE COURT:  And just to be clear about this, it

9    would still be open to you for you to prove this crime under

10   the objective standard, whether she testifies or not, and it

11   would still be open for you to prove this crime based on the

12   victim's subjective reaction, whether she testifies or not.

13   This is just -- this is another way of proving it that would be

14   effectively, in your mind, foreclosed if I didn't allow her

15   testimony.  That's --

16           MS. KRASINSKI:  I think that's fair, your Honor,

17   yes.

18           THE COURT:  All right.  All right.  So this is a

19   very complicated problem that you're presenting me with.  It's

20   complicated from the standpoint of trying to assess the risk of

21   COVID, it's complicated from the standpoint of trying to assess

22   my authority to have two-way live video in a circumstance such

23   as this where Congress and -- has authorized it in certain

24   kinds of criminal proceedings, hasn't authorized it in this

25   proceeding.

1         I'm inclined to say that I have the inherent

2    authority to do it and I'm inclined to say that the Sixth

3    Amendment confrontation right, although in almost all instances

4    requires in-court public confrontation, that that right is not

5    absolute because there are no rights in the Constitution that

6    are absolute that I'm aware of and they're all subject to some

7    balancing of competing considerations, although the standard

8    that is required, in my view, is -- requires that the defendant

9    in almost all instances be given the -- a right to be present,

10   physically present, when the testimony is given.

11        So I'll take this matter under advisement.  I can't

12   give you a ruling from the bench today on it.  I'm going to

13   have to think about it.

14        MR. LEVIN:  Can I just say one additional thing to

15   you supplement the record, your Honor?

16        From our perspective, this is a witness whose

17   credibility is at issue.  She has been inconsistent.  The

18   government, for example, is saying that she had -- that she

19   said that she had a conversation with her husband about the CPS

20   call that's been alleged.  She did not say that the first time,

21   yet the second time they spoke to her she said she, quote, felt

22   like it might have happened.  And that's an example.  And she

23   may be discussing the case with the alleged victim as well.

24        So the point I want to make is that this is not a

25   witness whose demeanor is irrelevant or whose testimony is the

1    equivalent of a stipulated fact.  This would be a -- a

2    contested issue.  And obviously the defendant -- our position

3    is he has the right to physically confront her and I think it

4    would be important in this case for there to be face-to-face

5    vigorous cross-examination of this witness.  And I just wanted

6    to say that so it's clear.

7          THE COURT:  All right.  I get it.  And I'll -- I'll

8    read the cases that you've cited.  I'll think about the issue.

9    I'll give you an answer as soon as I can.

10          It may become relevant to me whether we are going to

11    go ahead as scheduled tomorrow or whether we are going to

12    convene a new jury in two weeks because that does bring back

13    into play the Rule 15 deposition as an option that would

14    satisfy the confrontation clause and could arguably be done

15    with reasonable safety without -- while still allowing

16    sufficient time for the defendant and the entire trial team

17    to -- both sides -- to self-isolate and test and come into

18    court in two weeks and conduct the -- conduct the trial.

19          So in addition to knowing -- once I know what the

20    defense position is on whether they want to continue with the

21    trial as scheduled or have a new jury impaneled, that could

22    affect my thinking about these issues because I assume,

23    Ms. Krasinski, if I -- you would -- either of those options are

24    acceptable to you, either video testimony or a Rule 15

25    deposition that I denied you in the past for the -- because of

```
 1    the circumstances under which it was presented.  Am I right?
 2              MS. KRASINSKI:  Yes, your Honor.
 3              THE COURT:  Okay.  So I'm going to have to revisit
 4    the Rule 15 issue if we're going to postpone the case by a
 5    couple weeks because then there arguably is enough time to send
 6    you out there, have you do the deposition.  And I know counsel
 7    doesn't have any conflicts on their trial schedule because they
 8    booked their time to be in court this week.
 9              All right.  So you'll let me -- so, to summarize,
10    I'll take this particular issue under advisement.  I'll expect
11    to hear from defense counsel before the end of the day after
12    consulting with Mr. Cantwell.
13              Do you need -- do you need me to leave you in
14    this -- put you in a breakout room and leave you in this
15    conference so that you can talk to Mr. Cantwell right now or do
16    you want to set up your own separate conference with him?
17    What's the defense perspective --
18              MR. LEVIN:  If you would put us in a breakout room,
19    that would be much appreciated.
20              THE COURT:  Yeah.  What I'll do is all of us will
21    leave the call and we'll put you in a breakout room where
22    there's no record and nobody's listening.  And then when you're
23    done, you can just terminate your links, okay, Mr. Cantwell,
24    and then the conference will end.  But I don't think there's
25    any need for the rest of us to wait here because I don't want
```

1    you to feel rushed if you want to do a little research, you

2    want to reflect on it.  As long as you let me know towards the

3    end of the day, that'll be fine.  But you can start the process

4    with a breakout room in a minute and take as much time as you

5    need and when you're done, just terminate the link and the

6    conference will -- will end.

7                MR. LEVIN:  And to let the Court know, we just need

8    to email Vinny or --

9                THE COURT:  Yeah.  Email Vinny what you want to do

10   and then I will -- then I will set up -- Vinny will set up a

11   telephone call with the government and the defense and me and

12   I'll hear what your position is.  And once we decide whether

13   there'll be trial tomorrow or not, Vinny will then enter a --

14   make an entry on the docket and if we're not going to start

15   the trial tomorrow because the government wants a day to

16   postpone or -- because we're going to go to a new impanelment,

17   we'll make an entry on the docket so that the public and the

18   reporters here will know what -- what our -- what we're going

19   to do.

20                All right?  So --

21                MR. LEVIN:  We should probably let him know by 4:00

22   so we can do that or --

23                THE COURT:  That would be really helpful to me if

24   you could do that, yes.

25                MR. LEVIN:  Okay.

1            THE COURT:  And we'll try and set up something

2     towards the end of the day.

3            So, Mr. Cantwell, you stay on.  Defense -- you're

4     going to be put into a breakout room with Mr. Wolpin and

5     Mr. Levin.  The rest of us are going to sign off.

6            And I would ask my law clerks, I -- I want to

7     discuss some matters with you, case-related and uncase-related,

8     so I will send you a link to a separate conference and then the

9     three of us can talk through some of these issues a little

10    further.

11           Is there anything else anyone wants to take up with

12    me while you're all on the line?

13           MR. LEVIN:  No, your Honor.

14           MS. KRASINSKI:  No, your Honor.

15           THE COURT:  Okay.  So, Vinny, please move them into

16    a breakout room.  Leave the link active so -- Vinny, I think

17    you've got to keep your link active.  Otherwise the breakout

18    room will terminate because -- if you're the host.  And -- and

19    when they sign off, you can -- you can -- that should end the

20    conference.  Okay?  But I don't think you can sign off and

21    still leave them active in a breakout room.

22           THE CLERK:  Okay.

23           THE COURT:  Okay?  All right.

24           And my clerks, please look for an email from me.

25    I'll send you an invitation to a new meeting.

45

1          And that concludes the hearing.

2          MR. LEVIN:  Thank you.

3          (Proceedings concluded at 11:27 a.m.)

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 5/12/21         */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR