*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 10, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:20-cr-6-01-PB
              v.                    *   September 23, 2020
                                    *   9:08 a.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 2
MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:            John S. Davis, AUSA
                              Anna Z. Krasinski, AUSA
                              United States Attorney's Office




For the Defendant:            Eric Wolpin, Esq.
                              Jeffrey S. Levin, Esq.
                              Federal Defender's Office




Court Reporter:                Liza W. Dubois, RMR, CRR
                              Official Court Reporter

**I N D E X**

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

**SHAYNE TONGBUA**

| By Mr. Levin | | 22 | | |
| By Ms. Krasinksi | | | 46 | |
| By Mr. Levin | | | | 56 |

**BENJAMIN LAMBERT**

| By Mr. Davis | 60 | | | |

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibit 116 | | 107 |
| Government's Exhibit 117 | | 107 |
| Defendant's Exhibit B-20 | | 88 |

1                    P R O C E E D I N G S

2              (Sealed portion filed under separate cover.)

3              THE CLERK:  That's done.

4              THE COURT:  Okay.  Super.  I'll just give the public

5    a moment to come in.

6              Okay.  I can't -- could you call the case again,

7    Vinny, if you haven't already.  I can't remember whether you've

8    done it.

9              THE CLERK:  Court is in session and has for

10   consideration a jury trial in United States of America vs.

11   Christopher Cantwell, criminal case number 20-cr-6-01-PB.

12             THE COURT:  All right.  I want to begin by noting

13   that I began today's proceedings with a sealed hearing.  I

14   needed to discuss certain matters that can't be included in the

15   public record.

16             During that hearing I ruled on the government's

17   motion for live two-way video testimony of what we've been

18   referring to here as the victim's spouse.  I heard the

19   government's motion, the parties' views on that matter, and I

20   denied the motions for reasons that I specified on the record.

21   But that need to be, in part, under seal.

22             So before we bring the jury in, there's one other

23   issue I want to discuss with the parties.

24             During the testimony yesterday, the defense objected

25   to a government proposal to introduce certain excerpts from a

1    telephone call in which the defendant was allegedly a

2    participant and the defendant objected to the government's

3    effort to introduce those excerpts invoking what I refer to as

4    the rule of completeness.  That is a rule of evidence that

5    suggests that under certain circumstances where a party wants

6    to introduce some portions of a document or a recording, the

7    opposing party may be entitled to have more of the recording

8    played.

9            I understand that the defense has a -- an objection

10   to -- and wants the entire recording played.  I am not prepared

11   to grant that objection.  I've reviewed the transcript of the

12   entire recording and don't believe that the defendant's

13   entitled to have the entire recording prepared -- excuse me --

14   played.  If the defendant wants to make arguments as to

15   specific portions of that call that should be included with the

16   excerpts, I'll hear you on that, but if your argument is all or

17   nothing, Judge, either we want the entire thing played or we

18   don't have any specific argument for any parts of it, then we

19   can just move on.

20           But do you want to make an argument that certain

21   portions should be played?

22           MR. WOLPIN:  Yes, your Honor.

23           THE COURT:  All right.  Go ahead.

24           MR. WOLPIN:  Before I begin, because we're working

25   in partly a paper world and partly --

1          THE COURT:  I'm sorry.  I -- on my standing desk is

2    a copy of the -- the entire transcript of the entire call.

3    It's got some color-coding on it that we've done to try to

4    identify the excerpts.  If somebody could bring it down to me.

5    I'm sorry.  I just forgot to bring it.

6          But you can go ahead while we're -- sorry.

7          MR. WOLPIN:  I just wanted to make -- just for

8    purposes of the record to confirm whether a copy of this has

9    gone to the Court as a -- essentially an exhibit for the

10   purposes of this hearing.

11         THE COURT:  We'll mark the -- the transcript of the

12   entire call as a defendant's exhibit -- the next defendant's

13   exhibit for identification and the transcript of the -- of

14   the -- the redacted portions that -- the portions that the

15   government proposes to play, I also have those.  I don't know

16   if they're already marked as a government's exhibit or not.

17         MS. KRASINSKI:  They are, your Honor.

18         THE COURT:  Okay.  So you can refer to the

19   government's exhibit if you want to talk about the excerpts.

20         And does the clerk have a number for the defendant's

21   exhibit for the entire transcript?

22         THE CLERK:  I don't have their exhibit list right

23   here, your Honor.

24         THE COURT:  All right.  Well, he'll get it, but you

25   can just refer to it as the entire transcript for now and the

1    record will reflect that that's the exhibit that will be marked

2    as the next defendant's exhibit.

3            MR. WOLPIN:  So what I would begin with is referring

4    the Court to the second page of the transcript we have.

5            Obviously the argument we're making is a Rule 106

6    argument, which is addressed under the following:  When a

7    writing or recorded statement or part thereof is introduced by

8    a party, an adverse party may require the introduction at that

9    time.  Any other part of any other writing or recorded

10   statement ought to -- in fairness to be considered

11   contemporaneously with it.  So it's a fairness consideration.

12           As noted in the First Circuit case, *United States v.*

13   *Bucci*, B-u-c-c-i, that may at times, the First Circuit case

14   allow for the admission of otherwise inadmissible evidence.  So

15   it's not simply a question of whether the evidence -- the other

16   portions would be inadmissible; it's an a question of whether

17   in fairness they need to be played with it.

18           What I'm going to ask that the Court consider is

19   page 2, beginning with "the only choices."  And --

20           THE COURT:  All right.  I'll have my transcript in a

21   minute, but why don't you just first read me the closest

22   excerpt or the excerpt that you think relates most closely to

23   what you want to add.

24           MR. WOLPIN:  Okay.  So the government's highlighted

25   portion in 107 is:

1          "Okay.  But you threatened Cheddar Mane and said you

2    were going to come rape his wife.

3          "I didn't say I was going to rape his wife.

4          "Okay."

5          I fucking left that out there.

6          Okay.

7          So what we're seeking to get in is the portion just

8    above that.

9          THE COURT:  Okay.  Could you read that for me?

10         MR. WOLPIN:  Yes.

11         "The only choices I have here are go to law

12    enforcement or to go hunt this fucking asshole down and commit

13    a crime myself.  Those are the two choices I have.  Because

14    those are my two choices, I can say that" --

15         THE COURT:  I'm sorry.  Could you find Jen?  I did

16    have it in my pile of documents.  I apologize.  Tell her I'm

17    sorry to make her run up the stairs.  Okay.

18         MS. KRASINSKI:  Your Honor, I have another copy

19    and --

20         THE COURT:  I -- I have it.  They're all -- no,

21    these are my -- we'll have to get a -- I've already marked mine

22    up.  We need an unmarked copy of this.  So you'll provide it

23    and it will be the next --

24         THE CLERK:  It'll be marked as Exhibit A.

25         THE COURT:  All right.  So, again, I'm sorry.  I

1    just come down with a pile of materials.

2              All right.

3              MR. WOLPIN:  If the Court has it in front of it, it

4    is the second page.  The Court can read --

5              THE COURT:  Yeah, I've got it.  So you want to have

6    beginning what?

7              MR. WOLPIN:  The top of the page.

8              THE COURT:  With "the only choices that I have"?

9              MR. WOLPIN:  Yes.  So -- and I can explain the

10   reasoning why, though, we believe those two things are

11   connected.

12             THE COURT:  But are -- is that what you want, you

13   want to start with "the only choices I have"?

14             MR. WOLPIN:  Correct.

15             THE COURT:  Okay.  Let me just read this again.

16             Okay.  This is part of this Alice in Wonderland

17   feeling I have about this case where the strongest evidence the

18   government has against your client on motivation is the very

19   evidence that the government's trying to keep out and you're

20   trying to introduce.  So it's really -- it's like a -- it's

21   hard for me to even understand why you would want to introduce

22   evidence where the defendant talks about planning to commit the

23   crime that he's charged with.

24             Why do you feel you want to introduce evidence in

25   front of the jury that would tend to show that your client had

1    a strong motivation and --

2              I'm sorry.  Vinny didn't find you?  I sent him back

3    up to get you.  I had it.  I'm sorry.

4              So help me understand that, because it's a -- it's a

5    bizarre trial world I'm living in.  I see that statement as

6    among the strongest pieces of evidence the government has

7    against your client, but the government wants to keep it out

8    and you want to put it in.  How -- help me make sense of that.

9              MR. WOLPIN:  Okay.  So the reasoning why it's

10   relevant in this context is what he is telling this other

11   individual is that I don't intend to commit a crime, I'm not

12   going to commit a crime; I have two choices, to go to the FBI

13   or to commit a crime --

14             THE COURT:  But let's not -- let's not deny reality.

15   The evidence in this case will be undisputed that he felt he

16   did exercise those choices; they didn't produce fruit and so

17   he -- he went and did what he said next, commit a crime.

18             MR. WOLPIN:  Well --

19             THE COURT:  That's how I -- how does that help you?

20             MR. WOLPIN:  In our position to the jury, he did not

21   commit a crime in that incident involving June 16th, 17th.  Our

22   argument is that our client had a choice, which was to commit a

23   crime or go to law enforcement.  He went to law enforcement and

24   continued to go to law enforcement; went to them in May, went

25   to them in September, continued that process.  He never

```
 1    abandoned that process and decided to commit a crime.

 2              THE COURT:  What would you say -- what would you ask

 3    the jury to think if in its rebuttal closing if the government

 4    got up and quoted this and says, this is the game plan; try to

 5    go -- get him to stop, go to the police to get him to stop, and

 6    if that doesn't work, commit a crime and that's what he did.

 7    How -- are you worried at all that if the jury hears that that

 8    that's what they're going to conclude?

 9              MR. WOLPIN:  I think it's an argument between both

10    sides.  Our argument is, again, that he has continued to go to

11    the police for help throughout this process.  That was never

12    abandoned.  It was never his intent to commit a crime.  What

13    the government is doing is isolating the one section where he

14    says, well, maybe that was something.

15              THE COURT:  All right.  Let me try -- let me try the

16    government.

17              They want to put this in.  It seems to me obvious

18    that that's strong evidence of a motive on your client's -- on

19    the defendant's behalf.  Why do you want to keep it out?

20              MS. KRASINSKI:  Your Honor, we're trying to just

21    keep the case clean.  There's a statement that is directly

22    about a comment whether or not something is a rape threat or

23    whether it's a joke or whether it's --

24              THE COURT:  I know, but this argument doesn't go to

25    the it's-all-a-joke.  This argument -- I mean, I don't even,
```

1    frankly, understand what the defendant's argument is, but it

2    doesn't go to a it's-all-a-joke argument; it's more about this

3    nonexistent provocation defense that they say they're not

4    presenting, but if it helps the defense, it only helps if

5    there's a provocation defense, which there isn't.

6            So I -- I just -- I'm sorry, but the whole thing is

7    not making any sense to me.

8            MS. KRASINSKI:  Our intent was simply to limit it to

9    the exact portion where Mr. Cantwell is discussing his

10   statement, "so if you don't want me to come and fuck your wife

11   in front of your kids" -- I can't remember the exact words he

12   uses after that.

13           MR. DAVIS:  You need to make yourself --

14           MS. KRASINSKI:  "You need to make yourself scarce."

15           That is exactly what those two lines refer to, that

16   statement.  You threatened Cheddar Mane and you said you were

17   going to come rape his wife.  And Mr. Cantwell responds, "I

18   didn't say I was going to rape his wife.  Okay?  I fucking left

19   that out there.  Okay?"

20           So we were just trying to limit it to the exact

21   statement about that --

22           THE COURT:  Other than saying -- other than just

23   wanting to be -- and I applaud brevity and precision and I -- I

24   like all of that.  But other than that, is there any other

25   reason why I shouldn't allow that portion in, somehow that it's

1     unfairly prejudicial to you?

2              MS. KRASINSKI:  I don't think it's unfairly

3     prejudicial, no, your Honor, particularly if the Court grants

4     the government's request to include in its jury instructions an

5     instruction that provocation is not a defense.

6              THE COURT:  Yeah.  Well, I'm inclined, based on

7     reading this transcript if the government requests it, to add

8     an instruction -- an instruction to that effect, that

9     provocation's not a defense, nor is ignorance of the law a

10    defense.  And they aren't defenses to these charges.  And I --

11    because there's another excerpt in here where maybe he's -- has

12    some argument as to why he didn't think it was a legally

13    sufficient threat, but that isn't a defense to the charge

14    either.

15             But so -- okay.  So, as I said, I'm inclined to --

16    unless the defense presents me with evidence, a reason to think

17    that I'm wrong about the law and the government requests a

18    no -- provocation not a defense instruction, I'm inclined to

19    grant that request.  I don't believe the government would be

20    unfairly prejudiced by it.

21             So what I'm going to suggest is, Mr. Wolpin, we

22    start with "the only choices" and go down to the end of the

23    government's first excerpt, 105A.  Is that what you want to do?

24             MR. WOLPIN:  Yes.

25             THE COURT:  All right.  I grant the defendant's

1    request.

2              MR. WOLPIN:  I believe it's 107.

3              THE COURT:  I don't know.  I had my clerk mark

4    these.  She marked it as 105A.

5              "Okay.  But you threatened Cheddar Mane."

6              That statement, right?

7              MR. WOLPIN:  It might be my mistake.

8              THE COURT:  It might be my clerk's.  I don't know.

9              MS. KRASINSKI:  No, it's 105, your Honor.

10             THE COURT:  105A, the excerpt should start with "the

11   only choices that I have" and it should end where the

12   government proposes 105A to end.  Okay?

13             What's the next one, if there is one, that you want?

14             MR. WOLPIN:  We are now on page 3.  This one, I

15   believe, is the 107A.  The government has isolated near the

16   bottom of the page "the thing that there's liability on is,

17   like I said, give me Vic's information."

18             THE COURT:  Right.

19             MR. WOLPIN:  That one.  We would ask that that start

20   basically a sentence or two before with the word are, a-r-e,

21   three-quarters across --

22             THE COURT:  If that comes in and the government

23   requests an instruction that ignorance of the law is not a

24   defense, do you have any disagreement with that legal

25   principle?

1          MR. WOLPIN:  Well, I would have to consider whether

2   I think it should be something instructed.  As far as whether

3   that legal principle is correct, that -- yes.  But as mental

4   state is at issue --

5          THE COURT:  Right.

6          MR. WOLPIN:  -- I think it can be interpreted in

7   several ways and we're not going to argue that he was -- you

8   know, committed a crime but didn't know it at the time.  That's

9   not going to be our argument to the jury.

10          THE COURT:  Right.  And I think the now is probably

11   not.  When we actually listen to the transcript, I suspect it

12   says here "that's not, you know, I understand the definition of

13   threat legally, okay, so that's now what it is."

14          MR. WOLPIN:  Not what it is.

15          THE COURT:  I think that's "not what it is."

16          MR. WOLPIN:  Correct.

17          THE COURT:  So when you do present a transcript,

18   unless the parties hear that differently, I would -- in

19   context, that word now should be not.  But that clearly

20   implicates an ignorance-of-the-law problem, which if I allow

21   that evidence in, I would have to grant a request for

22   instruction from the government that ignorance of the law is

23   not an excuse, a defense.

24          I would also consider, of course, some additional

25   language that the defense would propose such as you still have

1    to prove criminal intent and context is important and, you

2    know, I -- I would -- I understand how you would not want the

3    jury to be confused about what ignorance of the law means.  The

4    defendant still must act with the requisite criminal intent.

5    That he doesn't know that acting with that intent is a crime is

6    not a defense to the crime.  I think those are basic legal

7    principles that we would all agree on.

8                MR. WOLPIN:  Yes, but --

9                THE COURT:  All right.  You don't have to take a

10   position on the instruction.  I'm just advising you that if

11   that comes in, in my mind, it brings directly to bear a

12   question about how should the jury evaluate an assertion by the

13   defendant that I know what a legally sufficient threat is and

14   that isn't one.  And that -- that's -- so it will increase the

15   likelihood that I will have to instruct on that point.  But I

16   don't have any problem with an excerpt that would be -- I'll

17   hear what the government says, but start with I didn't -- 106A,

18   that combines 106A and 107A and includes the one sentence in

19   between 106A and 107A so that the -- what would be admitted

20   would read, "I didn't threaten to rape his wife.  What I said

21   was F-ing you don't want me to put this out there.  One of my

22   incell listeners would love to give her a kid.  Okay?

23               "Not -- you know, I understand the definition of

24   threat legally, okay, and that's not what that is.  The thing

25   that they're -- the thing that there's a like -- a liability on

1    is, like I said, give me Vic's information, you know, to

2    prevent me from doing something.  Okay?"

3               So that's what the -- it would be one excerpt,

4    combining those two with the one sentence the government

5    omitted.  Is that clear?

6               MR. WOLPIN:  Yes.

7               THE COURT:  I'll hear the government as to why I

8    shouldn't do that.

9               MS. KRASINSKI:  So, your Honor, this call is from

10   December 5th, 2019.  There is nothing to suggest that before he

11   made the statements to Cheddar Mane in June of 2018 that he

12   researched, knew about, had any understanding of what

13   constituted a legal -- a threat legally.

14              And so I think to include this statement that was

15   made more than a year after he made the statements to --

16              MR. DAVIS:  Six months.

17              MS. KRASINSKI:  -- excuse me, six months after he

18   sent the messages to Mr. Lambert, I think it's confusing.  We

19   don't know what he knew about the law, even if he misunderstood

20   it at the time, and so because it was made so far after, it

21   doesn't have any bearing on what he knew or thought at the time

22   he made those statements.

23              THE COURT:  But it -- it's really just like cutting,

24   pasting, like taking out portions -- one sentence out of an

25   exchange he has where you want to put in what's above it and

1    what's below it and I -- that's exactly what Rule 106 is

2    designed to address.  So you don't have to introduce that

3    exhibit -- those excerpts.  If you don't like that sentence so

4    much, don't introduce those two excerpts.  But if you want to

5    introduce them, introduce them as a combined exhibit with 106A,

6    107A and the sentence in between.  And, as I said, if the

7    government requests an instruction on ignorance of the law and

8    it's properly drafted, in light of that statement coming in,

9    I'm inclined to admit an instruction on that and permit

10   argument on that so that the government is free to pull this

11   out and say, here's that statement on his part, but you'll hear

12   the judge instruct on that point and ignorance of the law is

13   not a -- is not a defense.  So whether he, in fact, thought

14   that or not, it's not a defense.  All right?

15             So I -- I guess I have more faith that jurors follow

16   what I tell them than the lawyers do.  And I -- I recognize

17   that's a fairly commonly held belief that jurors just disregard

18   what judges tell them, but I've done hundreds -- well over a

19   hundred trials as a judge and I -- I'm absolutely convinced

20   that jurors follow my instructions.  So I -- I don't believe

21   you'll be harmed in any way.

22             Is there anything else that the defense wants?

23             MR. WOLPIN:  No, your Honor.

24             THE COURT:  All right.  So that -- that's what we'll

25   do on those exhibits.  Otherwise, you can play your excerpts as

1    you propose.  You can choose to play some and not others, but

2    if you play the -- the two that we've addressed here, you need

3    to make the modifications that I've proposed.  Okay?

4              MS. KRASINSKI:  Yes, your Honor.

5              THE COURT:  So the motion from the defense is

6    granted in part and denied in part.

7              Are we ready to bring the jury in?

8              MS. KRASINSKI:  I guess just one sort of practical

9    question, your Honor.

10             We will obviously have to create new clips.  That

11   takes some time.

12             THE COURT:  Right.  You can introduce them out of

13   sequence even if it's after your case if you need to.  I'll let

14   you put it in and we won't need the -- the foundation for the

15   admission of the statements has already been laid through the

16   prior witness, so you're not going to need to recall somebody.

17   If you want to recall him to do it, you can, but you don't need

18   to.

19             MS. KRASINSKI:  And the only other sort of related

20   issue is we had talked a little bit about Government's Exhibit

21   700 yesterday, which is the summary chart.  So, again, I

22   know --

23             THE COURT:  Ah, yes.  So does somebody have that

24   summary chart?  Is it --

25             MS. KRASINSKI:  I think we can display it.

1            MR. DAVIS:  700.

2            MS. KRASINSKI:  It's 700.

3            THE COURT:  Okay.  What -- the objection is that

4  this doesn't qualify for admission under Rule 1006 because the

5  summarized documents are not so voluminous as to justify the

6  resort to the rule.  That's what I understand.  Is that what

7  the defense's --

8            MR. LEVIN:  That's correct, your Honor.

9            THE COURT:  All right.  So let's go through each of

10  these documents and why doesn't the government explain to me

11  its view as to why this is -- documents are so voluminous that

12  they have to be summarized.

13            MS. KRASINSKI:  So what it compiles is dates and

14  times from a large amount of different sources.  So there are

15  sources from Mr. Cantwell's radio shows; there's sources from

16  the pole camera surveillance; there's sources from the cell

17  phone extraction; there's --

18            THE COURT:  Which of these exhibits -- which of

19  these references is not something that is in evidence?

20            MS. KRASINSKI:  There are only two right now where

21  there has not been either an exhibit or testimony about.  The

22  first one, the June 14th, 2019, Radical Agenda introduction

23  stating that the defendant is in Keene, New Hampshire, and the

24  June 17th, 2019 Radical Agenda introduction saying that, again,

25  the defendant is in Keene, New Hampshire.

1          THE COURT:  Are those going to come into evidence?

2          MS. KRASINSKI:  I anticipate that they will, your

3 Honor, yes.

4          THE COURT:  Yeah.  Well, then we can -- we can use

5 it as a chalk.  You can show it to -- it'll be marked for

6 identification.  It could be displayed to the jury, including

7 during closing argument, and it should include the exhibit

8 numbers that you're referencing and then you can put it up in

9 front of the jury and go through, say, when you look at the

10 exhibits, I want to run through and tell you what each of these

11 things show.

12          So it -- it's -- it isn't -- doesn't strike me that

13 it's a Rule 1006 -- and I've written on this for the

14 First Circuit.  If you go back and read the 1006 cases in the

15 First Circuit, you'll see one that I've written on for the

16 Circuit and I -- my view is that there's nothing wrong with

17 using this as a chalk, but it really isn't a 1006 exhibit that

18 goes to the jury.

19          If you want to -- I mean, did you find the case that

20 I wrote on this?

21          MS. KRASINSKI:  We found a case affirming your

22 Honor --

23          THE COURT:  Okay.

24          MS. KRASINSKI:  -- but --

25          THE COURT:  Sorry.  Maybe I'm confused.  I may

1    have -- I just may have been affirmed on it.

2            Okay.  So, in any event, that's my basic approach.

3    We won't admit it as an exhibit at this time, but it can be

4    marked for identification and if you need to modify it, you

5    can, and when you want to display it during a -- a closing

6    argument, you could, or if you were wanting to go through with

7    a witness and show them the exhibit, it can be displayed to the

8    jury.  The difference is it doesn't carry evidentiary quality

9    on its own, but it can be used to -- as a way you could -- you

10   could write this up on a chart during an argument if you needed

11   to.

12           Okay.  So that's a ruling on that.  Are we ready to

13   bring the jury in?

14           THE CLERK:  Yes, Judge.

15           THE COURT:  Okay.  Let's go.

16                   WITH THE JURY PRESENT

17           THE COURT:  Good morning, members of the jury.

18   Sorry to keep you waiting.  I want you to know I -- we try to

19   get in here at 9:00 and do all our little cleanup before you

20   start, but -- everything we do is designed to make things run

21   more smoothly during the course of the trial, so hopefully

22   we've done some things to keep this thing moving for you.

23           We're ready for your next witness, so if you could

24   call your witness -- or did we finish cross?  I'm sorry.  I

25   can't --

1        MR. LEVIN:  No, your Honor.

2        THE COURT:  All right.  So the witness should be

3  recalled.

4        Sir, you understand you're still under oath.

5        THE WITNESS:  Yes, your Honor.

6        THE COURT:  All right.  Go ahead, Counsel.

7        MR. LEVIN:  Thank you, your Honor.

8                  CONTINUED CROSS-EXAMINATION

9  BY MR. LEVIN:

10       Q.   Agent Tongbua, yesterday toward the end of the day

11  we were talking about sort of how the -- how the investigation

12  proceeded.

13            Just to refresh some of the facts, you indicated

14  that you had been investigating Mr. Cantwell from the end of

15  2018, beginning of 2019; is that right?

16       A.   Correct.  That's when I took over the investigation.

17       Q.   That's when you took over the investigation.

18            And in June -- in -- and so leading up to the

19  June 2019 events that are the basis of this case, you were

20  surveilling him?

21       A.   Yes.

22       Q.   You were investigating certain records?

23       A.   Yes.

24       Q.   And then in June 2019 are the events that you

25  testified about previously, the screenshots that went into

1    evidence; is that right?

2         A.    Correct.

3         Q.    And after June 2019, the FBI started to communicate

4    with Mr. Cantwell?

5         A.    Correct.

6         Q.    And in September 2019, you actually met with

7    Mr. Cantwell --

8         A.    Correct.

9         Q.    -- is that right?

10        A.    Yes.

11        Q.    So in August of 2019, the FBI did receive emails

12   from Mr. Cantwell; is that right?

13        A.    Yes, we did.

14        Q.    And it was your understanding that he was

15   complaining about the pranking and harassment by members of the

16   Bowl Patrol in those emails?

17        A.    Yes.

18        Q.    And he attached to those emails photographs of

19   Cheddar Mane's family; is that right?

20        A.    He did.

21        Q.    A picture of Cheddar Mane appearing to have strips

22   of LSD on his tongue?

23        A.    Strips of something on his tongue, yes.

24        Q.    Cheddar Mane's address?

25        A.    Yes.

1        Q.    Those were provided to the FBI in August of 2019; is

2   that right?

3        A.    Correct.

4        Q.    And those were attached to -- those -- and

5   accompanying those or around the same time frame, there was

6   also an email that he sent to the FBI where he did admit that

7   he had threatened to expose Cheddar Mane's real identity if he

8   continued to harass and defame him?

9        A.    Yes.

10        Q.    And that he did expose him after offering him the

11   out of identifying Vic Mackey, which he declined?

12        A.    Correct.

13        Q.    And that he had called CPS in his area to warn that

14   Cheddar Mane was involved in a white supremacist terror group

15   which in combination with a photo appearing to show LSD on his

16   tongue might put his children in danger?

17        A.    Correct.

18        Q.    So that was all information that was provided to the

19   FBI by Mr. Cantwell even before you met with him; is that

20   right?

21        A.    Correct.

22        Q.    And then you met with him in September 2019.  That

23   was at the Keene Police Department, right?

24        A.    Correct.

25        Q.    That was a voluntary meeting; he walked in and

1    walked out?

2         A.    Correct.

3         Q.    The meeting lasted about three hours?

4         A.    Yes.

5         Q.    You've described it previously in testimony as being

6    a productive, constructive meeting?

7         A.    Absolutely.

8         Q.    You were present along with Kevin LeBlanc; is that

9    right?

10        A.    Correct.

11        Q.    And Joel Chidester?

12        A.    Correct.

13        Q.    And this was the Keene Police Department where Joel

14   Chidester works and he helped to facilitate the meeting?

15        A.    He did.

16        Q.    During that meeting, there was a discussion about

17   members of the Bowl Patrol?

18        A.    There was.

19        Q.    There was -- he talked about Cheddar Mane, Ben

20   Lambert?

21        A.    At that time, he did not know Mr. Lambert's

22   identity.

23        Q.    But he talked about Cheddar Mane; is that right?

24        A.    Right.

25        Q.    And, again, during that meeting he admitted that he

```
 1    had asked Cheddar Mane for Vic Mackey's information?
 2         A.    I believe so.
 3         Q.    And that he had threatened to dox Vic Mackey?
 4         A.    He threatened to dox Cheddar.
 5         Q.    But he wanted -- he wanted Vic Mackey's dox from
 6    Cheddar; is that right?
 7         A.    Yes.
 8         Q.    And that he admitted to -- to threatening -- he
 9    admitted to calling CPS if Cheddar Mane didn't provide Vic
10    Mackey's information?
11         A.    Correct.
12         Q.    And during that meeting with you and Sergeant
13    Chidester, he admitted that he did these things because he felt
14    he had to take action for himself on his own behalf; is that
15    right?
16         A.    I believe so.
17         Q.    He mentioned Katelen Fry, otherwise known as Peach?
18         A.    He did.
19         Q.    And said she might be able to provide details as
20    well?
21         A.    Correct.
22         Q.    And he indicated to you that she was also an
23    associate of Cheddar Mane and his friend Hardmous; is that
24    right?
25         A.    Correct.
```

1       Q.   And that she had visited them in Missouri and that

2  she had sent pictures of Cheddar Mane's family or she had sent

3  the pictures of Cheddar Mane's family; is that right?

4       A.   Correct.

5       Q.   She had relayed those to Mr. Cantwell.

6           Now, you learned about -- from Mr. Cantwell and

7  others about the history of Mr. Cantwell's relationship with

8  the Bowl Patrol; is that right?

9       A.   I'm sorry.  Could you repeat that?

10      Q.   You learned about the history of Mr. Cantwell and

11  the Bowl -- and members of the Bowl Patrol; is that right?

12      A.   Mr. Cantwell, is that what you were --

13      Q.   Yes.

14      A.   Yes, correct.

15      Q.   Mr. Cantwell and members of the BowlCast or the Bowl

16  Patrol.

17      A.   Correct.

18      Q.   That they were sort of colleagues at first?

19      A.   Sure.

20      Q.   That Mr. Cantwell was a guest speaker on an episode

21  of the BowlCast?

22      A.   He was.

23      Q.   That over time the relationship between Mr. Cantwell

24  and the members of the BowlCast soured?

25      A.   I believe so.

1    Q.   And there was a falling out?

2    A.   Yes.

3    Q.   And a divergence of views on certain matters?

4    A.   Yes.

5    Q.   And you learned that in the course of your

6    investigation that Cheddar Mane and some of his associates

7    started prank-calling Mr. Cantwell's shows and doing things

8    like that?

9    A.   Correct.

10   Q.   They would -- you learned that they had posted

11   insulting pictures of Mr. Cantwell?

12   A.   Correct.

13   Q.   And that they thought this was funny --

14   A.   Correct.

15   Q.   -- this was a joke.

16        And you learned that Mr. Cantwell had told them to

17   knock it off?

18   A.   Correct.

19   Q.   And that -- you learned that even earlier in 2019,

20   in January or February, he had threatened to dox or release

21   information about Cheddar Mane related to that harassment?

22   A.   Correct.

23   Q.   And you learned from Mr. Cantwell that it was his

24   perception that Cheddar Mane had continued to harass him and

25   that led to the exchange at issue in this case?

1          MS. KRASINSKI:  Objection, your Honor.

2          THE COURT:  Basis?

3          MS. KRASINSKI:  Relevance.

4          THE COURT:  Hang on just a second.

5          MS. KRASINSKI:  And hearsay.

6          THE COURT:  Overruled.

7     Q.    In fact, in the exchange between Mr. Cantwell and

8     Cheddar Mane, the first sentence of that exchange in those

9     screenshots is, "I guess you forgot the lesson which kept you

10    away for a short while.  Do you need to be reminded?"

11          Is that right?

12    A.    It is.

13    Q.    And that refers to -- is it your understanding that

14    that refers to Mr. Cantwell's referencing the earlier

15    harassment, his earlier threat, and the fact that Mr. Cheddar

16    Mane had kept away for a short while?

17    A.    Correct.

18    Q.    And Mr. Cantwell's perception that Mr. Cheddar Mane

19    had forgotten the lesson which kept him away for a short while

20    and needed to be reminded; is that right?

21    A.    That's how it reads.

22    Q.    Now, you would agree that Mr. Cantwell is a public

23    figure; is that right?

24    A.    Indeed.

25    Q.    That what he does is public under his own name?

```
 1          A.    It is.

 2          Q.    His true name?

 3          A.    It is.

 4          Q.    He had a website, christophercantwell.com, you're

 5   familiar with that website?

 6          A.    I am.

 7          Q.    Pictures of Mr. Cantwell are the real Mr. Cantwell,

 8   pictures that are presented on the Internet?

 9          A.    (Nods head.)

10          Q.    Is that right?

11          A.    Fairly speaking, yes.

12          Q.    He doesn't hide behind an avatar or some symbol;

13   he's out there as himself, his own identity, his own persona.

14   Is that right?

15          A.    Yes, for the most part.

16          Q.    Members of the Bowl Patrol, however, that's not

17   true, is it?  They are presenting themselves as aliases?

18          A.    For the most part, yes.

19          Q.    Pseudonyms?

20          A.    Correct.

21          Q.    The photographs they use are not their real

22   photographs?

23          A.    I don't believe so, yes.

24          Q.    The avatars are either artistic representations, is

25   that right --
```

1          A.    Yes.

2          Q.    -- sometimes incorporating the bowl haircut style of

3     Dylann Roof; is that right?

4          A.    Yes.

5          Q.    Sometimes incorporating other sort of ghoulish

6     elements, skeleton faces?

7          A.    Sure.

8          Q.    Sometimes incorporating photographs of weapons?

9          A.    Yes.

10         Q.    And the Bowl Patrol, is it your understanding and I

11    believe it was your testimony, they worship Dylann Roof, who is

12    a mass murderer of nine black parishioners in a church in South

13    Carolina?

14         A.    That's fair to say.

15         Q.    And they have other people that they similarly have

16    canonized; is that right?

17         A.    Yes.

18         Q.    Robert Bowers, who killed a number of people in a

19    synagogue in Pittsburgh, Pennsylvania?

20              MS. KRASINSKI:  Objection, relevance.

21              THE COURT:  Sustained.

22         Q.    The Bowl Patrol -- Dylann Roof is not the only

23    serial killer that the Bowl Patrol deifies or worships; is that

24    right?

25              MS. KRASINSKI:  Objection, relevance.

```
 1              THE COURT:  Sustained.
 2         Q.   Members of the Bowl Patrol did not want their real
 3    identities to become known; is that right?
 4         A.   That's fair to say.
 5         Q.   The fear of being doxed is the fear of having your
 6    true identity exposed?
 7         A.   Yes.
 8         Q.   And, particularly, they do not want their true
 9    identities connected with the contents of the BowlCast
10    episodes; is that right?
11              MS. KRASINSKI:  Objection, foundation.
12              MR. LEVIN:  If he knows.
13              THE COURT:  I mean, the jury can draw the conclusion
14    you want them to draw based on the testimony you've already
15    elicited, so just move on.
16         Q.   You've listened to episodes of the BowlCast?
17         A.   Pieces, yes.
18         Q.   And is it fair to say that the BowlCast contains
19    extreme language?
20         A.   That's fair to say.
21         Q.   Racist language?
22         A.   That's fair.
23         Q.   Homophobic language?
24              MS. KRASINSKI:  Objection, relevance.
25              THE COURT:  Overruled.  I'm going to allow -- I'm
```

1    going to allow you to describe in general terms, but I'm not

2    going to spend hours and hours going through every outrageous

3    thing the BowlCast does.

4         So you can -- the objection's overruled, but I'm

5    putting you on notice that there will come a time where I will

6    say we've heard enough and we need to move on.

7         MR. LEVIN:  Thank you, your Honor.  I just want to

8    point out that these -- the same language that I'm using was in

9    the government's opening and in the --

10        THE COURT:  And I said I'm allowing you to proceed

11   and I'm telling you that there's a point at which it will

12   become a waste of time and I will have to, because I have to

13   control the trial, decide when we've heard enough.  All right?

14        MR. LEVIN:  Thank you.

15        THE COURT:  So the objection was overruled and you

16   may continue.

17        Q.   Misogynistic language?

18        A.   Yes.

19        Q.   Anti-Semitic language?

20        A.   Yes.

21        Q.   And it's understandable why a person would not their

22   real identity associated with that; is that right?

23        A.   I can't speak for other's opinions, but ...

24        Q.   So you don't know why members of the Bowl Patrol are

25   fearful of having their identities exposed?

1          A.    That's their own personal opinions.  I can't answer

2     for them.

3          Q.    Now, in October 2019, you went to Missouri to see

4     Cheddar Mane; is that right?

5          A.    Correct.

6          Q.    This was four months after the events of June 2019

7     that are the basis of this prosecution; is that right?

8          A.    Correct.

9          Q.    And, again, Cheddar Mane had not contacted the

10    FBI --

11         A.    Correct.

12         Q.    -- about that exchange, had not contacted law

13    enforcement about that exchange?

14         A.    Not to my knowledge.

15         Q.    And your visit to Cheddar Mane, Mr. Lambert, was a

16    surprise visit; is that right?

17         A.    How do you mean exactly?

18         Q.    You hadn't contacted him ahead of time to say, we're

19    coming out to see you?

20         A.    Correct.

21         Q.    And you, on October 17th, 2019, drove up to his

22    house; is that right?

23         A.    Repeat the date, please.  I'm sorry.

24         Q.    October 17th, 2019.

25         A.    I don't recall the specific date.  If you could

1   refresh my memory.

2       Q.   Excuse me?

3       A.   I don't recall the specific date.  If you could

4   refresh my memory.

5       Q.   Would it --

6            THE COURT:  Hang on just a second, sir.  I'm having

7   just a little trouble hearing you.  Your voice is dropping off

8   towards the end of your statements.  So just speak a little

9   louder.  Okay?

10           THE WITNESS:  Yes, your Honor.

11           THE COURT:  Go ahead.

12      Q.   Would it refresh your recollection to look at a

13  report that you authored about this visit?

14      A.   Yes, it would.  Thank you.

15           MR. LEVIN:  If I could have the ELMO.

16           THE COURT:  Can you enable the ELMO?

17           MR. LEVIN:  You can show this to just the witness.

18           THE COURT:  I'm sorry.  Hang on just a second.  All

19  right.

20           We have to -- it's going to take us just a second.

21  Okay?  Now it's okay.

22      Q.   This is a report that's dated at the top

23  November 5th, 2019; is that right?

24      A.   Correct.  That's the date of entry.

25      Q.   And the -- and the -- at the bottom it says

1    investigation on October 17th, 2019.

2         A.    That's correct.

3         Q.    Is that the day that you appeared at Mr. Lambert's

4    house?

5         A.    Yes.

6         Q.    And there were a number of agents with you at that

7    time; is that right?

8         A.    There were a few of us, yes.

9         Q.    It was you, Mr. Fernald -- Brett Fernald;

10   is that correct?

11        A.    Correct.

12        Q.    Kevin LeBlanc; is that correct?

13        A.    Yes.

14        Q.    And Keith Kohne, K-o-h-n-e?

15        A.    Correct.

16        Q.    And Mr. -- Mr. Cheddar Mane was not present at the

17   residence; is that right?

18        A.    Correct.  He had just left for work.

19        Q.    You later located him at his job; is that right?

20        A.    That's correct.

21        Q.    And there were four agents that appeared at his

22   work; is that right?

23        A.    Well, two -- two agents and two task force officers,

24   but, yes, there were --

25        Q.    Two agents and two task force officers.

1          And you told Mr. Lambert and his employer that there

2    had been a threat to his family; is that right?

3          A.    I believe so.  I wasn't part of that conversation.

4          Q.    Now, this wasn't a new threat.  This is the same

5    alleged threat from June 2019; is that right?

6          A.    Correct.

7          Q.    And this would have been something that Mr. Lambert

8    was already aware of; is that right?

9          A.    Correct.

10         Q.    And he agreed to go voluntarily with you to the

11   Lincoln County Sheriff's Department; is that right?

12         A.    He did.

13         Q.    And when you -- and he drove in a vehicle with two

14   agents to the Lincoln County Sheriff's Department?

15         A.    Correct.

16         Q.    And there was a conversation between those two

17   agents, one of which was yourself, right?

18         A.    Correct.

19         Q.    And Mr. Lambert on the ride over --

20         A.    Yes.

21         Q.    -- is that right?  And that was not recorded; is

22   that right?

23         A.    No, because it was kept to be -- we didn't really

24   discuss the subject.  We told him, you know, we'd really wait

25   to talk about the issue when we sat down.

1      Q.   And then when you met with him, there were six

2  agents present; is that right?  Yourself, Mike Gibeley, Keith

3  Kohne, an Officer Cochrane, Fernald, and LeBlanc?

4      A.   In the initial interview with Mr. Lambert?

5      Q.   Yes.

6      A.   There were only two of us in that room.  It was

7  myself and Officer Fernald.  And there's a video recording of

8  that interview.

9      Q.   I may have been mistaken about that.

10          So you say there were only two people at that

11  interview?

12      A.   Yes.

13      Q.   Yourself and who else?

14      A.   Officer Brett Fernald.

15      Q.   Officer Brett Fernald.  And he is a task force

16  officer; is that right?

17      A.   Correct.

18      Q.   Now, when you first -- when you encountered

19  Mr. Lambert, Mr. Cheddar Mane, he was actually wearing a shirt

20  with a Bowl Patrol emblem on it; is that correct?

21      A.   He was.

22      Q.   A skull and crossbones with a Dylann Roof bowl cut?

23          MS. KRASINSKI:  Objection, relevance.

24          THE COURT:  Overruled.

25      Q.   Now, when you met with Mr. Lambert, you took his

```
 1   phone away; is that right?
 2       A.   Yes.
 3       Q.   You told him you didn't want him reaching out to
 4   anybody?
 5       A.   That was not our facility, so that was done with the
 6   officers there.  It was a controlled area.  I didn't physically
 7   take it from him.
 8       Q.   Who took it from him?  Who physically took it from
 9   him?
10       A.   I don't recall.
11       Q.   Who told him, we just don't want you reaching out to
12   anybody just yet?
13       A.   That -- it would have been the locals.
14       Q.   Were the locals involved in the interview?
15       A.   No, but it was their facility.  It was their
16   policies to state.
17       Q.   When you met with Mr. Lambert, you told him that
18   there was a threat against his family?
19       A.   We discussed the threat, yes.
20       Q.   Those were your words, right?
21       A.   He was aware of it.  He was party to it.
22       Q.   But -- but you told him, in your own language, that
23   you considered it a threat?
24       A.   Sure.
25       Q.   And you told him you were taking it seriously?
```

1    A.    Absolutely.

2    Q.    And you told him you were not letting it go?

3    A.    We were concerned for the welfare of his family.

4    Q.    Did you tell him you were not letting it go?

5    A.    I don't recall my exact words, but, again, there's a

6    recording.  If that's what I said, that's what I said.

7    Q.    Now, in the course of your investigation, you

8    learned that the exchange between Cantwell and Cheddar Mane was

9    initially a private text exchange; is that right?

10    A.    Correct.

11    Q.    And that Cheddar Mane took screenshots of that

12    exchange; is that right?

13    A.    Correct.

14    Q.    And released it in a public forum, a public chat

15    group; is that right?

16    A.    I don't know that he posted them himself, but that's

17    ultimately where they ended up.

18    Q.    And there were stickers over the -- certain aspects

19    of the exchange; is that right?

20    A.    Yes.

21    Q.    And did you determine who put those stickers on

22    there?

23    A.    Mr. Lambert told us that he did.

24    Q.    And some of those stickers that were placed over the

25    exchange are images of Mr. Cantwell; is that right?

```
 1          A.   Correct.

 2          Q.   Derogatory images of Mr. Cantwell?

 3          A.   Sure.

 4          Q.   Now, after you met with Mr. Lambert, a/k/a Cheddar

 5   Mane, you met with Chris Cantwell again; is that right?

 6          A.   I did not.

 7          Q.   You did not.  You were not present for that?

 8          A.   Correct.

 9          Q.   You -- you testified about certain slang terms and

10   concepts that are used in white supremacist extremist circles;

11   is that right?

12          A.   Yes.

13          Q.   You testified about incels --

14          A.   I did.

15          Q.   -- that that refers to someone who's involuntarily

16   celibate --

17          A.   Correct.

18          Q.   -- is that right?  Men who have not had romantic

19   success, correct --

20          A.   Yes.

21          Q.   -- and consider themselves involuntarily celibate.

22   And as part of that stigma, they embrace resentment and anger

23   towards women; is that right?

24          A.   Correct.

25          Q.   You testified about what an avatar is; is that
```

 1    right?

 2         A.    I remember discussing avatars.  I don't know if I

 3    specifically defined it, but yes.

 4         Q.    Are you familiar with the term cuckold or cuck?

 5         A.    I've seen it and heard it quite a bit, yes.

 6         Q.    Related to white supremacist circles?

 7         A.    Yes.

 8         Q.    Do you have -- do you know what it means?

 9         A.    I don't have a good definition, but it's certainly

10    intended to be derogatory, it appears.

11         Q.    What about accelerationism?  Have you heard that

12    term?

13         A.    I have.

14         Q.    And what does that mean?

15         A.    It's a general theory.  It's a little more

16    aggressive in wanting to bring about change to society

17    politically and it's basically -- as opposed to bringing that

18    about through productive political change, it's rather just

19    that the government collapses and then you just start over with

20    a new one that hopefully you can design the way you want it.

21         Q.    Is it your understanding that the Bowl Patrol has an

22    accelerationist philosophy?

23              MS. KRASINSKI:  Objection, relevance.

24              THE COURT:  Overruled.

25         A.    That's my understanding.

1          Q.    Now, when you met with Ben Lambert or Cheddar Mane,

2    you made it clear to him, did you not, that he could help

3    himself by cooperating with this investigation?

4          A.    How do you mean?

5          Q.    That he had some liability potentially.

6          A.    No, there were no promises there.  There was no

7    insinuation of criminal behavior on his part.

8          Q.    No insinuation of criminal behavior on his part?

9          A.    No.  We were there to address the threat and there

10   were no -- we told him he was not under investigation, he was

11   not charged with any crime.

12         Q.    Do you remember telling Mr. Lambert that he could

13   put Cheddar Mane behind him and go on into the world as Ben

14   Lambert?

15         A.    I don't remember saying that specifically, but that

16   seems like a logical statement.

17         Q.    Is that along the lines of the conversation you had

18   with him?

19         A.    With myself and Officer Fernald?  It's along the

20   lines, but that doesn't necessarily represent excuse for any

21   potential criminal behavior.

22         Q.    You've had numerous contacts with Mr. Lambert

23   between first meeting him in October 2019 and today; is that

24   right?

25         A.    Yes, a few.

 1     Q.    Conversations with him on the telephone?

 2     A.    A few times, yes.

 3     Q.    Meetings with him in person?

 4     A.    Once or twice, I believe, since then.

 5     Q.    Did you ever offer him any financial assistance?

 6     A.    Absolutely not.

 7     Q.    What about victim services?

 8     A.    We discussed it, because at that point he is

 9  classified as a victim in this case.

10     Q.    Did you tell him --

11     A.    He was made aware --

12     Q.    I'm sorry.  Go ahead.

13     A.    He was made aware that those services are available

14  to him and his family.

15     Q.    And would those services include financial

16  assistance?

17     A.    I can't speak to those.  I'm not a victim/witness

18  coordinator or specialist.  So my office has those, as does the

19  U.S. Attorney's Office, and those are the people that handle

20  those matters.

21     Q.    Is that a conversation you ever had with him?

22     A.    I just made him aware that those services were

23  available and I gave him some contacts.  He said he was fine,

24  but he understood how to get those services if he needed them.

25     Q.    Did you talk to him about being a paid confidential

1  informant?

2         A.    No.

3         Q.    When this case is over, that -- or during the case

4  or when the case is over, that he could get compensation for

5  being a paid confidential informant?

6         A.    No, he was never explicitly recruited.  I think we

7  left -- as we generally do, we leave that door open unless

8  there's a reason to specifically preclude someone from being a

9  source.

10        Q.    Did you ever have that conversation with him?

11        A.    No.  Again, not specifically.  No, we never said,

12 hey, would you like to be an informant for the --

13        Q.    What about in general terms?

14        A.    -- FBI.

15              He may have interpreted it that way.  I can't say.

16 Because, again, we left it open.  We didn't take it off the

17 table.  So only he can answer, you know, if he felt that we

18 were trying to recruit him.

19        Q.    So you put it on the table and left it out there?

20        A.    Again, I didn't specifically offer it to him.

21        Q.    Right.  But in general terms?

22        A.    Sure.  I mean, I don't know how to -- that's done

23 generally, but yes.

24              MR. LEVIN:  Thank you.

25              THE COURT:  All set?

1          MR. LEVIN:  Yes.

2          THE COURT:  All right.  Redirect?

3          MS. KRASINSKI:  Thank you, your Honor.

4                    REDIRECT EXAMINATION

5     BY MS. KRASINSKI:

6          Q.   Agent Tongbua, on your cross-examination you briefly

7     mentioned some of the many complaints that Mr. Cantwell was

8     raising with law enforcement.

9          Was Mr. Cantwell complaining about what he deemed

10    harassment from SHARP, Skinheads Against Racial Prejudice?

11         A.   I'm sorry.  I didn't catch the very last -- was he

12    complaining about?

13         Q.   I apologize.  Can you hear me better if I --

14         A.   Yes.

15         Q.   -- stand closer to the microphone?

16         Was he complaining about harassment that he claimed

17    was by SHARP, Skinheads Against Racial Prejudice?

18         A.   I don't recall that, that name specifically --

19         Q.   Did he --

20         A.   -- that group.

21         Q.   Did he complain about harassment from skinheads?

22         A.   He complained about harassment from a variety of

23    sources.  I don't remember that specifically.

24         Q.   What variety of sources do you remember?

25         A.   So, again -- so are we speaking to the FBI or to law

1    enforcement in general?

2         Q.    Anything that you have personal knowledge of.

3         A.    So I would do a summary of all his reporting to law

4    enforcement.  We did cover it.  We had the IC3 complaint to the

5    FBI in February of 2019, which we did not see until

6    Mr. Cantwell provided that.

7              That, again, specifically referenced one single

8    incident and it referenced two members of the Bowl Patrol.  It

9    referenced the defacement of Mr. Cantwell's website.  And in

10   that same report, he acknowledged that one of the two

11   individuals had an author's account to that website at one

12   point.

13             I would also say that while Mr. Cantwell might not

14   have approved that content, he would certainly admit that most

15   of the content on his website is offensive to other people.  So

16   I don't know that that was -- would have even been noticed by

17   anyone other than Mr. Cantwell.

18        Q.    Before you continue, you mentioned that that

19   complaint, the February 2019 complaint, complained of one

20   single incident and Mr. Cantwell identified two individuals.

21   Who were those individuals again?

22        A.    So that was Vic Mackey and a user named Mosin

23   Nagant.

24        Q.    And no reference to Cheddar Mane in that complaint?

25        A.    No.

1          Q.    Okay.  Please continue.

2          A.    So, again, the other individual he referenced was

3    Mosin -- an individual that went by the name Mosin Nagant.  He

4    did not identify him in that complaint, but he alluded to the

5    fact that we knew who that was.  We did know who that was at

6    the time and Mr. Cantwell did ultimately dox him weeks after

7    that -- that complaint to us.

8               So I don't know if Mr. Cantwell had that information

9    at that time, but he didn't provide it to us at that time or

10   subsequent to that complaint when he -- whenever he did obtain

11   that information.  So if it was vital to that report, he didn't

12   provide it to us.  Up until that and following that we had no

13   other complaints from Mr. Cantwell until July.

14              Concurrently over that time frame he did have an

15   open dialogue with the Keene Police Department, as we've

16   established.  I have been privy to a lot of that reporting, not

17   necessarily all of it, just through information sharing between

18   agencies and, frankly, most of that was not relevant to our

19   investigation.  From my review of what I've seen, that

20   information spanned a number of things and it spanned

21   harassment from a number of different sources, most of which

22   appeared to be local which would be under the local

23   jurisdiction of the Keene Police Department.

24              As far as I can recall, the first that I have seen

25   record -- unless I'm mistaken or I have not seen it -- the

1    first record that I can cite of information provided by -- from

2    Mr. Cantwell to the Keene Police Department citing Bowl Patrol

3    was an email on Friday June 21st, 2019, when he included the

4    Cheddar.zip file that he also sent to us in August.

5         Q.    So I just want to -- I want to make sure I

6    understand that.

7              So you said that you have reviewed a lot of the

8    reports to Keene Police; is that fair?

9         A.    A good amount.

10        Q.    You can't definitively say you've reviewed all of

11   them?

12        A.    Absolutely.

13        Q.    But that the first reference in anything that you've

14   seen to Bowl Patrol occurs on June 21st, 2019?

15        A.    The first that I can recall.

16        Q.    And that --

17        A.    That would be after the threat exchanged with

18   Mr. Lambert had already -- or Cheddar Blac -- Cheddy Blac had

19   already occurred.

20        Q.    Please continue.

21        A.    Again, that would have been the end of that same

22   week after the incident occurred and it essentially was the

23   same email that he ultimately forwarded to us later in August.

24              So that information was relayed to us shortly after

25   that happened, but obviously at that time we were not aware of

1    the exchange between the two and we were already -- or soon

2    after that because it was of an interstate nature is when

3    Mr. Cantwell was referred to us by Keene Police Department.

4            Now, they had had a discussion about referring the

5    matter to us and Mr. Cantwell was amenable to that, but I will

6    say that we were the ones who reached out to him in July.  He

7    ultimately did not reach out to us.  And it took almost two

8    months to the day for us to schedule an interview for him.  We

9    did not sit down with him until September 17th, when the

10   call -- when I spoke to him the first time was in July 17th.

11           In the first weeks and even over a month that we

12   communicated, it was very one-directional and we essentially

13   just received whatever information Mr. Cantwell felt was

14   pertinent.  We were not able to really ask a lot of questions

15   and really drive the investigation in the way that we normally

16   would and I couldn't glean information from him that I would

17   from a normal complainant or victim that came to us for help.

18           And so while he did provide the pictures to us in

19   late August 2019, if you follow the email chain, that was

20   actually in response to an email I sent him because we weren't

21   getting very far.  He constantly referred to these people in a

22   manner that seemed like they were known to him, that they were

23   acquaintances, but the information he was providing us wasn't

24   helping us to identify them.  So I specifically asked him if he

25   had identifying information that could help us identify these

1   people and it was in response to that that he actually sent us

2   the photos of Mr. Lambert.

3        Q.   Now, did you take Mr. Cantwell's complaints

4   seriously?

5        A.   Absolutely.

6        Q.   So, for example, you did mention that Mr. Cantwell

7   sent you the complaint that he had previously made in February

8   of 2019?

9        A.   He did.

10        Q.   And so when you reviewed it, did it include two IP

11   addresses?

12        A.   It did.

13        Q.   Did you follow up on that at all?

14        A.   I did.

15        Q.   What'd you learn?

16        A.   They came back to a couple of different providers,

17   one of which was a company in -- I think it was based in Korea;

18   the other was based in New York and it's a cloud-based company.

19   So both of those -- none of those gave individual subscriber

20   information, which is not atypical if you look for information,

21   but it certainly didn't corroborate or point us in a single

22   direction to find a specific user.

23        Q.   Okay.  So you followed up on that and you weren't

24   able to develop evidence to substantiate the complaint?

25        A.   Correct.

1      Q.     What about Mr. Cantwell's other complaints?  Did you

2    follow up on them?

3      A.     We did.  Extensive phone analysis was done by our

4    team, not necessarily by myself.  I know at some point he spoke

5    with a cyber expert-type state trooper who took some other

6    information and that was also looked into.  Every individual

7    that he identified who could corroborate his harassment

8    complaints we either interviewed or attempted to interview and

9    it was up to those individuals whether they could provide

10   information or they wanted to speak with us.  Ultimately, none

11   of that was very fruitful.

12            I will say the single Bowl Patrol individual we were

13   able to identify off of information provided by Mr. Cantwell

14   was Cheddar Mane.

15     Q.     Now, you were able to identify some things that

16   Mr. Cantwell had discussed or that you found out, right?  You

17   were able to determine that someone from the Bowl Patrol made a

18   rap song about Mr. Cantwell?

19     A.     We did.

20     Q.     During the course of your investigation, did you

21   determine whether Mr. Cantwell made a response rap song?

22     A.     He did.

23     Q.     Tell us about that.

24     A.     That was discovered in reviewing his digital

25   devices.  I want to say it was titled "I'm a Jew, Yo" and it

1    was set to a song by Billie Eilish.  I found multiple kind of

2    cuts or versions of it, edits, on one of Mr. Cantwell's

3    computers.

4        Q.    So things like that, the rap songs, that was a

5    back-and-forth?

6        A.    Absolutely.

7        Q.    Now, Mr. Levin was asking you about your

8    characterization of the exchange when you talked to

9    Mr. Lambert, but I want to talk to you about Mr. Cantwell's

10   characterization of the exchange when he emailed you in August

11   of 2019.

12           Mr. Levin asked you if in Mr. Cantwell's

13   August 28th, 2019, email if Mr. Cantwell said, "I threatened to

14   expose his identity."

15           The word threatened, was that your word or

16   Mr. Cantwell's?

17       A.    I believe that's the way the email read.

18       Q.    And so that would be Mr. Cantwell's word?

19       A.    Correct.

20       Q.    So he chose to characterize it as threatened?

21       A.    Correct.

22       Q.    And in that same email, let me see, that Mr. Levin

23   read to you -- quoted you from Mr. Cantwell said, "I did expose

24   him after offering him the out of identifying Vic?"

25       A.    Again, I believe that's the way the email reads.

1        Q.    And so it was Mr. Cantwell who described it as

2  offering Mr. Lambert the out of identifying Vic?

3        A.    Correct.

4        Q.    And you mentioned the June 21st, 2019, email from

5  Mr. Cantwell to Officer Chidester.  Have you reviewed that

6  email?

7        A.    I'm familiar with it, yes.

8        Q.    Okay.  And, again, in that email, does Mr. Cantwell

9  say, "I threatened to release one of their identities"?

10       A.    I believe so.

11       Q.    So that's Mr. Cantwell characterizing that exchange?

12       A.    Yes.

13       Q.    When you sat down with Mr. Cantwell in September of

14  2019, you asked Mr. Cantwell about who he then knew at the time

15  as Cheddar Mane, correct?

16       A.    Eventually.  At first we afforded him the

17  opportunity to speak about whatever he wanted.  I would say the

18  first hour of that was not even about Bowl Patrol.  He spoke

19  about a number of other individuals in the white nationalist

20  movement and once we finally got down to it, yes, we went

21  through a list of known Bowl Patrol affiliates to glean what

22  information he had on each one.

23       Q.    Who brought up the Bowl Patrol affiliates?

24       A.    I think we probably did.  I mean, that was sort of

25  the context of why we were there.

1    Q.    So the FBI brought up the Bowl Patrol affiliates?

2    A.    Yes.

3    Q.    So after all of these emails, after all this

4    back-and-forth, you sit down with Mr. Cantwell on -- in

5    September of 2019?

6    A.    Correct.

7    Q.    And you essentially give him the floor at first?

8    A.    Yes.

9    Q.    And when you do that, he doesn't mention Bowl Patrol

10   at all?

11   A.    He wanted to give us a lot of historical perspective

12   first.

13   Q.    And so it's the FBI that directs the conversation to

14   Bowl Patrol; is that fair?

15   A.    Ultimately, yes.

16   Q.    And you asked him about Cheddar Mane, correct?

17   A.    We did.

18   Q.    Did you ask him whether he had ever been threatened

19   by Cheddar Mane?

20   A.    We did.

21   Q.    What did Mr. Cantwell say?

22   A.    He said, no, he'd received no direct threats.

23         MS. KRASINSKI:  Nothing further, your Honor.

24         THE COURT:  All set, Mr. Levin, or -- do you have a

25   few more?  I normally don't allow --

1          MR. LEVIN:  I just have four areas and I'm done.

2    And it shouldn't take more than --

3          THE COURT:  Let me finish.  As I explained, I don't

4    usually allow recross, but this was an extensive redirect, so I

5    will allow you to follow up on matters that were covered in the

6    redirect.

7          MR. LEVIN:  Thank you, your Honor.

8                         RECROSS-EXAMINATION

9    BY MR. LEVIN:

10         Q.    Agent Tongbua, you indicated that the first

11   reference Mr. Cantwell made to Bowl Patrol was in July 2019.

12   That was your testimony just now?

13         A.    To us or to Keene Police Department?

14         Q.    To the FBI.

15         A.    Other than the IC3 complaint, which he -- I did not

16   see until July --

17         Q.    Right.

18         A.    -- and that is when we took up the matters with

19   him --

20         Q.    Right.

21         A.    -- regarding Bowl Patrol.

22         Q.    But you later became aware that he had made an

23   earlier complaint about the Bowl Patrol?

24         A.    Right, again which referenced that singular incident

25   to the website.  It was not about an ongoing campaign of

1    harassment.

2         Q.   Right.  And then you indicated that you reached out

3    to him in July 2019 and eventually scheduled a meeting in

4    September 2019?

5         A.   That's correct.

6         Q.   And you said that it was -- there was -- it was

7    one-sided communication up until that meeting.  I believe that

8    was your testimony.

9         A.   We exchanged emails, but the information flow, I

10   wasn't -- I was not able to ask questions or request specific

11   information.  It was a lot of Mr. Cantwell generally just

12   sending us volumes of information he felt was relevant.

13        Q.   Right.  But he was providing information to you --

14        A.   He was.

15        Q.   -- is that right?

16        A.   Yes.

17        Q.   And you were responding?

18        A.   Yes.

19        Q.   Okay.  You would agree, would you not, that much of

20   the evidence in this prosecution was provided by Chris Cantwell

21   to the FBI voluntarily.  Not all of it, but much of it.

22        A.   Some of it, yes.

23        Q.   In emails --

24        A.   Yes.

25        Q.   -- right?  Attachments to emails?

```
 1          A.    Yes.

 2          Q.    His voluntary interview?

 3          A.    Yes.

 4          Q.    His voluntary disclosure of a recorded call between

 5    him and a friend --

 6          A.    Yes.

 7          Q.    -- is that right?

 8                And just one more question.  You -- your job is

 9    to -- you indicated that you talked to Mr. Cantwell about

10    different members of Bowl Patrol and tried to get some

11    intelligence from him about who these people might be; is that

12    right?

13          A.    Absolutely.

14          Q.    Your job investigating terrorism, domestic

15    terrorism, white supremacism extremist groups, it's made more

16    difficult, isn't it, by -- when people hide on the Internet,

17    when they don't have their real identities out there; is that

18    correct?

19          A.    Yes, that's fair.

20          Q.    Part of your job is to figure out who these people

21    are so you can keep an eye on them; is that right?

22          A.    Absolutely.

23          Q.    And that's in the interest of public safety; is that

24    correct?

25          A.    Yes.
```

1       Q.    That when people are on the Internet inciting

2  violence, the FBI wants to know who those people are?

3       A.    Absolutely.

4       Q.    And they want to make sure they're not inciting

5  people to commit acts of violence?

6             MS. KRASINSKI:  Objection, relevance.

7             THE WITNESS:  You're winding up?

8             MR. LEVIN:  I'm winding up.

9             THE COURT:  All right.  Wind up.

10      Q.    Is that correct?

11      A.    That's correct.

12      Q.    So that's in the public interest; is that right?

13      A.    It is.

14            MR. LEVIN:  Okay.  Thank you.

15            THE COURT:  Thank you, sir.  You can step down.

16                        (Witness excused.)

17            THE COURT:  Let me ask my reporter.  Can you go

18  other 15, till -- 10:45?

19            THE COURT REPORTER:  Sure.

20            THE COURT:  All right.  So we'll go a little bit

21  longer and try to break at 10:45.

22            You can call your next witness.

23            MR. DAVIS:  Benjamin Lambert.

24            THE COURT:  We just have to wait until the

25  disinfecting process is completed.

1          All set.  You can come up, sir, stand by the witness

2   stand and raise your right hand, please.

3          THE CLERK:  Please raise your right hand.

4          **BENJAMIN LAMBERT**, having been first duly sworn,

5   testified as follows:

6          THE CLERK:  Thank you.  Would you please state your

7   name and spell your last name for the record.

8          THE WITNESS:  It's Benjamin Lambert, L-a-m-b-e-r-t.

9          THE CLERK:  Thank you.  You may be seated.

10                       DIRECT EXAMINATION

11  BY MR. DAVIS:

12      Q.   Good morning, Mr. Lambert.  I'll ask you to speak

13  clearly and to use the microphone.

14      A.   (Nods head.)

15      Q.   Now, sir, what state do you live in?

16      A.   I live in Missouri.

17      Q.   All right.  And did you have an online name that you

18  used in this case?

19      A.   Yes.

20      Q.   As what is that name?

21      A.   I went by Cheddar Mane.

22      Q.   Cheddar Mane?

23      A.   Uh-huh.

24      Q.   And -- and please say yes or no, not --

25      A.   Yes.

1      Q.    -- uh-huh.

2      A.    Yes.

3      Q.    Okay.  And would you summarize briefly your

4  educational background.

5      A.    I have some college experience.  I've been trained

6  in electromechanical field.

7      Q.    All right.  And prior to the events of June 2019,

8  what kind of jobs have you worked?

9      A.    Mostly in manufacturing surgical devices, medical

10  devices.  I made calibration devices for linear accelerators

11  for cancer treatment.  So mostly technological things.

12     Q.    Okay.  And are you married?

13     A.    Yes.

14     Q.    And how long have you been married?

15     A.    For -- since 2009, so what would that be?  Eleven

16  years.

17     Q.    All right.  And what does your wife do for work?

18     A.    She is a nurse, pediatric nurse.

19     Q.    And do you live with her in Missouri?

20     A.    Yes.

21     Q.    Do you have children?

22     A.    Yes.

23     Q.    How many children?

24     A.    Three.

25     Q.    And what are their ages now?

1      A.    Nine, six, and three.

2      Q.    And are you now expecting another child?

3      A.    We are.

4      Q.    And have you lived with your wife and your children

5  since you got married?

6      A.    Yes.

7      Q.    Do you know the defendant, Christopher Cantwell?

8      A.    I know who he is.  I've never been in the same room

9  with him, but yes.

10      Q.    Until today --

11      A.    Until today.

12      Q.    -- right?

13            And have you seen photographs and video of him?

14      A.    Yes.

15      Q.    And do you recognize him now in the courtroom?

16      A.    Yes.

17      Q.    And would you point him out, please, for the jury?

18      A.    He's wearing the blue shirt and the maroon tie.

19            MR. DAVIS:  Let the record reflect, your Honor, the

20  witness has identified the defendant.

21            THE COURT:  Yes.

22      Q.    When did you first make his acquaintance,

23  understanding you didn't sit in the same room with him?

24      A.    Well, I reached out to him over the Internet.  I

25  have a friend who was helping him with his radio server and

1   working with him on other things like that.

2        Q.   All right.  And who is that friend?

3        A.   His name is Tom Gibson.

4        Q.   And was he a Bowl Patrol member at least at some

5   point?

6        A.   At some point he was, yeah.

7        Q.   And did he go by his own nickname on the Internet?

8        A.   Yes.

9        Q.   And what was that?

10        A.   Hardmous.

11        Q.   All right.  So I asked you when you made the

12   acquaintance of Mr. Cantwell and you started talking about your

13   friend.  When was it?

14        A.   I would say that it was in the middle of 2019, I

15   want to say maybe.  No, I've got think about it.

16        Q.   So just to orient you, the charges in this case

17   relate to --

18        A.   Right.

19        Q.   -- June of 2019.

20        A.   Right.  So it would have been the middle of 2018.

21        Q.   Okay.  So a year earlier or so?

22        A.   Yes, approximately.

23        Q.   All right.  And how was it that you made his

24   acquaintance?

25        A.   Well, I don't recall actually, you know, ever having

1     an at-length conversation with him over the Internet, but I
2     knew of his radio program, so that's basically how I made his
3     acquaintance.
4          Q.    Okay.  And did you know that Mr. Cantwell lived in
5     New Hampshire?
6          A.    Yes.
7          Q.    And did you start to listen to some of his podcasts?
8          A.    I did.
9          Q.    Including the Radical Agenda show?
10         A.    Yes.
11         Q.    And what was your -- you've mentioned your friend
12    before, Tom Gibson?
13         A.    Uh-huh.  Yes.  Sorry.
14         Q.    All right.  Very good.
15               All right.  And the -- why did your -- why did --
16    what does Tom Gibson have to do with your interest in
17    Mr. Cantwell?
18         A.    He had been helping -- well, Tom helped build his
19    radio server and had been working on a VPN service with him.
20         Q.    With Mr. Cantwell?
21         A.    Correct.
22         Q.    And you knew that your friend was working with
23    Cantwell at least for a little while?
24         A.    Yes.
25         Q.    And -- okay.  So did you call in to -- and listen to

 1   every show or just when you could?

 2        A.   When I could, or I would listen to the rebroadcast.

 3        Q.   All right.  And did you sometimes actually call in

 4   to participate?

 5        A.   Yes.

 6        Q.   Okay.  Now, were you also a member of the Bowl

 7   Patrol?

 8        A.   Yes.

 9        Q.   What is the Bowl Patrol?

10        A.   It's a chat room and it's people who have -- make

11   memes and have reverence for Dylann Roof.

12        Q.   All right.  Are you still a member of the Bowl

13   Patrol?

14        A.   No.

15        Q.   Over what period were you a member, in your own

16   mind?

17        A.   It would have been early 2018 through -- I think I

18   left the chat in the fall of 2019.

19        Q.   All right.  So at the time of the charges in this

20   case in June of 2019, you still considered yourself a Bowl

21   Patrol member?

22        A.   Yes.

23        Q.   All right.  Now, explain to the jury where the name

24   Bowl Patrol comes from.

25        A.   Well, Dylann Roof had a bowl cut.

1      Q.    It is a haircut?

2      A.    His hairstyle was a bowl cut and so it was just a

3  play on that hairstyle, the bowl cut.

4      Q.    Okay.  When you became associated with Bowl Patrol,

5  did it already exist?  That is, were you a founding member?

6      A.    No, I was not a founding member.

7      Q.    All right.

8      A.    It did exist.

9      Q.    And do you recall how you actually decided to become

10  a member of Bowl Patrol?

11     A.    Well, the -- one of the people who was I would say a

12  founder who went by Tactical Bowlcut had videos on YouTube and

13  I came across one of the videos and then we became friends on

14  Facebook and just went from there.

15     Q.    All right.  Did Bowl Patrol have a founder?

16     A.    Yes.

17     Q.    And who was that?

18     A.    He went by Vic Mackey.

19     Q.    And to what extent was Vic Mackey the leader of the

20  Bowl Patrol?

21     A.    He referred to himself as the HBIC, which is Head

22  Bowl in Charge.

23     Q.    All right.  And did the other members generally

24  acknowledge him as the leader of Bowl Patrol?

25     A.    Yes.

1    Q.    And did he originally open up the chat room?

2    A.    I believe so, but I don't know for sure.

3    Q.    Okay.  But when you came in, Vic Mackey was running

4    things?

5    A.    Correct.

6    Q.    All right.  And did the Bowl Patrol have a

7    particular product?

8    A.    Well, we made memes and we had a podcast which was

9    called the BowlCast.

10    Q.    All right.  And the BowlCasts were kind of episodes?

11    A.    Correct.

12    Q.    How many BowlCasts were there?

13    A.    In all, there were 10.  One of them, episode 9, was

14    kind of a prank where it was just noise and -- yeah, that's it.

15    Q.    All right.  And do you recall approximately when the

16    first BowlCast was?

17    A.    I don't recall at this point.

18    Q.    All right.  And do you know whether Mr. Cantwell had

19    any role in the first BowlCast?

20    A.    He was the guest on the first episode of the

21    BowlCast.

22    Q.    And did you play a particular role in making that

23    happen?

24    A.    Yes.  I was the one who coordinated his appearance

25    on the show.  Basically, I helped put Cantwell in touch with

1    Vic Mackey and that's how he was on there.

2        Q.    All right.  Did you actually participate in the

3    first BowlCast?

4        A.    No.

5        Q.    And did you participate in the second BowlCast?

6        A.    No.

7        Q.    So what BowlCast were you actually part of?

8        A.    I was on episodes 3 through -- 3, 4, 5 and -- 3

9    through -- I know the last one I did was in -- came out on

10   June 6th of 2019, so that would have been 3 through 8.

11       Q.    All right.

12       A.    Yes, 3 through 8.

13       Q.    Okay.  And was Vic Mackey involved in all of the

14   BowlCasts?

15       A.    Yes.

16       Q.    And was Vic Mackey his real name?

17       A.    No.

18       Q.    Was -- did people generally know who Vic Mackey

19   actually was?

20       A.    No.

21       Q.    And were people interested in knowing?

22       A.    Yes.

23       Q.    Okay.  Now, Mr. Cantwell, when you asked him to be

24   on the first BowlCast, was he helpful and generally friendly?

25       A.    Yes.

1    Q.   And at that time, in 2018, were relations -- how

2  would you describe relations between the Bowl Patrol and

3  Mr. Cantwell?

4    A.   They were -- we were on the same team, so to speak.

5  We had a friendly relationship.

6    Q.   Okay.  And did that friendliness continue for a

7  period?

8    A.   For a period, it did.

9    Q.   All right.  And when did that change, just

10  approximately?

11    A.   It would have been sometime between very late 2018

12  and early 2019.

13    Q.   All right.  And so before very late 2018, were

14  you -- was the Bowl Patrol generally friendly with

15  Mr. Cantwell?

16    A.   Yes.

17    Q.   And during that period, did you continue to make

18  calls in to his show to contribute to his show?

19    A.   Yes.

20    Q.   Did you bear him any ill will --

21    A.   No.

22    Q.   -- at that time?

23    A.   No.

24    Q.   All right.  Now, let me direct your attention to --

25  this might be a good place to break, your Honor.

1          THE COURT:  Yeah.  We're past the time I suggested.

2          So let's take about a 15-minute break, members of

3   the jury.

4          (Recess taken from 10:50 a.m. until 11:05 a.m.)

5          THE COURT:  The witness can come up and take the

6   stand again.

7          All right, Counsel.  You can go ahead.

8      Q.    Directing your attention, Mr. Lambert, to

9   Thanksgiving time of 2018, you recall that time?

10     A.    I do.

11     Q.    And did you get a visit from a woman and your friend

12  Tom Gibson?

13     A.    Yes.

14     Q.    And at that time, were you on bad terms with

15  Mr. Cantwell?

16     A.    No.

17     Q.    All right.  And what's the name of the woman?

18     A.    She went by Peach.

19     Q.    All right.

20     A.    Her real name's Katelen Fry.

21     Q.    And was she -- was this visit at your home in

22  Missouri?

23     A.    Yes.

24     Q.    Okay.  And Peach is a nickname; is that right?

25     A.    Yes.

1      Q.    All right.  And did you -- had you met Peach online?

2      A.    Yes.

3      Q.    And describe that briefly.

4      A.    She was a member of the Radical Agenda Telegram chat

5    and so was I.  And so that's how we met.

6      Q.    All right.  And Radical Agenda was Mr. Cantwell's

7    channel?

8      A.    That's correct.

9      Q.    And had you found out that Peach was originally from

10   the St. Louis area?

11     A.    Yes.

12     Q.    All right.  And so were your communications with her

13   ever romantic?

14     A.    No.

15     Q.    How was it that you came to have her come to your

16   house?

17     A.    Well, I just reached out.  And, you know, I knew

18   that she was from the same region that I was, so I said, you

19   know, if you're in town for a holiday or something like that,

20   you know, come up.

21     Q.    All right.  And what was Tom Gibson's role?

22     A.    Well, he -- he was romantically interested in her

23   or, you know, wanted to basically make Peach his girlfriend.

24     Q.    All right.  And he told you that?

25     A.    Yes.

1      Q.    And was Tom Gibson married?

2      A.    No.

3      Q.    All right.  And so was it planned that Tom Gibson

4   and Peach would come to your house for a visit?

5      A.    Yes.

6      Q.    All right.  How many times did Peach come to your

7   house?

8      A.    Just the one time.

9      Q.    And do you remember how long she was there?

10      A.    A couple hours tops.

11      Q.    All right.  Now, at some point did you find out that

12   Peach was either Chris Cantwell's girlfriend or his

13   ex-girlfriend?

14      A.    Yes.

15      Q.    And when did you find that out?

16      A.    Almost immediately after she got there.

17      Q.    So you didn't know until she actually came to your

18   house that she was -- that she had a relationship with

19   Cantwell?

20      A.    That's correct.

21      Q.    So during the visit of Peach, were there photographs

22   taken?

23      A.    Yes.

24      Q.    And was one of them a selfie?

25      A.    Yes.

1      Q.    All right.  I'm showing you Government Exhibit 301,

2    which I believe is in evidence.

3            Do you recognize that photo?

4      A.    I do.

5      Q.    And who's in it?

6      A.    That is Tom on the right, Tom Gibson on the right,

7    that's Peach in the middle, and me on the left.

8      Q.    All right.  And where were you at that time?

9      A.    We were sitting on the couch in my living room.

10     Q.    And this is during that visit in Thanksgiving of

11   2018?

12     A.    Yes.

13           MR. DAVIS:  Your Honor?

14           THE COURT:  I'm just having my clerk enable my

15   screen.  You can continue.

16           MR. DAVIS:  Very good.

17     Q.    Now, before Peach came, did you actually send her

18   some pictures of your family?

19     A.    I did.

20     Q.    And why did you do that?

21     A.    Because my family is the most important thing in the

22   world to me and I am proud of them and I wanted to show them

23   off.

24     Q.    All right.  And so you just texted them to Peach

25   before the visit?

1     A.    Either text or by way of Telegram Messenger.

2     Q.    All right.

3     A.    But directly, yes.

4     Q.    By way of Telegram?

5     A.    Yes.

6     Q.    And what's Telegram?

7     A.    Telegram, it's a messaging app.  You can create

8  public channels, public chats, private chats, or send direct

9  messages to people.

10    Q.    Okay.  So I'm showing you now Government

11 Exhibit 201.  Do you recognize that picture?

12    A.    I do.

13          MR. DAVIS:  And was -- is 201 in evidence?

14          So 201 in evidence, your Honor.

15          THE COURT:  All right.  So that can be shown to the

16 jury.

17    Q.    Now, who is in that picture, Mr. Lambert?

18    A.    That's my wife and three children.

19    Q.    All right.  And do you recognize where that picture

20 is taken?

21    A.    Yes.

22    Q.    Where is that?

23    A.    It's at my wife's aunt's house, aunt and uncle's

24 house, in the St. Louis area.

25    Q.    So that's also in Missouri?

```
 1           A.    That's correct.
 2           Q.    And do you remember when the picture was taken?
 3           A.    That would be Christmas of 2017.
 4           Q.    So that's a Christmas photo you had?
 5           A.    Yes.
 6           Q.    All right.  And that's one of the ones you sent to
 7     Peach?
 8           A.    Yes.
 9           Q.    And then I'm showing you Government Exhibit 202,
10     also in evidence.  Do you recognize 202?
11           A.    Yes.
12           Q.    And what is that?
13           A.    That's another picture of my wife and three kids.
14           Q.    All right.  I'll ask you to speak a little louder.
15           A.    I said that's another photo of my wife and three
16     children.
17           Q.    Okay.  And do you recall who took that photo?
18           A.    Me.
19           Q.    And do you recognize where it is?
20           A.    Yes, it's in my kitchen.
21           Q.    And do you know when it was taken?
22           A.    I'm not sure.  I'm not positive.
23           Q.    Okay.  And so when you sent the photos to Peach, was
24     there any further discussion about how those were going to be
25     used?
```

1     A.    No.

2     Q.    All right.  Now, let me -- were those the only two

3   photos you sent to Peach?

4     A.    Those were the only two photos of my family.  I

5   don't recall whether I sent her other photos -- or it wasn't

6   other photos, but I might have sent memes over or something,

7   but nothing that would have been personally identifying that I

8   can recall.

9     Q.    All right.  And when you say a meme, what's a meme?

10    A.    It's a photo or a picture that has text in it that

11  is basically a joke or meant to, I guess -- you know, they use

12  memes for like political beliefs or just as jokes or -- you

13  know, there are memes on every topic, but it's kind of a -- I

14  guess a clever way to say something.

15    Q.    All right.  And are you -- are you particularly

16  interested in memes?  Do you like memes?

17    A.    I do, yes.

18    Q.    All right.  And did you, as part of your Bowl Patrol

19  association, like to make memes?

20    A.    Yes.

21    Q.    All right.  Now, let me show you another photo,

22  Government Exhibit 204, also in evidence, I believe.

23          Do you recognize 204?

24    A.    I do.

25    Q.    What is that?

1    A.    It's a picture of me that I took as a joke.  I was

2   pretending to be using drugs, but it was construction paper

3   from my daughter's -- from a notepad of construction paper of

4   hers.

5    Q.    You said window pad?

6    A.    No, it was construction paper from a -- my

7   daughter's notepad.

8    Q.    Notepad.

9    A.    Yeah.

10   Q.    All right.  So you took this as a joke?

11   A.    Yes.

12   Q.    And when you say you're pretending to be a drug

13  user, what kind of drugs are you pretending to use?

14   A.    Pretending to use LSD.

15   Q.    All right.  Are those actual LSD strips on your

16  tongue?

17   A.    No.

18   Q.    All right.  And did you -- is this a selfie or did

19  someone else take that?

20   A.    That's a selfie.  It's a selfie.

21   Q.    All right.  And what did you do with that selfie

22  after you took it?

23   A.    I don't recall exactly.  I probably posted it in a

24  chat as a joke.  I wouldn't have put that out publicly, but I

25  would imagine that I sent it to a chat just as a joke.

1    Q.   All right.  And when you say a chat, that's --

2    A.   Like a --

3    Q.   Go ahead.

4    A.   I'm sorry.  A private Telegram chat or a -- yeah,

5  private Telegram chat.

6    Q.   All right.  And once that happens, then other people

7  now have that photo?

8    A.   Yes.

9    Q.   Okay.  Do you know how Mr. Cantwell specifically got

10  that photo?

11    A.   No.

12    Q.   But you know you posted it on a chat at some point?

13    A.   Yes.

14    Q.   Okay.  Let me show you another one.  This is for

15  identification, I think, Government Exhibit 302.

16         302 is in evidence also, so that can be --

17         THE COURT:  That can be shown.

18         MR. DAVIS:  Yes.

19    Q.   You see 302, Mr. Lambert?

20    A.   Yes.

21    Q.   And do you recognize that?

22    A.   Yes.

23    Q.   And who is that?

24    A.   That's me.

25    Q.   And do you know what you did with that photo?

1      A.   No, I don't recall.

2      Q.   And do you have any idea how Mr. Cantwell got that

3  photo?

4      A.   I don't.

5      Q.   All right.  Now, you said Peach was at your house

6  for a couple of hours?

7      A.   Yes.

8      Q.   And when she left, did she -- did you have

9  any conversation about that she was going to be letting

10 Mr. Cantwell know what your address was?

11     A.   No.

12     Q.   And did she have any conversation that she would

13 tell -- show Mr. Cantwell the photos that you had sent?

14     A.   No.

15     Q.   Did she actually take some photographs while she was

16 at your house?

17     A.   Yes.

18     Q.   And what do you remember about that?

19     A.   That she took photos of my kids.

20     Q.   All right.  And what did you think about that then?

21     A.   At the time that it was happening, I had just, you

22 know, figured that she thought, adorable kids, you know.  After

23 the fact, I -- it really bothered me.

24     Q.   But at that -- at that point, the visit ended and

25 things were fine; is that fair?

1      A.   Correct, yes.

2      Q.   Okay.  And did Mr. Gibson and Peach strike up a

3  relationship?

4      A.   No.

5      Q.   That didn't go anywhere?

6      A.   No.

7      Q.   All right.  All right.  Now, at the end of 2018,

8  you've already testified the relationship between the Bowl

9  Patrol and Cantwell went south; is that right?

10     A.   Yes.

11     Q.   And what happened, in your words, between Cantwell

12  and Bowl Patrol?

13     A.   I think that many of the members of Bowl Patrol

14  thought that he had shifted his ideology and so it appeared

15  that he was trying to use his platform simply to make money and

16  not to, you know, actually -- he didn't actually believe what

17  he was saying; he was just doing it for financial gain.

18     Q.   That was an opinion in the Bowl Patrol among

19  members?

20     A.   Correct.

21     Q.   And what happened after that opinion began to take

22  root?

23     A.   Well, people started prank-calling the show.

24     Q.   All right.  So when you say prank-calling, what is

25  that?

1    A.    It's when you call somebody and you either act like

2  somebody else or do stupid things to try and, you know, make

3  funny sound clips or make jokes at the expense of, you know,

4  the person who's the host of the show or the person you're

5  pranking.

6    Q.    Okay.  And are you someone who's good at imitations?

7    A.    Yes.

8    Q.    You can do voices?

9    A.    Yes.

10   Q.    So are you good at prank calls?

11   A.    I think so.

12   Q.    Even though they're stupid?

13   A.    Yes.

14   Q.    All right.  So did you make prank calls to the

15  Cantwell show?

16   A.    Yes.

17   Q.    And any idea how many you made?

18   A.    I would say overall it would be probably around 15

19  maybe, 10 or 15.  I don't know exactly.

20   Q.    All right.  So let's talk about that.  Were there --

21  were there times when you called the show and you actually got

22  on?

23   A.    Yes.

24   Q.    Were there other times you called and you were put

25  on hold and you didn't get on?

1      A.   Yes.

2      Q.   Were there other times you called and you got a busy

3  signal?

4      A.   Yes.

5      Q.   But you're thinking 15 times --

6      A.   Yeah.

7      Q.   -- you actually got on the show and did a prank

8  call?

9      A.   Correct.

10     Q.   And when you did a prank call, what did -- what did

11  you do?

12     A.   I would play different characters.  One of the ones

13  that I did was -- it was an imitation of somebody else's

14  imitation of a person that -- who goes by Fevs.

15     Q.   All right.  And Fevs, how do you spell that?

16     A.   F-e-v-s.

17     Q.   Okay.  So you would imitate someone who imitated

18  Fevs?

19     A.   Well, I would imitate Fevs, but I had never actually

20  heard him talk.  I had only heard others' imitations of him.

21  So my imitation was, therefore, an imitation of theirs.

22     Q.   All right --

23     A.   Which made it more ridiculous and funnier.

24     Q.   -- you thought it was funny, at least at the time?

25     A.   At the time I did.

1      Q.    And how many times did you call Mr. Cantwell's show

2  and pretend to be Fevs?

3      A.    I don't know exactly.  I would say an estimate would

4  be like seven, I would say, maybe six or seven.

5      Q.    And when you called Mr. Cantwell's show and

6  pretended to be Fevs, how did that end typically?

7      A.    Typically, he did not enjoy it and would try and

8  hang up on me quickly.

9      Q.    All right.  So you knew he didn't like that, right?

10     A.    Yes.

11     Q.    Why did you keep doing it?

12     A.    Because it was funny.

13     Q.    All right.  Did you also call and pretend to be

14  someone else?

15     A.    Yes.

16     Q.    And who was that?

17     A.    I would -- I pretended I was George Knox, who is --

18  it's a Disney character from a movie called Angels in the

19  Outfield.  It's -- he -- it was Danny Glover, Danny Glover's

20  character.

21     Q.    And how many times did you call as George Knox, do

22  you know?

23     A.    I'm not positive, but not very many.  Maybe once or

24  twice.

25     Q.    And what other people did you call as?

1       A.    I think that was really it, to be honest with you.

2       Q.    All right.  But Mr. Cantwell obviously did not

3    welcome these calls, right?

4       A.    Right.

5       Q.    And did other people in the Bowl Patrol also call --

6       A.    Yes.

7       Q.    -- to your knowledge?

8       A.    Yes.

9       Q.    And how did you know that was happening?

10       A.    Because we would talk about it in the chat

11    afterwards.

12       Q.    All right.  And did you also talk about it in any

13    BowlCast, that you were calling and pranking the show?

14       A.    I don't recall.

15       Q.    All right.  But you certainly knew among the Bowl

16    Patrol that you were doing this?

17       A.    Yes.

18       Q.    So when was the first time, in your approximation,

19    that you prank-called Mr. Cantwell's show?

20       A.    It would have been -- I would say early 2019, very

21    early.

22       Q.    All right.  So January 2019?

23       A.    That sounds right, yeah.

24       Q.    Could it have been December of '18?

25       A.    It could have been.

1        Q.   And when was the last time you prank-called?

2        A.   I believe it would have been February of 2019.

3        Q.   All right.  And when you called Mr. Cantwell's show

4 to prank him, did you use the same number?

5        A.   I used my personal cell phone number, I used my

6 business cell phone number, and then -- which was actually like

7 an 866 number, and I used my business cell phone.

8        Q.   All right.  And did you principally use your

9 personal cell phone?

10       A.   Yes.

11       Q.   And was that number 636-248-1958?

12       A.   That's correct.

13       Q.   Is that still your cell phone number?

14       A.   Yes.

15       Q.   All right.  When you called Mr. Cantwell's show, did

16 you use fake numbers that masked what number it was?

17       A.   I did not, no.

18       Q.   All right.  So during your calls to the show, either

19 when you were friendly with Mr. Cantwell or when you were

20 prank-calling him, did you ever threaten him?

21       A.   No.

22       Q.   Did you ever try to get something from him?

23       A.   Never.

24       Q.   Did you ever threaten his family?

25       A.   Never.

1      Q.    All right.  Were you aware of a -- or did you become

2  aware of an incident in February 2019 when Mr. Cantwell's

3  website was defaced?

4      A.    Yes.

5      Q.    And how did you become aware of that?

6      A.    After it had already happened, I saw -- I saw

7  archived copies of the -- of the website.

8      Q.    All right.  Did you play any role in that defacing?

9      A.    None whatsoever.

10      Q.    And do you know who did it?

11      A.    Not specifically.  I think I have an idea, but I

12  really don't know for sure.

13      Q.    Okay.  Did Mr. Cantwell ever accuse you of defacing

14  his website, to your knowledge?

15      A.    Not that I recall.  But I think that he saw Bowl

16  Patrol as, you know, one -- if one person was doing it,

17  everybody was responsible for it.

18      Q.    All right.  And the -- and the person, again, who

19  led the Bowl Patrol was who?

20      A.    Vic Mackey.

21      Q.    Okay.  Now, directing your attention to March of

22  2019, specifically March 17th of 2019, did Mr. Cantwell

23  threaten to dox you that month?

24      A.    Yes.

25            MR. WOLPIN:  Objection, your Honor; leading.

1           THE COURT:  Overruled.

2      Q.   Did you have a direct communication with

3 Mr. Cantwell?

4      A.   Yes.

5      Q.   All right.  I'm showing you now defense Exhibit B-20

6 for identification.  Mr. Lambert, do you recognize B-20?

7      A.   Yes.

8      Q.   And can we see the second page, too?  Do you see all

9 of it?

10      A.   Yes.

11      Q.   All right.  So let's go back to the first page.

12           What is B-20?

13      A.   I'm sorry?

14      Q.   What is it?

15      A.   That's a screen cap of a conversation that I had

16 with Mr. Cantwell.

17      Q.   All right.  And in the course of that conversation,

18 does the subject of doxing -- is that discussed?

19      A.   Yes.

20           MR. DAVIS:  All right.  Your Honor --

21      Q.   And did you actually have this conversation with

22 Mr. Cantwell?

23      A.   Yes.

24           MR. DAVIS:  Your Honor, I'd move to strike the ID on

25 B-20.

1              THE COURT:  Any objection?

2              MR. LEVIN:  No objection.

3              THE COURT:  Without objection, it'll be admitted and

4    can be displayed.

5              (Defendant's Exhibit B-20 admitted.)

6         Q.   So, Mr. Lambert, up in the top left it says

7    Telegram.  What does that mean?

8         A.   That the conversation took place on the Telegram

9    app.

10        Q.   Okay.  And is this in a particular channel or

11   particular group chat?

12        A.   This was a direct message, so no.

13        Q.   Sorry?

14        A.   It was a direct message, so the answer is no.

15        Q.   All right.  So this is a private communication; is

16   that right?

17        A.   Yes.

18        Q.   And all these things on the left, Peaceful White

19   Folk and Outlaw Conservative and Radical Agenda, that -- that

20   doesn't mean they're reading this communication, right?

21        A.   Yes, that's correct.

22        Q.   This is you and Mr. Cantwell, right?

23        A.   Yes.

24        Q.   And do you recall what prompted this communication,

25   that is, what had happened on March 17th or around then that

```
 1   made this happen?
 2         A.    I'm not sure.
 3         Q.    You can't recall?
 4         A.    I can't.
 5         Q.    All right.  So let's just look at it.
 6               What does Mr. Cantwell say to start things off?
 7         A.    Stay the F away from me and my platforms or I
 8   will -- or I'll dox your stupid ass.
 9         Q.    Okay.  And the -- the pink ball and the thing that
10   says deleted, is that actually you?
11         A.    Yes.
12         Q.    So what did you say?
13         A.    I said, "why would you do a thing like that?"
14         Q.    All right.  And what did he say next?
15         A.    "Because I don't want you or your faggot ass friends
16   anywhere near me or my audience.  Try me and I'll do it."
17         Q.    All right.  And when you read "faggot ass friends,"
18   did you know who he was talking about or think you did?
19         A.    Yeah, I thought he was talking about Bowl Patrol.
20         Q.    All right.  And so what did you say in reply?
21         A.    I told him, "you've changed, buddy."
22               And then I said "okay."
23         Q.    All right.  And what did Mr. Cantwell say in
24   response to that?
25         A.    He said, "I'm not your buddy.  Stay away or I'll
```

1   prove it."

2        Q.    And how did you reply?

3        A.    "I'm sure I will."

4        Q.    Now, when you say -- when you said, "I'm sure I

5   will," were you -- what did you mean then?

6        A.    That, you know, I thought that he probably would dox

7   me and so I'm sure that I would.

8        Q.    Why did you think he could dox you?

9        A.    Because I figured that, you know, because Peach had

10  been up to my house and that he had an ongoing relationship

11  with her that he probably did know who I was and where I lived.

12       Q.    All right.  So let's go to the second page, just to

13  see the end of it.

14             There's a long break, do you see that, between

15  almost 4:00 p.m. and then 6:30 p.m.?

16       A.    Yes.

17       Q.    And then what does Mr. Cantwell say to you?

18       A.    "When you get doxed, it's all because of Vic.

19  Remember that."

20       Q.    And when you -- when you saw "it was all because of

21  Vic," did you know who he was talking about?

22       A.    Yes, Vic Mackey.

23       Q.    All right.  No ambiguity about that?

24       A.    No.

25       Q.    All right.  So that's enough on B-20.

1          Did you take that seriously?

2     A.   Yes.

3     Q.   Why?

4     A.   Because I -- like I said, I figured that he probably

5 did it -- did know where I was, who I was, and so he had the

6 ability to dox me.

7     Q.   All right.  And what is doxing, briefly?

8     A.   Doxing is the exposure of one's personal

9 information, their -- you know, anything that they've got

10 related to their life, their address, their name, their place

11 of employment.  Usually it's in hopes that somebody will do

12 something bad to you, like get you fired from your job or, you

13 know, worst case scenario that somebody would attack you, maybe

14 commit some sort of act of violence or vandalism or anything

15 like that.  It's basically to try and ruin somebody's life.

16    Q.   All right.  So in your community in Missouri, as of

17 spring of 2019, did anyone know that you were part of the Bowl

18 Patrol chat group?

19    A.   Nobody in my community, no.

20    Q.   All right.  Tom Gibson knew?

21    A.   Tom knew, yes.

22    Q.   Anyone else?

23    A.   I think -- I think I probably told my brother about

24 it, but I'm not sure.

25    Q.   All right.  And did any of those people know that

1    you were Cheddar Mane?

2        A.    Tom knew.  My brother or anybody else did not.

3        Q.    All right.  And did your employers know that you

4    were Cheddar Mane in the Bowl Patrol?

5        A.    No.

6        Q.    Did you want people to know that you were Cheddar

7    Mane in the Bowl Patrol?

8        A.    No.

9        Q.    Why not?

10       A.    Because the things that we were saying are not

11   things that are good.  It's terrible stuff that people would be

12   extremely offended by and it could cost me my job, it could

13   cost me friends, you know.  It would be very damaging if people

14   knew.

15       Q.    All right.  So after March 17th of 2019, did you

16   make any more prank calls?

17       A.    No.

18       Q.    Why not?

19       A.    Because I was worried that Cantwell would dox me.

20   And I went so far as to try and get other people to stop.

21       Q.    All right.  So tell about that.

22       A.    Well, I was the only one whose information that he

23   had and so I let everyone know in the Bowl Patrol chat to stop

24   messing with him, don't call him or anything like that because

25   it's going to affect my life and ruin my life and, you know,

1    that would be a bad thing, obviously.

2        Q.    All right.  You said you were the only one whose

3    info he had.  Did you know of someone who went by the name

4    Mosin Nagant?

5        A.    Yes.

6        Q.    And did you know what happened to Mosin Nagant?

7        A.    Yes.

8            MR. WOLPIN:  Objection, your Honor; relevance,

9    prejudice.

10           THE COURT:  I -- put the headset on.  I don't -- I

11   need to know more.

12                          AT SIDEBAR

13           THE COURT:  What does the government intend to do?

14           MR. DAVIS:  Just to ask if he was aware that

15   Mr. Cantwell doxed Mosin Nagant in February of 2019 and --

16           THE COURT:  Hasn't the jury already heard evidence

17   that Nagant was doxed by Mr. Cantwell?

18           MR. DAVIS:  Yes.  And the government asks this

19   witness that question because it bears on the reasonableness of

20   his apprehension about being doxed by Mr. Cantwell.

21           THE COURT:  All right.  The relevance objection is

22   overruled.

23                      CONCLUSION OF SIDEBAR

24       Q.    So, Mr. Lambert, you were aware what happened to

25   Mosin Nagant?

1        A.    Yes.

2        Q.    And what was that, briefly?

3        A.    He was doxed by Cantwell.

4        Q.    All right.  And after he was doxed, was Mosin

5   Nagant's real name known to the world?

6        A.    Yes.

7        Q.    And after he was doxed, did Mosin Nagant have any

8   further role in the Bowl Patrol?

9        A.    No.

10        Q.    So you had seen that happen, right?

11        A.    Yes.

12        Q.    All right.  So you said you encouraged other people

13   in the chat to stop antagonizing Mr. Cantwell?

14        A.    Yes.

15        Q.    Was that completely successful?

16        A.    No.

17        Q.    And what do you mean by that?

18        A.    People still continued to try and do prank calls or,

19   you know, just mess with him in whatever way they could.

20        Q.    All right.  But you had stopped; is that right?

21        A.    Yes.

22        Q.    Any question about that in your mind?

23        A.    There is no question.

24        Q.    Okay.  So fast forward a few months to mid-June of

25   2019.  Do you recall then?

```
 1        A.    Yes.

 2        Q.    And, particularly, June 15th of 2019, which was a

 3   Saturday.

 4        A.    Yes.

 5        Q.    And do you recall that was Father's Day weekend?

 6        A.    I do.

 7        Q.    All right.  So did something happen on June 15th of

 8   2019?

 9        A.    Yes.

10        Q.    All right.  What was that?

11        A.    Well, I -- someone posted a link in the Bowl Patrol

12   chat to a Telegram group, not indicating what it was.  And so I

13   clicked the link and I noticed a few names in there that I had

14   known, Matt Heimbach, the guy from Maine, I forget his name,

15   Tom, something Polish.

16        Q.    Is it Tom Kawczynski?

17        A.    That's it.

18        Q.    And do you recall the name of this chat?

19        A.    It was called Peaceful White Folk.

20        Q.    And so there's a link, and do you know who posted

21   this link?

22        A.    I don't.

23        Q.    All right.  But you clicked on it?

24        A.    I did.

25        Q.    And you found yourself in a chat group?
```

1          A.    Yes.  I joined the group and I, you know, said
2     something to Heimbach and then posted a couple stickers of
3     Heimbach and --
4          Q.    All right.  Can you -- do you remember what the
5     stickers looked like?
6          A.    Like him making funny faces, I think, that had been
7     from rallies that he had gone to and there were pictures of him
8     where he was fighting and making a really angry face, so I
9     posted a couple of photos of the stickers and then I was kicked
10    out of the chat.
11         Q.    When you say kicked out, what happened?
12         A.    One of the admins in the chat removes you from the
13    chat and it says this chat is no longer available.
14         Q.    Okay.  Now, while you were in the chat, you said you
15    noticed that Heimbach was there.
16         A.    Yes.
17         Q.    And is Heimbach someone who is pretty well known in
18    the far right wing?
19         A.    Yes.
20         Q.    And you also noticed Mr. Kawczynski?
21         A.    Yes.
22         Q.    And is he also well known?
23         A.    Yes.
24         Q.    And did you also notice that Mr. Cantwell was in the
25    same group?

1          A.    I didn't.

2          Q.    All right.  So you did not know it was Cantwell's

3    chat -- chat group?

4          A.    No.  Because if I would have known that it was his,

5    I would have stayed out of it.

6          Q.    Okay.  So you posted a couple of stickers of

7    Heimbach, right?

8          A.    Uh-huh, correct.

9          Q.    Do you recall how Heimbach reacted to that?

10         A.    I didn't see a reaction before I was removed.

11         Q.    Okay.  All right.  So you're removed from the chat.

12   What happens next?

13         A.    Moments later I got a direct message from Cantwell

14   basically saying, I guess I need to remind you why you should

15   stay away, and then posted my -- the street that I live on.

16         Q.    Okay.  So let's turn to Exhibit 100 in evidence.

17               Do you recognize this?

18         A.    Yes.

19         Q.    And is this a version of the exchange that you had

20   with Mr. Cantwell on June 15th and June 16th of 2019?

21         A.    Yes.

22         Q.    All right.  And as we look at it, is the green the

23   messages from Mr. Cantwell?

24         A.    Yes.  This would be what he had and I'm on the left.

25         Q.    All right.  And so the white would be what you

1    wrote; is that right?

2         A.    Correct.

3         Q.    Now, the -- the heading says Cheddy Blac.  Is that

4    something that's associated with you?

5         A.    Yes, that was the name that I was going by on

6    Telegram at that point.

7         Q.    Okay.  And, once again, is this a -- is this a group

8    communication?

9         A.    No, it's a direct communication.

10        Q.    And is there anyone else participating other than

11   you and Mr. Cantwell?

12        A.    No.

13        Q.    All right.  One thing I forgot to ask you before I

14   just want to make sure to ask you, did -- had you told your

15   wife that you were Cheddar Mane?

16        A.    No.

17        Q.    Did she know that you were in a group called the

18   Bowl Patrol?

19        A.    No.

20        Q.    So as of this day, your own wife didn't know what

21   you were doing?

22        A.    Correct.

23        Q.    All right.  So another question about this.  Where

24   were you when you received it?

25        A.    I was in my kitchen, facing east, looking out the

1    window.

2         Q.    And so at your house in Missouri?

3         A.    Yes.

4         Q.    And do you remember what was going on that Saturday

5    night?

6         A.    My wife was at work and I had put the kids to bed or

7    I was in the process of putting the kids to bed.

8         Q.    All right.  So if this call is -- initial chat is

9    9:00 p.m. eastern, it's 8:00 p.m. central, right?

10        A.    Correct.

11        Q.    So why is your wife at work at 8:00 p.m. on a

12   Saturday night?

13        A.    She works every Friday, Saturday, and Sunday

14   night overnight from 7:00 a.m. -- or I'm sorry -- 7:00 p.m. to

15   7:00 a.m. the next day.

16        Q.    All right.  So she would have been out of the house

17   that Saturday night?

18        A.    Yes.

19        Q.    Okay.  Another question.  Some of these have check

20   marks on -- next to them.  Do you see those?

21        A.    Yes.

22        Q.    And are you familiar with what check marks mean in

23   the Telegram app --

24        A.    Yes.

25        Q.    -- system?  Okay.

1        A.    One check mark means that your message has been

2    successfully sent and two check marks means that the person

3    that you've sent the message to has received it and seen it.

4        Q.    All right.  So it's a way of the sender to know that

5    the receiver has actually seen the message?

6        A.    Correct.

7        Q.    And did you have the same ability on your end to see

8    if Cantwell had seen your message?

9        A.    Yes.

10       Q.    And -- does Telegram app operate like a text, what

11   other people would just say is a text?

12       A.    I would say it's more like an instant messenger,

13   kind of, with the addition of the ability to make a channel or

14   host a group chat.

15       Q.    Okay.

16       A.    So essentially it can be used to perform the same

17   duty, yes.

18       Q.    Okay.  So you got the message at 9:00 p.m. eastern;

19   "I guess you forgot the lesson which kept you away for a short

20   while.  Do you need to be reminded?"

21             Do you see that?

22       A.    Yes.

23       Q.    And then there was a break of almost half an hour,

24   right?

25       A.    Uh-huh.  Yes.

1      Q.    All right.  Now, when you got the initial message,

2  "I guess you forgot the lesson which kept you away for a short

3  while," what did you take that to mean?

4      A.    Well, that would refer to the threat to dox me from

5  before, from March.

6      Q.    So the lesson was you knew that he could dox you?

7      A.    Correct.

8      Q.    And -- and he referred to "kept you away for a short

9  while."

10            What did you take that to mean?

11     A.    That he had noticed that I had not been doing

12  anything to antagonize him.

13     Q.    All right.  So he says it right there, right?

14     A.    Yes.

15     Q.    Okay.  Do you remember getting that first message,

16  just the first message?

17     A.    Yes.

18     Q.    And you haven't even gotten "Twin Creek Road" yet,

19  right?

20     A.    Right.

21     Q.    How did you react when you got the first message?

22     A.    Well, I mean, I was scared.  I, you know, got

23  the feeling where you, you know -- you flush with heat and

24  you've -- you know, your stomach drops; you -- I -- it was

25  very, very unsettling.

1    Q.   All right.  And why is it so unsettling?  You just

2  get a message from Chris Cantwell; why are you unsettled?

3    A.   Because, once again, he's holding the fact that he

4  can ruin my life over my head.

5    Q.   All right.  And then you -- but you don't reply,

6  right?

7    A.   Right.  I was busy trying to get the kids to bed.

8    Q.   And then he writes "Twin Creek Road."  That's all he

9  writes, right?

10    A.   Correct.

11    Q.   And was that your street?

12    A.   Yes.

13    Q.   And almost two more hours go by, right?

14    A.   Yes.

15    Q.   And then you replied?

16    A.   Uh-huh.  Yes.

17    Q.   And what did you say?

18    A.   "What are you talking about?  Some fag pretends to

19  be you, I told them to stop, they did.  What do you even stand

20  to gain here?  Let's think about this.  Every time you -- every

21  time someone you think is in BP," which is Bowl Patrol, "talks

22  shit about you, a public figure, you threaten to dox me?  Say

23  you did.  What then?"

24    Q.   All right.  So what were you doing in this -- in

25  these communications?  What were you trying to accomplish?

1      A.    I didn't know -- I still didn't know at the time

2   what I had done.  I thought that he -- that somebody else

3   had -- well, I was aware of the fact that there were others

4   that had fake Chris Cantwell accounts on Telegram and so I

5   thought that maybe somebody with a fake account had, you know,

6   pretended to be him and that's what was triggering this.  And

7   it took me a little while to figure out what I actually did

8   that --

9      Q.    What you did was going into the Peaceful White Folk

10  chat group --

11     A.    Correct.

12     Q.    -- and meme Heimbach?

13     A.    That's right.

14     Q.    Okay.  Now, in the -- in the course of -- and as of

15  11:59 p.m. eastern, Mr. Cantwell had said nothing more, right,

16  than just send your street address --

17     A.    Yes.

18     Q.    -- right?

19            And then another half-hour goes by and the date

20  turns and now you -- now what do you say?

21     A.    "I honestly don't even know what I did.  I followed

22  a link into a group I didn't even know you were in."

23     Q.    All right.  Now, in the course of these responses --

24  and, again, this is just you with no reply from Mr. Cantwell,

25  right?

1   A. Yes.

2   Q. Did you actually write some drafts?

3   A. Yes.

4   Q. All right.  Why did you write drafts?

5   A. Because I wanted to make sure that I was smart about

6 what I said and that I didn't go over any lines legally.  I

7 wanted to -- I didn't want to antagonize any more than I needed

8 to.  That's pretty much it.

9   Q. Did you want to escalate the situation?

10   A. No.

11   Q. What did you want?

12   A. I was trying to talk sense into him.  I was trying

13 to deescalate and, you know, show that I -- I really, you know,

14 didn't know what I had done that was wrong --

15   Q. All right.

16   A. -- and that, you know --

17   Q. All right.  So after you got the "Twin Creek Road,"

18 did you initially reach out to someone?

19   A. Yeah.  I called Tom Gibson.

20   Q. All right.  You said you called.  Do you know if you

21 called or messaged?

22   A. I contacted him.  I don't remember whether it was a

23 call or a message.

24   Q. All right.  And if you'd messaged him, do you know

25 what channel you would have used?

1          A.    It would have been directly.

2          Q.    All right.  But it -- would it have been -- did you

3     have other ways to communicate with Tom Gibson?

4          A.    Like -- it was likely a Signal message.

5          Q.    All right.  And what did you tell Tom Gibson?

6          A.    I told him that Cantwell's threatening to dox me

7     again --

8          Q.    All right.

9          A.    -- and --

10         Q.    And did he give advice to you?

11         A.    I sent him a photo of the first two communications

12    and he said, "delete and report spam."

13         Q.    Delete and report spam?

14         A.    Yes.

15         Q.    And that was the advice you got from Tom Gibson?

16         A.    Yes.

17         Q.    Did you follow that?

18         A.    No.

19         Q.    Why not?

20         A.    Because if I would have done that, then I was

21    worried that it would -- the dox would just happen.  I was

22    hoping that maybe I could stop it from happening.

23         Q.    Okay.  So you said you'd actually written -- written

24    some drafts and taken screenshots.  Do you recall that?

25         A.    Yes.

1      Q.    Showing you Government Exhibit 116 for
2   identification, so only you can see, do you recognize
3   Exhibit 116?
4      A.    Yes.
5      Q.    And what is that?
6      A.    This is a draft of what I was going to send to him.
7      Q.    To send back to Mr. Cantwell?
8      A.    To send to Cantwell, yes.
9      Q.    And what time are you doing this draft in relation
10  to the communications from Mr. Cantwell?
11     A.    I believe it was around 11:00 p.m. that night.
12     Q.    All right.  So it's -- is it after you had written
13  "what do you even stand to gain here?"
14     A.    Yes.
15     Q.    But before saying anything else?
16     A.    That's right.
17     Q.    Okay.  And showing you 117 for identification, do
18  you recognize that?
19     A.    Yes.
20     Q.    And is that another draft of a potential response to
21  Mr. Cantwell that you did yourself that night?
22     A.    It's the same draft, but more of what I was going to
23  say.
24           MR. DAVIS:  Okay.  Your Honor, I move to admit 116
25  and 117 and strike the ID.

```
1                    THE COURT:  Any objection?

2                    MR. WOLPIN:  No objection, your Honor.

3                    THE COURT:  It can be admitted.  It can be

4      displayed.

5              (Government's Exhibits 116 and 117 admitted.)

6         Q.   So going back to 116, you said, "you specifically

7      mention my kids."

8                    Do you see that?

9         A.   Yes.

10        Q.   Okay.  Had he mentioned your kids at that point?

11        A.   No, not that I remember.

12        Q.   Did he mention your kids later?

13        A.   He did --

14        Q.   All right.

15        A.   -- but there's no -- there would have had to be some

16     reason that I said that.

17        Q.   All right.  So is it possible it was later in the

18     chain than the very first part?

19        A.   No.  There would have had to be some other time that

20     he had mentioned that, that he had -- because --

21        Q.   All right.

22        A.   Yeah.

23        Q.   Okay.  But you remember this as early on that you

24     wrote this?

25        A.   Yes.
```

1    Q.   And going to 117, you said, "you think you're gonna

2  harm my family and I'm just gonna sit here and take that."

3         Right?

4    A.   Yes.

5    Q.   All right.  And then you took -- what did you do to

6  preserve these drafts?

7    A.   I had two phones at the time.  I took a photo of one

8  phone using the other phone.

9    Q.   All right.  And so you made a screenshot by a

10  picture using a different phone?

11    A.   Correct.

12    Q.   All right.  And what did you do with those

13  screenshots?

14    A.   I sent them to Paul Nehlen.

15    Q.   Okay.  And who is Paul Nehlen?

16    A.   He was a congressional candidate in Wisconsin.  He

17  had been in the Bowl Patrol chat, although was never actually

18  what we would consider of being part of the Bowl Patrol.

19    Q.   All right.  And was he someone you looked up to?

20    A.   Yes.

21    Q.   And is Nehlen spelled N-e-h-l-e-n?

22    A.   Yes.

23    Q.   And did he give you some advice?  I won't ask what

24  it is at this point.

25    A.   Yes.

1      Q.    All right.  So we'll get to that in a bit.  So let's

2   go back to 100.

3            Okay.  So at 3:56 a.m. eastern, you hear back from

4   Mr. Cantwell, right?

5      A.    Yes.

6      Q.    And what does he say?

7      A.    "Get a fucking life or I will ruin the one you have.

8   Don't bother anyone, then you won't have to worry about

9   crossing me."

10     Q.    Okay.  And can we go to the next part?

11           What time is the next reply?

12     A.    It's at 2:13 p.m.

13     Q.    All right.  So that's many hours, eleven hours or

14   so, after the prior communication, right?

15     A.    Correct.

16     Q.    Why did so much time go by?

17     A.    I just hadn't opened up my -- my phone yet.  I was

18   watching the kids because my wife had gotten off work that

19   morning and, you know, she was sleeping, so I would have been

20   busy watching the kids.

21     Q.    All right.  Did you forget about this?  Did you

22   think it was over?

23     A.    No.

24     Q.    All right.  But at 2:13 p.m., so that's 1:13 your

25   time, you get back on and get back to Cantwell, right

1      A.   Yes.

2      Q.   And what do you say?

3      A.   I say, "I haven't given you any thought and it was

4  an honest mistake.  Didn't even know you were in there or else

5  I'd have thought better of it.  Other than that, all I can do

6  is just leave you the fuck alone and tell other people to do

7  the same, which I have done.

8           "Seriously, man, I couldn't care less about what

9  you're trying to do these days."

10     Q.   All right.  So that's 2:13 p.m., and two more hours

11 go by, right?

12     A.   Yes.

13     Q.   Now, at this point, have you threatened

14 Mr. Cantwell?

15     A.   No.

16     Q.   Other than your F word there, have you used foul

17 language?

18     A.   No.

19     Q.   Had you threatened to dox him?

20     A.   No.

21     Q.   Had you -- were you still trying to deescalate?

22     A.   Yes.

23     Q.   And two more hours go by and then you hear from

24 Mr. Cantwell over a period of about half an hour, correct?

25     A.   Yes.

1      Q.    And what does he tell you then?

2      A.    He says:  You're a fucking liar.  You came here with

3  your loser fucking pals because you have the attention span of

4  an N and the morals of a K and because of that fact, you're

5  going to lose everything you have.

6            Next time I post that photo, the faces won't be

7  blurred and then you're going to start getting unexpected

8  visitors.

9            And I don't care if it's you causing the trouble.

10  You're the one who's going to suffer because you're the one who

11  I can get.

12            If you wanna dox Vic, he's a better target.  But if

13  you give me fake info, then your wife is gonna have trouble

14  sleeping at night until she leaves you and takes your kids

15  away.

16      Q.    Okay.  So he brings up your wife, right?

17      A.    Uh-huh.

18      Q.    Yes?

19      A.    Yes.

20      Q.    And he also brings up Vic, correct?

21      A.    Correct.

22      Q.    Had there been any mention of Vic Mackey before

23  4:47 p.m.?

24      A.    No.

25      Q.    He also says, "you're the one who's going to suffer

1    because you're the one who I can get."

2              Right?

3        A.    Yes.

4        Q.    How did you understand that?

5        A.    That I -- I was the one whose information that he

6    had, so it didn't matter if it was me or not, but I was the one

7    who was going to suffer because of it.

8        Q.    All right.  And he says, "next time I post that

9    photo, the faces won't be blurred."

10             Do you see that?

11       A.    Yes.

12       Q.    When you saw that, did you know what he was even

13   talking about?

14       A.    No.

15       Q.    Why not?

16       A.    I had been blocked from the place that he posted

17   them and I was unaware that they had been posted.

18       Q.    All right.  So you don't even know that there's been

19   photos posted?

20       A.    Correct.

21       Q.    All right.  And is -- is it possible on the Internet

22   to blur faces of people and post photos?

23       A.    Yes.

24       Q.    Okay.  So you don't even know what that photo is at

25   this point?

1    A.    No.

2    Q.    Okay.  So two more hours go by, right?

3    A.    Yes.

4    Q.    And then what do you say?

5    A.    "What picture are you even talking snout," which was

6  a typo, about.

7    Q.    Okay.  Now, he'd mentioned Vic.  Did you actually

8  have information about Vic?

9    A.    I did.

10    Q.    All right.  And what information was -- I won't ask

11  you what it is, but what kind of information did you have?

12    A.    Just very, very basic, not anything that would --

13  enough that if somebody tried, they would be able to figure out

14  who he was, but not anything as specific as like an address.

15    Q.    All right.  But did you have a name?

16    A.    Yes.

17    Q.    And did you know the area of the country where

18  Mr. Vic Mackey lived?

19    A.    Yes.

20    Q.    Okay.  So were you thinking about giving

21  Mr. Cantwell the information you had for Vic Mackey?

22    A.    No.

23    Q.    Why not?

24    A.    Because I felt like I owed -- that there was a

25  loyalty that -- you know, that's pretty much it.  I just didn't

1    want to throw a friend under the bus.

2         Q.   You regarded Vic Mackey as a friend?

3         A.   Yes.

4         Q.   All right.  So Mr. Cantwell gets back to you and he

5    says, "fuck around and I'll remind you the hard way."

6              Right?

7         A.   Yes.

8         Q.   All right.  So let's go to the next page.

9              And what did you write then?

10        A.   "So I'm assuming Peach took the picture.  Guess that

11   means you don't care what happens to her either."

12        Q.   Okay.  And why did you refer to Peach taking a

13   picture?

14        A.   Because I knew at the time, as did many members of

15   Bowl Patrol, that that's where he would have gotten the

16   pictures and that she would be implicated as the one who had

17   assisted in the dox.

18        Q.   Okay.  And when you said, "guess that means you

19   don't care what happens to her either," were you threatening

20   Peach?

21        A.   No.

22        Q.   What were you saying?

23        A.   Well, I knew that because the fact was known that

24   she would have been the source of the pictures that people

25   would be upset with her for, you know, participating in a dox

1  because that's one of the worst things that you can do to

2  somebody.

3       Q.   One of the worst things you can do is what?

4       A.   Is dox somebody or assist in doxing somebody.

5       Q.   All right.  Okay.  So Mr. Cantwell replies to you

6  soon after that, right?

7       A.   Yes.

8       Q.   And what does he write?

9       A.   "As a matter of fact, I don't.  So if you don't want

10 me to come and fuck your wife in front of your kids, then you

11 should make yourself scarce.

12            "Give me Vic.  It's your only out.

13            "I guess I'm going to have to prove my seriousness."

14      Q.   All right.  So he talks about coming and fucking

15 your wife at 6:41 p.m., right?

16      A.   Yes.

17      Q.   You don't reply, right?

18      A.   Correct.

19      Q.   Half an hour goes by, right?

20      A.   Yes.

21      Q.   And then he comes back to you; "give me Vic, it's

22 your only out."

23      A.   Yes.

24      Q.   Right?

25      A.   Yes.

1      Q.   And then another more than an hour goes by and he

2 comes back again, right?

3      A.   Yes.

4      Q.   And why weren't you replying to him once he'd said

5 this?

6      A.   At this point, I was -- I was still -- this would

7 have been at 5:41 p.m., 6:10 p.m., and 7:17 p.m. during my

8 time, which is -- my wife was going to be working that evening

9 and so we would have been having dinner with the kids and I

10 would have been helping her get out the door on time so she

11 could get to work.

12      Q.   So this is Father's Day dinner and you've got this

13 going on on your phone, right?

14      A.   Yes.

15      Q.   Did you take it as a joke when he said, "you don't

16 want me to come and fuck your wife in front of your kids"?  Was

17 that funny to you?

18      A.   Not at all.

19      Q.   How did it make you feel?

20      A.   I couldn't really believe that he said it at the

21 time, to be honest with you.  I was angry, I was scared about

22 what might happen, and I just -- I felt as though a line had

23 been crossed.

24      Q.   All right.  In all of your communications in the far

25 right world online, had anyone ever made a threat like that to

1   your wife and kids?

2        A.   No.

3        Q.   And had you ever made a threat like that to someone

4   else's wife and kids?

5        A.   No.

6        Q.   And were you aware of any such threat that ever

7   occurred?

8        A.   No.

9             MR. WOLPIN:  I'm going to object, your Honor;

10  relevance, prejudice.

11            THE COURT:  Sustained on both grounds.  I mean,

12  excuse me.  Overruled on both grounds.

13            MR. DAVIS:  All right.

14            THE COURT:  The answer can stand.

15       Q.   You said that this had crossed a line.  Can you

16  explain that to the jury?

17       A.   Well, I think it's pretty universal that you can say

18  stuff about somebody, you can say things about somebody's mom,

19  you can say things about a lot of things, you know, but once

20  you bring wife and kids into it, and especially directly like

21  that, it's -- it's a whole nother level.

22       Q.   All right.  And is there a difference, in your view,

23  between a communication in a channel that lots of people are

24  seeing and a direct communication that is private between two

25  people?

1      A.    Yes.

2      Q.    And what's that difference?

3      A.    The difference is that if it's on a channel, it can

4   still be construed as a joke.  I might be able to -- you might

5   be doing it for the entertainment of others.  But a direct

6   message like this is different than that.  It's a true threat.

7      Q.    All right.  All right.  So let's go back to the --

8   the larger shot.

9           It says, "I guess I'm going to have to prove my

10  seriousness."

11          Finally, at 8:21 p.m., what do you say?

12     A.    "Show me the picture you have."

13     Q.    Okay.  And he replies immediately what?

14     A.    "No."

15     Q.    But then you see a picture, right?

16     A.    Yes.

17     Q.    And that's the picture we've already seen of your

18  family at Christmas?

19     A.    Yes.

20     Q.    How did it make you feel to see that picture posted

21  in front of you?

22     A.    Well, a lot of different ways, to be honest with

23  you.  I was, of course, furious, but maybe even more than that

24  I was scared.  I thought about how stupid it was that I had

25  given anybody a picture of my family and -- but nothing about

1    it was funny.  Nothing about it was humorous at all.

2         Q.    All right.  And then after Mr. Cantwell sent you

3    that photo, he sends you a few more comments, right?

4         A.    Yeah.  Yes.

5         Q.    And what does he say?

6         A.    "More where that came from.

7               I'll bet one of my incell listeners would love to

8    give her another baby.

9               Do you think the FBI would take issue with an LSD

10   user owning guns around kids?"

11        Q.    Okay.  So let's talk about that.  What's an incell

12   listener?

13        A.    It would have been somebody who listened to his

14   program who was involuntarily celibate, which means that for

15   whatever reason, despite the fact that they wanted to have a

16   girlfriend or be with a woman, they couldn't.  So they were

17   celibate, but not by their own choice.

18        Q.    Okay.  So how is that different from the prior thing

19   where he says if you don't want me to come and F your wife in

20   front of your kids?

21        A.    Well, it's another form of a threat where he says --

22   you know, basically indicates that if he doesn't do something,

23   maybe somebody else will.

24        Q.    Okay.  And then three minutes after the incell

25   listeners, he talks about the FBI and LSD user owning guns

1    around kids, right?

2          A.    Correct.

3          Q.    All right.  And then does he send you another photo?

4    Let's go on to that.

5          A.    Yes.

6          Q.    Okay.  Next slide.

7                And do you recognize that photo?

8          A.    Yes.

9          Q.    And that's 8:31 p.m.?

10         A.    Yes.

11         Q.    And that's the -- you've already described that

12   photo?

13         A.    I have, yes.

14         Q.    Okay.  And what's the next message he sends you?

15         A.    Well, he says, "give me Vic."

16               And then I tell him that I don't own guns or do

17   drugs.  And so he says, "LOL --

18         Q.    Meaning laugh out loud?

19         A.    Correct.

20               "Okay.  I guess you're not going to give me what I

21   want.

22               "Fine.  Good luck."

23         Q.    Okay.  So it's 8:42 p.m.  This is more than 24 hours

24   after Mr. Cantwell first texted you, right?

25         A.    Yes.

```
 1        Q.   Had you threatened him in any way?

 2        A.   No.

 3        Q.   Had you said anything disrespectful in any way?

 4        A.   No.

 5        Q.   Were you still trying to deescalate?

 6        A.   Yes.

 7        Q.   Okay.  So what happens after 8:42 p.m.?  What do you

 8   say?

 9        A.   Well, I tell him that I don't even have his dox --

10        Q.   Was that true?

11        A.   -- Vic Mackey's dox.

12        Q.   Sorry?

13        A.   I say I don't even have his dox, referring to Vic

14   Mackey.

15        Q.   All right.  Was that true?

16        A.   No.

17        Q.   Okay.  And then Mr. Cantwell describes -- gives you

18   more information, right?

19        A.   Yes.

20        Q.   And what does he tell you?

21        A.   He says, "guess you're fucked then.

22             "All right.  Since you're obviously not

23   understanding the severity of this, I'll do you a favor.

24             "On Tuesday I'm going to send every episode of

25   BowlCast along with your identifying information to whatever
```

1    the local equivalent of CPS is in your jurisdiction."

2        Q.   Did you know what CPS was?

3        A.   Yes.

4        Q.   What is it?

5        A.   It's Child Protective Services.

6        Q.   Okay.  And what else did Mr. Cantwell write to you?

7        A.   "This way the information won't be public yet."

8        Q.   Okay.  And what next?

9        A.   "By Tuesday, you should be able to talk to your wife

10   and kids and to get them -- and get them to have all their

11   stories straight, get anything incriminating out of the house.

12            But I'm pretty sure once that visit comes, you'll

13   understand that this is serious.

14            If that doesn't work, I'll escalate until I get what

15   I want.

16            Tell Vic that if he gives himself up, he can save

17   your family."

18       Q.   Okay.  So that's 9:26 p.m. on June 16th, eastern,

19   right?

20       A.   Correct.

21       Q.   And then he makes one more comment?

22       A.   "He won't do it, but at least you'll know certain

23   that you chose the wrong side."

24       Q.   Okay.  So where does it go from there that Sunday

25   evening?

1      A.    At this point I just figured that there is nothing

2  that I'm going to be able to do to talk him out of this, so I

3  put up a front.  And, you know, I had kept my anger and

4  everything under wraps until that point, so I basically wanted

5  to tell him off, because I felt at that point that there was no

6  getting out of it.

7      Q.    And when you say getting out of it, what do you

8  mean?

9      A.    That he was going to dox me.  He was going to do

10  something.

11      Q.    All right.  Were you angry?

12      A.    I was more scared than angry, but I was definitely

13  angry.

14      Q.    All right.  And so you wrote what you wrote, right?

15      A.    Correct.

16      Q.    And then he says, "tomorrow then, no sense in

17  waiting till Tuesday."

18            Tomorrow's Monday, right?

19      A.    Correct.

20      Q.    And are you taunting him at this point?

21      A.    Yes.

22      Q.    All right.  You say now, "go ahead"?

23      A.    Yes.

24      Q.    And then what does he say?

25      A.    "CPS will visit you soon.  I'm not talking about

1  listeners.

2            "Good luck."

3        Q.    All right.  And how did you take that when he said

4   "I'm not talking about listeners."  Did you know what he meant?

5        A.    Not exactly.  I -- I assume that he realized that he

6   had crossed a line legally at that point and that he was trying

7   to walk back --

8            THE COURT:  Sustained.  Disregard the last comment,

9   members of the jury.

10       Q.    Don't assume -- I guess I sort of asked you to.

11           Did you understand -- "I'm not talking about

12  listeners," how did you take that?

13           You're not sure?

14       A.    I don't know.

15       Q.    Okay.  All right.  So then you wrote, "laugh out

16  loud; oh, no, I'm super scared; I'm sure this is going to go

17  exactly as you think it will."

18           Correct?

19       A.    Correct.

20       Q.    All right.  And he replies as he does, correct?

21       A.    Yes.

22       Q.    And he says, "have a good night"?

23       A.    Yes.

24       Q.    All right.  And are these your replies, these

25  cartoons?

```
 1          A.   Yes.

 2          Q.   And why did you put those in there?

 3          A.   Just to mess with him.

 4          Q.   Okay.  And was that it?

 5          A.   That was it.

 6          Q.   So that's 8:42 p.m. central and this has happened,

 7   right?

 8          A.   Yes.

 9          Q.   Okay.  And, again, when it's all over, did you take

10   it as a joke?

11          A.   No.

12          Q.   Did you see anything to funny about the whole

13   exchange?

14          A.   No.

15          Q.   To your knowledge, was anyone being entertained by

16   it?

17               MR. WOLPIN:  Objection, your Honor; leading at this

18   point.

19               THE COURT:  Sustained.

20               MR. DAVIS:  All right.

21          Q.   And you've already talked about crossing a line,

22   correct?

23          A.   Yes.

24          Q.   And what effect, if any, did this exchange have on

25   your sleep, at least for a while?
```

1     A.   I didn't sleep that night.  I just was -- everything

2  was very -- I was un -- it was unsettling.  I -- you know, it

3  really affected me.

4     Q.   All right.  Now, you've talked about before

5  contacting Paul Nehlen.

6     A.   Uh-huh.  Yes.

7     Q.   How did you contact him, in what form?

8     A.   I -- I sent him a text, but I called him as well.

9     Q.   All right.  You actually had a telephone

10  conversation with him?

11     A.   Yes.

12     Q.   Do you remember exactly where it was in all of this

13  that you talked to Paul Nehlen?

14     A.   I'm not sure exactly what -- what time it was, but

15  the basic gist of the call was that he's going to do this at

16  some point anyway and so you might as well just, you know, say

17  to hell with it.  And, you know, that's when I started, you

18  know, talking a little trash to him and posting the stickers

19  and things.

20     Q.   All right.  So did Mr. Nehlen give you some advice?

21     A.   Yes.

22     Q.   And did you tell him what had happened?

23     A.   Yes.

24     Q.   And, again, why did you call Paul Nehlen in the

25  first place?

1    A.    Because he was familiar with the situation -- with

2    the scene, I guess, of the far right on Telegram and because I

3    viewed him as somebody who would give me good advice and not

4    lead me the wrong way in this situation.

5    Q.    All right.  And when you called Paul Nehlen, were

6    you and he laughing about this?

7    A.    No.

8    Q.    All right.  Now, did you make a decision that same

9    night about posting what had happened?

10   A.    Yes.

11   Q.    All right.  And explain that decision.  What did you

12   decide to do?

13   A.    Well, I took screenshots of it and I sent it to the

14   Bowl Patrol chat.  And, you know, the idea was basically to

15   proliferate the screenshots to show the type of person that

16   Cantwell is.

17   Q.    All right.  So this is bad stuff that can happen to

18   you in these communications, right?

19   A.    Yes.

20   Q.    Why do you want to send them to other people to see?

21   A.    Because I knew that there might still be people who

22   followed him and maybe thought that he was a good person, but I

23   didn't want the same thing to happen to others.  I wanted to

24   show that, you know, the guy was not in his right mind at the

25   time, dangerous, and so I wanted to make sure that nobody did

1    anything like send him any sort of personal information or, you

2    know, even associate with him.

3         Q.    All right.  To what extent did sending that

4    information out to the Bowl Patrol help you, in your mind, with

5    your own security, if any?

6         A.    Well, it was a -- it was a record of what had

7    happened.

8         Q.    And explain that.

9         A.    Well, I -- you know, if I take the screen caps and

10   they go out, then there's a trail, basically.

11        Q.    Okay.  Now, let -- when you sent them out, did you

12   send them out so that the reader could see everything?

13        A.    Yes.

14        Q.    You -- but did you obscure some things?

15        A.    I obscured the photos of my family.

16        Q.    Okay.  And did you obscure your address?

17        A.    Yes.

18        Q.    Why?

19        A.    Because I didn't want that information to be out

20   there any more than it had to be.

21        Q.    Okay.  So let me show you a series of exhibits,

22   first Government Exhibit 214.  I believe that's in evidence.

23             Do you recognize that?

24        A.    Yes.

25        Q.    And explain briefly how 214 got to be the way it is.

1     A.    Well, I took the -- the screen cap that I had made

2  and then I used some of the stickers to cover up the things

3  that I didn't want to be out.

4     Q.    Which include the faces of your family?

5     A.    Correct.

6     Q.    All right.  And so 214 is the first of your -- with

7  the stickers on it?

8     A.    Yes.

9     Q.    And is this what you sent to the BowlCast?

10     A.    Yes.

11     Q.    Or the Bowl Patrol chat group?

12     A.    Yes.

13     Q.    Showing you now Government Exhibit 215 in evidence.

14  And that's another of your screenshots?

15     A.    Yes.

16     Q.    And there's nothing obscured in that one, correct?

17     A.    Correct.

18     Q.    And then 216 in evidence, another screenshot that is

19  not obscured, correct?

20     A.    Yes.

21     Q.    And then 217 in evidence.  And have you obscured

22  something there?

23     A.    Yes, I obscured my face.

24     Q.    All right.  So that's the picture of you that now

25  can't be seen?

```
 1        A.    That's correct.
 2        Q.    All right.  And now 218 in evidence.  And is
 3   there -- that's actually the first of the series, correct?
 4        A.    Yes.
 5        Q.    And what's obscured there?
 6        A.    The name of my street.
 7        Q.    Okay.  And, finally, 219 in evidence.  Anything
 8   obscured there?
 9        A.    No.
10        Q.    So you -- other than what you obscured, you sent
11   everything out to the Bowl Patrol --
12        A.    Yes.
13        Q.    -- right?  And that happened on June 17th in the
14   early morning?
15        A.    Yes.
16        Q.    Okay.  Now, did -- at some point did someone write
17   an introduction about what had happened?
18        A.    Yes.
19        Q.    And do you recall what channel that was on and who
20   wrote it?
21        A.    It was on Uncle Paul's channel, which I understood
22   to be Paul Nehlen.
23        Q.    Paul Nehlen?
24        A.    Uh-huh.  Yes.
25        Q.    Okay.  And did you later write even a longer
```

1   statement of what had happened from your perspective?

2       A.   Yes.

3       Q.   And did you put that on the BowlCast?

4       A.   Yes.

5       Q.   Okay.

6       A.   Well, I didn't put it, but I forwarded it in order

7   for it to be put on the channel.

8       Q.   Okay.  All right.  Now, at some point did you become

9   aware that Mr. Cantwell had actually doxed you?

10      A.   Yes.

11      Q.   All right.  And --

12           THE COURT:  Just a notice, Mr. Davis.  I'm going to

13  stop for lunch no later than 12:30.  All right?

14           MR. DAVIS:  Very good.

15      Q.   And showing you Government Exhibit 102 in evidence,

16  do you recognize 102?

17      A.   Yes.

18      Q.   And is that a screenshot of the Radical Agenda

19  channel?

20      A.   Yes, the public channel.

21      Q.   All right.  And who took that screenshot?

22      A.   I did.

23      Q.   And when did you take it?

24      A.   March 16th, 2020.

25      Q.   Okay.  So you actually took it this year, right?

1        A.    Yes.

2        Q.    That screenshot was still up on Radical Agenda in

3   March of 2020?

4        A.    Yes.

5        Q.    And has it remained up since then?

6        A.    To the best of my knowledge, it is still there.

7               MR. WOLPIN:  Objection, your Honor.  Can we --

8               THE COURT:  I -- sustained at the present time.

9   Disregard the answer.

10        Q.    Okay.  But you can see the -- the date by the

11   messages; you can see June 17th, 2019, on the left, correct?

12        A.    Yes.

13        Q.    And this is Mr. Cantwell as the administer --

14   administrator writing, right?

15        A.    Yes.

16        Q.    All right.  So going back to the -- he says, "here's

17   the redacted parts."

18               Right?

19        A.    Correct.

20        Q.    And those are the same photos we've already seen

21   that he had sent you in his Telegram, right?

22        A.    Yes.

23        Q.    And then the next page, did you also take this

24   screenshot?

25        A.    Yes.

1      Q.    And Mr. Cantwell is writing, "that's Cheddar Mane,
2    a/k/a Cheddy Blac."
3            Right?
4      A.    Yes.
5      Q.    And, again, those are your screen names?
6      A.    Yes.
7      Q.    And what does he tell his listeners at that point?
8      A.    He says that tomorrow morning he's calling CPS to
9    give them every episode of BowlCast and inform them that this
10   acid-dropping fake Nazi is endangering those children with his
11   behavior.
12     Q.    Okay.  And there's a redacted part and then what
13   does Mr. Cantwell say under that?
14     A.    "Like I said, if I could just drive down to Twin
15   Creek Road in Winfield, Missouri, and shoot this idiot, I
16   would.  But I can't, so I'll let the law do it."
17     Q.    Okay.  And is that the -- is that the end of the
18   doxing?
19     A.    Yes.
20     Q.    Okay.  Did Mr. Cantwell say anything in this public
21   dox about why he was doxing you?
22     A.    No, not that I'm aware of.
23     Q.    And any mention of he was trying to get Vic Mackey's
24   information?
25     A.    Not that I'm aware of.

1      Q.   Okay.  And you took these screenshots, and what did

2  you do with them?

3      A.   I sent them to law enforcement.

4      Q.   Okay.  You sent them to the FBI?

5      A.   Yes.

6      Q.   Okay.  Now, at some point soon after the Telegram

7  messages with Mr. Cantwell, did you talk to your wife about

8  CPS?

9      A.   Yes.

10      Q.   Tell the jury what you remember about that.

11           MR. WOLPIN:  Objection, your Honor; hearsay.

12           MR. DAVIS:  It's not for the truth, your Honor.

13           THE COURT:  I'm sorry.  Repeat the first -- the

14  prior question.

15           MR. DAVIS:  Did you -- did you talk to your wife

16  about CPS.

17           THE COURT:  And -- all right.  Let's take our lunch

18  break now.  I'll -- I'll discuss this with counsel when we

19  return.

20           So, counsel, be back here at -- let's see.  We'll do

21  45 minutes.  So counsel be back here at 1:10 and we'll resume

22  with the jury at 1:15.

23           All right?

24           (Lunch recess taken at 12:29 p.m.)

25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5/12/21        */s/  Liza W. Dubois*
                                     LIZA W. DUBOIS, RMR, CRR