*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 10, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:20-cr-6-01-PB
              v.                    *   September 24, 2020
                                    *   1:50 p.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 3
AFTERNOON SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:          John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             United States Attorney's Office




For the Defendant:           Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defender's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter

```
 1                        I N D E X

 2

 3

 4    WITNESS:              Direct  Cross    Redirect  Recross

 5

 6    BRETT FERNALD
      By Ms. Krasinski         7

 7

 8    CHRISTOPHER CANTWELL    Transcribed under separate cover

 9

10    EXHIBITS                          FOR ID         IN EVD

11    Government's Exhibit 105                            21

12    Government's Exhibit 106                            21

13    Government's Exhibit 108                            21

14    Government's Exhibit 109                            23

15    Government's Exhibit 110                            17

16    Government's Exhibit 111                            19

17    Government's Exhibit 114                            12

18    Government's Exhibit 114B                           11

19    Government's Exhibit 115                            14

20    Government's Exhibit 115B                           13

21

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  I just want to get some timing issues

3   together here.

4            So the government is going to have one more witness,

5   play a couple of excerpts, and rest.  I assume the defendant

6   will have a motion.  Is there -- can you give me a sense of how

7   long the government's witness will be on direct?

8            MS. KRASINSKI:  Maybe 25 minutes to half an hour,

9   your Honor.

10           THE COURT:  Okay.  And you've told the defense who

11   the witness is?

12           MS. KRASINSKI:  Yes, your Honor.

13           THE COURT:  How -- about how long do you anticipate

14   with cross?  I know it depends on what happens in direct,

15   but --

16           MR. LEVIN:  I don't think long, your Honor.  I don't

17   know what the witness is going to testify, but -- I know part

18   of what the witness is going to testify about and then there's

19   some other stuff, apparently, that I don't know.

20           THE COURT:  You know, lawyers don't get -- really

21   have the fun of surprise anymore.  When I was trying cases, I

22   tried a case against Bob Stein and the defendant was a state

23   senator who was a business partner with Bill Shaheen, who was

24   the U.S. Attorney at the time.

25           And I don't know if you ever tried a case with Bob,

1      but Bob would -- instead -- in the defense case, he not only

2      wouldn't tell us anything in advance, he wouldn't announce the

3      witness's name.  He would just walk into the back of the

4      courtroom and bring a person in.

5                  And I would try the case -- I would try the case

6      with a colleague and we'd look at the person, do you know who

7      that is?  I don't know.  Do you want to do him?  You do him.

8      That's how we -- and that's how much notice we got of what was

9      happening in our cases back then as a prosecutor.  The defense,

10     of course, got all the notice.

11                 So a short witness, it sounds like.  I guess what

12     I'm going to have to do is hear that evidence, have you rest,

13     and excuse the jury for a motion.  Is that --

14                 MR. LEVIN:  (Nods head.)

15                 THE COURT:  All right.  And do you anticipate we

16     will be bringing the jury back in for additional evidence?

17                 MR. WOLPIN:  I guess it's a question of timing and

18     how the Court wishes to operate over the next, you know,

19     36 hours.  I mean, my -- I think it's fair to say the odds are

20     that Mr. Cantwell will testify.

21                 THE COURT:  Okay.

22                 MR. WOLPIN:  So whether the Court wishes us to begin

23     that today or whether it wishes that to start tomorrow --

24                 THE COURT:  I'm inclined to have it begin today with

25     the idea that if that's your only witness, we'll finish with

1  him -- if we finish before noon, I have a strong preference for

2  having both arguments -- all arguments and charge on the same

3  day.  I don't like to -- so I -- if it gets much beyond the

4  lunch break, I have trouble hearing any of the closing

5  arguments.  So I'd like to push, and that's what I'll do.

6           But it sounds like then we will have evidence and so

7  I don't see any efficient way to avoid it.  I'll just have to

8  tell the jury to come out, we'll take a 15-minute break, and

9  then you can start your -- start your case.  All right?  So

10  that'll be the plan.

11           MR. WOLPIN:  Thank you.

12           THE COURT:  All right.  Are we ready to bring the

13  jury in?

14           Okay.  We'll bring the jury in.

15                     WITH THE JURY PRESENT

16           THE CLERK:  Please be seated.  This hearing is back

17  in session.

18           THE COURT:  So let me update you on scheduling.

19           The government has one more witness that should be

20  relatively short.  We're going to then take a break and the

21  defense will have an opportunity to put on evidence.

22           I have told you several times, but I'll just remind

23  you, of course.  The defendant has no obligation to put on any

24  evidence.  A defendant has -- is entitled to a presumption of

25  innocence and he remains innocent unless the government proves

1   his guilt beyond a reasonable doubt.  He has no obligation to

2   call any witnesses, ask any questions, and, of course, he has

3   no obligation to testify.  He has a right not to testify.  And

4   if he chooses not to testify, you can't hold his silence

5   against him in any way or even discuss the fact that he hasn't

6   testified.

7           But if there is a defense case here, I think there's

8   a very good prospect that we will conclude the case and have

9   closing arguments and charge on Friday.  I can't guarantee it,

10  but that's where I'm currently thinking we're likely to be.

11          So there's a possibility you could have the case to

12  begin deliberating on Friday and, if not, you should have it on

13  Monday with plenty of time.  So we're -- we're well within our

14  time schedule.

15          All right.  So could you call your next witness,

16  please.

17          MS. KRASINSKI:  United States calls Officer Fernald.

18          THE CLERK:  Raise your right hand.

19          **BRETT FERNALD**, having been first duly sworn,

20  testified as follows:

21          THE CLERK:  Thank you.  Would you please state your

22  name and spell your last name for the record.

23          THE WITNESS:  My name is Brett Fernald,

24  F-e-r-n-a-l-d.

25          THE COURT:  All right.  You can be seated.

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Go ahead, Counsel.

3                      DIRECT EXAMINATION

4    BY MS. KRASINSKI:

5          Q.    By whom are you employed?

6          A.    I'm employed by the Manchester, New Hampshire,

7    Police Department.

8          Q.    And how long have you served the Manchester Police

9    Department?

10         A.    Seven and a half years.

11         Q.    And before that, what did you do?

12         A.    I was a police officer in Hooksett, New Hampshire,

13   for two and a half years.

14         Q.    And before you joining the Hooksett Police

15   Department, did you undergo any training?

16         A.    Yes.  I went to the New Hampshire Police Academy.  I

17   graduated class 154 and I graduated in April of 2011.

18         Q.    And what'd you do before that?

19         A.    Before I got into law enforcement, I served in the

20   U.S. Army as an Airborne Ranger and I was honorably discharged

21   in May of 2010.

22         Q.    And what's your current assignment?

23         A.    My current assignment is a task force officer with

24   the FBI.

25         Q.    How long have you been a task force officer with the

1    FBI?

2          A.    Since May of 2019.

3          Q.    Were you involved in the investigation into

4    Christopher Cantwell?

5          A.    Yes, I was.

6          Q.    And as -- when did you become involved?

7          A.    I became involved when I -- my assignment was to be

8    a task force officer in May of 2019.

9          Q.    And as part of that, have you listened to some

10   Radical Agenda episodes?

11         A.    Yes, I have.

12         Q.    Have you listened to Mr. Cantwell on the first

13   episode of the BowlCast?

14         A.    Yes, I did.

15         Q.    Have you watched interviews of Mr. Cantwell?

16         A.    Yes.

17         Q.    Have you listened to Mr. Cantwell's recorded jail

18   calls?

19         A.    Yes, I have.

20         Q.    And as a result of this, have you become familiar

21   with Mr. Cantwell's voice?

22         A.    Yes, I have.

23         Q.    Now, I want to first turn to Radical Agenda

24   episodes.  Where'd you find the episodes that you listened to?

25         A.    They are available on the Internet to the public.

1    There's a few different ways you can --

2    christophercantwell.com, joshwhotv.com, bitchute.com,

3    radicalagenda.com.

4         Q.   And as part of this investigation, were some of

5    those episodes downloaded?

6         A.   Yes.

7         Q.   Other than making the audio recording or the

8    recording of the podcast itself, is there anything else that

9    Mr. Cantwell did in relation to each Radical Agenda episode?

10        A.   He stated in his show that the live show, sometimes

11   he would edit out things and then present the edited version on

12   the podcast on his website.

13        Q.   Did he put anything else on his website?

14        A.   Yes.

15        Q.   What would he put on his website in relation to

16   each --

17        A.   The website would have -- it would have an episode

18   description, each episode would have a title, it would have a

19   stage number, an episode number, a brief synopsis of the

20   episode, and it would have the date that it was published.

21             MS. KRASINKSI:  I want to show the witness only

22   what's been marked for identification as Government's Exhibit

23   114B.

24             Do you recognize that?

25        A.   Yes, I do.

1      Q.    What is it?

2      A.    That is from christophercantwell.com.  It is the way

3  each episode was presented on the website.  It has a picture,

4  displays Radical Agenda, it gives the stage number, it gives

5  the episode, and it gives a title of the episode.  It also has

6  the date and at the bottom you can also see that it's

7  christophercantwell.com.

8      Q.    And so you -- you know that this was something that

9  came from the defendant's website?

10     A.    Yes.

11          MS. KRASINSKI:  Your Honor, I move to admit

12  Government's Exhibit 114B.

13          MR. LEVIN:  Objection, 403.  We don't have an

14  objection to the exhibit, but to the image on the exhibit, we

15  think should be redacted.

16          THE COURT:  The one that's on the screen now?

17          MR. LEVIN:  Yes.

18          THE COURT:  Are you introducing it for that purpose

19  of that --

20          MS. KRASINSKI:  No, your Honor.

21          THE COURT:  -- that image?

22          MS. KRASINSKI:  It's for the date and to associate

23  it with the website, your Honor.

24          THE COURT:  How easily could you produce an exhibit

25  that redacts the image or blocks the image?

1          MS. KRASINSKI:  Just one moment, your Honor.

2          THE COURT:  All right.

3          MR. LEVIN:  We would have the same objection to

4     the -- 115B.  I don't know if that's where they're going,

5     but ...

6          Thank you.

7          THE COURT:  All right.  It'll be admitted with the

8     redactions.

9          So there's an image on there that has no bearing on

10    the case, so we're taking that out.

11         You can go ahead and show it to the jury.

12         (Government's Exhibit 114B admitted.)

13    Q.    And, Officer Fernald, can you tell us the date and

14    title of this episode?

15    A.    Yes.  It's Radical Agenda S05E044, titled False Flag

16    Day, and the date is June 14th, 2019.

17    Q.    Now, in preparation for your testimony today, did

18    you review Government's Exhibit 114?

19    A.    Yes.

20    Q.    And what's that?

21    A.    It's the audio.

22    Q.    And is Exhibit 114 a short portion of that Radical

23    Agenda episode?

24    A.    Yes, it is.

25    Q.    What portion is it?

1       A.   It's the beginning portion where Mr. Cantwell says

2  the date and he says where he's broadcasting from.

3       Q.   And how do you know it's Mr. Cantwell that says

4  that?

5       A.   Through my investigation, I've become familiar with

6  his voice.

7            MS. KRASINSKI:  Your Honor, I move to admit

8  Government's Exhibit 114.

9            MR. LEVIN:  No objection.

10           THE COURT:  Without objection.

11               (Government's Exhibit 114 admitted.)

12                   (Audio recording played.)

13      Q.   And where did Mr. Cantwell say he was coming from?

14      A.   He said he was from Keene, New Hampshire.

15      Q.   And that's where the Radical Agenda studio is?

16      A.   Yes.

17      Q.   And did you confirm that during the investigation?

18      A.   Yes, I did.

19      Q.   And where is the Radical Agenda studio in Keene,

20  New Hampshire?

21      A.   It's located at 103 South Lincoln Street, Keene,

22  New Hampshire.

23      Q.   Let's briefly turn to Government's Exhibit 115B for

24  the witness only.  It's been marked for identification.

25           Now, we will redact the image from this in a moment,

1    but do you recognize this?

2        A.   Yes, I do.

3        Q.   What is it?

4        A.   It's a posting on christophercantwell.com

5    referencing the Radical Agenda episode.  It gives the episode,

6    it gives the stage number, it gives the episode number, the

7    title of the episode, and it also gives the date of the

8    episode.

9        Q.   And how do you associate that with Mr. Cantwell?

10       A.   At the bottom, christophercantwell.com, and on the

11   show he refers listeners to that website and he appears to take

12   ownership of that website.

13           MS. KRASINSKI:  Your Honor, subject to a redaction

14   of the image, I move to admit Government's Exhibit 115B.  We

15   won't publish it until --

16           THE COURT:  All right.  Any objection, subject to

17   the -- if it's redacted in the way you're proposing?

18           MR. LEVIN:  No, your Honor.

19           THE COURT:  It'll be admitted, subject to the

20   redaction.

21           MS. KRASINSKI:  So we won't publish it at this time.

22            (Government's Exhibit 115B admitted.)

23       Q.   Officer Fernald, in preparation for your testimony

24   today, did you review Government's Exhibit 115?

25       A.   Yes, I did.

1      Q.   And what's that?

2      A.   It's an audio recording that -- Mr. Cantwell's voice

3  saying it's the Radical Agenda and he gives the date and

4  location that he's broadcasting from.

5      Q.   So, again, a similar introduction to the Radical

6  Agenda show?

7      A.   Yes.

8           MS. KRASINSKI:  Your Honor, I move to admit

9  Government's Exhibit 115.

10          MR. LEVIN:  No objection.

11          THE COURT:  Without objection.  It can be played.

12              (Government's Exhibit 115 admitted.)

13                  (Audio recording played.)

14     Q.   So, again, Mr. Cantwell said he was in Keene,

15  New Hampshire?

16     A.   That's correct.

17     Q.   And how did these dates, June 14th, 2017 -- excuse

18  me -- June 14th, 2019, and June 17th, 2019, relate to the

19  messages between Mr. Cantwell and Mr. Lambert?

20     A.   June 14th is the day prior to the exchange on

21  June 15th and June 17th is the day that Mr. Cantwell calls

22  Missouri CPS.

23     Q.   Now, let's switch gears for a bit and talk about

24  Mr. Cantwell's jail calls.

25          As part of the investigation, did you obtain and

1    listen to his jail calls?

2          A.    Yes, I did.

3          Q.    And what was the process for doing that?

4          A.    The process was after Mr. Cantwell's arrest on

5    January 23rd, I contacted Strafford County House of

6    Corrections.  From there I was referred to Sandy Bower, she's

7    a records supervisor, and I would make a request for the dates

8    in which I would like the phone calls and she would put the

9    dates -- she would put those phone calls on a CD for me and I

10   would go to Dover, New Hampshire, and pick up the CD.

11         Q.    And the CD, it contains the recordings of the calls

12   themselves?

13         A.    Yes.

14         Q.    Did it also contain associated data?

15         A.    Yes.  It obtained -- each CD obtained the software

16   to enable the jail calls to play.

17         Q.    So what other information were you able to identify

18   about each call?

19         A.    So each call would -- it would tell both parties

20   that the calls are being recorded and they can be used in

21   criminal proceedings.  It tells -- there's a recording of

22   Mr. Cantwell's voice saying it's -- that's who the call's from

23   and each call, it will give the -- the dial number, so the

24   number that Mr. Cantwell called, would be displayed and --

25         Q.    Was there a date?

1      A.    And also there would be a date associated with when
2   the call was placed.
3      Q.    Now, that sort of admonishment that you talked
4   about, that the call was being recorded and could be used in
5   criminal proceedings, was that admonishment given at the
6   beginning of every single jail call?
7      A.    Yes.
8      Q.    In preparation for your testimony today, did you
9   review Government's -- what's been marked for identification as
10   Government's Exhibit 110?
11      A.    Yes, I did.
12      Q.    And what is that?
13      A.    Exhibit 110 is a jail call from February 28th
14   between Mr. Cantwell and Hannah Pleasants.
15      Q.    February 28th of what year?
16      A.    Sorry.  February 28th of 2020.
17      Q.    And you said it's between Mr. Cantwell and someone
18   named Hannah Pleasants?
19      A.    Yes.
20      Q.    Who is that?
21      A.    She appears to be a friend of Mr. Cantwell.
22            MR. LEVIN:  Objection, speculation.
23            THE COURT:  Overruled.
24      Q.    Now, have you listened to the entire February 28th,
25   2020, call between Mr. Cantwell and Ms. Pleasants?

1      A.   Yes, I have.

2      Q.   And Exhibit 110 is a portion of that call?

3      A.   Yes, it is.

4      Q.   And is it a true and accurate portion of that call?

5      A.   Yes, it is.

6      Q.   Other than limiting the exhibit to that portion, was
7   the call edited, altered, modified, in any way?

8      A.   No, it's not.

9           MS. KRASINSKI:  Your Honor, I move to admit and
10   publish Government's Exhibit 110.

11           THE COURT:  All right.  All prior objections are
12   preserved.  Any other objections?

13           MR. LEVIN:  No other objections.

14           THE COURT:  All right.  It can be admitted.

15               (Government's Exhibit 110 admitted.)

16                  (Audio recording played.)

17      Q.   And, now, you said that that call occurred on
18   February 28th, 2018?

19      A.   Yes.

20      Q.   And when was the superseding indictment filed in
21   this case?

22      A.   July 8th, 2020.

23      Q.   And is that when Mr. Cantwell was charged with
24   threat to injure property or reputation?

25      A.   Yes.

```
 1          Q.    So after this call?

 2          A.    After the call.

 3          Q.    Now, in preparation for your testimony --

 4                THE COURT:  I may have misheard the original date.

 5   Did you say February 28th, 2018?

 6                MS. KRASINSKI:  If I did, that would be incorrect.

 7                THE COURT:  That's what I believe you said.  Is it

 8   correct?

 9                MS. KRASINSKI:  No.

10                THE COURT:  It's 2019, isn't it?

11                THE WITNESS:  2020.

12          Q.    This call -- what's the date of this call?

13          A.    The day of the jail call with Hannah Pleasants,

14   February 28th, 2020.

15                THE COURT:  Okay.  All right.  So there's no dispute

16   about that.  She just misspoke.

17                All right.

18                MS. KRASINSKI:  Thank you, your Honor.

19          Q.    In preparation for your testimony today, did you

20   review Government's Exhibit 111?

21          A.    Yes, I did.

22          Q.    What is that?

23          A.    It's a jail call between Mr. Cantwell and Ingrid

24   Dean.

25          Q.    Who is Ingrid Dean?
```

1     A.   Ingrid Dean is a friend -- appears to be a friend of

2   Mr. Cantwell.

3     Q.   And what's the date of that call?

4     A.   March 7th, 2020.

5     Q.   And, again, have you listened to the entire

6   March 7th, 2020, call between Mr. Cantwell and Ms. Dean?

7     A.   Yes, I have.

8     Q.   And is it -- Exhibit 111 a portion of that call?

9     A.   Yes, it is.

10    Q.   Is it a true and accurate copy of the portion of

11  that call?

12    A.   Yes, it is.

13    Q.   Other than limiting the exhibit to the relevant

14  portion, has the exhibit or has the call been altered or

15  modified in any way?

16    A.   No, it has not.

17         MS. KRASINSKI:  Your Honor, I move to admit

18  Government's Exhibit 111.

19         THE COURT:  Subject to the prior objections, are

20  there any additional objections?

21         MR. LEVIN:  Just the prior objections, your Honor.

22         THE COURT:  All right.  Those objections are

23  preserved and overruled.

24         You can play the excerpt.

25             (Government's Exhibit 111 admitted.)

1                    (Audio recording played.)

2        Q.    Now, Officer Fernald, did you hear Mr. Cantwell

3  mention a phone call between himself and Katelen in that jail

4  call?

5        A.    Yes.

6        Q.    And during the course of the investigation, did you

7  become aware that Mr. Cantwell had emailed a recording to the

8  FBI of a conversation he had with a woman?

9        A.    Yes.

10        Q.    And who was the woman that he had that conversation

11  with?

12        A.    Katelen Fry.

13        Q.    And what was the date that Mr. Cantwell emailed his

14  recorded conversation to the FBI?

15        A.    December 12th, 2019.

16        Q.    And what was the date of Mr. Cantwell's arrest?

17        A.    January 23rd, 2020.

18        Q.    So Mr. Cantwell's December 12th, 2019, recorded

19  conversation, that was before Mr. Cantwell was arrested?

20        A.    Yes.

21        Q.    Was it before he was charged?

22        A.    Yes.

23             MS. KRASINSKI:  Your Honor, I believe based

24  on Agent Tongbua's testimony and discussion with the parties,

25  at this point I'd move to introduce Government's Exhibits 105,

1     106, and 108, which are portions of that call.

2              THE COURT:  Are there objections other than those --

3     any of those previously raised?

4              MR. LEVIN:  No, just the ones we previously made,

5     your Honor.

6              THE COURT:  All right.  Those will be admitted

7     subject to those objections being overruled.

8          (Government's Exhibits 105, 106, 108 admitted.)

9              MS. KRASINSKI:  And permission to publish, your

10    Honor?

11             THE COURT:  Yes.

12             MS. KRASINSKI:  Let's do them, actually, in reverse

13    order.  Let's start with Government's Exhibit 108.

14                       (Audio recording played.)

15             MS. KRASINSKI:  All right.  Let's listen to

16    Government's Exhibit 106.

17                       (Audio recording played.)

18             MS. KRASINSKI:  And, finally, Government's

19    Exhibit 105.

20                       (Audio recording played.)

21             MS. KRASINSKI:  Nothing further, your Honor.

22             THE COURT:  Thank you.  Cross-examination?

23             MR. LEVIN:  No questions, your Honor.

24             THE COURT:  Thank you, sir.  You can step down.

25                       (Witness excused.)

1            THE COURT:  Does the government have any additional

2    witnesses?

3            MR. DAVIS:  Could we have just a moment, your Honor?

4            THE COURT:  Yes.

5            And I'll note if there are any exhibits that were

6    inadvertently omitted that were not moved into evidence, we can

7    do that as a cleanup matter later.

8            MS. KRASINSKI:  Your Honor, I think there's one last

9    item -- one last portion of the call between Katelen Fry and

10   Christopher Cantwell.  That's Government's Exhibit 109.

11           THE COURT:  All right.  So you need to -- do you

12   need to recall the witness?

13           MS. KRASINSKI:  We've already --

14           MR. LEVIN:  That's not necessary from our

15   perspective, your Honor.

16           THE COURT:  All right.  So you're not disputing that

17   this call was a call in which the person who appears to be

18   Mr. Cantwell is, in fact, Mr. Cantwell; is that what we're

19   talking about?

20           MR. LEVIN:  That's correct.

21           THE COURT:  All right.  So the -- the parties

22   stipulate as to this call that the person whose voice you will

23   recognize as being Mr. Cantwell's is, in fact, Mr. Cantwell's

24   voice and the government -- and the defense, subject to

25   objections previously raised with me, has no additional

1    objections to playing that tape.

2             MR. LEVIN:  That's correct.

3             THE COURT:  All right.  So you can go ahead and play

4    that --

5             MS. KRASINSKI:  Thank you, your Honor.

6             THE COURT:  -- additional --

7             (Government's Exhibit 109 admitted.)

8                      (Audio recording played.)

9             MS. KRASINSKI:  Your Honor, the United States rests.

10            THE COURT:  All right.  Members of the jury, we'll

11   take a short break and I'll be bringing you back into the

12   courtroom to hear any defense case that they may have starting

13   in a few minutes.

14            So take your break now and we'll bring you back in

15   as soon as we're ready.

16            THE CLERK:  All rise for the jury.

17                      (Jury excused.)

18            THE COURT:  All right.  The defense has a motion.

19   I'll hear you on it.

20            MR. LEVIN:  Yes, your Honor.  At this time, the

21   defense would move to dismiss under Rule 29 of the Federal

22   Rules of Criminal Procedure.

23            Viewed in the light most favorable to the

24   government, no reasonable jury could find the defendant guilty

25   on any of the three counts on the facts presented.

1    We're making a general motion for acquittal under

2    Rule 29.  We're not singling out any particular count or any

3    particular element of any count.  We're making a general

4    insufficiency motion to dismiss at this time, your Honor.

5    THE COURT:  All right.  And you don't want

6    to specifically draw my attention to any particular deficiency,

7    just generally you don't think they've put in a case that any

8    juror could find guilt on as to any of the three charges?

9    MR. LEVIN:  That's correct, your Honor.

10    THE COURT:  All right.  Construing the evidence in

11    the light most favorable to the government, based on the

12    arguments that have been presented to me, I believe there's

13    sufficient evidence to permit a reasonable jury to find the

14    defendant guilty on all three charges.

15    Accordingly, I deny the motion and the -- of course,

16    the defense can renew the motion at the appropriate time at the

17    end of its case if it chooses to do so.

18    I understand that there may be a defense case.  Am I

19    right?

20    MR. WOLPIN:  Correct.

21    THE COURT:  And does that case consist of the

22    defendant as the -- the defense principal witness?

23    MR. WOLPIN:  Yes, your Honor.

24    THE COURT:  Mr. Cantwell, before you testify, I just

25    want to make sure you understand something.  I go over it with

1    defendants at every -- every time we get to this point in the

2    proceeding.

3            That is, there are certain things that your lawyers

4    are principally responsible for in a case; they have to take

5    your advice, they have to consult with you, they have to listen

6    to you.  But there are certain aspects of a trial where they

7    make the decision after consulting with you, like which

8    witnesses to call, what questions to ask those witnesses.

9    That's really the job of the lawyers in consultation with you.

10           There are other things that are exclusively your

11   judgment, you have complete control over.  One of those things

12   is whether to testify or not to testify.  As you heard me say,

13   you have a constitutional right to remain silent.  I have told

14   and would continue to tell the jury they couldn't hold your

15   silence in any way against you.  It's totally up to you to

16   decide whether to testify or not.  Of course, I want you to

17   listen to your advice of counsel, but you have to make that

18   decision on your own.

19           Do you understand all of that?

20           THE DEFENDANT:  I do, sir.

21           THE COURT:  And understanding all of that, are you

22   electing to testify in your own behalf?

23           THE DEFENDANT:  I am, Judge.

24           THE COURT:  All right.  So as far as I'm concerned,

25   we're ready to bring the jury back in and let's get started

1    with the case.  Any reason why we can't go right ahead?

2             Oh, I did want to ask one thing.  Let me ask my

3    marshals; how do you want to handle him getting to the witness

4    stand?

5             THE MARSHAL:  I was just thinking that myself, your

6    Honor, and that would be your discretion.  I'm not sure what --

7             THE COURT:  All right.  I am not worried that

8    Mr. Cantwell is a security threat.  I'm sure -- he's been

9    completely compliant and I -- I'm sure he would obey my

10   instructions.  I have no objection to him walking up to the

11   stand and taking it.  I always listen to my marshals.

12            The other question I would have is sometimes the

13   marshal service people want to sit in closer proximity to the

14   defendant than across the room, but yet we may have -- I'd ask

15   my case manager who did this the last trial, have you thought

16   through that issue?  Is there space for them to --

17            THE CLERK:  At the last trial, your Honor, the

18   defendant wasn't in custody, so we didn't have an issue.

19            THE COURT:  Yeah.  I'm not sure as we sit here that

20   there's really much room for the marshals to sit consistent

21   with our social distancing policy.

22            Tracy, have you thought about this issue yet?

23            DEPUTY CLERK UHRIN:  No.  Do we have an empty chair

24   that we're not using for a juror?  The only thing I could think

25   of --

1          THE CLERK:  I could slide the jurors down.

2          DEPUTY CLERK UHRIN:  -- have them slide down and

3   have him in the corner.

4          THE COURT:  It isn't -- I mean, I want to be clear.

5          Mr. Cantwell, I don't think you're a danger to me or

6   anybody in the courtroom.  I'm perfectly comfortable with it.

7   I just always have to listen to advice I get from my security

8   folks on it.

9          So one of the marshals, senior Marshal Service

10  persons, is on his way up and I'll take his advice.  But I want

11  to reiterate I'm not worried about you, Mr. Cantwell; I don't

12  think the prosecutor's worried about you; but I -- I do listen

13  to my security people, at least hear what they have to say.

14         All right.  So our security chief has entered the

15  courtroom.

16         Sir, I wanted to consult with you about --

17  Mr. Cantwell's elected to testify.  We have in -- usually when

18  someone's in custody testifying in my courtroom, we move them

19  before the jury's brought in to the witness box and we have

20  marshals people sitting within closer proximity than they're

21  currently sitting.

22         Mr. Cantwell is in custody.  It's my judgment that I

23  am comfortable -- I personally am comfortable with him walking

24  to the witness stand and taking his seat there.  I note that

25  it's hard for me to see how I could configure the courtroom

1    consistent with social distancing rules and have your personnel

2    sitting close by.

3              So I'm -- I'm -- personally, I have no problem with

4    Mr. Cantwell testifying there with your personnel where they

5    are, but if there's a particular security concern you have and

6    a recommendation for me, I at least want to hear it.

7              THE MARSHAL:  If I could just take a quick look,

8    your Honor.

9              THE COURT:  Yeah, go ahead.

10             THE MARSHAL:  Thank you.  I appreciate it.

11             These are two jurors?

12             THE COURT:  Right.

13             THE MARSHAL:  Your Honor, if we could just maybe

14   keep this door propped --

15             THE COURT:  Yup.

16             THE MARSHAL:  -- and I can have one of my security

17   staff right over here.  I think that will cover it.

18             THE COURT:  I think that's a fine solution.

19             So we'll allow Mr. Cantwell, when called, to walk to

20   the witness stand.  He can testify as he normally does.  The

21   one difference from ordinary is that the rear courtroom door

22   will remain open and a marshal service person will be in the

23   vicinity of the open door.

24             And I -- I'm completely satisfied with that, sir.  I

25   think that's a good recommendation.  Thank you.

1          All right.  So let's -- let's deal with it that way

2   and we're ready to bring the jury in.

3                    WITH THE JURY PRESENT

4          THE CLERK:  Please be seated.  This hearing is back

5   in session.

6          THE COURT:  All right.  The defense may call its

7   first witness.

8          MR. WOLPIN:  The defense would call Mr. Cantwell.

9          THE COURT:  Mr. Cantwell, come on up.  Stand by the

10  witness stand and raise your right hand, please.

11  (Testimony of Christopher Cantwell filed under separate cover.)

12          (Proceedings adjourned at 4:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5/12/21         */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR