1                      UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW HAMPSHIRE
2

3       * * * * * * * * * * * * * * * * *
                                        *
4       UNITED STATES OF AMERICA        *
                                        *
5                                       * No. 1:20-cr-00006-PB
                       v.               * September 8, 2020
6                                       * 10:02 a.m.
                                        *
7       CHRISTOPHER CANTWELL,           *
                                        *
8                       Defendant.      *

9       * * * * * * * * * * * * * * * * *

10

        TRANSCRIPT OF TELEPHONE CONFERENCE RE: JURY INSTRUCTIONS AND
11                        MOTIONS *IN LIMINE*

12              BEFORE THE HONORABLE PAUL J. BARBADORO

13

14      APPEARANCES:

15

        For the Government:      AUSA Anna Z. Krasinski, Esq.
16                               (Via telephone)
                                 U.S. Attorney's Office
17

        For the Defendant:       Eric Wolpin, Esq.  (Via telephone)
18                               Jeffrey S. Levin, Esq. (Via telephone)
                                 Federal Defender Office
19

20

        Court Reporter:          Brenda K. Hancock, RMR, CRR
21                               Official Court Reporter
                                 United States District Court
22                               55 Pleasant Street
                                 Concord, NH 03301
23                               (603) 225-1454

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  For the record, the Court is in session |
| 3 | and has for consideration a telephone conference in the United |
| 4 | States of America versus Christopher Cantwell, criminal case |
| 5 | number 20-cr-06-01-PB. |
| 6 | THE COURT:  Okay.  I'll remind the parties we're on |
| 7 | the record. |
| 8 | All right.  Let me tell you what's on my agenda and |
| 9 | what I want to talk about, and then, after we run through my |
| 10 | agenda, anything that anyone else wants to cover I'm happy to |
| 11 | take up.  I want to talk to you about voir dire; I want to talk |
| 12 | to you about the way I'm going to proceed with respect to the |
| 13 | informant, the conference I'm going to have later today on |
| 14 | that; I want to talk to you about the jury instructions; and, |
| 15 | if we have time, maybe we can start talking about the motions |
| 16 | *in limine*. |
| 17 | So, let's start with voir dire.  Have the parties |
| 18 | submitted proposed in-court voir dire? |
| 19 | MR. WOLPIN:  The deadline's today.  We haven't |
| 20 | submitted ours yet. |
| 21 | THE COURT:  Okay.  So, you are probably not going to |
| 22 | have a chance to talk to me between now and next Tuesday, |
| 23 | unless it's some kind of emergency, because I'm trying to take |
| 24 | my first time off in about 18 months.  So, if you want to raise |
| 25 | issues with me on voir dire in a general sense now, I'm happy |

1    to hear what you have to say, and then I'll, obviously, be

2    reading your proposed voir dire and putting together mine when

3    I show up on Tuesday.

4         Let's take the government first and then the defense.

5    Does the government have anything you want to say about the

6    voir dire?

7         MS. KRASINSKI:  I don't think so.  Attorney Davis and

8    I talked about it, and I think we actually were not planning on

9    submitting any voir dire questions.

10         THE COURT:  Okay.  And how about the defense?

11    Anything you want to tell me in general about it, understanding

12    you'll be submitting your specific requests at the end of the

13    day?

14         MR. WOLPIN:  It's hard to talk about it in a general

15    sense.  I mean, we'll present our proposal.  I guess we would

16    ask for a limited amount of time before we actually begin to

17    address them, but, you know, I think there are things that

18    people could expect and anticipate as far as what we want

19    brought up with these particular jurors.

20         THE COURT:  Okay.  Well, again, I'm not sure how much

21    time I'm going to have to speak to you in advance, but I

22    obviously have a lot of experience doing voir dire, and I'll

23    look carefully at your proposals and ask the ones that I think

24    are appropriate, and you'll have an opportunity to object and

25    ask me to do further voir dire before I complete it.  So, we'll

1    cover it then.

2         Okay.  So, the informant, I will be questioning the

3    informant, and I intend to cover most but not every single one

4    of the defendant's questions.  I will not proceed in the order

5    in which they're being asked.  I will not ask them verbatim,

6    but I will cover the vast majority of things that the defendant

7    wants me to cover.  There are a couple of things that I don't

8    intend to cover, unless something comes up in the questioning

9    that makes them relevant.  I don't think this should be an

10   opportunity to develop impeachment information about the

11   informant.  Obviously, if something comes up, I may need to

12   question on those subjects, and I don't see at the present time

13   any reason to question about gun usage.  The focus is going to

14   be what do you know about Cheddar Mane's use of drugs, and how

15   do you know it, and I'll develop some context about their state

16   of their interactions and knowledge, and I'll probe deeply

17   about what he knows about drug usage and how he knows what he

18   knows about drug usage.  That's what I intend to do.

19        Does either party want to say anything to me about

20   that, starting with the government?

21        MS. KRASINSKI:  No, your Honor.

22        MR. LEVIN:  Just to be clear, your Honor, we have it

23   on our calendar as scheduled for 11:00, an *ex parte* phone

24   conference.  So, how will that -- will you be on that call with

25   a court reporter, or will it just be you and the informant?

1    THE COURT:  Yeah.  No, I would never talk to anybody

2    like this without a court reporter.  My intention is to conduct

3    the questioning under oath.  The government will be permitted

4    to attend but not to question, and I will make a transcript of

5    the conversation available to the defense.  That's my plan.

6    Obviously, if he blurts out something that's identifying that I

7    determine isn't appropriate for you to see, I'll redact that

8    and note that I've redacted it and give you an opportunity to

9    object and ask that it be disclosed.  But you'll get a

10   transcript that will fully disclose everything I've asked the

11   informant.

12       MR. NEWMAN:  Understood.

13       THE COURT:  All right.  Anything else you want to know

14   about that?

15       MR. WOLPIN:  No, your Honor.

16       THE COURT:  Okay.  All right.  So, let's chat about

17   jury instructions, and let me emphasize this is a preliminary

18   chat.  I view it as kind of a brainstorming session so that you

19   have an opportunity to try to educate me on the instructions.

20   I am not going to take any firm positions on issues like

21   instructions, but I will be continuing to think about it and

22   drafting proposed instructions, and I'll be talking to you

23   about it again; and, of course, I'll present you with any

24   instructions I intend to give prior to giving them at an

25   appropriate time and give you a full and fair opportunity to

1    comment on them.  So, at this stage I'm just trying to figure

2    out where you differ on the instructions and how your views

3    square with my understanding of the relevant law.

4         I have spent several hours looking at the relevant

5    statutes, at the indictment and at the parties' proposed

6    instructions and at some of the case law addressing issues that

7    the instructions raise.  But I'm not in a position today to

8    make any definitive ruling today.  I won't require the parties

9    to take any definitive position on it.  I'm more trying to just

10   get your general thoughts about it.

11        So, let's start with the government's proposed

12   instructions, and let me hear if the defendants see anything in

13   those instructions in particular they want to draw my attention

14   to that they think is problematic, and then we'll do the same

15   things with respect to the defendant's instructions.

16        So, what is the government proposing in their

17   instructions that the defense is concerned about?

18        MR. LEVIN:  I think in terms of proposed jury

19   instruction 1 the government noted that in the Eighth Circuit

20   pattern jury instructions and also Fourth Circuit case law that

21   this particular statute does not -- I'm sorry -- that this

22   particular statute contains an explicit requirement regarding

23   the defendant's subjective intent.  So, we added in our

24   instruction the elements that indicate that the communication

25   was transmitted for the purpose of issuing a true threat.

1      Those are not in the government's instruction.

2           And I would just note that in the indictment in Count

3      One it's indicted as for the purpose of issuing a threat and

4      with knowledge that it would be viewed as a threat.  So, the

5      subjective element is actually in the indictment itself.

6           THE COURT:  Yeah.  So, feel free to do this as we go

7      through this, to highlight where your instruction includes

8      something that's not in the government's instruction, because I

9      think it will help us get to the heart of the difference.

10          So, I think one of the issues I have, at least in my

11     initial thinking about this, is that 875(b) and 875(d) are

12     quite different statutes from 875(c), in that (b) and (d) are

13     extortion statutes and (c) is a threat statute, and the key

14     question for me is Elonis answers the question as to how a

15     threat statute in (c) should be instructed, but, as far as I

16     can tell, every court post Elonis that has looked at the

17     question has concluded that (b) and (d) are quite different

18     statutes and don't require the subjective intent to threaten as

19     a distinct element, because the *mens rea* specified in (b) and

20     (d) is an intent to extort, and so my inclination is to

21     instruct on the statute and use the -- and follow the case law

22     in other jurisdictions.  It's not just pattern instructions.

23     There's, as far as I can tell, an abundance of case law that

24     distinguishes post Elonis (b) and (d) from (c).  Do you have

25     any case law that says Elonis applies in the same way to (b)

1    and (d) as it does to (c)?

2         MR. LEVIN:  No, and I don't think there's any case law

3    on point in the First Circuit that I've been able to find.

4         THE COURT:  Let me, just so you guys know what I'm

5    thinking of, I've read United States against White, 810 F.3d

6    212, a Fourth Circuit decision; I've read United States versus

7    Killen, 729 Federal Appendix 703, a decision of the Eleventh

8    Circuit; I've read United States against White, reported at 654

9    Federal Appendix 956, another Eleventh Circuit decision; I've

10   read Hopkins versus United States, reported at 2018 Westlaw

11   1911805, a Northern District of Illinois decision; and I've

12   read United States against Godwin-Painter, reported at 2015

13   Westlaw 5838501.  All of those cases take the position that

14   either 875(b) or 875(d) -- there's also a Third Circuit

15   decision that I think I've misplaced -- post Elonis to suggest

16   that the subjective intent to threaten component of 875(c) does

17   not apply as a distinct instruction for 875(b) and (d).  So, my

18   inclination is not to include it.  To the extent that the

19   indictment includes additional mental state beyond that which

20   is required, it's kind of surplusage, the way I would

21   ordinarily think of it.

22        So, I'm inclined to craft my instructions to

23   definitely require a *mens rea* requirement there that it

24   requires a specific intent to extort something of value from a

25   person.  So, my inclination on that one is to track something

1   like the government's instruction on that particular point.  If

2   you have other issues I'm certainly interested in hearing them.

3          MR. LEVIN:  That was the main difference.  It does

4   indicate in the government's proposed jury instruction 2 --

5   yeah, okay -- so that does reference the language about a

6   threatening, a serious statement expressing an intent to injure

7   that's also included in ours.  Would that also be included in

8   the Court's?

9          THE COURT:  Something like that as I'm currently

10  thinking that that would be to define it in the way the

11  government is proposing.  The difference is really is there a

12  distinct element of subjective intent to threaten that is a

13  component of the (c) charge but is not a distinct element of

14  the (b) and (d) charge.  So, I think I'm going to track -- I'm

15  inclined, and, again, I'm just starting to get into this, to do

16  what you and the government are suggesting about the two

17  definitions, so I think that should be fine for you.  It's

18  really more the subjective intent to threaten as a distinct

19  element.

20          Anything else in 2 or 1 or 2 that you wanted to call

21  to my attention right now as we're thinking through this,

22  understanding that you'll have a chance to say whatever you

23  want to say about the instruction I'm giving?  But this is your

24  first chance to try to influence me, so it's helpful, if you

25  have something, to lay it out for me.

1          MR. LEVIN:  Nothing with regard to that.

2          MR. WOLPIN:  I guess on that specific issue, I mean,

3    my looking at it originally had at least been that (c) is

4    essentially the identical language with the additional element

5    of extort in (b).  So, if you read (b) and (c) next to each

6    other, everything tracks identically, except for the fact that

7    (b) has the intent to extort with it.  The remainder of the

8    language involving what a threat -- what that threat is in

9    interstate commerce, the reason I think we're asking for that

10   mental state to track all along is because there is the same

11   sort of criminal conduct as far as the threat.  It's just

12   whether your threat includes an additional element of intent to

13   extort.  So, I view (c) as sort of more in line with (b) than

14   (b) and (d) to be in line, because (c) is essentially a lesser

15   included of (b), as I read it.

16         THE COURT:  One can question the government's strategy

17   in pursuing (c) at all, because the government's case is really

18   an extortionate threat case.  It certainly just complicates the

19   instructions to charge every possible statutory theory one can

20   charge.

21         But I would ask you to go back and reread _Elonis_, and

22   if you read the cases that I mentioned to you, you'll see that

23   those courts see the distinction between (c) and (b) and (d) as

24   fundamentally what was the problem in _Elonis_.  The problem in

25   _Elonis_, as seen by the Court, was that there was no _mens rea_

1    specified in the statute, and so the Court had to infer a *mens*

2    *rea* for the statute, and it inferred one of subjective intent.

3    And the court, in fact, in <u>Elonis</u> distinguished (b) from (c)

4    precisely by noting that (b) has a specified *mens rea* element.

5    So, to apply an additional *mens rea* element, when one is

6    already specified in the statute, is quite a different judicial

7    act than to apply one when one is not specified.  The Court

8    routinely, as you know, reads into statutes without a *mens rea*

9    some kind of *mens rea* requirement.  (c) doesn't have a *mens rea*

10   requirement, and that's, I think, what is motivating the

11   Court's conclusion in <u>Elonis</u> to infer one, and I think the

12   comparison with (b) and (d) that have an expressed specific

13   intent *mens rea* requirement justifies treating the two cases

14   differently, as all courts that I've found have done it.

15          Okay.  Anything else on that particular issue?

16          MR. LEVIN:  No.

17          THE COURT:  No?  Okay.  Let's go into 3, because I've

18   got a bit of a problem with 3, and then the defense can add

19   anything it wants.  I don't know.  Ms. Krasinski, do you want

20   to try to tell me why you're trying to sneak in a recklessness

21   requirement here, when no one other than Justice Alito appears

22   to like that?

23          MS. KRASINSKI:  I'm certainly not trying to sneak it

24   in, your Honor.

25          THE COURT:  I'm not implying you're doing anything

1    deliberately -- deceptively, but you get my point.  In Elonis

2    there is a majority opinion that says what (c) requires and

3    says we don't decide on reckless, and Justice Alito likes

4    reckless, but I haven't found any court that has endorsed

5    reckless.  Have you found any?

6          MS. KRASINSKI:  I haven't, your Honor.  I just, when I

7    read Elonis, you know, they say that, at a minimum, we know

8    that sending the communication for the purpose of issuing a

9    threat and/or with knowledge that the communication would be

10   viewed as a threat, that those are submissions.  And you're

11   right.  They decline to address whether reckless disregard

12   would be sufficient.

13         I just read Justice Alito's dissent to kind of go one

14   step further than the majority opinion.  As you know, Justice

15   Alito says, well, this would be the minimum *mens rea*.  But I

16   have not found any additional case law post Elonis, so I

17   certainly understand that the Court is hesitant to put it in,

18   but I don't think the majority opinion should be viewed as

19   precluding it.

20         THE COURT:  I mean, I'll express my bias here.  My

21   bias is that Elonis was wrongly decided, and that the I think

22   eight or nine circuits that have reached a different conclusion

23   about the need for a subjective intent element, including the

24   First, were right and the Supreme Court is wrong in Elonis, and

25   I think they were motivated by a concern and an inability to

1    resolve the Constitutional question that, in fact, the parties

2    presented.  The statutory construction question in Elonis was

3    never even presented to the Supreme Court.  It crafted the

4    decision itself I think because it wasn't ready to take on the

5    true threat, First Amendment question, and I believe that the

6    preexisting circuit law, which was nearly unanimous -- I think

7    there was one circuit that went a different way -- was right in

8    not requiring a subjective intent requirement.  But I'm a

9    faithful lieutenant to the Supreme Court, but I also am not

10   someone who is just trying to push the outer boundaries of

11   whatever opinion can be pushed.  I don't see any particular

12   basis in the text of the statute to infer recklessness, and I

13   don't have quite the self confidence that the United States

14   Supreme Court has that they can just remake statutes to fit

15   whatever it is they feel should be in the statute.

16          So, I'm not inclined to give a recklessness

17   instruction with respect to (c).

18          So, that's basically my concern about the third

19   instruction.  Does the defendant have any problem with the

20   third instruction other than what I've just raised?

21          MR. LEVIN:  Well, again, you know, in the indictment

22   they've charged interstate and foreign commerce, so we added

23   that language to our instruction.  I think that was the main

24   difference --

25          THE COURT:  So, let me just look at.

1          MR. LEVIN:  -- other than excising the reckless

2     standard.

3          THE COURT:  I'm just getting my -- a quick look at the

4     statute.  Yeah.  The communication under (c) does have to be

5     transported in interstate or foreign commerce, so I'm sure I'll

6     give something along those lines.

7          Anything else in 3 that anyone wants to bring to my

8     attention?

9          MS. KRASINSKI:  So, I think one of the main

10    differences between the government's instruction and the

11    defendant's instruction is that with the *mens rea*, where the

12    government's instruction says that the defendant sent the

13    communication for the purpose of issuing the threat -- and I'm

14    just going to move the "or" here, since we're taking

15    recklessness out, or with knowledge that the communication

16    would be viewed as a threat, that in the defendant's

17    instruction it appears that there's an "and" rather than an

18    "or," so it would require the government to prove both that

19    this defendant had the purpose of issuing the threat and had

20    the knowledge that the communication would be viewed as a

21    threat, and I just don't think that's a correct application of

22    Elonis.  I think Elonis requires one or the other and not both.

23    So, I think "or" is the appropriate word there.

24         MR. LEVIN:  And, again, we were tracking the

25    indictment, which has a threat to injure the reputation of the

1      victim and a threat to accuse the victim of a crime.

2              THE COURT:  Yeah.  So, Mr. Levin, and I know you're

3      such an experienced defense attorney you probably, I'm sure

4      you're aware of this, but the indictment-drafting strategy that

5      the government uses in cases like this is to use the

6      conjunctive instead of the disjunctive in indicting because of

7      existing case law that allows them to treat it as disjunctive.

8      So, if you've got an argument based not on what the statute

9      actually requires but what because they alleged in the

10     indictment they have to stick with it, you should be prepared

11     to give me some case law on that.  I haven't gone back and

12     researched it, but it's my understanding generally, as I

13     suggested, to the extent that they allege with knowledge and

14     purpose and recklessly that you can disregard the surplusage

15     part of it and just treat whatever the *mens rea* is that the

16     statute actually requires.  But if I'm wrong on that you'll

17     present me with a good legal memo that will direct me to the

18     case law that makes clear to me that I'm wrong on it.  I'm

19     operating under that assumption, that just because they used

20     the conjunctive in the indictment that they're bound to -- that

21     I must instruct the jury in the conjunctive, I don't understand

22     that to be consistent with what the law requires.  If I'm wrong

23     on that, you'll tell me.  You don't have to do it today.  Okay?

24             MR. LEVIN:  Okay.

25             THE COURT:  All right.  So, other things about 3 that

1       anyone wants to talk to me about?

2              MS. KRASINSKI:  So, again, I'll just sort of highlight

3       one difference, particularly as it relates to government's

4       instruction 3 and contrasting it with defendant's instruction

5       number 2, which is that the defendant's instructions tends to

6       use this term "true threat," a phrase "true threat," whereas

7       the government's instructions generally use the word "threat,"

8       and I think that's something that is just sort of different

9       throughout our instructions.

10             My take on it, which appears to be what the Fifth

11      Circuit, the First Circuit pattern instructions and the Eighth

12      Circuit pattern instructions is not to use the phrase "true

13      threat," because the statute itself doesn't use that phrase.  I

14      think the better practice is to use the language of the statute

15      and then sort of include the definition of what a "true threat"

16      is sort of into the definition of "threat."  But that's just a

17      difference that I would highlight in our two instructions.

18             THE COURT:  I can tell you, and I've been thinking

19      about this, my general view is that it is usually a mistake to

20      take labels that lawyers use when speaking to each other and

21      try to build them into jury instructions.  The labels don't

22      have a lot of meaningful context.  Labels have to be defined,

23      and here the statute talks about a threat, and I will instruct

24      on what a Constitutionally sufficient threat is, but I don't

25      prefer to use the language "true threat" because it doesn't

1    convey meaningful information, and it tends to raise potential

2    for confusion; like when someone says "true threat," does that

3    mean that they actually mean that the speaker of the threat

4    must intend to carry out the threatened behavior?  It's not

5    true if you don't intend to actually do it.  That's one meaning

6    of "true threat."  Another meaning of "true threat" might mean

7    he might objectively intend to threaten.  But that issue has

8    not been authoritatively resolved by either the U.S. Supreme

9    Court or the First Circuit, as far as I can tell.  And I think

10   that it doesn't produce any clarity, it potentially produces

11   confusion, and I think the better approach is to use the

12   statutory term and then define it in a way that it can be

13   understood by a layperson.

14          Now, whether in defining it I might add the word

15   "true" in front of "threat" just to satisfy the defendant -- I

16   mean, I know that I approach these things rationally and I know

17   that lawyers like to use not just reason but also emotion to

18   present argument, that true sounds like it's a much higher

19   standard than a threat, but that is a kind of, I don't know, a

20   gut reaction kind of thing.  It's not something that is really

21   reasonable.  I'll hear the defense on it.

22          At the end of the day I don't think it should be in

23   there.  If I were writing for the Court of Appeals I wouldn't

24   put the term 'threat' in there in an instruction to the jury,

25   but whether I put it in just to avoid the Court of Appeals

1  having to take some additional time to explain why it can be

2  sufficient not to have the word "true" in there, I'll have to

3  think about that.  But I'm not inclined to caption the

4  instruction or the element as "true threat;" I'm inclined to

5  define the threat and possibly, I'm still thinking about it,

6  put the word "true" in when defining what the statutory threat

7  is.

8           But anything the defense wants to say in support of

9  why I should use "true threat"?

10          MR. LEVIN:  Your Honor, I would just, as background,

11 and I'm not suggesting it's binding on the Court in any way,

12 but in the case of Matthew Oliver, which was recently tried in

13 this court, the government proposed that language and it was

14 adopted by the Court, and that's docket number 19-cr-40, one of

15 Judge Laplante's cases.

16          THE COURT:  Was that an 875(c) case?

17          MR. LEVIN:  That was a (c) case, yes.

18          THE COURT:  Was that in front of Judge Laplante?

19          MR. LEVIN:  In front of Judge Laplante, yes.

20          THE COURT:  He's the expert on cyberstalking and

21 criminal threatening.  I'm just going to follow him.  So, I'll

22 get a copy of the Oliver instruction and read it over

23 carefully.  Obviously, I have a tremendous regard for Judge

24 Laplante.

25          MR. LEVIN:  The parties submitted joint jury

1    instructions that were drafted by the government, and that was

2    where that language came from, I believe.

3              THE COURT:  I'll take a look at _Oliver_.

4              But, go ahead.  What did you want to say in response?

5              MS. KRASINSKI:  Just that, as much respect as I have

6    for Attorney Kinsella, it's my position that the term "true

7    threat" shouldn't be in the instruction regardless of what he

8    submitted in the _Oliver_ case.

9              THE COURT:  I mean, if I put it in, it's not

10   reversible error; it's a judgment call about how you can most

11   clearly describe the elements of the charge.  I agree that the

12   word "true" in front of "threat" doesn't convey clear content

13   to a lay juror.  "True" in front of "threat" conveys

14   information to a lawyer who studied the First Amendment,

15   because that's how the Supreme Court defined the kinds of

16   threats that by themselves can be sufficient to support a

17   criminal-threatening-type charge, but it doesn't convey

18   information useful to a juror.  But I'll think it through, and

19   I'll look at _Oliver_, and I have tremendous regard for Judge

20   Laplante.  And I also just -- to me, whether I put it in or not

21   put it in, I can't imagine the Court of Appeals figuring out

22   that that's some kind of a legal error on my part, but

23   sometimes you just say, well, all right, if the defense wants

24   it and it doesn't muck up the charge too much, maybe I'll put

25   it in.  And, of course, I will only instruct the jury on what

1    the legally sufficient and necessary elements of the charge are

2    as I determine it, but there are elements of judgment involved

3    in how you express what is legally sufficient and legally

4    required, and I will try to do it in a way that's as clear as

5    possible for the jury, having had a lot of experience in

6    instructing juries and speaking to them afterwards about the

7    instructions that I've given them.

8            Okay.  Anything else on 3 that anybody wants to talk

9    about?  Okay.  Let's go on to 4.  I think the defense has the

10   same concerns about 4 that you had with respect to 2.  Anything

11   new and specific with respect to (d)?

12           MR. LEVIN:  No, your Honor.

13           THE COURT:  Okay.  And cyberstalking.  How do you feel

14   about the cyberstalking instruction that the government is

15   proposing?

16           MR. LEVIN:  Hold on a second.

17           THE COURT:  Again, Judge Laplante is the expert here.

18   He did Ackell, which is the leading First Circuit case on the

19   cyberstalking statute.

20           MR. LEVIN:  Right.  And I think that's one that we

21   looked at as well.  I can't remember how it shapes up, but

22   ours, obviously, has more I think elements than the

23   government's does; that there has to be a course of conduct,

24   that the intent to harass and intimidate we broke out, that the

25   course of conduct placed another person in reasonable fear of

1    serious bodily injury, that the course of conduct caused,

2    attempted to cause and would be reasonably expected to cause

3    substantial emotional distress.  So, I think there are

4    additional elements that aren't in the government's and then I

5    think also additional definitions.  A complicated statute.

6            THE COURT:  Yeah.  Okay.  So, as I said, I'm inclined

7    to follow -- Ackell was a charge that was examined by the First

8    Circuit.  I'm inclined to start with Judge Laplante's

9    instruction in Ackell as a baseline and work off of that in

10   light of what you are each proposing.  So, I will look at the

11   Ackell instruction and the Oliver instruction, because I

12   haven't instructed on either of these statutes before, and I'll

13   start with that as guidance.  And then, to the extent you have,

14   and you have cited in footnotes a number of decisions, I will

15   look at those cases when considering your specific requests to

16   the extent that they deviate from or add to what was instructed

17   in Ackell.

18           Okay.  Does the government want to say anything about

19   this cyberstalking instruction?

20           MS. KRASINSKI:  A couple of things.  The first is, in

21   looking at it yesterday as I was preparing for today, I need to

22   submit a revised instruction on this, because I did not include

23   that one of the means that's charged is that it placed the

24   other person in reasonable fear of serious bodily injury to

25   that person or that person's spouse.  So, I need to update this

1    and submit an updated version to the Court.

2            But, separately, kind of one of the main differences

3    between our instruction is whether or not the jury is required

4    to agree unanimously on the acts that constitute the course of

5    conduct.  So, the defense has submitted an instruction that

6    they must unanimously agree on which two or more text messages

7    or things constituted the course of conduct.

8            THE COURT:  Could I just interrupt you?

9            MS. KRASINSKI:  Sure.

10           THE COURT:  In Ackell the First Circuit resolved that

11   in your favor, didn't the Court?

12           MR. LEVIN:  Yes, I believe that's right.

13           MS. KRASINSKI:  Yes, your Honor.

14           THE COURT:  Yeah.  So, I guess they're requesting it

15   for purposes of preserving it for a Supreme Court appeal for an

16   en banc review, but I lack the power to disregard a controlling

17   First Circuit case.  So, on that issue I don't even consider it

18   an open question in my mind.  I'm going to instruct the way the

19   First Circuit said I should instruct.

20           And so, Mr. Levin, you agree with that, right?

21           MR. LEVIN:  Well, I don't think the First Circuit said

22   you have to instruct that way.  I think they said it wasn't

23   error not to instruct that way.  So, I think that's, you know,

24   a critical difference.  But I agree that was the outcome.

25           THE COURT:  Okay.  So, on that particular issue I'm

1    not inclined to deviate from what Judge Laplante did in <u>Ackell</u>

2    that was found to be appropriate or lawful or permissible by

3    the First Circuit.  There is one part of <u>Ackell</u> that I do or

4    one part of Judge Laplante's charge in <u>Ackell</u> that I have some

5    concern about, and that is -- I don't know.  I'll have to look

6    at the government's instruction.  Give me one second here.

7    Yeah.  I'm a little bit concerned about the "attempted to

8    cause" language in that instruction, because I am inclined to

9    say, and this is something that the Court in the First Circuit

10   in <u>Ackell</u> noted, as did Judge Laplante, was the kind of oddity

11   about the statute, and I agree that it's odd and I think it

12   could mislead a jury.  I think it has to cause or would

13   reasonably be expected to cause, and it has to be undertaken

14   with the intent to harass or intimidate another person.  So,

15   I'm not sure how you have a distinct act of liability for

16   attempting to cause.  And this is discussed in the <u>Ackell</u> First

17   Circuit decision, and I'm inclined to omit that attempts to

18   cause.

19          I assume the defense would like that.  I don't know if

20   you've focused on that, Mr. Levin.

21          MR. LEVIN:  No, no, but that sounds right.

22          THE COURT:  You agree to <u>Ackell</u>, and if you want to

23   press that argument with me I'll give the government a chance

24   to respond on it, but when I read that reference, I know Judge

25   Laplante -- that's an example, that's what made me bring it up,

1    is that's an example of where the Court said it was not error

2    to track the statutory language, but, in fact, I think tracking

3    the statutory language there might be more confusing to the

4    jury than clarifying, because if you act with the requisite

5    intent and you engage in action that would be reasonably

6    expected to cause, it doesn't have to cause, so it just has to

7    either actually cause or reasonably be expected to cause.

8    That, I think, is what the focus is on that element.

9           The government can think about that.  If you want to

10   tell me it would be reversible error for me to take out the

11   "attempt to cause," you could build a good legal argument,

12   citing case law and reasoned argument, other than, well, it's

13   in the statute and the First Circuit didn't reverse Laplante on

14   that basis, if you can give me a different, a better-reasoned

15   argument, you could persuade me to leave it in, but I didn't

16   see how it clarifies the jury's obligation to leave it in.

17          MS. KRASINSKI:  I will, your Honor.

18          THE COURT:  It's in the statute, Judge, and if the

19   Court said it was okay in Ackell, is there anything else you

20   wanted to add now?  You can do it later, after you've had a

21   chance to develop a more reasoned argument.

22          MS. KRASINSKI:  No.  I'll have to go back and look at

23   it, your Honor.

24          THE COURT:  All right.  Take a look at it and let me

25   know what you think.  Otherwise, I don't think the statute is

1   all that complicated.  We all do this for a living, and so we

2   all take a statute and we diagram it and we ask what's the *mens*

3   *rea* element, and what are the *actus reus* elements, we kick down

4   those, then we look at how you would logically structure an

5   instruction.  Then we read all the case law, the controlling

6   Supreme Court, First Circuit case law to determine whether

7   things like what the Court did in <u>Elonis</u>, where the Court reads

8   things into the statute that aren't there, and we add those in,

9   or where the Court puts a gloss on something that isn't

10  apparent to us when we do the diagramming, and then we try to

11  translate guidance we get from the Courts of Appeals and the

12  Supreme Court into language that a jury can understand and is

13  faithful to the precedent that controls us, and that's how we

14  put an instruction together.

15          It seems to me a fairly simple instruction, but I will

16  look at what Judge Laplante did in <u>Ackell</u>, I will build off of

17  what the defense and the government are suggesting, and put

18  something together for you probably by the time you start

19  evidence.

20          MS. KRASKINSKI:  Your Honor, I think there's sort of

21  just one other general difference between the cyberstalking

22  instructions, and that's sort of the extent of the course of

23  conduct.  The defendant's instructions limit the course of

24  conduct to the communication between the victim and the

25  defendant themselves, whereas the government's instructions and

1   I think the indictment includes the defendant communication

2   both to the Child Abuse and Neglect Hotline to sort of this

3   broader telegram chat.  And so, that's just sort of one other

4   difference between the two instructions on the cyberstalking

5   count.

6            THE COURT:  All right.  So, Mr. Levin, if you're going

7   to oppose that, that seems sensible to me, but to the extent

8   that you're going to oppose that, give me some case law.  It

9   does make sense to me that the course of conduct is not limited

10  to communications that are directly made from the defendant to

11  the alleged victim.  If the defendant acts with the *mens rea*

12  required and with the intention of prompting a third party to

13  engage in the conduct that is intimidating, that seems logical

14  to me that that could be part of the course of conduct, but I

15  have not researched the issue.

16           MR. LEVIN:  Right.  Well, again, I'm tracking the

17  statute, which talks about intent to harass and intimidate

18  victim 1, but if the government is suggesting that to expand

19  the proof that the defendant intended to harass and intimidate

20  the victim's spouse, we wouldn't object to that.  I don't think

21  the evidence supports that.

22           THE COURT:  No.  I think she means something

23  different.

24           Ms. Krasinski, if I've gotten you wrong you'll

25  interrupt me and tell me, but I think what she's saying is, We

1    want the course of conduct instruction to be broad enough to

2    encompass the defendant's communications directly with Cheddar

3    Mane and the defendant's actions that the government says are

4    part of a course of conduct to intimidate and harass Cheddar

5    Mane, such as contacting Child and Family Services with the

6    intent to get them to come out and potentially remove Cheddar

7    Mane's children, right?  Is that what you're getting out,

8    Ms. Krasinski?

9         MS. KRASINSKI:  Yeah.  And I can direct everyone to a

10   case, it's a Fourth Circuit case, U.S. v. Bartley, 711 Federal

11   Appendix 127, and it essentially says that the acts that

12   constitute the course of conduct can include acts directed at

13   third parties, you know, as long as those acts, the defendant

14   intended those acts to harass or intimidate the victim.  So,

15   that's all we're suggesting, is that the course of conduct also

16   can include acts directed at third parties, as long as those

17   acts are committed with the requisite intent.

18        THE COURT:  Well, are you saying, though, that what

19   you're telling me is communication -- I thought you were

20   focusing on, like, the Child and Family Services stuff.

21        MS. KRASINSKI:  Yes, yes.

22        THE COURT:  Are you including something else in there

23   that I'm not understanding?

24        MS. KRASINSKI:  So, there are two things that are

25   charged in the indictment that are acts directed at third

1    parties.  The first is the call to the Child Abuse and Neglect

2    Hotline, and the second is, separate from the communications

3    directly between Cheddar Mane and the defendant, the defendant

4    also sort of publicly posted a photograph of Cheddar Mane's

5    family on a group Telegram chat.  So, that would be an

6    additional act sort of directed at third parties that are both

7    charged in the indictment and we submit are part of the course

8    of conduct.

9          THE COURT:  Correct.  But it's harassing Cheddar Mane

10    by taking action with respect to a third party.

11          MS. KRASINSKI:  Yes.

12          THE COURT:  So, you're not trying to bring in another

13    victim.  You're trying to say, when you do something like

14    posting information on a public website, that Cheddar Mane

15    would understand it's harassing and intimidating him, and a

16    reasonable person in his position would understand that; the

17    act of doing that action with a third party can be part of the

18    course of conduct, right?

19          MS. KRASINSKI:  Correct.

20          THE COURT:  Okay.

21          MR. LEVIN:  I understand that, but I don't understand

22    where that's not reflected in the competing proposed jury

23    instructions.  It seems like both instructions get to that.

24          THE COURT:  All right.  Well, I'll take a close look

25    at it.  I get what counsel's saying, and I will look at it.

1   And I understand your response, but, again, I'll take a look at

2   the case she cites, but if you could also come up with any case

3   law to support any different view, and I'll look at which

4   language makes the most sense to me and adopt it.

5          Anything else from the government on the proposed

6   instructions?

7          MS. KRASINSKI:  Sort of the only other kind of big

8   issue is that it's just the appropriate definition of -- I'm

9   sorry, where am I -- substantial emotional distress.  You know,

10  I think we can sort of come to one definition, as opposed to

11  defining it in five or six different ways, three or four

12  different ways, but I suspect it's something we can work

13  through.

14         THE COURT:  I'll work on that.  I think I've gotten

15  out -- is there anything -- I think the government has raised

16  concerns with the defendant's instructions in ways that I can

17  understand.  Is there anything you wanted to say about the

18  defendant's instructions that you haven't already said?

19         MS. KRASINSKI:  No.  Thank you.

20         THE COURT:  Okay.  So, this has been helpful.  I think

21  we've sort of fleshed out some of the major differences.

22  Everybody's rights are preserved to object to whatever I decide

23  to do, but you've given me some stuff to work with, and I've

24  alerted you to some of my tentative thinking, and so you'll

25  come armed with case law if you think that my tentative

1    thinking on those subjects is incorrect.  So, that was helpful

2    to me.  Thank you.

3         Let's talk in general about motions *in limine*.  I

4    understand the parties haven't had chances to respond to them

5    yet, but, again, you're probably not going to talk to me before

6    jury selection.  So, if there's anything you want to say about

7    the specific motions *in limine*, feel free to raise them.

8         We'll start with the defense.  You filed most of them.

9    Why don't you tell me whatever it is you want to talk to me

10   about with the motions *in limine*.

11        MR. WOLPIN:  I think the primary one is the one

12   addressing the victim's motive and bias to lie.  I'm intending

13   to submit a supplement today to that to more directly address

14   the question.  They are public statements about the awareness

15   of their own liability, so they talk about something called

16   "fed posting," which is essentially their understanding that

17   the FBI and federal law enforcement is listening to what they

18   say because it is so violent and dangerous and puts them at

19   risk of prosecution.  So, adding to this understanding of why

20   he fears his own prosecution, it's quite clear and evident and

21   publicly stated that they were aware of that, worried about

22   that, and the specific context of that is an example that

23   involves Cheddar Mane threatening to and Patriots having a

24   segment about threatening to kill and rape a specific FBI agent

25   and then discussing how that said posting and how that could

1   get that intention.  We then have, obviously, the FBI itself

2   coming to investigate him or speak with him.  He knows they've

3   listened to the recordings.  Part of the recordings is

4   threatening to rape and kill an FBI agent.

5           And there's other evidence that I will note in that

6   motion that similarly addresses Cheddar Mane specifically in

7   the role of making similar statements, including calling in to

8   Chris's show and discussing his interest in causing harm to an

9   FBI agent and similar things.  So, ultimately I wanted to flesh

10  out the content that this individual was well aware of his own

11  liability before the FBI arrived at his door, which is then

12  followed up by his acknowledgment that they held that liability

13  over his head, and then, when you read the text of the

14  interviewer or the interview the FBI conducted, it was a very

15  terrible strong arm in the sense of, Here is what we want to

16  hear, we're taking this seriously, there's threats on your

17  life.  That's why they approached him, is an effort to

18  ultimately address that issue and making it clear what issue

19  they want to address, according to Cheddar Mane, make it very

20  clear to him that they are holding Bowl Control over his head

21  to get his cooperation in the prosecution of Cantwell.  The

22  motion goes through that in more detail.  The supplement

23  attempts to flesh out his state of mind.

24          But we think there's sort of no credible argument at

25  this point, when it lines up that way, that this was an honest

1    mind when the FBI got there, that he wasn't motivated by his

2    own criminal liability, and that the FBI wasn't telling him

3    what they were there to do, and, as he said himself, holding

4    his past over his head and the FBI's statements, discuss how

5    Cheddar Mane could disappear into sort of internet oblivion and

6    he can go back to being Mr. Lambert instead.  So, it was made

7    evident to him that there's benefits to his participation.  So,

8    ultimately, and the government will respond as it responds, but

9    I think a compelling and direct argument similar to the one

10   that was made in relation to the confidential informant issue

11   before the Court.  So, that is ultimately issue number one.  I

12   think the others are more sort of more clear relevance or

13   609-type issues.

14           THE COURT:  Well, let's talk about 1.  So, this

15   evidence to me is intentionally relevant for two purposes.  One

16   is to show Cheddar Mane's bias by his motive to satisfy the

17   government and avoid criminal liability for his own actions,

18   right?  I think you have given me a tremendous amount of detail

19   on that.  I don't know how much more in your supplement you can

20   do, but go ahead and do it.  But I'm always inclined, when it

21   comes to evidence of that sort, to give the defense a fairly

22   wide scope here.  It's important to make sure that any

23   potential motives to falsify are brought out in front of the

24   jury.  So, that's always important, and I think it's important

25   here, and I'm inclined to let you pursue that.  I think the

1     question is in what ways and to what degree.

2          You also have a second argument.  And I understand

3     your principal defense here is not that I didn't make the

4     communication.  It's that the communication doesn't qualify as

5     a criminal act, right?  Your argument is that this was not a

6     crime.  And so, you have one, your kind of principal legal

7     defense is, when you learn the context in which this was made

8     you will see that the defendant did not commit a crime either

9     because the communications are not ones that can be criminal,

10    the acts, his spoken acts are not criminal, or the defendant

11    did not have a criminal intent, or some combination of the two.

12    That seems to me to be what your core defense is.  Do I have

13    that right?

14         MR. WOLPIN:  I think you do.

15         THE COURT:  Okay.  And so, some of this may be

16    admissible as context to give you a fair opportunity to

17    establish that defense, and the other part of it is don't

18    believe anything Cheddar Mane says, and then there's kind of a

19    third portion, which you may or may not sign up for, but which

20    I am quite confident is part of your thinking, which is, if we

21    can show that Cheddar Mane is such a repugnant person, that he

22    associates with such horrible persons, that these people

23    deserve each other and I'm not going to find him guilty, that

24    may be something you're hoping will happen as a result of that

25    effort.

1       The third thing is not really a legitimate basis for

2   admitting evidence that is not otherwise admissible, but I

3   think the two principal reasons and permissible reasons to want

4   to inquire into some of this evidence is to establish bias and

5   to provide context for your principal theory of defense, and I

6   think you should be given some scope and opportunity to pursue

7   both of those issues.  The question is how far, how much.  And,

8   certainly, and I can't make any definitive ruling now,

9   certainly interactions, actual interactions between Cheddar

10  Mane and the FBI are entirely fair game.  They're entirely fair

11  game.  What they said to him, what he said in response, what he

12  did, what he thought when they were contacting him, all of

13  those things are fair game.  So, where we start to have -- I

14  start to have less clarity in my thinking is with respect to

15  interactions that people other than Cheddar Mane had with

16  people other than the defendant, and what they do and say and

17  believe.  To me at some point that starts to become evidence

18  that should be excluded under Rule 403.  So, just how far do

19  you intend to go?

20          MR. WOLPIN:  Well, I think to address that in a couple

21  of ways, one, I think --

22          MS. KRASINSKI:  Your Honor, can I just interrupt?

23          THE COURT:  Stop for a second.  Yes?

24          MR. WOLPIN:  Understood.

25          MS. KRASINSKI:  I just want to point out that I know

1   that this is something that Attorney Davis has been handling

2   and working on, this motion *in limine*, in particular, so just

3   for the purposes of the discussion now --

4           THE COURT:  I won't make up my mind without giving

5   Mr. Davis a chance to weigh in personally, okay?

6           MS. KRASINSKI:  Thank you.

7           THE COURT:  I'm just trying to get an understanding of

8   what the defendant wants to do.

9           MS. KRASINSKI:  Thank you, your Honor.

10          THE COURT:  I understand.  You haven't responded yet.

11  Mr. Davis isn't on the call.  This is his major area.  You did

12  the instructions, he's doing the *in limine*.  I'll give him a

13  chance to be heard.  But let me just spend a few more minutes

14  on it so that I understand the defendant's position.

15          MR. WOLPIN:  All right.  So, I think there's a lot in

16  there, that question, but I think the -- I'll start with I

17  think the jury needs to understand what was said to understand

18  why he has liability.  I mean, you can't make an argument that

19  someone has potential liability without some evidence of what

20  that liability is.  We're in the unique position of the

21  liability largely comes from recordings that exist and are

22  undeniably him, and so we don't have sort of trials within

23  trials about whether, you know, identification or the other

24  issues that would maybe jumble that along.  Very clear to say,

25  you know, there is a discussion he has online as Cheddar Mane

1    discussing how people should basically take up the role of mass

2    shooters, that he can't do that because he has children, and he

3    can't do that because he has other obligations, but others need

4    to do that and that should happen.  There's the threats to the

5    FBI agent where he's involved in and they discuss all as a

6    group about threatening to rape and murder a particular FBI

7    agent.  I'm not saying it needs to go on for days, and it's not

8    my style to do that, but the jury needs to hear it enough to

9    understand why he would be legitimately concerned that the FBI

10   could prosecute him.

11        THE COURT:  Let me step back.  So, I'm imagining here

12   that there's going to be some information that's going to come

13   out during the government's direct case about your client -- I

14   don't know, I don't pay attention to it -- but he basically has

15   some kind of a podcast or a YouTube channel or something where

16   he makes money off of doing -- saying extreme things.

17        MR. WOLPIN:  I mean, so obviously people, different

18   people, characterize him differently, so take that with a grain

19   of salt.  But Cheddar Mane describes him as a shock jock with

20   white nationalist tendencies, so he's someone who has an open

21   forum radio show that is online, not on sort of normal radio,

22   for two hours at a chunk, and people call in and they talk

23   about things and, you know, white nationalists, slash,

24   all-white, slash, Trump kind of discussions are pretty common.

25        THE COURT:  But I'm trying to find out.  It seems to

1    me that it's going to be hard for a lot of this not to spill

2    into the case as part of the government's effort to prove its

3    charge, right?  There's going to be evidence that he's a white

4    nationalist shock jock, right?  There's going to be evidence

5    that there's this entity called the Bowl Patrol that at some

6    point decides it doesn't like him.  There's going to be

7    evidence that Cheddar Mane is part of this Bowl Patrol, right?

8    And there's going to be evidence of what the defendant does to

9    try to find out Cheddar Mane's -- excuse me -- not Cheddar

10   Mane, the ultimate Bowl Patrol guy who they think is heading up

11   this effort to, I don't know, damage the defendant's shock jock

12   ability.

13            MR. WOLPIN:  They make it basically a concerted

14   effort, which he'll fully admit to, I believe, based on his

15   prior testimony, that they intended to harass him, they

16   intended to make him angry, their goal was to make him angry,

17   they called his show dozens upon dozens upon dozens of times,

18   and there's even discussion on another broadcast hoping that

19   that ultimately shut down his broadcast service, radio show

20   format for Cheddar Mane.

21            THE COURT:  So, you agree that you don't have any

22   problem with that all coming into evidence in the government's

23   case?

24            MR. WOLPIN:  No.

25            THE COURT:  A white nationalist shock jock, that he

1    has some kind of interaction with the Bowl Patrol, that the

2    Bowl Patrol decides it doesn't like him, that the Bowl Patrol

3    does some things to try to damage his ability to do what he

4    does, that he gets mad about it and wants to out somebody in

5    the Bowl Patrol, I don't know who it is, and he wants to find

6    that person's -- and he wants to -- excuse me.  Yeah, yeah, and

7    he wants to find -- force Cheddar Mane to give him that

8    person's identity, right?  You agree that's going to be the

9    core part of the government's case?

10        MR. WOLPIN:  Yes.  I don't see that either side can

11   ever effectively tell their version of events without having

12   some portion of that and most of what you just talked about in

13   evidence.  It's entirely wrapped up with the actual exchange.

14        THE COURT:  Let me ask Ms. Krasinski.  Again, I know

15   Mr. Davis is here, so you might not be able to answer, but it

16   would seem to me that some of this stuff is going to be coming

17   in just in part of your case, right, so that the jury can

18   understand what's happening?

19        MS. KRASINSKI:  I think some of it will.  I think

20   there are two -- so, first, Attorney Davis, one of the motions

21   *in limine* that he filed is to exclude evidence of acts of third

22   parties other than Cheddar Mane and Vic Mackey to cause

23   disruption of the defendant's entertainment and media -- so,

24   that is a motion *in limine* that Attorney Davis has filed.  I do

25   think some of it, you know, the fact that Cheddar Mane crank

1    calls Mr. Cantwell's show, I mean, that's certainly going to

2    come in.  There are things that Vic Mackey did or at least that

3    Cantwell accused Vic Mackey of doing, like posting spam on Mr.

4    Cantwell's website, that I think will come in, but Attorney

5    Davis has filed a motion *in limine* to exclude some of these

6    other acts.

7             THE COURT:  I think you're getting off the topic that

8    I'm concerned about right now, which is, I understand, you

9    know, if other people were trying to harass him and -- if he

10   testified he might be allowed to say some of that, some not.

11   I'm more interested in, basically, I think what the defense

12   wants to try to do is to make the jury think that Cheddar Mane

13   is, and he may be thinking this, I don't know, that Cheddar

14   Mane wants to kill blacks and Jews and that he wants to try to

15   get that out in addition to general setting the stage for this,

16   which is this is one white nationalist who is being -- thinks

17   he's being harassed by another white nationalist group, and he

18   tries to force a member of that group to out somebody in the

19   group.  That all has to come in, I think, but how much of the

20   communications where third-party members of the group are

21   talking about killing black people and Jews, I'm not sure how

22   that -- that seems to go too far under a Rule 403 analysis.

23   That's what I'm focused on now, not the question of what

24   actions by members of the Bowl Patrol against the defendant

25   come in or out.

1          MS. KRASINSKI:  I think the line that I anticipate

2     Attorney Davis will draw or attempt to, at least, is that I

3     think Cheddar Mane's statements that relate to rape, that might

4     show that he regarded the threat to rape as a joke might be

5     relevant and might be admissible if the defendant can show that

6     that statement was made before the exchange, that the statement

7     was, in fact, Cheddar Mane's, and that the defendant knew of

8     that statement so that he did something that would have

9     factored into Mr. Cantwell's intent.  I think that's sort of

10    the line that we would argue applies, and that whether or not

11    Cheddar Mane or members of his group made comments about race

12    or ethnicity or things like that, that's kind of separate as to

13    whether or not a discussion about f-ing someone in front of her

14    children would be taken as a rape threat.  Sort of our position

15    is that any of those statements really have to be centered

16    around the context here, which is rape.

17          THE CLERK:  Judge, this is Vinny.  We have the CI

18    probably going to call in very soon.  I just want to let you

19    know.

20          THE COURT:  Well, we have to stop.  We'll stop now,

21    then, and come back to this next week.  So, just so you're

22    understanding, what I'm looking for guidance on is where to

23    draw the line here.  I'm inclined to allow the defense to --

24    substantial latitude in pursuing bias arguments that Cheddar

25    Mane is a biased witness.  I'm inclined to allow evidence in

1    about the nature, the general nature of what the Bowl Patrol is

2    and why it has had interaction with the defendant.  That will

3    inevitably involve some discussion of what the defendant's

4    business is.  I am inclined to allow liberal examination about

5    communications to which Cheddar Mane was a party that could

6    arguably suggest that he viewed the comments -- that in that

7    context those comments would reasonably be viewed as not a

8    threat of rape but merely a way of, I don't know, signalling

9    or -- it's hard for me to even describe what these people do,

10   but a sort of like chest-thumping kind of thing, and I'm

11   inclined to allow substantial latitude to do that.  I'm not

12   inclined to allow extensive examination on unrelated positions

13   taken by other members of the Bowl Patrol about African

14   Americans or Jews or whatever other groups, other than to note

15   that they are a white nationalist organization and probably

16   allow you to say how did they get the name "Bowl Patrol," but

17   beyond that I don't want to be spending days hearing about

18   every outrageous thing that the Bowl Patrol people ever did or

19   said.

20          MR. WOLPIN:  I can say, strategically, I don't find

21   that effective.  I mean, my goal is to find examples that make

22   the point and then move on to the next questioning, and that's

23   sort of where I am right now.  But I think some of it is

24   understanding, you know, we're in one of these kinds of cases

25   where these people exist in a unique ecosystem where language

1    that's used is simply different than any other group might use.

2    So, I don't intend to do lengthy discussions of what other

3    people say.  I do need to make clear to the jury, however, what

4    the Bowl Patrol is, what kind of language the group uses on a

5    regular basis, because that's the only way our client knows

6    them.  It's not like these guys were friends in person.

7          THE COURT:  I've got to stop, because I've got to get

8    on to my other business.

9          MR. WOLPIN:  Okay.

10         THE COURT:  We'll revisit this, but I am laying out

11   some very tentative thinking that I'm not inclined to allow

12   substantial examination beyond getting out what the Bowl Patrol

13   is, how it got its name, that it's generally a white

14   nationalist, racist, anti-Semitic organization that advocates

15   violence against minorities and not go into every instance in

16   which they've said outrageous claims, but things that suggest

17   that a statement from your client that, "I'm going to rape your

18   wife in front of your children," is just a joke, I'm going to

19   allow you to do that.  Of course, to me the principal problem

20   with the case is the statement itself appears on its face to be

21   extortionate, and in order to be extortionate the threat to

22   rape has to convey some meaning other than a joke.  So, you

23   come up with an explanation for that and you may have a valid

24   defense, but without that that's the fundamental problem I have

25   with this idea, but you're, of course, free to try whatever

1   defense you want.  I'm inclined to give you a fair amount of

2   space in which to try to present that.  Not an unlimited

3   amount.  Rule 403 in the end does require that we keep the

4   focus on evidence that's not cumulative, that's not so

5   prejudicial as to substantially outweigh probative value, and

6   I'll find that line, but I'll be looking for guidance as we go

7   along.

8          All right.  I've got to terminate this call, because

9   I've got to start on my next thing.  So, we'll talk again.

10  Probably on Wednesday after jury selection we can start to hone

11  in on some of these issues in greater detail.  Okay.  Thank

12  you.  That ends the call.  Bye.

13         (WHEREUPON, the proceedings adjourned at 11:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

44

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of the

8     within proceedings.

9

10

11

12

13    Date:  ___5/17/21_____            /s/ Brenda K. Hancock
                                         Brenda K. Hancock, RMR, CRR
14                                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25