UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *
                                *  No. 1:20-cr-00006-PB
        v.                      *  September 22, 2020
                                *  1:18 p.m.
                                *
CHRISTOPHER CANTWELL,           *
                                *
                Defendant.      *

* * * * * * * * * * * * * * * * *


TRANSCRIPT OF DAY ONE OF JURY TRIAL - AFTERNOON SESSION

BEFORE THE HONORABLE PAUL J. BARBADORO


APPEARANCES:


For the Government:        AUSA John S. Davis
                          AUSA Anna Z. Krasinski, Esq.
                          U.S. Attorney's Office

For the Defendant:         Eric Wolpin, Esq.
                          Jeffrey S. Levin, Esq.
                          Federal Defender Office



Court Reporter:            Brenda K. Hancock, RMR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1454

<u>I  N  D  E  X</u>

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

**SHAYNE TONGBUA**
By Ms. Krasinski      8
By Mr. Levin                        86


<u>E  X  H  I  B  I  T  S</u>

<u>Govt's</u>                              <u>In Evd.</u>

100.........................14
113.........................25
112.........................26
304.........................32
101.........................34
301.........................37
302.........................39
102.........................40
400.........................46
600.........................51
601,  603,605,608.....................53
200.........................58
201 thru 226...............78

1                       P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.

3              Please remain standing for the jury.

4                   (The jury entered the courtroom)

5              THE CLERK:  Please be seated.  This hearing is back in

6       session.

7              THE COURT:  All right.  Please call your next witness.

8              MS. KRASINSKI:  The United States calls Special Agent

9       Tongbua.

10             THE COURT:  Yes.  Hang on a second.

11             MR. WOLPIN:  Could we have a brief sidebar, your

12      Honor?

13             THE COURT:  Yes.  So, the lawyers and I are going to

14      put the headsets on.

15      (SIDEBAR CONFERENCE AS FOLLOWS):

16             THE COURT:  Go ahead, Counsel.

17             MR. WOLPIN:  The government noted to us that with this

18      witness it intends to play jail call recordings of our client

19      specifically in relation to, I believe, a handful but one, in

20      particular.  They spliced out very small sections of that

21      recording.  We objected under rule of completeness, Rule 106,

22      to it being played and presented in that manner.  We have the

23      full recording in an exhibit within our exhibit list as B16,

24      and before they get prepared to present that, I would ask that

25      the Court listen to the recording in its entirety to understand

1    why it's necessary to understand the context in which he's

2    speaking.  It can't just be isolated that way.  It's misleading

3    to do that, but I think the best way to do that, rather than

4    have me recharacterize it, is to listen.

5          THE COURT:  Well, all right.  In the future, if you've

6    got a problem like this, present it to me before the jury is

7    brought back in.  I don't want to be constantly sending the

8    jury in and out to address these kinds of problems, and I don't

9    want them sitting here while I listen to a recording unless

10   it's more than a few seconds long.  I need the government to

11   tell me what you're doing and why you wouldn't just play the

12   whole call.

13         Yours is still off.  You've got to turn it on.

14         THE CLERK:  She needs to talk into the microphone.

15         THE COURT:  Just talk into the microphone.

16         MS. KRASINSKI:  I also only got about half of the

17   audio there.  It's not a jail call, your Honor.  It's a call

18   that Mr. Cantwell recorded between himself and a friend of his,

19   an ex-girlfriend, and then emailed to law enforcement.  The

20   government has made, I believe, five or four or five clips from

21   that call.

22         THE COURT:  How long is the call?

23         MS. KRASINSKI:  The call itself is a few minutes.

24         THE COURT:  What's the problem with playing the whole

25   call?

1          MS. KRASINSKI:  Well, I think the portions of the call

2     -- I'm sorry.  The audio for me keeps going out.  The portions

3     of the call are inadmissible, self-serving hearsay and should

4     not be allowed under 801, so the government intends to

5     introduce portions.

6          THE COURT:  All right.  I can't evaluate that argument

7     without listening.  I'm going to apologize to the jurors.

8     Don't put me in this position again.  If the parties have

9     objections like this, don't just wait until the jury is brought

10    in and raise them; raise them before the jury comes back in so

11    I can address the problem.

12    (END OF SIDEBAR CONFERENCE)

13         THE COURT:  I'm sorry, Members of the Jury, I've got

14    to excuse you again.  Please be patient with us.  As the

15    lawyers adjust to this new system I think we'll be more

16    efficient, and I'll do my best to make sure things run

17    efficiently, but I've got to take another short break, okay?

18    We'll bring you back in as soon as we can.

19              THE CLERK:  All rise.

20                   (The jury exited the courtroom)

21         THE COURT:  All right.  So, you don't want to play the

22    whole call, not because of its length, but because you think

23    there are things in there that you don't think the jury should

24    hear in the call; is that right?

25              MS. KRASINSKI:  Yeah, your Honor.

1          THE COURT:  All right.  And the call's about a couple

2     of minutes long?

3          MR. WOLPIN:  It's about seven, total.

4          THE COURT:  Do you have a transcript of it?

5          MR. WOLPIN:  I do not.

6          MS. KRASINSKI:  We only have a transcript of --

7          THE COURT:  What's in it that's in there that you

8     don't think the jury should hear?

9          MS. KRASINSKI:  So, I don't think the jury should be

10    able to hear Mr. Cantwell discussing how what he thinks he's

11    trying to do is solve a crime.  I don't think the jury should

12    hear from us.  We're not using it against the defendant.  The

13    defendant's talking about other members of Bowl Patrol

14    harassing him.  801 specifically defines something as not

15    hearsay as a party statement used against that party, and we

16    don't intend to use those portions against Mr. Cantwell.  There

17    are other ways to remedy.

18         THE COURT:  You understand the rule of completeness,

19    right?

20         MS. KRASINSKI:  I do, your Honor.

21         THE COURT:  All right.  So, that's his argument.

22    What's your response?

23         MS. KRASINSKI:  So, the rule of completeness I think

24    only applies if the segment is misleading in some way.  So,

25    having a question and an answer, that's not misleading, and so

1    the portions that the government intends to introduce aren't

2    misleading in a way that would make the rule of completeness

3    overrule the hearsay rules.  In the government's response to

4    the defendant's supplemental objections we cited --

5              THE COURT:  Do you have a written excerpt of the

6    portions -- this is going to take ten minutes.  Do not do this

7    to me again.  We have got to move more efficiently through

8    these proceedings.  The defendant should have raised this

9    objection with me earlier.  We need to be more efficient.  All

10   right?  So, you're on notice.  I first have to listen to your

11   proposed excerpts, then I have to listen to the whole call,

12   then I will make my ruling.  There's no other way I can do it,

13   and you've just wasted another 15 or 20 minutes of the jury's

14   time, which is not acceptable to me.  So, you're all on notice

15   I will not tolerate it.

16        MS. KRASINSKI:  Your Honor, I don't intend for this to be

17   the first thing to go through with the witness.  There's a lot

18   to go through with the witness.  This is something that I can

19   wait until after -- we can address this on a break, give the

20   Court time to listen to it all.  I can start with the witness

21   on a number of other topics.

22             THE COURT:  Can you go until quarter of 3:00 without

23   covering this?

24             MS. KRASINSKI:  Probably, your Honor.

25             THE COURT:  All right.  Let's get the witness in, and

1  let's get going.

2  　　　　THE CLERK:  All rise for the jury.

3  　　　　　　(The jury entered the courtroom)

4  　　　　THE CLERK:  Please be seated.

5  　　　　THE COURT:  All right.  Call your witness.

6  　　　　MS. KRASINSKI:  The United States calls Special Agent

7  Tongbua.

8  　　　　**SHAYNE TONGBUA**, duly sworn by the Clerk.

9  　　　　THE CLERK:  Thank you.  Would you please state your

10  name and spell your last name for the record.

11  　　　　THE WITNESS:  Shayne Tongbua, S-h-a-y-n-e,

12  T-o-n-g-b-u-a.

13  　　　　　　　　DIRECT EXAMINATION

14  BY MS. KRASINSKI:

15  Q.   Agent Tongbua, by whom are you employed?

16  A.   The Federal Bureau of Investigation.

17  Q.   How long have you served the FBI?

18  A.   Since 2009.

19  Q.   And what is your current role?

20  A.   I am a Special Agent.

21  Q.   How long have you been a Special Agent?

22  A.   Since 2016.

23  Q.   Are you assigned to a particular location?

24  A.   Yes, to the FBI Boston Office.  More specifically, I work

25  here in New Hampshire.

1  Q.   And what did you do before you were a special agent with
2  the FBI?
3  A.   I also served in the Army from 2003 to 2009.
4  Q.   And within the FBI, before you became a special agent,
5  what did you do?
6  A.   So, including my military time, I've been a certified bomb
7  technician since 2004.  So that's the job I was originally
8  recruited to do in the Bureau, but the seven years before I was
9  an agent also included two years when I was a digital forensic
10 examiner.
11 Q.   Can you generally briefly describe your training to become
12 a digital forensic examiner?
13 A.   It's a set pipeline or training path, if you will.  I'm
14 not exactly sure today what those courses entail, but it's
15 generally between 10, 12, 14 weeks of different training that
16 you have to complete in order to get your certification to be
17 an examiner, and that does include various industry IT
18 certifications.
19 Q.   And can you briefly describe the training to become a
20 special agent?
21 A.   Again, I'm not sure what it is today, but the time I went
22 through it was 21 weeks at the FBI Academy in Quantico,
23 Virginia.
24 Q.   Now, let's dive into what brings us here today.  In July
25 of 2019 did you receive information about messages that

1    appeared to be sent by Mr. Cantwell to someone else?

2    A.    Yes.

3    Q.    How did you receive that information?

4    A.    Those, that message exchange, those screenshots were first

5    relayed to a handful of us here in New Hampshire via an intel,

6    an intelligence analyst at our headquarters in Washington, D.C.

7    Q.    So, when you received the screenshots of this message

8    exchange, what did it look like?

9    A.    Like a website.  So, kind of akin to Facebook, how you

10   would just see messages posted there, almost like a blog, and

11   so there was a series of them.  They looked like an exchange

12   between two people.

13   Q.    So, if I'm understanding you correctly, it looked like an

14   exchange between two people had been publicly posted?

15   A.    That's correct.

16   Q.    Did you look at the exchange between two people?

17   A.    Yes.

18   Q.    And did it look like text messages, like what it would

19   look like on your phone?

20   A.    Yes.  That's a very accurate description.

21   Q.    And so, did you review the messages contained in that

22   exchange?

23   A.    Yes.

24   Q.    How many parties to that exchange were there?

25   A.    Two.

1  Q.   And during the course of the investigation did you

2  identify the two parties to that exchange?

3  A.   Yes.

4  Q.   Who were they?

5  A.   The defendant, Mr. Christopher Cantwell, and the alleged

6  victim in the exchange went under the pseudonym Cheddy Blac,

7  and that is associated with a Benjamin Lambert.

8  Q.   Generally speaking, how did you identify Christopher

9  Cantwell as one of the parties to this conversation?

10  A.   Due to familiarity with his Telegram account which was

11  used in that, in addition to Mr. Cantwell's own statements when

12  he admitted having that exchange.

13  Q.   And what about Mr. Lambert?  How did you identify that he

14  was a party to the exchange?

15  A.   After we identified Mr. Lambert he admitted that he was a

16  part of that same message exchange, that he was the user known

17  as Cheddy Blac.

18  Q.   So, we're talking about messages between two people, so if

19  I'm sending you text messages, for example, did it look like --

20  would there be sort of two mirror images of that?

21  A.   Correct.  There would be, basically, like if you and I

22  were having a conversation there would be my side and your side

23  where all the content is the same, basically.  If you guys are

24  familiar with texting, the layout would just be flipped.

25  Q.   So, there are essentially two mirror images of this

1  conversation?

2  A.  Correct.

3  Q.  One from one party's phone or side?

4  A.  Correct.

5  Q.  And one from the other's?

6  A.  Yes.

7  Q.  So, the first message exchange, the version that you first

8  received, whose side of the conversation did that appear to be

9  from?

10  A.  That would be Mr. Lambert's.

11  Q.  And during the course of the investigation did you find

12  the mirror image, the images as they would have appeared from

13  Mr. Cantwell's side of the conversation?

14  A.  Yes, I did.

15  Q.  Tell us about that.

16  A.  The only place I located the entire set was on

17  Mr. Cantwell's phone.

18  Q.  How is it that you came to look at the information on

19  Mr. Cantwell's phone?

20  A.  So, that device and a number of others were seized

21  pursuant to a search warrant which was executed at

22  Mr. Cantwell's residence in January 2020, on the same day of

23  his arrest.

24  Q.  So, the device that we're talking about where you found

25  these images, what device was that?

1   A.   It was a Samsung phone.  I believe we took three that day,

2   and this particular one was discovered on a small side table,

3   basically a bedside stand, in Mr. Cantwell's bedroom.

4   Q.   Now, you mentioned that you executed this warrant and

5   seized these devices from Mr. Cantwell's residence.  Where is

6   that residence?

7   A.   In Keene, New Hampshire.

8   Q.   Did anyone else live there at the time?

9   A.   Not in that apartment.

10   Q.   And was anyone else there at the time you executed the

11   warrant?

12   A.   No.

13   Q.   This cell phone, was it forensically downloaded?

14   A.   Yes.

15   Q.   And after the forensic extraction did you review the data

16   from the phone?

17   A.   Yes.

18   Q.   And is that where you found the mirror image,

19   Mr. Cantwell's side of this conversation?

20   A.   Yes.

21   Q.   Can you describe how that was in the phone?

22   A.   I'm sorry?

23   Q.   Can you describe sort of the file type that it was found?

24   A.   Basically, they were screenshots, so it would look the

25   way, you know, the display on your phone would look.

1          MS. KRASINSKI:  So, I want to show the witness only

2     what has been marked for identification as Government's Exhibit

3     100.

4     Q.   Is that on your screen, Agent Tongbua?

5     A.   No, it is not.  Yes, it is now.

6     Q.   Do you recognize that?

7     A.   Yes.

8     Q.   What is it?

9     A.   This would be the first in the series of messages that we

10    were just describing as they would have appeared on Mr.

11    Cantwell's phone.

12         MS. KRASINSKI:  And, Ms. Sheff, would you please

13    scroll through Exhibit 100 so Agent Tongbua can see all of the

14    pages.

15    Q.   Now that you've had a chance to look at all of it, is it

16    the entire conversation between Mr. Cantwell and Mr. Lambert?

17    A.   Yes.

18         MS. KRASINSKI:  Your Honor, I move to strike the

19    identification on Exhibit 100.

20         THE COURT:  Is there an objection?

21         MR. LEVIN:  No objection.

22         THE COURT:  Without objection, it will be admitted as

23    a full exhibit.

24      (Government's Exhibit No. 100 received into evidence)

25         MS. KRASINSKI:  Permission to publish, your Honor?

1          THE COURT:  Yes.

2          MS. KRASINSKI:  Could we please display Government's

3     100 to the jury?

4     Q.   Now, Agent Tongbua, at the top of the page you see the

5     name Cheddy Blac?

6     A.   Yes.

7     Q.   And tell us again what you learned about that.

8     A.   There was an individual who goes by different pseudonyms,

9     Cheddy Blac, Cheddarman and Cheddar Mane, and that individual

10    was identified as a Mr. Benjamin Lambert.

11    Q.   And you said the other party to this conversation is the

12    defendant, Christopher Cantwell, correct?

13    A.   Correct.

14    Q.   And, generally, who is Mr. Cantwell?

15    A.   Mr. Cantwell, who you see here in the courtroom, is a

16    self-professed Nazi podcaster and blogger.

17    Q.   Now, the screen in front of you should allow you to make

18    markings on it.  Would you please go ahead and mark a "C" next

19    to the messages that are attributed to Mr. Cantwell.

20    A.   Is there a marking tool?

21    Q.   You should just be able to use your finger, Agent Tongbua.

22         THE COURT:  Go up and help him.

23         THE CLERK:  I'm not getting a menu.

24              (Pause)

25         MS. KRASINSKI:  It looks like I can annotate.  Can we

1    try this a different way?

2    Q.    Agent Tongbua, I'm going to put something next to the

3    messages, and can you confirm for me whether or not they are

4    attributed to Mr. Cantwell?

5    A.    Yes.

6    Q.    So, I've marked four Xs next to sort of the green, the

7    text in green boxes.  Are those the conversations, the messages

8    attributed to Mr. Cantwell?

9    A.    Yes.

10   Q.    Now, what's the date of this exchange?

11   A.    June 15th, 2019.

12   Q.    And what is the first message that Mr. Cantwell sends?

13   A.    I guess you forgot the lesson which kept you away for a

14   short while.  Do you need to be reminded?  Twin Creek Road.

15   Q.    What time was the first message?

16   A.    9:00 p.m.

17   Q.    And did Mr. Lambert respond to that message?

18   A.    No.

19   Q.    And you read the second message, "Twin Creek Road."  What

20   time was that message sent?

21   A.    9:29 p.m.

22   Q.    So, almost a half an hour after the first one?

23   A.    Correct.

24   Q.    During the course of your investigation did you learn what

25   Twin Creek Road is?

1    A.    Yes.  That is the known address of the Lambert family's

2    house.

3    Q.    How do you know?

4    A.    Through verification record checks and having personally

5    visited that location.

6    Q.    When you visited the location did you interact with

7    anyone?

8    A.    Yes.

9    Q.    Who?

10   A.    Pam Lambert, Ben's wife, she was there with the three

11   children.  She greeted us and spoke with us when we arrived.

12   Q.    So, this address, you learned that a Ben Lambert does live

13   there?

14   A.    Yes.

15   Q.    Along with his wife and children?

16   A.    Yes.

17   Q.    Now, I want to next talk about a statement that would be

18   attributed to Mr. Lambert.  Do you see the statement that

19   begins, Let's think about this?

20   A.    Yes.

21   Q.    Can you read that, please?

22   A.    Let's think about this.  Every time someone you think is

23   in BP talks shit about you, a public figure, you threaten to

24   dox me.  Say you did.  What then?

25   Q.    Now, during the course of your investigation did BP come

1    to have any meaning for you?

2    A.    Yes.  It's understood to be an abbreviation for the Bowl

3    Patrol.

4    Q.    And what is Bowl Patrol?

5    A.    It is a group of online individuals who basically espouse

6    hate and violence, and they affiliate with the white

7    supremacists' extremist ideology.

8    Q.    Now, did you learn about a relationship between Mr.

9    Cantwell and Bowl Patrol?

10   A.    Yes.

11   Q.    Can you describe that for us?

12   A.    It appears that they had a historical relationship going

13   back a few years ago.  They appeared to be colleagues,

14   like-minded individuals, and it seemed as though Mr. Cantwell

15   basically helped give them a platform where they were just kind

16   of getting started as a place to post some of their online

17   content.

18   Q.    What do you mean by "give them a platform"?

19   A.    A foothold.  Because he was an established individual, he

20   has websites, he has his podcasts and regular shows, they

21   really didn't have that platform.  So, if you're starting out,

22   if you can latch onto someone who's established, they can sort

23   of vouch for you, you can post onto their websites, maybe

24   feature on their shows, and so it's a way to help bring in new

25   people into those types of arenas.

1    Q.   And so, did Bowl Patrol create a podcast of sorts?

2    A.   Yes.

3    Q.   What was that called?

4    A.   The BowlCast.

5    Q.   And where was that initially hosted?

6    A.   On a few different places.  Radio Werewolf, as we've

7    mentioned already, and I know that Mr. Cantwell hosted some of

8    their content on his sites as well.

9    Q.   And was Mr. Cantwell ever involved in the BowlCast?

10    A.   Yes.  He was actually the special guest on the very first

11    episode.

12    Q.   The members of Bowl Patrol, do they use pseudonyms?

13    A.   Yes.

14    Q.   Why?

15    A.   Apparently to protect their true identities, to maintain

16    anonymity online so they -- to say things that they felt they

17    could say safely without being exposed.

18    Q.   Is that uncommon in this white nationalist community?

19    A.   No.  It's very common.

20    Q.   And at some point did that relationship sour?

21    A.   It appears so.

22    Q.   When did that relationship sour?

23    A.   Approximately late 2018, it appears.

24    Q.   Now, below that message there's a new date.  Did this

25    conversation continue into the following day?

1    A.    Yes.

2    Q.    And so, what was the next day?

3    A.    June 16th, 2019.

4    Q.    And let's look now at the last two messages on this page

5    sent by Mr. Cantwell.  Can you please read those for us?

6    A.    Get a fucking life or I will ruin the one you have.  Don't

7    bother anyone.  Then you won't have to worry about crossing me.

8    Q.    And before we continue did you learn what platform these

9    messages were sent on?

10   A.    Yes.  These were all sent on Telegram.

11   Q.    What's Telegram?

12   A.    It's an online instant messaging platform.  It has a lot

13   of other capabilities, like Voice over IP, file sharing, things

14   like that.  It's widely regarded because of the simplicity,

15   ease of use and the security features.  It has encryption,

16   secret chats, private channels, things like that.

17   Q.    What's a "channel"?

18   A.    So, as opposed to like we were saying, you can do direct

19   messages between two people.  A "channel" would be a place

20   where you can post content, almost like a page or a blog.

21   Typically, only a person with admin. rights to that channel

22   would be able to post there.  Subscribers could belong to that

23   channel; then they can follow the posts.  Corresponding with

24   that, they usually can set up a discussion group, and then in a

25   discussion group you can have sidebar conversations where

1   anyone who participates in that channel can participate in the

2   discussion groups.

3   Q.   So, on Telegram you can have sort of a channel or a blog,

4   a group chat, and you can also send private messages?

5   A.   Correct.

6   Q.   What are these?

7   A.   These are direct messages, so one-to-one exchange.

8   Q.   So, what's the sort of physical act that you need to do to

9   send a message?

10  A.   Generally speaking, you'd select the user that you intend

11  to message, you open a box, type -- think about what you want

12  to say, type your box, depending on your platform might spell

13  check, and then you push "Send" or "Transmit."

14  Q.   Now, let's turn to the next page of Government's Exhibit

15  100.  And, again, I'm going to mark next to some

16  communications, and after that can you confirm whether those

17  are the communications attributed to Mr. Cantwell?

18  A.   Yes.

19  Q.   Are those Mr. Cantwell's statements?

20  A.   Yes.

21  Q.   Okay.  Let's look at these four main messages sent by

22  Mr. Cantwell.  We can look at them all at once.  Agent Tongbua,

23  can you read the first message for us.

24  A.   You're a fucking liar.  You came here with your loser

25  fucking pals because you have the attention span of a nigger

1  and the morals of a kike, and because of that fact you're going

2  to lose everything you have.

3  Q.   And what time was that sent?

4  A.   I think that's 4:15 p.m.

5  Q.   And how long after sending that message did Mr. Cantwell

6  send the next message?

7  A.   In approximately a half an hour.

8  Q.   What's that next message?

9  A.   Next time I post that photo, the faces won't be blurred,

10  and then you're going to start getting unexpected visitors.

11  Q.   And the next two?

12  A.   And I don't care if it's you causing the trouble, you're

13  the one who's gonna suffer, 'cause you're the one who I can

14  get.  If you want to dox Vic, he's a better target, but if you

15  give me fake info, then your wife is going to have trouble

16  sleeping at night until she leaves you and takes your kids

17  away.

18  Q.   So, let's break this down a bit, and let's focus on the

19  last message first, If you want to dox Vic...  During the

20  course of this investigation did you learn who "Vic" referred

21  to?

22  A.   Yes.  That's a reference to an individual who goes by "Vic

23  Mackey," who is known to be the sort of ringleader of Bowl

24  Patrol.

25  Q.   Is Vic Mackey a true name or a pseudonym?

1  A.   A pseudonym.

2  Q.   And you mentioned before a bit about the Bowl Patrol's

3  relationship with Mr. Cantwell.  Did you learn about Vic

4  Mackey's relationship with Mr. Cantwell specifically?

5  A.   A little bit.

6  Q.   What did you learn?

7  A.   Again, Mr. Cantwell told us basically the same thing, that

8  Vic was known to be the ringleader.  At one point Mr. Cantwell

9  had given Vic admin. credentials to his website so that he

10  could post some of the Bowl Patrol content there.  Ultimately,

11  the two had a falling out, didn't see eye to eye, and there

12  appeared to be a lot of animosity between the two.

13  Q.   So, let's talk about that animosity and what caused that.

14  Did you learn about anything that Mr. Cantwell believed that

15  Vic had done to him?

16  A.   Yes.  He believed that Vic was the primary instigator, I

17  think is what he called him, of a harassment campaign against

18  him.

19  Q.   And did Mr. Cantwell believe that Vic Mackey had done

20  anything to his website?

21  A.   Yes.  We ultimately learned -- Mr. Cantwell had filed a

22  complaint with us, and in that he named Vic Mackey as having

23  posted unauthorized content that defaced his website.

24  Q.   Let's look at some of Mr. Cantwell's statements about Vic.

25          MS. KRASINSKI:  Can we please show the witness only

1    what's been marked for identification as Government's Exhibit

2    113.

3         THE CLERK:  Can the witness put the screen back on?

4         THE WITNESS:  Oh, I'm sorry.

5         THE CLERK:  Thank you.

6         MS. KRASINSKI:  If I'm the one doing the marking can

7    the witness leave the privacy screen on?

8         THE CLERK:  Yes, absolutely.

9    Q.   Agent Tongbua, what is that?

10   A.   This is an article that was posted to Mr. Cantwell's

11   website.

12   Q.   How do you know?

13   A.   I personally have viewed it there, and it's also of the

14   same format which I'm familiar with, which most of his articles

15   where he would list the title, list the date, list the author

16   and then the article.

17   Q.   And who is the listed author?

18   A.   It lists as Chris.

19   Q.   And did you determine that Mr. Cantwell authored this?

20   A.   Yes.

21   Q.   How do you know?

22   A.   So, again, he's the only admin. I know of on his site that

23   lists Chris as the author.  I'm not sure what else you're

24   asking.

25        MS. KRASINSKI:  Your Honor, I move to strike the

1   identification on Government's Exhibit 113.

2          THE COURT:  Any objection?

3          MR. LEVIN:  No objection.

4          THE COURT:  Without objection, it will be admitted.

5          (Government's Exhibit No. 113 received into evidence)

6          MS. KRASINSKI:  Permission to publish, your Honor?

7          THE COURT:  Yes.

8   Q.   Agent Tongbua, what is the title and date of this web

9   posting?

10  A.   Sorry for spam posts, February 11, 2019.

11  Q.   And can you read that for us, please.

12  A.   Yes.  Last night, a bunch of posts were made to this

13  website which may have seemed out of character.  That is

14  because they were made without authorization.  Back in 2018, I

15  gave an author's account to a guy who goes by the name of Vic

16  Mackey.  The site was not hacked.  All of your data is safe.  I

17  just hadn't deleted Vic's account on the site because he never

18  really contributed much content in the first place, and it

19  slipped my mind.  Eventually these losers will overdose on

20  drugs or find a new man crush.  Until then, I ask for your

21  patience as I deal with what amounts to a spam problem.

22  Q.   He called this a "spam problem"?

23  A.   Correct.

24  Q.   Any references to Cheddar Mane in this posting?

25  A.   No.

1    Q.    Any references to Cheddy Blac?

2    A.    No.

3    Q.    Any references to Mr. Lambert?

4    A.    No.

5        MS. KRASINSKI:   Let's look at another one of

6    Mr. Cantwell's statements about Vic Mackey.   Can we display for

7    the witness only what has been marked for identification as

8    Government's Exhibit 112.

9    Q.    Agent Tongbua, do you recognize that?

10    A.    Yes.

11    Q.    What is it?

12    A.    This is a post by Mr. Cantwell via his Gab account.

13    Q.    How do you know?

14    A.    Again, it's the same format known for Mr. Cantwell's Gab

15    posts.   You have the name there, Christopher Cantwell,

16    @Cantwell, and this also corresponds to the previous article

17    and the previous FBI complaint he made to us about his website.

18        MS. KRASINSKI:   Your Honor, I move to strike the

19    identification on Government's Exhibit 112.

20        THE COURT:   Any objection?

21        MR. LEVIN:   No objection.

22        THE COURT:   Without objection, it will be admitted.

23        MS. KRASINSKI:   Permission to publish, your Honor?

24        THE COURT:   Yes.

25      (Government's Exhibit No. 112 received into evidence)

1  Q.    Agent Tongbua, can you read what Mr. Cantwell wrote on his

2  Gab account?

3  A.    Today I submitted a criminal complaint to the FBI naming

4  Vic Mackey and Mosin-Nagant for defacing my website last night.

5  Q.    Any references to Cheddarman?

6  A.    No.

7  Q.    To Cheddy Blac?

8  A.    No.

9  Q.    To Ben Lambert?

10 A.    No.

11 Q.    During the course of the investigation did you determine

12 whether Mr. Cantwell had filed a complaint with the FBI

13 regarding vandalism to his website?

14 A.    Yes, he did.

15 Q.    When was that report made?

16 A.    The report was made on February 11, 2019.

17 Q.    Did you learn what happened to that complaint, how it was

18 filed?

19 A.    I did.

20 Q.    Can you describe that to us, please?

21 A.    So, it came in through our Internet Crimes Complaint

22 Center, they call it the IC3, which means he basically

23 submitted it online as opposed to calling, like, an 800 number.

24 We did not receive that here in New Hampshire.  I actually did

25 not see that until Mr. Cantwell emailed that to us in July of

1   2019.

2   Q.   Have you since reviewed that complaint?

3   A.   Yes.

4   Q.   Did Mr. Cantwell complain that individuals had vandalized

5   his website?

6   A.   He did.

7   Q.   Did he name anyone?

8   A.   He did.

9   Q.   Who did he name?

10  A.   He specified the same two individuals here, Vic Mackey and

11  Mosin-Nagant.

12  Q.   That complaint he sent to the FBI, did it include any

13  mention of Cheddar Mane?

14  A.   No.

15  Q.   Any mention of Cheddy Blac?

16  A.   No.

17  Q.   Any mention of Ben Lambert?

18  A.   No.

19  Q.   And you said that was made in February of 2019?

20  A.   Correct.

21        MS. KRASINSKI:  So, let's take a look at one of Mr.

22  Cantwell's statements shortly after that.  I want to show to

23  the witness only what has been marked for identification as

24  Government's Exhibit 303.

25  Q.   Do you recognize that?

1    A.    Yes.

2    Q.    What is it?

3    A.    This is a Telegram chat featuring Mr. Cantwell and a

4    couple of other --

5          MR. LEVIN:  I'm going to object to this on relevance,

6    your Honor.

7          THE COURT:  This has been for identification only at

8    this point.

9          So, lay the foundation without getting into the

10   content, and then I'll hear the objection.

11   A.    It's a conversation on Telegram with Mr. Cantwell and a

12   couple of others regarding this dispute with Bowl Patrol.

13   Q.    Where did this come from?

14   A.    This was located on one of Mr. Cantwell's devices.

15   Q.    What device was it located on?

16   A.    I'm drawing a blank off the top of my head.  It was either

17   a desktop computer or an external hard drive recovered in his

18   residence.

19   Q.    But in either regard it came from one of Mr. Cantwell's

20   devices?

21   A.    Correct.

22   Q.    And without getting into the content of the statements,

23   how do you attribute the statements, some of these statements,

24   to Christopher Cantwell?

25   A.    Again, it was located on one of his devices.  It lists the

1   user name, "Christopher Cantwell," it lists his known icon

2   there, and the subject matter is consistent with other

3   conversations on this matter.

4           MS. KRASINSKI:  Your Honor, I would move to admit

5   Government's Exhibit 303.

6           THE COURT:  Do you have a relevance objection?

7           MR. WOLPIN:  Yes, your Honor.  It's undated.  We don't

8   know who Kaiser Peezy is, we don't know who the other people

9   are and what they're referring to.

10          THE COURT:  All right.  I am going to instruct you to

11  go on to a different subject.  We can revisit this at the next

12  break, if you remind me to do that.

13          MS. KRASINSKI:  Yes, your Honor.

14  Q.    I'm going to show you what's been marked, the witness

15  only, what's been marked as Government's Exhibit 304.  Do you

16  recognize that?

17  A.    Yes.

18  Q.    What is it?

19  A.    It is another Gab post by Mr. Cantwell.

20  Q.    How do you attribute that to Mr. Cantwell?

21  A.    So, again, the same format, same user icon, same name.  It

22  also contains the blue checkmark verification there.

23  Q.    What is the blue checkmark verification?

24  A.    As you see, well, it's also labeled a PRO account, and

25  those PRO accounts come with a variety of enhanced features,

1    one of which is user verification.

2    Q.    And is this from the Gab platform?

3    A.    Yes.

4    Q.    And where was this found?

5    A.    Again, on one of Mr. Cantwell's devices.

6    Q.    Agent Tongbua, would looking at a chart of images found on

7    Mr. Cantwell's electronic devices that you prepared help

8    refresh your recollection --

9    A.    Yes.

10   Q.    -- as to where this came from?

11         MS. KRASINSKI:  If we could please display for the

12   witness only what's been marked for identification as

13   Government's Exhibit 300.

14   Q.    Agent Tongbua, please take a look at that, and when you're

15   ready we'll switch back to Exhibit 304.

16   A.    (Witness complied).  Okay.

17   Q.    Does that refresh your recollection as to where

18   Government's Exhibit 304, what device that came from?

19   A.    Yes.

20         MS. KRASINSKI:  All right.  If we could please, again,

21   display for the witness only Government's Exhibit 304.

22   Q.    So, where did this come from?

23   A.    This was found both on Mr. Cantwell's phone as well as an

24   external hard drive that was found in a backpack in his

25   bedroom.

1    Q.   And in reviewing the data associated with this on

2    Mr. Cantwell's phone, were you able to identify a creation

3    date?

4    A.   Yes.

5    Q.   And what was that?

6    A.   It was listed as March 17th, 2019.

7         MS. KRASINSKI:  Your Honor, I move to admit

8    Government's Exhibit 304.

9         THE COURT:  Any objection?

10        MR. LEVIN:  Objection.  Relevance.  Another undated

11   post.  The screenshot may have been created on March 17th, but

12   the post itself is undated.

13        THE COURT:  All right.  The objection is overruled.

14   It may be admitted.

15        (Government's Exhibit No. 304 received into evidence)

16        MS. KRASINSKI:  Permission to publish, your Honor?

17        THE COURT:  Yes.

18   Q.   And let's enlarge the one posting.  Agent Tongbua, can you

19   read Mr. Cantwell's Gab statement here?

20   A.   I have dox on several of these Bowl Patrol idiots, and I'm

21   gonna start dropping them until they rat out Vic.

22   Q.   Now, we've seen the term "dox" now twice, once in

23   Government's Exhibit 100, and we've seen it now here.  Can you

24   tell us what that term means?

25   A.   "Doxing" is an online practice of researching and publicly

1  releasing an individual's private information, typically with

2  malicious intent.

3  Q.   And during your investigation did you determine whether or

4  not Mr. Cantwell has made any public statements about doxing?

5  A.   Yes.

6  Q.   Showing you, the witness now only, what has been marked as

7  Government's Exhibit 101, can you please take a look at that.

8  Agent Tongbua, do you recognize it?

9  A.   Yes.

10  Q.   What is it?

11  A.   It is an article authored by Mr. Cantwell to his website

12  regarding doxing and anonymity.

13  Q.   What's the date of the article?

14  A.   April 8th, 2018.

15  Q.   And that's before the exchange that took place between

16  Mr. Cantwell and Mr. Lambert?

17  A.   Correct.

18  Q.   And how do you attribute this to Mr. Cantwell?

19  A.   Well, it's listed as, you know, ChristopherCantwell.com.

20  I personally viewed it on that website.  It's in the same

21  format, with Christopher Cantwell at the top, Radical Agenda,

22  lists the article title, date and author.

23       MS. KRASINSKI:  Your Honor, I move to admit

24  Government's Exhibit 101.

25       THE COURT:  Any objection?

1    MR. LEVIN:  Objection.  Relevance.  This is from a

2  year before the incident.  It has nothing to do with the

3  incident, nothing to do with the facts of this case.

4    THE COURT:  Overruled.  It may be admitted.

5    (Government's Exhibit No. 101 received into evidence)

6    MS. KRASINSKI:  Now, permission to publish, your

7  Honor?

8    THE COURT:  Yes.

9  Q.   Let's go to the second page of this and the fourth

10  paragraph that begins with, In this sense... Agent Tongbua,

11  can you read Mr. Cantwell's statement about doxing here?

12  A.   In this sense, it helps to think of doxing as a form of

13  violence.  It certainly carries the potential for violence to

14  result, it is typically seen as a last resort, and, most

15  importantly, real men understand that it is sometimes

16  necessary.

17  Q.   And can we turn to page 8 of Mr. Cantwell's article on

18  doxing.  And there's a bold sentence in the middle of that

19  page.  Agent Tongbua, can you read that for us?

20  A.   Doxing is serious business.

21  Q.   Now, let's go back to Government's Exhibit 100, the

22  exchange between Mr. Cantwell and Mr. Lambert, and we were on

23  page 2 of that exchange.  Mr. Cantwell's second message on this

24  page that begins with, Next time, Next time I post that photo,

25  the faces won't be blurred, is public posting of photos, is

1  that a form of doxing?

2  A.   Absolutely.

3  Q.   Now, Mr. Cantwell's next statement in that includes,  And

4  I don't care if it's you causing the trouble.  You're the one

5  who's gonna suffer 'cause you're the one who I can get.  During

6  the course of your investigation did you understand what

7  "causing the trouble meant," the trouble that Mr. Cantwell was

8  referring to?

9  A.   I believe so.  I believe it's the what he considered

10  harassment that he thought was basically orchestrated by Vic

11  Mackey.

12  Q.   Now, let's move on to the next page in this exchange, and,

13  again, I'll just mark a number of messages here and ask you to

14  confirm are those the statements made by Mr. Cantwell?

15  A.   Yes.

16  Q.   And what was Mr. Cantwell's first message on this page of

17  the exchange?

18  A.   Fuck around and I'll remind you the hard way.

19  Q.   And let's look at Mr. Cantwell's next three messages.

20  Agent Tongbua, can you read that first message for us?

21  A.   As a matter of fact, I don't.  So if you don't want me to

22  come and fuck your wife in front of your kids, then you should

23  make yourself scarce.

24  Q.   What time did Mr. Cantwell send that message?

25  A.   6:41 p.m.

1   Q.   Did Mr. Lambert respond directly to that message?

2   A.   No.

3   Q.   How long between when Mr. Cantwell sent that message and

4   when Mr. Cantwell sent the next message?

5   A.   Approximately a half an hour.

6   Q.   And what was the next message that Mr. Cantwell sent?

7   A.   Give me Vic, it's your only out.

8   Q.   Did Mr. Lambert respond to that message?

9   A.   No.

10   Q.   How long after Mr. Cantwell said, Give me Vic, it's your

11   only out, did Mr. Cantwell send the next message?

12   A.   Approximately another hour.

13   Q.   And what was Mr. Cantwell's message then?

14   A.   I guess I'm going to have to prove my seriousness.

15   Q.   Let's move to the next page of Government's Exhibit 100,

16   and is this a continuation of what was on the previous page?

17   A.   Yes.

18   Q.   And, again, I will -- I've marked a number of statements.

19   Are those the statements that Mr. Cantwell made?

20   A.   Yes.

21   Q.   The image that you see here, the picture, what is that?

22   A.   That is a picture of the Lambert family minus Mr. Lambert.

23   Q.   And if we go back to the messages, what is the message

24   that Mr. Cantwell writes just after sending the image of Mrs.

25   Lambert and her children?

1    A.    More where that came from.

2    Q.    More where that came from.  During the course of the

3    investigation did you learn whether Mr. Cantwell did, in fact,

4    have more pictures of Mr. Lambert or pictures of his family?

5    A.    He did.

6    Q.    How did you learn that?

7    A.    They were discovered on his digital devices.

8    Q.    Showing the witness only what has been marked for

9    identification purposes as Government's Exhibit 301, Agent

10   Tongbua, do you recognize that?

11   A.    Yes.

12   Q.    What is it?

13   A.    That is a selfie or a digital photo of three individuals

14   it looks to be at the Lambert residence.

15   Q.    And so, is Mr. Lambert in this image?

16   A.    Yes.

17   Q.    And where was this image found?

18   A.    On Mr. Cantwell's devices.

19         MS. KRASINSKI:  Your Honor, I move to admit

20   Government's Exhibit 301.

21         THE COURT:  Any objection?

22         MR. LEVIN:  No objection.

23         THE COURT:  Without objection, it will be admitted.

24   (Government's Exhibit No. 301 received into evidence)

25         MS. KRASINSKI:  Permission to publish, your Honor.

1          THE COURT:  Yes.

2     Q.    Agent Tongbua, can you describe to us who's in the

3     picture?

4     A.    As you look at the picture, on the far left is Ben

5     Lambert, a/k/a Cheddar Mane, Cheddy Blac; in the middle is an

6     individual named Katelen Fry, who goes by the online pseudonym

7     of Peach; and on the right is Thomas Gibson, who goes by

8     Hardmous or DJ Hardmous.

9     Q.    And did you learn who Ms. Fry was in relation to

10    Mr. Cantwell?

11    A.    We did.

12    Q.    And tell us about that.

13    A.    During an interview with Mr. Cantwell, he told us that she

14    was a former girlfriend of his, and at this time she had gone

15    to visit Mr. Lambert at his residence.

16    Q.    Do you know approximately when this visit took place?

17    A.    Yes.  It was around Thanksgiving 2018.  I believe this

18    photo is actually dated November 30th.

19    Q.    And I'd like to show the witness only now what's been

20    marked for identification purposes as Government's Exhibit 302.

21    Agent Tongbua, do you recognize that?

22    A.    I do.

23    Q.    What is it?

24    A.    Again, it's another digital photo or selfie of Mr.

25    Lambert.

1    Q.    And where was this image found?

2    A.    Again, on the same digital devices, Mr. Cantwell's phone

3    and the backup hard drive.  I believe it was dated December

4    1st, 2018.

5          MS. KRASINSKI:  Your Honor, I move to admit

6    Government's Exhibit 302.

7          MR. LEVIN:  No objection.

8          THE COURT:  It will be admitted, and it may be

9    published.

10          MS. KRASINSKI:  Thank you, your Honor.

11          (Government's Exhibit No. 302 received into evidence)

12    Q.    And, again, Agent Tongbua, who is in this picture?

13    A.    That is Mr. Benjamin Lambert.

14    Q.    So, in addition to the two images we've just looked at of

15    Mr. Lambert that were found on Mr. Cantwell's devices, did you

16    learn whether Mr. Cantwell had other images of Mrs. Lambert?

17    A.    He did.

18    Q.    And did you learn what he did with those images?

19    A.    He retained them.  Ultimately, he did end up sending those

20    to us.  On at least one it shows the family in the kitchen of

21    the residence.

22    Q.    Did he ultimately use them to dox Mr. Lambert?

23    A.    Yes.

24          MS. KRASINSKI:  I'd like to show the witness only what

25    has been marked for identification purposes as Government's

1    Exhibit 102.

2    Q.    Agent Tongbua, do you recognize that?

3    A.    Yes.

4    Q.    What is it?

5    A.    It is a post to the, what do you call it, Radical Agenda

6    Telegram channel discussion group in which Mr. Cantwell posted

7    unredacted photos of the Lamberts.  This is the morning

8    following the Telegram message exchange.

9    Q.    The morning following the Telegram message exchange.  So,

10   would that be June 17th, 2019?

11   A.    Yes, early in the morning on the 17th.

12   Q.    And how do you attribute this to Mr. Cantwell?

13   A.    Again, this is his Radical Agenda Telegram channel.  You

14   have his same icon, his same user name, and this is the channel

15   of which he was known to be administrator.

16   Q.    And did he also provide you with copies of the images that

17   you see here?

18   A.    Yes, he did.

19         MS. KRASINSKI:  Your Honor, I move to admit

20   Government's Exhibit 102.

21         THE COURT:  Any objection?

22         MR. LEVIN:  No objection.

23         THE COURT:  It will be admitted and may be displayed.

24         MS. KRASINSKI:  Thank you, your Honor.

25       (Government's Exhibit No. 102 received into evidence)

1    Q.   Now, I want to focus first on the top.  You've mentioned

2    that this was the Radical Agenda Telegram channel.  What is

3    Radical Agenda?

4    A.   That is both a website and a podcast that is hosted by

5    Mr. Cantwell.

6    Q.   Now, looking at what's next to Radical Agenda, do you see

7    a number there?

8    A.   Yes.

9    Q.   What is that?

10   A.   It says "293 ME" dot, dot, dot.  It's generally a

11   reference to 293 members.

12   Q.   So, it's 293 members of that group?

13   A.   Yes, at that moment in time.

14   Q.   And what does Mr. Cantwell say before posting these

15   images?

16   A.   Here's the redacted parts.

17   Q.   Now, we've discussed this first photo.  Is that the same

18   photo of Mrs. Lambert that Mr. Cantwell had sent to Mr. Lambert

19   in their private exchange?

20   A.   Yes.

21   Q.   And so, what's the next image?

22   A.   That's the photo I was referring to previously again of

23   Mrs. Lambert with her children in their own kitchen.

24   Q.   And let's go to the second page of Government's Exhibit

25   102.  And is there a third image that Mr. Cantwell posted?

1    A.    Yes.

2    Q.    And who is depicted in that image?

3    A.    That's Ben Lambert.

4    Q.    And I want to briefly look at the bottom statement of

5    Mr. Cantwell that begins with, Like I said...  Can you please

6    read that to us.

7    A.    Like I said, if I could just drive down to Twin Creek Road

8    in Winfield, Missouri and shoot this idiot, I would.  But I

9    can't, so I'll let the law do it.

10   Q.    And, again, what is Twin Creek Road in Winfield, Missouri?

11   A.    That's the street on which the Lamberts live.

12   Q.    I'd like to go back now to Government's Exhibit 100.  We

13   were on page 4 of that exhibit.  So, we just discussed more

14   where that came from.  What's Mr. Cantwell's next post --

15   message.  Excuse me.

16   A.    I bet one of my incel listeners would love to give her

17   another baby.

18   Q.    Are you familiar with the term "incel"?

19   A.    I am.

20   Q.    What does it mean?

21   A.    It's an online slang term used to -- it's short for

22   "involuntary celibate."  It's a subculture of individuals,

23   typically male, who can't find romantic or sexual success, even

24   though they desire it, and they're often associated with

25   repression, anger, aggression.  They typically resent the

objects of their affection, and they promote violence towards

those who find romantic or sexual success.

Q.   You've reviewed -- you've looked at Mr. Cantwell's

website?

A.   Yes.

Q.   Before the date that he sent these messages in June of

2019 had Mr. Cantwell ever publicly on his website discussed a

link between those who believe the incel ideology and violence?

A.   Yes.  He actually posted an article, I believe it was

around April 2018, titled "Saints and Sinners," in which he

discusses incels.

Q.   And did he mention that there is a real world thing to

violence?

A.   Yes.  He names a handful of individuals who have all

committed heinous acts and who are self-proclaimed incels.

Q.   Back to this post, I'd bet one of my incel listeners would

love to give her another baby, what does "listeners" refer to?

A.   So, again, referring to his followers, people who

subscribe to his channels, listen to his shows.

Q.   And what is Mr. Cantwell's last statement on this page?

A.   You think the FBI would take issue with an LSD user owning

guns around kids?

Q.   Let's go to page 5 of Government's Exhibit 100.  And,

again, I will -- I've marked five messages, four messages and

one image.  Were those messages and image sent by Mr. Cantwell?

1    A.    Yes.

2    Q.    And we've seen that image before.  What is that?

3    A.    Again, that's Mr. Lambert.

4    Q.    And what does Mr. Cantwell say after he sends the image of

5    Mr. Lambert?

6    A.    Give me Vic.

7    Q.    And what are the remainder of Mr. Cantwell's messages on

8    this page?

9    A.    LOL.  Okay.  I guess you're not going to give me what I

10   want.  Fine.  Good luck.

11   Q.    Let's move on to page 6 of Government's Exhibit 100.  Are

12   all but one of these messages sent by Mr. Cantwell?

13   A.    Yes.

14   Q.    The only message sent by Mr. Lambert is, I don't even have

15   his dox?

16   A.    Correct.

17   Q.    So, let's go through Mr. Cantwell's statements on this

18   page of Government's Exhibit 100.  What's Mr. Cantwell's first

19   message?

20   A.    Guess you're fucked then.

21   Q.    Does Mr. Lambert respond directly to that message?

22   A.    No.

23   Q.    How long between after writing that does Mr. Cantwell send

24   his next message?

25   A.    A little over half an hour.

1   Q.   And what's that next message?

2   A.   All right.  Since you're obviously not understanding the

3   severity of this, I'll do you a favor.

4   Q.   What does Mr. Cantwell write next?

5   A.   On Tuesday I'm going to send every episode of BowlCast

6   along with your identifying information to whatever the local

7   equivalent of CPS is in your jurisdiction.

8   Q.   Now, did you learn whether Mr. Cantwell had, in fact,

9   called Child Protective Services?

10  A.   He did.

11  Q.   And this message says, I'm going to send every episode of

12  the BowlCast...  Did you determine whether or not Mr. Cantwell

13  did have copies of the BowlCast?

14  A.   He did.

15       MS. KRASINSKI:  I'd like to show the witness only what

16  has been marked for identification purposes as Government's

17  Exhibit 400.

18  Q.   What is this?

19  A.   So, this is a screenshot I took from one of our digital

20  analysis software programs that lists the file names of the

21  eight BowlCast episodes as well as created, accessed, modified

22  date, times for them.

23  Q.   And it's a screenshot you took from where?

24  A.   From our digital review network.

25  Q.   And what were you reviewing?

1    A.    Mr. Cantwell's digital devices.

2    Q.    So, this is a screenshot from the content of one of

3    Mr. Cantwell's electronic devices?

4    A.    Correct.

5    Q.    And does it show a complete set of the BowlCast as you

6    knew it to have existed at that point in time?

7    A.    Yes.

8          MS. KRASINSKI:  Your Honor, I move to admit

9    Government's Exhibit 400.

10         THE COURT:  Any objection?

11         MR. LEVIN:  No objection.

12         THE COURT:  Without objection, it will be admitted and

13   can be displayed.

14         MS. KRASINSKI:  Thank you, your Honor.

15        (Government's Exhibit No. 400 received into evidence)

16   Q.    Now, if we look at the created date for most of these,

17   Episodes 2 through 6, what is the created date of BowlCast

18   Episodes 2 through 6?

19   A.    On June 17th, 2019.

20   Q.    And did that date have any relationship to this

21   investigation?

22   A.    Yes.  That's the same date that Mr. Cantwell called CPS in

23   Missouri.

24   Q.    Now, only one of these episodes, BowlCast Episode 1, has

25   any type of date associated with it that predates June 17th,

1   2019.  What's the modified date of BowlCast 1?

2   A.    April 5th, 2018.

3   Q.    Did you find any evidence on any of Mr. Cantwell's devices

4   that he had any of these BowlCast episodes other than BowlCast

5   Episode 1 before June 17th, 2019?

6   A.    No.

7   Q.    And BowlCast Episode 1, is that the episode that

8   Mr. Cantwell, himself, contributed to?

9   A.    Yes, it was.

10  Q.    And other than the statements he made to Mr. Lambert in

11  the private message about calling CPS and the CPS call itself,

12  Mr. Cantwell made additional public statements about calling

13  Child Protective Services.  Is that fair?

14  A.    Yes.

15  Q.    Let's go back to Government's Exhibit 102, and let's go to

16  the second page of that exhibit.  Agent Tongbua, can you read

17  Mr. Cantwell's statement right after he posted the picture of

18  Mr. Lambert.

19  A.    That's Cheddar Mane a/k/a Cheddy Blac, and tomorrow

20  morning I'm calling CPS to give them every episode of BowlCast

21  and inform them that this acid-dropping fake Nazi is

22  endangering those children with his behavior.

23  Q.    Now, let's look at the third page of Government's Exhibit

24  102, and let's call out Mr. Cantwell's next statements.  Agent

25  Tongbua, can you read that for us, please.

1   A.   I think when CPS hears that fucking podcast he hosts,

2   they'll pay his fucking criminal ass a visit.  He's had ample

3   warning, so I'm sure he'll get rid of the drugs before then and

4   come up with suitable lies.

5   Q.   And if we could call out Mr. Cantwell's final statement,

6   can you please read that for us, Agent Tongbua.

7   A.   I hope every CPS worker in Missouri is a Jew or a nigger,

8   and I hope they break every rule and destroy this scumbag's

9   life.

10   Q.   Now, FBI obtained a record of the call that Mr. Cantwell

11   did make to the Missouri Child and Protective Services,

12   correct?

13   A.   Correct.

14   Q.   During the course of the investigation did you find any

15   other copies of that recorded call?

16   A.   Yes.

17   Q.   Where?

18   A.   I also found a copy on one of his devices.

19   Q.   So, Mr. Cantwell recorded a copy of that conversation?

20   A.   Correct.

21   Q.   Let's go back to page 6 of Government's Exhibit 100.  So,

22   we've just talked a bit about the message that Mr. Cantwell

23   sent at 9:18, the first message he sent at 9:18 p.m.  Agent

24   Tongbua, can you take us through the rest of those messages,

25   please.

A.   By Tuesday you should be able to talk to your wife and
kids and get them to all have their stories straight, get
anything incriminating out of the house.  But I'm pretty sure
once that visit comes, you'll understand that this is serious.
If that doesn't work, I'll escalate until I get what I want.
Tell Vic that if he gives himself up, he can save your family.
He won't do it, but at least then you'll know certain that you
chose the wrong side.

Q.   Let's look at the next page of the messages between
Mr. Cantwell and Mr. Lambert.  I've placed an X next to four
messages that all appear in green boxes.  Are those Mr.
Cantwell's messages?

A.   Yes.

Q.   Agent Tongbua, can you take us through those messages,
please.

A.   Okay, you got it.  Tomorrow then, no sense in waiting
until Tuesday.  CPS will visit you soon, I'm not talking about
listeners.  Good luck.

Q.   And let's look at the final page of this exchange.  I'm
attempting to clear my earlier -- there we go.  Are there two
messages sent by Mr. Cantwell on this page?

A.   Yes.

Q.   Both appear in green boxes?

A.   Yes.

Q.   And what's Mr. Cantwell's first message on this page?

A.   Dumb niggers like you never are, until it's too late.

Have a goodnight.

Q.   And after that Mr. Lambert responds with an offensive

image?

A.   Yes.

Q.   Now, let's talk briefly about where Mr. Cantwell was when

he sent these messages.  Was there a pole camera installed

outside of Mr. Cantwell's apartment?

A.   There was.

Q.   And, again, where was Mr. Cantwell's apartment?

A.   In Keene, New Hampshire.

Q.   What is a pole camera?

A.   It's pretty much what it sounds like.  It's a stationary

camera placed in an area that's generally to take advantage of

a public vantage point, so it's not aimed at anything private.

It's not aimed to look into a person's residence, for example.

It basically would have the same vantage point as an individual

citizen or a law enforcement officer either walking down the

street or standing on the sidewalk would have.

Q.   And was it in operation between June 15th and June 17th of

2019?

A.   Yes, it was.

Q.   And why was there a pole camera there?

A.   Because there was already an ongoing investigation

unrelated to this matter involving Mr. Cantwell.

1    Q.   So, in preparation for your testimony today did you review

2    the data that the pole camera captured between June 15th and

3    June 17th of 2019?

4    A.   I did.

5    Q.   And did you create screenshots from that footage?

6    A.   I did.

7    Q.   Showing the witness only what has been marked for

8    identification purposes as Government's Exhibit 600, Agent

9    Tongbua, do you recognize that?

10   A.   I do.

11   Q.   What is it?

12   A.   That's Mr. Cantwell's known vehicle.  It's a black 2013

13   Ford Taurus.

14   Q.   Is this a screenshot you took from the pole camera footage

15   from outside of his apartment?

16   A.   Yes.

17   Q.   And is this from around the time of this exchange?

18   A.   Yes.  It's dated June 14th.

19        MS. KRASINSKI:  Your Honor, I move to admit

20   Government's Exhibit 600.

21        MR. LEVIN:  No objection.

22        THE COURT:  It will be admitted, and it may be

23   displayed.

24        (Government's Exhibit No. 600 received into evidence)

25   Q.   Agent Tongbua, can you take a minute to orient us here,

1    first.  What do we see?

2    A.    So, the bottom of the screen you have, again,

3    Mr. Cantwell's known vehicle.  This would be the driveway to

4    the residence.  Generally speaking, that's probably eastbound,

5    but the driveway goes up.  There's a parking area, which you

6    can sort of see behind the trees, and the actual residential

7    building would be on the side where the trees are just out of

8    view.

9    Q.    So, we can't see the actual apartment?

10   A.    Correct.

11   Q.    And the area that I'm circling right here, is that what

12   you were mentioning as the parking area?

13   A.    Yes.

14   Q.    Now, what was the date and time of this image?

15   A.    It's June 14th, 2019, approximately 1:42 p.m.

16   Q.    And you said that this is Mr. Cantwell's known vehicle.

17   What vehicle is it?

18   A.    Again, it's a black Ford Taurus.  It's the vehicle that's

19   registered to him with the New Hampshire Department of Motor

20   Vehicles.  It's the only vehicle we've ever seen him drive,

21   seen it frequently at the residence.

22   Q.    Have you ever seen anyone else drive that vehicle?

23   A.    No.

24   Q.    Let's turn -- actually, if you could look at -- I'll show

25   the witness only what's been marked as Government's Exhibit

1   601, and then Government's Exhibit 603, Government's Exhibit

2   605, and Government's Exhibit 608.

3           Agent Tongbua, are all of those images that you just

4   looked at, Government's Exhibit 601, 603, 605 and 608,

5   screenshots of the pole camera footage that you took?

6   A.   Yes.

7   Q.   And are all of those from the pole camera that was outside

8   of Mr. Cantwell's residence --

9   A.   Yes.

10  Q.   -- within this June 15th - June 17th, 2019 time frame?

11  A.   Yes.

12          MS. KRASINSKI:  Your Honor, I move to admit

13  Government's exhibits 601, 603, 605 and 608.

14          MR. LEVIN:  No objection.

15          THE COURT:  They will be admitted and may be

16  displayed.

17  (Government's Exhibit Nos. 601, 603, 605 and 608 received into

18  evidence)

19  Q.   So, we'll just -- we'll work with -- we're looking at 601.

20  What's the date and time of this?

21  A.   June 15th, 2019, just after noon.

22  Q.   And what do you see?

23  A.   You can make out the back rear right tire of Mr.

24  Cantwell's vehicle, and that's in his usual parking spot, the

25  very first spot.

1   Q.   So, let's turn quickly to Government's Exhibit 603, and

2   looking at Government's Exhibit 603 what do you see here?

3   A.   Again, similar picture, same vehicle, but this is on the

4   evening of June 16th, 2019, which was that Sunday, Father's

5   Day, and this was approximately 5:19 p.m.

6   Q.   And Government's Exhibit 605?

7   A.   Again, similar, except for this one the vehicle is

8   arriving, and this is on Monday, June 17th, 2019 at

9   approximately or just after 5:00 a.m.

10  Q.   And, finally, Government's Exhibit 608.

11  A.   Same again.  Vehicle departing on Monday, June 17th, 2019

12  approximately 1:17 p.m.

13  Q.   So, is it fair to say between June 14th, 2019 and June

14  17th, 2019 the pole camera captured Mr. Cantwell's vehicle

15  coming and going from his residence in Keene, New Hampshire?

16  A.   Yes.

17  Q.   All right.  Let's switch gears.  In September of 2019 did

18  you interview Mr. Cantwell?

19  A.   Yes, I did.

20  Q.   And where did that take place?

21  A.   At the Keene, New Hampshire Police Department.

22  Q.   Who was there?

23  A.   Myself, Task Force Officer Kevin LeBlanc and Sergeant Joel

24  Chidester of Keene PD.

25  Q.   And how was this interview arranged?

1  A.    In coordination with Mr. Cantwell, both via email and both

2  through Sergeant Chidester, who also had a dialogue with Mr.

3  Cantwell, that was the location that he was most comfortable

4  with.  He didn't want to come to our office.  And we worked

5  around his schedule.  At that time he was traveling back and

6  forth frequently between New Hampshire and Maryland, and that

7  was the date we worked out with him.

8  Q.    Was the interview recorded?

9  A.    No, it was not.

10  Q.    Why not?

11  A.    So, both sides expressed interest in recording it.  We had

12  a brief conversation beforehand.  The room we were in had

13  recording capabilities.  Mr. Cantwell requested if he could get

14  a copy of it that day.  We told him, because it was an ongoing

15  investigation, it might be a little bit of time before he could

16  get a copy.  He wasn't really comfortable with that.  He

17  requested to record with his own equipment.  We weren't

18  comfortable with that.  So, the mutual agreement was that we

19  would not record the interview.

20  Q.    Now, when you met with Mr. Cantwell in September of 2019

21  did you provide him sort of any guidelines before you spoke?

22  A.    Again, it was a brief conversation, but we reiterated that

23  he was there voluntarily and we were there to take his

24  complaint and receive information from him, he was not being

25  held against his will, he was not under arrest, therefore, he

was not read his rights, but he was free to talk as much or as little as he wanted, and he could terminate the conversation any time he wanted and not talk about anything he didn't want to talk about.

Q.   Now, during this interview did Mr. Cantwell talk about Bowl Patrol?

A.   He did.

Q.   What did he say about their relationship?

A.   Similar to what I've already explained.  They had a, I wouldn't call it "partnership," but they were associates at one point before it went bad, and then now they had an ongoing dispute.

Q.   Did he make any statements about Vic Mackey?

A.   He did.

Q.   What did Mr. Cantwell say about Vic Mackey?

A.   At that time he did not know Vic Mackey's true identity. He believed him to be the ringleader of Bowl Patrol.  He thought he was the main orchestrater, basically, of a harassment campaign against him.  He said at one point he had given Vic admin. credentials to his website.  He'd never received any direct threats from Vic, even though they didn't get along.  They had no ongoing communications, and Mr. Cantwell had not retained copies of any of their previous communications.

Q.   And at this point did Mr. Cantwell talk about Cheddar Mane

1  or Cheddy Blac?

2  A.   He did.

3  Q.   And what did Mr. Cantwell say about Cheddar Mane or Cheddy

4  Blac?

5  A.   So, again, at that time he did not know his true identity.

6  He admitted to us that previously he had asked Cheddar for

7  Vic's info and threatened to dox him and call CPS if he didn't

8  provide it.  He expressed that he later learned from others

9  that that was extortion.  He relayed to us that the photos he

10 used in that exchange were actually provided by Katelen Fry,

11 who we previously discussed.  And, similarly, he said he had

12 not, you know, received any direct threats from Cheddar, did

13 not have any ongoing communications with Cheddar, and he denied

14 having records of any of their previous communications.

15 Q.   How long did that interview take?

16 A.   Approximately three hours.

17 Q.   In how much of that interview did Mr. Cantwell discuss

18 Cheddar Mane or Cheddy Blac?

19 A.   It was pretty brief, probably five or ten minutes at the

20 most.  We talked about a wide variety of individuals during

21 that time.

22 Q.   Now, you've mentioned that Mr. Cantwell said he did not

23 retain any records of their communications.

24 A.   Correct.

25 Q.   Let's take a look at some of what you found on Mr.

1    Cantwell's phone.

2         MS. KRASINSKI:  Can we please show the witness what

3    has been identified as Government's Exhibit 200, and we'll take

4    a minute and scroll through that so Agent Tongbua has a chance

5    to look at it.

6    Q.   Do you recognize Government's Exhibit 200?

7    A.   I do.

8    Q.   What is it?

9    A.   It's essentially like a spreadsheet.  It's basically an

10   excerpt from a report generated from our forensic analysis

11   software, and in the report it's showing digital images, so

12   files obtained from Mr. Cantwell's cell phone.

13   Q.   And how was this report generated?

14   A.   Through the forensic analysis software.  You basically can

15   go through and flag items of interest or evidentiary items, and

16   then you go back and generate a report and export those items.

17   Q.   And so, the data that's in this chart, the creation date,

18   time, the file name, where does that all come from?

19   A.   From the phone, from the device.

20        MS. KRASINSKI:  Your Honor, I move to admit

21   Government's Exhibit 200.

22        THE COURT:  Any objection?

23        MR. LEVIN:  Without objection, your Honor.

24        THE COURT:  No objection, it will be admitted.

25      (Government's Exhibit No. 200 received into evidence)

1        MS. KRASINSKI:  Permission to publish, your Honor?

2        THE COURT:  Yes.

3   Q.   So, Agent Tongbua, let's go through some of these, and

4   first let's start with the headings.  The first one is "Created

5   date/time."  What is that?

6   A.   That's the way that the phone time stamped when that

7   particular file was created.

8   Q.   And the image, is it a copy of the image itself?

9   A.   Yes.

10  Q.   "File name."  What's that?

11  A.   Again, it's whatever, however the device was -- or the

12  file was labeled inside the device.  Excuse me.

13  Q.   And external -- "_external files."  What does that mean?

14  A.   It's a similar reference to where the item was stored

15  within the device.

16  Q.   And sort of generally, is it fair to say that the images

17  that have been marked for identification as Government's

18  Exhibit 201 through 226 are sort of the clear, more clear

19  versions of the image as it is in this report?

20  A.   Yes.

21  Q.   So, let's go through this first image.  What's the date,

22  the creation date and time?

23  A.   Are you looking at the image?  Okay, the image.  It's June

24  16th, 2019, approximately 8:27 p.m.

25  Q.   Now, this first image is text, right?  What is that text?

1   A.   So, the very first one is actually Mr. Lambert's address.

2   Q.   And what type of file was that?

3   A.   They're all JPEGs.

4   Q.   What generally is a JPEG?

5   A.   It's a digital image, a photo.

6   Q.   And the next image?

7   A.   That's Mr. Lambert.

8   Q.   And what's the creation date and time of that?

9   A.   It's the same, June 16th at 8:27 p.m.

10  Q.   And what's the third image?

11  A.   That is basically a screenshot of like a map plotting that

12  address at the top, the Lambert address.

13  Q.   Is that something that Mr. Cantwell had sent to Mr.

14  Lambert?

15  A.   No.

16  Q.   But it does show a way to get to Mr. Lambert's address?

17  A.   Yes.  That's an accurate representation.

18  Q.   Let's go to the next page of this.  And are these the two

19  images of Mrs. Lambert that Mr. Cantwell published -- excuse

20  me -- publicly posted on the Radical Agenda Telegram group?

21  A.   Yes.

22  Q.   And the creation date and time of these images on

23  Mr. Cantwell's phone?

24  A.   So, again, June 16th, 2019, 8:27 p.m.

25  Q.   And let's go to the next page.  These identical images

1    that we've seen before are again created in Mr. Cantwell's

2    phone?

3    A.    Yes.  They appear to be redundant images.

4    Q.    So, multiple copies of the same image?

5    A.    Yes, it appears so.

6    Q.    And the next page, again, more copies of the same images?

7    A.    Yes.

8    Q.    With approximately the same date and time, June 16th,

9    2019?

10   A.    Yes, within a couple of minutes.

11   Q.    And the next page.  Again, more copies?

12   A.    Yes.

13   Q.    With a similar creation date and time?

14   A.    Yes.

15   Q.    Now, if we go to the next page, what are the images we see

16   here?

17   A.    So, these images are labeled as Screenshots, and they are

18   similar to the very first set that we saw depicting the direct

19   message Telegram exchange between Mr. Lambert and Mr. Cantwell.

20   Q.    What is a "screenshot"?

21   A.    It's capturing exactly what is on the screen at a given

22   point in time.

23   Q.    So, it's the user capturing what is on the user's screen?

24   A.    Yes.

25   Q.    And so, the first two images that we see on this page, on

1   page 6 of Government's Exhibit 200, are those the first two

2   portions of the messages between Mr. Cantwell and Mr. Lambert?

3   A.   Yes, I believe so.  The print's pretty small, but it looks

4   right.

5   Q.   What's the creation date and time of those?

6   A.   June 16th of 2019, 9:42 p.m.

7   Q.   And when did the exchange between Mr. Cantwell and

8   Mr. Lambert end?

9   A.   It concluded almost exactly that same time, on the same

10   date.

11   Q.   So, almost immediately after that conversation ended

12   screenshots of the conversation from Mr. Cantwell's side were

13   taken from Mr. Cantwell's phone?

14   A.   It appears so.

15   Q.   Let's go to page 7 of Government's Exhibit 200.  Are those

16   more screenshots of the same conversation?

17   A.   Yes.

18   Q.   Again, with the same creation date and time?

19   A.   Very close, yes.

20   Q.   Immediately after the conversation ended?

21   A.   Yes.

22   Q.   And page 8 of Government's Exhibit 200?

23   A.   More of the same, yes.

24   Q.   So, more screenshots of the conversation between Mr.

25   Cantwell and Mr. Lambert?

1    A.   Correct.

2    Q.   And Government's Exhibit page 9 -- page 9 of Government's

3    Exhibit 200?

4    A.   More of the same, yes.

5    Q.   More screenshots?

6    A.   At the exact same time.

7    Q.   More screenshots from Mr. Cantwell's phone of his

8    conversation with Mr. Lambert?

9    A.   Correct.

10   Q.   Let's go to Government's -- excuse me -- page 10 of

11   Government's Exhibit 200.  What are we looking at here?

12   A.   So, this would be, as we mentioned before, sort of the

13   mirror image.  These are identical to the screenshots that were

14   actually posted online by Mr. Lambert.

15   Q.   So, this is the conversation from Mr. Lambert's side, from

16   Mr. Lambert's phone?

17   A.   Correct, with little stickers added over the faces of his

18   family.

19   Q.   We'll go through this, and then we'll look at those a bit

20   more clearly.  What's the creation date and time of those?

21   A.   This would be on Monday, June 17th, 2019, at approximately

22   1:28 a.m.

23   Q.   And so, if we go to page 11 of Government's Exhibit 200,

24   what are those two images?

25   A.   Additional screenshots in the same series.

1   Q.   The conversation from Mr. Lambert's phone?

2   A.   Correct.

3   Q.   And, again, created on --

4   A.   As they were posted publicly online.

5   Q.   And, again, created on Mr. Cantwell's phone on June 17th,

6   2019?

7   A.   Correct.

8   Q.   And if we look at the next page of Government's Exhibit

9   200, what are those first two images?

10  A.   A continuation of that same conversation.

11  Q.   And I want to briefly go through the last few pages of

12  this chart, this report generated from -- the cell phone

13  extraction from Mr. Cantwell's phone.  Are there more images of

14  the exchange of these messages as it would have appeared on

15  Mr. Cantwell's phone?

16  A.   Yes, there were more taken at random dates and times, but

17  they were kind of individualized screenshots versus like the

18  whole set taken at once.

19  Q.   Are these a different file types than the screenshots?

20  A.   No.  They're still JPEGs.

21  Q.   Are they in a different file?

22  A.   They're labeled different.  They're not actually called

23  "screenshots," so it's more like how they would appear if they

24  were attachments to Telegram messages.

25  Q.   And are these duplicates, essentially copies?

1    A.    Yes.

2    Q.    So, Mr. Cantwell actually had multiple copies of this

3    conversation?

4    A.    Yes.

5          THE COURT:  Ms. Krasinski, I'm going to need to be

6    taking a break sometime in the next five minutes or so, so if

7    you want to go on you can, or we can take a break.  It's up to

8    you.

9          MS. KRASINSKI:  Now would be a good time, your Honor.

10         THE COURT:  All right.  So, Members of the Jury, we'll

11   take a break right now.  I've got to give the court reporter a

12   little bit of a rest, and then I've got to listen to something

13   before I bring you back in, so it might be a little longer than

14   our normal break.  I'd ask my case manager, it's such a

15   beautiful day, if any of you want to go outside and take your

16   mask off, they can arrange for that to happen.  I'll bring you

17   back here as soon as I can after giving the court reporter a

18   bit of a rest, and then I have to listen to the document they

19   want me to listen to.  So, we'll take a break right now.

20         THE CLERK:  All rise.

21         (The jury exited the courtroom)

22         THE COURT:  Just be seated for a second.  So, my plan

23   is to take a ten-minute break till 5 after 3:00, come back, and

24   I'll listen -- first I want to listen to the excerpts that you

25   propose to introduce as an exhibit; then I want to hear the

1  full audio exhibit; then I'll hear the defense argument as to

2  why the rule of completeness requires that it all be played at

3  one time and then your response.  Okay?  All right.  We'll

4  break for ten minutes.

5          THE CLERK:  All rise.

6          (Recess taken from 2:54 p.m. to 3:07 p.m.)

7          THE CLERK:  All rise for the Honorable Court.

8          THE COURT:  Before I listen to the exhibits, I

9  received a motion to reconsider from Mr. Freeman, who is the

10  person from the public who wants to attend.  I considered the

11  proposal presented by the government, reviewed it with the

12  staff and with my colleagues, and they were willing to allow

13  Mr. Freeman to come into the building with a mask on and wear a

14  mask in the public areas.  He could then be escorted to a

15  private room, where he could watch a live feed without his mask

16  on, but he would have to agree to wear the mask when he's in

17  the public areas.  He is either not able or not willing to

18  comply with that request, and he's asked me to reconsider my

19  decision.

20          I thought about the matter carefully.  I don't see any

21  basis on which to reconsider the decision, and I am going to

22  deny his request.  He's asked me to provide a written ruling,

23  but I don't have time to write a written ruling, I'm in the

24  middle of a trial, and I've asked the Chief Deputy Clerk to

25  communicate the ruling to him and explain the ruling, to

explain that I've made a ruling and analyzed the issue on the record in court so there is a record of my decision should he try to take some action to challenge it.

The next step for him would be, if he wanted to, would be to file a motion for writ of mandamus with the Court of Appeals. He's welcome to do that, but I do not have the time to sit down and write a written order in the middle of a trial, so I can't accommodate that request. But I am denying his original motion and his motion to reconsider, and he has rejected the option that I have given him, which is the only other alternative that I feel is appropriate and available to me under the circumstances. So, that's how I address that issue.

Now I'd like the government to play the short excerpts that it wishes to play of the -- and just to give me the background again on this, this is a telephone call that was recorded between the defendant and some romantic relationship?

MS. KRASINSKI: So, Mr. Cantwell recorded a conversation of himself with I believe at the time his ex-girlfriend. Her name is Katelen Fry.

THE COURT: Is this the person referred to as "Peach"?

MS. KRASINSKI: Yes, your Honor.

THE COURT: Okay.

MS. KRASINSKI: And it is, for the Court's knowledge, how Mr. Cantwell got this information that he used to then dox

1  Mr. Lambert.  He got the address on some of the photographs

2  from Ms. Fry.

3          THE COURT:  When was the phone call made?

4          MS. KRASINSKI:  It was December of 2019, your Honor,

5  and Mr. Cantwell recorded this conversation of himself and then

6  emailed that conversation to the FBI.

7          THE COURT:  Okay.  So, he recorded the full

8  conversation and emailed the full conversation to the FBI?

9          MS. KRASINSKI:  Correct, your Honor.  And, in fact, he

10  sent two versions to the FBI, one sort of as it was recorded,

11  and one he tried to enhance the audio so that the sound was

12  better.

13          THE COURT:  Which version are you playing?

14          MS. KRASINSKI:  I think the enhanced.

15          THE COURT:  Excerpts from the enhanced version?

16          MS. KRASINSKI:  I believe so, your Honor.

17          THE COURT:  So, this is what exhibit number?

18          MS. KRASINSKI:  So, this is Exhibits 105, 106, 107,

19  108 and 109.

20          THE COURT:  So, each excerpt is listed as a full

21  exhibit?

22          MS. KRASINSKI:  Correct, your Honor.

23          THE COURT:  All right.  So, you're going to play each

24  of those exhibits in sequence?

25          MS. KRASINSKI:  Correct, your Honor.

1          THE COURT:  All right.  Go ahead.

2          MR. DAVIS:  Your Honor, would you like the

3    transcripts?

4          THE COURT:  Oh, you have transcripts?

5          MS. KRASINSKI:  They're rolling on the call.  We don't

6    have transcripts of the full call, but we have transcripts of

7    the --

8          THE COURT:  All right.  I'll watch the rolling

9    transcripts as they come up.

10               (Audio recording played)

11          THE COURT:  Play the next exhibit.

12               (Audio recording played)

13          THE COURT:  And the next one.

14               (Audio recording played)

15          THE COURT:  And is there another?  Okay.

16               (Audio recording played)

17          THE COURT:  All right.  Now can you play the whole

18    call?

19               (Audio recording played)

20          THE COURT:  All right.  So, let me start by saying I

21    could only make out one out of every three or four words that

22    Peach was saying, so I have no idea what she was saying,

23    because I can't tell based on what's been played for me as the

24    full conversation, so I can't really comment on anything that

25    she has said.  Things that he has said, there may be one or two

1    lines that, in fairness, ought to be included in the excerpt,

2    but I need a full transcript.  So, the defense has to produce a

3    full transcript and show me line by line.

4          I do not agree to the extent the defense says the

5    entire conversation needs to be played.  No, it does not.  It

6    simply is Mr. Cantwell providing his justification for what

7    he's doing.  Some of it that the government hasn't played is

8    arguably more damaging to Mr. Cantwell than what the government

9    has played, but for reasons that aren't apparent to me the

10   government hasn't played those parts, and Mr. Cantwell wants to

11   play them.

12         But, again, I think the parties have to bear in mind

13   that it is not a defense to these charges to say, I was

14   provoked.  There's no provocation defense here.  So, to the

15   extent the parties are fighting about, Oh, I don't want the

16   jury to hear that Mr. Cantwell was provoked, or, I don't want

17   to the jury to hear that Mr. Cantwell was provoked, it's not a

18   defense.  So, I don't know why you're trying to keep it out and

19   they're trying to put it in.  In fact, the jury has already

20   heard in the opening statements that Mr. Cantwell feels that he

21   was provoked and he may well have been prompted to do these

22   things in part by communications.

23         So, my reaction is I cannot rule on the completeness

24   objection without seeing a transcript, because the ruling that

25   I am inclined to make based on one quick listen is that there

1    may be two or three lines in there that you didn't include that

2    probably should be included.  The rest is just him providing

3    his explanation as to why he went to the FBI, and that isn't

4    necessary for the rule of completeness at all.

5         So, I'm going to suggest -- I will give the defense

6    until tomorrow morning to present me with a full transcript of

7    the entire communication, at which point the defense shall be

8    prepared to argue with me line by line over what portions of

9    the call should also be played out of the rule of completeness,

10   and there may be a few sentences that I am willing to include,

11   but the vast majority of the rest of it is not necessary to be

12   played under the rule of completeness.  Whether it can come in

13   in the defense case for some other purpose I will reserve

14   judgment on, but as simply a Rule 106 objection, it's quite

15   clear to me that there's no reason to play the entire call to

16   satisfy Rule 106, but there are likely some portions of the

17   call that should be played.  All right?

18        So, tomorrow morning -- don't put the excerpts in now.

19   Tomorrow morning the parties will -- Mr. Levin can be here at

20   9:00.  Be here at 9:00, be prepared to argue that with me at

21   9:00 so I can get a ruling on it before the jury comes in.

22   Anybody have anything they want to say?

23        MS. KRASINSKI:  Only, your Honor, could I have Agent

24   Tongbua authenticate them?  We obviously will not play them.

25   We'll just say where they came from, generally that they are --

1        THE COURT:  He's going to be gone tomorrow, is your

2    hope?

3        MS. KRASINSKI:  He'll be here, your Honor, but we hope

4    his testimony to be concluded.

5        THE COURT:  Okay.  Yeah, so we can do the

6    authentication parts of it, and you can have him refer to

7    exhibit number, not only to your exhibit numbers but also the

8    additional exhibit number that the defendant wants to play, and

9    just say, You've listened to 106 for identification.  What is

10   it?  That's the full conversation.  And Exhibits 1, 2, 3 and 4,

11   what are those?  Those are excerpts from the larger exhibit.

12   And did you listen to the entire thing, and those are what you

13   say?  And then he can go off today, and then tomorrow I'll rule

14   on which additional portions should be played, and the

15   additional portions should be played all at one time.

16       But the defense may have to be -- we may have to -- if

17   I'm not likely to rule on the entire conversation being

18   admissible under the rule of completeness, we're going to need

19   to have the capacity to identify certain lines that might have

20   to be played.  Do you see what I'm saying?  If I had a

21   transcript I could point the parties to them, but they're just

22   coming in and going by.  I can't identify it without a

23   transcript.  But you're going to have to be able to play for me

24   -- if I say that three lines from the defense exhibit are

25   necessary for context, you're going to have to be able to play

1  those three lines.  That's what I'm saying.  All right?

2       Anything from the defense before we move on?

3       Mr. Davis, you want to say something?

4       MR. DAVIS:  It's possible that Ms. Sheff has already

5  typed a transcript of the full call.  She needs to go upstairs

6  to find out.

7       THE COURT:  Could you provide it to me tonight?  I

8  could read it overnight and hear you in the morning on it.

9  That would be good.

10      MR. DAVIS:  Have we provided it to the defendant?

11      MR. WOLPIN:  Not that I saw.

12      MS. SHEFF:  I'll go check.  I thought I did.

13      THE COURT:  She'll check and let us know, and if it

14  is, that will be helpful to me, but I also need a printed out

15  transcript of your excerpts so I can compare the two, because

16  what I basically will do is, I'll look at the excerpts you want

17  to play.  Then I'll go to the whole transcript, and I'll move

18  above and below it and highlight anything that I think needs to

19  come in under the rule of completeness.

20      MS. KRASINSKI:  Your Honor, do you mind if I put hand

21  sanitizer on my hands and remove the transcripts from my

22  binder?

23      THE COURT:  Do you have the actual clips in your

24  binder?

25      MS. KRASINSKI:  From the --

1          THE COURT:  Yeah, that's fine.  Hand them to the

2    clerk.  I'll read them tonight.

3          MR. DAVIS:  Last thing, Judge.  I just suggest if we

4    resolve what additional sentences, say, are added, with another

5    24 hours, and I'm sure we'll still be in trial, we could then

6    make new clips, new transcripts and bring them in and play them

7    all --

8          THE COURT:  That would be the cleanest way to do it,

9    if you are willing to delay the actual introduction until you

10   get it all put together in a nice little package.  I just want

11   to make sure that anything the defendants are entitled to have

12   in that package is there.  And then I have no objection to the

13   defendant being able to, if they have some other theory under

14   getting it in in their case or for something, they can try to

15   do that, but generally speaking a person's, a defendant's --

16   statements that the defendant records himself and wants to

17   introduce in his own case don't generally come in.  So, if it's

18   not admissible under the rule of completeness there may be some

19   other theory under which he can get it in, but I'm not ruling

20   on that.  I'm just saying the rule of completeness allows this

21   but not the rest.  All right?

22         Anything else?  I want to bring the jury back in and

23   get as much testimony in as I can today.

24         MS. KRASINSKI:  You asked us to remind you you wanted

25   to go back to Government's 303.  Would you like to do that now?

1        THE COURT:  Yes.  I didn't understand the -- I don't

2    have it in front of me, but it references certain individuals.

3    I didn't know who they were and how that was tied to this case.

4    Can you put the exhibit -- you don't have your assistant here.

5        MS. KRASINSKI:  Again, your Honor, I can put a copy of

6    it somewhere.

7        THE COURT:  Yeah, hand it up to me.

8        MS. KRASINSKI:  303.  Excuse me.  So, it appears

9    that --

10        THE COURT:  Wait just a second.

11                (Pause)

12        THE COURT:  Okay.  So, who are Vanderguard (ph) and

13    Heel (ph)?

14        MS. KRASINSKI:  My understanding is they are other

15    groups or online platforms that were associated with the Bowl

16    Patrol.

17        THE COURT:  All right.  And so, what you understand

18    this communication to be is not only that he intends to go

19    after the Bowl Guard but he intends to go after Vanguard (ph_

20    and Heel (ph) as well.  You want to get that in?

21        MS. KRASINSKI:  No.  I think the relevancy for this is

22    more motive of his desire to go after Bowl Patrol members that

23    he believed harmed him.  The only reference to Vanguard (ph)

24    and the other platform is because they were associated with the

25    Bowl Patrol.

1    THE COURT:  You've got abundant evidence already in

2    the record that he's upset with the Bowl gang, Bowl Patrol, and

3    he hasn't denied it.  He's saying he was upset with the Bowl

4    Patrol, so this doesn't add anything to the discussion at all.

5    I think to the extent it's relevant at all for that purpose,

6    its cumulativeness substantially outweighs its probative value,

7    and so I'm going to sustain the relevance objection.  I'm going

8    to add to the relevance objection and say under Rule 403 the

9    cumulativeness of it outweighs any, substantially outweighs any

10   possible relevance.  So, I will sustain the defendant's

11   objection to this exhibit.

12       MS. KRASINSKI:  Yes, your Honor.  And because we don't

13   have Ms. Sheff back, the thing that I was going to do next with

14   Agent Tongbua was have him review a group exhibit and in

15   conjunction with discussing it with counsel have him review

16   them and admit them as a group.  Is it possible --

17       THE COURT:  I shouldn't have let her leave the room,

18   should I?

19       MS. KRASINSKI:  So, again, I do have hard copies

20   outside of the presence of the jury.  I'd be happy to, again,

21   sanitize my hands.

22       THE COURT:  These are admitted -- these are ID

23   exhibits or admitted exhibits?

24       MS. KRASINSKI:  They are ID exhibits.  I think what we

25   had discussed was having the agent go through them.  It's a

1    grouping of them, 201 through 226, with the agent.  We would

2    ask the agent to review them and authenticate them as a group.

3    So, I can ask him to do that with a hard copy here so that we

4    can get the jury back in and get going.

5         THE COURT:  Yeah, I guess so.  So, bring the jury back

6    in.  They aren't going to be shown to the jury at this point.

7         MS. KRASINSKI:  Correct.  And, with the Court's

8    permission, I can take them up to the witness now.

9         THE COURT:  Yes, hand them up now.

10        MS. KRASINSKI:  Thank you, your Honor.

11        THE COURT:  All right.  Now we can bring the jury in.

12        But at this point they're just going to do it for ID,

13   so I'm fine with it.

14        So, my case manager notes that, if you want, once they

15   are admitted, you can use the document camera and display the

16   hard copy exhibit to the jury using the document camera if your

17   paralegal isn't back by then.

18        MS. KRASINSKI:  Okay.  Thank you, your Honor.

19        THE CLERK:  All rise for the jury.

20             (The jury entered the courtroom)

21        THE CLERK:  Please be seated.  This hearing is back in

22   session.

23        THE COURT:  Please proceed.  Ms. Krasinski, I see your

24   paralegal is back, so you can use the camera if you want.

25   Q.   Agent Tongbua, you are looking at what has been marked for

1    identification purposes only as Government's Exhibit 201 to

2    226.  Why don't you take a minute and flip through those and

3    let me know when you're done.

4    A.   (Witness complied).  Okay.

5    Q.   Are those the images that are included in Government's

6    Exhibit 200, the report generated from the defendant's cell

7    phone extraction of images from his phone?

8    A.   Yes.

9    Q.   And are those true and accurate copies of the images from

10   the defendant's cell phone?

11   A.   Yes.

12        MS. KRASINSKI:  Your Honor, I move to admit

13   Government's Exhibits 201 through 226.

14        THE COURT:  Any objection?

15        MR. LEVIN:  No objection, your Honor.

16        THE COURT:  They'll be admitted and can be displayed

17   using the computer evidence presentation system.

18   (Government's Exhibit Nos. 201 through 226 received into

19   evidence)

20        MS. KRASINSKI:  Thank you, your Honor.

21   Q.   We're only going to look at a few of them right now.

22   Let's start by looking at Government's Exhibit 218.  Agent

23   Tongbua, what is this?

24   A.   So, again, this is the other version of the Telegram

25   message exchange between Mr. Cantwell and Mr. Lambert.  This

1   would be as Mr. Lambert viewed it, and this would be the copy

2   that was posted publicly, because it contains the stickers that

3   covers up private information.

4   Q.   Now, you say, Stickers that covers up private information.

5   Are you talking about here this square that says, I believe,

6   Sassy, sassiest boys?

7   A.   Yes.  Yeah, a sticker, a little picture, icon, whatever

8   you want to call it.

9   Q.   And essentially is that an attempt to redact personal

10  information?

11  A.   Correct.

12  Q.   And other than these sort of redactions, are the messages

13  themselves the same as from Cantwell's side of the exchange?

14  A.   Yes.

15  Q.   And so, if we look, for example, at Government's Exhibit

16  214, again, is this a portion of the exchange from Mr. Lambert

17  as it would have been on Mr. Lambert's phone?

18  A.   Yes.

19  Q.   And you see the images that cover up Mrs. Lambert's face?

20  A.   Yes.

21  Q.   And the children's faces?

22  A.   Yes.

23  Q.   Those would not have appeared in the original?

24  A.   Correct.

25  Q.   And so, did Mr. Cantwell have a complete set of the mirror

1    image, the conversation, the messages as they would have

2    appeared on Mr. Lambert's phone?

3    A.    Yes.

4    Q.    Now, I want to -- we're going to briefly discuss a

5    telephone -- a copy of a recorded call that you received.

6    During the course of this investigation did Mr. Cantwell email

7    you a recording?

8    A.    He did.

9    Q.    And generally, without telling us the contents of that

10   recording, who were the parties to it?

11   A.    It was Mr. Cantwell and Katelen Fry.

12   Q.    And who recorded the conversation?

13   A.    I believe Mr. Cantwell did.

14   Q.    So, Mr. Cantwell sent you a recording of a conversation

15   with him and Ms. Fry?

16   A.    Correct.

17   Q.    How did he send that to you?

18   A.    I believe it was via email.

19   Q.    And did you listen to the entire call between Mr. Cantwell

20   and Ms. Fry?

21   A.    Yes.

22   Q.    And have you also reviewed what has been marked for

23   identification as Government's Exhibit 105?

24   A.    Would you refresh my memory what that is?

25           MS. KRASINSKI:  Can we show the witness only what has

1    been marked for identification as Exhibit 105A?

2         THE COURT:  Are you going to try to deal with the

3    excerpts from the audio call?  Is that what you're trying to

4    do?

5         MS. KRASINSKI:  Yes, your Honor.

6         THE COURT:  All right.  Maybe we can do this in a

7    shorthand way.  We simply want the witness to identify the fact

8    that he has listened to the entire call, he has listened to the

9    excerpts, and each of the excerpt exhibits is, in fact, a

10   portion of the telephone call which is -- what's the exhibit

11   that has the entire call on it?

12        MR. WOLPIN:  B16, your Honor.

13        THE COURT:  I'm sorry?

14        MR. WOLPIN:  B16, your Honor.

15        THE COURT:  B16?

16        MR. WOLPIN:  Correct.

17        THE COURT:  So, Exhibit B16 is the entire recorded

18   telephone call, and then we have a series of government

19   exhibits, which are what?

20        MS. KRASINSKI:  105, 106, 107, 108 and 109.

21        THE COURT:  Can we stipulate that those excerpts are,

22   in fact, excerpts of the larger, the full call that is the

23   defense exhibit?

24        MR. WOLPIN:  Yes, your Honor.

25        THE COURT:  So, the parties have stipulated to that.

1    So, I'm trying to save everyone some time here, Members of the

2    Jury.  What has happened is there is a full recording of the

3    telephone call that has been marked as a defense exhibit, there

4    are excerpts of that phone call, a series of them, that are

5    government exhibits, and the parties have stipulated that the

6    excerpts, the government exhibits that are excerpts are, in

7    fact, excerpts of the full call.

8              So, if you can just establish and authenticate that

9    this witness is familiar with the full call, then we can move

10   on and deal with what we play, if at all, to the jury of that

11   call tomorrow after we've had a chance to finish our review.

12             MS. KRASINSKI:  Thank you, your Honor.

13   Q.   The call between Mr. Cantwell and Ms. Fry, do you

14   recognize any voices in that call?

15   A.   Yes.

16   Q.   Tell us about that.

17   A.   I recognize Mr. Cantwell's voice from hearing it many

18   times in his different shows and speaking with him in person,

19   and the recording was provided to us by him, and in his

20   admission he indicated --

21   Q.   I don't want to go into the contents of the call.

22   A.   No.  I was just going to say that the person he is

23   speaking with was Katelen Fry.

24   Q.   Okay.  And you may not know the exhibits numbers, but

25   you've reviewed all of the government's portions of that call?

1    A.   Correct.

2    Q.   And, again, they just involve Mr. Cantwell and Ms. Fry?

3    A.   Correct.

4    Q.   And approximately when did you receive the email

5    containing this recorded call from Mr. Cantwell?

6    A.   This would have been in early December 2019.

7    Q.   Thank you.  Now, the last thing I want to talk with you

8    about is what's been marked for identification as Government's

9    Exhibit 700.  Agent Tongbua, do you recognize that?

10   A.   I do.

11   Q.   What is it?

12   A.   So, this is basically a chronological timeline that I

13   created, which is a composite of information obtained from

14   Mr. Cantwell's digital devices with the addition of, obviously,

15   the last column just to document items that he provided to us.

16   Q.   And so, where does the information in this demonstrative

17   exhibit come from?

18   A.   The factual information, such as the date, time, the file

19   names, which is under an event artifact, or the sources would

20   be primarily digital evidence, but there is also sprinkled in a

21   few items such as surveillance notes, but those are dictated or

22   labeled as appropriate.

23   Q.   And you prepared this chart?

24   A.   Correct.

25            MS. KRASINSKI:  Your Honor, I move to admit

1    Government's Exhibit 700.

2              THE COURT:  Is there objection?

3              MR. LEVIN:  Yes, your Honor.  I object under Rule

4    1006.  Under Rule 1006, a proponent may use a summary chart or

5    calculation to prove the content of voluminous writings,

6    recordings or photographs that cannot be conveniently examined

7    in court.  The items on this list are discrete enough that they

8    can be.  I don't think a chart is necessary.  So, we would

9    object pursuant to that rule.

10             THE COURT:  Are those items, in fact, in evidence at

11   this point?

12             MS. KRASINSKI:  Many of the items -- some of these

13   items are in evidence at this point, some are not, your Honor.

14             THE COURT:  All right.  I will reserve judgment on

15   this.  I will hear argument on it from the parties after we

16   finish with the evidence for the day.  To the extent it is

17   admitted into evidence, it could be allowed to be displayed to

18   the jury as a chalk, but if it is, in fact, a summary of

19   voluminous documents, I may admit it as a full exhibit, but I

20   need to know more about it, and I don't want to take the time

21   to do it now.

22   Q.   When you reviewed Mr. Cantwell's cell phone did you also

23   review call data?

24   A.   I did.

25   Q.   And did you note any calls that occurred around the time

1   of the message exchange between Mr. Cantwell and Mr. Lambert or

2   after?

3   A.   I noted calls around the time of the exchange.  I do not

4   recall calls between Mr. Lambert and Mr. Cantwell.

5   Q.   And did Mr. Cantwell tell you where he got the information

6   to dox Mr. Lambert?

7   A.   He indicated he got the photos and the address from

8   Katelen Fry.

9   Q.   Are there any calls between Mr. Cantwell and Ms. Fry?

10  A.   Yes.

11  Q.   Tell us about that.

12  A.   Specifically I know there was a call on the morning of

13  June 17th, early that morning, approximately 1:27, 1:28 a.m.

14  It's just before the creation times that you see for the set of

15  images as they were posted online publicly.

16  Q.   So, right around the time the images, the messages as they

17  would appear on Mr. Lambert's phone were created on Mr.

18  Cantwell's phone he has a call with his Ms. Fry?

19  A.   Correct.

20        MS. KRASINSKI:  The Court's indulgence for one moment.

21              (Pause)

22        MS. KRASINSKI:  I have nothing further, your Honor.

23        THE COURT:  Thank you.  If we need to have further

24  direct testimony about the chart that's the subject of the past

25  objection, I can receive it later on.  With that, we'll allow

cross-examination.

        Mr. Levin.

        MR. LEVIN:  Thank you, your Honor.

        THE COURT:  Are you going to examine from the back?

        MR. LEVIN:  I'm going to move to this podium right next to me.

        THE COURT:  Perfect.

CROSS-EXAMINATION

BY MR. LEVIN:

Q.   Agent Tongbua -- is it Tongbua?

A.   Yes, that's correct.

Q.   The events described in the indictment, the alleged threats and cyberstalking, those are alleged to have occurred in June 2019; is that right?

A.   Yes.

Q.   So, this wasn't this past summer but the summer before; is that right?

A.   Correct.

Q.   And at that time Chris Cantwell was already on your radar; is that right?

A.   Yes.

Q.   You had been investigating him prior to that?

A.   Yes.

Q.   You had surveilled him; is that right?

A.   Yes.

1   Q.   In fact, even before you knew about the incidents that are

2   described in the indictment you were surveilling him?

3   A.   Yes.

4   Q.   Is that right?  You had set up pole cameras outside his

5   house; is that right?

6   A.   Yes.

7   Q.   You had subpoenaed various documents relating to him?

8   A.   Yes, we had.

9   Q.   And that investigation had gone back six, seven months

10   prior to June 2019?

11   A.   It went back further than that.  That's when I took over

12   as the lead case agent, yes.

13   Q.   That's when you took over the investigation?

14   A.   Correct.

15   Q.   So, that would have been towards the end of 2018?

16   A.   Correct.

17   Q.   In fact, Mr. Cantwell was observed on the days of the

18   alleged incidents, on June 15th, 16th and 17th, by your people;

19   is that right?

20   A.   Yes.

21   Q.   Actually surveilled with the pole cameras?

22   A.   Correct.

23   Q.   And prior to June of 2019 Bowl Patrol was also on the

24   FBI's radar; is that right?

25   A.   How do you mean?

1  Q.   Well, individual members of the Bowl Patrol were known to

2  the FBI?

3  A.   Yes, that's fair to say.

4  Q.   And individual members of Bowl Patrol were persons of

5  interest to the FBI?

6  A.   Yes, that's fair.

7  Q.   And particularly as it relates to investigations of white

8  supremacists and domestic terrorists?

9  A.   Yes, that's fair.

10  Q.   Now, white racially motivated extremism, that's a subject

11  of interest, a current priority for the FBI; isn't that right?

12  A.   I believe so.

13  Q.   And something which the FBI Director has testified about

14  in Congress?

15  A.   He has.

16  Q.   And that's your area; is that right?

17  A.   Not specifically, not solely that.

18  Q.   You're not assigned to the Joint Terrorism Task Force?

19  A.   I am.

20  Q.   You are?  So, that's your area, is that not?

21  A.   It's one of them.

22  Q.   Yeah.  You indicated that with regard to the Bowl Patrol

23  that Vic Mackey was known as the leader of the Bowl Patrol; is

24  that right?

25  A.   Yes.

1   Q.   And Cheddar Mane was known as a member of the Bowl Patrol;

2   is that right?

3   A.   Yes.

4   Q.   Now, prior to June of 2019 you were aware that Mr.

5   Cantwell was communicating with local law enforcement about

6   harassment he received?

7            MS. KRASINSKI:  Objection.

8            THE COURT:  Basis?

9            MS. KRASINSKI:  Relevance and hearsay.

10           THE COURT:  Overruled at this point.  We'll go

11   question by question.

12   Q.   You had been in contact with the Keene Police Department;

13   is that right?

14   A.   Yes.

15   Q.   You were in contact with Sergeant Joel Chidester?

16   A.   Yes.

17   Q.   You knew that Mr. Cantwell had approached local law

18   enforcement about harassment he had received?

19   A.   Yes.

20   Q.   You understood that Mr. Cantwell had approached the Keene

21   Police Department about harassment by members of the Bowl

22   Patrol?

23   A.   Up to that point he spoke with Keene PD about a lot of

24   harassment.  I don't know that a lot of that information was

25   focused on Bowl Patrol, but I'm sure some of it was.

1  Q.   Information communicated by Mr. Cantwell with Keene Police

2  Department about attacks on his website?

3  A.   Sure, yes.

4  Q.   About anonymous phone calls that he got that were clogging

5  up the lines to his shows?

6  A.   Yes.

7  Q.   And you indicated in your testimony that Mr. Cantwell had

8  also made a complaint to the FBI online about harassment by the

9  Bowl Patrol?

10  A.   Right, which I had not learned about at that time, not

11  prior to June.

12  Q.   Excuse me?

13  A.   I had not learned about that prior to June in 2019.

14  Q.   You didn't know about that?

15  A.   Correct.

16  Q.   That information had not come back to you?

17  A.   Correct.

18  Q.   But you subsequently learned that he had made a complaint

19  to the FBI about harassment by the Bowl Patrol in February of

20  2019?

21  A.   Yes.

22  Q.   Now, you indicated that during that period you were

23  investigating Mr. Cantwell?

24  A.   Correct.

25  Q.   And during the same period that you were investigating

1    Mr. Cantwell he's making complaints to the FBI; is that right?

2    A.   He made a complaint that I'm aware of.

3    Q.   Right.  But that information never made it back to you?

4    A.   That's correct.

5    Q.   There's no system within the FBI, when a person that

6    you're investigating actually approaches the FBI for help, to

7    funnel that information back to the person who's investigating?

8    A.   It is possible.  Sometimes that does happen.  It did not

9    happen in this case.

10   Q.   It didn't happen in this case.  Now, you understood before

11   June of 2019, you knew that Mr. Cantwell had been in touch with

12   Keene PD?

13   A.   Correct.

14   Q.   And Keene PD was in touch with you about their contacts

15   with Mr. Cantwell?

16   A.   Correct.

17   Q.   And ultimately Officer Chidester referred Mr. Cantwell to

18   the FBI; is that right?

19   A.   Yes, when the matter exceeded his normal capacity.

20   Q.   When the matter exceeded his normal capacity.  So, when

21   Sergeant Chidester realized that Mr. Cantwell was complaining

22   about threats and harassment coming from outside the state, he

23   suggested to Mr. Cantwell that he not -- that he might want to

24   seek the help of the FBI?

25        MS. KRASINSKI:  Objection.  Hearsay.

1    THE COURT:  Sustained.  There hasn't been a basis of

2    knowledge elicited.

3    Q.   When you indicated, When it exceeded his capacity, what

4    did you mean by exceeded his capacity?

5    THE COURT:  First demonstrate that the witness has

6    personal knowledge of that which he's speaking about.

7    Q.   Okay.  Did you have communications with Sergeant Chidester

8    about Mr. Cantwell?

9    A.   Yes.

10   Q.   Prior to June of 2019?

11   A.   Yes.

12   Q.   Did you understand from Sergeant Chidester that Chris

13   Cantwell was having issues with harassment and defacement of

14   his website?

15   A.   I recall exchanging emails with Joel, and I recall

16   receiving information about harassment.  I cannot definitively

17   say that the website defacement was relayed to us.  I know

18   that, again, it was a lot of different harassment, did involve

19   spam phone calls, some of which, though, could be attributed to

20   local folks around the Keene area.  And so, again, it wasn't

21   till around the summertime they began to talk about Bowl Patrol

22   and other things.

23   Q.   So, how is it that you understood that Sergeant Chidester

24   had reached his capacity?

25   A.   Because at that time he was talking about things that

might have involved an interstate nature, because at that time,

around June, June, July is when he started to mention things

like the Bowl Patrol.

Q.   And that's when he referred Chris Cantwell to the FBI?

A.   Correct.

Q.   And encouraged Chris Cantwell to contact the FBI?

A.   I wouldn't say "encourage."  He just provided -- depending

on his seriousness and how far he was willing to pursue it,

there's only so much the Keene Police Department could do for

him.

Q.   And ultimately Mr. Cantwell did contact the FBI?

A.   Actually, we contacted him.

Q.   You contacted him?

A.   Yes.

Q.   Called him on his phone?

A.   Yes.

Q.   And had a phone conversation with him?

A.   Yes.

Q.   And then there was an email exchange, was there not?

A.   Yes.

Q.   And then at some point there was an in-person interview?

A.   Yes.

Q.   And at that interview, that was in September of 2019, Mr.

Cantwell was accompanied -- that interview took place at the

Keene Police Department; is that right?

1    A.    Correct.

2    Q.    And Sergeant Chidester was at that interview as well?

3    A.    Yes, he was.

4    Q.    And are you aware of whether Mr. Cantwell asked him to be

5    present there?

6    A.    I believe so.  I believe that was the agreement.  Either

7    that or Sergeant Chidester offered to be there.  I don't really

8    remember exactly how it happened.

9    Q.    Now, in his complaint, his online complaint in February

10   2019, Mr. Cantwell named the Bowl Patrol member who went by the

11   name of Vic Mackey as someone he suspected of harassing him; is

12   that right?

13   A.    I missed the first part.  That was the IC3 complaint in

14   February?

15   Q.    Yeah, the online FBI complaint.

16   A.    Yes, that's correct.

17   Q.    And also a person who went by the name of Mosin-Nagant; is

18   that right?

19   A.    Correct.

20   Q.    M-o-s-i-n, N-a-g-a-n-t?

21   A.    Yes.

22   Q.    So, at the same time that Mr. Cantwell was talking to you

23   and other members of the FBI, the Bedford office, talking to

24   Sergeant Joel Chidester about harassment and pranks by unknown

25   persons as well as members of the Bowl Patrol, at the same time

1 that was going on you were also investigating him; is that

2 right?

3 A. Yes.

4 Q. Prior to the June 19th incident and then after the June

5 19th incident?

6 A. Correct.

7 Q. And you had no problem with the concept that Mr. Cantwell

8 might also have been a victim of harassment; is that right?

9 A. Yes.  It's not impossible for a person to be both a

10 subject and a victim at the same time.

11 Q. And you took his complaints seriously as a victim of

12 harassment?

13 A. We did.

14 Q. And you had email exchanges with him about harassment and

15 attacks?

16 A. Yes, we did.

17 Q. You tried to get more information from him about the

18 individuals that he believed were attacking him and attacking

19 his website?

20 A. We did.

21 Q. And ultimately you did determine that there had been

22 harassment of Chris Cantwell by members of the Bowl Patrol?

23 A. We determined there was definitely a back and forth; there

24 was definitely a running dispute between both parties.

25 Q. You found evidence of actual harassment, though; is that

1    right?

2    A.    We definitely have call logs.  I mean, there were spam

3    calls.  We have his record of his website defacement.  I'm not

4    sure what specific harassment you're referring to.

5    Q.    You testified in the grand jury on January 22nd of 2020;

6    is that right?

7    A.    Yes.

8    Q.    I'm going to show you an excerpt from your --

9              MR. LEVIN:  If I could use the ELMO?

10             THE COURT:  I wonder does that need to be disinfected?

11             MR. LEVIN:  I won't touch it.

12             THE COURT:  Well, I think if we have to set it up you

13   probably do.  Did anybody from the government touch the

14   document camera?  All right.  So, you can go up to the document

15   camera and manipulate it as necessary to display what you want

16   to display.  Are you asking to show him something that's not in

17   evidence for purposes of impeachment?

18             MR. LEVIN:  Yes.

19             THE COURT:  So, this could be shown to the witness

20   only.  Go ahead.

21   Q.    I just want you to, if you could, read to yourself the

22   question and then the answer.  Are you able to see that?

23   A.    Yes.  So, you want me to read the question first?

24   Q.    Just to yourself.

25   A.    Okay.

1    Q.    There's a question and then there's two answers.

2    A.    (Witness complied).

3    Q.    Tell me when you're at the bottom of the page.

4    A.    Okay.  I'm good.

5    Q.    And just the end of the -- just up to the bottom of that

6    answer.

7    A.    (Witness complied).  Okay.

8    Q.    So, when you testified in the grand jury you were asked,

9    were you not, whether you found evidence of actual threats

10   against Cantwell by members of the Bowl Patrol; is that right?

11   And you answered, No direct threats, but there were phone

12   calls, there was harassment; is that right?

13   A.    Yes.

14   Q.    And you testified that they made memes and edited

15   different photos of him making fun of him; is that right?

16   A.    Yes.

17   Q.    And made a song about him?

18   A.    Yes.  And all of that I believe can be attributed to Bowl

19   Patrol.

20   Q.    What's that?

21   A.    I believe those items can be attributed to Bowl Patrol --

22   Q.    Right.

23   A.    -- not some of the other harassment.

24   Q.    And then people calling food delivery services to have

25   them delivered to him while he was recording his show?

1   A.   Right.  Things like that, we can't attribute to who did
2   that.
3   Q.   You couldn't attribute all of those to the Bowl Patrol, is
4   what you said; is that right?
5   A.   That's correct.
6   Q.   But you were in the course of your investigation able to
7   determine that there had been harassment of Chris Cantwell by
8   members of the Bowl Patrol?
9   A.   Sure.
10  Q.   And, in fact, you spoke to people who admitted to that?
11  A.   They admitted to pranking, making prank calls, making
12  jokes.
13  Q.   Now, you interviewed -- the FBI, I should say, interviewed
14  members of the Bowl Patrol; is that right?
15  A.   Yes, we did.
16  Q.   They interviewed Cheddar Mane or a man named Ben Lambert
17  who also goes by the name of Cheddar Mane; is that right?
18  A.   Yes.
19  Q.   They interviewed Uncle Paul, who is a person named Paul
20  Nehlen?
21  A.   Correct.
22  Q.   Someone who goes by the name in the group as Hardmous or
23  DJ Hardmous, who is Thomas Gibson?
24  A.   Yes.
25  Q.   Were there others that were interviewed as well?

1    A.    As a part of the inquiry into this harassment or just in
2    general?
3    Q.    About the Bowl Patrol harassment of Cantwell.
4    A.    I believe those were the only ones specifically about the
5    harassment.
6    Q.    What about Robert Moeller, Tactical BowlCut?
7    A.    I don't recall -- we didn't interview him, this office.
8    Q.    Jeffrey Clark of DC Bowl Gang?
9    A.    Again, not this office.
10   Q.    Ronald Evans, who's also known as Uncle Dad?
11   A.    No.
12   Q.    Dallas Medina, who's known as Mosin-Nagant?
13   A.    Dallas Medina has been interviewed by the FBI on multiple
14   occasions, not by our office.
15   Q.    He has been?
16   A.    Not by our office.
17   Q.    And not about harassment of Chris Cantwell?
18   A.    He was approached in this time frame.  I don't think -- he
19   chose not to speak with us, and he was not compelled to do so,
20   but he also has a history of interactions with Mr. Cantwell on
21   his own.
22   Q.    What about a gentleman known as Wignasty, who is also
23   known as David Fassler?
24   A.    He was not interviewed by us.
25   Q.    Or Mark Reardon, who is also known as Illegal Aryan?

1    A.    No.

2    Q.    What about Andrew Casarez, also known as Vic Mackey?

3    A.    He was identified over the course of this investigation by

4    our office, and we pushed very hard to have him interviewed,

5    but ultimately we lost that battle because it requires

6    coordination with other offices.  Very few of the people you're

7    mentioning were mentioned by Mr. Cantwell in his harassment

8    complaint, which is also why a lot of them weren't approached

9    unless we had definitive information that they were

10   participating.

11   Q.    Was Vic Mackey interviewed by any FBI agent?

12   A.    Not to my knowledge, not as part of this harassment

13   complaint.

14   Q.    Was he interviewed during this period about anything else

15   where they --

16          MS. KRASINSKI:  Objection.  Relevance.

17          MR. LEVIN:  I'll just finish my question.

18          THE COURT:  Finish the question, but don't answer it.

19   Q.    Was he interviewed during this period, during the period

20   of investigation of Mr. Cantwell, and not asked about the

21   investigation into Cantwell?

22          THE COURT:  Sustained.

23   Q.    Now, it was during your investigation of Chris Cantwell

24   that the FBI came across the text exchange that's the subject

25   of this criminal case; is that right?

1    A.    Yes.

2    Q.    And this wasn't a complaint that the FBI received from

3    Cheddar Mane, slash, Ben Lambert?

4    A.    Correct.

5    Q.    This was something that the FBI stumbled across while an

6    intelligence analyst was monitoring the Bowl Patrol account; is

7    that right?

8    A.    Correct.

9    Q.    And intelligence analysts in Washington D.C. were assigned

10   to monitor the Bowl Patrol; is that right?

11   A.    I can't definitively say that.

12   Q.    You can't say that?

13   A.    I don't know what their assignment was exactly.  I know

14   they observed this threat on that channel, and they relayed it

15   to us.

16        THE COURT:  Agent, you can only testify to what you

17   have personal knowledge of.  If you don't have personal

18   knowledge, you can so state.

19   Q.    You don't have personal knowledge of that.  You testified

20   in the grand jury on January 2nd -- 22nd, 2020; is that right?

21   A.    Yes, I did.

22        MR. LEVIN:  Can I approach the monitor, your Honor?

23        THE COURT:  Yes, you may, any time you want.

24   Q.    And if you see at the bottom this answer, could you just

25   read that to yourself.

1    A.    (Witness complied).  Okay.

2    Q.    In January of this year you testified, did you not, that

3    intelligence analysts were assigned to monitor or investigate a

4    group called the Bowl Patrol; is that right?

5              MS. KRASINSKI:  Objection.  Misstates the transcript.

6              THE COURT:  Wait a sec, wait a sec.

7              MR. LEVIN:  I'll rephrase the question.

8              THE COURT:  Wait a second.

9              MR. LEVIN:  Sorry.

10             THE COURT:  Okay.  Put the headsets on.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12             THE COURT:  All right.  It's not clear to me that this

13   witness has personal knowledge of the thing that the witness is

14   being asked to testify about.  As, of course, we know,

15   witnesses can testify in the grand jury without having personal

16   knowledge about the matters on which they're testifying; so to

17   establish that a witness testified to the grand jury on a

18   particular matter does not establish that the witness has

19   personal knowledge.  If he knows that there was an

20   investigation because somebody told him that there was an

21   investigation, it isn't based on personal knowledge, it's

22   hearsay.  So, you need to lay a foundation for what you're

23   doing.  Merely showing that he was asked a question and gave an

24   answer in the grand jury doesn't establish the basis of his

25   knowledge.

1          MR. LEVIN:  Understood.

2          THE COURT:  Okay.

3  (END OF SIDEBAR CONFERENCE)

4  Q.   Agent Tongbua, you testified to matters in the grand jury

5  regarding the initial discovery of the text messages exchange

6  that's at issue in this case; is that right?

7  A.   Yes.

8  Q.   And you testified that the initial discovery was by one of

9  your intelligence analysts at FBI headquarters in D.C.; is that

10  right?

11  A.   That's correct.

12  Q.   And I believe you testified to that today here, too, in

13  your direct testimony.

14  A.   Yes.

15  Q.   Do you know what caused the intelligence analysts in D.C.

16  to stumble on those text messages, what they were doing when

17  they stumbled -- do you have personal knowledge or any kind of

18  knowledge of what the FBI was doing when they stumbled across

19  those text messages?

20  A.   I have an understanding that someone was reviewing that

21  channel, but I don't have definitive knowledge of why and what

22  their specific assignment was.

23  Q.   Okay.  So, when you testified in the grand jury to what

24  you thought was happening, you didn't have any knowledge of

25  that?

A.    I said that was my understanding in the grand jury.  I said I believe that an analyst was monitoring that channel.

THE COURT:  I just want to be clear so there's no any misleading going on here.  What somebody can testify to in the grand jury is quite different, as you know, from what a person can testify to in public.  So, that someone can testify to something in the grand jury doesn't mean that they can testify in public about the same matter, so I just want to make that clear.

Q.    And is it your understanding that when the analysts in Washington came across this text exchange, that was in July of 2019; is that right?

A.    That is my understanding.  That's correct.

Q.    And that was about several weeks to a month after the alleged events?

A.    Correct.

Q.    Now, I just want to make it clear, because there was some testimony about items that were found on Mr. Cantwell's phone, items that were found on Mr. Cantwell's computer, these items were seized from Mr. Cantwell, and you testified that on the cell phone and on the computer that were in Mr. Cantwell's residence that there were photographs of Ben Lambert's family; is that right?

A.    Correct.

Q.    But isn't it also true that in August of 2019 Mr. Cantwell

1  sent emails to the FBI?

2  A.   That's correct.

3  Q.   And attached to the emails were the same photographs of

4  Mr. Lambert's wife and children that he had obtained?

5  A.   That's correct, and all of those photos were in the same

6  directories.  Both the photos of the family and this Telegram

7  message exchange were all found in the same folders.

8  Q.   Right.  And those same photographs that were emailed to

9  the FBI were later found on his phone and on his computer?

10  A.   Correct.

11  Q.   But he had shared those with the FBI in --

12  A.   He did not share any of the rest of the threat exchange,

13  images.

14  Q.   He shared the images of Cheddar Mane's wife and children;

15  is that right?

16  A.   He did.

17  Q.   He shared the photograph of Cheddar Mane or Ben Lambert

18  with what appeared to be strips of LSD on his tongue?

19  A.   Yes, the picture with something on his tongue.  Yes.

20  Q.   He shared Cheddar Mane's address in Missouri?

21  A.   Correct.

22  Q.   He admitted contacting Cheddar Mane to get Vic Mackey's

23  information?

24  A.   Correct.

25  Q.   Then he admitted that he threatened to expose Cheddar

Mane's identity if he continued harassing and defaming him; is

that right?

      MS. KRASINSKI:  Objection.

      THE COURT:  Basis?

      MS. KRASINSKI:  Misstates testimony and facts not in

evidence.

      THE COURT:  Lay a foundation for that, Mr. Levin.  I

don't recall it.

      MR. LEVIN:  Okay.

      MS. KRASINSKI:  And, your Honor, hearsay if it's

offered for the truth of the matter.

      THE COURT:  All right.  I have already instructed him

how to proceed.

Q.  Okay.  I just want to show you page 14 of your grand jury

testimony from Wednesday, January 22nd, 2020 in which you are

describing an email, the email that we're discussing.  This is

the question and the answer.  Does that sound familiar?

A.  Yes.

Q.  Is that an email that -- is that text from an email that

the FBI received?

A.  Yes, I believe so.

Q.  And in that email he admitted that he threatened to expose

his identity if he continued harassing and defaming me?

      MS. KRASINSKI:  Objection, your Honor.  Hearsay.

      THE COURT:  All right.  You folks have completely lost

1    me.  I don't understand what you're doing, and I'm speaking to

2    both sides here.

3         Unfortunately, Members of the Jury, I can't untangle

4    this without having extensive discussions with the parties.  I

5    hoped to be able to continue until 4:30 before I dismissed you,

6    but if I tried to keep you here I would just be wasting your

7    time.  So, I'm going to excuse you for the day while I work

8    with counsel to understand what's happening here.

9         I will remind you of my general instructions.  Keep an

10   open mind.  Don't discuss the case with anybody else.  Don't go

11   out and try to do any investigation.

12        And we're agreeing to start at 9:30.  Is that right?

13        Please come back a little before 9:30.  I'm going to

14   meet with the parties beforehand and do everything I can to

15   make sure that tomorrow's testimony flows as efficiently as

16   possible.

17        Have a good evening.  We'll see you tomorrow morning.

18        THE CLERK:  All rise for the jury.

19             (The jury exited the courtroom)

20        THE COURT:  Sir, you can step down, but why don't you

21   just stay in the courtroom in case we need you, okay?

22        THE WITNESS:  Yes, your Honor.

23        THE COURT:  All right.  Be seated.

24        Mr. Levin, I want to give you as wide a scope for

25   cross-examination as possible, but I don't really understand

1    what's happening right now.  Can you explain to me what you're

2    getting at here?

3            MR. LEVIN:  Your Honor, I guess what I'm getting at is

4    that there was I think an impression created during the direct

5    of Agent Tongbua that this evidence was seized from Mr.

6    Cantwell, and I'm trying to establish that Mr. Cantwell

7    provided this evidence to the FBI.

8            THE COURT:  Are you referring to the time when he sat

9    down in the interview with this agent?

10           MR. LEVIN:  This happened before that.  This happened

11   maybe a month before the sit-down interview.  He was having an

12   email exchange with the FBI.

13           THE COURT:  That's where I'm confused.  What testimony

14   did the government elicit on this particular point?

15           MS. KRASINSKI:  Agent Tongbua testified both that he

16   found these items on the defendant's hard drives, but I believe

17   he also testified that Mr. Cantwell provided them to him.

18           THE COURT:  That slipped by me, so I need to

19   understand better the sequencing here.  So, you tell me what

20   you think happened on direct in sequential order about how the

21   case agent came to learn of this -- of the emails and the

22   interaction.

23           MS. KRASINSKI:  So, when we were going through

24   Government's Exhibit 100 there's Mr. Cantwell's statement after

25   he sends the picture of Ms. Lambert and three of her children.

He says, More where that came from, and so I asked Agent
Tongbua --

THE COURT:  No.  I'm asking you to tell me about the
sequence by which Agent Tongbua first acquired information
about this email exchange and these photographs, and I want you
to tell me about what the evidence was on direct about the
first time he learned of these exhibits and when he
subsequently got them off of the phone.  And I apologize,
because if you said you elicited I don't doubt you, but its
significance did not register with me at the time, so I need
you to tell me exactly what you think was elicited on direct
about this.

I recall there was an interview where there was a
discussion where Mr. Cantwell was quite frank in discussing
what he had done, but it did not register with me that there
was an email that preceded that interview where Mr. Cantwell
volunteered all of this, this entire exchange to the FBI, and
if that's all that Mr. Levin's trying to do there is a way to
do that, and I don't understand why you would be objecting to
it.

So, I thought he was trying to do something completely
different, and part of it is the methodology that Mr. Levin is
using, which is one I'm not familiar with.  Showing someone
grand jury testimony without -- again, you can help educate me.
In my experience witnesses can testify about what they know

1  based on personal knowledge.  They can't testify about what

2  other people -- there's no, like, case agent exception to the

3  hearsay and personal knowledge rule, where the government or

4  the defense can ask the case agent, What did other guys down in

5  Washington a year before you got involved with the case, what

6  were they doing?  Why were they doing that?  What did they

7  learn?  That can't come in in an ordinary case.

8       Grand jury testimony, you can't just throw up grand

9  jury testimony to a witness and ask him to read it to himself

10  and then question him about it.  That isn't how I understand

11  the *Rules of Evidence*.  So, when that happens sometimes there's

12  no objection, sometimes there's objection, it becomes almost

13  impossible to untangle.  So, I think part of my confusion stems

14  from the method you were using, but part of it is, if the

15  government elicited this in their direct case and all they're

16  trying to do, all Mr. Levin is trying to do is establish, Hey,

17  before he even sat down with you he volunteered this stuff to

18  you in an email, he should be allowed to do that, and why

19  shouldn't he?

20       MS. KRASINSKI:  I don't have any objection to that at

21  all, your Honor.  My objection is to when he's going into and

22  asking questions about the contents of an August 28th email

23  that Mr. Cantwell sent to the FBI.  If Mr. Levin wants to say,

24  On August 28th, 2019, before you seized the electronic devices,

25  didn't Mr. Cantwell provide you with copies of these photos, I

1  don't have any objection to that, your Honor.

2       But when Mr. Levin is asking -- is referring to

3  portions of Mr. Cantwell's email, the email Mr. Cantwell says

4  in the email, Since I have this information about him I

5  threatened to expose his identity if he continues harassing and

6  defaming me, asking about that statement is hearsay.  So, if

7  Mr. Levin --

8       THE COURT:  Doesn't that help you and hurt him?  I

9  don't even understand what you're doing.  Why are you doing

10  what you're doing?  It doesn't make any sense to me.  So, it's

11  really hard when I'm operating in kind of an *Alice in*

12  *Wonderland* world, where the government is trying vigorously to

13  keep out things that are damaging to the defendant and the

14  defendant is trying to elicit them.  So, it's not making any

15  sense to me, so help me.  I don't have the email.  I don't know

16  what the email says.  I don't know why you're trying so

17  vociferously to keep it out.  I don't know if you're trying to

18  get into it.  If all you want to do is establish, Isn't it

19  true, Case Agent, that before you even sat down to interview

20  Mr. Cantwell he sent you an email and in that email he attached

21  the very same documents that are being used to prosecute him --

22  is that what you want to say?

23       MR. LEVIN:  That's it.

24       THE COURT:  Go for it.

25       You don't have a problem with that.

1       MS. KRASINSKI:  I don't have an objection to that.

2       THE COURT:  So, go for it.  That is fine, absolutely.

3       MR. LEVIN:  The email, by the way, is a government

4  exhibit.  That's what I was just referring to.

5       THE COURT:  I'm not sure, and I guess maybe it would

6  help me if I could understand the government's theory.  You

7  seem bound and determined to try to prevent Mr. Cantwell from

8  eliciting testimony that he felt he was being harassed by these

9  people.  You seem like you really want to do that, but I don't

10  even understand why, because it's not a defense to the crime.

11       MS. KRASINSKI:  So, I think there's a line.  I don't

12  think we are trying to exclude evidence that he felt harassed.

13  I think evidence that he tried to report that to law

14  enforcement, his conversations with law enforcement, I don't

15  think that's relevant to whether or not his intent was to

16  extort.

17       THE COURT:  Is this your fear, so that I can at least

18  understand your thinking?  Your thinking is, even though

19  provocation is not a defense, even though it's not a defense to

20  say, Well, I tried to go to law enforcement so I had to take

21  the law into my own hands, isn't a defense, you think it's

22  really damaging to your case to hear from the jury that Mr.

23  Cantwell was frustrated that the FBI wasn't doing what he

24  wanted them to do.

25       What's not resonating with me is the way I understand

the law, and if you had requested an instruction on this I

would give it, is that provocation is not a defense, and that

the government didn't investigate what Mr. Cantwell wanted him

to would not excuse his conduct if it was otherwise criminal.

Is that the law, or have I got that wrong?

MS. KRASINSKI:  It is the law.  And, actually, your

Honor, this morning I did file an instruction, request for an

instruction.

THE COURT:  So, why are you so concerned about it,

then?

MS. KRASINSKI:  I just think at some point this

becomes about Mr. Cantwell complaining to the FBI, and when

you're looking at 403, when you're looking at the fact that

it's not relevant to a defense --

THE COURT:  But in order to make -- okay.  This is

when I talk to you about context and why I have to allow the

defense to allow the full context for what's happening to come

in, and you, yourself, have acknowledged, I believe.  Mr. Davis

did in his opening statement, that this came about because Mr.

Cantwell was complaining to the FBI, and he was frustrated that

Bowl Patrol people were defacing his site and trying to

interrupt his ability to conduct his business, and he

eventually complained to the FBI, and when he felt the problems

were continuing he took these additional measures, which he

acknowledges that he did, and it's those additional measures

1  that are the criminal acts that comprise the charges here.  And

2  I'm just having a lot of trouble making sense of what's

3  happening.

4      But, Mr. Levin, your point is -- I want to be very

5  clear.  You have every right to elicit in cross-examination

6  from the agent that Mr. Cantwell produced these very same

7  exchanges that are the subject of these charges to the FBI.

8      MR. LEVIN:  That's right.  My problem with it is that

9  I feel like what the government's trying to do is say he was

10  hiding this stuff and that's consciousness of guilt, when, in

11  fact, he was giving it to them.  They're statements that he

12  makes that they want to characterize as admissions.  They're

13  actually him complaining about what happened to him.  They're

14  not admissions.  So, I think context matters in this

15  circumstance as well.

16      THE COURT:  So, the government clearly wants to elicit

17  some evidence that he failed to disclose certain things, right,

18  because you reference that in your opening statement?

19          (Attorney Krasinski nodded)

20      THE COURT:  What exactly is it that he didn't disclose

21  that you think tells us something about his guilt?

22      MS. KRASINSKI:  So, he disclosed the actual

23  photographs of Mrs. Lambert and Mr. Lambert, and he disclosed

24  their address.  What he did not disclose and what he told the

25  FBI he retained no records of were the messages themselves.  He

1    told the FBI that he did --

2        THE COURT:  Well, let me stop.  Again, the parties

3    have not done a great job of educating me about exactly what

4    the evidence in this case is, so I'm learning it as it's coming

5    out.  But there is this Telegram app, and on this Telegram app

6    you can do a variety of things:  you can direct message

7    somebody, you can host a blog, you can host a discussion group.

8    And the statements that comprise the -- give rise to the

9    charges in this case occurred primarily through direct

10   messages, right?

11       MS. KRASINSKI:  Correct, your Honor.

12       THE COURT:  Is the evidence in this case that Mr.

13   Cantwell -- did he ever disclose voluntarily those direct

14   messages to the FBI?

15       MS. KRASINSKI:  He did not, your Honor.

16       THE COURT:  Okay.  What Mr. Levin is referring to is

17   not the direct messages; he's referring to something else,

18   right?

19       MS. KRASINSKI:  Correct, your Honor.

20       THE COURT:  What do you say he's referring to?

21       MS. KRASINSKI:  You can look at it, your Honor.  If we

22   could display Government's Exhibit 501, I think that maybe will

23   help your Honor.

24       MR. LEVIN:  502 I think it was.

25       MS. KRASINSKI:  Sorry?

1    MR. LEVIN:  502 I think it was.

2    MS. KRASINSKI:  The images were attached to a separate

3  email, Government's Exhibit 501.

4    MR. LEVIN:  Oh.

5    MS. KRASINSKI:  So, he provided the actual family

6  photographs and the address information.  That is what he

7  provided.  And so, the images attached to Government's Exhibit

8  501 are included in that email.

9    THE COURT:  When he was complaining about Cheddar Mane

10  because that was identifying information he had about Cheddar

11  Mane?  That's what I'm not -- what I'm not getting is that I

12  think the government's position is -- well, let me ask you to

13  do it this way:  Tell me exactly what it was that he did not

14  disclose that you feel he should have disclosed and, because he

15  didn't, it suggests that he understood that those

16  communications were problematic.  Is it only the direct

17  messages?

18    MS. KRASINSKI:  Correct, your Honor, both versions of

19  the direct messages.

20    THE COURT:  All right.  Did he in the email he

21  submitted beforehand to the FBI say anything about threatening

22  to have sex with Cheddar Mane's wife in front of his children?

23    MS. KRASINSKI:  He did not, your Honor.

24    THE COURT:  All right.  Did he say anything about

25  reporting Cheddar Mane to CPS?

1          MS. KRASINSKI:  Yes, your Honor.

2          THE COURT:  All right.  So, some of it he did

3    disclose, and some of it he didn't disclose.  Is that fair to

4    say?

5          MS. KRASINSKI:  Yes.  What I'm saying he didn't

6    disclose is the actual Government's Exhibit 100, the actual

7    screenshots of the messages.

8          THE COURT:  He discloses the content.  To rebut your

9    theory that he's trying to conceal all this, it's very

10   important for the jury to hear what, in fact, he did disclose,

11   and then you can make your argument about what he didn't

12   disclose.  Mr. Levin is fully entitled to say that some of the

13   conduct that comprises these charges was, in fact, disclosed to

14   the FBI by Mr. Cantwell in an email on a particular date,

15   right?  And you don't disagree with that.

16         MS. KRASINSKI:  No, I agree with that.  I agree with

17   what you're saying.

18         THE COURT:  Okay.  So, the CPS stuff -- how about the

19   stuff, I'm going to dox you?

20         MS. KRASINSKI:  I agree that that's --

21         THE COURT:  Was that also disclosed?  All right.

22         MR. LEVIN:  It was.

23         THE COURT:  So, what wasn't disclosed was the alleged

24   threat to have sex with his wife in front of his children?

25         MS. KRASINSKI:  Correct, your Honor.

1        THE COURT:  Was there anything else in that exchange?

2    I know your point is the screenshots weren't disclosed, but

3    what matters is the content of the communications.  If they

4    were disclosed through another means, that tends to support his

5    argument that Mr. Cantwell didn't conceal the information and

6    undermine your argument that he's concealing the evidence of

7    his criminal conduct, and he needs to be able to do that.  So,

8    what have I got wrong in what we have just been talking about?

9        MS. KRASINSKI:  I agree with everything you just said,

10    your Honor.

11        THE COURT:  Okay.  So, what is it in this email that

12    you don't think is fair game?

13        MS. KRASINSKI:  So, I don't think that the defendant

14    should be able to introduce his self-serving hearsay statements

15    characterizing what Cheddar Mane was doing as harassing and

16    defaming.  There's no evidence that Cheddar Mane did anything

17    defamatory.  There's evidence of prank calls, but there's no

18    evidence of defamation, and so I think the government wants to

19    be careful about having cross-examination be used as a platform

20    to allow the defendant to introduce his own --

21        THE COURT:  Are you trying to get into the content of

22    Cheddar Mane's email to the FBI apart from showing that he

23    disclosed these communications?

24        MR. LEVIN:  This is Cantwell.  This is Cantwell's

25    email to the FBI.

1          THE COURT:  I'm sorry.  I meant Cantwell's

2     communication to the FBI.

3          MR. LEVIN:  That in August of 2019, before he sat down

4     with the FBI, he admitted to them that he threatened to expose

5     Cheddar Mane's real name if Cheddar Mane continued harassing

6     and defaming him; that he did expose him after offering him the

7     out of identifying Vic Mackey, which he declined; that he

8     called CPS in his area to warn that he was involved in a white

9     supremacist terror group, which, in combination with a photo

10    that appears to show LSD on his tongue, could put him in

11    danger; that this was information that the FBI received from

12    Cantwell before they even sat down with him.

13         THE COURT:  Would you be willing to do it in just that

14    way?

15         MR. LEVIN:  Sure.

16         THE COURT:  Mr. Case Agent, you know that the FBI got

17    an email from Cantwell well before you sat down to interview

18    him, right?  And in that email Mr. Cantwell did, in fact,

19    disclose that he had made this statement about Cheddar Mane,

20    and he did disclose that he was threatening to report him to

21    the FBI.

22         You don't have any problem with them doing that, do

23    you?

24         MS. KRASINSKI:  No, as long as they leave out the --

25         THE COURT:  Okay, yeah.  What you're so concerned

about I think is almost inconsequential, because it doesn't

provide any defense, and, as a result, it's creating tremendous

confusion.

But, Mr. Levin, unless I'm wrong about this,

provocation is not a defense to these charges, and if I get a

request for instruction on it, I'll give an instruction on

that, unless you can convince me that it is --

MR. LEVIN:  We're not asking for a provocation

instruction, your Honor, but there is a criminal intent element

to this offense.

THE COURT:  But if he did it with criminal intent

because he was provoked or because he felt, in his words, I

have to commit a criminal act if the FBI won't do it, that

isn't a defense.

MR. LEVIN:  Right.

THE COURT:  The FBI wouldn't investigate, so I had to

go out and commit a crime, that isn't a defense.

MR. LEVIN:  Right.  And our point is it's incongruous

that somebody has a criminal intent when he's telling the FBI,

This is what I'm doing.  This is what I did.

THE COURT:  That's why I'm suggesting that you should

be able to fully do what you want to do, and I'm suggesting --

surprised that the government is so repeatedly asserting these

objections about trying to keep the jury from hearing that Mr.

Cantwell was frustrated.  The jury will know that Mr. Cantwell

was frustrated, because that very evidence of frustration is
the evidence you want to introduce as motive, right?  You're
trying to show why he's trying to do this, and the reason he's
trying to do it is because he was damn mad at these people
because he felt they were ruining his business, and you
introduced evidence yourself that the FBI isn't doing anything
and that's aggravating his frustration.  That's your case,
isn't it?  That's the motive for committing the crime from your
perspective, isn't it?  That's what I'm not understanding.

MR. DAVIS:  I think it's subtle, your Honor, and I
understand your frustration.  The defense now is this whole
thing was a primal scream by Mr. Cantwell, Leave me alone,
leave me alone.  What the defense is saying is that in that
exchange Mr. Cantwell did not intend to issue a threat and did
not intend to extort the information of Vic Mackey, and those
are the specific intents we have to prove.

THE COURT:  Excuse me a second.  I'm just sort of
mindful of what the law is and how I intend to instruct the
law.  The way I understand the law, that he wanted to be left
alone is understandable but not a defense to criminal behavior;
that he wanted these people to stop attacking his site is
understandable but not a defense to criminal behavior; that the
FBI didn't act the way he thought they should act in response
to his threat is understandable but is not a defense; that he's
really, really mad when he does his acts doesn't mean it's not

1    a crime.

2         If he undertakes conduct with the requisite criminal

3    intent, and the conduct is sufficient if undertaken with that

4    intent to be criminal, the jury will be told to return a

5    verdict of guilty.  That he wants to be left alone and is

6    really, really frustrated, and it's a shame that the FBI didn't

7    investigate as aggressively, it doesn't lead anywhere.  It

8    doesn't in any way undermine your case.  That's what I'm trying

9    to understand.  It's almost as if you have a deep fear that the

10   jury won't follow my instructions and that they will basically

11   engage in jury nullification, maybe?  Is that what you're

12   mostly concerned about, that they'll be really upset at the FBI

13   and really sympathetic to Mr. Cantwell, and they'll ignore the

14   law and find him not guilty, even though the evidence points to

15   guilt?  Is that what your fear is?  I'm just trying to

16   understand what this is all about, and I'm not getting it.

17        I'll go back to this particular email.  All right.

18        So, Ms. Krasinski, I am going to allow Mr. Levin to

19   cross-examine about this email.  I agree with you that he can't

20   use his client's own statements that you haven't sought to

21   introduce to establish anything, because anything that would

22   otherwise be hearsay remains hearsay when the defendant seeks

23   to introduce it.

24        So, if he goes in and says, And in this email you said

25   my client said he did X to try to prove that he, in fact, did

X, that would be hearsay and would be inadmissible, but I haven't yet heard Mr. Levin do that, and I think he is entirely within his rights to rebut or eliminate confusion about one argument you're trying to make.  You're trying to make a narrow argument that is there were certain screenshots on his phone that he didn't disclose.  Yeah, he did tell the FBI, in fact, he, unsolicited, produced a lot of these conversations, which is entirely relevant to your defense that your client lacked criminal intent, because if he had criminal intent why would he disclose these things?  That makes perfect sense to me, and you should be given full opportunity to pursue that aggressively.  All right?  But if he tries to get into specific statements in the email that Mr. Cantwell made in the email that are admissible only if the hearsay rule can be overcome and there's no other exception to the hearsay rule that applies, then you have a valid hearsay objection that Mr. Cantwell's self-serving statements admitted for the truth of those statements in an email that he sent to the FBI is inadmissible hearsay.  So, I accept that.

Now, let's just go back over a couple of other things, because, again, I'm having trouble in ruling consistently and clearly, and that's this idea of a kind of case agent exception to the personal knowledge requirement.  And this is what happens in the grand jury, and I'm sure you don't like it, but in the grand jury the agent comes in, and he's like the summary

1   witness for the entire investigation.  He tells the grand jury

2   everything that his agents are doing that he read about in

3   reports and everything else.  But that he did that doesn't mean

4   that he can do that in court.  He couldn't do it for the

5   government, and he can't do it for you.  He can testify based

6   on personal knowledge to things that are not inadmissible

7   hearsay.  All right?

8           So, I need you both to be careful when dealing with

9   witnesses -- and I find this is the most misunderstood and most

10  important rule in the *Rules of Evidence*, is that you have to

11  have personal knowledge about that which you are testifying,

12  and you have to lay the foundation for that so that the

13  reviewing judge can know is that admissible or not.  So, lay

14  that foundation.

15          Second, when can you use transcripts of grand jury

16  testimony or deposition testimony?  You can use it to impeach

17  when there's inconsistency; you can use it to refresh memory

18  when there's no recollection, the witness says, I can't

19  remember, but you can't just say, Let me show you some grand

20  jury material.  Didn't you say in front of the grand jury X?

21  That is not an acceptable way to proceed.  So, establish a lack

22  of memory and then you can show it to him and ask, Having read

23  that, is your recollection refreshed?  Or if he says black when

24  it's white, you can say, Didn't you say white when you

25  testified in the grand jury?  Other than that, I don't think

you can use the grand jury testimony for any other purposes.

So, do those kind of things. I'll better understand what you're doing.

I understand your basic point is correct that the defendant cannot elicit in documents his own hearsay statements that you haven't gone into. I agree with that. Unless under the rule of completeness or something it comes in, you can't do that. But he certainly can establish that these things were, in fact, disclosed by him, because that's one of his central arguments he's going to make in closing argument, he should make. Half of the government's case Mr. Cantwell sent to the FBI in an unsolicited way. How is that consistent with somebody who is acting with a criminal intent? That I completely, completely understand. But I just want to be clear, and if you've got law on this, tell me, but I don't understand provocation as a defense, I don't understand the failure of the government to investigate his own complaints vigorously as a defense, and it doesn't undermine the government's case that he acted with criminal intent.

MR. LEVIN: Right. We're not raising a provocation defense. We don't believe one exists, and so we're not raising it.

THE COURT: Because evidence that he was really mad at these guys and wanted to get back at them is the motive, isn't it? As far as I could see, why is he doing what he's doing?

1    Because he's really mad at this guy and wants to get back at

2    him.  That's the motive.  So, it's rare that the government is

3    objecting vigorously, trying to keep out motive evidence that

4    supports the charge, and that's where I'm having a little bit

5    of trouble.  So, maybe you can think about that as well.

6          All right.  Now, the exhibits with the excerpts, do I

7    have a transcript of the full call?

8          MR. LEVIN:  Yes.  Ms. Sheff did provide one.

9          THE COURT:  All right.  We've got a full call.  And do

10   I have the transcripts of the excerpts you want introduced?

11         MS. KRASINSKI:  I think those may have been returned.

12   I don't know if copies have been made.

13         MR. LEVIN:  Those were Governments Exhibits 105 to

14   109.

15         THE COURT:  What I need to read tonight are both of

16   them, because what I'm going to do is I'm going to make a copy

17   of what I get for the full transcript; then I'm going to go

18   through and highlight exactly where the excerpts are; and then

19   I'm going to read the whole transcript and decide what else

20   beyond those excerpts, if anything, should come in under the

21   rule of completeness; and then I will tell you tomorrow morning

22   what it will be; and then you can put together a new composite

23   exhibit that satisfies the rule of completeness.

24         Did Mr. Wolpin leave?

25         MR. LEVIN:  No, he's here.

1          THE COURT:  If he needs to go for child care -- you

2     can go.

3          MR. WOLPIN:  The afternoon's good.

4          THE COURT:  Okay.  It's just the morning that's the

5     problem?

6          MR. WOLPIN:  Right.  Thank you.

7          THE COURT:  All right.  So, that's what I'm going to

8     do on that issue.  On the government's request to call a video

9     deposition of the victim's spouse, if there's still an issue

10    with respect to that, there's a confrontation clause objection,

11    I've got materials, I'm reading those opinions, and I should be

12    able to give you a decision tomorrow on that.  So, I'll give

13    you a ruling on that tomorrow.

14         Mr. Wolpin, you're standing.  Do you have something?

15         MR. WOLPIN:  Yes.  I had approached Clerk Negron about

16    this issue.  If the Court ultimately rules in favor of the

17    government, I think that the lesson of this morning for us is

18    that, for purposes of preservation, how that appears is not

19    going to be visible on the transcript, and so my concern was

20    how can we preserve what that actually, that testimony actually

21    looks like in the courtroom for appeal, or else we're just

22    looking at a transcript of someone like we had this morning,

23    and it really wouldn't show what it really looked like.

24         THE COURT:  So, I strongly defend the proposition that

25    the official record of the proceeding is what the court

reporter transcribes. I'm ordinarily very reluctant to admit any record of anything that happens in court other than testimony of a witness or the court reporter transcript, but your argument may be the one case where it makes a difference, so if I were to allow it and there is a way to record it, we would make a recording of it and keep it for purposes of appeal. The video today was not ideal; I think we can all agree to that. It was in my mind sufficient, especially since the witness's testimony, frankly, was of limited relevance and not contested, but I will assure you that if there's going to be a -- I would not let an important witness like the victim's spouse testify unless I was confident that the quality of the image and the sound was clear enough that you guys could have a fair shot at it on cross, okay? Because if that's as good as we could do, I would not allow that witness to testify by video. But we can do better, and we have done better, and I've seen it countless times. We did it better 20 years ago on 9/11, when I had a witness testify from a courthouse in Chicago. So, we can do it. I won't let it happen unless we can, in fact, do it in this case, and I think we should make a record of it so that, if there's some argument that, Hey, I couldn't see the person's lips moving, the jury couldn't make any credibility assessment, that would be all vitally important. But there are threshold questions about the admissibility of the testimony that we may not even get there.

1    I have to rule on that tonight.

2         All right.  So, tell me about -- and I'm sorry to keep

3    you, but I want to keep the testimony -- I want a full day of

4    testimony tomorrow.  So, what does the government anticipate

5    putting on tomorrow?

6         MR. DAVIS:  We anticipate calling the victim, Cheddar

7    Mane, Mr. Lambert.

8         THE COURT:  Okay.  And so this agent, finishing the

9    cross and redirect, and then Mr. Lambert will be a big chunk of

10   the day tomorrow?

11        MR. DAVIS:  Yes.

12        THE COURT:  And then how much more do you have to put

13   on by way of evidence?

14        MR. DAVIS:  I think we have maybe five witnesses, none

15   long, but --

16        THE COURT:  Another day, perhaps?

17        MR. DAVIS:  Yes.  I think we rest -- today's Tuesday.

18   I think we certainly rest by close of business Thursday, unless

19   something strange happens.

20        THE COURT:  Okay.  And I know, of course, you can't

21   make any prediction about anything, but if the defendant were

22   to testify, that would increase the length of the trial by at

23   least a day, which he might do, or he might exercise his right,

24   which he's entitled to do, which would take a day away from it.

25   Do you anticipate, regardless of what you're seeing now, that

1    there's a possibility for more days of defense testimony?

2              MR. LEVIN:  Other than Friday?

3              THE COURT:  Yeah.

4              MR. LEVIN:  No.  I mean, I don't think so, no.

5              THE COURT:  Okay.  So, we're still within the realm of

6    being on schedule here; is that fair to say?

7              MR. DAVIS:  Yes.

8              THE COURT:  All right.  Does anyone have anything else

9    that they want to take up with me before I let you go for the

10   day?

11             MS. KRASINSKI:  Your Honor, the defense has rule of

12   completeness objections to two other audio exhibits of the

13   government's, so two jail calls.  I have the transcripts of the

14   portions of the jail calls that the government intends to

15   introduce.

16             Ms. Sheff, do you know if we have complete transcripts

17   of either of the jail calls?

18             MS. SHEFF:  I do not think we do.

19             THE COURT:  How long are they?  Who are they with?

20   So, let me just review with you my basic thinking about the

21   rule of completeness for the defense.  Of course, you can

22   preserve any objection you want, but I don't think the mere

23   fact that relevant information is elicited in a telephone call

24   that is replete with all kinds of other self-serving, unrelated

25   stuff that that means the rule of completeness requires the

whole call to come in.  That's not the standard.  All right?

So, are you going to be arguing that the entire phone calls should come in or --

MR. WOLPIN:  We just widened the window is essentially what we did.

THE COURT:  All right.  Can you try to get someone in your office to produce a transcript of the portion that you think should be widened so you can say to me, Judge, here's what they want to produce, here's what I think should come in under the rule of completeness?  Then I can do that same exercise that I'm doing here, and I can do it more efficiently if you give me that transcript first.

MR. WOLPIN:  Understood.

THE COURT:  So, if you could try to produce that tomorrow so that I can effectively rule, that would be very helpful.  So, I'll then take your exhibits and their request for a wider exhibit, I'll read them and figure out what should come in.  All right.  Is there anything else?

MR. LEVIN:  No, your Honor.

THE COURT:  Let me just say one thing.  I have really high standards for what I expect to happen in my court, because I have such high regard for the legal profession, and I want you to understand I am not being critical of the lawyers in this courtroom.  I think the lawyers in this courtroom are fantastic lawyers, very good lawyers, and they're doing a very

good job here.  So, don't misunderstand when I say I'm

confused, or I'm frustrated, or I need more to rule.  It's not

a criticism.  You're doing what you're supposed to be doing,

and I think you're doing it well, but I'm going to keep pushing

ahead doing what I need to do to make sure I maximize the

chance that I rule correctly on the issues that the parties

present to me.

Okay.  So, tomorrow morning come at 9:00.  I hope to

have a ruling on the first rule of completeness problem.  I may

have a ruling on the video deposition.  But we're going to

start at 9:30 sharp and put in a good, full day.  Okay?

THE CLERK:  All rise.

(WHEREUPON, the proceedings adjourned at 4:56 p.m.)

C E R T I F I C A T E

　　　　I, Brenda K. Hancock, RMR, CRR and Official Court
Reporter of the United States District Court, do hereby certify
that the foregoing transcript constitutes, to the best of my
skill and ability, a true and accurate transcription of the
within proceedings.

Date: ___5/17/21_____　　　　　/s/ Brenda K. Hancock
　　　　　　　　　　　　　　　　Brenda K. Hancock, RMR, CRR
　　　　　　　　　　　　　　　　Official Court Reporter