UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                      \*
UNITED STATES OF AMERICA              \*
                                      \*
                                      \* No. 1:20-cr-00006-PB
            v.                        \* September 24, 2020
                                      \* 9:07 a.m.
                                      \*
CHRISTOPHER CANTWELL,                 \*
                                      \*
                Defendant.            \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>TRANSCRIPT OF DAY THREE OF JURY TRIAL - MORNING SESSION</u>

<u>BEFORE THE HONORABLE PAUL J. BARBADORO</u>

<u>APPEARANCES</u>:

<u>For the Government</u>:      AUSA John S. Davis
                           AUSA Anna Z. Krasinski, Esq.
                           U.S. Attorney's Office

<u>For the Defendant</u>:      Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defender Office

<u>Court Reporter</u>:        Brenda K. Hancock, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1454

I  N  D  E  X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **BENJAMIN LAMBERT** | | | | |
| By Mr. Wolpin | | 32 (Cont'd) | | 84 |
| By Mr. Davis | | | 56 | |
| **PAUL NEHLEN** | | | | |
| By Mr. Davis | 87 | | 105 | |
| By Mr. Wolpin | | 96 | | |
| **KEVIN LEBLANC** | | | | |
| By Mr. Davis | 108 | | | |
| By Mr. Levin | | 120 | | |

E  X  H  I  B  I  T  S

Govt's                                        In Evd.
110B.........................19

Deft's
B-4-A.........................33
C-21.........................85

1                    P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.  Please

3    be seated.

4              Court is in session and has for consideration jury

5    trial in United States of America versus Christopher Cantwell,

6    criminal case number 20-cr-06-01-PB.

7              THE COURT:  I have to address the defendant's Rule 106

8    objection, rule of completeness argument, but before I do that

9    I wanted to pick up with where we left off yesterday afternoon,

10   because I think there may be some -- maybe it's only on my

11   part -- misunderstanding about what uses the defendant can make

12   in cross-examination of prior statements by the witness.  Okay?

13             So, Mr. Wolpin, you were examining the witness at one

14   point about, as I understand it, although I haven't seen the

15   document, what purports to be a transcript of a recorded

16   interview with the FBI; is that right?

17             MR. WOLPIN:  Yes, your Honor.

18             THE COURT:  Okay.  So, that document is, it's not a

19   police report, it's not a 302, it's an actual transcript?

20             MR. WOLPIN:  Correct.

21             THE COURT:  Okay.  Now, that document is not itself in

22   evidence at this point, right?

23             MR. WOLPIN:  No.

24             THE COURT:  Okay.  So, here's my basic approach, and

25   if I'm wrong on this, please tell me, okay?  Ordinarily, people

1   can't read from things that are not in evidence, right?  So,

2   that's not yet in evidence.  It might come into evidence for

3   certain purposes, but it's not in evidence yet.  But I

4   understand it's a standard approach to cross-examination to use

5   statements as a control device, essentially, when examining a

6   witness, and I have zero problem with you asking questions in

7   leading form that simply quote from the document without

8   attributing it as a quote by saying, You were at an interview,

9   right, and at that interview the agent did this to you, didn't

10  he, and you said that to him, didn't you?  That's all fine, but

11  then what happens if he says, No, I didn't say that, or he

12  says, I don't remember that?  That's, as I see it, a Rule 613

13  problem, and I do think that in appropriate circumstances you

14  can admit the statement as opposed to a police report.

15  Ordinarily you couldn't admit the 302; you'd have to call the

16  investigating officer that heard the inconsistent statement.

17          But with the actual recording I think you can, under

18  appropriate circumstance, introduce the portion of it that is,

19  in fact, inconsistent with what the witness is now saying.  If

20  he disclaims memory or uncertainty about what he remembers, you

21  can show it to him, ask him, I am showing you a document, read

22  these words.  Does that now refresh your recollection?  And I

23  have no problem with that.  If he makes a statement that's

24  inconsistent with a statement that he made in the past, I have

25  no problem with you saying you, Didn't you tell the

1    investigating officer blah, and if he won't sign up for that,

2    then, if the matter is not collateral because there is a

3    collateral ruling, it's not collateral, you can then introduce

4    the statement, but you have to then authenticate the statement.

5    There are a variety of ways to do that.  You could do that

6    through a separate witness later on in your case, perhaps, as

7    long as you give the witness an opportunity to explain the

8    inconsistency, or potentially you could do it through the

9    witness himself by, say, for example, establishing that, in

10   fact, he did give the inconsistent statement by, before the

11   jury hears it, say, playing it for him, showing him the -- You

12   agree that you, in fact, made this statement, in which case the

13   statement can be admitted, but it's admitted under Rule 16 only

14   for impeachment purposes.  It's not admitted as substantive

15   evidence.  All right?

16          So, there's a second statement that you examined the

17   witness on, as I'm remembering, which was a statement in a

18   telephone call about whether doxing was or was not a big deal,

19   and apparently he said in that statement, you believe anyways,

20   he said doxing was not a big deal.  Again that statement is not

21   in evidence.  You can't read from that statement, but you can

22   ask him, Isn't it true you talked to a buddy of yours at the

23   prison, and those calls were recorded, and isn't it true you

24   told him doxing is not a big deal?  And if he says, I don't

25   remember, you can show it to him, refresh his memory.  If he

1   says, I didn't do it, you can find some way to get that in.

2   But you can't just put it in; you have to authenticate it to

3   establish that it was a statement that was made.  So, again, if

4   it's on a non-collateral matter and it's inconsistent and you

5   can authenticate the inconsistent statement, you can admit it

6   for impeachment purposes only.  That's how I view it.

7          Do the parties have a different understanding about

8   how I want documents to be used from?  So, my basic starting

9   point is, if someone whips out a document that's not in

10  evidence and starts reading from it, probably a red alert

11  should be going off, because you can't do that, because that

12  effectively puts in evidence the document that's not admitted.

13  But it can come in potentially; it just depends on how it's

14  done.

15         Does anybody else have anything else to say on that

16  particular issue?

17         MR. WOLPIN:  Just to note, if I could --

18         THE COURT:  Yeah.

19         MR. WOLPIN:  -- that the government has agreed to the

20  authenticity of the recordings prior to trial that come from

21  the jail.  We wouldn't need a jail person to do that.

22         THE COURT:  If you need to do it at the appropriate

23  time, if the government was not agreeing to that, yeah, but you

24  can also authenticate it through him, right?  If you say, Put a

25  headset on, listen to this, Is that not, in fact, you talking

1    on a phone call you had with this guy at the prison, and

2    doesn't it fairly and accurately represent what you, in fact,

3    said to him?  And if he doesn't sign up for that, then I'd let

4    you call a jail person, if the government, in fact, objected on

5    authenticity grounds.

6            But my point is for me, when people start reading from

7    documents not in evidence, that's when my alert goes up, I

8    start to get very nervous, because I don't understand what's

9    happening.  So, if you want to avoid me in an alert mode,

10   you'll find other kinds of ways of doing it that don't cause me

11   to be panicking about what's happening.

12           MR. WOLPIN:  Technologically are we able to have him

13   listen to recordings?

14           THE COURT:  I don't know the answer to that.  At this

15   point we can't play a -- can we play -- like, ordinarily in

16   drug trials when we have recorded conversations we can play

17   them over the headset and not over the PA system.  I don't know

18   if we could do that with these headsets.  We would have to

19   think about it.  It would take effort on our part.  I can't

20   guarantee you we can do that.  The better course of action

21   would be, and if you thought there was an issue and you wanted

22   to avoid the jail guard, I'd let you play it for him outside

23   the presence of the jury.  It will waste a little time.

24   Hopefully, you won't need to do that, because the government

25   could just step up and say, Hey, Judge, we agree he said this,

1    and we'll stipulate that he said it, because you may know, if

2    you know what the calls are, and if it's all accurate.  But

3    worst case I'd have to send the jury out, have you listen to

4    it, say, Now, have you listened to this recording, and that's

5    you, isn't it, and that's your buddy, and that's what you, in

6    fact, said to him, right?  Okay.  Judge, I ask that this be

7    admitted as an inconsistent statement to be considered for

8    impeachment purposes.  You've authenticated it, it's okay, I

9    say it comes in, it could be considered for impeachment

10   purposes.  So, that's how I would do it, I think.  Okay.

11          All right.  So, let's turn to the 106 objection and,

12   as I understand it, the government has two excerpts, 110A and

13   111A, and the defendant wants to -- those are excerpts from --

14   and it wasn't quite clear to me from these documents.  Are they

15   two different calls; each excerpt is for a different call?

16          MS. KRASINSKI:  That's correct, your Honor.

17          THE COURT:  Okay.  So, the excerpt that corresponds to

18   110A, this hasn't been marked.  I received it from the

19   defendant, Hannah Pleasants call transcript, is what it's

20   headed, as opposed to Ingrid Dean call excerpt.  So, I'm

21   talking about 110A, and the government wants to put in an

22   excerpt of the Hanna Pleasant call, and the defendant wants

23   some or all of the call transcript to come in.  I'm not

24   inclined to grant the request as to all of it.

25          If the defendant can explain to me what portions under

1    Rule 106 you think are your strongest arguments as to what

2    should be included.

3              MR. LEVIN:  Well, first of all, your Honor, we do have

4    a 401 and a 403 objection to this.  This is framed as an

5    admission of the defendant.

6              THE COURT:  Can I just stop you to make sure, because

7    this is new.  You're telling me, You don't even need to get

8    into 106, Judge.  Before you get into 106, you should exclude

9    the excerpt in its entirety.

10             MR. LEVIN:  Right.

11             THE COURT:  Okay.  So, let's examine that first.  Go

12   ahead.

13             MR. LEVIN:  The statement that the government wants to

14   get in, it says, You know what I threatened to do is dox this

15   fucking asshole, and then I ended up fucking adding CPS to the

16   fucking mix, and I called CPS, and they've got the phone call

17   of that.  So, like, you know, that's a different category of,

18   you know, it's not legal to do that.

19             What he's doing in this call, she's asking him, What

20   did your lawyers tell you?  He's talking basically in

21   hypotheticals this is the way the law works.  He's not even

22   charged with this at the time that he's making the statement.

23   This is not -- this hasn't been -- the extortion charge hasn't

24   been added to or the damage to reputation charge hasn't been

25   added to the indictment at this point.  But if you read the

1     fuller excerpt, he's talking, he says, You know, if you believe

2     the narrative, so he's really talking sort of hypothetically,

3     trying to explain to her what his lawyers have told them.

4     That's different than an admission to the offense.  So, I don't

5     think it's relevant.  I also think it's confusing and

6     potentially prejudicial, because it does -- if you isolate the

7     phrase that the government wants to put in, it does seem like

8     he's confessing to one of the charges, which he wasn't even

9     charged with at the time.  So, that would be our relevance and

10    prejudice objection.

11              If the Court is inclined to let it in --

12              THE COURT:  Can we focus on that one first?

13              MR. LEVIN:  I'm sorry.

14              THE COURT:  All right.  I don't see in here anything

15    that supports the conclusion that he's telling -- he's speaking

16    in hypotheticals and referring to legal advice.  I don't see

17    that.  Where is it?

18              MR. LEVIN:  Well, the first question she asks is,

19    "What does your lawyer have to say about this?"  He says,

20    "There's a limit to how much I can say on here, because they

21    would be sharing it with the prosecution."  And then he answers

22    her question:  "I mean, at the end of the day it's like this:

23    What they have, if you believe the narrative, if you just take

24    this thing as an isolated situation, it looks bad."

25              He's explaining, This is what my lawyers have told me.

1    I'm like give me Vic, you know?  I'm alleged to have said I

2    should have -- I should say give me Vic.  I'm alleged to have

3    said, I should have said, give me Vic, he's more valuable and

4    I'm -- there is, there is, you know, there and my thing is

5    this:  I think that I can convincingly make the case that if

6    you don't want me to fuck your wife or whatever it's not a

7    threat, okay?  And like, and it literally just isn't, you know?

8    What I threatened to do is dox this fuckin' asshole and then I

9    ended up adding, fucking' adding CPS to the fuckin' mix, and I

10   called CPS, and they've got the phone call of that.  So, you

11   know, that's a different category of, you know, it's not legal

12   to do that.  But, like, that's not the crime that I'm accused

13   of right?  So, you know it would be pretty easy to go in there

14   and, like, make the case that, like, okay, you know, find him

15   guilty of a lesser count or something like this, you know?  And

16   then he says, Think that they're going to be able -- I don't

17   think they're going to be able to convince 12 people that fuck

18   your wife in front of your kids is a rape threat, is the moral

19   of the story.  So, I really don't believe that's the case.

20             THE COURT:  It strikes me, to the extent you're making

21   a 401 objection, that clearly is without merit.  So, your

22   argument would be based on 403, on confusion grounds,

23   essentially, that this would, in fact, be misleading or

24   confusing, because certainly under one reading of it it's a

25   statement from the defendant that he did, in fact, do

1    something, and that what he did he understood was not legal,

2    but he's not been charged with it at this time.  That's

3    relevant.  There's no question it's relevant.  Your argument is

4    it's misleading because in context it's clear that he's merely

5    saying, My lawyers are telling me that that would be illegal.

6         MR. LEVIN:  Right.  But that's not what I'm charged

7    with.  My lawyers are saying this would be illegal.

8         THE COURT:  Refresh my memory as to what the charge

9    was at that point.

10        MR. LEVIN:  At that point I believe the first, the

11   original first two charges in this case, the extortion threat

12   and the true threat, threaten to injure, were the only charges

13   in the indictment, what used to be Counts One and Two and now

14   are Counts One and dismissed.

15        THE COURT:  Okay.  So, you're saying the original

16   charges were what are Count One and Count Two of the

17   superseding; is that correct?

18        MR. LEVIN:  Yes.

19        THE COURT:  Okay.  So, the CPS charge, the (d) charge,

20   which I think of as the --

21        MR. LEVIN:  Right.

22        THE COURT:  I think of Count One as the

23   sexual-assault-type charge --

24        MR. LEVIN:  Right.

25        THE COURT:  -- and Count Three as the CPS charge.

1          MR. LEVIN:  Right.

2          THE COURT:  -- and the CPS charge was not brought, had

3     not been brought at that point.

4          MR. LEVIN:  That's correct.  What he's describing

5     hadn't been brought.

6          THE COURT:  All right.  What's the government's

7     response under Rule 403, argument?

8          MS. KRASINSKI:  Well, I just disagree that at that

9     point he's talking about his lawyer's advice.  I mean, if you

10    look earlier he says, I think I can make the case.  He's now

11    talking about his opinion of what he thinks, and so when he

12    says later, What I threatened to do is dox this guy and ended

13    up adding CPS to the mix, that's an admission.  It is a clear

14    admission that he made threats and that --

15         THE COURT:  Well, it definitely is an admission that

16    he did those things, that's true.  The only question would be

17    "and that's illegal," that part of it.

18         MS. KRASINSKI:  And I think it's a fair -- I think

19    it's fair to include his understanding that his conduct is

20    illegal.  He's not saying, My lawyer told me it's illegal.

21    He's not saying that at all.

22         THE COURT:  Shouldn't, then, if I reject the Rule 403

23    argument, why shouldn't I err on the side of caution here and

24    admit the entire statement so that the parties can argue about

25    how it should be understood?  Certainly one option is

1    Mr. Cantwell could testify and explain it.  He doesn't have any

2    obligation to do that, but in fairness, then, shouldn't I just

3    let the whole statement come in?

4            MS. KRASINSKI:  Actually, I think it is more confusing

5    with the entire statement than actually narrowing it to the

6    focused part that relates to the charges.

7            THE COURT:  It's less compelling for you, but that

8    doesn't mean it shouldn't come in.  I get it.  You want just

9    the most compelling part of it for you, but that's exactly what

10   Rule 106 is designed to prevent, that we don't pull things --

11   my reading of it, frankly, in the entirety is not the reading

12   of it that Mr. Levin gives to it, but Mr. Cantwell does not

13   clearly express in the first part of his statement what -- I

14   mean, he doesn't speak in carefully crafted paragraphs in the

15   first couple of paragraphs of his communication.  He's kind of

16   musing about what the situation is.

17           So, I agree that the grammar isn't great, the sentence

18   structure is not great, it's a little more confusing in the

19   beginning, but that's, I think, the defendant's point, is they

20   want to use that to say the best way to construe this

21   communication is simply Mr. Cantwell reflecting that he did do

22   -- and I don't think the defense will challenge this, because

23   the evidence on it seems to be so overwhelming -- he did make

24   the CPS, whether you call it a threat or not -- he's not going

25   to dispute that.  What he really wants to keep out is the one

1   sentence on, And that's illegal, right?  You're not going to

2   tell the jury there's reasonable doubt about whether Mr.

3   Cantwell actually ever indicated that he would call CPS or that

4   he ever called CPS, there's just substantial doubt about that.

5   I mean, that doesn't appear to be the theory that you're

6   advocating at trial here.  Have I got that right?

7          MR. LEVIN:  No, your Honor.  And I guess with regard

8   to the completeness argument I would say that either the whole

9   thing should come in, because it is more clear what he's

10   talking about and how the issue comes up and how he's trying to

11   sort of parse through what his lawyers have told them; or, if

12   the Court's not inclined to do that, then strike the last

13   sentence of Government's Exhibit 110A, which says, So, like,

14   you know, that's a different category of, you know, it's not

15   legal to do that.

16          THE COURT:  Yeah, that's the key statement you want to

17   try to keep out, and that's the key statement the government

18   wants to try to get in.  So, I don't think that inclusion of

19   everything in the -- the entire statement makes it more clear,

20   but that isn't the test.  Rule 106 doesn't say you can do it if

21   it's needed to make the statement's meaning more clear, right?

22   I don't have it in front of me.  Let me pull it out.

23                            (Pause)

24          THE COURT:  106 says, "If a party introduces all or

25   part of a writing or recorded statement, an adverse party may

1     require the introduction at that time of any other part or any

2     other writing or recorded statement that in fairness ought to

3     be considered at that time."  Even if that doesn't increase the

4     clarity -- because I read it the way you do.  I read it as an

5     admission by the defendant that, Hey, these guys screwed up.  I

6     committed a crime, but they didn't charge me with the right

7     crime.  That's how I read it.

8          But I recognize Mr. Levin's point that the call is

9     prefaced with a statement about asking about what lawyers told

10    him, and it's not an admission if you simply say, Hey, I don't

11    know whether I've done anything wrong, but my lawyers told me

12    it's a crime, but that's not how I read the statement.  But I

13    think out of fairness Mr. Levin ought to be able to try to

14    argue for his interpretation.  Ultimately, it will be left to

15    the jury how to interpret the exhibit.

16         My view is it is not so clear either in the excerpt

17    you've presented or in its entirety that the probative value is

18    substantially outweighed by the danger of confusion, so either

19    in excerpt form or in its entirety I'm not inclined to exclude

20    the exhibit under Rule 403.  I also think the excerpt is

21    relevant.  But I do think that the defense ought to be given an

22    opportunity to have the full statement played to the jury and

23    ought to be given an opportunity to argue about the meaning

24    that should be given to it.

25         And so, my ruling on this one is you've persuaded me,

1    Mr. Levin, on your rule of completeness argument that the

2    entire call on 110A should be played.

3              MR. LEVIN:  It's not the entire call; it's just the

4    excerpt that we provided.  I think the entire call goes on

5    for --

6              THE COURT:  Okay.  So, I didn't understand that.

7              MR. LEVIN:  Yeah.  This is just the expanded excerpt.

8              THE COURT:  Okay.  So, you don't want the rest of it

9    in.  You want it all out, the excerpt out, the whole call out.

10             MR. LEVIN:  Right.

11             THE COURT:  I'm telling you I can't -- I'm denying

12   your request on 403, 401 grounds on that basis.  Your fallback

13   position is, if you aren't going to take the entire call out,

14   give the expanded excerpt we provided you, and I'm ruling on

15   that one that, under the rule of completeness, I'm ruling in

16   your favor, and the entire excerpt can be played.

17             MR. LEVIN:  Thank you, your Honor.

18             MS. KRASINSKI:  Your Honor, are you including in that

19   the second page of this, that, I don't think they're going to

20   be able to convince 12 people that fuck your wife in front of

21   your kids, is a rape threat?

22             THE COURT:  Why do you want to keep that -- I just,

23   like --

24             MS. KRASINSKI:  Your Honor, I'm just trying to make

25   sure we make the right clip.  That's all.

1          THE COURT:  I just can't understand a lot of things

2     that lawyers are doing.  That evidence, that statement seems to

3     me to be damning for the defendant, and I just don't get it.

4     All right.  But, in any event, I have highly skilled lawyers

5     for the defense and the government, and you are better skilled

6     and better able to make technical judgments than I am.  As the

7     person trying to rule on things, it's easier for me to rule if

8     I understand what the parties are doing, and I just -- again,

9     this is another example of the parties fighting about things;

10    Please let me put in evidence that seems to me to be harmful to

11    the defendant, and the government saying, Please keep out the

12    evidence that is harmful to the defendant.  I'm just going to

13    let the entire call in, the whole thing.

14         MS. KRASINSKI:  I just want to do it right, your

15    Honor.  Thank you.

16         THE COURT:  All right.  And these are tactical

17    judgments that skilled lawyers have to make.  I want to be

18    clear about this.  That I see a different interpretation of

19    that evidence doesn't mean that the lawyers aren't justified in

20    pursuing what is in their judgment the best tactical approach

21    they can have to help their client or to help the government.

22    You're the experts on that matter, not me.  I'm explaining and

23    commenting on these things outside the presence of the jury,

24    because I have to rule on evidence, and when I don't understand

25    why people are trying to keep things out or why they're trying

1    to put them in, it's harder to rule.  That's why I'm explaining

2    these things.

3            Okay.  So, the defense wins on that.  You should

4    modify 110A, so you can mark it as 110B, which would be the

5    excerpt as expanded by the government, and that can be

6    admitted.

7            (Government's Exhibit 110B received into evidence)

8            THE COURT:  All right.  And so, that leaves us with

9    111A.  I didn't fully understand what the defense was giving

10   me, so what you're saying, Mr. Levin, with respect to 111A is

11   the government has proposed an excerpt, we've given you a

12   bigger excerpt, and we would like you to play the whole thing

13   if you're going to allow any of 111A.

14           MR. LEVIN:  That's correct.

15           THE COURT:  All right.  So, I'm sorry, I didn't

16   understand that.  Do you have a Rule 403 argument with respect

17   to 111A that the entire clip should be excluded?

18           MR. LEVIN:  Mr. Wolpin will address this.

19           THE COURT:  All right.

20           MR. WOLPIN:  It's just the same argument in regards to

21   what the charge was at the time.  He wasn't charged with

22   875(d).  He's having conversations of a technical statutory

23   nature with his attorneys and trying to explain that to the

24   outside world.  I think that should be excluded for the same

25   reasons that Attorney Levin just requested in the prior

1    excerpt.

2                THE COURT:  All right.  Let me look at it.

3                           (Pause)

4                THE COURT:  All right.  Again, I think the defendant's

5    argument, to the extent it's based on Rule 401 and 403, the

6    statement does seem to be relevant because it -- it provides

7    the discussion in which the defendant is explaining that merely

8    doxing somebody is not a crime.  Threatening to dox by

9    extortion is a crime, which is one of the crimes he's charged

10   with here.

11               MR. WOLPIN:  Briefly follow up?

12               THE COURT:  Yeah, go ahead.

13               MR. WOLPIN:  One of my concerns is that, should

14   Mr. Cantwell testify, this is going to create a situation that

15   is going to be relatively confusing to the jury, which is

16   trying to explain that he wasn't charged with something at one

17   point, that the charges were changed, that he used to be

18   charged with this other thing.  I was looking at the ones I was

19   charged with.

20               It's going to create a degree of confusion, I think,

21   that has to be allowed, because he has to explain, if he

22   testifies, why he said the things he said, but it's going to

23   end up going down that process and that --

24               THE COURT:  Well, that's a little confusing to me that

25   you're making that argument in light of the position that you

1    took with respect to 110A, because with respect to 110A you

2    wanted to exclude the whole thing, but then your fallback

3    position is you need to include the rest of the statements,

4    which raises all these issues about what he was charged with

5    and wasn't charged with, and so I don't really credit that

6    argument very -- I don't give much credence to that particular

7    argument on your part, because it's inconsistent with the very

8    position you took with respect to the last exhibit.

9         But I understand your position that the entire thing

10   should be kept out.  Again, I don't think that the excerpt the

11   government proposes to introduce is confusing, that it's -- I

12   do think it is relevant.  I don't think there's any 403

13   consideration that requires its exclusion.  So, I overrule your

14   objection to the extent it's based on Rule 401 or Rule 403.

15        Now, I'm guessing -- this comes back to the very issue

16   where I just see the issue in such different terms from the

17   parties.  So, again, this is another example where the defense

18   seems to want to put in -- if they have to have anything from

19   111, it wants to put in statements like, Get away from me, and

20   you know I was trying to -- what I was trying to accomplish was

21   for a proper purpose.  I'm telling you to stop harassing me.

22   Leave me alone or I'm going to f-ing expose you.  All right.

23   That's a reasonable thing.  The liability enters when I say,

24   Give me Vic.  It's your only out.  So, okay, I didn't realize

25   that until Ryan emailed me about that later on, and so that's

1    why I told Katelen that, you know, there's some liability, and

2    this is one of the things that they're using against me, okay?

3          Again, that seems to be, and I get it maybe as a sort

4    of general matter Mr. Cantwell wants to assert that, I was just

5    trying to protect myself, and I understand that, but it's not a

6    defense, or Mr. Cantwell might want to say, No, I didn't really

7    understand this was a crime when I did these things.  But

8    that's not a defense.

9          And so, if I introduce the excerpts that the defense

10   wants me to introduce, it will create confusion in the jury's

11   mind, but I can remedy that confusion by giving the

12   instructions on provocation is not a defense and ignorance of

13   the law is not a defense.  Maybe I just have higher confidence

14   than you folks do that the jury will follow my instructions,

15   but I think that's -- therefore, it doesn't seem to me that

16   what the defendant wants to produce is really useful to the

17   defense, but I'm inclined to err on the side of putting in the

18   entire call excerpt that the defense wants here.  Now, just

19   explain to me why I shouldn't do that.

20         MS. KRASINSKI:  Your Honor, I'm fine with including

21   the entire excerpt that's the first page of what they've sent.

22   I just want to make clear the second page is a totally

23   different part of the call.

24         MR. WOLPIN:  We would withdraw that.  We would agree.

25         THE COURT:  All right.  I appreciate that.  Thank you.

1      MS. KRASINSKI:  So, we'll change 111 to be the entire.

2      THE COURT:  Page 1.

3      MS. KRASINSKI:  Excuse me.  Yes, page 1 of --

4      THE COURT:  The excerpt.

5      MS. KRASINSKI:  -- the excerpt to be government's

6   exhibit --

7      THE COURT:  All right.  So, the defendant's 401, 403

8   and 106 arguments are preserved with respect to the two

9   exhibits, but I have granted the defendant's request with

10  respect to the 106 argument on both the excerpts that they've

11  presented to me, so that argument has been resolved in the

12  defendant's favor.  The defendant's 401 and 403 arguments are

13  preserved.

14      Okay.  Is there anything else that we need to address

15  before I bring the jury in?  Okay.

16      MR. WOLPIN:  May we just have two or three minutes

17  with Mr. Cantwell just to go over quickly some questions?

18      THE COURT:  Yes.  You don't need us out of here, do

19  you?  Are you telling me you need everybody to vacate the

20  courtroom?

21      MR. WOLPIN:  It has been a little bit of a challenge

22  just getting that time in.  Five or ten minutes?

23      THE COURT:  I have no trouble arranging for -- what

24  time does the defendant usually get here in the morning?

25      THE CLERK:  There's a courtroom set up for them to

1    meet.

2         MR. LEVIN:  He's been getting here at about 9:00.  So,

3    we did talk to them, and they've agreed to bring him into the

4    courtroom then so we can chat with him.

5         THE COURT:  So, there's another courtroom they can

6    bring him into?

7         MR. LEVIN:  I might also add yesterday we had lunch

8    with him across the hall.  They said they would do that.

9         THE COURT:  We'll stay here.  Mr. Cantwell will be

10   brought by the Marshal's people to the other courtroom.  You'll

11   go to the other courtroom and talk to him, but please, please,

12   please hurry, okay?

13        MR. WOLPIN:  We will.  I appreciate it.

14        MR. DAVIS:  Very briefly, Judge, we talked about the

15   redacted indictment.  We have not submitted a new indictment,

16   and I don't know if the jury actually gets an indictment, but,

17   if so, does the Court need the government to do a redacted

18   version that takes out Count Two now that it's dismissed?

19        THE COURT:  Yes.  I think the safer practice would be

20   to -- because I'm going to actually read -- I am amending my

21   charge to read the actual language of each of the three counts,

22   but I am referring to them as Count One, Two and Three.  So,

23   just giving them a redacted indictment would not work.  So, you

24   need to type up a new indictment.  You don't have to phony up a

25   signature or anything like that.  Just caption it "Indictment,

1      Count One, Count Two, Count Three," all right, and that will be

2      a redacted version that will go to the jury so they'll get my

3      instruction, a redacted indictment and a verdict form and all

4      of the exhibits.  All right?  And I'll wait here.  Let's see if

5      we can get this done.  I appreciate the Marshals Service folks

6      accommodating us on that.  We'll move as quickly as possible

7      and try to get going as soon as we can.

8      (Defense counsel conferred with the defendant off the record)

9            THE COURT:  Are we ready to go?

10           MR. WOLPIN:  We have a question that may make sense to

11     bring this up now before we bring in the jury.

12           THE COURT:  Let's do it now.

13           MR. WOLPIN:  So, as the Court is aware, we have had

14     conversations and motions about items that would be played to

15     the jury to show why this witness would have concern about

16     liability in regards to his statements online.  I mean, I have

17     it not immediately teed up but not too far in, and obviously I

18     expect the government to object and then us to have a

19     conversation about whether it's admissible or not, so it seems

20     to make more sense to address --

21           THE COURT:  All right.  Roll.

22           MR. WOLPIN:  All right.  So, what I am seeking to

23     introduce on that regard are two clips from the BowlCast

24     involving this witness.  The first one involves him saying the

25     following.  This is E15.  Would the Court like us to play it or

1    read for you --

2            THE COURT:  Reading it is fine.

3            MR. WOLPIN:  Okay.  And this is the type of system

4    they have built up in so many industries and they are -- they

5    have such hutzpah.  They have such, you know, they don't even

6    care.  They're not even trying to camouflage themselves

7    anymore.  They're almost to the point of coming out and saying,

8    Fuck you, whitey, because they have us, they have us, so the

9    only logical solution is to speak to them in a force they

10   understand.  I think that CEOs, I think that journalists, I

11   think that politicians need to feel the fear of the bullet.

12   They need to feel the fear of if I don't do the right thing, if

13   I do somebody wrong I'm going to fucking pay for it in a big

14   way.  That's how I feel.

15           THE COURT:  You think that exposes somebody to

16   criminal prosecution for saying that?

17           MR. WOLPIN:  I don't think the question is necessarily

18   whether it would result in criminal prosecution.

19           THE COURT:  Could it be a predicate for an

20   investigation?

21           MR. WOLPIN:  We have evidence that the FBI already in

22   this case was monitoring the BowlCast and their platform.  So,

23   the FBI is interested in them.  We know that.  We have

24   follow-up reports indicating that Vic Mackey was the subject of

25   an investigation for terrorism from the FBI.

1          THE COURT:  But we don't know what the predicate was

2     for those things.  If I'm wrong I need you to tell me, but you

3     have been insistent on recognizing your client's First

4     Amendment rights not to be prosecuted unless the conduct

5     qualifies as a true threat under the First Amendment, and

6     insisting in trying to protect your client's rights I assume

7     you've become familiar with the true threat doctrine, and I

8     assume you've become familiar with case law that draws

9     distinctions between people who express reprehensible views and

10    even express views that others should die and where the line is

11    between a reprehensible, appalling statement and a criminal

12    statement.  And I have not studied the issue as you have,

13    because I haven't had to do it in the context of this case, but

14    my only moderately informed understanding is that statement

15    would not be a basis for criminal prosecution, it would not be

16    a predicate for a criminal investigation, because people have

17    First Amendment rights to think whatever they want and say

18    things that are reprehensible, outrageous but that don't cross

19    the line into true threat because they're not advocating

20    imminent violence against individuals.

21          Look, do I like this kind of stuff?  I do not.  I'm

22    not even saying I necessarily agree with what the First

23    Amendment doctrine is.  I'm telling you my understanding of

24    that doctrine.  And, as I understand that doctrine, saying

25    things like someone should come and shoot bullets into

1       someone's grave clearly is a carefully crafted statement to try

2       to walk as close to the line of saying, I want this person to

3       die and I want you to go out and kill him, as you can without

4       crossing into the criminal behavior.  And people who engage in

5       this kind of rhetoric work very hard to find that line and try

6       to go as close to it as they can without crossing it.  Those

7       statements, I don't understand them to be a basis for criminal

8       prosecution or even investigation.  Do you?

9               MR. WOLPIN:  My client had a subjective expectation,

10      for example, that the FBI would be monitoring what he said.

11      These guys I know, because they talk about what they call "Fed

12      posting," which is an expectation that they are of interest to

13      the FBI for the violence that they talk about or I would argue

14      in that instance suggest is necessary at this time.  I think

15      it's the subjective question that this person certainly had

16      concerns that the FBI looked at him as a violent, dangerous

17      individual, and he was --

18              THE COURT:  All right.  We're after 10:00 now.  We're

19      over half an hour late for starting the day.  I simply can't go

20      on and on and on.  I get your basic point.  Let me briefly hear

21      from the government.

22              MR. DAVIS:  Briefly, Judge, the government does object

23      to this extrinsic evidence.  This whole area is only being

24      discussed because of the impeachment for bias doctrine.  The

25      government does not object to general questions of the witness

1    on cross-examination about his fear as a prosecution, if any

2    that he had, by the FBI.  What the government's objecting to is

3    the extrinsic evidence, which is a step further in which the

4    impeachment --

5           THE COURT:  Let me stop and make sure I understand

6    your position.  Are you saying to me, Judge, if he wants to ask

7    the witness didn't you say in a BowlCast blah, blah, blah, and

8    weren't you afraid you were going to get prosecuted for that,

9    you would have no problem with that?

10          MR. DAVIS:  No.

11          THE COURT:  Because that's not extrinsic evidence.

12   So, it's not simply the extrinsic evidence; it is, in fact,

13   your position that under Rule 403 the probative value of that

14   statement is virtually nonexistent.

15          MR. DAVIS:  Correct.

16          THE COURT:  It isn't relevant because it doesn't tend

17   to show bias.  I've let the bias issue go extremely far here to

18   make sure that the defendant has a full and fair opportunity to

19   develop bias points.  I don't find this proffer to give rise to

20   admissible evidence on bias, and I'm not going to allow the

21   excerpt to be played.

22          Your objection is noted.  Do you have another one?

23          MR. WOLPIN:  At this point, no.  I had a second one.

24   I guess, yes, I'll address the second one very briefly.  In

25   that one he talks about, and this was a longer clip,

1    essentially people needing to accept their role.  That role is

2    suggested to be involved with mass murder.  However, he says

3    he's not advocating violence, Vic Mackey chips in that he is,

4    and then they go back and forth about how we canonize these

5    guys and people need to take up this call.

6            THE COURT:  Look, I get it that you want the jury to

7    hate the witness and think everything he does and says and his

8    views are deeply offensive.  I get that, but that isn't a

9    legitimate basis on which the jury cannot credit his testimony

10   as truthful.  It has to be tied to -- and, again, I let you

11   take this argument about bias as far as I think you possibly

12   can, and now you've strayed into I just want to have things

13   that will dirty up the witness so the jury will hate him, and

14   that's not a sufficient basis, in my view.

15           Your objection is -- the government's objection to the

16   use of the statement is sustained, and you will not be allowed

17   to use it.  Your disagreement with me on that point is, of

18   course, preserved for purposes of the record.

19           MR. WOLPIN:  I'd note for the record that was Exhibit

20   E14 of the defense's.

21           THE COURT:  All right.

22           MR. DAVIS:  And just to respond to the Court's last

23   question, the government will object to a question about a

24   specific instance of a specific statement, we're likely to

25   object, such as these, even on cross.  What we don't object to

1    is general questions, because it's already in, the general

2    nature of what the BowlCast did.

3          THE COURT:  Every member of the jury fully understands

4    that the views that this witness has are reprehensible, and

5    we've allowed -- I've allowed abundant evidence on that point.

6          MR. DAVIS:  All right.

7          THE COURT:  All right.  Thanks.  Let's bring the jury

8    in.

9          THE CLERK:  All rise for the jury.

10              (The jury entered the courtroom)

11          THE COURT:  Good morning.  I apologize for the delay.

12    It's all on me.  I'm trying to make things run smoothly.  But I

13    want to tell you something.  We're doing fine in terms of the

14    schedule.  I expect that we'll have closing arguments and

15    charge on Monday.  So, it's a little bit ahead of the schedule

16    that I told you about, and there's a remote possibility we

17    could get to it on Friday, but I'm not optimistic on that

18    point.  So, for your planning purposes know we're okay, we're

19    moving ahead, and we'll have a good day of testimony today.

20    Everything we've been doing is to short circuit all of these

21    times when you're just sitting there and we're talking on the

22    headsets and I'm ruling on different arguments that the parties

23    present.

24          So, we're ready to begin, and the witness should

25    resume the witness stand.

1    **BENJAMIN LAMBERT**, having previously been duly sworn,

2    was further examined and testified as follows:

3          THE COURT:  Sir, you understand you're still under

4    oath?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  All right.  Go ahead, Counsel.

7          MR. WOLPIN:  Thank you.

8                CONTINUING CROSS-EXAMINATION

9    BY MR. WOLPIN:

10   Q.   So, I wanted to pick up with some loose ends we left

11   yesterday before moving on.  Yesterday we had talked about a

12   particular meme that you created and you described but wasn't

13   available in a format to be viewed.

14         MR. WOLPIN:  Can we bring up for identification at

15   this point B-4-A?

16   Q.   All right.  So, now in front of you, I won't go through it

17   in the same detail again, but is this the same photograph or,

18   excuse me, same meme you identified yesterday?

19   A.   It is.  And it's colorized, but, yes, it is.

20   Q.   And this is the one created by you?

21   A.   Yes.

22         MR. WOLPIN:  I would ask this, move for this to be

23   stricken for ID and made a full exhibit.

24         MR. DAVIS:  No objection.

25         THE COURT:  No objection, it will be admitted and can

1    be shown to the jury.

2          (Defendant's Exhibit B-4-A received into evidence)

3    Q.    Just to do very briefly a reminder about what this was,

4    this is Chris Cantwell in the white overalls?

5    A.    Yes.

6    Q.    And it's an FBI hat on his head?

7    A.    Correct.

8    Q.    And then the individual to the left is FBI Agent Dino

9    Capuzzo?

10   A.    Yes.

11   Q.    Who is, again, known to investigate white nationalist

12   issues?

13   A.    Yes.

14   Q.    Okay.  Thank you.

15         MR. WOLPIN:  If we could bring up 216, which is

16   already a full exhibit, Government's 216.  Excuse me.

17   Q.    Now, this is a screenshot of the communication between you

18   and Mr. Cantwell; is that correct?

19   A.    That's correct.

20   Q.    I asked you yesterday about a song, and I guess I have a

21   little confusion as to the top portion of this has a play arrow

22   and the word "Wig Nasty" after it at 20:14.  Do you have an

23   explanation for that?  Do you understand that what that is?

24   A.    Yes.

25   Q.    So, that is, I presume, a song about Mr. Cantwell?

1    A.    No.

2    Q.    Okay.  That is not a song about Mr. Cantwell?

3    A.    No.

4    Q.    Do you know why it appears in your chat with Mr. Cantwell?

5    A.    Yes.  It's not actually in the chat itself.  That is a

6    separate window.  He wouldn't have seen that.  It wasn't

7    something that I sent to him.  It was a voice note sent by Wig

8    Nasty, and it really has no bearing on the conversation with

9    Cantwell.

10   Q.    Okay.  Thank you.  If we can move on to Government Exhibit

11   213, now, we had also some confusion about the timing of

12   things, and I wanted to make sure the timing was clear that

13   these are the last series of texts in this case?

14   A.    Yes.

15   Q.    And the final one arrives or it looks like it's sent at

16   9:42 p.m.?

17   A.    Yes.

18          MR. WOLPIN:  Just for the witness at this point,

19   because it's just for ID, can you bring up Exhibit A.

20   Q.    All right.  So, that's 9:42 on June 16th, correct, is the

21   final of those exchanges?

22   A.    Yes.

23   Q.    Is what you see before you is the BowlCast page, which we

24   reviewed yesterday?

25   A.    Yes.

1   Q.   Does that look familiar?

2        MR. WOLPIN:   You can scroll down or highlight, excuse

3   me, for the witness the date.

4   Q.   This also is June 16th, 2019, correct?

5   A.   Yes.

6   Q.   Okay.  And on the next page we can see the public version

7   that was posted on the BowlCast website, and if you can

8   highlight the time on that below the first one.  So, that is

9   shown as being posted online on June 16th at 22:57?

10  A.   That's correct.

11  Q.   Okay.  Which is 10:57 p.m., essentially?

12  A.   Correct, Central Time.

13  Q.   Okay.  So, at 9:42 p.m. it's over, and by 10:57 p.m. it's

14  up online that same day?

15  A.   Yes.

16  Q.   Now, if we can bring up Government's 102, which is a full

17  exhibit, this is the screenshot you later took of Radical

18  Agenda, correct?

19  A.   Correct.

20  Q.   And that's showing up as June 17th, 2019, if you look on

21  the left-hand side?

22  A.   Yes.  I'm familiar with it, yes.

23  Q.   Okay.  Yeah, it doesn't blow up too well.  And if we look

24  at the time frames, these pictures are being posted at 1:50

25  something a.m. on June 17th?

A.    Yes.

Q.    Okay.  So, at the time that your exchange was posted online on the BowlCast these photographs hadn't been posted to this Radical Agenda site?

A.    No, not those specific photographs.

Q.    All right.  And, as you understand now, no call to CPS had been placed before the BowlCast posted your exchange?

A.    As I understand it, yes.

Q.    All right.  We can move on from that at this point.  Thank you.

At the time that you received these messages you did not seriously think that an incel listener was going to come to your house and rape your wife?

A.    I knew that it was a very small chance that it would happen, but that doesn't mean that there is no chance.

Q.    I guess the question I have again is did you take it seriously that an incel listener was going to come to your house and rape your wife after this exchange?

A.    Yes.

Q.    Now, you ended up speaking with the FBI in October, correct?

A.    Correct.

Q.    And your intent in that conversation was to be direct and honest with them, correct?

A.    I mean, correct.  It was obviously nerve-wracking, and I

1    felt as though I was under scrutiny.

2    Q.   All right.  We'll talk about that in a minute.

3         MR. WOLPIN:  If I could just have a moment to speak

4    with the government?

5         THE COURT:  Sure.

6    Q.   So, when you spoke with the FBI in October you addressed

7    this comment about incel listeners with the FBI?

8    A.   If you could refresh my memory with the exhibit, that

9    would be good.

10   Q.   Yes.

11        MR. WOLPIN:  So, if we could, I don't know if it's

12   easier here to either bring up D through the system or for me

13   to place it just for the witness only at this point to refresh

14   his recollection.

15        THE COURT:  So, you want to enable the web camera and

16   do it.

17        MR. WOLPIN:  That may be faster than trying to bring

18   it up and finding the page.

19        THE COURT:  All right.  We could do that.

20        MR. WOLPIN:  And I'll tell the Court there is an error

21   in the transcript, that's why I was discussing that with the

22   government, as far as a single word was miswritten by

23   agreement.  And this is now being presented just to the

24   witness.

25        THE COURT:  All right.

1    Q.   Looking at what is highlighted, what you told them at the

2    time was that you did not think -- I'll phrase it in the exact

3    way you did.  Do I think that one of the incel listeners, incel

4    members of his audience was going to come rape my wife at the

5    time?  No.  Now?  Maybe.

6          Is that familiar?

7    A.   Yes.  That's familiar, yes.

8    Q.   So, what you told them is at the time it happened you

9    didn't seriously think an incel listener was going to come and

10    have sex with your wife?

11    A.   At the time I said that, because I had confidence in my

12    ability to defend myself from that happening and for my wife to

13    defend herself from that happening.

14    Q.   Now, the FBI came to your work, as we discussed yesterday?

15    A.   Yes.

16    Q.   And they made clear to you that they knew what the Bowl

17    Patrol was?

18    A.   Yes.

19    Q.   And that they knew who Cheddar Mane was?

20    A.   Yes.

21    Q.   And that they knew that you, Ben Lambert, were Cheddar

22    Mane?

23    A.   Yes.

24    Q.   And before the recording started, the FBI told you that

25    they had a CD of all the episodes where you were on the

1    BowlCast?

2    A.   Yes.

3    Q.   They told you that they were going to play the episodes of

4    the BowlCast while they were interviewing you if you didn't

5    cooperate with them?

6    A.   No.

7    Q.   Now, as we talked about briefly yesterday, you do have a

8    friend within the Bowl Patrol by the name of Tactical Bowlcut?

9    A.   Yes.

10   Q.   And he is named Robert Moeller by real name?

11   A.   Correct.

12   Q.   And for a period after the FBI came to you Mr. Moeller was

13   incarcerated?

14   A.   That's correct.

15   Q.   And you guys would have fairly regular conversations about

16   all kinds of topics, correct, over the phone?

17   A.   That's correct.

18   Q.   Including what was going on or what had gone on between

19   you and the FBI?

20   A.   Yes.

21   Q.   Okay.  And what you told him after the FBI came was that,

22   We were going to play the episodes of the BowlCast while we

23   were interviewing you if you weren't going to cooperate with

24   us.  That's how you described it to him?

25   A.   It is.

1    Q.   Now, the Bowl Patrol or, excuse me, the FBI came after you

2    like they were going to hold all of the Bowl Patrol stuff over

3    your head?

4    A.   That's what I told him, yeah.

5    Q.   The FBI, when they came to you, it felt like to you that

6    they were holding the Bowl Patrol stuff over your head?

7    A.   That's what I told him.

8    Q.   That's not quite the question I'm asking.  I'm asking you

9    whether or not when the FBI came to you they held the Bowl

10   Patrol stuff over your head.

11   A.   No.

12   Q.   So, let's go back through that.  You had a conversation

13   with your friend soon after your interaction with the FBI,

14   correct, over the phone?

15   A.   That's correct.

16   Q.   That friend, again, is a member of the Bowl Patrol?

17   A.   Correct.

18   Q.   That friend is someone who you consider a very close

19   friend?

20   A.   I wouldn't say that, no.

21   Q.   That's someone you would send money to while he was

22   incarcerated?

23   A.   I did.  I did buy him, you know, one of those care

24   packages with the coffee and stuff in it, yeah.

25   Q.   And he's someone you would talk to on a regular basis

1    about lots of things, about sports, about family, about what's

2    going on in the saga with Chris Cantwell?

3    A.    Yes.

4    Q.    And you told him over the phone that, They came after me

5    like they were going to hold all the BP stuff over my head.

6    A.    That's what I told him, yes.

7    Q.    Okay.  So, before the recorder was ever turned on the FBI

8    had told you they had listened to all of the episodes of the

9    BowlCast that you were on?

10   A.    I don't recall that specifically, so I can't really say

11   yes or no to that.

12   Q.    I thought you just testified to that a few minutes ago.

13   A.    Did I?

14   Q.    I believe so.

15   A.    Okay.  I mean, I'm sorry.  This is, you know, a little bit

16   stressful for me.

17          THE COURT:  Why don't you put your question again to

18   the witness.

19          And listen to what he asks and try to answer it.

20          THE WITNESS:  Okay.

21   Q.    All right.  So, when the FBI came to speak with you they

22   told you that they had listened to the episodes of the BowlCast

23   or had a CD of all the episodes of you on the BowlCast?

24          MR. DAVIS:  Objection.  Compound question.  It's

25   different to say they'd listened, to say that they had a CD.

1    THE COURT:  All right.  Start again, Counsel.

2  Q.   Okay.  I can break it down.  Okay.  When the FBI came to

3  speak with you they told you, We have a CD of all the episodes

4  you've been on on the BowlCast?

5  A.   Yes.

6  Q.   And when the FBI came and told you that, they told you

7  that they were going to play them while we were recording you

8  talking to make you look bad, but they decided not to?

9  A.   I don't think that that actually happened.  I don't recall

10  at this point, no.

11  Q.   But, again, you had a conversation with Mr. Moeller far

12  closer in time to that interaction than it is today?

13  A.   Yes.

14  Q.   Okay.  And when talking with Mr. Moeller, you told him

15  that they said they were going to play the recordings while we

16  were talking to you to make you look bad, and we decided not to

17  do that?

18  A.   That's what I told him, yes.

19  Q.   Before the recorder went on the FBI threatened you with

20  saying that there was going to be CNN on your doorstep, because

21  if you did not help them they were going to tell CNN, *New York*

22  *Times*?

23  A.   That's what I told Ian, Robby.

24    MR. DAVIS:  Objection.  Hearsay.  This is improper

25  impeachment.  Counsel can ask --

1          THE COURT:  Hang on.  Hang on a minute.

2          Right.  You can ask the witness, you can cross-examine

3     the witness, And they told you this, didn't they?  And if he

4     says, No, then you can deal with the alleged consistency:

5     Well, you told Mr. So and So -- the FBI told you X, didn't

6     they?  No, they didn't.  Well, you told Mr. So and So they told

7     you X, didn't you?  Yes, I did.  That is an inconsistent

8     statement that you can ask him about.

9          MR. WOLPIN:  I thought that's how I prefaced the

10    question.

11         THE COURT:  I maybe didn't understand it, so I

12    apologize, but I have now explained to you what you can do, so

13    please go ahead.

14         MR. WOLPIN:  Yes.  Thank you.

15    Q.   When the FBI came to you they threatened you with saying

16    that they were going to have CNN on your doorstep, because if

17    you didn't help them they were going to tell CNN, *New York*

18    *Times*?

19    A.   No.

20    Q.   So, your testimony today is that they did not say that to

21    you?

22    A.   Correct.

23    Q.   Now, as we just went through, far closer in time to this

24    you had a conversation with Mr. Moeller?

25    A.   Yes.

1    Q.    And that was on a recorded line?

2    A.    Yes.

3    Q.    And in that conversation you were talking to someone you

4    were friends with?

5    A.    Yes.

6    Q.    And you talked with him many times about what was going on

7    in the situation between you and Chris Cantwell?

8    A.    I did.

9    Q.    You were comfortable enough to talk to him about the fact

10   that you were speaking with the FBI, which you said is not

11   necessarily a positive in your movement?

12   A.    Yes.

13   Q.    So, this is someone you had some comfort or closeness

14   with?

15   A.    Yeah, you could say that.

16   Q.    And you told him that the FBI had threatened you, saying

17   there was going to be CNN on my doorstep, because if I did not

18   help them they were going to tell CNN, *New York Times*?

19   A.    That's what I told him, yes.

20   Q.    Now, that's what you told him, but you're saying at this

21   point that they did not say that to you when they were there?

22   A.    Yes.

23   Q.    Now, as we reviewed, the interview you had with the FBI

24   was recorded?

25   A.    Yes.

1   Q.   Okay.  And you spoke with them.  There was a recording

2   device in the room at the police station?

3   A.   I didn't see a recording device in the room, but it was

4   recorded on a camera.

5   Q.   Okay.  And in that interview you told them, Right, and,

6   like you said, CNN.  I'm like fucking sitting on the porch?

7   A.   I don't recall saying that.

8   Q.   Okay.  Would it refresh your recollection to see the

9   transcript of what you said?

10  A.   Sure.

11         MR. WOLPIN:  Okay.  This is just for the witness.

12  A.   Yes.

13  Q.   Okay.  So, unprompted, you can see what happened before

14  and after, you told them, Like you said, I'm like fucking

15  sitting on the porch?

16  A.   Yes.

17  Q.   Do you remember whether there's any other mentions of CNN

18  in that interview that would explain why you were talking about

19  that?

20  A.   No.

21  Q.   And it's still your testimony that they did not tell you

22  or threaten you with CNN being on your doorstep if you did not

23  help them?

24  A.   They didn't threaten me with CNN being on my doorstep, no.

25  Q.   Now, the FBI had made it clear to you that they had

1    listened to what you said on the BowlCast before the interview.

2    We established that, correct?

3    A.    Correct.

4    Q.    Okay.  So, they knew what kinds of things you said, if

5    they had listened to it?

6    A.    Yes.

7    Q.    And they made you aware of that before they sat down for

8    the recorded portion of the interview?

9    A.    I don't recall.

10   Q.    Now, if they had listened to the episodes of the BowlCast

11   they would have heard you talk about very violent things?

12   A.    Yes.

13   Q.    We've heard some of the jokes about rape but other violent

14   things about mass murder, about people needing to fear the

15   bullet, about dangerous things?

16   A.    About dangerous things and mass murder, sure.  Yes, yes.

17   Q.    Okay.  And the FBI would have been aware that there was an

18   Episode Number 7 of the Bowl Patrol, if they had listened to

19   all the ones that you were on?

20   A.    Yes.

21   Q.    And you're familiar with Number 7, correct?

22   A.    I'm familiar that I know that I was on it.  I don't

23   remember everything that was said by everybody on it.

24   Q.    Do you remember the title -- excuse me.  The title of

25   BowlCast Number 7 was *Taste of Terror*?

1    A.   That sounds right, yeah.

2    Q.   And that episode is the only episode that ultimately got

3    taken down from the BowlCast, correct?

4    A.   I don't know.

5    Q.   Okay.  In that episode, the theme of the episode was how

6    to cause terror in your community?

7              MR. DAVIS:  Objection.  Rule 403, hearsay, relevance.

8              THE COURT:  Put on the headsets.

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10             THE COURT:  Is this something different from what you

11   proposed to play and that I said you couldn't play?

12             MR. WOLPIN:  That was Episode 8.  This is Episode 7.

13   I'm done.  This was going to be the last question in the

14   series.

15             THE COURT:  All right.  You can move on, then.

16             MR. WOLPIN:  I would just renew simply the motion that

17   we had, the motion in the hearing we just had, I'd incorporate

18   the motion *in limine* hearing, and I'd note that we've now

19   established to some degree that he knew that they had listened

20   to the episodes, which provides --

21             THE COURT:  Hang on a second.  Counsel for the

22   government can't hear.

23             MR. WOLPIN:  Okay.  I'm just trying to finish the rest

24   of it.

25             THE COURT:  All right.  Now make your record.

1          MR. WOLPIN:  In an effort to finish the record, I

2     would just incorporate the arguments made in the initial

3     motions *in limine* on this topic as well as the hearing we had

4     prior to the commencement of today's proceedings and note that

5     the foundation has been established that the FBI had told him

6     about his involvement in the Bowl Patrol and that they knew

7     about it, which is the rationale why we believe it's relevant

8     to show the seriousness of the items he said and why that would

9     be on his mind at the time he was meeting with the FBI.

10          THE COURT:  All right.  And I just want to make clear

11     for the record that I've given you extensive opportunities to

12     present to me any arguments you have about specific pieces of

13     evidence that you wish to introduce.  In fact, we took about a

14     half an hour at the beginning of court today to go over two

15     excerpts that you said you wanted to play.  None of those

16     concern BowlCast 7.  I don't know what's on BowlCast 7.  I only

17     know what you've done so far.  So, you haven't given me a

18     specific piece of evidence that you're trying to introduce.

19          There is abundant evidence in the record already

20     that's uncontroverted that this person and members of the Bowl

21     Patrol hold reprehensible views, they advocate violent conduct,

22     they are accelerations, and that they want to bring down the

23     government.  All of that is in front of the jury.

24          I don't have anything specific from you, so I have

25     nothing more that I can rule on.  So, since you have given me

1      nothing more to rule on, I sustain the government's objection.

2              MR. WOLPIN:  I was just completing the record.

3              THE COURT:  And I'm just completing the record as

4      well.  Let's move on.

5      (END OF SIDEBAR CONFERENCE)

6      Q.   When you appear on the BowlCast there are discussions of

7      something called "fed posting," correct?

8      A.   Yes.

9      Q.   Okay.  And that's basically a compound word, "fed" and

10     "posting"?

11     A.   Yes.

12     Q.   And the idea is that you are saying something, meaning

13     posting, correct?

14     A.   Correct.

15     Q.   And that the fed portion of it is that it's something that

16     federal law enforcement would be interested in following or

17     hearing because of the nature of the content?

18     A.   Essentially, yeah, that's fair.

19     Q.   So, it's something where you're pushing the line of what

20     might be legal to gather the attention of federal law

21     enforcement?

22     A.   I don't know that you would want to gather attention of

23     federal law enforcement, but would it be something that could?

24     Yes.

25     Q.   And so, there are times when you say something and you

1    say, This is fed posting or this is fed posting, acknowledging

2    it would be something that law enforcement would be interested

3    in hearing?

4    A.   Yes.

5         MR. WOLPIN:  Now, on a slightly different area but a

6    related area, I don't want to go down that road without asking

7    the Court, your Honor.  I apologize.

8         THE COURT:  All right.  So, there's another subject

9    you want to talk about but you need to make me aware of it.

10   All right.  Go put the headset on.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12        THE COURT:  Speak into the microphone.

13        MR. WOLPIN:  This is the issue raised in the motion *in*

14   *limine* prior to trial about threatening the FBI Agent Capuzzo

15   and talking about how that's fed posting and knowing that

16   essentially the FBI would know that he participated in a

17   conversation that threatened to kill and rape specific --

18        THE COURT:  All right.  I don't know what this is, so

19   I can't -- I need more information.  How much more

20   cross-examination do you have?

21        MR. WOLPIN:  Not a lot, your Honor.

22        THE COURT:  All right.  Go and finish everything else

23   you're doing, and when you're done I'll take a break and you

24   can explain what you want to do.  All right?

25   (END OF SIDEBAR CONFERENCE)

1    Q.   So, in your conversations with the FBI it was important

2    for you that they see this all as performance art, correct?

3    A.   Correct.

4    Q.   And so, what you told them on numerous occasions was that

5    everything you had ever said on the Bowl Patrol was just

6    performance art?

7    A.   Yes.

8    Q.   Now, it was also important to you that the FBI see that

9    Ben Lambert is one person and Cheddar Mane was a different

10   person?

11   A.   That's correct.

12   Q.   It was important because of the kinds of things that

13   Cheddar Mane says online?

14   A.   Correct.

15   Q.   Now, do you personally think mass shootings are funny, or

16   is that just something that your character finds funny?

17   A.   I don't personally think mass shootings are funny at all,

18   no.

19   Q.   Okay.  So, as Cheddar Mane online you pretend they are,

20   but as Ben Lambert offline they are not funny to you?

21   A.   Yes.

22   Q.   Now, you had, as we said, quite a few conversations with

23   Mr. Moeller over the phone, correct?

24   A.   Yes.

25   Q.   And in those conversations, again, you're not appearing as

1 | a character, correct?

2 | A.   No.

3 | Q.   You were appearing as -- well, not appearing -- you were

4 | speaking as Ben Lambert, correct?

5 | A.   It's not really that clear.  I mean, yes and no.

6 | Q.   When you're talking to your friend it's not for a public

7 | audience, correct?  This is a private call between the two of

8 | you?

9 | A.   It is a private call, yeah.

10 | Q.   Okay.  And this is a call with someone, as we have talked

11 | about, who you've considered a friend?

12 | A.   Yes.

13 | Q.   And in that call, in those calls, excuse me, you joked

14 | about shootings?

15 | A.   Yes.

16 | Q.   You laughed about a shooting that happened in Jersey that

17 | was a mass shooting?

18 | MR. DAVIS:  Objection.

19 | THE COURT:  Overruled.

20 | A.   You'd have to refresh my memory.

21 | MR. WOLPIN:  Okay.  So, it would ultimately be Exhibit

22 | F23 I could put up just for the witness.  It would be a

23 | transcript.

24 | Q.   So, do you see Exhibit F23?

25 | A.   Yes.

1    MR. DAVIS:  Can I just have a word with counsel?

2    THE COURT:  Yes.

3    (Counsel conferred off the record)

4    Q.   And in that call between the two of you, you were laughing

5    about a shooting?

6    A.   Yes.

7    Q.   Now, your testimony yesterday was that you take doxing

8    very seriously?

9    A.   Yes.

10   Q.   And we've gone through who your friend is, and you've had

11   a number of conversations with him, and in speaking with him

12   you told him -- and in speaking to him you told him, you said,

13   Doxing people is not a big deal like it used to be?

14   A.   If you could show me.

15   Q.   Because it's so brief, I didn't make a transcript of it.

16   This is F24.  I could also play the recording, if that would

17   help you.

18   A.   Yeah, I think that was -- I can't remember exactly what

19   was said.

20   Q.   That doesn't refresh your memory?

21   A.   Not really.

22   THE COURT:  All right.  We can -- when we take our

23   break, we'll figure out a way to pursue that matter.  You can

24   play the recording for the witness outside the presence of the

25   jury and see if that refreshes his memory.

1    Q.   Now, in addition to the FBI having listened to the

2    episodes of the BowlCast, the FBI would have seen that

3    photograph of you with the pieces of paper on your tongue?

4    A.   Yes.

5    Q.   And in addition to having seen that, if they had listened

6    to the BowlCast, they would have heard times where you talk

7    about tripping?

8    A.   Yes.

9    Q.   Would have heard you talking about times where you took

10   strips of acid?

11   A.   Yes.

12   Q.   Hear you talking about dropping acid?

13   A.   Yeah.

14   Q.   Talking about it on a number of occasions?

15   A.   Yeah.

16   Q.   Now, you've talked about how you have firearms?

17   A.   That's correct.

18   Q.   And you had firearms before this interaction with Chris

19   and you had firearms after, it seems.

20   A.   Yes.

21   Q.   Okay.  So, you've been someone who's had guns for some

22   time?

23   A.   Yes.

24   Q.   So, you didn't go out and buy a gun in relation to this

25   June conversation?

1    A.    No.

2    Q.    Okay.  Now, guns are very important to you, correct?

3    A.    Yes.

4    Q.    And something that you would not want to see taken away

5    from you?

6    A.    Of course not.

7    Q.    And you knew when the FBI got there that they knew about

8    this stuff about acid, and when they got there you told them

9    you had a gun.

10    A.    Yes.

11    Q.    You were aware at the time that the FBI had prosecuted a

12    number of white supremacists for having a gun while a drug

13    user?

14    A.    I wouldn't say that, no, but I was aware that, you know,

15    it would be against the law to have a firearm and be a drug

16    user.

17    Q.    Okay.  And so, you told the FBI, as you did here today,

18    that you didn't use acid?

19    A.    That's correct.

20    Q.    Now -- I apologize.  Excuse me.

21                    (Pause)

22    Q.    When the FBI met with you after telling you about the Bowl

23    Patrol, they told you cooperating would be your opportunity to

24    get ahead of this?

25    A.    It was brought up during the interview, yes.

1    Q.    And they told you that you had a lot to lose?

2    A.    Yes.

3    Q.    And they offered that Cheddar Mane could go off into

4    internet oblivion?

5    A.    Yes.

6    Q.    And you responded that you absolutely understood?

7    A.    Yes.

8              MR. WOLPIN:  If I could just have a moment, your

9    Honor.

10                         (Pause)

11             MR. WOLPIN:  Your Honor, other than that one area, I

12   would be done.

13             THE COURT:  All right.  Thank you.  And we'll reserve

14   your rights on that.  I will deal with it at the next break.

15             Let's have redirect, and we'll go for another 10 or 15

16   minutes, unless you finish with the witness before then,

17   Mr. Davis.

18             MR. DAVIS:  Thank you.

19             THE COURT:  And we need to take a moment to disinfect

20   here.

21                         (Pause)

22             THE COURT:  All right.  Go ahead, Mr. Davis.

23                    REDIRECT EXAMINATION

24   BY MR. DAVIS:

25   Q.    Let's talk about the avatar of you.  You recall being

1    shown the picture of Cheddar Mane with the gun and the other

2    stuff?

3    A.   Yes.

4    Q.   So, how did you get that avatar?

5    A.   I had one of the other members of Bowl Patrol draw it for

6    me.

7    Q.   And why did you want it?

8    A.   Well, everybody else had a fancy avatar, and I didn't, so

9    I had him draw one for me.

10   Q.   All right.  And which member of Bowl Patrol drew it for

11   you?

12   A.   The one that goes by Illegal Aryan.

13   Q.   Illegal Aryan?

14   A.   Yes.

15   Q.   And did you actually pay Illegal Aryan to do your avatar?

16   A.   I did.

17   Q.   And how much did you pay for it?

18   A.   $75.

19   Q.   Okay.  Let's talk about prank calls.  Was there discussion

20   that you were aware of between members of Bowl Patrol and Mr.

21   Cantwell regarding his knowledge that prank calls were coming

22   in?

23   A.   Can you repeat it?

24   Q.   So, did Bowl Patrol and Mr. Cantwell ever discuss the fact

25   that prank calls were coming in and that at times they were

1   actually entertaining?

2   A.   We didn't discuss it with him, no.

3   Q.   All right.  Did Mr. Cantwell make suggestions about the

4   timing of calls to the Bowl Patrol?

5   A.   He did.

6   Q.   All right.  Can you explain that?

7   A.   There was a time when we were -- when there was --

8          MR. WOLPIN:  Objection.  Relevance, your Honor.

9          THE COURT:  Overruled.

10  A.   There was a time where there was a series of three prank

11  calls, and on the air Cantwell said, and I'll paraphrase, If

12  you want to prank the show, that's fine, but don't do it at the

13  beginning or the end of the show.  And that was pretty much it.

14  Q.   Okay.  So, you were asked -- let's talk about the meme.

15  You were shown the meme of Mr. Cantwell with the FBI hat and

16  the janitorial supplies?

17  A.   Yes.

18  Q.   And you drew up that meme, right?

19  A.   Correct.

20  Q.   Now, were you doing that meme to reveal a secret that no

21  one knew about?

22  A.   No.

23  Q.   That is, did anyone make a secret of Mr. Cantwell's having

24  made a complaint to the FBI about Vic Mackey and Mosin-Nagant?

25  A.   No.  In fact, on his website he had said specifically that

1    he was going to, you know, forward information and forward all

2    the prank calls to the FBI.

3    Q.   All right.  Showing you Government Exhibit 112 in

4    evidence, I believe -- so that's Mr. Cantwell's account, right?

5    A.   Yes.

6    Q.   And it says, Today I submitted a criminal complaint to the

7    FBI, right?

8    A.   Yes.

9    Q.   And does it state exactly whom he named?

10   A.   It says that he named Vic Mackey and Mosin Nagant.

11   Q.   Okay.  So, is this generally known in the alt-right

12   community that Mr. Cantwell had called?

13   A.   Yes.

14   Q.   So, when you did this meme, are you outing him in some way

15   that he isn't already outed?

16   A.   No.

17   Q.   All right.  Let's talk about the chats.  You were shown

18   the chats and the time they ended.  Let's look at the chat on

19   Government Exhibit 219.  Do you have that?  That's in evidence.

20   A.   I see it.

21   Q.   Okay.  Now, that's actually your screenshot of that chat,

22   right?

23   A.   That's correct.

24   Q.   And that's from your perspective in Missouri, which is on

25   Central Time, right?

1   A.   That's correct.

2   Q.   And do you remember defense counsel asking you if the

3   chats ended at 9:45 p.m.?

4   A.   Yes.

5   Q.   And you agreed with that, right?

6   A.   Yes.

7   Q.   But that was Eastern Time, right?

8   A.   That's correct, yes.

9   Q.   And so, what time Central Time did the exchange with

10  Mr. Cantwell end?

11  A.   I can't see from this photo, but it would have been -- if

12  it was 9:45 Eastern it would have been 8:45 Central.

13  Q.   Can you see at the bottom of 219 it says 20:35?

14  A.   Yes.

15  Q.   So, that would be 8:35 p.m., right?

16  A.   Correct.

17  Q.   Okay.  So, you remember the thing that you wrote about

18  what happened that you posted on June 20th?

19  A.   I do.

20  Q.   And do you remember defense counsel asking whether you

21  described it as a pathetic dox?  Do you recall that?

22  A.   Yes.

23  Q.   So, you did say it was a pathetic dox, right?

24  A.   Yes.

25  Q.   So, can you explain what you meant?

1    A.    That it was pathetic that he had done it, basically, you

2    know; just that it was a pathetic route to take, to do.

3    Q.    But explain that.  What do you mean it was a pathetic

4    route to take?  What do you mean by that?

5    A.    Because it was unnecessary.  You know, I made a mistake of

6    joining a chat, and so for him to turn around and do that

7    instead of letting me talk some sense into him, that was

8    pathetic.

9    Q.    All right.  Now, you were also asked on cross about the

10   screenshots of your draft message.  Do you recall that?

11   A.    Yes.

12   Q.    And you said you believed you sent that draft to Paul

13   Nehlen?

14   A.    Yes.

15   Q.    All right.  And the defense asked you, well, you didn't

16   turn them over in October when the FBI interviewed you.  Do you

17   recall that?

18   A.    Yes.

19   Q.    And you said, I didn't know I had them, right?

20   A.    Right.

21         MR. DAVIS:  All right.  And can we call up, just so we

22   know what we're talking about, they're both in evidence, the

23   draft screenshots.  I believe they're around 114.

24         MS. KRASINSKI:  117.

25         MR. DAVIS:  I'm sorry.  It's what?

1          MS. KRASINSKI:  117.

2     Q.   This is the screenshot we're talking about, Exhibit 117?

3     A.   Yes.

4     Q.   And the one after that.  So, tell the jury about how this

5     came to be something that's an exhibit in the trial.  What

6     happened?

7     A.   I'm not sure I understand.

8     Q.   When did you realize that you had this item, and what did

9     you do about it?

10    A.   A couple of weeks ago I offered it to law enforcement.

11    Q.   And you sent it to them, right?

12    A.   Yes.

13    Q.   But why had you not sent it earlier?  That's the question.

14    A.   I didn't realize that I still had it in my phone.

15    Q.   And what did you have to do to actually find it?

16    A.   I had to go through a bunch of pictures on my phone.

17    Q.   And this was one of them?

18    A.   Yes.

19    Q.   And then you realized, Hey, I wrote this back when it was

20    happening?

21    A.   Yes.

22    Q.   And you sent it in, correct?

23    A.   Correct.

24    Q.   Okay.  And is that also true of the note that you wrote to

25    your lawyer?

1   A.   It didn't happen exactly the same way.  I had to search

2   back through my history of conversations with him on my phone,

3   and I realized, you know, wow, I have this on my phone, so I

4   screenshotted it and sent it in.

5   Q.   All right.  Okay.  So, you were also asked on cross about

6   after June 16th whether Mr. Cantwell contacted you.  Do you

7   recall that?

8   A.   Yes.

9   Q.   And it's true he didn't contact you after June 16th,

10  right?

11  A.   That's correct.

12  Q.   That is, he didn't call you, right?

13  A.   That's right.

14  Q.   And other than doxing you he didn't send other messages to

15  you, right?

16  A.   No.

17  Q.   And he didn't come to your door, actually show up in

18  Missouri, right?

19  A.   Correct.

20  Q.   Did you know what he was doing with law enforcement about

21  you at that time?

22  A.   No.

23  Q.   Did you know that in August, for instance, he was sending

24  pictures of your family to the FBI?

25  A.   No.

1   Q.   Did you know he was telling the FBI about you in

2   interviews?

3   A.   No.

4   Q.   So, Mr. Cantwell hadn't forgotten you as of -- after June

5   16th, right?

6            MR. WOLPIN:  Objection, your Honor.

7            THE COURT:  Sustained.

8            MR. DAVIS:  I'll move on.

9   Q.   You were asked about phone calls with Tactical Bowlcut.

10  Do you recall that?

11  A.   Yes.

12  Q.   And he was also in Bowl Patrol?

13  A.   Yes.

14  Q.   And he was a guy in jail, right?

15  A.   Correct.

16  Q.   And you sent him a care package?

17  A.   Two, yes.

18  Q.   And did you also talk to him on the phone regularly?

19  A.   Yes.

20  Q.   And is it fair to say the main thing you talked about was

21  sports?

22  A.   I don't really recall.

23  Q.   All right.  In any event, you said at one point, you were

24  asked on cross whether when you talked to Tactical you were Ben

25  Lambert or Cheddar Mane, right?

1   A.   Yes.

2   Q.   You were asked about laughing about a shooting, right?

3   A.   Yes.

4   Q.   And do you recall answering defense counsel, It's not

5   really that clear; it's not a yes-or-no answer?  Do you

6   remember that answer?

7   A.   Yes.

8   Q.   Can you explain that?  What were you saying there?

9   A.   Well, because I was still in the Telegram in the far

10  right, you know, one of the things that's really -- I mean, it

11  was kind of to pump up notoriety and to, you know, make it seem

12  like something that it wasn't, to kind of, I don't know, be

13  dramatic, tell him a story, you know, that was -- that would

14  keep me from looking like a snitch and make it seem like

15  something that it wasn't.

16  Q.   All right.  So, is looking like a snitch a good thing in

17  far-right circles?

18  A.   No.

19  Q.   All right.  And is most of what Mr. Tactical Bowlcut knew

20  about you from the Bowl Patrol?

21  A.   Yes.

22  Q.   Did he know much about you back then as Ben Lambert of

23  Missouri?

24  A.   I mean, he knew a little bit, yeah.  I mean, it was a mix.

25  Q.   All right.  Did you at one point tell Tactical on one of

1    those phone calls that you would have helped the FBI anyway,

2    regardless of whether they held Bowl Patrol over your head?

3    A.    Yes.

4    Q.    And can you explain that?  Why did you say that?

5    A.    Well, it goes back to not wanting to look like a snitch or

6    look like I was cooperating with the investigation.  I didn't

7    want to seem like I was cooperating.

8    Q.    But you said you would have helped them anyway, right?

9    A.    I would have?

10   Q.    Yes.

11   A.    I don't recall exactly.

12   Q.    All right.  So, let's talk about acid.  The defense

13   counsel asked you about a picture with the cardboard strips on

14   your tongue?

15   A.    Yes.

16   Q.    And you said that you talked about acid on BowlCasts?

17   A.    Yes.

18   Q.    And did you do that fairly frequently?

19   A.    I wouldn't say frequently, no, but the topic did come up,

20   yeah.

21   Q.    All right.  And why did you talk about acid on BowlCast?

22   A.    Well, one of the memes that is very common is -- well, it

23   kind of started off when there was after -- I'm not allowed to

24   say what it is.  After a rally there was kind of a split in the

25   movement where one faction was referred to as wignats, and this

1    would be like -- and they were described as, you know, drug

2    users, you know, kind of white trash, basically, and so just to

3    act like that wasn't something that bothered anybody we would

4    meme about, you know, all the drugs we did and like sacrificing

5    cats and stuff like that, even though it wasn't true.  There

6    was a specific meme that said, Smoke meth, hail Satan, and it

7    was obviously done, you know, tongue in cheek.  And so, that's

8    kind of what that was all about, like, look at these wignats,

9    you know, they do all these drugs, they worship the devil and,

10   you know, perform satanic rituals and things like that.  So, it

11   was a joke.

12   Q.   All right.  Were you actually worried that, if anyone

13   looked into it, someone would decide you really were an LSD

14   user?

15           MR. WOLPIN:  I would object and ask to --

16           THE COURT:  Overruled.

17           MR. WOLPIN:  There's another issue this relates to.

18           THE COURT:  No.  We've got to move on.  You can make a

19   proffer at the next break.

20           MR. WOLPIN:  Thank you.

21   A.   Can you repeat the question, please?

22   Q.   The question is were you worried that if someone looked

23   into whether you, in fact, were an LSD user they would find

24   that you were an LSD user?

25   A.   No.

1   Q.   All right.  Now, let's talk about the interview with the

2   FBI briefly.  So, that happened on October 17, 2019, right?

3   A.   Yes.

4   Q.   That was a surprise to you?

5   A.   It was.

6   Q.   Do you recall the first thing you said to the FBI when

7   they showed up?

8   A.   Yes.

9   Q.   What did you say?

10  A.   I told them that, you know, just to put it out there that

11  I was not a -- you know, I knew that the photo existed of me,

12  you know, doing acid, (indicating), which I wasn't really doing

13  it, and so I was concerned.  So, the first thing I said was

14  that I'm not a drug user at all, you know, and that wasn't real

15  acid.

16  Q.   All right.  But even before that do you recall when the

17  FBI very first came up to you a question you had about what

18  this was all about?

19  A.   Yes.

20       MR. WOLPIN:  Objection, your Honor.  This has been

21  asked and answered.

22       THE COURT:  Overruled.

23  Q.   What was your question?

24  A.   I said, Is this about Cantwell?  Does this have to do with

25  Chris Cantwell?

1    Q.   That was the first thing you asked the FBI?

2    A.   Yeah.

3    Q.   And why were you asking about Chris Cantwell?

4    A.   Because that was the only thing that I really thought it

5    could be about at the time.

6    Q.   All right.  And when you say the "thing," what thing are

7    you talking about?

8    A.   His threats to me.

9    Q.   Okay.  Now, you were asked when you were interviewed by

10   the FBI when they asked you about incel listeners.  Do you

11   recall that?

12   A.   Yes.

13   Q.   And you were asked about whether you took it seriously.

14   Do you recall that?

15   A.   Yes.

16   Q.   So, do you recall saying to the FBI, when they asked you

17   about the incel listeners, Good luck with that?

18   A.   Yes.

19   Q.   All right.  So, why did you say, Good luck with that, and

20   what did you mean?

21   A.   What I meant was that I have confidence in my ability to

22   defend myself, and so if they wanted to try and commit some

23   sort of act against me and my wife, good luck, because I was

24   prepared to defend myself.

25   Q.   All right.  So, is it fair to say that you weren't too

1    worried about your ability to defend yourself, if necessary,

2    with a gun, if someone showed up?

3              MR. WOLPIN:  Leading, your Honor.

4              THE COURT:  It is leading, but I'll allow that

5    question.  Just don't lead, okay?

6              You can answer that question.

7    A.    Yes.

8    Q.    Okay.  Were you also saying or were you saying you thought

9    the thing about incel listeners was a joke?

10   A.    No.

11   Q.    All right.  So, let's talk about doxing.  You were asked

12   whether you said at one point that doxing is not a big deal.

13   Do you recall those questions?

14   A.    Yes.

15   Q.    Do you think doxing is a serious thing?

16   A.    Yes.

17   Q.    Has your life changed as a result of being identified as

18   Cheddarman?

19             MR. WOLPIN:  Objection, your Honor.

20             THE COURT:  Overruled.

21   A.    Yes.

22   Q.    And, Mr. Lambert, what's your favorite sport?

23   A.    Hockey.

24   Q.    Hockey?

25   A.    Yes.

1   Q.   And are you a hockey fan?

2   A.   I am.

3   Q.   And you also are a hockey player?

4   A.   Yes.

5   Q.   And are you also a hockey dad?

6   A.   I am.

7   Q.   And did you have plans about being a hockey coach for one

8   of your children?

9        MR. WOLPIN:  Objection, your Honor.  This is beyond

10  the scope.

11       THE COURT:  I'm not sure where you're going with this.

12       MR. DAVIS:  It's relevant to the issue of substantial

13  emotional distress, your Honor.

14       THE COURT:  All right.  Overruled.  Wrap it up.  Move

15  on to a different subject.

16       Your objection is overruled.

17  Q.   What were your plans?

18  A.   Well, I'm sorry, this is hard.  Can I just get a minute?

19  This is --

20                    (Pause)

21  Q.   Sure.

22  A.   I was supposed to coach my son's hockey team.

23  Q.   All right.  I just have one more question.

24  A.   Now I can't do it.

25  Q.   Okay.  And can you not do it because you've been

1   identified as a Bowl Patrol member?

2   A.   Yes.

3   Q.   All right.  Now, just one other thing I wanted to show

4   you, and that is your phone calls to Chris Cantwell.  Do you

5   recall that?

6   A.   Yes.

7   Q.   All right.  Let's look at Exhibit I-2-B in evidence.  You

8   testified you made prank calls over a period of time.  Do you

9   remember that?

10   A.   Yes.

11   Q.   And those calls ended sometime in early 2019; is that

12   right?

13   A.   Correct.

14   Q.   All right.  I'm asking you to look at I-2-B.  I thought it

15   was I-2-B.

16          MR. DAVIS:  I thought it was I-2-B.

17          MR. WOLPIN:  It is.  There was a typo.

18   Q.   All right.  Do you recognize the phone number at the top

19   of I-2-B, Mr. Lambert?

20   A.   Yes.

21   Q.   And is that your cell phone number, 636 ending in 1958?

22   A.   Yes.

23   Q.   All right.  And there's a bunch of calls starting in

24   February of 2018, right?

25   A.   That's correct.

1    Q.   All right.  Let's go to the next page briefly.  Now, just

2    for the record, these aren't all prank calls, right?

3    A.   Correct.

4    Q.   All right.  Let's go to the next page.  And by now we're

5    in December of 2018, right?

6    A.   Yes.

7    Q.   At the end, 71?

8    A.   Yes.

9    Q.   And let's go to the last page.  Okay.  Do you see call

10   number 79?

11   A.   Yes.

12   Q.   And what's the date of that call?

13   A.   January 30th, 2019.

14   Q.   Okay.  And do you see call number 80?

15   A.   Yes.

16   Q.   And what's the date of that call?

17   A.   June 21st, 2019.

18   Q.   So, is it fair to say that for over five months there's no

19   phone calls from your cell phone to Mr. Cantwell?

20   A.   That's correct.

21   Q.   Had you left him alone as of June 15th, 2019?

22   A.   Yes.

23        MR. DAVIS:  No further questions.

24        THE COURT:  All right.  Thank you.  We'll take our

25   late mid-morning break, and we'll bring you back in about 15

1   minutes.  I have to do one other thing with the lawyers.  I'm

2   not sure how long it will take.

3            THE CLERK:  All rise.

4                (The jury exited the courtroom)

5            THE COURT:  All right.  Mr. Wolpin, what is it that

6   you want to do that you haven't yet done?

7            MR. WOLPIN:  I think the only two outstanding issues

8   from the initial cross were the Tactical Bowlcut statement

9   regarding --

10           THE COURT:  Can we play that?

11           MR. WOLPIN:  Maybe we could give the witness a minute.

12           THE COURT:  All right.  Let me know when you're ready,

13   Mr. Lambert.

14           But key it up so that we can go.

15           THE WITNESS:  I'm good.  Go ahead.

16           MR. WOLPIN:  Okay.  The Tactical Bowlcut, F24.

17               (Audio recording played)

18           THE COURT:  Okay.  Does that refresh your memory as to

19   what you said to Tactical --

20           THE WITNESS:  Yes.

21           THE COURT:  Is it Tactical Bowlcut?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.  What you said to Tactical Bowlcut?

24           THE WITNESS:  Yes.

25           THE COURT:  So, if the lawyer asked you in front of

1    the jury, Did you, in fact, have a conversation with Tactical

2    Bowlcut in which you said those words, you'll say, Yes, your

3    memory is refreshed and you did, in fact, say those words?

4            THE WITNESS:  Yes.

5            THE COURT:  Okay.  So, do you want to do that in front

6    of the jury, Mr. Wolpin?

7            MR. WOLPIN:  Yes, please.

8            THE COURT:  All right.  So, you'll be allowed to do

9    that.

10           MR. WOLPIN:  I'm sorry.  I had split attention.  I

11   will be able to play it, or I should just ask the witness?

12           THE COURT:  You'll be able to ask him his memory is

13   now refreshed, and he will acknowledge that, in fact, he did

14   say that in front of the jury to Tactical Bowlcut.  What's the

15   other issue?

16           MR. WOLPIN:  The other issue is we had raised the

17   question of a fed posting in a specific example of a group

18   conversation that discussed --

19           THE COURT:  I'm still not, based on your questioning

20   and his answers, really understanding what -- do you and he

21   agree on what fed posting is and what it is?  So, why don't you

22   tell me with your understanding is, and then I need to

23   understand what the witness is saying, and then I can evaluate

24   your argument.

25           MR. WOLPIN:  So, the idea of fed posting is that you

1   say things online to draw the -- pique the interest of federal

2   law enforcement.  So, it's this idea of going right to the

3   line.

4           THE COURT:  So, you're thinking that, when you say

5   "pique the interest," it's actually to cause the Feds to pay

6   attention to you?

7           MR. WOLPIN:  It's used as a weapon by some people for

8   that purpose.

9           THE COURT:  That's what I'm trying to -- let me just

10   be sure I understand.  You're saying people come in and say

11   outrageous things not so that the Feds will investigate them

12   but so the Feds will investigate other people?  Is that what

13   you're trying to imply?

14           MR. WOLPIN:  There are multiple purposes.  One purpose

15   is, if you do it to somebody else, to get that effect.  If you

16   do it yourself it's sort of a proof of your extremity, that

17   you're saying things that are that far over the limit that --

18           THE COURT:  So, some people might say, I'm fed

19   posting, as a boast to show other like-minded individuals I'm

20   willing to make a statement that goes right up to the line of

21   legality?

22           MR. WOLPIN:  And in this specific instance -- -

23           THE COURT:  Can you just say yes or no to me?

24           MR. WOLPIN:  Yes, yes, yes.

25           THE COURT:  Okay.  And then there are other purposes.

1    Is one of the purposes you think to make a statement that will

2    cause the Feds to pay attention to someone else?

3              MR. WOLPIN:  Correct.

4              THE COURT:  All right.  And is that the type of fed

5    posting you're talking about here?

6              MR. WOLPIN:  No.  The reason we're saying it's

7    relevant is because it relates to this group of people saying

8    things that they recognize bring the attention of the FBI.

9              THE COURT:  But that they know are not criminal?

10             MR. WOLPIN:  Well, they then say, We might have gone

11   over the line.  So, that's the issue.

12             THE COURT:  Do you have a specific example in which

13   Mr. Lambert said, I just may have gone over the line in

14   something that I've said?

15             MR. WOLPIN:  This one is a group conversation while

16   everyone's chipping in left and right, so I can't say --

17             THE COURT:  Read it to me.

18             MR. WOLPIN:  I have -- if I can have a moment.

19             THE COURT:  Can you read it or give me the written

20   version?  Because when you play these excerpts I basically

21   can't understand who's saying what most of the time.

22             MR. WOLPIN:  I just need a moment, because it got

23   mixed in with my other stuff.

24             THE COURT:  All right.  While you're doing that, Mr.

25   Lambert, "fed posting," what do you understand "fed posting" to

1      mean?  Has the lawyer described it correctly to me?

2              THE WITNESS:  It's a complex thing.  Like, fed

3      posting, you know, so there chats where you say, No fed

4      posting, which means, you know, nothing that goes to that line.

5      I mean, it can be used in so many different ways, and there's

6      not really like an official definition of it.

7              THE COURT:  Is fed posting said in reference to

8      something that approaches the line of illegality?

9              THE WITNESS:  Yes.

10             THE COURT:  So, if a statement is a fed posting

11     statement, it's something that purportedly goes up to the line

12     but not over the line of illegality?

13             THE WITNESS:  Correct.

14             THE COURT:  Okay.  So, it could be used in a variety

15     of contexts, but what it refers to is a statement that goes up

16     to but not over the line of illegality?

17             THE WITNESS:  I mean, you could actually use it to say

18     that, you know, somebody is going over the line of illegality,

19     but, I mean, usually that's not the case.

20             THE COURT:  All right.  So, it's a slang term that has

21     a meaning in this subculture that refers to a statement that

22     someone might make that is at or over the line of legality?

23             THE WITNESS:  Correct.

24             THE COURT:  And why it's called "fed posting" is

25     because you're making the statement in a forum where it's

1      posted, and it's the kind of statement that, because it's close

2      to the line, that could attract the interest or attention of

3      government investigators?

4                THE WITNESS:  Correct.

5                THE COURT:  Okay.  Now, when you're ready, Mr. Wolpin.

6                MR. WOLPIN:  Okay.  So, this is a conversation from

7      the BowlCast episode.  I have a shorter version and a longer

8      version.  The longer version begins, This is easily the most

9      fed posting episode.  I love it.  It's close to over the line,

10     it really is.  And then they go on to talk about Dino Capuzzo.

11     Then what happens is we are busy fed posting.  That was really

12     fed posting.  That was really good.  Dino Capuzzo, you should

13     have raped, yeah, raped, you know, Capuzzo is the fucking front

14     post, dude, so money that could literally just be the episode

15     write-up, rape Dino Capuzzo.  Yeah, no, no, who was that?  Who

16     was the fucking, redacted, who just did that?  No, I'm not a,

17     redacted, anymore.  Who just did that?  Special Agent Dino

18     Capuzzo.  I know you did that.  Who raped Dino right now?

19     1690, rape Dino Capuzzo to death.  I do a lot of voices.  Will

20     you rape Special Agent Peach voice.  That was mine.  Can we

21     rape Dino Capuzzo with Special Agent Peach?  That would be

22     hilarious.  This is getting awfully ambitious.  You guys just

23     did it.  You just did it, dude, you just did it.  All right.

24     You guys just did it.  It was damn near perfect, and now you're

25     saying we can't do it again.  I'm just trying to think of a way

1    we can wrap this up.

2            THE COURT:  Were any of those speakers are you

3    alleging was Mr. Lambert?

4            MR. WOLPIN:  One that I can identify is at the

5    initial, It's close to over the line it really is.  The rest

6    are people doing voices, and so, no, I cannot.

7            THE COURT:  Are you alleging that any of the

8    statements that are being referred to as over-the-line

9    statements were statements by Cheddar Mane?

10           MR. WOLPIN:  I can't identify that, your Honor.

11           THE COURT:  This is cumulative of abundant other

12   evidence that I've allowed you to get into on this point, and

13   I'm going to sustain the government's objection on Rule 403

14   grounds.  There is minimal, if any, relevance to the statement.

15   Its relevance is clearly substantially outweighed by the

16   cumulativeness of it.  And the danger that I have to say I

17   think is being courted by the defense, that to invite the jury

18   to not credit a witness because they hold reprehensible views

19   rather than for any legitimate purpose.

20           And I just, I really have gone to extraordinary

21   lengths to give your client every opportunity to put in every

22   piece of relevant evidence that I can possibly allow without

23   completely wasting the jury's time.  You have had abundant

24   evidence put in the record about what Mr. Lambert's

25   reprehensible views are, about his statements about violence,

1   and I have allowed you to put in the specific statements that

2   Mr. Lambert has made, even ones that he made in a private

3   communication where he says he was joking.  You've had a fair

4   and full opportunity to develop this aspect of your case.

5           So, I overrule -- to the extent the government is

6   objecting to the admission of this statement, I sustain the

7   government's objection.

8           All right.  What else?

9           MR. WOLPIN:  For record purposes, that was defense

10  Exhibit E25.  I believe that finishes what we had.

11          THE COURT:  All right.  So, we'll bring the jury back.

12  You can play -- excuse me -- you can inquire of him, I want to

13  take you back to the phone call you had with Tactical Bowlcut,

14  and I want to ask you again did you, in fact, say to Tactical

15  Bowlcut whatever it is he said, and he'll say, Yes, I did, and

16  then we can end this.

17          Is there anything else you need to do on

18  recross-examination, if I allow it?

19          MR. WOLPIN:  I have maybe one or two areas.

20          THE COURT:  What are they?  I don't normally allow

21  recross.

22          MR. WOLPIN:  The government went and elicited more

23  information saying that he said to leave him alone.  There is a

24  post online that he says, Do your worst, to him that

25  contradicts that at this point.

1          THE COURT:  We've already covered that.  That's
2     already been covered at length, has it not?
3          MR. WOLPIN:  No.  He's denied that.  He has asserted
4     that he was not telling others to do their worst to Cantwell.
5          THE COURT:  I'm sorry.  I'm confused.  I thought you
6     were referring to his kind of bravado statements to Cantwell.
7     Are you talking about something else?
8          MR. WOLPIN:  In March there is a post that, contrary
9     to the statement, I told everyone to leave him alone, there was
10    a statement made on social media to -- it's C21 so I can be --
11    March of this year:  I wash my hands of the entire situation.
12    Last year, excuse me, 2019.  Do your worst on Cantwell.  He is
13    clearly unhinged, clearly --
14         THE COURT:  Slow, slow, slow.
15         MR. WOLPIN:  I'll give it another try.  I apologize.
16    I wash my hands of the entire situation.  Do your worst on
17    Cantwell.  He is clearly unhinged, clearly bottom texting his
18    butthole with meth again, and he needs to probably seek medical
19    detox.  Nobody likes him anymore, and he should probably walk
20    off a cliff.
21         THE COURT:  All right.  So, that has not come in.  I
22    thought you were referring to statements he was making to
23    Cantwell, but this is some kind of -- did he make it on the
24    Bowl Patrol channel?  Where was this made?
25         MR. WOLPIN:  He will have to, obviously, authenticate

1    it.  It's under Cheddar Mane 1690 at Cheddar Mane, public post.

2            THE COURT:  Mr. Davis, where does this date fit within

3    the timeline of the examination that you were conducting with

4    him about the phone calls and having left him alone?

5            MR. WOLPIN:  This is February.

6            THE COURT:  I'm asking Mr. Davis.

7            MR. DAVIS:  It's March 5th of 2019, which is within

8    the period of time.  That is, it's after the phone calls

9    stopped but three months before the June --

10           THE COURT:  All right.  But there was a suggestion, an

11   implication in your redirect that he was leaving Cantwell

12   alone --

13           MR. DAVIS:  Yes.

14           THE COURT:  -- between January and June.  This was

15   during that period.

16           MR. DAVIS:  Yes.

17           THE COURT:  So, I will allow that line of inquiry.

18   What else have you got?

19           MR. WOLPIN:  That's all.

20           THE COURT:  All right.  So, we'll take a break.  If he

21   doesn't go into other areas, Mr. Davis, I'm not going to allow

22   any re-redirect; you're just going to have to live with it.  If

23   something shocking should happen, you can ask, but don't expect

24   your request to be granted, unless it is truly something

25   unusual and shocking.  We need to get Mr. Lambert over with and

1   out of the courthouse.  So, we'll take a short break, come

2   back, finish this.  The government can be ready to call its

3   next witness.

4          THE CLERK:  All rise.

5                (Recess taken from 11:39 a.m. to 11:45 a.m.)

6          THE CLERK:  All rise.

7                (The jury entered the courtroom)

8          THE COURT:  All right.

9          MR. WOLPIN:  All right.  If we could bring up

10  Exhibit C-21 for ID just for the witness.

11                    RECROSS-EXAMINATION

12  BY MR. WOLPIN:

13  Q.   Before you is a social media post; is that correct?

14  A.   Yes.

15  Q.   Okay.  And the nameplate is Cheddar Mane 1690 RWH?

16  A.   Yes.

17  Q.   This was an account of yours?

18  A.   Yes.

19  Q.   And this is a post from March 5th, 2019?

20  A.   Yes.

21  Q.   And in this post from March 25th, was this made public?

22  A.   Yes.

23  Q.   And in it you wrote, among other things, Do your worst on

24  Cantwell?

25  A.   Yes.

1    Q.   And I would ask that -- again, just to be clear, this is

2    your account?

3    A.   Yes.

4    Q.   And your post?

5    A.   And my what?

6    Q.   And your post?

7    A.   Yes.

8         MR. WOLPIN:  All right.  I would move that the ID be

9    stricken from C-21 and it be moved in as a full exhibit.

10        MR. DAVIS:  No objection.

11        THE COURT:  No objection, it will be admitted.

12   (Defendant's Exhibit C-21 received into evidence)

13        MR. WOLPIN:  We can move on.

14   Q.   Now, I had previously asked you about a conversation you

15   had had with your friend in Florida.

16   A.   Yes.

17   Q.   Specifically, the one about doxing.

18   A.   Yes.

19   Q.   And at the time you couldn't remember whether you had said

20   that, correct?

21   A.   Yes.

22   Q.   And in the break we had did you have a chance to listen to

23   that recording?

24   A.   I did.

25   Q.   Okay.  And that recording was, in fact, of you?

1    A.    Yes.

2    Q.    And in that recording you said, Doxing doesn't have the

3    same effect it used to?

4    A.    At the time that's what I believed, and that's what I

5    said.

6    Q.    And doxing people is not really a big deal like it used to

7    be?

8    A.    I was telling that to myself as much as I was telling it

9    to anybody.

10            MR. WOLPIN:  Thank you.

11            THE COURT:  Thank you, sir.  You can step down.  You

12   are released from your subpoena.  You can call your next

13   witness.

14                    (Witness stepped down)

15            MR. DAVIS:  Paul Nehlen.  I can probably, Judge, if it

16   helps move things, question from here.

17            THE COURT:  All right.  That's fine.

18                          (Pause)

19            THE CLERK:  Please raise your right hand.

20            **PAUL NEHLEN**, duly sworn by the Clerk.

21            THE CLERK:  Thank you.  Would you please state your

22   full name and spell your last name for the record.

23            THE WITNESS:  Paul Nehlen, N-e-h-l-e-n.

24            THE CLERK:  Thank you.  You may be seated.

25            THE COURT:  You can proceed when ready, Mr. Davis.

<div align="center"><u>DIRECT EXAMINATION</u></div>

BY MR. DAVIS:

Q.   Mr. Nehlen, what town do you live in?

A.   Sullivan, Wisconsin.

Q.   In Wisconsin?  And what's your occupation, please?

A.   Business owner, inventor.

Q.   Okay.  And in what particular area?

A.   Filtration.

Q.   All right.  Do you know the defendant in this case, Christopher Cantwell?

A.   I do.

Q.   And have you ever met with him personally?

A.   I have not.  Just online.

Q.   All right.  So, how long have you known him online?

A.   I think I was on a podcast of his maybe a few times starting in 2017.

Q.   Okay.

A.   Or 2018, maybe.

Q.   And were you actually interviewed by Mr. Cantwell at one point?

A.   I was.

Q.   And how many times?

A.   Once or twice.

Q.   And do you recall what years you were interviewed by Mr. Cantwell?

1    A.    I think it was 2017, when I was running for Congress.

2    Q.    Are you also acquainted or were you acquainted with a chat

3    group called Bowl Patrol?

4    A.    Yes.

5    Q.    And were you known by a particular nickname by members of

6    the Bowl Patrol?

7    A.    A nickname?

8    Q.    Were you sometimes called Uncle Paul?

9    A.    Oh, Uncle Paul, okay.  Sure.

10   Q.    Yes?

11   A.    Yes.

12   Q.    Okay.  In particular, did you know a person named Benjamin

13   Lambert?

14   A.    Yes.

15   Q.    And of all the Bowl Patrol members, which one did you feel

16   like you knew the best?

17   A.    Well, I guess I don't know what you mean by "members,"

18   necessarily.  I know Ben.  I would say I probably know Ben the

19   best.

20   Q.    All right.  That's all I'm asking.

21   A.    Okay.

22   Q.    So, when did you first meet Ben Lambert?

23   A.    It was while I was running for Congress in 2017.

24   Q.    Okay.  And did you meet him online also?

25   A.    Yeah.

1   Q.   And how would you characterize your relationship with Ben
2   Lambert?
3   A.   Friendly.
4   Q.   Friendly?  Okay.  How frequently do you communicate or did
5   you communicate?
6   A.   Online or via text message.  Maybe we text-messaged each
7   other every few months or something.
8   Q.   Okay.  And do you recall whether Mr. Lambert has actually
9   visited you at your home in Wisconsin?
10  A.   Yes.  He was traveling somewhere north of Wisconsin or he
11  was coming back from somewhere north of Wisconsin and stopped
12  by the house.
13  Q.   All right.  And was someone with him on that visit?
14  A.   There was, a guy who went by the pseudonym of Hardmous.
15  Q.   Hardmous?  Okay.  And have you also been to Mr. Lambert's
16  home?
17  A.   I have.
18  Q.   How many times?
19  A.   Once or twice.  I think maybe twice on business trips.  I
20  don't know if I was to his house twice.  I've seen him at his
21  house once and maybe somewhere else near his house, maybe a
22  restaurant --
23  Q.   Okay.
24  A.   -- on another occasion.
25  Q.   And have you met Mr. Lambert's wife?

1    A.    I have.

2    Q.    And have you met his children?

3    A.    I have.

4    Q.    All right.  Now, I want to direct your attention to

5    Father's Day weekend of 2019.  So, that's June 16th, was

6    Father's Day 2019.  Okay?

7    A.    Yeah.

8    Q.    Do you recall whether you got a communication from Ben

9    Lambert that weekend?

10   A.    I did.

11   Q.    All right.  And what kind of communication do you recall?

12   A.    A phone call.

13   Q.    A phone call?

14   A.    Yeah.

15   Q.    All right.  And do you remember which day it was?

16   A.    Father's Day.

17   Q.    So, that would have been June 16th?

18   A.    It was Sunday.

19   Q.    Okay.  And in that call did -- and just listen carefully

20   to my question, if you would -- did Mr. Lambert communicate to

21   you about Christopher Cantwell?

22   A.    He did.

23   Q.    All right.  And did he have a statement about what he

24   thought about Mr. Cantwell's mental state, for lack of a better

25   word?  And don't answer.  I just want to make sure we're clear

1    on what this is.

2              MR. WOLPIN:  I'm going to object.

3              THE COURT:  You do object or you don't?

4              MR. WOLPIN:  It has no relevance --

5              THE COURT:  I just heard "Object," but then I saw you

6    shaking your head.  So, you do object on relevance grounds?

7              MR. WOLPIN:  The follow-up will not --

8              THE COURT:  All right.  I don't know what the answer

9    is going to be, so I can't judge the relevance, so please put

10   the headsets on.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12             THE COURT:  Okay.  What's the witness going to say?

13             MR. DAVIS:  So, I am just trying to avoid or let the

14   Court rule on any hearsay issue.  The witness is going to say,

15   I believe, that Ben Lambert said that Cantwell was insane, and

16   further he asked him for his advice about what to do about it.

17   Neither of those is hearsay; they're both relevant to the

18   victim's mental state while this is going on, and that's why I

19   intend to ask it.

20             THE COURT:  So, is the defense posing any relevance --

21   excuse me -- any hearsay objection?  It doesn't appear that

22   they would be hearsay.

23             MR. WOLPIN:  I don't understand why his statement

24   about --

25             THE COURT:  Just speak into the microphone.

1          MR. WOLPIN:  -- about him being insane would be for a

2    purpose other than hearsay.  I think that's --

3          THE COURT:  It's a mental state statement for Mr.

4    Cantwell, and so it's not admitted for the truth to prove that

5    he's insane.  It's admitted to prove that Mr. Lambert was

6    concerned about his sanity.  So, if you want a limiting

7    instruction that it's not being admitted to try to prove that

8    Mr. Cantwell was insane, I'll give you that, but I don't think

9    that's what you want.

10         MR. WOLPIN:  No.

11         THE COURT:  All right.  So, the real argument is one

12   of relevance, and the government says it's relevant with

13   respect to Mr. Lambert's response to the conduct, which is the

14   alleged threats, and you argue relevance.  I agree that it

15   meets the requirements of Rule 401, so I'll overrule your

16   objection.

17         MR. WOLPIN:  I'll just note 403 as well.

18         THE COURT:  And I'll make the same response on 403,

19   that the probative value is not substantially outweighed by any

20   of the grounds identified in Rule 403.  All right.  Do you have

21   anything else?  Okay?  Okay.

22   (END OF SIDEBAR CONFERENCE)

23         THE COURT:  The objection's overruled.  You can ask

24   the question.

25   Q.   So, Mr. Nehlen, in the Father's Day phone call what did

1   Mr. Lambert say to you about what he thought about Mr.

2   Cantwell?

3   A.   He said, He is insane.

4   Q.   He said he was insane?

5   A.   Yes.

6   Q.   All right.  Now, when he called you was he laughing?

7   A.   No, he was not.

8   Q.   Did the two of you laugh about this exchange between him

9   and Cantwell?

10  A.   No, we did not.

11  Q.   Did he say he thought it was a joke?

12  A.   No, he did not.

13  Q.   All right.  And did he ask for your advice?

14  A.   Yes, sir.

15  Q.   Okay.  And did you give Mr. Lambert advice?

16  A.   Yes, sir, I did.

17  Q.   And what advice did you give him?

18  A.   I said that I thought he would need to push back, because

19  I felt like Cantwell was being a bully, and that, unless he

20  verbally pushed back, he was going to continue to be bullied.

21  Q.   Okay.  Now, after the phone call do you recall whether the

22  text communications, the Telegram communications between Mr.

23  Lambert and Mr. Cantwell were actually posted on the BowlCast

24  channel?

25  A.   I recall at some point they were, yes.

1    Q.   All right.  And do you recall playing any role in that

2    happening?

3    A.   I did not.

4    Q.   All right.  Do you recall writing any introduction from

5    Uncle Paul that introduced this exchange between Mr. Lambert

6    and Mr. Cantwell?

7    A.   I don't specifically remember writing it, but I can't rule

8    out that I did write it.

9    Q.   Okay.  So, you might have written --

10    A.   Yeah.

11    Q.   And are you familiar with a posting I'm talking about,

12    that begins --

13    A.   I am.

14    Q.   -- So out of the blue yesterday?

15    A.   I am.

16    Q.   So, your testimony is you might have written that, but

17    you're not sure?

18    A.   Correct.

19    Q.   Okay.  Mr. Nehlen, have you been active on social media in

20    the far-right community, or were you at that time?  Is that

21    fair to say?

22    A.   That's fair to say.

23    Q.   All right.  Before or after this particular exchange

24    between Mr. Lambert and Mr. Cantwell have you ever seen in that

25    social media one person threaten the wife and children of

1    another member of that community?

2    A.    No.  To the best of my recollection, no, I do not.

3    Q.    Do you regard that as kind of the usual banter among the

4    people?

5            MR. WOLPIN:  Objection, your Honor.

6            THE COURT:  I'm sorry.  You object?

7            MR. WOLPIN:  Yes.

8            THE COURT:  The form of the question is leading, so

9    you can ask another question.

10   Q.    How would you characterize in this community, the social

11   media community in the far right, how would you characterize a

12   threat against someone's wife and children?

13   A.    I would say that's over the line.

14   Q.    And what do you mean by that?

15   A.    Well, it's one thing, in my mind, for --

16           MR. WOLPIN:  I object, your Honor.  I don't see his

17   position as relevant.

18           THE COURT:  I'll sustain the objection.  Go ahead.

19           MR. DAVIS:  All right.  Nothing further.  Thank you.

20           THE COURT:  Thank you.  Cross-examination.  Do you

21   want to be in the front?

22           MR. WOLPIN:  Yes, please.

23           THE COURT:  All right.  If we could sanitize.

24                           (Pause)

25           THE COURT:  Go ahead, Mr. Wolpin.

1          MR. WOLPIN:  Thank you.

2                    CROSS-EXAMINATION

3    BY MR. WOLPIN:

4    Q.   Good morning, Mr. Nehlen.

5    A.   Good morning.

6    Q.   So, you are friends with Ben Lambert?

7    A.   Yes, sir.

8    Q.   And, as you noted, that friendship is more than just

9    something that's online, correct?

10   A.   Yes, sir.

11   Q.   You've had him over to your home?

12   A.   Yeah.  Yes, sir.

13   Q.   And you've been to his home?

14   A.   Yes, sir.

15   Q.   And you don't live close by, so it's not someone you could

16   easily get back and forth between, correct?

17   A.   No, but I think, if I could clarify that --

18   Q.   Yeah.

19   A.   -- he was traveling by on a trip that he was on, and I

20   happened to be traveling by his place.  It wasn't -- this was

21   not a planned trip to go see each other.

22   Q.   Okay.  But you made efforts when you were on a trip for

23   another reason to make sure you saw this person?

24   A.   Mm-hmm.

25   Q.   Correct?

1    A.    That's correct.

2    Q.    You just have to speak.

3    A.    Yes, sir.  Sorry.

4    Q.    Thank you.  And you've met his family as well, as you

5    noted, correct?

6    A.    Yes, sir.

7    Q.    Now, you testified about a phone call just a moment ago in

8    some detail about what was said on that call.

9    A.    Yes, sir.

10   Q.    Okay.  About what Mr. Lambert said and what you said on

11   that call?

12   A.    That's correct.

13   Q.    Now, you spoke to the FBI on September 2nd of this year,

14   correct?

15   A.    I believe so.

16   Q.    So, that was just a few weeks ago, correct?

17   A.    Yes.

18   Q.    Okay.  And when you spoke with them, they asked you

19   questions about your relationship with Mr. Lambert?

20   A.    Yes.

21   Q.    And they asked you questions specifically about your

22   contacts with Mr. Lambert as well?

23   A.    Okay.

24   Q.    Correct?

25   A.    Yes, sir.

1    Q.   I'm sorry.

2    A.   I'm sorry, too.

3    Q.   You just need to fully answer.  And at that time, when you

4    spoke to the FBI a few weeks ago, you explained that you had

5    spoken to Ben Lambert approximately a dozen times or so, but

6    you did not recall any specific call with him and can't say

7    that it happened or did not happen?

8    A.   At that time that was correct.

9    Q.   Okay.  So, at that time when you spoke with the FBI you

10   weren't even sure whether you had this call with Ben Lambert or

11   not?

12   A.   Yes.

13   Q.   Okay.  Now, you, as you noted, have this online presence

14   as Uncle Paul, correct?

15   A.   Yes.  That's correct.

16   Q.   And that includes a presence on the Telegram platform?

17   A.   Correct.

18   Q.   You're familiar with that platform?

19   A.   That is correct.  Yes, sir.

20   Q.   Okay.  And you, in fact, have a Telegram channel under

21   Uncle Paul, correct?

22   A.   Correct.

23   Q.   I think it's @uncle_paul_gtkrwn.

24   A.   That is correct.

25   Q.   Okay.  Before you met with the FBI there were quite a few

1    posts on that channel, correct?

2    A.    That's correct.

3    Q.    Going back a significant period of time and a significant

4    number of posts?

5    A.    That is correct.

6    Q.    Since you've met with the FBI those posts are gone?

7    A.    That is correct.

8    Q.    Those posts have been deleted by you or just hidden?

9    A.    They're deleted.

10   Q.    Okay.  And among the posts that appeared under your name

11   were posts that were derogatory towards Mr. Cantwell?

12   A.    All of the posts.

13   Q.    Okay.  So, all of the posts that you deleted over this

14   period of time said pretty nasty things about Mr. Cantwell?

15   A.    No.  I meant to say that all of the posts, not just posts

16   that had to deal with Mr. Cantwell, were deleted, all of the

17   posts.

18   Q.    Okay.  But there were numerous posts that did have to do

19   with Mr. Cantwell?

20   A.    I can't say how many, but there probably were a few, yes.

21   Q.    Okay.  And those posts may be memes with his picture, for

22   example?

23   A.    Possibly.

24   Q.    And would have included some of the language we've heard

25   in this case, maybe calling him names?

1    A.    Quite possibly.

2    Q.    Okay.  You would call him boofwell (ph)?

3    A.    Yes, that's correct.

4    Q.    And other names that you knew were derogatory or negative?

5    A.    Yes, sir.

6            MR. WOLPIN:  Now, could we bring up, is it C26, just

7    for the witness?

8    Q.    Is this your Uncle Paul channel?

9    A.    Yes.

10   Q.    Okay.  And, as we can see, there are only what appear to

11   be two posts left?

12   A.    That's correct.

13   Q.    Okay.  The top one happens to be about Mr. Cantwell?

14   A.    That's correct.

15   Q.    And that is from January 25th of this year?

16   A.    I'm not sure if it's from this year or if it's from last

17   year.  It might be from this year.

18   Q.    Okay.  And it addresses this situation with Mr. Cantwell?

19           MR. DAVIS:  Objection.  Vague.  "This situation"?

20           THE COURT:  Rephrase your question.

21           MR. WOLPIN:  All right.  That's fine.

22   Q.    So, let's just, so we get back to basics, this is the

23   channel you have as Uncle Paul?  Can you see on your screen?

24   A.    Yes.

25   Q.    Okay.  And these are the only two posts that were left up?

1    A.    That is correct.

2              MR. WOLPIN:  Okay.  I would move at this point to have

3    this as a full exhibit.

4              MR. DAVIS:  Objection.  Relevance.

5              THE COURT:  I don't understand the relevance at the

6    present time.

7              MR. WOLPIN:  Motive and bias towards the defendant.

8              THE COURT:  I can't discern what that is by looking at

9    it.

10             MR. WOLPIN:  It's not clear?  I don't want to address

11   it openly.

12             THE COURT:  All right.  Go put the headsets on.

13   (SIDEBAR CONFERENCE AS FOLLOWS):

14             THE COURT:  If it's easier for you, you can sit down

15   while you do this.

16             MR. WOLPIN:  Thank you.  I feel odd not making eye

17   contact.

18             THE COURT:  That's all right.

19             MR. WOLPIN:  Our issue here is the one that you chose

20   to leave out, was a post that came immediately after Chris's

21   arrest.  It's meant to needle him, in our opinion, and

22   continue --

23             THE COURT:  What does the post say that is derogatory

24   of Mr. Cantwell?

25             MR. WOLPIN:  It says, In the end it wasn't the prank

1    calls that sent Chris Cantwell over the edge.  It was me

2    personally on two separate occasions offering him advice on how

3    to get a job.

4            THE COURT:  What does that mean?

5            MR. WOLPIN:  It's just their usual taunt about him,

6    that, It's us that's causing him to be arrested ultimately.

7            THE COURT:  I guess I don't understand the humor of

8    this group.  What is Mr. Nehlen's statement about him getting a

9    job, giving him advice on getting a job?

10           MR. WOLPIN:  I guess I should be more clear.  The post

11   is Uncle Paul, and it's a repost of someone else named Mosin,

12   and that repost says, In the end it wasn't the prank calls that

13   sent Chris over the edge.  It was me personally on two separate

14   occasions offering him advice on how to get a job.  This is

15   right after Chris was arrested.  This is them gloating in the

16   fact that they got him to be arrested.  Mosin is Mosin-Nagant.

17           THE COURT:  We're so off the track of anything

18   remotely relevant here.  I'm sorry.  You can cross-examine him

19   about the two posts, you can say that that post is taunting

20   Chris.  You can do all of that, if you want.  I'm just not

21   going to let the post in.  It doesn't add anything.  I don't

22   know what the second post is at all.  I can't understand that.

23           MR. WOLPIN:  Okay.  Understood.

24           THE COURT:  All right.  Let's go on.

25   (END OF SIDEBAR CONFERENCE)

1          MR. WOLPIN:  All right.  We can move on, so we can

2     take that down, please.  So, if we could bring up Exhibit AA,

3     this is just for the witness.  For the Court's understanding, I

4     had shortened an exhibit for the government.  They wish further

5     things to be redacted, so this currently is not an exhibit that

6     is before the jury.

7     Q.   In front of you is another Telegram channel.  Is that

8     familiar to you?  Are you able to see it?

9     A.   I don't know if you can blow that up.  Okay.

10    Q.   Okay.  And this is the channel for the BowlCast?

11    A.   I can see that.

12    Q.   And this is a channel that you are also familiar with?

13    A.   I'm familiar with it, yes.

14         MR. WOLPIN:  Okay.  If we scroll down to the next

15    page, please.

16    Q.   And these are the posts that ultimately went up on the

17    BowlCast that came from Mr. Lambert?

18    A.   Can you zoom in a little bit?  I can't see the --

19    Q.   Sure.

20    A.   Okay.  I can see it now.

21    Q.   Okay.  And so, I think you testified that at least as to

22    the introduction which came from Uncle Paul that may or may not

23    have been you?

24    A.   Yes, that's correct.

25    Q.   If we go down a little further to after the conversation

1    is posted there are comments under Uncle Paul again.  I will

2    show those to you, hopefully, in a moment.

3             MR. WOLPIN:  There we go.  Thank you.  So, if we

4    highlight the three down here.  Thank you.

5    Q.   Following the posts there's a number of derogatory

6    comments about Chris Cantwell made on the BowlCast site,

7    correct?

8    A.   I'm sorry.  Would you repeat that question?

9    Q.   Yeah.  So, following the posts from Ben Lambert's chat

10   there are comments about that below?

11   A.   Okay.

12   Q.   Okay.  And some of those comments also originate from

13   Uncle Paul?

14   A.   Okay.

15   Q.   Were those derogatory comments about Chris Cantwell from

16   you or from someone else?

17   A.   Probably from me.

18   Q.   Okay.  So, it's fair to say that, even before this

19   situation between Ben Lambert and Chris Cantwell you and

20   Mr. Cantwell were not on good terms?

21   A.   I'd say that was probably true, but possibly related to

22   this incident here I can't recall.  I can't recall.

23   Q.   Were you aware of the Bowl Patrol's pranks and harassment

24   of Chris that went on before this?

25   A.   I was aware of prank phone calls.

1    Q.   Okay.  And was that something you participated in or

2    cheered on in any way?

3    A.   No.  I never made any prank phone calls.

4    Q.   Okay.  But you knew that there was sort of bad blood

5    between the Bowl Patrol and Mr. Cantwell at that time?

6    A.   I did.

7         MR. WOLPIN:  If I could just have a moment.

8              (Pause)

9         MR. WOLPIN:  That's all, Mr. Nehlen.  Thank you.

10        THE COURT:  Thank you.

11        Any redirect?

12        MR. DAVIS:  Briefly.

13        THE COURT:  Why don't you just do it from there,

14   Mr. Davis.

15                   REDIRECT EXAMINATION

16   BY MR. DAVIS:

17   Q.   Mr. Nehlen, you were asked on cross about meeting with the

18   FBI on September 2nd.  Do you remember that?

19   A.   Yes, sir.

20   Q.   And you were asked whether you recalled a specific phone

21   call with Ben Lambert at that time?

22   A.   Yes.

23   Q.   All right.  And were you then uncertain whether you had

24   had a phone call as opposed to text communications with Ben

25   Lambert?

1    A.    I was.  At that time I wasn't sure if it was a phone call

2    or a text.

3    Q.    But did you remember on that day that you had communicated

4    with Ben Lambert about this thing from Cantwell?

5    A.    Yes, I absolutely remembered.

6    Q.    And did you tell the FBI that day that Mr. Lambert said

7    that Mr. Cantwell was insane?

8    A.    Yes, I did.

9    Q.    And did you also tell the FBI on that day that Mr. Lambert

10   asked you for advice about this?

11   A.    Yes, sir, I did.

12   Q.    And did you tell them about the advice you gave?

13   A.    I did.

14   Q.    What made you remember that it was a phone call and not

15   text exchanges that you had with Mr. Lambert?

16   A.    I looked at a calendar that had holidays listed on it, and

17   I realized that it was Father's Day.

18   Q.    And why is that significant?

19   A.    Well, because Ben euphemistically refers to me as "Dad,"

20   so I felt like it was a phone call for sure at that point,

21   because he would call me on Father's Day.

22   Q.    All right.  Last thing:  If we see a channel called Uncle

23   Paul, again, you said that was a nickname for you?

24   A.    Yes, sir.

25   Q.    Did that channel have at some point more than one

1   administrator?

2   A.   Yes, sir.

3   Q.   And when a channel has more than one administrator, what

4   does that mean in terms of knowing the origin of a post on that

5   channel?

6   A.   You can't really.  I mean, it comes from the channel, but

7   you don't know what person it came from, you know.

8   Q.   So, any administrator could have posted that?

9   A.   That is correct.

10  Q.   But there's no question that after this happened, at

11  least, you have not been on good terms with Chris Cantwell?

12  A.   That's fair to say, yes.

13          MR. DAVIS:  Nothing further.

14          THE COURT:  Thank you.

15          MR. WOLPIN:  Brief.

16          THE COURT:  Is there something on that last subject?

17  Otherwise, we've covered it.  Do you have something on the

18  administrator and who posted kind of thing?

19          MR. WOLPIN:  No.

20          THE COURT:  No?  Okay, then we've covered it.

21          Thank you, sir.  You can step down.  You're excused.

22                  (Witness stepped down)

23          THE COURT:  Call your next witness.  I know we're

24  close to lunchtime.  I want to be sure we're being efficient.

25          MR. DAVIS:  We can do it, Judge.

1          THE COURT:  How long will this witness be?

2          MR. DAVIS:  This witness will be probably ten minutes

3     on direct.

4          THE COURT:  Can the jury wait for a little bit for

5     lunch?  We'll try to get one more witness in and we'll take a

6     lunch break.  Okay?  Thank you.

7          MR. DAVIS:  Kevin LeBlanc.

8          THE CLERK:  Please raise your right hand.

9          **KEVIN LEBLANC**, duly sworn by the Clerk.

10          THE CLERK:  Thank you.  Please state your name and

11     spell your last name for the record.

12          THE WITNESS:  Kevin LeBlanc, L-e-B-l-a-n-c.

13                        DIRECT EXAMINATION

14     BY MR. DAVIS:

15     Q.    And how are you employed?

16     A.    I'm employed as a New Hampshire State Trooper.

17     Q.    Okay.  Could I ask you to lean a little closer to the

18     microphone, Trooper LeBlanc?  And are you currently a task

19     force officer?

20     A.    Yes.  I'm a sergeant task force officer for the FBI.

21     Q.    All right.  Would you summarize, briefly, your law

22     enforcement experience, Officer LeBlanc?

23     A.    Sure.  My career began in 1998 with the Baltimore City

24     Police Department in Maryland.  I was employed there from 1998

25     till 2003.  In 2003 I received a job at the Concord, New

1   Hampshire Police Department, became certified in New Hampshire,

2   and then in 2007 is when I started with the New Hampshire State

3   Police.

4   Q.   All right.  And when were you assigned to the FBI task

5   force?

6   A.   Summer of 2017.

7   Q.   All right.  And have you worked as a case agent on the

8   Christopher Cantwell case?

9   A.   Yes, I have.

10   Q.   All right.  Directing your attention to October 24th of

11   2019, do you recall that day?

12   A.   Yes.

13   Q.   And what happened on that day?

14   A.   On that day I met Mr. Cantwell at the Keene Police

15   Department for an interview.

16   Q.   When you say "Mr. Cantwell," is that the defendant in this

17   case?

18   A.   Yes, Christopher Cantwell.

19   Q.   Do you see him in the courtroom?

20   A.   I do.

21   Q.   All right.

22   A.   Behind you with the maroon shirt (indicating).

23   Q.   All right.  Thank you.  What time was the meeting?

24   A.   9:00 a.m.

25   Q.   And where was it?

1    A.   At the Keene Police Department in New Hampshire.

2    Q.   All right.  And how had the interview of Mr. Cantwell been

3    arranged?

4    A.   It was arranged via email.

5    Q.   Okay.  And what information -- well, who requested the

6    interview?  Was it FBI, or was it Mr. Cantwell?

7    A.   FBI.

8    Q.   All right.  And what information did you give to

9    Mr. Cantwell about the purpose of the interview?

10   A.   The purpose was to follow up with him, since it had been

11   several weeks since the first interview with him, and he was

12   told that we had identified different members of Bowl Patrol,

13   to include Cheddarman and Vic Mackey, and that we had conducted

14   multiple interviews in different parts of the country, and that

15   I wanted to follow up with him on that.

16   Q.   Okay.  And who participated with you from law enforcement

17   in the interview?

18   A.   Sergeant Joel Chidester from the Keene Police Department

19   was present at the interview, but he didn't ask any questions.

20   Q.   All right.  And were you the lead on the interview?

21   A.   Yes.

22   Q.   Okay.  Was this interview voluntary on Mr. Cantwell's

23   part?

24   A.   Yes.

25   Q.   That is, he was not told he had to come in or he was under

1    subpoena?

2    A.    Correct.

3    Q.    And did he agree to do that?

4    A.    Yes.

5    Q.    All right.  Do you recall where the interview occurred?

6    A.    It was in a back area at the Police Department in a

7    conference room.

8    Q.    All right.  And at that time was Mr. Cantwell under

9    arrest?

10   A.    No.

11   Q.    All right.  And had you actually met with Mr. Cantwell in

12   that same room at another time?

13   A.    Yes.

14   Q.    And when was that, approximately?

15   A.    I believe it was September 17th.

16   Q.    Okay.

17   A.    Around that time, the first interview.

18   Q.    And was that first interview one that Special Agent Shayne

19   Tongbua was part of?

20   A.    Yes.

21   Q.    Okay.  Was there any recording made of the interview on

22   October 24th?

23   A.    No, there was not.

24   Q.    And why was that?

25   A.    By agreement between myself and Mr. Cantwell, based on the

1     previous discussions we had with him for the first interview.

2     Q.   Okay.  And you were aware that Mr. Cantwell had complained

3     about harassment that he had received from other persons?

4     A.   Yes.

5     Q.   Okay.  And was it your purpose to show him anything in

6     regard to the exchange with Mr. Lambert?

7     A.   Yes.

8     Q.   All right.  So, what had happened between the September

9     interview of Mr. Cantwell and the October interview?

10    A.   During that time frame is when we had traveled to

11    St. Louis and conducted interviews with Ben Lambert and Cheddar

12    Mane.

13    Q.   All right.  So, you had been able to identify the alleged

14    victim?

15    A.   Yes.

16    Q.   And you had actually interviewed him and gotten his side

17    of the story?

18    A.   I did not, but FBI did, yes.

19    Q.   Okay.  But you did go to Missouri, right?

20    A.   Yes.

21    Q.   Okay.  And so, what documents did you bring with you for

22    your meeting with Mr. Cantwell in October of 2019?

23    A.   I brought with me an email that he had sent to the FBI and

24    copies of that message exchange between him and Cheddar Mane.

25    Q.   Okay.  And so, when you say the "message exchange," is

1    that the Telegram message exchange that we've been looking at

2    throughout the trial showing communications on June 15th and

3    16th between Mr. Cantwell and Mr. Ben Lambert?

4    A.   Yes.

5    Q.   Okay.  And back in September had you shown those documents

6    to Mr. Cantwell?

7    A.   No.

8    Q.   All right.  So, this is the first time you were going to

9    be able to do that?

10   A.   Yes.

11   Q.   Okay.  So, how did Mr. Cantwell present on that morning?

12   A.   He seemed okay, normal, regular.

13   Q.   Okay.  And how did you begin the meeting?

14   A.   I had arrived first, and then when he arrived Joel had to

15   go get him and bring him there.  I'm pretty sure we probably

16   would have shaken hands, brief introduction again.  I

17   reiterated with him the purpose of the interview that I wanted

18   to discuss with him in regards to the interviews conducted and

19   the identification of Bowl Patrol members.  And from there I

20   moved into, I discussed with him how in the first interview he

21   had indicated to us that he was willing to cooperate and

22   testify, if needed, and I had asked him if he was still willing

23   to testify.

24   Q.   All right.  And I'll ask you to slow down a little bit,

25   Task Force Officer LeBlanc, just so the court reporter can get

1  it.

2       And when you asked him if he was still willing to

3  testify, what did Mr. Cantwell say?

4  A.   He told me that he was willing to testify against them,

5  meaning Bowl Patrol, and that he would want the testimony to be

6  in regards to their harassment of him, and he did not want any

7  testimony to be about their beliefs.

8  Q.   No testimony about their beliefs?

9  A.   About their beliefs.

10 Q.   Okay.  So, what happened next?

11 A.   And then discussed with him how during the first interview

12 with him back in September, when we discussed Cheddar Mane, he

13 had mentioned in that interview that he had threatened to dox

14 Cheddar Mane, and that he had been told by other people that

15 that was extortion, so he didn't really want to talk about it

16 too much.  So, I brought that topic up, and while doing that I

17 showed him the email that he had sent to the FBI.

18 Q.   All right.  And was that email dated August 28th of 2019?

19 A.   I believe so, yes.

20 Q.   And did that email describe in Mr. Cantwell's words the

21 interaction he had with Cheddar Mane back in June?

22 A.   Yes.  There was a paragraph within that email where he

23 says, The CPS thing was, and he describes an interaction with

24 Cheddar Mane, how he had threatened to expose him if he did not

25 stop harassing him, he threatened to call CPS, and that he had

1    given him an out by identifying Vic Mackey, and that he did

2    expose him and did call CPS.

3    Q.   So, did you, then, show -- what did you do then?

4    A.   I showed Mr. Cantwell that email and asked him if he was

5    familiar with it.  He acknowledged that he did send that to the

6    FBI and that he was familiar with the content of the email.

7    Q.   All right.  So, you had a hard copy of the email there?

8    A.   Yes.  I had printed it off.

9    Q.   All right.  And you passed it over to him?

10   A.   Yes.

11   Q.   Did he take long to read it?  What happened?

12   A.   No.  He essentially glanced at it.  It was apparent to me

13   he recognized it, and that's when he said he had sent it and he

14   was familiar with the content and slid it back towards me.

15   Q.   Okay.  So, what happened next in the interview?

16   A.   I then had the copies of the message exchange between him

17   and Cheddar Mane, did the same thing, slid it towards him, and

18   what I was trying to do is understand with him that he had

19   mentioned an exchange between him and Cheddar Mane in the

20   interview, he had mentioned it in the email.  So, I handed him

21   the messages saying, Is this what you're talking about?  Are

22   these the messages that you are referencing?

23   Q.   Okay.  And at that time did the FBI have unobscured

24   versions of the exchange between Cheddar Mane and Cantwell?

25   A.   No, we did not.

1   Q.   What version did you have?

2   A.   It was a version where there are stickers, I guess you'd

3   call them, over the faces to blur out people's faces and

4   things.

5   Q.   Okay.  And that's the version you since learned that Mr.

6   Lambert made and posted after the exchange happened?

7   A.   Correct.

8   Q.   Okay.  And had you printed out a copy of that entire

9   exchange?

10  A.   Yes.

11  Q.   And you handed that over to Mr. Cantwell?

12  A.   Yes.

13  Q.   And what did he do?

14  A.   He looked at it briefly.  It seemed apparent that he

15  recognized it, and he said, Yes, I sent these messages.

16  Q.   Okay.

17  A.   And then he went on to state that he was becoming nervous

18  because I was asking about these messages, because they, and

19  I'm not sure who "they" was, but they had told him it was

20  extortion.

21  Q.   And did he say anything else at that point?

22  A.   No.  I just confirmed with him the date of them as far as

23  the year that it had occurred, in June of 2019.

24  Q.   All right.  And what about his appearance at that point in

25  the interview did you note?

1    A.    He became uneasy.  It was clear to me it was uncomfortable

2    for him to talk about it.  He kind of leaned back, was shifting

3    in his seat, because it was just an uncomfortable topic for him

4    to talk about.

5    Q.    All right.  So, but he certainly acknowledged he had sent

6    those texts, right?

7    A.    Correct.  He recognized it and said, I sent these

8    messages.

9    Q.    All right.  What happened next?

10   A.    I had a discussion with him where I had already told him

11   that we had conducted different interviews in different parts

12   of the country, so I had asked him if he had heard about any of

13   these interviews, just if any word or rumors made it back to

14   him.

15   Q.    Do you recall whether you referenced the dates in the

16   exchange between him and Ben Lambert?

17   A.    Yes.  I believe it was June 15 or 16.  I confirmed that it

18   was, in fact, of 2019.

19   Q.    And did he agree that that had happened in June of 2019?

20   A.    Yes.

21   Q.    Okay.  So, when you asked him about whether he had heard

22   about any interviews of Bowl Patrol people, how did he respond?

23   A.    He said he had not, but then he added that within the last

24   week or so a person who goes by the name Chief fed Poster

25   Sophie had contacted his Telegram administrator, whose name was

1    Shelly, asking them to delete their Telegram history, because

2    they had been contacted by the Feds.  He went on to state that

3    he doubts we talked to this person and that it was even

4    doubtful that really happened to Chief fed, because that person

5    had the ability to delete their own Telegram, if they wanted

6    to.

7    Q.   All right.  So, at that point in the interview did you ask

8    if Mr. Cantwell had any questions?

9    A.   Yes, I did.

10   Q.   And did he have a question?

11   A.   Yes.  He had asked me if any of the phone numbers that he

12   provided to the FBI helped us identify Vic Mackey.

13   Q.   So, he specifically asked about Vic Mackey?

14   A.   Yes.

15   Q.   And at that point did he ask about anyone else?

16   A.   No.

17   Q.   All right.  What did you tell him?

18   A.   I told him I couldn't discuss the specifics of the case,

19   and that all I could tell him is that we learned the identities

20   of people through various sources, and that the case was

21   progressing.

22   Q.   Okay.  And did he make any other statement?

23   A.   He told me that, as he had previously mentioned to us,

24   that he suspected that people pose to be members of the

25   movement, the white nationalist movement, and he suspects

1    people do that in order to sabotage the movement, and that he

2    had also had speculated whether or not Vic Mackey or Cheddarman

3    were, in fact, feds.

4    Q.    Were, in fact, feds?

5    A.    He said that and then added that that is why he gave Vic

6    Mackey credentials to his website.  In case Vic Mackey was a

7    fed, he'd be able to see there was nothing to hide on his

8    computer, that he had nothing to hide on his computer.

9    Q.    That Mr. Cantwell had nothing to hide?

10   A.    Correct.

11   Q.    Okay.  And how long did the -- was that the conclusion of

12   the interview?

13   A.    Yes, basically.

14   Q.    And how long did it go, the entire time?

15   A.    Between 20 and 25 minutes.

16   Q.    All right.  And how did you leave it?  How did the FBI

17   leave it with Mr. Cantwell as of the end of that interview on

18   October 24?

19   A.    Just left it that I would be in touch with him as the case

20   progressed.

21              MR. DAVIS:  All right.  No further questions.  Thank

22   you.

23              THE COURT:  Cross-examination.

24                          CROSS-EXAMINATION

25   BY MR. LEVIN:

1    Q.   Mr. LeBlanc, you testified that this meeting in October

2    24th, 2019 with Mr. Cantwell, that was to follow up after your

3    previous meeting about a month previous to that?

4    A.   Yes, sir.

5    Q.   And you are aware that over the summer Mr. Cantwell had

6    sent emails to the FBI where he had talked about this

7    interaction he had had with Benjamin Lambert or Cheddar Mane,

8    as he was known to him at that point?

9    A.   Yes.

10   Q.   And he had talked about wanting Vic Mackey's dox?

11   A.   Yes.

12   Q.   And had sent some materials to the FBI, including

13   photographs to the FBI in August of 2019?

14   A.   Yes.

15   Q.   And then on September 24th, 2019 you met with Mr.

16   Cantwell, and Joel Chidester was present as well?

17   A.   On which date?  I'm sorry.

18   Q.   On September -- at the end of September of 2019.

19   A.   The first interview with him?

20   Q.   That's right.

21   A.   Yes.

22   Q.   September 24th; is that right?

23   A.   I believe it was September 17th.

24   Q.   Okay.  I'm looking at your report, and it says, Interview

25   of Cantwell on September 24th, 2019, but I'll take your word

1    for it that it was September 17th.

2          On September 17th, 2019 you had interviewed Cantwell

3    at the Keene Police Department; is that right?

4    A.   Yes.

5    Q.   So, at that time Mr. Cantwell had talked about various

6    members of the Bowl Patrol, had talked to you about being

7    pranked and harassed by them and made, basically, a more

8    expanded complaint?

9    A.   Yes.

10   Q.   And then a month later you contacted him and said, We'd

11   like to update you on the investigation --

12   A.   Yes.

13   Q.   -- essentially?

14   A.   Essentially.

15   Q.   And between those two dates, the September 17th, 2019 and

16   October 24th, 2019, you had actually gone to Missouri and

17   talked to Ben Lambert; is that right?

18   A.   I went to Missouri, but I did not talk to Ben Lambert.

19   Q.   Yeah.  But your group -- you're a task force officer; is

20   that right?

21   A.   Yes.

22   Q.   You're a New Hampshire State Trooper that's embedded in

23   the FBI, right?

24   A.   Yes, sir.

25   Q.   And you're working on these terrorism-type investigations

with Shayne Tongbua?

A. Yes.

Q. And other members of the FBI and other task force officers?

A. Correct.

Q. So, a group of you traveled to Missouri together for the purpose of gathering information about this case?

A. Yes.

Q. And then, when you came back to Missouri -- I mean, when you came back from Missouri to New Hampshire you reached out to Mr. Cantwell and asked to speak with him; is that right?

A. Yes.

Q. And he met you at the Keene Police Department. That was a voluntary interview that you had with him, a sit-down with him?

A. Yes.

Q. And Joel Chidester was also present at that?

A. Yes.

Q. And when you met with Mr. Cantwell, initially he started off talking about how he would be happy to testify, if needed; is that right?

A. Yes.

Q. It was a polite, cordial conversation you had with him?

A. Yes.

Q. He wasn't rude or disrespectful to you?

A. No.

1    Q.   He indicated that he was still willing to testify in

2    regards to the Bowl Patrol destroying his business; is that

3    right?

4    A.   Yes.

5    Q.   And the harassment that was directed towards him by the

6    Bowl Patrol; is that right?

7    A.   He was alleging it was Bowl Patrol.

8    Q.   Right.  But he indicated that he would still be willing to

9    testify about that, right?

10   A.   Yes.

11   Q.   But he did not want the testimony to be about their

12   beliefs; is that right?

13   A.   Correct.

14   Q.   I'm just trying to characterize your testimony.  Is that

15   correct?

16   A.   Yes.

17   Q.   And then during the interview you asked him about some of

18   the things that he had spoken about during the September 17th

19   interview; is that right?

20   A.   Yes.

21   Q.   And during the September 17th interview he had talked

22   about threatening to call CPS on Cheddar Mane if Cheddar Mane

23   didn't provide him with the identity of Vic Mackey; is that

24   right?

25   A.   That's correct.

1  Q.   Now, you indicated that you showed him a text exchange; is
2  that right?
3  A.   Yes.
4  Q.   And he admitted that that was a text exchange that he was
5  involved in; isn't that correct?
6  A.   Yes.
7  Q.   And it was after he admitted to that that he confessed to
8  you, I'm a little bit nervous that you guys are asking me about
9  this?
10 A.   Correct.
11 Q.   Because somebody had told him that that might be
12 extortion; is that right?
13 A.   Yes.
14 Q.   He was candid with you, in other words?
15 A.   Sorry?
16 Q.   He was candid with you about that?
17        MR. DAVIS:   Objection.   Calls for speculation.
18        THE COURT:   If the officer knows, he can answer.   If
19 he doesn't, he doesn't have to answer.
20 A.   I would say he was candid with that specific item.
21 Q.   He indicated that -- he provided some more information to
22 you, is that right, about a person on his Telegram site
23 indicating that they wanted their Telegram history deleted
24 because they had been visited by the feds; is that right?
25 A.   He provided that information but then added that he

1   doubted that it was even true.

2   Q.   And had the feds visited this person, or was that just

3   complete out of the blue to you?

4   A.   That was news to me.  I don't know anything about that

5   name.

6   Q.   Now, at the end of the interview you said that Cantwell

7   wondered if any of the telephone numbers he had provided had

8   led to the identification of Vic Mackey; is that right?

9   A.   Yes.

10  Q.   And you said that you didn't want to share any information

11  with him?

12  A.   Correct.

13  Q.   You wrote a report, did you not, about this interview?

14  A.   Yes.

15  Q.   And the interview took place on October 24th, 2019, and

16  the report was written the same day; is that right?

17  A.   I'd have to see the bottom of the report.

18          THE COURT:  Show him on the document camera, if you

19  want.

20          MR. LEVIN:  Yes, please.

21  Q.   Is this the report -- I'm sorry.  I'm going to show you

22  the top of it.  Is this the report you wrote about your

23  interview with Mr. Cantwell on October 24th, 2019?

24  A.   Yes.  I just need to --

25  Q.   Was that drafted the very same day?

1       THE COURT:  Can you enlarge it a little bit?

2       Can you see it okay?

3       THE WITNESS:  It was distorted but, yes, I got a

4   glimpse.  10/24.  Yes, I saw it.

5   Q.   So, the interview took place on October 24th; is that

6   right?

7   A.   Yes.

8   Q.   And the date it was drafted was also October 24th?

9   A.   Yes.

10  Q.   And if you see just above that, it indicates, it talks

11  about a September 24th, 2019 interview.  You're saying that's

12  the September 17th, 2019 interview; is that right?

13  A.   Yes.  Because if you look at the top of this page, if you

14  go back up, that date of 10/28, that's the date that the report

15  became serialized and approved.

16  Q.   Right.

17  A.   And the September 24th date was me misreading the other --

18  the September 17th report actually says September 17th for the

19  interview, and when I referenced it I incorrectly looked at the

20  date of entry on that original report --

21  Q.   Oh, okay.

22  A.   -- and mixed up the dates.

23  Q.   So, the report on that date had been a week later.

24  A.   But the actual report, September 17th, I incorrectly

25  referenced it as September 24th.

1    Q.   All right.  Now, you testified just now, I just have one

2    more question, which is you testified that Mr. Cantwell wanted

3    to know whether there had been any -- whether the telephone

4    numbers he had provided had led to the identification of Vic

5    Mackey, and you said that you didn't want to talk about that;

6    is that right?

7    A.   I explained to him that for the purpose of case integrity

8    I was not going to discuss specifics of the case with him, as I

9    would not with any other person.

10   Q.   Okay.  But in this report, when you talk about the

11   conclusion of the interview, you do indicate that you told him

12   that information had -- various information had led to the

13   identification of Cheddar Mane and Vic Mackey; is that right?

14   A.   Yes.

15   Q.   So, you did share with him that they had been identified?

16   A.   Well, I began the introduction to the interview by

17   explaining to him the purpose was to follow up with him because

18   they had been identified.

19   Q.   They had been identified?

20   A.   Yes.

21   Q.   So, you did share with him that you knew who they were at

22   that point?

23   A.   Yes.  I told him that was one of the reasons for the

24   interview, was that Cheddar Mane and Vic Mackey had been

25   identified, and I wanted to follow up with him on the case,

1    with the case.

2              MR. LEVIN:  Just one moment, your Honor.

3                        (Pause)

4              MR. LEVIN:  No further questions, your Honor.

5              THE COURT:  Anything else?

6              MR. DAVIS:  No redirect.

7              THE COURT:  All right.  Thank you, sir.  You're

8    excused.

9                   (Witness stepped down)

10             THE COURT:  Thank you for your patience, Members of

11   the Jury.  I'm sure some of you are pretty hungry right now,

12   but we'll break until 1:40 and come back and resume with

13   testimony at that time.

14             THE CLERK:  All rise.

15                  (The jury exited the courtroom)

16             THE COURT:  Anybody have anything they need with me?

17             MS. KRASINSKI:  Yes, your Honor.

18             THE COURT:  All right.  People can be seated.

19             MS. KRASINSKI:  I just want to put on the record that

20   the parties have agreed to stipulate to the authenticity of

21   Government's Exhibits 110 and 111 as they will be remade in

22   accordance with the Court's ruling this morning, and I want to

23   get that on the record so that we can advise the custodian of

24   jail call records that she doesn't need to testify.

25             THE COURT:  All right.  So, the parties have agreed to

1   authenticity, and, given my prior rulings, all objections of

2   the defendant, which are preserved, the recordings can just be

3   played, the excerpted recordings.  All right?

4           MS. KRASINSKI:  Thank you.

5           THE COURT:  And what else have you got this afternoon?

6           MR. DAVIS:  Just one more witness.  We will, I'm sure,

7   rest this afternoon.

8           THE COURT:  All right.  Over the lunch break consult

9   with your client about whether he's likely to testify and give

10  me any kind of advice you have with respect to that so I can

11  plan after lunch.  Do you have other witnesses that you want to

12  call this afternoon?

13          MR. LEVIN:  No, your Honor.

14          THE COURT:  All right.  So, in fact, we may be

15  potentially closing tomorrow, is what it's coming down to.

16  It's a good thing I've been working on the jury instructions.

17          Okay.  Let me know right after lunch what your

18  client's position is on that issue, because I do want to try to

19  plan things in an orderly way.  All right?

20          THE CLERK:  All rise.

21          (Lunch recess taken at 12:53 p.m.)

22

23

24

25

1

2

3

4

5

6

7

8

$$\text{C E R T I F I C A T E}$$

        I, Brenda K. Hancock, RMR, CRR and Official Court

Reporter of the United States District Court, do hereby certify

that the foregoing transcript constitutes, to the best of my

skill and ability, a true and accurate transcription of the

within proceedings.

9

10

11

12

13

14

Date: ___5/17/21_____          /s/ *Brenda K. Hancock*
                                Brenda K. Hancock, RMR, CRR
                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25