1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:20-cr-00006-PB
                   v.                 *  September 25, 2020
6                                     *  1:15 p.m.
                                      *
7     CHRISTOPHER CANTWELL,           *
                                      *
8                    Defendant.       *

9     * * * * * * * * * * * * * * * * *

10

        TRANSCRIPT OF DAY FOUR OF JURY TRIAL - AFTERNOON SESSION
11

            BEFORE THE HONORABLE PAUL J. BARBADORO
12

13

      APPEARANCES:
14

15    For the Government:      AUSA John S. Davis
                               AUSA Anna Z. Krasinski, Esq.
16                             U.S. Attorney's Office

17    For the Defendant:       Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
18                             Federal Defender Office

19

20    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
21                             United States District Court
                               55 Pleasant Street
22                             Concord, NH 03301
                               (603) 225-1454

23

24

25

1                    <u>I   N   D   E   X</u>

Page

Closing Argument By Ms. Krasinski.........8
Closing Argument by Mr. Wolpin............23
Rebuttal Closing Argument by Mr. Davis....36
Jury Charge...............................45

```
 1                    P R O C E E D I N G S

 2         THE CLERK:  All rise for the Honorable Court.

 3         THE COURT:  First, the defendant has a categorical

 4   objection to any instruction on provocation.  I understand that

 5   objection.  Let me briefly explain why I feel compelled to give

 6   an instruction on the concept of provocation.

 7         As I've noted, I've struggled during the course of

 8   pretrial preparation to understand the defendant's defense.

 9   I've repeatedly inquired of defense counsel to ask them to

10   explain the defense so that I could prepare properly.  I worked

11   hard to develop a proposed charge that I submitted to the

12   parties well in advance of the trial.  I made clear to them

13   when I thought a provocation defense would be needed I believe

14   on the first day of trial, once I heard their opening

15   statement.  I submitted a proposed provocation charge which

16   came from the government because the defendant didn't submit

17   any alternative charge.

18         I then met with counsel at about 5:00 last night and

19   heard proposed changes to the entire charge, including the

20   provocation charge.  I made certain changes to the provocation

21   charge at the defendant's request.

22         I showed up at 8:10 this morning, and I had delivered

23   the proposed charge to defense counsel as modified at 8:00.  I

24   came down and talked to the parties about the proposed charge

25   this morning.
```

1          It is, frankly, a little bit frustrating for me to be

2     forced to delay the jury while we continue to evaluate an issue

3     that, frankly, should have been resolved long ago, given the

4     many opportunities I have given counsel to present this issue

5     to me.  But why I needed to do a provocation charge became

6     apparent to me in the opening statement, when the defendant

7     made an opening statement that was obviously crafted as a

8     direct appeal to a non-existent provocation defense, and at

9     that point the jury would have been impossibly confused if I

10    were to instruct without giving any kind of provocation

11    instruction.

12          The need for it became even more apparent when the

13    defendant insisted on the introduction of evidence, over the

14    government's objection, that was minimally relevant for any

15    other purpose than provocation but that directly addressed a

16    potential provocation defense.  I nevertheless erred on the

17    side of caution and admitted that evidence, because I've always

18    been sensitive to the need to allow the defendant a full and

19    fair opportunity to develop context evidence.  But because I

20    did that, and because that evidence that otherwise wouldn't

21    have been admissible but for the defendant's insistence in its

22    minimal relevance for a legitimate purpose, it also carried

23    with it a potential for an improper purpose, and so I have to

24    give this instruction over the defendant's objection.

25          Now, I have tried to craft a modified instruction that

1    very closely tracks the defendant's proposal but is in my own

2    words and tries to address a couple of things.  One, I am

3    sensitive to the need to make sure that there is absolutely no

4    doubt that the burden of proof remains with the government as

5    to each element of the charge at all times, that it never

6    switches to the defendant.  I've tried to build that into the

7    proposed charge in even stronger terms than the defense has

8    proposed.

9         Second, I'm aware of the context defense, and although

10   I gave the context instruction earlier in the case, I'm

11   prepared to repeat it here.

12        So, let me read the proposed instruction, and I,

13   again, remain open to hearing suggestions from the parties as

14   to how to improve it.

15        "You have heard evidence that Victim 1 and others have

16   engaged in behavior that disrupted the defendant's live call-in

17   radio show.  You have also heard evidence that Vic Mackey or

18   others may have engaged in behavior that disrupted the

19   defendant's website.  You may consider such evidence for the

20   purpose of understanding all of the circumstances surrounding

21   the making of the communications at issue in this case,

22   including, for example, the language, specificity and frequency

23   of the communications, the context surrounding the

24   communications, the relationship between the defendant and

25   Victim 1, Victim 1's response, any previous communications

1    between the defendant and Victim 1, and whether you believe the

2    person making the communications was serious, as distinguished

3    from mere idle or careless talk, exaggeration or something said

4    in a joking manner.  You may not consider this evidence for any

5    other purpose.  Remember, the defendant cannot be found guilty

6    of any charge unless the government proves every element of the

7    charge beyond a reasonable doubt.  That burden never switches

8    to the defendant.  If, however, the government proves every

9    element of the charge beyond a reasonable doubt, evidence of

10   provocation, justification or self defense does not negate the

11   defendant's criminal culpability with respect to that charge."

12        So, I have taken a little bit of the government's

13   proposed charge, I've taken a large part of the defendant's

14   proposed charge, and I put it into language that I believe

15   accurately describes the burden of proof, how this evidence can

16   be considered and the purpose for which it will not provide a

17   defense if the government proves every element of the charge

18   beyond a reasonable doubt.

19        What does the defendant want to say about how I could

20   improve the charge, understanding your view is I've

21   categorically erred in giving it and it can't be improved, but

22   if I ask you for suggestions, telling you I'm going to do it,

23   what else would you say to me?

24        MR. LEVIN:  We have no other suggestions, your Honor.

25   That's fine.

1      THE COURT:  All right.  What does the government want

2  to say?

3      MR. DAVIS:  No objection.

4      THE COURT:  All right.  So, we will incorporate that

5  into the charge.  I'd ask my law clerk to -- is Lorraine back

6  from her appointment?

7      THE CLERK:  She might be.

8      THE COURT:  I ask you to see if you can contact her

9  and ask her to substitute this for the provocation and then

10  print up four copies of the jury charge, and if she can't

11  because she's not available, then I'll ask Caroline to do it

12  for me.  Okay?  All right.

13      All right.  Are we ready to bring the jury in?

14      MS. KRASINSKI:  Yes, your Honor.

15      THE COURT:  All right.  Let's bring the jury in.

16      THE CLERK:  Please remain standing for the jury.

17          (The jury entered the courtroom)

18      THE CLERK:  Please be seated.  This hearing is back in

19  session.

20      THE COURT:  Sorry for the delay.  It's on me again.  I

21  apologize.  I apologize.  We are, though, ready for closing

22  arguments, so we'll hear the government's closing argument.

23      You can proceed when ready.

24      MS. KRASINSKI:  Thank you, your Honor.

25

<u>CLOSING ARGUMENT</u>

1

2    <u>BY MS. KRASINSKI:</u>  Ladies and gentlemen, Christopher Cantwell

3    is guilty of extortion and cyberstalking.  He's guilty because

4    he sent an interstate communication threatening to rape

5    Mrs. Lambert, and he sent that threat with the intent to get

6    something he wanted, Vic Mackey's personal information, his

7    dox.  He's guilty because he threatened to try to get Child

8    Protective Services to destroy Ben Lambert's life by claiming

9    that Ben Lambert uses LSD and by reporting his involvement in a

10   white nationalist group to Child Protective Services and to the

11   FBI.  He's guilty of cyberstalking because he engaged in a

12   campaign intended to harass and intimidate Ben Lambert.  He

13   threatened to dox Ben Lambert, and he did.  He publicized

14   photos of Mrs. Lambert and their three children.  He threatened

15   to call Child Protective Services, and he did.  And during this

16   campaign Chris Cantwell made it clear that he would stop if,

17   and only if, Ben Lambert gave up Vic's information.  Give me

18   Vic.  It's your only out.

19          Chris Cantwell wanted revenge.  He wanted revenge on

20   Vic.  He wanted to eliminate a rival, and this was his path to

21   that information.  Chris Cantwell was willing to say or do

22   anything to get Ben Lambert to give him what he wanted, the

23   information that he needed to do that.

24          Chris Cantwell's words and his actions were

25   purposeful, they were manipulative and designed to get that

1    result.  And what was the purpose, the result that Chris

2    Cantwell was seeking?  You know this now.  Vic Mackey's

3    information.  He wanted to dox Vic Mackey.  He told you he

4    wanted to expose Vic Mackey.  Why?  He told you he was angry.

5    He was really angry.  He was frustrated.  He described to you

6    the prank calls he was getting into his show, people were

7    making memes he didn't like, and he believed Vic Mackey was the

8    ringleader who was organizing this harassment campaign.

9         Both Agent Tongbua testified and Mr. Cantwell

10   testified about this, that he placed the majority of the blame

11   on Vic Mackey.  And you know that Mr. Cantwell blamed Vic

12   Mackey and one other person, a guy who went by the pseudonym

13   Mosin-Nagant, for defacing his website.  Chris Cantwell places

14   the blame for all of that on Vic Mackey.  And Mr. Cantwell made

15   his objective clear.  He brought Vic up during the

16   conversation.

17        And let's have Government's Exhibit 100 up while we

18   talk about this, because the first time he mentions Vic Mackey

19   it's all about getting Vic Mackey's information.  If you want

20   to dox Vic, he's a better target, but if you give me fake info,

21   then your wife is going to have trouble sleeping at night until

22   she leaves you and takes your kids away, and he repeats his

23   demand for Vic's dox over and over again.  He says on Page 3,

24   Give me Vic.  It's your only out.  And then later, on Page 5 of

25   this he repeats it again, Give me Vic.  And close to the end of

1    the conversation, Tell Vic if he gives himself up you can save

2    your family.

3         In opening the defense laid out a theory that all

4    Chris Cantwell meant was, Leave me alone, but I want you to

5    think about that, because to adopt that theory you'd have to

6    ignore this purpose, you would have to ignore the purpose that

7    is littered throughout these communications.  And,

8    conveniently, in their opening statement there was no reference

9    to Vic Mackey at all.  But you've seen the messages, and you

10   know the history.  It's always been about Vic Mackey, even back

11   in March of 2019, months before the exchange that brings us

12   here today, and you see that in Defense Exhibit B-20.  When you

13   get doxed it's all because of Vic.  Remember that.

14        And to adopt the defense theory, you'd also have to

15   ignore all of the evidence that shows what Chris Cantwell

16   really thought about Ben Lambert, that he wasn't after Ben

17   Lambert, but Ben Lambert was the one who could give him what he

18   did want.  He said this during his call to the Missouri Child

19   Abuse and Neglect Hotline.  And let's listen to a small portion

20   of that call.  The call is in evidence as Government's Exhibit

21   103, but let's listen to just a very small portion of that now.

22                    (Audio recording played)

23        MS. KRASINSKI:  I've had problems with these other

24   members of the group.  This isn't about Ben Lambert.  And Mr.

25   Cantwell again explains this in his call with Katelen Fry, his

1  confidante, his friend, and this is the call that he recorded

2  back in December of 2019, back before any charges, back before

3  his arrest, and let's listen to that now.  It's Government's

4  Exhibit 109.

5                    (Audio recording played)

6            MS. KRASINSKI:  Vic Mackey is the hostile actor.  He

7  doesn't know how conscious of it Cheddar was.  He doesn't know

8  how conscious of it Ben Lambert was.  And he explained it in

9  his messages to Ben Lambert back in Government's Exhibit 100,

10  and what he writes is, And I don't care if it's you causing the

11  trouble.  You're the one who's going to suffer, because you're

12  the one who I can get.  And you know that by this point Ben

13  Lambert wasn't causing the trouble.  He sat there, and he

14  admitted to you that he had made prank calls, that he had made

15  memes.  He admitted all of the things that he had done to get a

16  rise out of Mr. Cantwell.  But he also told you in March of

17  2019, after Mr. Cantwell threatened to dox him the first time,

18  that he had left him alone, and the evidence bears that out,

19  and Mr. Cantwell sat there, and he told you today that he had

20  not seen anything associated with Cheddar, with Ben Lambert's

21  pseudonym, for three months before this exchange, and if you

22  look at the phone records, Defense Exhibit I-2-B, and you look

23  at the last page, Mr. Lambert's cell phone didn't call in to

24  Radical Agenda for months before this exchange.

25            Now, let's talk about how serious Mr. Cantwell was,

1    how much he wanted Ben Lambert to believe him.  This was a

2    multi-pronged attack.  Chris Cantwell made a number of threats,

3    a threat to dox, a threat to report to CPS, a threat to report

4    to the FBI, and a threat to rape.  And look at the language he

5    uses, and right now I'm specifically talking about this

6    language directed at Mrs. Lambert.  It's specific.  It is

7    directed at a particular person.  It is coupled with all of the

8    other threats, two of which he followed through on, and this is

9    after Mr. Cantwell sent that message of just his street

10   address.  Mr. Cantwell knows where they live; he could show up

11   any time.  And he follows it with a picture of Mrs. Lambert.

12   He knows who his target is; he knows what she looks like.

13          And Mr. Cantwell testified and he told you he cares

14   about language, and he's precise with his language, and with

15   each of these messages he had time to think, he had time to

16   craft his message, he had time to type it out, he had time to

17   consider whether to send it, and he was careful with his

18   language here.  He told you he wanted to send something that

19   was profoundly unpleasant.

20          Now, he told you that, while he cares about language,

21   he's not always careful with his language, and what happens

22   when you're having a conversation face-to-face with someone?

23   This wasn't a bar fight.  This wasn't two people screaming at

24   each other.  These are written communications.  He had time to

25   deliberate, he had time to come up with exactly what he wanted

1    to say, type it out and send it.

2          Mr. Cantwell wants you to believe that this rape

3    threat was some impassioned response to a threat to his former

4    girlfriend, Katelen Fry, to Peach.  But compare the two

5    statements.  Mr. Lambert wrote, Guess that means you don't care

6    what happens to her either.  There is no specific language in

7    there.  Mr. Lambert doesn't say he is going to do anything to

8    her.  He doesn't say he's going to send anyone else to do

9    anything to her.  He certainly doesn't use the type of

10   language, the type of sexual violence and sexual imagery in Mr.

11   Cantwell's response.  Mr. Cantwell's response is the opposite.

12   It's active, it involves Chris Cantwell, it involves a specific

13   person, Mrs. Lambert, and it involves their young children:  If

14   you don't want me to come and fuck your wife in front of your

15   kids...  It is specific and it is direct.

16         Now, he wants you to think that there is a reference

17   to cucking, somehow that he would be more satisfying to her,

18   that doing this in front of her children would somehow satisfy

19   her in a way that Mr. Lambert couldn't.  But use your common

20   sense and look at this language.  This isn't talking about some

21   satisfying sexual encounter.  This is rape, and it's talking

22   about sexual violence against a woman in a way that would also

23   traumatize her children.

24         He also talked about fantasy violence, but there's

25   nothing fanciful about this.  Fanciful is the refuge of the

1    defendant who's now been charged with a threat.  He has nowhere

2    else to go but to try to dismiss this as fanciful.  But here's

3    where it's not.  It's focused on a specific individual, it's

4    coupled with threats that Mr. Cantwell actually carried out,

5    and it's coupled with a demand for something:  Give me Vic,

6    it's your only out.

7            And as you're thinking about whether or not he

8    intended this statement to reflect violence, think about his

9    previous statements on doxing, that it's helpful to think of

10   doxing as a form of violence.  Do you really think that he

11   intended his threat to dox, to convey some sort of form of

12   violence, but he didn't intend for this statement to convey a

13   form of violence?  No.  That's not plausible.  He testified

14   that he has two incel listeners, and he testified that they're

15   pathetic.  He's trying to make his later statements, that, One

16   of my incel listeners would love to give her a baby, somehow is

17   less ominous than it really was.  And then he told you, Well, I

18   only thought incel listeners were dangerous sometime after I

19   sent this exchange.  But then you heard that well before this

20   exchange he had written an article about a number of people

21   that were identified as mass murderers and were incels.

22           The statements weren't a joke.  There's zero

23   entertainment value.  There's no audience.  It's not idle talk.

24   He carried out some of his threats.  It's not a political

25   statement, it's not exaggeration.  It was designed and planned

1    to get something, to get Vic's information.

2         And think back to Mr. Cantwell's testimony.  Think

3    back to what he said about Katelen Fry.  This is someone he

4    trusts, someone he asks to marry him, someone he confides in,

5    and he tells her about what he meant, and we're going to play a

6    portion of Government's 105.

7                    (Audio recording played)

8         MS. KRASINSKI:  I left that out there.  I didn't say

9    it; I implied it.  Mr. Cantwell also wants you to believe that

10   this is just the way these two talk to each other, this is

11   normal within their community.  But you've heard from people

12   within that community.  Both Ben Lambert and Paul Nehlen

13   testified about this.  They talk about violence generally,

14   there's no denying that, but going after someone's spouse

15   crosses a line, and you know, based on Mr. Cantwell's reaction

16   after making these statements, that this crossed a line even in

17   their community.  He told you he became worried after his tech,

18   Ryan, told him not to blackmail people.  And then you've heard

19   Ms. Fry's reaction to it.  People within his own community

20   thought that this crossed the line.

21        And you know that trash talk is normal in certain

22   contexts.  For example, trash talk is normal in sports, right?

23   Michael Jordan trash-talked Patrick Ewing in the Nicks, but he

24   didn't say, Throw the next game or I'll fuck your wife.

25   There's a difference.  And you have all of the communications.

1    You can see the foul words that they sling back and forth at

2    each other, but there is nothing between these two people when

3    they're talking that comes close to this threat of sexual

4    violence.

5         Now, I want to be clear, in America everybody has the

6    right to their beliefs, even despicable beliefs.  We have a

7    First Amendment, and for better or worse people have the right

8    to express reprehensible beliefs.  There's a difference to

9    making appalling, racist statements on a podcast no matter how

10   offensive and private threats issued with the purpose of

11   getting something.

12        Now, I'm not here to condone Ben Lambert's involvement

13   in the Bowl Patrol, I'm not here to condone his personal

14   beliefs, but even people who believe or say appalling things

15   can be victims of crime, and the fact that Ben Lambert

16   expressed these beliefs under a pseudonym is what made him the

17   target.  It's precisely why Mr. Cantwell chose him as a victim.

18   It's why Mr. Cantwell believed Ben Lambert could give him what

19   he wanted.  Mr. Cantwell wasn't going to be able to get Vic

20   Mackey's identity from a Boy Scout; he could only get Vic

21   Mackey's identity from someone else within the Bowl Patrol.

22   And the fact that Ben Lambert used a pseudonym, that's what

23   gave Mr. Cantwell leverage, especially because Chris Cantwell

24   knew that Ben Lambert had a family, had kids and had something

25   to lose.

1            Now, we've also seen that Mr. Cantwell uses racial or

2    anti-Semitic slurs, but, again, I want to be very clear, this

3    is not a prosecution about racial or anti-Semitic beliefs.

4    It's not a referendum on whether or not it's good or bad to

5    expose the identity of someone who holds these beliefs.  This

6    is a prosecution of Christopher Cantwell because he tried to

7    use Ben Lambert's racial and anti-Semitic beliefs as a weapon

8    to get something he wanted, because he threatened to fuck Pam

9    Lambert in front of her children unless Ben Lambert gave Chris

10   Vic Mackey's identification, because Chris Cantwell began to

11   carry out some of his threats when Mr. Lambert didn't give in.

12   He did publicly post the Lamberts' identifying information,

13   their address, their photographs, their minor children's

14   photographs without their consent, without their permission,

15   all because Mr. Cantwell knew it could result in terrible

16   consequences for them.  And he knows this.  Mr. Cantwell

17   understands this.  He's candid about it when he talks to his

18   friends and his confidantes.  He explained it to Ms. Fry again

19   back in December of 2019, and we're going to play a very small

20   portion of Government's Exhibit 106.

21                     (Audio recording played)

22            MS. KRASINSKI:  And we won't play the jail calls now,

23   but you have both of them, Government's Exhibit 111 and 110.

24   He explained it to his on-and-off-again girlfriend, Ingrid Dean

25   that he's essentially guilty of Count Two, of sending an

1    interstate threat to injure reputation, and he explained that

2    it's not legal to do what he did to his friend, Hannah

3    Pleasant.

4         And you can think about everything he saved on his

5    devices.  That's consciousness of guilt.  Immediately after

6    their conversation ended he took screenshots of it.  He wanted

7    to keep a record of the conversation.  And yet, despite this,

8    when Special Agent Tongbua met with Mr. Cantwell, Mr. Cantwell

9    said he didn't keep any record of these communications.  He was

10   open and transparent about so many things.  Why not just say,

11   Yes, I still have records of these communications?  Why lie?

12   He took the screenshots, but that's not what he told the FBI.

13        Now, I want to take a few minutes to outline the

14   criminal charges.  You'll hear the judge instruct you about the

15   essential elements of the crime charged here, and the essential

16   elements basically become your checklist as you're

17   deliberating.  They're questions of fact that each of you and

18   collectively you all have to decide that the government has

19   proved beyond a reasonable doubt.  So, I just want to go

20   through your checklist for you.

21        Count One charges that Christopher Cantwell sent

22   extortionate interstate communication, and there are three

23   essential elements to that:  that he knowingly transmitted a

24   communication in interstate commerce; that the communication

25   contained a threat to injure the person of another; and that

1   the defendant transmitted the communication with the intent to

2   extort something of value from any person.

3        Count Two charges that the defendant, Christopher

4   Cantwell, sent a threat to injure the property or reputation of

5   another, and there are three essential elements to that count

6   as well:  first, that he knowingly transmitted a communication

7   in interstate commerce; second, that the communication

8   contained a threat to accuse another person of a crime or to

9   injure the reputation of another person; and, third, that the

10  defendant transmitted the communication with the intent to

11  extort something of value from another person.

12       And, finally, Count Three charges that Mr. Cantwell

13  engaged in cyberstalking, and there are four essential elements

14  of that:  first, that Mr. Cantwell used the facilities of

15  interstate commerce, including an electronic communication

16  service or system; second, that he used that electronic

17  communication service or facility in interstate commerce to

18  engage in a course of conduct; and, third, that while engaging

19  in that course of conduct Mr. Cantwell acted with the intent to

20  injure, harass or intimidate the victim; and, fourth, that

21  Mr. Cantwell's course of conduct placed the victim in

22  reasonable fear of serious bodily injury to his wife, caused

23  substantial emotional distress to him, or would reasonably be

24  expected to cause substantial emotional distress either to him

25  or his wife.

1          Now, you know that the messages were sent from

2     Mr. Cantwell here in New Hampshire to Mr. Lambert in Missouri.

3     You know that many of them were sent using the Telegram

4     messenger app, and you also know that when Mr. Cantwell

5     followed through on his threat to call Child Protective

6     Services he picked up the phone from here in New Hampshire and

7     he called Missouri.  So, we know that he transmitted these

8     communications in interstate commerce and that he used an

9     electronic communication service or other facility of

10    interstate commerce.

11         Now, both Counts One and Two require that Mr. Cantwell

12    had transmitted the communications with the intent to extort.

13    He wanted something.  You know he wanted something.  You know

14    he wanted it badly.  Vic Mackey's information was worth

15    something to him, it was valuable to him, and you'll hear the

16    defendant instruct you on what a thing of value is, that it

17    doesn't need to be a tangible thing.  The thing of value as

18    you're evaluating whether or not Mr. Cantwell had the intent to

19    extort something of value was information -- knowledge is

20    power -- Vic Mackey's information.

21         Now, as it relates to Count Two, that the

22    communication contained a threat to accuse another person of a

23    crime or to injure the reputation of another person,

24    Mr. Cantwell has admitted that to you.  He told you that when

25    he said he was going to dox Mr. Lambert, he told you that was a

1       threat.  He told you that he is careful what he describes as a

2       threat, and he called that a threat, and he told you when he

3       was talking about calling Child Protective Services that that

4       was a threat.  He's told you that he threatened to injure

5       Mr. Lambert's reputation, and he told you that he threatened to

6       accuse Mr. Lambert of a crime.

7               And his statement about Mrs. Lambert we've talked

8       about.  It was also a threat, and the important thing here is

9       that Mr. Cantwell intended it to be perceived as a threat.  It

10      doesn't matter whether or not Mr. Cantwell ever actually

11      intended to travel to Missouri to carry it out.  And you'll

12      hear His Honor instruct you that, while the government has to

13      prove that Mr. Cantwell intended to issue a threat, a serious

14      statement expressing an intent to injure, a statement that

15      under the circumstances would cause apprehension in a

16      reasonable person, His Honor will instruct you that it is not

17      necessary to prove that he actually intended to carry it out.

18              Apprehension in a reasonable person in Mr. Lambert's

19      position, when you're looking at that, I ask you to use your

20      common sense.  Would a reasonable person in his position

21      receiving these messages along with his address, along with

22      photos of his family, along with the other threats that

23      Mr. Cantwell ultimately did follow through on, perceive it as a

24      threat?  Yes, especially because Mr. Cantwell followed it up

25      with an ultimatum:  Give me Vic, it's your only out, and then

1    he looped back to this theme again later.  He wanted to think,

2    Well, it might not be me, maybe one of my incel listeners would

3    come and give her another baby, one of my incel listeners would

4    like to do it.

5         And you know that Mr. Lambert perceived it that way.

6    He told you that he started driving his wife to work for a bit

7    after this.  He told you he contacted his attorney to talk

8    about what to do.  He told you that he called Paul Nehlen.

9    Paul Nehlen told you that Mr. Lambert considers him a fatherly

10   figure.  And Mr. Lambert told you that, look, he thought the

11   chances were low that Mr. Cantwell would actually come out and

12   do it, but he didn't know for sure, because, as Paul Nehlen

13   told you, when Ben Lambert received all of these messages his

14   reaction was, Chris Cantwell's insane.  He might not do this,

15   but I don't know what he's going to do.

16        And Mr. Cantwell engaged in, in relation to the

17   cyberstalking count, a course of conduct, two or more acts.

18   Again, he threatened to dox.  He did dox.  He threatened to

19   call Child Protective Services.  He did that.  He made

20   Mr. Lambert fearful for his safety, for his wife's safety, for

21   his children's safety by his messages and his actions.

22        And Mr. Lambert suffered substantial emotional

23   distress.  You saw how this is impacting his life.  Now, again,

24   and I want to be candid, you might not feel sorry for him.  You

25   might think it's not a bad thing for his attitudes to be

1    exposed, but that's not the question.  The question is whether

2    or not the government has proved beyond a reasonable doubt that

3    he suffered substantial emotional distress, and after seeing

4    him testify and break down when he was talking to you about how

5    he cannot be a hockey dad, the hockey dad that he wanted to be,

6    you know he has.  You can think about how Mrs. Lambert would

7    have reacted to this, whether or not Mr. Cantwell's conduct

8    would reasonably be expected to cause substantial emotional

9    distress to her.  How would she have reacted to seeing those

10   messages?

11            Ladies and gentlemen, you have seen all of the

12   evidence, the defendant has had a fair trial, and the evidence

13   shows that the defendant is guilty beyond any reasonable doubt.

14   I ask that after you go into the jury room, have a chance to

15   review all of the evidence, that you find Mr. Cantwell guilty

16   on all counts.

17            THE COURT:  Thank you, Counsel.  We'll take just a

18   moment to disinfect, and then we'll hear the defense's closing.

19                           (Pause)

20            THE COURT:  Thank you.  Mr. Wolpin, you can proceed.

21            MR. WOLPIN:  May I take a moment, please?

22            THE COURT:  Yes.

23                      CLOSING ARGUMENT

24   BY MR. WOLPIN:  Chris responded angrily to someone he knew took

25   a lot to shock.  It was over the top, it was obscene, but Chris

1   did not make a serious statement expressing an intent to

2   injure, and it was not tied to a thing of value.  He is not

3   guilty of making an extortionate threat.  He did not attempt to

4   cause to this particular person under these particular

5   circumstances, which are unique, and we will discuss that more,

6   substantial emotional distress.  Chris Cantwell is not guilty

7   of cyberstalking, and he is not guilty of reputational

8   extortion.

9         The Bowl Patrol was an anonymous, nebulous group.  It

10  reveled in mocking Chris, interrupting him, posting pornography

11  on his website, calling him a snitch and posting his address

12  online.  Ben Lambert was a troll, self-acknowledged troll, a

13  troll who acts with the intent of causing emotional distress

14  and then repeats it over and over again to cause that distress

15  to compound.  The number one rule of trolling is don't feed the

16  trolls.

17        And what is obvious to see about Chris is it's easy to

18  get a reaction out of him.  Why is he the target?  Because when

19  they go after him he goes over the top.  That's fun to see.

20  That's the joy of trolling.  That's why you troll, is to get

21  the reaction.  They know how Chris reacts.  They know that when

22  he reacts he says things that are outrageous but not

23  necessarily dangerous, and Chris had just enough notoriety that

24  taking him down had a little bit of extra pleasure.

25        They felt safe doing this to Chris because they knew

1    who he was.  When you choose to bully someone, you don't choose

2    to bully the person who can hurt you back.  You choose to bully

3    the person who you believe is weak, who you believe is just

4    bluster.  That's the target of bullying.  That's why they go

5    after Chris.

6           Now, Ben Lambert may be a really wonderful person in

7    his family life, in his community, at home.  If the internet

8    had never been invented he might have lived a pretty normal,

9    wonderful life.  But for some people the internet is a drug, is

10   an addiction.  It takes you to dark places and emboldens you to

11   say things you would never say in person.  It allows you to

12   worship mass murderers and egg them on, because it's online.

13   It emboldens people to say things that are extreme and over the

14   top, using language they wouldn't use in their normal life.

15   You need to think about the words in this case in that context,

16   that understanding that these two men live much of their lives

17   online in a rather unhealthy and abnormal space.

18          Now, it's come up a number of times that the

19   interaction in this case happened in a private sphere rather

20   than in this public performance element, for example, their

21   podcasts.  However, it was telling then when Mr. Lambert was on

22   the stand and he was asked about a conversation he had with a

23   friend of his in Florida on a jail call that was private, that

24   wasn't to be publicly distributed, it was a phone call between

25   friends.  And we talked about why he was laughing about mass

1    murder with that person, if it wasn't a public performance, if

2    it wasn't a joke.  And his answer was, The lines get blurred.

3    I'm not even sure who I am when I'm in that call.  Am I Cheddar

4    Mane, Mr. Machine Gun, or am I Ben Lambert, the father?  The

5    lines among these people are blurred as to who they are, when

6    they can say what they say, and what that means.  That is not

7    normal.  That is not the culture most of us live in on a daily

8    basis, but when the judge instructs you on the law, you will be

9    told you can consider these surrounding circumstances when you

10   evaluate the words that were said in this case, and, in doing

11   so, you must consider this context.

12          Now, to start with the first count, the first count of

13   extortionate interstate communications, it requires that the

14   communication contain a threat to injure the person of another.

15   A threat is a serious (indicating) statement expressing an

16   intent to injure another person.  It also requires that that

17   threat, if you were to find that was a statement that's of

18   serious purpose, that that be tied to extort this thing of

19   value.  The government has not met its burden as to this charge

20   on either of those two elements.

21          As to that first question, was this a serious

22   statement of an intent to injure, you've heard from a number of

23   people.  You've heard from Chris, himself, over and over again.

24   As you've seen, Chris likes to talk about things.  He likes to

25   record himself talking about things.  He's talking about things

1    from the jail.  He's talking about things with Katelen Fry.

2    He's talking about things with the police.  In each instance he

3    understands that the CPS thing may be a problem, that he did

4    not see this as a serious statement.  And the statement that is

5    in the actual charge is, So, if you don't want me to come and

6    fuck your wife in front of your kids, then you should make

7    yourself scarce.  Give me Vic, it's your only out.  That is the

8    statement in this charge, not the incel listeners.  That's not

9    the statement he's charged with, and yet you saw, when Katelen

10   Fry addressed with him, What's going on, that's what he thinks

11   in his head might be the thing that's the problem, not the

12   thing that he's actually charged with.

13        When you consider whether this was serious, you can

14   consider the time it took for him to come to the decision to

15   make the statement.  The government made a point of pointing

16   out that the first two contacts of Chris were a full half an

17   hour apart, and he had all kinds of time to think about it.

18   The statement about the wife comes within two minutes of

19   Mr. Lambert's statement about Peach.  Now, it's probably

20   evident from Chris's testimony that that is someone he cared

21   about, that is someone he asked to marry him, that is someone

22   that the mere mention of her name brings tears.  The government

23   can play that statement down of Mr. Lambert and say it wasn't

24   specific or clear, but when you talk about something happening

25   to somebody, the ambiguity is what makes it scary, because you

1    don't know what that means; you don't know what that will

2    result in.  And so, Chris comes back and returns within two

3    minutes with the meanest thing he can think to say, which is

4    outrageous, that's, In front of your children.  It's over the

5    top.  It's exactly the kind of reaction that Cheddar Mane has

6    watched Chris give to their prank calls for months.  It was not

7    a serious statement.

8          You can look to Ben Lambert's response.  He doesn't

9    instantly respond to that with something about the threat.

10   He's back onto something else and then goes on to other things.

11   You can consider what he does over the next number of hours and

12   days.  Now, whether it's Eastern Standard Time, Central

13   Standard Time, 9:42, 8:42, that's not what matters.  What

14   matters is within that evening it's posted online for the world

15   to see, this thing that is supposedly making him afraid.  It's

16   posted with a naked picture of Chris on top, and it's available

17   for all the world to see, because when you're a troll the

18   purpose of getting the reaction is so you can show others what

19   you've done.  That's the badge, that's the honor.  That goes

20   up, and Chris starts getting in his harassment.  Cheddar Mane

21   knew that was going to happen.  The second that goes online the

22   rest of the world's going to be flooding Chris with this, that,

23   boof meth, or whatever.  Only then does Chris post the picture;

24   only after that does he call CPS.  You can go back and see that

25   after this Mr. Lambert had his own post online calling Chris a

1   fed, snitch, nigger, kike.  Why that language?  Because that's

2   just the standard language, because that is the universe these

3   two men live in.  What does he do?  He calls in the show.  Why

4   does he call Chris's show?  It's not going to make his life

5   better.  He calls Chris's show because that's the troll, that's

6   the entertainment, that's the process, because it was not a

7   serious statement.

8          We have or had Paul Nehlen here to testify briefly

9   about this.  He told the FBI three weeks ago he couldn't even

10  say whether he had a phone call with Ben Lambert, and then he

11  got up on the stand and told you all the details of the call.

12  He was visited by or spoke with the FBI in preparation several

13  weeks ago, and what's the reaction?  Take down everything on

14  his website.  Why?  Because what is his website full of?  The

15  same stuff against Chris Cantwell.  Who is his friend?  Ben

16  Lambert.  What is his response?  Bully back, because that's how

17  this works, not go to the police, not take this as a serious

18  statement.

19         We have a screenshot that Ben Lambert recently

20  produced of an inexplicable text message.  In that message he's

21  typing stuff in response to texts that haven't happened yet.

22  That's in reference -- You referenced my kids.  Chris hadn't

23  referenced his kids.  He can't explain what that means, why

24  that happened, but he felt a need to give something more to

25  show that this was serious.

1          You've seen the fancy technology the FBI has.  They

2     can take a phone, they can figure out the date it was created,

3     the date it was modified.  They did all of that to Chris's

4     stuff.  They don't do that to Cheddar Mane when he gives them

5     this message that makes no sense.  Who did he send it to?  Why

6     is that person not here explaining that they actually received

7     that?  Why is he taking a screenshot -- not a screenshot, which

8     he clearly knows how to do, but he's taking another camera to

9     take a picture of it rather than a screenshot, because before

10    he comes he recognizes that it wasn't a serious statement.

11         We have a screenshot of a text to his lawyer

12    (indicating).  You can take a look at that.  That's Steve

13    (indicating).  How do we know it's Steve?  Because the text

14    says Steve.  Who is Steve?  No idea.  Is there a lawyer named

15    Steve in Missouri?  Possibly.  Did he speak with a lawyer?  Who

16    knows?  Where is the lawyer who got the text?  What's his name?

17    Why isn't that image looked at by the FBI?  They just took it

18    and gave it to you.  That's not what they did with all of

19    Chris's stuff.

20         And Lambert's statements that he took this all

21    seriously are simply not credible.  He says he was fearful and

22    he got a game camera to put outside his house.  The FBI shows

23    up in October, four months later, and no SD card.  Did he even

24    put a game camera up at his house?  The FBI is at his house.

25    Do they check to see if that's true?  No.  Who needs to?  He

1    says he started driving his wife to work some.  Is that true?

2    We have no idea.  What did he tell her?  He said, I didn't tell

3    her there was any threat against her, so suddenly he's taking

4    her to work all the time?  What's the explanation?  Did that

5    happen?  We don't know.  What Ben Lambert said he did is simply

6    not credible.

7              Now, let's take a little step back and ask the

8    question how we even got here in court today.  These guys have

9    this thing over the internet.  It ended.  No one called the

10   police.  So, why are we here?  How did we get here?  We got

11   here because Ben Lambert posted it online, which I guess is his

12   right to do so, not a problem.  We get here because the FBI,

13   someone is monitoring the BowlCast website on Telegram.  Why

14   are they doing that?  Because they're terrorists.  So, they see

15   it.  No one's reported a crime to them.  And they make a

16   decision that, This is what we're going to pursue, that we take

17   this seriously, that this is a serious threat in our opinion.

18   And so, they go to Missouri.  They meet with Chris first,

19   because, as you've heard, Chris will meet with the law

20   enforcement at the drop of a hat.  But then they go to

21   Missouri, and what has Mr. Lambert said about that experience?

22   The start of the interview is, We take this threat seriously.

23   Your family is in danger.  We are, quote, not letting it go.

24   Does that tell you what you're supposed to say?  I took it

25   seriously.  He knows what they want to hear, because they've

1    told him what they want to hear.  You'd ask, well, why did he

2    give it to them, then?  What did he tell his friend?  They were

3    holding Bowl Patrol over my head to get my cooperation.  In the

4    same way that some have the power to reveal the identity of a

5    person, so does law enforcement have the power to reveal the

6    identity of a person.  And so, he said it was serious.  He knew

7    what they wanted to hear.  He knew they were holding Bowl

8    Patrol over his head.  This was not a quest to find out what he

9    actually believed.  This was an effort to prosecute Chris

10   Cantwell.

11          And we understand why the FBI might be monitoring

12   Chris Cantwell.  It's the same reason they're monitoring the

13   BowlCast.  That should be their job, but this isn't something

14   where they put up pole cameras outside his house and caught him

15   doing a crime.  This is something they found on the internet

16   and went to this guy and told him what they wanted to hear.  He

17   told his friend that, and agreed he told his friend, that they

18   basically said that, I was going to have CNN on my doorstep if

19   I didn't help them.  He'd be doxed.  So, he helps them, and he

20   says it's serious, and he takes them up on that offer.

21          Now, what's interesting about that is he has a

22   conversation with his friend in Florida after that about

23   doxing, and he says to his friend, Really, it's not all that

24   serious.  Because what did Chris do?  Chris posted a picture of

25   his wife on a tiny, fractional corner of the internet that

1    normal people are never going to go to, not even the name, and

2    the government asked him and he responded in tears as to what

3    happened, but the government didn't ask him when.  When could

4    you not coach your hockey team?  Is it because of Chris's post

5    on the internet, or is it because of the decision to bring this

6    charge?  And so, if Cheddar Mane didn't take it seriously --

7    excuse me -- if Ben Lambert didn't take it seriously before, he

8    does now.

9         Now, the second part of that extortionate threat is it

10   requires that there be an intent to extort something of value

11   from a person that is tied to the communication.  You will see

12   and have seen, more times than maybe you want to, the

13   communication between these two men.  In that communication he

14   says not, Give me Vic.  He says, Make yourself scarce.  That is

15   the, Leave me alone.  It's not for another half an hour, when

16   he's off doing other things, and he comes back to his thought

17   that you get, You give me Vic.  You need to consider that time

18   difference.  The statement about the wife is simply not tied to

19   an intent to extort, and if that is the case, then he is not

20   guilty.

21        We're going to talk next about the cyberstalking

22   charge.  The cyberstalking charge requires conduct that would

23   be reasonably expected to cause substantial emotional distress

24   to a person.  You must consider whether in light of the

25   evidence presented in this case a reasonable person in the same

1    or similar circumstances... So, again, what are you being told

2    by that?  This is not abstract people.  This is not a question

3    of whether a doctor or a judge or a construction worker or

4    someone who's outside of this community would feel that

5    distressed.  The question is specific to this person in this

6    circumstance.

7           This was someone who spent their life obsessing about,

8    joking about mass murder, who knew the risk that he would be

9    doxed, because they essentially all get doxed.  You've heard

10   all their names in here.  It's almost inevitable.

11          Now, Chris certainly testified that he intended to

12   cause discomfort, but in these particular circumstances, with

13   this particular individual, his intent was not substantial

14   emotional distress.  Consider what you have learned about the

15   culture of doxing in this case.  You saw the FBI meme of Chris.

16   You saw that Chris's address was posted above.  That is sort of

17   a double whammy.  So, here in the world is where this guy

18   lives, and, B, he's a fed, snitch, rat, which, as you know, is

19   not something that is a favorably looked upon characteristic.

20   You know that the person that Mr. Lambert chose to go to to

21   talk about his issue with doxing was someone who doxed

22   somebody.  You're going to read Chris's article that they have

23   cited for you.  The article they cited for you is about Paul

24   Nehlen choosing to dox another person in the movement.  That's

25   his father figure.  That's his confidante for this.  This is a

1   universe and a world that they were a part of.  Remember he

2   told his friend, Doxing was really no big deal.  In this

3   circumstance, in this case, there was not substantial emotional

4   distress.

5          Now, you've heard from Chris Cantwell.  You've seen in

6   a courtroom he struggles not to use a swear word.  They knew

7   this guy.  They knew how he spoke.  They knew they riled him

8   up.  They did it because they could.  They knew when he said

9   something as outrageous as, Sex with your wife in front of your

10  children, that it was not serious.  They knew it.  Chris knew

11  it.  It is the government's burden to prove to you Mr. Cantwell

12  is guilty beyond a reasonable doubt.  It is a heavy burden,

13  heavy burden on purpose, because this is criminal law.

14         And so, when you consider all of this evidence, it's

15  not a question of possibly or maybe; you need to be convinced

16  of each of the elements beyond a reasonable doubt.  When you

17  review that evidence, when you consider whether this was a

18  serious threat in this context, when you consider whether this

19  was extreme emotional distress in -- excuse me -- substantial

20  emotional distress in this context, Chris Cantwell is not

21  guilty.  Thank you.

22         THE COURT:  Thank you, Counsel.

23         Again, we need to disinfect and brief rebuttal from

24  the government.

25                        (Pause)

1          THE COURT:  Okay.  Mr. Davis.

2                    <u>REBUTTAL CLOSING ARGUMENT</u>

3     <u>BY MR. DAVIS</u>:  The defendant says that giving me Vic was an

4     afterthought from the threat to rape Mrs. Lambert.  Let's look

5     at Exhibit 100 maybe one more time.  What happened at the

6     beginning of all this?  What do we know now?  Well, we know we

7     got the initial salvo at 9:00 on this one, 9:00 Eastern, and

8     then the road is, the street address is left there, and Ben

9     Lambert is definitely upset now, and he's worried, and he's

10    wondering what to do, and so for the next four and a half hours

11    we see his responses.

12          But what's going on right there?  Well, we know now

13    from Mr. Cantwell's testimony what was going on.  What's going

14    on is that Mr. Cantwell has got photographs of the family, and

15    he's industriously taking time to blur out the faces of

16    Mr. Lambert's family in Missouri and then to post those

17    blurred-face photographs in the proud white folk channel, and

18    assuming that Mr. Lambert is going to find out about that or

19    see that, and he's setting all of that up, and that takes some

20    effort, and it takes some time, and it takes some patience, but

21    he's got all of that, and that's what he does.  That's what's

22    happening right then.

23          And so, the hours go by, and it's almost 4:00 in the

24    morning Mr. Cantwell's time, and he still hasn't heard

25    anything, and then he talks about getting a fucking life.

1          Maybe he goes to bed then.  And at 2:13 p.m. the next afternoon
2          Mr. Cheddy Blac says, I haven't given it any thought, and it
3          was an honest mistake.  Seriously, man, I couldn't care less
4          about what you're trying to do these days.  That's what he
5          says.
6                  Now, think about that.  What's happened now, he's
7          posted some blurred photos, he's maybe had a night's sleep, and
8          Mr. Ben Lambert is trying not to engage, trying to de-escalate,
9          trying to be reasonable.  Maybe for once in the miserable life
10         of this subculture he's actually being reasonable and
11         restrained.  And so, a couple of hours go by that Sunday,
12         Father's Day afternoon, and then the real crime begins, because
13         Mr. Cantwell has made a very deliberate, very unprovoked, very
14         certain decision about a plan that he is going to execute, and
15         he's posted these blurred photos, and that hasn't gotten too
16         far, and so now it's time to push "Send" and execute.  So, at
17         4:15 p.m. in rapid succession we get this.  We get the insults,
18         the prediction that, You are going to lose everything you have,
19         the fact that, The next time I post that photo, again, the
20         photo he's already put up somewhere else trying to stir Mr.
21         Lambert into coming to the table, he says, The faces won't be
22         blurred, and then you're going to start getting unexpected
23         visitors, another theme of this crime.  And he gives him in,
24         again, rapid succession, 4:45 p.m., 4:45 p.m., 4:47 p.m., maybe
25         there's a little bit of a candid apology, as only Mr. Cantwell

1    can do, he says, You know, I really know it's not you causing

2    the trouble, but you're the one who is going to suffer, because

3    you're the one I can get, a little bit of candor from Mr.

4    Cantwell.

5         And then two minutes after that what's going on here?

6    What's actually happening here, If you want to dox Vic, he's a

7    better target.  He sure is.  But if you give me fake info, then

8    he's talking about his wife, Your wife is going to have trouble

9    sleeping at night until she leaves you and takes your kids away

10   and we start thinking about a family broken up.  That was the

11   big salvo.  That was all the guns firing, and Mr. Cantwell must

12   have been pretty confident that results would come through, but

13   actually maybe Mr. Lambert had the children to feed or

14   something, and all he can say is, What picture are you even

15   talking about?  Because he doesn't even know then.  He doesn't

16   know many hours after this whole thing is started that Mr.

17   Cantwell's already taken him out with blurred photos on a chat

18   group with his friends.

19        And so, it takes two hours for Mr. Lambert to come

20   back, and he's still befuddled and asking questions, and then

21   he says, What picture are you even talking about?  He doesn't

22   know.  And that's 6:37 p.m., and guess who's been waiting,

23   waiting for two hours almost to fire back?  Mr. Lambert is, at

24   6:37 p.m., and at that very same minute, without a delay,

25   Mr. Cantwell says, Fuck around, and I'll remind you the hard

1    way.  And so, Mr. Lambert may be figuring out Peach took a

2    picture that you posted, and he responds 6:39, two minutes

3    later, As a matter of fact, I don't, and the threat and then

4    more silence, and then he says, Give me Vic, it's your only

5    out.  I'm going to have to prove my seriousness.

6         Mr. Cantwell at 6:37 p.m. was sitting by his computer

7    ready to fire back.  He was executing a plan that he'd laid out

8    at 4:45 p.m., and he was probably kind of frustrated he hadn't

9    heard anything.  And now he says that the threat against Mrs.

10   Lambert was just sort of, just sort of a throwaway, and that

11   talking about Vic had nothing to do with that.  Does that make

12   any sense?  This is a campaign that's been going on since the

13   previous night, and this is a campaign whose purpose he has

14   already clearly announced that he is doxing Vic, and now he's

15   saying the only thing he can say, which is, Well, actually,

16   when I talked about f-ing the wife, that didn't have anything

17   to do with this.  Do you believe that?

18        All right.  So, what are the defenses here?  One

19   defense is that Benjamin Lambert is a liar, and he is a lot of

20   things, but what is he lying about?  What is Benjamin Lambert

21   lying about?  Well, think about that.  What we know about

22   Benjamin Lambert is that he said from the beginning, You know

23   that I had stopped bothering the guy, and today even Mr.

24   Cantwell admits, For three months he hadn't been bothering me,

25   and his own messages acknowledge, You're not the one who's

1    causing the trouble.  And so, that's true.  And then he says,

2    You know, I tried to de-escalate and to reason with this guy,

3    and that's true, and that's true because, in part, you can see

4    the threat.

5           And one of the most important pieces of evidence in

6    this case is the quiet and the silence of Ben Lambert in the

7    middle of this, because what the defendant desperately wants

8    you to think is that we in the Bowl Patrol world and the

9    alt-right, what we love to do is engage in horrible invective

10   against each other, we're entertained endlessly by stupid stuff

11   where we throw insults and joke about violence, and that's what

12   we love in this world, and there's probably some truth to that.

13          But on this occasion, on this weekend between these

14   two guys, when Mr. Cantwell opens fire, Ben Lambert draws back.

15   He almost goes into a shell, and he does eventually write the

16   usual stuff about, I forget what horrible words, but look at

17   the time.  It takes him 24 hours to say anything to

18   Mr. Cantwell that would give a rise to anyone, that's

19   insulting, that's fighting back.  And, remember, Paul Nehlen

20   had told him, At some point you've got to stand up to a bully,

21   and that makes sense, too.  But Mr. Lambert tells you, I didn't

22   take this -- I wasn't trying to fight this guy.  I was trying

23   to de-escalate.  And the fact that he holds his fire for so

24   long shows just how seriously he did take this.  And then he

25   did write drafts of a possible response, and he did call Paul

1      Nehlen, a guy he admired, for his advice and tells him,

2      Cantwell's insane, and he asks him what he should do.

3              And then he did something else at the end of all this.

4      He posts the exchange on the BowlCast.  Well, that's kind of a

5      strange thing to do, but it's not that strange in that world.

6      You can't go to the feds.  It's not a good thing to talk to the

7      cops.  But for a little security one thing you want to do is

8      make sure your community knows about that.  You don't go to law

9      enforcement, but you make sure the community is aware, and

10     that's what he did.  And then he warned his wife about a visit

11     from CPS.  That took a risk.  And he did consider calling law

12     enforcement, because he was expecting a call to CPS, and he

13     wrote his lawyer for advice about that, and he called in to the

14     show on June 19th, not to prank, but to try to stand up to a

15     bully.  He wasn't making some voice there.  He was actually

16     talking to Chris Cantwell:  I really appreciated that you put

17     photos of my wife and kids, until he cuts him off and pretends

18     to everyone nothing just happened, there's nothing to see

19     there.  And then he wrote a full account of what had happened,

20     and he posted it, and then he walked away.  He never made

21     another BowlCast.  He's back in Missouri at the first day of a

22     new job, and the FBI comes to see him, and the first thing he

23     says is, Is this about Cantwell?

24             What's he lying about?  Where in this story is Ben

25     Lambert lying about something?  He's not.

1          And so, the other defense really, and the only other

2     defense, is the rape is not a serious threat.  The defense says

3     the lines are blurred, the lines are blurred.  What is a

4     threat?  The Court will tell you a threat is a serious

5     statement expressing an intent to injure another person, which

6     under the circumstances would cause apprehension in a

7     reasonable person.  It's not necessary that the defendant

8     actually intend to carry out the threat.  What he has to do is

9     intend to issue a threat.

10          Well, look at this threat.  It was private, it was

11     confidential, there's no humor, there's no one listening,

12     there's no entertainment value.  Its only purpose is for its

13     effects on Ben Lambert.  The threat is accompanied with some

14     effort by other stuff, namely photographs of the wife and the

15     children back home and the residential address.  Take me

16     seriously, because I'm looking at a picture of your wife.  And

17     the threat's repeated.  It isn't said once.  It's said twice.

18     We're talking about incel listeners.  And the threat is, we

19     always talk about context in this case, the threat is part of

20     all of this; it's in the context of a very serious and

21     sustained effort to get Vic Mackey's information.  Why would

22     all of that be an obvious, serious effort to get through

23     extortion the information he so desperately wants, but in the

24     middle of it there's something that it's kind of a throwaway,

25     it means nothing, we all laugh about it now.

1        And it's also a threat that's accompanied by two other

2    threats that are both serious and real and are actually acted

3    upon, a threat to dox and a threat to call CPS, and it's a

4    threat that Mr. Cantwell, himself, took seriously enough to

5    make screenshots of everything and save on his devices and have

6    right there on his computer, while telling the law enforcement

7    that, I don't have any copies of all of that.  And it's a

8    threat that, when Mr. Cantwell talked about it, he admitted

9    making the threats, but he never claimed then that he was just

10   joking or talking trash.

11       Is that threat anything other than serious?  Is it

12   something -- if you're the husband of that mother, and you're

13   looking at a picture of her and your little children, is that

14   something that would cause apprehension in a reasonable person?

15   Of course it would.  And when the defense says, Oh, the lines

16   are blurred here, what I say back is, if there's anything

17   that's emerged from all of this, is that, even in this awful

18   world there is a very clear line between all that trash and a

19   threat on someone's wife and kids, and that line was crossed,

20   and Mr. Cantwell knows it.

21       I want to emphasize one other thing, and that is that

22   provocation is not a defense.  You'll hear from the Court that

23   it is not a way to negate criminal liability, for you to say,

24   Oh, it was pretty bad, the Bowl Patrol did bad things, and so

25   there was provocation, and it's an excuse.  It's not an excuse.

1          Retaliation is not a defense.  Taking the law in your

2     own hands is not a defense.  And think about that.  How could

3     it be any other way?

4          This is not the first time that a victim has done bad

5     things like being a troll and still be a victim, and it's not

6     the first time that a defendant has committed a crime against

7     someone he didn't like.  There's always another side to a

8     story.  But what the law says is you've got to cut through that

9     and say what are the elements of the crime and decide whether

10    those elements are present beyond a reasonable doubt.

11         Ladies and gentlemen, there is no reasonable doubt

12    here.  This was a serious threat that would cause in a

13    reasonable person apprehension, and there's no question that

14    this exchange is all about extorting from Ben Lambert, who is

15    collateral damage in Missouri, a guy who doesn't even matter to

16    this guy (indicating), extorting from him because he's the one

17    I can get the information about Vic Mackey, the big prize, and

18    in an extortion that is very clearly accompanied by a threat to

19    report a crime and a threat to ruin reputation, because if

20    you're in the anonymous world of being an awful person on the

21    internet, the one thing that absolutely threatens you is being

22    doxed and unmasked.

23         And so, it's very clear that Count One, and Count Two,

24    and Count Three, when you look at their elements, when you look

25    at what happened here, they're proved beyond a reasonable

1    doubt; and, provocation or not, there's no question, no serious

2    question about the result.

3           Ladies and gentlemen, the defendant, Mr. Cantwell, has

4    had a fair trial.  On behalf of the United States and my

5    partner, Ms. Krasinski, I ask you to return verdicts of guilty

6    on all counts.  Thank you.

7           THE COURT:  Thank you, Counsel.  We'll take a short

8    break, and then I will give you the instructions, and then

9    you'll be good to go.  Okay?  So, we'll take a short break now.

10          THE CLERK:  All rise.

11          (Recess taken from 2:54 p.m. to 3:00 p.m.)

12          THE CLERK:  All rise for the Honorable Court.

13          Please remain standing for the jury.

14                 (The jury entered the courtroom)

15          THE CLERK:  Please be seated.  This hearing is back in

16   session.

17                             JURY CHARGE

18          THE COURT:  All right.  I'm going to instruct you on

19   the law at this point.  I want to let you know I'm going to

20   read these instructions, because I need to convey the law

21   precisely to you.  You don't need to take notes during this

22   process, if you don't want to, because you'll have a set of the

23   instructions with you in the deliberation room, and the way I

24   write it up, each separate topic has a heading.  So, if you

25   say, Oh, let's find out what the government's burden of proof

1    is, well, there's a section called "Government's Burden of

2    Proof," or the first charge, there's a section on that and

3    subsections.  So, you can just quickly page through, get to the

4    instructions, and you'll have them there.  Okay?  So, feel free

5    to just sit and listen, if that's what you choose to do.

6            I also tell you that I'm going to just pull this down

7    a little, because I can't read without my glasses fogging up,

8    and I'm going to be reading for about 20 minutes to a half an

9    hour here.  So, I'll do that to make sure that I can actually

10   see what it is that I'm reading to you.

11           Okay.  At this stage of the trial it is my duty to

12   instruct you on the principles of law that you will apply in

13   deciding this case.  It is your duty to follow these

14   instructions during your deliberations.  You should not single

15   out any one instruction but, instead, apply these instructions

16   as a whole to the evidence in the case.

17           You are the sole and exclusive judges of the facts.

18   You must weigh the evidence that has been presented

19   impartially, without bias, without prejudice and without

20   sympathy.  You must decide what the facts are, what the truth

21   is, based upon the evidence presented in the case.  You will

22   decide the case by applying the law as I give it to you in

23   these instructions and the facts as you find them to be from

24   the evidence.

25           In determining what the facts are and what the truth

1    is, you must necessarily assess the credibility of each witness

2    and determine what weight you will give to each witness's

3    testimony.  By "credibility" I mean the believability or the

4    truthfulness of a witness.  You should scrutinize all of the

5    testimony given, the circumstances under which each witness has

6    testified and every matter in evidence which tends to show

7    whether a witness is or is not worthy of belief.  Consider each

8    witness's intelligence, motive, state of mind, demeanor and

9    manner while testifying.  Consider the witness's ability to

10   see, hear or know the matters about which that witness has

11   testified.  Consider whether the witness had a good memory of

12   what he or she has testified about.  Consider whether the

13   witness had any reason for telling the truth or not telling the

14   truth, whether the witness had an interest in the outcome of

15   the case, whether the witness had anything to gain or lose as a

16   result of his or her testimony, whether the witness had any

17   friendship, relationship or animosity towards other individuals

18   involved in the case, and whether the witness's testimony was

19   consistent or inconsistent with the witness's own testimony and

20   the testimony of other witnesses.  Consider the extent to

21   which, if any, the testimony of each witness is either

22   supported or contradicted by other evidence in the case.

23         After assessing the credibility of each witness, you

24   will assign to the testimony of each witness, both under direct

25   and cross-examination, such weight as you deem proper.

1            You are not required to believe the testimony of any

2    witness simply because that witness was under oath.  You may

3    believe or disbelieve all or part of the testimony of any

4    witness.  It is within your province to determine what

5    testimony is worthy of belief and what testimony may not be

6    worthy of belief.

7            During the trial you have heard several government

8    agents testify.  You should consider the testimony of a

9    government agent in the same manner as you consider the

10   testimony of any other witness in the case.  In no event should

11   you give the testimony of a government agent any more

12   credibility or any less credibility simply because that witness

13   is a government agent.

14           The testimony of a witness may be discredited or, as

15   we sometimes say, impeached by showing that the witness

16   previously made statements which are different than or

17   inconsistent with his or her testimony here in court.

18   Inconsistent or contradictory statements which are made by a

19   witness outside of court may be considered only to discredit or

20   impeach the credibility of the witness and not to establish the

21   truth of those earlier out-of-court statements.

22           You must decide what weight, if any, should be given

23   to the testimony of a witness who has made prior inconsistent

24   or contradictory statements.  In making this determination, you

25   may consider whether the witness purposely made a false

1    statement or whether it was an important mistake, whether the

2    inconsistency concerns an important fact or whether it had to

3    do with a small detail, whether the witness had an explanation

4    for the inconsistency, and whether the explanation appealed to

5    your common sense.

6         If a person is shown to have knowingly testified

7    falsely concerning any important or material matter, you have a

8    right to distrust the testimony of such an individual

9    concerning other matters.  You may reject all of the testimony

10   of that witness or give it such weight or credibility as you

11   may think it deserves.

12        It is exclusively your duty, based upon all of the

13   evidence and your own good judgment, to determine whether the

14   prior statement was inconsistent and, if so, how much, if any,

15   weight is to be given to the inconsistent statement in

16   determining whether to believe all or part of the witness's

17   testimony.

18        The fact that the prosecution is brought in the name

19   of the United States of America entitles the government to no

20   greater consideration than that accorded to any other party in

21   litigation.  By the same token, the government is entitled to

22   no less consideration.  All parties, whether the government or

23   individuals, stand as equals at the bar of justice.

24        The weight of the evidence is not necessarily

25   determined by the number of witnesses testifying on either

1   side.  You'll consider all of the facts and circumstances in

2   evidence to determine which of the witnesses may be worthy of

3   belief.  You may find the testimony of a small number of

4   witnesses on a particular issue is more credible than the

5   testimony of a greater number of witnesses on the other side of

6   that issue.

7           In reviewing the evidence, you will consider the

8   quality of the evidence and not the quantity.  It is not the

9   number of witnesses or the quantity of testimony that is

10  important but the quality of the evidence that has been

11  produced that is important.  You will consider all of the

12  evidence, no matter which side produced or elicited it, because

13  there are no property rights in witnesses or in the evidence

14  that has been presented.

15          During the trial you have heard certain statements,

16  arguments and remarks from counsel.  These are intended to help

17  you in understanding the evidence and in applying the law to

18  this case.  However, if counsel have made any statements

19  concerning the evidence that are contrary to your recollection

20  of the evidence, then you must take your own recollection as to

21  the evidence.  If counsel have made any statements concerning

22  the law that are contrary to my instructions, you must take the

23  law from me.  You are not to be concerned with the wisdom of

24  any rule of law.  Regardless of any opinion you may have as to

25  what the law ought to be, it would be a violation of your sworn

1    duty to base a verdict upon any other view of the law than the

2    law as I give it to you in my instructions.

3            From time to time during the trial counsel have made

4    objections.  This is a proper function to be performed by

5    counsel on behalf of their respective clients.  You should not

6    concern yourself with the fact that objections have been made

7    nor with my rulings on those objections.  I must rule on

8    objections, and I have not intended to indicate in any way by

9    my rulings or what I have said what the verdict should be in

10   this case.  In this case, as in all cases, I'm completely

11   neutral and impartial.  It's up to you to determine whether the

12   defendant is guilty or not guilty based on the facts as you

13   find them to be and the law as I give it to you.

14           So, what is evidence?  The direct evidence in this

15   case consists of, one, the sworn testimony of the witnesses,

16   both on direct and cross-examination, regardless of who may

17   have called the witness, two, the exhibits which have been

18   received into evidence, and, three, any facts to which all of

19   the lawyers have agreed or stipulated.

20           Certain things are not evidence and cannot be

21   considered by you as evidence.  Arguments and statements by

22   lawyers are not evidence.  What they have said in their opening

23   statements, closing arguments and at other times is intended to

24   help you interpret the evidence, but it is not evidence.  If

25   the facts as you remember them differ from the way the lawyers

1    have stated them, you must rely on your memory.

2         Questions and objections by lawyers are not evidence.

3    Attorneys have a duty to their clients to object when they

4    believe a question is improper under the *Rules of Evidence*.

5    You should not be influenced by objections or by my rulings on

6    objections.  Testimony that has been excluded or stricken or

7    that you have been instructed to disregard is not evidence and

8    must not be considered.  Anything you have seen or heard when

9    court was not in session is not evidence.  You are to decide

10   the case solely on the evidence received at trial.

11        There are two types of evidence which you may properly

12   consider in deciding whether a defendant is guilty or not

13   guilty.  Direct evidence is the testimony given by a witness

14   about what that witness has seen, has heard, or has observed or

15   what the witness knows based on personal knowledge.  Direct

16   evidence also includes any exhibits that have been marked and

17   any stipulations which have been agreed to by the lawyers for

18   both sides.

19        Evidence may also be used to prove a fact by

20   inference, and this is what is sometimes -- this is referred to

21   as "circumstantial evidence."  In other words, from examining

22   direct evidence you may be able to draw certain inferences

23   which are reasonable and justified based on your daily

24   experience and common sense.  Such reasonable inferences

25   constitute circumstantial evidence.

1          The law makes no distinction between the weight to be

2     given to either direct or circumstantial evidence.  It is up to

3     you to decide how to weigh the evidence in this case.  However,

4     the defendant cannot be found guilty on any crime based on a

5     hunch or a suspicion, even a strong one, on what is probably

6     the case.  He can only be found guilty if on the direct

7     evidence and the reasonable inferences you draw from the direct

8     evidence you are satisfied that he is guilty of the crime

9     beyond a reasonable doubt.

10          During the trial I may have instructed you that

11     certain evidence was being admitted for a limited purpose.  It

12     is your duty to follow these instructions during your

13     deliberations.

14          The fact that an indictment has been returned against

15     the defendant is not evidence of the defendant's guilt.  An

16     indictment is merely a formal means of accusing an individual

17     of a crime in order to bring that person to trial.  It is you

18     who will determine whether the defendant is guilty or not

19     guilty of the offenses charged based on a consideration of all

20     the evidence presented and the law applicable to the case.

21     Therefore, you must not consider the indictment in this case as

22     any evidence of the guilt of the defendant; nor should you draw

23     any inference from the fact that an indictment has been

24     returned against him.

25          A defendant, although accused, begins a trial with a

1     clean slate with no evidence against him.  The law permits

2     nothing but the admissible evidence presented before you to be

3     considered in support of any charge against the defendant.  The

4     presumption of innocence alone is sufficient to acquit the

5     defendant, unless you are satisfied beyond a reasonable doubt

6     that the defendant is guilty after a careful and impartial

7     consideration of all of the evidence in the case.  The burden

8     is always on the government to prove guilt beyond a reasonable

9     doubt.  This burden never shifts to the defendant.  The law

10    does not impose upon a defendant in a criminal case the burden

11    or duty of calling any witnesses or producing any evidence.

12           If, after careful and impartial consideration of all

13    of the evidence in this case, you have a reasonable doubt as to

14    whether the defendant is guilty of any charge, you must find

15    the defendant not guilty of that charge.  If you view the

16    evidence in the case as reasonably permitting either of two

17    conclusions, one consistent with innocence and the other

18    consistent with guilt, you must adopt the conclusion that is

19    consistent with innocence.  You must never find the defendant

20    guilty based on mere suspicion, conjecture or guess.  Rather,

21    you must decide the case on the evidence that is before you and

22    on the reasonable inferences that can be drawn from that

23    evidence.

24           A separate crime is charged in each count of the

25    indictment.  Each count and the evidence pertaining to it

1          should be considered separately.  The fact that you may find

2          the defendant guilty or not guilty of one or more of the

3          offenses charged should not control your verdict as to any

4          other offense charged against the defendant.  The defendant is

5          not on trial for any act or conduct not alleged in the

6          indictment.  Neither are you to be concerned with the guilt of

7          any person or persons not on trial as a defendant in this case.

8                    The defendant has pleaded not guilty to each charge in

9          the indictment.  This plea puts at issue each of the essential

10         elements of the offenses as described in these instructions and

11         imposes on the government the burden of establishing each of

12         these elements by proof beyond a reasonable doubt.

13                   The indictment in this case contains three counts.

14         Each count charges the defendant with a separate crime.  When

15         you begin your deliberations, each of you will be provided with

16         a copy of the indictment containing the counts which are before

17         you in the case.  Remember, with respect to each count in the

18         indictment the prosecution must prove beyond a reasonable doubt

19         that each essential element of the count existed in the manner

20         charged in that count before you may return a verdict of guilty

21         with respect to that count.

22                   You will note that the indictment charges that the

23         offenses at issue were committed on or about certain dates.

24         The proof need not establish with certainty the exact date of

25         an alleged offense when the term "on or about" is used.  It's

1    sufficient if the evidence establishes beyond a reasonable

2    doubt that the offense charged was committed on a date

3    reasonably near the date alleged, that is, a date reasonably

4    close in time to the date upon which the offense is alleged to

5    have occurred.

6          In addition to the elements of each offense charged in

7    the indictment you must consider with respect to each offense

8    whether any act in furtherance of the offense was committed in

9    New Hampshire.  In this regard, the government need not prove

10   that the crime itself was committed in New Hampshire or that

11   the defendant was present here.  Instead, the government need

12   only prove by a preponderance of the evidence that at least one

13   act in furtherance of one or more of the charged offenses was

14   committed in New Hampshire.

15         I want to emphasize everywhere else where I talk about

16   the burden of proof the burden of proof is on the government to

17   establish guilt beyond a reasonable doubt.  This is the one

18   section where the burden of proof is by a preponderance rather

19   than beyond a reasonable doubt.

20         The indictment charges the defendant, Christopher

21   Cantwell, with one count of Extortionate Interstate

22   Communications, in violation of 18 United States Code, Section

23   875(b), one count of Threatening to Injure Property Or

24   Reputation, in violation of 18 U.S.C. Section 875(d), and one

25   count of cyberstalking, in violation of 18 U.S.C. Section

1    2261A(2).

2            The indictment refers to the alleged victim in each

3    count as "Victim 1."  The government asserts that Victim 1 is

4    Benjamin Lambert.  Lambert was also known by the online

5    pseudonym "Cheddar Mane."

6            Now I'll talk to you about each of the three charges,

7    one at a time, starting with Count One, Extortionate Interstate

8    Communications.  Count one of the indictment charges that,

9    quoting now, "On or about June 16th, 2019, within the District

10   of New Hampshire and elsewhere, the defendant, Christopher

11   Cantwell, Christopher C. Cantwell, with intent to extort from

12   Victim 1 a thing of value, namely, personal identifying

13   information for a man known by the on-line pseudonym 'VM,' and

14   for the purpose of issuing a threat and with knowledge that the

15   communications would be viewed as a threat, transmitted a

16   communication in interstate commerce containing a threat to

17   injure the person of another."

18           In order to sustain its burden of proof for the crime

19   of extortionate interstate communication as charged in the

20   indictment, the government must prove each of the following

21   elements beyond a reasonable doubt:  first, that the defendant

22   knowingly transmitted a communication in interstate commerce;

23   second, that the communication contained a threat to injure the

24   person of another; and, third, that the defendant transmitted

25   the communication with the intent to extort money or something

1    of value from any person.

2              I will now define several of the terms used in Count

3    One.

4              To transmit something in interstate commerce means to

5    send it from a place in one state to a place in another state.

6    A "threat" in this context is a serious statement expressing an

7    intent to injure another person, which under the circumstances

8    would cause apprehension in a reasonable person, as

9    distinguished from a political statement, idle talk,

10   exaggeration or something said in a joking manner.  It is not

11   necessary to prove that the defendant actually intended to

12   carry out the threat.

13             To act with intent to extort means to act with the

14   intent to obtain something of value from another person with

15   that person's consent but induced by wrongful use of threatened

16   force, threatened violence or fear.  An intent to extort by

17   threat also requires that the defendant act with an intent to

18   threaten.

19             In determining whether the defendant's communication

20   was sent with the intent to extort, you may consider all of the

21   circumstances surrounding the making of the communication.  For

22   example, you may consider the language, specificity and

23   frequency of the threat, the context in which the threat was

24   made, the relationship between the defendant and the threat

25   recipient, the recipient's response, and any previous threat

1   made by the defendant and whether you believe the person making

2   the statement was serious, as distinguished from mere idle or

3   careless talk, exaggeration or something said in a joking

4   manner.

5   The term "thing of value" is anything of value.  It is

6   not limited to money or tangible things with an identifiable

7   price tag.

8   I'll now turn to Count Two, threat to injure property

9   or reputation.  Count Two of the indictment charges that,

10  "Between on or about June 15, 2019, and on or about June 17,

11  2019, within the District of New Hampshire and elsewhere, the

12  defendant, Christopher C. Cantwell, with intent to extort from

13  Victim 1 a thing of value, namely, personal identifying

14  information for a man known by the on-line pseudonym 'VM,'

15  knowingly transmitted in interstate and foreign commerce

16  communications containing a threat to injure the reputation of

17  Victim 1 and a threat to accuse Victim 1 of a crime."

18  In order to sustain its burden of proof for the crime

19  of threat to injure property or reputation as charged in the

20  indictment, the government must prove each of the following

21  elements beyond a reasonable doubt:  first, that the defendant

22  knowingly transmitted a communication in interstate commerce;

23  second, that the communication contained a threat to accuse

24  another person of a crime or to injure the reputation of

25  another person; and, third, that the defendant transmitted the

1    communication with intent to extort money or something of value

2    from any person.

3            With respect to Count Two, the count I'm describing

4    now, a threat is a serious statement expressing an intent to

5    accuse another person of a crime or to injure the reputation of

6    another person.  The previous definitions I gave you for

7    interstate commerce, intent to extort and thing of value also

8    apply to Count Two.

9            All right.  Now I'll talk to you about Count Three,

10   the cyberstalking charge.  Count Three of the indictment

11   charges that, "Between in or about June 15 and June 17, 2019,

12   within the District of New Hampshire and elsewhere, the

13   defendant, Christopher C. Cantwell, with intent to harass and

14   intimidate Victim 1, did use facilities of interstate and

15   foreign commerce, including electronic communication services

16   and telephone facilities, to engage in a course of conduct that

17   placed Victim 1 in reasonable fear of serious bodily injury to

18   Victim 1's spouse, and that caused, attempted to cause and

19   would be reasonably expected to cause substantial emotional

20   distress to Victim 1 and Victim 1's spouse."

21           In order to sustain its burden of proof for the crime

22   of cyberstalking as charged in the indictment, the government

23   must prove each of the following elements beyond a reasonable

24   doubt:  first, the defendant used facilities of interstate

25   commerce, including an electronic communications service or

1    system; second, the defendant used the electronic communication

2    service or other facility of interstate commerce to engage in a

3    course of conduct; third, that the defendant, while engaged in

4    that course of conduct, acted with intent to harass or

5    intimidate Victim 1; and, fourth, that the defendant's course

6    of conduct placed Victim 1 in reasonable fear of serious bodily

7    injury to his spouse, caused substantial emotional distress to

8    Victim 1, or would be reasonably expected to cause substantial

9    emotional distress to either Victim 1 or his spouse.

10          I will now define several of the terms used in Count

11   Three.

12          "Using facilities of interstate commerce" means

13   employing or utilizing any method of communication or

14   transportation between one state and another and includes, for

15   example, electronic cellular telephone networks, the mail or

16   the internet.

17          A "course of conduct" in this context is a pattern of

18   conduct comprised of two or more acts evidencing a continuity

19   of purpose.  You may consider each communication between the

20   defendant and another person to be a separate act.  In order to

21   find the defendant guilty, you are required to agree

22   unanimously that the United States has proven beyond a

23   reasonable doubt that the defendant engaged in a course of

24   conduct.  While you are required to agree unanimously that the

25   defendant engaged in two or more acts evidencing the continuity

1 of purpose in order to find him guilty of this crime, you are

2 not required to agree unanimously on which two or more acts

3 constitute the course of conduct.

4   To find the defendant guilty of the crime charged you

5 must unanimously agree that the United States has proved beyond

6 a reasonable doubt, one, the defendant's course of conduct

7 placed Victim 1 in reasonable fear of serious bodily injury to

8 his spouse; two, that the defendant's course of conduct caused

9 substantial emotional distress to Victim 1; or, three, the

10 defendant's course of conduct would be reasonably expected to

11 cause substantial emotional distress to either Victim 1 or

12 Victim 1's spouse.  The government must prove only one of the

13 three means set forth in the statute.

14   "Substantial emotional distress" means mental

15 distress, mental suffering or mental anguish.  It includes

16 depression, dejection, shame, humiliation, mortification,

17 shock, indignity, embarrassment, grief, anxiety, worry, fright,

18 disappointment, nausea, nervousness, as well as physical pain.

19   When considering whether the intended course of

20 conduct would be reasonably expected to cause substantial

21 emotional distress to a person, you must consider whether in

22 light of the evidence presented in this case a reasonable

23 person in the same or similar circumstances as Victim 1 or

24 Victim 1's spouse would suffer substantial emotional distress

25 as a result of the intended course of conduct as defined in

1    these instructions.

2         To act with intent means to act voluntarily and

3    intelligently, not by ignorance, accident or mistake, and with

4    the specific intent or purpose of causing a desired result in a

5    particular individual.  It is not enough merely to foresee that

6    such a result is a likely consequence of repeated

7    communications.  Moreover, a bad motive of some other kind

8    standing alone is not enough.

9         "Intent to harass" means to act with the specific

10   intent or purpose of causing an adverse emotional reaction in a

11   specific person, not merely speech that happens to cause

12   annoyance or insult.

13        "Intent to intimidate" means to act with the specific

14   intent or purpose of putting a person in fear or apprehension

15   of injury inflicted by a particular person.

16        You have heard evidence that Victim 1 and others have

17   engaged in behavior that disrupted the defendant's live call-in

18   radio show.  You have also heard evidence that Vic Mackey or

19   others may have engaged in behavior that disrupted the

20   defendant's website.  You may consider such evidence for the

21   purpose of understanding all of the circumstances surrounding

22   the making of the communications at issue in this case,

23   including, for example, the language, specificity and frequency

24   of the communications, the context surrounding the

25   communications, the relationship between the defendant and

1       Victim 1, Victim 1's response, any previous communications

2       between the defendant and Victim 1 and whether you believe the

3       person making the communication was serious, as distinguished

4       from mere idle and careless talk, exaggeration or something

5       said in a joking manner.  You may not consider this evidence

6       for any other purpose.

7              Remember, the defendant cannot be found guilty of any

8       charge unless the government proves every element of the charge

9       beyond a reasonable doubt.  That burden never switches to the

10      defendant.  If, however, the government proves every element of

11      a charge beyond a reasonable doubt, evidence of provocation,

12      justification or self defense does not negate the defendant's

13      criminal culpability with respect to that charge.

14             The government is not required to prove that the

15      defendant knew that he was violating the law.  Ignorance of the

16      law is not a defense to the charges alleged in the indictment.

17             The principles of law set forth in these instructions

18      are intended to guide you in reaching a fair and just result in

19      this case, which is important to both of the parties.  You are

20      to exercise your judgment and common sense without prejudice,

21      without sympathy, but with honesty and understanding.  You must

22      be conscientious in your determination of a just result in this

23      case, because this is your highest duty as officers of this

24      court.

25             Remember also, the question before you can never be

will the government win or lose the case.  The government always wins when justice is done, regardless of whether the verdict be guilty or not guilty.

When you've considered and weighed all of the evidence, you must make one of the following findings with respect to each count:  If you have a reasonable doubt as to whether the government has proved any one or more of the essential elements of the crime charged, it is your duty to find the defendant not guilty.  If you find the government has proved all of the essential elements of the crime charged beyond a reasonable doubt, then you may find the defendant guilty.

The punishment provided by law for the offense charged in the indictment is exclusively my responsibility and should never be considered by you in any way in arriving at an impartial verdict.

When you retire, you should elect one member of the jury as your foreperson.  That individual will act very much like the chairman of a committee, seeing to it that the deliberations are conducted in an orderly fashion and that each juror has a full and fair opportunity to express his or her views, positions and arguments on the evidence and on the law.  The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous as to each

1   count.  It is your duty as jurors to consult with one another

2   and to deliberate with a view to reaching an agreement, if you

3   can do so without violence to individual judgment.  Each of you

4   must decide the case for yourselves but only after an impartial

5   consideration of the evidence in the case with your fellow

6   jurors.  During your deliberations, do not hesitate to

7   reexamine your own views and to change your opinion, if

8   convinced it is erroneous; but do not surrender your honest

9   conviction as to the weight or effect of the evidence solely

10  because of the opinion of your fellow jurors or merely for the

11  purpose of returning a verdict.

12          Always remember you are not partisans, you are judges,

13  judges of the facts.  Your sole interest is to seek the truth

14  from the evidence in the case.

15          If during your deliberations it becomes necessary to

16  communicate with me, you may do so only in writing, signed by

17  the foreperson or by one or more members of the jury.  Give

18  that note to the Marshal, and he will bring it to my attention.

19  No member of the jury should ever attempt to communicate with

20  me except by a signed writing, and I will communicate with you

21  on anything concerning the case either in writing or orally in

22  the courtroom.

23          Remember, you are not to tell anyone, including me,

24  how the jury stands numerically or otherwise on the matters you

25  are deciding until after you have reached a unanimous verdict

1    or have been discharged.

2          Nothing said in these instructions is intended to

3    suggest or to convey in any way or manner what your verdict

4    should be.  The verdict is your sole and exclusive

5    responsibility.

6          When you have arrived at a verdict, notify the

7    Marshal, and you will be returned to the courtroom where the

8    foreperson will render the verdicts orally.

9          I need to speak on the headsets with counsel just

10   briefly.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12         THE COURT:  I want to note for the record that the

13   defendant has objected to my provocation instruction.  The

14   defendant has argued that, even with the suggested changes,

15   that I should not give any provocation instruction, and that

16   objection is preserved for purposes of appeal.

17         MR. LEVIN:  Thank you, your Honor.

18         THE COURT:  Are there any other objections that anyone

19   has to the proposed charge?

20         MR. LEVIN:  No, your Honor.

21         THE COURT:  Anything from the government?

22         MR. DAVIS:  No.

23         THE COURT:  No?

24         MS. KRASINSKI:  No.

25         THE COURT:  Okay.  Thank you.

1    (END OF SIDEBAR CONFERENCE)

2         THE COURT:  All right.  We're almost done.  I want to

3    tell you that you will have the instructions, you will have the

4    indictment, you will have a verdict form, and there is an

5    answer that I ask you to fill in with respect to each of the

6    three charges, and it asks you to state whether the defendant

7    is guilty or not guilty of each of the three charges.  So, fill

8    out the entire form, have the foreperson sign and date it, and

9    then you knock on the door when you've reached a verdict, and

10   the security officer will inform us, and we'll bring you into

11   the courtroom to render the verdict orally.

12        You also will have access to the exhibits.  My very

13   experienced case managers know this better than I.  But you'll

14   give them some instruction on how to operate the system?  So,

15   you'll be able to call up exhibits on the screen the same way

16   the lawyers have, so you'll be able to look at those, if you

17   choose.

18        With that said, the only thing left is to swear the

19   Court Security Officer.  Oh, alternates.  Okay.

20        This is always an unfortunate thing for me, that we

21   impanel more than the number of jurors that we need for a

22   trial.  We started with 14.  We lost two early in the trial.

23   We still have two more than we need, and those two jurors are

24   alternates, and, unfortunately, despite your sacrifice of

25   sitting through the trial, you're not going to be able to

1    participate in the deliberations, and those alternates are --

2    do you know?

3              THE CLERK:  13 and 14.

4              THE COURT:  Juror Numbers 13 and 14.

5              THE CLERK:  Oh, 15 and 14.  I'm sorry.

6              THE COURT:  15 and 14.  Okay.  So, Jurors 15 and 14,

7    I'm going to excuse you in a moment.  You can pick up your

8    things and head out, but I'm going to ask you not to be

9    released from your oath at this point.  You can't discuss the

10   case with anyone else, but also don't expose yourself to any

11   discussions of the case in the media.  Don't discuss the case

12   with anybody.  I will have the Clerk call you as soon as the

13   jury reaches a verdict.  Once the verdict is reached, then you

14   are released from your oath, and you can do anything you want

15   to do with respect to the case.  But I can't let you

16   participate.  You're free to get your stuff and head home, and

17   we'll contact you when a verdict is reached.  And I do want to

18   thank you for your service, particularly in this difficult

19   time, sitting around all day with a mask on waiting for me to

20   get to you.  It's a real sacrifice, and I appreciate it.  I

21   want to thank you for your service, but you are discharged but

22   still subject to your oath until released by the Clerk.

23             Now we can administer the oath to the Court Security

24   Officer.

25             THE CLERK:  Please raise your right hand.  Do you

1   solemnly swear that you will keep this jury together in their

2   room provided for them, that you will separate them from

3   others, that you will guard the secrecy of their deliberations,

4   that you will not communicate with them yourself, nor permit

5   any other person to do so unless directed by the Court, and

6   that you will not ask the results of their deliberation until

7   the verdict has been returned in open court, so help you God?

8           THE COURT SECURITY OFFICER:  I do.

9           THE CLERK:  Thank you.

10          THE COURT:  Can I see the headset for just a moment?

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12          THE COURT:  Mr. Levin, you had previously indicated to

13   me that you were likely to render an objection to my statement

14   that the facts comprising the course of conduct need not be

15   unanimously agreed upon, and I want to be sure that, unless

16   you're prepared to abandon that objection --

17          MR. LEVIN:  We abandon that, your Honor.

18          THE COURT:  You do abandon it?

19          MR. LEVIN:  Yeah.

20          THE COURT:  Okay.  Thank you.  I just didn't want to

21   let it go by by inadvertence.

22          MR. LEVIN:  Thank you.

23   (END OF SIDEBAR CONFERENCE)

24          THE COURT:  All right.  Is there anything else?

25          THE CLERK:  All rise for the jury.

1          (The jury exited the courtroom)

2          THE COURT:  So, I would just ask the parties to sit

3  with the case managers and ensure that the JERS system has in

4  everything admitted and nothing that hasn't been admitted so

5  that you are both satisfied with what the exhibits are that

6  will be going to the jury.  And with that, if somebody can

7  remain in the courthouse.  If we get to the point where I

8  excuse the jury for the evening, I'll notify you and -- the

9  government can go back to their offices, but just be available

10  in the event that we should get a verdict.

11          THE CLERK:  Can you please write down your cell phone

12  numbers for me.  Thank you.

13          (Recess taken from 3:41 p.m. to 5:32 p.m.)

14          THE CLERK:  All rise for the Honorable Court.

15              (The jury entered the courtroom)

16          THE CLERK:  Please be seated.

17          THE COURT:  Okay, folks.  So, I want you to take the

18  weekend off, okay?  That means don't go out and try to

19  investigate the case.  Don't even be thinking about the case.

20  You should do your deliberating with other jurors here in the

21  courtroom, so I don't want you to be wasting any time and

22  energy this weekend on this case.  The following instructions

23  that I've given you in the past I want to reemphasize how

24  important it is now.  I've discharged the alternates.  You're

25  in the middle of deliberation.  You must not expose yourself to

1   any discussions of the case in the media.  You must not let

2   anybody talk to you about this case.  So, don't watch any local

3   news, don't listen to any local radio, don't read any local

4   newspapers, don't go out and do any internet searches where

5   something could pop up and you could potentially see something

6   that would be a problem.  It's very, very important that you do

7   that this weekend.  So, keep my general instructions in mind,

8   have a nice, enjoyable, relaxing weekend where you're not

9   thinking about this case, and then come in on Monday at 9:00

10  and resume your deliberations.  Okay, everybody go and have a

11  good weekend.

12          THE CLERK:  All rise.

13                  (The jury exited the courtroom)

14          THE COURT:  Each side have a representative here

15  Monday at 9:00.

16          MR. LEVIN:  Thank you, your Honor.

17          THE COURT:  Thank you.

18      (WHEREUPON, the proceedings adjourned at 5:34 p.m.)

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13    Date: ___5/17/21_____                /s/ *Brenda K. Hancock*
                                           Brenda K. Hancock, RMR, CRR
14                                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25