# United States Court of Appeals
## For the First Circuit

---

No. 21-1186

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER CANTWELL,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lipez and Gelpí, Circuit Judges.

---

Christine DeMaso, Assistant Federal Public Defender, for
appellant.
Anna Z. Krasinski, Assistant United States Attorney, with
whom John J. Farley, Acting United States Attorney, and John S.
Davis, Assistant United States Attorney, were on brief, for
appellee.

---

April 5, 2023

---

LIPEZ, **Circuit Judge**.  On the basis of a series of heated online messages, Christopher Cantwell was convicted of extortionate interstate communications under 18 U.S.C. § 875(b) and threatening to injure property or reputation under 18 U.S.C. § 875(d).  He appeals his conviction and sentence, arguing that the government improperly relied on statements made by a non-testifying witness in its closing argument, that the district court improperly instructed the jury that provocation was not a defense, and that the district court abused its discretion by refusing to grant a downward departure due to the victim's provocative behavior under U.S.S.G. § 5K2.10.  Because Cantwell has not met his burden on any of these claims of error, we affirm.

**I.**

**A. Background**

Cantwell was a New Hampshire-based media personality who gained popularity in the online white nationalist community.  As of late 2017, he hosted a call-in radio show called Radical Agenda, which he described as an intentionally "shocking production" featuring obscene, racist, and homophobic language from Cantwell and his callers.  Cantwell also hosted a website related to his radio show content and was active across several social media platforms, including Telegram.[1]

---

[1] Telegram is an "online instant message platform."  Users can send private messages directly to an individual and can also

In 2017, Cantwell began communicating online with members of an extremist group called the Bowl Patrol, who were calling into his program. The Bowl Patrol was a white nationalist hate group, whose members subscribed to "accelerationism," or the aggressive advocacy of government collapse.[2] The group's primary activity was producing a podcast, the "Bowl Cast," on which they espoused racist, anti-Semitic, homophobic, and misogynistic views.

The Bowl Patrol operated solely online using platforms like Telegram, with its members relying on pseudonyms to maintain anonymity in all their online activities. One of the Bowl Patrol's members was Missouri-based Benjamin Lambert, known online only by his alias, "Cheddar Mane."[3] Cantwell, who ran his live radio show, website, and Telegram channels under his own name, was initially on good terms with the Bowl Patrol and was the first guest on the Bowl Cast podcast.

In the fall of 2018, members of the Bowl Patrol began to target Cantwell's platforms after concluding that Cantwell "didn't actually believe what he was saying" and that he was "simply

---

create "channels," which bring together multiple people who can comment and post messages to a group.

[2] The Bowl Patrol was so named in reference to the bowl-cut hairstyle of Dylann Roof, who shot and killed nine Black people in a church in Charleston, South Carolina, in 2015. The Bowl Patrol group revered Roof and his crime.

[3] Lambert also used variations on his alias, such as "Cheddar Man," "Cheddy Blac," and "Hombre Cheddar."

[trying] to make money."  Members of the Bowl Patrol, including
Lambert, began to make a series of prank calls to Cantwell's
Radical Agenda show.  The prank callers filled Cantwell's phone
lines with unintelligible sounds, imitations of fictional
characters, and generally disruptive noise.  These activities
continued through the first months of 2019, and Lambert himself
made 10-15 prank calls to Cantwell's live show between fall 2018
and the end of February 2019.  In February 2019, the Bowl Patrol's
harassment campaign escalated when members of the group posted
pornography and other obscene content to Cantwell's website.
Cantwell believed this incident to be the work of the Bowl Patrol's
leader, known by the alias "Vic Mackey."  Cantwell reported the
calls and website defacement to the FBI and the local police on
February 11, 2019, but they declined to investigate Cantwell's
claims.

In March 2019, Cantwell decided to take further action.
He wrote to Lambert on Telegram telling him to stay "away from me
and my platforms or I'll dox[4] your stupid ass."  Cantwell also told
Lambert that he did not want him "or [his] faggot ass friends
anywhere near" Cantwell's platforms.  Lambert was one of the only
members of the Bowl Patrol whose identity Cantwell knew, and whose

---

[4] "Doxing" refers to the practice of revealing an individual's
private information online, especially as a form of revenge.  See
Dox, The Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/dox (last visited Mar. 31, 2023).

personal information he could therefore reveal.  Despite the
precautions that Lambert took to maintain anonymity online, he had
met someone in Cantwell's entourage in person: Cantwell's then-
girlfriend, Katelyn Fry, alias "Peach."  In November 2018, Fry had
visited Lambert at his home in Missouri and therefore had Lambert's
home address, as well as photos of Lambert and his wife and
children.  After Cantwell threatened to dox him, Lambert did not
make any more prank calls to Cantwell's show and encouraged other
members of the Bowl Patrol to stop harassing Cantwell.

**B. Cantwell's June 15-16, 2019 Texts to Lambert**

Lambert and Cantwell next interacted on June 15, 2019,
following two incidents that prompted Cantwell to contact Lambert.
Shortly after midnight on June 15, 2019, Fry received a Telegram
message from an unknown sender reading, "So why did you take
pictures of those kids? . . . Do you think we're going to forget?"
Fry forwarded the message to Cantwell and asked if "Cheddar" had
sent it.  Cantwell initially told Fry that he did not think that
Lambert had sent the anonymous message but later decided that it
must have come from him.

Later that same day, Lambert clicked on a link in the
Bowl Patrol group chat which took him to a private Telegram channel
called "Peaceful White Folk."  Peaceful White Folk was Cantwell's
private, invitation-only channel, though Lambert maintains that he

did not know this when he clicked the link.[5]  When Cantwell noticed
Lambert in his private channel, he removed him from the chat.
Moments later, Lambert received a direct message from Cantwell,
and a series of messages between Cantwell and Lambert followed.
The precise language of Cantwell's messages became the basis for
the criminal charges against him.  We therefore reproduce key parts
of the exchange in full (the statements quoted in the indictment
are bolded):

6/15/19

9:00pm (EDT) - Cantwell

I guess you forgot the lesson which kept you away for a short
while, do you need to be reminded?

9:29pm - Cantwell

[Sends the name of the street where Lambert lives]

11:24pm - Lambert

What are you talking about

. . .

11:56pm - Lambert

Let's think about this. Every time someone you think is in
[Bowl Patrol] talks shit about you -- a public figure -- you
threaten to dox me?  Say you did.  What then?

---

[5]  Cantwell testified that Peaceful White Folk was an
invitation-only group, meaning that a person could only join if
they had the invitation link, but that the invitation link had
been widely shared.

6/16/19

12:21am - Lambert

I honestly don't know what I even did

I followed a link into a group I didn't even know you were in

3:56am - Cantwell

**Get a fucking life or I will ruin the one you have**

3:57am - Cantwell

Don't bother anyone, then you won't have to worry about crossing me

2:13pm - Lambert

I haven't given you any thought and it was an honest mistake. Didn't even know you were in there or I'd have thought better of it. Other than that, all I can do is just leave you the fuck alone and tell other people to do the same -- which I have done.

. . .

4:15pm - Cantwell

You're a fucking liar. You came here with your loser fucking pals . . . and because of that fact, **you are going to lose everything you have.**

4:45pm - Cantwell

**Next time I post that photo,[6] the faces won't be blurred, and then you're going to start getting unexpected visitors**

And I don't care if it's you causing the trouble, **you're the one who's gonna suffer cause you're the one who I can get**

4:47pm - Cantwell

If you wanna dox Vic, he's a better target, but if you give me fake info then your wife is gonna have trouble sleeping at night

. . .

6:39pm - Lambert

So I am assuming peach took the picture.  Guess that means you d[o]n't care what happens to her either

6:41pm - Cantwell

As a matter of fact, I don't.  **So if you don't want me to come and fuck your wife in front of your kids, then you should make yourself scarce**

7:10pm - Cantwell

**Give me Vic, it's your only out**

8:17pm - Cantwell

I guess I'm going to have to prove my seriousness

8:21pm - Lambert

Show me the picture you have

---

[6] It is unclear to which photo Cantwell is referring at this point in the exchange.

8:23pm - Cantwell

No

8:27pm - Cantwell

[Sends a photo of Lambert's wife and three small children]

8:27pm - Cantwell

More where that came from

8:28pm - Cantwell

I bet one of my incel[7] listeners would love to give her another
baby

Cantwell then told Lambert that he was going to call the FBI and tell them that Lambert was a drug user, and that he would send information about Lambert's activities with the Bowl Patrol to Missouri's Child Protective Services. Finally, Cantwell reiterated to Lambert that he wanted Vic Mackey's information: "Tell Vic that if he gives himself up, he can save your family."

Cantwell was true to his word. On June 17, 2019 -- the day after the above exchange concluded -- Cantwell posted photos of Lambert, his wife, and his children to Cantwell's public Telegram channel. That same day, Cantwell called the Child Abuse and Neglect Hotline of the Missouri Department of Social Services

---

[7] "Incel" is a shorthand term for "involuntary celibate," a term used to refer to individuals (usually men) who desire a sexual partner but cannot find one. Incels typically express extreme resentment and hostility to women for denying them sex. See Incel, The Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/incel (last visited Mar. 31, 2023).

to make a report against Lambert. Cantwell claimed that Lambert was putting his children in danger because he used drugs and was involved in a right-wing extremist group.[8]

## C. The Charges

Cantwell was charged with four counts relating to his conversation with Lambert on June 15-16, 2019. Count 1 charged extortionate interstate communications in violation of 18 U.S.C. § 875(b), based on Cantwell's messages about having sex with Lambert's wife in front of their children and asking for Vic Mackey's identifying information. Count 2 charged threatening interstate communications in violation of 18 U.S.C. § 875(c), based on the same messages. Count 3 charged Cantwell with threatening to injure property or reputation in violation of 18 U.S.C. § 875(d), based on his messages about Lambert's family, calling the FBI, and calling child protective services. Finally, Count 4 charged Cantwell with cyberstalking in violation of 18 U.S.C. § 2261, based on the same messages. The government dismissed Count 2 shortly before trial and the jury ultimately acquitted Cantwell on Count 4.

Under 18 U.S.C. § 875(b), the basis for Count 1, the government had to show (1) that the defendant transmitted a communication in interstate commerce; (2) that the communication

---

[8] The Department of Social Services determined that the call did not warrant further action and so did not follow up.

contained a threat to injure the person of another; and (3) that the defendant transmitted the communication with the intent to extort something of value from another. Similarly, under 18 U.S.C. § 875(d), the basis for Count 3,[9] the government had to establish (1) that the defendant transmitted a communication in interstate commerce; (2) that the communication contained a threat to injure the reputation of another or to accuse another person of a crime; and (3) that the defendant transmitted the communication with the intent to extort something of value from another. Because the mental state that the government had to prove is relevant to the errors Cantwell claims on appeal, we will briefly contextualize the parties' presentation of these issues by outlining the legal framework on which they rely.

The parties did not dispute below that the mental state required under sections 875(b) and (d) could be proved by an intent to extort by threat. They did dispute, however, how the government could prove an intent to extort by threat. Cantwell argued that to prove the requisite intent, the government needed to establish both that he intended to extract something of value from another and that he intended to make a threat -- that is, that he made a communication "for the purpose of issuing a threat" and with "the

---

[9] This count became Count 2 under the superseding indictment, once the government dismissed its original Count 2. For ease of reference, we will continue to refer to the count charging Cantwell under 18 U.S.C. § 875(d) as Count 3.

knowledge that the communication would be viewed as a threat."
The government disagreed initially and argued that it could prove
an intent to extort by threat by showing only that Cantwell was
reckless as to whether the communication would be viewed as a
threat.

The district court rejected the government's position
and appears to have adopted Cantwell's understanding of the mens
rea element.  The court's jury instruction laying out the mental
state that the government had to prove stated:

> To act with intent to extort means to act with
> the intent to obtain something of value from
> another person with that person's consent but
> induced by wrongful use of threatened force,
> threatened violence or fear.  An intent to
> extort by threat also requires that the
> defendant act with an intent to threaten.

The parties proceed on appeal with this understanding of the
required mental state.  Indeed, Cantwell's challenges focus solely
on the latter portion of this inquiry -- that he "act[ed] with an
intent to threaten" -- though neither he nor the government offer
any gloss on their understanding of what an "intent to threaten"
requires.  Nonetheless, we assume, favorably to the defendant,
that to prove an intent to extort by threat, the government had to
prove that Cantwell made a communication "for the purpose of
issuing a threat" and with "the knowledge that the communication
would be viewed as a threat."  We analyze the parties' appellate

arguments accordingly while drawing no conclusions going forward that the intent to extort under 875(b) and (d) should be understood in our circuit to require such proof. We also choose this course as a matter of prudence as there was not adequate briefing on this issue below or on appeal.

Finally, we must also address the question of what constitutes a "threat," a separate element of the offenses under sections 875(b) and (d) and one that is also critical to the parties' arguments on appeal. In keeping with our prior law interpreting this element of 18 U.S.C. § 875(b), a threat is a communication that a reasonable recipient familiar with the context of the communication would find threatening. See United States v. Nishnianidze, 342 F.3d 6, 15 (1st Cir. 2003) (holding that a "threat is one that a reasonable recipient familiar with the context of the communication would find threatening"); cf. United States v. Oliver, 19 F.4th 512, 517-18 (1st Cir. 2021) (reasoning that a jury could reasonably find that a communication was, indeed, a threat under 18 U.S.C. § 876(c) because the victim perceived the communication as a threat).

## D. Cantwell's Trial and Sentencing

The government sought to prove its case on Count 1 by presenting evidence that Cantwell intended to extort a thing of value from Lambert, namely Vic Mackey's identifying information, by intentionally threatening harm to Lambert's wife through

- 13 -

messages that would reasonably cause Lambert to fear such harm. The government's case on Count 1 solely concerned Cantwell's message "[s]o if you don't want me to come and fuck your wife in front of your kids, then you should make yourself scarce[.] Give me Vic, it's your only out."

On Count 3, the government sought to prove that Cantwell intended to extort Vic Mackey's identifying information by intending to threaten harm to Lambert's reputation and accusing him of a crime, through messages that would reasonably cause Lambert to fear such harm. The core of the government's argument relied on these messages: "you are going to lose everything you have," "you're the one who's gonna suffer because you're the one who I can get," "tell Vic that if he gives himself up, he can save your family," and Cantwell's messages saying he would report Lambert to the FBI and Missouri Child Protective Services.

The government's main witness at trial was Lambert, who testified about the Bowl Patrol's activities, his interactions with Cantwell, and how Katelyn Fry -- Cantwell's former girlfriend -- had acquired photos of the Lambert family. On direct examination, Lambert said that Cantwell's messages about his wife and children made him "scared," "angry," and that he "didn't sleep that night" because the messages so unsettled him. Lambert also testified that when he received Cantwell's messages about his wife and children, he "felt as though a line had been crossed." He

stated that he began to worry for his wife's safety, though he did
not tell her about the messages.  The government elicited testimony
from a second member of the Bowl Patrol community, Paul Nehlen,
who testified that he had never seen one member of the community
threaten another's wife and children, and that such a message was
"over the line."

The government also introduced a recorded telephone
conversation between Cantwell and Fry from December 2019 in which
Cantwell discussed the fallout from his messages to Lambert.  The
admitted call contained statements by both Fry ("KF") and Cantwell
("CC"), including the following exchange:

> CC: The only choices that I have are to go to law enforcement
> or to . . . commit a crime myself.
>
> . . .
>
> [Lambert and the Bowl Patrol] broke the law and the only
> remedy I have is law enforcement.
>
> KF: Okay, but you threatened Cheddar Mane and said you are
> going to come and rape his wife.
>
> CC: I didn't say I was going to rape his wife, ok?  I left
> that out there, okay?

Later, in its rebuttal closing argument, the government
returned to this telephone call.  The prosecutor discussed how
Cantwell himself characterized his interactions with Lambert as

"form[s] of violence."[10]  The prosecutor then stated that Cantwell
"confide[d] in" Fry and said, "he tells her about what he meant,
and we're going to play a portion of [that call]."  The government
then played an excerpt of the call, beginning with Fry's statement,
"[o]kay, but you threatened Cheddar Mane."  The government went on
to argue that Fry and other members of Cantwell's community thought
that Cantwell's messages "crossed a line," stating, "you've heard
Ms. Fry's reaction to [the messages]."  The parties did not mention
the phone call any further.

      Cantwell, for his part, hoped to persuade the jury that
he did not intend to threaten by drawing attention to the context
of his messages.  Cantwell's defense elicited testimony from
Lambert, Paul Nehlen, and Cantwell about the extreme and derogatory
rhetoric that members of the Bowl Patrol routinely used.  The
defense questioned Lambert about his appearances on the Bowl
Patrol's podcast, during which he had "made jokes about rape" and
other forms of violence.  Cantwell also testified about the Bowl
Patrol's defacement of his website with sexually explicit and

---

[10] Cantwell testified on cross-examination that he viewed
doxing -- and, therefore, his exchange with Lambert about doxing
him -- as a "form of violence."  The prosecutor's rebuttal referred
to this when she stated: "And as you're thinking about whether or
not [Cantwell] intended []his statement [about Lambert's wife] to
reflect violence, think about his previous statements on doxing,
that it's helpful to think of doxing as a form of violence.  Do
you really think that he intended his threat to dox, to convey
some sort of form of violence, but he didn't intend for this
statement to convey a form of violence?"

violent material, which Cantwell characterized as "terrorist propaganda." Cantwell argued that the extremist online space in which he and Lambert communicated was therefore dominated by insults, violent language, and antagonizing communications, and that, in this context, his messages did not evince an intent to threaten Lambert.

The defense also suggested that Cantwell had been baited into making the statements at issue in this case. Cantwell's cross-examination of Lambert sought to highlight Lambert's participation in the Bowl Patrol's harassment of Cantwell, including his "mocking and taunting [of Cantwell]" through fall 2018 and into 2019. Cantwell himself testified that the prank calls to his show felt like a "campaign of nonstop torment" and that his statements about harming Lambert's wife were a response to Lambert's "ominous statement about [Fry]" -- that is, Lambert's message to Cantwell stating "guess that means you d[o]n't care what happens to [Fry]." Marshalling this testimony, Cantwell claimed that his messages to Lambert were a reaction to longstanding harassment, arguing from the trial's very outset that "[Cantwell] had been pushed, taunted, and harassed for months to make him angry, to wind him up, to provoke a bigger and bolder response."

The court voiced its concern on at least three occasions before the charging conference that Cantwell's strategy veered

close to implicitly presenting an affirmative provocation defense, which is not a defense to crimes committed under 18 U.S.C. §§ 875(b) and (d).[11]  The court noted that Cantwell's defense strategy regarding his mental state had "a potential for an improper purpose" because it suggested that Lambert provoked Cantwell's outburst when he participated in the Bowl Patrol's prank calls and impliedly threatened Cantwell's then-girlfriend, Fry. Cantwell discussed his defense theory extensively with the court throughout trial and was aware of the court's concerns.  The court ultimately decided to give a jury instruction on provocation, making clear that provocation was not a defense available to Cantwell on the charges before the jury.

The jury found Cantwell guilty on Count 1, extortionate interstate communication, and Count 3, threatening to injure

---

[11] A defendant cannot bring an affirmative provocation defense when there is a reasonable opportunity to refrain from engaging in illegal conduct, as is the case with threat crimes.  See United States v. Bailey, 444 U.S. 394, 410 (1980) (stating that affirmative justification defenses fail with respect to crimes in which there is "a reasonable, legal alternative to violating the law"); United States v. Sovie, 122 F.3d 122, 125-126 (2d Cir. 1997) (relying on Bailey to note that provocation does not constitute a legal defense to threat crimes committed under 18 U.S.C. § 857(c)); Kevin F. O'Malley et al., 1A Fed. Jury Prac. & Instr. § 19:02 (6th ed.) (explaining that defenses such as provocation only apply when a defendant can show "that she lacked a reasonable opportunity to escape harm other than by engaging in the illegal activity."). Cf. Dagley v. Russo, 540 F.3d 8, 12n.2 (1st Cir. 2008) (approving of jury instructions stating that "mere words, no matter how insulting or abusive standing alone do not constitute reasonable provocation").

property or reputation, on September 28, 2020. Cantwell's
sentencing hearing took place on February 24, 2021. The
presentence report calculated a total offense level of 20 and a
criminal history category of III, which yielded a guideline
sentencing range of 41-51 months of incarceration. The government
argued for a sentence of 51 months, while Cantwell argued for a
downward departure due to Lambert's provocation of the offense
under U.S.S.G. § 5K2.10. The court denied the request for a
downward departure and sentenced Cantwell to 41 months of
incarceration and two years of supervised release. This appeal
followed.

## II.

Cantwell raises three arguments on appeal: (1) the
government improperly referred to a statement made by a non-
testifying witness in its closing argument, thereby prejudicing
him, (2) the district court abused its discretion by instructing
the jury that provocation was not a defense, and (3) the district
court abused its discretion when sentencing Cantwell by refusing
to grant a downward departure based on Lambert's provocation of
the offense.

### A. The Government's Closing Argument

Cantwell challenges the government's reference to a
statement made by Fry, a non-testifying witness, in its rebuttal.
As already noted, the government argued that Cantwell "t[old Fry]

- 19 -

about what he meant" in his messages and immediately played an excerpt of the previously admitted telephone conversation in which Fry said "you threatened Cheddar Mane."  The government then argued that people in Cantwell's community understood the messages to be threatening and told the jury "you've heard Ms. Fry's reaction to [the messages]."  Cantwell did not request a limiting instruction when the evidence was first admitted, nor did he object to the government's use of Fry's statement in its rebuttal.

**1. Standard of Review**

When a defendant does not contemporaneously object to a statement made during closing argument, we review for plain error. See United States v. Pérez-Vásquez, 6 F.4th 180, 201 (1st Cir. 2021).  Under our traditional plain error analysis, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Pérez-Rodríguez, 13 F.4th 1, 16 (1st Cir. 2021) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

As applied to closing arguments of prosecutors, our plain error analysis requires us first to ask "whether the challenged comment [is] obviously improper" and, if so, "whether the comment 'so poisoned the well that the trial's outcome was

- 20 -

likely affected.'"[12] Pérez-Vásquez, 6 F.4th at 201 (quoting United
States v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017)). This
is a high bar, requiring us to weigh the impact of the contested
prosecutorial comment against the strength of the evidence against
the defendant.  See id. at 201-2 (finding no plain error in the
government's use of two contested statements during its closing
argument primarily because the statements "[did] not cast doubt on
the conviction" and "[were] unimportant to the outcome");
Walker-Couvertier, 860 F.3d at 10 (finding no plain error primarily
because "the possibility that the . . . [improper] statement
affected the outcome of the trial is miniscule" given the
"overwhelming proof of defendants' guilt").  We have previously
explained that where a defendant alleges improper argument in the
government's closing, "unpreserved claims have to approach a
miscarriage of justice before they warrant reversal." United
States v. Potter, 463 F.3d 9, 25 (1st Cir. 2006).

---

[12] Our caselaw clarifies that there is no substantive
difference between our plain error standard as applied to
prosecutors' closing arguments and our traditional plain error
review. See Walker-Couvertier, 860 F.3d at 10 (equating the first
step in our closing argument review with the first two prongs of
the traditional plain error review); United States v.
Vizcarrondo-Casanova, 763 F.3d 89, 97 (1st Cir. 2014) (applying,
after satisfying the first step of closing argument review, a
standard substantively akin to the third and fourth prongs of our
traditional plain error review).

**2. The Improper Comment**

The parties do not contest the hearsay nature of Fry's statement referred to in the government's rebuttal. Fry was an out-of-court declarant, and the parties agree that the government's comment -- "And you've heard Ms. Fry's reaction to [Cantwell's messages]" -- invited the jury to consider her statement for its truth, namely, that she understood Cantwell's message as a threat. See Fed. R. Evid. 801(c) (defining hearsay); United States v. Pena, 24 F.4th 46, 61 (1st Cir. 2022) ("For an out-of-court statement to constitute hearsay . . . the statement must be offered to prove the truth of the matter it asserts."). Hearsay is generally not admissible unless subject to a defined exception. See Fed. R. Evid. 802. The parties agree that whether the government's comment was "obviously improper" therefore turns on the circumstances under which Fry's statement was admitted.

The government argues that the comment was not improper because Fry's statement was admitted without limitation. The government was therefore free to use the statement as it wished, including for its truth.

Cantwell, on the other hand, argues that the government's use of Fry's statement in its rebuttal was obviously improper because the government was precluded from using the statement for its truth. Cantwell contends that his portion of the telephone call with Fry was admitted as the statement of a

party-opponent under Federal Rule of Evidence 801(d)(2)(A) and that Fry's words were admitted to contextualize his portion of the call only.    Under this theory, the government impermissibly appealed to the jury to consider the truth of Fry's statement, which harmed Cantwell in two ways.    First, the truth of Fry's statement supports the government's contention that Cantwell intended to threaten Lambert.  The government's rebuttal proposed that Cantwell was so close to Fry that he told her what he meant by his messages and therefore Fry's understanding that Cantwell threatened Lambert reflected Cantwell's intent.  Second, the truth of Fry's statement bolsters the government's argument that Cantwell's messages contained a threat -- that is, Fry's belief supports the assertion that Lambert would reasonably perceive Cantwell's messages as a threat, particularly since the government referred to Fry as part of its argument that right-wing community members, including Lambert and Paul Nehlen, perceived Cantwell's messages as threatening.    Instead, Cantwell argues that the government was restricted to referring to Fry's statement solely to contextualize Cantwell's own words, given the limited purpose for which it was admitted.

Cantwell is correct that Fry's statement was admitted for a limited purpose.  The government introduced Cantwell's portion of the call with Fry as statements of a party-opponent under Federal Rule of Evidence 801(d)(2)(A).  Rule 801(d)(2)(A)

classifies a statement of a party-opponent that is offered against
the party-opponent as nonhearsay.    Fed. R. Evid. 801(d)(2)(A).
Statements of a party-opponent can thus be offered for their truth.
See United States v. Ruiz, 999 F.3d 742, 748-49 (1st Cir. 2021).
Statements by declarants other than the party-opponent can still
be admitted in the context of 801(d)(2) evidence, where such
statements are offered for a limited purpose -- such as providing
an    explanation    for    the    party-opponent's    portion    of    the
conversation    --    but    are    not    admitted    for    their    truth.    See
Pérez-Vásquez, 6 F.4th at 197 (holding that statements by a non-
testifying witness may be admitted under Rule 801 "only to provide
context for statements made [by the party-opponents] in the
conversation and make them intelligible to the jury, not for their
truth").

         The government understood that Cantwell's portion of the
call came in under Rule 801(d)(2)(A) and that Fry's corresponding
statements    were    admitted    for    the    limited    purpose    of
contextualization.    The government twice stated that it was
introducing the phone call under "Rule 801" and referred to
Cantwell's statements as "party statements," indicating that the
government introduced the call under Rule 801(d)(2)(A).    The
government    well    understood    the    boundaries    and    scope    of
801(d)(2)(A) evidence -- the prosecutor explained that she knew
that some of the statements in the call were hearsay and stated

that the government did not intend to use those portions against Cantwell.[13] Since there were only two participants in the call and Cantwell's statements were nonhearsay, the government clearly understood that Fry's statement was hearsay if used for its truth and therefore that it was admitted for contextualization only.[14] Hence, the prosecutor's use of Fry's statement beyond its admitted purpose was obviously improper.

**3. Effect of the Comment on the Trial's Outcome**

Cantwell's claim nevertheless fails because he cannot demonstrate that the prosecutor's improper comment "likely affected" the outcome of the trial. See Pérez-Vásquez, 6 F.4th at

---

[13] In a sidebar conference discussing why the government had excerpted the phone conversation the way it had, the government recognized that portions of the call were hearsay. The prosecutor stated: "801 specifically defines something as not hearsay as a party statement used against that party, and we don't intend to use [hearsay] portions against Mr. Cantwell."

[14] This conclusion does not change in light of the court's expansion of the excerpt that was ultimately admitted. Cantwell successfully argued that the court should expand the government's excerpt of the call under Federal Rule of Evidence 106, which allows a party to expand an excerpt of a recorded statement admitted against him to prevent the proponent of the evidence from cherry-picking damaging excerpts. See Fed. R. Evid. 106; see also United States v. Altvater, 954 F.3d 45, 49 (1st Cir. 2020) (noting that Rule 106 "is meant to prevent the jury from being misled by reading or hearing a statement 'out of context.'" (quoting Fed. R. Evid. 106 Advisory Committee's Note to 1972 Proposed Rules)). Cantwell's expansion of the excerpt does not change the evidentiary theory under which Fry's statement was admitted into evidence because the statement was part of the original excerpt that the government sought to introduce and did not come in under Cantwell's Rule 106 expansion.

201 (quoting Walker-Couvertier, 860 F.3d at 10).  As noted, the truth of Fry's statement strengthened the government's argument on two fronts: first, regarding Cantwell's intent to threaten and, second, regarding Lambert's reasonable perception of Cantwell's messages as a threat to harm his wife, on Count 1, and as threats to his reputation, on Count 3.  Even without Fry's statement, the government presented ample evidence on each of these elements from which a jury could properly conclude that the government had met its burden.

The exchange between Cantwell and Lambert, which the jury had in full, gave the jury strong evidence from which to conclude that Cantwell intended to threaten harm to Lambert's wife.  The entire exchange included multiple, persistent references to harming Lambert's wife.  Cantwell wrote, "your wife is gonna have trouble sleeping at night," "I bet one of my incel listeners would love to give her another baby," and he sent photos of her to Lambert, showing that he knew her identity.

Cantwell's own testimony also provided evidence of his intent to threaten Lambert.  Cantwell testified that he had previously threatened Lambert with exposing his identity, stating that in March 2019 he "warned [Lambert] that if he came back around that I was going to dox him."  Cantwell admitted on the stand that he did, in fact, dox Lambert by posting Lambert's address online, circulating photos of his family, and reporting Lambert to

Case: 21-1186      Document: 00117008158      Page: 27      Date Filed: 04/05/2023      Entry ID: 6560044

Missouri's Department of Social Services.  Further, the jury had
before it Cantwell's email to the FBI reporting the Bowl Patrol's
harassment, in which he said: "I threatened to expose [Lambert's]
identity."  In the face of such robust evidence on Cantwell's
intent, we cannot conclude that the government's single improper
comment "so poisoned the well that the trial's outcome was likely
affected."  Pérez-Vásquez, 6 F.4th at 201 (quoting Walker-
Couvertier, 860 F.3d at 10).

          Nor can Cantwell demonstrate that the government's
improper comment affected his trial's outcome regarding the
threatening nature of his messages.  The government presented
extensive evidence that Lambert could reasonably view Cantwell's
messages as threats.  Two government witnesses testified about the
messages and their impact.  Critically, Lambert himself testified
that he viewed Cantwell's words about "fuck[ing] [his] wife in
front of [his] kids" as a threat, describing that they made him
"angry," "scared," and he "felt as though a line had been crossed."
Another member of the Bowl Patrol, Paul Nehlen, testified that
Cantwell's references to Lambert's wife and children "crossed a
line," even within the context of their extremist community.  The
jury had ample evidence from which to conclude that Lambert could
reasonably perceive Cantwell's message as a threat without the
addition of Fry's belief that it was so.  Again, the strength of
the government's evidence on Cantwell's threats belies any

argument that its use of Fry's statement during closing argument likely affected the outcome of the case.

## B. The District Court's Provocation Instruction

Cantwell contends that the district court erred by instructing the jury that provocation is not a defense to his charges under 18 U.S.C. §§ 875(b) and (d). Throughout the trial, Cantwell presented evidence of the Bowl Patrol's harassment of him, including Lambert's and others' prank calls to his live show, their defacement of his website, and Lambert's implied threat to Fry -- "[g]uess that means you d[o]n't care what happens to her.". Cantwell argues that such evidence was important to undermining two elements of the offenses with which he was charged -- a strategy that Cantwell terms his "elements-based defense." At trial, Cantwell contended that the government could not prove that he intended to threaten Lambert because his communications were merely an expression of his frustration at the Bowl Patrol. Cantwell also argued that the government could not prove that Lambert reasonably perceived his messages as a threat, given the routinely vitriolic and antagonistic context of online interactions in this community.

The district court, however, saw Cantwell's strategy differently. While acknowledging that evidence about the Bowl Patrol's harassment provided important context for Cantwell's messages, and thus was relevant to the jury's interpretation of

Cantwell's intent and his communications, the court determined such evidence also impermissibly invited the jury to consider an affirmative provocation defense.  The court therefore gave a jury instruction on the permissible use of "provocation" evidence, stating in relevant part:

> You have heard evidence that [Lambert] and others have engaged in behavior that disrupted the defendant's live call-in radio show.  You have also heard evidence that Vic Mackey or others may have engaged in behavior that disrupted the defendant's website.  You may consider such evidence for the purpose of understanding all of the circumstances surrounding the making of the communications at issue in this case, including, for example, the language, specificity and frequency of the communications, the context surrounding the communications, the relationship between the defendant and [Lambert], [Lambert's] response, any previous communications between the defendant and [Lambert] and whether you believe the person making the communication was serious, as distinguished from mere idle and careless talk, exaggeration or something said in a joking manner.  You may not consider this evidence for any other purpose. . . . [E]vidence of provocation, justification or self defense does not negate the defendant's criminal culpability with respect to that charge.

Cantwell objected to the instruction, arguing that it tended to confuse and mislead the jury by raising the topic of an affirmative provocation defense and negating his elements-based defense.

## 1. Standard of Review

We review preserved claims of instructional error under a split standard: we consider de novo whether the instruction correctly stated the law, while we review for abuse of discretion

whether the instruction tended to "confuse or mislead the jury on the controlling issues." See United States v. Cotto-Flores, 970 F.3d 17, 37 (1st Cir. 2020) (quoting United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012)).  The instructions here correctly stated the law and Cantwell does not appear to contend otherwise. As such, our review of the instruction is for abuse of discretion.

**2. The Jury Instruction**

Jury instructions are intended to provide jurors with the proper legal standards to apply in deciding a case.  See Teixeira v. Town of Coventry, 882 F.3d 13, 16 (1st Cir. 2018) (noting that "[j]ury instructions are intended to furnish a set of directions composing, in the aggregate, the proper legal standards to be applied by lay jurors in determining the issues that they must resolve in a particular case" (quoting United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995))).  This purpose necessarily includes advising the jury on applicable legal defenses.  See United States v. Florentino-Rosario, 19 F.4th 530, 537 (1st Cir. 2021); cf. United States v. Fera, 616 F.2d 590, 596-97 (1st Cir. 1980) (upholding a jury instruction that corrected the defense's misrepresentation of evidence because the instruction was "properly given to dispel any doubt which the jury may have had as a result of the defendant's [evidence]").

Far from raising the concept of provocation in a confusing or misleading manner, the district court's jury

instruction demonstrated a reasonable and considered response to Cantwell's presentation of evidence at trial. The court acknowledged in the charge conference that Cantwell's defense sought to undermine his intent, but also noted that Cantwell impliedly argued that he had been baited into making the statements at issue, thereby drawing heavily on the concept of provocation. Cantwell's defense elicited testimony from Lambert and Cantwell about how the Bowl Patrol sought to deliberately antagonize Cantwell. The defense asked Lambert whether the purpose of "trolling," a term used in the trial to describe the Bowl Patrol's harassment of Cantwell, is to "provoke a response from the other person that you're trolling" and asked if the Bowl Patrol members "were trying to make Chris angry[.]" Moreover, Cantwell testified that Lambert's reference to Fry in the June 15-16, 2019 messages -- "So I am assuming peach took the picture. Guess that means you d[o]n't care what happens to her" -- was "trying to get a rise out of [Cantwell]." The court reasonably concluded that the defense presented such evidence to "invit[e] the jury to find the defendant not guilty because he was provoked by Mr. Lambert," thereby effectively mounting an affirmative provocation defense. As already noted, this affirmative defense was not available to Cantwell because provocation cannot constitute a legal defense to threat crimes. See Bailey, 444 U.S. at 410; Sovie, 122 F.3d at

125-26.  The court's jury instruction on the permissible use of
Cantwell's provocation evidence was therefore appropriate.

    The court's desire to instruct the jury on the
permissible use of provocation evidence regarding Cantwell's
intent was not surprising to Cantwell.  Indeed, the court first
voiced its concerns about Cantwell's strategy on the first day of
the trial, after hearing Cantwell's opening statement.  That
statement began by arguing that he had been "pushed, taunted, and
harassed . . . to provoke a bigger and bolder response," leading
the court to tell defense counsel that it may give a clarifying
jury instruction on provocation if it felt this would be necessary.
The court then raised this issue with Cantwell two more times.
While Cantwell rightly notes that "provocation" has a lay meaning,
independent of the criminal defense context, the court's well-
aired concerns that Cantwell's evidence carried the potential for
improperly inviting the jury to consider an affirmative
provocation defense were entirely reasonable.

    Moreover, the court accommodated Cantwell's concerns
about the instruction impeding his ability to effectively present
his elements-based defense, particularly regarding the
reasonableness of characterizing Cantwell's communications as
threats.  Cantwell's defense extensively documented the tone and
content of his communications with Bowl Patrol members, eliciting
testimony about the misogynistic and racist rhetoric that was

- 32 -

commonplace in their extremist community and arguing that violent words were simply part of how this community spoke with each other. The court explicitly clarified that the jury could consider such evidence in assessing whether Lambert would reasonably perceive Cantwell's messages as threats as opposed to other forms of communication, instructing the jurors:

> You may consider such evidence for the purpose of understanding all of the circumstances surrounding the making of the communications at issue in this case, including, for example the language, specificity and frequency of the communications, the context surrounding the communications, the relationship between the defendant and [Lambert] . . . [and whether they were] mere idle and careless talk, exaggeration or something said in a joking manner.

Contrary to misleading or confusing the jury, the court's instruction provided jurors with clear parameters on the proper use of the provocation evidence.  The court did not abuse its discretion in giving that instruction.

**C. Cantwell's Sentence**

Lastly, Cantwell contends that the district court abused its discretion in denying his request for a downward departure under U.S.S.G. § 5K2.10, which allows the court to reduce a sentence below the guideline range where the victim provoked the offense.  The court sentenced Cantwell to 41 months' incarceration, at the bottom of the guideline range.  We review a district court's discretionary refusal to depart from the guideline range for

reasonableness.  See United States v. Herman, 848 F.3d 55, 58 (1st
Cir. 2017).

Section 5K2.10 provides that a court may reduce the
sentence below the guideline range where the "victim's wrongful
conduct contributed significantly to provoking the offense
behavior."  U.S.S.G. § 5K2.10 (U.S. Sent'g Comm'n 2004).  Where
the victim's conduct was nonviolent, such a departure is only
warranted in "unusual circumstances" involving "substantial victim
misconduct."  Id.  Factors the court considers in determining
whether a departure is warranted include the victim's persistence
and the defendant's efforts to deescalate the confrontation, and
the "proportionality and reasonableness of the defendant's
response to the victim's provocation."  Id.

We conclude that the district court did not abuse its
discretion for three reasons.  First, the court reasonably
concluded that Lambert had not provoked Cantwell in the months
leading up to the June 15-16, 2018 incident.  During the sentencing
hearing, the court recognized that "the members of the Bowl Patrol
were trying to drive [Cantwell] crazy" through their efforts to
disrupt his program and livelihood.  While the court determined
that Lambert was a participant in some of the Bowl Patrol's early
harassment, it determined that Lambert did not contribute
significantly to provoking Cantwell's messages because the

"pattern of harassment had waned by June and in any event did not involve the victim in this case."

Second, the court reasonably determined that another provocative act -- the anonymous communication to Fry in the early hours of June 15, 2019 -- could not be attributed to Lambert. The sparse discussion of this anonymous message during the sentencing hearing is replete with ambiguity and the court correctly pointed out that even Cantwell did not consistently believe that this text had come from Lambert.

Third, the court reasonably decided that Lambert's appearance in the Peaceful White Folks chat room did not constitute provocation justifying a downward departure under 5K2.10. Although the court recognized that Cantwell was agitated to see Lambert there, it noted that Lambert's act of appearing in the group was not in and of itself provocation to justify Cantwell's response and that Lambert also attempted to deescalate the situation.

Cantwell challenges the court's reliance on the lack of immediate provocation when justifying its refusal to grant a downward departure. The court made two references to immediacy when sentencing Cantwell, first saying, "I'm not satisfied that the immediate incident was precipitated by any provocation by the victim" and moments later stating, "I can't say that you were provoked in any way in the immediate sense."

Cantwell is correct that immediacy is not required for provocation under section 5K2.10. See U.S.S.G. § 5K2.10 (noting that "an extended course of provocation and harassment" may warrant a departure); Koon v. United States, 518 U.S. 81, 104 (1996) (reasoning in relation to section 5K2.10 that "[a] response need not immediately follow an action in order to be provoked by it."). The court did not require Cantwell to show immediacy, though. Rather, the court considered immediacy a factor in strengthening a provocation argument, reasonably explaining in the sentencing hearing that "provocation is less compelling as a justification . . . if the provocative act occurred months in the past." Cf. United States v. Mussayek, 338 F.3d 245, 256-57 (3d Cir. 2003 (upholding district court's refusal to grant departure under U.S.S.G. § 5K2.10 in part because the defendant's offensive conduct was months after the alleged provocation); Koon, 518 U.S. at 104 (finding that the district court did not abuse its discretion in departing downward when the defendant's offensive conduct occurred "within seconds" of provocation, even though "an immediate response" is not required by § 5K2.10). Moreover, the record makes clear that the court looked at the months preceding the offensive conduct when deciding whether to grant Cantwell's 5K2.10 request. The court did not abuse its discretion in its carefully considered decision to deny the downward departure.

**Affirmed**.